## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

METROPOLITAN TRANSPORTATION
AUTHORITY and TRIBOROUGH BRIDGE AND
TUNNEL AUTHORITY,

*Plaintiffs*,

v.

SEAN DUFFY, in his official capacity as Secretary of
the United States Department of Transportation,
GLORIA M. SHEPHERD, in her official capacity as
Executive Director of the Federal Highway
Administration, UNITED STATES DEPARTMENT
OF TRANSPORTATION, and FEDERAL HIGHWAY
ADMINISTRATION,

*Defendants*.

Case No. _____

**COMPLAINT**

Plaintiffs the Metropolitan Transportation Authority ("MTA") and Triborough Bridge and

Tunnel Authority ("TBTA") file this complaint against Defendants Sean Duffy, in his official

capacity as Secretary of the United States Department of Transportation, Gloria M. Shepherd, in

her official capacity as Executive Director of the Federal Highway Administration, the United

States Department of Transportation ("USDOT"), and the Federal Highway Administration

("FHWA"), and allege as follows:

### INTRODUCTION

1.      On January 5, 2025, the State of New York embarked on a bold new program to

reduce traffic congestion in the New York City metropolitan area and fund and promote mass

transportation with the Central Business District ("CBD") Tolling Program ("Program"), also

known as Congestion Pricing, a market-based, user-pay solution that has seen success in major

cities around the world.  The Program accomplishes its aims by tolling eligible vehicles entering

the CBD in order to encourage mass transportation and using that money to support the City's transportation infrastructure. In a matter of weeks, the Program has already achieved remarkable results: traffic congestion and commute times have materially fallen; more people are visiting Manhattan's commercial districts and supporting the region's businesses; and the MTA's vital mass transit system is seeing the benefit of increased funding. Despite its obvious success, however, the Trump Administration has precipitously—and for blatantly political reasons—purported to "terminate" the Program, as then-candidate Trump proclaimed he would do in his first week in office. The Administration's efforts to summarily and unilaterally overturn the considered determinations of the political branches—federal, state, and city—are unlawful, and the Court should declare that they are null and void.

2.    The Manhattan CBD is one of the most congested urban areas in the country, where travel times had been extraordinarily slow for decades. Indeed, the term "gridlock" was invented right here in Manhattan. Congestion in the CBD has been a $20 billion annual drag on the regional economy, and thus the national economy, as well. For over 50 years, New York state and local officials, policy experts, and advocacy groups have studied various solutions to identify the most effective way to reduce congestion, which results in lost productivity, poor air quality, slower and less reliable bus service, delayed emergency response times, and reduced public safety, among other harmful conditions. That extensive deliberation led to the consensus that congestion pricing— charging vehicles to drive in highly congested areas and providing a dedicated source of funding for public transit for the metropolitan area—is the most effective tool to achieve that goal. That expert consensus also makes good common sense. Traffic congestion and public transit are inextricably linked: to reduce traffic, the region needs to improve the reliability of its transit system, which is chronically underfunded and in need of capital investment.

3.       In April 2019, the New York Legislature and then-Governor Andrew Cuomo passed the Traffic Mobility Act ("TMA"), a landmark statute with the goal of reducing traffic congestion in the CBD and creating a dedicated funding source for the MTA's capital needs. N.Y. Veh. & Traf. Law § 1701 *et seq.*  The TMA authorized and directed TBTA, the MTA's independent affiliate, to establish and operate a congestion pricing program, including tolling of eligible vehicles entering or remaining in the CBD, and earmarked the revenues from the Program for the MTA's 2020-2024 Capital Program (the "Capital Program") and subsequent capital programs.

4.       Several months later, in June 2019, New York State, through the New York State Department of Transportation ("NYSDOT"), TBTA, and the New York City Department of Transportation ("NYCDOT") (collectively, the "Project Sponsors"), submitted to FHWA an Expression of Interest for authority to assess tolls on vehicles entering the CBD under the federal Value Pricing Pilot Program ("VPPP").  The VPPP is a program created by Congress under which FHWA may authorize tolling of federal aid highways to reduce roadway congestion and improve air quality, including through congestion pricing strategies.  It has been used across the country to authorize tolling to reduce congestion, improve the environment, and raise funds.

5.       Pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, FHWA was required to evaluate the potential environmental effects of the Program, including—as directed by a former Executive Order that has since been revoked by President Trump—the Program's potential to have a disproportionately high and adverse impact on minority and low-income (*i.e.*, environmental justice, or "EJ") populations and communities that have pre-existing pollution and health burdens due to historic transportation and land use decisions.

6. Following a multi-year environmental review process from 2019 into 2023 that yielded an administrative record of more than 45,000 pages, FHWA and the Project Sponsors prepared a 958-page Final Environmental Assessment ("Final EA"), followed by a Finding of No Significant Impact ("FONSI") and two Re-Evaluations, which determined that the Program would not have a significant adverse impact on the environment or a disproportionately high and adverse impact on EJ communities in light of (1) the anticipated reduction of overall vehicle miles traveled ("VMT") and vehicular emissions in the region, and (2) the Project Sponsors' commitment to a robust, $155 million mitigation package to improve air quality and public health in EJ communities which have pre-existing pollution and health burdens and could receive traffic diversions as a result of the Program.

7. On November 21, 2024, FHWA executed the VPPP Agreement with the Project Sponsors, *see* **Exhibit A**, which authorized the Program's collection of tolls and required (among other things) implementation of the Project Sponsors' mitigation commitments and regular reports to FHWA on the Program's effects.

8. The Program went into effect on January 5, 2025, and eligible vehicles entering the CBD are being tolled in accordance with the toll rate schedule adopted by the TBTA Board and authorized in the VPPP Agreement. Already, preliminary data for January 2025 (and simply looking at the roads) show that the Program is working.

9. Traffic congestion and travel times are down substantially, making commutes more efficient. Almost 1.2 million fewer vehicles entered the CBD in the month of January than would be expected without the Program. Crossing times were 17% faster at the Lincoln Tunnel and 48% faster at the Holland Tunnel in January 2025 compared to January 2024. Trip times on the Williamsburg Bridge and Queensboro Bridge have been 30% faster. Drivers are saving on average

20 to 30 minutes driving into the CBD.  Within the CBD, weekday daytime travel speeds were 14% faster during the second week of the Program, and 12% faster in the third week.  Weekend daytime travel within the CBD was 15% faster during the second week of the Program, and 18% faster during the third week.  Meanwhile, more people are taking mass transit options.  Compared to January 2024, weekday bus ridership has grown by 7%, and weekend express bus ridership is up 21%.  Ridership on the MTA's two commuter railroads, the Long Island Rail Road and Metro-North Railroad, was up by 11% and 7% respectively in January 2025, as compared to January 2024.  Similarly, subway ridership has grown by 7.3% on weekdays and 12% on weekends.

10.    Businesses are benefiting from the Program as well.  *Crain's New York Business* reports that more people visited the Business Improvement Districts ("BIDs") within the CBD in January 2025 than during the same month last year, noting a 4.6% year-over-year increase in visitation.[1]  Indeed, while vehicle traffic may be down in Manhattan, *Gothamist* notes, "pedestrian traffic is up."[2]  Data from the Broadway League, meanwhile, shows that there was a 17% increase in attendance for Broadway theatre performances in January 2025, as well as a 25% increase in gross revenue.[3]

11.    Business leaders have voiced their support for the Program, recognizing the benefits of Congestion Pricing for businesses in the CBD and the broader economy.  Greater New York Chamber of Commerce CEO Mark Jaffe has stated that the Program "will improve the quality

---

[1] Caroline Spivack, *Business Foot Traffic Is Up Within the Congestion Pricing Zone*, CRAIN'S N.Y. Bus. (Feb. 5, 2025), https://www.crainsnewyork.com/transportation/congestion-pricing-zone-business-foot-traffic.

[2] Arun Venugopal, *Vehicle Traffic is Down in Manhattan, But Pedestrian Traffic Is Up, Data Says*, GOTHAMIST (Feb. 13, 2025), https://gothamist.com/news/vehicle-traffic-is-down-in-manhattan-but-pedestrian-traffic-is-up-data-says.

[3] Gersh Kuntzman, *Wind in Their Sales: Congestion Pricing Is No 'Toll' on the Broadway Box Office*, STREETSBLOG NYC (Feb. 5, 2025), https://nyc.streetsblog.org/2025/02/05/wind-in-their-sales-congestion-pricing-is-no-toll-on-the-broadway-box-office.

of life in Manhattan for all who live, work and visit," and that decreased traffic from the Program "should decrease labor time and improve the efficiencies of getting essential commodities onto the shelves."[4] The Partnership for New York City, a non-profit group of New York business leaders, has likewise voiced its support for the Program, pointing out that it could reduce "an estimated $20 billion that excess congestion costs annually because of more efficient and timely movement of people and goods, which will increase productivity and reduce expenditures on fuel and time."[5] More recently, the Partnership for New York City's President & CEO Kathryn Wylde stated that, "[i]n every respect, this is a policy that President Trump and the Republicans should be supporting."[6]

12.     The region's subways, buses, and commuter railroads—vital lifelines for so many New Yorkers who live in the New York City metropolitan area and beyond—are already benefiting from substantial investments that have been made as a result of the Program. In particular, key tenets of the Capital Program include improving outdated signaling and other equipment to increase system reliability; improving safety and customer service through technology; and extending public transit to under-served areas. Program revenue will also be used to update and renovate numerous subway stations consistent with the Americans with Disabilities Act, by building new elevators at 70 stations across the boroughs and replacing up to 65 escalators and 78 elevators—bringing the transportation system to greater than 50% accessibility.

---

[4] New York's Chamber (@NYChamber), X, (Nov. 15, 2024, 3:29 PM), https://x.com/NYChamber/status/1857521387583451602.

[5] Louisa Chafee, Andrew Rein, & Kathryn Wylde, *Op-ed: Congestion Pricing Will Be a Boon for New York*, PFNYC.ORG (Nov. 14, 2014), https://pfnyc.org/news/op-ed-congestion-pricing-will-be-a-boon-for-new-york/.

[6] Ry Rivard & Nick Reisman, *New York's business boosters push Trump to keep Manhattan tolls*, POLITICO (Feb. 11, 2025), https://www.politico.com/news/2025/02/11/new-york-trump-congestion-pricing-00203540.

13.     Program revenue will also be used to advance the $155 million package of mitigation for EJ communities, which is designed to address preexisting pollution and chronic health burdens.  These measures will include replacing diesel engines with cleaner technology; installing electric charging infrastructure for trucks; planting roadside vegetation to improve near-road air quality; and installing air filtration units in schools near highways.

14.     TBTA has issued debt that is supported by revenues generated by the Program and by long-term bonds issued partly in reliance on revenues generated by the Program.  This includes no less than $378.8 million in short-term notes currently outstanding to fund infrastructure costs, and $500 million in short-term notes to fund a portion of the $15 billion of capital projects in the Capital Program.  By the end of the month, TBTA also expects to close a $500 million bank loan to support the Capital Program, relying on Program revenues as security.

15.     New Yorkers support the Program because it is working.  According to a poll reported by *CBS News*, the majority of New Yorkers want the Program to continue.[7]  On a 2-to-1 basis, New Yorkers say that the Program is working.[8]  The Program's biggest supporters are the individuals who actually drive into the CBD frequently.[9]  Ultimately, 6 out of every 10 New Yorkers say that President Trump should not take any steps to end the Program.[10]

16.     Notwithstanding the extensive evaluations—and now early results—showing that Congestion Pricing is the best way to reduce congestion in the CBD, reduce overall vehicle emissions in the greater region, and fund the regional mass transit system, the Program has continued to have its political detractors, including President Trump.  As early as May 2024,

---

[7] Alecia Reid, *6 in 10 Say They Want NYC Congestion Pricing to Continue, New Poll Finds*, CBS NEWS (Feb. 5, 2025), https://www.cbsnews.com/amp/newyork/news/new-york-city-congestion-pricing-morning-consult-poll/.

[8] *Id.*

[9] *Id.*

[10] *Id.*

President Trump posted on "Truth Social" that he would "TERMINATE Congestion Pricing in my FIRST WEEK back in Office," and subsequent media reports—from the President and his allies in Congress—have indicated that the Administration intended to immediately and summarily end Congestion Pricing to achieve political objectives.

17.    On February 19, 2025, the Trump Administration attempted to do just that. Specifically, Defendants issued a letter to Governor Hochul purporting to rescind the VPPP Agreement in an effort to "terminate" the Program (the "Challenged Action").

18.    The Trump Administration's efforts to "terminate" Congestion Pricing are unlawful.

19.    Neither the VPPP Agreement nor applicable law or regulations permit FHWA to unilaterally terminate the VPPP Agreement.  This makes good sense.  If FHWA had the right to unilaterally terminate a VPPP program that had already been approved and implemented, it would create uncertainty around the future of such programs any time leadership at FHWA, USDOT, or the White House changed—uncertainty that may make it difficult to issue bonds for other projects and would clearly undermine the purposes of the VPPP.

20.    Defendants also provided no basis for FHWA's abrupt reversal of its position on the Program, despite having reaffirmed the FONSI and approved the Program only a few months prior.  And, in stark contrast to the nearly four-year process that led to FHWA's VPPP approval, Defendants purported to take this agency action in a matter of less than two months, and despite having conducted no NEPA review of the effects on the environment from ceasing tolling and reintroducing tens of thousands of additional vehicular trips into the CBD daily, as well as from termination of the EJ mitigation committed to as part of the Program and to be funded through Program revenue.

21. In short, FHWA's decision to purportedly terminate the VPPP Agreement is in open disregard of a host of federal statutes and regulations, not to mention the MTA and TBTA's rights under the United States Constitution.

22. Though the FHWA's attempt to terminate the Program is clearly contrary to law, it is perhaps unsurprising given that the Trump Administration has attempted to take a number of unilateral executive actions that have been challenged in and stopped by the courts.[11]  These actions include attempts to freeze federal funding despite prior Congressional appropriations, to cut funding from the National Institutes of Health, and to redefine the Fourteenth Amendment's citizenship guarantee in a move that one court called "blatantly unconstitutional."[12]  In many of these instances, the effect of the arbitrary or unlawful federal action was to hamstring vital funding sources for states and localities—regardless of legal commitments the federal government has made.  The Trump Administration's action here is just the latest example of its disregard for the rule of law.

23. Termination of the Program is also in direct contrast with the USDOT's newly announced policy to "prioritize" projects "that utilize user-pay models," and recent remarks by Defendant Duffy that saving people time on their commutes would be part of his mission as

---

[11] *See, e.g.*, *Washington v. Trump*, No. 25 Civ. 127 (W.D. Wash. Jan. 23, 2025) (ECF 43) (granting temporary restraining order against Trump Administration's attempt to redefine the Fourteenth Amendment's citizenship guarantee); *Casa Inc. v. Trump*, No. 25 Civ. 201 (D. Md. Feb. 5, 2025) (ECF 65) (granting preliminary injunction against Trump Administration's attempt to redefine the Fourteenth Amendment's citizenship guarantee); *New York v. Trump*, Case No. 25 Civ. 39 (D.R.I. Jan. 29, 2025) (Minute Entry) (granting temporary restraining order against Trump Administration's attempts to impose broad "freeze" of federal funding); *Nat'l Council of Nonprofits v. Off. Mgmt. Budget*, No. 25 Civ. 239 (D.D.C. Feb. 3, 2025) (ECF 30) (same); *Massachusetts v. Nat'l Insts. Health*, No. 25 Civ. 10338 (D. Mass. Feb. 10, 2025) (ECF 25) (granting temporary restraining order against Trump Administration's attempt to broadly cut research funding from the National Institutes of Health).

[12] Josh Gerstein, *Judge slams Trump while extending block on birthright citizenship order*, POLITICO (Feb. 6, 2025), https://www.politico.com/news/2025/02/06/judge-slams-trump-birthright-citizenship-00202928.  Judge Coughenour, who has served on the federal bench since being appointed by President Ronald Reagan and confirmed by the Senate in 1981, stated at a subsequent hearing that "[i]t has become ever more apparent that to our president, the rule of law is but an impediment to his policy goals. The rule of law is, according to him, something to navigate around or simply ignore, whether that be for political or personal gain. Nevertheless, in this courtroom and under my watch, the rule of law is a bright beacon which I intend to follow."  *Id.*

Secretary. At a conference of state highway and transportation officials on February 5, 2025, Defendant Duffy stated that he wanted to commit to create projects that "mak[e] peoples lives better. What you do makes people's lives better. We're able to get to work and back home to see our loved ones more quickly. If we don't have our systems that are delayed and we don't sit in traffic we get to spend an extra 15 minutes, maybe an extra 45 minutes a day with the ones that we love as opposed to listening to music or a podcast or, I don't know what you listen to in the car, but whatever you're listening to in the car, or on the train. We can make people's lives better and spend time with the people we love as opposed to going to the grind of our transportation system."[13]

24.    In addition to being inconsistent with its own broader policy statements, the Trump Administration's efforts to "terminate" the Program are contrary to its purported respect for federalism. The Program is the first congestion pricing program of its kind in the United States, and a necessary solution to the unique policy challenges facing the New York metropolitan region and one that reflects the will of the majority of New Yorkers and their elected representatives at every level of government. As Justice Brandeis explained nearly a century ago, "[i]t is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." *Whalen v. Roe*, 429 U.S. 589, 597 n.20 (1977) (quoting *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J. dissenting)). President Trump claims to embrace this philosophy and has even pledged, in his own signature way, to "make states the laboratories of democracy once again."[14] In his first inaugural address, President Trump declared that "we are not

---

[13] Sean Duffy, *U.S. Secretary of Transportation Sean Duffy speaks at the American Association of State Highway and Transportation Officials 2025 Washington Briefing*, U.S. Dep't of Transp. (Feb. 5. 2025), https://www.transportation.gov/briefing-room/us-secretary-transportation-sean-duffy-speaks-american-association-state-highway-and.

[14] Michael Stratford, *Trump Endorses States' Rights – but Only When He Agrees With the State*, POLITICO (Apr. 2, 2018), https://www.politico.com/story/2018/04/02/trump-states-rights-education-sanctuary-drilling-492784.

merely transferring power from one administration to another, or from one party to another, but we are transferring power from Washington, D.C., and giving it back to you, the American people."[15] And Defendant Duffy, shortly after being confirmed as Secretary of Transportation, recently committed to not interfering with state transportation initiatives, saying at a conference of state highway and transportation officials: "I think that you guys know how to do your jobs, and I think we should rethink the way we're doing business together by giving you all a lot more autonomy and a lot more authority, a lot more freedom to do the projects that you know are important in your communities."[16]  Yet the Trump Administration's efforts to end the Program, when most New Yorkers believe he shouldn't interfere, are directly contrary to those promises.

25.    To be clear, while the Trump Administration has purported to unlawfully terminate the VPPP agreement, its actions—as a mere signatory to a multi-party agreement—obviously do not require Plaintiffs to cease operation of the Program.  The status quo is that Congestion Pricing continues, and unless and until a court orders otherwise, Plaintiffs will continue to operate the Program as required by New York law.

26.    Plaintiffs bring this action solely for a declaratory judgment that the Trump Administration's purported termination of the VPPP Agreement is null and void, and for an order vacating the Challenged Action.

### PARTIES, JURISDICTION, AND VENUE

27.    Plaintiff the MTA is a public benefit corporation organized under the laws of New York and is responsible for North America's largest public transportation network, serving 15.3

---

[15] *Id.*

[16] Duffy, *U.S. Secretary of Transportation Sean Duffy speaks at the American Association of State Highway and Transportation Officials 2025 Washington Briefing*, https://www.transportation.gov/briefing-room/us-secretary-transportation-sean-duffy-speaks-american-association-state-highway-and.

million people across 5,000 square miles in New York City, Long Island, Southeastern New York, Northeastern New Jersey, and Southern Connecticut. The MTA has offices in New York, New York, and is governed by a 23-member board which is coterminous with the board of TBTA.

28.    Plaintiff TBTA is an affiliate of the MTA. It is a public benefit corporation organized under the laws of New York, with offices in New York, New York. TBTA is a signatory to the VPPP Agreement and is responsible under New York law for the implementation and operation of the Program.

29.    Defendant Duffy is the Secretary of USDOT. He is sued in his official capacity.

30.    Defendant Shepherd is the Executive Director of the FHWA. She is sued in her official capacity.

31.    Defendant USDOT is a cabinet department of the federal government, with offices in Washington, D.C.

32.    Defendant FHWA is an agency within the USDOT, with offices in Washington, D.C.

33.    This Court has subject matter jurisdiction over this action pursuant to 23 U.S.C. § 1331 because this case presents a federal question under the laws of the United States, including the United States Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* This Court has remedial authority including pursuant to the APA, 5 U.S.C. §§ 705, 706, the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and Rule 57 of the Federal Rules of Civil Procedure.

34.    Venue is proper in this district under 28 U.S.C. § 1391(e) because the MTA and TBTA are headquartered in this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## BACKGROUND

A.    **New York's Enactment of Congestion Pricing**

35.    Traffic congestion has long plagued the New York metropolitan area.  For decades, congestion has stymied economic growth and harmed the environment and public health, not to mention the quality of life in the region.

36.    Congestion on New York City roads, and in the CBD in particular, has a serious negative impact on public health.  As the U.S. Environmental Protection Agency has recognized, higher vehicle traffic leads to higher vehicle emissions, which are associated with negative health impacts like "asthma onset and aggravation, cardiovascular disease, reduced lung function, impaired lung development in children, pre-term and low-birthweight infants, childhood leukemia, and premature death."[17]  FHWA has consistently acknowledged that "less vehicle traffic can improve air quality and reduce chronic lower respiratory diseases."[18]

37.    Congestion also increases travel times, eroding worker productivity, reducing bus and paratransit service, raising the cost of deliveries, and impeding the movement of emergency vehicles.  A 2018 study estimated that "traffic congestion [would] be a $100 billion drag" on the metropolitan-area economy over the next five years, and identified Manhattan below 60th street— where a quarter of the economic activity is concentrated—as the primary source of traffic congestion in the region.[19]

38.    New York policy makers have considered ways to reduce congestion in the CBD,

---

[17] U.S. ENVIRONMENTAL PROTECTION AGENCY, NEAR ROADWAY AIR POLLUTION AND HEALTH: FREQUENTLY ASKED QUESTIONS (Aug. 2014), https://nepis.epa.gov/Exe/ZyPDF.cgi/P100NFFD.PDF?Dockey=P100NFFD.PDF.

[18] Jhoset Burgos-Rodriguez, et al., *Making Healthy Connections in Transportation*, 87 PUBLIC ROADS 28 (Summer 2023), https://highways.dot.gov/sites/fhwa.dot.gov/files/Public%20Roads%20Summer%202023.pdf.

[19] The Partnership for New York City, *$100 Billion Cost of Traffic Congestion in Metro New York*, PFNYC.ORG (Jan. 2018) https://pfnyc.org/research/100-billion-cost-of-traffic-congestion-in-metro-new-york/.

including tolling programs, for decades. In fact, the idea for congestion pricing was first developed in the 1950s by Columbia University economist and Nobel laureate William S. Vickrey, who believed that congestion pricing would be a market-based solution to overcrowding, whether on subway cars or New York City's streets.

39.    The last decade has seen further recognition of the benefits that a congestion pricing program could have for reducing congestion in the city, improving air quality, and raising funds to improve mass transit. As New Yorkers faced serious mass transit issues in 2017, Governor Andrew Cuomo raised the possibility of implementing a congestion pricing program that would help fund improvements to New York City's transit infrastructure. Governor Cuomo instituted an advisory panel which recommended a congestion pricing program.

40.    In 2019, the New York State Legislature enacted the TMA, which authorized and directed TBTA to implement a congestion tolling program in the CBD. N.Y. Veh. & Traf. Law § 1701 *et seq*. The TMA's legislative findings declare that traffic in New York—which "ranks second worst among cities in the United States and third worst among cities in the world" and is estimated to cost the metropolitan economy more than "one hundred billion dollars over the next five years"—is "crippling ... [for] residents, commuters, taxi and for-hire vehicle traffic, bus transit and emergency services" and "a significant contributor to decreased air quality." *Id.* § 1701.

41.    The Legislature further found that the underfunding of New York City's aging subway infrastructure has "a deleterious impact on the health, safety, and livelihood of commuters, tourists, resident New Yorkers" as well as "the economy of the state of New York," such that "a long-term and sustainable solution is necessary in order to ensure stable and reliable funding" for this "important mass transit asset." *Id.* Consequently, the Legislature declared that to ensure the

"public health and safety of New York's residents," the creation of a congestion pricing program in the Manhattan CBD was "a matter of substantial state concern." *Id.*

42.    The TMA authorizes and directs TBTA to "establish the central business district tolling program," *id.* § 1704 (1), grants TBTA the power "to establish and charge variable tolls and fees for vehicles entering or remaining in the [CBD],"[20] and authorizes TBTA "to make rules and regulations for the establishment and collection of central business district tolls, fees, and other charges," *id.* § 1704-a (1).

### B.    The Federal Value Pricing Pilot Program

43.    Because Congestion Pricing would impose a toll on several federal-aid highways in Manhattan, the federal government has taken the position that the Program could not begin without federal approval. *Mulgrew v. United States Dep't of Transp.*, No. 23 Civ. 10365, 2024 WL 3251732, at *4 (S.D.N.Y. June 20, 2024) (Liman, J.).

44.    Tolls are generally prohibited on federal-aid highways, subject to a number of exceptions found in federal law, including exceptions that authorize tolling on new infrastructure, tolling on additional lanes added to existing highways, and tolling in connection with high-occupancy vehicle lanes. *See* 23 U.S.C. §§ 129, 301.

45.    In 1991, Congress enacted the Intermodal Surface Transportation Efficiency Act of 1991, Pub. L. 102-240 (Dec. 18, 1991) ("ISTEA"), which permits tolling on federal-aid highways in connection with pilot projects seeking to reduce congestion.

46.    Specifically, ISTEA established the Congestion Pricing Pilot Program, which directed the Secretary of Transportation to "solicit the participation of State and local governments

---

[20] As delineated by the Act, the CBD encompasses the geographic area of Manhattan south and inclusive of 60th Street, but not including the FDR Drive, the West Side Highway, the Battery Park Underpass, and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West Street. *Id.* § 1704(2).

and public authorities for one or more congestion pricing pilot projects," and authorized the Secretary to "enter into" agreements to "establish, maintain, and monitor congestion pricing projects." ISTEA § 1012(b).  ISTEA further authorized the Secretary "to allow the use of tolls" by states, local governments, and public authorities "as part of a pilot program under this section," *id.*

47.    In 1998, Congress enacted the Transportation Equity Act for the 21st Century of 1998, which renamed the Congestion Pricing Pilot Program the VPPP and expanded the Secretary's authority to enter into agreements authorizing value pricing pilot programs.  Pub. L. 105-178 § 1216 (June 9, 1998).

48.    As FHWA describes it, the VPPP is "intended to demonstrate whether and to what extent roadway congestion may be reduced through application of congestion pricing strategies, and the magnitude of the impact of such strategies on driver behavior, traffic volumes, transit ridership, air quality and availability of funds for transportation programs."[21]    FHWA has recognized that congestion pricing can reduce delays and stress, allow for more deliveries per hour for businesses, improve transit speeds and reliability of service, and save lives by shortening the incident response times for ambulances and emergency personnel.[22]

49.    According to FHWA, "congestion pricing ... is a way of harnessing the power of the market to reduce the waste associated with traffic congestion."[23]    Congestion pricing is effective because it shifts "some rush hour highway travel to other transportation modes or to off-

---

[21] *Value Pricing Pilot Program*, U.S. FED. HIGHWAY ADMIN., https://ops.fhwa.dot.gov/congestionpricing/value_pricing/ (accessed Jan. 19, 2025).

[22] *Benefits of Congestion Pricing*, U.S. FED. HIGHWAY ADMIN., https://ops.fhwa.dot.gov/congestionpricing/cp_benefits.htm (accessed Jan. 19, 2025).

[23] *Congestion Pricing*, U.S. FED. HIGHWAY ADMIN., https://ops.fhwa.dot.gov/congestionpricing/index.htm (accessed Jan. 18, 2025); *Federal Tolling Programs*, U.S. FED. HIGHWAY ADMIN., https://www.fhwa.dot.gov/ipd/tolling_and_pricing/tolling_pricing/vppp.aspx (accessed Jan. 18, 2025) ("Value pricing – sometimes called congestion pricing – works by charging drivers on congested roadways during peak periods.").

peak periods.  By removing even just a small fraction of the vehicles from a congested roadway, pricing helps the system to flow more efficiently."  *Id.*

50.    The Secretary of Transportation has delegated the authority to administer the VPPP, and to enter into agreements under Section 1012(b) of ISTEA, to the FHWA Administrator.  *See* 49 C.F.R. § 1.85(c)(22).  FHWA provides tolling authority under the VPPP by entering into tolling agreements with the relevant state actors.  *See Value Pricing Pilot Program Participation, Fiscal Years 2010 and 2011*, 75 F.R. 64397, 64403 (Nov. 19, 2010).

51.    Several states have taken advantage of the VPPP.  For example, Texas has established a program under the VPPP that examined potential congestion pricing incentives and programs on the IH-30/Tom Landry Highway.  Similarly, Florida has established a project examining the potential for a congestion pricing program on the Florida Turnpike System.  After less than two years, the 95 Express project in Miami and Fort Lauderdale, Florida saw total ridership on the Bus Rapid Transit "increase[] by 145 percent," along with "dramatic improvement in express lane travel speeds along the corridor utilized by transit," with average speeds during morning peak time increasing from 20 to 62 miles per hour.  *Id.*  FHWA has not rescinded tolling authority for any of these projects.

52.    Indeed, on information and belief, FHWA has never attempted to unilaterally rescind tolling authority for any VPPP program or project.  FHWA has never publicly announced a unilateral rescission of tolling authority for a VPPP program or project in the Federal Register or on its public-facing website.  Nor has FHWA ever reported such a rescission in its regular reports to Congress on the status of the VPPP.

**C.    FHWA and the Project Sponsors Conducted a Lengthy Environmental Review Process**

53.    In 2019, the Project Sponsors submitted an Expression of Interest to FHWA seeking

authorization to implement a variable tolling program aimed at reducing congestion (i.e., a congestion pricing program) in the Manhattan CBD.  FHWA responded that the VPPP "appear[ed] to be the best potential fit" among the various programs in Federal law allowing for tolling on Federal-aid highways.

54.    A years-long environmental review process under NEPA ensued.  In assessing the Program, FHWA specifically considered the Program's purpose "to reduce traffic congestion in the [CBD] in a manner that will generate revenue for future transportation improvements," and its specific objectives of: (1) reducing daily VMT within the CBD by at least five percent; (2) reducing the number of vehicles entering the CBD daily by at least ten percent; and (3) creating a funding source for capital improvements and generating sufficient annual net revenues to fund $15 billion for capital projects.[24]

55.    On August 10, 2022, FHWA and the Project Sponsors issued a Draft Environmental Analysis ("Draft EA"), which was informed by early public outreach and comments as well as complex and comprehensive technical analyses.  The Draft EA examined numerous categories of potential environmental effects, such as the visual effects of tolling infrastructure, the indirect air quality and noise effects of changes in traffic patterns, and the effects on transit systems of shifts in travel mode choice.  In accordance with former Executive Order ("EO") 12,898 (1994), the Draft EA also studied the potential for disproportionately high and adverse effects on EJ communities, including the potential effects of traffic diversions on local air quality in the locations throughout the region most likely to experience diversions.

---

[24] *See* FHWA et al., *Central Business District Tolling Program, Finding of No Significance, Appendix A: Final Environmental Assessment* at ES-6, MTA.INFO (June 14, 2024), https://new.mta.info/project/CBDTP/environmental-assessment.

56.     Because the tolling structure was not yet established when the Draft EA was issued, and in order to allow FHWA and the Project Sponsors to better assess the range of potential impacts from the Program, the Draft EA analyzed seven tolling scenarios, each with different variables, using U.S. Environmental Protection Agency-approved traffic and air quality models to predict changes in regional travel demand and patterns for those scenarios, as compared to predicted conditions in 2023 and 2045 without the Program.  It then studied the scenarios that yielded the representative worst-case effects for different resource categories (e.g., traffic, noise, etc.) to consider the full range of potential effects from the Program.  The Draft EA also identified measures to mitigate potential adverse environmental effects and potential effects on EJ populations that were identified in the analyses.

57.     FHWA and the Project Sponsors provided a 44-day public comment period, during which anyone could submit comments on the Draft EA.  In late August 2022, FHWA and the Project Sponsors held six virtual public hearings, totaling over 38 hours, to discuss the Draft EA.  This was in addition to early outreach conducted while the Draft EA was in development, and special outreach to communities and organizations, including multiple meetings to discuss environmental justice in relation to the Program.

58.     On March 30, 2021, while working with the Project Sponsors, then-Acting FHWA Administrator Stephanie Pollack commended the Program, saying "The FHWA looks forward to assisting New York so we can arrive at a prompt and informed NEPA determination on this important and precedent-setting project."[25]

---

[25] *FHWA Greenlights Environmental Assessment for New York City's Proposed Congestion Pricing Plan*, U.S. FED. HIGHWAY ADMIN. (March 30, 2021), https://highways.dot.gov/newsroom/fhwa-greenlights-environmental-assessment-new-york-citys-proposed-congestion-pricing-plan.

59.     Between August 2022 and April 2023, FHWA and the Project Sponsors reviewed and prepared responses to each of the thousands of comments and prepared a Final EA incorporating these responses and changes informed by the public input.

60.     The Final EA determined that the Program would not have adverse effects on air quality because it would not cause exceedances of health-based National Ambient Air Quality Standards.  Nevertheless, the Project Sponsors committed to a robust, $155 million mitigation package over five years to improve air quality and public health in EJ communities with preexisting pollution and health burdens throughout the region, with particular investments directed to EJ communities in which the Project could cause any increase in truck traffic.

61.     The Final EA further predicted that the Program would meet each of the objectives described in Paragraph 54 above based on detailed modeling, using the federally approved Best Practices Model maintained by the New York Metropolitan Transportation Council.

62.     The Final EA also predicted many beneficial environmental effects of the Program, including but not limited to:

    a.   reducing emissions of harmful air pollutants including volatile organic compounds, nitrogen oxides, carbon monoxide, particulate matter, carbon dioxide equivalent (*i.e.*, greenhouse gases), and Mobile Source Air Toxics, both within the CBD and region-wide, through an overall reduction in VMT region-wide;

    b.   reducing localized emissions for most EJ communities in the CBD and others outside of the CBD;

    c.   reducing the number of vehicles entering the CBD;

    d.   reducing delays at many intersections and highway segments, thereby improving travel times, reducing vehicle operating costs, and improving safety;

e.   increasing transit ridership;

f.   reducing travel times for bus operations and thereby facilitating faster, more reliable bus trips;

g.   reducing parking demand within the CBD;

h.   reducing regional energy consumption and greenhouse gas emissions, helping to meet carbon reduction goals;

i.   improving air quality and health in EJ communities through implementation of a $155 million mitigation program; and

j.   creating a dedicated revenue source for investments in public transit, which will further reduce congestion and improve air quality over time.

63.    In May 2023, FHWA approved the Final EA.

64.    Starting on May 12, FHWA made the Final EA and Draft FONSI available for public review for a period of 30 days, from May 12 to June 12, 2023.

65.    On June 22, 2023, FHWA issued a FONSI determining that the Program, including mitigation, would not have a significant adverse impact on the environment and would not have a disproportionately high and adverse impact on EJ communities or populations.

66.    On June 23, 2023, FHWA's New York Division Administrator signed the FONSI.

67.    On March 27, 2024, the TBTA Board approved a toll rate schedule through a formal ratemaking process under New York State law.

68.    In June 2024, the Project Sponsors, in consultation with FHWA, completed a reevaluation under NEPA ("Reevaluation 1"), which assessed the effects of the adopted toll structure.  On June 14, 2024, FHWA concluded that the adopted toll structure and associated impacts were analyzed and mitigated appropriately under NEPA, that no additional environmental

analysis was warranted, and that the conclusions in the Final EA and FONSI remained valid. Reevaluation 1 also concluded that the adopted toll structure would meet the congestion-reduction and revenue goals for the Program and achieve similar environmental benefits to those described in the Final EA.

69.     In November 2024, the Project Sponsors completed a second reevaluation under NEPA ("Reevaluation 2") to assess a toll structure approach whereby those toll rates would be phased in gradually over the first several years of the Program (the "Phase-In Approach").

70.     Reevaluation 2 confirmed that under the Phase-In Approach, the Program would still meet its purpose and need, and all of its objectives.  Reevaluation 2 also confirmed that the Project Sponsors would still implement all mitigation commitments, including for EJ communities, within the same timeframes as contemplated in the Final EA and FONSI.

71.     On November 18, 2024, the TBTA Board formally adopted the Phase-In Approach to the toll rate schedule under New York State law.

72.     On November 21, 2024, FHWA approved Reevaluation 2, concluding that the effects of the Program were consistent with those disclosed in the EA, that the Phase-In Approach of the adopted toll structure and impacts associated with it were analyzed and mitigated accordingly, and that no additional environmental analysis was warranted.

**D.    The VPPP Agreement Is Executed by FHWA and the Project Sponsors**

73.     That same day, on November 21, 2024, FHWA and the Project Sponsors signed an agreement under the VPPP authorizing the Program's collection of tolls and requiring (among other things) implementation of the mitigation commitments made in the FONSI.

74.     The VPPP Agreement states in relevant part that "[e]ffective on the date of this Agreement, the project is approved as a pilot program," and TBTA is authorized to "operate the Program as a toll Project in accordance with the provisions of this Agreement and as a value pricing

project." VPPP Agmt., cl. 1, 8. FHWA further agreed that "the imposition of tolls under this Agreement does not render Federal-aid highways within the State of New York generally ineligible for Federal-aid highway funds where such highways are otherwise eligible under the particular funding program." *Id.* cl. 5.

75.     In return, the Project Sponsors agreed to a number of obligations in the VPPP Agreement, including: (1) "to adequately maintain" federal-aid highways located in the geographic area of the Program, *id.* cl. 6; (2) to submit regular reports on the effects of the Program "on driver behavior, traffic volume, congestion, transit ridership" and other topics to FHWA, *id.* cl. 8(b); and (3) "to comply with all Federal laws and requirements applicable to this project, including the laws and policies applicable to the Value Pricing Pilot Program," *id.* cl. 9. Clause 8 of the VPPP Agreement further requires that the Project Sponsors "identify benefits the application of tolls has in reducing climate pollution" and "demonstrate the benefits mitigation measures provide to underserved communities." *Id.* cl. 8.

76.     In addition, the VPPP Agreement requires that FHWA and the Project Sponsors "will cooperate and work together in the implementation of the Project." *Id.* cl. 8(a).

77.     The VPPP Agreement does not include any provision authorizing FHWA to terminate the agreement. Rather, it contemplates that only TBTA could unilaterally decide to discontinue the Program, requiring the Project Sponsors to "work with FHWA to return the Project to its original operating condition *if TBTA* decides to discontinue tolls on the Project." *Id.* cl. 11 (emphasis added). The VPPP Agreement further provides that TBTA and NYCDOT shall "monitor and report on the project performance" for "a period of at least ten years or to the end of the life of the Project, whichever is sooner." *Id.* cl. (8)(b).

78.     The VPPP Agreement references FHWA regulations at 23 C.F.R. Part 940 and 950. These regulations do not grant FHWA authority to unilaterally terminate the VPPP Agreement.

**E.     The Successful Implementation of the Program**

79.     Prior to implementation of the Program, TBTA budgeted over $500 million towards efforts to establish the Program, and much of that budget has already been expended.  These expenditures included developing the methodological approach; conducting the assessment and extensive outreach and developing the final documentation for the environmental review process under NEPA; design, development, implementation, and testing of the roadway infrastructure and system; design, development, implementation, and testing of the Back Office System; additional extensive outreach for the State administrative review process; staff costs, including new staff for the Program; and consulting costs.

80.     On June 5, 2024, New York Governor Kathy Hochul announced a temporary pause of the Program.  On November 14, 2024, Governor Hochul proposed that the Program move forward with the Phase-In Approach, featuring a lower initial toll amount to lessen the burden on drivers.

81.     In late 2024, several groups and individuals, as well as the State of New Jersey, sought preliminary injunctive relief barring the MTA and TBTA from beginning the Program or collecting tolls on various federal and state constitutional and statutory grounds.  Each of these claims for injunctive relief was rejected by the courts.  *See Chan v. U.S. Dep't of Transp.*, No. 23 Civ. 10365, 2024 WL 5199945 (S.D.N.Y. Dec. 23, 2024) (Liman, J.) (111-page opinion denying motions for preliminary injunction in four related cases challenging the program); *see also County of Rockland v. Metro. Transp. Auth.*, No. Civ. 24-3325 (2d Cir. Jan. 28, 2025), ECF 31 (per curiam); *New Jersey v. Metro. Transp. Auth.*, No. Civ. 25-1033 (3d Cir. Jan. 4, 2025), ECF 9 (Bibas, J.); *Rockland v. Metro. Transp. Auth.*, No. 24 Civ. 2285 (S.D.N.Y. Jan. 14, 2025)

(Seibel, J.), ECF 56 (Seibel, J.); *New Jersey v. U.S. Dep't of Transp.*, No. 23 Civ. 3885 (D.N.J. Jan. 3, 2025), ECF 212 (Gordon, J.); *Rockland v. Metro. Transp. Auth.*, No. 24 Civ. 2285 (S.D.N.Y. Dec. 23, 2024) (Seibel, J.), ECF 52; *Neuhaus v. Triborough Bridge & Tunnel Auth.*, No. 24 Civ. 3983 (S.D.N.Y. Dec. 23, 2024 (Seibel, J.), ECF 44.  In rejecting these plaintiffs' requests for a preliminary injunction to halt the Program, courts recognized that the equities and public interest favored the Program moving forward, especially in light of the expenditures necessary to implement the Program and the revenues expected from its operation, *see, e.g.*, *Chan*, 2024 WL 5199945, at *48-49; that the implementation of the Program reflected a policy choice by New York's elected representatives, *see id.* at *48; and that FHWA conducted a thorough analysis in deciding to allow the Program to proceed, *see id.* at *5-10; *New Jersey v. U.S. Dep't of Transp.*, No. 23 Civ. 3885, ECF 212 at 35.

82.    One of the plaintiffs that sued to prevent implementation of the Program is the State of New Jersey, which sued USDOT and FHWA among others.  On December 30, 2024, Judge Leo Gordon granted USDOT, FHWA, MTA, and TBTA's motions for summary judgment in overwhelming part, rejecting New Jersey's claims that FHWA acted arbitrarily in assessing the potential adverse environmental impacts on New Jersey resulting from air pollution and identifying and assessing the potential for disproportionately high and adverse impacts on New Jersey EJ communities.  *New Jersey*, No. 23 Civ. 3885 (D.N.J. Jan. 3, 2025), ECF 191.  New Jersey also raised concerns about the adequacy of participation afforded to New Jersey entities, officials, and the public throughout the process, and that FHWA had failed to conduct a transportation conformity analysis under the Clean Air Act for the Project with regard to New Jersey's State Implementation Plan, which claims the Court also rejected.  The Court reserved judgment on two issues that it remanded to FHWA for further explanation: the amount of place-

based mitigation funding allocated to New Jersey EJ communities and the consideration of alternatives in light of the adopted Phase-In Approach. *Id.* The Court did not, as sought by New Jersey, vacate the FONSI pending the completion of the remand. New Jersey subsequently moved for reconsideration and for a temporary restraining order, which the Court denied. FHWA filed its remand results on January 17, 2025, and New Jersey's response to those results was filed on February 7, 2025. *Id.*, ECF 226.

83.     On January 5, 2025, the Program went into effect. Eligible vehicles entering the CBD are being tolled at the rates established in the approved toll rate schedule.

84.     While the Program has only just begun and its full benefits have yet to be realized, it is clearly working. The *Financial Times* has estimated that "motorists … will save thousands of hours per year they currently waste crawling through smoggy tunnels or over clogged bridges."[26] MTA hourly traffic data "also showed fewer vehicles in affected tunnels during rush hours."[27] The *New York Times* reported that officials estimated there were "tens of thousands fewer vehicles entering the busiest parts of Manhattan below 60th street" in the first week the Program was in effect.[28]

85.     *NBC News* reported, based on data provided by MTA Deputy Policy Chief Juliette Michaelson, that crossing times were 17% faster at the Lincoln Tunnel and 40% faster at the Holland Tunnel in January 2025, compared to January 2024.[29] Trips on the Williamsburg Bridge

---

[26] Oliver Roeder & Sam Learner, *First US congestion pricing scheme brings dramatic drop in NY traffic*, FINANCIAL TIMES (Jan. 16, 2025), https://www.ft.com/content/c229b603-3c6e-4a1c-bede-67df2d10d59f.

[27] *Id.*

[28] Ana Ley, Winnie Hu, & Keith Collins, *Less Traffic, Faster Buses: Congestion Pricing's First Week*, N.Y. TIMES (Jan. 13, 2025), https://www.nytimes.com/2025/01/13/nyregion/congestion-pricing-nyc.html.

[29] Andrew Siff, *MTA Calls Congestion Pricing 'Transformative" on Commutes*, NBC NEW YORK, (Jan. 29, 2025), https://www.nbcnewyork.com/new-york-city/mta-congestion-pricing-transformative-commute-impact/6126670/.

and Queensboro Bridge have been 30% faster and riders on express buses are saving about 10 minutes on their commutes.[30]

86.    Data collected by the MTA reveals that since the Program began, traffic in the CBD decreased substantially, with 1.2 million fewer vehicles entering the CBD than projected.  Drivers in the CBD are experiencing travel time improvements in the afternoon peak hours "with reductions as high as 59%."[31]  Inbound river crossings to the CBD have seen a 10%-48% decrease in travel times, and several bus routes have seen significant decreases in the time needed to complete their routes.[32]

87.    At the same time, the fact that there are now fewer cars on the road in the CBD has not stymied economic activity.  In fact, data provided by the MTA shows that in January 2025, 35.8 million people visited Business Improvement Districts in the CBD, a 1.5 million increase compared to last January.  As one example of businesses in the CBD continuing to thrive, the gross revenue of Broadway shows in January 2025 was 25% higher than January last year and attendance at shows was 17% higher.[33]  This should come as no surprise given business leaders' support for the Program even before it began.  After Governor Hochul announced the Program would move forward with the Phase-In Approach, the Greater New York Chamber of Commerce posted a statement by its CEO on X, noting that the Program "will improve the quality of life in Manhattan

---

[30] *Id.*

[31] *See New Congestion Relief Zone Data Captures Magnitude of Faster Commutes for Drivers and Bus Riders, Fewer Vehicles and Surging Express Bus Ridership*, METRO. TRANSP. ASS'N (Jan. 29, 2025), https://www.mta.info/press-release/new-congestion-relief-zone-data-captures-magnitude-of-faster-commutes-drivers-and-bus.

[32]*Id.*

[33]*Grosses-Broadway in NYC*, THE BROADWAY LEAGUE https://www.broadwayleague.com/research/grosses-broadway-nyc/.

for all who live, work and visit."[34]  And the Partnership for New York City's President & CEO Kathryn Wylde has stated that, since the onset of Congestion Pricing, New Yorkers are "moving faster and there's less traffic,"[35] and that "[i]n every respect, this is a policy that President Trump and the Republicans should be supporting."[36]

88.    Emergency vehicle speeds have also improved.  For many years, increasing traffic in New York City led to longer and longer emergency vehicle response times.  As documented in a report issued by State Senator Brad Hoylman-Sigal, who represents much of the CBD, and traffic engineer Sam Schwartz, over the past decade, "E.M.S. response times to life-threatening situations had increased by 29%; for Fire Department vehicles tending to medical emergencies, the lag was up by 72 percent."[37]  The preliminary data indicates that emergency vehicles have benefited from the reduction in congestion and are able to respond more quickly to calls.[38]

89.    Reports also indicate that the Program has made the streets safer, with data gathered by Streetsblog NYC indicating a striking 51% drop in crash-related injuries in the Program's first 12 days as compared to the same time period in 2024.[39]  Thirty-seven people were injured in 90 total reported crashes, down from 76 injuries in 199 crashes in the same 12-day period in 2024.

90.    Also since the onset of Congestion Pricing, subway ridership has increased, while

---

[34] New York's Chamber (@NYChamber), X, (Nov. 15, 2024, 3:29 PM), https://x.com/NYChamber/status/1857521387583451602.

[35] Dick Brennan, *President Trump said to have NYC's congestion pricing, bike lanes in his crosshairs*, CBS NEWS (Feb. 10, 2025), https://www.cbsnews.com/newyork/news/president-trump-nyc-congestion-pricing-bike-lanes/.

[36] Ry Rivard & Nick Reisman, *New York's business boosters push Trump to keep Manhattan tolls*, POLITICO (Feb. 11, 2025), https://www.politico.com/news/2025/02/11/new-york-trump-congestion-pricing-00203540.

[37] Ginia Bellfante, *The Life-or-Death Consequences of Killing Congestion Pricing*, N.Y. TIMES (Oct. 10, 2024), https://www.nytimes.com/2024/10/10/nyregion/new-york-fire-department-response-times.html.

[38] *See* METRO. TRANSP. ASS'N, *Congestion Relief Zone Update*, YOUTUBE (Jan. 29, 2025), https://www.youtube.com/watch?v=fD5KpBz2yIE.

[39] Diana Ionescu, *NYC Congestion Pricing May be Saving Lives*, PLANETIZEN (Jan. 27, 2025), https://www.planetizen.com/news/2025/01/133978-nyc-congestion-pricing-may-be-saving-lives#:~:text=New%20York%20City's%20new,time%20period%20the%20prior%20year.

crime in the subway has plummeted.  In January 2025, there were 36% fewer crimes reported on the subway than last January.[40]

91.    According to a poll reported by *CBS News*, the majority of New Yorkers want the Program to continue.[41]  On a 2-to-1 basis, New Yorkers say that the program is working.[42]  The Program's biggest supporters are the individuals who actually drive into the CBD frequently.  And many of New York's elected representatives also strongly support the Program.  Congressman Jerry Nadler has stated that "congestion pricing is the best — and only — solution to getting our transit system back on track" and will allow the "MTA to advance work on the 2nd Avenue Subway extension, Penn Access, ADA accessibility upgrades, and more.  We will end the congested streets that put public safety and emergency response at risk while meeting our climate goals to fight the climate crisis."[43]  Manhattan Borough President Mark Levine has also given his strong support to the Program, stating: "Implementing congestion pricing as soon as possible will raise the critical funds we need to build elevators and escalators, modernize signals, and give New Yorkers the transit system we deserve."[44]  Assemblymember Tony Simone from Manhattan expressed a similar sentiment: "There is not, has never been and never will be, a substitute for the

---

[40] Barbara Russo-Lennon, *Subway Crime Plummets as Ridership Jumps Significantly in 2025 in Congestion Pricing Era*, AM NY (Feb 4, 2025), https://www.amny.com/nyc-transit/nyc-subway-crime-plummets-ridership-jumps-2025/.

[41] Alecia Reid, *6 in 10 Say They Want NYC Congestion Pricing to Continue, New Poll Finds*, CBS NEWS (Feb. 5, 2025), https://www.cbsnews.com/amp/newyork/news/new-york-city-congestion-pricing-morning-consult-poll/. Another poll, run close in time to the Program's launch, likewise found that a majority of New Yorkers support congestion pricing.  *See* Barbara Russo-Lennon, *The Poll Results Are In: Here's How New Yorkers Really Feel About Congestion Pricing*, AM NY (Dec. 3, 2024), https://www.amny.com/news/how-new-yorkers-feel-about-congestion-pricing/.

[42] *Id.*

[43] Gov. Kathy Hochul, *What They are Saying: Elected and Community Leaders Support Governor Hochul's Plan to Fund Transit and Put Commuters First,* GOVERNOR.NY.GOV (Nov. 14, 2024), https://www.governor.ny.gov/news/what-they-are-saying-elected-and-community-leaders-support-governor-hochuls-plan-fund-transit.

[44] *Id.*

funding promised through congestion pricing.  Mass transit is the backbone of our city and state, which are the economic engine for the nation.  This funding is critical to making our system fully accessible, improving service, delivering the infrastructure to increase residential density to combat the housing crisis, create thousands of direct and indirect jobs, and induce billions of dollars of investment."[45]  Although some state and local representatives have opposed the Program, they are in the minority, and regardless, the TMA was enacted into law by the Legislature and signed by then-Governor Cuomo.

92.    Following its implementation, many New Yorkers have spoken out about the benefits of the Program.  Illena Robbins, who grew up in Manhattan and now lives in Queens, said in an interview with the *New York Times* that crossing the street to get lunch "would stress me out," but now that the Program is in effect, she is "able to cross safely, and cars weren't honking. It was like a whole other world."[46]  Asad Dandia, who owns and operates a walking tour company, agreed "it was much easier to cross the street … definitely quieter [and] definitely calmer."[47]

93.    On social media, New Yorkers have also been praising the Program.  Ramit Sethi posted in all caps on January 9th that his trip to Newark Liberty International Airport was "the fastest trip I've ever taken to the airport from NYC!!! Thank you Congestion Pricing!!!"[48]  Paul Rieckhoff posted on X, "'Its been a month now, and its completely different. I love it. I don't mind driving here anymore. It's great.' – My uber driver today on congestion pricing in Manhattan.  I agree. The change to traffic in the city is significant. Especially on the weekends.  And especially

---

[45] *Id.*

[46] Dodai Stewart, *New Yorkers Have Little Data but Big Feelings about Congestion Pricing*, N.Y. TIMES, (Jan. 11, 2025), https://www.nytimes.com/2025/01/11/nyregion/new-york-congestion-pricing-reaction.html.

[47] *Id.*

[48] *Id.*

for those of us that live here."[49]  Sam Biederman wrote, "Congestion pricing is amazing.  Was just in Lower Manhattan.  Not car-choked, foot, bike and car traffic flowing very freely.  Good idea, absolutely worth $9."[50]

94.    There is evidence that even former skeptics of the Program are coming to see its benefits.  Ali Lyles, who first posted a video on TikTok comparing being charged the toll to "being robbed without a gun," later posted a video acknowledging that he had saved half an hour on his commute and said, "there wasn't no traffic, bruh … I might actually like congestion pricing."[51] This is consistent with the experiences of other cities that have implemented congestion pricing programs, such as London and Stockholm, where support for congestion pricing increased significantly following implementation, as the benefits became apparent.[52]  As the old adage goes, time is money—in this case, collectively tens of billions of dollars that will be saved as a result of the Program, far more than the collective cost to drivers.

**F.    Then-Candidate Trump's Repeated Threats to "Kill" Congestion Pricing and "Slash" Environmental Regulations**

95.    Despite the strong support for the Program in New York, Donald Trump, as a candidate for national office, repeatedly voiced his political opposition to the Program and stated that he would "terminate" and "kill" the Program once in office.

---

[49] Paul Rieckhoff (@PaulRieckhoff), X, (Feb. 2, 2025, 4:18 PM), https://x.com/PaulRieckhoff/status/1886162240250028417.

[50] Sam Biederman (@Biedersam), X, (Jan. 5, 2025, 3:32 PM), https://x.com/Biedersam/status/1876001600835354735.

[51] *Id.*

[52] Abdallah Fayyad, *NYC's Congestion Pricing is Unpopular – For now*, Vox (Jan. 10, 2025), https://www.vox.com/policy/394514/congestion-pricing-popular-support-new-york-stockholm-london

96.    On May 7, 2024, in anticipation of the June 2024 expected implementation, he wrote on Truth Social:



> **Donald J. Trump** ✓
> @realDonaldTrump
>
> I can't believe that New York City is instituting Congestion Pricing, where everyone has to pay a fortune for the "privilege" of coming into the City, which is in desperate trouble without it. It is a big incentive not to come - there are plenty of other places to go. It's been a failure everywhere it has been tried, and would only work if a place were HOT, HOT, HOT, which New York City is not right now. What office tenant or business would want to be here with this tax. Hopefully, it will soon be withdrawn!
>
> **4.99k** ReTruths  **17.2k** Likes                May 07, 2024, 9:01 AM

97.    On May 24, 2024, he wrote the following on Truth Social:



> **Donald J. Trump** ✓
> @realDonaldTrump
>
> "Congestion Pricing" is a disaster for NYC. I stopped it for years at the Federal level, but Crooked Joe railroaded it through. A massive business killer and tax on New Yorkers, and anyone going into Manhattan. I will TERMINATE Congestion Pricing in my FIRST WEEK back in Office!!! Manhattan is looking for business, not looking to kill business!
>
> **3.12k** ReTruths  **11.7k** Likes                May 24, 2024, 2:41 PM

98.    Following the election, President Trump has continued to express his personal opposition to the Program, saying in an interview with the *New York Post* on November 14, 2024 that he "strongly disagree[d] with the decision on the congestion tax."[53]

99.    On January 11, then President-elect Trump met with Representatives Nicole Malliotakis and Mike Lawler from New York.[54]    Following the meeting, Representative

---

[53] Steven Nelson, *Trump slams Hochul move to revive NYC congestion tax: 'It will hurt workers, families, and businesses'*, N.Y. POST (Nov. 14, 2024), https://nypost.com/2024/11/14/us-news/trump-slams-hochul-move-to-revive-nyc-congestion-tax/.

[54] Rep. Lawler represents a district in Rockland County, which filed suit to block the program on March 26, 2024, alleging that the Program violates the Equal Protection clauses of the United States and New York constitutions, is an

Malliotakis posted the following on X presumably from President Trump's Mar-a-Lago Club:



100.    The next day, she posted on X that, during the meeting, Trump "told us that he …
wants to provide SALT relief and kill congestion pricing."

101.    As a candidate, President Trump also made it clear that he planned to "slash"
existing environmental regulations, including those promulgated pursuant to NEPA.

102.    In his last term, President Trump described NEPA as a "job-killing regulation" and
implemented regulations as part of a "campaign to slash" NEPA's effectiveness.[55]

103.    As President-elect, indicating his general disregard for the nation's environmental

---

"unauthorized tax," and constitutes an excessive fine in violation of the Eighth Amendment.    Judge Seibel denied
Rockland's request for a preliminary injunction on December 23, 2024, ruling that Rockland had "failed to show a
likelihood of success on the merits as to any of their claims."    *Rockland v. Metro. Transp. Auth.*, No. 24 Civ. 2285
(S.D.N.Y. Dec. 23, 2024) (Seibel, J.), ECF 52.

[55] *Remarks by President Trump on Proposed National Environmental Policy Act Regulations*, TRUMP WHITE HOUSE
ARCHIVES, (Jan. 9, 2020), https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-
proposed-national-environmental-policy-act-regulations/.

regulations, Trump posted on Truth Social:



**Donald J. Trump** ✓
@realDonaldTrump

Any person or company investing ONE BILLION DOLLARS, OR MORE, in the United States of America, will receive fully expedited approvals and permits, including, but in no way limited to, all Environmental approvals. GET READY TO ROCK!!!

**9.47k** ReTruths   **40.9k** Likes                    Dec 10, 2024, 2:16 PM

## G.    The Administration Moves to 'Terminate' Congestion Pricing

104.    On the day of President Trump's Inauguration, January 20, 2025, New Jersey Governor Phil Murphy made a personal appeal to him to end the Program.  Governor Murphy noted that President Trump had previously described congestion pricing as a "disaster" and had vowed to "TERMINATE" it on his "FIRST WEEK BACK in office!!!"[56]

105.    On January 29, 2025, and in apparent contrast to President Trump's desire to end the Program, Secretary Duffy issued an order titled "Ensuring Reliance Upon Sound Economic Analysis in Department of Transportation Policies, Programs, and Activities."[57]  Section 5(f)(i) of the order states that USDOT will "prioritize" projects "that utilize user-pay models."  Congestion pricing is, by definition, a "user-pay" model, as it requires payment for use of the roadways in the CBD.  Similarly, Section 5(f)(iii) of the order requires projects to "mitigate the unique impacts of DOT programs," such as "the accessibility of transportation to families with young children."  The Program meets these goals by generating revenues to install elevators at subway stations, improve

---

[56] Carl Campanile, *NJ Gov. Phil Murphy Makes Personal Appeal to Trump to Kill Congestion Pricing*, N.Y. POST (Jan. 20, 2025), https://nypost.com/2025/01/20/us-news/nj-gov-phil-murphy-makes-personal-appeal-to-trump-to-kill-congestion-pricing/.

[57] *Signed DOT Order re: Ensuring Reliance Upon Sound Economic Analysis in Department of Transportation Policies Programs and Activities*, U.S. DEP'T. TRANSP. (Jan. 29, 2025), https://www.transportation.gov/briefing-room/signed-dot-order-re-ensuring-reliance-upon-sound-economic-analysis-department

pedestrian and cyclist safety, and reduce gridlock to improve travel time reliability, thereby increasing transportation options for families with young children, while also reducing vehicular emissions and financing significant environmental mitigation measures to enhance their health.

106.    On January 30, 2025, the *New York Times* reported that officials at USDOT had been discussing "whether to withdraw a key federal authorization that the tolling plan received from the Biden administration last year."[58]  Though the Trump Administration has no authority to unilaterally stop the Program, given President Trump's statements during the presidential campaign and after the election, as well as other apparently lawless actions taken in the first two weeks of the second Trump Administration,[59] it is unsurprising that the Administration has pressed forward to try to find a way to "terminate" the Program—notwithstanding FHWA's prior approval, and notwithstanding even USDOT's more recent express prioritization of user-pay programs like this one.

107.    On February 19, 2025, DOT followed through with the President's promise to attempt to "terminate" congestion pricing by purporting to terminate approval for the VPPP.  In the announcement of its action, DOT cited "two reasons" for termination: (1) that "the scope of the CBDTP is unprecedented and provides no toll-free option for many drivers" and (2) that "the toll rate was set primarily to raise revenue for transit, rather than at an amount needed to reduce

---

[58] Benjamin Oreskes, Ana Ley, *et al.*, *Trump Administration Considers Halting Congestion Pricing*, N.Y. TIMES (Jan. 30, 2025), https://www.nytimes.com/2025/01/30/nyregion/nyc-trump-congestion-pricing.html.

[59] *See, e.g.*, *Washington v. Trump*, Case No. 2:25-cv-00127-JCC (W.D. Wash. Jan. 23, 2025) (ECF 43) (granting temporary restraining order against Trump Administration's attempt to redefine the Fourteenth Amendment's citizenship guarantee); *Casa Inc. v. Trump*, Case No. 8:25-cv-00201-DLB (D. Md. Feb. 5, 2025) (ECF 65) (granting preliminary injunction against Trump Administration's attempt to redefine the Fourteenth Amendment's citizenship guarantee); *New York v. Trump*, Case No. 1:25-cv-00039 (D.R.I. Jan. 29, 2025) (Minute Entry) (granting temporary restraining order against Trump Administration's attempts to impose broad "freeze" of federal funding); *Nat'l Council of Nonprofits v. Off. Mgmt. Budget*, Case No. 1:25-00239-LLA (D.D.C. Feb. 3, 2025) (ECF 30) (same); *Massachusetts v. Nat'l Insts. Health*, Case No. 1:25-cv-10338-AK (D. Mass. Feb. 10, 2025) (ECF 25) (granting temporary restraining order against Trump Administration's attempt to broadly cut research funding from the National Institutes of Health).

congestion," and so "runs contrary to the purpose of the VPPP, which is to impose tolls for congestion reduction – not transit revenue generation."

108.    This is the definition of arbitrary and capricious—not to mention hypocrisy. DOT did not cite any basis in the statute authorizing it to reverse the approval it had provided just three months earlier, following a four-year intensive review process, let alone explain how the fact that the Program obviously imposes a toll (as DOT admits is authorized under the VPPP) or is aimed at congestion reduction by way of reducing vehicular congestion and promoting mass transportation—facts DOT has known all along—render the Program impermissible.

## H.    The MTA, TBTA, and the Region's Economy and Public Transit System Will be Irreparably Harmed if Plaintiffs are Forced to End the Program

109.    TBTA budgeted over $500 million to establish the Program, and much of the budget was expended in advance of implementation. These expenditures included developing the methodological approach; conducting the assessment and extensive outreach and developing the final documentation for the environmental review process under NEPA; design, development, implementation and testing of the roadway infrastructure and system; design, development, implementation and testing of the Back Office System; additional extensive outreach for the State administrative review process; staff costs, including new staff for the Program; and consulting costs.

110.    If TBTA is unlawfully prevented from proceeding with the Program, it will incur roughly $12 million in additional expenditures per month, most of which would be related to a combination of the operations and maintenance of the roadside tolling system, the operations of the back-office system and Customer Contact Center, and consultant costs. This figure does not include the costs related to additional staff that were brought on specifically for the Program nor other costs, such as those related to outreach and advertising and assessments to be undertaken for

the Program. These costs cannot be deferred pending litigation over the legality of the Challenged Action.

111.    Any pause in the Program would also cause TBTA to lose estimated monthly revenues in the first phase of the Program of over $40 million, based on projected net annual revenues of roughly $500 million during that period.

112.    Furthermore, a pause in the Program would result in increased traffic and congestion, which will lengthen travel times for bus operations and reduce transit ridership.

113.    Stopping the Program would also prevent MTA, the end recipient of Program revenues, from proceeding with vitally important work under the Capital Program, which is intended to ensure that improvements put in place will be sustainable for years to come. The Capital Program identifies $52 billion of critical investments in the region's subways, buses, and commuter railroads, nearly one-third of which would be supported by the Program.

114.    New York's economy, and therefore the nation's economy, depends on keeping New York moving. In practical terms, that means funding the Capital Program, which is much needed and cannot be further delayed. As Janno Lieber, the MTA CEO, explained: "Concrete and steel, you poke holes in it, subject it to water and chemicals and salt for 100 years, it's going to give out." The reason the State's elected representatives chose Congestion Pricing was, again, because it is simply the best solution to promote transportation in the nation (and North America's) largest transportation system.

115.    Critical parts of the Capital Program would be delayed if Program tolling revenues are halted. The Capital Program includes: (1) adding accessibility improvements (including elevators) to numerous subway stations consistent with the Americans with Disabilities Act, by making at least 70 more subway systems accessible through building new elevators at 70 stations

in all of the boroughs and replacing up to 65 escalators and 78 elevators, and finally bring the transportation system to greater than 50% accessibility; (2) improving outdated signaling, by doubling the track lines with modernized signals; (3) purchasing over 1,900 new rail cars, which are six times more reliable than older ones, and replacing 2,400 buses; (4) replacing approximately 60 miles of track; and (5) renewing stations and addressing critical repair projects at 175 stations.

116.    The Capital Program will also provide much-needed repairs to Grand Central Terminal, a more than 100-year-old structure that is used by more than 700 trains a day.  And coupled with funding from the 2015-2019 program, the Capital Program further provides funding for three new fully accessible stations on the Second Avenue Subway that would allow connection to the Metro-North lines, strengthening connections for Harlem and East Harlem residents.

117.    New Yorkers, through the Capital Program, will also receive better access to Penn Station through a new route with four new stations on the Metro-North New Haven Line that will carry up to 50,000 Metro-North customers directly to Penn Station every day.

118.    TBTA has incurred debt that it will rely on Program revenues to repay.  This includes $378.8 million in short-term notes that were previously issued and currently outstanding to fund infrastructure costs and $500 million in short-term notes to fund a portion of the $15 billion of capital projects in the MTA's Capital Program.

119.    Finally, ending the Program means the unabated continuation of the severe congestion in the CBD, with its concomitant economic, environmental, and public health and safety costs to businesses, residents, commuters, workers, and visitors in this area, without any evaluation of these and other environmental impacts, opportunity for public participation, or consideration of alternatives required by NEPA.

120.    Plaintiffs will continue to operate the Program as required by New York law until and unless Plaintiffs are directed to stop by a court order.

121.    Based on the foregoing, there is an actual controversy within the jurisdiction of this Court under 28 U.S.C. §§ 2201 and 2202.

**CAUSES OF ACTION**

**COUNT I**
**Termination of the VPPP Agreement**
**Violation of the Administrative Procedure Act**
**(Substantively Arbitrary & Capricious – Contrary to Law)**
(5 U.S.C. § 701 *et seq.*)

122.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

123.    The acts of all executive branch officers "must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902).

124.    Further, under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be … contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(B)-(C).

125.    Defendants are not authorized by any law—statutory or constitutional—to unilaterally terminate the VPPP Agreement contrary to its terms.  The VPPP Agreement is a valid agreement, currently in effect, supported by consideration, and subject to considerable reliance interests.  Neither ISTEA nor the VPPP Agreement authorizes FHWA to unilaterally rescind the VPPP Agreement or to rescind FHWA's approval of the Program.

126.    ISTEA does not include any provision authorizing FHWA to terminate the VPPP Agreement.  ISTEA authorizes the Secretary to "enter into" agreements "to establish, maintain, and monitor" value pricing pilot programs. ISTEA § 1012(b).  ISTEA further directs that the Secretary shall "monitor the effect of such programs for a period of at least 10 years."

127.    The VPPP Agreement does not include any provision authorizing FHWA to terminate the agreement.  Rather, the VPPP Agreement contemplates that only TBTA could unilaterally decide to discontinue the Program, requiring the Project Sponsors to "work with FHWA to return the Project to its original operating condition if TBTA decides to discontinue tolls on the Project."  VPPP Agmt. cl. 11.  The VPPP Agreement further provides that TBTA and NYCDOT shall "monitor and report on the project performance" for "a period of at least ten years or to the end of the life of the Project, whichever is sooner."  *Id.* cl. (8)(b).

128.    The VPPP Agreement references FHWA regulations at 23 C.F.R. Part 940 and 950. These regulations do not purport to grant FHWA authority to unilaterally terminate the VPPP Agreement, and the FHWA has acted *ultra vires*.

129.    In addition, an executive officer acts *ultra vires* where it "deprives a contractor of a right expressly or impliedly granted by another statute."  *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996).

130.    Defendants have deprived Plaintiffs of rights expressly and impliedly granted by ISTEA § 1012(b), which permits tolling of federally funded highways following approval of a VPPP Project.

131.    Defendants have no authority to terminate the VPPP Agreement or rescind TBTA's authority to operate the Program.  Therefore, Defendants have acted contrary to law and the Challenged Action is arbitrary and capricious and must be declared unlawful, vacated, and set aside.

## COUNT II
### *Ultra Vires*
### Termination of the VPPP Agreement

132.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

133.    The acts of all executive branch officers "must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902).

134.    ISTEA does not authorize Defendants to unilaterally rescind a cooperative agreement entered into to authorize tolling under the VPPP, nor does the VPPP Agreement itself empower Defendants to terminate the agreement or rescind FHWA's approval of the Program.

135.    The Challenged Action is *ultra vires* because it purports to unilaterally terminate the VPPP Agreement and rescind TBTA's authority to implement tolls under the VPPP for the Program without statutory authority and contrary to the applicable agency regulations and the terms of the VPPP Agreement.

136.    The Challenged Action is *ultra vires* because rescission of the VPPP Agreement is not authorized under any provision of law.

137.    The Challenged Action is *ultra vires* because the VPPP Agreement is a valid and binding agreement and the VPPP Agreement does not permit unilateral rescission by FHWA or any other governmental actor.

138.    In addition, an executive officer also acts *ultra vires* where it "deprives a contractor of a right expressly or impliedly granted by another statute." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996).

139.    Defendants have deprived Plaintiffs of rights expressly and impliedly granted by ISTEA §1012(b), and thus acted *ultra vires*.

**COUNT III**
**Termination of the VPPP Agreement**
**Violation of the Administrative Procedure Act**
**<u>(Procedurally Arbitrary & Capricious – Contrary to Regulations)</u>**
(5 U.S.C. § 701 *et seq.*)

140.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

141.    The VPPP Agreement is a cooperative agreement because "the principal purpose of the relationship is to transfer a thing of value" (authority to collect toll revenues) and "substantial [federal] involvement is expected."  31 U.S.C. § 6305; 2 C.F.R. 200.1; *see also* 23 U.S.C. § 149 note (Value Pricing Pilot Program), cl. 1 (authorizing Secretary to enter into "cooperative agreements" under the VPPP).  FHWA has determined that agreements authorizing projects that require tolling authority under the VPPP are cooperative agreements, even where such agreements do not include a federal funding component.  *See Congestion Pricing, Value Pricing Pilot Program*, FHWA (May 17, 2024), https://ops.fhwa.dot.gov/congestionpricing/value_pricing ("The Moving Ahead for Progress in the 21st Century (MAP-21) Act did not authorize additional funds after FY2012 for the discretionary grant component of the Value Pricing Pilot Program (VPPP). However, FHWA's ability to enter into cooperative agreements for projects that require tolling authority under this program for their implementation will continue.") (last accessed Feb. 12, 2025).

142.    FHWA has adopted the Office of Management and Budget's agency-wide *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* ("Uniform Guidance"), 2 C.F.R. Part 200.  *See id.* § 1201.1.

143.    The Uniform Guidance sets out specific conditions under which an award, including a cooperative agreement, *see id.* § 200.1, may be terminated:

    a.  by the agency if the recipient "fails to comply with the terms and conditions" of the award;

    b.  by the agency with the "consent" of the recipient;

    c.  by the recipient; and

    d.  by the agency "pursuant to the terms and conditions" of the award.

*Id.* § 200.340(a).

144.    None of the conditions in which termination is permitted under the Uniform Guidance are present here.  First, Defendant Duffy did not and cannot claim that the recipients have failed to comply with the terms of the conditions of the VPPP Agreement, and the recipients have in fact complied with the terms of the VPPP Agreement; second, the recipients did not and do not consent to termination of the VPPP Agreement; third, the recipients have not requested termination of the VPPP Agreement; and, fourth, the VPPP Agreement does not contain any provisions that would permit Defendants to terminate the agreement unilaterally.  Additionally, to the extent the VPPP Agreement contemplates termination by any party, it reflects that TBTA would be the one party which could "discontinue tolls on the Project."  VPPP Agmt., cl. 11.

145.    The Uniform Guidance describes specific steps that an agency must take before it may terminate an award for noncompliance, including providing written notice and an opportunity to be heard.  2 C.F.R. § 200.341(a), 342; *see also* U.S. Dep't of Transp., *Guide to Financial Assistance* at 72-77 (Oct. 2019) (further describing requirements for pre-termination notice and appeals).  FHWA did not provide the recipients with notice of its intent to terminate the VPPP Agreement and also has not provided notice to the recipients of any alleged noncompliance with the VPPP Agreement.  The recipients have not been provided with an opportunity to be heard or to appeal the termination.

146.    The Administration's action in terminating tolling authority under the VPPP Agreement contrary to the terms of the VPPP Agreement and to the applicable regulations governing the administration of the VPPP Agreement was arbitrary, capricious, and not in accordance with law, and without observance of procedure required by law, within the meaning of the APA, 5 U.S.C. § 706(2), and should be held unlawful and set aside by the Court.

**COUNT IV**
**Termination of the VPPP Agreement**
**<u>Violation of the Due Process Clause of the Fifth Amendment</u>**
(U.S. Const. amend. V, cl. 3)

147.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

148.    The Due Process Clause of the Fifth Amendment provides that "No person shall … be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V, cl. 3.

149.    Upon the execution of the VPPP Agreement, Plaintiffs had a property interest in the VPPP Agreement and in the authority granted by the VPPP Agreement to implement tolls within the CBD for the Program.

150.    An agency's withdrawal of consent for public or private entities to engage in a contract implicates a property interest protected by the Due Process Clause. *See, e.g.*, *Toxco Inc. v. Chu*, 724 F. Supp. 2d 16, 27-28 (D.D.C. 2010). Defendants' unilateral termination of the VPPP Agreement deprives Plaintiffs of a property interest contrary to law.

151.    Further, the Plaintiffs' property interest in the Program and its infrastructure "attain ... constitutional status by virtue of the fact that they have been initially recognized and protected by state law," here, the TMA. *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014) (*quoting Paul v. Davis*, 424 U.S. 693, 710, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)).

152.    Unilateral termination of the VPPP Agreement does not afford Plaintiffs the process they are entitled to under the VPPP Agreement, the relevant regulations, and the United States Constitution.  Prior to terminating the VPPP Agreement, Defendants did not provide Plaintiffs with notice and failed to give Plaintiffs an opportunity to respond or be heard.

153.    In addition, the VPPP Agreement constitutes an agreement which cannot be invalidated without due process in accordance with its terms.

154.    Defendants' actions violate the Due Process Clause of Fifth Amendment by depriving Plaintiffs without due process of their property interest in the VPPP Agreement and the authority granted by the VPPP Agreement to implement tolls within the CBD for the Program.

**COUNT V**
**Termination of the VPPP Agreement**
**Violation of the Administrative Procedure Act**
**<u>(Substantively Arbitrary & Capricious – Insufficient Explanation)</u>**
(5 U.S.C. § 701 *et seq.*)

155.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

156.    At the time of Defendants' purported termination of the VPPP Agreement, FHWA had issued the Final EA, FONSI, Reevaluation 1, and Reevaluation 2, and had executed the VPPP Agreement authorizing tolling under the Program.

157.    FHWA's execution of the VPPP Agreement constituted final agency action with respect to FHWA's decision to authorize tolling under the Program.

158.    Under the APA, an agency "changing its course" by rescinding a prior rule or order "is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983).

159.    Defendants did not adequately explain their reasoning for purportedly rescinding the VPPP Agreement, in violation of the APA.  *See Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 106 (2015) ("[T]he APA requires an agency to provide more substantial justification when its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account.")

160.    Defendants did not adequately examine or rely on relevant data in deciding to terminate the VPPP Agreement, in violation of the APA.  *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 30 (an agency "must examine the relevant data and articulate a satisfactory explanation for its action.")

161.    Defendants failed to consider the impact on the economy, the environment, and congestion in the CBD in acting to terminate the tolling authority for the Program.  The Program will provide substantial benefits to the CBD and the region in terms of reduced traffic and congestion, improved air quality, and concomitant environmental, public health, and economic benefits resulting from shifting traffic patterns that occurred following the implementation of the Program.

162.    Defendants were obligated to consider the costs of ending the VPPP Agreement for transit riders, people residing, working, learning and recreating in and around the CBD, and TBTA and MTA.  Defendants  transparently failed to do so, having made their decision without seeking input from Plaintiffs and without inquiring about the costs from congestion, pollution, and cessation of a program the TBTA has invested hundreds of millions to bring online.

163.    Defendants also failed to adequately consider whether "there was 'legitimate reliance' on the" prior administration's method of using the VPPP Agreement as an indispensable tool in efforts to address congestion, reduce pollution, and raise revenues to support public transit.

*Dep't of Homeland Sec. v. Regents of the Univ. of Ca.*, 140 S. Ct. 1891, 1913 (2020) (quoting *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996). The MTA, TBTA, and now holders of debt issued in reliance on Program revenues, have all relied on the executed VPPP Agreement. The Challenged Action was arbitrary and capricious; where, as here, "an agency changes course ... it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Id.* (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)).

164.    In addition, Defendants failed to consider alternative approaches that would allow at least some of the Program to continue, or another means to raise revenues, and that would have accordingly imposed less-significant burdens on Plaintiffs. The Supreme Court has held an agency action is arbitrary and capricious because it was issued "'without any consideration whatsoever' of a [more limited] policy." *Regents of the Univ. of Cal.,* 140 S. Ct. at 1912 (quoting *State Farm,* 463 U.S. at 51).

165.    By omitting any analysis of continuing at least some elements of the Program, the Challenged Action "failed to consider important aspects of the problem" before it. *Id.* at 1910.

166.    The Challenged Action, likewise, fails to meaningfully consider more limited policies than complete termination of VPPP Agreement.

167.    Instead, Defendants acted entirely based on political considerations. Defendants had made no indication that it was reconsidering the Program until President Trump took office last month. But President Trump has long indicated his desire to "kill" or terminate the Program, both in conversations with Republican lawmakers and in social media posts. Defendants, bending under this political pressure, did not undertake any analysis or provide any explanation before revoking its prior decision to enter into the VPPP Agreement and approve the Program.

168.    Defendants' action purporting to revoke tolling authority under the VPPP Agreement without providing sufficient explanation of its decision was therefore arbitrary, capricious, and not in accordance with law, and without observance of procedure required by law, within the meaning of the APA, 5 U.S.C. § 706(2), and should be held unlawful and set aside by the Court.

**COUNT VI**
**Termination of the VPPP Agreement**
**Violation of the National Environmental Policy Act and the Administrative Procedure Act**
(42 U.S.C. § 4321 *et seq.*; 5 U.S.C. §§ 701–706)

169.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

170.    At the time of Defendants' purported termination of the VPPP Agreement, Defendants had issued the Final EA, FONSI, Reevaluation 1, and Reevaluation 2, and had executed the VPPP Agreement authorizing tolling under the Program.

171.    At the time of Defendants' purported termination of the VPPP Agreement, the NEPA process for the Program was complete, and there was no "major federal action" remaining to occur with respect to the Program.

172.    Defendants' purported termination of the VPPP Agreement constitutes a new final agency action under NEPA and the APA and a major federal action within the meaning of NEPA, 42 U.S.C. §§ 4332(C), 4336e(10).

173.    NEPA requires Defendants to prepare an EIS for any "major federal action[] significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).

174.    To determine whether a "major federal action" will have a significant effect on "the quality of the human environment," Defendants may prepare an EA.  42 U.S.C. § 4336(b)(2); 40 C.F.R. § 1501.5; 23 C.F.R. § 771.119.

175.    If an agency determines that the proposed action will not have significant effects, accounting for mitigation, it can issue a FONSI. 42 U.S.C. § 4336(b)(2); 40 C.F.R. § 1501.6; 23 C.F.R. § 771.121.  If the EA reveals that there may be significant effects, an EIS is required.

176.    Either level of review requires public participation opportunities and consideration of alternatives to the proposed action.  *E.g.*, 42 U.S.C. § 4332(C)(iii), (F) and (H); 40 C.F.R. §§ 1501.5(c), (f), 1502.14s; 23 C.F.R. 771.119(b).

177.    Defendants failed to undertake *any* NEPA review of their decision to terminate the VPPP Agreement, much less an adequate environmental review that considered all environmental impacts of the proposed action.

178.    Defendants did not undertake any public participation with respect to their decision to terminate the VPPP Agreement, in contrast to the substantial public participation opportunities afforded prior to the adoption of the Final EA (including 44-day public comment period) and FONSI (including a 30-day public availability period).

179.    Under NEPA and its implementing regulations, Defendants are required to take a hard look at the reasonably foreseeable social, economic, and environmental impacts of a proposed action and its alternatives.  42 U.S.C. § 4336; 23 C.F.R. § 771.119(b).

180.    Defendants failed to consider the full extent of the reasonably foreseeable impacts of seeking to terminate the Program, which will provide substantial benefits to the CBD and the region in terms of reduced traffic and congestion, improved air quality, and concomitant environmental, public health, and economic benefits resulting from shifting traffic patterns that occurred following the implementation of the Program.

181.    Defendants failed to consider alternatives to terminating the program. 42 U.S.C. § 4332(C)(iii), (F) and (H); 40 C.F.R. §§ 1501.5(c), 1502.14s; 23 C.F.R. § 771.119(b).

182.    Defendants failed to consider mitigation measures that "avoid, minimize, or compensate for adverse effects caused by a proposed action or alternatives," 40 C.F.R. § 1508.1(y), or to identify measures which might mitigate adverse environmental impacts, and incorporate measures necessary to mitigate adverse impacts into its action terminating the VPPP Agreement. 23 C.F.R. §§ 771.105(e), 771.119(b).

183.    Defendants' action in revoking tolling authority under the VPPP Agreement without conducting the required NEPA review was therefore arbitrary, capricious, and not in accordance with law, and without observance of procedure required by law, within the meaning of the APA, 5 U.S.C. § 706(2), and should be held unlawful and set aside by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

   i.    Declare that Defendants' purported termination of the VPPP Agreement was undertaken in violation of the terms of the VPPP Agreement and is in excess of statutory authority and *ultra vires*; in violation of Plaintiffs' Fifth Amendment right to Due Process; without observance of procedure required by law in violation of the APA; arbitrary and capricious in violation of the APA; and violates NEPA;

   ii.    Vacate the Challenged Action and Defendants' decision to purportedly terminate the VPPP Agreement;

   iii.    Grant any further necessary and proper relief pursuant to 28 U.S.C. § 2202;

   iv.    Award Plaintiffs their costs for the action, including reasonable attorneys' fees; and

   v.    Grant all such other and further relief as it deems just and proper.

Dated: February 19, 2025                Respectfully submitted,
       New York, New York

Roberta A. Kaplan
D. Brandon Trice
Maximilian T. Crema
KAPLAN MARTIN LLP
1133 Avenue of the Americas | Suite 1500
New York, NY 10036
Tel.: (212) 316-9500
rkaplan@kaplanmartin.com
btrice@kaplanmartin.com
mcrema@kaplanmartin.com


Mark A. Chertok
Elizabeth Knauer
John F. Nelson
SIVE, PAGET & RIESEL, P.C.
560 Lexington Avenue, 15th Floor
New York, NY 10022
Tel.: (212) 421-2150
mchertok@sprlaw.com
eknauer@sprlaw.com
jnelson@sprlaw.com


*Attorneys for Plaintiffs Metropolitan Transportation Authority and Triborough Bridge and Tunnel Authority*