UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

METROPOLITAN TRANSPORTATION
AUTHORITY and TRIBOROUGH BRIDGE
AND TUNNEL AUTHORITY,

*Plaintiffs*,

THE NEW YORK STATE DEPARTMENT OF
TRANSPORTATION,

*Intervenor-Plaintiff,*

v.

SEAN DUFFY, in his official capacity as
Secretary of the United States Department of
Transportation, GLORIA M. SHEPHERD, in
her official capacity as Executive Director of the
Federal Highway Administration, UNITED
STATES DEPARTMENT OF
TRANSPORTATION, and FEDERAL
HIGHWAY ADMINISTRATION,

*Defendants.*

No.  1:25-cv-01413-LJL

**COMPLAINT-IN-INTERVENTION**

---

Intervenor-Plaintiff the New York State Department of Transportation ("State DOT") brings this complaint against defendants Sean Duffy, in his official capacity as Secretary of the United States Department of Transportation, Gloria M. Shepherd, in her official capacity as Executive Director of the Federal Highway Administration, the United States Department of Transportation ("USDOT"), and the Federal Highway Administration ("FHWA"), and allege as follows on information and belief:

## INTRODUCTION

1.      On January 5, 2025, plaintiff Triborough Bridge and Tunnel Authority ("Triborough") began collecting tolls from motor vehicles entering Manhattan's "central business district," pursuant to New York's Traffic Mobility Act, N.Y. Vehicle & Traffic L. §§ 1704-a, 1705, and the federal Value Pricing Pilot Program ("VPPP") established by the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA"), Pub. L. 102-240, § 1012(b) (December 18, 1991), 23 U.S.C. § 149 note.

2.      On February 19, defendant Secretary Sean Duffy notified Kathy Hochul, Governor of New York State, that he was rescinding defendant FHWA's approval of congestion pricing in the central business district and unilaterally terminating the cooperative agreement that FHWA had signed under the VPPP ("cooperative agreement").  *See* Exhibit 1 (Letter from Secretary Sean Duffy to Governor Kathy Hochul (Feb. 19, 2025)); Exhibit 2 (Agreement among FHWA, State DOT, Triborough and New York City Department of Transportation (Nov. 21, 2024)).  Although the Secretary stated that he was terminating the agreement because FHWA had lacked authority to enter into it under ISTEA, the Secretary also indicated that the termination was motivated by the President's opposition to congestion pricing as well as the Secretary's own policy disagreement with New York State. The Secretary stated that, in his view, congestion pricing in Manhattan was not a "fair deal." Exhibit 1 at 2.

3.      On February 20, the President of the United States announced, "CONGESTION PRICING IS DEAD.  Manhattan, and all of New York, is SAVED. LONG LIVE THE KING."

4.      Also on February 20, 2025, defendant Executive Director Shepherd notified State DOT, the New York City Department of Transportation ("NYCDOT"), and Triborough that, pursuant to Secretary Duffy's February 19 letter, "[State DOT] and its project sponsors must cease the collection of tolls on Federal-aid highways in the [central business district] by March 21, 2025."  *See* Exhibit 3 (Letter from Executive Director Gloria Shepherd to Commissioner Marie Therese Dominguez and others (Feb. 20, 2025)).  The Project Sponsors are State DOT, NYCDOT, and Triborough.

5.      The President is not a king.  Instead, he is subject to the rule of law and when he or his subordinate acts without authority, as Secretary Duffy did when he purported to terminate federal approval of the congestion pricing program, that action is invalid.

6.      The Secretary asserted that the congestion pricing program was "not an eligible [VPPP]" for two reasons: (1) the congestion pricing program creates "cordon pricing," meaning that there is not a toll-free means to enter the central business district; and (2) the toll rate was calculated "primarily" to raise revenue for Metropolitan Transit Authority ("MTA") capital projects, as opposed to reducing congestion or meeting other road-related goals, which, according to the Secretary, are the only authorized purposes of congestion pricing tolls.  Exhibit 1 at 2.

3

7. Defendants' purported termination of the cooperative agreement was arbitrary and capricious, not in accordance with law, in excess of statutory authority, and without observance of procedure required by law under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), (C) & (D), as well as *ultra vires*.

8. The termination by defendants was not in accordance with law for several reasons. First, defendants lacked authority to unilaterally terminate the cooperative agreement. The rescission was also in excess of statutory authority and *ultra vires* for the same reason.

9. Second, even if defendants acted with lawful authority, the termination was not in accordance with law and was also without observance of procedure required by law because defendants were required to give State DOT, NYCDOT, and Triborough an opportunity to be heard before the agreement was rescinded, which they did not do.

10. Third, the termination was arbitrary and capricious and not in accordance with law because Secretary Duffy's proffered rationales for the reversal of FHWA's prior determination that the congestion pricing program is eligible for the VPPP are erroneous.

11. Secretary Duffy stated that the VPPP does not allow cordon pricing but nothing in the VPPP supports that interpretation, and FHWA has determined in the past that congestion pricing includes cordon pricing, which it also called "area pricing." Secretary Duffy states that cordon pricing has only been used on interstate

highways where drivers have alternative non-toll routes, but according to FHWA, tolls on highways are not cordon or area pricing.

12.    Secretary Duffy also stated that congestion pricing was "primarily driven by the need to raise revenue for the [MTA]," which he asserts is forbidden by the VPPP.  Exhibit 1 at 2.  Congestion pricing for entry into the central business district of Manhattan was designed both to reduce congestion and to raise revenue for the MTA.  In any event and contrary to the Secretary's claim, the VPPP permits states and local government authorities to include revenue objectives when setting toll rates, as evidenced by the language of the statute, ISTEA § 1012(b)(3), which provides that toll revenues may be used to fund other transportation infrastructure projects.

13.    Fourth, the termination was not in accordance with law because defendants did not review the potential environmental impacts of their decision to terminate, as required by the National Environmental Policy Act, 42 U.S.C. §§ 4332(C), 4336(b)(2).

14.    For these reasons and pursuant to 5 U.S.C. § 706(2), the Court should (a) declare that the termination of the cooperative agreement was not in accordance with law, arbitrary and capricious, in excess of statutory authority, without observance of procedure required by law, and *ultra vires*; and  (b) hold unlawful and set aside the purported termination of the cooperative agreement and the directive that State DOT, NYCDOT, and Triborough cease the collection of tolls by March 21, 2025.

## PARTIES

15.    Intervenor plaintiff State DOT is a New York State agency.

16.    Defendant Duffy is the Secretary of USDOT.  He is sued in his official capacity.

17.    Defendant Shepherd is the Executive Director of FHWA.  She is sued in her official capacity.

18.    Defendant USDOT is a cabinet department of the federal government, with offices in Washington, D.C.

19.    Defendant FHWA is an agency within USDOT, with offices in Washington, D.C.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction over this action pursuant to 23 U.S.C. § 1331 because this case presents a federal question under the laws of the United States, including the APA, 5 U.S.C. § 551 *et seq.*

21.    Venue is proper in this district under 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## STATUTORY BACKGROUND

### New York's Traffic Mobility Act

22.    Traffic congestion has long plagued the New York metropolitan area. For decades, congestion has stymied economic growth and harmed the environment and public health and safety, not to mention the quality of life in the region.

6

23.    Congestion on New York City roads, and in the central business district of Manhattan in particular, has a serious negative impact on public health.  As the U.S. Environmental Protection Agency has recognized, higher vehicle traffic leads to higher vehicle emissions, which are associated with negative health impacts like "asthma onset and aggravation, cardiovascular disease, reduced lung function, impaired lung development in children, pre-term and low-birthweight infants, childhood leukemia, and premature death."[1]  FHWA has consistently acknowledged that "less vehicle traffic can improve air quality and reduce chronic lower respiratory diseases."[2]

24.    Congestion also increases travel times, eroding worker productivity, reducing bus and paratransit service, raising the cost of deliveries, and impeding the movement of emergency vehicles.  A 2018 study estimated that "traffic congestion [would] be a $100 billion drag" on the metropolitan-area economy over the next five years and identified Manhattan below 60th street—where a quarter of the region's economic activity is concentrated—as the primary source of traffic congestion.[3]

25.    In 2019, the New York State Legislature enacted the Traffic Mobility Act, which authorized and directed Triborough to implement a congestion tolling program in the central business district.  N.Y. Veh. & Traf. Law § 1701 *et seq.*

---

[1] U.S. ENVIRONMENTAL PROTECTION AGENCY, NEAR ROADWAY AIR POLLUTION AND HEALTH: FREQUENTLY ASKED QUESTIONS at 2 (Aug. 2014), https://nepis.epa.gov/Exe/ZyPDF.cgi/P100NFFD.PDF?Dockey=P100NFFD.PDF.

[2] Jhoset Burgos-Rodriguez, et al., *Making Healthy Connections in Transportation*, 87 PUBLIC ROADS 28, 28 (Summer 2023), https://highways.dot.gov/sites/fhwa.dot.gov/files/Public%20Roads%20Summer%202023.pdf.

[3] The Partnership for New York City, *$100 Billion Cost of Traffic Congestion in Metro New York* (Jan. 2018), https://pfnyc.org/research/100-billion-cost-of-traffic-congestion-in-metro-new-york/.

26.    The Act's legislative findings declare that traffic in New York—which "ranks second worst among cities in the United States and third worst among cities in the world" and is estimated to cost the metropolitan economy more than "one hundred billion dollars over the next five years"—is "crippling" for "residents, commuters, taxi and for-hire vehicle traffic, bus transit and emergency services" and "a significant contributor to decreased air quality." *Id.* § 1701.

27.    The Legislature further found that the underfunding of New York City's subway infrastructure has "a significant deleterious impact on the health, safety, and livelihood of commuters, tourists, resident New Yorkers" as well as "the economy of the state of New York," such that "a long-term and sustainable solution is necessary in order to ensure stable and reliable funding" for this "important mass transit asset." *Id.*

28.    Consequently, the Legislature declared that to ensure the "public health and safety of New York's residents," the creation of a congestion pricing program in the Manhattan central business district was "a matter of substantial state concern." *Id.*

29.    The Act authorizes and directs Triborough to "establish the central business district tolling program," *id.* § 1704(1), grants Triborough the power "to establish and charge variable tolls and fees for vehicles entering or remaining in the [central business district],"[4] and authorizes Triborough "to make rules and

---

[4] As delineated by the Act, the central business district encompasses the geographic area of Manhattan south and inclusive of 60th Street, but not including the FDR Drive, the West Side Highway, the Battery Park Underpass, and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West Street. *Id.* § 1704(2).

regulations for the establishment and collection of central business district tolls, fees, and other charges," *id.* § 1704-a(1).

30.    The goals of the Act are to reduce traffic congestion and pollution in that district and raise funds for the capital needs of the MTA subway, bus and commuter rail operations.  *Id.* § 1701.

## The VPPP

31.    Tolls are generally prohibited on federal-aid highways, 23 U.S.C. § 301, subject to exceptions.

32.    A "federal-aid highway" is "a public highway eligible for assistance under [Title 23, Chapter 1] other than a highway functionally classified as a local road or rural minor collector."  23 U.S.C. § 101(a)(6).

33.    Congress enacted ISTEA, to foster "a National Intermodal Transportation System," consisting of "all forms of transportation in a unified, interconnected manner."  ISTEA § 2, 49 U.S.C. § 101 note.

34.    Among other things, ISTEA established two programs that authorized tolls on federal-aid highways.  First, it created the "Basic Program" that authorized tolls on highways, bridges, and tunnels pursuant to certain conditions. ISTEA § 1012(a), 23 U.S.C. § 129.

35.    ISTEA also created the "Congestion Pricing Pilot Program," later renamed the VPPP, which directed the Secretary of Transportation to "solicit the participation of State and local governments and public authorities for one or more

congestion pricing pilot projects." ISTEA § 1012(b), 23 U.S.C. § 149 note. *See also* Pub.

L. 105-178 § 1216 (June 9, 1998) (renaming the program to the VPPP).

36.     As FHWA describes it, the VPPP is "intended to demonstrate whether

and to what extent roadway congestion may be reduced through application of

congestion pricing strategies, and the magnitude of the impact of such strategies on

driver behavior, traffic volumes, transit ridership, air quality and availability of

funds for transportation programs."[5]

37.     FHWA has recognized that congestion pricing can reduce delays and

stress, allow for more deliveries per hour for businesses, improve transit speeds and

reliability of service, and save lives by shortening the incident response times for

ambulances and emergency personnel.[6]

38.     Also according to FHWA, congestion pricing "is a way of harnessing the

power of the market to reduce the waste associated with traffic congestion."[7]

Congestion pricing is effective because it shifts "some rush hour highway travel to

other transportation modes or to off-peak periods.  By removing even just a small

fraction of the vehicles from a congested roadway, pricing helps the system to flow

more efficiently."  *Id.*

---

[5] *Value Pricing Pilot Program*, U.S. FED. HIGHWAY ADMIN.,
https://ops.fhwa.dot.gov/congestionpricing/value_pricing/ (last accessed Mar. 17, 2025).

[6] *Benefits of Congestion Pricing*, U.S. FED. HIGHWAY ADMIN.,
https://ops.fhwa.dot.gov/congestionpricing/cp_benefits.htm (last accessed Mar. 17, 2025).

[7] *Welcome to the FHWA Congestion Pricing Web Site*, U.S. FED. HIGHWAY ADMIN.,
https://ops.fhwa.dot.gov/congestionpricing/index.htm   (last accessed Mar. 17, 2025); *Federal Tolling Programs*, U.S. FED. HIGHWAY ADMIN.,
https://www.fhwa.dot.gov/ipd/tolling_and_pricing/tolling_pricing/vppp.aspx (last accessed Jan. 18Mar. 17, 2025) ("Value pricing – sometimes called congestion pricing – works by charging drivers on congested roadways during peak periods.").

39.     FHWA has also recognized that congestion pricing includes cordon pricing.[8]   In contrast to charging tolls for using particular roads, bridges, tunnels, or ferries, "[z]one-based pricing, including cordon and area pricing, involves either variable or fixed charges to drive within or into a congested area within a city."[9]

40.     "Revenues generated by any pilot project under [the VPPP] must be applied to projects eligible under [Title 23]."  ISTEA § 1012(b)(3), 23 U.S.C. 149 note. Pursuant to 23 U.S.C. § 133(b)(1)(C), eligible projects include public transportation projects under 49 U.S.C. §§ 5307(a)(1) and 5337(b)(1). *See Owner Operator Indep. Drivers Ass'n, Inc. v. Penn. Tpk. Comm'n*, 934 F.3d 283, 292 (3d Cir. 2019) ("ISTEA authorizes states to construct, among other things, 'transit capital projects eligible for assistance under chapter 53 of title 49.'") (quoting 23 U.S.C. § 133(b)(1)(C)); *Chan v. U.S. Dep't of Transp.* No. 23-CV-10365 (LJL), 2024 WL 5199945, at *17 (S.D.N.Y. Dec. 23, 2024) ("[I]t is Congress' unmistakably clear intent that a public authority be permitted to collect funds that exceed a toll road's costs and spend those funds on non-toll road projects.") (citations omitted).

41.     The FHWA has explained that "[n]et revenues after payment of operating costs can be used to pay for expansion of roadway facilities, to support alternatives to driving alone such as public transit, to address impacts on low-income individuals by providing toll discounts or credits, or to reduce other taxes that

---

[8] *Report on the Value Pricing Pilot Program Through April 2018* at 3, 12, 13, 39 (undated), U.S. FED. HIGHWAY ADMIN., https://rosap.ntl.bts.gov/view/dot/51791/dot_51791_DS2.pdf; *Congestion Pricing: A Primer on Institutional Issues* at 3, 10, 17, 23, 24 (Apr. 2013), U.S. FED. HIGHWAY ADMIN., https://rosap.ntl.bts.gov/view/dot/26194/dot_26194_DS1.pdf .

[9] *Zone-Based Pricing*, U.S. FED. HIGHWAY ADMIN., https://ops.fhwa.dot.gov/congestionpricing/strategies/involving_tolls/zone_based.htm.

motorists pay for highways such as fuel taxes, vehicle registration fees, or sales taxes."[10]

42.     The VPPP provides "the Secretary shall allow the use of tolls on the Interstate System as part of any value pricing pilot program under this subsection." 23 U.S.C. § 149 note (VPPP § 4, as amended by the Transportation Equity Act for the 21st Century, Pub. L. 105-178, § 1216(a)(4) (June 9, 1998)).

43.     The VPPP does not set limits or restrictions on the types of congestion pricing projects eligible for the program, the amount of toll money a State can raise, or the factors a State can consider in calculating tolls, with the exception of a requirement that States consider, "if appropriate," the financial impacts of tolls on low-income drivers.  *Id.* (VPPP § 7, as amended by the Transportation Equity Act for the 21st Century, Pub. L. 105-178, § 1216(a)(6) (June 9, 1998)).

44.     To participate in the VPPP, states, local governments, and public authorities enter into "cooperative agreements" with the Secretary of Transportation. *Id.* (VPPP § 1, as amended by the Transportation Equity Act for the 21st Century, Pub. L. 105-178, § 1216(a)(2) (June 9, 1998)).

45.     The Secretary of Transportation has delegated the authority to administer the VPPP and to enter into cooperative agreements to the FHWA Administrator.  49 C.F.R. § 1.85(c)(22).

---

[10] What is Congestion Pricing?, U.S. FED. HIGHWAY ADMIN., https://ops.fhwa.dot.gov/congestionpricing/cp_what_is.htm.

46.    The VPPP does not grant the defendants unilateral authority to terminate a cooperative agreement.

**Termination of a Cooperative Agreement Under 2 C.F.R. Part 200**

47.    FHWA has determined that agreements authorizing projects that require tolling authority under the VPPP are cooperative agreements, even where such agreements do not include a federal funding component.[11]

48.    FHWA has adopted the Office of Management and Budget's agency-wide *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* ("Uniform Guidance"), 2 C.F.R. Part 200. *See id.* § 1201.1.

49.    The Uniform Guidance sets out specific conditions under which an award, including a cooperative agreement, may be terminated:

　　　　a.  by the agency if the recipient "fails to comply with the terms and conditions" of the award;

　　　　b.  by the agency with the "consent" of the recipient;

　　　　c.  by the recipient; and

　　　　d.  by the agency "pursuant to the terms and conditions" of the award.

*Id.* § 200.340(a).

---

[11] *Value Pricing Pilot Program*, U.S. FED. HIGHWAY ADMIN., ("The Moving Ahead for Progress in the 21st Century (MAP-21) Act did not authorize additional funds after FY2012 for the discretionary grant component of the [VPPP]. However, FHWA's ability to enter into cooperative agreements for projects that require tolling authority under this program for their implementation will continue."), https://ops.fhwa.dot.gov/congestionpricing/value_pricing (last accessed Mar. 17, 2025).

50.     The Uniform Guidance also provides that, before an agency may terminate an award, including a cooperative agreement, an agency must provide written notice and an opportunity to be heard.  *Id.* §§ 200.341(a), 342.

### The National Environmental Policy Act

51.     The National Environmental Policy Act requires that, before a federal agency takes a "major Federal action significantly affecting the quality of the human environment," the agency is required to prepare a report that discusses, among other things, the action's "reasonably foreseeable environmental effects."    42 U.S.C. § 4332(2)(C).

52.     A "major Federal action" is "an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility." *Id.* § 4336e(10).

53.     To determine whether a major federal action will significantly affect the quality of the environment, an agency may prepare an "environmental assessment" ("EA").  *See, e.g., id.* § 4336(b)(2); 23 C.F.R. § 771.119.

54.     Agencies are required to take a hard look at the reasonably foreseeable social, economic, and environmental impacts of a proposed action and its alternatives. *See, e.g.*, 42 U.S.C. § 4336; 23 C.F.R. § 771.119(b); *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).

55.     Agencies are required to consider alternatives to taking a proposed action.  *See, e.g.*, 42 U.S.C. § 4332(C)(iii), (F) and (H); 23 C.F.R. § 771.119(b).

56.    Agencies are required to identify measures which might mitigate adverse environmental impacts, and incorporate measures necessary to mitigate adverse impacts into its action.  *See*, *e.g.*, 23 C.F.R. §§ 771.105(e), 771.119(b).

57.    If an agency determines that the proposed action will not have significant effects, accounting for mitigation, it can issue a "Finding of No Significant Impact" ("FONSI"). 42 U.S.C. § 4336(b)(2); 23 C.F.R. § 771.121.  If the EA reveals that there may be significant effects, an environmental impact statement ("EIS") is required.  42 U.S.C. § 4336(b)(1); 23 C.F.R. § 771.119(i).

## The Administrative Procedure Act

58.    The Administrative Procedure Act provides that a court shall "hold unlawful and set aside agency actions, findings, and conclusions found to be," among other things "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C) & (D).

## FACTUAL ALLEGATIONS

### The Initial Environmental Analysis, Toll Schedule, and Pause

59.    In 2019, the Project Sponsors submitted an expression of interest to FHWA seeking authorization to implement the congestion pricing program in the Manhattan central business district.  *See* Exhibit 4 (Expression of Interest (June 17, 2019)).  FHWA responded that the VPPP "appear[ed] to be the best potential fit" among the various federal programs that allowed tolling on Federal-aid highways.

15

*See* Exhibit 5 (Letter from Administrator Nicole Nason to Executive Deputy Commissioner Ron Epstein at 1 (Oct. 24, 2019).

60.    A years-long environmental review process under NEPA ensued.  In assessing the congestion pricing program, FHWA specifically considered the congestion pricing program's purpose "to reduce traffic congestion in the [central business district] in a manner that will generate revenue for future transportation improvements," and its specific objectives of: (1) reducing daily vehicle miles traveled within the district by at least five percent; (2) reducing the number of vehicles entering the district daily by at least ten percent; and (3) creating a funding source for capital improvements and generating sufficient annual net revenues to fund $15 billion for capital projects.[12]

61.    On March 30, 2021, while working with the Project Sponsors, then-Acting FHWA Administrator Stephanie Pollack commended the congestion pricing program, saying "[t]he FHWA looks forward to assisting New York so we can arrive at a prompt and informed NEPA determination on this important and precedent-setting project."[13]

62.    The Final EA ruled out alternatives that did not meet the Project's purpose and objectives,[14] and predicted that the congestion pricing program would

---

[12] *See* FHWA et al., *Central Business District Tolling Program, Finding of No Significance, Appendix A: Final Environmental Assessment* at ES-7, MTA.INFO (June 14, 2024), https://new.mta.info/project/CBDTP/environmental-assessment.

[13] *FHWA Greenlights Environmental Assessment for New York City's Proposed Congestion Pricing Plan*, U.S. FED. HIGHWAY ADMIN. (Mar. 30, 2021), https://highways.dot.gov/newsroom/fhwa-greenlights-environmental-assessment-new-york-citys-proposed-congestion-pricing-plan.

[14] Final EA, Table ES-1 at ES-9.

16

meet each of the objectives described in Paragraph 60 above.[15] Those predictions were based on detailed modeling using the federally approved Best Practices Model maintained by the New York Metropolitan Transportation Council.

63.    In May 2023, FHWA approved the Final EA.

64.    On June 22, 2023, FHWA issued a "Finding of No Significant Impact" determining that the congestion pricing program, including mitigation, would not have a significant adverse impact on the environment and would not have a disproportionately high and adverse impact on environmental justice communities or populations.

65.    On March 27, 2024, the Triborough Board approved a toll schedule through a formal ratemaking process under New York State law.

66.    On June 5, 2024, New York Governor Kathy Hochul announced a temporary pause of the congestion pricing program.

67.    On June 14, 2024, FHWA concluded that the approved toll schedule and associated impacts were analyzed and mitigated appropriately under NEPA, that no additional environmental analysis was warranted, and that the conclusions in the Final EA and FONSI remained valid.

68.    On November 14, 2024, Governor Hochul proposed that the congestion pricing program move forward with the toll schedule adopted by the Triborough Board in March 2024, but to be phased in over several years, with a lower initial toll amount to lessen the burden on drivers during early implementation (the "Phase-In

---

[15] Final EA, Table ES-3 at ES-14.

Approach"). In November 2024, the Project Sponsors completed a second reevaluation under NEPA to assess the Phase-In Approach.

69.    That reevaluation confirmed that under the Phase-In Approach, the congestion pricing program would still meet its purpose and need, and all of its objectives. Specifically, Reevaluation 2 predicted that the Phase-In Approach with an initial $9 toll would exceed a daily five percent reduction in vehicle miles traveled in the central business district and a ten percent reduction in vehicles entering the district daily and would generate sufficient annual revenues to fund MTA capital projects. After phase-in of the $15 peak auto toll, the Phase-In Approach would result in at least 8.9 percent reduction in miles traveled, at least 17.3 percent reduction in vehicle entry, and at least $0.9 billion in annual revenue.

70.    On November 18, 2024, the Triborough Board formally adopted the Phase-In Approach.

71.    On November 21, 2024, FHWA concluded that the impacts of the Phase-were analyzed and mitigated accordingly, that the conclusions in FHWA's Final EA and FONSI remained valid, and that no additional environmental analysis was warranted.

## The Cooperative Agreement

72.    That same day, on November 21, 2024, FHWA and the Project Sponsors signed the cooperative agreement.

73.    The cooperative agreement states in relevant part that "[e]ffective on the date of this Agreement, the project is approved as a pilot program," and

Triborough is authorized to "operate the Project as a toll Project in accordance with the provisions of this Agreement and as a value pricing project, as part of State DOT's value pricing pilot program." Exhibit 2, cl. 1.

74.    FHWA further agreed that "the imposition of tolls under this Agreement does not render Federal-aid highways within the State of New York generally ineligible for Federal-aid highway funds where such highways are otherwise eligible under the particular funding program." *Id.* cl. 5.

75.    In return, the Project Sponsors agreed to a number of obligations in the cooperative agreement, including: (1) "to adequately maintain" federal-aid highways located in the geographic area of the congestion pricing program, *id.* cl. 6; (2) to submit regular reports on the effects of the congestion pricing program "on driver behavior, traffic volume, congestion, transit ridership" and other topics to FHWA, *id.* cl. 8(b); and (3) "to comply with all Federal laws and requirements applicable to this project, including the laws and policies applicable to the [VPPP]," *id.* cl. 9.  Clause 8 of the cooperative agreement further requires that the Project Sponsors "identify benefits the application of tolls has in reducing climate pollution" and "demonstrate the benefits mitigation measures provide to underserved communities." *Id.* cl. 8.

76.    In addition, the cooperative agreement requires that FHWA and the Project Sponsors to "cooperate and work together in the implementation of the Project." *Id.* cl. 8(a).

77.    The cooperative agreement does not include any provision authorizing FHWA to terminate the agreement.  Rather, it contemplates that only Triborough

could unilaterally decide to discontinue the congestion pricing program, requiring the Project Sponsors to "work with FHWA to return the Project to its original operating condition if [Triborough] decides to discontinue tolls on the Project." *Id.* cl. 11.

78.    The cooperative agreement references FHWA regulations at 23 C.F.R. Parts 940 and 950. *Id.* cl. 9. These regulations do not grant FHWA authority to unilaterally terminate the cooperative agreement.

**Implementation of the Congestion Pricing Program**

79.    In late 2024, several groups, individuals, and counties, as well as the State of New Jersey, sought preliminary injunctive relief barring the MTA and Triborough from beginning the congestion pricing program or collecting tolls on various federal and state constitutional and statutory grounds. Each of these claims for injunctive relief was rejected by the courts. *See Chan v. U.S. Dept. of Transp.*, No. 23 Civ. 10365 (LJL), 2024 WL 5199945 (S.D.N.Y. Dec. 23, 2024) (Liman, J.); *County of Rockland v. Metro. Transp. Auth.*, No. Civ. 24-3325 (2d Cir. Jan. 28, 2025) (per curiam) [*Rockland* 2d Cir. ECF No. 31]; *New Jersey v. Metro. Transp. Auth.*, No. Civ. 25-1033 (3d Cir. Jan. 4, 2025) (Bibas, J.) [*New Jersey* 3d Cir. ECF No. 9]; *Rockland v. Metro. Transp. Auth.*, No. 24 Civ. 2285 (S.D.N.Y. Jan. 14, 2025) (Seibel, J.) [*Rockland* ECF No. 56]; *New Jersey v. U.S. Dept. of Transp.*, No. 23 Civ. 3885 (D.N.J. Jan. 3, 2025) (Gordon, J.) [*New Jersey* ECF No. 212]; *Rockland v. Metro. Transp. Auth.*, No. 24 Civ. 2285 (S.D.N.Y. Dec. 23, 2024) (Seibel, J.) [*Rockland* ECF No. 52]; *Neuhaus v. Triborough Bridge & Tunnel Auth.*, No. 24 Civ. 3983 (S.D.N.Y. Dec. 23, 2024) (Seibel, J.) [*Neuhaus* ECF No. 44].

80.     On January 5, 2025, the congestion pricing program went into effect. Eligible vehicles entering the central business district are being tolled at the rates established in the Phase-In Approach.

81.     MTA data showed that crossing times were significantly faster at the Lincoln Tunnel and the Holland Tunnel in January 2025, compared to January 2024.[16]  Trips on the Williamsburg Bridge and Queensboro Bridge have also been significantly faster and riders on express buses are saving time on their commutes.[17]

82.     Data collected by the MTA reveals that since the congestion pricing program began, traffic in the central business district decreased substantially, with 1.2 million fewer vehicles entering the district than projected.  Drivers in the district are experiencing travel time improvements in the afternoon peak hours "with reductions as high as 59%."[18]  Inbound river crossings to the central business district have seen a 10%-48% decrease in travel times, and several bus routes have seen significant decreases in the time needed to complete their routes.[19]  After a brief rise in January, daily average traffic volumes have dropped on the bridges that do not

---

[16] Andrew Siff, *MTA Calls Congestion Pricing 'Transformative" on Commutes,* NBC NEW YORK, (Jan. 29, 2025), https://www.nbcnewyork.com/new-york-city/mta-congestion-pricing-transformative-commute-impact/6126670/.

[17] *Id.*

[18] *See New Congestion Relief Zone Data Captures Magnitude of Faster Commutes for Drivers and Bus Riders, Fewer Vehicles and Surging Express Bus Ridership*, MTA (Jan. 29, 2025), https://www.mta.info/press-release/new-congestion-relief-zone-data-captures-magnitude-of-faster-commutes-drivers-and-bus.

[19] *Id.*

connect directly to the central business district, indicating that the toll has not diverted traffic.[20]

83.    The congestion pricing program has not stymied economic activity. Data provided by the MTA shows that in January 2025, 35.8 million people visited Business Improvement Districts within the central business district, a 1.5 million increase compared to last January.[21]

84.    The Partnership for New York City's President & CEO Kathryn Wylde has stated that, since the onset of Congestion Pricing, New Yorkers are "moving faster and there's less traffic,"[22] and that "[i]n every respect, this is a policy that President Trump and the Republicans should be supporting."[23]

85.    Emergency vehicle speeds have also improved. For many years, increasing traffic in New York City led to longer and longer emergency vehicle response times. As documented in a report issued by State Senator Brad Hoylman-Sigal, who represents much of the district, and traffic engineer Sam Schwartz, over the past decade, "E.M.S. response times to life-threatening situations had increased by 29%; for Fire Department vehicles tending to medical emergencies, the lag was up

---

[20] Dave Colon, *Data: Congestion Pricing is Not Rerouting Traffic to Other Boroughs*, STREETSBLOG NYC (Mar. 12, 2025) https://nyc.streetsblog.org/2025/03/12/data-outer-borough-congestion-pricing-spillover-traffic-not-happening.

[21] Arun Venugopal, *Vehicle traffic is down in Manhattan, but pedestrian traffic is up, data says,* GOTHAMIST (Feb. 13, 2025) https://gothamist.com/news/vehicle-traffic-is-down-in-manhattan-but-pedestrian-traffic-is-up-data-says

[22] Dick Brennan, *President Trump said to have NYC's congestion pricing, bike lanes in his crosshairs,* CBS NEWS (Feb. 10, 2025), https://www.cbsnews.com/newyork/news/president-trump-nyc-congestion-pricing-bike-lanes/.

[23] Ry Rivard & Nick Reisman, *New York's business boosters push Trump to keep Manhattan tolls,* POLITICO (Feb. 11, 2025), https://www.politico.com/news/2025/02/11/new-york-trump-congestion-pricing-00203540.

by 72 percent."[24]   The preliminary data indicates that emergency vehicles have benefited from the reduction in congestion and are able to respond more quickly to calls.[25]

86.    Reports also indicate that the congestion pricing program has made the streets safer, with data gathered by Streetsblog NYC indicating a striking 51% drop in crash-related injuries in the congestion pricing program's first 12 days as compared to the same time period in 2024.[26]   Thirty-seven people were injured in 90 total reported crashes, down from 76 injuries in 199 crashes in the same 12-day period in 2024.

87.    Subway ridership has increased, while crime in the subway has decreased.   In January 2025, there were 36% fewer crimes reported on the subway than last January.[27]

88.    According to a poll reported by *CBS News*, the majority of New Yorkers want the congestion pricing program to continue.[28]

---

[24] Ginia Bellafante, *The Life-or-Death Consequences of Killing Congestion Pricing*, N.Y. TIMES (Oct. 10, 2024), https://www.nytimes.com/2024/10/10/nyregion/new-york-fire-department-response-times.html.

[25] *See* MTA *Congestion Relief Zone Update*, YOUTUBE (Jan. 29, 2025), https://www.youtube.com/watch?v=fD5KpBz2yIE.

[26] Diana Ionescu, *NYC Congestion Pricing May be Saving Lives*, PLANETIZEN (Jan. 27, 2025), https://www.planetizen.com/news/2025/01/133978-nyc-congestion-pricing-may-be-saving-lives#:~:text=New%20York%20City's%20new,time%20period%20the%20prior%20year.

[27] Barbara Russo-Lennon, *Subway Crime Plummets as Ridership Jumps Significantly in 2025 in Congestion Pricing Era*, AM NY (Feb 4, 2025), https://www.amny.com/nyc-transit/nyc-subway-crime-plummets-ridership-jumps-2025/.

[28] Alecia Reid, *6 in 10 Say They Want NYC Congestion Pricing to Continue, New Poll Finds*, CBS NEWS (Feb. 5, 2025), https://www.cbsnews.com/amp/newyork/news/new-york-city-congestion-pricing-morning-consult-poll/.   Another poll, run close in time to the Program's launch, likewise found that a majority of New Yorkers support congestion pricing.   *See* Barbara Russo-Lennon, *The Poll Results*

**Then-Candidate Trump's Repeated Threats
to "Kill" Congestion Pricing**

89.    In his Presidential campaign, Donald Trump repeatedly voiced his political opposition to the congestion pricing program and stated that he would "terminate" and "kill" the congestion pricing program once in office.

90.    Following the election, President Trump continued to express his opposition to the Program, saying in an interview with the *New York Post* on November 14, 2024, that he "strongly disagree[d] with the decision on the congestion tax."[29]

**Unlawful Termination of the Cooperative agreement**

91.    On February 19, 2025, Secretary Duffy notified Kathy Hochul, Governor of New York State, that he was rescinding defendant FHWA's approval of congestion pricing in the central business district and terminating the cooperative agreement. *See* Exhibit 1.  Although the Secretary stated that he was terminating the agreement because FHWA had lacked authority to enter into it under ISTEA, the Secretary also indicated that the termination was motivated by the President's opposition to congestion pricing as well the Secretary's own policy disagreement with New York State.    *Id.* at 1-2.    The Secretary stated that, in his view, congestion pricing in Manhattan was not a "fair deal."    *Id.* at 2.

---

*Are In: Here's How New Yorkers Really Feel About Congestion Pricing*, AM NY (Dec. 3, 2024), https://www.amny.com/news/how-new-yorkers-feel-about-congestion-pricing/.

[29] Steven Nelson, *Trump slams Hochul move to revive NYC congestion tax: 'It will hurt workers, families, and businesses'*, N.Y. POST (Nov. 14, 2024), https://nypost.com/2024/11/14/us-news/trump-slams-hochul-move-to-revive-nyc-congestion-tax/.

92.    The Secretary asserted that the congestion pricing program was "not an eligible [cooperative agreement]" for two reasons: (1) the program creates "cordon pricing," meaning that there is not a toll-free means to enter the central business district; and (2) the toll rate was "primarily" calculated to raise revenue for MTA capital projects, as opposed to reducing congestion. *Id.* at 3.

93.    The Secretary did not provide any explanation of the grounds for the reversal of FHWA's earlier determination that the congestion pricing program was eligible for the VPPP or FHWA's publicly available guidance that cordon pricing is permitted under VPPP, and that revenues from VPPP programs may be used to support public transit.

94.    Defendants did not give State DOT, NYCDOT, or Triborough notice or an opportunity to be heard nor did it conduct any environmental review under NEPA before terminating the cooperative agreement.

95.    On February 20, 2025, Executive Director Shepherd notified State DOT, NYCDOT, and Triborough that, pursuant to Secretary Duffy's February 19 letter, "[State DOT] and its project sponsors must cease the collection of tolls on Federal-aid highways in the [central business district] by March 21, 2025." Exhibit 3 at 1. The Project Sponsors are State DOT, NYCDOT, and Triborough.

**The Harms to New York State<br>from Ending the Congestion Pricing Program**

96.    New York State's sovereign and quasi-sovereign interests will be harmed if congestion pricing is halted.

97.     New York State has an interest in ensuring that the cooperative agreement authorizing congestion pricing to which State DOT, as an authorized participant in the VPPP, was a signatory remains in effect.

98.     New York State's sovereign interest in the implementation of the Act will be harmed if tolling revenues are halted.

99.     For several reasons, New York State's quasi-sovereign interest in the health and welfare of its residents will be harmed if tolling revenues are halted.

100.     New York's economy, and to a significant degree the nation's economy, depends on keeping vehicle traffic in the New York City metropolitan area moving.

101.     Critical parts of the MTA capital program would be delayed if program tolling revenues are halted.   The program includes: (1) adding accessibility improvements (including elevators) to numerous subway stations consistent with the Americans with Disabilities Act, by making at least 70 more subway systems accessible through building new elevators at 70 stations in all of the boroughs and replacing up to 65 escalators and 78 elevators, and finally bring the transportation system to greater than 50% accessibility; (2) doubling the number of track lines with modernized signals; (3) purchasing over 1,900 new rail cars, which are six times more reliable than older ones, and replacing 2,400 buses; (4) replacing approximately 60 miles of track; and (5) renewing stations and addressing important repair projects at 175 stations.

102.     The congestion pricing program will also provide funding for much-needed repairs to Grand Central Terminal, a more than 100-year-old structure that

is used by more than 700 trains a day. And coupled with funding from the 2015-2019 program, the MTA Capital Program further provides funding for three new fully accessible stations on the Second Avenue Subway that would allow connection to the Metro-North lines, strengthening connections for Harlem and East Harlem residents.

103.    New Yorkers, through the MTA Capital Program, will also receive better access to Penn Station through a new route with four new stations on the Metro-North New Haven Line that will carry up to 50,000 Metro-North customers directly to Penn Station every day.

104.    Finally, ending the congestion pricing program means the unabated continuation of the severe congestion in Manhattan's central business district, with its concomitant economic, environmental, and public health and safety costs to businesses, residents, commuters, workers, and visitors in this area, without any evaluation of these and other environmental impacts, opportunity for public participation, or consideration of alternatives required by NEPA.

## CLAIMS FOR RELIEF

### FIRST CLAIM

**Termination of the Cooperative Agreement
Not in Accordance with Law and In Excess of Statutory Authority
In Violation of the Administrative Procedure Act**

105.    The State realleges all of the preceding paragraphs.

106.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that the court finds to be, among other things, "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A) & (C).

107.   Neither ISTEA nor the cooperative agreement authorizes FHWA to unilaterally rescind the cooperative agreement or to rescind FHWA's approval of the congestion pricing program.

108.   Under 2 C.F.R. § 200.340(a), a cooperative agreement may be terminated by an agency only if the recipient has failed to comply with the agreement, if the recipient consents, or pursuant to the terms and conditions of the agreement.

109.   None of those conditions required by 2 C.F.R. § 200.340(a) are present here.

110.   Defendants unilaterally terminated the cooperative agreement without authority.

111.   Executive Director Shepherd's directive that State DOT, NYCDOT, and Triborough cease the collection of tolls by March 21, 2025, was based on the unlawful termination of the cooperative agreement and thus was also without authority.

112.   Defendants' unlawful termination of the cooperative agreement and Executive Director Shepherd's directive were not in accordance with law and were in excess of authority.  As a result, the termination and directive are null and void and should be declared unlawful and set aside under 5 U.S.C. § 706(2)(A) and (C).

### SECOND CLAIM

**Termination of the Cooperative Agreement**
***Ultra Vires***

113.   The State realleges all of the preceding paragraphs.

114.    A court must set aside an *ultra vires* act by a federal official.

115.    Defendants' unlawful termination of the cooperative agreement was *ultra vires*.

116.    Executive Director Shepherd's directive that State DOT, NYCDOT, and Triborough cease the collection of tolls by March 21, 2025, was based on the Secretary's unlawful termination of the cooperative agreement and thus was also *ultra vires*.

117.    The termination of the cooperative agreement and Executive Director Shepherd's directive are null and void and should be declared unlawful and set aside.

## THIRD CLAIM

**Termination of the Cooperative Agreement
Not in Accordance with Law and
Without Observance of Procedure Required by Law
In Violation of the Administrative Procedure Act**

118.    The State realleges all of the preceding paragraphs.

119.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that the court finds to be, among other things, "not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A) & (D).

120.    The Uniform Guidance provides that, before an agency may terminate an award, including a cooperative agreement, the agency must provide written notice and an opportunity to be heard.  2 C.F.R. §§ 200.341(a), 342.

121.    Defendants terminated the cooperative agreement without giving the State written notice and an opportunity to be heard before the termination.

122.    Executive Director Shepherd's directive that State DOT, NYCDOT, and Triborough cease the collection of tolls by March 21, 2025, was based on the termination of the cooperative agreement.

123.    Defendants' termination of the cooperative agreement and Executive Director Shepherd's directive were without observance of procedure required by law and thus were also not in accordance with law.  As a result, the termination and directive are null and void and should be declared unlawful and set aside under 5 U.S.C. § 706(2)(A) and (C).

## FOURTH CLAIM

### Termination of the Cooperative Agreement
### Not in Accordance with Law
### In Violation of the Administrative Procedure Act

124.    The State realleges all of the preceding paragraphs.

125.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that the court finds to be, among other things, "arbitrary and capricious" or "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

126.    Secretary Duffy terminated the cooperative agreement on the ground that the congestion pricing program was not eligible for the VPPP.

127.    An agency action is arbitrary and capricious when the agency fails to provide a rationale for reversal of a prior determination.

128.    Secretary Duffy did not provide any rationale for reversal of FHWA's prior termination that the congestion pricing program was eligible for the VPPP.

129.   Defendants' termination of the cooperative agreement on the ground that the congestion pricing program was not eligible for the VPPP was arbitrary and capricious.

130.   Secretary Duffy contended that the congestion pricing program was not eligible for the VPP because the VPPP does not allow cordon pricing and does not allow a congestion pricing program where tolls are primarily calculated to raise revenue for MTA capital projects rather than to reduce congestion or meet other road-related goals.

131.   The VPPP allows cordon pricing.

132.   The tolls established by the congestion pricing program are calculated to reduce congestion as well as raise revenue for MTA capital projects.  The VPPP does not limit the factors that States can consider in calculating tolls and allows States to use toll revenue for non-road projects, including public transit.

133.   Defendants' termination of the cooperative agreement on the grounds that the VPPP does not allow cordon pricing and the use of toll revenue for non-road projects was not in accordance with law.

134.   Executive Director Shepherd's directive that State DOT, NYCDOT, and Triborough cease the collection of tolls by March 21, 2025, was based on the unlawful termination of the cooperative agreement and thus was also arbitrary and capricious and not in accordance with law.

135.   Defendants' termination of the cooperative agreement and Executive Director Shepherd's directive were arbitrary and capricious and not in accordance

31

with law and are therefore null and void and should be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(A).

## FIFTH CLAIM

### Termination of the Cooperative Agreement
### In Violation of the National Environmental Policy Act and
### Not in Accordance with Law and
### Without Observance of Procedure Required by Law
### In Violation of the Administrative Procedure Act

136.    The State realleges all of the preceding paragraphs.

137.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that the court finds to be, among other things, "not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A) & (D).

138.    NEPA requires federal agencies to prepare an EIS for any "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

139.    Agencies are required to take a hard look at the reasonably foreseeable social, economic, and environmental impacts of a proposed action and its alternatives. *See, e.g.*, 42 U.S.C. § 4336; 23 C.F.R. § 771.119(b); *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).

140.    Agencies are required to consider alternatives to taking a proposed action. *See, e.g.*, 42 U.S.C. § 4332(C)(iii), (F) and (H); 23 C.F.R. § 771.119(b).

141.    Agencies are required to identify measures which might mitigate adverse environmental impacts and incorporate measures necessary to mitigate

adverse impacts into its action terminating the cooperative agreement. *See*, *e.g.*, 23 C.F.R. §§ 771.105(e), 771.119(b).

142.  To determine whether a major federal action will have a significant effect on "the quality of the human environment," agencies may prepare an EA. *See*, *e.g.*, 42 U.S.C. § 4336(b)(2); 23 C.F.R. § 771.119.

143.  If an agency determines that the proposed action will not have significant effects, accounting for mitigation, it can issue a FONSI. *See*, *e.g.*, 42 U.S.C. § 4336(b)(2); 23 C.F.R. § 771.121.  If the EA reveals that there may be significant effects, an EIS is required.

144.  Defendants' purported termination of the cooperative agreement constitutes a major federal action within the meaning of NEPA, 42 U.S.C. §§ 4332(C), 4336e(10), as was the decision to approve the congestion pricing program and sign the agreement.

145.  Defendants did not prepare an EA and FONSI, or EIS, regarding the termination of the cooperative agreement.

146.  As result, defendants failed to consider the full extent of the reasonably foreseeable impacts of terminating the cooperative agreement, which will provide substantial benefits to the central business district and the region in terms of reduced traffic and congestion, improved air quality, and concomitant environmental, public health, and economic benefits resulting from shifting traffic patterns that occurred following the implementation of the congestion pricing program.

147.    Defendants also failed to consider alternatives to terminating the cooperative agreement and mitigation measures.

148.    Defendants' termination of the cooperative agreement violated NEPA.

149.    Executive Director Shepherd's directive that State DOT, NYCDOT, and Triborough cease the collection of tolls by March 21, 2025, was based on the unlawful termination of the cooperative agreement and thus also violated NEPA.

150.    Defendants' termination of the cooperative agreement and Executive Director Shepherd's directive were not in accordance with law and not in observance of procedure required by law and are therefore null and void and should be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(A) and (D).

## **PRAYER FOR RELIEF**

WHEREFORE, the State respectfully requests that the Court:

i.      Declare that the termination of the cooperative agreement was not in accordance with law, arbitrary and capricious, in excess of statutory authority, and without observance of procedure required by law, in violation of the Administrative Procedure Act, violated NEPA, and was *ultra vires*;

ii.     Hold unlawful and set aside the termination of the cooperative agreement and Executive Director Shepherd's directive that State DOT, NYCDOT, and Triborough cease the collection of tolls by March 21, 2025;

iii.    Grant any further necessary and proper relief pursuant to 28 U.S.C. § 2202;

iv.     Award the State its costs for the action, including reasonable attorneys' fees; and

v.      Grant all such other and further relief as it deems just and proper.

Dated:  New York, New York
        March 27, 2025

Respectfully Submitted,

LETITIA JAMES
Attorney General of the State of New
York

By: _____

    Andrew G. Frank
    Assistant Attorney General
    N.Y.S. Attorney General's Office
    28 Liberty Street
    New York, New York 10005
    Telephone: (212) 416-8271
    E-mail:    andrew.frank@ag.ny.gov

*Attorneys for Intervenor-Plaintiff*
*New York State Department of*
*Transportation*