# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

METROPOLITAN TRANSPORTATION
AUTHORITY and TRIBOROUGH BRIDGE
AND TUNNEL AUTHORITY,

*Plaintiffs,*

RIDERS ALLIANCE, SIERRA CLUB, THE
NEW YORK STATE DEPARTMENT OF
TRANSPORTATION, and THE NEW YORK
CITY DEPARTMENT OF TRANSPORTATION,

*Intervenor-Plaintiffs,*

v.

SEAN DUFFY, in his official capacity as
Secretary of the United States Department of
Transportation, GLORIA M. SHEPHERD, in
her official capacity as Executive Director of the
Federal Highway Administration, UNITED
STATES DEPARTMENT OF
TRANSPORTATION, and FEDERAL
HIGHWAY ADMINISTRATION,

*Defendants.*

No. 1:25-cv-01413-LJL

**[PROPOSED]
COMPLAINT-IN-
INTERVENTION**

---

Intervenor-Plaintiff the New York City Department of Transportation ("City

DOT") brings this complaint against defendants Sean Duffy, in his official capacity

as Secretary of the United States Department of Transportation, Gloria M. Shepherd,

in her official capacity as Executive Director of the Federal Highway Administration,

the United States Department of Transportation ("USDOT"), and the Federal

Highway Administration ("FHWA"), and allege as follows on information and belief:

## INTRODUCTION

1.     On January 5, 2025, plaintiff Triborough Bridge and Tunnel Authority ("Triborough") began collecting tolls from motor vehicles entering Manhattan's "central business district," pursuant to New York's Traffic Mobility Act, N.Y. Vehicle & Traffic L. §§ 1704-a, 1705, and the federal Value Pricing Pilot Program ("VPPP") established by the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA"), Pub. L. 102-240, § 1012(b) (December 18, 1991), 23 U.S.C. § 149 note.

2.     In a February 19 letter, defendant Secretary Sean Duffy notified New York State Governor Kathy Hochul, along with City DOT Commissioner Ydanis Rodriguez and others, that he purported to rescind defendant FHWA's approval of congestion pricing in the central business district and unilaterally terminate the cooperative agreement that FHWA had signed under the VPPP ("cooperative agreement"). See Exhibit 1 (Letter from Secretary Sean Duffy to Governor Kathy Hochul (Feb. 19, 2025)); Exhibit 2 (Agreement among FHWA, State DOT, Triborough and New York City Department of Transportation (Nov. 21, 2024)). Although the Secretary stated that he was terminating the agreement because FHWA had lacked authority to enter into it under ISTEA, the Secretary also indicated that the termination was motivated by policy considerations.

3.     On February 20, 2025, defendant FHWA Executive Director Shepherd notified City DOT, the New York State Department of Transportation ("State DOT"), and Triborough that, pursuant to Secretary Duffy's February 19 letter, "[State DOT] and its project sponsors must cease the collection of tolls on Federal-aid highways in the [central business district] by March 21, 2025." *See* Exhibit 3 (Letter from

Executive Director Gloria Shepherd to Commissioner Rodriguez and others (Feb. 20, 2025)). The Project Sponsors are Triborough, State DOT, and City DOT. On March 20, 2025, Shepherd sent a second letter purporting to extend the deadline to April 20, 2025. *See* Exhibit 4 (Letter from Executive Director Shepherd to City DOT Commissioner Rodriguez and others (Mar. 20, 2025)).

4.     The Secretary asserted that the congestion pricing program was "not an eligible [VPPP]" for two reasons: (1) the congestion pricing program creates "cordon pricing," meaning that there is not a toll-free means to enter the central business district; and (2) the toll rate was calculated "primarily" to raise revenue for Metropolitan Transit Authority ("MTA") capital projects, as opposed to reducing congestion or meeting other road-related goals, which, according to the Secretary, are the only authorized purposes of congestion pricing tolls. Exhibit 1 at 3.

5.     Defendants' purported termination of the cooperative agreement was arbitrary and capricious, not in accordance with law, in excess of statutory authority, and without observance of procedure required by law under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), (C) & (D), as well as *ultra vires*.

6.     The termination by defendants was not in accordance with law for several reasons. First, defendants lacked authority to unilaterally terminate the cooperative agreement. The rescission was also in excess of statutory authority and *ultra vires* for the same reason.

7.     Second, even if defendants acted with lawful authority, the termination was not in accordance with law and was also without observance of procedure required by law because defendants were required to give City DOT, State DOT, and

3

Triborough an opportunity to be heard before the agreement was rescinded, which they did not do.

8.    Third, the termination was arbitrary and capricious and not in accordance with law because Secretary Duffy's proffered rationales for the reversal of FHWA's prior determination that the congestion pricing program is eligible for the VPPP are erroneous.

9.    Secretary Duffy stated that the VPPP does not allow cordon pricing but nothing in the VPPP supports that interpretation, and FHWA has determined in the past that congestion pricing includes cordon pricing, which it also called "area pricing." Secretary Duffy states that cordon pricing has only been used on interstate highways where drivers have alternative non-toll routes, but according to FHWA, tolls on highways are not cordon or area pricing.

10.    Secretary Duffy also stated that congestion pricing was "primarily driven by the need to raise revenue for the [MTA]," which he asserts is forbidden by the VPPP. Exhibit 1 at 3. Congestion pricing for entry into the central business district of Manhattan was designed both to reduce congestion and to raise revenue for the MTA. In any event and contrary to the Secretary's claim, the VPPP permits states and local government authorities to include revenue objectives when setting toll rates, as evidenced by the language of the statute, ISTEA § 1012(b)(3), which provides that toll revenues may be used to fund other transportation infrastructure projects.

11.    Fourth, the termination was not in accordance with law because defendants did not review the potential environmental impacts of their decision to

4

terminate before deciding to do so, as required by the National Environmental Policy Act, 42 U.S.C. §§ 4332(C), 4336(b)(2).

12.    For these reasons and pursuant to 5 U.S.C. § 706(2), the Court should (a) declare that the termination of the cooperative agreement was not in accordance with law, arbitrary and capricious, in excess of statutory authority, without observance of procedure required by law, and *ultra vires*; and (b) hold unlawful and set aside the purported termination of the cooperative agreement and the directive that City DOT, State DOT, and Triborough cease the collection of tolls by April 20, 2025.

## PARTIES

13.    Intervenor plaintiff City DOT is an agency of the City of New York, a municipal corporation codified under the laws of the State of New York, one of the co-applicants for the VPPP approval, and a co-signatory of the VPPP cooperative agreement.

14.    Defendant Duffy is the Secretary of USDOT.  He is sued in his official capacity.

15.    Defendant Shepherd is the Executive Director of FHWA.  She is sued in her official capacity.

16.    Defendant USDOT is a cabinet department of the federal government, with offices in Washington, D.C.

17.    Defendant FHWA is an agency within USDOT, with offices in Washington, D.C.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over this action pursuant to

5

23 U.S.C. § 1331 because this case presents a federal question under the laws of the United States, including the APA, 5 U.S.C. § 551 *et seq*.

19.    Venue is proper in this district under 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## STATUTORY BACKGROUND

### New York's Traffic Mobility Act

20.    Traffic congestion has long plagued the New York metropolitan area. For decades, congestion has hampered  economic growth and harmed the environment and public health and safety, not to mention the quality of life in the region.

21.    Congestion on New York City roads, and in the central business district of Manhattan in particular, has a serious negative impact on public health.

22.    The U.S. Environmental Protection Agency has recognized, higher vehicle traffic leads to higher vehicle emissions, which are associated with negative health impacts like "asthma onset and aggravation, cardiovascular disease, reduced lung function, impaired lung development in children, pre-term and low-birthweight infants, childhood leukemia, and premature death."[1] FHWA has consistently acknowledged that "less vehicle traffic can improve air quality and reduce chronic lower respiratory diseases."[2]

---

[1] U.S. ENVIRONMENTAL PROTECTION AGENCY, NEAR ROADWAY AIR POLLUTION AND HEALTH: FREQUENTLY ASKED QUESTIONS at 2 (Aug. 2014), https://nepis.epa.gov/Exe/ZyPDF.cgi/P100NFFD.PDF?Dockey=P100NFFD.PDF.

[2] Jhoset Burgos-Rodriguez, et al., *Making Healthy Connections in Transportation*, 87 PUBLIC ROADS

23.    Congestion also increases travel times, eroding worker productivity, reducing bus and paratransit service, raising business expenses, including the cost of deliveries, and impeding the movement of emergency vehicles. A 2018 study estimated that "traffic congestion [would] be a $100 billion drag" on the metropolitan-area economy over the next five years and identified Manhattan below 60th street—where a quarter of the region's economic activity is concentrated—as the primary source of traffic congestion.[3]

24.    In 2019, the New York State Legislature enacted the Traffic Mobility Act, which authorized and directed Triborough to implement a congestion tolling program in the central business district. N.Y. Veh. & Traf. Law § 1701 *et seq*.

25.    The 2019 Act's legislative findings declare that traffic in New York—which "ranks second worst among cities in the United States and third worst among cities in the world" and is estimated to cost the metropolitan economy more than "one hundred billion dollars over the next five years"—is "crippling" for "residents, commuters, taxi and for-hire vehicle traffic, bus transit and emergency services" and "a significant contributor to decreased air quality." *Id.* § 1701.

26.    The Legislature further found that the underfunding of New York City's subway infrastructure has "a significant deleterious impact on the health, safety, and livelihood of commuters, tourists, resident New Yorkers" as well as "the economy of the state of New York," such that "a long-term and sustainable solution is necessary

---

28, 28 (Summer 2023), https://highways.dot.gov/sites/fhwa.dot.gov/files/Public%20Roads%20Summer%202023.pdf.

[3] The Partnership for New York City, *$100 Billion Cost of Traffic Congestion in Metro New York* (Jan. 2018), https://pfnyc.org/research/100-billion-cost-of-traffic-congestion-in-metro-new-york/.

in order to ensure stable and reliable funding" for this "important mass transit asset." *Id.* Consequently, the Legislature declared that to ensure the "public health and safety of New York's residents," the creation of a congestion pricing program in the Manhattan central business district was "a matter of substantial state concern." *Id.*

27.    The Act authorizes and directs Triborough to "establish the central business district tolling program," *id.* § 1704(1), grants Triborough the power "to establish and charge variable tolls and fees for vehicles entering or remaining in the [central business district],"[4] and authorizes Triborough "to make rules and regulations for the establishment and collection of central business district tolls, fees, and other charges," *id.* § 1704-a(1).

28.    The goals of the Act are to reduce traffic congestion and pollution in that district and raise funds for the capital needs of the MTA subway, bus and commuter rail operations. *Id.* § 1701.

## The VPPP

29.    Tolls are generally prohibited on federal-aid highways, 23 U.S.C. § 301, subject to exceptions.

30.    A "federal-aid highway" is "a public highway eligible for assistance under [Title 23, Chapter 1] other than a highway functionally classified as a local road or rural minor collector." 23 U.S.C. § 101(a)(6).

31.    Congress    enacted    ISTEA,    to    foster    "a    National    Intermodal

---

[4] As delineated by the Act, the central business district encompasses the geographic area of Manhattan south and inclusive of 60th Street, but not including the FDR Drive, the West Side Highway, the Battery Park Underpass, and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West Street. *Id.* § 1704(2).

Transportation System," consisting of "all forms of transportation in a unified, interconnected manner." ISTEA § 2, 49 U.S.C. § 101 note.

32. Among other things, ISTEA established two programs that authorized tolls on federal-aid highways.

33. First, it created the "Basic Program" that authorized tolls on highways, bridges, and tunnels pursuant to certain conditions. ISTEA§ 1012(a), 23 U.S.C. § 129.

34. ISTEA also created the "Congestion Pricing Pilot Program," later renamed the VPPP, which directed the Secretary of Transportation to "solicit the participation of State and local governments and public authorities for one or more congestion pricing pilot projects." ISTEA § 1012(b), 23 U.S.C. § 149 note. See also Pub. L. 105-178 § 1216 (June 9, 1998) (renaming the program to the VPPP).

35. As FHWA describes it, the VPPP is "intended to demonstrate whether and to what extent roadway congestion may be reduced through application of congestion pricing strategies, and the magnitude of the impact of such strategies on driver behavior, traffic volumes, transit ridership, air quality and availability of funds for transportation programs."[5]

36. FHWA has recognized that congestion pricing can reduce delays and stress, allow for more deliveries per hour for businesses, improve transit speeds and reliability of service, and save lives by shortening the incident response times for ambulances and emergency personnel.[6]

---

[5] *Value Pricing Pilot Program*, U.S. FED. HIGHWAY ADMIN., https://ops.fhwa.dot.gov/congestionpricing/value_pricing/ (last accessed Apr. 2, 2025).
[6] *Benefits of Congestion Pricing*, U.S. FED. HIGHWAY ADMIN., https://ops.fhwa.dot.gov/congestionpricing/cp_benefits.htm (last accessed Apr. 2, 2025).

37.    Also according to FHWA, congestion pricing "is a way of harnessing the power of the market to reduce the waste associated with traffic congestion."[7] Congestion pricing shifts "some rush hour highway travel to other transportation modes or to off-peak periods.  By removing even just a small fraction of the vehicles from a congested roadway, pricing helps the system to flow more efficiently."  *Id.*

38.    FHWA has also recognized that congestion pricing includes cordon pricing.[8]  In contrast to charging tolls for using particular roads, bridges, tunnels, or ferries, "[z]one-based pricing, including cordon and area pricing, involves either variable or fixed charges to drive within or into a congested area within a city."[9]

39.    "Revenues generated by any pilot project under [the VPPP] must be applied to projects eligible under [Title 23]."  ISTEA § 1012(b)(3), 23 U.S.C. 149 note. Pursuant to 23 U.S.C. § 133(b)(1)(C), eligible projects include public transportation projects under 49 U.S.C. §§ 5307(a)(1) and 5337(b)(1). *See Owner Operator Indep. Drivers Ass'n, Inc. v. Penn. Tpk. Comm'n*, 934 F.3d 283, 292 (3d Cir. 2019) ("ISTEA authorizes states to construct, among other things, 'transit capital projects eligible for assistance under chapter 53 of title 49.'") (quoting 23 U.S.C. § 133(b)(1)(C)); *Chan v. U.S. Dep't of Transp.* No. 23-CV-10365 (LJL), 2024 WL 5199945, at *17 (S.D.N.Y.

---

[7] Welcome to the FHWA Congestion Pricing Web Site, U.S. FED. HIGHWAY ADMIN., https://ops.fhwa.dot.gov/congestionpricing/index.htm (last accessed Mar. 17, 2025); Federal Tolling Programs, U.S. FED. HIGHWAY ADMIN., https://www.fhwa.dot.gov/ipd/tolling_and_pricing/tolling_pricing/vppp.aspx (last accessed Apr. 2, 2025) ("Value pricing – sometimes called congestion pricing – works by charging drivers on congested roadways during peak periods.").

[8] *Report on the Value Pricing Pilot Program Through April 2018* at 3, 12, 13, 39 (undated), U.S. FED. HIGHWAY ADMIN., https://rosap.ntl.bts.gov/view/dot/51791/dot_51791_DS2.pdf; *Congestion Pricing: A Primer on Institutional Issues* at 3, 10, 17, 23, 24 (Apr. 2013), U.S. FED. HIGHWAY ADMIN., https://rosap.ntl.bts.gov/view/dot/26194/dot_26194_DS1.pdf .

[9]        *Zone-Based Pricing*,    U.S.    FED.    HIGHWAY    ADMIN., https://ops.fhwa.dot.gov/congestionpricing/strategies/involving_tolls/zone_based.htm.

Dec. 23, 2024) ("[I]t is Congress' unmistakably clear intent that a public authority be permitted to collect funds that exceed a toll road's costs and spend those funds on non-toll road projects.") (citations omitted).

40.    The FHWA explains that "[n]et revenues after payment of operating costs can be used to pay for expansion of roadway facilities, to support alternatives to driving alone such as public transit, to address impacts on low-income individuals by providing toll discounts or credits, or to reduce other taxes that motorists pay for highways such as fuel taxes, vehicle registration fees, or sales taxes."[10]

41.    The VPPP provides "the Secretary shall allow the use of tolls on the Interstate System as part of any value pricing pilot program under this subsection." 23 U.S.C. § 149 note (VPPP § 4, as amended by the Transportation Equity Act for the 21st Century, Pub. L. 105-178, § 1216(a)(4) (June 9, 1998)).

42.    To participate in the VPPP, states, local governments, and public authorities enter into "cooperative agreements" with the Secretary of Transportation. *Id.* (VPPP § 1, as amended by the Transportation Equity Act for the 21st Century, Pub. L. 105-178, § 1216(a)(2) (June 9, 1998)).

43.    The Secretary of Transportation has delegated authority to administer the VPPP and to enter into cooperative agreements to the FHWA Administrator. 49 C.F.R. § 1.85(c)(22).

44.    The VPPP does not grant the defendants unilateral authority to terminate a cooperative agreement.

---

[10]    What is Congress Pricing?, U.S. FED. HIGHWAY ADMIN., https://ops.fhwa.dot.gov/congestionpricing/cp_what_is.htm.

## Termination of a Cooperative Agreement Under 2 C.F.R. Part 200

45.    FHWA has determined that agreements authorizing projects that require tolling authority under the VPPP are cooperative agreements, even where such agreements do not include a federal funding component.[11]

46.    FHWA has adopted the Office of Management and Budget's agency-wide *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* ("Uniform Guidance"), 2 C.F.R. Part 200.  *See id.* § 1201.1.

47.    The Uniform Guidance sets out specific conditions under which an award, including a cooperative agreement, may be terminated:

> a.  by the agency if the recipient "fails to comply with the terms and conditions" of the award;
>
> b.  by the agency with the "consent" of the recipient;
>
> c.  by the recipient; and
>
> d.  by the agency "pursuant to the terms and conditions" of the award.

*Id.* § 200.340(a).  The Uniform Guidance also provides that, before an agency may terminate an award, including a cooperative agreement, an agency must provide written notice and an opportunity to be heard.  *Id*. §§ 200.341(a), 342.

## The National Environmental Policy Act

48.    The National Environmental Policy Act requires that, before a federal agency takes a "major Federal action significantly affecting the quality of the human

---

[11] *Value Pricing Pilot Program*, U.S. FED. HIGHWAY ADMIN., ("The Moving Ahead for Progress in the 21st Century (MAP-21) Act did not authorize additional funds after FY2012 for the discretionary grant component of the [VPPP].  However, FHWA's ability to enter into cooperative agreements for projects that require tolling authority under this program for their implementation will continue."), https://ops.fhwa.dot.gov/congestionpricing/value_pricing (last accessed Apr. 2, 2025).

environment," the agency is required to prepare a report that discusses, among other things, the action's "reasonably foreseeable environmental effects."    42 U.S.C. § 4332(2)(C).

49.    A "major Federal action" is "an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility." *Id.* § 4336e(10).

50.    To determine whether a major federal action will significantly affect the quality of the environment, an agency may prepare an "environmental assessment" ("EA").  *See*, *e.g.*, *id.* § 4336(b)(2); 23 C.F.R. § 771.119.

51.    Agencies are required to take a hard look at the reasonably foreseeable social, economic, and environmental impacts of a proposed action and its alternatives. *See*, *e.g.*, 42 U.S.C. § 4336; 23 C.F.R. § 771.119(b); *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).

52.    Agencies are required to consider alternatives to a proposed action.  *See*, *e.g.*, 42 U.S.C. § 4332(C)(iii), (F) and (H); 23 C.F.R. § 771.119(b).

53.    Agencies are required to identify measures that might mitigate adverse environmental impacts, and incorporate measures necessary to mitigate adverse impacts into its action.  *See*, *e.g.*, 23 C.F.R. §§ 771.105(e), 771.119(b).

54.    If an agency determines that the proposed action will not have significant effects, accounting for mitigation, it can issue a "Finding of No Significant Impact" ("FONSI"). 42 U.S.C. § 4336(b)(2); 23 C.F.R. § 771.121.  If the EA reveals that there may be significant effects, an environmental impact statement ("EIS") is required.  42 U.S.C. § 4336(b)(1); 23 C.F.R. § 771.119(i).

13

## The Administrative Procedure Act

55.     The Administrative Procedure Act provides that a court shall "hold unlawful and set aside agency actions, findings, and conclusions found to be," among other things "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C) & (D).

## FACTUAL ALLEGATIONS

### The Initial Environmental Analysis, Toll Schedule, and Pause

56.     In 2019, the Project Sponsors submitted an expression of interest to FHWA seeking authorization to implement the congestion pricing program in the Manhattan central business district.  *See* Exhibit 5 (Expression of Interest (June 17, 2019)).  FHWA responded that the VPPP "appear[ed] to be the best potential fit" among the various federal programs that allowed tolling on Federal-aid highways. *See* Exhibit 6 (Letter from Administrator Nicole Nason to Executive Deputy Commissioner Ron Epstein at 1 (Oct. 24, 2019).

57.     A years-long environmental review process under NEPA ensued.  In assessing the congestion pricing program, FHWA specifically considered the congestion pricing program's purpose "to reduce traffic congestion in the [central business district] in a manner that will generate revenue for future transportation improvements," and its specific objectives of: (1) reducing daily vehicle miles traveled within the district by at least five percent; (2) reducing the number of vehicles entering the district daily by at least ten percent; and (3) creating a funding source

14

for capital improvements and generating sufficient annual net revenues to fund \$15 billion for capital projects.[12]

58.    On March 30, 2021, while working with the Project Sponsors, then-Acting FHWA Administrator Stephanie Pollack commended the congestion pricing program, saying "[t]he FHWA looks forward to assisting New York so we can arrive at a prompt and informed NEPA determination on this important and precedent-setting project."[13]

59.    The Final EA ruled out alternatives that did not meet the Project's purpose and objectives,[14] and predicted that the congestion pricing program would meet each of the objectives described in Paragraph 57 above.[15] Those predictions were based on detailed modeling using the federally approved Best Practices Model maintained by the New York Metropolitan Transportation Council.

60.    In May 2023, FHWA approved the Final EA.

61.    On June 22, 2023, FHWA issued a "Finding of No Significant Impact" determining that the congestion pricing program, including mitigation, would not have a significant adverse impact on the environment and would not have a disproportionately high and adverse impact on environmental justice communities or populations.

---

[12] *See* FHWA et al., *Central Business District Tolling Program, Finding of No Significance, Appendix A: Final Environmental Assessment* at ES-7, MTA.INFO (June 14, 2024), https://new.mta.info/project/CBDTP/environmental-assessment.

[13] *FHWA Greenlights Environmental Assessment for New York City's Proposed Congestion Pricing Plan*, U.S. FED. HIGHWAY ADMIN. (Mar. 30, 2021), https://highways.dot.gov/newsroom/fhwa- greenlights-environmental-assessment-new-york-citys-proposed-congestion-pricing-plan.

[14] Final EA, Table ES-1 at ES-9.

[15] Final EA, Table ES-3 at ES-14.

62.     On March 27, 2024, the Triborough Board approved a toll schedule through a formal ratemaking process under New York State law.

63.     On June 5, 2024, New York Governor Kathy Hochul announced a temporary pause of the congestion pricing program.

64.     On June 14, 2024, FHWA concluded that the approved toll schedule and associated impacts were analyzed and mitigated appropriately under NEPA, that no additional environmental analysis was warranted, and that the conclusions in the Final EA and FONSI remained valid.

65.     On November 14, 2024, Governor Hochul proposed that the congestion pricing program move forward with the toll schedule adopted by the Triborough Board in March 2024, but to be phased in over a period of years, with a lower initial toll amount to lessen the burden on drivers during early implementation (the "Phase-In Approach"). In November 2024, the Project Sponsors completed a second reevaluation under NEPA to assess the Phase-In Approach.

66.     That reevaluation confirmed that under the Phase-In Approach, the congestion pricing program would still meet its purpose and need, and all of its objectives. Specifically, Reevaluation 2 predicted that the Phase-In Approach with an initial $9 toll would exceed a daily five percent reduction in vehicle miles traveled in the central business district and a ten percent reduction in vehicles entering the district daily and would generate sufficient annual revenues to fund MTA capital projects. After phase-in of the $15 peak auto toll, the Phase-In Approach would result in at least 8.9 percent reduction in miles traveled, at least 17.3 percent reduction in vehicle entry, and at least $0.9 billion in annual revenue.

16

67. On November 18, 2024, the Triborough Board formally adopted the Phase-In Approach.

68. On November 21, 2024, FHWA concluded that the impacts of the Phase-were analyzed and mitigated accordingly, that the conclusions in FHWA's Final EA and FONSI remained valid, and that no additional environmental analysis was warranted.

## The Cooperative Agreement

69. That same day, on November 21, 2024, FHWA and the three Project Sponsors signed the cooperative agreement.

70. The cooperative agreement states in relevant part that "[e]ffective on the date of this Agreement, the project is approved as a pilot program," and Triborough is authorized to "operate the Project as a toll Project in accordance with the provisions of this Agreement and as a value pricing project, as part of State DOT's value pricing pilot program." Exhibit 2, cl. 1.

71. FHWA further agreed that "the imposition of tolls under this Agreement does not render Federal-aid highways within the State of New York generally ineligible for Federal-aid highway funds where such highways are otherwise eligible under the particular funding program." *Id.* cl. 5.

72. In return, the Project Sponsors agreed to a number of obligations in the cooperative agreement, including: (1) "to adequately maintain" federal-aid highways located in the geographic area of the congestion pricing program, *id.* cl. 6; (2) to submit regular reports on the effects of the congestion pricing program "on driver behavior, traffic volume, congestion, transit ridership" and other topics to FHWA, *id.* cl. 8(b);

17

and (3) "to comply with all Federal laws and requirements applicable to this project, including the laws and policies applicable to the [VPPP]," *id.* cl. 9. Clause 8 of the cooperative agreement further requires that the Project Sponsors "identify benefits the application of tolls has in reducing climate pollution" and "demonstrate the benefits mitigation measures provide to underserved communities." *Id.* cl. 8.

73.    In addition, the cooperative agreement requires that FHWA and the Project Sponsors to "cooperate and work together in the implementation of the Project." *Id.* cl. 8(a).

74.    The cooperative agreement does not include any provision authorizing FHWA to terminate the agreement. Rather, it contemplates that only Triborough could unilaterally decide to discontinue the congestion pricing program, requiring the Project Sponsors to "work with FHWA to return the Project to its original operating condition if [Triborough] decides to discontinue tolls on the Project." *Id.* cl. 11.

75.    The cooperative agreement references FHWA regulations at 23 C.F.R. Parts 940 and 950. *Id.* cl. 9. These regulations do not grant FHWA authority to unilaterally terminate the cooperative agreement.

## Implementation of the Congestion Pricing Program

76.    In late 2024, several groups, individuals, and counties, as well as the State of New Jersey, sought preliminary injunctive relief barring the MTA and Triborough from beginning the congestion pricing program or collecting tolls on various federal and state constitutional and statutory grounds. Each of these claims for injunctive relief was rejected by the courts. *See Chan v. U.S. Dept. of Transp.*, No. 23 Civ. 10365 (LJL), 2024 WL 5199945 (S.D.N.Y. Dec. 23, 2024) (Liman, J.); *County*

18

*of Rockland v. Metro. Transp. Auth.*, No. Civ. 24-3325 (2d Cir. Jan. 28, 2025) (per curiam) [*Rockland* 2d Cir. ECF No. 31]; *New Jersey v. Metro. Transp. Auth.*, No. Civ. 25-1033 (3d Cir. Jan. 4, 2025) (Bibas, J.) [*New Jersey* 3d Cir. ECF No. 9]; *Rockland v. Metro. Transp. Auth.*, No. 24 Civ. 2285 (S.D.N.Y. Jan. 14, 2025) (Seibel, J.) [*Rockland* ECF No. 56]; *New Jersey v. U.S. Dept. of Transp.*, No. 23 Civ. 3885 (D.N.J. Jan. 3, 2025) (Gordon, J.) [*New Jersey* ECF No. 212]; *Rockland v. Metro. Transp. Auth.*, No. 24 Civ. 2285 (S.D.N.Y. Dec. 23, 2024) (Seibel, J.) [*Rockland* ECF No. 52]; *Neuhaus v. Triborough Bridge & Tunnel Auth.*, No. 24 Civ. 3983 (S.D.N.Y. Dec. 23, 2024) (Seibel, J.) [*Neuhaus* ECF No. 44].

77.    On January 5, 2025, the congestion pricing program went into effect.

78.    Eligible vehicles entering the central business district are being tolled at the rates established in the Phase-In Approach.

79.    MTA data showed that crossing times were significantly faster at the Lincoln Tunnel and the Holland Tunnel in January 2025, compared to January 2024.[16] Trips on the Williamsburg Bridge and Queensboro Bridge have also been significantly faster and riders on express buses are saving time on their commutes.[17]

80.    Data collected by the MTA reveals that since the congestion pricing program began, traffic in the central business district decreased substantially, with 1.2 million fewer vehicles entering the district than projected. Drivers in the district are experiencing travel time improvements in the afternoon peak hours "with

---

[16] Andrew Siff, *MTA Calls Congestion Pricing 'Transformative" on Commutes,* NBC NEW YORK, (Jan. 29, 2025), https://www.nbcnewyork.com/new-york-city/mta-congestion-pricing-transformative-commute-impact/6126670/.

[17] *Id.*

reductions as high as 59%."[18]  Inbound river crossings to the central business district have seen a 10%-48% decrease in travel times, and several bus routes have seen significant decreases in the time needed to complete their routes.[19]  After a brief rise in January, daily average traffic volumes have dropped on the bridges that do not connect directly to the central business district, indicating that the toll has not diverted traffic.[20]

81.    The congestion pricing program has not stymied economic activity.  Data provided by the MTA shows that in January 2025, 35.8 million people visited Business Improvement Districts within the central business district, a 1.5 million increase compared to last January 2024. [21]

82.    The Partnership for New York City's President & CEO Kathryn Wylde has stated that, since the onset of Congestion Pricing, New Yorkers are "moving faster and there's less traffic,"[22] and that "[i]n every respect, this is a policy that President Trump and the Republicans should be supporting." [23]

83.    Subway ridership has increased, while crime in the subway has

---

[18] *See New Congestion Relief Zone Data Captures Magnitude of Faster Commutes for Drivers and Bus Riders, Fewer Vehicles and Surging Express Bus Ridership*, MTA (Jan. 29, 2025), https://www.mta.info/press-release/new-congestion-relief-zone-data-captures-magnitude-of-faster-commutes-drivers-and-bus.

[19] *Id.*

[20] Dave Colon, *Data: Congestion Pricing is Not Rerouting Traffic to Other Boroughs*, STREETSBLOG NYC (Mar. 12, 2025) https://nyc.streetsblog.org/2025/03/12/data-outer-borough-congestion-pricing- spillover-traffic-not-happening.

[21] Arun Venugopal, *Vehicle traffic is down in Manhattan, but pedestrian traffic is up, data says,* GOTHAMIST (Feb. 13, 2025) https://gothamist.com/news/vehicle-traffic-is-down-in-manhattan-but-pedestrian-traffic-is-up-data-says

[22] Dick Brennan, *President Trump said to have NYC's congestion pricing, bike lanes in his crosshairs*, CBS NEWS (Feb. 10, 2025), https://www.cbsnews.com/newyork/news/president-trump-nyc-congestion- pricing-bike-lanes/.

[23] Ry Rivard & Nick Reisman, *New York's business boosters push Trump to keep Manhattan tolls*, POLITICO (Feb. 11, 2025), https://www.politico.com/news/2025/02/11/new-york-trump-congestion-pricing-00203540.

decreased. In January 2025, there were 36% fewer crimes reported on the subway than last January.[24]

## Then-Candidate Trump's Repeated Threats to "Kill" Congestion Pricing

84.    In his Presidential campaign, Donald Trump repeatedly voiced his political opposition to the congestion pricing program and stated that he would "terminate" and "kill" the congestion pricing program once in office.

85.    Following the election, President Trump continued to express his opposition to the Program, saying in an interview with the *New York Post* on November 14, 2024, that he "strongly disagree[d] with the decision on the congestion tax."[25]

## Unlawful Termination of the Cooperative agreement

86.    On February 19, 2025, Secretary Duffy notified New York Governor Hochul, along with City DOT and Triborough, that he purported to rescind defendant FHWA's approval of congestion pricing in the central business district and terminate the cooperative agreement. *See* Exhibit 1. Although the Secretary stated that he was terminating the agreement because FHWA had lacked authority to enter into it under ISTEA, the Secretary also indicated that the termination was motivated by the President's opposition to congestion pricing and the Secretary's own policy disagreement with New York State. *Id.* at 1-2. The Secretary stated that, in his view,

---

[24] Barbara Russo-Lennon, Subway Crime Plummets as Ridership Jumps Significantly in 2025 in Congestion Pricing Era, AM NY (Feb 4, 2025), https://www.amny.com/nyc-transit/nyc-subway-crime-plummets-ridership-jumps-2025/.

[25] Steven Nelson, *Trump slams Hochul move to revive NYC congestion tax: 'It will hurt workers, families, and businesses'*, N.Y. POST (Nov. 14, 2024), https://nypost.com/2024/11/14/us-news/trump- slams-hochul-move-to-revive-nyc-congestion-tax/.

congestion pricing in Manhattan was not a "fair deal." *Id.* at 2.

87.    The Secretary asserted that the congestion pricing program was "not an eligible [cooperative agreement]" for two reasons: (1) the program creates "cordon pricing," meaning that there is not a toll-free means to enter the central business district; and (2) the toll rate was "primarily" calculated to raise revenue for MTA capital projects, as opposed to reducing congestion. *Id.* at 3.

88.    The Secretary did not provide any explanation of the grounds for the reversal of FHWA's earlier determination that the congestion pricing program was eligible for the VPPP or FHWA's publicly available guidance that cordon pricing is permitted under VPPP, and that revenues from VPPP programs may be used to support public transit.

89.    Defendants did not give City DOT, State DOT, or Triborough notice or an opportunity to be heard nor did it prepare any environmental review under NEPA before terminating the cooperative agreement.

90.    On February 20, 2025, Executive Director Shepherd notified project sponsors City DOT, State DOT, and Triborough that, pursuant to Secretary Duffy's February 19 letter, "[State DOT] and its project sponsors must cease the collection of tolls on Federal-aid highways in the [central business district] by March 21, 2025." Exhibit 3 at 1. On March 20, 2025, Shepherd sent a second letter purporting to extend the deadline to April 20, 2025. Exhibit 4. The Project Sponsors are Triborough, State DOT, and City DOT.

### The Harms to New York City
### from Ending the Congestion Pricing Program

91.    New York City's interests will be harmed if congestion pricing is halted.

92.   New York City has an interest in ensuring that the cooperative agreement authorizing congestion pricing to which City DOT, as an authorized participant in the VPPP, was a signatory remains in effect.

93.   New York City's interest in the implementation of the Act will be harmed if tolling revenues are halted.

94.   New York's economy, and to a significant degree the nation's economy, depends on keeping vehicle traffic in the New York City metropolitan area moving.

95.   Critical parts of the MTA capital program would be delayed if program tolling revenues are halted.  The program includes: (1) adding accessibility improvements (including elevators) to numerous subway stations within the City consistent with the Americans with Disabilities Act; (2) doubling the number of track lines with modernized signals; (3) purchasing over 1,900 new rail cars, which are six times more reliable than older ones, and replacing 2,400 buses; (4) replacing approximately 60 miles of track; and (5) renewing stations and addressing important repair projects at 175 stations.

96.   The congestion pricing program will also provide funding for much-needed repairs to Grand Central Terminal, a more than 100-year-old structure that is used by more than 700 trains a day.  And coupled with funding from the 2015-2019 program, the MTA Capital Program further provides funding for three new fully accessible stations on the Second Avenue Subway that would allow connection to the Metro-North lines, strengthening connections for Harlem and East Harlem residents.

97.   New Yorkers, through the MTA Capital Program, will also receive better access to Penn Station through a new route with four new stations on the Metro-

North New Haven Line that will carry up to 50,000 Metro-North customers directly to Penn Station every day.

98.    Finally, ending the congestion pricing program means the unabated continuation of the severe congestion in Manhattan's central business district, with its concomitant economic, environmental, and public health and safety costs to businesses, residents, commuters, workers, students and visitors in this area, without any evaluation of these and other environmental impacts, opportunity for public participation, or consideration of alternatives required by NEPA.

## CLAIMS FOR RELIEF

### COUNT I
### Termination of the VPPP Agreement
### Violation of the Administrative
### Procedure Act

### (Substantively Arbitrary & Capricious – Contrary to Law)
(5 U.S.C. § 701 *et seq.*)

99.    The City realleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

100.    The acts of all executive branch officers "must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902).

101.    Further, under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be … contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.e" 5 U.S.C. §§ 706(2)(B)-(C).

24

102.  Defendants are not authorized by any law—statutory or constitutional—to unilaterally terminate the VPPP Agreement contrary to its terms. The VPPP Agreement is a valid agreement, currently in effect, supported by consideration, and subject to considerable reliance interests.  Neither ISTEA nor the VPPP Agreement authorizes FHWA to unilaterally rescind the VPPP Agreement or to rescind FHWA's approval of the Program.

103.  ISTEA does not include any provision authorizing FHWA to terminate the VPPP Agreement.  ISTEA authorizes the Secretary to "enter into" agreements "to establish, maintain, and monitor" value pricing pilot programs. ISTEA § 1012(b). ISTEA further directs that the Secretary shall "monitor the effect of such programs for a period of at least 10 years."

104.  The VPPP Agreement does not include any provision authorizing FHWA to terminate the agreement.  Rather, the VPPP Agreement contemplates that only Triborough could unilaterally decide to discontinue the Program, requiring the Project Sponsors to "work with FHWA to return the Project to its original operating condition if TBTA decides to discontinue tolls on the Project."  VPPP Agmt. cl. 11.  The VPPP Agreement further provides that City DOT and Triborough shall "monitor and report on the project performance" for "a period of at least ten years or to the end of the life of the Project, whichever is sooner." *Id.* cl. (8)(b).

105.  The VPPP Agreement references FHWA regulations at 23 C.F.R. Part 940 and 950. These regulations do not purport to grant FHWA authority to unilaterally terminate the VPPP Agreement, and the FHWA has acted *ultra vires*.

106.  In addition, an executive officer acts *ultra vires* where it "deprives a

25

contractor of a right expressly or impliedly granted by another statute." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996).

107.    Defendants have deprived Plaintiffs of rights expressly and impliedly granted by ISTEA § 1012(b), which permits tolling of federally funded highways following approval of a VPPP Project.

108.    Defendants have no authority to terminate the VPPP Agreement or rescind TBTA's authority to operate the Program.  Therefore, Defendants have acted contrary to law and the Challenged Action is arbitrary and capricious and must be declared unlawful, vacated, and set aside.

## COUNT II

### *Ultra Vires*

### Termination of the VPPP Agreement

109.    The City realleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

110.    The acts of all executive branch officers "must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902).

111.    ISTEA does not authorize Defendants to unilaterally rescind a cooperative agreement entered into to authorize tolling under the VPPP, nor does the VPPP Agreement itself empower Defendants to terminate the agreement or rescind FHWA's approval of the Program.

112.    The Challenged Action is *ultra vires* because it purports to unilaterally

26

terminate the VPPP Agreement and rescind the VPPP Agreement without statutory authority and contrary to the applicable agency regulations and the terms of the VPPP Agreement.

113.    The Challenged Action is *ultra vires* because rescission of the VPPP Agreement is not authorized under any provision of law.

114.    The Challenged Action is *ultra vires* because the VPPP Agreement is a valid and binding agreement and the VPPP Agreement does not permit unilateral rescission by FHWA or any other governmental actor.

115.    In addition, an executive officer also acts *ultra vires* where it "deprives a contractor of a right expressly or impliedly granted by another statute." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996).

116.    Defendants have deprived Plaintiffs of rights expressly and impliedly granted by ISTEA §1012(b), and thus acted *ultra vires*.

## COUNT III

### Termination of the VPPP Agreement
### Violation of the Administrative
### Procedure Act

### (Procedurally Arbitrary & Capricious – Contrary to Regulations)
(5 U.S.C. § 701 *et seq.*)

117.    The City realleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

118.    The VPPP Agreement is a cooperative agreement because "the principal purpose of the relationship is to transfer a thing of value" (authority to collect toll revenues) and "substantial [federal] involvement is expected." 31 U.S.C. § 6305; 2 C.F.R. 200.1; *see also* 23 U.S.C. § 149 note (Value Pricing Pilot Program), cl. 1

27

(authorizing Secretary to enter into "cooperative agreements" under the VPPP).

119. FHWA has determined that agreements authorizing projects that require tolling authority under the VPPP are cooperative agreements, even where such agreements do not include a federal funding component. *See Congestion Pricing, Value Pricing Pilot Program*, FHWA (May 17, 2024), https://ops.fhwa.dot.gov/congestionpricing/value_pricing ("The Moving Ahead for Progress in the 21st Century (MAP-21) Act did not authorize additional funds after FY2012 for the discretionary grant component of the Value Pricing Pilot Program (VPPP). However, FHWA's ability to enter into *cooperative agreements* for projects that require tolling authority under this program for their implementation will continue.") (last accessed Apr. 2, 2025).

120. FHWA has adopted the Office of Management and Budget's agency-wide *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* ("Uniform Guidance"), 2 C.F.R. Part 200. *See id.* § 1201.1.

121. The Uniform Guidance sets out specific conditions under which an award, including a cooperative agreement, *see id.* § 200.1, may be terminated:

> a. by the agency if the recipient "fails to comply with the terms and conditions" of the award;
>
> b. by the agency with the "consent" of the recipient;
>
> c. by the recipient; and
>
> d. by the agency "pursuant to the terms and conditions" of the award.

*Id.* § 200.340(a).

122. None of the conditions in which termination is permitted under the

Uniform Guidance are present here. First, Defendant Duffy did not and cannot claim that the recipients have failed to comply with the terms of the conditions of the VPPP Agreement, and the recipients have in fact complied with the terms of the VPPP Agreement; second, the recipients did not and do not consent to termination of the VPPP Agreement; third, the recipients have not requested termination of the VPPP Agreement; and, fourth, the VPPP Agreement does not contain any provisions that would permit Defendants to terminate the agreement unilaterally. Additionally, to the extent the VPPP Agreement contemplates termination by any party, it reflects that TBTA would be the one party which could "discontinue tolls on the Project." VPPP Agmt., cl. 11.

123. The Uniform Guidance describes specific steps that an agency must take before it may terminate an award for noncompliance, including providing written notice and an opportunity to be heard. 2 C.F.R. § 200.341(a), 342; *see also* U.S. Dep't of Transp., *Guide to Financial Assistance* at 72-77 (Oct. 2019) (further describing requirements for pre-termination notice and appeals). The Uniform Guidance also provides that, before an agency may terminate an award, including a cooperative agreement, an agency must provide written notice and an opportunity to be heard. *Id*. §§ 200.341(a), 342. FHWA did not provide the state and local sponsor recipients with notice of its intent to terminate the VPPP Agreement and also has not provided notice to the same recipients of any alleged noncompliance with the VPPP Agreement. The recipients have not been provided with an opportunity to be heard or to appeal the termination.

124. The Administration's action in terminating tolling authority under the

29

VPPP Agreement contrary to the terms of the VPPP Agreement and to the applicable regulations governing the administration of the VPPP Agreement was arbitrary, capricious, and not in accordance with law, and without observance of procedure required by law, within the meaning of the APA, 5 U.S.C. § 706(2), and should be held unlawful and set aside by the Court.

**COUNT IV**

**Termination of the VPPP Agreement**

**Violation of the Due Process Clause of the Fifth Amendment**
(U.S. Const. amend. V, cl. 3)

125.  The City realleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

126.  The Due Process Clause of the Fifth Amendment provides that "No person shall … be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V, cl. 3.

127.  Upon the execution of the VPPP Agreement, the City had a property interest in the VPPP Agreement, and in the benefits it would provide to the City through the tolling authority granted to plaintiff Triborough.

128.  An agency's withdrawal of consent for public or private entities to engage in a contract implicates a property interest protected by the Due Process Clause. *See, e.g.*, *Toxco Inc. v. Chu*, 724 F. Supp. 2d 16, 27-28 (D.D.C. 2010). Defendants' unilateral termination of the VPPP Agreement deprives the City of a property interest contrary to law.

129.  Further, the Plaintiffs' property interest in the Program and its infrastructure "attain... constitutional status by virtue of the fact that they have been

initially recognized and protected by state law," here, the TMA. *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014) (*quoting Paul v. Davis*, 424 U.S. 693, 710, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)).

130.   Unilateral termination of the VPPP Agreement does not afford Plaintiffs the process they are entitled to under the VPPP Agreement, the relevant regulations, and the United States Constitution.   Prior to terminating the VPPP Agreement, Defendants did not provide Plaintiffs with notice and failed to give Plaintiffs an opportunity to respond or be heard.

131.   In addition, the VPPP Agreement constitutes an agreement which cannot be invalidated without due process in accordance with its terms.

132.   Defendants' actions violate the Due Process Clause of Fifth Amendment by depriving the City without due process of its property interest in the VPPP Agreement and the benefits flowing from the authority granted by the VPPP Agreement to plaintiff Triborough to implement tolls within the CBD for the Program.

## COUNT V

### Termination of the VPPP Agreement
### Violation of the Administrative
### Procedure Act

### (Substantively Arbitrary & Capricious – Insufficient Explanation)
(5 U.S.C. § 701 *et seq.*)

133.   The City realleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

134.   At the time of Defendants' purported termination of the VPPP Agreement, FHWA had issued the Final EA, FONSI, two reevaluations, and had

executed the VPPP Agreement authorizing tolling under the Program.

135.   FHWA's execution of the VPPP Agreement constituted final agency action with respect to FHWA's decision to authorize tolling under the Program.

136.   Under the APA, an agency "changing its course" by rescinding a prior rule or order "is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983).

137.   Defendants did not adequately explain their reasoning for purportedly rescinding the VPPP Agreement, in violation of the APA. *See Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 106 (2015) ("[T]he APA requires an agency to provide more substantial justification when its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account.")

138.   Defendants did not adequately examine or rely on relevant data in deciding to terminate the VPPP Agreement, in violation of the APA. *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 30 (an agency "must examine the relevant data and articulate a satisfactory explanation for its action.")

139.   Defendants failed to consider the impact on the economy, the environment, and congestion in the CBD in acting to terminate the tolling authority for the Program. The Program will provide substantial benefits to the CBD and the region in terms of reduced traffic and congestion, improved air quality, and concomitant environmental, public health, and economic benefits resulting from

32

shifting traffic patterns that occurred following the implementation of the Program.

140.   Defendants were obligated to consider the costs of ending the VPPP Agreement for transit riders, people residing, working, learning and recreating in and around the CBD, and Triborough and MTA.  Defendants transparently failed to do so, having made their decision without seeking input from the City and without inquiring about the costs from congestion, pollution, and cessation of a program the project sponsors have invested hundreds of millions to bring online.

141.  Defendants also failed to adequately consider whether "there was 'legitimate reliance' on the" prior administration's method of using the VPPP Agreement as an indispensable tool in efforts to address congestion, reduce pollution, and raise revenues to support public transit. *Dep't of Homeland Sec. v. Regents of the Univ. of Ca.*, 140 S. Ct. 1891, 1913 (2020) (quoting *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996)).  The City relies in part, for the transportation of its residents and the economic activity that takes place therein, on the services of MTA, TBTA, which now hold debt issued in reliance on Program revenues. Thus, all project sponsors have relied on the executed VPPP Agreement. The Challenged Action was arbitrary and capricious; where, as here, "an agency changes course ... it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Id.* (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)).

142.   In addition, Defendants failed to consider alternative approaches that would allow at least some of the Program to continue, or another means to raise revenues, and that would have accordingly imposed fewer burdens on Plaintiffs.  The

33

Supreme Court has held an agency action is arbitrary and capricious because it was issued "'without any consideration whatsoever' of a [more limited] policy." *Regents of the Univ. of Cal.,* 140 S. Ct. at 1912 (quoting *State Farm,* 463 U.S. at 51).

143.   By omitting any analysis of continuing at least some elements of the Program, the Challenged Action "failed to consider important aspects of the problem" before it. *Id.* at 1910.

144.   The Challenged Action, likewise, fails to meaningfully consider more limited policies than complete termination of VPPP Agreement.

145.   Defendants had made no indication that it was reconsidering the Program until President Trump took office last month. But President Trump has long indicated his desire to "kill" or terminate the Program, both in conversations with Republican lawmakers and in social media posts. Defendants, bending under this political pressure, did not undertake any analysis or provide any explanation before revoking the prior decision to enter into the VPPP Agreement and approve the Program.

146.   Defendants' action purporting to revoke tolling authority under the VPPP Agreement without providing sufficient explanation of its decision was therefore arbitrary, capricious, and not in accordance with law, and without observance of procedure required by law, within the meaning of the APA, 5 U.S.C. § 706(2), and should be held unlawful and set aside by the Court.

## COUNT VI

### Termination of the VPPP Agreement

### Violation of the National Environmental Policy Act and the Administrative Procedure Act

(42 U.S.C. § 4321 *et seq*.; 5 U.S.C. §§ 701–706)

147.  The City realleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

148.  At the time of Defendants' purported termination of the VPPP Agreement, Defendants had issued the Final EA, FONSI, two reevaluations and had executed the VPPP Agreement authorizing tolling under the Program.

149.  At the time of Defendants' purported termination of the VPPP Agreement, the NEPA process for the Program was complete, and there was no "major federal action" remaining to occur with respect to the Program.

150.  Defendants' purported termination of the VPPP Agreement constitutes a new final agency action under NEPA and the APA and a major federal action within the meaning of NEPA, 42 U.S.C. §§ 4332(C), 4336e(10).

151.  NEPA requires Defendants to prepare an EIS for any "major federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

152.  To determine whether a "major federal action" will have a significant effect on "the quality of the human environment," Defendants may prepare an EA. 42 U.S.C. § 4336(b)(2); 40 C.F.R. § 1501.5; 23 C.F.R. § 771.119.

153.  If an agency determines that the proposed action will not have significant effects, accounting for mitigation, it can issue a FONSI. 42 U.S.C. §

35

4336(b)(2); 40 C.F.R. § 1501.6; 23 C.F.R. § 771.121.  If the EA reveals that there may be significant effects, an EIS is required.

154.  Either level of review requires public participation opportunities and consideration of alternatives to the proposed action.  *E.g.*, 42 U.S.C. § 4332(C)(iii), (F) and (H); 40 C.F.R. §§ 1501.5(c), (f), 1502.14s; 23 C.F.R. 771.119(b).

155.  Defendants failed to undertake *any* NEPA review of their decision to terminate the VPPP Agreement, much less an adequate environmental review that considered all environmental impacts of the proposed action.

156.  Defendants did not undertake any public participation with respect to their decision to terminate the VPPP Agreement, in contrast to the substantial public participation opportunities afforded prior to the adoption of the Final EA (including 44-day public comment period) and FONSI (including a 30-day public availability period).

157. Under NEPA and its implementing regulations, Defendants are required to take a hard look at the reasonably foreseeable social, economic, and environmental impacts of a proposed action and its alternatives.  42 U.S.C. § 4336; 23 C.F.R. § 771.119(b).

158.  Defendants failed to consider the full extent of the reasonably foreseeable impacts of seeking to terminate the Program, which will provide substantial benefits to the CBD and the region in terms of reduced traffic and congestion, improved air quality, and concomitant environmental, public health, and economic benefits resulting from shifting traffic patterns that occurred following the implementation of the Program.

159.  Defendants failed to consider alternatives to terminating the program. 42 U.S.C. § 4332(C)(iii), (F) and (H); 40 C.F.R. §§ 1501.5(c), 1502.14s; 23 C.F.R. § 771.119(b).

160.  Defendants failed to consider mitigation measures that "avoid, minimize, or compensate for adverse effects caused by a proposed action or alternatives," 40 C.F.R. § 1508.1(y), or to identify measures which might mitigate adverse environmental impacts, and incorporate measures necessary to mitigate adverse impacts into its action terminating the VPPP Agreement. 23 C.F.R. §§ 771.105(e), 771.119(b).

161.  Defendants' action in revoking tolling authority under the VPPP Agreement without conducting the required NEPA review was therefore arbitrary, capricious, and not in accordance with law, and without observance of procedure required by law, within the meaning of the APA, 5 U.S.C. § 706(2), and should be held unlawful and set aside by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

i.   Declare that Defendants' purported termination of the VPPP Agreement was undertaken in violation of the terms of the VPPP Agreement and is in excess of statutory authority and *ultra vires*; in violation of Plaintiffs' Fifth Amendment right to Due Process; without observance of procedure required by law in violation of the APA; arbitrary and capricious in violation of the APA; and violates NEPA;

ii.  Vacate the Challenged Action and Defendants' decision to purportedly terminate the VPPP Agreement;

iii. Grant any further necessary and proper relief pursuant to 28 U.S.C. § 2202;

iv.  Award Plaintiffs their costs for the action, including reasonable

attorneys' fees; and

v.   Grant all such other and further relief as it deems just and proper.

Dated: New York, New York
     April 2, 2025

Respectfully   Submitted,

MURIEL GOODE-TRUFANT
Corporation Counsel of the City of
New York

By: _____

   Nathan Taylor
   Christian Harned
   New York City Law Department
   100 Church Street
   New York, New York 10007
   Telephone: (212) 356-2315
   E-mail:    charned@law.nyc.gov
              ntaylor@law.nyc.gov
   *Attorneys  for Intervenor-Plaintiff New
   York City Department of
   Transportation*

38

# Exhibit 1



**THE SECRETARY OF TRANSPORTATION**
WASHINGTON, DC 20590

February 19, 2025

The Honorable Kathy Hochul
Governor of New York
Albany, NY  12224

Dear Governor Hochul:

I am writing to you concerning the Federal Highway Administration's (FHWA) approval of the Central Business District (CBD) Tolling Program (CBDTP), which is a pilot project under the Value Pricing Pilot Program (VPPP).  The FHWA implements VPPP on behalf of the Secretary of Transportation pursuant to a delegation of authority.  On November 21, 2024, FHWA and the New York State Department of Transportation (NYSDOT) executed an agreement (November 21 Agreement) approving the CBDTP pilot project under VPPP.  The VPPP is an exception to the general rule prohibiting tolling on highways. Congress approved the VPPP exception in 1991 as a pilot to test congestion reduction techniques. New York State is one of 15 States authorized to implement the program.

Pursuant to the November 21 Agreement, FHWA approved NYSDOT's implementation of CBDTP as a pilot project under VPPP.  Under the pilot project, NYSDOT and its project sponsors, Triborough Bridge and Tunnel Authority (TBTA) and New York City Department of Transportation (NYCDOT), were authorized to implement a method of congestion pricing known as "cordon pricing," under which certain vehicles are charged tolls upon entry into Manhattan south of and inclusive of 60th Street. The imposition of tolls under the CBDTP pilot project by NYSDOT and its project sponsors became operational on January 5, 2025.

President Trump recently took office on January 20, 2025.  I was nominated by the President to be the Secretary of Transportation, confirmed by the Senate on January 28, 2025, and sworn into office on January 29, 2025.  Upon assuming my responsibilities, President Trump asked me to review FHWA's approval of CBDTP as a pilot project under VPPP.  In particular, the President expressed his concerns about the extent of the tolling that was approved by the Department of Transportation on highways that have been constructed with funds under the Federal-aid Highway Program and the significant burdens on the New York City residents, businesses, and area commuters (including those from New Jersey and Connecticut) who regularly use the highway network in the CBD tolling area.

As Secretary of Transportation, I am aware of many concerns regarding the CBDTP pilot project. For example, in a January 20, 2025, letter to President Trump, which I reviewed, New Jersey Governor Murphy expressed significant concerns about the impacts that the imposition of tolls under the CBDTP pilot project is having on New Jersey commuters and residents. Also, in a January 20, 2025, letter to me, New Jersey Department of Transportation Commissioner O'Connor also expressed many concerns regarding the impacts of the CBDTP pilot project to New Jersey communities. Additionally, I have been made aware that legal challenges are pending regarding the project, which question whether the scope of the project exceeds the authority of VPPP.

I share the President's concerns about the impacts to working class Americans who now have an additional financial burden to account for in their daily lives. Users of the highway network within the CBD tolling area have already financed the construction and improvement of these highways through the payment of gas taxes and other taxes. The recent imposition of this CBDTP pilot project upon residents, businesses, and commuters left highway users without any free highway alternative on which to travel within the relevant area. Moreover, the revenues generated under this pilot program are directed toward the transit system as opposed to the highways. I do not believe that this is a fair deal.

In light of the President's concerns about the CBDTP pilot project, the legal challenges that have been made, as well as the concerns expressed by New Jersey Governor Murphy and New Jersey Commissioner O'Connor, I reviewed the tolling authority granted under VPPP to the CBDTP pilot project for compliance with Federal law. For the reasons explained below, I have concluded that the scope of this pilot project as approved exceeds the authority authorized by Congress under VPPP.

The construction of Federal-aid highways as a toll-free highway system has long been one of the most basic and fundamental tenets of the Federal-aid Highway Program. Ever since the enactment of the Federal-Aid Road Act of 1916, Congress has required that roads constructed with Federal-aid highway funds be free from tolls of all kinds, subject to limited exceptions. *See* Public Law 64-154, § 1, 39 Stat. 355 (1916). This general requirement was codified at 23 U.S.C. § 301 under Pub. L. No. 85-767, 72 Stat. 885 (1958), and remains the law today. Specifically, this statute currently reads as follows:

> Except as provided in section 129 of this title with respect to certain toll bridges and toll tunnels, all highways constructed under the provisions of this title shall be free from tolls of all kinds.

In 1991, Congress created a limited exception to the tolling prohibition for "congestion pricing pilot projects" implemented by States, local governments, or public authorities. Intermodal Surface Transportation Efficiency Act of 1991, § 1012(b), Pub. L. No. 102-240. Congress did not define "congestion pricing pilot project." Congress later amended the statute to replace "congesting pricing pilot projects" with "value pricing pilot programs," but it again did not

define this term.  Transportation Equity Act of the 21st Century, § 1216(a), Pub. L. No. 105-178 (1998).  The long-standing history of the anti-tolling provision requires me to narrowly construe this exception.

I have concluded that CBDTP is not an eligible "value pricing pilot program," for two reasons.

*First*, CBDTP uses a method of tolling known as "cordon pricing," under which drivers who enter Manhattan south of 60th Street are charged tolls no matter what roads they use.  Unlike other forms of tolling, the CBDTP's cordon pricing program provides no toll-free option for many drivers who want or need to travel by vehicle in this major urbanized area.  Congress in a separate statutory provision has authorized cordon pricing on the *Interstate System* where drivers can choose a non-Interstate route.  *See* 23 U.S.C. § 129(d)(4)(B), (6)(A).  But no statute contemplates cordon pricing in a situation where tolls are inescapable, and FHWA has never before approved a VPPP program that uses cordon pricing or that does not provide a toll-free option.  I have concluded that Congress did not, in using the vague phrase "value pricing pilot program," authorize the unprecedented and consequential step of cordon pricing.  Indeed, the Town of Hempstead and its supervisor have sued FHWA, TBTA, and NYSDOT making this argument, and I believe that FHWA faces a significant risk of loss in that litigation.  *See Town of Hempstead v. DOT*, No. 24-cv-3263 (E.D.N.Y.).

*Second*, the imposition of tolls under the CBDTP pilot project appears to be driven primarily by the need to raise revenue for the Metropolitan Transit Authority (MTA) system as opposed to the need to reduce congestion.  I recognize that preliminary project data published by the MTA reports a congestion reduction benefit, but the toll rate that is set under VPPP should not be driven primarily by revenue targets, particularly revenue targets that have nothing to do with the highway infrastructure.  While revenue generation is a necessary outcome of any congestion pricing scheme and specifically allowable under the VPPP statute, the primary consideration of the toll rates here is to raise revenue for an MTA capital program.  This revenue target for MTA projects artificially drives the establishment of toll rates to the highway users rather than the price needed to reduce congestion.  As a result, highway users of the Federal-aid highway network within the priced zone are burdened with a price that is set to raise certain amounts of revenue for MTA capital projects rather than a price that is necessary to have an impact on congestion.  Even if improving the transit system may eventually affect roadway congestion, there is no indication that the tolls were set in order to achieve these attenuated effects.  I have concluded that VPPP does not authorize tolls that are calculated based on considerations separate from reducing congestion or advancing other road-related goals.

Federal-aid infrastructure projects must be carried out in compliance with Federal law.  Due to my conclusion that FHWA lacked statutory authority to approve the cordon pricing tolling under the CBDTP pilot project, I am rescinding FHWA's approval of the CBDTP pilot project under the November 21 Agreement and terminating the Agreement.  I recognize that FHWA under the prior Administration concluded, when executing the November 21 Agreement, that the CBDTP was eligible for approval under VPPP, and that my determination represents a change in position.

FHWA, however, did not explain the basis for its conclusion, and nothing in the prior approval undermines the above analysis upon which my determination is based.

I recognize, moreover, that TBTA and NYSDOT have relied on the Agreement to begin collecting tolls under the program, but I have concluded that such reliance should not prevent the termination of the November 21 Agreement.  While the TBTA and NYSDOT have incurred costs related to the program, many of those costs were incurred before FHWA signed the Agreement, and FHWA is not aware of any substantial costs associated with the physical stopping of the program.  To be sure, the termination of the program may deprive the transit system of funding, but any reliance on that funding stream was not reasonable given that FHWA approved only a "pilot project."  Finally, any reliance interests cannot overcome the conclusion that FHWA's approval was not authorized by law.

The FHWA will contact NYSDOT and its project sponsors to discuss the orderly cessation of toll operations under this terminated pilot project.

Sincerely,

Sean P. Duffy

CC:    Marie Therese Dominquez, Esq. NYSDOT Commissioner
        Catherine T. Sheridan, President of TBTA
        Ydanis Rodriguez, NYCDOT Commissioner

# Exhibit 2

THIS AGREEMENT ("Agreement"), made and entered into this 21st day of
_____November_____, 2024, by and among the FEDERAL HIGHWAY
ADMINISTRATION, UNITED STATES DEPARTMENT OF TRANSPORTATION,
(hereinafter referred to as "FHWA") and the NEW YORK STATE DEPARTMENT OF
TRANSPORTATION, an agency of the State of New York, Triborough Bridge and
Tunnel Authority, and New York City Department of Transportation, (hereinafter
referred to as "NYSDOT, TBTA, and NYCDOT ").

WITNESSETH:

WHEREAS, section 1012(b) of the Intermodal Surface Transportation Efficiency Act of
1991 (ISTEA), Public Law 102-240, as amended by section 1216(a) of the Transportation
Equity Act for the 21st Century (TEA-21), and section 1604 (a) of the Safe, Accountable,
Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA- LU), Pub.
L. 109-59 (August 10, 2005) establishes the Value Pricing Pilot Program, hereinafter
referred to as the "pilot program," and permits the FHWA to allow the collection of tolls
as part of the value pricing pilot program established under Section 1012(b); and

WHEREAS, Section 1012(b) of ISTEA, as amended, authorizes the Secretary of
Transportation to enter into cooperative agreements with as many as fifteen (15) State or
local governments or public authorities to establish, maintain, and monitor value pricing
programs, or projects; and

WHEREAS, NYSDOT, through the execution of cooperative agreements for prior value
pricing projects, is one of the fifteen participants in the pilot program; and

WHEREAS, NYSDOT has requested that the FHWA enter into an  agreement with
NYSDOT, TBTA, and NYCDOT related to establishing, maintaining, and monitoring a
value pricing project, known as the Central Business District Tolling Program (CBDTP)
(hereinafter referred to as the "Project"), as part of NYSDOT's participation in the value
pricing pilot program; and

WHEREAS, as part of the CBDTP value pricing pilot program, TBTA intends to toll an
area which includes portions of highway facilities that have been constructed,
reconstructed, rehabilitated, restored, resurfaced or maintained with title 23 funds as
described in Attachment A, and made part of this agreement; and

WHEREAS, the FHWA has determined that this Agreement is necessary to oversee and
administer the collection of tolls pursuant to Section 1012(b)(4) of ISTEA, as amended;
and

WHEREAS, Section 1012(b) of ISTEA, as amended requires that all revenues received
from the operation of a value pricing project be applied only toward the project's
operating costs (including project implementation costs; mitigation measures to deal with
adverse financial effects on low-income drivers; the proper maintenance of the Project;

any reconstruction, rehabilitation, restoration, or resurfacing of the Project; any debt service incurred in implementing the project; a reasonable return on investment of any private person financing the project), and other projects eligible for assistance under title 23, United States Code; and

WHEREAS, this Agreement is neither intended to, nor shall it, result in the independent participation by TBTA and NYCDOT in the value pricing pilot program, it being expressly understood that TBTA's and NYCDOT's participation in the value pricing pilot project approved in this Agreement is (i) derivative of and only exists through NYSDOT's participation in the value pricing pilot program and (ii) limited to the Project; and

NOW THEREFORE, in consideration of the premises and mutual undertakings of the parties, and in conformity with all applicable laws, the NYSDOT, TBTA, NYCDOT, and FHWA hereby agree as follows:

(1)  The FHWA agrees that TBTA may operate the Project as a toll Project in accordance with the provisions of this Agreement and as a value pricing project, as part of NYSDOT's  value pricing pilot program.

(2)  Pursuant to Section 1012(b) of ISTEA, as amended, TBTA will use all toll revenues received from the operation of the Project for the operating costs of the project as described in attachment A (including project implementation costs; mitigation measures to deal with adverse financial effects on low-income drivers; the proper maintenance of the Project; any reconstruction, rehabilitation, restoration, or resurfacing of the Project; any debt service incurred in implementing the project; a reasonable return on investment of any private person financing the project), and any other projects eligible for assistance under title 23, United States Code.

(3)  The toll rates applicable to the Project will vary as described in Attachment A. and in accordance with Section 1012(b) of ISTEA, as amended including Sec. 1012(b)(6) - HOV Passenger Requirements. Notwithstanding section 102(a) of title 23, United States Code, a State may permit vehicles with fewer than 2 occupants to operate in high occupancy vehicle lanes if the vehicles are part of a value pricing pilot program under this section. Sec. 1012(b)(7) - Financial Effects on Low-Income Drivers – Any value pricing pilot program under this subsection shall include, if appropriate, an analysis of the potential effects of the pilot program on low-income drivers and may include mitigation measures to deal with any potential adverse financial effects on low-income drivers.

(4)  TBTA shall conduct or have an independent auditor conduct an annual audit of toll Project records to verify compliance with use of revenues and report the results of the audits to FHWA.

(5)   As of the date of the execution of this Agreement, the imposition of tolls under this Agreement does not render Federal-aid highways within the State of New York generally ineligible for Federal-aid highway funds where such highways are otherwise eligible under the particular funding program.

(6)   NYSDOT, TBTA, and NYCDOT, as applicable, will continue to adequately maintain or cause to be adequately maintained, the highway facilities that have been constructed, reconstructed, rehabilitated, restored, or resurfaced or maintained with title 23 funds located in the Project.

(7)   That TBTA agrees, upon reasonable notice, to make all of its records pertaining to the Project subject to audit by the FHWA. TBTA agrees to annually audit the records of the Project for compliance with the provisions of this Agreement and report the results thereof to FHWA. In lieu of the TBTA performing said audit, a report of the New York State Comptroller or an independent auditor furnished to FHWA may satisfy the requirements of this section.

(8)   Effective on the date of this Agreement, the project is approved as a pilot program, and the following requirements shall apply:

   a.  In order to carry out Section 1012(b)(5) of ISTEA, as amended, the FHWA and NYSDOT, TBTA and NYCDOT will cooperate and work together in the implementation of the Project.

   b.  That TBTA and NYCDOT, as applicable, shall monitor and report on the project performance (Attachment B) from the date of implementation for a period of at least ten years or to the end of the life of the Project, whichever is sooner, to evaluate the effects on driver behavior, traffic volume, congestion, transit ridership, air quality, and availability of funds for transportation programs. Reports begin one year after the operation date and every two years thereafter.

   c.  That TBTA and NYCDOT will identify benefits the application of tolls has in reducing climate pollution.

   d.  That TBTA and NYCDOT will demonstrate the benefits mitigation measures provide to underserved communities.

(9)   That NYSDOT, TBTA and NYCDOT agree to comply with all Federal laws and requirements applicable to this project, including the laws and policies applicable to the Value Pricing Pilot Program. Such laws and requirements include, but are not limited to Section 1012(b) of ISTEA, as amended, the guidance implementing Section 1012(b) of ISTEA, and 23 CFR Part 940 and 950.

(10)  TBTA, through NYSDOT, agrees to provide FHWA notice of any proposed changes to the toll structure other than the phases set forth in Attachment A, a minimum of 60 days before such changes go into effect. Any such changes must be eligible pursuant to the VPPP enacted by section 1012(b) of the Intermodal Surface Transportation Efficiency Act of 1991 (ISTEA), Public Law 102-240, as amended by section 1216(a) of the Transportation Equity Act for the 21st Century (TEA-21), and section 1604 (a) of the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA- LU), Pub. L. 109-59 (August 10, 2005).

(11)  That NYSDOT, TBTA and NYCDOT agree they will work with FHWA to return the Project to its original operating condition if TBTA decides to discontinue tolls on the Project.

(12)  That this Agreement will be prepared in quadruplicate originals so that each signatory will have a signed Agreement. This Agreement may be signed in counterparts, each of which shall be deemed an original and taken together shall constitute one and the same agreement.


IN WITNESS THEREOF, the parties hereto have caused this instrument to be duly executed, the day and year first written above.

STATE OF NEW YORK DEPARTMENT OF TRANSPORTATION

BY: _____

Title:  Commissioner

TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY

BY: _____
        Catherine T. Sheridan
Title: President _____



NEW YORK CITY DEPARTMENT OF TRANSPORTATION

BY: _____
        Ydanis Rodriguez
Title: Commissioner _____

4

FEDERAL HIGHWAY ADMINISTRATION
UNITED STATES DEPARTMENT OF TRANSPORTATION

BY: _____

Title: __Executive Director_____

ATTACHMENT A – Project Description
ATTACHMENT B – Performance Metrics

**Attachment A**

**Project Description**

The CBD Tolling Program will implement a vehicular tolling program to reduce traffic congestion in the Manhattan Central Business District ("CBD"), consistent with the MTA Reform and Traffic Mobility Act. Traffic congestion is expected to be reduced by disincentivizing use of vehicles within the CBD by imposition of tolls, and concurrently by investments in transit that will incentivize use of transit systems instead of driving. The project purpose is to reduce traffic congestion in the CBD in a manner that will generate revenue for future transportation improvements, pursuant to acceptance into FHWA's Value Pricing Pilot Program.

The CBD consists of the geographic area of Manhattan south and inclusive of 60th Street, but not including Franklin D. Roosevelt Drive ("FDR Drive"), West Side Highway/Route 9A, the Battery Park Underpass, and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West Street (the West Side Highway/Route 9A).

TBTA will toll vehicles entering the CBD via a cashless tolling system. The toll amount will be variable, with higher tolls charges during peak periods when congestion is greater. The toll will apply to all registered vehicles (i.e., those with license plates), with the exception of qualifying vehicles transporting persons with disabilities, qualifying authorized emergency vehicles, transit buses, and specialized government vehicles. Passenger vehicles will be tolled no more than once a day. Taxis and for-hire vehicles ("FHVs") will be tolled on a per-trip basis for rides carrying passengers occurring wholly or partially within the CBD.

The Project will use the same tolling infrastructure and tolling system equipment described and evaluated in the Final Environmental Assessment for the Project (the "Final EA").

The environmental commitments made in the Finding of No Significant Impact will be implemented as described in the Environmental Documents.

To address effects to low-income drivers, the Project will include a tax credit for CBD tolls paid by residents of the CBD whose New York adjusted gross income for the taxable year is less than $60,000. TBTA will coordinate with the New York State Department of Taxation and Finance to ensure availability of documentation needed for drivers eligible for the tax credit. In addition, the Project commits, for five years, to a Low-Income Discount Plan offering low-income frequent drivers a 50 percent discount on the full E-ZPass toll rate after the first 10 trips in each calendar month (excluding the overnight period, which will already be deeply discounted).

The toll amounts will be graduated over a six year period in accordance with the toll rate schedule below. Phase 1 will span 2025 through 2027, Phase 2 will span 2028 through 2030, and Phase 3 will commence in 2031.

## Toll Rate Schedule

| | PHASE 1 2025-2027 | | PHASE 2 2028-2030 | | PHASE 3 starting 2031 | |
|---|---|---|---|---|---|---|
| **TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY CENTRAL BUSINESS DISTRICT (CBD) CHARGES** | | | | | | |
| **a E-ZPass Customers** | CBD ENTRY CHARGE | TUNNEL CROSSING CREDIT | CBD ENTRY CHARGE | TUNNEL CROSSING CREDIT | CBD ENTRY CHARGE | TUNNEL CROSSING CREDIT |
| **VEHICLE CLASSIFICATION** | | | | | | |
| **1** Passenger and other vehicles, including sedans, sport utility vehicles, station wagons, hearses, limousines, pickup trucks with factory beds, pickup trucks with caps below the roofline and not extending over the sides, and vans without an extended roof above the windshield | | | | | | |
|   Peak period (5am-9pm weekdays, 9am-9pm weekends) | $9.00 | | $12.00 | | $15.00 | |
|   Peak period for registered Low-Income Discount Plan participants using an eligible vehicle, 11th trip and trips thereafter in a calendar month (5am-9pm weekdays, 9am-9pm weekends) | $4.50 | | $6.00 | | $7.50 | |
|   Peak period per-trip credit (maximum daily credit $5.00) | | | | | | |
|     If entering the CBD via the Lincoln Tunnel or Holland Tunnel | | $3.00 | | $4.00 | | $5.00 |
|     If entering or exiting the CBD via the Queens-Midtown Tunnel or Hugh L. Carey Tunnel | | $1.50 | | $2.00 | | $2.50 |
|   Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $2.25 | | $3.00 | | $3.75 | |
| **2** Single-unit trucks, including non-articulated trucks, pickup trucks with modified beds, vans with modified body behind the drivers cab, pickup trucks with caps above the roofline or extending over the sides, and vans with an extended roof above the windshield | | | | | | |
|   Peak period (5am-9pm weekdays, 9am-9pm weekends) | $14.40 | | $19.20 | | $24.00 | |
|   Peak period per-trip credit | | | | | | |
|     If entering the CBD via the Lincoln Tunnel or Holland Tunnel | | $7.20 | | $9.60 | | $12.00 |
|     If entering or exiting the CBD via the Queens-Midtown Tunnel or Hugh L. Carey Tunnel | | $3.60 | | $4.80 | | $6.00 |
|   Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $3.60 | | $4.80 | | $6.00 | |
| **3** Multi-unit trucks, including articulated trucks where a power unit is carrying one or more trailers | | | | | | |
|   Peak period (5am-9pm weekdays, 9am-9pm weekends) | $21.60 | | $28.80 | | $36.00 | |
|   Peak period per-trip credit | | | | | | |
|     If entering the CBD via the Lincoln Tunnel or Holland Tunnel | | $12.00 | | $16.00 | | $20.00 |
|     If entering or exiting the CBD via the Queens-Midtown Tunnel or Hugh L. Carey Tunnel | | $6.00 | | $8.00 | | $10.00 |
|   Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $5.40 | | $7.20 | | $9.00 | |
| **4** Buses, including vehicles registered with the DMV and plated as a bus, omnibus, or have other designated official plates | | | | | | |
|   Peak period (5am-9pm weekdays, 9am-9pm weekends) | $14.40 | | $19.20 | | $24.00 | |
|   Peak period per-trip credit | | | | | | |
|     If entering the CBD via the Lincoln Tunnel or Holland Tunnel | | $7.20 | | $9.60 | | $12.00 |
|     If entering or exiting the CBD via the Queens-Midtown Tunnel or Hugh L. Carey Tunnel | | $3.60 | | $4.80 | | $6.00 |
|   Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $3.60 | | $4.80 | | $6.00 | |
|   Licensed sightseeing buses | | | | | | |
|   Peak period (5am-9pm weekdays, 9am-9pm weekends) | $21.60 | | $28.80 | | $36.00 | |
|   Peak period per-trip credit | | | | | | |
|     If entering the CBD via the Lincoln Tunnel or Holland Tunnel | | $12.00 | | $16.00 | | $20.00 |
|     If entering or exiting the CBD via the Queens-Midtown Tunnel or Hugh L. Carey Tunnel | | $6.00 | | $8.00 | | $10.00 |
|   Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $5.40 | | $7.20 | | $9.00 | |
| **5** Motorcycles | | | | | | |
|   Peak period (5am-9pm weekdays, 9am-9pm weekends) | $4.50 | | $6.00 | | $7.50 | |
|   Peak period per-trip credit | | | | | | |
|     If entering the CBD via the Lincoln Tunnel or Holland Tunnel | | $1.50 | | $2.00 | | $2.50 |
|     If entering or exiting the CBD via the Queens-Midtown Tunnel or Hugh L. Carey Tunnel | | $0.75 | | $1.00 | | $1.25 |
|   Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $1.05 | | $1.40 | | $1.75 | |

E-ZPass CBD entry charges are available subject to terms, conditions, and agreements established by the Authority.

The Authority reserves the right to determine whether any vehicle is of unusual or unconventional design, weight, or construction and therefore not within any of the listed categories. The Authority also reserves the right to determine the CBD charge for any such vehicle of unusual or unconventional design, weight, or construction. Any single unit vehicle identified as belonging to Classes 1, 2, or 5 will be up-classed to the next toll class when towing a trailer or another vehicle.

Daily toll cap of once per day for Class 1 and Class 5 vehicles. Caps for other vehicles are subject to change pursuant to the adaptive management approach to mitigating project effects, as committed to in the Final Environmental Assessment.

CBD entry charges and tunnel credits are subject to a variable percentage increase/decrease of up to 10% for up to one year after implementation pursuant to the adaptive management approach to mitigating project effects, as committed to in the Final Environmental Assessment.

The Low-Income Discount Plan shall continue for five years as committed to in the Final Environmental Assessment.

The Authority reserves the right to charge a 25% higher CBD charge during Gridlock Alert Days. Each year, the NYCDOT identifies Gridlock Alert Days during the UN General Assembly and throughout the holiday season when heavy traffic is expected in Manhattan. On Gridlock Alert Days, consider walking, biking, or taking mass transit for any trips in Manhattan.

Qualifying authorized emergency vehicles and qualifying vehicles transporting persons with disabilities are exempt pursuant to Vehicle and Traffic Law § 1704-a (2).

Qualifying authorized commuter buses and specialized government vehicles, as determined by the Authority, are exempt.

| TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY CENTRAL BUSINESS DISTRICT (CBD) CHARGES | | | | | | |
|---|---|---|---|---|---|---|
| | | PHASE 1 2025-2027 | | PHASE 2 2028-2030 | | PHASE 3 starting 2031 |
| b Customers Using Fare Media Other Than E-ZPass | | CBD ENTRY CHARGE | PER TRIP CHARGE PLAN* (TO/FROM/ WITHIN/ THROUGH CBD) | CBD ENTRY CHARGE | PER TRIP CHARGE PLAN* (TO/FROM/ WITHIN/ THROUGH CBD) | CBD ENTRY CHARGE |
| VEHICLE CLASSIFICATION | | | | | | PER TRIP CHARGE PLAN* (TO/FROM/ WITHIN/ THROUGH CBD) |
| 1 | Passenger and other vehicles, including sedans, sport utility vehicles, station wagons, hearses, limousines, pickup trucks with factory beds, pickup trucks with caps below the roofline and not extending over the sides, and vans without an extended roof above the windshield | | | | | |
| | Peak period (5am-9pm weekdays, 9am-9pm weekends) | $13.50 | | $18.00 | | $22.50 |
| | Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $3.30 | | $4.40 | | $5.50 |
| 2 | Single-unit trucks, including non-articulated trucks, pickup trucks with modified beds, vans with modified body behind the drivers cab, pickup trucks with caps above the roofline or extending over the sides, and vans with an extended roof above the windshield | | | | | |
| | Peak period (5am-9pm weekdays, 9am-9pm weekends) | $21.60 | | $28.80 | | $36.00 |
| | Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $5.40 | | $7.20 | | $9.00 |
| 3 | Multi-unit trucks, including articulated trucks where a power unit is carrying one or more trailers | | | | | |
| | Peak period (5am-9pm weekdays, 9am-9pm weekends) | $32.40 | | $43.20 | | $54.00 |
| | Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $8.10 | | $10.80 | | $13.50 |
| 4 | Buses, including vehicles registered with the DMV and plated as a bus, omnibus, or have other designated official plates | | | | | |
| | Peak period (5am-9pm weekdays, 9am-9pm weekends) | $21.60 | | $28.80 | | $36.00 |
| | Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $5.40 | | $7.20 | | $9.00 |
| | Licensed sightseeing buses | | | | | |
| | Peak period (5am-9pm weekdays, 9am-9pm weekends) | $32.40 | | $43.20 | | $54.00 |
| | Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $8.10 | | $10.80 | | $13.50 |
| 5 | Motorcycles | | | | | |
| | Peak period (5am-9pm weekdays, 9am-9pm weekends) | $6.75 | | $9.00 | | $11.25 |
| | Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $1.65 | | $2.20 | | $2.75 |
| | NYC TLC taxis, green cabs, for-hire vehicles (FHVs) | | | | | |
| | Taxis, green cabs, and FHVs on trips | | $0.75 | | $1.00 | $1.25 |
| | FHVs on trips dispatched by high-volume for-hire services (HVFHSs) | | $1.50 | | $2.00 | $2.50 |

The Authority reserves the right to determine whether any vehicle is of unusual or unconventional design, weight, or construction and therefore not within any of the listed categories. The Authority also reserves the right to determine the CBD charge for any such vehicle of unusual or unconventional design, weight, or construction. Any single unit vehicle identified as belonging to Classes 1, 2, or 5 will be up-classed to the next toll class when towing a trailer or another vehicle.

Daily toll cap of once per day for Class 1 and Class 5 vehicles. Caps for non-passenger vehicles are subject to change pursuant to the adaptive management approach to mitigating project effects, as committed to in the Final Environmental Assessment.

NYC TLC taxi, green cab, and FHV tolls are to be paid by the passenger pursuant to Rules of City of NY Taxi & Limousine Commn (35 RCNY) §§ 58-26 (f), 59A-23 (b), 59D-17 (c).

CBD entry charges and per trip charges are subject to a variable percentage increase/decrease of up to 10% for up to one year after implementation pursuant to the adaptive management approach to mitigating project effects, as committed to in the Final Environmental Assessment.

The Authority reserves the right to charge a 25% higher CBD charge during Gridlock Alert Days. Each year, the NYCDOT identifies Gridlock Alert Days during the UN General Assembly and throughout the holiday season when heavy traffic is expected in Manhattan. On Gridlock Alert Days, consider walking, biking, or taking mass transit for any trips in Manhattan.

Qualifying authorized emergency vehicles and qualifying vehicles transporting persons with disabilities are exempt pursuant to Vehicle and Traffic Law § 1704-a (2).

Qualifying authorized commuter buses and specialized government vehicles, as determined by the Authority, are exempt.

*Subject to full execution of and in compliance with plan agreement by FHV bases and taxi technology system providers.

**ATTACHMENT B – Performance Metrics**

As developed in the Final EA and the Reevaluations for the Project dated June 2024 and November 2024, the performance metrics of the system for evaluating the effectiveness of the pilot program and managing congestion are related to reducing vehicles entering the CBD and reducing VMT within the CBD. For reference, the amount of congestion reduction within the CBD for the toll structure is as follows::

- Reduce daily vehicle miles traveled (VMT) within the Manhattan CBD by 6.4 percent (Phase 1) to 8.9 percent (Phase 3)
- Reduce the number of vehicles entering the Manhattan CBD by 13.4 percent (Phase 1) to 17 percent (Phase 3)

Another important factor for measuring congestion reduction in the CBD related to transit investment is transit ridership in the CBD.:

- Increase in transit use entering the CBD.

The program will be collecting a significant amount of data to assess, track, and trend the direct and indirect effects of the project. These data, which are described in the following bullets, will be made public on a regular basis in open data format to the greatest extent practicable.

**Direct Congestion Measures**
- Vehicle entries into the CBD (by type of vehicle, day of week, time of day)
- Historic volumes entering the CBD (average fall weekday/weekend, time of day)
- Taxi and FHV trips to, from, and within the CBD
- Taxi and FHV VMT within the CBD

**Indirect Congestion Measures**
- System-wide transit ridership for transit services providing CBD-related service (monthly total ridership by mode and transit operator)
- Metropolitan Transportation Authority bus speeds within the CBD
- Capital projects funded or financed through Project revenue

**Monitored and Modeled Air Quality Measures**
- PM2.5
- Nitrogen Oxides
- Ozone: via modeling
- Greenhouse Gases

**Reporting on revenue and for audit purposes**
- Project revenue
- Project capital and operating expenses

# Exhibit 3



U.S. Department
of Transportation
**Federal Highway
Administration**

1200 New Jersey Ave., SE
Washington, DC  20590

February 20, 2025

Marie Therese Dominguez, Commissioner
New York State Department of Transportation
50 Wolf Road
Albany, NY  12232

Ydanis Rodriguez, Commissioner
New York City Department of Transportation
55 Water Street, 9th Floor
New York, NY  10041

Catherine T. Sheridan, President
MTA Bridges and Tunnels
2 Broadway, 23rd Floor
New York, NY  10004

Dear Commissioner Dominguez, Commissioner Rodriguez, and President Sheridan:

I am writing pursuant to Secretary Duffy's February 19, 2025, letter terminating the November 21, 2024 Value Pricing Pilot Program (VPPP) Agreement under which the Federal Highway Administration (FHWA) has approved the implementation of tolls as part of the New York's Central Business District Tolling Program (CBDTP).  The Secretary's letter stated that the FHWA will contact the New York State Department of Transportation (NYSDOT) and its project sponsors, Triborough Bridge and Tunnel Authority (TBTA) and New York City Department of Transportation (NYCDOT), to discuss the orderly cessation of toll operations under the CBDTP.

In order to provide NYSDOT and its project sponsors time to terminate operations of this pilot project in an orderly manner, this rescission of approval and termination of the November 21, 2024 Agreement will be effective on March 21, 2025.  Accordingly, NYSDOT and its project sponsors must cease the collection of tolls on Federal-aid highways in the CBDTP area by March 21, 2025.  Please work with Rick Marquis, the FHWA's New York Division Administrator, to provide the necessary details and updates regarding the cessation of toll operations.

Sincerely,

*Gloria M. Shepherd*

Gloria M. Shepherd
Executive Director

# Exhibit 4



U.S. Department
of Transportation

**Federal Highway
Administration**

1200 New Jersey Ave., SE
Washington, DC  20590

March 20, 2025

Marie Therese Dominguez, Commissioner
New York State Department of Transportation
50 Wolf Road
Albany, NY  12232

Ydanis Rodriguez, Commissioner
New York City Department of Transportation
55 Water Street, 9th Floor
New York, NY  10041

Catherine T. Sheridan, President
MTA Bridges and Tunnels
2 Broadway, 23rd Floor
New York, NY  10004

Dear Commissioner Dominguez, Commissioner Rodriguez, and President Sheridan:

I am writing pursuant to my February 20, 2025 letter, providing you until March 21, 2025, to cease tolling operations that were initiated through the November 21, 2024, Value Pricing Pilot Program (VPPP) Agreement.  The Secretary has directed that I extend the period of time to comply by 30 days.   Accordingly, toll operations must cease by April 20, 2025.

Please work with Rick Marquis, FHWA's New York Division Administrator, to provide the necessary details and updates regarding the cessation of toll operations.

Sincerely,

Gloria M. Shepherd
Executive Director

# EXHIBIT 5

If you have any questions completing this form, please contact Angela Jacobs at (202) 366-0076. Please complete all applicable information and attach this request via email to angela.jacobs@dot.gov or via U.S. mail to:

**Tolling and Pricing Team,**
**Federal Highway Administration**
**Office of Operations, Attn: Angela Jacobs,**
**1200 New Jersey Avenue, SE, Room E-86 204,**
**Washington, DC, 20590**

Please copy your respective FHWA State Division Office

---

### A) What is the requesting agency, authority, or public company? What is the lead office within the requesting agency, authority, or private company?

*Name(s):* New York State through the New York State Department of Transportation (NYSDOT), the Triborough Bridge and Tunnel Authority (TBTA), an affiliate of the Metropolitan Transportation Authority (MTA), and the New York City Department of Transportation (NYC DOT).

*Project Website (if applicable) or Your Agency/Company Website:*
https://www.dot.ny.gov
https://new.mta.info/
https://www1.nyc.gov/dot

### B) Contact Information

*Name:*     Ron Epstein
*Title:*    Executive Deputy Commissioner, New York State Department of Transportation
*Address:*  50 Wolf Road, 6th Floor, Albany, NY 12232
*Phone:*    (518) 457-8362
*Email:*    ron.epstein@dot.ny.gov

*Name:*     Allison L. C. de Cerreño, Ph.D.
*Title:*    Sr. V.P., Business Operations & Transformation Officer, Triborough Bridge and Tunnel Authority
*Address:*  2 Broadway, New York, New York 10004
*Phone:*    (646) 252-7750
*E-mail:*   acdecerreno@mtabt.org

*Name:*     William Carry
*Title:*    Senior Director for Special Projects, New York City Department of Transportation
*Address:*  55 Water Street, 9th Floor, New York, NY 10041
*Phone:*    212-839-6657
*Email:*    wcarry@dot.nyc.gov

### C) What is the requesting agency seeking? (Please mark appropriate box)

☑ *Federal Tolling Authority ONLY* for this project or study (no funds requested).

*Please briefly elaborate:* New York State, through NYSDOT, TBTA and NYC DOT, is seeking federal approval under the Value Pricing Pilot Program (VPPP) to initiate a variable tolling program within the Manhattan Central Business District (CBD), generally defined as the area of Manhattan south and inclusive of 60th Street. The purpose of this variable price tolling program is to reduce the high level of traffic congestion in the CBD. The applicants believe that a variable toll to access the CBD, combined with an investment of the

DOT_0038307

resultant revenues in improving public transit alternatives, will maximize the congestion reduction in the CBD and the surrounding area.

**D) Please provide a brief description of the project/corridor seeking tolling authority. Please identify and describe the subject facility or general area where a toll is to be applied (i.e. name of project/study, location, length, level of service, problem to be addressed, etc.**

**1). Project History:**
The New York City metropolitan region is a vital part of the national economy, accounting for nearly 10% of U.S. gross domestic product. At the center of this region is New York City, home to 8.6 million residents and 4.4 million jobs. Since 2010, the City has undergone tremendous growth and added 440,000 residents, equivalent to the population of Miami, and 700,000 jobs, equivalent to total employment in Philadelphia. New York City is also now the most visited city in the United States, with an estimated 65 million visitors in 2018. Within New York City, the most economically important area is the Manhattan CBD (the area south of and inclusive of 60th Street). This area of just nine square miles boasts over two million jobs, 450 million square feet of office space, and 600,000 residents. See Attachment A for a description of the Manhattan CBD.

However, the continued economic vibrancy of the City and region is threatened by rising traffic congestion. With robust growth have come additional demands on the City's transportation infrastructure, with an increasing number of cars, buses, delivery trucks, taxis and for-hire vehicles competing for scarce roadway capacity. Congestion in New York City ranks fourth worst among cities in the United States (*Global Traffic Scorecard*, INRYX, 2018), with the average auto commuter spending an additional 133 hours on the road each year due to traffic. As shown in Attachment B, traffic speeds in Manhattan south of 60th Street have steadily fallen: from 9.1 miles per hour (mph) in 2010 to 7 mph in 2018, a decline of 23%.

Traffic congestion adversely affects the economy and quality of life in New York City and the metropolitan region. Low travel speeds and unreliable travel times increase auto commute times and erode worker productivity; reduce bus service quality and depress ridership; raise the cost of deliveries and the overall cost of business; increase vehicle emissions; and degrade the quality of life for residents, visitors, and workers. According to a 2018 analysis by the Partnership for New York City, a business group, congestion in the New York City region will cost business, commuters, and residents $100 billion over the next five years (PFNYC, 2018).

In terms of air pollution, growing congestion threatens to undermine recent improvements in air quality in New York City and the region. High levels of fine particulate matter (PM2.5), nitrogen dioxide, and nitric oxide—pollutants that exacerbate heart and respiratory disease—continue to be observed in areas of high traffic. The problem is particularly acute in the Manhattan CBD, which a New York City Department of Health and Mental Hygiene (DOHMH) air quality study found has among the highest concentrations of PM2.5 in the city. DOHMH estimates that PM2.5 contributes to more than 2,000 deaths and almost 6,000 emergency room visits and hospitalizations for cardiovascular and respiratory disease each year in the five boroughs.

One of the strategies to reduce the level of congestion experienced in the CBD is sustained investment in public transportation alternatives. More than 75 percent of trips into the Manhattan CBD are made by bus, subway, commuter rail or ferry. Due to the age and extent of the bus and subway system, service quality has declined markedly since 2010. Improving reliability and performance of the bus and subway system is essential to retaining existing riders, increasing ridership and reversing the growth of private car and for-hire vehicles trips, which are putting further stress on the street network. Due to congested conditions, local bus service speeds in Manhattan are, on average, 24% slower than citywide speeds. Reduction in traffic will result in faster more reliable bus service, which will disproportionally benefit low-income residents.

Reducing congestion in the Manhattan CBD is essential to continued economic growth and to improved regional air quality. In recognition of the scope of these challenges, the State of New York enacted legislation in April

DOT_0038308

2019 creating the Central Business District Tolling Program (CBDTP). Under the program, TBTA, in coordination with the NYS and NYC DOTs, will charge vehicles that enter or remain within the CBD. Pricing access to the CBD will reduce vehicle demand, relieving congestion and increasing the efficiency of the street network. Revenue raised by the program will provide sustained funding for public transportation, which as it becomes more reliable, will contribute to congestion relief. Please see Attachment C for the CBDTP legislation and Attachment D for a program history.

**2.) Area Description:**
Vehicles would be charged a toll to enter or remain within the Manhattan CBD, defined in the legislation as Manhattan south of and inclusive of sixtieth street, exclusive of the FDR Drive, New York State Route 9A (known as the West Side Highway or West St.), the Battery Park Underpass, and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West Street. Please see Attachment E for a map of the CBD.

**3.) Previous Studies/Current Studies**
**e.g.(Existing HOV, Managed Lanes/Feasibility, Environmental Impact Statement Project Studies)**

In July 2007, the State of New York created the New York City Traffic Congestion Mitigation Commission to consider proposals to reduce congestion in New York City, including a plan put forward by then Mayor Michael Bloomberg to implement congestion pricing in Manhattan. The Commission analyzed and reviewed a number of different strategies for reducing congestion and ultimately recommended a modified version of the Bloomberg congestion pricing plan in January 2008. The proposal was not acted upon by the New York State Legislature. https://www.dot.ny.gov/programs/repository/TCMC-Final-Report.pdf

In October 2017, New York Governor Andrew M. Cuomo created the Fix NYC Panel, bringing together community representatives, government officials, and business leaders from across the region. The panel was tasked with developing recommendations to address the severe traffic congestion problems in Manhattan's CBD and identify sources of revenue to fix the subway system. The panel examined what congestion pricing could look like for the Manhattan CBD; the panel's January 2018 final report can be found here: https://www.hntb.com/HNTB/media/HNTBMediaLibrary/Home/Fix-NYC-Panel-Report.pdf

Building on the work of the Fix NYC Panel, the 2018 New York State Enacted Budget created the Metropolitan Transportation Sustainability Advisory Workgroup. The workgroup examined actions that state and local governments could take to deal with the multiple challenges confronting the transportation system in the New York City region. The panel recommended that congestion pricing be adopted to reduce congestion and generate new revenue to modernize the MTA; the workgroup's December 2018 final report can be found here: https://pfnyc.org/wp-content/uploads/2018/12/2018-12-Metropolitan-Transportation-Sustainability-Advisory-Workgroup-Report.pdf

**4.) Project Goals:**
The goals of the CBD Tolling Program are to:

*(1) Reduce traffic congestion*
        - Key metrics: traffic volumes, speeds, and travel time reliability within the Manhattan CBD and on key routes connecting to the CBD.
*(2) Improve air quality*
        - Key metrics: air quality measurements at locations within and around the Manhattan CBD, with a focus on environmental justice communities.
*(3) Create a sustainable funding source to repair and revitalize the MTA transit system*
        - Key metric: generate revenues, net of VPPP operating costs, to support $15 billion in bonds for MTA capital transit repair and revitalization projects.
 *(4) Increase transit ridership*
        - Key metrics: bus, subway, and commuter rail ridership; modal shift from auto, particularly single occupant vehicles, to transit; quality of transit services.

DOT_0038309

*(5) Improve travel options for low-income residents*
- Key metrics: quality of transit services available to low-income residents; bus speeds and travel time reliability.

**5.) Project Concept:**
Vehicles entering the Manhattan CBD would be charged a toll, which would be collected via a cashless tolling system. The legislation leaves open the possibility that trips that occur entirely within the zone could also be charged a toll. It is envisioned that motorists could pay by app, online, by phone, by mail, or through a pre-paid account-based system. The revenues generated by the program would be used to construct, operate and maintain the CBD toll collection program and modernize the MTA transit system, with the goal of attracting new riders and further reducing vehicle demand for scarce road capacity in and connecting to the Manhattan CBD.

*E) Which type of facility is proposed to be tolled or studied?*

☐*Interstate*

☐*Non-Interstate*

☐*Project contains both types of facilities*

☑*Project is not specific to any type of facility*
As explained above, vehicles would be charged to enter or remain within a specific area. This area does not include an interstate facility.

*F) Does the toll project involve ANY construction?*

☐*No*        ☑*Yes (if so, please mark all that apply)*        ☐*Not applicable*

☐*New construction*            ☐*Expansion*            ☐*Rehabilitation*☐*Reconstruction*
☐*HOV to HOT Conversion*      ☑*Other not listed.*

*Please briefly elaborate*:
Limited construction to install tolling infrastructure and supporting utilities will be required. The tolling equipment will, to the extent practicable, be mounted on existing infrastructure. Where this is not practicable, new infrastructure or replacement infrastructure will be installed, likely in the form of street light poles, sign gantries or similar structures that are already in use throughout the city. Power and communications will need to be supplied to these locations if not already present. There may be some minor modification of street geometry to enhance or maintain safe pedestrian, bicycle and vehicle movements. The TBTA and NYC DOT have entered into a memorandum of understanding (MOU) for coordinating the planning, design, installation, construction and maintenance of the CBD tolling infrastructure. Please see Attachment F for a copy of the MOU.

*G) Does an HOV lane(s) currently exist on the facility?*

☐*No*            ☐*Yes*            ☑*Not applicable*

*H) What is the timetable to enact the tolling or pricing project or study?*

New York State desires to implement the tolling program in early 2021. A preliminary schedule is presented in Attachment G.

Expression of Interest-FHWA Office of Operations
Version 1.0 12/05

DOT_0038310

*I) Are there expressions of support from public officials or the public? Have any public meetings been held? If no public meetings or expressions of support are available, please indicate the agency's plans for ensuring adequate public involvement and seeking public support for the toll project or study.*

Legislation approved by the New York State Senate and Assembly and signed by Governor Andrew M. Cuomo went into effect in April 2019. The CBD Tolling Program was proposed by the Governor Cuomo and supported by the Assembly Speaker Carl Heastie, Senate Majority Leader Andrea Stewart-Cousins, New York City Mayor Bill de Blasio and a majority of the New York State Assembly and Senate. In addition, the FixOurTransit coalition, a group representing over 100 business, labor, environmental, transportation and justice organizations, supported the CBD Tolling Program. Please see Attachment H for a list of coalition members and supportive stakeholder statements.

TBTA with NYC DOT will develop a robust public engagement process as the program moves forward. Working with elected officials, community boards, interest groups in town hall and other settings, the agencies will solicit feedback on all phases of the program. Additionally, the federal environmental review process will provide opportunities for public involvement.

*J) Where known (and if applicable), what is plan for implementing tolls or prices and the strategies to vary toll rates or prices (i.e., the formulae for variable pricing)?*

The authorizing legislation for the program put forth a general framework that will be refined over the next 18 months. The law mandates that passenger vehicles will be charged once daily to enter or remain in the zone, the toll will be variable, and emergency vehicles and vehicles transporting disabled persons will be exempt from the toll. Residents of the CBD with an adjusted gross income of under $60,000 will be eligible for a state tax credit for any tolls paid. A new six-member board, called the Traffic Mobility Review Board (TMRB), will recommend specific toll rates and policies, and will consider variable toll options, additional exemptions, and credits for tolls paid on other facilities for adoption by the TBTA Board.

The authorizing legislation also requires TBTA and NYC DOT to conduct a traffic study that the TMRB will use to inform its recommendations. The traffic study will examine a range of toll rates, variable tolling structures, exemptions, and toll credits. The study will be separate from, but consistent with, the traffic analysis required for the federal environmental review for the program (which will also assess other areas of impact).

Preliminary work is underway for the traffic study and the environmental review. Both efforts will rely upon the most advanced modeling and data analysis tools available, including the Best Practice Model (BPM), the regional transportation model developed by New York Metropolitan Transportation Council (the regional metropolitan planning organization).

In order to develop a range of variable tolling structures, rates and policy scenarios for the TMRB's consideration, the traffic study will examine:

- Effects on general traffic volumes, speeds and travel time reliability within and outside the Manhattan CBD
- Effects on driver behavior, including route, mode and time of travel
- Effects on bus speeds and travel time reliability within and outside the Manhattan CBD
- Effects on transit ridership within and to/from the Manhattan CBD
- Effects on vehicle emissions and air quality within and outside the Manhattan CBD
- Effects on low-income drivers to the Manhattan CBD
- Revenue generation
- Other relevant factors

The TMRB will make its recommendations to the TBTA Board between November 15 and December 31, 2020, per the authorizing statute. Informed by the TMRB recommendations, the TBTA Board will follow the

DOT_0038311

prescribed statutory process for determining the toll structure, which includes a public hearing and a vote on the rates. The environmental review, which is expected to be complete before the TMRB makes its recommendations, will include traffic analysis based on a range of potential rates and variable tolling structures.

Beginning one year after the CBD tolling program is implemented and every two years thereafter for the life of the program, TBTA, in consultation with the NYC DOT, will undertake a comprehensive evaluation of the effects of the program and produce an evaluation report that looks at congestion, air quality, transit ridership and other factors. In addition, NYC DOT will undertake a study of effects of the program on parking activity and demand in and around of the Manhattan CBD, which is due 18 months after the system begins operation.

### K) What is the reason(s) of the toll project or study? Please mark all that apply.

☐ Financing construction
☑ Reducing congestion
☑ Improving air quality
☑ Other not listed.

ADDRESS ALL AREAS
Please briefly elaborate:

Reducing Congestion
As detailed in Section D, worsening congestion in and around the Manhattan CBD is increasing commute times, degrading bus service, contributing to vehicle emissions, eroding quality of life, and raising the cost of business. By reducing congestion, the CBD tolling program would reverse these trends by improving the efficiency of the transportation network, including improving bus speeds, and supporting the continued economic growth of the city and region.

Improving Air Quality
As detailed in Section D, emissions from the transportation sector are a major contributor to air pollution in New York City and the region, particularly in the congested Manhattan CBD. These emissions exacerbate cardiovascular and respiratory illness and are a public health concern. By reducing traffic volumes and congestion and associated emissions, the CBD tolling program would improve air quality and overall public health.

Create a Sustainable Capital Funding Source for Transit
The MTA subway system is over one hundred years old and needs to be fundamentally modernized to serve the needs of New York City and the region. Improvements are also needed in the MTA's bus and commuter rail systems. By creating a new sustainable revenue source, the CBD tolling program would enable the MTA to invest in improving its transportation network, which in turn, would support the program's goals of increasing transit ridership and improving transit services for low-income residents.

Increasing Transit Ridership
As detailed in Section D, bus and subway service quality in New York City has fallen. As a result, some transit riders have switched to private cars or for-hire vehicle services, putting added strain on the street network. By funding the modernization of the transit network, the CBD tolling program would improve transit services and attract commuters back to the system, helping to further ease demand on surface streets and thus reduce congestion in the CBD.

Improving Transit Services for Low-Income Residents
Ninety-eight percent of low-income workers with jobs in the Manhattan CBD do not commute by private vehicle (Community Service Society, 2017). Dedicating program revenues to transit improvements will

Expression of Interest-FHWA Office of Operations
Version 1.0 12/05

DOT_0038312

disproportionately benefit low-income New Yorkers, who overwhelmingly rely on transit to access employment, education, and essential services. By enabling investments in transit, the CBD tolling program would improve transit options for low-income New Yorkers.

***L) Please provide a description of the public and/or private agency that will be responsible for operation, maintenance, and/or enforcement for the toll project or study?***

1) **NYSDOT** coordinates and develops comprehensive transportation policy for New York State; coordinates and assists in the development and operation of transportation facilities and services for highways, railroads, mass transit systems, ports, waterways and aviation facilities; and, formulates and keeps current a long-range, comprehensive statewide master plan for the balanced development of public and private commuter and general transportation facilities.

2) **TBTA** is authorized by the program legislation to establish, plan, design, construct, install, operate and maintain the Central Business District Tolling Program in consultation with NYC DOT.

TBTA is among the largest toll agencies in the world.  In 2018 TBTA served more than 322 million customers and collected nearly $2.0 billion in toll revenue on its seven bridges and two tunnels within New York City: the Bronx-Whitestone, Cross Bay Veterans Memorial, Marine Parkway-Gil Hodges Memorial, Throgs Neck, Robert F. Kennedy and Verrazzano-Narrows Bridges and the Hugh L. Carey and Queens-Midtown Tunnels. The Legislature created TBTA's initial predecessor, the Triborough Bridge Authority, in 1933 to build the Triborough Bridge. TBTA is a New York State public benefit corporation, currently governed by Article 3, Title 3 of the New York Public Authorities Law, §550 *et seq.*

TBTA was designed to generate surplus toll revenue, which has been used to support the MTA's integrated transportation network since TBTA became an MTA affiliate in 1968. In 2018, TBTA provided nearly $1.1 billion in total support for transit. TBTA is also dedicated to maintaining its seven bridges and two tunnels in a state of good repair and to providing safe and efficient travel across its facilities. TBTA's 2015-2019 Capital Program, which totals nearly $3 billion, gives high priority to key rehabilitation projects. In 2017 TBTA enhanced the customer experience by converting all of its facilities to open road, Cashless Tolling.

3) **NYC DOT**, which owns and operates the roadway network within and outside of the CBD charging zone, will support and assist TBTA. NYC DOT's mission is to provide for the safe, efficient, and environmentally responsible movement of people and goods in the City of New York and to maintain and enhance the transportation infrastructure crucial to the economic vitality and quality of life of our primary customers, city residents. Over 5,000 employees of NYC DOT oversee one of the most complex urban transportation networks in the world. NYC DOT's staff manage an annual operating budget of $900 million and a five-year $10.1 billion capital program, along with 6,000 miles of streets and highways, 12,000 miles of sidewalk, and 794 bridges and tunnels, including the iconic East River bridges. NYC DOT's staff also installs and maintains over one million street signs, 12,700 signalized intersections, over 315,000 street lights, and over 200 million linear feet of markings.

***M) Please provide a description of how, if at all, any private entities are involved in the up-front costs, or will share in project responsibilities, debt retirement, or revenues?***

No private entities are involved.

Expression of Interest-FHWA Office of Operations
Version 1.0 12/05

DOT_0038313

*N) Please provide any additional information you feel is necessary.*

Below is further information on New York's Best Practice Model (BPM), which will be used for both the environmental review and the traffic study for the TMRB:

The applicants will use the New York Metropolitan Transportation Council's (NYMTC) Best Practice Model (BPM) to assess the potential impact of the tolling program on travel patterns throughout the city and region. The BPM, developed by the New York City metropolitan area's metropolitan planning organization (MPO), is an activity-based transportation model that incorporates transportation behavior and relationships with an extensive set of data that includes a major travel survey of households in the region, land-use inventories, socioeconomic data, traffic and transit counts, and travel times. The applicants will use a base year 2017 BPM calibrated to the toll program, which includes a taxi trip table updated to include for hire vehicles (FHV) trips in New York City in addition to yellow and green taxi trips. The BPM will be used to model several different pricing scenarios and will produce the following metrics: (1) comparison of river crossing volumes by time period (AM, MD, PM, NT, 24 hours), (2) district level vehicle-miles travelled and vehicle hours travelled measures (AM, MD, PM, NT, 24 hours), and district-to-district flow and mode shares (auto, transit, and FHV) for 2021 and 2040 (or another future year). The analysis will include regional routes into Manhattan including trans-Hudson crossings. Districts can be defined at the county and traffic analysis zone level of analysis. New York City districts will include all five boroughs and four to five sub-regions within the Manhattan CBD that will be defined at the start of the program.

Expression of Interest-FHWA Office of Operations
Version 1.0 12/05

DOT_0038314

# EXHIBIT 6



U.S. Department
of Transportation

**Federal Highway
Administration**

Office of the Administrator

1200 New Jersey Ave., SE
Washington, D.C. 20590

October 24, 2019

Mr. Ron Epstein
Executive Deputy Commissioner/CFO
New York State Department of Transportation
50 Wolf Road
Albany, NY 12232

Dear Mr. Epstein:

Thank you for submitting an Expression of Interest (EoI) to the Federal Highway Administration
(FHWA) on behalf of the New York City Department of Transportation, the Triborough Bridge
and Tunnel Authority and your department, requesting authority within the Value Pricing Pilot
Program (VPPP) to toll motor vehicles within New York City, south of 60th Street, on existing
roadways. This letter responds to your EoI and outlines further information that is required.
This letter does not constitute an approval or a denial, rather it simply requests additional
information that will be necessary as FHWA contemplates future actions.

As you are aware, the VPPP is intended to demonstrate whether and to what extent roadway
congestion may be reduced through application of congestion pricing strategies, and the
magnitude of the impact of such strategies on driver behavior, traffic volumes, transit ridership,
air quality and availability of funds for transportation programs. In fact, of the multiple VPPP
projects that have been implemented, FHWA has found that congestion pricing can be very
effective for reducing traffic, improving roadway capacity, and providing reliable trips for
automobiles as well as commercial vehicles and transit vehicles.

The FHWA has reviewed your EoI to consider the tolling and pricing concepts. Under the
various programs in Federal law that allow tolling of existing infrastructure, the VPPP appears to
be the best potential fit, provided the overall purpose of variable tolling remains to reduce
roadway traffic congestion. While the EoI indicates that a variable pricing structure will be
implemented to help mitigate congestion, it does not sufficiently express the degree to which the
proposed tolling framework would reduce roadway traffic congestion and on which facilities.
Further, many of the implementation and operational details are still in early stages of
development, including the various impacts associated with traffic diversion.

For FHWA to conduct a thorough assessment, the Agency requests the findings of a thorough
traffic and revenue study to include the following, among other pertinent facts, impacts, and
options:

    A. Estimated reduction in traffic volumes and congestion levels for various types of system
        users, including commercial vehicles and transit vehicles;

B. How tolling charges will be varied in the variable priced system, and if and how adjustments to the toll pricing schedule will be considered and approved;

C. Anticipated effects on driver behavior, especially as impacted by congestion charge exemptions that may be granted, as well as impacts on low-income drivers and relevant mitigation measures under consideration;

D. Proposed use of revenues generated by the project, especially for operating and maintaining the roadway facilities that will be tolled;

E. Potential impact on transit ridership and plans to sustain the area's transit operations, infrastructure, and rolling stock in a state-of-good-repair;

F. Intended use of Federal-aid highway program funds to implement the project, if applicable and if so, procurement and sourcing plans, including plans to maximize domestic content; and,

G. Considerations of the ITS Regional Architecture, systems engineering, and electronic tolling interoperability.

The FHWA anticipates that much of this information will be further developed and supported by analysis done for the traffic and revenue study and during the environmental review process.

In addition, the proposed project is an area-wide congestion pricing system, which is unprecedented in the VPPP and such type system has not yet been implemented in the U.S. Therefore, FHWA must consider the precedents set by this project. One such consideration is that the VPPP requires maintenance of the infrastructure that is subject to the tolling allowed by the program. However, per our interpretation of the state law that initiates this project, toll revenues must be used almost exclusively for improving transit systems. The FHWA therefore requests further information regarding the planned use of revenues and a certification that the highway and street infrastructure and traffic control devices within the proposed pricing area will be maintained adequately, as is required in other VPPP projects.

If the Central Business District Tolling Project proceeds to the implementation stage, a toll agreement between FHWA, your agency, and the other project partners would need to be developed and signed to secure Federal tolling authority under the VPPP. Upon execution of the toll agreement with FHWA, New York State DOT (NYSDOT) and your partners could then implement the project and collect and use the toll revenues consistent with the legal requirements outlined in Title 23, United States Code.

The FHWA recognizes that NYSDOT and its partners seek an expedited deployment schedule. We will review your information as expeditiously as possible following your submittals, but we cannot guarantee that our determinations will meet your desired start date, especially considering the complexity and new constructs of cordon pricing that the VPPP has not previously authorized elsewhere.

Further information on the VPPP is available on FHWA's Tolling and Pricing Opportunities Website: http://www.ops.fhwa.dot.gov/tolling_pricing/index.htm. As with all VPPP proposals, the Department stands ready to provide technical assistance as requested. If you have any

specific questions or require additional information related to the Federal interests or requirements associated with tolling authority under the VPPP or a toll agreement, please feel free to contact the FHWA Division Administrator for the New York Division Office, Mr. Rick Marquis, at 518-431-8897.

Sincerely,

Nicole R. Nason
Administrator

cc:
Marie Therese Dominguez, Commissioner, NYSDOT
Polly Trottenberg, Commissioner, NYCDOT
Patrick Foye, Chairman and CEO, Metropolitan Transportation Authority
Allison L. C. de Cerreno, Senior V.P., Business Operations & Transformation Officer,
Triborough Bridge and Tunnel Authority
William Carry, Senior Director for Special Projects, NYCDOT