UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

METROPOLITAN TRANSPORTATION
AUTHORITY and TRIBOROUGH BRIDGE
AND TUNNEL AUTHORITY,

*Plaintiffs*,

RIDERS ALLIANCE, SIERRA CLUB, THE
NEW YORK STATE DEPARTMENT OF
TRANSPORTATION, and THE NEW YORK
CITY DEPARTMENT OF TRANSPORTATION,

*Intervenor-Plaintiffs,*

v.

SEAN DUFFY, in his official capacity as
Secretary of the United States Department of
Transportation, GLORIA M. SHEPHERD, in
her official capacity as Executive Director of the
Federal Highway Administration, UNITED
STATES DEPARTMENT OF
TRANSPORTATION, and FEDERAL
HIGHWAY ADMINISTRATION,

*Defendants*.

---

No.  1:25-cv-01413-LJL

**COMPLAINT-IN-INTERVENTION**

Intervenor-Plaintiff the New York City Department of Transportation ("City DOT") brings this complaint against defendants Sean Duffy, in his official capacity as Secretary of the United States Department of Transportation, Gloria M. Shepherd, in her official capacity as Executive Director of the Federal Highway Administration, the United States Department of Transportation ("USDOT"), and the Federal Highway Administration ("FHWA"), and allege as follows on information and belief:

## INTRODUCTION

1.    On January 5, 2025, plaintiff Triborough Bridge and Tunnel Authority ("Triborough") began collecting tolls from motor vehicles entering Manhattan's "central business district," pursuant to New York's Traffic Mobility Act, N.Y. Vehicle & Traffic L. §§ 1704-a, 1705, and the federal Value Pricing Pilot Program ("VPPP") established by the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA"), Pub. L. 102-240, § 1012(b) (December 18, 1991), 23 U.S.C. § 149 note.

2.    In a February 19 letter, defendant Secretary Sean Duffy notified New York State Governor Kathy Hochul, along with City DOT Commissioner Ydanis Rodriguez and others, that he purported to rescind defendant FHWA's approval of congestion pricing in the central business district and unilaterally terminate the cooperative agreement that FHWA had signed under the VPPP ("cooperative agreement"). See Exhibit 1 (Letter from Secretary Sean Duffy to Governor Kathy Hochul (Feb. 19, 2025)); Exhibit 2 (Agreement among FHWA, State DOT, Triborough and New York City Department of Transportation (Nov. 21, 2024)). Although the Secretary stated that he was terminating the agreement because FHWA had lacked authority to enter into it under ISTEA, the Secretary also indicated that the termination was motivated by policy considerations.

3.    On February 20, 2025, defendant FHWA Executive Director Shepherd notified City DOT, the New York State Department of Transportation ("State DOT"), and Triborough that, pursuant to Secretary Duffy's February 19 letter, "[State DOT] and its project sponsors must cease the collection of tolls on Federal-aid highways in the [central business district] by March 21, 2025." *See* Exhibit 3 (Letter from

Executive Director Gloria Shepherd to Commissioner Rodriguez and others (Feb. 20, 2025)).  The Project Sponsors are Triborough, State DOT, and City DOT. On March 20, 2025, Shepherd sent a second letter purporting to extend the deadline to April 20, 2025. *See* Exhibit 4 (Letter from Executive Director Shepherd to City DOT Commissioner Rodriguez and others (Mar. 20, 2025)).

4.    The Secretary asserted that the congestion pricing program was "not an eligible [VPPP]" for two reasons: (1) the congestion pricing program creates "cordon pricing," meaning that there is not a toll-free means to enter the central business district; and (2) the toll rate was calculated "primarily" to raise revenue for Metropolitan Transit Authority ("MTA") capital projects, as opposed to reducing congestion or meeting other road-related goals, which, according to the Secretary, are the only authorized purposes of congestion pricing tolls.  Exhibit 1 at 3.

5.    Defendants' purported termination of the cooperative agreement was arbitrary and capricious, not in accordance with law, in excess of statutory authority, and without observance of procedure required by law under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), (C) & (D), as well as *ultra vires*.

6.    The termination by defendants was not in accordance with law for several reasons. First, defendants lacked authority to unilaterally terminate the cooperative agreement.  The rescission was also in excess of statutory authority and *ultra vires* for the same reason.

7.    Second, even if defendants acted with lawful authority, the termination was not in accordance with law and was also without observance of procedure required by law because defendants were required to give City DOT, State DOT, and

Triborough an opportunity to be heard before the agreement was rescinded, which they did not do.

8.    Third, the termination was arbitrary and capricious and not in accordance with law because Secretary Duffy's proffered rationales for the reversal of FHWA's prior determination that the congestion pricing program is eligible for the VPPP are erroneous.

9.    Secretary Duffy stated that the VPPP does not allow cordon pricing but nothing in the VPPP supports that interpretation, and FHWA has determined in the past that congestion pricing includes cordon pricing, which it also called "area pricing." Secretary Duffy states that cordon pricing has only been used on interstate highways where drivers have alternative non-toll routes, but according to FHWA, tolls on highways are not cordon or area pricing.

10.    Secretary Duffy also stated that congestion pricing was "primarily driven by the need to raise revenue for the [MTA]," which he asserts is forbidden by the VPPP. Exhibit 1 at 3. Congestion pricing for entry into the central business district of Manhattan was designed both to reduce congestion and to raise revenue for the MTA. In any event and contrary to the Secretary's claim, the VPPP permits states and local government authorities to include revenue objectives when setting toll rates, as evidenced by the language of the statute, ISTEA § 1012(b)(3), which provides that toll revenues may be used to fund other transportation infrastructure projects.

11.    Fourth, the termination was not in accordance with law because defendants did not review the potential environmental impacts of their decision to

terminate before deciding to do so, as required by the National Environmental Policy Act, 42 U.S.C. §§ 4332(C), 4336(b)(2).

12.  For these reasons and pursuant to 5 U.S.C. § 706(2), the Court should (a) declare that the termination of the cooperative agreement was not in accordance with law, arbitrary and capricious, in excess of statutory authority, without observance of procedure required by law, and *ultra vires*; and (b) hold unlawful and set aside the purported termination of the cooperative agreement and the directive that City DOT, State DOT, and Triborough cease the collection of tolls by April 20, 2025.

## PARTIES

13.  Intervenor plaintiff City DOT is an agency of the City of New York, a municipal corporation codified under the laws of the State of New York, one of the co-applicants for the VPPP approval, and a co-signatory of the VPPP cooperative agreement.

14.  Defendant Duffy is the Secretary of USDOT. He is sued in his official capacity.

15.  Defendant Shepherd is the Executive Director of FHWA. She is sued in her official capacity.

16.  Defendant USDOT is a cabinet department of the federal government, with offices in Washington, D.C.

17.  Defendant FHWA is an agency within USDOT, with offices in Washington, D.C.

## JURISDICTION AND VENUE

18.  This Court has subject matter jurisdiction over this action pursuant to

23 U.S.C. § 1331 because this case presents a federal question under the laws of the United States, including the APA, 5 U.S.C. § 551 *et seq.*

19.    Venue is proper in this district under 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## STATUTORY BACKGROUND

### New York's Traffic Mobility Act

20.    Traffic congestion has long plagued the New York metropolitan area. For decades, congestion has hampered  economic growth and harmed the environment and public health and safety, not to mention the quality of life in the region.

21.    Congestion on New York City roads, and in the central business district of Manhattan in particular, has a serious negative impact on public health.

22.    The U.S. Environmental Protection Agency has recognized, higher vehicle traffic leads to higher vehicle emissions, which are associated with negative health impacts like "asthma onset and aggravation, cardiovascular disease, reduced lung function, impaired lung development in children, pre-term and low-birthweight infants, childhood leukemia, and premature death."[1] FHWA has consistently acknowledged that "less vehicle traffic can improve air quality and reduce chronic lower respiratory diseases."[2]

---

[1] U.S. ENVIRONMENTAL PROTECTION AGENCY, NEAR ROADWAY AIR POLLUTION AND HEALTH: FREQUENTLY ASKED QUESTIONS at 2 (Aug. 2014), https://nepis.epa.gov/Exe/ZyPDF.cgi/P100NFFD.PDF?Dockey=P100NFFD.PDF.

[2] Jhoset Burgos-Rodriguez, et al., *Making Healthy Connections in Transportation*, 87 PUBLIC ROADS

23.    Congestion also increases travel times, eroding worker productivity, reducing bus and paratransit service, raising business expenses, including the cost of deliveries, and impeding the movement of emergency vehicles. A 2018 study estimated that "traffic congestion [would] be a $100 billion drag" on the metropolitan-area economy over the next five years and identified Manhattan below 60th street—where a quarter of the region's economic activity is concentrated—as the primary source of traffic congestion.[3]

24.    In 2019, the New York State Legislature enacted the Traffic Mobility Act, which authorized and directed Triborough to implement a congestion tolling program in the central business district. N.Y. Veh. & Traf. Law § 1701 *et seq*.

25.    The 2019 Act's legislative findings declare that traffic in New York—which "ranks second worst among cities in the United States and third worst among cities in the world" and is estimated to cost the metropolitan economy more than "one hundred billion dollars over the next five years"—is "crippling" for "residents, commuters, taxi and for-hire vehicle traffic, bus transit and emergency services" and "a significant contributor to decreased air quality." *Id.* § 1701.

26.    The Legislature further found that the underfunding of New York City's subway infrastructure has "a significant deleterious impact on the health, safety, and livelihood of commuters, tourists, resident New Yorkers" as well as "the economy of the state of New York," such that "a long-term and sustainable solution is necessary

28, 28 (Summer 2023),
https://highways.dot.gov/sites/fhwa.dot.gov/files/Public%20Roads%20Summer%202023.pdf.

[3] The Partnership for New York City, *$100 Billion Cost of Traffic Congestion in Metro New York* (Jan. 2018), https://pfnyc.org/research/100-billion-cost-of-traffic-congestion-in-metro-new-york/.

in order to ensure stable and reliable funding" for this "important mass transit asset." *Id.* Consequently, the Legislature declared that to ensure the "public health and safety of New York's residents," the creation of a congestion pricing program in the Manhattan central business district was "a matter of substantial state concern." *Id.*

27.    The Act authorizes and directs Triborough to "establish the central business district tolling program," *id.* § 1704(1), grants Triborough the power "to establish and charge variable tolls and fees for vehicles entering or remaining in the [central business district],"[4] and authorizes Triborough "to make rules and regulations for the establishment and collection of central business district tolls, fees, and other charges," *id.* § 1704-a(1).

28.    The goals of the Act are to reduce traffic congestion and pollution in that district and raise funds for the capital needs of the MTA subway, bus and commuter rail operations. *Id.* § 1701.

### The VPPP

29.    Tolls are generally prohibited on federal-aid highways, 23 U.S.C. § 301, subject to exceptions.

30.    A "federal-aid highway" is "a public highway eligible for assistance under [Title 23, Chapter 1] other than a highway functionally classified as a local road or rural minor collector." 23 U.S.C. § 101(a)(6).

31.    Congress    enacted    ISTEA,    to    foster    "a    National    Intermodal

---

[4] As delineated by the Act, the central business district encompasses the geographic area of Manhattan south and inclusive of 60th Street, but not including the FDR Drive, the West Side Highway, the Battery Park Underpass, and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West Street. *Id.* § 1704(2).

Transportation System," consisting of "all forms of transportation in a unified, interconnected manner."  ISTEA § 2, 49 U.S.C. § 101 note.

32.    Among other things, ISTEA established two programs that authorized tolls on federal-aid highways.

33.    First, it created the "Basic Program" that authorized tolls on highways, bridges, and tunnels pursuant to certain conditions. ISTEA§ 1012(a), 23 U.S.C. § 129.

34.    ISTEA also created the "Congestion Pricing Pilot Program," later renamed the VPPP, which directed the Secretary of Transportation to "solicit the participation of State and local governments and public authorities for one or more congestion pricing pilot projects." ISTEA § 1012(b), 23 U.S.C. § 149 note. See also Pub. L. 105-178 § 1216 (June 9, 1998) (renaming the program to the VPPP).

35.    As FHWA describes it, the VPPP is "intended to demonstrate whether and to what extent roadway congestion may be reduced through application of congestion pricing strategies, and the magnitude of the impact of such strategies on driver behavior, traffic volumes, transit ridership, air quality and availability of funds for transportation programs."[5]

36.    FHWA has recognized that congestion pricing can reduce delays and stress, allow for more deliveries per hour for businesses, improve transit speeds and reliability of service, and save lives by shortening the incident response times for ambulances and emergency personnel.[6]

---

[5]    *Value    Pricing    Pilot    Program*,    U.S.    FED.    HIGHWAY    ADMIN., https://ops.fhwa.dot.gov/congestionpricing/value_pricing/ (last accessed Apr. 2, 2025).
[6]    *Benefits    of    Congestion    Pricing*,    U.S.    FED.    HIGHWAY    ADMIN., https://ops.fhwa.dot.gov/congestionpricing/cp_benefits.htm (last accessed Apr. 2, 2025).

37.    Also according to FHWA, congestion pricing "is a way of harnessing the power of the market to reduce the waste associated with traffic congestion."[7] Congestion pricing shifts "some rush hour highway travel to other transportation modes or to off-peak periods.  By removing even just a small fraction of the vehicles from a congested roadway, pricing helps the system to flow more efficiently." *Id.*

38.    FHWA has also recognized that congestion pricing includes cordon pricing.[8]  In contrast to charging tolls for using particular roads, bridges, tunnels, or ferries, "[z]one-based pricing, including cordon and area pricing, involves either variable or fixed charges to drive within or into a congested area within a city."[9]

39.    "Revenues generated by any pilot project under [the VPPP] must be applied to projects eligible under [Title 23]."  ISTEA § 1012(b)(3), 23 U.S.C. 149 note. Pursuant to 23 U.S.C. § 133(b)(1)(C), eligible projects include public transportation projects under 49 U.S.C. §§ 5307(a)(1) and 5337(b)(1). *See Owner Operator Indep. Drivers Ass'n, Inc. v. Penn. Tpk. Comm'n*, 934 F.3d 283, 292 (3d Cir. 2019) ("ISTEA authorizes states to construct, among other things, 'transit capital projects eligible for assistance under chapter 53 of title 49.'") (quoting 23 U.S.C. § 133(b)(1)(C)); *Chan v. U.S. Dep't of Transp.* No. 23-CV-10365 (LJL), 2024 WL 5199945, at *17 (S.D.N.Y.

---

[7]  Welcome to the FHWA Congestion Pricing Web Site, U.S. FED. HIGHWAY ADMIN., https://ops.fhwa.dot.gov/congestionpricing/index.htm (last accessed Mar. 17, 2025); Federal Tolling Programs, U.S. FED. HIGHWAY ADMIN., https://www.fhwa.dot.gov/ipd/tolling_and_pricing/tolling_pricing/vppp.aspx (last accessed Apr. 2, 2025) ("Value pricing – sometimes called congestion pricing – works by charging drivers on congested roadways during peak periods.").

[8]  *Report on the Value Pricing Pilot Program Through April 2018* at 3, 12, 13, 39 (undated), U.S. FED. HIGHWAY ADMIN., https://rosap.ntl.bts.gov/view/dot/51791/dot_51791_DS2.pdf; *Congestion Pricing: A Primer on Institutional Issues* at 3, 10, 17, 23, 24 (Apr. 2013), U.S. FED. HIGHWAY ADMIN., https://rosap.ntl.bts.gov/view/dot/26194/dot_26194_DS1.pdf .

[9]      *Zone-Based    Pricing*,    U.S.    FED.    HIGHWAY    ADMIN., https://ops.fhwa.dot.gov/congestionpricing/strategies/involving_tolls/zone_based.htm.

Dec. 23, 2024) ("[I]t is Congress' unmistakably clear intent that a public authority be permitted to collect funds that exceed a toll road's costs and spend those funds on non-toll road projects.") (citations omitted).

40.    The FHWA explains that "[n]et revenues after payment of operating costs can be used to pay for expansion of roadway facilities, to support alternatives to driving alone such as public transit, to address impacts on low-income individuals by providing toll discounts or credits, or to reduce other taxes that motorists pay for highways such as fuel taxes, vehicle registration fees, or sales taxes."[10]

41.    The VPPP provides "the Secretary shall allow the use of tolls on the Interstate System as part of any value pricing pilot program under this subsection." 23 U.S.C. § 149 note (VPPP § 4, as amended by the Transportation Equity Act for the 21st Century, Pub. L. 105-178, § 1216(a)(4) (June 9, 1998)).

42.    To participate in the VPPP, states, local governments, and public authorities enter into "cooperative agreements" with the Secretary of Transportation. *Id.* (VPPP § 1, as amended by the Transportation Equity Act for the 21st Century, Pub. L. 105-178, § 1216(a)(2) (June 9, 1998)).

43.    The Secretary of Transportation has delegated authority to administer the VPPP and to enter into cooperative agreements to the FHWA Administrator. 49 C.F.R. § 1.85(c)(22).

44.    The VPPP does not grant the defendants unilateral authority to terminate a cooperative agreement.

---

[10]    What is Congestion Pricing?, U.S. FED. HIGHWAY ADMIN., https://ops.fhwa.dot.gov/congestionpricing/cp_what_is.htm.

**Termination of a Cooperative Agreement Under 2 C.F.R. Part 200**

45.    FHWA has determined that agreements authorizing projects that require tolling authority under the VPPP are cooperative agreements, even where such agreements do not include a federal funding component.[11]

46.    FHWA has adopted the Office of Management and Budget's agency-wide *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* ("Uniform Guidance"), 2 C.F.R. Part 200. *See id.* § 1201.1.

47.    The Uniform Guidance sets out specific conditions under which an award, including a cooperative agreement, may be terminated:

   a.  by the agency if the recipient "fails to comply with the terms and conditions" of the award;

   b.  by the agency with the "consent" of the recipient;

   c.  by the recipient; and

   d.  by the agency "pursuant to the terms and conditions" of the award.

*Id.* § 200.340(a).  The Uniform Guidance also provides that, before an agency may terminate an award, including a cooperative agreement, an agency must provide written notice and an opportunity to be heard.  *Id.* §§ 200.341(a), 342.

**The National Environmental Policy Act**

48.    The National Environmental Policy Act requires that, before a federal agency takes a "major Federal action significantly affecting the quality of the human

---

[11] *Value Pricing Pilot Program*, U.S. FED. HIGHWAY ADMIN., ("The Moving Ahead for Progress in the 21st Century (MAP-21) Act did not authorize additional funds after FY2012 for the discretionary grant component of the [VPPP].  However, FHWA's ability to enter into cooperative agreements for projects that require tolling authority under this program for their implementation will continue."), https://ops.fhwa.dot.gov/congestionpricing/value_pricing (last accessed Apr. 2, 2025).

environment," the agency is required to prepare a report that discusses, among other things, the action's "reasonably foreseeable environmental effects."   42 U.S.C. § 4332(2)(C).

49.   A "major Federal action" is "an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility." *Id.* § 4336e(10).

50.   To determine whether a major federal action will significantly affect the quality of the environment, an agency may prepare an "environmental assessment" ("EA"). *See*, *e.g.*, *id.* § 4336(b)(2); 23 C.F.R. § 771.119.

51.   Agencies are required to take a hard look at the reasonably foreseeable social, economic, and environmental impacts of a proposed action and its alternatives. *See*, *e.g.*, 42 U.S.C. § 4336; 23 C.F.R. § 771.119(b); *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).

52.   Agencies are required to consider alternatives to a proposed action. *See*, *e.g.*, 42 U.S.C. § 4332(C)(iii), (F) and (H); 23 C.F.R. § 771.119(b).

53.   Agencies are required to identify measures that might mitigate adverse environmental impacts, and incorporate measures necessary to mitigate adverse impacts into its action. *See*, *e.g.*, 23 C.F.R. §§ 771.105(e), 771.119(b).

54.   If an agency determines that the proposed action will not have significant effects, accounting for mitigation, it can issue a "Finding of No Significant Impact" ("FONSI"). 42 U.S.C. § 4336(b)(2); 23 C.F.R. § 771.121.   If the EA reveals that there may be significant effects, an environmental impact statement ("EIS") is required.   42 U.S.C. § 4336(b)(1); 23 C.F.R. § 771.119(i).

## The Administrative Procedure Act

55.    The Administrative Procedure Act provides that a court shall "hold unlawful and set aside agency actions, findings, and conclusions found to be," among other things "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C) & (D).

## FACTUAL ALLEGATIONS

### The Initial Environmental Analysis, Toll Schedule, and Pause

56.    In 2019, the Project Sponsors submitted an expression of interest to FHWA seeking authorization to implement the congestion pricing program in the Manhattan central business district.  *See* Exhibit 5 (Expression of Interest (June 17, 2019)).  FHWA responded that the VPPP "appear[ed] to be the best potential fit" among the various federal programs that allowed tolling on Federal-aid highways. *See* Exhibit 6 (Letter from Administrator Nicole Nason to Executive Deputy Commissioner Ron Epstein at 1 (Oct. 24, 2019).

57.    A years-long environmental review process under NEPA ensued.  In assessing the congestion pricing program, FHWA specifically considered the congestion pricing program's purpose "to reduce traffic congestion in the [central business district] in a manner that will generate revenue for future transportation improvements," and its specific objectives of: (1) reducing daily vehicle miles traveled within the district by at least five percent; (2) reducing the number of vehicles entering the district daily by at least ten percent; and (3) creating a funding source

14

for capital improvements and generating sufficient annual net revenues to fund $15 billion for capital projects.[12]

58.    On March 30, 2021, while working with the Project Sponsors, then-Acting FHWA Administrator Stephanie Pollack commended the congestion pricing program, saying "[t]he FHWA looks forward to assisting New York so we can arrive at a prompt and informed NEPA determination on this important and precedent-setting project."[13]

59.    The Final EA ruled out alternatives that did not meet the Project's purpose and objectives,[14] and predicted that the congestion pricing program would meet each of the objectives described in Paragraph 57 above.[15] Those predictions were based on detailed modeling using the federally approved Best Practices Model maintained by the New York Metropolitan Transportation Council.

60.    In May 2023, FHWA approved the Final EA.

61.    On June 22, 2023, FHWA issued a "Finding of No Significant Impact" determining that the congestion pricing program, including mitigation, would not have a significant adverse impact on the environment and would not have a disproportionately high and adverse impact on environmental justice communities or populations.

---

[12] *See* FHWA et al., *Central Business District Tolling Program, Finding of No Significance, Appendix A: Final Environmental Assessment* at ES-7, MTA.INFO (June 14, 2024), https://new.mta.info/project/CBDTP/environmental-assessment.
[13] *FHWA Greenlights Environmental Assessment for New York City's Proposed Congestion Pricing Plan*, U.S. FED. HIGHWAY ADMIN. (Mar. 30, 2021), https://highways.dot.gov/newsroom/fhwa-greenlights-environmental-assessment-new-york-citys-proposed-congestion-pricing-plan.
[14] Final EA, Table ES-1 at ES-9.
[15] Final EA, Table ES-3 at ES-14.

62.    On March 27, 2024, the Triborough Board approved a toll schedule through a formal ratemaking process under New York State law.

63.    On June 5, 2024, New York Governor Kathy Hochul announced a temporary pause of the congestion pricing program.

64.    On June 14, 2024, FHWA concluded that the approved toll schedule and associated impacts were analyzed and mitigated appropriately under NEPA, that no additional environmental analysis was warranted, and that the conclusions in the Final EA and FONSI remained valid.

65.    On November 14, 2024, Governor Hochul proposed that the congestion pricing program move forward with the toll schedule adopted by the Triborough Board in March 2024, but to be phased in over a period of years, with a lower initial toll amount to lessen the burden on drivers during early implementation (the "Phase-In Approach"). In November 2024, the Project Sponsors completed a second reevaluation under NEPA to assess the Phase-In Approach.

66.    That reevaluation confirmed that under the Phase-In Approach, the congestion pricing program would still meet its purpose and need, and all of its objectives. Specifically, Reevaluation 2 predicted that the Phase-In Approach with an initial $9 toll would exceed a daily five percent reduction in vehicle miles traveled in the central business district and a ten percent reduction in vehicles entering the district daily and would generate sufficient annual revenues to fund MTA capital projects. After phase-in of the $15 peak auto toll, the Phase-In Approach would result in at least 8.9 percent reduction in miles traveled, at least 17.3 percent reduction in vehicle entry, and at least $0.9 billion in annual revenue.

67.    On November 18, 2024, the Triborough Board formally adopted the Phase-In Approach.

68.    On November 21, 2024, FHWA concluded that the impacts of the Phase-were analyzed and mitigated accordingly, that the conclusions in FHWA's Final EA and FONSI remained valid, and that no additional environmental analysis was warranted.

## The Cooperative Agreement

69.    That same day, on November 21, 2024, FHWA and the three Project Sponsors signed the cooperative agreement.

70.    The cooperative agreement states in relevant part that "[e]ffective on the date of this Agreement, the project is approved as a pilot program," and Triborough is authorized to "operate the Project as a toll Project in accordance with the provisions of this Agreement and as a value pricing project, as part of State DOT's value pricing pilot program." Exhibit 2, cl. 1.

71.    FHWA further agreed that "the imposition of tolls under this Agreement does not render Federal-aid highways within the State of New York generally ineligible for Federal-aid highway funds where such highways are otherwise eligible under the particular funding program." *Id.* cl. 5.

72.    In return, the Project Sponsors agreed to a number of obligations in the cooperative agreement, including: (1) "to adequately maintain" federal-aid highways located in the geographic area of the congestion pricing program, *id.* cl. 6; (2) to submit regular reports on the effects of the congestion pricing program "on driver behavior, traffic volume, congestion, transit ridership" and other topics to FHWA, *id.* cl. 8(b);

and (3) "to comply with all Federal laws and requirements applicable to this project, including the laws and policies applicable to the [VPPP]," *id.* cl. 9.  Clause 8 of the cooperative agreement further requires that the Project Sponsors "identify benefits the application of tolls has in reducing climate pollution" and "demonstrate the benefits mitigation measures provide to underserved communities." *Id.* cl. 8.

73.    In addition, the cooperative agreement requires that FHWA and the Project Sponsors to "cooperate and work together in the implementation of the Project." *Id.* cl. 8(a).

74.    The cooperative agreement does not include any provision authorizing FHWA to terminate the agreement.  Rather, it contemplates that only Triborough could unilaterally decide to discontinue the congestion pricing program, requiring the Project Sponsors to "work with FHWA to return the Project to its original operating condition if [Triborough] decides to discontinue tolls on the Project." *Id.* cl. 11.

75.    The cooperative agreement references FHWA regulations at 23 C.F.R. Parts 940 and 950.  *Id.* cl. 9.  These regulations do not grant FHWA authority to unilaterally terminate the cooperative agreement.

### Implementation of the Congestion Pricing Program

76.    In late 2024, several groups, individuals, and counties, as well as the State of New Jersey, sought preliminary injunctive relief barring the MTA and Triborough from beginning the congestion pricing program or collecting tolls on various federal and state constitutional and statutory grounds.  Each of these claims for injunctive relief was rejected by the courts.  *See Chan v. U.S. Dept. of Transp.*, No. 23 Civ. 10365 (LJL), 2024 WL 5199945 (S.D.N.Y. Dec. 23, 2024) (Liman, J.); *County*

*of Rockland v. Metro. Transp. Auth.*, No. Civ. 24-3325 (2d Cir. Jan. 28, 2025) (per curiam) [*Rockland* 2d Cir. ECF No. 31]; *New Jersey v. Metro. Transp. Auth.*, No. Civ. 25-1033 (3d Cir. Jan. 4, 2025) (Bibas, J.) [*New Jersey* 3d Cir. ECF No. 9]; *Rockland v. Metro. Transp. Auth.*, No. 24 Civ. 2285 (S.D.N.Y. Jan. 14, 2025) (Seibel, J.) [*Rockland* ECF No. 56]; *New Jersey v. U.S. Dept. of Transp.*, No. 23 Civ. 3885 (D.N.J. Jan. 3, 2025) (Gordon, J.) [*New Jersey* ECF No. 212]; *Rockland v. Metro. Transp. Auth.*, No. 24 Civ. 2285 (S.D.N.Y. Dec. 23, 2024) (Seibel, J.) [*Rockland* ECF No. 52]; *Neuhaus v. Triborough Bridge & Tunnel Auth.*, No. 24 Civ. 3983 (S.D.N.Y. Dec. 23, 2024) (Seibel, J.) [*Neuhaus* ECF No. 44].

77.    On January 5, 2025, the congestion pricing program went into effect.

78.    Eligible vehicles entering the central business district are being tolled at the rates established in the Phase-In Approach.

79.    MTA data showed that crossing times were significantly faster at the Lincoln Tunnel and the Holland Tunnel in January 2025, compared to January 2024.[16] Trips on the Williamsburg Bridge and Queensboro Bridge have also been significantly faster and riders on express buses are saving time on their commutes.[17]

80.    Data collected by the MTA reveals that since the congestion pricing program began, traffic in the central business district decreased substantially, with 1.2 million fewer vehicles entering the district than projected.  Drivers in the district are experiencing travel time improvements in the afternoon peak hours "with

---

[16] Andrew Siff, *MTA Calls Congestion Pricing 'Transformative" on Commutes,* NBC NEW YORK, (Jan. 29, 2025), https://www.nbcnewyork.com/new-york-city/mta-congestion-pricing-transformative-commute-impact/6126670/.
[17] *Id.*

reductions as high as 59%."[18]  Inbound river crossings to the central business district have seen a 10%-48% decrease in travel times, and several bus routes have seen significant decreases in the time needed to complete their routes.[19]  After a brief rise in January, daily average traffic volumes have dropped on the bridges that do not connect directly to the central business district, indicating that the toll has not diverted traffic.[20]

81.    The congestion pricing program has not stymied economic activity. Data provided by the MTA shows that in January 2025, 35.8 million people visited Business Improvement Districts within the central business district, a 1.5 million increase compared to last January 2024. [21]

82.    The Partnership for New York City's President & CEO Kathryn Wylde has stated that, since the onset of Congestion Pricing, New Yorkers are "moving faster and there's less traffic,"[22] and that "[i]n every respect, this is a policy that President Trump and the Republicans should be supporting." [23]

83.    Subway ridership has increased, while crime in the subway has

---

[18] *See New Congestion Relief Zone Data Captures Magnitude of Faster Commutes for Drivers and Bus Riders, Fewer Vehicles and Surging Express Bus Ridership*, MTA (Jan. 29, 2025), https://www.mta.info/press-release/new-congestion-relief-zone-data-captures-magnitude-of-faster-commutes-drivers-and-bus.

[19] *Id.*

[20] Dave Colon, *Data: Congestion Pricing is Not Rerouting Traffic to Other Boroughs*, STREETSBLOG NYC (Mar. 12, 2025) https://nyc.streetsblog.org/2025/03/12/data-outer-borough-congestion-pricing-spillover-traffic-not-happening.

[21] Arun Venugopal, *Vehicle traffic is down in Manhattan, but pedestrian traffic is up, data says,* GOTHAMIST (Feb. 13, 2025) https://gothamist.com/news/vehicle-traffic-is-down-in-manhattan-but-pedestrian-traffic-is-up-data-says

[22] Dick Brennan, *President Trump said to have NYC's congestion pricing, bike lanes in his crosshairs*, CBS NEWS (Feb. 10, 2025), https://www.cbsnews.com/newyork/news/president-trump-nyc-congestion-pricing-bike-lanes/.

[23] Ry Rivard & Nick Reisman, *New York's business boosters push Trump to keep Manhattan tolls*, POLITICO (Feb. 11, 2025), https://www.politico.com/news/2025/02/11/new-york-trump-congestion-pricing-00203540.

decreased.  In January 2025, there were 36% fewer crimes reported on the subway than last January.[24]

### Then-Candidate Trump's Repeated Threats to "Kill" Congestion Pricing

84.    In his Presidential campaign, Donald Trump repeatedly voiced his political opposition to the congestion pricing program and stated that he would "terminate" and "kill" the congestion pricing program once in office.

85.    Following the election, President Trump continued to express his opposition to the Program, saying in an interview with the *New York Post* on November 14, 2024, that he "strongly disagree[d] with the decision on the congestion tax."[25]

### Unlawful Termination of the Cooperative agreement

86.    On February 19, 2025, Secretary Duffy notified New York Governor Hochul, along with City DOT and Triborough, that he purported to rescind defendant FHWA's approval of congestion pricing in the central business district and terminate the cooperative agreement. *See* Exhibit 1.  Although the Secretary stated that he was terminating the agreement because FHWA had lacked authority to enter into it under ISTEA, the Secretary also indicated that the termination was motivated by the President's opposition to congestion pricing and the Secretary's own policy disagreement with New York State. *Id.* at 1-2.  The Secretary stated that, in his view,

---

[24] Barbara Russo-Lennon, Subway Crime Plummets as Ridership Jumps Significantly in 2025 in Congestion Pricing Era, AM NY (Feb 4, 2025), https://www.amny.com/nyc-transit/nyc-subway-crime-plummets-ridership-jumps-2025/.

[25] Steven Nelson, *Trump slams Hochul move to revive NYC congestion tax: 'It will hurt workers, families, and businesses'*, N.Y. POST (Nov. 14, 2024), https://nypost.com/2024/11/14/us-news/trump-slams-hochul-move-to-revive-nyc-congestion-tax/.

congestion pricing in Manhattan was not a "fair deal." *Id.* at 2.

87.   The Secretary asserted that the congestion pricing program was "not an eligible [cooperative agreement]" for two reasons: (1) the program creates "cordon pricing," meaning that there is not a toll-free means to enter the central business district; and (2) the toll rate was "primarily" calculated to raise revenue for MTA capital projects, as opposed to reducing congestion. *Id.* at 3.

88.   The Secretary did not provide any explanation of the grounds for the reversal of FHWA's earlier determination that the congestion pricing program was eligible for the VPPP or FHWA's publicly available guidance that cordon pricing is permitted under VPPP, and that revenues from VPPP programs may be used to support public transit.

89.   Defendants did not give City DOT, State DOT, or Triborough notice or an opportunity to be heard nor did it prepare any environmental review under NEPA before terminating the cooperative agreement.

90.   On February 20, 2025, Executive Director Shepherd notified project sponsors City DOT, State DOT, and Triborough that, pursuant to Secretary Duffy's February 19 letter, "[State DOT] and its project sponsors must cease the collection of tolls on Federal-aid highways in the [central business district] by March 21, 2025." Exhibit 3 at 1. On March 20, 2025, Shepherd sent a second letter purporting to extend the deadline to April 20, 2025. Exhibit 4. The Project Sponsors are Triborough, State DOT, and City DOT.

### The Harms to New York City
### from Ending the Congestion Pricing Program

91.   New York City's interests will be harmed if congestion pricing is halted.

92.    New York City has an interest in ensuring that the cooperative agreement authorizing congestion pricing to which City DOT, as an authorized participant in the VPPP, was a signatory remains in effect.

93.    New York City's interest in the implementation of the Act will be harmed if tolling revenues are halted.

94.    New York's economy, and to a significant degree the nation's economy, depends on keeping vehicle traffic in the New York City metropolitan area moving.

95.    Critical parts of the MTA capital program would be delayed if program tolling revenues are halted. The program includes: (1) adding accessibility improvements (including elevators) to numerous subway stations within the City consistent with the Americans with Disabilities Act; (2) doubling the number of track lines with modernized signals; (3) purchasing over 1,900 new rail cars, which are six times more reliable than older ones, and replacing 2,400 buses; (4) replacing approximately 60 miles of track; and (5) renewing stations and addressing important repair projects at 175 stations.

96.    The congestion pricing program will also provide funding for much-needed repairs to Grand Central Terminal, a more than 100-year-old structure that is used by more than 700 trains a day. And coupled with funding from the 2015-2019 program, the MTA Capital Program further provides funding for three new fully accessible stations on the Second Avenue Subway that would allow connection to the Metro-North lines, strengthening connections for Harlem and East Harlem residents.

97.    New Yorkers, through the MTA Capital Program, will also receive better access to Penn Station through a new route with four new stations on the Metro-

North New Haven Line that will carry up to 50,000 Metro-North customers directly to Penn Station every day.

98.    Finally, ending the congestion pricing program means the unabated continuation of the severe congestion in Manhattan's central business district, with its concomitant economic, environmental, and public health and safety costs to businesses, residents, commuters, workers, students and visitors in this area, without any evaluation of these and other environmental impacts, opportunity for public participation, or consideration of alternatives required by NEPA.

## CLAIMS FOR RELIEF

### COUNT I
### Termination of the VPPP Agreement
### Violation of the Administrative
### Procedure Act

### (Substantively Arbitrary & Capricious – Contrary to Law)
### (5 U.S.C. § 701 *et seq.*)

99.    The City realleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

100.    The acts of all executive branch officers "must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902).

101.    Further, under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be … contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(B)-(C).

102.    Defendants   are   not   authorized   by   any   law—statutory   or constitutional—to unilaterally terminate the VPPP Agreement contrary to its terms. The VPPP Agreement is a valid agreement, currently in effect, supported by consideration, and subject to considerable reliance interests.  Neither ISTEA nor the VPPP Agreement authorizes FHWA to unilaterally rescind the VPPP Agreement or to rescind FHWA's approval of the Program.

103.    ISTEA does not include any provision authorizing FHWA to terminate the VPPP Agreement.  ISTEA authorizes the Secretary to "enter into" agreements "to establish, maintain, and monitor" value pricing pilot programs. ISTEA § 1012(b). ISTEA further directs that the Secretary shall "monitor the effect of such programs for a period of at least 10 years."

104.    The VPPP Agreement does not include any provision authorizing FHWA to terminate the agreement.  Rather, the VPPP Agreement contemplates that only Triborough could unilaterally decide to discontinue the Program, requiring the Project Sponsors to "work with FHWA to return the Project to its original operating condition if TBTA decides to discontinue tolls on the Project." VPPP Agmt. cl. 11.  The VPPP Agreement further provides that City DOT and Triborough shall "monitor and report on the project performance" for "a period of at least ten years or to the end of the life of the Project, whichever is sooner." *Id.* cl. (8)(b).

105.    The VPPP Agreement references FHWA regulations at 23 C.F.R. Part 940 and 950. These regulations do not purport to grant FHWA authority to unilaterally terminate the VPPP Agreement, and the FHWA has acted *ultra vires*.

106.    In addition, an executive officer acts *ultra vires* where it "deprives a

contractor of a right expressly or impliedly granted by another statute." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996).

107.  Defendants have deprived Plaintiffs of rights expressly and impliedly granted by ISTEA § 1012(b), which permits tolling of federally funded highways following approval of a VPPP Project.

108.  Defendants have no authority to terminate the VPPP Agreement or rescind TBTA's authority to operate the Program.  Therefore, Defendants have acted contrary to law and the Challenged Action is arbitrary and capricious and must be declared unlawful, vacated, and set aside.

## COUNT II

### *Ultra Vires*

### Termination of the VPPP Agreement

109.  The City realleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

110.  The acts of all executive branch officers "must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902).

111.  ISTEA does not authorize Defendants to unilaterally rescind a cooperative agreement entered into to authorize tolling under the VPPP, nor does the VPPP Agreement itself empower Defendants to terminate the agreement or rescind FHWA's approval of the Program.

112.  The Challenged Action is *ultra vires* because it purports to unilaterally

26

terminate the VPPP Agreement and rescind the VPPP Agreement without statutory authority and contrary to the applicable agency regulations and the terms of the VPPP Agreement.

113.   The Challenged Action is *ultra vires* because rescission of the VPPP Agreement is not authorized under any provision of law.

114.   The Challenged Action is *ultra vires* because the VPPP Agreement is a valid and binding agreement and the VPPP Agreement does not permit unilateral rescission by FHWA or any other governmental actor.

115.   In addition, an executive officer also acts *ultra vires* where it "deprives a contractor of a right expressly or impliedly granted by another statute." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996).

116.   Defendants have deprived Plaintiffs of rights expressly and impliedly granted by ISTEA §1012(b), and thus acted *ultra vires*.

## COUNT III

**Termination of the VPPP Agreement
Violation of the Administrative
Procedure Act**

**(Procedurally Arbitrary & Capricious – Contrary to Regulations)**
(5 U.S.C. § 701 *et seq.*)

117.   The City realleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

118.   The VPPP Agreement is a cooperative agreement because "the principal purpose of the relationship is to transfer a thing of value" (authority to collect toll revenues) and "substantial [federal] involvement is expected." 31 U.S.C. § 6305; 2 C.F.R. 200.1; *see also* 23 U.S.C. § 149 note (Value Pricing Pilot Program), cl. 1

(authorizing Secretary to enter into "cooperative agreements" under the VPPP).

119.    FHWA has determined that agreements authorizing projects that require tolling authority under the VPPP are cooperative agreements, even where such agreements do not include a federal funding component. *See Congestion Pricing, Value Pricing Pilot Program*, FHWA (May 17, 2024), https://ops.fhwa.dot.gov/congestionpricing/value_pricing ("The Moving Ahead for Progress in the 21st Century (MAP-21) Act did not authorize additional funds after FY2012 for the discretionary grant component of the Value Pricing Pilot Program (VPPP). However, FHWA's ability to enter into *cooperative agreements* for projects that require tolling authority under this program for their implementation will continue.") (last accessed Apr. 2, 2025).

120.    FHWA has adopted the Office of Management and Budget's agency-wide *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* ("Uniform Guidance"), 2 C.F.R. Part 200. *See id.* § 1201.1.

121.    The Uniform Guidance sets out specific conditions under which an award, including a cooperative agreement, *see id.* § 200.1, may be terminated:

   a.  by the agency if the recipient "fails to comply with the terms and conditions" of the award;

   b.  by the agency with the "consent" of the recipient;

   c.  by the recipient; and

   d.  by the agency "pursuant to the terms and conditions" of the award.

*Id.* § 200.340(a).

122.    None of the conditions in which termination is permitted under the

Uniform Guidance are present here. First, Defendant Duffy did not and cannot claim that the recipients have failed to comply with the terms of the conditions of the VPPP Agreement, and the recipients have in fact complied with the terms of the VPPP Agreement; second, the recipients did not and do not consent to termination of the VPPP Agreement; third, the recipients have not requested termination of the VPPP Agreement; and, fourth, the VPPP Agreement does not contain any provisions that would permit Defendants to terminate the agreement unilaterally. Additionally, to the extent the VPPP Agreement contemplates termination by any party, it reflects that TBTA would be the one party which could "discontinue tolls on the Project." VPPP Agmt., cl. 11.

123. The Uniform Guidance describes specific steps that an agency must take before it may terminate an award for noncompliance, including providing written notice and an opportunity to be heard. 2 C.F.R. § 200.341(a), 342; *see also* U.S. Dep't of Transp., *Guide to Financial Assistance* at 72-77 (Oct. 2019) (further describing requirements for pre-termination notice and appeals). The Uniform Guidance also provides that, before an agency may terminate an award, including a cooperative agreement, an agency must provide written notice and an opportunity to be heard. *Id*. §§ 200.341(a), 342. FHWA did not provide the state and local sponsor recipients with notice of its intent to terminate the VPPP Agreement and also has not provided notice to the same recipients of any alleged noncompliance with the VPPP Agreement. The recipients have not been provided with an opportunity to be heard or to appeal the termination.

124. The Administration's action in terminating tolling authority under the

VPPP Agreement contrary to the terms of the VPPP Agreement and to the applicable regulations governing the administration of the VPPP Agreement was arbitrary, capricious, and not in accordance with law, and without observance of procedure required by law, within the meaning of the APA, 5 U.S.C. § 706(2), and should be held unlawful and set aside by the Court.

## COUNT IV

### Termination of the VPPP Agreement

### Violation of the Due Process Clause of the Fifth Amendment
(U.S. Const. amend. V, cl. 3)

125.   The City realleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

126.   The Due Process Clause of the Fifth Amendment provides that "No person shall … be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V, cl. 3.

127.   Upon the execution of the VPPP Agreement, the City had a property interest in the VPPP Agreement, and in the benefits it would provide to the City through the tolling authority granted to plaintiff Triborough.

128.   An agency's withdrawal of consent for public or private entities to engage in a contract implicates a property interest protected by the Due Process Clause.  *See, e.g.*, *Toxco Inc. v. Chu*, 724 F. Supp. 2d 16, 27-28 (D.D.C. 2010). Defendants' unilateral termination of the VPPP Agreement deprives the City of a property interest contrary to law.

129.   Further, the Plaintiffs' property interest in the Program and its infrastructure "attain... constitutional status by virtue of the fact that they have been

initially recognized and protected by state law," here, the TMA. *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014) (*quoting Paul v. Davis*, 424 U.S. 693, 710, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)).

130.    Unilateral termination of the VPPP Agreement does not afford Plaintiffs the process they are entitled to under the VPPP Agreement, the relevant regulations, and the United States Constitution.  Prior to terminating the VPPP Agreement, Defendants did not provide Plaintiffs with notice and failed to give Plaintiffs an opportunity to respond or be heard.

131.    In addition, the VPPP Agreement constitutes an agreement which cannot be invalidated without due process in accordance with its terms.

132.    Defendants' actions violate the Due Process Clause of Fifth Amendment by depriving the City without due process of its property interest in the VPPP Agreement and the benefits flowing from the authority granted by the VPPP Agreement to plaintiff Triborough to implement tolls within the CBD for the Program.

## COUNT V

### Termination of the VPPP Agreement
### Violation of the Administrative
### Procedure Act

### (Substantively Arbitrary & Capricious – Insufficient Explanation)
(5 U.S.C. § 701 *et seq.*)

133.    The City realleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

134.  At the time of Defendants' purported termination of the VPPP Agreement, FHWA had issued the Final EA, FONSI, two reevaluations, and had

executed the VPPP Agreement authorizing tolling under the Program.

135.    FHWA's execution of the VPPP Agreement constituted final agency action with respect to FHWA's decision to authorize tolling under the Program.

136.    Under the APA, an agency "changing its course" by rescinding a prior rule or order "is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983).

137.    Defendants did not adequately explain their reasoning for purportedly rescinding the VPPP Agreement, in violation of the APA. *See Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 106 (2015) ("[T]he APA requires an agency to provide more substantial justification when its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account.")

138.    Defendants did not adequately examine or rely on relevant data in deciding to terminate the VPPP Agreement, in violation of the APA. *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 30 (an agency "must examine the relevant data and articulate a satisfactory explanation for its action.")

139.    Defendants failed to consider the impact on the economy, the environment, and congestion in the CBD in acting to terminate the tolling authority for the Program. The Program will provide substantial benefits to the CBD and the region in terms of reduced traffic and congestion, improved air quality, and concomitant environmental, public health, and economic benefits resulting from

shifting traffic patterns that occurred following the implementation of the Program.

140.   Defendants were obligated to consider the costs of ending the VPPP Agreement for transit riders, people residing, working, learning and recreating in and around the CBD, and Triborough and MTA. Defendants transparently failed to do so, having made their decision without seeking input from the City and without inquiring about the costs from congestion, pollution, and cessation of a program the project sponsors have invested hundreds of millions to bring online.

141.   Defendants also failed to adequately consider whether "there was 'legitimate reliance' on the" prior administration's method of using the VPPP Agreement as an indispensable tool in efforts to address congestion, reduce pollution, and raise revenues to support public transit. *Dep't of Homeland Sec. v. Regents of the Univ. of Ca.*, 140 S. Ct. 1891, 1913 (2020) (quoting *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996)). The City relies in part, for the transportation of its residents and the economic activity that takes place therein, on the services of MTA, TBTA, which now hold debt issued in reliance on Program revenues. Thus, all project sponsors have relied on the executed VPPP Agreement. The Challenged Action was arbitrary and capricious; where, as here, "an agency changes course ... it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Id.* (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)).

142.   In addition, Defendants failed to consider alternative approaches that would allow at least some of the Program to continue, or another means to raise revenues, and that would have accordingly imposed fewer burdens on Plaintiffs. The

Supreme Court has held an agency action is arbitrary and capricious because it was issued "'without any consideration whatsoever' of a [more limited] policy." *Regents of the Univ. of Cal.,* 140 S. Ct. at 1912 (quoting *State Farm,* 463 U.S. at 51).

143.   By omitting any analysis of continuing at least some elements of the Program, the Challenged Action "failed to consider important aspects of the problem" before it. *Id.* at 1910.

144.   The Challenged Action, likewise, fails to meaningfully consider more limited policies than complete termination of VPPP Agreement.

145.   Defendants had made no indication that it was reconsidering the Program until President Trump took office last month.  But President Trump has long indicated his desire to "kill" or terminate the Program, both in conversations with Republican lawmakers and in social media posts.  Defendants, bending under this political pressure, did not undertake any analysis or provide any explanation before revoking the prior decision to enter into the VPPP Agreement and approve the Program.

146.   Defendants' action purporting to revoke tolling authority under the VPPP Agreement without providing sufficient explanation of its decision was therefore arbitrary, capricious, and not in accordance with law, and without observance of procedure required by law, within the meaning of the APA, 5 U.S.C. § 706(2), and should be held unlawful and set aside by the Court.

## COUNT VI

### Termination of the VPPP Agreement

### Violation of the National Environmental Policy Act and the Administrative Procedure Act

(42 U.S.C. § 4321 *et seq.*; 5 U.S.C. §§ 701–706)

147.  The City realleges and incorporates by reference all preceding paragraphs as if set forth fully herein.

148.  At the time of Defendants' purported termination of the VPPP Agreement, Defendants had issued the Final EA, FONSI, two reevaluations and had executed the VPPP Agreement authorizing tolling under the Program.

149.  At the time of Defendants' purported termination of the VPPP Agreement, the NEPA process for the Program was complete, and there was no "major federal action" remaining to occur with respect to the Program.

150.  Defendants' purported termination of the VPPP Agreement constitutes a new final agency action under NEPA and the APA and a major federal action within the meaning of NEPA, 42 U.S.C. §§ 4332(C), 4336e(10).

151.  NEPA requires Defendants to prepare an EIS for any "major federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

152.  To determine whether a "major federal action" will have a significant effect on "the quality of the human environment," Defendants may prepare an EA. 42 U.S.C. § 4336(b)(2); 40 C.F.R. § 1501.5; 23 C.F.R. § 771.119.

153.  If an agency determines that the proposed action will not have significant effects, accounting for mitigation, it can issue a FONSI. 42 U.S.C. §

4336(b)(2); 40 C.F.R. § 1501.6; 23 C.F.R. § 771.121.  If the EA reveals that there may be significant effects, an EIS is required.

154.  Either level of review requires public participation opportunities and consideration of alternatives to the proposed action.  *E.g.*, 42 U.S.C. § 4332(C)(iii), (F) and (H); 40 C.F.R. §§ 1501.5(c), (f), 1502.14s; 23 C.F.R. 771.119(b).

155.  Defendants failed to undertake *any* NEPA review of their decision to terminate the VPPP Agreement, much less an adequate environmental review that considered all environmental impacts of the proposed action.

156.  Defendants did not undertake any public participation with respect to their decision to terminate the VPPP Agreement, in contrast to the substantial public participation opportunities afforded prior to the adoption of the Final EA (including 44-day public comment period) and FONSI (including a 30-day public availability period).

157.  Under NEPA and its implementing regulations, Defendants are required to take a hard look at the reasonably foreseeable social, economic, and environmental impacts of a proposed action and its alternatives.  42 U.S.C. § 4336; 23 C.F.R. § 771.119(b).

158.  Defendants failed to consider the full extent of the reasonably foreseeable impacts of seeking to terminate the Program, which will provide substantial benefits to the CBD and the region in terms of reduced traffic and congestion, improved air quality, and concomitant environmental, public health, and economic benefits resulting from shifting traffic patterns that occurred following the implementation of the Program.

159.    Defendants failed to consider alternatives to terminating the program. 42 U.S.C. § 4332(C)(iii), (F) and (H); 40 C.F.R. §§ 1501.5(c), 1502.14s; 23 C.F.R. § 771.119(b).

160.    Defendants failed to consider mitigation measures that "avoid, minimize, or compensate for adverse effects caused by a proposed action or alternatives," 40 C.F.R. § 1508.1(y), or to identify measures which might mitigate adverse environmental impacts, and incorporate measures necessary to mitigate adverse impacts into its action terminating the VPPP Agreement. 23 C.F.R. §§ 771.105(e), 771.119(b).

161.    Defendants' action in revoking tolling authority under the VPPP Agreement without conducting the required NEPA review was therefore arbitrary, capricious, and not in accordance with law, and without observance of procedure required by law, within the meaning of the APA, 5 U.S.C. § 706(2), and should be held unlawful and set aside by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

i.    Declare that Defendants' purported termination of the VPPP Agreement was undertaken in violation of the terms of the VPPP Agreement and is in excess of statutory authority and *ultra vires*; in violation of Plaintiffs' Fifth Amendment right to Due Process; without observance of procedure required by law in violation of the APA; arbitrary and capricious in violation of the APA; and violates NEPA;

ii.    Vacate the Challenged Action and Defendants' decision to purportedly terminate the VPPP Agreement;

iii.    Grant any further necessary and proper relief pursuant to 28 U.S.C. § 2202;

iv.    Award Plaintiffs their costs for the action, including reasonable

attorneys' fees; and

v.      Grant all such other and further relief as it deems just and proper.


Dated: New York, New York
   April 2, 2025

Respectfully  Submitted,

MURIEL GOODE-TRUFANT
Corporation Counsel of the City of
New York

By: _____
   Nathan Taylor
   Christian Harned
   New York City Law Department
   100 Church Street
   New York, New York 10007
   Telephone: (212) 356-2315
   E-mail:      charned@law.nyc.gov
       ntaylor@law.nyc.gov
   *Attorneys for Intervenor-Plaintiff New*
   *York City Department of*
   *Transportation*