UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| METROPOLITAN TRANSPORTATION AUTHORITY and TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY,<br><br>Plaintiffs,<br><br>and<br><br>RIDERS ALLIANCE and SIERRA CLUB, NEW YORK STATE DEPARTMENT OF TRANSPORTATION, and NEW YORK CITY DEPARTMENT OF TRANSPORTATION,<br><br>Intervenor-Plaintiffs,<br><br>v.<br><br>SEAN DUFFY, in his official capacity as Secretary of the United States Department of Transportation, GLORIA M. SHEPHERD, in her official capacity as Executive Director of the Federal Highway Administration, UNITED STATES DEPARTMENT OF TRANSPORTATION, and FEDERAL HIGHWAY ADMINISTRATION,<br><br>Defendants. | CIVIL ACTION NO. 1:25-cv-01413-LJL<br><br>**AMENDED INTERVENOR COMPLAINT OF RIDERS ALLIANCE AND SIERRA CLUB** |

## PRELIMINARY STATEMENT

1.      Since January 5, 2025, New York City has witnessed a minor miracle. Years of intense and combined efforts at the local, state, and federal levels have brought to fruition the decades-old promise of congestion pricing. The streets are clearer, the air is cleaner, and the millions of New Yorkers who rely on public transit have secured a durable source of funding for this vital civic resource.

2.      On February 19, 2025, the Trump administration declared an end to all that. Secretary of Transportation Sean Duffy announced by letter that the federal government had purported to rescind its previous agreement to authorize the Congestion Pricing Program.

1

Although President Trump had repeatedly announced his opposition to the Program and his intention to end it, Secretary Duffy did not acknowledge that the decision was based on political animosity to a successful program that was delivering results for New Yorkers. Instead, Secretary Duffy explained that he had discovered an unwritten restriction in federal law, a secret loophole establishing that the Congestion Pricing Program had never been lawfully authorized to begin with. An hour later, the White House posted a statement from President Trump: "CONGESTION PRICING IS DEAD. Manhattan, and all of New York, is SAVED. LONG LIVE THE KING!" The White House accompanied the statement with an image of President Trump, wearing a crown, posed against the Manhattan skyline.

3.    Fortunately, President Trump is not a king, and the Congestion Pricing Program is not dead. In our system of government neither presidents nor cabinet secretaries may impose their will on New Yorkers except by following the law. Secretary Duffy's letter utterly fails this test by resting on a legal theory so insubstantial as to appear pretextual. The Congestion Pricing Program weathered numerous significant challenges before the cameras enabling tolling could finally be turned on. The Trump administration's feeble decree cannot justify turning them off.

4.    For years, New York City was choking on cars. In the absence of any congestion relief program, vehicles crawled through Manhattan's Central Business District ("CBD") in some of the worst traffic in the world, spewing dangerous fumes, harming the region's economy and quality of life, and exacerbating the climate crisis. In a typical year, more than one thousand City residents would die prematurely from air pollution produced by motor vehicle traffic alone.

5.    Even as New York City struggled under the weight of hundreds of thousands of excess vehicles, the main alternative—New York City's public transit system—suffered the consequences of chronic underinvestment. Many parts of the City's transit infrastructure are over

one hundred years old, and repairs and capital improvements that would render the system more reliable and accessible were repeatedly deferred. City buses—stuck in New York City's clogged streets—crawled at the slowest speed of all major cities in the United States.

6.    New Yorkers found a solution. After years of advocacy by broad coalitions of New Yorkers, the Legislature in 2019 enacted the Traffic Mobility Act. The Act rests on the Legislature's determination that the city's twin problems of traffic congestion and an underfunded public transit system can be addressed together by imposing a toll on vehicle traffic. The Act requires the establishment of a tolling program in the CBD, defined as Manhattan south of 60th street, except for FDR Drive and the West Side Highway. Tolling revenues, in turn, support capital projects to fund public transit and provide an alternative to motor vehicle traffic. Because the tolled area includes federal-aid highways, the federal government took the position that the Program required federal approval before it could begin. In June 2019, the New York State and City Departments of Transportation, and Triborough Bridge and Tunnel Authority ("TBTA")— an affiliate of the Metropolitan Transportation Authority ("MTA")—sought an agreement to implement congestion pricing from the Federal Highway Administration ("FHWA") under the Value Pricing Pilot Program ("VPPP").

7.    The FHWA spent years studying the Congestion Pricing Program, ultimately authorizing it by executing a VPPP agreement on November 21, 2024. The FHWA's review included a comprehensive 958-page Environmental Assessment of the proposed Congestion Pricing Program under the National Environmental Policy Act ("NEPA"), produced after careful study and consideration of tens of thousands of public submissions. The Environmental Assessment concluded the Program would reduce levels of all pollutants in the New York City metropolitan area that are regulated under the federal Clean Air Act.

8.      On January 5, 2025, the Congestion Pricing Program implemented the requirements imposed by the Traffic Mobility Act. It is the product of years of environmental planning, infrastructure procurement, and coordination between local, state, and federal authorities. The Program is essential to New York City's future. It provides cleaner air, reduces economically ruinous traffic congestion, and funds desperately needed improvements to the public transit system that will allow it to better serve the needs of all New Yorkers, including New Yorkers with disabilities.

9.      Within weeks of the program's successful launch, Secretary Duffy announced his decision to end it. The Secretary claimed to have discerned two novel limitations on the FHWA's VPPP authority that appear nowhere in the text of the operative statute: First, that VPPP authority implicitly excludes tolling an entire congested area (a form of congestion pricing known as "cordon pricing"); and second, that VPPP toll levels may not be set by accounting for the need to accommodate displaced vehicle traffic through funding alternate transit options. According to the letter, these unwritten restrictions mean that the FHWA could never have lawfully authorized the Congestion Pricing Program. On this basis, Secretary Duffy disclaimed any need to consider the effects of ending the Congestion Pricing Program, announced that the FHWA had unilaterally withdrawn from the VPPP agreement, and declared that the program would end.

10.      Rather than identifying a policy judgment underlying his decision to end the Congestion Pricing Program, Secretary Duffy purported to rely entirely on a legal judgment. But the legal reasoning in the letter is patently inadequate: it disregards both statutory text and decades of history. The FHWA has long recognized that "cordon pricing" is a form of congestion pricing available under the VPPP authority; the agency initially funded such a project more than

twenty years ago, and it has reported to Congress throughout on the use of VPPP authority. Meanwhile Congress has repeatedly preserved the FHWA's VPPP authority without restricting the FHWA's straightforward and commonsense understanding that cordon pricing is a permissible form of congestion pricing. Secretary Duffy's claim that it was impermissible to calculate tolls by reference to the funding needed to sustain mass transit is equally specious. For congestion pricing to work, there must be a reliable transit alternative for travelers displaced from the congested streets. Federal caselaw has long recognized that New York City's roads and public transit system are two sides of the same coin: funding public transit is a necessary condition for reducing congestion on our streets.

11.     It is baffling that Secretary Duffy would rest his entire decision on such a flimsy legal theory, except as a pretext. Ordinarily, when an agency considers abandoning its previous position, federal law requires serious consideration of whether other actors have already spent enormous amounts of money and time in reliance on the agency's guidance. Here, such consideration would have to account for the hundreds of millions of dollars that have already been spent over the long years in which the federal government took the opposite position, and any lawful effort to unwind the current Congestion Pricing Program would have to consider less costly and disruptive alternatives. The Trump administration evidently hoped to evade these requirements by claiming that Secretary Duffy is merely correcting a previous legal error. But as the Supreme Court made clear last time a cabinet secretary tried to evade judicial scrutiny by concocting a thin pretext, federal law prohibits agencies from hiding their true reasons behind a convenient fiction.

12.     Further dooming the Secretary's decision, there is no indication that the agency even attempted to consider the environmental consequences of the radical action it purports to

require, even as the federal government's own studies establish that ending congestion pricing will harm New Yorkers' air quality. Finally, while Secretary Duffy takes the position that he may unilaterally end the Congestion Pricing Program, nothing in the statute actually provides him this authority, rendering his action ultra vires.

13.    The Court should vacate the Secretary's decision and declare unlawful the Trump administration's attempt to unilaterally deprive New Yorkers of the cleaner air and clearer streets that so many have worked toward for so long. The people of New York City deserve to breathe.

## PARTIES

14.    Intervenor-Plaintiff Riders Alliance is New York City's grassroots nonprofit membership organization of thousands of subway and bus riders who come together to work toward a more reliable, accessible, and affordable public transit system. Riders Alliance members participate in a wide variety of activities to improve public transit, including community meetings, rallies, press conferences, interviews, public testimony, visits with elected and appointed officials, and more. Since forming in 2012, the group's organizers have canvassed subway platforms and bus stops to recruit thousands of members to volunteer on a range of campaigns. In 2018 and 2019, Riders Alliance members were integral to the adoption of the Congestion Pricing Program.

15.    Intervenor-Plaintiff Sierra Club is a grassroots environmental organization with more than 800,000 members across the country; the Atlantic Chapter is responsible for membership and activities in New York State. Sierra Club works to promote a cleaner, healthier, and more sustainable natural environment in its members' communities. Sierra Club has approximately 50,000 members in New York State.

16.     Numerous Riders Alliance and Sierra Club members live in and around the areas of New York City directly affected by the Congestion Pricing Program. As transit riders, many of whom depend on bus service and are particularly vulnerable to air pollution, these members have a significant interest in the outcome of this litigation and the implementation of congestion pricing. Ending the Congestion Pricing Program would harm them in numerous ways, including by: degrading the air quality around their homes, workplaces, and the outdoor areas they regularly use and enjoy; reducing their ability to access medical care and business opportunities due to buses afflicted by the slowest speeds in the nation; and reducing their ability to use public transport due to the defunding of the MTA's previously budgeted accessibility improvements.

17.     Riders Alliance members include Bill Cryer. He and his family live less than one mile from the Kingsbridge bus depot. He works less than half a mile from the Holland Tunnel. His child attends kindergarten less than one mile from the Trans-Manhattan Expressway, where Interstate 95 crosses Manhattan east of the George Washington Bridge. The Congestion Pricing Program reduces traffic near the Holland Tunnel, improving air quality. Additionally, as part of the Congestion Pricing Program, the MTA has prioritized transitioning the fossil fuel-burning bus fleet at the Kingsbridge Depot and the Gun Hill Depot to electric buses, in order to improve the air quality near both locations.

18.     Deborah Baldwin is a Riders Alliance member from Manhattan. She is a senior citizen and is undergoing cancer treatments. She lives and works near the Queens-Midtown Tunnel portal and is heavily exposed to car and truck exhaust fumes whenever she goes outside. Ms. Baldwin also rides buses to visit her doctors and to other appointments; Manhattan's bus speeds are significantly improved by the Congestion Pricing Program.

19.    Norma Ginez is a Riders Alliance member from the Bronx. She lives several blocks from the Cross Bronx Expressway. She has three children with special needs who also attend schools within several blocks of the Cross Bronx Expressway. She and her family depend on buses to get around and often endure long waits for service in congested areas. They benefit from the mitigation projects that are funded by the Congestion Pricing Program, as well as from the faster bus service that results from the Program.

20.    George Bettman is a Riders Alliance member from Brooklyn. He is a senior citizen and suffers from impaired mobility. He rides the subway to work and to medical appointments, but reaching the subway platform in stations without elevators is extremely difficult for him. The Congestion Pricing Program raises funds for the accessibility improvements that he and other riders with disabilities desperately need.

21.    Barbara Moore is a Riders Alliance member who has lived on Canal Street in lower Manhattan since 1978. She is seventy-two years old. She spends most of her time in the CBD and enjoys walking and biking outdoors. Because Ms. Moore was diagnosed with Chronic Obstructive Pulmonary Disease, she must curtail her outdoor activities when the air quality is poor. She has also had to invest in two large indoor air purifiers to mitigate the degraded air quality around her home.

22.    Numerous individual Sierra Club members live in or near the Manhattan CBD, regularly engage in outdoor activities in the CBD, and are particularly vulnerable to the threats posed by air pollution in the CBD in the absence of the Congestion Pricing Program.

23.    For example, Michelle M. Tokarczyk is a Sierra Club member who has lived for decades in Chelsea, in the Manhattan CBD. Ms. Tokarczyk enjoys cycling on the Manhattan Waterfront Greenway in the CBD and taking long walks outdoors near her home in the

Manhattan CBD. But Ms. Tokarczyk is seventy-one years old and has diabetes and Microvascular Cardiac Disease. She has been instructed by her cardiologist to avoid exerting herself outdoors when the air quality is impaired. As a result, she has been unable to ride her bicycle or take long walks outdoors at times due to the frequent high levels of air pollution in the Manhattan CBD. The Congestion Pricing Program helps improve the air quality near Ms. Tokarczyk's home and increases her ability to use and enjoy the parks and roads near her home.

24.    Lawrence S. Freund is a Sierra Club member who regularly runs outdoors in the Manhattan CBD. However, he is eighty-one years old and has already had lung cancer surgery that removed a portion of one lung. He is also susceptible to pulmonary diseases from working on Wall Street on and after September 11, 2001. Mr. Freund was exposed to the World Trade Center dust cloud and spent significant amounts of time in the disaster area, and his pulmonary health has been monitored for several years by the World Trade Center Health Program. He faces significant health risks from poor air quality in the Manhattan CBD.

25.    Mary Olowin is a Sierra Club member who lives in the Manhattan CBD. She is seventy-six years old. Ms. Olowin frequently spends time outdoors in the CBD, walking an average of five miles a day outdoors. Ms. Olowin faces increased risks from the Manhattan CBD's degraded air quality due to her age and the number of outdoor activities she undertakes. Ms. Olowin moved to the CBD specifically so that she could give up her car and use public transportation. Yet the public transportation Ms. Olowin relies on has been placed in financial jeopardy due to Secretary Duffy's threat to the Congestion Pricing Program.

26.    Defendant Sean Duffy is the Secretary of the United States Department of Transportation ("DOT"). He is sued in his official capacity.

27.    Defendant Gloria M. Shepherd is the Executive Director of the FHWA. She is sued in her official capacity.

28.    Defendant DOT is a cabinet department of the federal government, with offices in Washington, D.C.

29.    Defendant FHWA is an agency under the DOT, with offices in Washington, D.C.

## JURISDICTION AND VENUE

30.    This Court has subject matter jurisdiction pursuant to 24 U.S.C. § 1331 because this case presents a federal question under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*.

31.    Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(e) because numerous plaintiffs and intervenors are headquartered in this district and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## BACKGROUND

***New York City's air quality, traffic congestion, and public transit system were in desperate need of reform.***

32.    New York City's traffic congestion has been consistently among the worst in the United States. The cars, trucks, and buses that clog the roads are a major source of harmful air pollution in the metropolitan area, and a significant contributor to climate change. Vehicles emit air pollutants such as particulate matter, nitrogen oxides (which lead to ozone formation), as well as toxics like benzene and volatile organic compounds that are known to cause and exacerbate health problems including chronic obstructive pulmonary disease, lung cancer, asthma, and diabetes.

33.     Air pollution from cars, trucks, and buses has been estimated to cause over 1,000 deaths each year in New York City, as well as many emergency department admissions and missed days of school and work.[1]

34.     Traffic emissions are by far the largest contributor to high ozone levels in the New York City metropolitan area.[2] For many years, the New York City metropolitan area has been out of compliance with federal air quality standards for ozone, and ozone levels in New York City were higher in 2022 than any previous year of citywide air monitoring.[3]

35.     According to the United States Environmental Protection Agency, exposure to ozone "can cause a number of health problems, including coughing, breathing difficulty, and lung damage. Exposure to ozone can make the lungs more susceptible to infection, aggravate lung diseases, increase the frequency of asthma attacks, and increase the risk of early death from heart or lung disease."[4] People at greater risk from ozone exposure include people with lung disease, older adults, and people who are active outdoors.

---

[1]  Susan Anenberg et al., Int'l Council on Clean Transp., *A Global Snapshot of the Air Pollution-Related Health Impacts of Transportation Sector Emissions in 2010 and 2015*, at 19 tbl.4, 38 tbl.A2 (2019), https://theicct.org/sites/default/files/publications/Global_health_impacts_transport _emissions_2010-2015_20190226.pdf; *see also* Calvin A. Arter et al., *Mortality-Based Damages Per Ton Due to the On-Road Mobile Sector in the Northeastern and Mid-Atlantic U.S. by Region, Vehicle Class, and Precursor*, 16 Env't Rsch. Ltrs 065008 (2021), https://iopscience.iop.org/article/10.1088/1748-9326/abf60b.

[2] Ozone Transp. Comm'n, *Mobile Sources Committee Annual Report 2020,* at 2 (2020), https://otcair.org/upload/Documents/Reports/OTC_MSC_Annual_Report_2020.pdf

[3]  NYC Community Air Survey Report, 2008–2022, https://a816-dohbesp.nyc.gov/IndicatorPublic/data-features/nyccas/.

[4] EPA, Air Quality Guide for Ozone, at 2 (2015), https://www.epa.gov/sites/default/files/2017-12/documents/air-quality-guide_ozone_2015.pdf.

36.     Traffic congestion causes people living in the New York City metropolitan area to experience high levels of risk for cancer and respiratory difficulties caused by air toxics and diesel particulate matter, compared to the rest of the United States.[5]

37.     Concentrations of fine particulate matter, nitrogen oxides, and black carbon are highest in parts of the city with high traffic density—in particular, the CBD.[6]

38.     Older adults with lung disease and diabetes are particularly vulnerable to air pollution. According to the EPA, "Ozone and Particulate Matter (PM) (especially smaller, fine particle pollution called PM 2.5) have the greatest potential to affect the health of older adults. Fine particle pollution has been linked to premature death, cardiac arrhythmias and heart attacks, asthma attacks, and the development of chronic bronchitis. Ozone, even at low levels, can exacerbate respiratory diseases."[7]

39.     While traffic congestion pollutes the air and snarls travel on the streets, below ground New York City subway travelers face the consequences of aging infrastructure that has long suffering from a major backlog of capital investment needs. Aboveground, bus speeds slowed by 28 percent in the CBD between 2010 and 2019. The average traffic speed in the CBD in 2019 was only seven miles per hour.[8]

---

[5] Environmental Assessment for the Central Business District Tolling Program ("EA") App. 17D at 17D-18, https://new.mta.info/document/111056.
[6] NYC Community Air Survey Report, 2008–2002, https://a816-dohbesp.nyc.gov/IndicatorPublic/data-features/nyccas/.
[7] *Older Adults and Air Quality*, AirNow, https://www.airnow.gov/air-quality-and-health/older-adults/ (last visited Mar. 3, 2025).
[8] EA Exec. Summary at ES-6, https://new.mta.info/document/110756.

40.     Millions of people use public transit to reach and travel around New York City each day. In 2019, New York City subways served 1.7 billion passengers, and MTA buses served 677.6 million passengers.[9]

41.     Underinvestment renders many parts of the transit system difficult to access, particularly for riders with disabilities. Many parts of New York City's transit infrastructure are over a century old and "essential capital needs remain to ensure a state of good repair and to bring MTA's transit and rail assets into the 21st Century."[10] The MTA's 2020–2024 capital program identifies "$52.0 billion in investments in the region's subways, buses and commuter railroads" that are required to improve and sustain adequate service.[11]

42.     During the spring and summer of 2017, New Yorker subway riders experienced "seemingly daily failures of the tracks, signals, switches or power systems, including three derailments," leading to major travel delays. In June 2017, Governor Cuomo declared the MTA – specifically, the New York City Transit Authority – to be in a state of emergency.[12]

### New York Enacts Congestion Pricing Legislation.

43.     In 2019, after years of advocacy and organizing, a broad coalition of New Yorkers—ranging from grassroots organizations like Riders Alliance to a mix of community representatives, business leaders, and government officials convened by the Governor to serve on the Fix NYC Advisory Panel—successfully persuaded the Legislature and Governor to sign legislation requiring the Congestion Pricing Program.

44.     On April 1, 2019, the Legislature enacted the Traffic Mobility Act. The Act's legislative findings declare that traffic in New York is estimated to cost the metropolitan

---

[9] *Id.*
[10] *Id.* at ES-7.
[11] *Id.*
[12] Fix NYC Advisory Panel Report, at 10 (Jan. 2018), https://www.hntb.com/fix-nyc-report/.

economy more than "one hundred billion dollars over the next five years", and that it is "crippling . . . [for] residents, commuters, taxi and for-hire vehicle traffic, bus transit and emergency services" and "a significant contributor to decreased air quality." N.Y. Veh. & Traf. Law § 1701. Moreover, the Legislature determined that ongoing failures with New York City's subway infrastructure "continue to have a . . . deleterious impact on the health, safety, and livelihood of commuters, tourists, resident New Yorkers, as well as . . . the economy of the state of New York," such that "a long-term and sustainable solution is necessary in order to ensure stable and reliable funding to repair and revitalize this significantly important mass transit asset." *Id.*

45.      To address the twin issues of overwhelming traffic and underfunded public transit infrastructure, the Act directs the TBTA to establish a tolling program in the CBD. *Id.* § 1704-A.

***The Federal Government Studies and Approves the Congestion Pricing Program as part of the Federal Value Pricing Pilot Program.***

46.      In accordance with the Court's instruction at the initial pretrial conference on April 9, 2025 that nongovernmental Plaintiffs Riders Alliance and Sierra Club confer with the governmental Plaintiffs about amending their complaint to seek efficiencies with the consolidated governmental complaint, Riders Alliance and Sierra Club adopt and incorporate here by reference paragraphs 62–117 of the consolidated governmental Plaintiffs' complaint, ECF. No. 62.[13]

---

[13] Courts in this circuit have recognized that an intervening "party may also adopt another party's pleading rather than filing its own." *Briscoe v. City of New Haven*, No. 09-CV-1642, 2012 WL 13026762, at *5 (D. Conn. Oct. 5, 2012) (citing *Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.*, 782 F. Supp. 870, 874 (S.D.N.Y. 1991)); see also Wright & Miller, 7C Fed. Prac. & Proc. Civ. § 1914 (3d ed. 2023) ("If the intervenor is content to stand on the pleading an existing party has filed, it is difficult to see what is accomplished by adding to the papers in the case a new pleading that is identical in its allegations with one that is already in the file. Thus, other courts have so held and have allowed adoption of an existing pleading.").

47.    Governor Hochul hailed the federal environmental approval of the Congestion
Pricing Program in the summer of 2023, noting that the Program would deliver significant air
quality improvements. That summer, as the city suffered through smoke from wildfires burning
in Canada, Governor Hochul emphasized that relief was coming: "[F]or many New Yorkers in
the city, poor air quality isn't a rare occurrence. It's already making people sick in our own city. .
. . We're more cognizant of what's going into our lungs these days, and we're experiencing the
effects of the wildfires in Canada. What about the wildfires that are happening on our own streets
right here coming out of the exhaust pipes from all these vehicles? 700,000 vehicles enter the
central business district every single day of the week. That's almost impossible to comprehend.
And so, buses, like I said, can't move. They're trying to do the right thing, people on buses.
You're trying to make sure they're doing what's maybe more affordable for them, which is
important. We have to keep those buses moving. These people have to get to their jobs too. It
doesn't help that they have our buses immobilized."[14]

48.    Before tolling was set to begin on June 30, 2024, Governor Hochul announced a
"pause" in the implementation of the Congestion Pricing Program.

49.    Riders Alliance and Sierra Club sued Governor Hochul, the New York State
Department of Transportation, the MTA, and TBTA to enforce their right to the benefits that the
Congestion Pricing Program was set to deliver to their members. *See Riders Alliance v. Hochul*,
Index No. 156711/2024 (N.Y. Sup. Ct. New York Cnty. 2024). After Riders Alliance and Sierra
Club secured a ruling confirming that their claims could proceed and that they had standing to

---

[14] Press Release, Governor Kathy Hochul, *Governor Hochul Announces First-in-Nation
Congestion Pricing Will Move Forward, Improving Air Quality and Reducing Traffic* (June 27,
2023), https://www.governor.ny.gov/news/video-audio-photos-rush-transcript-governor-hochul-
announces-first-nation-congestion-pricing.

pursue them, *see* Decision and Order on Motion, *Riders Alliance*, Index No. 156711/2024, NYSCEF No. 57 (N.Y. Sup. Ct. Sept. 30, 2024), the parties agreed to a settlement.

50.    On November 14, 2024, Governor Hochul announced an end to the "pause" on the implementation of the Congestion Pricing Program, and that the Program would adopt an approach where the previously studied toll rates would phase in over several years.

51.    On November 18, 2024, TBTA approved the phased-in approach, and on November 21, 2024, the FHWA approved a second reevaluation of the tolls, confirming that no further environmental analysis was required before the Congestion Pricing Program could begin.

52.    On November 21, 2024, the FHWA also signed the VPPP agreement, authorizing toll collection as a project approved under the VPPP.

53.    The agreement does not provide any means by which the FHWA may unilaterally terminate the agreement or the Congestion Pricing Program. It does, however, set forth terms under which the TBTA may unilaterally decide to end the program.

### *The Program is Implemented and Begins Delivering Results for New Yorkers.*

54.    On January 5, 2025, the Congestion Pricing Program began to collect tolls. There is already significant evidence of the Program's success: vehicle traffic is down, transit ridership is up, and foot traffic has risen over 2024 levels.[15]

55.    Shortly after the program began, a New York Times headline summarized the results: "Less Traffic, Faster Buses: Congestion Pricing's First Week."[16] While different bus

---

[15] Arun Venugopal, *Vehicle Traffic Is Down in Manhattan, But Pedestrian Traffic Is Up, Data Says*, Gothamist (Feb. 13, 2025), https://gothamist.com/news/vehicle-traffic-is-down-in-manhattan-but-pedestrian-traffic-is-up-data-says.

[16] Ana Ley, Winnie Hu, & Keith Collins, *Less Traffic, Faster Buses: Congestion Pricing's First Week*, N.Y. Times (Jan. 13, 2025), https://www.nytimes.com/2025/01/13/nyregion/congestion-pricing-nyc.html.

routes have experienced different levels of improvement at this early stage, The City reported that express bus riders have benefitted enormously: "Commutes on Hudson River and East River crossings for several express bus routes linking the boroughs with Manhattan have, on some lines, shaved more than 15 minutes off commuting times."[17] By February 24, the New York Times reported that "New York's congestion pricing plan raised $48.6 million in tolls during its first month, a strong start for the program that exceeded expectations and kept it on track to raise billions of dollars for the region's decaying mass transit system."[18]

56.     In addition to the direct reduction in traffic, funds made available by the Program are already promising to improve New York's air quality by prioritizing transformation of the MTA's bus depots to accommodate electric buses. New charging infrastructure has been commissioned for the Jamaica Bus Depot, with additional charging systems to be deployed at Gun Hull and Queens Village to support new zero-emissions buses.

### *The Federal Government Purports to End the Program.*

57.     President Trump has consistently opposed the combined local, state, and federal effort to implement the Congestion Pricing Program, announcing during his candidacy that he would "TERMINATE Congestion Pricing" once in office. Within weeks of inauguration, the Trump administration began casting about for a rationale under which it could summarily terminate the program. On January 30, Representative Nicole Malliotakis, who had spoken with President Trump about their shared dislike for the Congestion Pricing Program, stated that "this

---

[17] Jose Martinez & Mia Hollie, *Manhattan Buses Got a Bit Faster in First Month of Congestion Pricing*, The City (Feb. 21, 2025), https://www.thecity.nyc/2025/02/21/crosstown-bus-speeds-up-congestion-pricing/.
[18] Stefanos Chen & Winnie Hu, *Congestion Pricing Reduced Traffic. Now It's Hitting Revenue Goals*, N.Y. Times (Feb. 24, 2025), https://www.nytimes.com/2025/02/24/nyregion/nyc-congestion-pricing-revenue-mta.html.

is a priority task that has been given to the Department of Transportation by the president, and he is serious about doing something."[19]

58.    On February 19, 2025, by letter from Secretary of Transportation Sean Duffy, the Department of Transportation carried out the "priority task" it had been given and announced the purported recission of its previous agreement to implement the Congestion Pricing Program.

59.    Although the letter recited several policy disagreements that President Trump and others had expressed about the Congestion Pricing Program, and although Secretary Duffy would subsequently describe his action as "[t]erminat[ing] NYC elitist, anti-worker congestion pricing,"[20] Secretary Duffy maintained that his decision to try and rescind federal approval rested solely on legal judgment. According to his letter, his reading of federal law led him to conclude that "FHWA lacked statutory authority to approve the cordon pricing tolling under the CBDTP pilot project."[21]

60.    Secretary Duffy cited "two reasons" for his conclusion: First, all roads into the CBD are tolled so as to discourage vehicles from entering, "a method of tolling known as 'cordon pricing.'" Cordon pricing mechanisms do not include toll-free lanes or approaches, and according to Secretary Duffy, "no statute contemplates cordon pricing in a situation where tolls are inescapable."[22] Although the letter does not explain why Congress would have considered cordon pricing as categorically distinct from other forms of allowable congestion pricing,

---

[19] Benjamin Oreskes et al., *Trump Administration Considers Halting Congestion Pricing*, N.Y. Times (Jan. 30, 2025), https://www.nytimes.com/2025/01/30/nyregion/nyc-trump-congestion-pricing.html.

[20] Secretary Sean Duffy (@SecDuffy), X (Feb. 24, 2025 9:28 AM), https://x.com/SecDuffy/status/1894031690256818515.

[21] Letter from Sean Duffy, Sec'y of Transp., to Kathy Hochul, Governor of N.Y. (Feb. 19, 2025), https://ops.fhwa.dot.gov/memorandum/VPPPletter_termination_021925.pdf.

[22] *Id.*

Secretary Duffy's letter insists that Congress implicitly meant to exclude any form of cordon pricing from consideration under FHWA's VPPP authority.

61.    Second, Secretary Duffy asserted that "the imposition of tolls under the [Congestion Pricing Program] appears to be driven primarily by the need to raise revenue for the Metropolitan Transit Authority (MTA) system as opposed to the need to reduce congestion." According to Secretary Duffy, despite the mountains of evidence demonstrating that the Congestion Pricing Program was developed as a durable response to New York City's gridlock, the Program is in fact an impermissible attempt to fund mass transit. In his interpretation of the statute, "[the] VPPP does not authorize tolls that are calculated based on considerations separate from reducing congestion or advancing other road-related goals." And because Secretary Duffy maintains that any connection between "improving the transit system" and reducing congestion is "attenuated," in his view the VPPP prohibits considering the MTA's need to accommodate the displaced vehicle traffic through sufficiently funded mass transit.

62.    Secretary Duffy's letter goes on to concede that there are reliance interests detrimentally affected by his abrupt abandonment of years of FHWA policy. But, according to Secretary Duffy, basing the decision on purported statutory grounds allows the government to summarily ignore any reasoned consideration of these interests because "any reliance interests cannot overcome the conclusion that FHWA's approval was not authorized by law."

63.    Secretary Duffy's reasoning suffers from significant and obvious flaws that suggest that his purported statutory conclusion is a pretext, chosen specifically to try and avoid the enormous reliance interests that would otherwise weigh strongly against the abrupt reversal of federal policy.

64.     First, Secretary Duffy maintains that federal law in general, and the VPPP in particular, has never contemplated "cordon pricing" as a permissible congestion pricing strategy, except where toll-free options are available to drivers.

65.     In fact, cordon pricing has for decades been recognized by the FHWA as a form of congestion pricing, and it has awarded funds to study cordon pricing projects under the VPPP authority.

66.     As early as 2002, the FHWA announced a VPPP project for "cordon pricing" in Fort Meyers Beach. *See* Press Release, FHWA 31-02, *U.S. Transportation Secretary Mineta Announces $56.3 Million for States in Highway Discretionary Funds* (July 12, 2002), 2002 WL 1487104. Cordon pricing presented a natural solution to the congested roadways of the Town of Fort Myers Beach, Florida, because there was no ability to add new roads or widen existing ones. The VPPP project funded a study of a variable toll that would apply at every approach to the town, in an attempt to reduce the number of vehicles on its overloaded streets. In other words, the FHWA approved a VPPP project more than two decades ago that "provides no toll-free option for many drivers," a cordon pricing strategy "where tolls are inescapable"—precisely the type of project that Secretary Duffy now asserts the "FHWA has never before approved." And the FHWA regularly reported its VPPP projects to Congress. Although the 2002 project was ultimately cancelled before final implementation due to political opposition to tolls, there is no indication that Congress or the FHWA ever considered the contemplated cordon pricing strategy to be outside of the VPPP authorization. On the contrary, FHWA continued for years to describe the Florida cordon pricing project in lists of VPPP projects in its quarterly reports.

67.     In subsequent years, FHWA has continued to recognize cordon pricing as an important element of the congestion pricing framework. In 2008, for example, the agency issued

a primer on congestion pricing, identifying "four main types of pricing strategies." [23] The FHWA identified "cordon pricing" as one of these four main strategies: "Cordon pricing involves charging a fee to enter or drive within a congested area, usually a city center."[24] The FHWA observed that such strategies have been deployed around the world beginning in 1975, and that New York was considering a cordon pricing scheme in 2008.[25]

68.    In the decades since FHWA authorized the study of cordon pricing in Florida under its VPPP authority, Congress has preserved the FHWA's VPPP authority and ability to enter into VPPP agreements without ever disapproving or modifying the agency's straightforward and commonsense interpretation of that authority as including cordon pricing projects. In 2005, Congress reauthorized the VPPP in Section 1604(a) of the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU), Pub. L. No. 109-59. Although it modified aspects of the program, it made no changes to the operative definition of eligible congestion pricing programs. When Congress most recently acted to alter federal highway programs through the Moving Ahead for Progress in the 21st Century Act (MAP-21), Pub. L. No. 112-141 (2012), it once again preserved the VPPP authority and language without alteration.

69.    Secretary Duffy's letter fails to consider important aspects of the problem it ostensibly addresses. The Secretary's letter does not address the VPPP's history or identify any statutory text disapproving or limiting the definition of congestion pricing so as to exclude cordon pricing strategies.

---

[23] FHWA, U.S. Dep't of Transp., *Congestion Pricing, A Primer: Overview* 4 (2008), https://ops.fhwa.dot.gov/publications/fhwahop08039/fhwahop08039.pdf.
[24] *Id.* at 6.
[25] *Id.* at 6, 17.

70.    Secretary Duffy's second stated reason for his decision is no more compelling.

Secretary Duffy maintains that the VPPP does not authorize the Congestion Pricing Program

because the tolls involve consideration of the need to fund the MTA. But decades of precedent

establish that New York City has an integrated transit system, so that funding alternative transit

options improves service for the cars that remain in the tolled area. And beyond caselaw, basic

common sense dictates that one cannot reduce vehicle congestion on New York City's bridges,

roads, and tunnels without providing a functional alternative to transport the displaced travelers.

Funding the MTA sufficiently to perform that task is the only way in which congestion pricing

could work, and both federal law and the FHWA itself have long recognized the permissibility of

this type of funding.

71.    As an initial matter, there is no serious dispute that federal law authorizes the

spending of revenues from road tolls on non-road projects. *See Chan v. U.S. Dep't of Transp.*,

No. 23-CV-10365 (LJL), 2024 WL 5199945, at *16–17 (S.D.N.Y. Dec. 23, 2024) ("[I]t is

Congress' unmistakably clear intent that a public authority be permitted to collect funds that

exceed a toll road's costs and spend those funds on non-toll road projects.").

72.    Nor can there be a serious dispute that funding public transportation is an

important tool for reducing traffic congestion in New York City. More than thirty years ago, a

federal court explained that drivers who pay bridge tolls derive congestion benefits when the

tolls are used to fund public transit in and around New York City: "[T]he commuter rail facilities

that serve the eastern and northern suburbs of New York City, along with the subways and buses

in New York City, effectively reduce traffic on the same arteries, river crossings and streets that

are used by commuters from Staten Island who use the Verrazano-Narrows Bridge." *Molinari v.

New York Triborough Bridge & Tunnel Auth.*, 838 F. Supp. 718, 726 (E.D.N.Y. 1993).

73.     This basic premise has been sustained repeatedly for many years. The direct

relationship between funding the MTA and reducing traffic congestion has been recognized

again and again by the federal courts. *See, e.g.*, *Janes v. Triborough Bridge & Tunnel Auth.*, 977

F. Supp. 2d 320, 341 (S.D.N.Y. 2013), *aff'd*, 774 F.3d 1052 (2d Cir. 2014) ("Defendants have

impressively demonstrated the value of mass transit in reducing congestion on bridges and

tunnels throughout New York City."); *Angus Partners LLC v. Walder*, 52 F. Supp. 3d 546, 570

(S.D.N.Y. 2014) ("[T]he uncontested benefits that MTA's functionally integrated transit system

confers to TBTA toll-payers include reductions in traffic congestion on TBTA bridges and

tunnels, along with associated reductions in fuel costs, stress, auto emissions, and wait times.").

74.     The Congestion Pricing Program specifically rests on the straightforward

relationship between funding transit alternatives and reducing traffic congestion. "The premise of

the Tolling Program and the evidence that supports it demonstrates that the improvements to the

transit system from the toll will provide benefits to motorists who use the roadways." *Chan*,

2024 WL 5199945, at *21.

75.     Along with the courts, the FHWA has long recognized this feature of congestion

pricing. As the agency explains in its 2008 primer, "Congestion pricing can generate substantial

revenues from tolls," which, after paying operating costs, can "support alternatives to driving

alone, such as public transit."[26]

76.     The contrary theory proposed by Secretary Duffy is absurd. There is no

possibility of setting a reasonable toll that accomplishes congestion reduction without a

concomitant funding of public transit to accommodate the displaced travelers.

---

[26] FHWA, *Congestion Pricing, A Primer*, *supra* note 23, at 7.

77.    Secretary Duffy's second theory fails to consider important aspects of the problem it ostensibly addresses, addressing neither the caselaw describing New York City's integrated transit system, nor the basic requirement of providing reliable alternate transit.

78.    Riders Alliance and Sierra Club adopt and incorporate by reference paragraphs 172-176 of the governmental Plaintiffs' complaint, ECF. No. 62.

### Riders Alliance and Sierra Club Members Will Be Harmed if Defendants are Allowed to End the Program.

79.    Ending implementation of the Congestion Pricing Program means that New Yorkers will endure approximately 400,000 additional vehicle miles traveled each day.[27] This will deprive Riders Alliance and Sierra Club members of benefits to air quality that have only just begun.[28] Reevaluation 1 of the CBD Tolling Program estimated that congestion pricing would sharply reduce particulate matter levels in the Central Business District by 11 percent and fine particulate matter by 10.49 percent.[29]

80.    In addition, it the Congestion Pricing Program is halted, the Project Sponsors will no longer be implementing the promised mitigation measures in environmental justice areas that would have decreased air pollution below the baseline levels existing prior to the Program. For example, replacing up to 1000 highly polluting transport refrigeration units ("TRUs") at the Hunts Point Market in the Bronx, as called for as part of the implementation of congestion pricing, will substantially improve air quality by removing tons of nitrogen oxides and fine particulate matter emissions from the air each year.[30]

---

[27] *See* EA Ch. 10 at 10-12, tbl.10-3, https://new.mta.info/document/111101.
[28] *Id*. at 10-21.
[29] CBD Tolling Program Reevaluation at 93, tbl.10-3 (June 2024), https://new.mta.info/document/142711.
[30] EA Appendix 17D at 77, https://www.mta.info/document/111056.

81.    Finally, Riders Alliance and Sierra Club members will suffer from the foregone MTA safety, usability, and accessibility improvements that the Congestion Pricing Program would have funded. The buses they depend on will slow down, stations will continue to deteriorate, subway platforms will remain inaccessible to members with disabilities, and the necessary signal improvements for increased service will be once again deferred.

## CAUSES OF ACTION

### COUNT I
### Violation of the Administrative Procedure Act — Impermissible Pretext

82.    Riders Alliance and Sierra Club repeat and re-allege the allegations contained in each paragraph above and incorporate such allegations by reference as if set forth herein.

83.    The Administrative Procedure Act requires reasoned agency decisionmaking and authorizes the judiciary to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).

84.    "[I]n order to permit meaningful judicial review, an agency must 'disclose the basis' of its action." *Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167–169 (1962)).

85.    "Several points, considered together, reveal a significant mismatch between the decision the Secretary made and the rationale he provided." *Dep't of Com.*, 588 U.S. at 783.

86.    The public record indicates that President Trump instructed his administration to immediately terminate the Congestion Pricing Program based on his political opposition to the Program.

87.    Very shortly after the Secretary of Transportation took office, he purported to announce a radical change in the agency's years-long course of conduct based on obviously flawed legal rationales.

88.     The Secretary then pointed to the rationale identified—dubious statutory theories—as justifying complete disregard for the reliance interests that otherwise would appear to have constrained the agency from abruptly declaring an abrupt about-face on an enormously expensive, consequential, years-long policy. "When an agency changes course, as [FHWA] did here, it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Dep't of Homeland Sec. v. Regents of Univ. of California*, 591 U.S. 1, 30 (2020) (cleaned up). Rather than seriously evaluate the reliance interests and consider alternatives, the purported reliance on a statutory pretext allowed the agency to short-circuit this administrative process.

89.     Secretary Duffy also appears to believe that the use of a statutory rationale frees him from any environmental review obligations. While the agency had spent years studying the environmental impact of implementing the Congestion Pricing Program, the agency did not even attempt to study the environmental impacts of abruptly and fully turning the program off.

90.     Thus, although the Congestion Pricing Program was debated and studied for years, and although the significant reliance and environmental interests implicated in any decision would appear to bar any immediate termination of the Program, Secretary Duffy nonetheless announced that he had discovered a convenient rationale that required the Program be ended without further review. Secretary Duffy maintained that it was for this reason alone that he had decided to swiftly eliminate the Congestion Pricing Program.

91.     "Altogether, the evidence tells a story that does not match the explanation the Secretary gave for his decision." *Dep't of Com.*, 588 U.S. at 784. The Administrative Procedure Act bars such pretextual decision-making: "The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for

important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise." *Id.* at 785.

92.     Because Secretary Duffy's decision purports to rely on a basis that is not the genuine reason for his decision, the decision must be set aside under the APA.

### COUNT II
**Violation of the Administrative Procedure Act — Substantively Arbitrary and Capricious Due to Erroneous Legal Premise**

93.     Riders Alliance and Sierra Club repeat and re-allege the allegations contained in each paragraph above and incorporate such allegations by reference as if set forth herein.

94.     When an "[agency] action is based upon a determination of law as to which the reviewing authority of the courts does come into play, an order may not stand if the agency has misconceived the law." *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94 (1943).

95.     So long as an agency maintains that its action is compelled by law, its action is substantively arbitrary and capricious if it depends on an erroneous legal conclusion.

96.     The decision to end the Congestion Pricing Program is based on purported restrictions in federal law that appear nowhere in statutory text and contradict decades of shared understanding between the agency and Congress. The decision cannot stand because the agency has misconceived the law.

97.     Secretary Duffy's letter states that the VPPP authority must be read to implicitly exclude cordon pricing. But as described above, the FHWA has for decades recognized cordon pricing as a form of congestion pricing eligible under the VPPP, Congress has repeatedly reauthorized and left intact the authority, and nothing in the statute draws a distinction between cordon pricing and other forms of congestion pricing.

98.     Secretary Duffy's letter also states that the tolls for the Congestion Pricing Program were impermissibly set in consideration of the financial needs of the integrated system of alternate transportation that would be required to accommodate displaced vehicle traffic. But both federal courts and the FHWA have recognized for decades that funding the MTA works to reduce congestion on the roads. New York City's transit system is inextricably interconnected, and there is no indication that Congress silently intended to bar such interconnected systems from consideration under the VPPP.

99.     Because the agency has justified its action on the basis of a legal requirement it has fundamentally misconstrued, the action must set aside under the APA.

### COUNT III
### Violation of the National Environmental Policy Act, 42 U.S.C. § 4332

100.    Riders Alliance and Sierra Club repeat and re-allege the allegations contained in each paragraph above and incorporate such allegations by reference as if set forth herein.

101.    NEPA requires federal agencies, including the FHWA, to take a hard look at the direct, indirect, and cumulative impacts of proposed major federal actions that significantly affect the quality of the human environment. 42 U.S.C. § 4332(2)(C). These include the "reasonably foreseeable environmental effects of the proposed agency action," "reasonably foreseeable adverse effects which cannot be avoided should the proposal be implemented," and consideration of alternatives.

102.    Terminating the Congestion Pricing Program is a proposed major federal action.

103.    Based on the Environmental Assessment that FHWA approved, the Congestion Pricing Program produces improved air quality in the Manhattan CBD and throughout the region.

104.    Terminating the Congestion Pricing Program would naturally be expected to affect the quality of the human environment by reducing air quality due to a direct rise in vehicles miles traveled, and by depriving New Yorkers of the mitigation projects and other improvements funded by the Program.

105.    Yet Defendants did not even attempt to assess whether there would be environmental impacts, whether the impacts would rise to the level of significance, whether alternatives were available, or whether the public should be informed about the environmental consequences of the agency's action.

106.    Defendants therefore violated NEPA.

**COUNT IV**
**Ultra Vires**

107.    Riders Alliance and Sierra Club repeat and re-allege the allegations contained in each paragraph above and incorporate such allegations by reference as if set forth herein.

108.    "Generally, judicial relief is available to one who has been injured by an act of a government official which is in excess of his express or implied powers." *Harmon v. Brucker*, 355 U.S. 579, 581–82 (1958)).

109.    There is no provision in federal law, the VPPP, or FHWA regulations that permits the Secretary of Transportation or any other federal official to unilaterally revoke a VPPP agreement and require termination of an agreed-upon tolling program.

110.    Secretary Duffy has nonetheless purported to require the unilateral recission of the VPPP agreement and the end of the Congestion Pricing Program. Secretary Duffy's actions are undertaken in excess of his express or implied powers and threaten to inflict injury on Riders Alliance and Sierra Club members.

## PRAYER FOR RELIEF

WHEREFORE, Riders Alliance and Sierra Club respectfully request that the Court:

a) Declare that Secretary Duffy's decision to unilaterally revoke the VPPP and require the end of the Congestion Pricing Program on the basis of a pretextual and misconstrued legal rationale is arbitrary and capricious in violation of the APA;

b) Declare that Defendants have violated NEPA by, inter alia, failing to conduct any NEPA analysis, failing to provide any opportunity for public participation, and failing to take a "hard look" at the potential environmental impacts of their actions;

c) Vacate Secretary Duffy's decision;

d) Award Riders Alliance and Sierra Club their reasonable costs of litigation, including reasonable attorneys' fees and costs, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 and/or other authority; and

e) Grant such other and further relief as the Court may deem just and proper.

Dated: April 18, 2025
New York, NY

Respectfully submitted,

*s/Dror Ladin*
Dror Ladin
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(917) 410-8701
dladin@earthjustice.org

*Counsel for Intervenor-Plaintiffs*
*Riders Alliance and Sierra Club*