

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*86 Chambers Street*
*New York, New York 10007*

April 11, 2025

**By Email**
Erin Hendrixson
Senior Trial Attorney
Office of Litigation and Enforcement
U.S. Department of Transportation
erin.hendrixson@dot.gov

Re: *MTA v. Duffy*, No. 25 Civ. 1413 (S.D.N.Y.)

Dear Erin:

We write with respect to the above-referenced litigation brought by the Metropolitan Transportation Authority ("MTA") against the U.S. Department of Transportation ("DOT"), U.S. Secretary of Transportation Sean Duffy, the Federal Highway Administration ("FHWA"), and Executive Director of the FHWA, Gloria Shepherd, to provide you with information concerning (1) the litigation risk that DOT faces in defending the Secretary's February 19, 2025 decision to terminate the New York City Central Business District Tolling Program ("CBDTP") agreement, and (2) a process for terminating the CBDTP agreement outside of the current litigation for DOT to consider.

As discussed below, there is considerable litigation risk in defending the Secretary's February 19, 2025 decision against plaintiffs' claims under the Administrative Procedure Act, that the decision was contrary to law, pretextual, procedurally arbitrary and capricious, and violated due process. For the reasons outlined below, it is unlikely that Judge Liman or further courts of review will accept the argument that the CBDTP was not a statutorily authorized "value pricing" pilot under the Value Pricing Pilot Program ("VPPP").

FHWA may, however, be able to properly terminate the CBDTP value pricing pilot pursuant to established Office of Management and Budget ("OMB") regulations concerning the termination of cooperative agreements. Termination of the CBDTP agreement pursuant to these OMB regulations would still allow FHWA to end the CBDTP for the Secretary's stated reasons, but would do so as a matter of changed agency priorities rather than arguing the CBDTP was not statutorily authorized in the first instance. Importantly, DOT can seek termination of the agreement pursuant to the OMB regulations in addition to, and not in place of, defending the rationale laid out in the Secretary's letter.

## I. The Court Is Unlikely To Uphold FHWA's Stated Rationale for Terminating the CBDTP Agreement

The Secretary provides two reasons why the CBDTP is not an eligible pilot project under the VPPP statutory language: (1) the program constitutes impermissible "cordon pricing," which is not authorized because it does not offer a toll-free option, and (2) the level of CBDTP tolls has been set primarily by the need to raise revenues rather than prevent congestion. Neither of these reasons is likely to convince the Court:

*First,* with respect to the rationale that "cordon pricing" is not authorized under the phrase "congestion pricing" or "value pricing," we have been unable to identify a compelling legal argument to support this position. As you are aware, the legislation that enacted the VPPP, Section 1012(b) of the Intermodal Surface Transportation Efficiency Act (ISTEA), Pub. L. 102-240 (1991) (23 U.S.C. § 149 note), as amended by Section 1216(a) of the Transportation Equity Act for the 21st Century (TEA-21), Pub. L. 105-178 (1998) (when the term "value pricing" replaced "congestion pricing" in 1998, the two terms were used synonymously), and Section 1604(a) of the Safe Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU), Pub. L. 109-59 (2005), does not define "value pricing." Under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), the Court will not afford the Secretary's current interpretation any deference, and will engage in its own interpretation of whether cordon pricing is included within the term value pricing. The factors that the court will look at in making this decision point towards the conclusion that the type of cordon pricing utilized in the CBDTP is included within the terms "congestion pricing" or "value pricing."

At the outset, the term "congestion pricing" is not defined in the statute, is admittedly broad, and has no ordinary, plain meaning. Instead, it is a "term of art" that has technical meaning within the realm of transportation and under the ISTEA. The main argument for reading the term "congestion pricing" narrowly is that the VPPP provides an exemption to the longstanding bar on tolling on federal-aid highways imposed by 23 U.S.C. § 301, for congestion pricing projects. *See, e.g., Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 118 (2001) ("narrow construction" of exemption to FAA warranted by reference "to the statutory context in which it is found and in manner consistent with the FAA's purpose"). However, this "narrow construction" argument is undercut by more recent Supreme Court opinions that have moved away from this canon of statutory interpretation. *See, e.g., Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 89 (2018) (interpreting exemptions to the FLSA, and noting that the Court has "no license to give the exemption anything but a fair reading"); *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 439 (2019) (interpreting FOIA exemptions, and noting that "just as we cannot properly expand [an exemption] beyond what its terms permit, we cannot arbitrarily constrict it either by adding limitations found nowhere in its terms" (cleaned up)).

Moreover, the explicit statutory purpose of the ISTEA supports the argument that "congestion pricing" should be read broadly, allowing states to develop flexible traffic solutions

"with particular attention to the external benefits of . . . reduced traffic congestion," and "with insistent attention to the concepts of innovation." ISTEA, § 2, 105 Stat 191.[1] Indeed, Judge Liman has already held that the VPPP was founded on the "theory" that states and localities would try "novel social and economic experiments," such as the CBDTP. *Chan v. U.S. DOT*, No. 23 Civ. 10365 (LJL), 2024 WL 5199945, at *24 (S.D.N.Y. Dec. 23, 2024); *see also id.* at *34 ("Congress has expressly signaled its support for tolled projects aimed at mitigating congestion such as the Tolling Program."). Based on the foregoing, it is unlikely the Court would conclude that a zone-based or area-wide pricing system—*i.e.*, cordon pricing—is not the type of "innovative" pilot program included in the undefined and broad term "congestion pricing." *Cf. Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) ("[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." (cleaned up)). As a result, it is unlikely that courts will narrowly construe the term "congestion pricing" to exclude cordon pricing projects based on the longstanding prohibition on tolling alone.

While we would argue that "excerpts from committee hearings and scattered floor statements by individual lawmakers" are generally considered "among the least illuminating forms of legislative history," *Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 481 (2017), in this instance, there is little else that sheds light on the meaning of the term "congestion pricing." And the legislative history concerning "congestion pricing" provides evidence of its "technical meaning" at the time, as well as the historical background of the term's breadth. In this instance, the "clear evidence of congressional intent may illuminate [the] ambiguous text," especially in the technical area of transportation projects. *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011); *see also, e.g., Van Buren v. United States*, 593 U.S. 374, 388 (2021) (concluding that the statutory term "access" has a long-standing "technical meaning" "[i]n the computing context"). That legislative history makes clear that when the ISTEA was passed in 1991 the term "congestion pricing," was understood by its drafters to simply mean "a system of charging for highway or bridge user-tolls based on peak hour travel demand." S. Comm. on Env't and Pub. Works, S. Hr'g 102-37, Congestion Pricing and Infrastructure Financing at 5 (Mar. 21, 1991) (Opening Statement of Senator John W. Warner). Among the examples of "congestion pricing" that were discussed was

---

[1] Its drafters similarly understood that the ISTEA allowed states and localities "to adopt flexible solutions to deal with congestion" including "aggressive programs to better manage transportation demands." 137 Cong. Rec. S7453-01, S7454, 1991 WL 99693, at *2; *see also* 137 Cong. Rec. S7412-01, S7416, 1991 WL 99676, at *9 ("This bill gives the States a tremendous amount of flexibility. … those States and cities that choose to construct new, innovative transportation or management systems can serve as models for other States and cities."); S. Conf. Rep. at 23, 137 Cong. Rec. S18581-01, S18591, 1991 WL 252477 ("Other innovative programs including a congestion pricing pilot program …"); Statement of President George Bush Upon Signing the ISTEA, 1991 U.S.C.C.A.N. 1865, 1865 ("Another major element of our proposal was to provide State and local officials unprecedented flexibility.").

Singapore, which since 1975 had required a sticker "to enter the central areas during morning rush hours," *id.* at 7-8 (Testimony of Steven A. Morrison)—a situation where tolls are inescapable.[2] In light of this legislative history, it is unlikely that the Court will agree that the term "congestion pricing" must be read narrowly.

Although DOT's interpretation of the statutory language "cannot bind a court," a court may still look to "the longstanding practice of the government—like any other interpretive aid—[to]

---

[2] Additional testimony from subject matter experts concerning congestion pricing before the Senate Environment and Public Works Committee, the Senate committee which reported out the ISTEA, also explicitly reference this type of congestion pricing and nascent plans to test such programs. *Id.* at 13-17 (discussing cordon pricing in Singapore, Hong Kong, Stockholm, and plans for a "test program in congestion pricing" in Southern California); *id.* at 25 (discussing cordon pricing project in Netherlands, and noting "peak pricing in transportation is not new … you pay higher parking fees in cities in central business districts during the peak hours"); *id.* at 44-45 ("Congestion pricing has been tried in Singapore and in Hong Kong … It is perhaps premature to suggest that congestion pricing be introduced en masse, but it is time for some well developed, visible experiments to guide policy makers toward the next step."); *id.* at 86 ("Charging motorists a tax or user fee when they drive their cars into the central business district during peak commuting hours is another method to employ peak pricing.").

Other DOT and FHWA documents that pre-date the passage of the ISTEA show that the term "congestion pricing" was understood as allowing for flexible zone-based pricing. The Secretary of Transportation's February 1990 report "Moving America," which preceded the passage of ISTEA and is referenced in the legislative history, similarly refers to "congestion pricing" or "peak-period pricing" as instituting "relatively higher prices for travel during periods of peak demand and lower prices in off-peak periods." *Moving America* Report at 48, *available at* https://babel.hathitrust.org/cgi/pt?id=uiug.30112097068693&seq=14. The report similarly espouses giving states and localities flexibility to institute congestion pricing. *Id.* ("We also need to give greater attention to the potential for capacity-enhancing pricing techniques in transportation, such as peak-period, or congestion pricing, and to refine them and extend their use."); *see also id.* at 4 ("In urban and intercity travel, Department programs will encourage system management improvements, peak-period pricing, and other initiatives to reduce congestion."); at 49 ("It is Federal transportation policy to … encourage peak-period or congestion pricing to ensure the most effective use of transportation facilities."): *id.* at 122 (DOT's policy is to "[e]ncourage pricing and other transportation management techniques for all modes where there is system congestion"). Moreover, DOT's March 1990 National Transportation Strategic Planning Study lists the "Singapore licensing scheme that charges fees for vehicles to enter the downtown center" as one "innovative idea[] … that may be of interest to the United States." *See* pg. 6-14, *available at* https://babel.hathitrust.org/cgi/pt?id=mdp.39015075326614&seq=172. Neither report suggests that toll-free options for access should be a required element of a congestion pricing program.

inform a court's determination of 'what the law is,'" *Loper Bright*, 603 U.S. at 386, and "factual premises within the agency's expertise," can be "especially informative" of the Court's interpretation. *Id.* at 402. Here, that means that the FHWA's lengthy history of including "area wide pricing" or "cordon pricing" as a proper "congestion pricing" or "value pricing" strategy will inform the court's interpretation. While we would point to the FHWA's own statements that the CBDTP "is an area-wide congestion pricing system, which is unprecedented in the VPPP and such type [of] system has not yet been implemented in the U.S." (Oct. 24, 2019 letter from FHWA to NYS DOT), there are numerous examples of FHWA interpreting "congestion pricing" to include such area-wide or cordon pricing projects, including the following:

- The FHWA's solicitation of VPPP applications that followed SAFETEA-LU's reauthorization of VPPP in 2005, notes: "Applications of value pricing which are comprehensive and include pricing of currently free facilities, such as area wide pricing," are projects of interest that squarely fall within the term "value pricing project." SAFETEA-LU, Value Pricing Pilot Program Participation, 71 FR 970-01 (Jan. 6, 2006). The FHWA's solicitation of VPPP applications in its 2007 notice explicitly identifies "cordon pricing" as an eligible, and preferred, value pricing project. *See* Value Pricing Pilot Program Participation, Fiscal Years 2007-2009, 71 FR 77084-02 (Dec. 22, 2006) ("Unlike previous VPP program solicitation notices which sought a wide variety of project applications, the FHWA is now only seeking projects to study or implement pricing that is broad in nature and will no longer entertain applications for studying or implementing single-facility projects. Such applications should cover a significantly-sized geographical area and include multiple roadway facilities that are priced, an interconnected managed lane network, *or cordon pricing, where, as in London, cars are charged a substantial fee to drive in a congested area on weekdays*. (emphasis added); Value Pricing Pilot Program Participation, Fiscal Year 2009, 73 FR 53478-01 (Sep. 16, 2008) (similar).

- FHWA's Reports to Congress also discuss, among other types of programs, "cordon pricing" as a viable project under the VPPP. A 2009 FHWA Report on VPPP explicitly notes that the types of congestion pricing projects such as the CBDTP *must* be included in the VPPP. "To achieve its stated objectives, the VPPP portfolio of implemented projects must include pilot implementations of broad congestion pricing projects – projects involving tolls on all lanes of a highway facility, all roads in a congested area, or all roads of an entire roadway network. Such approaches tend to *take away* the choice to drive alone for free in congested traffic." FHWA, Report On The Value Pricing Pilot Program Through May 2009, at iii, 2 (Sep. 17, 2009) (emphasis in original), *available at* https://ops.fhwa.dot.gov/congestionpricing/value_pricing/pubs_reports/rpttocongress/pdf/vppp09rpt.pdf.

- In addition, the assertion in the Secretary's letter that "FHWA has never before approved a VPPP program that uses cordon pricing or that does not provide a toll-free option," is not entirely correct. While it is true that implementation of an actual cordon/area-wide pricing

pilot had not been approved by the FHWA prior to the CBDTP, similar cordon pricing projects have been approved under the VPPP. *See* U.S. Transportation Secretary Mineta Announces $56.3 Million For States In Highway Discretionary Funds, FHWA 31-02, 2002 WL 1487104 (FHWA's approval of funding for a "Value Pricing Pilot, Cordon pricing in Fort Myers Beach, $500,000""). And VPPP funding has been approved for studying cordon/area-wide pricing in Southern California, that would not include a toll-free option. *See* FHWA, Report on the Value Pricing Pilot Program Through April 2018, at 12-13, *available at* https://ops.fhwa.dot.gov/congestionpricing/value_pricing/pubs_reports/rpttocongress/pdf/vppp18rpt.pdf (funding amount $916,802). In their intervenor complaint, the NYS Department of Transportation has cited this 2018 FHWA Report that refers to the VPPP-funded study concerning implementing a "cordon/areawide pricing pilot" in California, as well as a 2013 FHWA primer on congestion pricing that refers to "zone-based (area or cordon) charges" as a main type of congestion pricing strategy, *see* FHWA, *Congestion Pricing: A Primer on Institutional Issues* at 3 (Apr. 2013), https://rosap.ntl.bts.gov/view/dot/26194/dot_26194_DS1.pdf.

The Secretary's letter further asserts that "cordon pricing" in this context is impermissible because it (unlike other congestion pricing strategies) does not provide a toll-free option. The letter argues that 23 U.S.C. § 129(d)(4)(B), which contains a "congestion relief program" for Federal Aid Highways and specifically identifies "cordon pricing" as one of the "eligible projects," is the basis for this argument because it only applies to the "*Interstate System* where drivers can choose a non-Interstate route." However, the provision at 23 U.S.C. § 129(d)(4)(B) was added in 2021, pursuant to Section 11404 of the Infrastructure Investment and Jobs Act, Pub. L. 117-58 (2021), and thus this contextual argument does not provide compelling evidence concerning the meaning of the term "congesting pricing" (or "value pricing") as used in the ISTEA. Furthermore, we have not identified a provision that requires there to be a non-Interstate route to a particular location, or a requirement that that route not be tolled (presumably if the route is not part of the federal highway system and not constructed with federal funds, the states would be making the decision about whether it is tolled). As outlined above, the legislative history and FHWA's prior guidance implementing the VPPP undercut this assertion.

Finally, the Secretary's letter refers to arguments made by the Town of Hempstead in litigation currently pending (but stayed) against FHWA and the MTA in Eastern District of New York. *See Town of Hempstead v. DOT*, No. 24 Civ. 3263 (E.D.N.Y.). There the Town of Hempstead argued (in its Complaint at ¶¶ 63-71) that the major questions doctrine prevents the VPPP statutory language from being read expansively to include the type of cordon pricing used in the CBDTP. It is very unlikely that Judge Liman or any court of review would agree with that assertion. The major questions doctrine, as outlined by the Supreme Court, is limited to situations where agencies seek to uphold "unheralded regulatory power over a significant portion of the American economy." *W. Virginia v. EPA*, 597 U.S. 697, 722 (2022) (cleaned up); *id.* at 724 (the doctrine applies to

Case 1:25-cv-01413-LJL    Document 65    Filed 04/23/25    Page 7 of 11

Page 7

"assertions of extravagant statutory power over the national economy"); *Biden v. Nebraska*, 600 U.S. 477, 504 (2023) ("A decision of such magnitude and consequence [on a matter of] earnest and profound debate across the country must rest with Congress itself, or an agency acting pursuant to a clear delegation." (cleaned up)). The imposition of cordon pricing in the central business district, in a portion of Manhattan, does not have the requisite wide-ranging effects on the national economy. Moreover, this is not a case where the FHWA has "conveniently enabled [itself] to enact a program that Congress has chosen not to enact itself." *Nebraska*, 600 U.S. at 503 (cleaned up). Here, Congress explicitly included in the VPPP the ability of states and localities to enter into cooperative agreements with FHWA in connection with value pricing pilots and explicitly exempted them from the general prohibition on the use of tolls on federal-aid highways. Finally, there are other equities in making this "major questions" argument—including that it necessarily serves to curtail executive power—that would counsel against making such an argument in defense of the Secretary's letter.

*Second,* with respect to the argument that the CBDTP is not authorized because the "VPPP does not authorize tolls that are based on considerations separate from reducing congestion or advancing other road-related goals," there are two impediments to this argument being successful. At the outset, as a factual matter, FHWA has already publicly taken the position that a goal of the CBDTP is reducing congestion in the CBP. In our filings before Judge Liman (as well as in the NEPA documents), the Government has repeatedly stated that the goals of the CBDTP are two-fold, reducing traffic congestion within the CBD and funding capital projects, *see, e.g.,* Apr. 1, 2024 Gov't SJ Brief in *Chan* at 6, 9 (quoting final environmental assessment ("EA")); *see also Chan*, 2024 WL 5199945, at *33 ("[T]he Tolling Program in fact has two aims: to reduce congestion and to generate revenue."). The EA, and the Reevaluation documents, both support the conclusion that the tolls set will decrease congestion in the CBD. As a legal matter, there is nothing in the statute that prohibits a VPPP program from having a two-fold goal, limits how tolls are to be set, or sets forth the amount of congestion reduction that is to be achieved. Moreover, the VPPP at Section 3 provides that "revenues generated by a pilot project" be applied to "projects eligible under [Title 23 of the U.S.C.]," and the legislative history contains discussions about tolls from congestion pricing projects being used to fund such eligible transit improvements (which is exactly what MTA intends to do here).[3] This appears to be less of an argument supporting the assertion that the CBDTP agreement was never lawful, but more of an argument that DOT has reconsidered its decision to accept the CBDTP into the VPPP program based on changed agency priorities.

---

[3] The Court has previously found that revenues raised by the CBDTP tolls that are directed towards eligible transit improvements will also effectively reduce congestion. *See Chan*, 2024 WL 5199945, at *26 ("The evidence before the Court is that investments in transit will "reduce vehicle demand for road capacity in and connecting to the Manhattan CBD," in turn leading to travel-time savings improvements, travel-time reliability improvements, and safety benefits for drivers (among others)." (citing final EA)).

It is very unlikely that Judge Liman or further courts of review will uphold the Secretary's decision on the legal grounds articulated in the letter. Defending the case on this basis, with the most likely outcome being vacatur of the Secretary's decision or remand to the agency for further administrative process, will only serve to delay FHWA's elimination of the CBDTP. The agency will have to answer the MTA's and intervenors' complaints, compile and produce the administrative record, and then the parties will engage in briefing, likely oral argument, and await a decision from Judge Liman—which is exceedingly likely to be averse to the agency.

Moreover, based on a preliminary review of the documents provided for inclusion in the administrative record, it appears that other than the Secretary's decision itself, there is no other material supporting or explaining the DOT's change of position with respect to the two points identified above that would not be subject to deliberative process or attorney-client privileges. The thin administrative record may lead plaintiffs to point to these "gaps" in the administrative record as justification for extra-record discovery from DOT, including requests for production of emails and depositions of agency officials, including the Secretary in particular. Indeed, during preliminary conversations concerning scheduling in this matter, the MTA and other intervenor-plaintiffs have indicated they will likely seek extra-record discovery on this basis. While we would strongly contest any request for extra-record discovery, it is always a possibility in cases where there is very little written justification for an agency's action.

## II. FHWA Could Pursue Termination Through Established OMB Procedures

While there is considerable litigation risk in defending the decision to terminate the CBDTP based on the argument that it is not a statutorily authorized "value pricing" pilot under the VPPP, FHWA may be able to accomplish the same goal, for the same reasons, utilizing established OMB procedures for the termination of cooperative agreements.

One option would be to seek termination of the CBDTP agreement pursuant to OMB regulations at 2 C.F.R. §§ 200.339(c), 340(a)(4), because the cooperative agreement "no longer effectuates … agency priorities." The relevant OMB regulation at 2 C.F.R. § 200.340(a)(4) (adopted by DOT at 2 C.F.R. Part 1201) provides that federal awards (including cooperative agreements) may be terminated "by the federal agency… pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." Moreover, the MTA, NYS DOT, and NYC DOT have already argued in their complaints that FHWA should have utilized the OMB regulations at 2 C.F.R. §§ 200.340-342, if it wanted to end the CBDTP. *See* MTA Compl. ¶¶ 141-146; NYS DOT Compl. ¶¶ 47-50; NYC DOT Compl. ¶¶ 118-123. Utilizing the OMB termination procedures would thus insulate FHWA from plaintiffs' arguments that they were not provided due process or that the termination was procedurally arbitrary and capricious.

DOT has noted that the CBDTP agreement between the MTA and FHWA does not appear to fit within the regulatory definition of a "cooperative agreement" because there is no explicit

"financial assistance" provided by the FHWA pursuant to the Agreement. *See* 2 C.F.R. § 200.1 (definition of cooperative agreement) ("[A] legal instrument of financial assistance between a Federal agency and a recipient …"). However, the definition of "assistance" is broadly defined by the relevant statute to refer to "the transfer of anything of value for a public purpose of support or stimulation authorized by a law of the United States." 31 U.S.C. § 6101(3). And the term "cooperative agreement," as defined by statute, does not require an actual transfer of funds from an agency to a recipient. *See* 31 U.S.C. § 6305 ("An executive agency shall use a cooperative agreement as the legal instrument reflecting a relationship between the United States Government and a State, a local government, or other recipient when—(1) the principal purpose of the relationship is to transfer a thing of value to the State, local government, or other recipient to carry out a public purpose of support …"). The term "cooperative agreement," as used in the OMB regulations, also tracks this broad definition—noting a cooperative agreement is a legal instrument "used to enter into a relationship the principal purpose of which is to transfer anything of value to carry out a public purpose authorized by a law of the United States." 2 C.F.R. § 200.1 (definition of Cooperative agreement, subsection (1)). Here, FHWA's grant of authority to the MTA to apply tolls on federal-aid highways is clearly a transfer of a thing of value, and thus it appears the CBDTP agreement would properly be a cooperative agreement under the regulations. Moreover, the VPPP statute explicitly refers to agreements between FHWA and states and localities as "cooperative agreements." 23 U.S.C. § 149 note ("The Secretary may enter into cooperative agreements with as many as 15 such State or local governments or public authorities to establish, maintain, and monitor value pricing programs."). Finally, the FHWA has noted that VPPP agreements that require tolling authority are still "cooperative agreements" even without the grant of actual funds. *See* Congestion Pricing, Value Pricing Pilot Program, FHWA (May 17, 2024), https://ops.fhwa.dot.gov/congestionpricing/value_pricing ("The Moving Ahead for Progress in the 21st Century (MAP-21) Act did not authorize additional funds after FY2012 for the discretionary grant component of the Value Pricing Pilot Program (VPPP). However, FHWA's ability to enter into cooperative agreements for projects that require tolling authority under this program for their implementation will continue.").

The CBDTP agreement does not have any explicit termination provisions, which may make this argument more difficult. *See* 2 C.F.R. § 200.340(b) ("The Federal agency or pass-through entity must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award."). The agreement does, however, reference "all Federal law and requirements applicable to the project," so if there are other DOT or FHWA regulations that pertain to termination of cooperative agreements, they would be incorporated by reference. This is similar to the argument made for termination of grants in *U.S. Conference of Catholic Bishops v. State*, 2025 WL 763738 (Mar. 11, 2025) and *AIDS Vaccine Advocacy v. U.S. Dep't of State*, 2025 WL 752378 (Mar. 10, 2025); however, those cases involve State Department grants which specifically reference State Department "Standard Terms and Conditions for Federal Awards" which permit termination "if the award no longer effectuates the program goals or agency priorities." If the FHWA or DOT have similar provisions for contract awards, even in sub-regulatory guidance or

policy, it would strengthen this argument.[4] Even if FHWA cannot point to explicit termination provisions that are incorporated within the CBDTP agreement, it is plain that the "pilot project" agreement can be terminated at some point by FHWA. Moreover, as noted, the MTA, NYS DOT, and NYC DOT have argued in their complaints that the CBDTP agreement is a "cooperative agreement," and can only be terminated pursuant to the OMB regulations. Accordingly, we believe the FHWA could successfully invoke these provisions and seek termination of the CBDTP agreement as "no longer effectuat[ing] … agency priorities," even in the absence of explicit termination provisions.

Termination of the CBDTP agreement utilizing the OMB procedures would still allow FHWA to argue that the program should be terminated for the reasons outlined in the Secretary's letter—*i.e.*, (1) the CBDTP does not offer a toll-free option, and (2) the level of tolls has been set primarily by the need to raise revenues rather than prevent congestion—except not as a matter of statutory construction, but rather as a matter of changed agency priorities. Under the change-in-position doctrine, "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change," "'display awareness that [they are] changing position,'" and consider "'serious reliance interests.'" *FDA v. Wages and White Lion Investments, LLC*, --- U.S. ---, 2025 WL 978101, at *13 (Apr. 2, 2025) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U. S. 211, 221-22 (2016)). There is ample precedent for FHWA changing its agency priorities with respect to the types of VPPP projects which are solicited and approved by FHWA. *See, e.g.,* SAFETEA-LU, Value Pricing Pilot Program Participation, 71 FR 40578-01 (July 17, 2006) (announcing delay in consideration of VPPP applications "to allow the FHWA to revise the VPP program guidance to solicit certain types of projects that further the goals of the Secretary of Transportation's new National Strategy to Reduce Congestion on America's Transportation Network, announced on May 16, 2006. This national strategy contains a number of elements that involve pricing, and thus a reconsideration of the types of projects that are being solicited for VPP program participation is warranted to ensure consistency with the national strategy.").

Moreover, FHWA does not need to abandon the Secretary's stated rationale—that the CBDTP is not a statutorily authorized VPPP project—altogether. Rather, FHWA can follow this termination process in addition to defending the Secretary's letter, and as an alternative, more-defensible ground. To the extent FHWA decides to issue letters concerning MTA's non-compliance after the April 20th deadline, it may include in those letters a formal "notice of termination" of the CBDTP agreement. Such letter(s) should include an explanation that, in the alternative, the FHWA has decided to change the types of VPPP projects it decides to prioritize or exclude (such as CBDTP) going forward, should be supported by a "reasoned explanation" in light of FHWA's previous pronouncements as to what will constitute acceptable VPPP applications, "display

---

[4] It appears that Section 16 of the FHWA's Contractors & Recipients General Terms and Conditions for Assistance Awards may be one such applicable provision. *See* https://www.fhwa.dot.gov/cfo/contractor_recip/gtandc_generaltermsconditions.cfm.

awareness" that FHWA is "changing position," and "consider the serious reliance interests," attendant with the buildout of the tolling infrastructure of the CBDTP—building on these same elements that are already included in the Secretary's letter. In addition, if FHWA determines that non-compliance cannot be remedied by imposing specific conditions, *see* 2 C.F.R. § 200.339 (referencing 2 C.F.R. § 200.208), it should follow all applicable notice and hearing provisions, *see, e.g.,* 2 C.F.R. §§ 200.341, 342, and also evaluate whether a new NEPA analysis is required to assess the environmental impacts of terminating the CBDTP.

Following the OMB termination regulations, while not abandoning the Secretary's stated rationale, will provide alternative and more defensible grounds for the ending of the CBDTP program. We welcome further dialogue as we continue to litigate this matter. Please let us know if you would like to schedule a call or meeting to discuss.

Sincerely,

Dominika Tarczynska
David Farber
Christine S. Poscablo
Assistant United States Attorneys