UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

METROPOLITAN TRANSPORTATION AUTHORITY
and TRIBOROUGH BRIDGE AND TUNNEL
AUTHORITY,

                              *Plaintiffs*,

  and

NEW YORK STATE DEPARTMENT OF
TRANSPORTATION, RIDERS ALLIANCE, SIERRA
CLUB, and NEW YORK CITY DEPARTMENT OF
TRANSPORTATION,

                              *Intervenor-Plaintiffs*,

                            v.

SEAN DUFFY, in his official capacity as Secretary of
the United States Department of Transportation,
GLORIA M. SHEPHERD, in her official capacity as
Executive Director of the Federal Highway
Administration, UNITED STATES DEPARTMENT
OF TRANSPORTATION, and FEDERAL HIGHWAY
ADMINISTRATION,

                              *Defendants*.

Case No. 25 Civ. 1413 (LJL)

**DECLARATION OF KEVIN WILLENS**

      I, Kevin Willens, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

      1.    I am the Chief Financial Officer ("CFO") of the Metropolitan Transportation Authority (the "MTA"), a position I have held since February 2022. I have 40 years of experience in public finance. Prior to joining the MTA, I served for 10 years as Co-head of US Public Finance at Goldman Sachs. I have provided investment banking expertise to the MTA for more than 30

1

years, including serving as the MTA's financial advisor for 10 years.

2. In my capacity as CFO of MTA, I advise the Board of MTA and the Board of its affiliate, Triborough Bridge and Tunnel Authority ("TBTA"), with respect to the use of revenues derived from the Central Business District ("CBD") Tolling Program (the "CBD Tolling Program" or "Program") to finance MTA capital projects. I also have responsibility for overseeing the securing of billions of dollars per year in federal funding for certain MTA projects.

3. Every year, consistent with historic practice, the MTA and TBTA issue bonds to raise money to pay for MTA's capital projects. Interest and a portion of the principal is paid in future years from the revenue pledged to investors until the bonds are fully paid off, which is usually over a 30-to-40-year period, roughly matching the expected useful life of the projects financed by the bonds. This approach to funding MTA's capital projects is analogous to an individual financing a home purchase with a mortgage and paying the bank over 30 years using the individual's income.

4. The Traffic Mobility Act ("TMA") enacted by the New York State legislature requires TBTA to implement the CBD Tolling Program in a manner that achieves a minimum $15 billion of funding for the 2020-2024 MTA Capital Program ("Capital Program"). Debt to be paid from CBD Tolling Program revenue has been and will continue to be issued over the next several years to pay for the $15 billion in project expenditures, and then principal and interest of the congestion pricing bonds will be paid from toll revenue over an approximately 30-year period.

5. Issuing long-term bonds that will be repaid with toll revenues over time has always been a necessary component of the CBD Tolling Program to raise the $15 billion needed for the Capital Program over the nearer term, rather than only funding projects as the revenues actually accrue. I am aware that on April 24, 2019, shortly after the TMA was enacted, the

Federal Highway Administration ("FHWA"), Federal Transit Authority ("FTA"), and United States Department of Transportation ("USDOT") representatives met with representatives from the New York City Department of Transportation ("NYCDOT"), MTA, TBTA, the New York State Department of Transportation ("NYSDOT"), and the New York Governor's Office. It is my understanding that the purpose of the meeting was to provide FHWA with more information regarding the Program, including that toll revenue would be used in part to secure bonds and repay investors over time with toll revenues. *See* Declaration of Allison L. C. de Cerreño ("C. de Cerreño Decl."), Exhibit A.

6.     In March 2024, the TBTA Board approved a specific toll rate structure for the Program, which was studied in a reevaluation document approved by FHWA in June 2024. During the preparation of the reevaluation document, I consulted with FHWA, during which I explained my professional opinion that based on current economic factors, such as interest rates, the adopted toll structure could generate sufficient funding through the issuance of long-term bonds to meet the TMA requirement. My opinion was grounded in the standard practice for public infrastructure project finance used by the MTA in issuing long-term bonds for capital projects, with which FHWA has familiarity in its role providing funding for federal shares of large infrastructure projects otherwise funded by states.

7.     In November 2024, the TBTA Board was presented with and voted to approve a plan to phase in the March 2024 adopted toll structure. I evaluated that proposal for its ability to accomplish the TMA's funding requirement, and my opinion was reflected in a second reevaluation document. During the preparation of the second reevaluation, I determined that to account for the phased-in approach, which would generate less revenue in the first six years, MTA and TBTA could issue the required amount of long-term bonds over a longer period of

3

years. Although this approach would take longer, it would nonetheless satisfy the Capital Program funding obligation imposed by the TMA and allow the MTA to complete the projects identified in the Capital Program. FHWA approved the second reevaluation in November 2024.

8. FHWA confirmed that it understood the MTA financing plan was reliant on 30-year bonds in court filings. *See* Manhattan Central Business District Tolling Program Supplemental Memorandum at 20–22, *New Jersey v. U.S Dep't of Trans. et al.*, 23-cv-3885 (Jan. 17, 2025), Dkt. 218-1 (confirming that declaration signed by me on January 2, 2025 explaining how MTA and TBTA planned to issue long-term bonds to be repaid by Program revenue "reflects FHWA's contemporaneous understanding of the information conveyed by the Project Sponsors before FHWA's issuance of Re-Evaluation #2"); *see also* Reply Memorandum in Support of the Federal Defendants' Cross-Motion for Summary Judgment at 4, *Chan et al. v. U.S. Dep't of Trans. et al.*, 23-cv-10365 (Dec. 18, 2024), Dkt. 160.

9. The MTA's plan to leverage CBD Tolling Program revenues through bond issuance was also a subject of discussions between FHWA and the Project Sponsors, TBTA, NYSDOT, and NYCDOT, in which I participated, to negotiate the terms of the binding agreement ultimately executed on November 21, 2024, authorizing the CBD Tolling Program under the Value Pricing Program (the "VPPP Agreement"). During those discussions, I and other TBTA representatives consistently explained to FHWA that it was critical that potential investors would be able to rely on the VPPP Agreement's durability in investing in 30-year bonds secured by Program revenues.

10. Given that the financing of $15 billion in 2020-2024 Capital Program projects is dependent on attracting investors to purchase long-term bonds secured with Program revenue, TBTA could not have agreed to sign the VPPP Agreement if it authorized FHWA to unilaterally

terminate the agreement. Such a provision would make it impossible to find sufficient financing because it would allow FHWA to cut off the means for investors to be paid principal and interest due—through revenues generated by the Program over the long term.

11. The necessity for lasting tolling authority is clear from simple math. Based on the forecast revenue generation from the Program as reflected in the November 2024 reevaluation, the Program will generate approximately $500 million annually for the first three years, $700 million for the second three years, and $900 million thereafter. Even if the MTA issued interest-free bonds (which of course no investor would buy), it would take over 18 years to repay them. Obviously, with interest included, it will take more time, which is why our plan is to issue several rounds of 30-year bonds. Essentially, it would be impossible to achieve the stated goal of funding $15 billion in capital projects from the Program without the VPPP Agreement remaining in place for a minimum of 18 years, and the financing plan realistically requires the agreement to be in place for 30 years or more.

12. The MTA and TBTA have relied on the durability of the VPPP Agreement in incurring debt already. To date, TBTA has issued $1.378 billion in short-term debt that is supported by revenues generated by the Program and will be refinanced with bonds secured by CBD Tolling Program revenues.

13. More specifically, TBTA issued a $192.8 million note that must be repaid in November 2025 and a $186 million note that must be repaid in December 2025. The total remaining principal and interest payments due on these notes is $397.2 million, which TBTA intends to pay with either CBD Tolling Program revenue or proceeds from long-term CBD Tolling Program bonds secured by and payable from such revenues.

14. TBTA issued an additional $500 million in short-term notes to fund a portion of

the Capital Program, which must be repaid in February 2028. The total remaining principal and interest payments due on these notes is $574.6 million, which TBTA intends to pay with either CBD Tolling Program revenue or proceeds from long-term CBD Tolling Program bonds secured by and payable from such revenues.

15. On May 2, 2025, TBTA closed a $500 million loan secured by CBD Tolling Program revenues. This loan is secured by CBD Tolling Program revenue, which loan has to be repaid by May 1, 2026. The total remaining principal and interest payments will be approximately $520 million, which MTA intends to pay with either CBD Tolling Program revenue or proceeds from long-term CBD Tolling Program bonds secured by and payable from such revenues.

16. If tolling under the CBD Tolling Program does not cease by May 21, 2025, FHWA has threatened several actions, including to withhold approval of any Statewide Transportation Improvement Program ("STIP") amendments concerning New York Metropolitan Transportation Council ("NYMTC") Transportation Improvement Program ("TIP") modifications, which are necessary to obtain federal funding under Title 23 (highways) and Title 49 (transit) of Chapter 53 of the U.S. Code. Another threatened action is to prohibit further obligations of FHWA funds for projects within New York City. These threats were articulated in a letter dated April 21, 2025, from the Secretary of Transportation to Governor Hochul and the Project Sponsors.

17. This presents the Project Sponsors with a terrible choice if the Court does not enjoin FHWA from taking such actions, as NYSDOT, NYCDOT and MTA all depend on FHWA and/or FTA funding to maintain the regional transportation system in a state of good repair. If TBTA stops tolling during the pendency of this action to protect against the loss of these funds, MTA or TBTA would have to pay for the debt it has already issued reliant on toll revenues (as

described in paragraphs 12-15, *supra*) using other funds, thereby reducing monies that would otherwise be used to undertake other critical public transportation projects.

18. On the other hand, if, as USDOT has threatened, all FHWA approval actions necessary to release federal funding are withheld, MTA would have to defer, if not forgo, planned improvements to the transit system, including, as explained below, increased accessibility upgrades at numerous subway stations, and, just in the near term, lose out on billions of dollars in funding used to pay for state of good repair and track maintenance in the New York City Subway and Long Island Rail Road ("LIRR"), as well as potentially even greater deprivation over the longer term if this litigation is not finally resolved in 2025.

19. Before describing these harms, a brief description of the transportation system operated by the MTA is warranted. The MTA operates the New York City subway and bus systems, as well as the Metro-North and the LIRR commuter rail networks. The subway is one of the world's oldest public transit systems, one of the most used, and has 472 stations in operation.

20. The subway system operates 24/7 every day of the year. By annual ridership, the New York City subway is the busiest rapid transit system in the Western Hemisphere and Europe. It transported over one billion passengers in 2024—a number that reflects a still depressed ridership due to COVID-19 pandemic. The subway system is also one of the world's longest, covering 248 miles in Manhattan, the Bronx, Brooklyn, and Queens.[1]

21. The MTA also operates a large-scale bus system in each of the five boroughs. The MTA and New York City Transit ("NYCT"), an affiliate of the MTA, oversee a fleet of approximately 5,800 buses that service 238 bus routes, 20 Select Bus Service routes, and 75

---

[1] MTA operates the Staten Island Rail system in that borough.

express bus routes throughout the five boroughs of New York City. 43 of these lines operate in Manhattan. In 2023 alone, New York City buses served approximately 427 million riders and traveled a collective 152 million miles.

22. The MTA operates the two largest commuter railroads in the nation—Metro-North and LIRR. The Metro-North operates approximately 124 stations and more than 775 miles of track. In 2024, Metro-North served over 67 million passengers throughout seven counties in New York and two in Connecticut. The LIRR system services approximately 200,000 customers each weekday. In 2024, it transported a total of 75.5 million riders. The LIRR encompasses 126 stations throughout Manhattan, Brooklyn, Queens, and Nassau and Suffolk counties and includes over 700 miles of tracks, sending out 947 trains every weekday.

23. USDOT's threat to withhold approvals of STIP amendments concerning NYMTC TIP modifications places significant funding at risk. The STIP is a list of all projects or project phases in New York State proposed to receive federal highway and transit funding. NYSDOT develops New York State's STIP, which is updated every four years, and is amended frequently to reflect projects newly proposed for federal funding. New York State is broken into fourteen regions, each of which has a Metropolitan Planning Organization ("MPO") that develops a TIP for its region. NYMTC is the MPO for New York City, Long Island, and the Lower Hudson Valley, including Westchester, Putnam, and Rockland counties—a region with more than 13 million residents. MPOs submit TIPs to NYSDOT for inclusion in New York State's STIP.

24. FHWA and FTA, which oversees federal transit funding, must jointly approve each STIP and STIP amendment, and only projects in a STIP or STIP amendment approved by both FHWA and FTA are eligible for FHWA or FTA funding. Thus, all future MTA projects seeking federal funding that are not already included in the STIP are at risk if the threat is carried out,

8

including projects necessary for the long-term safety and reliability of the regional transportation system.  As MTA relies on billions of dollars in federal dollars per year to maintain its systems and serve the public, this threat could eviscerate the relatively smaller annual value of CBD Toll Program tolls and stymie planning for critical projects under the newly legislatively approved 2025-2029 MTA Capital Program.

25.     One concrete example is already pending.  NYSDOT recently submitted a proposed STIP amendment concerning a $2.2 billion package of NYMTC projects for subway and bus maintenance and railroad track work for approval by FHWA and FTA so that FTA funding can be released to MTA.  These funds are now at risk if FHWA refuses to approve the STIP amendment pursuant to the threatened actions in the April 21st letter.

26.     In addition to the loss of any FTA funding due to USDOT's threatened refusal to allow FHWA to approve STIP amendments, the threatened retaliatory actions, which include cutting off all future obligations of FHWA funding for projects within New York City, could also forestall MTA receipt of FHWA funding aimed at improving air quality, which MTA has used to make subway stations more accessible and thereby reduce vehicle emissions. FHWA's Congestion Mitigation and Air Quality Improvement Program ("CMAQ") provides a flexible funding source to State and local governments for transportation projects and programs to help meet the requirements of the federal Clean Air Act.  The funding initially goes to NYSDOT, which in turn disburses funds to different governmental entities.  Funding is available to reduce congestion and improve air quality for areas that do not meet the National Ambient Air Quality Standards for ozone, carbon monoxide, or particulate matter (and are thus nonattainment areas for those pollutants) and for former nonattainment areas that are now in compliance (maintenance areas).

MTA expects to receive approximately $55 million from this program for the federal fiscal year (October 1, 2024 to September 30, 2025).

27. MTA utilizes the majority of CMAQ funding for Americans with Disabilities Act ("ADA") projects. These undertakings align with the CMAQ program requirements by contributing to reductions in vehicle miles traveled ("VMT") and associated emissions, improving air quality, and reducing regional congestion. Specifically, the installation of ADA-compliant elevators and equipment at non-accessible stations increases subway ridership and reduces reliance on vehicular modes of transportation such as taxis, for-hire-vehicles, private vehicles, and paratransit services like Access-A-Ride. Consequently, this shift reduces VMT and resultant emissions as well as congestion.

28. A single illustration reflects the need for and effectiveness of the CMAQ program funding. In September 2024, MTA was awarded $50 million to make ADA improvements at the Middletown Road station on the Pelham Line (No. 6 Train) in the Bronx, including the installation of ADA-compliant elevators and related equipment. These improvements are projected to increase transit ridership by approximately 21 additional trips per day, which would be shifted from private vehicles, taxis, vehicles-for-hire, and paratransit services. This shift in ridership is estimated to reduce daily VMT by 260 miles, as trips that would have been made by car are instead accommodated by the subway system.

29. A similar ADA-accessible project, using CMAQ funds, is planned for the Morrison Avenue / Soundview Avenue station, also on the No. 6 line in the Bronx, and at the Broadway Junction station in Brooklyn, where five subway lines intersect, in 2025. The benefits in reduced VMT and emissions, and improved air quality, along with benefits to the ADA community, will be similar to those projected for the Middletown Road station. Similar projects

to these would be at least deferred, if not foregone, if CMAQ funding becomes unavailable.

30. In addition to losing the CMAQ funds, MTA's extensive bus operations will also be harmed, as they operate on roadways throughout the City that are maintained by NYCDOT in part using FHWA funding. If the condition of these roadways deteriorates due to funding constraints, it will inevitably affect the ability of MTA buses to meet their schedules, and likely contribute to deterioration of the buses themselves, thereby increasing expenses for MTA to maintain or replace them.

31. If federal funding typically received by MTA becomes unavailable during the pendency of this lawsuit until the Court rules on the legality of FHWA's purported rescission of the VPPP Agreement, MTA would be forced to juggle priorities and defer, if not eliminate, many important projects (including accessibility projects) due to the lack of funding. The same would be true if the Project Sponsors capitulated and stopped tolling entries to the CBD, as MTA would have to divert other capital funds to repay the almost $1.4 billion in congestion pricing-related debt that would otherwise be used for important projects and could not issue bonds or finance projects that are already planned. Some projects would undoubtedly not proceed at all or would be materially delayed, contributing to deterioration of transit and commuter rail service and delay of improvements to access. The consequence would be irreparable harm to the public transit system, and thus to the traveling public.

32. This would be the case, under USDOT's threats, notwithstanding the fact that federal funding used by the MTA, NYSDOT and NYCDOT is appropriated by Congress specifically to maintain transportation systems in the New York City metropolitan region pursuant to legislative formulas under 49 U.S.C. § 5307, 49 U.S.C. § 5337, and other statutes.

I declare under the penalty of perjury that the foregoing is true and correct.

*Kevin Willens*
_____
Kevin Willens

Dated: May 5, 2025
        New York, New York