## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

<table>
<tr>
<td>

METROPOLITAN TRANSPORTATION AUTHORITY and TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY,

<em>Plaintiffs</em>,

and

NEW YORK STATE DEPARTMENT OF TRANSPORTATION, RIDERS ALLIANCE, SIERRA CLUB, and NEW YORK CITY DEPARTMENT OF TRANSPORTATION,

<em>Intervenor-Plaintiffs</em>,

v.

SEAN DUFFY, in his official capacity as Secretary of the United States Department of Transportation, GLORIA M. SHEPHERD, in her official capacity as Executive Director of the Federal Highway Administration, UNITED STATES DEPARTMENT OF TRANSPORTATION, and FEDERAL HIGHWAY ADMINISTRATION,

<em>Defendants</em>.

</td>
<td>

Case No. 25 Civ. 1413 (LJL)

</td>
</tr>
</table>

## DECLARATION OF ALLISON L. C. DE CERREÑO, PH.D.

I, Allison L. C. de Cerreño, Ph.D., hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am the Chief Operating Officer of the Triborough Bridge and Tunnel Authority ("TBTA"), an affiliate of the Metropolitan Transportation Authority (the "MTA"). I have responsibility for overseeing the work of roughly 800 personnel in three TBTA departments: Tolling Management (including roadway and back-office operations), Facilities Management

(including nine bridges and tunnels, the Robert Moses complex, central maintenance, and fleet), and Environmental, Safety and Health (EHS). In addition, in that capacity and in my prior positions with the MTA, I have been and remain the project lead (aka "Project CEO") for the Central Business District Tolling Program (the "CBD Tolling Program" or the "Program"), a New York State legislatively mandated program pursuant to which TBTA, the New York State Department of Transportation ("NYSDOT"), and the New York City Department of Transportation ("NYCDOT") (collectively, the "Project Sponsors") developed and introduced congestion pricing to Manhattan's Central Business District (the "CBD"). The State legislation providing for the Program is the 2019 MTA Reform and Traffic Mobility Act (the "TMA"). The Program, which commenced operations on January 5, 2025, has reduced congestion and, as it continues to operate, will provide a stable source of revenue for the MTA to improve subway, bus and commuter rail systems through projects included in the MTA's 2020-2024 Capital Program and successor capital programs.

2.      In my role as TBTA lead for the Program, I was involved in and have personal knowledge of meetings and communications with the U.S. Department of Transportation ("USDOT") and the Federal Highway Administration ("FHWA"), which date back to 2019. As reflected by those meetings and correspondence, USDOT and FHWA fully understood that the Program entailed what is commonly known as "cordon pricing"—that is, tolling all non-exempt vehicles accessing a specified geographic area, in this case the CBD. USDOT and FHWA also fully understood that the Program was intended to reduce congestion through two complementary means: disincentivizing driving into the CBD by charging tolls, and making the use of transit more attractive by directing net revenues (after costs associated with the Program) to capital

improvements in mass transit. FHWA's ultimate approval of the Program reflected this understanding.

### A. The History of the Program

3.      The USDOT/FHWA determined that the Program required approval from FHWA, which had been conferred the authority to allow state and local agencies to implement tolls on federal-aid highways through the Value Pricing Pilot Program (the "VPPP"). The VPPP was established through the enactment of Section 1012(b) of the Intermodal Surface Transportation Efficiency Act ("ISTEA") of 1991, as amended. The VPPP was initially called the Congestion Pricing Pilot Program; the name of the program was changed to the VPPP in the Transportation Equity Act for the 21st Century ("TEA-21") of 1998, and was continued in the Safe, Accountable, Flexible, Efficient Transportation Equity Act ("SAFETEA-LU") of 2005.[1]   For a detailed description of FHWA's interpretation, guidance and application of the VPPP, *see* Plaintiffs' Amended Complaint at ¶¶ 62–98.

4.      The three Program Sponsors initiated contact with USDOT and FHWA with regard to the Program in the Spring of 2019, shortly after the April 1, 2019 adoption of the TMA. There were several in-person meetings and numerous telephone conferences, including three in-person meetings in Washington D.C. and two in Albany. The initial in-person meeting, in Washington, D.C., was on April 23, 2019, and the second was in Albany the next day; the other in-person meetings were in Washington D.C. in October and December of 2019 and in Albany in November 2019.

---

[1]    *Value Pricing Pilot Program*, U.S. FED. HIGHWAY ADMIN., https://ops.fhwa.dot.gov/congestionpricing/value_pricing/ (last accessed Apr. 18, 2025).

5.    At those meetings, and particularly in the April 2019 meetings with USDOT and FHWA, the Project Sponsors presented the Program and provided detailed explanations of its contemplated operation. Those explanations included that tolling would apply to vehicles that enter the CBD, defined as below and inclusive of 60th Street (with the exception of vehicles using the FDR Drive, West Side Highway, the Battery Park Underpass, and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West Street) in order to reduce the severe congestion in the CBD. This type of congestion pricing is generally called "cordon pricing" (or sometimes "zone-based" or "area-wide pricing"), as the tolling is for a specific geographic area.[2] In addition, it was explained that the Program would incorporate toll rates that would provide a new and recurring source of revenue for the MTA, with net revenues (after paying for Program costs) to be dedicated to capital improvements identified in the MTA's 2020-2024 Capital Plan. The minutes FHWA prepared of the April 24th meeting in Albany reflect the explanation and discussion of these and other elements of the Program. In addition, at that meeting the Project Sponsors provided USDOT and FHWA with a description of the Program. A copy of the April 24, 2019 meeting minutes, along with the Program description that was provided to USDOT/FHWA at the meeting, are annexed hereto as Exhibit "A."

6.    At these meetings, as well as at the later meetings, USDOT and FHWA representatives made clear that, given the nature of the Program, the VPPP is the appropriate vehicle to provide tolling authority on federal-aid highways for a cordon-based congestion pricing program like the Program. That is plain by the "Discussion" subheading in the minutes of the April 24th meeting, which reference the VPPP and its attendant requirements (including compliance with the National Environmental Policy Act, or "NEPA"). The federal agencies explained that

---

[2] *Id.*

NYSDOT already had one of the 15 "slots" allotted in the VPPP, and could have multiple congestion pricing projects under that "slot," including the Program. The federal agencies further explained that there would need to be a VPPP agreement between FHWA and the Project Sponsors. At the close of the April 24th meeting, it was agreed that FHWA would forward to the Project Sponsors a template for a VPPP "Expression of Interest," which was needed to commence the eligibility/approval process, as well as an example of a cooperative agreement that the Project Sponsors would need to enter into with FHWA. *See* Exhibit "A" at 3.

7.     On June 14, 2019, the Project Sponsors held a conference call with FHWA. During that call, as occurred in later meetings, there was discussion of what class of action would be applicable for the anticipated NEPA process (an Environmental Assessment ("EA") or Environmental Impact Statement ("EIS")) and what steps the Project Sponsors could take to advance the Program pending completion of the NEPA process.

8.     The Project Sponsors submitted an Expression of Interest ("EoI") to FHWA seeking approval under the VPPP to implement the Program on June 17, 2019. A copy of the June 17, 2019 cover letter accompanying the EoI and the EoI are annexed hereto as Exhibit "B." As noted in the cover letter, "[t]he purpose of this variable price tolling program is to specifically mitigate the untenable levels of traffic congestion that currently exists in the Central Business District." The cover letter further noted that improving mass transit through revenues from the Program, "provides the greatest return on investment for mitigation traffic congestion." *Id.* at 1.

9.     The full EoI also makes plain the basic elements of the Program and its goals. For example, Section D.2 provides a description of the area to be tolled (*i.e.*, the CBD, with the exceptions noted above).  Section D.4 describes the goals of the Program, including the reduction

of congestion and improvement of air quality, as well as the creation of a sustainable source of funding for the MTA and increase in transit ridership.

10.     The FHWA response to the EoI came in the form of an October 24, 2019 letter from the Administrator, which requested further information. A copy of the October 24, 2019 letter is annexed hereto as Exhibit "C" The FHWA stated that "[u]nder the various programs in Federal law that allow tolling of existing infrastructure, the VPPP appears to be the best potential fit, provided that the overall purpose of variable tolling remains to reduce roadway traffic congestion." *Id.* at 1.[3] In addition, noting the Program revenues would be used almost exclusively for mass transit improvement, FHWA asked for details about the use of those revenues. *Id*. at 2. Finally, FHWA acknowledged that the use of cordon pricing was "unprecedented", and that the agency had to consider the precedent it would be setting by approval. *Id.*[4]

11.     Following this letter, the Project Sponsors met FHWA in Albany on November 6, 2019 to discuss the October 24th letter. The Project Sponsors then met with USDOT and FHWA in Washington D.C. on December 6, 2019 and obtained guidance on responding to the agencies' further requests for information. At that meeting, there was discussion of the use of the Program revenues and the NEPA class of action.

12.     After the December 6 meeting, the Project Sponsors submitted a December 17, 2019 letter to FHWA, together with information requested in the FHWA's October 24th letter. A

---

[3] "Variable tolling" refers to tolling that, like the Program, imposes different toll amounts at different times of the day.

[4] This assertion was not entirely correct, as there had been prior proposals for area-wide tolling approved by FHWA. For example, in 2007, New York City and FHWA entered into an Urban Partnership Agreement in which FHWA agreed to award New York City $5 million in VPPP funding to pursue "a broad area pricing system in Manhattan south of 86th Street." *See* Plaintiffs' Amended Complaint at ¶¶ 84. This approval was conditioned on State legislative action which did not occur at that time.

copy of the December 17, 2019 letter is annexed hereto as Exhibit "D." The Project Sponsors' December 17th letter emphasized that the premise of the Program was "to implement an area-wide pricing program under the Value Pricing Pilot Program." The attachment included with the letter explained, again, that net Program revenues would be dedicated to capital investments in mass transit. After noting that much of the information requested by the agencies would typically be contained in the environmental documentation that would be prepared pursuant to NEPA, the Project Sponsors requested a prompt decision on the class of action for NEPA review that had been under consideration by USDOT/FHWA for months (since the April 24th meeting). On January 27, 2020, the Project Sponsors submitted the Traffic and Revenue Study that had been requested by FHWA; a copy of the cover letter submitting that study is annexed hereto as Exhibit "E."

13.    There was no response to the December 2019 or January 2020 submissions, so the Project Sponsors wrote the FHWA on July 2, 2020 to request prompt agency action on the EoI (as required by an Executive Order and guidance issued by the first Trump administration) and a determination on the NEPA process; *viz*, whether an EA or EIS would be required. A copy of the July 2, 2020 letter is annexed hereto as Exhibit "F." On September 3, 2020, FHWA responded, stating that due to the Covid-19 pandemic and potential changed circumstances with regard to traffic and mass transit ridership, the agency needed more information on these conditions, "as the impact on congestion is a relevant consideration under the [VPPP]." A copy of the September 3, 2020 letter is annexed hereto as Exhibit "G."

14.    The Project Sponsors submitted the requested information on traffic and transit ridership on October 13, 2020, and reiterated the request that FHWA inform them of the type of NEPA process to be undertaken. A copy of the October 13, 2020 letter is annexed hereto as Exhibit

"H." It was not until March 30, 2021 that FHWA responded, and informed the Project Sponsors that an EA would be the appropriate NEPA documentation. A copy of the March 30, 2021 letter is annexed hereto as Exhibit "I."

15.    A lengthy environmental review process under NEPA ensued. Consistent with discussions with FHWA in 2019 and 2020, as well as at the commencement of the NEPA process, the EA's description of the purpose for the Program was "to reduce traffic congestion in the Manhattan CBD in a manner that will generate revenue for future transportation improvements, pursuant to acceptance into FHWA's VPPP."[5] The EA identified two Program needs: the need to reduce vehicle congestion in the CBD, and the need to create a new local, recurring funding source for MTA's transit capital projects.[6] To further refine the purpose and address the identified needs, the EA identified two specific congestion reduction objectives, which made plain that the primary purpose of the Program was to reduce congestion. These objectives were the reduction of daily vehicle miles traveled ("VMT") in the CBD by at least 5% and the reduction of daily vehicles entering the CBD by at least 10%. The objective related to creating the new, local, recurring source of funding was to generate sufficient net revenue to support the financing of $15 billion for MTA transit capital projects in the agency's 2020-2024 Capital Program.[7]

16.    Because the final tolling structure had not yet been defined, for the purpose of evaluating the potential environmental impacts of various tolling options, the Final EA analyzed

---

[5] Final EA Chapter 1, Introduction at 1-10, https://www.mta.info/document/110766 (last accessed Apr. 18, 2025).
[6] Id. at 1-10 to 1-18.
[7] Id. at 1-18.

seven tolling scenarios, with tolls for passenger cars ranging from $9 to $23 (with different rates for different classes of vehicles), with different toll amounts, credits and exemptions.[8]

17.    The environmental review culminated in the April 2023 Final EA and the June 2023 Finding of No Significant Impact ("FONSI").

18.    On November 30, 2023, the Traffic Mobility Review Board, an entity required by the TMA to recommend a toll structure for consideration by the TBTA Board, issued its recommendation,[9] which was informed by the Final EA. On December 6, 2023, the TBTA Board authorized TBTA to take the requisite steps to promulgate a CBD toll rate schedule.[10]

19.    On March 27, 2024, the TBTA Board adopted a toll rate schedule for the Program, with a planned implementation date in or about June 2024. The Project Sponsors prepared a reevaluation document ("Reevaluation 1") consistent with FHWA's regulations and as contemplated by the FONSI, to assess the effects of the March 2024 adopted toll schedule and determine whether the FONSI was still valid.[11] On June 14, 2024, FHWA confirmed that the reevaluation was consistent with FHWA's regulations and determined that the FONSI remained valid.[12]

---

[8] Final EA Chapter 2, Project Alternatives at 2-29 to 2-38, https://www.mta.info/document/110771 (last accessed Apr. 18, 2025).
[9] Traffic Mobility Review Board, *Congestion Pricing in New York* (Nov. 2023), https://www.mta.info/document/127761.
[10] MTA Board Votes to Begin Public Review Process for Central Business District Tolling Rate Schedule, MTA (Dec. 6, 2023), https://www.mta.info/press-release/mta-board-votes-begin-public-review-process-central-business-district-tolling-rate.
[11] Central Business District (CBD) Tolling Program, Reevaluation (June 24, 2024), https://www.mta.info/document/142711.
[12] Letter from Richard J. Marquis, Division Administrator, Fed. Highway Admin., to Allison L. C. de Cerreño, Ph.D., Chief Operating Officer, MTA Bridges and Tunnels (June 14, 2024), https://www.mta.info/document/142701.

20.    On June 5, 2024, prior to a VPPP agreement being executed, the Governor announced a pause in implementation of the Program, which at that point had been scheduled to begin on June 30, 2024.

21.    On November 14, 2024, the Governor announced a proposal to proceed with the Program, but with the toll rates that had been adopted by the TBTA Board in March 2024 being phased-in gradually over several years. On November 18, 2024, the TBTA Board adopted the phase-in feature of the toll rate schedule that it had approved in March (the "Phase-In Approach").[13]

22.    Under the Phase-In Approach, toll rates for each vehicle class and time of day, as well as tunnel crossing credits, are proportionally reduced from, and then gradually return to, the corresponding values in the March 2024 adopted toll rate schedule. Thus, subject to certain tunnel crossing credits, from 2025 to 2027, the peak-period E-ZPass entry toll rate charged for passenger vehicles will be $9; for motorcycles, $4.50; for larger vehicles including transit and commuter buses and trucks, $14.40 or $21.60, depending on their size; for taxis, $0.75 per trip; and for for-hire vehicles ("FHVs") on trips dispatched by high-volume for-hire services ("HVFHSs"), $1.50 per trip. The toll rates and tunnel crossing credits later increase proportionally for each vehicle category, once in 2028, then again in 2031 to match those in the March 2024 toll rate schedule, as set forth in the November 2024 toll rate schedule.

23.    The Project Sponsors prepared a second reevaluation consistent with FHWA's regulations to assess the effects of the Phase-in Approach of the March 2024 adopted toll structure, entitled Reevaluation 2. This Reevaluation concluded that the effects of the Program were

---

[13] Triborough Bridge and Tunnel Authority Central Business District (CBD) Charges, https://www.mta.info/document/138931 (last accessed Mar. 20, 2025).

consistent with those disclosed in the Final EA, the mitigation set forth in the FONSI (and Reevaluation 1) remained appropriate, and the FONSI remained valid.[14]

24.    On November 21, 2024, FHWA confirmed that Reevaluation 2 was consistent with FHWA's regulations and determined that the FONSI remained valid.[15] FHWA and the Project Sponsors then signed an agreement under the VPPP authorizing the Program's collection of tolls.[16] The agreement, *inter alia*, requires that the Project Sponsors report to FHWA on various performance metrics. Along with direct indicators of congestion reduction, such as daily vehicle entries into the CBD, are indirect indicators, including transit ridership and "capital projects funded or financed through Project revenue."[17]

25.    The Program commenced tolling customers on January 5, 2025. Information available for the first months of operations indicates a noticeable reduction in congestion in the CBD as compared to the same time period in 2024, with the corollary benefits of decreased time for emergency vehicle trips, Access-A-Ride Paratransit Service trips, and commutes.

   a.    Traffic in the CBD decreased substantially, with approximately 5.8 million fewer vehicles entering the district in January through March 2025 than would be expected based on data for prior years. This represents an 8% reduction from a typical January, a 12% reduction from a typical February, and a 13% reduction from a typical March.[18] Although not yet published, preliminary data for April indicate that traffic in the CBD was down by 12%.

---

[14] Central Business District (CBD) Tolling Program, Reevaluation 2 (Nov. 2024), https://www.mta.info/document/158191.

[15] Letter from Richard J. Marquis, Division Administrator, Fed. Highway Admin., to Allison L. C. de Cerreño, Ph.D., Chief Operating Officer, MTA Bridges and Tunnels (Nov. 21, 2024), https://www.mta.info/document/158196.

[16] Value Pricing Pilot Program Agreement (Nov. 21, 2024), https://www.mta.info/document/158201.

[17] *Id.* at 9.

[18] MTA Metrics, Reduction in Vehicle Entries to the CBD, https://metrics.mta.info/?cbdtp/vehiclereductions (last accessed Apr. 18, 2025). Compared to historical monthly averages for each respective month, a total of 1,267,083 fewer vehicles entered the CBD in January 2025; 2,029,860 fewer vehicles in February 2025; and 2,548,820 fewer in

b.  Based on MTA's review of relevant data, there was a 10% reduction in VMT by all vehicles in the CBD from January to mid-March of 2025 as compared to the same period in 2024.

c.  According to data collected by TRANSCOM,[19] crossing times were 12% faster at the Lincoln Tunnel and 45% faster at the Holland Tunnel from January-March 2025, compared to January-March 2024.[20] Trip times from Brooklyn and Queens to the CBD have dropped between 10% and 30%.[21] Express buses save about 10 minutes on their commutes.[22]

d.  According to MTA's assessment of data collected by TRANSCOM, traffic speeds on river crossings were 5% to 30% faster this February than last February.  Traffic speeds on major bridges improved significantly: on the Queensboro Bridge, by 31%; on the Brooklyn Bridge, by 26%; and on the Manhattan Bridge, by 7%.[23]

e.  Commuter time is reduced; commuters are saving as much as 21 minutes on their trips.[24]

f.  Fewer vehicles utilize the nine MTA bridges and tunnels, with levels dropping 2.4% from March of 2024 to March of 2025. The largest reductions are at the Hugh L. Carey and Queens-Midtown Tunnels, which lead directly into the zone.[25]  Truck

---

March 2025. Reductions are measured by subtracting vehicle totals against a historical average of 580.5K daily entries in January, 613.9K daily entries in February, and 642.5K daily entries in March.

[19] TRANSCOM is a coalition of 16 transportation and public safety agencies in the New York – New Jersey – Connecticut metropolitan region. It was created in 1986 to provide a cooperative, coordinated approach to regional transportation management.

[20] January 2025 MTA Board Meeting, Congestion Relief Zone Tolling January 29, 2025 Update , at 4-5, https://www.mta.info/document/163411 (last accessed Apr. 18, 2025); *see also* Andrew Siff, *MTA Calls Congestion Pricing 'Transformative' on Commutes,* NBC NEW YORK, (Jan. 29, 2025), https://www.nbcnewyork.com/new-york-city/mta-congestion-pricing-transformative-commute-impact/6126670/.

[21] January 2025 MTA Board Meeting, Congestion Relief Zone Tolling January 29, 2025 Update, at Slide 5, https://www.mta.info/document/163411 (last accessed Apr. 18, 2025).

[22] *Id.* at 9; February 2025 MTA Board Presentation at 10 (Feb. 26, 2025), https://www.mta.info/document/165401 (last accessed Apr. 18, 2025).

[23] February 2025 MTA Board Presentation at 10 (Feb. 26, 2025), https://www.mta.info/document/165401 (last accessed Apr. 20, 2025); *TRANSCOM*, internally sourced data week of February 24, 2025.

[24] RPA*, Congestion Pricing: What it Means to Save Time* (Mar. 11, 2025), https://rpa.org/news/lab/what-it-means-to-save-time.

[25] MTA Daily Ridership and Traffic, New York State, https://data.ny.gov/Transportation/MTA-Daily-Ridership-and-Traffic-Beginning-2020/sayj-mze2/about_data (last accessed Apr. 18, 2025).

traffic traveling through these tunnels dropped 14% this year compared to the same period in 2024.[26]

g. Trips are also far more reliable. According to TRANSCOM, traffic through the Holland Tunnel used to be delayed more than 3 minutes more than half of all weekdays (54%) – now 12%. On the Williamsburg Bridge, delays used to be greater than 3 minutes 65% of the time; the Program has reduced that to 2%.[27]

h. A recent study published by the National Bureau of Economic Research, with lead authors from Yale and Stanford, found a 15% improvement in CBD traffic speeds.[28] MTA internal data show that local bus speeds have increased by an average of 3% within the CBD, with some routes increasing by as much as 7%.[29]

i. Several bus routes have seen significant decreases in the time needed to complete their routes.[30] Based on internal MTA data from March 2025, there are 23% fewer customer trips on express bus that are delayed 10 minutes or more. Express buses are traveling 21% faster on the portion of their routes leading into and within the CBD.[31]

j. The Program appears to have reversed a long trend of increased emergency response times;[32] as a corollary of lessened congestion in the CBD. Similarly, reduced congestion translates into less delay for school buses in the congestion zone.

---

[26] Roosevelt House Public Policy Institute at Hunters College, *Where have all the Trucks Gone? Truck Diversions through the Bronx and State*, https://www.roosevelthouse.hunter.cuny.edu/?forum-post=trucks-gone-truck-diversions-bronx-staten-island (last accessed Apr. 18, 2025).

[27] February 2025 MTA Board Meeting Presentation at 12 (Feb. 26, 2025), https://www.mta.info/document/165401; *see also TRANSCOM*, internally sourced data week of February 24, 2025.

[28] Cody Cook et al., *The Short-Run Effects of Congestion Pricing in New York City*, NBER (March 17, 2025), https://www.nber.org/system/files/working_papers/w33584/w33584.pdf (last accessed Apr. 18, 2025).

[29] MTA Metrics, Reduction in Vehicle Entries to the CBD, https://metrics.mta.info/?cbdtp/vehiclereductions (last accessed Apr. 18, 2025).

[30] January 2025 MTA Board Meeting, Congestion Relief Zone Tolling January 29, 2025 Update at Slides 9–10, https://www.mta.info/document/163411 (last accessed Apr. 18, 2025).

[31] MTA Metrics, Reduction in Vehicle Entries to the CBD, https://metrics.mta.info/?cbdtp/vehiclereductions (last accessed Apr. 18, 2025).

[32] Ginia Bellafante, *The Life-or-Death Consequences of Killing Congestion Pricing*, N.Y. TIMES (Oct. 10, 2024), https://www.nytimes.com/2024/10/10/nyregion/new-york-fire-department-response-times.html.

k.  NYC open data of 311 calls show that complaints about excessive car horn honking within the CBD in January and February are down by more than 70% from the same time period last year, plummeting to 67 this year from 219.[33]

l.  According to an internal analysis, between January 5 and March 4, two New York City Department of Environmental Protection noise cameras in the CBD did not issue a single horn-honking ticket. Those two cameras issued 27 during the same time last year.[34]

m.  There has been less diversion of traffic to the outer boroughs than expected, thus lessening potential traffic increases in those areas (which include environmental justice communities).[35] The recent National Bureau of Economic Research study confirmed that the Program has benefitted areas outside of the CBD as well, with highways and major roadways also seeing sustained speed improvements.[36]

n.  A recent Hunter College study found that truck volumes on MTA bridges and tunnels leading into and out of the Bronx and Staten Island remained essentially the same from January-February of 2024 to those months in 2025.[37] An MTA assessment shows that traffic volumes (cars and trucks) are slightly down on the Cross-Bronx Expressway, with speed increased.[38]

26.  While reducing congestion, the Program has shown no adverse effects on economic activity:

a.  Pedestrian traffic in Manhattan increased 4.6% between January 5 (the day that toll collection began) and January 31 compared to the same period in 2024.[39]

---

[33] Jose Martinez and Mia Hollie, *Honking Complaints Plunge 69% Inside Congestion Relief Zone*, (Mar. 11, 2025), (citing analysis of 311 call data); MTA Metrics, Reduction in Vehicle Entries to the CBD, https://metrics.mta.info/?cbdtp/vehiclereductions (last accessed Apr. 18, 2025).

[34] MTA Metrics, Reduction in Vehicle Entries to the CBD, https://metrics.mta.info/?cbdtp/vehiclereductions (last accessed Apr. 18, 2025).

[35] David Colon, *Data: Congestion Pricing Is Not Rerouting Traffic to Outer Boroughs*, STREETSBLOG (Mar. 12, 2025), https://nyc.streetsblog.org/2025/03/12/data-outer-borough-congestion-pricing-spillover-traffic-not-happening.

[36] Cody Cook et al., *The Short-Run Effects of Congestion Pricing in New York City*, NBER (Mar. 17, 2025), https://www.nber.org/system/files/working_papers/w33584/w33584.pdf.

[37] Roosevelt House Public Policy Institute at Hunters College, *Where have all the Trucks Gone? Truck Diversions through the Bronx and State*, https://www.roosevelthouse.hunter.cuny.edu/?forum-post=trucks-gone-truck-diversions-bronx-staten-island (last accessed Apr. 18, 2025).

[38] *See* MTA Metrics, Vehicle Reductions Traffic Patterns in the Bronx Post-Congestion Pricing presentation (Mar. 2025), a copy of which is annexed hereto as Exhibit J.

[39] *See Arun Venugopal*, Vehicle Traffic Is Down in Manhattan, But Pedestrian Traffic Is Up, Data Says, GOTHAMIST (Feb. 13, 2025), https://gothamist.com/news/vehicle-traffic-is-down-in-manhattan-but-pedestrian-traffic-is-up-data-says.

b. Hotel occupancy in the CBD was 73% in January 2025 compared to 70% in January 2024.[40]

c. The gross revenue of Broadway shows January-March 2025 was 25% higher than the same period last year, and attendance at Broadway shows was up 20% for January-March compared to this period of last year.[41]

d. Retail sales were up 1.5% in January and February – on track to be $900M higher this year than last.[42]

e. Leasing in the CBD was up 11% this January versus the fourth quarter of 2024, and up 80% since the first quarter of last year.[43]

f. Real estate availability is down.[44]

27.    As aptly stated by Kathryn Wylde, President and CEO of The Partnership for New York, since the initiation of congestion pricing, New Yorkers are "moving faster and there's less traffic."[45]

**B. TBTA and MTA Will Suffer Irreparable Harm if the Project Sponsors are Forced to Suspend the Program in Order to Avoid the Withholding of FHWA funding to the Project Sponsors**

28.    TBTA would incur substantial expenses which could not be recouped if the Project Sponsors are compelled to suspend the Program until a final decision in order for the Project Sponsors to avoid the loss of significant State funding.

---

[40] This is based on a March 10, 2025 internal analysis conducted by New York City Economic Development Corporation of CoStar data.

[41] This is based on a March 2025 internal analysis of data made publicly available by the Broadway League. *See* Research and Statistics, Grosses: Broadway in NYC, The Broadway League, https://www.broadwayleague.com/research/grosses-broadway-nyc/ (last accessed Apr. 18, 2025).

[42] This is based on a March 2025 internal analysis of Affinity Solutions Cards & Transactions data.

[43] Colliers, *Downtown NYC Office Market Report: 2025 Q1*, https://www.colliers.com/en/research/new-york/nyc-q1-2025-downtown-office-market-report (last accessed Apr. 18, 2025).

[44] Colliers, *Manhattan Monthly Snapshot: January 2025*, https://www.colliers.com/en/research/new-york/2025_01_manhattan-monthly-snapshot (last accessed Apr. 18, 2025).

[45] Dick Brennan, *President Trump said to have NYC's congestion pricing, bike lanes in his crosshairs*, CBS NEWS (Feb. 10, 2025), https://www.cbsnews.com/newyork/news/president-trump-nyc-congestion-pricing-bike-lanes/.

29.    TBTA has expended substantial taxpayer dollars in reliance on FHWA's repeated representations that the VPPP would encompass the Program, and in the agency's words, is the "best potential fit" for the Program. *See* Exhibit "C" at 1.

30.    TBTA budgeted and has expended over $500 million to establish the Program. These expenditures included developing the methodological approach; conducting the assessment and extensive outreach and developing the final documentation for the environmental review process under NEPA; design, development, implementation and testing of the roadway infrastructure and system; design, development, implementation and testing of the back-office system; additional extensive outreach for the State administrative review process; staff costs, including new staff for the Program; and consulting costs.

31.    Few if any of these costs would have been incurred had USDOT/FHWA taken the position at the beginning of the long and tortuous 5-year process it now takes—that the Program is not lawful under the VPPP because it utilizes cordon pricing to raise money for mass transit. They did not assert such illegality. Instead, as reflected in the Draft EA, the Final EA and the FONSI, the agencies specifically endorsed the goals and objectives of the Program and entered into a VPPP Agreement with the Project Sponsors.

32.    If the Program is temporarily suspended, all the benefits identified above would be lost: traffic would return, travel times would increase, emergency response times would lengthen, buses (including school buses) would face greater delays, and the streets would become less safe. The public would lose the benefits of congestion pricing, and thus the benefits reasonably expected to flow from the $500 million spent by TBTA for the Program, for at least the period of the suspension. These benefits could not be recouped.

33.     Moreover, if the Program is temporarily suspended, TBTA would incur roughly $12 million in additional expenditures per month, most of which would be related to a combination of the operations and maintenance of the roadside tolling system, the operations of the back-office system and customer contact center, and consultant costs. This figure does not include the costs related to additional staff that were brought on specifically for the Program nor other costs, such as those related to outreach and advertising and assessments to be undertaken for the Program. These costs cannot be deferred even if operation of the tolling is suspended. Further, these costs could not be paid by Program revenues, as there would be none during this period. These funds would be lost as a result of a suspension.

34.     Furthermore, a Program suspension would cause TBTA the loss of estimated monthly revenues from the first phase of the Program of over $50 million, based on revenues in January, February, and March 2025, which if annualized would meet the projected net annual revenues forecasted in Reevaluation 2 of roughly $500 million in the first phase.[46] These public dollars could never be recouped, even if the Program is restarted, as those months of tolling revenues would be lost forever.

35.     This loss of funds means that the MTA would, at a minimum, have to delay undertaking much-needed capital improvement to the mass transit system, including such undertakings as adding accessibility to numerous subway stations consistent with the Americans with Disability Act, improving outdated signaling and other improvements to system reliability,

---

[46]     *See* February 2025 Report of the MTA Finance Committee, https://www.mta.info/document/165106 (last accessed Apr. 18, 2025), March Report of the MTA Finance Committee Meeting, https://www.youtube.com/live/VuALrov3tBA?t=1812s (last accessed Apr. 18, 2025).

improving safety and customer service through technology, and extending public transit to under-served areas.[47]

### C. The Public Interest Strongly Favors a Preliminary Injunction

36.    Without an injunction, the Project Sponsors, as noted above, may be compelled to suspend the Program in order to avoid the loss of State funding. In that event, MTA, the recipient of Program revenues, could be prevented from proceeding with vitally important work under the MTA's 2020-2024 Capital Program, which is intended to ensure that improvements put in place will be sustainable for years to come. The total Capital Program is $55.6 billion. Of that amount, $52.2 billion is identified for critical investments in the region's subways, buses, and commuter railroad, nearly one-third of which would be supported by the Program. Key projects of the Capital Program, which would be delayed by a suspension that would halt Program tolling revenues, include those referenced in Paragraph 35, above.

37.    In addition, because MTA would be forced to halt operation of the Program, TBTA could not advance the $155 million package of regional and place-based mitigation for environmental justice communities to which the Project Sponsors committed in the Final EA, FONSI, and reevaluations, and which would address preexisting pollution and chronic health burdens in such communities, including particularly burdened environmental justice communities in New York and New Jersey.[48] Moreover, TBTA has already reached out to the environmental justice communities identified for place-based mitigation, to discuss which types of mitigation are most appropriate for each community. Such measures could include installing roadside vegetation,

---

[47] *See generally* MTA, 2020–2024 Capital Program: Exec. Summary (Oct. 1, 2019), https://files.mta.info/s3fs-public/2019-09/MTA%202020-2024%20Capital%20Program%20-%20Executive%20Summary.pdf (last accessed Apr. 18, 2025).
[48] Final EA Chapter 17, Environmental Justice at App. 17D-25–64, 74–80, https://www.mta.info/document/92741 (last accessed Apr. 18, 2025).

renovating parks and green space, and/or installing air filtration units in schools near highways. Delay of the Program would necessarily stall these efforts.

38.     In contrast, the public would not be harmed by continued operation of the Program; rather, it would continue to receive the benefits of the Program set forth above. In addition, if it became necessary, there are mechanisms that allow TBTA to fully refund toll payers in the unlikely event that USDOT/FHWA prevail in this action. All eligible vehicles entering the CBD are charged and pay the applicable toll rate using one of two mechanisms. Toll payers with an E-ZPass account pay the toll using their E-ZPass account. If the vehicle is not associated with an E-ZPass account, the registered owner of the vehicle receives a toll bill in the mail. No matter what the method of payment by that toll payer, it is recorded. Because the Program uses these cashless methods of collection, no one pays with cash at a toll booth — an outdated method of collection that TBTA replaced at its bridge and tunnel facilities years ago.

39.     Between 92% and 95% of toll payers on current TBTA tolling facilities that enter Manhattan use E-ZPass, and it appears from data available to date that a significant majority of drivers use E-ZPass for the Program. If required for toll payers with a New York E-ZPass account, TBTA is able to refund any tolls paid by crediting such E-ZPass accounts. Toll payers who pay the toll through a non-New York E-ZPass account will be traceable by their respective state tolling agencies, and their payments will also be traceable by those agencies. Consistent with TBTA's prior practice when issuing refunds to toll payers who use a non-New York E-ZPass account, any such refunds can be issued to the respective state tolling agency, which would then reimburse the toll payer. For example, someone driving into the CBD from Delaware with a Delaware E-ZPass account would pay the toll amount to the Delaware state tolling agency. This agency would send the toll amount, on the toll payer's behalf, to TBTA. In turn, if required, TBTA can refund the

Delaware state tolling agency, which in turn could then credit the toll payer's account. Where warranted, TBTA already routinely reconciles New York E-ZPass accounts and non-New York E-ZPass accounts in the ordinary course of business in this manner for bridge and tunnel facilities; Program toll reconciliation would be no different.

40.    The remaining toll payers who do not use E-ZPass are also traceable and can be refunded by the same mechanism that they use to pay their bill. Toll payers without E-ZPass receive a bill in the mail with a unique identifying bill number. These toll payers then have the option of paying that bill through credit card, cash at an authorized payment facility, or by mailing in a check. If a toll payer has paid their bill, and thus paid the toll, TBTA can refund the toll payer by reversing the charges if they used a credit card, or by issuing a refund check if the toll payer paid by cash or check.

41.    In summary, it bears emphasizing that a suspension of the Program would delay the extensive benefits to the public that accompany the Program—and thus the benefits that would otherwise flow from these large-scale expenditures, such as making subway stations accessible to the disabled. Delaying implementation of the Program means the reinstitution of the severe congestion in the CBD, with its concomitant economic and environmental costs to businesses, residents, commuters, workers, and visitors in this area.  Congestion in the CBD has been a $20 billion annual drag on the region's, and thus the country's, economy.[49] And as the most congested urban area in the country, travel times—including for public buses and emergency vehicles, are extraordinarily slow.[50] Delay of the Program would mean the continuation of these conditions, and

---

[49] Final EA Chapter 1, Introduction at 1-12, https://www.mta.info/document/92761 (last accessed Apr. 18, 2025).
[50] *Id*. at 1-1.

harm to the public, while allowing the Program to proceed pending a final decision on the merits would cause no harm to USDOT or FHWA.


Dated:    May 4, 2025
          New York, New York                    Allison L. C. de Cerreño, Ph.D.