UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

METROPOLITAN TRANSPORTATION AUTHORITY and TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY,

                *Plaintiffs*,

and

NEW YORK STATE DEPARTMENT OF TRANSPORTATION, RIDERS ALLIANCE, SIERRA CLUB, and NEW YORK CITY DEPARTMENT OF TRANSPORTATION,

                *Intervenor-Plaintiffs*,

v.

SEAN DUFFY, in his official capacity as Secretary of the United States Department of Transportation, GLORIA M. SHEPHERD, in her official capacity as Executive Director of the Federal Highway Administration, UNITED STATES DEPARTMENT OF TRANSPORTATION, and FEDERAL HIGHWAY ADMINISTRATION,

                *Defendants*.

Case No. 25 Civ. 1413 (LJL)

**DECLARATION OF WILLIAM CARRY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

**DECLARATION OF WILLIAM CARRY**

I, William Carry, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am the Assistant Commissioner for Policy for the New York City ("City") Department of Transportation ("City DOT"). City DOT is responsible for one of the most complex urban transportation networks in the world, including 6,300 miles of streets and highways, approximately 800 bridges and tunnels, and 13,500 signalized intersections. I submit this

1

Declaration in support of the Plaintiffs' request for a preliminary injunction and/or temporary restraining order.

2. The facts set forth herein are based on my personal and professional knowledge, conversations with relevant City DOT staff, and a review of records in City DOT's possession.

3. As part of my work at City DOT, I have knowledge of federal competitive grants, formula funds, and cooperative agreements awarded to the City of New York and administered by City DOT, including those from the United States Department of Transportation ("USDOT") through the Federal Highway Administration ("FHWA"), and those passed to City DOT through the New York State Department of Transportation ("State DOT").

**The April 21, 2025 Letter**

4. On April 21, 2025, City DOT received a letter from United States Secretary of Transportation Sean Duffy (the "April 21 Letter") which warned that if it "determines that New York is out of compliance with 23 U.S.C. § 301… FHWA will implement appropriate initial compliance measures beginning on or after May 28, 2025," and that those measures would roll out in separate tranches. In the first tranche, the letter states the measures would include:

- "No further advance construction ("AC") authorizations for projects within the borough of Manhattan, except for projects determined by FHWA to be essential for safety ("Safety Projects").[1]
- No further National Environmental Policy Act ("NEPA") approvals for projects within the borough of Manhattan, except for Safety Projects.
- No further approvals of Statewide Transportation Improvement Program ("STIP") amendments concerning New York Metropolitan Transportation Council ("NYMTC") TIP modifications."

The letter also explains that, continuing "non-compliance" could result in FHWA launching a second tranche of "measures", including if the State's "non-compliance continues …, :

---

[1] According to the April 21 Letter, "Safety Projects include projects under the National Highway Performance Program, Bridge Formula Program, and Highway Safety Improvement Program."

- "No further obligations of FHWA funds (both formula and competitive) for projects within New York City, except for Safety Projects.
- No further AC authorizations for projects within New York City, except for Safety Projects.
- No further NEPA approvals for projects within New York City, except for Safety Projects."

Programs cited to in the April 21 Letter are discussed in some greater detail below.

**Federal Transportation Programs In New York City**

5. Transportation projects are complex and often take years of planning before construction begins. Projects are typically identified, developed, and funded over several years, or even decades, and involve close coordination by partners at the local, state and federal levels. Like other local governments, the City of New York identifies projects for which it prepares preliminary designs and cost estimates, which it presents to its state and federal partners. State DOT and USDOT work with the City as projects advance – or fall out of – review and approval processes that are unique to each federal funding stream.

6. Federal funds are essential to advance significant capital improvements to bridges, roads, public spaces, and sidewalks throughout the City. Separate federal programs enable the City to keep existing infrastructure in a good state of repair, and expand access to people with mobility challenges consistent with legal requirements such as the Americans with Disabilities Act. Funding decisions are often made after there has been back and forth between the governmental partners and practical impediments are identified and assessed.

7. The April 21 letter identifies three USDOT activities that will be curtailed if USDOT finds that the CBDTP tolls federal-aid highways without authorization. Each are discussed below.

8. Advance construction authorizations allow projects to begin without sufficient Federal-aid obligation authority to cover the Federal share of project costs. Without advance

construction authorization, the local sponsor must set aside the full amount of the project's costs (including the share that the federal government is obligated to fund) before starting projects. As a result, a local agency can undertake fewer concurrent projects, and larger projects may crowd out the ability to maintain sufficient obligational authority for smaller ones. Thus, curtailing advance construction authorizations for transportation projects in New York City would immediately reduce City DOT's flexibility in its extensive transportation funding program.

9. NEPA refers to the National Environmental Policy Act, which requires that the policies, regulations, and laws of the Federal Government be interpreted and administered in accordance with its environmental protection goals. The lead Federal agency is required to work cooperatively with other Federal, state, and local agencies to prepare environmental reviews assessing proposed projects' impacts. These coordinated reviews can include input from the public, as well as from other agencies, and are a prerequisite to federal discretionary action. A pre-determination by a federal agency to preemptively withhold NEPA approvals would effectively halt projects in the pipeline where federal funding or approvals are necessary in order to undertake the anticipated work.

10. The Statewide Transportation Improvement Program ("STIP") is a comprehensive list of all projects or project phases in New York State proposed to receive Federal funding, pursuant to Title 23 U.S.C. and 49 U.S.C. Chapter 53, during a given four-year period. The most recent STIP for New York State was formally approved on December 23, 2022. The STIP includes highway, transit and non-motorized projects as well as urban and rural projects. The New York Metropolitan Transportation Council is responsible for developing the Transportation Improvement Program ("TIP", or 4-year plan) for New York City, Long Island and the lower Hudson Valley. A blanket refusal to approve STIP projects would essentially block any new

projects from entering the federal fund eligibility pipeline. Furthermore, to the extent that major modifications are required for projects, amendments to the TIP/STIP are necessary before those modifications are eligible for federal funds.

11. I understand that the federal government has stated that "Safety Projects" are exempt from the threatened curtailment, and that the carve-out includes those that fall under the National Highway Performance Program, Bridge Formula Program, and Highway Safety Improvement Program. However, the letter also suggests that FHWA will determine in the first instance which projects qualify as important for public safety. This risks that a project would not be found to be a "Safety Project" even if it primarily promotes public safety, and is funded through the programs named in the letter, which could stop NEPA review or threaten federal funding. Any new process that contemplates limiting the availability of federal funding outside the existing statutory framework in the above-mentioned programs, risks subjective curtailment despite their safety focus. Thus, conditioning funding of projects on a new, discretionary determination of their status as "Safety Projects" would also harm City DOT's ability to plan, budget, and ultimately execute its mission.

**Federal Contributions to City DOT's Capital Budget**

12. While the April 21 Letter addresses funding to State DOT, some of this funding is passed through to City DOT, and forms a crucial part of the agency's Capital Budget. City DOT receives, on average, approximately $250 Million in FHWA funding each year across both capital and expense projects.

13. In Manhattan alone, multiple major projects could be immediately affected by the threatened curtailment of funding and approvals. The Trans Manhattan Expressway, a roughly $470 Million project, is currently in the preparatory stages of seeking review under NEPA. This

project will rebuild the ramp connecting the Harlem River Drive to the Trans-Manhattan Expressway in Upper Manhattan. The ramp structure was originally constructed in 1939 by the Port Authority, and has thus been in operation for 80 years and is nearing the end of its intended service life. I understand that the federal government may refuse to process further NEPA approvals or federal funding for the project, which is expected to cover about $98 Million of the project cost. If either or both actions are taken by the federal government, City DOT would be unable to make important improvements to the Expressway. Notably, the project is in far Northern Manhattan, and is not subject to the CBDTP tolls. And while the project should qualify as a Safety Project, not every component is safety related. Any determination by USDOT that some part or all of the project may be curtailed because it is not safety related would threaten City DOT's ability to proceed with this important project.

14.     Similarly, two other projects involve reconstructing streets near the New York Public Library ($9.5 Million) and at Delancey Street in the Lower East Side ($41 Million) to improve pedestrian safety. Each of these projects is in the final phase of design, approaching the construction phase. Delancey Street, in particular, is classified as being among the top 10% of high-crash corridors in the borough. By expanding public space, installing proven safety treatments, and providing multimodal transit infrastructure, the Delancey Street Reconstruction project will transform a half mile urban highway into a safer, more accessible, and resilient streetscape for all users. The project will also include critical subsurface utility and infrastructure upgrades to a 100+ year old roadway, which, if left unaddressed, can lead to street failure events such as sinkholes. City DOT expects to solicit bids for construction in Summer 2025; however, the threatened additional discretionary review to determine whether this project is a Safety Project could threaten this timeline, and an adverse determination could yield months of delay. Such a

delay could result in cascading delays, coupled with inflation and other cost increases. Any delay to this project—either by curtailing its funding or approvals, or by requiring the City to demonstrate that it is an exempt "Safety Project"—will deprive New Yorkers of long promised critical safety, accessibility and infrastructure upgrades.

15. Similarly, the "Safe Routes to School" Manhattan capital project is dedicated to pedestrian safety and safe streets near schools in underserved areas. This project will provide critical safety improvements at 19 intersections in the vicinity of seven different schools, all located in upper Manhattan. This project is currently scheduled to start construction in 2026, and delaying the work would deprive New Yorkers – especially children and their families - of critical safety improvements. Even withholding funding for a few months would introduce uncertainty and delay to the project which would ultimately harm the City's ability to complete it.

16. In further tranches, the April 21 Letter anticipates expanding its curtailment beyond Manhattan to the remainder of New York City. This could threaten federal matching funds for more than 20 projects, with a combined cost of over $3.1 Billion, and a combined federal share of about $570 Million. The projects include efforts intended to improve safer public streets and sidewalks near public schools and other community facilities like public libraries, and important bridge and roadway rehabilitation projects.

17. Another project potentially subject to federal curtailment of funding and approvals is the reconstruction of the Shore Road Bridge in the borough of the Bronx. This roughly $545 Million project would replace a movable bridge—one of the most frequently opened in the City—that was designed to standards in place over 110 years ago. Delaying the environmental reviews for this project, withholding the roughly $130 Million federal cost-share, or requiring the City to demonstrate to FHWA's discretionary satisfaction that the this is a "Safety Project" would harm

City DOT's ability to execute this necessary replacement because it slows the ability to design and advance the project through the review process while adding construction and other inflationary costs that are regularly incurred over time.

18.    Similarly, the Secretary's threatened enforcement could impact the rehabilitation of West Tremont Avenue Bridge over the Metro-North Railroad Hudson Line and the Major Deegan Expressway. This roughly $95 Million project, of which the federal government is to fund approximately $73 Million, or 77%, is currently undergoing final design.

**Impacts of Federal Enforcement**

19.    The threatened curtailment of federal funds and approvals to State DOT for projects in Manhattan, and, eventually, New York City as a whole, would irreparably harm City DOT by preventing the commencement and completion of current and future projects necessary to its mission of providing for the safe, equitable, and sustainable movement of people and goods and the creation of public spaces that would otherwise strengthen our communities. Eventually, the curtailment of the threatened funds would lead to projects being delayed or abandoned altogether, and associated cost increases even if funding were later restored. A long-term curtailment of funds could lead to the cancellation of projects necessary for keeping transportation infrastructure in a state of good repair, the loss of staff needed to maintain and improve infrastructure, and the need to forego other projects that would otherwise improve the lives of New Yorkers, commuters, and those traveling to our through the City.  It would also impact City DOT's collaborative work with local vendors, subcontractors, and the Transportation departments of connected jurisdictions.

20.    If this enforcement is allowed to occur during the pendency of this litigation, the effects would be immediate, and the resulting delays and cost escalations could not be remedied after a final determination on the merits, and could force the City to choose between substituting

City funds to keep necessary projects on track, and keeping the City's other infrastructure in a state of good repair. To be clear, as described above, the termination of the City's access to federal transportation funding—even for a few months—could have far-reaching consequences for the City of New York. It would reduce City DOT's ability to fulfill its mission, to the detriment of the City of New York's vitally important roads, sidewalks and bridges.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on May 5, 2025, at New York, NY.

_____
William Carry