UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X

METROPOLITAN TRANSPORTATION
AUTHORITY, *et al.*,

                *Plaintiffs,*

RIDERS ALLIANCE, *et al.*,
                                       No. 1:25-cv-1413-LJL

              *Intervenor-plaintiffs,*

          v.

SEAN DUFFY, in his official capacity as Secretary
of the United States Department of
Transportation, *et al.*,

                *Defendants.*
------------------------------------------------------------------------ X

# MEMORANDUM OF LAW IN SUPPORT OF INTERVENOR-PLAINTIFF NEW YORK STATE DEPARTMENT OF TRANSPORTATION'S MOTION FOR A PRELIMINARY INJUNCTION

LETITIA JAMES
Attorney General of the State of New York
New York State Attorney General's Office
28 Liberty Street
New York, New York 10005
(212) 416-8271

Andrew G. Frank,
  Assistant Attorney General
*Of Counsel*

May 5, 2025

# **TABLE OF CONTENT**S

<u>Page</u>

TABLE OF AUTHORITIES.............................................................................................ii

PRELIMINARY STATEMENT ..................................................................................... 1

STATUTORY BACKGROUND..................................................................................... 2

A.     Federal Highway and Transit Funding to New York .......................................... 2

B.     The Impoundment Control Act ............................................................................. 5

FACTUAL BACKGROUND .......................................................................................... 5

A.     The Process by Which State DOT Receives Federal Funds ............................... 6

B.     US DOT's Threatened Actions ........................................................................... 7

ARGUMENT ................................................................................................................... 9

I.     STATE DOT IS LIKELY TO SUCCEED ON THE MERITS......................... 10

II.     THE ACTIONS THREATENED BY SECRETARY DUFFY WILL
       CAUSE IRREPARABLE HARM ..................................................................... 15

III.    THE PUBLIC INTEREST AND EQUITIES FAVOR A
       PRELIMINARY INJUNCTION ....................................................................... 22

CONCLUSION............................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

<u>Pages</u>

### FEDERAL DECISIONS

*City & Cty. of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) ........................................................................ 11

*Colorado v. U.S. Env't Prot. Agency*,
  989 F.3d 874 (10th Cir. 2021) ........................................................................ 9

*County of Santa Clara v. Trump*,
  250 F. Supp. 3d 497 (N.D. Cal. 2017), *recons. denied*,
  267 F. Supp. 3d 1201 (N.D. Cal. 2017), *appeals dismissed as
  moot*, Nos. 17-16886, 17-16887, 2018 WL 1401847 (Jan. 4, 2018) ................ 16

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
  481 F.3d 60 (2d Cir. 2007) .............................................................................. 15

*In re Aiken Cty.*,
  725 F.3d 255 (D.C. Cir. 2013) ................................................................... 10, 14

*Issa v. Sch. Dist. of Lancaster*,
  847 F.3d 121 (3d Cir. 2017) ............................................................................ 22

*Jones v. Wolf*,
  467 F. Supp. 3d 74 (S.D.N.Y. 2020) ............................................................... 23

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ............................................................... 22, 23, 24

*Louisiana v. Biden*,
  622 F. Supp. 3d 267 (W.D. La. 2022) ............................................................. 23

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
  No. CV 25-239, 2025 WL 597959 (D.D.C. Feb. 25, 2025),
  *clarification denied*, 2025 WL 829677 (Mar. 14, 2025),
  *appeal filed*, No. 25-5148 (D.C. Cir. Apr. 25, 2025) ....................................... 23

*Nat. Res. Def. Council, Inc. v. Abraham*,
  355 F.3d 179 (2d Cir. 2004) ............................................................................ 10

Pages

*New York v. Trump,*
　No. 25-CV-39-JJM-PAS, 2025 WL 715621 (D.R.I. Mar. 6, 2025),
　*reconsideration on other grounds denied,* 2025 WL 1098966
　(Apr. 14, 2025), *appeals filed, New York v. Trump,* No. 25-1236
　(1st Cir. Feb. 10, 2025), *Heghmann v. Trump,* No. 25-8010
　(1st Cir. Mar. 6, 2025) ...................................................................... 11, 14, 15, 16, 24

*New York v. U.S. Dep't of Homeland Sec.,*
　969 F.3d 42 (2d Cir. 2020) .................................................................... 9, 17, 22

*Nnebe v. Daus,*
　510 F. Supp. 3d 179 (S.D.N.Y. 2020), *aff'd,*
　Nos. 21-170-cv, 21-170-cv, 2022 WL 1220204
　(2d Cir. Apr. 26, 2022) ............................................................................................. 9

*Pac. Merch. Shipping Ass'n v. Goldstene,*
　639 F.3d 1154 (9th Cir. 2011) ......................................................................... 23

*Pennhurst State School  & Hospital  v. Halderman,*
　451 U.S. 1 (1981) ................................................................................................ 15

*Planned Parenthood of N.Y.C. v. U.S. Dep't of Health & Human Servs.,*
　337 F. Supp. 3d 308 (S.D.N.Y. 2018) ............................................................. 24

*R.I.L-R v. Johnson,*
　80 F. Supp. 3d 164 (D.D.C. 2015) ................................................................... 24

*Rodriguez v. Robbins,*
　715 F.3d 1127 (9th Cir. 2013) ......................................................................... 24

*Saget v. Trump,*
　375 F. Supp. 3d 280 (E.D.N.Y. 2019) ............................................................. 22

*Sierra Forest Legacy v. Sherman,*
　951 F. Supp. 2d 1100 (E.D. Cal. 2013) .......................................................... 23

*State Highway Comm'n v. Volpe,*
　479 F.2d 1099 (8th Cir. 1973) ................................................................... 3, 12

Pages

*Ward v. Brown,*
    22 F.3d 516 (2d Cir 1994) ........................................................................ 17

*Washington v. Reno,*
    35 F.3d 1093 (6th Cir. 1994) .................................................................. 23

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ..................................................................................... 9

*Yang v. Kosinski,*
    960 F.3d 119 (2d Cir. 2020) .................................................................. 22

## FEDERAL STATUTES

Impoundment Control Act, 2 U.S.C.
    § 681(4) .................................................................................................... 5
    § 682(1) .................................................................................................... 5
    § 684(a) .............................................................................................. 5, 15
    § 684(b) .............................................................................................. 5, 14

Administrative Procedure Act, 5 U.S.C.
    § 705 ................................................................................................ 1, 9, 25
    § 706(2) .................................................................................................. 10

Federal-Aid Highway Act, 23 U.S.C.
    § 101 *et seq.* .......................................................................................... 2
    § 101(c) .................................................................................................. 13
    § 104(b) ............................................................................................. 3, 12
    § 104(c) .................................................................................................... 3
    § 104(h) .................................................................................................... 4
    § 105(a) .................................................................................................... 3
    § 106(a) .............................................................................................. 3, 4
    § 115 ........................................................................................................ 7
    § 129 ........................................................................................................ 7
    § 176 ........................................................................................................ 3
    § 301 ........................................................................................................ 7

<u>Pages</u>

Federal Transit Act, 49 U.S.C.
§ 5301 *et seq* ............................................................................................ 2
§ 5310(c) ........................................................................................... 4, 13
§ 5311(c) ........................................................................................... 4, 13
§ 5329(e) ........................................................................................... 4, 12
§ 5338(d) ................................................................................................ 4

Multimodal Infrastructure Investments, 49 U.S.C.
§ 6701 .............................................................................................. 4, 13
§ 6701(b) ............................................................................................... 4
§ 6701(d) ............................................................................................... 4
§ 6701(m) .............................................................................................. 4

Intermodal Surface Transportation Efficiency Act of 1991, Pub. L. 102-240
§ 1012(b), 23 U.S.C. § 149 note ........................................................ 14

# FEDERAL REGULATIONS

23 C.F.R.
§ 1.36 .................................................................................................. 14
§ 450.218 ............................................................................................... 6
§ 450.218(b) ........................................................................................... 6
§ 450.218(k) ........................................................................................... 6
§ 450.222(a) ........................................................................................... 6

# FEDERAL RULES

Federal Rules of Civil Procedure
65(a) ............................................................................................. 1, 9, 25

## PRELIMINARY STATEMENT

On February 19, 2025, Secretary of Transportation Sean Duffy notified New York Governor Kathy Hochul that he was purportedly terminating a cooperative agreement ("VPPP Agreement") through which the Federal Highway Administration ("FHWA") provided federal approval for congestion pricing in Manhattan and directed her to stop congestion pricing by March 20, which he later extended to April 20.  Even though State DOT has challenged that purported termination in this Court, on April 21, 2025 Secretary Duffy sent a letter to Governor Hochul directing intervenor-plaintiff New York State Department of Transportation ("State DOT") to "show cause" by May 21 why the Federal Highway Administration ("FHWA") should not take action against the State for continuing the congestion pricing program. Secretary Duffy also stated that FHWA would place a moratorium on approvals that are needed to obtain federal funds for highway and transit projects in the New York City area beginning May 28 and would expand that moratorium statewide if congestion pricing continued.

State DOT seeks a preliminary injunction under Federal Rule of Civil Procedure 65(a) and preliminary relief under 5 U.S.C. § 705 prohibiting defendants (together, "US DOT")  from taking the actions threatened in Secretary Duffy's April 21 letter or any other action or withholding of action against State DOT for continuing the congestion pricing program while this lawsuit is pending. The Court should grant that relief because State DOT is likely to be successful on the merits and will suffer irreparable harm if the relief is not granted, and because the public

interest and equities favor granting that relief.

State DOT is likely to be successful on the merits because a federal agency may not withhold funds that Congress has appropriated and the retaliatory moratorium that Secretary Duffy has threatened will do just that. Even if US DOT had authority to withhold funds—which it does not—it may not do so based on the purported termination of the VPPP Agreement because the termination was arbitrary and capricious.  US DOT's threatened retaliation will delay essential transportation projects in New York, causing irreparable harm to State DOT and the people of New York, including increased congestion and risk of traffic accidents; non-compensable economic losses, and significant administrative burdens.  And a preliminary injunction will serve the public interest by allowing State DOT to continue activities that protect public safety, the economy and jobs and requiring US DOT to abide by the law, both of which outweigh any interest US DOT may have in withholding federal funds from State DOT.

## STATUTORY BACKGROUND

### A.    Federal Highway and Transit Funding to New York

The funds that US DOT has threatened to withhold from NY DOT are primarily distributed to States by FHWA under the Federal-Aid Highway Act, 23 U.S.C. § 101 *et seq.* ("Highway Act") but some are distributed by the Federal Transit Administration ("FTA") under the Transit Act. 49 U.S.C. § 5301 *et seq*.  *See* Declaration of Janet Ho ("Ho Decl.") ¶¶ 21-24 (May 5, 2025). Those funds are mainly "formula funds" or "formula grants" but also include competitive grants.   The

Highway and Transit Act mandate the disbursement of formula funds and grants to States and establish the requirements imposed on competitive grants.

*Formula funds and grants.* 23 U.S.C. § 104(b) provides that "[t]he Secretary [of Transportation] *shall* distribute the amount of the base apportionment apportioned to a State for a fiscal year" (emphasis added) for the programs covered by § 104(c)—national highway performance; surface transportation block grants; highway safety improvement, congestion mitigation and air quality improvement; national highway freight; carbon reduction; PROTECT (Promoting Resilient Operations for Transformative, Efficient, and Cost-saving Transportation, *see* 23 U.S.C. § 176); and metropolitan transportation planning. The "base apportionment" is "the combined amount authorized for appropriation" for those programs. *Id.* § 104(h). Section 104(c) establishes a formula for apportioning those grants or funds among the States. Thus, "[b]ased upon specific formulas set forth within the [Highway] Act, the Secretary [of Transportation] is required to apportion among the several states certain sums authorized to be appropriated for expenditure" under 23 U.S.C. § 104(b). *State Highway Comm'n v. Volpe*, 479 F.2d 1099, 1107 (8th Cir. 1973).

"After the apportionment, the states, through their respective highway departments, are to submit programs of proposed projects based upon the apportioned funds," and "[t]he Secretary is instructed in Section 105(a) to 'act upon programs submitted to him as soon as practicable after the same have been submitted.'" *Id.* at 1107-08. "Section 106(a) then provides that 'as soon as practicable after program approval,' specific 'surveys, plans, specifications, and estimates for

3

each proposed project' will be submitted to the Secretary for his approval. In this regard, Section 106(a) specifically states that in approving the project plans 'the Secretary shall be guided by the provisions of section 109 of this title.'" *Id.* at 1108. "It is at this stage that the contract controls are imposed, for once a project is approved by the Secretary it 'shall be deemed an obligation of the Federal Government for the payment of its proportional contribution thereto.'" *Id.* (citing 23 U.S.C. § 106(a)).

Formula grants to States are also made under the Transit Act. For example, 49 U.S.C. § 5329(e)(6)(A) provides that the Secretary "shall make grants" for public transportation safety oversight; § 5310(c)(1) provides that the Secretary "shall apportion" grants for projects facilitating the enhanced mobility of seniors and individuals with disabilities; and § 5311(c)(4)(B) provides a formula for the apportionment of grants for rural areas among the States. The Transit Act funds and grants that US DOT has withheld also constitute obligations of the federal government. *See* 49 U.S.C. § 5338(d)(1).

*Competitive grants.* The competitive grant programs established by the Highway and Transit Acts dictate the criteria that FHWA and FTA may consider when they award those grants. For example, the Transit Act establishes the National Infrastructure Project Assistance program, which provides that $2,000,000,000 will be appropriated annually from 2022 to 2026 for competitive grants awarded to States and other entities for eligible projects. 49 U.S.C. § 6701(b), (d), (m). Once a grant is awarded, a grantee is required to enter into a grant agreement. *Id.* § 6701.

4

B.    <u>**The Impoundment Control Act**</u>

When applicable, the Impoundment Act authorizes the President to withhold funds that Congress has appropriated. That authority does not, however, "supersed[e] any provision of law which requires the obligation of budget authority or the making of outlays thereunder." 2 U.S.C. § 681(4).

Where the Impoundment Act is applicable and the President or another federal officer or agency "proposes to defer any budget authority provided for a specific purpose or project," the Act provides that the President "shall transmit" to Congress a "special message" that provides the details of the deferral. 2 U.S.C. § 684(a). The Act provides further that a "deferral shall be permissible only—

(1)    to provide for contingencies;

(2)    to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or

(3)    as specifically provided by law."

*Id.* § 684(b). A "deferral of budget authority" includes "withholding or delaying the obligation or expenditure of budget authority (whether by establishing reserves or otherwise) provided for projects or activities." *Id.* § 682(1)(A).

## FACTUAL BACKGROUND

State DOT incorporates by reference the background section of the Metropolitan Transportation Authority's ('MTA") memorandum of law in support of its motion for a preliminary injunction. Mem. of Law in Support of Plaintiffs the Metropolitan Transportation Auth. and Triborough Bridge and Tunnel Auth. and

Intervenor-Plaintiff N.Y.C. Dept. of Transportation's Mot. for a Prelim Inj. ("MTA Br."). at 6-20 (May 5, 2025) [ECF No. 83].

## A.    The Process by Which State DOT Receives Federal Funds

Once Congress has appropriated formula funds to State DOT under the Highway Act or the Transit Act, State DOT must take several actions to obtain FHWA's or FTA's approval of specific projects or programs. First, to be eligible for funds administered by FHWA or the FTA, a project must be included in the "State Transportation Improvement Plan" ("STIP"). 23 C.F.R. § 450.222(a); *see also id.* § 450.218 (describing STIPs). The STIP includes Transportation Improvement Plans ("TIPs") formulated by metropolitan areas and is developed in consultation with officials from nonmetropolitan areas and with tribal governments. *Id.* § 450.218(b). Projects in the STIP are required to be consistent with "the long-range statewide transportation plan" and, in metropolitan areas, with "an approved metropolitan transportation plan." *Id.* § 450.218(k). When a project is added to the STIP, State DOT is required to state the funding source, including any federal funding. Ho Decl. ¶ 32.

Second, as explained above (at 3-4), State DOT needs to submit surveys, plans, specifications, and estimates to FHWA or FTA. *State Highway Comm'n*, 479 F.2d at 1108. Third, State DOT needs to conduct an environmental review of the project or program under NEPA and submit the review to FHWA or FTA for approval. Ho Decl. ¶ 30. As also explained above (at 4), once a program or project is finally approved, the federal funds are obligated.

If the State DOT decides that it would like to proceed with a project for which FHWA funds are planned to be used, before federal funds are obligated, it can seek "advance construction" authorization from FHWA and start the project before federal funds are obligated.  *Id.* ¶ 31. *See also* 23 U.S.C. § 115.

## B.    US DOT's Threatened Actions

On March 20, 2025, Secretary Duffy posted on X an apparent threat that US DOT might withhold unspecified federal funding from the State unless the congestion pricing program is ended.  Specifically, he stated that "billions of dollars the federal government sends to New York are not a blank check," and "continued noncompliance" with his directive to cease congestion tolling "will not be taken lightly." Declaration of D. Brandon Trice ("Trice Decl.") (May 5, 2025), Ex. 7 [ECF No. 87-7].  On April 8, 2025, US DOT posted another threat on X, warning that "USDOT will not hesitate to use every tool at our disposal in response to non-compliance later this month."  *Id.*, Ex.9 [ECF No. 87-9].

On April 21, 2025, Secretary Duffy sent a letter directing State DOT to "show cause" by May 21, 2025 that congestion pricing in Manhattan does not violate 23 U.S.C. § 301, which prohibits tolls on federal-aid highways except as provided under 23 U.S.C. § 129.  Trice Decl., Ex. 10 at 1 ("April 21 Letter") [ECF No. 87-10].  US DOT stated further that, if it determined that the State was violating § 301, it would implement three stages of actions until "compliance is achieved."  *Id.* at 2. The initial actions were:

- No further advance construction ("AC") authorizations for projects within the borough of Manhattan, except for projects determined by FHWA to be essential for safety ("Safety Projects").

- No further National Environmental Policy Act ("NEPA") approvals for projects within the borough of Manhattan, except for Safety Projects.

- No further approvals of Statewide Transportation Improvement Program ("STIP") amendments concerning New York Metropolitan Transportation Council ("NYMTC") TIP modifications."

*Id.*

"If New York's noncompliance continues, FHWA may consider imposing additional measures such as":

- No further obligations of FHWA funds (both formula and competitive) for projects within New York City, except for Safety Projects.

- No further AC authorizations for projects within New York City, except for Safety Projects.

- No further NEPA approvals for projects within New York City, except for Safety Projects."

*Id.*  Finally, if the congestion pricing in Manhattan does not end, these actions may be expanded to other geographic areas within the State.  *Id.*  The letter did not specify any schedule for these escalating retaliatory actions.

If amendments to the STIP, NEPA approvals, and obligations of funds do not move forward, State DOT will lose access to many millions of dollars of federal funds that it relies on to provide essential transportation resources, which will cause irreparable harm to the State and its residents.  That harm includes increased congestion, air pollution, and risk of traffic accidents; lost jobs and economic development opportunities; increased costs to State DOT; and significant administrative burdens on State DOT.  Ho Decl. ¶¶ 38, 41, 43, 44, 55, 56, 63.

# ARGUMENT

A preliminary injunction is warranted under Rule 65(a) where the moving party establishes that (1) it is likely to succeed on the merits; (2) irreparable harm is likely in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Where, as here, the government is a party to the suit, the final two factors merge." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58-59 (2d Cir. 2020); *see also Nnebe v. Daus*, 510 F. Supp. 3d 179, 189 (S.D.N.Y. 2020), *aff'd,* Nos. 21-170-cv, 21-170-cv, 2022 WL 1220204 (2d Cir. Apr. 26, 2022). A stay under 5 U.S.C. § 705 is warranted for the same reasons. *Colorado v. U.S. Env't Prot. Agency*, 989 F.3d 874, 883 (10th Cir. 2021).

This motion meets each of these factors. State DOT is likely to succeed on the merits of its challenge to the actions threatened in Secretary Duffy's April 21 letter because US DOT lacks constitutional and statutory authority to take those actions, and even if it had authority, those actions are arbitrary and capricious because they are based on the purported termination of the VPPP Agreement, which was itself arbitrary and capricious. A preliminary injunction is necessary to avert irreparable harm because delays in transportation projects as a result of the measures that US DOT has threatened will lead to, among other harms, increased congestion and risk of traffic accidents; lost jobs; and significant administrative burdens on State DOT. The balance of equities and public interest also tip in State DOT's favor.

# I

## STATE DOT IS LIKELY TO SUCCEED ON THE MERITS.

Under the Administrative Procedure Act, a court must "hold unlawful and set aside agency action" that the court finds to be, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  State DOT is likely to succeed on the merits of its challenge to the actions that Secretary Duffy threatened to take in his April 21 letter because US DOT does not have authority to prevent the disbursement of formula funds or competitive grant funds to State DOT.

It is a "well-established principle that an agency literally has no power to act . . . unless and until Congress confers power upon it." *Nat. Res. Def. Council, Inc. v. Abraham*, 355 F.3d 179, 202 (2d Cir. 2004) (quotation marks and citations omitted).  In the appropriations context, it is a "settled, bedrock principle[] of constitutional law" that, "[u]nder Article II of the Constitution and relevant Supreme Court precedents, the President must follow statutory mandates so long as there is appropriated money available and the President has no constitutional objection to the statute." *In re Aiken Cty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.) (emphasis omitted).  When the President wants "to spend less than the full amount appropriated by Congress," he may do so only under the Impoundment Act, *id.* at 261 n.1—which US DOT has not invoked here and in any event does not apply here.

Thus, the executive branch may not withhold formula funds from States because "Congress has mandated that the Executive spend appropriated funds according to [the] prescribed statutory formula, thus leaving [the Secretary] with no discretion to deviate from such formula." *New York v. Trump*, No. 25-cv-39-JJM-PAS, 2025 WL 715621, at *11 (D.R.I. Mar. 6, 2025) (*"Trump"*), *reconsideration on other grounds denied*, 2025 WL 1098966 (Apr. 14, 2025), *appeals filed*, *New York v. Trump*, No. 25-1236 (1st Cir. Feb. 10, 2025), *Heghmann v. Trump*, No. 25-8010 (1st Cir. Mar. 6, 2025).  The executive branch also may not withhold federal grant funds from a local government on the ground that the local government has not complied with an unrelated federal requirement.  *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1234-35 (9th Cir. 2018) ("Because Congress did not authorize withholding of funds, the Executive Order [withholding federal grants from 'sanctuary jurisdictions that do not comply with federal immigration enforcement efforts] violates the constitutional principle of the Separation of Powers.").

Here, the actions threatened in Secretary Duffy's April 21 letter would prevent the disbursement of both formula funds and competitive grant funds to State DOT, in violation of the Highway and Transit Acts and Article II.  US DOT lacks authority to take those actions because it is mandated to disburse formula funds to State DOT and may withhold competitive grant funds only when State DOT has violated the terms of the grant, which Secretary Duffy does not allege State DOT has done.

First, the actions that Secretary Duffy threatened to take in his April 21 letter will prevent the disbursement of formula and competitive grant funds to State DOT.  Before funds for a specific project can be disbursed, FHWA must, among other things, (1) approve an amendment of the State's STIP to include the project; and (2) approve the obligation of the fund or grant.  *See* this brief above at 6. Secretary Duffy's April 21 letter threatens to stop issuing those approvals—specifically, to initially withhold approval of NEPA reviews in Manhattan and STIP amendments submitted by the New York Metropolitan Transportation Council; then to stop issuing NEPA approvals and approving obligations in all of New York City; and finally, to stop issuing all those approvals statewide, Duffy April 21 letter at 2— would prevent the disbursement of funds and grants, Ho Decl. ¶¶ 8, 40, 42, 45, 47-53.

Second, US DOT does not have authority to withhold formula funds or competitive grants from State DOT.  The statutory mandates requiring the disbursement of formula funds under the Highway and Transit Acts are clear.  23 U.S.C. § 104(b) provides that the Secretary "shall distribute" funds to States based on a formula for apportionment.  *See State Highway Comm'n v. Volpe*, 479 F.2d 1099, 1107 (8th Cir. 1973) ("Based upon specific formulas set forth within the Act, the Secretary is required to apportion among the several states certain sums authorized to be appropriated for expenditure") (citing § 104(b)). The provisions of the Transit Act under which State DOT receives formula grants impose similar mandates. 49 U.S.C. § 5329(e)(6) (the Secretary "shall make grants"); *id.*

§ 5310(c)(1) (the Secretary "shall apportion" amounts); *id*. § 5311(c)(4)(B) (providing a formula for the apportionment of grants).

Moreover, 23 U.S.C. § 101(c) provides that "[i]t is the sense of Congress that under existing law no part of any sums authorized to be appropriated for expenditure upon any Federal-aid highway which has been apportioned pursuant to the provisions of this title shall be impounded or withheld" except for funds that the Secretary of the Treasury, after consultation with the Secretary of Transportation, determines must "be withheld from obligation for specific periods of time to assure that sufficient amounts will be available in the Highway Trust Fund to defray the expenditures which will be required to be made from such fund." *See State Highway Comm'n*, 479 F.2d at 1115 ("When the provisions of the Federal-Aid Highway Act are considered as a whole, it is apparent that the Secretary does not have the authority to withhold funds for anti-inflationary purposes.").

The Highway Act and Transit Act also do not authorize US DOT to withhold competitive grant funds from State DOT. For example, State DOT has been awarded a competitive grant under the National Infrastructure Project Assistance Program. Ho Decl. ¶ 45; *see also* 49 U.S.C. § 6701. The requirements imposed on grantees under that program do not include any requirement that would allow US DOT to withhold funds from State DOT based on the purported termination of the VPPP Agreement, which governs a completely unrelated project. *See* 40 U.S.C. § 6701.

There is also no provision in the VPPP statute, ISTEA more broadly, or the VPPP Agreement authorizing US DOT to withhold funds from State DOT, much

less withhold highway and transportation funds that are unrelated to the VPPP—nor does Secretary Duffy claim that there is. *See* ISTEA § 1012(b), 23 U.S.C. 149 note; Pub. L. 102-240 (Dec. 18, 1991); First Am. Compl., Ex. B [ECF No. 62-2]. Secretary Duffy claims instead that 23 C.F.R. § 1.36 authorizes him to take the retaliatory actions he threatens in his April 21 letter but he needs *statutory* authority, not regulatory authority, to take actions that withhold funds appropriated by Congress, *see In re Aiken Cty.*, 725 F.3d at 259. Indeed, if the Secretary were right that 23 C.F.R. § 1.36 gave him the authority to withhold funds, every agency could circumvent the limited power that Article II grants to the executive branch, *see Aiken Cty.* at 259, by simply giving itself that authority. In any event, 23 C.F.R. § 1.36 does not grant the Secretary that authority for the reasons stated by MTA and Triborough. MTA Br. at 43-45.

Because Congress has mandated the disbursement of formula funds and grants to State DOT, US DOT does not have the authority to carry out its threatened actions. Even the Impoundment Act, which Secretary Duffy has not invoked or even attempted to follow, would not authorize those actions. The Impoundment Act authorizes a delay or deferral of funds only (1) "to provide for contingencies;" (2) "to achieve savings made possible by or through changes in requirements or greater efficiency of operations;" or (3) "as specifically provided by law." 2 U.S.C. § 684(b); *see also Trump*, 2025 WL 715621, at *10. None of those circumstances is present here. Moreover, to exercise the authority provided the Act,

the President is required to transmit a "special message" to Congress detailing the proposed deferral, *id.* § 684(a), which he did not do.

In short, the actions that Secretary Duffy threatened to take in his April 21 letter would prevent the disbursement of both formula funds and competitive grant funds to State DOT, in violation of the Highway and Transit Acts and thus of Article II. *See Trump*, 2025 WL 715621, at *11 (finding "sufficient evidence that, in implementing the funding freeze, the Agency Defendants withheld funding that Congress did not tie to compliance with the President's policy priorities") (emphasis omitted). Those threatened actions also violate the 'clear statement' rule in *Pennhurst State School  & Hospital  v. Halderman*, 451 U.S. 1, 25 (1981) and are unconstitutionally coercive  for the reasons stated by MTA and Triborough.  MTA Br. at 47-51.  In addition, even US DOT had statutory authority to take those actions and the actions were otherwise constitutional, they are arbitrary and capricious because they are based on the purported termination of the VPPP Agreement, which was itself arbitrary and capricious for the reasons stated by the MTA and Triborough, MTA Br. at 24-42.

## II

### THE ACTIONS THREATENED BY SECRETARY DUFFY WILL CAUSE IRREPARABLE HARM.

To establish irreparable harm, a party must demonstrate that it will suffer an "actual and imminent" injury that cannot be remedied "if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citation omitted).  If US DOT carries out the threats in

Secretary Duffy's April 21 letter, State DOT will not have access to millions of dollars of federal funds that it relies on to provide essential transportation resources, which will cause irreparable harm to the State and its residents.

Various States were recently granted preliminary relief enjoining a federal freeze of apportioned and obligated funds, including for critical transportation infrastructure, due in part to the irreparable harm that "States may have to suspend, delay or cancel [transportation] projects" and, more generally, due to the "chaos and uncertainty" caused to states by funding freeze. *Trump*, 2025 WL 715621, at *14-15; *see also id.* at 13 ("It is so obvious that it almost need not be stated that when money is obligated and therefore expected . . .and is not paid as promised, harm follows—debt is incurred, debt is unpaid, essential health and safety services stop, and budgets are upended"); *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017), *recons. denied*, 267 F. Supp. 3d 1201 (N.D. Cal. 2017), *appeals  dismissed as moot*, Nos. 17-16886, 17-16887, 2018 WL 1401847 (Jan. 4, 2018) (granting injunction against withholding of funds from "sanctuary jurisdictions," which would cause irreparable harm in the form of budget uncertainty by "interfer[ing] with the Counties' ability to budget, plan for the future, and properly serve their residents" and by requiring them to take "mitigating steps," including placing funds in reserve or making cuts to other services),. Economic injury caused by federal agency action is also irreparable where the federal government's sovereign immunity makes monetary damages

unrecoverable. *See New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020) (citing *Ward v. Brown*, 22 F.3d 516, 520 (2d Cir 1994)).

Here, the irreparable harm from the actions threatened by Duffy include increased congestion, air pollution, and risk of traffic accidents; non-compensable economic losses; lost jobs and opportunities for economic development; increased costs to State DOT; and significant administrative burdens on State DOT. For example, State DOT is relying primarily on Highway Act formula funds to reconfigure I-81 in the Syracuse area by replacing an aging viaduct that carries a heavily used portion of the highway with a street-level highway and making improvements to other nearby highways. Ho Decl. ¶ 37.   A contract for partial demolition of the viaduct has been awarded, and that partial demolition is scheduled to begin shortly.  *Id.* ¶ 40.  But critical components of the project—improvement of the Syracuse local street grid to handle traffic that will divert to those local streets and to the new "Business Loop 81" as a result of the viaduct demolition—has not been approved by FHWA.  *Id.*  Before State DOT has access to the formula funds to do that work, FHWA needs to approve NEPA reevaluations and obligate the funds, *id.*, both of which Secretary Duffy has threatened not to do because State DOT has not stopped the congestion pricing program in Manhattan, more than 200 miles away.

If State DOT cannot access those funds, the modification of the local street grid in Syracuse and completion of Business Loop 81 cannot proceed, and people driving in the area will face increased congestion with the increased risk of traffic accidents and increased local air pollution than if the entire project were completed as planned.

*Id.* ¶ 41.  In addition, jobs will be lost: there are approximately 600 construction personnel working directly on the contracts that have already been awarded and the contracts also support jobs in industries supplying fuel, materials, and other support to the project. *Id.* ¶ 38.  Economic development also relies on travel infrastructure, and the benefits lost when economic opportunities are missed or delayed because of the unavailability of an approval or a funding freeze cannot be recreated.  *Id.* ¶ 44. Even if the approvals are subsequently granted, the I-81 work would become vastly more expensive by millions of dollars, which cannot be recovered.  *Id.* ¶ 43.  In addition, crashes that would have otherwise been prevented will happen, with tragic impact in the form of injury or death.  *Id.* ¶ 44.

Hundreds of other State DOT projects would also be devastatingly impacted by an approval moratorium. *Id.* ¶ 46.  For example, federal formula funds have not been obligated for any of the following projects and in some instances, NEPA approval by FHWA is required:

- State DOT plans to reconstruct New York Route 347 from Hallock Road to County Route 97 near Lake Grove and Centereach on Long Island. This project, estimated at approximately $50 million, will create new travel lanes, address traffic choke points, and enhance safety, and federal formula funds planned for the project have yet to be obligated.

- Also on Long Island, State DOT has an approximately $4 million project to make safety enhancements on New York Route 101 in Flower Hill, near the St. Francis Hospital & Heart Center.  The project, currently scheduled to be let in June 2025, adds turn lanes and makes other safety improvements.  Federal funds planned for the project have yet to be officially obligated.

- In Hamilton County, State DOT recently let an approximately $8.6 million contract to ensure pavement preservation along Route 30 from Long Lake to the Franklin County line.  This investment in

infrastructure will ensure driver safety and prevent the taxpayers from having to bear higher road repair costs later. Federal funds for the project have yet to be officially obligated.

- Also in the Adirondacks, State DOT recently advanced numerous paving projects, among them an approximately $1 million project to repave Route 190 near Devil's Den Road in Altona, and an $800,000 project to repave Route 37 near Beaver Meadow Road in Akwesasne. Both projects will ensure resiliency of the traveling surface throughout Adirondack winters to come. For both projects, federal funds planned for the projects have yet to be officially obligated.

- In Jefferson County, State DOT is planning an approximately $18 million project improving Routes 3 and 12E. The 2025 project will replace six bridges and one culvert. Federal funds planned for the project have not yet been authorized and still need to be officially obligated.

- In Washington County, State DOT assist with two local projects receiving federal funds: a $3.25 million replacement of the bridge carrying Gray Lane over the Mettawee River in Whitehall and a $1.6 million project to replace the superstructure of the Lock 8 Road Bridge in Kingsbury. Both projects require NEPA approval as well as approval of obligations.

- In the Hudson Valley, State DOT is planning a project to transform the current Route 17 to the future Interstate 86, addressing congestion issues, improving safety, and resolving non-standard design and operational elements. Much of this work is anticipated to include federal funding. This project also needs NEPA approval as well as obligation approval.

*Id.* ¶¶ 47-53. Like the I-81 project, the cancellation or delay of these projects will have numerous serious and irreparable impacts on State DOT and the State's residents, including increased costs, additional traffic accidents, and loss of economic benefits from cancelled or delayed economic development. *Id.* ¶¶ 55-56.

Moreover, Secretary Duffy and US DOT threatened in the March 20 and April 8 social media posts to take action even broader retaliatory actions against the

State, *see* this brief above at 7, and his April 21 letter did not limit retaliatory actions to the actions listed in the letter.  If US DOT withheld obligated federal funds from State DOT, State DOT may have to cancel on-going projects including, for example:

- Replacement of two bridges on the Bronx River Parkway, with unexpended funds of $126 million of federal dollars;

- Reconstruction of the interchange to interstate standards on Route 17 at Exit 122 in Orange County, with unexpended funds of $38.8 million;

- Pavement rehabilitation on Route 17 between Apalachin and the Broome County line, which will replace two bridge decks and rehabilitate 27 culverts, with unexpended funds of $14.7 million;

- Replacement and rehabilitation of two bridges carrying I-590 in Monroe County, with unexpended funds of $22.7 million; and

- Rehabilitation of a bridge on Interstate 86 over Chautauqua Lake, with unexpended funds of $17.4 million.

*Id.* ¶¶ 57, 60.  Such cancellations could result in extra costs to the state to reimburse contractors for previously purchased materials and to undertake maintenance needed in the absence of the cancelled projects.  *Id.* ¶¶ 58-59.  Even day-to-day highway preventative maintenance, such as pavement surface treatments like overlays, striping, and crack sealing, as well as minor rehabilitation to structures like bridges, will be stalled by freezing federal funds.  *Id.* ¶ 61.

State DOT also receives federal funding for more than 140 transit service providers across New York.  *Id.* ¶ 62.  These entities provide transportation to senior citizens and individuals with disabilities, as well as providing transportation in rural areas.  *Id.*  A freeze in federal funds would end or drastically curtail transit service funding, imposing disproportionate, undue and irreparable hardships on senior

citizens and rural residents. *Id.* Medical or other problems that these individuals might face because such services were no longer available when needed would not be reparable after the fact. *Id.*

Finally, a moratorium on approvals will create significant administrative burdens for State DOT. *Id.* ¶ 63. To carry out its functions, State DOT needs to move each project it plans to undertake using federal funds through a timely and orderly process of obtaining approvals, including approvals of STIP amendments, NEPA reviews, advance construction authorizations, and funding obligations. *Id.* Those approvals are needed for projects that are planned as well as projects that are underway but may need to be modified, for example, to add or eliminate a project phase or for changes in right of way acquisition, utility or railroad work. *Id.* ¶ 64. Denying those approvals—or a funding freeze—will stop work on projects already underway and will create an administrative logjam as well as widespread uncertainty that will preclude the ability to plan and implement an efficient transportation program and force State DOT to modify how it makes plans and implements that program. *Id.* Once approvals resume or the funding freeze ends, State DOT will be required to devote significant resources to addressing the logjam and return to an orderly administrative process. *Id.*

For the reasons stated by the MTA and Triborough, Secretary Duffy's threats would also cause irreparable harm to State DOT by infringing on its sovereign interests and preventing it from effectuating a state law. MTA Br. at 53-54, 59-60.

### III

### THE PUBLIC INTEREST AND EQUITIES FAVOR A PRELIMINARY INJUNCTION.

Finally, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief, as well as the public consequences in employing the extraordinary remedy of injunction." *Yang v. Kosinski,* 960 F.3d 119, 135-36 (2d Cir. 2020) (citations and internal quotation marks omitted). "Where, as here, the government is a party to the suit, the final two factors merge." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58-59 (2d Cir. 2020). Here, both factors strongly favor granting State DOT's motion for a preliminary injunction.

A preliminary injunction would serve the public interest for several reasons. First, as established above, State DOT has a very strong likelihood of prevailing on the merits of its challenges to the actions threatened in Secretary Duffy's April 21 letter, and that "extremely high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). The irreparable harm that those actions are likely to cause to State DOT and the people of New York further demonstrates that the public interest favors the preliminary injunction *See Saget v. Trump*, 375 F. Supp. 3d 280, 377 (E.D.N.Y. 2019) ("Because Plaintiffs have shown both a likelihood of success on the merits and irreparable harm, it is also likely the public interest supports preliminary relief." (citing *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017)).

A preliminary injunction is also in the public interest because the threatened actions will impede State DOT activities that protect public safety, the economy, and jobs. *Louisiana v. Biden*, 622 F. Supp. 3d 267, 298 (W.D. La. 2022) (a permanent injunction terminating a pause in oil and gas leasing on federal lands was in the public interest where "[l]local government funding, jobs for Plaintiff States' workers, and funds for the restoration of Louisiana's Coastline are at stake"); *Jones v. Wolf*, 467 F. Supp. 3d 74, 94 (S.D.N.Y. 2020) ("ensuring public health and safety" is in the public interest); *Sierra Forest Legacy v. Sherman*, 951 F. Supp. 2d 1100, 1115 (E.D. Cal. 2013) ("The economic health of communities" is "an important element of the public interest."); *see also Pac. Merch. Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1180-81 (9th Cir. 2011) (noting that state "clearly has an especially powerful interest in controlling the harmful effects of air pollution"); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-239, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) (ruling that the public interest and equities factors were met when a funding freeze "placed critical programs for children, the elderly, and everyone in between in serious jeopardy"), *clarification denied*, 2025 WL 829677 (Mar. 14, 2025), *appeal filed*, No. 25-5148 (D.C. Cir. Apr. 25, 2025).  As these cases indicate, the public has a clear interest in avoiding the loss of public funds and the substantial benefits to which those funds would be used.

Moreover, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters*, 838 F.3d at 12 (quoting *Washington v. Reno*, 35 F.3d 1093,

1103 (6th Cir. 1994)); *see also R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C.
2015) ("[t]he public interest is served when administrative agencies comply with
their obligations under the [Administrative Procedure Act].").  Conversely, "[t]here
is generally no public interest in the perpetuation of unlawful agency action."
*League of Women Voters*, 838 F.3d at 12; *see also Planned Parenthood of N.Y.C. v.
U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018).
Here, as State DOT has shown, the threatened actions would be unlawful. There is
therefore a strong public interest in halting the US DOT's unlawful conduct.

As for the balance of the equities, State DOT's and the public's interests in
preserving the continuity of existing federal funds to State DOT outweighs any
interest US DOT may have in cutting off those funds.  "The Defendants are not
harmed where the order requires them to disburse funds that Congress has
appropriated to the States and that they have obligated." *Trump*, 2025 WL 715621,
at *16.  In addition, US DOT "cannot suffer harm from an injunction that merely
ends an unlawful practice or reads a statute as required." *R.I.L-R*, 80 F. Supp. 3d
at 191 (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).  US
DOT has no judicially cognizable interest in ceasing to issue project approvals it
otherwise would grant or terminating funding.

In short, the public interest and equities favor issuance of a preliminary
injunction.

## **CONCLUSION**

For the foregoing reasons, this Court should enter a preliminary injunction under Federal Rule of Civil Procedure 65(a) and grant preliminary relief under 5 U.S.C. § 705 prohibiting defendants from taking the actions threatened in Secretary Duffy's April 21 letter or any other action or withholding of action against State DOT based on the continuation of the New York's congestion pricing program, pending further order of the Court.

Dated:      New York, New York
             May 5, 2025

                           Respectfully Submitted,

                           LETITIA JAMES
                           Attorney General of the State of New York

                           By:   */s/ Andrew G. Frank*
                              Andrew G. Frank
                              Assistant Attorney General
                              N.Y.S. Attorney General's Office
                              28 Liberty Street
                              New York, New York 10005
                              Telephone:   (212) 416-8271
                              E-mail:      andrew.frank@ag.ny.gov

                           *Attorneys for Intervenor-Plaintiff New York State Department of Transportation*