UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X

METROPOLITAN TRANSPORTATION
AUTHORITY, *et al.*,

                         *Plaintiffs,*

RIDERS ALLIANCE, *et al.*

                  *Intervenor-Plaintiffs,*      No. 1:25-cv-1413-LJL

          v.

SEAN DUFFY, in his official capacity as Secretary
of the United States Department of
Transportation, *et al.*,

                *Defendants.*
------------------------------------------------------------------------ X

## DECLARATION OF JANET HO

I, Janet Ho, declare as follows:

1.      I am the Assistant Commissioner for Finance and Integrated Modal Services for the New York State Department of Transportation ("State DOT").

2.      I have held this position for nearly three years. My responsibilities include overseeing transportation budgeting and accounting, as well as freight and passenger rail, aviation, local programs and the Public Transportation Bureau.

3.      I submit this declaration in support of State DOT's motion for a preliminary injunction to prevent the federal defendants in this matter from terminating or withholding funding or any required project approvals from State DOT based on the purported illegality of New York's congestion pricing program,

including as alleged in (a) the February 19, 2025 letter from U.S. Secretary of Transportation Sean Duffy to Governor Kathy Hochul purporting to rescind approval of New York's congestion pricing program and terminate the related cooperative agreement (the "February 19 Letter"); (b) the February 20, 2025 letter from the Executive Director of the Federal Highway Administration ("FHWA") Gloria Shepherd to New York State Transportation Commissioner Marie Therese Dominguez and others purporting to set a deadline for cessation of congestion pricing (the "February 20 Letter"); (c) the March 20, 2025 letter from Executive Director Shepherd to Commissioner Dominguez and others purporting to extend the deadline for cessation of congestion pricing until April 20, 2025 (the "March 20 Letter"); (d) Secretary Duffy's March 20, 2025 social media post directed to Governor Hochul; and (e) the April 21, 2025 letter from Secretary Duffy to Governor Hochul directing the State DOT to "show cause . . . why FHWA should not take appropriate steps . . . to remedy New York's noncompliance with 23 U.S.C. § 301." (the "April 21 Letter").

4.      In the February 19 Letter, Secretary Duffy stated that the congestion pricing program, which had been approved by FHWA under the Value Pricing Pilot Program ("VPPP"), was now "not an eligible [VPPP]" project.  Executive Director Shepard's February 20 Letter characterized the February 19 Letter as "terminating "the VPPP Agreement authorizing the congestion pricing program and set a deadline for the State DOT to cease toll collection on Federal-aid highways subject to the congestion pricing program by March 21, 2025.

5. Subsequently, in the March 20 Letter, Executive Director Shepherd revised the deadline in the February 20 Letter and directed that the congestion toll operations cease by April 20, 2025.

6. Also on March 20, 2025, Secretary Duffy, in a social media post, stated "that the billions of dollars the federal government sends to New York are not a blank check. Continued noncompliance will not be taken lightly." Notably, this post from Secretary Duffy implicates all federal funding to New York.

7. The April 21 Letter reiterates that the VPPP Agreement was terminated and directed State DOT to "show cause" why it was not in violation of 23 U.S.C. § 301, with the matter to be adjudicated by FHWA. The April 21 Letter sets forth escalating "compliance measures" to be taken against New York by FHWA, noting that while the initial steps focus on the New York City area, they "may be expanded to other geographic areas within the State of New York, if any noncompliance continues." Those measures include withholding authorization of advance construction, approval of environmental reviews conducted under the National Environmental Policy Act ("NEPA"), and approval of amendments to the "State Transportation Improvement Plan" ("STIP") as well as not obligating funds (both formula and competitive).

8. Withholding these approvals as well as not authorizing or obligating funding, effectively freezes federal funds on projects.

9. At no time has Secretary Duffy, Executive Director Shepherd, or FHWA rescinded the threats to all federal funding to New York, and in fact, the

Secretary has indicated that he would halt necessary administrative approvals that allow State DOT's work to progress – such as those associated with the NEPA process.

State DOT's Broad Responsibilities and Impacts

10.    State DOT works to ensure that those who live, work, and travel in New York State have a safe, efficient, and reliable transportation system. State DOT directly maintains and improves the State's approximately 44,500 State highway lane miles and nearly 7,700 bridges and coordinates federal funding eligibility and inspections for nearly all the 17,600 bridges carrying traffic, regardless of ownership. In addition, State DOT plays a significant role in the safety and funding of locally operated transit systems, local government highway and bridge construction, and rail and certain aviation travel.

11.    State DOT has an extremely broad set of responsibilities relating to land and air travel in New York. In addition to performing critical infrastructure inspections, State DOT maintains, designs, and constructs highways, bridges, and roads. State DOT ensures that highways are safe from snow and ice, flooding, falling trees, and other obstructions.

12.    State DOT also regulates commercial and passenger transportation, provides oversight of public transit systems, inspects school and charter buses, and owns two airports: Stewart Airport in Newburgh and Republic Airport on Long Island. It would be difficult to move from one place to another in New York by land or air without State DOT's work.

13.     While primarily known for highway travel, State DOT's rail service responsibilities in New York are far-reaching.  There are 48 railroads operating in the New York, and State DOT is responsible for overseeing the safe operation of each.  Indeed, New York State has the largest commuter rail and transit rail operations in the United States, with ridership of more than 1.2 billion passengers per year.  State DOT provides significant funding for Amtrak in New York, which serves more than 2 million passengers annually.  Additionally, there are 39 freight railroads in New York that operate along 3,765 route miles of track.  Beyond safety oversight of this massive operation, State DOT's responsibility for rail extends to the management of rail-related capital and infrastructure projects.  Currently, State DOT oversees or administers approximately $1.4 billion of rail-related infrastructure projects, of which $327.9 million is federally funded.  In addition, State DOT is working with the United States Department of Transportation ("US DOT") currently on finalizing funding agreements for another $605 million worth of rail infrastructure projects, of which $265 million is federally funded.

14.     State DOT also plays a role in border security.  Two Interstate Highways in New York, I-81 and I-87, terminate at the United States' border with Canada.  I-81's northern terminus is on Wellesley Island, where State DOT worked with United States Customs and Border Protection during a rebuilding of the Land Port of Entry to accommodate traffic flows and address security concerns.

15.     Similarly, State DOT will be working with the United States General Services Administration to accommodate vehicles awaiting customs inspection at

the northern end of I-87. Redesign and reconstruction of I-87 will accommodate the United States' border protection work and help traffic flow more safely.

16.    State DOT's spending on transportation results in jobs. The Federal Highway Administration ("FHWA"), a division of US DOT, employs a job creation multiplier that projects that every $1 million of highway investment supports 13 jobs.

17.    State DOT is planning to award in federal fiscal year 2025 more than 400 construction contracts with an estimated cost of $3.9 billion, of which $1.9 billion is federal funding. A refusal to grant necessary approvals or a freeze on federal funding to State DOT would jeopardize its ability to perform those contracts and could cause the loss of nearly 50,700 jobs.

Federal Formula Funding for State DOT Work

18.    It would be difficult to overstate the impact of federal funding on State DOT's work. Approximately 55% of State DOT's current five-year plan for road and bridge projects is funded federally, amounting to approximately $2.7 billion per year in aid – or $13.7 billion over the life of the five-year plan. The absence of that funding could stop a significant portion of important projects that directly benefit the public.

19.    In federal fiscal year 2025, State DOT has already obligated $874 million in federal funding and needs to obligate an additional $1.1 billion before the close of the fiscal year to fully utilize the current year federal obligation limits set by FHWA. These federal obligations advance projects that address critical safety

needs, improve overall system performance and promote economic growth for both the State and Nation. A freeze on federal funding to State DOT would eliminate the State's ability to advance federally eligible projects and could permanently jeopardize its ability to utilize the remaining $1.1 billion of federal obligation authority, as unused obligation limit is not carried over to following fiscal years.

20.    To provide further detail on this point, the US DOT programs from which State DOT receives funding include many programs that provide formula funds, that is, funding awards where the relevant substantive and appropriation statutes specify not only the total amount of funding available nationwide but also how that total amount is to be allocated to the various States.

21.    State DOT receives formula funds under both the Highway Act and the Transit Act, which are found, respectively, in Titles 23 and 49 of the United States Code.

22.    23 U.S.C. § 104, as amended by the Infrastructure Investment and Jobs Act, Pub. L. 117-58 (2021), provides for formula funding from the FHWA for a number of programs.

23.    Those FHWA formula programs include:

> (a)    the national highway performance program, 23 U.S.C. § 119, for which the FHWA has apportioned State DOT over $4.6 billion to date since the most recent authorization statute in 2021;

> (b)    the surface transportation block grant program, including the bridge formula program, 23 U.S.C. § 144, and the national electric

vehicle infrastructure program, 23 U.S.C. § 133(b)(15), for which the FHWA has apportioned State DOT a total of over $4.0 billion to date;

(c)    the congestion mitigation and air quality program, 23 U.S.C. § 149, for which the FHWA has apportioned State DOT over $800 million to date;

(d)    the highway safety improvement program, 23 U.S.C. § 148, for which the FHWA has apportioned State DOT over $500 million to date;

(e)    the national highway freight program, 23 U.S.C. § 167, for which the FHWA has apportioned State DOT over $230 million to date;

(f)    the PROTECT (Promoting Resilient Operations for Transformative, Efficient and Cost-saving Transportation) program, 23 U.S.C. § 176, for which the FHWA has apportioned State DOT over $230 million to date;

(g)    the carbon reduction program, 23 U.S.C. § 175, for which the FHWA has apportioned State DOT over $200 million to date; and

(h)    the metropolitan planning program, 23 U.S.C. § 134. for which the FHWA has apportioned State DOT over $135 million to date.

24.    State DOT receives other formula funding from programs under the Transit Act, Title 49 of the United States Code.  Those programs are administered

by the Federal Transit Administration ("FTA"), which is also part of US DOT. Those formula programs include:

> (a)    the formula grants for rural areas program which provide capital, planning, and operating assistance to support public transportation in rural areas, for which the FTA has apportioned State DOT over $104 million to date;

> (b)    the grants for the enhanced mobility of seniors and individuals with disabilities program which provides funding to meet the transportation needs of older adults and people with disabilities when the local transportation service provided is unavailable, insufficient, or inappropriate to meet their needs, for which the FTA has apportioned State DOT over $113 million to date; and

> (c)    the state safety oversight program relating to certain rail and bus operations, for which the FHWA has allocated State DOT over $17 million to date.

25.    In total, from these programs and others, Congress apportioned over $11.0 billion in formula funds to State DOT for fiscal years 2022 through 2026

26.    Of those $11.0 billion in formula funds, the federal government has obligated over $7.0 billion to New York and, of this amount, New York is unreimbursed for approximately $3 billion as of the date of this filing, which is a remaining obligation of the federal government.

27.     Freezing or terminating these funds would bring much of State DOT's important safety and other work to a halt.

28.     In addition to Congress appropriating formula funds to State DOT under the Highway Act or the Transit Act, for a specific project to receive federal funds it must undergo a multistep administrative process.  First, to be eligible for funds administered by FHWA or the FTA, a project must be included in the "State Transportation Improvement Plan" ("STIP").  23 C.F.R. § 450.222(a).  *See also id.* § 450.218 (describing STIPs).  The STIP includes Transportation Improvement Plans ("TIPs") formulated by metropolitan areas.  The STIP is also developed in consultation with officials from nonmetropolitan areas and with tribal governments.  *Id.*  Projects in the STIP are required to be consistent with "the long-range statewide transportation plan" and, in metropolitan areas, with "an approved metropolitan transportation plan."  *Id.* § 450.218(k).

29.     A project's inclusion in the STIP indicates that it has gone through planning and eligibility review necessary to qualify for obligation of federal funds for the project.

30.     Before the funds are obligated for costs beyond preliminary design, however, FHWA or FTA need to conduct an environmental review of a project under NEPA and submit it to FHWA or FTA for approval.

31.     If the State DOT decides that it would like to proceed with a project for which FHWA funds are planned to be used, before federal funds are obligated, it can seek "advance construction" authorization from FHWA and start the project

before federal funds are obligated.  If State DOT does not receive this advance construction authorization, it is not able to proceed with the project pending approval of federal funds for the project.

32.     When a project is added to the STIP, State DOT is required to state the funding source, including any federal funding.  A project must be added to the STIP before advance construction authorization has been given and before funds are obligated.

33.     As noted above, significant portions of funding for work under the jurisdiction of State DOT comes from FHWA.  Terminating the necessary approvals and funding obligations would mean delaying, at the very least, important State DOT work.  Specific examples of projects that could be impacted are set for the below.

34.     The claimed exemption for "Safety Projects" set forth in the April 21 Letter does not mitigate the harm to State DOT and travelers because it does not clearly indicate what constitutes a "Safety Project."  On the one hand, the letter says that such projects are those "determined by FHWA to be essential for safety." On the other hand, it says that Safety Projects are those funded under three specific statutory programs:  the National Highway Performance Program, the Bridge Formula Program, and the Highway Safety Improvement Program.  In light of this confusion, there is no certainty that any particular project would be exempt from FHWA retaliatory action.

Specific Examples of State DOT Programs Harmed by FHWA Retaliatory Action

35.    Focusing on even a small segment of State DOT's work—two categories of highway contracts—illustrates the extremely disruptive, counter-productive, and economically devastating impact of the actions stated in Secretary Duffy's April 21 letter and the broader funding freeze threatened in his March 20 social media post.

36.    The first group of contracts are those for the I-81 corridor, which runs from Tennessee to the United States' border with Canada.  For the most part, I-81 bypasses major cities, and its largely rural path is heavily used as a trucking corridor.  It is vitally important to United States manufacturing and shipping, with a proliferation of distribution centers along the corridor, as well as connections to rail transportation.

37.    State DOT's I-81 contracts are in the Syracuse area, where the agency is replacing an aging viaduct that carries a heavily used portion of the highway with a street-level highway and improvements to other nearby highways.  This project consists of nine contracts, of which five have been awarded.  The total value of those contracts currently is more than $2.25 billion, with up to 80 percent planned to be provided by formula funds administered by FHWA.

38.    Work began in 2023 and is expected to continue through 2028.  There are approximately 600 construction personnel working directly on the awarded I-81 contracts.  Along with the construction employees, there are numerous designers working directly on the job.  In addition, the awarded contracts support jobs in industries supplying fuel, materials, and other support to the project.

39.     A refusal to grant FHWA approvals or a freeze on federal funding would leave the I-81 corridor project in limbo, with some but not all of the infrastructure designed to replace the aging Syracuse viaduct in place or in process,

40.     A contract for partial demolition of the viaduct has been awarded, and that partial demolition is scheduled to begin shortly.  But critical components of the project—improvement of the Syracuse local street grid to handle traffic that will divert to those local streets and to the new Business Loop 81 as a result of the viaduct demolition—has not been approved by FHWA. Before FHWA approves that component of the project and obligates federal funding of the project, it needs to (1) approve NEPA reevaluations and (2) obligate the funds.

41.     If the NEPA reevaluations are not approved or funds are not obligated for these components or are frozen for these components, the modification of the local street grid and completion of Business Loop 81 cannot proceed, and individuals driving in the area will face increased congestion with accompanying increased local air pollution because the viaduct is gone but the local street grid and other connecting roadways have not been improved.

42.     More broadly, the entire Phase 2 of the I-81 project (comprised of the remaining four contracts) needs funding authorization, which it will not receive if NEPA reevaluations are not approved or funds are not obligated, as threatened by Secretary Duffy's April 21 letter, or funds are frozen, as threated by his March 20 social media post.

43.     Even if the approvals are subsequently granted or funding is later
"unfrozen," the I-81 work would become vastly more expensive.  FHWA's Seasonally
Adjusted National Highway Construction Cost Index shows that for the two years
ending with the second quarter of 2024—the most recent information available—the
inflation rate for highway construction costs has been approximately 7 percent a
year.[1]  For the I-81 corridor project contracts, where over $1 billion of work remains,
that is an annual increase of $70 million, a cost borne by both New York and the
federal government that cannot be recovered.

44.     Some of the other harms resulting from termination or postponement
of this work could also not be undone or resolved through a later infusion of funds.
Crashes that would have otherwise been prevented will happen, with tragic impact
in the form of injury or death.  Economic development relies on travel
infrastructure, and the benefits lost when economic opportunities are missed or
delayed because of the unavailability of an approval or a funding freeze cannot be
recreated.

45.     Similarly, State DOT's project to replace and rehabilitate five bridges
on the Cross Bronx Expressway is currently going through NEPA evaluation.  It is
currently anticipated to receive a federal NEPA determination in 2025.
Withholding any NEPA determination will prevent this project from moving ahead
when critical construction work needs to occur to ensure the safety of the traveling

---

[1] https://explore.dot.gov/views/NHIInflationDashboard/NHCCI_1?%3Aiid=1&%3Aem
bed=y&%3AisGuestRedirectFromVizportal=y&%3Adisplay_count=n&%3AshowViz
Home=n&%3Aorigin=viz_share_link.

public.  Moreover, this project is currently programmed to receive approximately $330 million of federal formula funds and discretionary funds under the National Infrastructure Project Assistance Program, some or all of which would not become available if NEPA approval is withheld.

46.    Hundreds of smaller State DOT projects would also be devastatingly impacted by an approval moratorium or a federal funding freeze.

47.    For instance, State DOT's recent projects include New York Route 347 Reconstruction from Hallock Road to County Route 97 near Lake Grove and Centereach on Long Island.  This project, estimated at approximately $50 million, will create new travel lanes, address traffic choke points, and enhance safety. Federal funds planned for the project have yet to be officially obligated.

48.    Also on Long Island, State DOT has an approximately $4 million project to make safety enhancements on New York Route 101 in Flower Hill, near the St. Francis Hospital & Heart Center.  The project, currently scheduled to be let in June 2025, adds turn lanes and makes other safety improvements.  Federal funds planned for the project have yet to be officially obligated.

49.    In Hamilton County, State DOT recently let an approximately $8.6 million contract using federal funding to ensure pavement preservation along Route 30 from Long Lake to the Franklin County line.  This investment in infrastructure will ensure driver safety and prevent the taxpayers from having to bear higher road repair costs later.  Federal funds for the project have yet to be officially obligated.

50.    Also in the Adirondacks, State DOT recently advanced numerous paving projects that use federal funding, among them an approximately $1 million project to repave Route 190 near Devil's Den Road in Altona, and an $800,000 project to repave Route 37 near Beaver Meadow Road in Akwesasne.  Both projects will ensure resiliency of the traveling surface throughout Adirondack winters to come.  For both projects, federal funds planned for the projects have yet to be officially obligated.

51.    In Jefferson County, State DOT is planning an approximately $18 million project improving Routes 3 and 12E in Jefferson County.  The 2025 project will replace six bridges and one culvert. Federal funds planned for the project have not yet been authorized, and still need to be officially obligated.

52.    In Washington County, State DOT will be assisting with two local projects receiving federal funds:  a $3.25 million replacement of the bridge carrying Gray Lane over the Mettawee River in Whitehall (NEPA and funding authorization needed), and a $1.6 million project to replace the superstructure of the Lock 8 Road Bridge in Kingsbury. For both local projects, NEPA determinations from FHWA are still required and federal funds planned for the projects have not yet been authorized or officially obligated.

53.    Lastly, in the Hudson Valley, NYSDOT is planning on a project to transform the current Route 17 to the future Interstate 86, with work including addressing congestion issues, improving safety, and resolving non-standard design and operational elements.  Much of this work is anticipated to include federal

funding. NEPA determinations from FHWA are still required and federal funds planned for the construction of the project have not yet been authorized or officially obligated.

54.    All of these highway projects are vitally important to the communities surrounding them. All of these highway projects—and the hundreds of other State DOT projects like them—will be jeopardized by delay or cancellation if their approvals are unavailable or if federal funds are frozen.

55.    As noted above in paragraph 43, all resumed or rescheduled projects will become more expensive, even if approvals are eventually granted or funds are unfrozen.

56.    As noted above in paragraph 44, the cancellation or delay of such projects can result in additional accidents with additional injury or death, and additional loss of economic benefits from cancelled or delayed economic development.

57.    In addition to cancellation or delay of recently let or soon-to-be-let projects, State DOT may have to cancel on-going projects if US DOT carries out the funding freeze threatened in Secretary Duffy's March 20 social media post. The costs to the state fisc, and ultimately taxpayers, from such cancellations will be immense.

58.    First, under contracts for projects, the state will be responsible for costs incurred by contractors before termination of the project. If a contactor has already purchased project-specific materials, including steel or precast components,

taxpayers may have to pay for those materials, even though they will never get the use of them.

59.    Second, as unrepaired infrastructure continues to age and degrade, the state fisc and state taxpayers will incur increased maintenance costs.

60.    Some examples of projects currently under construction that may have to be cancelled in the event of a funding freeze include:

(a)    The replacement of two bridges on the Bronx River Parkway, with unexpended funds of $126 million of federal dollars;

(b)    The reconstruction of the interchange to interstate standards on Route 17 at Exit 122 in Orange County, with unexpended funds of $38.8 million;

(c)    Pavement rehabilitation on Route 17 between Apalachin and the Broome County line, which will replace two bridge decks and rehabilitate 27 culverts, with unexpended funds of $14.7 million;

(d)    The replacement and rehabilitation of two bridges carrying Interstate 590 in Monroe County, with unexpended funds of $22.7 million; and

(e)    The rehabilitation of a bridge on Interstate 86 over Chautauqua Lake, with unexpended funds of $17.4 million.

61.    Even day-to-day highway preventative maintenance, such as pavement surface treatments like overlays, striping and crack sealing, as well as minor rehabilitation to structures like bridges, will be stalled by freezing federal funds.

Federal funds play a large part in such maintenance, whether in New York or any other state. A freeze on federal funds will require State DOT to limit its maintenance work to only urgent repairs. Cost-saving preventative maintenance and investments in infrastructure will dwindle or end, again with negative impacts on safety and economic activity.

62.     State DOT also receives federal funding for more than 140 transit service providers across New York. These entities provide transportation to senior citizens and individuals with disabilities, as well as providing transportation in rural areas. A freeze in federal funds would end or drastically curtail transit service funding, imposing disproportionate, undue and irreparable hardships on senior citizens and rural residents. Medical or other problems that these individuals might face because such services were no longer available when needed would not be reparable after the fact.

63.     In addition to the impacts discussed above, withholding STIP, NEPA, and advanced construction approvals and not obligating funds will lead to backlogs and delays that will create significant administrative burdens for State DOT, as will a funding freeze. To carry out its functions, State DOT needs to move each project it plans to undertake using federal funds through a timely and orderly process of obtaining approvals, including approvals of STIP amendments, NEPA reviews, advance construction authorizations, and funding obligations.

64.     Those approvals are needed for projects that are planned as well as projects that are underway but may need to be modified, for example, to add or

eliminate a project phase or for changes in right of way acquisition, utility or railroad work. Denying those approvals—or a funding freeze—will stop work on projects already underway and will create an administrative logjam as well as widespread uncertainty that will preclude the ability to plan and implement an efficient transportation program and force State DOT to modify how it makes plans and implements that program. Once approvals resume or the funding freeze ends, State DOT will be required to devote significant resources to addressing the logjam and return to an orderly administrative process.

Conclusion

65.    A moratorium on approvals and a freeze in federal funds based on an unlawful termination of the VPPP agreement and New York's congestion pricing program will irreparably harm State DOT's efforts to carry out its duties under state law to maintain and improve New York's transportation infrastructure and services.

66.    The approval moratorium's and funding freeze's interference with the agency's work will in turn irreparably harm virtually all New Yorkers, particularly senior citizens and rural residents; all people traveling through New York, including truckers transporting goods to and from distribution centers along the I-81 corridor; railroads; airports; users of common carriers of people and goods; and anyone else who relies on land or air transportation of any kind in New York. Safety, security, and commerce will all be negatively affected, and many of the injuries and impacts will be irreparable.

67.     Other than a large scale natural disaster—which State DOT plays a vital role in responding to and recovering from—it is hard to imagine a more harmful event for New York's infrastructure than terminating or withholding federal transportation approvals and funds from New York.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 5, 2025

_____
Janet Ho