**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| METROPOLITAN TRANSPORTATION AUTHORITY & TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY, | |
| Plaintiffs, | **Case No. 25-cv-01413-LJL** |
| NEW YORK STATE DEPARTMENT OF TRANSPORTATION, RIDERS ALLIANCE, SIERRA CLUB, & NEW YORK DEPARTMENT OF TRANSPORTATION | |
| Intervenor-Plaintiffs, | |
| v. | |
| SEAN DUFFY, et al. | |
| Defendants. | |

**DEFENDANTS' COMBINED OPPOSITION TO PLAINTIFFS' MOTIONS FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ................................................................................................................... 4

I. Statutory Background ................................................................................................ 4

II. The Agreement ......................................................................................................... 5

III. Aftermath of the Agreement .................................................................................... 8

IV. Notice of Termination of the Agreement and Opportunity to Object ................... 9

V. This Litigation .........................................................................................................11

STANDARD OF REVIEW ................................................................................................... 12

ARGUMENT ..................................................................................................................... 13

I. The Court lacks jurisdiction over Plaintiffs' claims............................................. 13

  A. Plaintiffs fail to establish reviewable final agency action...................... 13

    1. The process to terminate has not been consummated. ............... 16

    2. Tangible legal consequences have not flowed from FHWA's and the Secretary's actions................................................................ 18

  B. Plaintiffs' claims are not ripe for judicial review. ................................. 20

  C. The Tucker Act vests exclusive jurisdiction over Plaintiffs' claims in the Court of Federal Claims. ........................................................................ 26

II. Plaintiffs fail to show irreparable harm................................................................ 28

III. Plaintiffs are not likely to succeed on the merits because the Secretary and FHWA have acted lawfully. ................................................................................... 35

  A. The Secretary and FHWA have authority to terminate the Agreement................. 36

  B. The Secretary and FHWA reasonably noticed termination of the Agreement according to federal regulations. ........................................ 40

    1. The Secretary reasonably determined that the CBDTP's lack of a toll-free alternative conflicted with the government's priorities and policy goals. ........................................................................... 43

2.      The Secretary reasonably determined that the CBDTP's approach
        to calculating toll rates conflicted with the government's priorities
        and policy goals. ...................................................................................... 45

3.      The Secretary and FHWA considered the competing interests,
        including Plaintiffs' reliance interests. ...................................................... 46

4.      The Secretary and FHWA did not need to conduct a NEPA review
        again before issuing a notice of termination. ............................................. 49

C.      The Secretary and FHWA have authority to take enforcement action after a
        final agency action. .............................................................................................. 51

IV.     The public interest and balance of equities weigh against an injunction. ......................... 57

V.      The broadest relief available to plaintiffs is to vacate the termination notices and
        remand to the agency. ......................................................................................................... 58

CONCLUSION ................................................................................................................................ 59

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Abbot Lab'ys v. Gardner*,
  387 U.S. 136 (1967) ............................................................................................ 20

*Aerolease Long Beach v. United States*,
  31 Fed. Cl. 342 (1994), *aff'd*, 39 F.3d 1198 (Fed. Cir. 1994) ................................... 37

*Air Espana v. Brien*,
  165 F.3d 148 (2d Cir. 1999) ........................................................................... 13, 14

*Akiachak Native Cmty. v. Jewell*,
  995 F. Supp. 2d 7 (D.D.C. 2014)............................................................................ 31

*Allandale Neighborhood Ass'n v. Austin Transp. Study Policy Advisory Comm.*,
  840 F.2d 258 (5th Cir. 1988) ................................................................................. 18

*Beldock v. Deutsche-Eco USA Corp.*,
  No. 2:16-CV-14, 2016 WL 8809221 (D. Vt. Feb. 22, 2016)................................... 34

*Bell v. New Jersey*,
  461 U.S. 773 (1983) ............................................................................................. 14

*Bennett v. Spear*,
  520 U.S. 154 (1997) ............................................................................................. 14

*Berkeley-Dorchester Ctys. Econ. Dev. Corp. v. U.S. Dep't of Health & Hum. Servs.*,
  2:04-22950-23, 2006 WL 8443181 (D.S.C. Feb. 24, 2006)......................... 14, 15, 16

*City and County of San Francisco v. Trump*,
  --- F. Supp. 3d ---, 2025 WL 1186310 (N.D. Cal. Apr. 24, 2025) ....................... 30-31

*City of Los Angeles v. Sessions*,
  No. 17-7215, 2018 WL 6071072 (C.D. Cal. Sept. 13, 2018)................................... 33

*Clallam Cnty. v. Dep't of Transp., of State of Wash.*,
  849 F.2d 424 (9th Cir. 1988) ................................................................................. 55

*Comm. to Pres. Boomer Lake Park v. Dep't of Transp.*,
  4 F.3d 1543 (10th Cir. 1993) ................................................................................. 49

*Cone Corp. v. Fla. Dep't of Transp.*,
  921 F.2d 1190 (11th Cir. 1991)............................................................................... 52

*Connecticut v. Duncan*,
  612 F.3d 107 (2nd Cir. 2010) ................................................................................ 22

*County of Santa Clara v. Trump*,
  250 F. Supp. 3d 497 (N.D. Cal. 2017)................................................................ 31

*Cunningham v. Potts*,
  9 F.2d 469 (W.D. Wash. 1925) ............................................................................ 4

*Dagbazhalsanova v. U.S. Citizenship & Immigr. Servs.*,
  No. 23-CV-9599, 2025 WL 964071 (E.D.N.Y. Mar. 31, 2025) ............................ 13

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019)............................................................................................. 42

*Dep't of Education v. California*,
  145 S. Ct. 966 (2025) ............................................................................... 26, 27, 34

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  140 S. Ct. 1891 (2020) ........................................................................................ 47

*Endsley v. City of Chicago*,
  230 F.3d 276 (7th Cir.2000) ................................................................................ 18

*Env't Encapsulating Corp. v. City of New York*,
  855 F.2d 48 (2d Cir. 1988) .................................................................................. 35

*Fair Hous. Just. Ctr. v. Town of Eastchester*,
  No. 16 CV 9038 (VB), 2019 WL 13388549 (S.D.N.Y. June 24, 2019)............................ 33, 34

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
  559 F.3d 110 (2d Cir. 2009).............................................................................. 28-29

*Falls Riverway Realty, Inc. v. City of Niagara Falls*,
  754 F.2d 49 (2d Cir. 1985) .................................................................................. 28

*Federal Election Comm'n v. Akins*,
  524 U.S. 11 (1998) ............................................................................................... 58

*Fla. Power & Light Co. v. E.P.A.*,
  145 F.3d 1414 (D.C. Cir. 1998)........................................................................... 22

*Fox Ins. Co. v. Envision Pharm. Holdings, Inc.*,
  No. 09-0237, 2009 WL 790312 (E.D.N.Y. Mar. 23, 2009)................................... 30

*Freedom Holdings, Inc. v. Spitzer*,
  408 F.3d 112 (2d Cir. 2005)................................................................................. 32

*Friends of Animals v. Pendley*,
  523 F. Supp. 3d 39 (D.D.C. 2021)....................................................................... 23

*FTC v. Standard Oil Co. of Cal.*,
   449 U.S. 232 (1980) .................................................................................. 14

*G.L. Christian & Assocs. v. United States*,
   160 Ct. Cl. 1, *reh'g denied*, 160 Ct. Cl. 58, *cert. denied*, 375 U.S. 954, 84 (1963) ................ 37

*Georgia v. Pruitt*,
   326 F. Supp. 3d 1356 (S.D. Ga. 2018) ................................................... 31

*German Language Ctr. v. United States*,
   No. CIV. A. H-09-3950, 2010 WL 3824636 (S.D. Tex. Sept. 27, 2010)................................. 21

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
   481 F.3d 60 (2d Cir. 2007) ..................................................................... 12

*Griffin v. Oceanic Contractors, Inc.*,
   458 U.S. 564 (1982) .............................................................................. 40

*Guertin v. United States*,
   743 F.3d 382 (2d Cir. 2014) ............................................................. 58-59

*Hornig v. Trustees of Columbia Univ.*,
   No. 17 CV 3602, 2018 WL 5800801 (S.D.N.Y. Nov. 5, 2018)................................. 29

*Ida. Conservation League v. Bonneville Power Admin.*,
   826 F.3d 1173 (9th Cir. 2016) ........................................................... 50, 51

*Ingersoll-Rand Co. v. United States*,
   780 F.2d 74 (D.C. Cir. 1985).............................................................. 27, 28

*Isaacs v. Bowen*,
   865 F.2d 468 (2nd Cir. 1989) ............................................................ 22-23

*Jayaraj v. Scappini*,
   66 F.3d 36 (2nd Cir. 1995) ................................................................... 29

*Jersey Heights Neighborhood Ass'n v. Glendening*,
   174 F.3d 180 (4th Cir. 1999) ................................................................ 18

*Just Bagels Mfg., Inc. v. Mayorkas*,
   900 F. Supp. 2d 363 (S.D.N.Y. 2012)..................................................... 40

*Kamerling v. Massanari*,
   295 F.3d 206 (2d Cir. 2002) ....................................................... 29, 33, 34

*K-Con, Inc. v. Sec'y of Army*,
   908 F.3d 719 (Fed. Cir. 2018) .............................................................. 37

*Keystone Driller Co. v. Gen. Excavator Co.*,
290 U.S. 240 (1933) ......................................................................... 48

*KM Enters., Inc. v. McDonald*,
No. 11–CV–5098, 2012 WL 4472010 (E.D.N.Y. Sept. 25, 2012) ............................................. 18

*Koretoff v. Vilsack*,
614 F.3d 532 (D.C. Cir. 2010) ............................................. 58

*Lab. Council for Latin Am. Advancement v. EPA ("LCLAA")*,
12 F.4th 234 (2nd Cir. 2021) ............................................. 21, 23

*Lacewell v. Off. of Comptroller of Currency*,
999 F.3d 130 (2nd Cir. 2021) ............................................. 21

*Libby Welding Co. v. United States*,
444 F. Supp. 987 (D.D.C. 1977) ............................................. 47

*Makarova v. United States*,
201 F.3d 110 (2d Cir. 2000) ............................................. 13

*Marsh v. Ore. Nat. Res. Council*,
490 U.S. 360 (1989) ............................................. 50

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) ............................................. 13

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) ............................................. 28

*Mulgrew v. United States Dep't of Transp.*,
750 F. Supp. 3d 171 (S.D.N.Y. 2024) ............................................. *passim*

*Nat'l Council of Nonprofits v. O.M.B.*,
No. 25-239, 2025 WL 597959 (D.D.C. Feb. 25, 2025) ............................................. 31

*Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA*,
752 F.3d 999 (D.C. Cir. 2014) ............................................. 21

*Nat'l Park Hospitality Ass'n v. Dep't of the Interior*,
538 U.S. 803 (2003) ............................................. 26

*Nevada v. Dep't of Energy*,
457 F.3d 78 (D.C. Cir. 2006) ............................................. 50

*New York Foreign Freight Forwarders & Brokers Ass'n v. Fed. Mar. Comm'n*,
337 F.2d 289 (2d Cir. 1964) ............................................. 54

*New York v. Trump*,
  No. 25-cv-39, 2025 WL 715621 (D.R.I. Mar. 6, 2025)............................................. 31

*New York v. U.S. Dep't of Health & Hum. Servs.*,
  No. 07 CIV.8621, 2008 WL 5211000 (S.D.N.Y. Dec. 15, 2008) ............................... 26

*New York v. U.S. Dep't of Homeland Sec.*,
  969 F.3d 42 (2d Cir. 2020) ...................................................................................... 30

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................................................. 57

*Pagan v. NYNEX Pension Plan*,
  52 F.3d 438 (2d Cir. 1995) ...................................................................................... 40

*Perkins Coie LLP v. U.S. Dep't of Just.*,
  No. CV 25-716 (BAH), 2025 WL 1276857 (D.D.C. May 2, 2025)........................... 25

*Psihoyos v. John Wiley & Sons, Inc.*,
  No. 11 CIV. 1416 JSR, 2011 WL 4634172 (S.D.N.Y. Oct. 4, 2011)......................... 13

*Purpose Built Families Found., Inc. v. United States*,
  634 F. Supp. 3d 1118 (S.D. Fla. 2022) ........................................................ 14, 15, 18

*Salazar v. King*,
  822 F.3d 61 (2d Cir. 2016) ...................................................................................... 14

*Seafarers Int'l Union of N. Am., AFL-CIO v. U.S. Coast Guard*,
  736 F.2d 19 (2d Cir. 1984) ...................................................................................... 20

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  701 F.2d 1011 (2d Cir. 1983)................................................................................... 49

*Simmonds v. INS*,
  326 F.3d 351 (2nd Cir. 2003) .................................................................................. 21

*South Dakota v. Adams*,
  587 F.2d 915 (8th Cir. 1978) ................................................................................... 52

*South Dakota v. Dole*,
  483 U.S. 203 (1987) ................................................................................................. 56

*State of Neb., Dep't of Roads v. Tiemann*,
  510 F.2d 446 (8th Cir. 1975) ................................................................................... 56

*Stewart Park & Rsrv. Coal., Inc. (SPARC) v. Slater*,
  352 F.3d 545 (2d Cir. 2003) .................................................................................... 49

*Students for Fair Admissions v. U.S. Mil. Acad. at West Point,*
    709 F. Supp. 3d 118 (S.D.N.Y. 2024) ................................................................. 12

*Texas v. EPA,*
    829 F.3d 405 (5th Cir. 2016) ............................................................................... 32

*Town of Portsmouth, R.I. v. Lewis,*
    813 F.3d 54 (1st Cir. 2016) ........................................................................... 18, 55

*U.S. Army Corps of Engineers v. Hawkes Co.,*
    578 U.S. 590 (2016) ............................................................................................. 14

*United States v. Corliss Steam Engine Co.,*
    91 U.S. 321 (1875) ............................................................................................... 53

*United States v. North Carolina,*
    192 F. Supp. 3d 620 (M.D.N.C. 2016) ............................................................... 31

*United States v. Winstar Corp.,*
    518 U.S. 839 (1996) ....................................................................................... 37, 40

*Up State Fed. Credit Union v. Walker,*
    198 F.3d 372 (2d Cir. 1999) ..................................................................... 26, 27, 28

*W.R. Grace & Co.—Conn. v. EPA,*
    959 F.2d 360 (1st Cir. 1992) ......................................................................... 22, 25

*Ward v. Brown,*
    22 F.3d 516 (2d Cir. 1994) .................................................................................. 19

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................................................ 13

*Zhao v. U.S. Dep't of Justice,*
    265 F.3d 83 (2d Cir.2001) ................................................................................... 40

## **Statutes**

5 U.S.C. § 702 ....................................................................................................... 58

5 U.S.C. § 704 ................................................................................................. 13, 58

5 U.S.C. § 706 ....................................................................................................... 58

23 U.S.C. § 115 ..................................................................................................... 54

23 U.S.C. § 129 ............................................................................................... 35, 55

23 U.S.C. § 131 ..................................................................................................... 55

23 U.S.C. § 149 ("VPPP Statute") .................................................................. *passim*

23 U.S.C. § 158 ............................................................................................... 55

23 U.S.C. § 301 ............................................................................................... *passim*

23 U.S.C. § 315 ............................................................................................... 54, 55

28 U.S.C. 1491 ................................................................................................ 27

National Environmental Policy Act,
    42 U.S.C. § 4321 et seq. ............................................................................ 49

42 U.S.C. § 4332(2)(C) .................................................................................. 49

42 U.S.C. § 4336(b)(2) ................................................................................... 49

Federal Aid Highway Act of 1921,
    Pub. L. No. 67-87, 42 Stat. 212 ................................................................ 4

Federal Aid Highway Act of 1973,
    Pub. L. No. 93-87, 87 Stat. 250 ................................................................ 4

Intermodal Surface Transportation Efficiency Act ("ISTEA"),
    Pub. L. No. 102-240, § 1012(b), 105 Stat. 1938 (1991) .......................... 4

Transportation Equity Act for the 21st Century,
    Pub. L. No. 105-178, 112 Stat. 107 (1998) ............................................... 4

**<u>Legislative Materials</u>**

151 Cong. Rec. H1319 (March 10, 2005) ...................................................... 5

Transportation and Environmental Infrastructure Needs: Report of the H. Subcomm. on
    Investigations and Oversight (1995) ......................................................... 5

*Statement by President George Bush Upon Signing H.R. 2950,*
    1991 U.S.C.C.A.N. 1865 (Dec. 18, 1991) ............................................... 57

**<u>Administrative & Executive Materials</u>**

2 C.F.R. § 200.211 ....................................................................................... 36, 37, 38

2 C.F.R. § 200.340 ....................................................................................... *passim*

2 C.F.R. § 200.341 ....................................................................................... 11

2 C.F.R. § 200.342 ....................................................................................... 11, 46

23 C.F.R. § 1.1 .................................................................................................... 55

23 C.F.R. § 1.36 ............................................................................................... *passim*

23 C.F.R. § 771.121 ............................................................................................ 49

## Other Authorities

*Congestion Pricing*, FHWA Dept. of Transportation Website,
   https://ops.fhwa.dot.gov/congestionpricing/ ................................................ 44

*Congestion Pricing: Overview, Advantages and Disadvantages*,
   Investopedia (Nov. 18, 2024),
   https://www.investopedia.com/terms/c/congestion-pricing.asp ..................... 44

FHWA, *Contractors and Recipients General Terms and Conditions
   for Assistance Awards* § 17,
   https://www.fhwa.dot.gov/cfo/contractor_recip/gtandc_after2023aug07.cfm ................... 36, 38

Hilary Howard, *The South Bronx Has a Pollution Issue. Congestion Pricing May Worsen It*,
   NYT (Feb. 2, 2025),
   https://www.nytimes.com/2025/02/02/nyregion/congestion-pricing-air.html ...................... 8, 9

*On account of*,
   Webster New World Dictionary of the American Language (college ed. 1960) ...................... 53

Press Release, SIENA RESEARCH INSTITUTE,
   *Siena College New York States Poll* (March 10, 2025),
   https://scri.siena.edu/wp-content/uploads/2025/03/
   SNY-March-2025-Poll-Release-FINAL.pdf ...................................................... 8

*Tax*, Tax Foundation (last accessed May 13, 2025),
   https://taxfoundation.org/taxedu/glossary/tax ............................................... 45

Statement from Governor Murphy Opposing New York's Congestion Pricing Plan, State of New
   Jersey (Nov. 14, 2024),
   https://www.nj.gov/governor/news/news/562024/approved/20241114c.shtml. ........................ 7

*What is Congestion Pricing?*, Washington Policy Center (April 7, 2008),
   https://www.washingtonpolicy.org/publications/detail/what-is-congestion-pricing ................ 44

Yang & Ostrovsky, *Effective and Equitable Congestion Pricing: New York City and Beyond*,
   Stanford University Working Paper (2024) ...................................................... 9

Defendants Sean Duffy, in his official capacity as Secretary of the United States Department of Transportation ("DOT"), Gloria M. Shepherd, in her official capacity as Executive Director of the Federal Highway Administration ("FHWA"), DOT, and FHWA (together "Defendants" or "Government") respectfully submit this memorandum of law in opposition to Plaintiffs  the Metropolitan Transportation Authority ("MTA") and Triborough Bridge and Tunnel Authority ("TBTA"), an MTA affiliate, and Intervenor-Plaintiff New York City Department of Transportation ("NYCDOT") preliminary injunction motion and in opposition to intervenor-plaintiff New York State Department of Transportation ("NYSDOT") preliminary injunction motion.

## PRELIMINARY STATEMENT

In a last-minute rush to save their controversial cordon pricing project, Plaintiffs hastily signed a Value Pricing Pilot Program Agreement with FHWA in November 2024—just weeks after President Trump won the election and before he took office.  The Agreement allowed Plaintiffs to charge tolls in connection with their cordon pricing project on federally aided highways in Manhattan.  Nearly a year earlier, this project had been paused by New York's Governor following President and then-candidate Trump's public criticism of the project.

Once in office, President Trump directed his Secretary of Transportation to reassess the Agreement, which had only recently taken effect in January 2025.  Following an evaluation, the Secretary initiated a process to terminate the Agreement and end the cordon pricing project.  First, on February 19, 2025, the Secretary sent a letter to New York Governor Hochul providing notice that the Agreement was terminated.  He provided two reasons for the termination.  First, he explained that the cordon pricing project's lack of a toll-free alternative placed a "disproportionate financial burden on low and medium-income hardworking American drivers." Second, he concluded that toll revenues should not be set primarily to support MTA capital projects but rather

1

should be calculated to reduce traffic congestion.  The Secretary raised policy objections on the basis of these flaws and also stated that the flaws rendered the project ineligible under the governing statute.  The very next day, FHWA extended the effective date of the termination to March 20, and then again to April 20.  On April 21, Secretary Duffy sent another letter to Governor Hochul.  In that letter, he reaffirmed his concerns with New York's cordon pricing project.  The letter also laid out potential compliance measures FHWA would take, should FHWA determine that New York was out of compliance with the federal anti-tolling statute, 23 U.S.C. § 301.  At the time of the April 21 letter (and even now), FHWA had not determined—as it must, pursuant to 23 C.F.R. § 1.36—what, if any, compliance measures would ultimately be taken.  Finally, in the April 21 letter, the Secretary provided Plaintiffs with an opportunity to object to the termination and provide information challenging the action within 30-days—before any final action on termination or compliance would be taken by the Secretary or FHWA.

Rather than engage with this still-unfolding administrative process, Plaintiffs have rushed to court—asking this Court to enjoin an incomplete process they claim is inadequate.  But judicial intervention is not warranted.

First, there is no final agency action to review.  Courts have held that agency action is not final under the APA when the challenged agency conduct, viewed holistically, is part of a larger, unfolding administrative process that remains incomplete.  That is the case here.  Even Plaintiffs appear uncertain what they seek to enjoin—asking the Court to enjoin both the February Letter and the April Letter. Plaintiffs also ask this Court to enjoin any compliance measures FHWA or DOT may take in connection with the decision to terminate the congestion pricing program.  The problem is, FHWA has not determined what, if any, compliance measures it will take.  And because these compliance measures have not yet been decided, there is neither a final decision nor a

complete administrative record for the Court to review to determine whether the compliance measures are authorized by statute or are otherwise lawful.

Beyond a lack of final agency action, Plaintiffs' request for a preliminary injunction also fails as prudentially unripe for similar reasons. The agency's decisionmaking process is still unfolding and could significantly impact or even moot this Court's assessment of Plaintiffs' scattershot claims.

And, to the extent Plaintiffs' press any valid claim, the Tucker Act vests exclusive jurisdiction over this contractual dispute (whether the Agreement may be terminated and under what terms) in the Court of Federal Claims.

Even if the Court found jurisdiction, which it should not, Plaintiffs cannot show irreparable harm. Their own two-month delay in bringing this alleged "emergency" motion is reason enough to deny their motions. But more so, Plaintiffs cannot show irreparable harm because of the premature nature of this entire dispute over what Plaintiffs concede are merely "proposed" compliance measures. Thus, each of the harms Plaintiffs assert are speculative.

If the Court reaches the merits, the record from February to April shows that the Secretary acted within his lawful authority. FHWA and the Secretary have the authority to terminate the Agreement based on changed agency priorities. And to the extent the Court finds that the April 21 letter constitutes a final termination, the Secretary terminated the agreement reasonably: he outlined his reasons for FHWA's changed priorities and considered Plaintiffs' reasonable reliance interests. A preliminary injunction is not warranted on any front. But most importantly, the Court should allow the current ongoing administrative process to run its course rather than enjoin it. The Court should deny both of Plaintiffs' motions for preliminary injunction.

## BACKGROUND

### I.     Statutory Background

Federal highway funding laws have evolved over the decades, shifting with the country's infrastructure needs and priorities.  *See, e.g.*, Federal Aid Highway Act of 1921, P.L. 67-87; Federal Aid Highway Act of 1973, P.L. 93-87.  But a consistent guardrail for taxpayers in this statutory scheme has been that federally funded highways must remain free of tolls of all kinds.  S*ee Cunningham v. Potts*, 9 F.2d 469, 471 (W.D. Wash. 1925) (interpreting the 1921 federal statute that banned "tolls of all kinds" from federal highways).  Over a hundred years ago, Congress built this requirement into the legal framework, and it has stayed with very limited exceptions.  *Id.*  The current statute banning tolls on federal highways reads: "Except as provided in section 129 of this title with respect to certain toll bridges and toll tunnels, all highways constructed under the provisions of this title shall be free from tolls of all kinds."  23 U.S.C. § 301.

In 1991, Congress enacted the "Congestion Pricing Pilot Program" as part of the Intermodal Surface Transportation Efficiency Act ("ISTEA").  Pub. L. No. 102-240, § 1012(b), 105 Stat. 1938 (1991).  At the time of enactment, Congress did not define the term "congestion pricing."  Later, Congress changed the name of the program to the "Value Pricing Pilot Project" ("VPPP") but also did not define, and has not since defined, the term "value pricing."  P.L. 105-178, codified as 23 U.S.C. § 149 Statutory Notes ("VPPP Statute").  As such, the VPPP itself is silent on whether "cordon pricing" is included in the meaning of either "value pricing" or "congestion pricing."

The VPPP allows the Secretary of Transportation to enter into "cooperative agreements" with as many as 15 States, local governments, or local authorities to "establish, maintain, and monitor value pricing programs."  VPPP Statute cl. 1.  Any pilot project operating under the VPPP requires an agreement between the Secretary and the sponsoring authority.  *Id.*  The statute also

provides that "[r]evenues generated by any pilot program . . . must be applied to projects eligible under [title 23]." *Id.* cl. 3.

Although the VPPP provides an exception to the ban on tolls in § 301, it also limits that exception to "tolls . . . as part of any value pricing *pilot* program under this subsection." *Id.* cl. 4 (emphasis added). The statute directs the Secretary of Transportation to monitor the effects of any value pricing program on "low-income drivers." *Id.* cl. 7. The statute further empowers the Secretary to impose "mitigation measures to deal with any potential adverse financial effects on low-income drivers." *Id.* Indeed, since the VPPP's enactment, Congress has voiced concerns that congestion pricing programs "place a proportionally larger burden on people with lower incomes who are less able to afford the cost, as compared with revenues based on progressive income or property taxes." *See* Transportation and Environmental Infrastructure Needs: Report of the H. Subcomm. on Investigations and Oversight, 193 (1995); *see also* 151 Cong. Rec. H1319 (March 10, 2005) (statement by Rep. Green of Texas: "Now we [are] forced into a situation where every new highway in America will be tolled, something my middle and low-income commuters and professional truck drivers vigorously oppose.").

## II.    The Agreement

In April 2019, the New York State Legislature enacted the MTA Reform and Traffic Mobility Act (the "Traffic Mobility Act"), which directed the Triborough Bridge and Tunnel Authority ("TBTA") to establish certain "congestion pricing" projects in the Manhattan Central Business District ("CBD"). *Mulgrew v. United States Dep't of Transp.*, 750 F. Supp. 3d 171, 188 (S.D.N.Y. 2024). The Legislature enacted the Traffic Mobility Act despite public pushback and despite prior congestion pricing proposals failing due to lack of political support. *Id.*

TBTA wished to implement a cordon pricing project within the CBD called the Central Business District Tolling Program ("CBDTP"). ECF 87-1 at 7. In general, cordon pricing charges drivers a fee to enter or drive within a defined, cordoned area, typically a city center. *Id.* In this case, New York City aimed to charge drivers a fee to enter the CBD, which is primarily defined as the southern part of Manhattan, inclusive of 60th Street. ECF 87-1 at 7. Tolling is active at all times, with rates that vary based on whether a driver enters during "peak period" or "overnight period" and based on the type of vehicle. *Id.* at 9.

Because the CBDTP involved tolling federal aid highways, several of the Plaintiffs, including TBTA, NYSDOT, NYCDOT, and MTA (together referred to as the "Project Sponsors" or "Sponsors") sought federal authorization. *Mulgrew*, 750 F. Supp. 3d at 188. In June 2019, the Sponsors applied to the FHWA to establish the CBDTP as a federal value pricing pilot project under the VPPP. *Id.* Initially, the Project Sponsors pushed to speed up this process by seeking an "expedited deployment schedule," but FHWA insisted on further studies before determining whether to authorize the project. *Id.*

After some of those studies concluded, FHWA and the Project Sponsors released a final environmental assessment. *Id.* Legal challenges in state and federal courts quickly followed, targeting both the CBDTP and the adequacy of the related environmental assessment. *Id.* Some of those cases reached this Court. *See, e.g.*, *id.* at 187 (addressing three separate lawsuits challenging the CBDTP and the environmental assessment). In one such case, this Court held in June 2024 that the environmental assessment done on the CBDTP satisfied the National Environmental Policy Act ("NEPA"). *Id.* at 249.

By this time, the Project Sponsors and FHWA still had not signed a VPPP agreement. In May 2024, while campaigning for president, President Trump criticized the CBDTP, labeling it a

tax on New Yorkers and anyone entering Manhattan.  ECF 87-2.  In response, Governor Hochul paused implementation of the CBDTP.  *Mulgrew*, 750 F. Supp. 3d at 198.

After President Trump won the Presidential Election on November 5, 2024, the Project Sponsors rushed to finalize a VPPP agreement, knowing full well that the incoming administration would be very unlikely to approve the pilot project based on President Trump's stated priorities. *See* ECF 87-1.  This rushed action prompted New Jersey Governor Phil Murphy to publicly oppose any agreement with the federal government, stating that he "firmly opposed" Plaintiffs' "attempt to force through a congestion pricing proposal in the final months of the Biden Administration." *Id.; see* Statement from Governor Murphy Opposing New York's Congestion Pricing Plan, State of New Jersey (Nov. 14, 2024), https://www.nj.gov/governor/news/news/562024/approved/20241114c.shtml.  Governor Murphy went further, stating that the CBDTP was an effort "to take money from the pockets of New Jersey residents to bail out the MTA from a mountain of debt." *Id.*

Despite the backlash, two weeks later, on November 21, 2024, the Project Sponsors and FHWA signed a VPPP agreement.  ECF 87-1 ("the Agreement").  The Agreement authorizes tolling in the CBD, including on federally aided highways.  Agreement, cl. 1.  It includes several provisions relevant to this dispute.  The Agreement purports to create mitigation measures for low-income drivers.  The Agreement indicates that as part of the CBDTP, Plaintiffs will offer a tax credit for low-income drivers—but only for those that live in the CBD.  *Id.* cl. 2, Attachment A ("Att. A").  The CBDTP also provides a discount for certain low-income individuals who can prove that they are "frequent drivers."  *Id.* cl. 2, Att. A.  And consistent with the statute, the Agreement provides that FHWA retains authority to take mitigation action to reduce adverse effects on low-income drivers.  *Id.* cl. 2.

The Agreement also requires the Project Sponsors to "monitor and report on the project performance from the date of implementation for a period of at least ten years or to the end of the life of the project, *whichever is sooner*." *Id.* cl. 8(b) (emphasis added).  One of the final clauses states that the Project Sponsors will work with FHWA to "return the Project to its original operation . . . if TBTA decides to discontinue tolls[.]"  *Id.* cl. 11.  The Agreement also requires that the "NYSDOT, TBTA and NYCDOT agree to comply with all Federal laws and requirements applicable to this program."  *Id.* cl. 9.

### III.    Aftermath of the Agreement

In January 2025, the CBDTP went into effect and Plaintiffs began charging drivers to enter the CBD.  ECF 83 at 26.  Plaintiffs claim the CBDTP has been a "dramatic success, creating measurable improvement in travel times . . . and the overall quality of life[.]"  ECF 83 at 26–27.  But that is not the full story.

The CBDTP remains unpopular in New York.  A March 2025 Siena College Poll found that 40 percent of New York State residents want to end the CBDTP, while only 33 percent support keeping it.  *See* Press Release, Siena Research Institute, *Siena College New York States Poll* (March 10, 2025), https://scri.siena.edu/wp-content/uploads/2025/03/SNY-March-2025-Poll-Release-FINAL.pdf.

Low-income communities in New York are also feeling the negative impacts from the Project.  While the Project may benefit other neighborhoods, poorer and more racially diverse neighborhoods are suffering from the downstream effects.  *See* Hilary Howard, *The South Bronx Has a Pollution Issue. Congestion Pricing May Worsen It*, NYT (Feb. 2, 2025), https://www.nytimes.com/2025/02/02/nyregion/congestion-pricing-air.html.  For example, in the South Bronx, traffic congestion has worsened since January 2025.  *Id.*   Drivers trying to avoid

tolls now clog local streets in the Bronx, bringing more congestion and pollution to an area already burdened by high pollution. *Id.* New York City responded with plans to add asthma centers and air filters in schools. *Id.* But some local residents say that is not enough. *Id.*

Moreover, experts have also raised concerns about the CBDTP's efficacy and fairness. For example, scholars have pointed out that the pricing model favors taxis, which pay far less per trip than everyone else, despite accounting for more than half of the daily congestion. *See* ECF 87-1, Toll Rate Schedule; Yang & Ostrovsky, *Effective and Equitable Congestion Pricing: New York City and Beyond*, Stanford University Working Paper (2024). A taxi without an E-ZPass pays just 75 cents per one-way trip, while a working-class driver commuting to the CBD would pay nearly $7 per one-way trip. *See* Agreement, Toll Rate Schedule; Yang & Ostrovsky, *supra*. Two experts from Stanford University and University of Chicago found that the Project's design "was unlikely to be effective at solving the traffic congestion problem" considering "taxis and other [for-hire vehicles] are responsible for 52%" of the vehicles traveling in the CBD. *Id.*

## IV.  Notice of Termination of the Agreement and Opportunity to Object

On February 19, 2025, the Secretary sent a letter to Governor Hochul. ECF 87-5 ("the February 19 Letter"). In the letter, the Secretary stated that President Trump had directed him to review FHWA's approval of the CBDTP as a pilot project under the VPPP. *Id.* The Secretary raised two primary concerns with the Agreement and the CBDTP. *Id.* First, the Secretary objected to the CBDTP's cordon pricing model, which charged drivers tolls for entering the CBD with no toll-free alternative. *Id.* He pointed out that this approach was unprecedented and inconsistent with Congressional intent, citing its impact on working-class commuters and the burden it would place on New Jersey. *Id.* Second, the Secretary criticized the fact that the pilot program calculated the particular toll rates in order to raise a certain amount of revenue for MTA projects, and not in

order to reduce congestion.  *Id.*  In addition to these policy concerns, the Secretary concluded that "FHWA lacked statutory authority to approve the cordon pricing tolling under the CBDTP pilot project."  *Id.*

Following these concerns, the Secretary in the February 19 Letter stated that he was "rescinding FHWA's approval of the CBDTP pilot project . . . and terminating the Agreement."  *Id.*  The Secretary recognized TBTA and NYSDOT's reliance interests but concluded that such reliance should not prevent the termination of the Agreement considering that many of the costs incurred predated the Agreement and that "any reliance on that funding stream was not reasonable given that FHWA approved only a 'pilot project.'"  The Secretary concluded that the reliance interests did not outweigh his legal concerns with the Agreement.  *Id.*

The next day on February 20, 2025, the FHWA Executive Director extended the effective termination of the Agreement to March 21, 2025.  ECF 87-6.  A subsequent letter from FHWA extended the effective date again to April 20, 2025.  ECF 87-8.

On April 21, 2025, the Secretary sent another letter to Governor Hochul.  ECF 87-10 ("the April Letter").  In that letter, the Secretary reiterated his two primary concerns with the Agreement and the CBDTP, emphasizing that the CBDTP and the Agreement conflict with the agency's priorities.  *Id.*  First, the Secretary maintained that the absence of a toll-free alternative places a "disproportionate financial burden on low and medium-income hardworking American drivers," who already contribute to federally aided highways through federal taxes.  *Id.*  Second, he reaffirmed as a policy matter that toll rates should not be set primarily based on MTA capital project needs but rather based on improving the infrastructure on which the tolls are collected and reducing congestion.  *Id.* Because the Secretary found the Agreement "no longer effectuates the program

goals or agency priorities," he reaffirmed his termination rationale, invoking 2 C.F.R. § 200.340(a)(4). *Id.*

The April Letter also outlines proposed compliance measures that FHWA could implement on or after May 28, 2025, *if* the FHWA determines that New York is out of compliance with federal law. *Id.* The FHWA's formal determination is required prior to initiating such compliance measures, pursuant to 23 C.F.R. § 1.36, which provides the only mechanism for enforcing the federal prohibition on tolls. Those proposed compliance measures include no further advance construction authorizations or NEPA approvals for certain projects within the Manhattan borough. *Id.* The April Letter also states that FHWA might "consider" imposing additional compliance measures, such as "no further obligations to FHWA funds." *Id.*

The April Letter provides written "notice of the termination" of the Agreement but also provides Plaintiffs the "opportunity to be heard" on termination and any proposed compliance measures. *Id.* (citing to 2 C.F.R. §§ 200.340, 200.341, 200.342). The April Letter invites Plaintiffs to submit written responses within 30 days of April 20, 2025 (i.e., by May 21, 2025), contesting the termination and proposed compliance action. *Id.*

Plaintiffs have not submitted anything yet—but the deadline remains open.

## V.    This Litigation

On February 19, 2025—the same day the Secretary sent his initial letter to the New York Governor—MTA and TBTA ("Original Plaintiffs") filed a 51-page complaint against Defendants. ECF 1. The complaint primarily asserted claims under the Administrative Procedure Act ("APA") along with constitutional and ultra vires claims. *Id.*

NYSDOT, NYCDOT, Riders Alliance, and Sierra Club ("Intervenor-Plaintiffs") moved to intervene, and the Court granted the motion. *See* ECF 23–24, 30–32, 36. The TBTA, MTA,

NYSDOT, and NYCDOT subsequently filed a consolidated amended complaint on April 18, 2025. *See* ECF 58, 62–63. Then on May 6, 2025, TBTA, MTA, NYSDOT, and NYCDOT filed a second consolidated amended complaint, which is the operative complaint for those Plaintiffs. ECF 96. The second amended complaint spans 119 pages and asserts 10 counts: 6 counts under the APA, 3 standalone constitutional counts, and 1 ultra vires count. *Id.*

Also, on May 5, 2025, the same day the second amended complaint was filed, TBTA, MTA, and NYSDOT (together referred to as the "Plaintiffs") filed motions for preliminary injunction. ECF 79–91. MTA, TBTA, and NYCDOT filed a 65-page motion arguing that the Secretary's February 19 Letter constituted final agency action that was arbitrary and capricious. MTA, TBTA, & NYCDOT's Memo. ISO Mot. Prelim. Injunction ("MTA Mot."), ECF 83, at 21–42. They also challenge the lawfulness of the Defendants' "proposed" compliance measures. *Id.* at 42–51. NYSDOT filed a 30-page motion that incorporated MTA's and TBTA's arguments and further argued why the "proposed" compliance measures are unlawful. NYSDOT Memo. ISO Mot. Prelim. Injunction ("NYSDOT Mot."), ECF 89, at 10–15.[1]

Defendants oppose both motions here.[2]

## **STANDARD OF REVIEW**

"A preliminary injunction 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Students for Fair Admissions v. U.S. Mil. Acad. at West Point*, 709 F. Supp. 3d 118, 129 (S.D.N.Y. 2024) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). To obtain a preliminary injunction, the movant must establish (1) a likelihood of success on the merits; (2)

---

[1] For clarity, Defendants cite to Plaintiffs' page numbers on the bottom of their briefs rather than the ECF numbers at the top.

[2] The MTA Mot. and the NYSDOT Mot. advance essentially the same arguments. Defendants address these arguments in this combined opposition brief, but primarily cite the MTA Mot.

irreparable harm absent injunctive relief; (3) that the balance of equities tips in the movant's favor; and (4) that a preliminary injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The preliminary injunction standard is a conjunctive test," and thus the plaintiff must establish "all four elements of the test" to receive a preliminary injunction. *Psihoyos v. John Wiley & Sons, Inc.*, No. 11 CIV. 1416 JSR, 2011 WL 4634172, at \*2 (S.D.N.Y. Oct. 4, 2011).

## **ARGUMENT**

### I.    **The Court lacks jurisdiction over Plaintiffs' claims.**

Plaintiffs bear the burden of establishing subject matter jurisdiction. *See Makarova v. United State*s, 201 F.3d 110, 113 (2d Cir. 2000). And in the preliminary injunction context, they must do so by a "clear showing." *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Plaintiffs fail to meet their burden, as there is no reviewable final agency action, none of plaintiffs' claims is ripe for judicial review, and jurisdiction over any justiciable part of this contract dispute lies solely with the Court of Federal Claims. The Court should thus deny Plaintiffs' motions for preliminary injunction for lack of jurisdiction.

### A.    **Plaintiffs fail to establish reviewable final agency action.**

"The APA explicitly requires that an agency action be final before a claim is ripe for review." *Air Espana v. Brien*, 165 F.3d 148, 152 (2d Cir. 1999) (citing 5 U.S.C. § 704). "This requirement of finality is jurisdictional, . . . and serves several functions." *Id.*[3] "It allows the

---

[3]  Some district courts in this circuit have questioned whether the Second Circuit has decided if final agency action is a jurisdictional requirement or not. *See Dagbazhalsanova v. United States Citizenship & Immigr. Servs.*, No. 23-CV-9599 (LDH), 2025 WL 964071, at \*4 n.3 (E.D.N.Y. Mar. 31, 2025) ("The question of whether final agency action is a jurisdictional requirement remains open in the Second Circuit."). But the Second Circuit's decision in *Air Espana* could not be clearer that it is jurisdictional. Regardless, establishing a final agency action is a threshold requirement— whether jurisdictional or as part of stating a justiciable claim.

agency an opportunity to apply its expertise and correct its mistakes, it avoids disrupting the agency's processes, and it relieves the courts from having to engage in 'piecemeal review which is at the least inefficient and upon completion of the agency process might prove to have been unnecessary.'" *Id.* (quoting *FTC v. Standard Oil Co. of California*, 449 U.S. 232, 242 (1980)).

For agency action to be "final," it must meet two conjunctive requirements: (1) "the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature," and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)); *accord Salazar v. King*, 822 F.3d 61, 82 (2d Cir. 2016). Courts must "interpret[] pragmatically the requirement of administrative finality, focusing on whether judicial review at the time will disrupt the administrative process." *Bell v. New Jersey*, 461 U.S. 773, 779 (1983).

Agency action is not final under the APA when the challenged conduct of the agency, viewed holistically, is part of a larger, unfolding administrative process that remains incomplete. *See, e.g.*, *Berkeley-Dorchester Ctys. Econ. Dev. Corp. v. United States Dep't of Health & Hum. Servs., Admin. for Child. & Fams.*, No. CV 2:04-22950-23, 2006 WL 8443181, at *1 (D.S.C. Feb. 24, 2006); *Purpose Built Families Found., Inc. v. United States*, 634 F. Supp. 3d 1118, 1121 (S.D. Fla. 2022), *aff'd*, 95 F.4th 1346 (11th Cir. 2024).

In *Berkeley-Dorchester*, the plaintiff received grant awards from HHS to provide low-income children with pre-elementary instruction. 2006 WL 8443181 at *1. Due to health concerns with the plaintiff's facility, HHS sent the plaintiff a summary suspension of the grants. *Id.* at *1. HHS rescinded the summary suspension within days, upon plaintiff producing certain documents. *Id.* But then HHS sent two subsequent letters to the plaintiff purporting to terminate the grants but

giving plaintiff 30 days to cure the deficiencies.  *Id.* at *2.  Plaintiff sued HHS under the APA, claiming that the original termination was a final agency action or, in the alternative, that HHS had conducted a "series of final agency actions."  *Id.* at *15.  But the court rejected and dismissed plaintiff's claims, finding no final agency action because the summary suspension was not "a consummation of the agency's decisionmaking" and did not have "determinative consequence on the parties."  *Id.* at *16.  The court looked at HHS's actions as a whole and found that HHS's subsequent actions after the summary termination indicated that the agency had not made a final decision.  *Id.*  The court reasoned that it was "reluctant to insert itself into the center of an abstract and unreconciled dispute."  *Id.*  And "for similar reasons," the court also rejected the plaintiff's argument about there being "a series of final agency actions."  *Id.*

Similarly, in *Purpose Built Families*, the government issued two letters to plaintiff.  634 F. Supp. 3d at 1121.  The first letter notified the plaintiff that the government would be "immediately" withholding certain grants, pending completion of the government's audits of those grants.  *Id.*  The second letter notified the plaintiff that the government would be terminating plaintiff's grants within seven days of receipt.  *Id.*  The court found that the first letter was not a final agency action because it did not represent the consummation of the agency's decisionmaking process, noting that the audit of the grant indicated that the agency procedures were still "ongoing" and were "tentative" and that plaintiff had an opportunity to "engage" with the government through an administrative process.  *Id.* at 1124. On the other hand, the court found that the second letter was a final agency action because the government's actions gave no indication that the grant termination was part of any "ongoing administrative process."  *Id.* at 1124–25.

Here, the Secretary and FHWA's actions, taken as a whole, show an ongoing decision-making process that has neither reached a definitive conclusion nor imposed tangible legal consequences.  As such, there is no final agency action to challenge.

### 1.  The process to terminate has not been consummated.

No action by the Secretary or FHWA represents a final consummated decision.  Plaintiffs challenge the February 19 Letter as a final agency action.  MTA Mot. at 24–38.  But the agency's actions should be evaluated as a whole, not in isolation.  The February 19 Letter cannot be viewed as the consummation of the agency's decision when subsequent events demonstrate an unfolding administrative process that is not complete.  The day after issuing the February 19 Letter, the agency delayed the effective date of termination and then delayed the effective date of termination again, ultimately extending the effective date of termination to April 20.  ECF 87-5, 87-6, 87-8.  In the April Letter, the Secretary issued a written notice of termination but gave Plaintiffs until May 21, 2025, to contest the termination and the proposed compliance measures.  ECF 87-10.  These incremental, incomplete steps toward a final decision show that the Secretary and FHWA have not reached a definitive end point in their decisionmaking.

And this pattern closely tracks with the agency's conduct in *Berkeley-Dorchester*, where the court found no final agency action after HHS terminated the grant, rescinded the termination, and then issued another termination with the opportunity to cure.  2006 WL 8443181 at *16.  There, the court refused to treat the initial termination as final because the agency's subsequent actions showed the process was still unfolding.  The same principle applies here: the totality of the Secretary's and FHWA's conduct shows the agency's decisionmaking process has not been consummated. Plaintiffs seek to bypass the established process and proceed directly to court and injunctive relief, presumably because they believe the current, non-final record favors their

position.  But the Court should not entertain Plaintiffs' attempt to derail an administrative process that is still ongoing and nearing a clear end.

This ongoing process also aligns with principles of cooperative federalism Congress set out to codify in the VPPP Statute, and the Court should allow that process to continue.  In the April Letter, the Secretary invited Plaintiffs to engage with FHWA before the Secretary exercises his lawful discretion to consider any submissions by Plaintiffs, determine whether Plaintiffs are in noncompliance, and determine what, if any, compliance measures are appropriate.  An acceptable, alternative VPPP proposal could be developed through this engagement.  That collaborative process remains active, and this Court should permit that process to proceed without judicial interference.

Plaintiffs argue that any further consideration by the Secretary and FHWA would be merely "pretextual" and in "name only," pointing to the use of the past tense—"terminated"—in the April letter.  MTA Mot. at 24.  But Plaintiffs are wrong.  First, Plaintiffs omit that the April letter not only provided written notice of termination but also provided an opportunity be heard on termination.  *See* ECF 87-10 ("[T]his letter serves as the written notice of termination . . . and NYCDOT's opportunity to object and provide information challenging the termination[.]").  Second, this argument is, like many of Plaintiffs' arguments, speculative.  Neither Plaintiffs nor this Court knows the outcome of continued engagement with FHWA, which may lead to a narrowing or even resolution of the present dispute.  For example, engagement with FHWA on or before May 21, 2025, may yield an acceptable path forward for all parties or it may influence the agency regarding the propriety of any compliance measures, which could at the very least narrow this dispute.  In short, the Court should not credit Plaintiffs' speculative claims of pretext and

futility.  Nor should the Court allow Plaintiffs to short-circuit the non-final administrative process and in the same breath challenge it as inadequate.

### 2.  Tangible legal consequences have not flowed from FHWA's and the Secretary's actions.

The actions by FHWA and the Secretary thus far have no tangible consequences for Plaintiffs.  Defendants have affirmatively stated they will not pursue any compliance measures until at the earliest May 28—after Plaintiffs' May 21 deadline for contesting the termination.  ECF 87-10.  That commitment negates any claim that rights or obligations have been altered or determined.

And Defendants' actions stand in contrast to the second letter in *Purpose Built Families*, which terminated a grant with no follow up agency action indicating an ongoing process.  634 F. Supp. 3d at 1121–25.  Here, the April Letter invites Plaintiffs to engage with the agency regarding both termination and proposed compliance—much like the first letter terminating the grant in *Purpose Built Families*, which the court found non-final because it was still contingent on an unresolved audit.

Moreover, there is no private right of action to enforce the anti-tolling provision under 23 U.S.C. § 301.  *See KM Enters., Inc. v. McDonald*, No. 11–CV–5098, 2012 WL 4472010, at *17 (E.D.N.Y. Sept. 25, 2012) (finding that Federal Aid Highway Act does not provide a provide right of action (collecting cases)), *aff'd*, 518 Fed. App'x 12 (2d Cir. 2013); *Town of Portsmouth, R.I. v. Lewis*, 813 F.3d 54, 63 (1st Cir. 2016) ("Thus the anti-tolling provision does not provide the Town with a private right of action."); *Endsley v. City of Chi.*, 230 F.3d 276, 279 (7th Cir.2000); *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 186 (4th Cir. 1999); *Allandale Neighborhood Ass'n v. Austin Transp. Study Policy Advisory Comm.*, 840 F.2d 258, 267 (5th Cir.1988). Therefore, only the federal government can enforce the anti-tolling provision, meaning

that Plaintiffs face no tangible consequences unless and until FHWA and the Secretary choose to act.  And not only have they not acted, but they have specifically told Plaintiffs they will not take any action until after making a final decision in response to Plaintiffs' submission(s) contesting the termination.  *See* ECF 87-10.

Two further points underscore the non-final nature of FHWA's and the Secretary's actions thus far.  First, on remedy, if the Court were to deem the February 19 Letter a final agency action that is unlawful, as Plaintiffs urge, the only appropriate remedy would be to set aside and remand for the Secretary and FHWA to reconsider that action.  *See Ward v. Brown*, 22 F.3d 516, 522 (2d Cir. 1994) (in holding that an agency acted arbitrarily or capriciously, "the appropriate course for a reviewing court ordinarily is to remand the case to the agency").  But currently, the April Letter remains active and operative, creating procedural complexity here.  Plaintiffs themselves appear uncertain about what constitutes the final agency action they seek to enjoin, as they ask this Court to enjoin Defendants from "taking any further agency action founded on the February 19 Letter *or* the April 21 Letter."  *See* ECF 82 at 2 (emphasis added).  This ambiguity reinforces that FHWA and the Secretary have neither completed their decisionmaking process nor issued a decision with concrete consequences that are appropriate for judicial remedies.

Second, Plaintiffs' months-long delay between filing their initial complaint and seeking a preliminary injunction demonstrates that even they did not view the February 19 Letter as the final word on termination—let alone compliance—when they filed their initial complaint.  Had they truly believed that the February 19 Letter constituted final agency action, they would have presumably sought injunctive relief at that time rather than waiting until April.  Their recent motions appear driven not by the February 19 Letter, but by the April Letter.  But the April Letter

affords Plaintiffs the opportunity to contest the termination by May 21, indicating that this process is not over and is not final.

Plaintiffs also appear to assert independent constitutional claims that do not rely on the APA's cause of action. *See* NYSDOT Mot. at 10–15, MTA Mot. at 49–50. Those claims challenge the constitutionality of the "potential" compliance decisions. *See* NYSDOT Mot. at 10–15, MTA Mot. at 49–50. Not only are those claims not currently justiciable for many of the same reasons argued above, but they are also not ripe, as a lack of final agency action is indicative of a lack of ripeness generally. *See Abbot Lab'ys v. Gardner*, 387 U.S. 136, 148–49 (1967) (stating that the ripeness requirement "protect[s] the agencies from judicial interference until an administrative decision has been formalized"); *Seafarers Int'l Union of N. Am., AFL-CIO v. U.S. Coast Guard*, 736 F.2d 19, 26 (2d Cir. 1984) ("The law of ripeness is now very much a matter of common sense, whether one speaks in the related terms of 'ripeness,' of satisfying the 'final agency action' requirement of the APA, or of the exhaustion requirement implicit in the APA. What these doctrines require, however they may be put, is a determination that there is a justiciable case or controversy within the prudential rules by which we are governed." (citations omitted)). Moreover, the Court should not evaluate the legality of any "potential" compliance measures without first determining that a final agency action on termination has occurred, which it has not.

In short, FHWA and the Secretary have taken no actions that represent a consummation of decisionmaking that will have concrete consequences for any Plaintiffs. Plaintiffs have thus failed to establish final agency action, and this Court should deny both motions for preliminary injunction.

### B.  Plaintiffs' claims are not ripe for judicial review.

Even if review of Plaintiffs' claims were statutorily permitted, which they are not, the Court should nonetheless decline to consider this motion for preliminary injunction because Plaintiffs'

claims are not prudentially ripe. "Under the doctrine of prudential ripeness, courts will decline to review administrative action that would otherwise be reviewable under constitutional and statutory standards because, upon a balancing of the pertinent interests, it is preferable for judicial review to await a more advanced state of administrative consideration." *Lab. Council for Latin Am. Advancement v. EPA* ("*LCLAA*"), 12 F.4th 234, 252–53 (2nd Cir. 2021); *see also Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999, 1007–08 (D.C. Cir. 2014) ("Even when an agency has taken final action, a court may refrain from reviewing a challenge to the action if the case is unripe for review." (citation omitted)). In the administrative context, the ripeness doctrine "protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Lacewell v. Off. of Comptroller of Currency*, 999 F.3d 130, 148 (2nd Cir. 2021) (cleaned up).

The prudential ripeness doctrine involves a two-part balancing inquiry: whether the issues are "fit" for judicial review, and whether withholding a decision would cause substantial hardship on the parties. *LCLAA*, 12 F.4th at 252–53.

Other courts' application of the prudential ripeness doctrine is instructive and shows that an agency action is not ripe for judicial review when the agency process is still ongoing and the plaintiff retains a meaningful opportunity to affect that ongoing process. In *German Language Ctr. v. United States*, No. CIV. A. H-09-3950, 2010 WL 3824636, at *4 (S.D. Tex. Sept. 27, 2010), the district court found that judicial review of a visa determination was not ripe, as the agency had reopened the matter for further consideration. Because the visa decision had not been finalized, the court declined to intervene on ripeness grounds, emphasizing the need to avoid premature adjudication and to allow the administrative process to run its course. *Id.*; *see also Simmonds v. INS*, 326 F.3d 351, 359 (2nd Cir. 2003) (holding plaintiff's suit was not fit for judicial decision

where "uncertainty . . . exists . . . over 'whether or when' [plaintiff] will be detained by the INS and the removal order against him executed").

Similarly, in *W.R. Grace & Co.—Conn. v. EPA*, 959 F.2d 360, 364–67 (1st Cir. 1992), the First Circuit concluded that a challenge to the EPA's issuance of a corrective action permit was prudentially unripe.  The corrective action permit required the plaintiff to conduct certain investigations in accordance with a schedule of compliance. *Id.* at 361–62.  Plaintiff sued the EPA, but the court determined that the matter was not yet fit for judicial review, as the plaintiff failed to demonstrate that the agency had taken any coercive action or had rejected any of plaintiff's investigative proposals. *Id.* at 365–66.  The court also noted that the parties might still resolve their disagreements without court involvement, such that plaintiff's "claim may become moot before it ever ripens." *Id.* at 366.  Finally, the court rejected plaintiff's claim of hardship, emphasizing that the plaintiff had not pursued available administrative remedies—such as seeking extensions or engaging in further dialogue with the agency—before initiating litigation. *Id.* at 366–67; *see also Connecticut v. Duncan*, 612 F.3d 107, 114 (2nd Cir. 2010) (finding the case not ripe for review because "further administrative proceedings—which could include the resolution of pending factual disputes about the Secretary's suggestion of cost-cutting measures different from those already proposed by the State—would render such final action unnecessary"); *Fla. Power & Light Co. v. E.P.A.*, 145 F.3d 1414, 1417 (D.C. Cir. 1998) (holding that challenge to an EPA's preamble statement that indicated that the EPA could inspect plaintiff's facilities was not ripe for review because the agency had not taken any "corrective action order against it").

Here, regardless of whether the court finds a reviewable final agency action, Plaintiffs' motion for preliminary injunction is still not ripe for judicial review because the agency process is ongoing and Plaintiffs retain a meaningful opportunity to affect that ongoing process. *See Isaacs*

*v. Bowen*, 865 F.2d 468, 478 (2nd Cir. 1989) ("[T]he issues sought to be adjudicated are contingent on future events or may never occur."). Both prongs of the ripeness inquiry support deferring judicial intervention.

In assessing fitness for review, courts consider the following factors: (1) whether judicial review would benefit from delay to see an agency decision further "crystalize"; (2) whether judicial intervention would interfere with administrative progress, "particularly where the possibility that further consideration by the agency will actually occur is not theoretical, but real"; (3) whether the agency's action is sufficiently final; (4) whether the case presents a purely legal question, which typically weighs against deferring judicial action, while one requiring further factual development weighs in favor of deferring. *See LCLAA*, 12 F.4th at 252–53 (cleaned up); *Friends of Animals v. Pendley*, 523 F. Supp. 3d 39, 59–60 (D.D.C. 2021).

This matter is not currently "fit" for judicial review because key facts remain unsettled, as Plaintiffs still have an opportunity to engage in the administrative process outlined in the April Letter. The factors that courts consider when determining case fitness all weigh in favor of delaying judicial action.

On factor one, the Court would benefit from waiting to issue a decision on the merits of the case. The Secretary's April letter represents a good faith effort to afford Plaintiffs the opportunity to submit all information that they deem appropriate, which may affect the termination of the agreement or any potential compliance measures. *See* ECF 87-10. The parties, and this Court, do not know yet whether Plaintiffs will respond to the April letter, what arguments they will raise to FHWA, or how FHWA will react. Until FHWA issues a final decision in response to Plaintiffs' submissions, judicial review would risk resolving an abstract, hypothetical dispute, rather than a concrete, crystalized one.

On factor two, judicial review would interfere with the administrative process. Plaintiffs, in filing their preliminary injunction motion, are asking this Court to review possible compliance measures that the FHWA may take. In essence, the Court would have to step in and superintend the compliance process. There is no such judicial preclearance regime in any governing statute or in 23 C.F.R. § 1.36, so there is no authority for the Court to wade into the agency's decisionmaking process at this preliminary stage.

On factor three, the agency's action lacks sufficient finality, as outlined more fully in Part I.A., above. In short, because the Secretary has expressly invited Plaintiffs to contest the notice of termination and any potential compliance measures, no definitive action has been taken and thus agency action is not sufficiently final.

Fourth, the primary legal challenge is whether the Secretary acted arbitrarily and capriciously. That is a fact-intensive, rather than a purely legal, inquiry, as shown by the 95-pages of briefing from Plaintiffs, including over 20 pages of factual background. *See* MTA Mot. (65 pages of briefing with 13 pages of background); NYSDOT Mot. (25 pages of briefing with 8 pages of background). Such an inquiry is ill-suited for judicial resolution at this time where the factual record is incomplete and still evolving, evidenced by the government's invitation to Plaintiffs to submit any information it deems relevant by May 21, 2025. ECF 87-10. The Court should defer review until FHWA has issued a final decision, as such a delay will give the court a more complete record when deciding whether the Secretary in fact acted arbitrarily and capriciously.

The same reasoning applies, if not more so, to Defendants' "potential" compliance measures. Plaintiffs themselves acknowledge that the action they are challenging is merely "*proposed* enforcement." *See* MTA Mot. at 42 (emphasis added). Given that Defendants have afforded Plaintiffs until May 21, 2025, to present arguments contesting both termination and

potential compliance measures, it would be premature for this Court to assess the legality of any "proposed enforcement" action that has not occurred and may never occur, depending on how FHWA responds to Plaintiffs' submissions.

To argue that their claims are ripe and fit for review, Plaintiffs invoke *Perkins Coie LLP v. U.S. Dep't of Just.*, No. CV 25-716 (BAH), 2025 WL 1276857, at *9 (D.D.C. May 2, 2025). ECF 83 at 23–24. But their reliance on that case is misplaced. There, the court found the case ripe for review where the challenged executive order directed an agency to terminate security clearances of Perkins Coie attorneys and "[t]hat same day" federal officials refused to allow Perkins Coie attorneys to attend certain meetings, citing the executive order and termination of security clearances. *Perkins Coie LLP*, 2025 WL 1276857 at *9–12. That is nothing like this case. Defendants here have taken no compliance action against Plaintiffs, and Defendants have twice extended the effective termination date and have most recently given Plaintiffs the opportunity to be heard on termination and any potential compliance action *before* they become effective.

The second ripeness consideration—whether the parties will suffer hardship if review is withheld—does little to outweigh the strong showing that this case is not yet fit for judicial review. Plaintiffs will not suffer meaningful or tangible harm from the Court deferring review until the administrative process is complete. Plaintiffs seem to acknowledge that the termination "has not yet gone into effect," MTA Mot. at 52, yet still assert irreparable harm based on speculative future action—action that has not occurred, may never occur, and could be avoided altogether through Plaintiffs engaging with FHWA in the ongoing administrative process. As in *W.R. Grace*, where the court found a lack of harm because the plaintiff had not fully pursued available administrative remedies, the same reasoning applies here. 959 F.2d at 364–67.

And Plaintiffs' claims of potential harms, absent any actual enforcement action, are not legally cognizable. *See Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 810–11 (2003) (rejecting plaintiff's hardship claim because announcement of the regulation, without enforcement, resulted in no practical harm to plaintiff and "mere uncertainty as to the validity of a legal rule" fails to constitute a hardship for purposes of the ripeness analysis); *New York v. U.S. Dep't of Health & Hum. Servs.*, No. 07 CIV.8621 (PAC), 2008 WL 5211000, at *14 (S.D.N.Y. Dec. 15, 2008) ("Maryland's claim would become ripe if CMS were to enforce provisions of the SHO Letter and impose sanctions on Maryland following a hearing in accordance with the statutory and regulatory guidelines.").

### C. The Tucker Act vests exclusive jurisdiction over Plaintiffs' claims in the Court of Federal Claims.

Plaintiffs are unlikely to prevail on the merits because their claims, fundamentally, are an effort to reinstate and enforce the November 21 cooperative agreement, which they claim was improperly terminated. That agreement is a contract with the federal government. ECF 87-1 ("by and among the Federal Highway Administration, United States Department of Transportation" and some of Plaintiffs). Because Plaintiffs' claims "essentially arise[] from" that contract, the Tucker Act "provides the sole basis for jurisdiction for this action" and "jurisdiction resides exclusively in the Court of Federal Claims," to the extent any of Plaintiffs' claims is valid. *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 373 (2d Cir. 1999).

In *Department of Education v. California*, the Supreme Court stayed a temporary restraining order that had "enjoin[ed] the Government from terminating various education-related grants." 145 S. Ct. 966 (2025). The Supreme Court held that the government was "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA," reasoning that "the Tucker Act grants the Court of Federal Claims jurisdiction over suits

based on 'any express or implied contract with the United States.'" *Id.* at 968–69 (quoting 28 U.S.C. §1491(a)(1)). The same jurisdictional bar equally applies to the claims in this case, which are based on Plaintiffs' cooperative agreement with Plaintiffs, and seek reinstatement and enforcement (i.e., specific performance) of that agreement. *See Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 79–80 (D.C. Cir. 1985) (holding that a claim requesting "an order reinstating" a contract "must be resolved by the Claims Court," in part because it "may amount to a request for specific performance" of the contract).

Simply put, because there is no statutory obligation that the agency agree to authorize the CBDTP (or any particular VPPP), Plaintiffs' claims are grounded in contract. The Second Circuit's decision in *Up State Federal Credit Union* demonstrates why the same result (dismissal for lack of subject matter jurisdiction) is appropriate here. Most fundamentally, all of Plaintiffs' arguments "require[] an interpretation of the [agreement]," so "the source of the right at issue here is the contract between the parties rather than [a regulation of statute]." *Up State Fed. Credit Union*, 198 F.3d at 377. Indeed, the crux of this dispute turns on interpreting specific terms and conditions of the contract, such as section (9) about "comply[ing] with all Federal laws and requirements applicable to this project." ECF 87-1, § 9.

Notably, a direct exchange of funds need not be at issue for a dispute to sound in contract and trigger the Tucker Act's exclusive jurisdictional grant. Indeed, the alleged agreement by the Army to "take title to the [credit union's] building at the end of the one-year lease" and "give the Credit Union first choice at that time to continue occupying the building under a facility lease" did not condition that title transfer or first-choice authority on an exchange of funds between the government and plaintiff. *Up State Fed. Credit Union*, 198 F.3d at 373-74 (emphasis added). Rather, the agreement was conditioned on the credit union "obtain[ing] the requested

documentation" (i.e., a building permit and certificate of occupancy from the town).  *Id.* at 373. Similarly, here, the agreement Plaintiffs claim that Defendants invalidly terminated had authorized TBTA to "operate the Project as a toll Project in accordance with the provisions of this Agreement and as a value pricing project."  ECF 87-1 at 2. Neither involved a direct transfer of funds, but both fundamentally sound in contract.

Although the agency's *authority* to *enter* such agreement derives from statute, Plaintiffs "right[s] in this case stem[] from no independent, non-contractual source."  *Up State Federal Credit Union*, 198 F.3d at 376. They are "not 'ultimately based' on anything other than the [agreement with the agency]."  *Id.* at 377 (quoting *Megapulse, Inc. v. Lewis,* 672 F.2d 959 (D.C.Cir.1982)).  "Had the parties not entered into the agreement at issue in this case, [Plaintiffs] could have had no possible right to [operate the project], or to demand that the [agency] grant it [authorization to do so]. In the absence of a contract with the [agency], therefore, 'it is likely that no cause of action would exist at all.'"  *Id.* (quoting *Falls Riverway Realty, Inc. v. City of Niagara Falls,* 754 F.2d 49, 54–55 (2d Cir. 1985)).

And the fundamental remedy Plaintiffs seek, reinstatement of the terminated agreement— like "an order directing the Army to enter into a facility lease, as requested by the Credit Union"— "would be analogous to a contractual remedy for specific performance because it would enforce an alleged agreement between the parties."  *Id.*  The only appropriate conclusion, then, is that the Tucker Act "provides the sole basis for waiver of sovereign immunity in this case and therefore that the Court of Federal Claims has exclusive jurisdiction over this matter."  *Id.*; *see Ingersoll-Rand Co.*, 780 F.2d at 79–80.

## II.    Plaintiffs fail to show irreparable harm.

A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction."  *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d

Cir. 2009). To establish irreparable harm, the moving party must "show that there is a continuing harm which cannot be adequately addressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (citation omitted).  In this context, the relevant harm is that which arises "during the interim between the request for an injunction and final disposition of the case on the merits." *Jayaraj v. Scappini*, 66 F.3d 36, 40 (2nd Cir. 1995).  The moving party "must show that injury is likely before the other requirements for an injunction will be considered." *Kamerling*, 295 F.3d at 214.

Plaintiffs here fail to meet their burden of irreparable harm.[4]  First, Plaintiffs' claims of irreparable harm ring hollow given their delay in filing for a preliminary injunction.  *See Hornig v. Trustees of Columbia Univ.*, 17 CV 3602, 2018 WL 5800801 at*7 (S.D.N.Y. Nov. 5, 2018) (finding that plaintiff's two-and-a-half-month delay in bringing a motion for preliminary injunction in employment discrimination case undermined "a finding [o]f irreparability because courts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months") (citation omitted). Plaintiffs argue that the Agreement was finally terminated on February 19, 2025, and trace possible irreparable harm to that date.  *See, e.g.*, MTA Mot. at 54–56 (arguing irreparable harm due to being deprived the property right in the VPPP agreement without due process).  But this preliminary injunction motion comes over two months after this alleged termination.  This delay alone forecloses a finding of irreparable harm.

Plaintiffs' arguments for irreparable harm also fail on their own terms.  Plaintiffs' asserted injuries are speculative or self-inflicted, turning on actions that Plaintiffs concede are merely

---

[4]  Plaintiffs advance similar irreparable harm arguments, but the MTA Mot. includes additional irreparable harm arguments compared to the NYCDOT Mot. All fail as overly speculative.

"proposed," "potential," or "indeterminate." MTA Mot. at 42, 54, 56, 58; *see New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020) (finding that a plaintiff must show an "injury that is neither remote nor speculative, but actual and imminent," and that "cannot be remedied by an award of monetary damages"). Seeming to recognize the difficulty of showing irreparable harm when compliance measures have not been decided, Plaintiffs recite a litany of harms, hoping one will gain traction with the Court.

First, Plaintiffs argue that they face irreparable harm because MTA may have to "forgo all funding and projects requiring FHWA actions." MTA Mot. at 52; *see also* NYSDOT Mot. at 15–21. These harms are speculative, as FHWA has not imposed any compliance measures, much less rescinded "all funding" or halted actions on projects requiring FHWA input. *See Fox Ins. Co. v. Envision Pharm. Holdings, Inc.*, 2009 WL 790312, at *7 (E.D.N.Y. Mar. 23, 2009) (denying defendant's request for injunctive relief where defendant argued that other vendors "*may* cease doing business with [defendant] and *if* that occurred, [defendant] would *likely* fail to meet the Medicare access requirements, making it impossible for [defendant] to continue to serve its Medicare clients" (emphasis in original)). As explained in Part I.A., above, FHWA has not reached a final decision about any appropriate compliance measures under 23 C.F.R. § 1.36. Unless and until compliance measures are decided and communicated to MTA, any harm from what Plaintiffs concede is merely "proposed enforcement" is too speculative to serve as a basis for a preliminary injunction.

Plaintiffs point to a number of cases that purportedly show that the "expected loss of federal approvals or funding" is sufficient for irreparable harm. *See* MTA Mot. at 52. But each of these cases involved the government actually identifying which funds would be withheld or which approvals would be revoked. *See City and County of San Francisco v. Trump*, --- F. Supp. 3d ---,

2025 WL 1186310, at *2 (N.D. Cal. Apr. 24, 2025) (President directed federal agencies to withhold federal funds from sanctuary jurisdictions); *New York v. Trump*, 2025 WL 715621, at *13, 15 (D.R.I. Mar. 6, 2025) (OMB froze federal grant money); *Nat'l Council of Nonprofits v. O.M.B.*, 2025 WL 597959, at *18 (D.D.C. Feb. 25, 2025) (concerning a pause in federal funding); *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017) (concerning federal executive order threatening to withhold funds from sanctuary jurisdictions); *United States v. North Carolina*, 192 F. Supp. 3d 620, 630 n.2 (M.D.N.C. 2016) (concerning specific funding and grants). In contrast, the April Letter identifies a list of broad categories of compliance measures FHWA may take, without determining whether it would impose any such measures at all, let alone actually identifying what specific measure(s) the agency would take within those categories.

Plaintiffs also argue irreparable harm from so-called "unconstitutional threats." MTA Mot. at 53. But these arguments amount to bare allegations, without support. MTA Plaintiffs state that "Defendants seek to impose retroactive conditions on the receipt of federal funds to hobble programs meant to further New York's sovereign interests, irreparably harming State sovereignty." *Id.* Even taking Plaintiffs allegations as true, these so-called "retroactive conditions" do not impact New York's sovereign interests to the degree of irreparable harm. The two cases Plaintiffs cite found irreparable harm to sovereign interest where the very land the sovereign controlled was taken under Federal trust. *See Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 17 (D.D.C. 2014) ("a stay is necessary to prevent the irreparable harm to state sovereignty and state management of land that will befall Alaska if state land begins to be taken into trust for the Tribes"); *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1367 (S.D. Ga. 2018) (finding irreparable harm where "the States will lose their sovereignty over certain intrastate waters").

Plaintiffs do not identify what sovereign interests are impacted, or how any sovereign interest would be impacted by the lawful imposition of compliance measures under 23 C.F.R. § 1.36. MTA Mot. 53-54. Nor could MTA Plaintiffs. As described above, FHWA has not determined what, if any, compliance measures will be used under 23 C.F.R. § 1.36. MTA Plaintiffs cannot credibly show that a sovereign interest is impacted by undetermined compliance measures.

Plaintiffs also argue that there are "compliance costs" to acceding to FHWA's proposed compliances measures. MTA Mot. at 54. But Plaintiffs do not describe what these compliance costs are. In contrast, the case relied on by MTA Plaintiffs, *Texas v. EPA*, the Court there found significant costs in complying with emissions regulations, as there were "tremendous costs of the emissions controls" required by the agency action. 829 F.3d 405, 433 (5th Cir. 2016). Plaintiffs have not provided any evidence of similar compliance costs, so this cannot be a basis of irreparable harm. *See Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) (holding "ordinary compliance costs are typically insufficient to constitute irreparable harm… Plaintiffs' general failure to demonstrate the adverse impact of interim compliance—at least on the record before us—is dispositive"). Indeed, Plaintiffs have not provided any evidence that they have taken compliance-like measures, presumably because they view the termination of the Agreement as invalid.

Plaintiffs further argue that they suffer irreparable harm by being deprived of their property interest in the VPPP in violation of "due process." MTA Mot. at 54-56. That argument falls especially flat considering that they seek to bypass and enjoin the very process the agency has provided them through an opportunity to be heard and challenge the termination before FHWA and the Secretary. Also, Plaintiffs do not make any substantive arguments in the briefing to show they were denied due process and instead reference bare citations to their amended complaint. *Id.*

at 54.  To the extent Plaintiffs allege they have a property interest in the funding that is allegedly being threatened by a potential future compliance measure, *id.* at 55-56, these future compliance measures have not been decided or implemented, again making any harm too speculative to support a preliminary injunction.  *Kamerling*, 295 F.3d at 214 ("irreparable harm must be shown to be actual and imminent, not remote or speculative"); *Fair Hous. Just. Ctr. v. Town of Eastchester*, No. 16 CV 9038 (VB), 2019 WL 13388549, at *4 (S.D.N.Y. June 24, 2019) ("To be sure, this may change should Elide Manor enforce the residency preference in the future. But a speculative future injury does not support a preliminary injunction.").

Plaintiffs then argue that they will be harmed because they will lose credibility with the public. MTA Mot. at 56.  The basis for this harm is that Defendants will be stymying MTA's ability to "perform its obligations to the public to provide safe, reliable and accessible transportation." *Id.*  But this is not the type of reputational harm supported by Plaintiffs' authority.  Plaintiffs rely on *City of Los Angeles v. Session*s, 2018 WL 6071072, at *3 (C.D. Cal. Sept. 13, 2018), but that case involved the choice between following long-standing policies and funding. Here, even taking Plaintiffs arguments as true, Plaintiffs face the choice between a policy a few months old and certain funds.  But Plaintiffs arguments are not in fact true, because FHWA has not imposed any compliance measures, or determined which compliance measures it will impose in the future.  It is purely speculative whether MTA will be "stymied" in its objectives.  *See Kamerling*, 295 F.3d at 214; *Fair Hous. Just. Ctr.*, 2019 WL 13388549, at *4.  Second, the April 21 Letter explicitly states that approvals for safety related projects will not be withheld by FHWA.  Finally, Plaintiffs do not provide any evidence that the halt of any of its projects would negatively impact public perception of the MTA Plaintiffs.  There is thus no basis on this ground for the finding of irreparable harm.

Plaintiffs argue irreparable harm because they purportedly made substantial resource investment in reliance of the Government's approval and now will face the loss of the expected benefits of their investment.  MTA Mot. 56–57.  Similarly, Plaintiffs argue that the loss of revenues to secure bonds would result in a loss of reputation and goodwill.  *Id.* at 58.  These are harms of Plaintiffs' own making.  First, Plaintiffs put in place the tolling infrastructure *long before* the FHWA ever agreed to sign the Agreement—and while multiple challenges in federal and state courts were ongoing. Having chose to assume those risks, they cannot now claim a reliance interest in operating this *pilot* project in perpetuity.  Second, as described above, President Trump campaigned in part on terminating congestion pricing in New York City.  *See* ECF 87-2.  After he won the election, Plaintiffs raced to sign with the prior administration and implement the CBDTP, knowing full well the likely risk that the Agreement could be terminated by the incoming administration.  Now, after investing in the CBDTP knowing the risk, they complain that the risk is about to be realized.  This kind of foreseeable and self-created harm cannot be a basis for a preliminary injunction. *See Beldock v. Deutsche-Eco USA Corp*., No. 2:16-CV-14, 2016 WL 8809221, at *4 (D. Vt. Feb. 22, 2016) ("But it has long been the rule that the party claiming irreparable harm cannot also be the cause of the harm."); *cf. Dep't of Educ. v. California*, 145 S. Ct. at 969 (where "irreparable harm would be of their own making. 'Such self-imposed costs are not properly the subject of inquiry on a motion for stay.'" (citation omitted)).

Plaintiffs also argue irreparable harm due to budgetary uncertainty "if" federal funding becomes unavailable.  MTA Mot. at 58.  Likewise, Plaintiffs speculate that compliance measures "could" stop NYCDOT projects.  *Id.* at 58-59.  Yet again, Plaintiffs' harm is speculative—FHWA has not decided whether, and to what extent, to withhold federal funding from MTA or any of the Plaintiffs.  *See Kamerling*, 295 F.3d at 214; *Fair Hous. Just. Ctr.*, 2019 WL 13388549, at *4.

Indeed, the Secretary in his April Letter made plain that any withholding of funding is still uncertain and undetermined. *See* ECF 87-10 (stating that, if the FHWA determines they are appropriate, initial compliance measures will be the withholding of approval, and only if "New York's noncompliance continues, FHWA *may* consider additional measures" that could include withholding of funding (emphasis added)).

Finally, Plaintiffs argue irreparable harm because they cannot effectuate a state statute that mandates congestion pricing. MTA Mot. at 59-60. But congestion pricing always required authorization from the Federal Government. *See* 23 U.S.C. § 301 ("all highways constructed under the provisions of this title shall be free from tolls of all kinds"); 23 U.S.C. § 129 note ("Notwithstanding sections 129 and 301 of title 23, United States Code, the Secretary shall allow the use of tolls on the Interstate System as part of any value pricing pilot program under this subsection"). If a state could manufacture harm and thus compel Federal approvals and action by mere passage of a state law, the fundamental principles of federalism would be upended, and the Federal Government could be held hostage to any state law. Of course, the Constitution does not allow this, as state laws are preempted by conflicting federal laws. *See Env't Encapsulating Corp. v. City of New York*, 855 F.2d 48, 53 (2d Cir. 1988) ("[S]tate law is preempted to the extent that it actually conflicts with federal law. Such conflict is found where 'compliance with both federal and state regulations is a physical impossibility.'" (citation omitted)). Thus, this is not a basis for finding irreparable harm.

The Court should reject Plaintiffs' scattershot attempt at establishing irreparable harm.

### III.    Plaintiffs are not likely to succeed on the merits because the Secretary and FHWA have acted lawfully.

Even if the Court determines that there is jurisdiction over this dispute and that Plaintiffs can establish irreparable harm, the Secretary's and FHWA's actions were still lawful. The

Secretary and FHWA have the authority to terminate the agreement, did not act arbitrarily and capriciously, and have authority to impose compliance measures if deemed appropriate.

### A.  The Secretary and FHWA have authority to terminate the Agreement.

Defendants have the authority to terminate the VPPP Agreement under the regulations governing the grant of assistance awards, including VPPP cooperative agreements.  Clause Nine of the VPPP agreement states that "NYSDOT, TBTA and NYCDOT agree to comply with all Federal laws and requirements applicable to this project, including the laws and policies applicable to the Value Pricing Pilot Program."  ECF 87-1 cl. 9.  Those "laws and requirements" necessarily include and incorporate 2 C.F.R. § 200.211.  This regulation requires all federal awards to include certain information, including that a federal award "incorporate, by reference, all general terms and conditions of the Federal award, which must be maintained on the Federal agency's website."  2 C.F.R. § 200.211(c)(2).

The general terms and conditions, which the regulation required to be—and were in fact—incorporated by reference into the Agreement, appear on the FHWA's website and state in part: "this Agreement may be terminated or suspended in whole or in part, *at any time* prior to its expiration date in accordance with 2 C.F.R. 200.340."  *See* FHWA, *Contractors and Recipients General Terms and Conditions for Assistance Awards § 17*, available at https://www.fhwa.dot.gov/cfo/contractor_recip/gtandc_after2023aug07.cfm (emphasis added).  In turn, 2 C.F.R. § 200.340 states that "the Federal award may be terminated in part or its entirety… [b]y the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."

And federal regulations also state that "Federal agencies must inform recipients [of federal awards] of the termination provisions in [2 C.F.R.] § 200.340, including the applicable termination

provisions in the Federal agency's regulations or terms and conditions of the Federal award." 2 C.F.R. § 200.211(c)(1)(v).  In short, the Agreement expressly incorporated all applicable laws and requirements, including two separate regulations that require all federal awards to permit termination based on agency priorities.  FHWA thus has the authority to terminate the agreement consistent with 2 C.F.R. § 200.340.

Even if this Court were to find that the Agreement did not expressly incorporate the termination clause of FHWA's general terms and conditions, the clause would still be included by operation of law under the *Christian* doctrine.  *See Aerolease Long Beach v. United States,* 31 Fed. Cl. 342, 374 (1994) ("[T]he most basic tenet of federal procurement law states that all Government contracts by implication contain all required contract terms.") (citing *G.L. Christian & Assocs. v. United States*, 160 Ct. Cl. 1 (1963), *reh'g denied*, 160 Ct. Cl. 58, *cert. denied*, 375 U.S. 954, 84 (1963)), *aff'd*, 39 F.3d 1198 (Fed. Cir. 1994).  That doctrine requires that all mandatory terms, including a termination clause, be implicitly incorporated into a government agreement.  *See id.* ("Even if the contract contained no termination [] clause, the *Christian* doctrine would incorporate such a clause by operation of law."); *K-Con, Inc. v. Sec'y of Army*, 908 F.3d 719, 727 (Fed. Cir. 2018) ("The *Christian* doctrine has been applied essentially to clauses involving the government's administration of a contract such as terminations." (cleaned up and citation omitted)).  And waiver of such a fundamental clause would need to be unmistakable, which is not the case here.  *See United States v. Winstar Corp.*, 518 U.S. 839, 877–78 (1996) ("We thus rejected the proposal 'to find that a sovereign forever waives the right to exercise one of its sovereign powers unless it expressly reserves the right to exercise that power in the contract[.]'" (citation omitted)).

Plaintiffs nonetheless contend that the Agreement can continue indefinitely for as long as they choose.  Their arguments fail both legally and practically.

First, Plaintiffs argue that the VPPP Agreement "says nothing at all in its terms and conditions about Defendants terminating it." MTA Pls. Mot. at 35. But that is incorrect. As outlined above, the Agreement expressly incorporates all applicable laws, and those laws include the authority to terminate where the agreement no longer effectuates agency priorities under 2 C.F.R. § 200.340.

Next, Plaintiffs argue that incorporation by reference is insufficient, rather the Agreement itself must explicitly and expressly contain the termination agreement, word for word. MTA Mot. at 35 ("the very regulations that Defendants invoke actually require that the 'Federal agency or pass-through entity must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award") (citing 2 C.F.R. § 200.340(b)). In support, they cite 2 C.F.R. § 200.340(b) that states: "The Federal agency or pass-through entity must clearly and unambiguously *specify all termination provisions* in the *terms and conditions* of the Federal award." (emphasis added). But that regulation only mandates that such "termination provisions" be *specific*—i.e., be included in the agency's terms and condition for federal awards—not in the text of the agreement itself. FHWA met that requirement by publishing its standard terms and conditions on its website, in accordance with 2 C.F.R. § 200.211(c)(2), and those terms and conditions "specify" the "termination provision" at Section 17, which is entitled "Termination and Suspension." *See* FHWA, *Contractors and Recipients General Terms and Conditions for Assistance Awards § 17*. And the Agreement expressly incorporates those terms by reference, as is required by the applicable regulation, 2 C.F.R. § 200.211(c)(1)(v).

In alleged support for their argument that Defendants cannot terminate the Agreement, Plaintiffs selectively quote monitoring provisions within the VPPP that set forth time periods. MTA Mot. at 2; *id.* at 34; *id.* at 35 ("Finally, because the VPPP Agreement, consistent with the

VPPP, contemplates that the Secretary will monitor the Program for 'at least ten years,' and everyone (including FHWA) understood that the Program would rely on tolling revenues to raise $15 billion in long-term bonds, only TBTA has the right to terminate.").  But the VPPP Agreement they signed states that TBTA and NYCDOT shall "monitor and report on the project performance" for "a period of at least ten years *or* to the end of the life of the Project, *whichever is sooner*."  ECF 87-1, cl. (8)(b) (emphasis added).  Nor does the VPPP Statute contemplate that any given pilot project shall continue for 10 years.  Instead, the statute states that DOT will monitor the effect of all the "programs for a period of at least 10 years," and make periodic reports to Congress on such programs every 2 years.  *See* VPPP Statute cl. 5.  That timeframe thus applies to the VPPP program as a whole, not any given pilot project agreement thereunder.

And the VPPP's cap on agreements with "as many as 15" different sponsors underscores Congress's intent to allow the federal government to terminate agreements based on agency priorities.  *See* VPPP Statute cl. 1.  Without such authority, the federal government could be locked into just 15 ongoing *pilot* projects indefinitely, preventing other states or local governments from participating in the program.

Plaintiffs' position on termination is also cloaked in practical absurdity.  Taken to its logical conclusion, their argument would allow one administration to bind all future administrations to open-ended cooperative agreements, so long as the parties omit termination clauses.  According to Plaintiffs, no matter how outdated the policy, harmful the outcomes, or shifting the national priorities, future Presidents and Secretaries could do nothing.  That interpretation of this Agreement defies reason, and the court should reject it.  *See Winstar Corp*., 518 U.S. at  889–90 (where "a contract has the effect of extinguishing pro tanto an undoubted power of government," we have insisted that "both [the contract's] existence and the authority to make it must clearly and

unmistakably appear, and all doubts must be resolved in favor of the continuance of the power."); *see also Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) (directing that courts should interpret the law to avoid "absurd results," especially if reasonable "alternative interpretations . . . are available").    Indeed, the consequences of Plaintiffs' position that the agency can never terminate the agreement (or pursue enforcement based on it, *see infra* Part III.C.) would give Plaintiffs a blank check to violate the agreement's terms at will.    For example, even if they used tolling revenues for "other projects" indisputably "[in]eligible for assistance under title 23" or imposed crippling toll rates far above those set out in the Project Description, Plaintiffs' position would render the agency helpless to do anything.    *See* ECF 87-1.    That cannot be right.

### B.    The Secretary and FHWA reasonably noticed termination of the Agreement according to federal regulations.

Plaintiffs claim that the Secretary and FHWA acted arbitrarily and capriciously in terminating the VPPP Agreement.    MTA Mot. at 24–32.    But arbitrary and capricious review is "highly deferential" and limited.    *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 443–44 (2d Cir. 1995).    An agency acts arbitrarily and capriciously only if it "provides no rational explanation, inexplicably departs from established policies, is devoid of any reasoning, or contains only summary or conclusory statements."    *Just Bagels Mfg., Inc. v. Mayorkas*, 900 F. Supp. 2d 363, 372 (S.D.N.Y. 2012) (citing *Zhao v. U.S. Dep't of Justice*, 265 F.3d 83, 93 (2d Cir.2001)).    The court is "not to engage in an independent evaluation" nor is it to "substitute its judgment for that of the agency," rather it is "to determine whether the agency has considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its action."    *Id.* (cleaned up).

Here, federal regulations allow the Secretary and FHWA to terminate a cooperative agreement if they determine that the agreement "no longer effectuates the program goals or agency

priorities". 2 C.F.R. § 200.340. That the Agreement was terminated on these grounds appears uncontested. As Plaintiffs concede, "policy grounds" and "policy concerns" informed both the February 19 Letter and the April Letter. *See* MTA Mot. at 16 ("the February 19 Letter did note that Defendants' review of the Program's eligibility was prompted by their disagreement on policy grounds[.]"); *id.* at 42 n.25 (claiming that the February 19 Letter was based on the administration's "policy concerns" with the program). That should end the matter, because it is an independently valid reason to support termination. To the extent the Court finds that the Secretary and FHWA have made a final, reviewable decision to terminate the Agreement, their actions were reasonable under the APA and consistent with federal regulations.

To begin, Plaintiffs in their preliminary injunction motions attempt to cabin the Secretary's and FHWA's termination decision in just the February 19 Letter, arguing that only it forms the basis of Defendants' actions. MTA Mot. at 32–33. But the record contradicts that blinkered view. The Secretary's and FHWA's communications and actions reflect a consistent, incremental process toward termination: where, first, the Secretary sent an initial notice of termination in February, extended the effective date of termination twice, and then provided a further notice of termination in April with the opportunity to contest termination. *See* ECF 87-5, 87-6, 87-8, 87-10. The April Letter is not a departure but a continuation of the termination process, which includes an opportunity to object and be heard. Thus, if the Court finds that Defendants engaged in a final action to terminate (which it should not), it should evaluate the Secretary's actions from February through April as a unified, continued action.

Plaintiffs offer one other reason why the April Letter should not be considered as part of Defendants' decision, alleging that the April Letter was merely pretextual and a post-hoc rationalization, citing to *Department of Commerce v. New York*, 588 U.S. 752, 785 (2019), where

the Supreme Court found an agency's decision unreasonable due to a mismatch between the decision and its justification.  MTA Mot. at 42 n.25.  But that mismatch does not exist here.

The Secretary's April Letter did not introduce a new, post hoc rationale for termination. The same two key reasons for termination of the Agreement were reflected in both the February 19 Letter and in the April Letter—the CBDTP does not (1) provide a toll-free alternative route for low- and medium-income drivers and (2) set tolls with the aims of reducing congestion or raising revenue primarily for highway infrastructure, as opposed to transit capital projects.  *See* ECF 87-5, 87-10.  Indeed, Plaintiffs concede that "policy grounds" or "policy concerns" informed the February Letter, as well as the April Letter.  MTA Mot. at 16, 32, 42, n.25.  This consistency undercuts Plaintiffs' claims that the April Letter was merely a post-hoc rationalization.[5]  These two rationales also match with the Secretary's decision to terminate the VPPP Agreement.  Termination is the only way to ensure that working-class drivers entering the CBD retain a toll-free alternative on federally funded highways and eliminates a tolling scheme created to benefit a single local jurisdiction's transit capital projects.  The alignment between the Secretary's stated rationale and his decision refutes Plaintiffs' allegations that the April Letter served only as a pretext.

On the merits, to the extent the Court finds that the Secretary made a final decision to terminate, the Secretary's decision was both reasonable and lawful.

### 1. The Secretary reasonably determined that the CBDTP's lack of a toll-free alternative conflicted with the government's priorities and policy goals.

In his February and April letters, the Secretary concluded that the CBDTP and the Agreement conflicted with FHWA's and the Department of Transportation's priorities of ensuring

---

[5] As the Supreme Court noted in *Department of Commerce*, "[i]t is hardly improper for an agency head to come into office with policy preferences and ideas, discuss them with affected parties, sound out other agencies for support, and work with staff attorneys to substantiate the legal basis for a preferred policy." 588 U.S. 752 at 783.

toll-free alternatives.  *See* ECF 87-5, 87-10.  And the Secretary explained his reasons for this change in agency priorities:

- "I share the President's concerns about the impacts to working class Americans who now have an additional financial burden to account for in their daily lives."  ECF 87-5.

- "Users of the highway network within the CBD tolling area have already financed the construction through the payment of gas taxes and other taxes."  *Id.*

- "New York's cordon pricing program imposes a disproportionate financial hardship on low and medium-income hardworking American drivers for the benefit of high-income drivers."  ECF 87-10.

- "Highway users whose taxes already paid for the Federal-aid highways in the cordon area are now being forced to pay again while receiving no new highway benefits in return because there are no toll-free alternative routes available to access the [CBD]."  *Id.*

- "Anyone needing to drive into the area is either forced to pay a cost-prohibitive toll or required to use substandard transit system run by the Metropolitan Transit Authority ("MTA"). This is a breach of the promise made to the hardworking American taxpayers[.]" *Id.*

- "[S]etting tolls with the primary goal of raising revenue for the MTA conflicts with the purpose of the VPPP to initiate pilot projects designed to relieve congestion, not fund transit capital projects."  *Id.*

As the February and April Letters show, the Secretary did more than state his and FHWA's priorities, he thoroughly explained his reasons behind those priorities. That kind of explanation reflects reasoned decisionmaking, not arbitrary and capricious action.

The Secretary also reasonably decided that the CBDTP and the Agreement failed to serve Congress's objectives for the VPPP. *See* ECF 87-5. Value pricing (or congestion pricing) is rooted in principles of supply and demand—where governments charge more to drive in certain areas when demand is high and less when demand is low. *See Congestion Pricing*, FHWA Dept. of Transportation Website (explaining that "[c]ongestion pricing - sometimes called value pricing - is a way of harnessing the power of the market to reduce the waste associated with traffic congestion"), https://ops.fhwa.dot.gov/congestionpricing/; *What is Congestion Pricing?*, Washington Policy Center (April 7, 2008) "A true congestion pricing scheme would (1) price a road system, (2) fluctuate based on demand, and (3) divert the revenue to support only those who paid the fee: drivers"), https://www.washingtonpolicy.org/publications/detail/what-is-congestion-pricing; *Congestion Pricing: Overview, Advantages and Disadvantages*, Investopedia (Nov. 18, 2024) ("The term congestion pricing refers to a dynamic pricing strategy designed to regulate demand by increasing prices without increasing supply."), https://www.investopedia.com/terms/c/congestion-pricing.asp. Thus, value pricing strategies aim to reduce peak-hour traffic by incentivizing drivers to shift their travel patterns—either by choosing different times, modes, or routes—thereby relieving pressure on overcrowded infrastructure.

But cordon pricing, especially CBDTP's cordon pricing scheme, does not fit with the traditional value pricing model. It imposes a flat fee to enter—one fixed amount during the day and another at night—regardless of traffic volume or conditions and then uses the toll revenue to

cover costs of MTA programs.  *See* ECF 87-1.  Thus, cordon pricing functions more like a tax on

working class drivers than a congestion pricing tool.  *See Tax*, Tax Foundation (last accessed May

13, 2025) (defining tax as "a mandatory payment or charge collected by local, state, and national

governments from individuals or businesses to cover the costs of general government services,

goods, and activities."), https://taxfoundation.org/taxedu/glossary/tax.  The Secretary's decision to

terminate the Agreement, is consistent with the statute that permits the Secretary to take mitigation

efforts to protect low-income drivers.  *See* VPPP Statute cl. 7.  It also aligns with regulations that

authorize termination when an Agreement no longer advances program goals.

As the Secretary noted, these deficiencies also rise to the level of a statutory problem and

render the project ineligible under the VPPP statute.  But even if Plaintiffs are right that FHWA

had authority to enter into an Agreement authorizing the kind of cordon pricing scheme operating

under the CBDTP, that still does not detract from the valid policy concerns with the CBDTP's lack

of toll-free options for working class drivers.  Those policy concerns, which undoubtedly reflect

changed agency priorities and program goals, are independently sufficient to justify FHWA's

actions thus far.

### 2. The Secretary reasonably determined that the CBDTP's approach to calculating toll rates conflicted with the government's priorities and policy goals.

The Secretary also reasonably concluded that the CBDTP's calculation of toll rates based

on purposes unrelated to the tolled infrastructure was inconsistent with FHWA's and the

Department of Transportation's priorities.  He explained that it was "unconscionable as a matter

of policy" to require drivers, especially working-class Americans, to pay both federal taxes and

tolls, only to see their money diverted from the roads they actually use "to bail out the MTA

transit system."  ECF 87-10.  This rationale reflects a sound, well-explained shift in policy

priorities.

While the Secretary acknowledged in his April Letter that the VPPP statute permits tolling revenues to be used for eligible transit projects under Title 23, he also made clear his desire to see those funds directed to support highway improvements. As the Secretary explained: "It is a fundamental principle of the Federal-aid Highway Program that toll revenues should be used to pay for the infrastructure on which the toll is imposed, with any excess reinvested back into the broader highway network." *Id.* Because the CBDTP uses tolling revenues "to improve and expand the region's aging public transportation system, particularly the NYC subway," ECF 83-14, it does not align with the policy goals and priorities of the Department. This policy reason alone is independently sufficient to justify the FHWA's actions thus far.

Again, in his April Letter, the Secretary afforded Plaintiffs an opportunity to object to and contest the termination, consistent with the requirements of 2 C.F.R. § 200.342. *See* ECF 87-10. The Secretary deemed it important to provide Plaintiffs with an opportunity to be heard by affording them the opportunity to challenge, if they choose to do so, the termination notification through the submission of all information and arguments that they consider relevant. *Id.* Such an approach can hardly be viewed as anything other than reasonable, logical, and consistent with the APA. In fact, Plaintiffs want to enjoin that process and at the same time claim that it is inadequate. That is an unreasonable ask, and the Court should not grant it.

### 3. The Secretary and FHWA considered the competing interests, including Plaintiffs' reliance interests.

Plaintiffs also argue that the Secretary's decision to terminate was arbitrary and capricious because he failed to adequately consider their reliance interests. MTA Mot. at 38–42. It is true that an agency should "assess the existence and strength of any reliance interests, and weigh them against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1896 (2020). But an agency need not consider and weigh "unreasonable" reliance

interests. *See Libby Welding Co. v. United States*, 444 F. Supp. 987, 992 (D.D.C. 1977), *aff'd*, 595 F.2d 887 (D.C. Cir. 1979).

Here, the Secretary properly considered Plaintiffs' reliance interests when making his decision. Plaintiffs' theory rests on two claims of reliance: first, that they relied on FHWA's prior interpretation of the VPPP statute, and second, that they relied on the Agreement itself in planning their transit program. MTA Mot. at 38–42.

Starting with Plaintiffs' alleged reliance on FHWA's and the Secretary's interpretation of the statute: that is not a reliance interest Defendants needed to account for. The applicable regulation expressly allows FHWA and the Secretary to terminate the agreement based solely on agency priorities, one of the independent grounds the Secretary invoked in this case. *See* 2 C.F.R. § 200.340; ECF 87-5, 87-10. If Plaintiffs failed to account for FHWA's and the Secretary's regulatory authority to terminate based on agency priorities, then their reliance rested on an unreasonable understanding of the termination framework. The Secretary did not have to account for such unreasonable reliance interests. *See Libby Welding Co.*, 444 F. Supp. at 992 (rejecting a plaintiff's arbitrary and capricious argument because "[t]o accept plaintiff's claim of prejudice would allow plaintiff to benefit from its unreasonable reliance" on a waiver clause).

As for Plaintiffs' reliance on the Agreement itself, the Secretary both acknowledged and addressed it. He first recognized that certain costs had been incurred in connection with the CBDTP, though noted that most of those expenditures predated the November VPPP Agreement. *See* ECF 87-5. Indeed, New York was prepared to rollout the CBDTP in June of 2024 but paused final implementation of the program after President Trump voiced his criticism of the program. *See* ECF 87-2; *Mulgrew*, 750 F. Supp. 3d at 188 (finding that in June 2024, "just weeks before Congestion Pricing was scheduled to go into effect, New York Governor Kathleen Hochul

'directed the MTA to pause implementation'" of the program "such that the policy's fate remains uncertain").

The Secretary also emphasized that the Agreement approved a "pilot project," a designation that, by definition, implies a limited and experimental effort, not intended to generate long-term reliance. *See* ECF 87-5. Plaintiffs attempt to counter this by citing the statute: "[the] Secretary shall monitor the effect of such programs for a period of at least 10 years." MTA Mot. at 41 (citing the VPPP). But as already noted, Plaintiffs fail to mention that the agreement they signed states that the parties shall "monitor and report on the project performance from the date of implementation for a period of at least ten years *or* to the end of the life of the project, *whichever is sooner*." ECF 87-1 cl. 8(b) (emphasis added). Plaintiffs omit that crucial context, which reinforces the limited and conditional nature of the Agreement.

Moreover, Plaintiffs now assert substantial reliance even though they rushed to finalize an agreement in November knowing that the incoming President was opposed to the CBDTP. Plaintiffs were thus fully aware, before the Agreement was even signed, that the change in administration could alter the CBDTP's future. Under these circumstances, their claim of substantial and settled reliance is inconsistent with the record and common sense. *See Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 241 (1933) ("He who comes into equity must come with clean hands."). This substantial and settled reliance is also inconsistent with the fact that the Agreement is only a few months old.

In short, the Secretary recognized Plaintiffs' reliance on the Agreement but weighed that against the broader harms—to working-class commuters, to New Jersey, and to federal taxpayers. *See* ECF 87-5, 87-10. He concluded that, on balance, termination better served agency priorities. *See* ECF 87-5, 87-10. The question is not whether Plaintiffs, or this Court, would have made the

same decision.  The only question is whether the Secretary acted reasonably and according to federal regulations.  He did.

### 4. The Secretary and FHWA did not need to conduct a NEPA review again before issuing a notice of termination.

Plaintiffs also argue that the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. ("NEPA") requires FHWA to prepare an Environmental Impact Statement ("EIS") or Environmental Assessment ("EA") before terminating the VPPP Agreement.  MTA Mot. at 36-38. This is not so.  As an initial matter, FHWA and the Secretary have not consummated the agency decision-making process, so it is premature under the APA to assess whether FHWA needs to perform or has adequately performed an EIS or EA.  *See Mulgrew*, 750 F. Supp. 3d at 200 ("Because NEPA does not provide for judicial review, NEPA suits are governed by the [APA].").

But on the merits, Plaintiffs are also wrong.  "NEPA is a procedural statute that mandates a process rather than a particular result."  *Stewart Park & Rsrv. Coal., Inc. (SPARC) v. Slater*, 352 F.3d 545, 557 (2d Cir. 2003) (citing *Sierra Club v. U.S. Army Corps of Eng'rs*, 701 F.2d 1011, 1029 (2d Cir. 1983)).  NEPA requires agencies to prepare an EIS only for any "major Federal action[ ] significantly affecting the quality of the human environment."  *Comm. to Pres. Boomer Lake Park v. Dep't of Transp.*, 4 F.3d 1543, 1554 (10th Cir. 1993) (citing 42 U.S.C. § 4332(2)(C)). And normally an agency would prepare an EA to determine whether an EIS or Finding of No Significant Impact ("FONSI") is required.  *See* 42 U.S.C. § 4336(b)(2); 23 C.F.R. § 771.121.

To start, it is far from clear that *issuance* of a notice of termination of a cooperative agreement constitutes "major federal action."  The Secretary has afforded NYSDOT, TBTA, and NYCDOT the opportunity to object to termination, and the FHWA will consider their responses. To the extent the FHWA determines, after consideration of TBTA, NYSDOT, and NYCDOT's

responses, that New York is not in compliance with 23 U.S.C. § 301, then FHWA may initiate appropriate compliance measures. However, at present, no major federal action has occurred.

Moreover, Defendants need not conduct further NEPA review at all before terminating the VPPP Agreement. As Plaintiffs concede, FHWA has already completed an extensive EA on the CBDTP. MTA Mot. at 37–38. In this EA, there was a "no-option" alternative, which assessed the environmental impact if the VPPP Agreement was not signed and implemented, and then compared that with the environmental impact if the VPPP Agreement was signed and implemented. As such, FHWA could simply rely on this preexisting EA in weighing the environmental impact of terminating the Agreement, given that all the relevant comparative information has already been assembled by FHWA. A new analysis is not required, as other courts have recognized that requiring a new EA when the analysis had been done in a different guise "would be a meaningless gesture." *Nevada v. Dep't of Energy*, 457 F.3d 78, 90 (D.C. Cir. 2006) ("We have applied the prejudicial error rule in the NEPA context where the proposing agency engaged in significant environmental analysis before reaching a decision but failed to comply precisely with NEPA procedures."); *see also Idaho Conservation League v. Bonneville Power Admin.*, 826 F.3d 1173, 1176–78 (9th Cir. 2016) (relying on prior EA in finding that "reverting to the previous regime doesn't change the status quo" since action was "consistent with past conduct."); *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 373–74 (1989) (explaining that the "rule of reason" only requires agencies to conduct certain NEPA analyses where the significance of the action's effects have "not already [been] considered").

And considering that FHWA's and the Secretary's termination of the agreement simply "revert[s] to the previous regime" that existed mere months ago, an EIS is also not required. *See*

*Idaho Conservation League* 826 F.3d at 1176–78.  FHWA and the Secretary thus complied with NEPA.

### C.  The Secretary and FHWA have authority to take enforcement action after a final agency action.

At the outset, it bears repeating that Plaintiffs' challenge to the Secretary's merely "proposed" compliance measures is non-justiciable, because those measures are not final and the dispute over them is not ripe.  The Secretary has not taken any enforcement action but has merely proposed some broad categories of potential compliance measures.  Evaluating the legality of mere proposals would require the Court to adjudicate an abstract and hypothetical dispute, which the Court should not do at this time.

In any event, to the extent the Court considers the issue, the Secretary's proposed compliance actions fall with his regulatory authority.  The plain language of 23 C.F.R. § 1.36 grants the FHWA administrator wide latitude in selecting and using compliance measures when a State does not "comply with Federal Laws or the regulations . . . with respect to a project."  First, the Administrator "may withhold payment to the State of Federal funds on account of such project." 23 C.F.R. § 1.36.  Second, the Administrator may "withhold approval of further projects in the State." *Id.*  And third, the Administrator may "take such other action that he deems appropriate under the circumstances," which drives home that FHWA and the Secretary have wide latitude to shape compliance measures.  *Id.*; *see also Mulgrew v. U.S. Dep't of Transp.*, 750 F. Supp. 3d 171, 242 (S.D.N.Y. 2024) ("[T]he FHWA is empowered to pull funding, withhold further approvals, or 'take such other action that [it] deems appropriate' if the Sponsors fail to implement" commitments related to the program.); *South Dakota v. Adams*, 587 F.2d 915, 919 (8th Cir. 1978) (upholding DOT's withholding authority under 1.36); *Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1194 (11th Cir. 1991).

Consistent with this power, Secretary Duffy advised Plaintiffs that, if FHWA found Plaintiffs in non-compliance with 23 U.S.C. § 301, it "will implement appropriate initial compliance measures beginning on or after May 28, 2025, until compliance is achieved, to include" the following:

- No further advance construction ("AC") authorizations for projects within the borough of Manhattan, except for projects determined by FHWA to be essential for safety ("Safety Projects").

- No further National Environmental Policy Act ("NEPA") approvals for projects within the borough of Manhattan, except for Safety Projects.

- No further approvals of Statewide Transportation Improvement Program ("STIP") amendments concerning New York Metropolitan Transportation Council ("NYMTC") TIP modifications. ECF 87-10 at 2.

If New York's noncompliance continues, FHWA may consider imposing additional measures, such as:

- No further obligations of FHWA funds (both formula and competitive) for projects within New York City, except for Safety Projects.

- No further AC authorizations for projects within New York City, except for Safety Projects.

- No further NEPA approvals for projects within New York City, except for Safety Projects.

*Id.* Each of these compliance measures falls within the plain language of 23 C.F.R § 1.36.

Plaintiffs concede that this regulation allows FHWA to withhold funds if a project violates or is out of compliance with federal law. MTA Mot. at 44 ("Perhaps, if Defendants had provided funding under the VPPP Agreement and subsequently determined that the Program is not authorized, and had the right to terminate, they could then withhold that particular stream of funding."). Plaintiffs, however, argue that this power should be limited to funds that go toward the project that is out of compliance. They rest part of their argument in interpreting "an account

of" as requiring a direct connection between the program at issue and the source of federal funds that may be withheld, or in other words, that the Secretary can only withhold funds allocated to the VPPP.  MTA Mot. at 56–57.

But Plaintiffs' reading is wrong.  The conventional meaning of "on account of" is "because of."  *See On account of*, Webster'' New World Dictionary of the American Language (college ed. 1960) (defining the phrase as "because of").  In applying that definition to the regulation, 23 C.F.R. § 1.36 would read: "If the Administrator determines that a State has violated or failed to comply with the Federal laws or the regulations in this part with respect to a project, he may withhold payment to the State of Federal funds [**because of**] such project."  23 C.F.R. § 1.36 (modification bolded).  The phrase "on account of" explains why funds are withheld, it does not limit the types of project from which the funds may be withheld.  *See United States v. Corliss Steam Engine Co.*, 91 U.S. 321, 322 (1875) ("That legislation existing, the discharge of the duty devolving upon the secretary necessarily requires him to enter into numerous contracts for the public service; and the power to suspend work contracted for . . . when from any cause the public interest requires such suspension, must necessarily rest with him.").

Plaintiffs also contend that 23 C.F.R. § 1.36 cannot be read to grant power to "withhold STIP amendments, advance construction authorizations,[6] or NEPA approvals in response to an alleged violation of 23 U.S.C. § 301."  MTA Mot. at 45. It is difficult to tell from Plaintiffs' brief whether they argue that 23 C.F.R. § 1.36 is narrow and does not authorize specific actions, or whether the portions of 23 C.F.R. § 1.36 are invalid.  MTA Mot. at 44 ("the second and third clauses of Section 1.36 . . . clearly do not authorize Defendants to take the sweeping actions outlined in

---

[6]  It should be noted that the Secretary is also endowed with broad discretion to authorize or not authorize advance construction.  *See* 23 U.S.C. § 115 (The Secretary *may* authorize . . . proceed with a project authorized under this title[.]" (emphasis added))

the April 21 Letter and, if they did, they would exceed the agency's authority under the authorizing statute, 23 U.S.C. § 315"). But either version of the argument fails.

First, if Plaintiffs concede that 23 C.F.R. § 1.36 allows DOT to enforce compliance, Plaintiffs have not articulated why the Secretary's proposed actions would fall outside the scope of the regulation whereas other actions would fall within the scope. And deciding this issue at this juncture would be premature, because FHWA has not taken any final action on enforcement or committed to a specific course of action. Yet, Plaintiffs claim that Defendants have crossed some vague and undefined legal limit to compliance measures and ask this Court to preemptively bar the FHWA and the Secretary from taking steps it has not decided on. The Court should pass on Plaintiffs' request for such an advisory opinion.

Second, if Plaintiffs argue that certain portions of 23 C.F.R. § 1.36 are invalid, they have not carried their burden.[7] "A regulation is presumptively valid, and one who attacks it has the burden of showing its invalidity." *New York Foreign Freight Forwarders & Brokers Ass'n v. Fed. Mar. Comm'n*, 337 F.2d 289, 295 (2d Cir. 1964). As the regulations point out, 23 C.F.R. § 1.36 was promulgated under the "Federal law relating to the administration of Federal aid for highways," *see* 23 C.F.R. § 1.1, and was validly promulgated pursuant to Congressional authorization to "carry out" the provisions of Title 23, *see* 23 U.S.C. § 315, including enforcement of the tolling bar at 23 U.S.C. § 301 ("all highways constructed under the provisions of this title shall be free from tolls of all kinds."). It is entirely consistent with the statutory scheme enacted by Congress to impose compliance measures where a highway constructed under the FAHA is subject to unauthorized tolls.

---

[7] It should also be noted that Plaintiffs may be barred from challenging 23 C.F.R. § 1.36, as their statute of limitations on such a challenge may have run.

Plaintiffs also argue that the presence of explicit enforcement mechanisms in other statutes preclude enforcement for unauthorized tolling under 23 C.F.R. § 1.36.  Pls. Br at 46-47.  But the statutes Plaintiffs cite are for enforcement of entirely different violations of Federal Highway laws. *See* 23 U.S.C. § 131(b) (for enforcement of the Highway Beautification Act); *id.* § 158(a) (for enforcement of minimum age drinking laws).[8]  Congress's choice not to prescribe a specific enforcement mechanism in Title 23 should be understood as preserving FHWA's and the Secretary's discretion to enforce § 301, just as it does any other statutory provision lacking a designated enforcement procedure—especially pursuant to a longstanding regulation (which Plaintiffs do not challenge) like 23 C.F.R. § 1.36.  *Clallam Cnty. v. Dep't of Transp., of State of Wash.*, 849 F.2d 424, 428 (9th Cir. 1988) ("Congress has not provided a comprehensive scheme to enforce section 301… indeed, Congress has provided no express remedy under Title 23."); *Town of Portsmouth*, 813 F.3d at 63 ("Finally, the Act grants the FHWA enforcement authority through its discretion to approve federal funds ... FHWA's ample authority to enforce the Act plainly exhibits Congress's preference for public enforcement." (citation omitted)).  Under Plaintiffs' reasoning, the federal government would be powerless to enforce the tolling prohibition, and as noted above, no private right of action exists to do so either.  If that were the case, Congress's century-old commitment to maintain toll-free federal highways would be reduced to a toothless, empty promise.  The Court should reject such an interpretation.

It is also constitutional to enforce compliance with a federal highway statute by withholding federal highway funds.  "While the state is constitutionally free to operate its own highway system, the federal government is not bound constitutionally or statutorily to grant federal

---

[8]  Plaintiffs also cite 23 U.S.C. § 129(a)(3)(C), but as they concede, this statute involves "circumstances not present here."  MTA Mot. at 46.

highway funds to states which do not operate their systems in accordance with federal guidelines."
*State of Neb., Dep't of Roads v. Tiemann*, 510 F.2d 446, 448 (8th Cir. 1975); *see also South Dakota
v. Dole*, 483 U.S. 203, 211 (1987) (finding similar withholding of FHWA funding to be
constitutional).

      Plaintiffs' arguments concede that the details of any compliance measure are determinative
of the constitutional inquiry. But, critically, FHWA has not decided to impose any of these
"proposed" or "potential" compliance measures yet. Plaintiffs still have the opportunity to "show
cause . . . why FHWA should not take appropriate steps under 23 C.F.R. § 1.36 to remedy New
York's noncompliance with 23 U.S.C. § 301 in connection with the CBDTP." ECF 87-10 at 1.
And only "after evaluating NYSDOT's response and any responses received from TBTA and
NYCDOT" will FHWA consider and implement any compliance measures. *Id.* Only then could
this Court possibly be in a position to determine whether the Secretary has the authority to
implement said measure.

      Finally, Plaintiffs argue that the VPPP Statute supplants the bar on tolling at 23 U.S.C.
§ 301 in whole. *See* MTA Mot. at 50 ("Moreover, any underlying federal policy of avoiding tolls
on federal-aid highways as expressed in Section 301 has been overtaken by ISTEA's countervailing
policy of flexibility and promotion of intermodal transportation systems and congestion
reduction."). This may be true as to particular highways subject to a valid, effective VPPP
agreement. But that will not be the case if the agency determines that Plaintiffs are in
noncompliance with Section 301 because the Agreement has been properly terminated.. *If*
Defendants impose compliance measures, it will only be *when* there is a final agency determination
that no valid VPPP agreement in effect.

IV.    **The public interest and balance of equities weigh against an injunction.**

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).  These factors cut against granting a preliminary injunction

There is substantial public interest in allowing the changes in agency priorities forecasted during the campaign and ratified by the election to play out through appropriate regulatory processes.  Protecting taxpayers and working-class Americans is one such priority directly at stake in this VPPP.  Taxpayer dollars funded, in part, the federal roads now subject to tolls set and collected by Plaintiffs.  The public has an interest in receiving the benefit of its tax dollars by accessing those roads without the revenues from the CBDTP being redirected *away* from roads.[9] Entering a preliminary injunction will frustrate those interests, potentially setting a large burden on low- and middle-income Americans who drive into the CBD.

These interests were in part the rationale for Defendants to begin the process to end cordon tolling in Manhattan.  That process is still playing out.  There is no valid interest in disrupting this ongoing agency decisionmaking process with a preliminary injunction. The court would effectively create a preclearance regime for potential compliance measures that the agency has not

---

[9]    Plaintiffs selectively quote President Bush's signing statement to suggest that the ISTEA contemplated redirecting tolling revenues to public transit projects (at MTA Br. 10), but the full text actually demonstrates the opposite. Rather than providing state and local officials with "discretion to finance transportation improvements 'with toll revenue'" writ large, MTA Br. 10, President Bush stated that the VPPP would permit "financing highway improvements with a combination of Federal funds and private investment to be repaid with toll revenue" and provide state and local "discretion to use a major portion of their Federal surface transportation funds on the improvements that would best meet local needs, whether highway projects or public transit projects." *Statement by President George Bush Upon Signing H.R. 2950*, 1991 U.S.C.C.A.N. 1865 (Dec. 18, 1991). Nothing in the statement suggests redirecting highway toll revenues to fund public transit projects was contemplated, let alone authorized or encouraged.

yet decided to take, which finds no authority in the statute and which creates substantial separation-of-powers concerns regarding the appropriate role of the judiciary. Nor is there a valid public interest in allowing a tolling project to proceed without the requisite Federal authorization.

In contrast, Plaintiffs argue the loss of funding is not in the public interest and maintaining the benefits of the Program, alleged reduced congestion, is in the public interest. But while Plaintiffs' claim that congestion has improved may hold true for those living and working in Manhattan, congestion has worsened in other New York communities, including the Bronx. *See supra* pages 5-6. As a result, issuing an injunction would run counter to the interests of those New York communities. Weighing those competing policy interests in the context of this Federal program is the province of democratically accountable Executive officials, not Plaintiffs and not the courts. Additionally, Plaintiffs' highly speculative assertions do not outweigh the Government's overarching interest in advancing policy goals that protect the American people from unnecessary fees, especially those most vulnerable to fluctuations in day-to-day monetary demands.

## V.   The broadest relief available to plaintiffs is to vacate the termination notices and remand to the agency.

Plaintiffs brought this challenge under the APA, which provides a "generic cause of action," *Koretoff v. Vilsack*, 614 F.3d 532, 536 (D.C. Cir. 2010), for any "person suffering legal wrong because of agency action," 5 U.S.C. §§ 702, 704. Significantly, the APA also prescribes a remedy: "[T]he reviewing court shall ... hold unlawful and set aside agency action" found to violate its terms. 5 U.S.C. § 706(2) (emphases added). By the statute's plain terms, therefore, the remedy in a successful APA challenge is to set aside the final agency action at issue and remand to the agency. *See, e.g., Federal Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998) ("If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case ...."); *Guertin v. United States*, 743 F.3d 382, 388 (2d Cir. 2014) ("In the usual case, when an

agency violates its obligations under the APA, we will vacate a judgment and remand to the agency ....").

Accordingly, the broadest possible relief available is to vacate the notices of termination of the Agreement and remand to the agency for further consideration. The Court should not, and, for the reasons discussed *supra* Part I, lacks jurisdiction to enter any relief regarding merely "proposed" or "potential" enforcement measures. Yet, here, the Secretary has *explicitly* stated that the FHWA will consider any submission of NYSDOT (and those of TBTA and NYCDOT, if they choose to submit them) in response to his directive to show cause prior to making any determination as to whether compliance measures are warranted. Plaintiffs seek to end-run that ongoing process by inviting this Court to intervene prematurely. The Court should not accept the invitation.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Plaintiffs' motions for a preliminary injunction.

Dated: May 16, 2025.                              Respectfully submitted,

                                                  YAAKOV M. ROTH
                                                  Acting Assistant Attorney General
                                                  Civil Division

                                                  CHARLES E.T. ROBERTS
                                                  Counsel to the Assistant Attorney General

                                                  JOHN GRIFFITHS
                                                  Branch Director
                                                  Federal Programs Branch

                                                  STEPHEN M. ELLIOTT
                                                  Assistant Branch Director
                                                  Federal Programs Branch

                                                  */s/ Michael Bruns*
                                                  Michael Bruns
                                                  Samuel S. Holt
                                                  Trial Attorneys
                                                  Federal Programs Branch
                                                  Civil Division, Department of Justice
                                                  1100 L Street NW
                                                  Washington, DC 20005
                                                  Telephone: 202-514-4011
                                                  Email: michael.bruns@usdoj.gov