**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

METROPOLITAN TRANSPORTATION
AUTHORITY and TRIBOROUGH BRIDGE AND
TUNNEL AUTHORITY,

*Plaintiffs*,

and

NEW YORK STATE DEPARTMENT OF
TRANSPORTATION, RIDERS ALLIANCE, SIERRA
CLUB, and NEW YORK CITY DEPARTMENT OF
TRANSPORTATION,

*Intervenor-*
*Plaintiffs*,

v.

SEAN DUFFY, in his official capacity as Secretary of
the United States Department of Transportation,
GLORIA M. SHEPHERD, in her official capacity as
Executive Director of the Federal Highway
Administration, UNITED STATES DEPARTMENT
OF TRANSPORTATION, and FEDERAL HIGHWAY
ADMINISTRATION,

*Defendants*.

Case No. 25 Civ. 1413 (LJL)

**ORAL ARGUMENT**
**REQUESTED**

---

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
PLAINTIFFS THE METROPOLITAN TRANSPORTATION AUTHORITY AND
TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY AND INTERVENOR-
PLAINTIFF NEW YORK CITY DEPARTMENT OF TRANSPORTATION'S
MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ........................................................................................................................ 3

    I.      The Court has jurisdiction........................................................................................ 3

        A.     Finality .............................................................................................................. 3

        B.     Ripeness ............................................................................................................ 6

        C.     The Tucker Act .................................................................................................. 8

    II.     Likelihood of success on the merits......................................................................... 11

        A.     Defendants' *post hoc* rationalizations .................................................................. 11

        B.     Lack of authority to terminate the VPPP Agreement .......................................... 16

        C.     Plaintiffs' reliance interests................................................................................. 19

        D.     NEPA ................................................................................................................ 21

        E.     Enforcement authority ....................................................................................... 23

    III.    Irreparable harm..................................................................................................... 25

    IV.    The public interest and balance of equities............................................................. 29

CONCLUSION.................................................................................................................... 30

<u>**TABLE OF AUTHORITIES**</u>

**CASES**

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967)..................................................................................... 8

*Abbott v. Perez*,
585 U.S. 579 (2018)................................................................................... 27

*American Bar Ass'n v. U.S. Dept. of Educ.*,
370 F.Supp.3d 1 (D.D.C. 2019) ................................................................. 6

*Berkeley-Dorchester Counties E.D.C. v. U.S. Department of Health & Human Services*,
2006 WL 8443181 (D.S.C. Feb. 24, 2006) ................................................. 5

*Chan v. U.S. Dep't of Transp.*,
2024 WL 5199945 (S.D.N.Y. Dec. 23, 2024) ............................... *passim*

*City and Cnty. of San Francisco v. Trump*,
2025 WL 1186310 (N.D. Cal. Apr. 24, 2025) ......................................... 27

*Clallam County v. Department of Transportation*,
849 F.2d 424 (9th Cir. 1988) .................................................................. 24

*Climate United Fund v. Citibank, N.A.*,
2025 WL 842360 (D.D.C. Mar. 18, 2025)............................................... 28

*Cmty. Legal Servs. v. H.H.S.*,
2025 WL 1393876 (9th Cir. May 14, 2025) ....................................... 9, 10

*Cnty. of Rockland v. Triborough Bridge & Tunnel Auth.*,
No. 24 Civ. 2285 (S.D.N.Y.) .............................................................. 14, 16

*Cone Corp. v. Fla. Dep't of Transp.*,
921 F.2d 1190 (11th Cir. 1991) .............................................................. 23

*Connecticut v. Duncan*,
612 F.3d 107 (2d Cir. 2010)...................................................................... 7

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024)................................................................................. 23

*County of Santa Clara v. Trump*,
250 F. Supp. 3d 497 (N.D. Cal. 2017) .................................................... 29

*Crowley Gov't Servs., Inc. v. G.S.A.*,
　　38 F.4th 1099 (D.C. Cir. 2022) ........................................................................ 9, 10

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
　　591 U.S. 1 (2020) .............................................................................. 8, 11, 20, 21

*Dep't of Com. v. New York*,
　　588 U.S. 752 (2019) ................................................................................................ 15

*Dep't of Educ. v. California*,
　　145 S. Ct. 966 (2025) ............................................................................................ 10

*Earman v. United States*,
　　114 Fed. Cl. 81 (2013) .......................................................................................... 18

*Encino Motorcars, LLC v. Navarro*,
　　579 U.S. 211 (2016) ................................................................................................ 20

*FCC v. Fox Television Stations, Inc.*,
　　556 U.S. 502 (2009) ................................................................................................ 21

*Fl. Power & Light Co. v. EPA*,
　　145 F.3d 1414 (D.C. Cir. 1998) .............................................................................. 7

*Friends of Keeseville, Inc. v. F.E.R.C.*,
　　859 F.2d 230 (D.C. Cir. 1988) ................................................................................ 7

*Garland v. Cargill*,
　　602 U.S. 406 (2024) ................................................................................................ 20

*German Language Ctr. v. United States*,
　　2010 WL 3824636 (S.D. Tex. Sept. 27, 2010) ...................................................... 7

*Guertin v. United States*,
　　743 F.3d 382 (2d Cir. 2014) .................................................................................... 31

*Hous. Auth. v. United States*,
　　140 Fed. Cl. 773 (2018) .......................................................................................... 11

*Idaho Conservation League v. Bonneville Power Administration*,
　　826 F.3d 1173 (9th Cir. 2016) ................................................................................ 22

*Ingersoll-Rand Co. v. United States*,
　　780 F.2d 74 (D.C. Cir. 1985) .................................................................................. 10

*Isaacs v. Bowen*,
   865 F.2d 468 (2d Cir. 1989) ........................................................................... 7

*Kakar v. U.S. Citizenship & Immigr. Servs.*,
   29 F.4th 129 (2d Cir. 2022) ......................................................................... 11

*K-Con, Inc. v. Sec'y of Army*,
   908 F.3d 719 (Fed. Cir. 2018) ...................................................................... 18

*League of Women Voters v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) .......................................................................... 26

*Libby Welding Co. v. United States*,
   444 F. Supp. 987 (D.D.C. 1977) ................................................................... 20

*Loper Bright Enterprises v. Raimondo*,
   603 U.S. 369 (2024) ......................................................................... 20, 23, 30

*Mantena v. Hazuda*,
   2018 WL 3745668 (S.D.N.Y. Aug. 7, 2018) ................................................... 5

*Marbury v. Madison*,
   5 U.S. 137 (1803) ......................................................................................... 29

*Marsh v. Or. Nat. Resources Council*,
   490 U.S. 360 (1989) ......................................................................... 21, 22, 23

*Mass. Coal. for Immigration Reform v. D.H.S.*,
   698 F. Supp. 3d 10 (D.D.C. 2023) ................................................................ 22

*Megapulse v. Lewis*,
   672 F.2d 959 (D.C. Cir. 1982) ...................................................................... 10

*Mktg. & Mgmt. Info., Inc. v. United States*,
   57 Fed. Cl. 665 (2003) ................................................................................. 18

*Mulgrew v. U.S. Dep't of Transp.*,
   750 F. Supp. 3d 171 (S.D.N.Y. 2024) ..................................................... 23, 30

*Murphy v. New Milford Zoning Comm'n*,
   402 F.3d 342 (2d Cir. 2005) ........................................................................... 7

*N.R.D.C. v. Nat'l Highway Traffic Safety Admin.*,
   894 F.3d 95 (2d Cir. 2018) ........................................................................... 24

*Nat'l Org. for Marriage, Inc. v. Walsh*,
    714 F.3d 682 (2d Cir. 2013)..................................................................... 8

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
    538 U.S. 803 (2003).............................................................................. 7

*Nevada v. Dept. of Energy*,
    457 F.3d 78 (D.C. Cir. 2006) ............................................................... 23

*New York v. Health & Human Servs.*,
    414 F. Supp. 3d 475 (S.D.N.Y. 2019)............................................. 8, 13, 23

*New York v. Trump*,
    2025 WL 715621 (D.R.I. Mar. 6, 2025) ................................................ 27

*New York v. Trump*,
    2025 WL 573771 (S.D.N.Y. Feb. 21, 2025).......................................... 12

*New York v. U.S. Dept. of Com.*,
    351 F. Supp. 3d 502 (S.D.N.Y. 2019).................................................. 31

*Normandy Apartments v. H.U.D.*,
    554 F.3d 1290 (10th Cir. 2009) .......................................................... 10

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*,
    896 F.3d 520 (D.C. Cir. 2018) ........................................................... 23

*PaineWebber Inc. v. Bybyk*,
    81 F.3d 1193 (2d Cir. 1996)............................................................... 17

*Pension Benefit Guaranty Corp. v. LTV Corp.*,
    496 U.S. 633 (1990)........................................................................... 11

*Purpose Built Families Foundation, Inc. v. United States*,
    634 F. Supp. 3d 1118 (S.D. Fla. 2022) ................................................. 5

*RELX, Inc. v. Baran*,
    397 F. Supp. 3d 41 (D.D.C. 2019) ....................................................... 7

*Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA*,
    10 F.4th 87 (2d Cir. 2021) ................................................................... 6

*RFE/RL, Inc. v. Lake*,
    2025 WL 1232863 (D.D.C. Apr. 29, 2025) ........................................... 9

*Ryan, Beck & Co., LLC v. Fakih*,
    268 F. Supp. 2d 210 (E.D.N.Y. 2003) ................................................................. 17

*Sabre, Inc. v. Dep't of Transp.*,
    429 F.3d 1113 (D.C. Cir. 2005) ............................................................................. 6

*Sackett v. E.P.A.*,
    566 U.S. 120 (2012) ........................................................................................... 4, 6

*Sharkey v. Quarantillo*,
    541 F.3d 75 (2d Cir. 2008) ................................................................................... 7

*Simmonds v. I.N.S.*,
    326 F.3d 351 (2d Cir. 2003) ................................................................................. 7

*South Dakota v. Adams*,
    587 F.2d 915 (8th Cir. 1978) .............................................................................. 24

*Spectrum Leasing Corp. v. United States*,
    764 F.2d 891 (D.C. Cir. 1985) ............................................................................ 10

*St. Bernard Par. Gov't v. United States*,
    134 Fed. Cl. 730 (2017) ...................................................................................... 10

*State Highway Comm'n v. Volpe*,
    479 F.2d 1099 (8th Cir. 1973) ............................................................................ 24

*State of Tennessee v. Dep't of Educ.*,
    104 F.4th 577 (6th Cir. 2024) ............................................................................. 27

*Stewart Park & Reserve Coal., Inc. v. Slater*,
    352 F.3d 545 (2d Cir. 2003) ............................................................................... 22

*Tootle v. Sec'y of Navy*,
    446 F.3d 167 (D.C. Cir. 2006) ............................................................................ 10

*Town of Portsmouth v. Lewis*,
    813 F.3d 54 (1st Cir. 2016) ................................................................................. 24

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
    625 F. Supp. 3d 164 (S.D.N.Y. 2022) ................................................................ 29

*Up State Fed. Credit Union v. Walker*,
    198 F.3d 372 (2d Cir. 1999) ............................................................................... 10

*W.R. Grace & Co. Conn. v. E.P.A.*,
   959 F.2d 360 (1st Cir. 1992) ................................................................. 7

*Woonasquatucket River Watershed v. U.S.D.A.*,
   2025 WL 1116157 (D.R.I. Apr. 15, 2025) ............................................. 9

**STATUTES**

23 U.S.C. § 129 ....................................................................................... 15

23 U.S.C. § 131 ....................................................................................... 24

N.Y. Pub. Auth. L. § 569-c ..................................................................... 15

**REGULATIONS**

2 C.F.R. § 200.211 ................................................................................... 17

2 C.F.R. § 200.340 ............................................................................ *passim*

2 C.F.R. § 200.342 ................................................................................... 28

2 C.F.R. §§ 200.211 ................................................................................... 9

23 C.F.R. § 1.36 ......................................................................... 23, 24, 25

**OTHER AUTHORITIES**

FHWA, *Value Pricing Pilot Program Funding* ...................................... 19

FHWA, *Value Pricing Pilot Program Participation, Fiscal Years
   2010 and 2011*, 75 Fed. Reg. 64,397, 64,399 (Oct. 19, 2010) ............. 19

Golden Gate Bridge Highway and Transportation District, *Golden
   Gate Bridge Five-Year Toll Program Proposal*, (Feb. 1, 2024) ........... 15

*Here Is Everything That Has Changed Since Congestion Pricing
   Started in New York*, N.Y. TIMES (May 11, 2025) ............................... 30

Kristi King, *How Toll Money Paid to the I-395 Express Lanes
   Gets Used Elsewhere*, WTOPnews (Mar. 2, 2022) ............................... 15

*Pilot*, Collins Dictionary,
   https://www.collinsdictionary.com/us/dictionary/english/pilot ........... 21

U.S. DEP'T OF TRANSP., Signed DOT Order, *Ensuring Reliance Upon Sound Economic Analysis in USDOT Policies Programs* (Jan. 29, 2025) ............................ 16

Plaintiffs the MTA and TBTA and Intervenor-Plaintiff NYCDOT (together, "Plaintiffs") respectfully submit this reply in further support of their motion for a preliminary injunction.[1]

## PRELIMINARY STATEMENT

Plaintiffs filed this motion to preserve the status quo after Defendants declared their unambiguous intention to implement sweeping "compliance measures" on May 28 unless congestion pricing ends. According to Defendants, although they already "terminated" the VPPP Agreement on February 19, there is no reason for the Court to decide whether that termination was lawful now because some sort of administrative process is still "ongoing." And while Defendants have made it clear that they "will implement" a variety of enforcement measures if congestion pricing continues after May 21 (as it has), they say that the Court should not determine whether those measures are lawful at this time, because it is not yet May 28 so Defendants have not yet implemented them.

But all of this is Orwellian double speak. Defendants seem to be trying to come up with something—anything—to justify a pre-baked, political decision by President Trump to "kill" congestion pricing by any means necessary, including by unlawfully withholding funds that were paid by New York taxpayers and that are congressionally mandated to go back to New York. Federal law does not allow the Administration to arbitrarily end the Program, or to penalize Plaintiffs for refusing to comply with an unlawful demand to do so. While Defendants' principal argument is that the challenged actions and agency decision-making process are not final, that is not consistent with Defendants' own statements. Over the last three months, Defendants have made clear, in their correspondence to us and in their statements to the public, that they "terminated" congestion pricing on February 19, and "will implement" certain "compliance

---

[1] Citations to "Mot." are to Plaintiffs' opening brief (ECF 83) and citations to "Opp." are to Defendants' opposition (ECF 118). Unless otherwise indicated, all defined terms have the meaning set out in Plaintiffs' opening brief.

measures" on or after May 28 unless we comply.  Defendants' so-called invitation for Plaintiffs to convince them that congestion pricing is permissible does not suddenly "reopen" the agency process or prevent this Court from deciding whether Defendants' actions are lawful.  Neither Plaintiffs nor the Court are required to wait until the last minute, when Defendants actually implement certain compliance measures—and then scramble to ask the Court to decide whether those measures are permissible.

Defendants' reliance on the Tucker Act fares no better.  This is not a case to enforce Plaintiffs' "contract rights."  Plaintiffs sued for a declaration, vacatur, and an injunction as to Defendants' February 19 Letter purporting to rescind VPPP approval and terminate the VPPP Agreement.  Plaintiffs do not seek any money at all—in fact, the VPPP Agreement gives them none—nor do they seek any specific performance from Defendants.  They simply want the statutory authorization they received to remain in place.

On the merits, Defendants have given up trying to defend their position in the February 19 Letter that the Program is not authorized by the applicable statutes.  Instead, they now claim they are entitled to terminate the Agreement due to a change in policy.  But such *post hoc* rationales are the epitome of arbitrary and capricious decision making.  And even if they could be considered, the governing regulations demonstrate Defendants have no authority to terminate: had Defendants wanted to preserve such a right, then they needed to say so explicitly in the VPPP Agreement, given that everyone understood the Program—from its tolling phases, to the Secretary's monitoring, to the collection of revenues in order to fund billions of dollars in long-term bonds— would run for years.  In any case, under Congress' carefully-crafted framework for appropriations and approvals, Defendants cannot take any of the enforcement actions that they have threatened.

Not surprisingly, Defendants also fail to rebut Plaintiffs' detailed showing of irreparable harm and the balance of the equities. Plaintiffs did not delay in seeking injunctive relief. It was only when Defendants threatened on April 21 to take sweeping actions to cut funding to New York that it became necessary to seek this Court's intervention. And the public interest clearly favors allowing congestion pricing and New York's other critical transportation programs to continue without undue coercion or improper retaliation by Defendants.

## **ARGUMENT**

### I.    **The Court has jurisdiction**

#### A.    **Finality**

Secretary Duffy's February 19 Letter states in no uncertain terms: "I am rescinding FHWA's approval of the [Program] under the November 21 [VPPP] Agreement and terminating the Agreement." Feb. 19 Ltr. at 3. After sending that letter, Defendants proclaimed on social media that "CONGESTION PRICING IS DEAD."[2] And in the April 21 Letter, Secretary Duffy once again confirmed that the February 19 termination decision was final, stating that FHWA "will implement" certain "compliance measures" if congestion pricing continues. Apr. 21 Ltr. at 2.[3] Even Defendants' Opposition—despite its doublespeak—acknowledges these basic facts. Opp. at 1 (VPPP Agreement "was terminated"); *id.* at 9 (describing February 19 Letter as a "notice of

---

[2] Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 19, 2025), https://truthsocial.com/@realDonaldTrump/posts/114032082899254855; *see also* Secretary Sean Duffy (@SecDuffy), X (Feb. 20, 2025 3:53 AM), https://x.com/SecDuffy/status/1892422299317383648 ("That's why I shut it down today."); Secretary Sean Duffy (@SecDuffy), X (Feb. 24, 2025 2:28 PM), https://x.com/SecDuffy/status/1894031690256818515 ("5 things I did last week: 1. Terminated NYC elitist, anti-worker congestion pricing."); Secretary Sean Duffy (@SecDuffy), X (Mar. 20, 2025 2:04 PM), https://x.com/SecDuffy/status/1902783361900331100 ("@GovKathyHochul … Your refusal to end cordon pricing and your open disrespect towards the federal government is unacceptable").

[3] Defendants did not "delay[] the effective date of termination" to April 20. Opp. at 16, 41. While Defendant Shepherd's February 20 letter extended the effective termination by 30 days, her March 20 letter did not. *See* ECF 87-8.

termination"). This all unmistakably marks the "consummation" of the agency's decision to terminate the VPPP Agreement and rescind approval for congestion pricing.

Defendants insist that their termination decision is part of some "larger, unfolding administrative process," thereby depriving the Court of jurisdiction. Opp. at 14. But that argument is foreclosed by *Sackett v. E.P.A.*, 566 U.S. 120 (2012), a decision Plaintiffs relied upon, Mot. at 23-25, but Defendants fail to mention. There, landowners challenged an EPA compliance order that found their construction project violated the Clean Water Act and ordered them to restore their property or face penalties in future enforcement proceedings. *Sackett*, 566 U.S. at 122, 126. The Supreme Court held that the EPA order was a "final agency action" because the "text" of the order made clear that EPA's "deliberation" was "at an end," and the only thing left to determine was whether the agency was "confident enough about its conclusion to initiate litigation." *Id.* It did not matter that the order invited the landowners to "engage in informal discussion" and "inform [EPA] of any allegations therein [that were] inaccurate." *Id.* at 127.

The same is true here: the February 19 and April 21 Letters purport to determine the "rights or obligations" of the parties and (if upheld) will have substantial "legal consequences" for the Program. *Id.* at 126. The fact that Defendants have given Plaintiffs the illusory opportunity to convince them that the Program is lawful does not change anything. Under *Sackett*, "[t]he mere possibility that an agency might reconsider in light of 'informal discussion' and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal." 566 U.S. at 127.

Moreover, even if Defendants had reopened the decision-making process (which they have not), any such "reopening" would be "in name only" for the sole purpose of preventing this Court from taking action. *Mantena v. Hazuda*, 2018 WL 3745668, at *6 (S.D.N.Y. Aug. 7, 2018). Defendants have been quite candid that their objective is to "end," "shut down," and "terminate"

congestion pricing. *See supra* note 2. While Defendants may not want to defend the merits of their actions in court, they have neither rescinded their decision to terminate, nor "identified issues with the original decision [or] areas that warranted further evidentiary development." *Mantena*, 2018 WL 3745668, at *6. While Plaintiffs maintain that Defendants' invitation to submit materials is nothing more than an attempt to delay this proceeding, Plaintiffs have submitted a response to the Secretary's April 21 Letter to avoid any claims of waiver. A copy of those responses are attached as Exhibit 1 and Exhibit 2 to the Declaration of Brandon Trice.

Instead of addressing *Sackett*, Defendants principally rely on *Berkeley-Dorchester Counties E.D.C. v. H.H.S.*, 2006 WL 8443181, at *16 (D.S.C. Feb. 24, 2006), an out-of-circuit district court case that was decided six years before *Sackett* and is inapposite in any event. There, the challenged "summary suspension" of financial assistance under the Head Start program was "a temporary action prompted by an emergency situation and anticipated to be resolved within a limited time frame," as evidenced by the fact that the agency rescinded the suspension within days of issuing it. *Id.* at *15-16. Here, however, not a single thing has changed with respect to Defendants' position on the Program from February 19 to today.[4]

The fact that Defendants have not yet imposed the threatened "compliance measures" does not render the agency action non-final. Just as the *Sackett* court did not find it relevant that the agency had not initiated compliance proceedings because "legal consequences" already flowed from the order, 566 U.S. at 125-26, here, Defendants have already decided that the Project Sponsors are "not legally permitted to collect tolls," Apr. 21 Ltr. at 1, and have stated that Plaintiffs

---

[4] Defendants also rely on *Purpose Built Families Foundation, Inc. v. United States*, 634 F. Supp. 3d 1118 (S.D. Fla. 2022). But there, the court held that the letter regarding the first grant was not a final agency action where it explicitly stated that the government's internal review process was not yet complete. *Id.* at 1124. Here, FHWA's internal review process is complete. *See* Feb. 19 Ltr. at 2 ("I … have concluded that the scope of this pilot project as approved exceeds the authority authorized by Congress under the VPPP.").

have a legal obligation to end the Program, Mar. 20 Ltr. at 1.  And like the EPA in *Sackett*, the Secretary has specifically threatened financial penalties.  *See* Apr. 21 Ltr. at 1, 3.  Moreover, the MTA and TBTA have "structured … long-term financial plans" based on the validity of the Program, including their reasonable expectation that Program revenue could be used to raise financing for the MTA's capital projects—which cuts decisively in favor of finality.  *Am. Bar Ass'n*, 370 F. Supp. 3d at 24-25; *see also* Mot. at 51-59.  While Defendants assert the letters are not final agency action because they have not yet resulted in any "tangible" legal consequences, Opp. at 16, 18, they cite no authority for a "tangibility" requirement because there is none.  Even if this requirement existed (and it does not), the termination and threatened "compliance measures" here are more than enough to establish finality.

## B.    Ripeness

Defendants argue that even if their termination of the VPPP Agreement is final agency action reviewable under the APA, the Court should exercise its discretion to deny Plaintiffs' motion as unripe.  Because prudential ripeness "constitutes a narrow exception to the strong principle of mandatory exercise of jurisdiction," *Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA*, 10 F.4th 87, 102 (2d Cir. 2021), the test "incorporate[s] a presumption of reviewability," *Sabre, Inc. v. Dep't of Transp.*, 429 F.3d 1113, 1119 (D.C. Cir. 2005).  "Determining whether administrative action is ripe" generally requires a court "to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration."  *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).

The first fitness prong "requires a weighing of the sensitivity of the issues presented and whether there exists a need for further factual development."  *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005).  Here, "there is no serious contention that 'further

administrative action is needed to clarify the agency's position.'" *RELX, Inc.*, 397 F. Supp. 3d at 49 (quoting *Friends of Keeseville, Inc. v. F.E.R.C.*, 859 F.2d 230, 234-35 (D.C. Cir. 1988)).  While Defendants assert that this dispute is too "fact-intensive" for the Court to decide now, they concede that this case presents a "legal challenge," Opp. at 24, and they have not identified any facts that need to be developed further.  Even if they had, where a dispute "presents legal questions and there is a concrete dispute between the parties, the issues are fit for judicial decision" even where "the factual record is not yet fully developed." *Sharkey v. Quarantillo*, 541 F.3d 75, 89 (2d Cir. 2008).

Defendants' claim that "judicial review would interfere with the administrative process," Opp. at 24, gets it backwards.  Defendants have already reached a decision on the legality of the Program; the only real "process" that remains is enforcement, which they have threatened to implement while this case proceeds.  None of the cases Defendants cite prevent this Court from reviewing what is plainly a final agency action based on the record before the agency at the time it was made.[5]  To be clear, Plaintiffs are not "asking the Court to review *possible* compliance measures that the FHWA *may* take."  Opp. at 24 (emphases added).  The April 21 Letter clearly states that "FHWA *will* implement" specific, identified "compliance measures beginning on or after May 28."  Apr. 21 Ltr. at 2 (emphasis added).  While Defendants object that the Court should not "superintend the compliance process," Opp. at 24, reviewing final agency action is the purpose

---

[5] *See Connecticut v. Duncan*, 612 F.3d 107 (2d Cir. 2010) (state remained in compliance with agency interpretation of federal law and was entitled to administrative hearing before federal funds could be withheld); *Simmonds v. I.N.S.*, 326 F.3d 351, 360 (2d Cir. 2003) (inmate who sought review would not be at risk of INS detention for at least ten years); *Fl. Power & Light Co. v. EPA*, 145 F.3d 1414 (D.C. Cir. 1998) (plaintiff sought review before EPA had ever conducted an inspection plaintiff feared would lead to corrective action); *W.R. Grace & Co. Conn. v. EPA*, 959 F.2d 360, 363 (1st Cir. 1992) ("record [was] devoid of any dispute whatsoever" because plaintiff had not yet submitted proposal to EPA for consideration); *Isaacs v. Bowen*, 865 F.2d 468, 477 (2d Cir. 1989) (plaintiff brought pre-enforcement challenge to proposal for changing agency adjudication process); *German Language Ctr. v. United States*, 2010 WL 3824636, at *4, 11, 14-15 (S.D. Tex. Sept. 27, 2010) (agency decision had been "reopen[ed]" to review additional information in light of recent administrative opinion).

of APA review, *D.H.S. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (APA establishes "basic presumption of judicial review for one suffering legal wrong because of agency action").

The second prong of the ripeness analysis is easily satisfied because "the challenged action creates a direct and immediate dilemma for the parties." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 691 (2d Cir. 2013). Indeed, this case "presents a prototypical instance of hardship." *New York v. H.H.S.*, 414 F. Supp. 3d 475, 565 (S.D.N.Y. 2019).[6] The Secretary terminated the VPPP Agreement and stated that he will implement "compliance measures" if the Project Sponsors "continue[] to fail to comply with Federal law." Apr. 21 Ltr. at 2. Thus, the Secretary's termination and enforcement threats "require[] an immediate and significant change in [the Project Sponsors'] conduct of [their] affairs" by stopping the Program (and foregoing its many public benefits and a stable source of revenue to invest in public transit), or they will face "serious penalties attached to noncompliance." *New York*, 414 F. Supp. 3d at 565 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 153 (1967)). Courts have long recognized that "where noncompliance could cost a State or locality many millions, or even billions, of dollars in federal ... funding," forcing parties to wait for enforcement "blinks these realities." *Id.*

## C.    The Tucker Act

The Tucker Act has no application here. Whether an action against the federal government is "at its essence a contract claim" and therefore subject to the jurisdiction of the Court of Federal Claims depends on (1) "the source of the rights upon which the plaintiff bases its claims," and (2) the "type of relief sought." *Crowley Gov't Servs., Inc. v. G.S.A.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022). From the beginning of this case, Plaintiffs have sought to vacate the February 19 Letter,

---

[6] We have not "acknowledge[d] that the termination 'has not yet gone into effect.'" Opp. at 25 (quoting Mot. at 52). That quoted language from our brief was describing the holdings of numerous other courts—holdings that Defendants have not refuted.

and enjoin the Secretary from enforcing it, because the February 19 Letter is contrary to the VPPP statute, NEPA, and Defendants' own regulations, not to mention the Constitution.  SAC ¶ 40. These claims fall squarely within this Court's jurisdiction.  *Cmty. Legal Servs. v. H.H.S.*, --- F.4th ---, 2025 WL 1393876, at *3 (9th Cir. May 14, 2025) (ensuring "compliance with statutory and regulatory commands" is "beyond the scope" of Tucker Act); *Woonasquatucket River Watershed v. U.S.D.A.*, 2025 WL 1116157, at *14 (D.R.I. Apr. 15, 2025).  Defendants do not claim that the challenge to the April 21 Letter implicates the Tucker Act.  *See* Mot. at 21-22.

Although Defendants object that there is "no statutory obligation that the agency agree to authorize the [Program]," Opp. at 27, we are not asking for that.  That ship sailed when FHWA approved the Program under the VPPP on November 21, 2024.  To the extent that our claims implicate the terms of the VPPP Agreement, that is merely because that cooperative agreement is the "vehicle" memorializing FHWA's statutory approval of the Program.  *RFE/RL, Inc. v. Lake*, 2025 WL 1232863, at *4 (D.D.C. Apr. 29, 2025); *see also* VPPP § 4.  Plaintiffs have not sued to enforce a contract; they have sued to enforce federal law.  Even Defendants' own arguments prove our point: while Defendants contend that the Court will be required to construe the VPPP Agreement to determine if they have authority to terminate approval, Opp. at 27, their Opposition cites only a single generic clause in the Agreement referencing "all federal laws" on this point, and otherwise relies on 2 C.F.R. §§ 200.211 and 340, *see* Opp. at 36-40.  To the extent the Court needs to reference the VPPP Agreement, that does "not magically 'transform the action into one on the contract and deprive the court of jurisdiction it might otherwise have.'"  *Normandy Apartments v. H.U.D.*, 554 F.3d 1290, 1300 (10th Cir. 2009) (quoting *Megapulse v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)); *Crowley*, 38 F.4th at 1111-12.

The "type of relief sought" also forecloses application of the Tucker Act because Plaintiffs are not seeking "an order compelling the government to pay money owed." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985); *Crowley*, 38 F.4th at 1108 ("crux of … inquiry" is whether plaintiff "effectively seeks to attain monetary damages"). Unlike the cases Defendants rely on, this case obviously does not involve a "disguised claim for monetary relief," *Megapulse*, 672 F.2d at 971, especially since the VPPP Agreement does not confer any federal funding at all. *See Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (plaintiffs sought "order [requiring] the payment of money"); *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 374 (2d Cir. 1999) (government contractor sought "substantial monetary damages"); *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 79-80 (D.C. Cir. 1985) (government contractor sought "equitable remedy for the identical contract rights redressable by money damages").[7]

In any event, the Tucker Act does not apply "when no jurisdiction lies in the Court of Federal Claims." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006); *see also Cmty. Legal Servs.*, 2025 WL 1393876, at *9. The VPPP Agreement is an *unfunded* cooperative agreement, *see* Opp. at 26, memorializing TBTA's authority to collect tolls, not a contract requiring the transfer of money. Accordingly, it is not subject to the jurisdiction of the Court of Federal Claims. *See St. Bernard Par. Gov't v. United States*, 134 Fed. Cl. 730, 735 (2017), *aff'd*, 916 F.3d 987 (Fed. Cir. 2019) (agreement could not "be fairly interpreted as contemplating money damages, thus precluding the Court's jurisdiction under the Tucker Act"); *Hous. Auth. v. United States*, 140 Fed. Cl. 773, 786 (2018) (Tucker Act only applies to "money-mandating contracts").

---

[7] To the extent that enjoining the February 19 and April 21 Letters could be compared to the remedy of specific performance, "the mere fact that an injunction would require the same governmental restraint that specific (non)performance might require in a contract setting is an insufficient basis to deny a district court jurisdiction." *Megapulse*, 672 F.2d at 971. In any event, no performance is sought from Defendants.

## II.        Likelihood of success on the merits

Recognizing that the two statutory arguments in the Secretary's February 19 Letter are meritless, Defendants attempt to salvage their case with newfound "policy concerns," and argue that permits them to end the VPPP Agreement under 2 C.F.R. § 200.340(a)(4).  Agencies, however, may not raise new rationales during litigation to defend a challenged decision, and the law does not permit Defendants to unilaterally terminate the Agreement based on a sudden policy reversal.

### A.        Defendants' *post hoc* rationalizations

When an agency takes action on grounds that are inadequate, it may seek to cure that failure by doing "one of two things."  *D.H.S. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020). First, "the agency can offer 'a fuller explanation of the agency's reasoning *at the time of the agency action*,'" but it "may not provide new" reasons.  *Id.* at 1907 (emphasis in original) (quoting *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990)).  Second, the agency can "deal with the problem afresh by taking *new* agency action," in which case it "is not limited to its prior reasons but must comply with the procedural requirements for new agency action."  *Id.* at 1908 (emphasis in original).  But an agency may not offer new policy rationales for an action it has already taken, since those new reasons "can be viewed only as impermissible *post hoc* rationalizations."  *Id.* at 1909; *accord Kakar v. U.S. Citizenship & Immigr. Servs.*, 29 F.4th 129, 133 (2d Cir. 2022) (agency is "required to articulate a 'contemporaneous explanation[ ]' for its decision," which cannot be salvaged by an explanation the agency "formulated while litigating this lawsuit").

Here, Defendants' opposition on the merits relies entirely on just such an impermissible *post hoc* rationale.  Despite abandoning the statutory rationales that Secretary Duffy articulated at the time, Defendants continue to insist that VPPP Agreement "was terminated" by the February 19 Letter.  Opp. at 1; *see also* Apr. 21 Ltr. at 1 ("On February 19, 2025, I terminated [the VPPP

Agreement].").  Yet, in order to defend that termination, Defendants now rely *entirely* on newly invented "policy concerns."  Opp. at 40-46.

It is not appropriate for Defendants to ignore the record they created.[8]  Although the beginning of the February 19 Letter does briefly mention policy issues, the Secretary assiduously avoids basing the termination on them.  After citing vague concerns raised by President Trump and an environmental justice challenge brought by the State of New Jersey which FHWA and USDOT vigorously defended against, the Letter states that Secretary Duffy "reviewed the tolling authority granted under the VPPP" and "*[f]or the reasons explained below*, [] concluded that the scope of [the Program] as approved exceeds the authority authorized by Congress under [the] VPPP."  Feb. 19 Ltr. at 2 (emphasis added).  Secretary Duffy then goes on to explain that he "concluded that [the Program] is not an eligible 'value pricing pilot program,' *for two reasons*": (1) cordon pricing is not authorized under Congress' use of the phrase value pricing pilot program, and (2) the "VPPP does not authorize tolls that are calculated based on considerations separate from reducing congestion."  *Id.* at 3 (emphasis added).  This was a deliberate choice on the part of Secretary Duffy, who cited the fact that he relied on purely legal rationales as a reason to discount Plaintiffs' substantial reliance interests.  *Id.* at 4.  Having now realized that the two reasons in the February 19 Letter lack merit, Defendants cannot "pivot" mid-litigation to an entirely new set of rationales.  But even if Defendants could rely on these newfound "policy concerns," their concerns are themselves arbitrary, "counter to the evidence," "inconsistent," and the result of "bad faith." *New York v. Trump*, 2025 WL 573771, at *21 (S.D.N.Y. Feb. 21, 2025).

---

[8] Defendants also engage in wishful thinking about the record by claiming that it is "uncontested" that the February 19 Letter rested on policy grounds.  Opp. at 41.  Plaintiffs have vigorously contested that issue from the start.  *See* Mot. at 32-33.

### 1. *"Toll-free" option*

As Plaintiffs have explained, the Secretary's new policy of requiring "toll free options" appears nowhere in any USDOT or FHWA guidance.  Mot. at 33.  As FHWA is aware, many geographic areas do not provide toll-free access, including several here in New York such as on the bridges to Staten Island, as well as on the two I-190 bridges to Grand Island.  Similar tolls exist in many other states.  *See* SAC ¶¶ 82, 88, 92, 94, 97.  Plaintiffs are not aware of any effort by Defendants to terminate tolling authority for any project other than congestion pricing in New York, which shows that Duffy's newfound "policy" is not only pretextual, but arbitrary and capricious.  *See id.*  Defendants have made no effort to reconcile his supposed new policy with USDOT and FHWA's longstanding position that cordon pricing (which necessarily does not include a toll-free option) is permissible and even desirable, or present any statements reflecting the new policy other than in the Secretary's letters here.  *See* SAC ¶¶ 27, 74, 79-100.  Since this "policy" applies only to the Program, it is not in fact an agency policy at all.  *See New York*, 414 F. Supp. 3d at 550 (vacating agency decision that failed to acknowledge or explain inconsistency).

Moreover, while the Secretary now claims without factual basis that the Program imposes a "disproportionate financial burden on low and medium-income hardworking American drivers," Opp. at 10, FHWA concluded, as part of its exhaustive, years-long NEPA review, that the Program would provide substantial benefits to low- and medium-income commuters, including by facilitating mass transit opportunities and reducing congestion on the roads, as well as providing a discount for frequent low-income drivers to the CBD.  *See* Mot. at 16, 33.[9]

---

[9] The VPPP does not permit the *Secretary* to take mitigation efforts to protect low-income drivers by cancelling a VPPP authorization.  Opp. at 45.  Rather, the statute states that "any value pricing pilot program under this subsection … may include mitigation measures to deal with any potential adverse financial effects on low-income drivers." VPPP, cl. 7.  Thus, the statute provides that *the Program* may include mitigation measures (which it does).

Defendants' new objection that the Program "does not fit within the traditional value pricing model" because it charges a "fixed amount" similarly demonstrates their disregard for the regular process of administrative decision making. Opp. at 44. This rationale appears nowhere in the February 19 Letter *or* the April 21 Letter and is clearly a *post hoc* rationale. It is also meritless. Defendants fail to engage with the extensive evidence that Congress and FHWA explicitly contemplated cordon-based approaches with fixed tolls, including for New York City specifically. *See* SAC ¶¶ 67-79, 85-87.[10] Value pricing need not be dynamic as, in fact, the first dynamic pricing toll road in the United States was only established in 1998, and the second in 2005, long after ISTEA was enacted.[11] In the Final EA and in *Chan*, after all, the Defendants supported the decision not to use dynamic pricing. *Chan*, No. 23 Civ 10365, ECF No. 81 at 15.

Defendants next suggest that the Program is a tax, an argument that also does not appear in the February 19 or the April 21 Letters. Opp. at 56. Defendants neglect to mention that this argument has already been rejected by Judge Seibel. *See Cnty. of Rockland v. Triborough Bridge & Tunnel Auth.*, No. 24 Civ. 2285 (S.D.N.Y.), ECF No. 64 at 26 (holding that "the charge is a toll, not a tax"). Indeed, the Program is not a tax even under Defendants' proffered definition because it is not a "mandatory charge" on all citizens, but rather is dependent on the mode of transportation into the Central Business District. Moreover, the revenues are not used "to cover the costs of general government services," but to support improvements to New York's "integrated

---

[10] Defendants' own definitions of "congestion pricing" further illustrate the irrationality of this distinction. *See* Opp. at 44. Defendants note that congestion pricing "harness[es] the power of the market to reduce the waste associated with traffic congestion," *id.*, but the Program plainly fits that definition, as it applies a pricing mechanism to reduce congestion. Defendants' own sources defining what constitutes a "true" congestion pricing program *all* confirm that the Program comfortably fits within the ambit of the VPPP. *See What Is Congestion Pricing?*, Washington Policy Center (Apr. 7, 2008) ("a cordon model, also known as 'value pricing'"); *Congestion Pricing: Overview, Advantages and Disadvantages*, Investopedia (Nov. 18, 2024) https://www.investopedia.com/terms/c/congestion-pricing.asp (describing pricing based on "peak travel times" as "congestion pricing," which is "common in transportation").

[11] Farias et al., "An overview of dynamic pricing toll roads," 17 *Case Studies on Transport Policy* 101226, 2 (2024).

transportation system." *Chan v. U.S. Dep't of Transp.*, 2024 WL 5199945, at *14 (S.D.N.Y. Dec. 23, 2024) (Liman, J.); *see also Rockland*, ECF 64 at 26-27.

### 2. Use of toll revenues to support transit

While the Secretary may disagree with the policy underlying Congress' mandate that Program revenues may be used for "projects eligible under [Title 23]" including capital transit projects, Mot. at 29-32, he does not have the power to void that part of the statute. FHWA approved this use of toll revenues when it entered into the VPPP Agreement, VPPP Agmt., Attach. A, and it has no ability to terminate based on a retroactively imposed change in policy that conflicts with the clearly expressed will of Congress. *See* Mot. at 34-42; SAC ¶¶ 78, 96.[12] What's more, Defendants point to no documents announcing a "policy" of ensuring toll revenues are solely invested in roadways, apart from their brief in this case.

There are countless tolling programs in the United States that use revenue obtained from tolls on drivers to support mass transit. The Golden Gate Bridge toll, for example, supports bus and ferry services, and the I-395 Express Lane in Virginia supports a wide variety of transit projects.[13] So do tolls collected by TBTA on the bridges and tunnels it operates. N.Y. Pub. Auth. L. § 569-c. Congress has allowed such uses under both 23 U.S.C. § 129 and the VPPP, confirming again that the Secretary's articulated "policy" is pretextual. *Dep't of Com. v. New York*, 588 U.S. 752, 783-84 (2019).

---

[12] Indeed, FHWA has repeatedly authorized federal funds under the VPPP for cordon pricing studies where the revenue generated from the tolls would be used to pay for local transportation improvements, including in San Francisco and Los Angeles. *See id.* at 14; SAC ¶¶ 90, 92, 94.

[13] Golden Gate Bridge Highway and Transportation District, *Golden Gate Bridge Five-Year Toll Program Proposal*, (Feb. 1, 2024), http://www.goldengate.org/toll-increase; Kristi King, *How Toll Money Paid to the I-395 Express Lanes Gets Used Elsewhere*, WTOPnews (Mar. 2, 2022), https://wtop.com/virginia/2022/03/how-toll-money-paid-to-the-i-395-express-lanes-gets-used-elsewhere/.

The Secretary's attempt to separate investments in mass transit from "the infrastructure on which the toll is imposed" is nonsensical. Congestion pricing revenues *do* benefit drivers because the "MTA's transit systems and the CBD roadways form a single integrated system." *Chan*, 2024 WL 5199945, at *13-14, 20, n.17, 21, 26; *see also Rockland*, ECF No. 64 at 27. Making transit more reliable, accessible, and attractive motivates more commuters to use public transit, which then reduces congestion and wear and tear on roads. Thus, even if the Secretary's purported "policy concerns" were somehow relevant, the Program satisfies them in any event. Mot. at 16, 32-33.[14]

## B.    Lack of authority to terminate the VPPP Agreement

As Plaintiffs have established and Defendants acknowledge, a federal agency's right to terminate a cooperative agreement under Section 200.340(a)(4) must be "pursuant to the terms and conditions of the Federal award." 2 C.F.R. § 200.340(a)(4). The VPPP Agreement's terms and conditions contain no such right. *See* Mot. at 34-35. Rather, the VPPP Agreement only grants *TBTA* the right to terminate. *Id.* at 38-42.

Unable to point to language in the VPPP Agreement, Defendants argue that the agreement incorporates by reference various federal regulations, thereby giving FHWA a termination right. Opp. at 36-37. But the only textual hook for Defendants' incorporation-by-reference theory is the provision in the VPPP Agreement stating that the Project Sponsors "agree to comply with all Federal laws and requirements applicable to this project, including the laws and policies applicable to the Value Pricing Pilot Program." *Id.* at 36 (quoting VPPP Agmt., cl. 9). As we pointed out in

---

[14] These supposed  concerns also cannot be reconciled with the only relevant policy document promulgated by the Secretary to date, which announced that USDOT will "priorit[ize]" projects that utilize "user-pay" models, which the Program obviously satisfies. U.S. DEP'T OF TRANSP., Signed DOT Order, *Ensuring Reliance Upon Sound Economic Analysis in USDOT Policies Programs* at § 5(f)(i) (Jan. 29, 2025), https://rb.gy/omn7mq.

our opening brief, this provision says nothing about incorporation of additional terms and conditions, and Defendants' reliance on such an obviously inapposite provision only reinforces the lack of a "clear[] and unambiguous[]" termination provision in the VPPP Agreement itself, as required by 2 C.F.R. § 200.340(b).  Mot. at 34-36 & n.23; *see PaineWebber v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996); *Ryan, Beck & Co. v. Fakih*, 268 F. Supp. 2d 210, 223 (E.D.N.Y. 2003).

Moreover, the regulations Defendants cite as incorporated by reference don't help them either.  *See* Opp. at 36-38.[15]  2 C.F.R. § 200.211(c)(1)(v) states only that a federal agency must "inform recipients of the termination provisions in § 200.340, including the applicable termination provisions in the Federal agency's regulations or terms and conditions of the Federal award."  This provision actually supports Plaintiffs, as FHWA never informed the Project Sponsors of any provision giving FHWA a unilateral right to terminate the VPPP Agreement.  *See* Willens Decl. ¶ 4-10; C. de Cerreño Decl. ¶¶ 11-12.  Likewise, 2 C.F.R. § 200.211(c)(2) provides that "the Federal award must incorporate, by reference, all general terms and conditions of the Federal award."  This too supports our argument by directing that any "general terms and conditions" be explicitly incorporated by reference (which, of course, did not happen here).

More fundamentally, Defendants' entire argument is inconsistent with the termination requirements in Section 200.340.  In order to prevent the kind of governmental "about-face" that is at issue here, the regulations provide that a federal agency must "clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award," 2 C.F.R. § 200.340(b), and may *only* terminate a federal award "pursuant to the terms and conditions of the Federal award," *id*. § 200.340(a)(4).  In other words, the very regulations Defendants rely on

---

[15] Even assuming the General Terms were somehow incorporated into the VPPP Agreement, they would not authorize termination under Section 200.340(a)(4).  As Plaintiffs previously argued, Mot. at 35 n.23, the General Terms only authorize termination "in accordance with 2 C.F.R. § 200.340," which requires the agency to include an agency termination provision in the terms of the federal award.

require that any termination be "pursuant to the terms and conditions *of the Federal award*" and that any right to terminate "to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities" be specified "in the terms and conditions *of the Federal award*." *Id.* at §§ 200.340(a)(4) & (b) (emphases added).  Again, the terms and conditions of the VPPP Agreement say *nothing* about FHWA having a right to terminate.  Mot. at 34-35.[16]

While Defendants resort to arguing that Plaintiffs must have known Secretary Duffy had a right to terminate since the Program could not continue indefinitely, *see* Opp at 38-40, Plaintiffs have presented ample evidence that, given the need to attract investors to purchase long-term bonds supported by Program revenue, they justifiably anticipated that the Program would operate for many years and that TBTA alone would have the right to terminate.  Mot. 38-42; Willens Dec. ¶¶ 5, 8-10; C. de Cerreño Decl. ¶¶ 11-12.  That is consistent with the VPPP statute's 10-year monitoring provision.  VPPP § 5.

Defendants claim that the statute merely requires USDOT to monitor the VPPP program "as a whole" for a period of ten years, rather than monitor each individual program for that period. *See* Opp. at 39.  This, of course, would mean USDOT's obligation to monitor any VPPP projects expired more than two decades ago.  But FHWA has continued to send biannual reports to Congress on the VPPP as recently as September 22, 2023, and included a ten-year monitoring provision in the VPPP Agreement.  VPPP Agmt., cl. 8(b).  In the event that *TBTA* decided to exercise its right to terminate the Program before ten years, the Project Sponsors would obviously

---

[16] The *Christian* doctrine (Opp. at 37) does not apply because the VPPP Agreement is not a government procurement contract.  *K-Con, Inc. v. Sec'y of Army*, 908 F.3d 719, 724 (Fed. Cir. 2018); *Earman v. United States*, 114 Fed. Cl. 81, 112 (2013), *aff'd*, 589 F. App'x 991 (Fed. Cir. 2015); *Mktg. & Mgmt. Info., Inc. v. United States*, 57 Fed. Cl. 665, 674 (2003).  The Second Circuit has never recognized the *Christian* doctrine, and Defendants cite no authority to suggest that it applies to an unfunded cooperative agreement like the VPPP.  Even if it did apply, none of the regulations cited by Defendants are "mandatory" because they do not *require* that the agency have a termination right, and none reflect a "deeply ingrained strand of public procurement policy."  *K-Con, Inc.*, 908 F.3d at 724.

not be required to continue to monitor a project that no longer existed.  But that does not mean that the Project Sponsors also agreed to give FHWA an implied right to end the Program.[17]

Nor would it be a "practical absurdity" if congestion pricing were to continue indefinitely, Opp. at 39, since there is nothing illogical about allowing a state or local government to continue tolling a federal-aid highway indefinitely.  As Defendants are surely aware, federal-aid highways into Manhattan such as the Holland Tunnel and Queens-Midtown Tunnel are currently tolled and have been tolled for many decades, and the precursors to the Program (in London and Singapore) have been operating for decades.  What would be absurd would be to allow the federal government to invoke an unspoken right to unilaterally terminate a program based on the whims of changing Executive branch officials—particularly where, as here, Project Sponsors invested half-a-billion dollars implementing the Program in reliance on federal authorization and then issued debt based on projected toll revenue.  *See* Mot. at 35.[18]

### C.    Plaintiffs' reliance interests

Tacitly acknowledging that Secretary Duffy failed to address Plaintiffs' reliance on Defendants' longstanding interpretation of the VPPP, and Defendants' representation that the VPPP was the "best fit" for the Program, Mot. at 38, Defendants argue they did not need to

---

[17] Defendants also argue that the statute's "cap" on cooperative agreements with "'as many as 15' different sponsors" supports their having a silent right to terminate the VPPP Agreement because, without termination rights, the federal government might be "locked into" 15 ongoing projects indefinitely.  *Id.*  But the "cap" that Defendants cite is for the number of "State or local governments or public authorities" with which USDOT may enter into cooperative agreements; the statute says nothing about a cap on the number of projects, and indeed FHWA has funded or approved dozens of projects over the years.  *See* FHWA, *Value Pricing Pilot Program Funding,* https://ops.fhwa.dot.gov/congestionpricing/value_pricing/projects/funding.htm (last accessed May 22, 2025) (listing 50 projects funded through the VPPP, not including unfunded projects like the Program).  Defendants' interpretation also conflicts with FHWA's prior representations.  *See* FHWA, *Value Pricing Pilot Program Participation, Fiscal Years 2010 and 2011,* 75 Fed. Reg. 64,397, 64,399 (Oct. 19, 2010).

[18] Plaintiffs have never claimed a right to "violate the agreement's terms at will."  Opp. at 40; *see* 2 C.F.R. § 200.340(a)(1) (agency may terminate award under certain conditions including if the recipient "fails to comply" with the award's terms and conditions); SAC ¶ 240.  And Defendants' parade of horribles are irrelevant because Plaintiffs have at all times complied with the VPPP Agreement.  Opp. at 40.

consider these interests because FHWA has a right to terminate the VPPP Agreement "based solely on agency priorities" under Section 200.340(a)(4). Opp. at 47. This reasoning appears nowhere in the February 19 Letter, and would have required that such a term be included in the VPPP Agreement to apply. But even if Defendants had such a right, they would still have to consider Plaintiffs' reliance interests. *See Encino Motorcars v. Navarro*, 579 U.S. 211, 222 (2016) (agency must be "cognizant that longstanding polices may have 'engendered serious reliance interests that must be taken into account'"). Even where an agency has determined that its prior policy was not legally authorized, the Supreme Court has held that the agency was still obligated to consider reliance interests based on that prior policy. *See Regents of the Univ. of Cal.*, 591 U.S. at 33. Defendants do not even try to distinguish Plaintiffs' cases on this issue. *See id.*; *Loper Bright Entrs. v. Raimondo*, 603 U.S. 369, 386, 410-11 (2024); *Garland v. Cargill*, 602 U.S. 406, 412 (2024). The sole case Defendants cite involved a government contractor's unreasonable expectation that they were "entitled" to a waiver of certain costs despite the fact that the solicitation at issue expressly stated that the decision to provide such waivers was "discretionary." *Libby Welding Co. v. United States*, 444 F. Supp. 987, 992 (D.D.C. 1977).

Although Defendants argue that Secretary Duffy "recognized that certain costs had been incurred in connection with the [Program], though noted that most of those expenditures predated the November VPPP Agreement," Opp. at 47, the timing of the VPPP Agreement does not matter either. Plaintiffs spent years studying the likely environmental impact of the Program and invested half-a-billion dollars in its implementation based on Defendants' decades-long interpretation of the VPPP and Defendants' representations—including during the first Trump Administration— that the Program was eligible under the VPPP. Mot. at 40. Defendants fail to acknowledge Plaintiffs' other reliance interests, like the hundreds of millions of dollars in debt taken on by

20

TBTA in reliance on Program revenues, *see* SAC ¶ 214, and the MTA's reliance on the Program to fund critical aspects of MTA's Capital Program, *see id.* ¶¶ 209-11.  Against this backdrop, Secretary Duffy's purported "recogni[tion]" of Plaintiffs' costs in setting up the Program, Opp. at 47, comes nowhere close to providing the "detailed justification" required by law.  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see also* Mot. at 38-39.[19]

While Defendants argue Plaintiffs' reliance on the VPPP Agreement was not reasonable because Plaintiffs "rushed to finalize the agreement in November knowing that the incoming President was opposed to the [Program]," Opp. at 48, there is no such thing as a "new presidential administration" exception to the APA.  *See Regents*, 591 U.S. at 35-36.  FHWA's interpretation of the VPPP stretches back decades across administrations from both parties, and it was President Trump's own administration that informed Plaintiffs in 2019 that the VPPP was the "best fit" for the Program.  Mot. at 40.

### D.    NEPA

Defendants want to have it both ways on NEPA, insisting that it is both too *early* to assess whether FHWA must prepare an EIS or EA "before terminating the VPPP Agreement," Opp. at 50, and too *late* because the agency has already satisfied NEPA by assessing a "no-option" [sic] alternative as part of the 2023 EA for the Program itself, *id.*  They are wrong on both counts.

NEPA requires that federal agencies consider the environmental effects of their actions before they occur.  *See, e.g.*, *Marsh v. Or. Nat. Resources Council*, 490 U.S. 360, 371 (1989); *Stewart Park & Reserve Coal., Inc. v. Slater*, 352 F.3d 545, 557 (2d Cir. 2003).  As Defendants

---

[19] While Defendants make much of the fact that the VPPP is called the "value pricing *pilot* program," Opp. at 48, a "pilot project" is a project "that is used to test an idea" before "deciding whether to introduce it on a larger scale." *Pilot*, Collins Dictionary, https://www.collinsdictionary.com/us/dictionary/english/pilot.  The fact that Congress enacted the VPPP to permit states to develop new and innovative methods of reducing traffic congestion, *see Chan*, 2024 WL 5199945 at *24, does not mean that Plaintiffs' reliance interests are not legitimate.

concede, "normally an agency would prepare an EA to determine whether an EIS or … FONSI … is required." Opp. at 49. FHWA was required to fulfill its NEPA obligations before taking the major federal action of terminating the VPPP Agreement, which is intended to change the status quo and would have significant, negative environmental impacts. *See, e.g.*, *Mass. Coal. for Immigration Reform v. D.H.S.*, 698 F. Supp. 3d 10, 35 (D.D.C. 2023). Defendants were required therefore to either prepare an EIS or issue a FONSI before terminating the VPPP Agreement.

Defendants cannot rely on the 2023 EA. That document analyzed a different federal action (granting of tolling authority under the VPPP), and that NEPA process ended once FHWA signed the VPPP Agreement and issued Reevaluation 2, at which point there were no further federal approvals remaining. *Cf. Marsh*, 490 U.S. at 374. While the 2023 EA compared the Program's predicted effects to a "no-action" alternative (*i.e.*, continuation of the status quo *at the time*), that status quo no longer exists. [20] The Program has been in operation for nearly five months, and the new status quo is that congestion and pollution are down, business and quality of life are up, and drivers, pedestrians, cyclists and transit users have adjusted travel patterns and behaviors to account for the toll and its effects reduction of congestion. Likewise, the 2023 EA's "action" alternative analyzed the Program's predicted, future effects; today's "no-action" alternative would include continuation of the Program and nearly five months of demonstrated, beneficial effects.

---

[20] *Idaho Conservation League v. Bonneville Power Administration* is inapposite. 826 F.3d 1173, 1176-78 (9th Cir. 2016). The question there was whether an EIS was required; the agency had already conducted a new EA to consider whether reversion to the previous regime (allowing seasonal fluctuations in a lake's water levels within a range previously studied and authorized, and consistent with prior agency practice) would cause new significant impacts that had not already been analyzed in an earlier EA and EIS. *Id.* at 1175, 1178. The other cases Defendants cite are also inapposite, as in each case, the agency *conducted* a NEPA analysis *for the challenged agency action at issue*; the question was whether additional analysis was required. *See Marsh*, 490 U.S. at 373-74; *Nevada v. Dept. of Energy*, 457 F.3d 78, 91 (D.C. Cir. 2006). Defendants' failure to conduct *any* NEPA analysis prior to terminating the VPPP Agreement "was neither a failure of precision nor a technicality," but rather a "significant deficiency." *Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520, 534 (D.C. Cir. 2018).

FHWA can no more reverse, re-label and recycle the previous "action" and "no-action" alternatives than it can rewind the passage of time.

### E.    Enforcement authority

Defendants are not authorized to implement the sweeping "compliance measures" threatened by Secretary Duffy in his April 21 Letter.  Mot. at 43-47.  Even if the VPPP did not authorize the Program, and Defendants had the ability to terminate the VPPP Agreement, 23 C.F.R. § 1.36 does not empower Defendants to upend New York's Title 23 and 49 funding and authorizations, since that would "exceed[] the agency's authority under the authorizing statute." Mot. at 44.[21]  When it comes to congressionally appropriated funds and approvals, Congress has not given FHWA a blank check, but rather has specified the circumstances where the Executive can act.  Mot. at 45-47; *Loper Bright*, 603 U.S. at 395, 404 (court's role is to "fix the boundaries of the delegated authority" and "police the outer statutory boundaries of those delegations") (cleaned up); *New York*, 414 F. Supp. 3d at 562 ("agency may not withhold funds in a manner, or to an extent, unauthorized by Congress").  While Defendants read this to "preserv[e] FHWA's and the Secretary's discretion to enforce § 301" in whatever manner Defendants see fit, Opp. at 55, that runs contrary to basic principles of administrative law and statutory interpretation.

The handful of cases cited by Defendants only reinforce the unprecedented and unlawful nature of the April 21 Letter.  *See Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1194 (11th Cir. 1991) (noting 23 C.F.R. § 1.36 in dicta, in a case not involving federal government); *Mulgrew v. U.S. Dep't of Transp.*, 750 F. Supp. 3d 171, 242 (S.D.N.Y. 2024) (Liman, J.) (quoting

---

[21] While Defendants suggest that "Plaintiffs do not challenge" Section 1.36, Opp. at 55, that is inaccurate.  Likewise, Plaintiffs' challenge to Section 1.36 clearly is not "barred" by the statute of limitations.  *Id.* at 54 n.7; *see Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 813 (2024).

23 C.F.R. § 1.36).[22] *South Dakota v. Adams* is instructive. 587 F.2d 915, 919 (8th Cir. 1978). At issue in that case was South Dakota's obligation under 23 U.S.C. § 131 to exercise "effective control" on highway advertising, or face the withholding of ten percent of funds under that provision. Citing Section 1.36, FHWA argued that it was entitled to withhold such funding on an interim basis, before a final determination, because it was "appropriate," while South Dakota argued that Section 131's express allowance for withholding following a final determination precluded withholding on an interim basis. *Id.* at 919. Rather than simply defer to Section 1.36, the court concluded that the Secretary could withhold the specified funds on an interim basis because "*the Act* impliedly allows it," and such enforcement action was "consistent with the enforcement powers Congress conferred upon the Secretary to achieve highway beautification." *Id.* at 919-20 (emphasis added). In other words, it is Congress and the statute, not FHWA and its regulation, that controls and prescribes enforcement authority. Here, Defendants do not and cannot point to any statutory authority that would authorize them to withhold funding and approval from New York. *Cf. State Highway Comm'n v. Volpe*, 479 F.2d 1099, 1118 (8th Cir. 1973) (FHWA withholding is circumscribed in light of congressional appropriations and mandate).

Defendants' claim that enjoining the April 21 Letter would leave them "powerless" to enforce Section 301, Opp. at 55, is a non sequitur. The question is not whether Defendants have authority to enforce Section 301 in general, but rather whether they have authority to implement the "compliance measures" they identified in the April 21 Letter, including withholding congressionally appropriated funds. *N.R.D.C. v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d

---

[22] Defendants' reliance on *Town of Portsmouth v. Lewis* is particularly misplaced, as the First Circuit there conspicuously did *not* cite Section 1.36 when outlining FHWA's discretion to approve federal funds. 813 F.3d 54, 63 (1st Cir. 2016). And if anything, the Ninth Circuit's decision in *Clallam County v. Department of Transportation* supports Plaintiffs rather than Defendants. 849 F.2d 424, 428 (9th Cir. 1988) ("Congress has not provided a comprehensive scheme to enforce section 301 … indeed, Congress has provided no express remedy under Title 23.").

95, 112 (2d Cir. 2018) ("[A]n agency literally has no power to act unless and until Congress confers

power upon it.").  As Plaintiffs have explained, Defendants' threat to withhold STIP amendment

authorizations, NEPA approvals, and the obligation of funds is not only unsupported by the FAHA,

*see supra*, but is also directly foreclosed by numerous statutory and regulatory provisions, Mot.

at 45-47.  Moreover, the most reasonable reading of Section 1.36 in conjunction with the VPPP

would be that Defendants could withhold funding *for the Program* (assuming there were actually

Program funding to withhold, which there is not).  *See* VPPP §§ 1-2 (providing federal funding

for programs authorized under the VPPP).[23]

## III.        Irreparable harm

It is the height of audacity for Defendants to suggest that Plaintiffs' "delay in filing for a

preliminary injunction" undermines a finding of irreparable harm, Opp. at 29, given Plaintiffs'

well-documented attempts to establish an orderly schedule and secure Defendants' commitment

to avoid burdening the Court with unnecessary expedited motion practice.  The record is clear that

Plaintiffs sought to avoid any exigency and filed this motion shortly after Defendants identified

the specific enforcement measures they would pursue absent judicial intervention.

More specifically, on April 2, 2025, Plaintiffs asked whether Defendants "contemplate[d]

taking any unilateral action on or after April 20 that might require Plaintiffs to seek expedited

injunctive relief," to which Defendants demurred.  ECF 49 at 4.  On April 4, the parties submitted

a joint scheduling proposal to the Court that noted the potential need for injunctive relief, and

expressed Plaintiffs' view "that this highly consequential intergovernmental dispute … is best

---

[23] Section 1.36 refers to three separate types of enforcement actions, including withholding funding "on account of" such project.  Mot. at 44.  Defendants contend that "on account of" means "because of" so they can withhold every cent due to New York, Opp. at 53, but the Regulation provides: "if the Administrator determines that a State has violated [the law] with respect to *a project*, he may withhold payment to the State of Federal funds *on account of such project*."  23 C.F.R. § 1.36 (emphasis added).

resolved through orderly summary judgment briefing and without the exigency that accompanies motions under Rule 65." *Id.* Defendants took the position that the "potential need for expedited injunctive relief is premature." *Id.* at 5. On April 8, in response to further threats from Defendants on social media, Plaintiffs wrote to the Court that Defendants "should be required to let us know what they intend to do and when they intend to do it" and that "in the event that an application for injunctive relief proves to be necessary, any failure by … Defendants to provide timely notice can and should be taken into account in assessing irreparable harm and the balance of the equities." ECF 54 at 2. One day later, the Court specifically asked Defendants to confirm that there was "no action that is imminent to be expected from the federal government," ECF 60 at 5:20-21, and Defendants so confirmed, *id.* at 5:22-23. The Court then adopted the parties' proposed schedule.

When the April 21 Letter was issued, Plaintiffs promptly informed the Court that they intended to seek injunctive relief. ECF 64 at 2. On April 24 and again on 29, Plaintiffs sought to meet and confer with Defendants about a proposed briefing schedule, reiterating their offer to postpone seeking injunctive relief "if the government would agree not to take enforcement action, even temporarily," a proposal that Defendants rejected. ECF 71 at 1-2. Plaintiffs then filed this motion on May 5.

Reversing course, Defendants also assert that Plaintiffs are seeking relief too early because the enumerated "compliance measures" the Secretary says he "will implement" in less than a week are too speculative for the Court to enjoin. Apr. 21 Ltr. at 1-2. This makes no sense. "Damocles's sword does not have to actually fall … before the court will issue an injunction." *League of Women Voters v. Newby*, 838 F.3d 1, 8-9 (D.C. Cir. 2016). Defendants do not dispute that the Secretary's threatened compliance measures will cause irreparable harm. Carry Decl. ¶¶ 8-18; Mot. at 54-59. Defendants also do not dispute that the indeterminate exemption for "Safety Projects" provides no

comfort because NYCDOT cannot plan and budget around that uncertainty.  Carry Decl. ¶ 11.

Defendants are left with characterizing these explicit threats as "speculative" because of the

extremely remote possibility that the Secretary may change his mind and retract termination of the

VPPP Agreement.  Opp. at 30.  As a practical matter, however, this would mean that the Court

would have to entertain an identical emergency motion the moment the sanctions are actually

imposed, which would obviously compromise, rather than promote, judicial efficiency.[24]

Defendants insist that the Secretary's imposition of retroactive conditions on the receipt of

federal funds does "not impact New York's sovereign interests to the degree of irreparable harm."

*Id*. at 31.  This seems to suggest that some ill-defined threshold of harm to state sovereignty must

be met, but there is no support for this proposition in the case law.  Instead, courts frequently find

irreparable injury where the federal government threatens "legal consequences" in an effort to

override State law.  *See Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024); *Abbott v.*

*Perez*, 585 U.S. 579, 602 n.17 (2018) ("[T]he inability to enforce its duly enacted plans clearly

inflicts irreparable harm on the State.").  Defendants ignore the fact that such conditions are being

imposed based on an unlawful agency demand, which "almost always produces [] irreparable

harm."  Mot. at 54.  The clear point of Defendants' warning that they "will not hesitate to use every

tool at [their] disposal," ECF 54 at 4, is to inflict enough pain that Plaintiffs bend under pressure

and do what Defendants cannot do legally—kill a Program that FHWA has already authorized.

While Defendants assert that Plaintiffs have not described the "compliance costs" the

Project Sponsors would face by acceding to the Secretary's coercive demand, that misses the point.

---

[24] Defendants attempt to dismiss the conclusion of other courts that losing federal funding constitutes irreparable harm by arguing that those cases involved the government "actually identifying which funds would be withheld."  Opp. at 30-31.  This is a false distinction.  The Secretary has specifically identified compliance measures that will result in cutting off specific streams of federal funds.  Mot. at 54-59.  The cases also hold that uncertainty itself causes irreparable harm.  *See, e.g.*, *City and Cnty. of San Francisco v. Trump*, --- F. Supp. 3d ---, 2025 WL 1186310, at *2 (N.D. Cal. Apr. 24, 2025); *New York v. Trump*, --- F. Supp. 3d ---, 2025 WL 715621, at *13, 15 (D.R.I. Mar. 6, 2025).

The "compliance costs" are obvious: the termination of the Program would lead to the unrecoverable loss of approximately $500 million in public funds spent in reliance on FWHA's longstanding interpretation of the VPPP, ongoing expenses to the tune of $12 million per month, the loss of $50 million in average monthly revenues earmarked to fund critical capital projects, among others, and the loss of substantial public benefits, including to air quality, benefits, and worker productivity.  Mot. at 56-58, 63.

Defendants claim that the Court should disregard their violation of the Project Sponsors' due process rights—which violation Defendants now effectively concede—because FHWA has belatedly offered "an opportunity to be heard and challenge the termination."  Opp. at 32-33.  But because this sham "opportunity" was afforded two months after terminating the VPPP Agreement, it cannot cure the original harm, unless Defendants retract the prior termination.  *See* 2 C.F.R. § 200.342; *Climate United Fund v. Citibank, N.A.*, 2025 WL 842360, at *6 (D.D.C. Mar. 18, 2025). And while Defendants seek to minimize the harms of the Secretary's threats because the Program is only "a few months old," Opp. at 33, Defendants do not cite a single case supporting that position.  Plaintiffs made long-term infrastructure plans in reliance on Program revenues and the government funds that FHWA has now threatened, and the security of Program revenue is essential to attract investors to purchase long-term bonds to finance $15 billion in capital improvements. *See* Willens Decl. ¶¶ 8-18, 31; Mot. at 36, 40, 56-58.

Last but not least, pointing to then-presidential candidate Donald Trump's statements opposing the Program as a reason why Plaintiffs should not have relied on the VPPP Agreement, Defendants actually have the nerve to assert that Plaintiffs' harms from the Secretary's termination of the VPPP Agreement and compliance measures are "self-created."  Opp. at 34.  A presidential candidate's threat of illegal action cannot render the resulting harms "self-created."  *Id.*

Defendants' position on this boils down to the argument that no one in this country of laws can reasonably rely on the laws being followed.  This perspective is not only antithetical to the APA, but also to federalism, not to mention the very purpose of judicial review.  *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

## IV.        The public interest and balance of equities

Defendants do not seriously dispute that early evidence shows the Program is working as intended: congestion is down, traffic speeds are up, commutes are faster and more reliable (including for public buses), and more people are visiting Manhattan's commercial districts and supporting the region's businesses.  Mot. at 62-65.  Nor do Defendants contest that pausing the Program would return Manhattan to a state of unrelenting congestion and cause TBTA to incur millions of dollars in monthly operating expenses with no offsetting revenue, both of which this Court has already found are not in the public interest.  *Chan*, 2024 WL 5199945, at *49; Mot. at 63-64.  Defendants have not tried to convince the Court that the public interest would be served by blocking funding to make subway stations more accessible.  Mot. at 61-62.  Nor do Defendants dispute that withholding funding earmarked for public projects, including where such threats create "significant budget uncertainty" and entail "coercive effects," is harmful to the public interest. *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 539 (N.D. Cal. 2017); *see also* Mot. at 52-53.  By failing to "directly respond to this argument in its opposition briefing," Defendants have conceded the public interest arguments that Plaintiffs have made.  *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 220 (S.D.N.Y. 2022) (Liman, J.).

Defendants claim there is a "substantial public interest" in allowing FHWA to reverse its decades-old interpretation of the VPPP, in order to block toll revenues from being invested in public transit.  Opp. at 57.  But, as the Supreme Court has recently made clear, allowing agencies

to alter their statutory interpretations based on who sits in the White House "fosters unwarranted instability in the law, leaving those attempting to plan around agency action in an eternal fog of uncertainty." *Loper Bright*, 603 U.S. at 411.

All that is left for Defendants to argue are unfounded claims that the Program disproportionately harms low- and middle-income drivers, which is addressed above, and that congestion has worsened in the Bronx, a claim based on speculation in one news article dating from the Program's first few weeks. Opp. at 8; C. de Cerreño Decl. ¶¶ 26(m)-(n) (actual effects in the Bronx are less pronounced than predicted).[25] But diversions were predicted in the EA and mitigation was identified, which mitigation both Defendants and this Court affirmed as sufficient. *Mulgrew*, 750 F. Supp. 3d at 237-46; *Chan v. U.S. Dep't of Transp.*, 2025 WL 1144703, at *36-38 (S.D.N.Y. Apr. 17, 2025). And Defendants' concern for low-and middle-income residents in the Bronx is ironic given that stopping the Program would "necessarily stall" investments of over $71 million to improve local air quality in the Bronx. C. de Cerreño Decl. ¶ 37.

Finally, although Defendants assert that a ruling in Plaintiffs' favor would raise "substantial separation-of-powers concerns," Opp. at 57-58, it is the province of the courts, not the executive branch, to weigh the public interests and to enjoin threatened enforcement measures based on an illegal agency decision. *See Chan*, 2024 WL 5199945, at *48.[26]

## **CONCLUSION**

The Court should grant Plaintiffs' motion for a preliminary injunction.

---

[25] A more recent analysis by the same publication found that traffic outside of the CBD is "[n]ot worse." Emily Bader, *Here Is Everything That Has Changed Since Congestion Pricing Started*, N.Y. TIMES (May 11, 2025), https://www.nytimes.com/interactive/2025/05/11/upshot/congestion-pricing.html.

[26] To the extent that Defendants look beyond Plaintiffs' current motion to the scope of relief on the merits, that issue is not currently before the Court. Opp. at 58-59. But to be clear, while vacatur is the "usual" APA remedy, a court may grant further relief where "principles of equity support such relief." *New York v. U.S. Dep't of Com.*, 351 F. Supp. 3d 502, 673 (S.D.N.Y. 2019) (Furman, J.); *accord Guertin v. United States*, 743 F.3d 382, 388 (2d Cir. 2014).

Dated:  May 22, 2025                                     Respectfully submitted,
        New York, New York


                                                         */s/ Roberta A. Kaplan*
                                                         Roberta A. Kaplan
                                                         D. Brandon Trice
                                                         Maximilian T. Crema
                                                         KAPLAN MARTIN LLP
                                                         1133 Avenue of the Americas | Suite 1500
                                                         New York, NY 10036
                                                         Tel.: (212) 316-9500
                                                         rkaplan@kaplanmartin.com
                                                         btrice@kaplanmartin.com
                                                         mcrema@kaplanmartin.com


                                                         */s/ Mark A. Chertok*
                                                         Mark A. Chertok
                                                         Elizabeth Knauer
                                                         Amy Lynn Cassidy
                                                         John F. Nelson
                                                         Phillip Dane Warren
                                                         SIVE, PAGET & RIESEL, P.C.
                                                         560 Lexington Avenue, 15th Floor
                                                         New York, NY 10022
                                                         Tel.: (212) 421-2150
                                                         mchertok@sprlaw.com
                                                         eknauer@sprlaw.com
                                                         acassidy@sprlaw.com
                                                         jnelson@sprlaw.com
                                                         dwarren@sprlaw.com


                                                         *Attorneys for Plaintiffs the Metropolitan
                                                         Transportation Authority and Triborough
                                                         Bridge and Tunnel Authority*



                                                         MURIEL GOODE-TRUFANT
                                                         Corporation Counsel of the City of New York

                                                         */s/ Nathan Taylor*
                                                         Nathan Taylor
                                                         Christian C. Harned
                                                         New York City Law Department
                                                         100 Church Street
                                                         New York, NY 10007

31

Tel.: (212) 356-2315
ntaylor@law.nyc.gov
chharned@law.nyc.gov

*Attorneys for Intervenor-Plaintiff New York
City Department of Transportation*