# EXHIBIT 1A



1133 Avenue of the Americas
Suite 1500
New York, New York 10036

(212) 316-9500
rkaplan@kaplanmartin.com

May 21, 2025

**BY EMAIL**

Richard Marquis
Division Administrator
Federal Highway Administration, New York Division
11A Clinton Avenue
Albany, NY 12207
rick.marquis@dot.gov

      *Re:*    Response to April 21, 2025 Order to Show Cause

Dear Division Administrator Marquis:

On behalf of the Metropolitan Transportation Authority ("MTA") and Triborough Bridge and Tunnel Authority ("TBTA"), we write in response to United States Department of Transportation ("USDOT") Secretary Sean Duffy's letter dated April 21, 2025 (the "April 21 Letter" or "Apr. 21 Ltr."), in which he "directs" the New York State Department of Transportation ("NYSDOT") to "show cause" by May 21 "why [the Federal Highway Administration ('FHWA')] should not take appropriate steps under 23 CFR § 1.36 to remedy New York's noncompliance with 23 U.S.C. § 301 in connection with" New York's Central Business District Tolling Program (the "Program"). The April 21 Letter also invites TBTA and the New York City Department of Transportation ("NYCDOT," and together with NYSDOT and TBTA, the "Project Sponsors") to submit responses.

At the outset, the MTA and TBTA object to Secretary Duffy's so-called "order to show cause" as procedurally improper. Secretary Duffy already purported to "terminate" the Value Pricing Pilot Program Agreement authorizing the Program (the "VPPP Agreement") in his letter dated February 19, 2025 (the "February 19 Letter" or "Feb. 19 Ltr."), without any prior notice or opportunity to be heard as required by the relevant regulations, 2 C.F.R. §§ 200.341(a) and 342. The April 21 Letter is clear that, in his view, the VPPP Agreement was already "terminated" by virtue of that earlier correspondence. Apr. 21 Ltr. at 1. Indeed, the Secretary has reaffirmed that position repeatedly on television and social media, including as recently as last week.[1] It is thus obvious that USDOT's decision has already been made, and that this is an "opportunity to be heard" in name only. Secretary Duffy did not afford the Project Sponsors any notice or due process

---

[1] @SecDuffy, X (May 15, 2025 6:07 PM) ("I'm fighting back against New York's illegal toll …"), https://x.com/SecDuffy/status/1923138083194626177.

before that alleged termination, and he cannot cure that failure now through a sham exchange of letters.

As to whether the Program is authorized under the VPPP and whether FHWA may seek to coerce compliance with Secretary Duffy's directives that tolling under the Program end, as you know, those questions (among others) are already pending before a federal court in litigation that the MTA and TBTA commenced on February 19th, the same day on which the Secretary purported to terminate the VPPP Agreement. *See Metro. Transp. Auth. v. Duffy*, No. 25 Civ. 1413 (LJL) (S.D.N.Y.) ("*Duffy*").[2] While the MTA and TBTA take this opportunity to summarize many of the points made in our pleadings and briefs in *Duffy* and to provide information about the success of the Program, this response should not be construed as a basis to claim that any determination by Secretary Duffy or USDOT currently the subject of litigation in *Duffy* is non-final or otherwise unripe for judicial review.

**The Program Is Authorized Under the Value Pricing Pilot Program.**

The Program is authorized under the Value Pricing Pilot Program statute, which allows cordon pricing programs and gives states the flexibility to use revenues from their tolling programs to fund transit projects. 23 U.S.C. § 149 note (Value Pricing Pilot Program) (the "VPPP").

First, and contrary to the first justification cited in the February 19 Letter, the VPPP clearly authorizes cordon pricing programs. As explained more fully in the MTA and TBTA's memorandum of law in support of their motion for a preliminary injunction, *Duffy*, ECF 83, when Congress first enacted the VPPP, "congestion pricing" meant a charge intended to reduce congestion, without any limitation on whether the charge could be imposed on a geographic area. In fact, at that time cordon pricing was the quintessential example of "congestion pricing." During the congressional debates concerning the initial passage of the VPPP in 1991, for instance, members of Congress specifically pointed to the example of Singapore, which operated a cordon pricing program, as inspiration. That same meaning persisted over the ensuing decades as Congress reauthorized the VPPP and FHWA sought out programs to fulfill the VPPP's objectives. Indeed, FHWA has long interpreted the VPPP to authorize cordon pricing and has approved and funded multiple programs intended to impose a charge on a geographic area rather than just a particular highway.[3] There is nothing in the text, context, and history of the statute, or in FHWA's decades of administrative practice, that suggests that a cordon pricing program would not be covered; indeed, everything indicates the opposite. *See Duffy*, ECF 83 at 24–29.

Second, and contrary to the second justification in the February 19 Letter, the VPPP allows state and local governments to use the revenues from tolls to fund public transportation projects like those planned in MTA's 2020-2024 Capital Program. The statute explicitly states that governments can use the revenues from tolling programs to fund transportation projects that are otherwise eligible under Title 23 of the U.S. Code, which includes capital transit projects. *See id.*

---

[2] Attached hereto and incorporated by reference are the MTA and TBTA's filings in *Duffy*, including the Second Amended Complaint ("SAC") (ECF 96) and the memoranda, declarations, and exhibits submitted in support of the MTA and TBTA's motion for a preliminary injunction (ECF 83, 84, 85, 86, 87, 91).

[3] FHWA has authorized federal funds under the VPPP for numerous cordon pricing studies, including in Fort Myers Beach, Florida in 2001 and 2002; downtown San Francisco in 2005; downtown Los Angeles in 2011; and Treasure Island in San Francisco in 2012. *See Duffy*, ECF 83 at 11; SAC ¶¶ 82, 88, 92, 94. Additionally, in 2007, FHWA agreed to award New York City $5 million in VPPP funding to consider a cordon pricing scheme in which all vehicles entering Manhattan south of 86th Street would be tolled. *Duffy*, ECF 83 at 11; SAC ¶ 86.

at 29.  And other aspects of the statute make clear that Congress anticipated that state governments would use VPPP project revenues to improve public transportation options.  *See id.* at 30. Furthermore, it simply is not true that the Program's toll rates were "set and will be used primarily for funding transit capital projects."  Apr. 21 Ltr. at 3.  The toll rates were not set "primarily" for funding public transit capital projects, but to achieve congestion reduction and to provide a reliable source of funding for public transit capital projects.  *See Duffy*, ECF 96 ("SAC") ¶¶ 101–104. Moreover, the provision of funding for public transportation projects obviously has the effect of reinforcing the goal of reducing congestion: improving New York City's public transit system will make public transit more attractive and shift travelers from using private vehicles to using public transit.  *See Duffy*, ECF 83 at 29 n.19.

The April 21 Letter states, without citation, that it is a "fundamental principle of the Federal-aid Highway Program that toll revenues should be used to pay for the infrastructure on which the toll is imposed, with any excess reinvested back into the broader highway network." Apr. 21 Ltr. at 3.  That claim finds no support in the text of the VPPP or in other toll-related provisions of Title 23.  In fact, as described above and in detail in the MTA and TBTA's litigation filings, the VPPP and Title 23 specifically allow for toll revenues to be used on capital transit projects.  Indeed, the April 21 Letter admits this, stating that "the VPPP statute permits revenues from pilot programs to be used for transit projects eligible for funding under title 23 of the U.S. Code."  *Id.*  Secretary Duffy's sole response to this statutory provision is that "it is unconscionable as a matter of policy that highway users are being forced to bail out the MTA transit system."  *Id.* As explained below, those supposed policy concerns are simply after-the-fact rationalizations to justify the Secretary's illegal attempt to end the Program, but even taking those concerns at face value, the Secretary is mistaken.  Whatever the Administration's feelings about how revenues from the Program *should* be used, that is not its decision to make; the people's elected representatives in Congress decided to allow states to use toll revenues to fund public transportation projects when they enacted (and subsequently reauthorized) the VPPP, and the people's elected representatives in New York made the decision to create the Program and direct MTA and TBTA to use toll revenues to help fund projects under MTA's 2020-2024 Capital Program.  The Program fully complies with the requirements of the VPPP and FHWA's prior approval.

**The Secretary's "Policy Concerns" Are Unfounded and Are Not a Basis to Terminate the Program.**

The Secretary's putative "policy concerns" likewise do not support the purported termination of the VPPP Agreement.  To begin with, this rationale is entirely *post hoc*: again, the February 19 Letter is clear that the Secretary's decision to "terminate" the VPPP Agreement was made on February 19 and rested solely on "two reasons" derived from his interpretation of the VPPP statute, namely, that (1) cordon pricing "is not authorized under Congress' use of the phrase 'value pricing pilot program,'" and (2) the "VPPP does not authorize tolls that are calculated based on considerations separate from reducing congestion."  Feb. 19 Ltr. at 3.  For the reasons explained in the MTA and TBTA's preliminary injunction motion, the Secretary cannot rectify the fatal flaws in those justifications by inventing new justifications after the fact.  *Duffy*, ECF 83 at 32–33.

Even if the Secretary could rely on his *post hoc* policy rationalizations, they are flatly contradicted by the VPPP itself and the extensive environmental review record.  Contrary to the Secretary's claims that the Program "imposes a disproportionate financial burden on low and medium-income hardworking American drivers for the benefit of high-income drivers," FHWA

concluded as part of the exhaustive review under the National Environmental Policy Act ("NEPA") that the Program would provide substantial benefits to low- and medium-income commuters, *id.* at 16, 33.[4] The VPPP Agreement confirms that FHWA and the Project Sponsors analyzed this issue and that the Project Sponsors adopted several mitigation measures that would avoid any disproportionately high and adverse effect on low-income drivers, which is the demographic group identified in the VPPP statute as subject to protection. *See* VPPP Agreement cl. 3, 8(d), Attachment A; *see also* VPPP § 7.

The April 21 Letter also claims that the Program is a "breach of the promise" to drivers as part of the Federal-aid Highway Program because they will receive "no new highway benefits" from paying a toll. Apr. 21 Ltr. at 3. This position is not only untenable, but it is contradicted by the Secretary's acknowledgement that the Program will benefit drivers. Numerous courts, including in cases challenging the Program on constitutional grounds, have rejected this very argument. *See, e.g.*, *Chan v. U.S. Dep't of Transp.*, No. 23 Civ. 10365, 2024 WL 5199945, at *21, 23–24, 26–27 (S.D.N.Y. Dec. 23, 2024) (Liman, J.) (holding "[a]ll drivers … will benefit equally from the reduced congestion, saving time otherwise spent in traffic, improving travel-time reliability, and reducing the potential for auto collisions" and collecting cases); *see also Chan v. U.S. Dep't of Transp.*, No. 23 Civ. 10365, 2025 WL 1144703, at *20 n.17 (S.D.N.Y. Apr. 17, 2025) (Liman, J.) (rejecting as "flawed" the argument that the Program provides no benefits to drivers "if the revenues are not directed toward road maintenance" because "[e]ven if the trucks have no alternative route, they may benefit from the fact that others do have the ability to take advantage of alternative routes in the form of reduced congestion and quicker transit through the CBD"). Thus, even if the Secretary's purported "policy concerns" were relevant, the Program was fully consistent with those policies when it was approved, and it remains so today. *Duffy*, ECF 83 at 16, 32–33.[5]

The Secretary's April 21 Letter also announces that FHWA "will no longer support this type of project" and states his view that "it is unconscionable as a matter of policy" for Program revenues to be invested in improving public transit. Apr. 21 Ltr. at 3. But while FHWA may have discretion to adopt forward-looking policies provided they comply with governing law, FHWA has no authority to terminate the VPPP Agreement based on retroactively imposed changes in administrative policy or priorities. *See Duffy*, ECF 83 at 34–42. With respect to the use of Program revenues, even the Secretary acknowledges that the VPPP specifically authorizes the use of tolling revenue for "projects eligible under" Title 23, including capital transit projects. *Id.* at 29–32. Moreover, FHWA has already authorized federal funds under the VPPP for cordon pricing studies where the revenue generated from the tolls would be used to pay for local transportation

---

[4] *See also* Final EA Chapter 6, Economic Conditions at 6-47–49, 6-80–84 (Apr. 2023), https://www.mta.info/document/110831; Final EA Chapter 17, Environmental Justice at 17–62, 17–67–72 (Apr. 2023), https://www.mta.info/document/110886 (describing "substantial benefits associated with reduced vehicle congestion in the Manhattan CBD" and measures designed to lessen impacts on low-income drivers).

[5] The Program is also consistent with Secretary Duffy's January 29, 2025 order stating that USDOT will "prioritize" projects that "utilize user-pay models." U.S. DEP'T OF TRANSP., Signed DOT Order re: Ensuring Reliance Upon Sound Economic Analysis in Department of Transportation Policies Programs and Activities at § 5(f)(i) (Jan. 29, 2025), https://www.transportation.gov/briefing-room/signed-dot-order-re-ensuring-reliance-upon-sound-economic-analysis-department.

improvements, including in San Francisco and Los Angeles. *See id.* at 14; SAC ¶¶ 90, 92, 94.[6] Secretary Duffy may now find that policy "unconscionable," Apr. 21 Ltr. at 3, but he cannot displace Congress' statute with his own view of what constitutes "good transportation policy." Moreover, because "MTA's transit systems and the CBD roadways form a single integrated system," investment in public transit furthers the goal of congestion reduction that the Secretary cannot deny underlies the VPPP statute and is consistent with current FHWA policy. *Chan*, 2024 WL 5199945, at *13–14, 21, 26.

Finally, to the extent that the Secretary is now attempting to recast his decision to "terminate the VPPP Agreement" as discretionary and one based on "policy concerns," then his decision also violated the law because there is no record showing that USDOT conducted an environmental review prior to taking that action, as mandated by NEPA. *See Duffy*, ECF 83 at 36–38. Indeed, USDOT under the first Trump Administration recognized that NEPA required an environmental review of the Program because the approval of tolling authority under the VPPP qualified as a major federal action. The Secretary's purported termination is no less major than FHWA USDOT's execution of the VPPP Agreement in the first place, particularly given the adverse environmental consequences that would inevitably flow from halting the Program now that tolling has commenced. *Id.* Indeed, evidence from the Program's initial months shows that traffic in the CBD is down, vehicle speeds are up (including for public buses), commutes are faster and more reliable, and more people are visiting Manhattan's commercial districts and supporting the region's businesses. *Id.* at 13–14, 62–65. The Secretary had no authority to discard these and other benefits, and thus generate negative environmental impacts, without undertaking the environmental review mandated by NEPA.

### The Secretary Has No Authority to "Terminate" the Congestion Pricing Program or to Implement His Threatened Compliance Measures.

The foregoing demonstrates that the Program is fully consistent with the VPPP and that the Secretary's legal rationales and newfound policy concerns fall far short of permitting him to terminate the VPPP Agreement. What's more, even beyond these threshold challenges, the Secretary has no authority either to terminate the Program or to effectuate any of his threatened compliance measures.

The VPPP Agreement itself says nothing about FHWA or USDOT having a right to terminate. Rather, it grants TBTA alone such right. VPPP Agmt., cl. 11. There is nothing in the VPPP Agreement, the statute, or other sources of law that would grant the Secretary the authority to end the VPPP Program. *Duffy*, ECF 83 at 34–36. While the Secretary claims in the April 21 Letter that 2 C.F.R. § 200.340(a)(4) grants authority to terminate an award that "no longer effectuates the program goals or agency priorities," that is not what the regulation says. Rather, under the cited regulation, USDOT or FHWA may terminate an agreement "*pursuant to the terms and conditions*" of the award. *Id.* (emphasis added). That, of course, has no relevance here where, as noted, the VPPP Agreement by its express terms gives only TBTA, and not the Secretary, the power to terminate. *Duffy*, ECF 83 at 13. If USDOT or FHWA wanted to have the right to unilaterally terminate congestion pricing, they were required under their own regulations to

---

[6] Moreover, tolling is already authorized on many routes that do not provide alternatives for toll-free access, including several in New York State, such as the two I-278 bridges to Staten Island, as well as on two I-90 bridges to Grand Island, leaving no toll-free alternative routes to access either of those destinations. See *Duffy*, ECF 83 at 33.

negotiate with the Project Sponsors for such a term that was "clearly and unambiguously" explicit —having failed to do so, they cannot attempt to renegotiate that issue now. *See* 2 C.F.R. § 200.340(b).

In any event, the Project Sponsors would never have agreed to such a right, because that uncertainty would have rendered impossible the infrastructure investments the Program required in order to operate, as well as the long-term bonding the Program is statutorily required to support. As FHWA's own court filings concede, the goal of raising $15 billion in capital improvements for the MTA Capital Program is dependent on attracting investors to purchase long-term bonds secured by Program revenue. The MTA and TBTA made crystal clear to FHWA and USDOT when negotiating the VPPP Agreement that long-term operation of the Program is essential for this reason. Obviously, the MTA and TBTA never would have spent years studying the potential environmental effects of congestion pricing or invested a half-billion dollars in planning, technology, and infrastructure if they had understood that the Secretary could end the Program on a whim. To the extent that Secretary Duffy relies on the fact that the VPPP uses the term "pilot program" to support his argument for a unilateral termination right, the VPPP explicitly contemplates that the USDOT Secretary "*shall* monitor the effect of such programs for a period of *at least 10 years*," *Duffy*, ECF 83 at 13; VPPP § 5 (emphases added), and the VPPP Agreement requires that "TBTA and NYCDOT … shall monitor and report on the project performance … from the date of implementation for a period of at least ten years or to the end of the life of the Project," VPPP Agmt. cl. 8(b). These provisions are inconsistent with the idea that the Program was ever intended to be short-term or temporary.

Finally, we are compelled to note that implementing certain threatened measures in an attempt to force the Project Sponsors to terminate the Program is unlawful for multiple other reasons, including that: (1) FHWA does not have authority under 23 C.F.R. § 1.36 to impose such sanctions; (2) FHWA's enforcement of such sanctions would violate the clear statement rule outlined in *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981); and (3) FHWA's withholding of federal funds is unconstitutionally coercive. *Duffy*, ECF 83 at 42–51.

Needless to say, MTA and TBTA reserve all rights, including the right to assert additional and/or alternative reasons why the Program is compliant with 23 U.S.C. §301.

Very truly yours,

Roberta A. Kaplan

cc:    Mark A. Chertok
       Elizabeth Knauer
       D. Brandon Trice

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Filed 05/05/25

Metro. Transp. Auth. v. Duffy, No. 25 Civ. 1413 (S.D.N.Y.)
(LJL)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

METROPOLITAN TRANSPORTATION AUTHORITY
and TRIBOROUGH BRIDGE AND TUNNEL
AUTHORITY,

*Plaintiffs*,

and

NEW YORK STATE DEPARTMENT OF
TRANSPORTATION, RIDERS ALLIANCE, SIERRA
CLUB, and NEW YORK CITY DEPARTMENT OF
TRANSPORTATION,

*Intervenor-Plaintiffs*,

v.

SEAN DUFFY, in his official capacity as Secretary of
the United States Department of Transportation,
GLORIA M. SHEPHERD, in her official capacity as
Executive Director of the Federal Highway
Administration, UNITED STATES DEPARTMENT
OF TRANSPORTATION, and FEDERAL HIGHWAY
ADMINISTRATION,

*Defendants*.

Case No. 25 Civ. 1413 (LJL)

**ORAL ARGUMENT
REQUESTED**

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS
THE METROPOLITAN TRANSPORTATION AUTHORITY AND
TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY AND INTERVENOR-
PLAINTIFF NEW YORK CITY DEPARTMENT OF TRANSPORTATION'S
<u>MOTION FOR A PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ................................................................................................... 6

    A. The Traffic Mobility Act and FHWA's representations ................................. 6

    B. New York's statutory right to federal funds ................................................ 7

    C. The broad scope of congestion pricing tolling authority under the VPPP ...... 9

    D. The parties complete the years' long NEPA process and FHWA
       and the Project Sponsors execute the VPPP Agreement ........................ 12

    E. The Administration purports to "terminate" the VPPP Agreement
       based on spurious and transparently pretextual arguments .................... 14

    F. Plaintiffs bring suit and Defendants attempt to coerce compliance
       by threatening to illegally withhold federal approvals and funding ........... 15

    G. Defendants threaten unlawful "compliance" measures, dramatically
       altering the status quo ........................................................................ 16

ARGUMENT ...................................................................................................... 20

    I. Plaintiffs are likely to succeed on the merits ............................................. 21

    A. The Court has jurisdiction ...................................................................... 21

    B. The February 19 Letter is arbitrary and capricious .................................. 24

       1.    Cordon Pricing ............................................................................ 24

       2.    Revenue Objectives ..................................................................... 29

       3.    Defendants' "policy concerns" ..................................................... 32

       4.    Defendants have no right to terminate the VPPP
            Agreement—regardless of their justification .............................. 34

5.      Defendants failed to conduct an environmental review
        under NEPA before purporting to terminate the VPPP Agreement ......... 36

6.      The MTA and TBTA's reliance interests .................................................... 38

C. Defendants' proposed enforcement ............................................................. 42

1.      Defendants lack authority to impose the sanctions
        threatened in the April 21 Letter ................................................................ 43

2.      Enforcing the February 19 Letter would violate
        the *Pennhurst* clear statement rule ........................................................... 47

3.      Defendants' withholding of federal funding is
        unconstitutionally coercive ....................................................................... 49

II.  The MTA and TBTA have shown irreparable harm ........................................ 51

III. A preliminary injunction would serve the public interest ............................... 60

CONCLUSION .................................................................................................... 65

# TABLE OF AUTHORITIES

## CASES

*A.H. by & through Hester v. French*,
  985 F.3d 165 (2d Cir. 2021)..................................................................... 54

*Aetna Cas. & Sur. Co. v. United States*,
  71 F.3d 475 (2d Cir. 1995)....................................................................... 21

*Akiachak Native Cmty. v. Jewell*,
  995 F. Supp. 2d 7 (D.D.C. 2014).............................................................. 53

*Am. Sch. of Magnetic Healing v. McAnnulty*,
  187 U.S. 94 (1902).................................................................................... 36

*Am. Trucking Assn's, Inc. v. N.Y. State Thruway Auth.*,
  886 F.3d 238 (2d Cir. 2018)................................................................... 9, 31

*Avon Nursing & Rehab. v. Becerra*,
  995 F.3d 305 (2d Cir. 2021)...................................................................... 47

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
  462 U.S. 87 (1983).................................................................................... 37

*Barnes v. Gorman*,
  536 U.S. 181 (2002).................................................................................. 48

*Bloate v. United States*,
  559 U.S. 196 (2010).................................................................................. 45

*Bond v. United States*,
  572 U.S. 844 (2014).................................................................................. 30

*Bondi v. VanDerStok*,
  145 S. Ct. 857 (2025)................................................................................ 41

*Bostock v. Clayton Cnty.*,
  590 U.S. 644 (2020).................................................................................. 25

*Bowen v. Georgetown Univ. Hosp.*,
  488 U.S. 204 (1988).................................................................................. 47

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988).................................................................................. 21

*Broecker v. N.Y.C. Dep't of Educ.*,
   585 F. Supp. 3d 299 (E.D.N.Y. 2022) ................................................................ 54

*Broecker v. N.Y.C. Dep't of Educ.*,
   No. 23-655, 2023 WL 8888588 (2d Cir. Dec. 26, 2023) ....................................... 54

*California v. Dep't of Educ.*,
   132 F.4th 92 (1st Cir. 2025) ................................................................................. 22

*Carroll v. Trump*,
   49 F.4th 759 (2d Cir. 2022) ................................................................................. 27

*Cascadia Wildlands v. Thrailkill*,
   49 F. Supp. 3d 774 (D. Or. 2014) ........................................................................ 63

*Cascadia Wildlands v. Thrailkill*,
   806 F.3d 1234 (9th Cir. 2015) ............................................................................. 63

*Chan v. U.S. Dep't of Transp.*,
   2024 WL 5199945 (S.D.N.Y. Dec. 23, 2024) .............................................. *passim*

*Chao v. Russell P. Le Frois Builder, Inc.*,
   291 F.3d 219 (2d Cir. 2002) ................................................................................ 36

*Citizens to Save Spencer Cnty. v. EPA*,
   600 F.2d 844 (D.C. Cir. 1979) ............................................................................. 44

*City and County of San Francisco v. Trump*,
   2025 WL 1186310 (N.D. Cal. Apr. 24, 2025) ................................................ 52, 58

*City of Los Angeles v. Sessions*,
   No. 17 Civ. 7215, 2018 WL 6071072 (C.D. Cal. Sept. 13, 2018) .......................... 56

*Climate United Fund v. Citibank, N.A.*,
   2025 WL 1131412 (D.D.C. Apr. 16, 2025) .................................................... 23, 34

*Climate United Fund v. Citibank, N.A.*,
   2025 WL 842360 (D.D.C. Mar. 18, 2025) ........................................................... 35

*Climate United Fund v. Citibank, N.A.*,
   No. 25-5122 (D.C. Cir. Apr. 16, 2025) ............................................................... 35

*Cnty. of Rockland v. Metro. Transp. Auth.*,
   No. 24 Civ. 2285 (S.D.N.Y. Jan. 14, 2025) ....................................................... 13

*Cnty. of Rockland v. Metro. Transp. Auth.*,
No. 24A945 (S. Ct. Apr. 8, 2025) ....................................................... 13

*Cnty. of Rockland v. Triborough Bridge & Tunnel Auth.*,
No. 24 Civ. 2285 (S.D.N.Y. Dec. 23, 2024), ..................................... 13

*Cohen v. Postal Holdings, LLC*,
873 F.3d 394 (2d Cir. 2017) ............................................................... 21

*County of Santa Clara v. Trump*,
250 F. Supp. 3d 497 (N.D. Cal. 2017) ................................... 53, 60, 61

*Credit Suisse Sec. (USA) LLC v. Ebling*,
2006 WL 3457693 (S.D.N.Y. Nov. 27, 2006 ........................................ 6

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ........................................................................... 42

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ................................................................... 32, 39, 42

*Department of Education v. California*,
145 S. Ct. 966 (2025) ......................................................................... 22

*E. Bay Sanctuary Covenant v. Trump*,
932 F.3d 742 (9th Cir. 2018) ............................................................. 59

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ........................................................................... 41

*Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*,
405 U.S. 707 (1972) ........................................................................... 30

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ............................................................... 39, 40, 41

*Fiero v. Fin. Indus. Regul. Auth., Inc.*,
660 F.3d 569 (2d Cir. 2011) ....................................................... 27, 31

*Garland v. Cargill*,
602 U.S. 406 (2024) ........................................................................... 38

*Georgia v. Pruitt*,
326 F. Supp. 3d 1356 (S.D. Ga. 2018) ............................................... 53

*Grand River Enter. Six Nations, Ltd. v. Pryor,*
   481 F.3d 60 (2d Cir. 2007) ............................................................... 51

*Gutierrez v. Ada,*
   528 U.S. 250 (2000) ....................................................................... 28

*In re Bernard L. Madoff Inv. Sec. LLC,*
   779 F.3d 74 (2d Cir. 2015) ............................................................... 32

*Jama v. I.C.E.,*
   543 U.S. 335 (2005) ....................................................................... 30

*Johnson v. Newport Lorillard,*
   2003 WL 169797 (S.D.N.Y. 2003) ................................................... 20

*League of Women Voters v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) ...................................................... 51, 60, 61

*Linea Area Nacional de Chile S.A. v. Meissner,*
   65 F.3d 1034 (2d Cir. 1995) ............................................................. 22

*Loper Bright Enterprises v. Raimondo,*
   603 U.S. 369 (2024) ................................................................... 38, 44

*Louisiana ex rel. Guste v. Brinegar,*
   388 F. Supp. 1319 (D.D.C. 1975) ...................................................... 46

*Louisiana v. Biden,*
   622 F. Supp. 3d 267 (W.D. La. 2022) ................................................ 63

*Maine v. U.S. Dep't of Agric.,*
   F. Supp. 3d, 2025 WL 1088946 (D. Me. Apr. 11, 2025) ........................ 22

*Mantena v. Hazuda,*
   2018 WL 3745668 (S.D.N.Y. 2018) ................................................... 24

*Maryland v. King,*
   567 U.S. 1301 (2012) ..................................................................... 59

*Melendres v. Arpaio,*
   695 F.3d 990 (9th Cir. 2012) ............................................................ 60

*Mendis v. Filip,*
   554 F.3d 335 (2d Cir. 2009) ............................................................. 30

*Mulgrew v. U.S. Dep't of Transp.*,
750 F. Supp. 3d 171 (S.D.N.Y. 2024).............................................................. 6, 12

*N.L.R.B. v. Noel Canning*,
573 U.S. 513 (2014)................................................................................................ 39

*N.L.R.B. v. SW General, Inc.*,
580 U.S. 288 (2017)................................................................................................ 26

*N.R.D.C. v. EPA*,
749 F.3d 1055 (D.C. Cir. 2014) ............................................................................. 46

*Nat'l Council of Nonprofits v. O.M.B.*,
No. 25 Civ. 239, 2025 WL 597959 (D.D.C. Feb. 25, 2025)............................... 54, 63

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012)...................................................................................... 49, 52, 55

*Neuhaus v. Triborough Bridge & Tunnel Auth.*,
No. 24 Civ. 3983 (S.D.N.Y. Dec. 23, 2024) ......................................................... 14

*New Jersey v. Metro. Transp. Auth.*,
No. 1033 (3d Cir. Jan. 4, 2025).............................................................................. 14

*New Jersey v. U.S. Dep't of Transp.*,
No. 23 Civ. 3885 (D.N.J. Jan. 3, 2025).............................................................. 14, 41

*New York v. D.H.S.*,
969 F.3d 42 (2d Cir. 2020)..................................................................................... 62, 63

*New York v. H.H.S.*,
414 F. Supp. 3d 475 (S.D.N.Y. 2019)...................................................... 30, 50, 55

*New York v. Rescue*,
705 F. Supp. 3d 104 (S.D.N.Y. 2023).................................................................... 21

*New York v. Trump*,
2025 WL 1098966 (D.R.I. Apr. 14, 2025)............................................................ 23

*New York v. Trump*,
No. 25 Civ. 39, 2025 WL 715621 (D.R.I. Mar. 6, 2025) ........................... 54, 60, 63

*New York v. U.S. Dep't of Educ.*,
477 F. Supp. 3d 279 (S.D.N.Y. 2020).................................................................... 20

*New York v. U.S. Dep't of Just.*,
  951 F.3d 84 (2d Cir. 2020) ................................................................ 50

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................... 20, 62

*Our Wicked Lady LLC v. Cuomo*,
  2021 WL 915033 (S.D.N.Y. Mar. 9, 2021) ................................... 61

*PaineWebber Inc. v. Bybyk*,
  81 F.3d 1193 (2d Cir. 1996) .......................................................... 37

*Park Irmat Drug Corp. v. Optumrx, Inc.*,
  152 F. Supp. 3d 127 (S.D.N.Y. 2016) ........................................... 21

*Pennhurst State Sch. & Hosp. v. Halderman*,
  451 U.S. 1 (1981) .......................................................................... 49

*Perkins Coie LLP v. U.S. Dep't of Just.*,
  F. Supp. 3d, 2025 WL 1276857 (D.D.C. May 2, 2025) ................. 24

*Planned Parenthood of Greater Wash. & N. Idaho v. H.H.S.*,
  328 F. Supp. 3d 1133 (E.D. Wash. 2018) ...................................... 54

*Regeneron Pharmaceuticals, Inc. v. H.H.S.*,
  510 F. Supp. 3d 29 (S.D.N.Y., 2020) ............................................ 21

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
  102 F.3d 12 (1st Cir. 1996) ........................................................... 60

*Sackett v. EPA*,
  566 U.S. 120 (2012) ...................................................................... 24

*Saget v. Trump*,
  375 F. Supp. 3d 280 (E.D.N.Y. 2019) ........................................... 63

*SEC v. SIPC*,
  872 F. Supp. 2d 1 (D.D.C. 2012) ................................................... 33

*Sierra Forest Legacy v. Sherman*,
  951 F. Supp. 2d 1100 (E.D. Cal. 2013) ......................................... 65

*Singh v. U.S. Dep't of Just.*,
  461 F.3d 290 (2d Cir. 2006) .......................................................... 35

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ........................................................................... 32

*Smiley v. Citibank (South Dakota), N.A.*,
   517 U.S. 735 (1996) ........................................................................... 41

*Sols. in Hometown Connections v. Noem*,
   2025 WL 1103253 (D. Md. Apr. 14, 2025) ...................................... 36

*South Dakota v. Dole*,
   483 U.S. 203 (1987) ................................................................. 50, 51, 52

*Spadaro v. U.S. C.B.P.*,
   978 F.3d 34 (2d Cir. 2020) ............................................................... 28

*State Highway Comm'n of Missouri v. Volpe*,
   479 F.2d 1099(8th Cir. 1973) .......................................................... 47

*Tennessee ex rel. Leech v. Dole*,
   567 F. Supp. 704 (M.D. Tenn. 1983) ......................................... 44, 45

*Texas v. Brooks-LaSure*,
   2021 WL 5154219 (E.D. Tex. Aug. 20, 2021) .............................. 58, 65

*Texas v. Cardona*,
   743 F. Supp. 3d 824 (N.D. Tex. 2024) ........................................ 49, 51

*Texas v. EPA*,
   829 F.3d 405 (5th Cir. 2016) ........................................................... 55

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) ......................................................................... 55

*United States v. North Carolina*,
   192 F. Supp. 3d 620 (M.D.N.C. 2016) ........................................ 55, 59

*Upper Snake River Chapter of Trout Unlimited v. Hodel*,
   921 F.2d 232 (9th Cir. 1990) ........................................................... 39

*Wash. All. of Tech. Workers v. D.H.S.*,
   50 F.4th 164 (D.C. Cir. 2022) ......................................................... 28

*Washington v. Trump*,
   No. 25 Civ. 244, 2025 WL 509617 (W.D. Wash. Feb. 16, 2025) ........................................... 61

*West Virginia ex rel. Morrisey v. U.S. Dep't of Treasury*,
   59 F.4th 1124 (11th Cir. 2023) ......................................................... 50

*Yang v. Kosinski*,
   960 F.3d 119 (2d Cir. 2020) ............................................................. 62

## STATUTES

5 U.S.C. § 702 ....................................................................................... 22

5 U.S.C. § 706 ....................................................................................... 37

12 U.S.C. § 1464 ................................................................................... 46

23 U.S.C. § 106 ..................................................................................... 47

23 U.S.C. § 101 .............................................................................. 4, 7, 47

23 U.S.C. § 104 .................................................................................... 7, 8

23 U.S.C. § 106 ........................................................................... 8, 31, 47

23 U.S.C. § 109 ........................................................................... 8, 31, 47

23 U.S.C. § 112 ..................................................................................... 42

23 U.S.C. § 115 ..................................................................................... 18

23 U.S.C. § 129 ............................................................................. *passim*

23 U.S.C. § 131 ............................................................................... 42, 48

23 U.S.C. § 142 ..................................................................................... 10

23 U.S.C. § 149 ................................................................................... 2, 57

23 U.S.C. § 151 ..................................................................................... 42

23 U.S.C. § 158 ..................................................................................... 48

23 U.S.C. § 301 ...................................................................... 9, 23, 25, 46

23 U.S.C. § 315 ........................................................................... 44, 45, 46

28 U.S.C. § 1331 ................................................................................... 22

42 U.S.C. § 4321 ..................................................................................... 2

42 U.S.C. § 4332 ............................................................................... 19, 38

42 U.S.C. § 4336 ............................................................................... 19, 38

49 U.S.C. § 5303 ..................................................................................... 9

49 U.S.C. § 5329 ..................................................................................... 9

49 U.S.C. § 5336 ..................................................................................... 9

49 U.S.C. § 5337 .................................................................................................... 9

49 U.S.C. § 5338 ................................................................................................. 8, 9

49 U.S.C. § 60301 ................................................................................................ 31

7 U.S.C. § 1375(b) ............................................................................................... 46

N.Y. Veh. & Traf. Law § 1701 ........................................................................ 6, 30

Pub. L. 102-240 (Dec. 18, 1991 .......................................................................... 9

Pub. L. 104-59 (Nov. 28, 1995) ......................................................................... 11

Pub. L. 105-178 (June 9, 1998) ...................................................................... 9, 11

Pub. L. 105-206, § 9006(b) (July 22, 1998) ...................................................... 11

Pub. L. 109-59, § 1604(a) (Aug. 10, 2005) ....................................................... 11

## REGULATIONS AND ADMINISTRATIVE GUIDANCE

2 C.F.R. § 200.340 ........................................................................................ *passim*

23 C.F.R. § 1.36 ............................................................................... 17, 19, 23, 44

23 C.F.R. § 450.220 ............................................................................................ 18

23 C.F.R. § 450.222 ............................................................................................ 18

23 C.F.R. § 771.111 ............................................................................................ 46

23 C.F.R. § 771.113 ............................................................................................ 46

23 C.F.R. § 771.119 ............................................................................................ 38

23 C.F.R. § 771.121 ....................................................................................... 38, 46

23 C.F.R. § 771.124 ............................................................................................ 46

23 C.F.R. § 771.125 ............................................................................................ 47

49 C.F.R. § 1.85 ................................................................................................. 33

89 Fed. Reg. at 30089 ........................................................................................ 36

*Guidance for Federal Financial Assistance*, 89 Fed. Reg. 30046, 30089 (Apr. 22, 2024) .......... 36

## OTHER AUTHORITIES

*About Us*, NYMTC, ............................................................................................ 18

Alex Lemonides et al., *Tracking the Lawsuits Against Trump's Agenda*, N.Y. TIMES (May 2, 2025), ......................................................................................................... 4

Arun Venugopal, *Vehicle Traffic Is Down in Manhattan*, GOTHAMIST (Feb. 13, 2025),............. 66

*Congestion Charging*, *Black's Law Dictionary* (10th ed. 2014) .................................................. 27

*Congestion*, *Cassell Encyclopaedia Dictionary*, 312 (1990)........................................................ 27

Elena Safiorva, Kenneth Gillingham & Abram Lipman, *Choosing Congestion Pricing Policy:*
    *Cordon Tolls Versus Link-Based Tolls*, 1932 J. OF TRANSP. RSCH. BD. (2005) ...................... 29

FHWA, *Advance Construction and Partial Conversion of Advance Construction*,..................... 18

FHWA, *Welcome to the FHWA Congestion Pricing Web Site*,....................................................... 9

Final EA Chapter 17, Environmental Justice at 17-62, 17-67–72 (Apr. 2023), ................... 17, 34

Final EA Chapter 6, Economic Conditions at 6-47–49, 6-80–84 (Apr. 2023), ..................... 17, 34

Good Day New York, WNYW-NY (FOX) (Apr. 29, 2025), ................................................. 20, 34

MTA, MTA CAPITAL PROGRAM 2020–2024 (Sept. 25, 2019) ...................................................... 52

NYSDOT, STATE TRANSPORTATION IMPROVEMENT PROGRAM SUMMARY, ............................... 18

Oldfield Act of 1927, Pub. L. 69-773 (Mar. 3, 1927)..................................................................... 9

Paul W. Wilson, *Welfare Effects of Congestion Pricing In Singapore*,
    15 TRANSP. 191, 191 (1988)........................................................................................................ 27

Peter Senzamici, *Feds Accidentally Upload Internal Memo Admitting Plan to Kill NYC*
    *Congestion Pricing Is 'Very Unlikely' to Succeed—Before Quickly Deleting It*, N.Y. POST
    (Apr. 24, 2025)........................................................................................................................... 20

*Statement by President George Bush Upon Signing H.R. 2950*,
    1991 U.S.C.C.A.N. 1865 (Dec. 18, 1991) ............................................................................. 10

Plaintiffs the Metropolitan Transportation Authority ("MTA") and Triborough Bridge and Tunnel Authority ("TBTA"), an MTA affiliate, and Intervenor-Plaintiff New York City Department of Transportation ("NYCDOT") respectfully submit this memorandum of law in support of their motion for a preliminary injunction enjoining the illegal, arbitrary, and unfounded withholding of federal transportation project approvals and funding, and other unlawful acts intended to coerce the cessation of the Central Business District ("CBD") Tolling Program ("Program" or "congestion pricing").

## PRELIMINARY STATEMENT

On January 5, 2025, after more than five years of engagement with and reliance on the federal government and its longstanding interpretation of the statute establishing the Value Pricing Pilot Program ("VPPP")—including during the first Trump Administration—New York launched congestion pricing. The Program is a long-sought-after effort to reduce traffic congestion in the New York City metropolitan area by implementing a market-based, user-pay solution that charges drivers a toll to enter the CBD (Manhattan at and below 60th Street), and then uses the revenue from those tolls to improve and expand the region's aging public transportation system, particularly the NYC subway. This method of tolling, also known as "congestion pricing," has been successful in big cities around the world including London, Milan, Singapore, and Stockholm, and was first conceived of here in New York City at Columbia University in the 1950s as a solution to what even then was perceived to be the region's significant congestion woes. As of today, only four months into the Program, the available data, not to mention simply looking at the streets, show that the Program is working: traffic in the CBD has dropped, commute times have fallen, vehicle speeds (including for public buses) have increased, more people are visiting Manhattan's commercial districts and supporting the region's businesses, and the MTA's regional public transit system is seeing increased ridership and benefiting from increased funding.

Despite the Program's success, the President continues to oppose it, consistent with his position since he began running for his second term last year, when he promised to "TERMINATE" and "kill" the Program if elected. The President is entitled to his personal and political view on whether congestion pricing is or is not good policy. But he has no authority to stop the Program now. In fact, during the first Trump Administration, Defendants advised TBTA, New York State Department of Transportation ("NYSDOT"), and NYCDOT (collectively, the "Project Sponsors") to seek federal authorization for the Program under the VPPP, 23 U.S.C. § 149 note, and the federal government and the Project Sponsors proceeded to do precisely that, analyzing the Program's environmental impacts under the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA"), for more than four years in a process that yielded thousands of pages of environmental assessment.

Defendant Federal Highway Administration ("FHWA") (through Defendant Gloria Shepherd) and the Project Sponsors then executed a binding agreement on November 21, 2024 authorizing the Program under the VPPP (the "VPPP Agreement"). The VPPP Agreement contemplates that congestion pricing will continue unless and until *TBTA* alone decides to stop it, and says nothing whatsoever to even suggest that the federal government (which has not contributed and is not contributing any funds to the Program) has the power to unilaterally terminate it—let alone do so just months after the VPPP Agreement was executed and the Program began. The absence of such a right on the part of Defendants is consistent with the VPPP statute, which envisions that the Program will continue for *at least ten years*, with regular updates being provided to the federal government on its impact on congestion, transit ridership, and transit funding. It is also consistent with the fact that a central component of the Program, as everyone has long known, is to use the tolling revenue (now projected between $500 million and $900

million a year) to raise $15 billion for the MTA Capital Program through bonds with terms running at least *30 years* out from the commencement of tolling.  Obviously, none of that would make any sense if Defendants could simply terminate the Program at any time.  Indeed, Defendants themselves have recognized that agreements like the one here "must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award."  2 C.F.R. § 200.340(b).  The VPPP Agreement's silence is dispositive.

Nonetheless, shortly after taking office this year, President Trump decided to make good on his 2024 campaign promises, declaring on social media that "CONGESTION PRICING IS DEAD.  … LONG LIVE THE KING!"  Simultaneously, on February 19, 2025, Defendant Sean Duffy issued a four-page letter purporting to "terminate" the VPPP Agreement.  Duffy claimed to have determined—without any statutory basis or analysis, and contrary to decades of FHWA public statements (including to Congress), approvals, and guidance—that the VPPP does not permit FHWA to authorize congestion pricing programs covering all the roads in a geographic area (known as "cordon," "zone-based," or "area-wide" pricing).  Duffy also claimed to have determined that the VPPP does not authorize a program that "appears to be driven primarily by the need to raise revenue for the Metropolitan Transit [sic] Authority."  But these rationales are so weak as to be transparently pretextual.  The VPPP plainly covers tolling programs like the one here, since Congress understood congestion pricing to encompass cordon pricing when it passed the VPPP in 1991 and when it reauthorized the VPPP several times over the last 30 years.  Likewise, the statutory text authorizes the use of tolling revenue to fund transit programs.  Congress (and FHWA) have long understood that the VPPP allows tolling programs that have a revenue objective; tolling, by definition, raises revenue.  Using tolls to promote public transit as an alternative to driving, as the Program does, obviously reduces traffic congestion.  What's more,

Duffy did not cite any provision of law entitling him to terminate the VPPP Agreement, because there is none.

Given the patently unlawful nature of the purported rescission, the MTA and TBTA did not agree to stop congestion pricing as directed by Duffy.  Instead, they immediately commenced this lawsuit seeking a declaration that Duffy's action is invalid.  ECF 1.  With no serious defense on the merits, the Administration has now resorted to what seems to be its *modus operandi*: attempting to improperly leverage federal funding in order to coerce compliance with its wishes, rather than defend the legality of its propositions in court.[1]  After making several proclamations that congestion pricing must end, Defendant Duffy wrote to Governor Hochul on April 21 reiterating that the VPPP Agreement had been terminated, but "direct[ing] New York to show cause" by May 21 that it was in compliance with the Federal-Aid Highway Act, 23 U.S.C. § 101 *et seq.* ("FAHA"), and warning that if Defendants determine congestion pricing is not permitted under the VPPP (as they already have) and congestion pricing continues (as Plaintiffs have said it will absent a court order to the contrary), FHWA "will implement" "compliance measures beginning on or after May 28."  The sweeping sanctions outlined in the letter include withholding FHWA funds authorized by Congress under the FAHA, as well as withholding advance construction authorizations and NEPA approvals (other than undefined "Safety Projects")—which means that myriad future projects depending on federal approvals, and ultimately federal funding, could not proceed.  The sanctions also include withholding approval of amendments to the Statewide Transportation Improvement Program, which would preclude funding for highway and transit projects throughout the State.  Any or all of these would have immediate and harmful

---

[1] Alex Lemonides et al., *Tracking the Lawsuits Against Trump's Agenda*, N.Y. TIMES (May 2, 2025), https://www.nytimes.com/interactive/2025/us/trump-administration-lawsuits.html.

implications for the ability of MTA and TBTA (and NYSDOT and NYCDOT) to deliver vital transportation services for the metropolitan region.

Defendants' efforts to avoid the judicial process have placed Plaintiffs and NYCDOT in an impossible position. The threatened measures will undeniably cause irreparable harm. That is the point: Defendants acknowledge that they seek to coerce compliance with their lawless demands by threatening the funding of other public projects. The loss of federal approvals and funding will undermine the MTA, TBTA, and NYCDOT's ability to maintain an efficient transportation system on behalf of the millions of people who rely on that system each day. On the other hand, capitulating to Defendants' demands would be just as devastating: the MTA would lose $50 million or more in monthly revenues, a dedicated source of public transit funding to support the bonding of much higher amounts, which loss could never be recovered. The MTA would also be deprived of funds to make much-needed improvements to the subway system. And the public would once again suffer the negative environmental and economic impacts that the Program is intended to reduce. As this Court recognized in rejecting efforts to enjoin the Program before it started, stopping congestion pricing "would delay the environmental and economic benefits the Tolling Program was designed to convey and force the TBTA to bear a sizeable financial burden." *Chan v. U.S. Dep't of Transp.*, 2024 WL 5199945, at *48 (S.D.N.Y. Dec. 23, 2024) (Liman, J.).

Under our legal system, the Administration cannot set aside the longstanding and well-reasoned determinations of Congress and the Executive agencies, nor displace the Judiciary from its role in construing the law, by trying to strong-arm compliance. And Plaintiffs and NYCDOT should not be put to the Hobson's choice of acceding to unlawful demands to shut down one vital program in order to avoid losing funding for so many others. *See Credit Suisse Sec. (USA) LLC v. Ebling*, 2006 WL 3457693, at *3 (S.D.N.Y. Nov. 27, 2006) (preliminary injunction warranted

where harm movant seeks to redress would occur before ultimate resolution and thus movant would "lose its right to meaningfully resolve" its claims). The Court should enjoin Defendants from engaging in such unlawful retribution and preserve the status quo while this litigation proceeds so that the legality of Defendants' actions can be decided in an orderly manner.

## BACKGROUND

### A.     The Traffic Mobility Act and FHWA's representations

Traffic congestion has long stymied economic growth, harmed the environment and public health, and undermined quality of life in the New York City metropolitan region. In 2019, after decades of discussion about solutions, New York passed the Traffic Mobility Act (the "TMA"), N.Y. Veh. & Traf. Law § 1701 *et seq.*, which authorizes TBTA to establish and implement a plan for tolling all eligible vehicles entering the Manhattan CBD, and requires that the tolling "ensure[s] annual revenues and fees collected under such program, less costs of operation of the same, provide for sufficient revenues ... to fund fifteen billion dollars for capital projects for the 2020 to 2024 MTA capital program, and any additional revenues above that amount to be available for any successor programs," *Mulgrew v. U.S. Dep't of Transp.*, 750 F. Supp. 3d 171, 187, 191 (S.D.N.Y. 2024) (Liman, J.).

Because the Program would apply to certain federal-aid highways within the area to be tolled, the Project Sponsors (as noted, TBTA, NYSDOT, and NYCDOT) engaged with FHWA and the United States Department of Transportation ("USDOT") to discuss how best to implement such tolling in a manner consistent with the FAHA. From the outset, the Project Sponsors explained in meetings with FHWA that the Program's tolls would apply to all eligible vehicles entering the CBD, and that the Program would incorporate toll rates that would provide a new and recurring revenue source for the MTA. Declaration of Dr. Allison L. C. de Cerreño ("C. de

6

Cerreño Decl.") ¶¶ 5-12.  In response, FHWA and USDOT advised the Project Sponsors that the VPPP was the appropriate vehicle for them to use to obtain such tolling authority.  *Id.* ¶¶ 6, 10.

And so, on June 17, 2019, the Project Sponsors submitted an Expression of Interest ("EoI") seeking authorization under the VPPP to charge vehicles a "toll to enter or remain within the Manhattan CBD," with the goals (first) of "reduc[ing] traffic congestion," and, among other things, "[c]reat[ing] a sustainable funding source to repair and revitalize the MTA transit system" and "[i]ncreas[ing] transit ridership."  C. de Cerreño Decl., Ex. B at 3-4.  The EoI did not contemplate an end date for the Program and stated that the Project Sponsors would prepare reports on "the effects of the program" once "every two years … for the life of the program."  *Id.* at 6.  On October 24, 2019, FHWA reiterated that the VPPP "appear[ed] to be the best potential fit" among the various programs available under federal law that allow for tolling on federal-aid highways.  C. de Cerreño Decl., Ex. C at 1.

### B.    New York's statutory right to federal funds

The FAHA was enacted "to accelerate the construction of Federal-aid highway systems," 23 U.S.C. § 101(b)(1), and to that end requires the apportionment of funds from the Highway Trust Fund, which consists of taxes paid by each State's highway users, to be appropriated by the Secretary to the States for federal-aid highways.  Specifically, the Secretary "shall distribute" a "base apportionment" of funding to each State based upon a specified formula for various programs, 23 U.S.C. § 104(b), with each State "[g]uaranteed" an apportionment of at least 95 cents on the dollar with respect to its tax payments into the Highway Trust Fund attributable to the number of highway users in the State, *id.* § 104(c)(1)(B).  Upon apportionment to the State, the State transportation department submits proposed projects to the Secretary for approval, and the Secretary "shall act on the plans, specifications, and estimates as soon as practicable," "guided by Section 109," and "enter into a formal project agreement … formalizing the conditions of the

7

project approval." *Id.* § 106(a)(1)-(2), (4). Section 109, in turn, sets forth detailed standards to guide the Secretary in carrying out his duty promptly to act on proposals, including in order to "adequately serve the existing and planned future traffic of the highway in a manner that is conducive to safety, durability, and economy of maintenance." *Id.* § 109(a)(1). In other words, each State—including New York—is entitled to get back nearly all of the money that *its taxpayers paid* to the federal government for these purposes, with relatively limited discretion afforded to the Secretary.

Federal Transit Administration ("FTA") funding is similarly subject to legislative directives. Congress establishes the legal authority for FTA programs through authorizing legislation, with each reauthorization amending the Federal Transit laws codified in Title 49 U.S.C. Chapter 53. The most recent authorization, the Infrastructure Investment and Jobs Act ("IIJA"), reauthorizes surface transportation programs for Fiscal Year ("FY") 2022 through FY 2026. The IIJA authorizes up to $108 billion to support federal public transportation programs, including $91 billion in "guaranteed" funding. *See* 49 U.S.C. § 5338. The largest sums of funding fall under the Urbanized Area Formula Grants ("UAFGs") ($33.5 billion) (§ 5338(a)(2)(C)), the Rail Vehicle Replacement Program ($1.5 billion), the Capital Investment Grants (up to $23 billion, with $8 billion guaranteed); and the State of Good Repair Grants ($23.1 billion) (§ 5338(a)(2)(L)). These amounts cover the *total* apportionment under the life of the IIJA, until the passage of the next surface transportation reauthorization. The total appropriations are then provided to States and transit agencies under different programs within Chapter 53.[2] Although each provision provides different bases for calculating the funds to be distributed to each state, urban area, or particular

---

[2] *See e.g.*, § 5303 (Metropolitan transportation planning); § 5307(Urbanized Area Formula Grants); § 5329 (Public Transportation Safety Program); § 5336 (Apportionment of appropriations for formula grants).

project, the allocations for Urbanized Area Formula Grants and State of Good Repair Grants are determined by a Congressionally designated formula provided in Sections 5336 and 5337.

### C.    The broad scope of congestion pricing tolling authority under the VPPP

When Congress established the forerunner to today's federal-aid highway program in 1916, it determined that highways eligible for federal funds under the program should generally be free from tolls.  However, that rule was immediately subject to numerous carveouts.  *See, e.g.*, Oldfield Act of 1927, Pub. L. 69-773 (Mar. 3, 1927).  Indeed, the current codification of the "Freedom from tolls" provision in Section 301 acknowledges a broad exception in Section 129, which allows for projects as wide-ranging as the construction of new toll highways, construction of new lanes and conversion into a toll highway, and the reconstruction of toll-free highways and conversion into toll facilities.  *See* 23 U.S.C. §§ 301 & 129(a)(A), (F).

Originally called the "Congestion Pricing Pilot Program,"[3] the VPPP was enacted as part of the Intermodal Surface Transportation Efficiency Act of 1991, Pub. L. 102-240 (Dec. 18, 1991) ("ISTEA"), to grant "states 'greater flexibility to operate toll facilities and use toll revenues for a variety of transportation projects,'" *Chan*, 2024 WL 5199945, at *33 (quoting *Am. Trucking Assn's, Inc. v. N.Y. State Thruway Auth.*, 886 F.3d 238, 241 (2d Cir. 2018)).  In passing ISTEA, Congress explained that it sought to "develop a National *Intermodal* Transportation System" consisting "of all forms of transportation in a unified, interconnected manner."  ISTEA § 2 (emphasis added); *see also* Second Amended Complaint ("SAC") ¶ 67.[4]  And in signing the bill

---

[3] Congress renamed the Congestion Pricing Pilot Program the Value Pricing Pilot Program in 1998.  Pub. L. 105-178 § 1216 (June 9, 1998).  FHWA has explained that "value pricing" is a synonym for congestion pricing and that the agency uses the terms interchangeably.  *See, e.g.*, FHWA, *Welcome to the FHWA Congestion Pricing Web Site*, https://ops.fhwa.dot.gov/congestionpricing/index.htm  (last accessed Mar. 26, 2025) ("Congestion pricing— sometimes called value pricing—is a way of harnessing the power of the market to reduce the waste associated with traffic congestion.").

[4] Simultaneous with today's filing, Plaintiffs and Plaintiff-Intervenors have moved for leave to file a Second Amended Complaint based upon Defendants' post-April 19 actions.  ECF 79.  Defendants do not oppose the amendment, and

into law, President Bush observed that a "major element" of ISTEA was "to provide State and local officials unprecedented flexibility," including discretion to finance transportation improvements "with toll revenue" and use funds "on the improvements that [will] best meet local needs, whether highway projects or public transit projects." *Statement by President George Bush Upon Signing H.R. 2950*, 1991 U.S.C.C.A.N. 1865 (Dec. 18, 1991).

The VPPP directs that the Secretary of Transportation "*shall* solicit" State and local government participation in "value pricing pilot programs," and therefore may "enter into" agreements with project sponsors to "establish, maintain, and monitor congestion pricing projects," and "to allow the use of tolls" as "part of a pilot program under this section." VPPP, cls. 1, 4 (emphasis added).[5] Again, to be clear, the VPPP permits tolls "[n]otwithstanding sections 129 and 301," and permits project sponsors to use "[r]evenues generated by any pilot project" to fund other "projects eligible under such title," which include transit capital projects eligible for federal assistance. *Id.*, cl. 3; *see also* 23 U.S.C. § 142(a)(2).

Although ISTEA does not define the term "congestion pricing," the concept was then (and is today) understood to include cordon pricing. In fact, cordon pricing was the *prototype* of congestion pricing, originating with Columbia economist William S. Vickrey, who testified before Congress in 1959 that congestion pricing should be "applied to the street and highway system [in New York City] as a whole, and not merely to bits and pieces of it" because, if tolls were "only on selected facilities, such as on the bridges, tunnels, and parkways in the New York area," it might only have the unintended consequence of rerouting traffic. SAC ¶ 55. Indeed, when ISTEA was

---

while the motion is *sub judice*, for the sake of convenience we refer in this memorandum to the allegations in the proposed Second Amended Complaint.

[5] In a separate section, ISTEA directs states to consider "the use of innovative mechanisms for financing projects, including … congestion pricing." ISTEA § 1025(a).

enacted in 1991, Singapore had already successfully operated cordon pricing for over 15 years. *See id.* ¶¶ 72-79 (describing legislative history).  And as FHWA explained to Congress shortly after ISTEA was enacted, the agency understood that the "potential scope of congestion pricing applications [under the VPPP] can vary widely, ranging from pricing on a new or existing single road facility to more comprehensive *area-wide road pricing strategies*."  *Id.* ¶ 77 (emphasis added).

In the decades since the VPPP was enacted, during which Congress has amended the statute several times (in 1995, 1998, and 2005), *id.* ¶ 73,[6] Congress and FHWA have continued to understand congestion pricing to include cordon pricing.  FHWA, for example, has repeatedly concluded that "areawide pricing" should merit the "highest priority for Federal support" under the VPPP because such programs are often the most effective at reducing congestion.  *Id.* ¶ 79.  FHWA has reiterated this interpretation in notices published to the Federal Register, *id.*, official guidance documents, *id.* ¶ 90, and reports to Congress, *id.* ¶¶ 79-81.  FHWA has also authorized federal funds under the VPPP for numerous cordon pricing studies, including in Fort Myers Beach, Florida in 2001 and 2002, *id.* ¶ 82; downtown San Francisco in 2005, *id.* ¶ 88; downtown Los Angeles in 2011, *id.* ¶ 92; and Treasure Island in San Francisco in 2012, *id.* ¶ 94[7]

In fact, in 2007, FHWA agreed to award New York City $5 million in VPPP funding to consider a cordon pricing scheme in which all vehicles entering Manhattan south of 86th Street would be tolled.  *Id.* ¶ 86.  Speaking before Congress, the FHWA Administrator at the time described cordon pricing in Manhattan as the "best idea" he had heard for managing congestion,

---

[6] Pub. L. 104-59, § 325(e) (Nov. 28, 1995); Pub. L. 105-178, § 1216(a) (June 9, 1998); Pub. L. 105-206, § 9006(b) (July 22, 1998); Pub. L. 109-59, § 1604(a) (Aug. 10, 2005).

[7] In 2021, the Utah Department of Transportation submitted an Expression of Interest for a project aimed at reducing congestion at Little Cottonwood Canyon, including a cordon pricing component.  SAC ¶ 97.  FHWA noted this project in its most recent report to Congress on the VPPP submitted in 2023.  *Id.*

and explained that "the beauty of this program is whatever we invest in now … this congestion pricing will throw off about $300 million a year to finance such things as a $6 billion or $7 billion 2nd Avenue subway, more Express Bus service, and all those things so the commuters and everybody else can get to work in a lot less time."  *Id.* ¶ 87.  Even now, FHWA's website continues to make clear that cordon pricing is a permissible use of VPPP tolling authority.  *Id.* ¶ 98.

**D.    The parties complete the years' long NEPA process and FHWA and the Project Sponsors execute the VPPP Agreement**

In reliance on Defendants' representations in late 2020 to proceed under the VPPP, the Project Sponsors commenced a four-year environmental review process under NEPA that culminated in 2024.  *See Mulgrew*, 750 F. Supp. 3d at 189-95.  The final environmental authorization, the Second "Re-Evaluation" issued by Defendants at the end of November 2024, recognizes that the Program's tolling schedule would "be implemented through a phase-in over six years," with the last toll schedule implemented beginning in 2031, *Chan*, No. 23 Civ. 10365, ECF 129-5 at 8-9, and that the MTA would issue bonds to generate the $15 billion mandated under the TMA based on $500 million to $900 million per year in toll revenues, *id.* at 15.

On November 21, 2024, FHWA and the Project Sponsors signed the VPPP Agreement authorizing the Program's collection of tolls from eligible vehicles entering the CBD pursuant to the VPPP.  Declaration of Brandon Trice ("Trice Decl."), Ex. 1 ("VPPP Agreement" or "VPPP Agmt.").  The VPPP Agreement states that "[e]ffective on the date of this Agreement, the project is approved as a pilot program" under the VPPP, and TBTA is authorized to "operate the Program as a toll Project in accordance with the provisions of this Agreement and as a value pricing project." *Id.*, cls. 1, 8.  FHWA agreed that "the imposition of tolls under this Agreement does not render Federal-aid highways within the State of New York generally ineligible for Federal-aid highway funds where such highways are otherwise eligible under the particular funding program." *Id.*, cl. 5.

Consistent with the statute, the VPPP Agreement states TBTA may use "toll revenues received from the operation of the Project" for, among other things, "any other projects eligible for assistance under title 23, United States Code." *Id.*, cl. 2.; *see* VPPP, cl. 3. It also includes an attachment describing the Program in detail and states that TBTA "will toll vehicles entering the CBD," includes the approved toll rate schedule, and notes that a goal of the Program is to "generate revenue for future transportation improvements." VPPP Agmt., Attach. A.

The VPPP Agreement does not include any provision authorizing FHWA to terminate the agreement unilaterally, as the Secretary has purported to do here. Just the opposite: it specifies that only TBTA could unilaterally decide to discontinue the Program, requiring the Project Sponsors to "work with FHWA to return the Project to its original operating condition *if TBTA decides to discontinue tolls on the Project.*" *Id.*, cl. 11 (emphasis added). The VPPP Agreement further provides, consistent with the VPPP, that TBTA and NYCDOT shall "monitor and report on the project performance" for "a period of at least ten years or to the end of the life of the Project, whichever is sooner." *Id.*, cl. (8)(b); *see* VPPP, cl. 5. And it reflects the three phases of tolling, with the last increase occurring in 2031—six years from now. VPPP Agmt., Attach. A.

After the courts rejected numerous attempts to stop the Program, congestion pricing went into effect on January 5, 2025.[8] Although the full benefits of the Program have yet to be realized, it has already proven to be a dramatic success, creating measurable improvements in travel times,

---

[8] *See Chan*, 2024 WL 5199945 (111-page decision denying motions for preliminary injunctions in four related cases); *see also Cnty. of Rockland v. Metro. Transp. Auth.*, No. 24A945 (S. Ct. Apr. 8, 2025) (Sotomayor, J., in chambers); *Cnty. of Rockland v. Metro. Transp. Auth.*, No. 24-3325 (2d Cir. Jan. 28, 2025), ECF 31 (per curiam); *New Jersey v. Metro. Transp. Auth.*, No. 1033 (3d Cir. Jan. 4, 2025), ECF 9 (Bibas, J.); *Cnty. of Rockland v. Metro. Transp. Auth.*, No. 24 Civ. 2285 (S.D.N.Y. Jan. 14, 2025), ECF 56 (Seibel, J.); *New Jersey v. U.S. Dep't of Transp.*, No. 23 Civ. 3885 (D.N.J. Jan. 3, 2025), ECF 212 (Gordon, J.); *Cnty. of Rockland v. Triborough Bridge & Tunnel Auth.*, No. 24 Civ. 2285 (S.D.N.Y. Dec. 23, 2024), ECF 52 (Seibel, J.); *Neuhaus v. Triborough Bridge & Tunnel Auth.*, No. 24 Civ. 3983 (S.D.N.Y. Dec. 23, 2024), ECF 44 (Seibel, J.).

traffic congestion, and the overall quality of life for those who live, visit and work in the CBD. *See* C. de Cerreño Decl. ¶¶ 25-27, 41.

    **E.**    **The Administration purports to "terminate" the VPPP Agreement based on spurious and transparently pretextual arguments**

Despite the Program's success and its growing support, President Trump has remained a stubborn and vocal opponent. Even before the Program began, in May 2024, then-candidate Trump posted to social media that he would "TERMINATE Congestion Pricing in my FIRST WEEK back in Office!!!!" Trice Decl., Ex. 2. In January 2025, Representative Nicole Malliotakis posted on X that then-candidate Trump informed her during a meeting with New York and New Jersey Republicans that he "wants to … kill congestion pricing." *Id.*, Ex. 3.

On February 19, President Trump followed through on trying to "kill" the Program, declaring on X that "CONGESTION PRICING IS DEAD. … LONG LIVE THE KING." *Id.*, Ex. 4. To effectuate this "royal decree," that same day, Defendant Duffy sent a letter to Governor Hochul purporting to withdraw Defendants' approval of the Program and rescind the VPPP Agreement. *Id.*, Ex. 5 (the "February 19 Letter" or "Feb. 19 Ltr."). As grounds for the purported recission, Duffy asserted that the VPPP is "a limited exception" to Section 301 that must be "narrowly construe[d]," and that the VPPP, through "the vague phrase 'value pricing pilot program,'" does not "authorize the unprecedented and consequential step of cordon pricing." *Id.* at 2-3. Duffy further claimed that the VPPP does not authorize tolls "that are calculated based on considerations separate from reducing congestion or advancing other road-related goals." *Id.* at 3. The February 19 Letter fails to acknowledge that FHWA has for many decades interpreted the VPPP to permit cordon pricing, and that such projects can and should have a revenue objective, including one that supports public transit projects. *See supra* at Background Section C; SAC ¶ 26. Duffy did not cite any statutory, regulatory, or other basis to terminate the VPPP Agreement.

F.      **Plaintiffs bring suit and Defendants attempt to coerce compliance by threatening to illegally withhold federal approvals and funding**

Plaintiffs commenced this action the same day the February 19 Letter was issued, seeking a declaratory judgment that Defendants' purported termination of the VPPP Agreement is unlawful and without effect, and seeking vacatur of that decision.  The MTA and TBTA further stated that congestion pricing would "continue … as required by New York law until and unless" a court orders otherwise.  ECF 1 ¶ 120.

The next day, February 20, Defendant Shepherd sent a letter to the Project Sponsors demanding that they "cease the collection of tolls" by March 21.  Trice Decl., Ex. 6.  The day before that deadline, on March 20, Duffy posted on X that the continued operation of the Program exhibited "disrespect towards the federal government" and was "unacceptable."  *Id.*, Ex. 7.  The Secretary threatened to leverage federal funding to compel compliance, stating: "Know that billions of dollars the federal government sends to New York are not a blank check.  Continued noncompliance will not be taken lightly."  *Id.*  That same day, Shepherd sent a second letter stating that Duffy had directed her to "extend the period of time to comply by 30 days" and instructing that tolling cease by April 20.  *Id.*, Ex. 8.  During an April 2 meet and confer, counsel for the MTA and TBTA asked if Defendants intended to take any action to enforce the April 20 "deadline" set forth in Shepherd's March 20 letter, so that the parties and the Court could set an orderly briefing schedule.  ECF 49 at 4.  Counsel for Defendants responded that they "did not have information to provide."  *Id.*  Notwithstanding this representation, on April 8, USDOT posted another threat on X, warning that the agency "will not hesitate to use every tool at our disposal in response to non-compliance later this month."  Trice Decl., Ex. 9.

### G. Defendants threaten unlawful "compliance" measures, dramatically altering the status quo

On April 18, the MTA, TBTA, NYSDOT, and NYCDOT filed their 111-page consolidated first amended complaint, ECF 62, setting out in detail why the February 19 Letter's claimed legal rationales for seeking to terminate the VPPP Agreement are without merit, and alleging that the purported rescission is invalid and based on transparently pretextual reasoning.

Three days later, on April 21, Duffy sent another letter to Governor Hochul demanding for the third time that she end the Program. Trice Decl., Ex 10 ("April 21 Letter" or "Apr. 21 Ltr."). At the outset, the April 21 Letter affirmed Defendants' position that the VPPP Agreement had already been "terminated" by the February 19 Letter. *Id.* at 1. But in apparent recognition of the weaknesses in that letter, Duffy attempted to recast the federal government's reasoning, claiming that the February 19 Letter also rested on several policy rationales, including that the Program "imposes a disproportionate financial hardship on low and medium-income hardworking American drivers," and that "there are no toll-free alternative routes available to access the cordoned-off area of Manhattan." *Id.* at 2-3. While the February 19 Letter did note that Defendants' review of the Program's eligibility was prompted by their disagreement on policy grounds, the February 19 Letter is clear that Defendants' purported termination of the VPPP Agreement rested on their legal interpretation of the VPPP. Feb. 19 Ltr. at 3. What's more, Defendants' alleged "policy concerns" are fatally undermined by their own extensive findings that congestion pricing would benefit low- and medium-income people, including by facilitating mass transit opportunities and reducing congestion on the roads, as well as the discount for frequent low-income drivers to the CBD built into the Program.[9]

---

[9] *See* Final EA Chapter 6, Economic Conditions at 6-47–49, 6-80–84 (Apr. 2023), https://www.mta.info/document/110831; Final EA Chapter 17, Environmental Justice at 17-62, 17-67–72 (Apr. 2023),

The April 21 Letter goes on to threaten that Defendants "*will* implement appropriate initial compliance measures" on or after May 28, 2025 if New York continues to operate the Program, citing 23 C.F.R. § 1.36, a regulation enacted pursuant to the FAHA that sets forth FHWA's potential enforcement mechanisms to ensure compliance with the law. *Id.* at 2 (emphasis added). These "compliance measures," according to Duffy, include the broad suspension of federal approvals for transportation projects, which would result in the withholding of federal transportation funding in many instances. Specifically, the April 21 Letter threatens to suspend: (1) "further advance construction ('AC') authorizations," (2) "further [NEPA] approvals," (3) "further approvals of Statewide Transportation Improvement Program ('STIP') amendments concerning New York Metropolitan Transportation Council TIP modifications," and (4) "further obligations of FHWA funds (both formula and competitive) for projects within New York City." *Id.* The April 21 Letter further threatens that those measures may be extended "to other geographic areas within the State of New York." *Id.*

The STIP is "a comprehensive list of all projects or project phases in New York State proposed to receive Federal funding pursuant to Title 23 [(highways)] and 49 [(transit)] U.S.C. Chapter 53," and includes all highway, transit and non-motorized projects" requiring Federal aid from across urban and rural parts of the state. [10] NYSDOT is responsible for updating New York's STIP, which includes Transportation Improvement Programs ("TIPs") from each of the state's fourteen Metropolitan Planning Organizations ("MPOs"). [11] The STIP is updated every four years,

---

https://www.mta.info/document/110886 (describing "substantial benefits associated with reduced vehicle congestion in the Manhattan CBD" and measures designed to lessen impacts on low-income drivers).

[10] NYSDOT, STATE TRANSPORTATION IMPROVEMENT PROGRAM SUMMARY, https://www.dot.ny.gov/programs/stip/files/2023_STIP_Narrative.pdf.

[11] The New York Metropolitan Transportation Council ("NYMTC") is the MPO for New York City, Long Island, and the Lower Hudson Valley, including Westchester, Putnam, and Rockland counties—a region with more than 13 million residents. *About Us*, NYMTC, https://www.nymtc.org/en-us/ (last accessed May 1, 2025).

and is amended frequently to reflect projects newly proposed for federal funding. Declaration of Kevin Willens ("Willens Decl.") ¶ 23.  FHWA and FTA, which oversees federal transit funding, must jointly approve each STIP and STIP amendment submitted to them by NYSDOT, and only projects in a STIP or STIP amendment approved by both FHWA and FTA "are eligible for funds administered by the FHWA or the FTA."  23 C.F.R. §§ 450.220(a), 450.222(a).  Accordingly, the threat not to provide further approvals of STIP amendments encompasses all federal funding to the Project Sponsors for projects not included in the STIP.

The breadth of harm is enhanced by the threatened withholding of any advance construction authorizations.  Advance construction, provided for in 23 U.S.C. § 115, allows states to obtain federal authorization for projects on the STIP while not yet allocating federal funding to the project, and to later convert the project to a Federal-aid project.[12]  And the withholding of NEPA "approvals"—which are needed for "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), or to determine that a project will not have significant effects, *id.* § 4336—could include even non-federally funded projects that require federal authorization, as did the Program.  Finally, the April 21 Letter threatens to withhold all "further obligations of FHWA funds (both formula and competitive) for projects within New York City."  The April 21 Letter does not explain the Secretary's authority to take any of these enforcement measures, beyond citing 23 C.F.R. § 1.36 (which does not authorize the Secretary to deem the Program "illegal," let alone impose the sweeping "compliance measures" on account of its continued operation), and it does not cite any basis for these threatened actions other than the continued operation of the Program.

---

[12]  See FHWA, *Advance Construction and Partial Conversion of Advance Construction*, https://www.fhwa.dot.gov/ipd/finance/tools_programs/federal_aid/ac_pcac/, last accessed May 4, 2025.

The threatened enforcement measures, if taken, would deprive Plaintiffs and NYCDOT of access to federal transportation funds, or the ability to initiate any new projects, shutting down critical transportation investment in the nation's largest city. *See* Willens Decl. ¶ 24 (noting loss of STIP approvals would jeopardize funding for subway and bus maintenance, and railroad track work, as well as other future projects requiring FTA funding); *id.* ¶¶ 25-26 (describing projects currently funded by FHWA dedicated to improving air quality and funding accessibility upgrades to public transportation infrastructure). And they would similarly deprive NYSDOT and NYCDOT of funding for vital projects, thereby harming MTA's ability to provide safe and reliable bus service on City streets. *Id.* ¶ 30; *see also* Declaration of William Carry ("Carry Decl.") ¶¶ 8-10 (explaining how withholding of advance construction authorizations and NEPA and STIP approvals would reduce NYCDOT's project funding flexibility and halt many projects).

Defendants have left no doubt that they intend to impose "compliance measures" on May 28 if Plaintiffs and NYCDOT do not end congestion pricing. On April 24, a spokesperson for the USDOT stated, "if New York doesn't shut it down, the Department of Transportation is considering halting projects and funding for the [S]tate."[13] On April 29, Duffy took to TV to criticize the Program, telling the hosts of *Good Day New York* that if Plaintiffs and NYCDOT do not "treat those who want to come into Manhattan fairly, maybe we should look at how much money we send the City. And that's what the Governor [of New York] is going to have to grapple with."[14] That same day, counsel for Plaintiffs requested that Defendants agree not to take any enforcement action or postpone the April 21 Letter's deadlines. Defendants responded by

---

[13] Peter Senzamici, *Feds Accidentally Upload Internal Memo Admitting Plan to Kill NYC Congestion Pricing Is 'Very Unlikely' to Succeed—Before Quickly Deleting It*, N.Y. Post (Apr. 24, 2025), https://nypost.com/2025/04/24/us-news/fed-lawyers-cast-doubt-on-duffys-dubious-congestion-kill/.

[14] Good Day New York, WNYW-NY (FOX) (Apr. 29, 2025), https://mms.tveyes.com/PlaybackPortal.aspx?SavedEditID=ab76562d-0726-4d6b-bcc4-f28ef11d100b.

reiterating their coercive threats, claiming that the termination and schedule for "compliance measures" remain in place, but taking the position that, because "administrative proceedings" are ongoing, Plaintiffs are precluded from seeking any relief from this Court.  ECF 73.

## LEGAL STANDARD

Plaintiffs are entitled to preliminary injunctive relief because they have shown that "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest."  *New York v. U.S. Dep't of Educ.*, 477 F. Supp. 3d 279, 293 (S.D.N.Y. 2020). Where, as here, the federal government is the opposing party, the last two factors merge.  *Id.* at 294 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  "In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence." *Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016) (quoting *Johnson v. Newport Lorillard*, 2003 WL 169797, at *1 (S.D.N.Y. 2003).[15]  Courts in this district recognize that preliminary injunctions are essential tools "to preserve the status quo by preventing during the pendency of the suit the occurrence of that irreparable sort of harm which the movant fears will occur."  *New York v. Rescue*, 705 F. Supp. 3d 104, 118 (S.D.N.Y. 2023).

## ARGUMENT

The Court should preliminarily enjoin Defendants from taking any of the actions outlined in the April 21 Letter or any other actions in retaliation for Plaintiffs' refusal to comply with their unlawful demand to stop congestion pricing.  Defendants have no valid basis to implement "compliance measures" because the Program is authorized by the VPPP Agreement.  The February

---

[15] The Court is currently considering whether Defendants have waived privilege over a document that was filed to the public docket and, according to news reports, establishes that Defendants' stated rationales for terminating the VPPP Agreement are pretextual.  ECF 72.  Should the Court find that Defendants waived privilege, Plaintiffs respectfully request permission to submit a supplemental letter, limited to three pages, addressing this highly relevant evidence.

19 Letter "terminating" the VPPP Agreement rests on pretextual and borderline frivolous legal arguments, to which the Court owes no deference. Secretary Duffy's "policy concerns" are unavailing; they are not only irrelevant as a matter of law but illegal, *post hoc* justifications, and Duffy has no authority to terminate the VPPP Agreement on his own. Even if Defendants' actions with respect to the VPPP Agreement were lawful, that would not entitle them to withhold funds or approvals consistent with either the FAHA or the U.S. Constitution, and those threatened actions would not only cause irreparable harm, but would be against the public interest.

## I.     Plaintiffs are likely to succeed on the merits

### A.     The Court has jurisdiction

As an initial matter, this Court has jurisdiction over this case under 28 U.S.C. § 1331 because Plaintiffs assert federal constitutional, equitable, and statutory claims. With respect to Plaintiffs' Administrative Procedure Act ("APA") claims, the Court may grant relief under 5 U.S.C. §§ 702 and 705 based on the "source of the rights upon which the plaintiff bases its claims," and the "type of relief sought." *Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 403 (2d Cir. 2017). Plaintiffs seek to vindicate their statutory and constitutional rights, and—since we seek declaratory and injunctive relief and vacatur, not monetary damages—this case is at core a challenge to Defendants' wrongful rescission of the VPPP Agreement, purported "termination" of the Program, and attempt to coerce compliance through the unlawful withholding of critical federal approvals for transportation projects. Although enjoining Defendants' latest attempts to coerce compliance with the February 19 Letter would result in the issuance of certain federal approvals, and lead to funds being released to Plaintiffs, that is insufficient to divest the Court of jurisdiction to afford relief under the APA or the Constitution. *See Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988); *see also Aetna Cas. & Sur. Co. v. United States*, 71 F.3d 475, 478 (2d Cir. 1995) (recognizing distinction between (1) claims "for damages to compensate for the government's failure to perform

a duty," and (2) claims seeking "to require the government to perform its duty"); *Linea Area Nacional de Chile S.A. v. Meissner*, 65 F.3d 1034, 1042 (2d Cir. 1995) (APA jurisdiction where plaintiff sought reimbursement of its expenses because the statute required government to reimburse parties such as the plaintiff).

While we expect that Defendants may raise it, *Department of Education v. California* is not inconsistent with these principles. 145 S. Ct. 966 (2025) (per curiam). There, the "terms and conditions of [109] individual grant awards [were] at issue," *California v. Dep't of Educ.*, 132 F.4th 92, 96-97 (1st Cir. 2025), and the plaintiffs fundamentally sought "to enforce a contractual obligation to pay money" and "represented … that they ha[d] the financial wherewithal to keep their programs running," *California*, 145 S. Ct. at 968-69. Here, Plaintiffs first and foremost challenge Defendants' improper agency actions of rescinding approval under the VPPP, a challenge that unquestionably does not fall with the Tucker Act's exclusive-jurisdiction provision. Plaintiffs also seek to enjoin Defendants' sweeping (and retaliatory) attempts to enforce the February 19 termination by withholding certain necessary federal approvals. Plaintiffs are not relying on any federal funding agreements as a source of rights. As numerous courts have recognized since *California*, challenges like this are properly heard by the federal district courts. *See, e.g.*, *New York v. Trump*, 2025 WL 1098966, at *1-2 (D.R.I. Apr. 14, 2025); *Maine v. U.S. Dep't of Agric.*, --- F. Supp. 3d ---, 2025 WL 1088946, at *19 & n.8 (D. Me. Apr. 11, 2025). It would neither make sense nor be consistent with basic principles of substantial justice if the federal government could divest a district court of jurisdiction in a pending case simply by threatening to withdraw some aspect of the plaintiff's federal funding.

Despite Defendants' assertions to the contrary, the instant motion is also ripe for resolution. While Defendants in their April 21 Letter have purported to keep the door open by issuing an order

to "show cause … why FHWA should not take appropriate steps under 23 CFR § 1.36 to remedy New York's noncompliance with 23 U.S.C. § 301 in connection with the [Program.]," Apr. 21 Ltr. at 1, there is no serious question that: (i) Defendants have already determined that the Program is not compliant with Section 301; and (ii) they "will" therefore take some or all of the compliance measures identified in the April 21 Letter, *id*. at 2. Indeed, in the April 21 Letter, Secretary Duffy reiterates that in the February 19 Letter, he "terminated" the VPPP Agreement (past tense), that "New York therefore is not legally permitted to collect tolls…," *id*. at 1,[16] and that "New York risks serious consequences if it *continues* to fail to comply with Federal law…," *id*. (emphasis added).

As in *Sackett v. EPA*, 566 U.S. 120 (2012), Defendants' February 19 Letter and compliance orders constitute "final agency action" because they have "all of the hallmarks of APA finality," including that "legal consequences will flow from issuance of the order." *Id*. at 127. It does not matter that Defendants may (putatively) invite Plaintiffs and Plaintiff-Intervenors to "engage in informal discussion of the terms and requirements" or "inform" Defendants of any errors in their understanding of the facts and the law. The mere possibility that an agency might reconsider in light of informal discussion and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal." *Id*. Judge Howell reached a similar conclusion in the case involving the Executive Order issued against the law firm Perkins Coie. *See Perkins Coie LLP v. U.S. Dep't of Just.*, --- F. Supp. 3d ---, 2025 WL 1276857, at *24-25 (D.D.C. May 2, 2025) (challenge was ripe because "whatever the exact guidance ultimately issued," "access of employees of Perkins Coie to federal buildings and government employees will be 'limit[ed]' as a

---

[16] Moreover, although Duffy claims to provide "notice" and an "opportunity to contest" under 2 C.F.R. § 200.342 in the April 21 letter, this opportunity came weeks *after* the February 19 termination of the VPPP Agreement. *See Climate United Fund v. Citibank, N.A.*, 2025 WL 842360, at *2 (D.D.C. Mar. 18, 2025) (explaining that the OMB Regulations require an agency to "take certain procedural steps *before* it can terminate a federal award").

result"). Indeed, this case is on even firmer footing than *Sackett* because Defendants are not asking for further information from Plaintiffs to determine whether they are "confident enough about [their] conclusion to initiate litigation." *Id.* After all, they already have it—Plaintiffs and Plaintiff-Intervenors have spelled out in the Amended Complaint why the purported termination of the VPPP Agreement is unlawful. First Amended Complaint ¶¶ 49-176; *see also* SAC ¶¶ 51-178.

Moreover, even if Defendants were implying that they would re-open their determination that the Program is invalid—and they have not—it could hardly be clearer under the circumstances that any further consideration would be completely pretextual. The April 21 Letter itself reiterates that the VPPP Agreement *was terminated*, so any suggestion that said termination is being reconsidered would be in "name only." *Mantena v. Hazuda*, 2018 WL 3745668, at *6 (S.D.N.Y. 2018) (declining to find "re-opening" of immigration proceeding rendered agency action non-final where "circumstances of reopening [were] suspect" because government did not "identif[y] issues with the original decision [or] areas that warranted further evidentiary development" and government acted just nine days after plaintiff filed amended complaint).

### B. The February 19 Letter is arbitrary and capricious

The February 19 Letter, which serves as the purported basis for Defendants' actions, is entirely inconsistent with the statutory scheme it seeks to enforce, and arbitrarily announces an atextual interpretation of the FAHA in violation of the APA. The VPPP, by its plain terms, authorizes both "cordon pricing" and the use of toll revenue to support public transit, and Duffy failed to adequately consider Defendants' own long-held legal positions or Plaintiffs' justifiable reliance on those positions, among other things.

#### 1. Cordon Pricing

In the February 19 Letter, Duffy first and principally argues that 23 U.S.C. § 301 prohibits "tolls" on "roads constructed with Federal-aid highway funds," "subject to limited exceptions,"

and because the VPPP's "value pricing pilot program," is such an "exception," it must be "narrowly construe[d]" to exclude "cordon pricing." Feb. 19 Ltr. at 2-3. This is wrong.

To begin with, the VPPP is not an "exception" to Section 301's toll ban. The express "exception" to Section 301 is Section 129, which provides non-discretionary authority for tolling on federal-aid highways under a wide variety of circumstances. *See* 23 U.S.C. § 301 ("Except as provided in Section 129…"); *id.* § 129 (setting forth various circumstances in which federal-aid highways may be tolled). The VPPP, on the other hand, is an additional, stand-alone program that Congress created for project sponsors to consider potential "value pricing pilot projects," in which the Secretary "shall solicit" participation. VPPP, cl. 1. To that end, the VPPP states that "*[n]otwithstanding* section 129 and 301," tolling is permitted for "value pricing pilot programs." *Id.*, cls. 2, 4. As the Supreme Court has recognized, this "notwithstanding" language "shows which of two or more provisions prevails in the event of a conflict." *N.L.R.B. v. SW General, Inc.*, 580 U.S. 288, 302 (2017).[17]

Rather than putting a thumb on the scale, as Duffy does, the proper starting place in interpreting the VPPP is the statutory text, "in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020). Nothing in the plain language of the VPPP suggests that Congress required there to be other toll-free routes that could be used to access the area subject to tolling. To the contrary, the VPPP authorizes tolling as part of "value pricing pilot programs" without limitation. VPPP, cl. 1.

There can be no serious dispute that the VPPP permits a broad set of programs including

---

[17] Even if the VPPP were an "exception" to Section 301, exceptions must be interpreted in the same manner as any other statutory provision. *See, e.g.*, *BP P.L.C. v. Mayor of Balt.*, 141 S. Ct. 1532, 1538-39 (2021) (rejecting argument that court must construe exceptions narrowly and explaining that courts have "no license to give statutory exemptions anything but a fair reading"); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 359 (2012) (rejecting the "false notion" that "tax exemptions—or any other exemptions for this matter—should be strictly construed").

cordon pricing. When the VPPP was enacted into law in 1991, the Secretary was directed to solicit participation for "congestion pricing pilot programs," later amended in 1998 to "value pricing pilot programs." *Id.*, cl. 1. While neither term is defined in the statute, at the time of enactment, "congestion pricing" meant a charge (or price) intended to remedy or offset congestion. *See Congestion*, *Cassell Encyclopaedia Dictionary*, 312 (1990) (defined as an "abnormal accumulation (of inhabitants, traffic etc.)"); *see also Congestion Charging*, *Black's Law Dictionary* (10th ed. 2014) (defined as "method of reducing traffic in major cities, esp. in city centers, by charging drivers a fee to go beyond a certain point on the roads in the cities"). Nothing in that definition suggests a limitation on the types of congestion pricing programs that may be implemented, much less a ban on "cordon pricing." To the contrary, as noted, the very architect of congestion pricing, Professor Vickrey, proposed cordon pricing as *the way* to cure congestion *in New York* City, given the relatively narrow geography of Manhattan, the solution necessarily involves cordon pricing. *See supra* at 10-11. And by the time the VPPP was enacted, Singapore had successfully operated a cordon pricing system for over 15 years, commonly referred to as a "congestion pricing program." *See, e.g.*, Paul W. Wilson, *Welfare Effects of Congestion Pricing In Singapore*, 15 TRANSP. 191, 191 (1988).

This common and contemporaneous understanding of the term "congestion pricing" persisted over the next three decades, as Congress reauthorized the VPPP in 1995, 1998, and 2005. Shortly after the passage of ISTEA in 1991, Congress asked FHWA how it defined the term "congestion pricing" in the VPPP, and FHWA responded as follows: the "potential scope of congestion pricing applications can vary widely, ranging from pricing on a new or existing single road facility to more comprehensive *area-wide road pricing strategies*." SAC ¶ 69 (emphasis added). From there, FHWA consistently understood congestion pricing to encompass—and in fact

quintessentially cover—cordon pricing, and the agency even funded multiple cordon pricing studies under the VPPP.  *See supra* at 11-12; SAC ¶¶ 82, 88, 92, 94.  Far from limiting project sponsors to any particular methodology, Congress continued to allow experimentation, which after all was the whole point of the VPPP in the first place.  *See supra* at 10-11; SAC ¶ 72.  Thus, the "contemporary legal context" in which Congress acted demonstrates that the ordinary meaning of "congestion pricing" included cordon pricing.  *Fiero v. Fin. Indus. Regul. Auth., Inc.*, 660 F.3d 569, 577 (2d Cir. 2011); *see also Wash. All. of Tech. Workers v. D.H.S.*, 50 F.4th 164, 182 (D.C. Cir. 2022) ("If Congress has continually declined to disturb a longstanding interpretation of a statute," it indicates Congress "at least acquiesces in, and apparently affirms, that interpretation").

Not surprisingly, this construction is supported by the broader statutory context as well. ISTEA is rife with limitations and specific definitions where Congress intended them, but there are no such limitations for the VPPP.  For example, in creating the Suspended Light Rail System Technology Pilot Program, Congress described certain characteristics that any such program "shall" have.  ISTEA § 3030(c)(3).  The VPPP contains no such limitation: at most, beyond the broad authorization to enter into "value pricing pilot programs," it requires the Secretary to "monitor" the "effects such programs are having on driver behavior, traffic volume, transit ridership, air quality, and availability of funds for transportation programs," which requirements reflect a general focus on objectives like reducing congestion through reducing traffic and promoting other forms of transportation.  VPPP, cl. 5.  After all, this is not just the common understanding of Congress; it is simply common sense.

To the extent there were any doubt, the fact that everyone always understood that congestion pricing encompassed cordon pricing is supported by the "mischief the statute sought to remedy," *Carroll v. Trump*, 49 F.4th 759, 770-71 (2d Cir. 2022), as well as the legislative history,

*Spadaro v. U.S. C.B.P.*, 978 F.3d 34, 46 (2d Cir. 2020).  Indeed, during hearings leading to the passage of ISTEA, the bill's sponsor, Senator Daniel Patrick Moynihan, described Singapore as a "particularly interest[ing]" method of "congestion pricing," and agreed that cordon pricing was a promising method of congestion pricing, explaining, "Singapore is doing it, Hong Kong is doing it, we are talking about it."  SAC ¶ 74.  Likewise, in passing the Clean Air Act Amendments of 1990, Congress was clear that "transportation control measures" under that statute should include tolling vehicles "to enter central business districts."  *Id.* ¶ 75.  Again, Congress has repeatedly said the point of the VPPP was to encourage *experimentation* in order to curb congestion.  *Id.* ¶ 74.

Duffy's reliance on 23 U.S.C. § 129(d)(4)(B) doesn't work either.  Feb. 19 Ltr. at 3.  For one thing, Section 129(d), which establishes the "Congestion relief program," was enacted as part of the 2021 Infrastructure Jobs and Investment Act, and as a later law that is separate from the VPPP, it has no relevance to the meaning of the VPPP.  *Gutierrez v. Ada*, 528 U.S. 250, 257-58 (2000) ("[L]ater laws that do not seek to clarify an earlier enacted general term and do not depend for their effectiveness upon clarification, or a change in the meaning of an earlier statute, are beside the point in reading the first enactment.").  Regardless, the fact that Congress described projects eligible for funding under that program to include "deployment and operation of a system that implements or enforces high occupancy vehicle toll lanes, cordon pricing, parking pricing, or congestion pricing," hardly shows that the "value pricing pilot program" under the VPPP excludes "cordon pricing."  Again, the VPPP broadly refers, without limitation, to "value pricing," which has always been understood to include cordon pricing.[18]  If anything, the list of examples in

---

[18] *See* Elena Safiorva et al., *Choosing Congestion Pricing Policy: Cordon Tolls Versus Link-Based Tolls*, 1932 J. OF TRANSP. RSCH. BD. (2005) ("Distributional effects of cordon and link-based tolls are also examined in the hope of understanding why one scheme might be preferred over another.").

Section 129(d) again reflects Congress's understanding of the diverse, non-exclusive methods that are encompassed under the umbrella term "congestion pricing."

### 2. Revenue Objectives

Duffy also claims that tolls cannot be "calculated based on considerations separate from reducing congestion or advancing other road-related goals." Feb. 19 Ltr. at 3. He then goes on to chastise the Program (which Defendants approved) for being "driven primarily by the need to raise revenue for the Metropolitan Transit [sic] Authority as opposed to the need to reduce congestion." *Id.*[19] But this second rationale in the February 19 letter is just as invalid.

First of all, the VPPP authorizes tolls on federal-aid highways. It therefore follows that "raising revenue" is a permissible function of a VPPP program—that, of course, is what tolls do. And while Duffy appears to take issue with the particular toll rates of the Program, nothing in the VPPP statute imposes limits on those rates. Moreover, the statute explicitly provides that "[r]evenues generated" may be used to fund other transportation "projects eligible under" Title 23, including capital transit projects. VPPP, cl. 4; *cf.* 23 U.S.C. § 129(d)(6)(B) (setting specific limits on toll rates for separate "congestion relief program"). As this Court has explained, and as Duffy is compelled to concede, *see* Feb. 19 Ltr. at 3, the statutory text makes it "unmistakably clear" that "a public authority [is] permitted to collect funds that exceed a toll road's costs and spend those funds on non-toll road projects," *Chan*, 2024 WL 5199945, at * 17.

---

[19] Duffy is mistaken in claiming that raising revenue is the "primary" driver of the Program. Feb. 19 Ltr. 3. The Program has complementary goals of congestion reduction and providing MTA with a stable funding source, with the latter also supporting congestion reduction by helping travelers shift modes from driving to transit. *See* N.Y. Veh. & Traf. Law § 1701. These dual goals were reflected in the EoI, *see* C. de Cerreño Decl., Ex. B, at 3-4, and the purpose and need for the Program was developed in consultation with FHWA, *see* SAC ¶¶116-24. Indeed, FHWA previously acknowledged and defended these complementary objectives in filings before this Court. *See Chan*, ECF 65 at 6, 9; *Chan*, ECF 160 at 8. Duffy's clear factual error is another reason to find the February 19 Letter invalid. *See New York v. H.H.S.*, 414 F. Supp. 3d 475, 545, 577 (S.D.N.Y. 2019) (where agency's stated justification for undertaking rulemaking was "factually untrue," that "alone made the agency's decision … arbitrary and capricious").

Duffy's position on revenue generation is also undermined by the rest of the VPPP.  Far from prohibiting consideration of revenue, Congress anticipated and even required States to consider using excess revenues from congestion pricing programs as a funding source for public transportation.  VPPP, cl. 4.  The VPPP instructs the Secretary to report to Congress "every 2 years on the effects" that VPPP programs "are having on … transit ridership, air quality, and *availability of funds for transportation programs*."  *Id.*, cl. 5 (emphasis added).  And, in a separate section of ISTEA, Congress directed that States "shall undertake a continuous transportation planning process," which "shall" consider "the use of innovative mechanisms for financing projects, including … tolls [and] congestion pricing."  ISTEA § 1025(a).  This, of course, is in keeping with the broader intent of ISTEA, which was enacted to "develop a National *Intermodal* Transportation System" consisting "of all forms of transportation in a unified, interconnected manner," *id.* § 2 (emphasis added), and to grant "states greater flexibility to operate toll facilities and use toll revenues for a variety of transportation projects" including congestion pricing.  *Chan*, 2024 WL 5199945, at *33; *see also* SAC ¶ 64-78 (collecting legislative history establishing Congress intended to permit the use of tolls to fund public transit programs).

The courts "do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply."  *Mendis v. Filip*, 554 F.3d 335, 340 n.5 (2d Cir. 2009) (quoting *Jama v. I.C.E.*, 543 U.S. 335, 341 (2005)).  This is particularly true where, as here, the federal government's proposed interpretation of a statute would curtail an area "of traditional State responsibility" like public transportation systems such as buses or subways.  *Bond v. United States*, 572 U.S. 844, 858-59 (2014) (Congress must provide a "clear statement" if it seeks to "override the usual constitutional balance of federal and state powers"); *see also Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 715 (1972) (describing

States' traditional authority over road tolls). Congress knows how to specify the factors that should or should not be considered in connection with projects authorized under Title 23, and it did not include any prohibition on the consideration of revenue in the VPPP. *See, e.g.*, 23 U.S.C. § 106(a)(4) (cross-referencing 23 U.S.C. § 109); *see also* 49 U.S.C. § 60301(e).

The Second Circuit considered an argument much like Duffy's in *American Trucking Associations, Inc. v. New York State Thruway Authority*, which concerned the use of toll revenue to fund New York's canal system under another tolling provision in ISTEA. 886 F.3d 238, 246 (2d Cir. 2018) (citing ISTEA §1012(e)). There, the Trucking Associations argued that the Thruway Authority's desire to use tolling revenue to fund New York's canal program meant that the challenged tolls were higher than they ought to be, and that Congress, in enacting ISTEA, had "meant to limit the amount" of tolls that could be collected "to fund unrelated projects." *Id.* The Second Circuit rejected this argument, holding that it was "unmistakably clear" that "Congress meant to permit the Thruway Authority to continue collecting tolls of whatever amount" and to use any "surplus revenue" for "other transportation projects." *Id.* Like Section 1012(e), VPPP clause 3 permits toll revenues to be used for "any project eligible for assistance" under Title 23, including capital transit projects, without any limitation on the toll amounts.

Again, the whole point of the VPPP was to encourage experimentation through pilot programs intended to actually *reduce congestion*, and everyone understood that meant an "*intermodal*" approach where other forms of transportation, besides cars, were incentivized and supported. SAC ¶ 67. Given that tolls would generate revenue, it was assumed—and encouraged—that those revenues would go toward other transportation methods to reduce traffic congestion, like buses or subways. And on top of that, Congress acquiesced to FHWA's longstanding interpretation of the VPPP, *see Fiero*, 660 F.3d at 577; *see also* SAC ¶¶ 84-100

31

(collecting examples of FHWA recognizing VPPP permits revenue objective), by amending the VPPP four times without seeking to disturb that interpretation.[20]

### 3. Defendants' "policy concerns"

After Plaintiffs filed their amended complaint detailing at length the deficiencies in Duffy's statutory analysis on April 18, Defendants realized they needed a new approach, so in their April 21 Letter they sought to recast Duffy's original termination decision as also resting on supposed "policy concerns," including the alleged "disproportionate financial hardship" the Program imposes and the "unconscionable" nature of "highway users" (*i.e.*, drivers on the City's streets) "being forced to bail out the MTA transit system."  April 21 Ltr. at 2-3.  But the February 19 Letter is clear that these policy concerns merely prompted Duffy's legal review, and that his ultimate decision to terminate the VPPP Agreement rests on "two reasons" derived from his interpretation of the VPPP, specifically his conclusions that (1) cordon pricing "is not authorized under Congress' use of the phrase 'value pricing pilot program,'" and (2) the "VPPP does not authorize tolls that are calculated based on considerations separate from reducing congestion."  Feb 19. Ltr. at 3.  Having apparently realized the weaknesses of those justifications, Defendants do not get a second bite at the apple.  Where, as here, an agency issues a memorandum "to elaborate on the reasons" for the initial agency action, offering new and "separate," policy reasons for action already taken, those new reasons "can be viewed only as impermissible *post hoc* rationalizations."  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21-22 (2020).  This would

---

[20] The Court does not owe any deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), to the February 19 Letter's abrupt and poorly reasoned reversal of FHWA's longstanding interpretation of the VPPP.  *See In re Bernard L. Madoff Inv. Sec. LLC*, 779 F.3d 74, 82 (2d Cir. 2015).  It is perfectly clear that the President set out to "kill" the Program for political reasons and directed Secretary Duffy to manufacture a legal rationale for doing so, so that is what he did.  *See supra.*  An agency decision that contradicts an agency's long-held view is entitled "to little, if any, deference."  *SEC v. SIPC*, 872 F. Supp. 2d 1, 10 (D.D.C. 2012).  FHWA has for many years had the authority to administer the VPPP, 49 C.F.R. § 1.85(c)(22), and in that capacity, it has consistently and repeatedly concluded that the VPPP permits cordon pricing as well as the consideration of revenue objectives.  *See supra* at 10-12; SAC ¶ 27.

include elevating policy concerns that were previously cited as commentary in the Feb. 19 letter into supposed legal rationales for the decision to terminate. And, even if these *post hoc* rationalizations could be considered, they are flatly inconsistent (again) with the VPPP itself, which expressly contemplates the use of tolling revenues to promote mass transit as a means of reducing congestion, as well as with the extensive environmental review record in this case, which concluded that the Program will provide substantial benefits to low- and moderate-income commuters.[21] Moreover, even if the Court were willing to entertain Defendants' policy rationales, and even assuming that Secretary Duffy's decision was based on policy and not a legal infirmity in the VPPP Agreement, then the termination of the Agreement without any NEPA review was clearly in violation of law for the reasons explained *infra*, Point I.B.5. In any event, Duffy's concern that "there are no toll-free alternative routes available to access the [CBD]," Apr. 21 Ltr. at 2, and purported belief that this is unprecedented or against preexisting USDOT policy, *see* Good Day New York, *supra* note 14, is unfounded. FHWA has approved tolls on many routes that do not provide for toll-free access, including several here in New York such as on the two I-278 bridges to Staten Island, as well as on two I-190 bridges to Grand Island, leaving no toll-free alternative routes to access either of those destinations. It also defies belief that Duffy (a cabinet member and New Jersey resident) would claim that absent the Program, New Jersey drivers could access the CBD through a toll-free "roundabout way." Though technically true, the only such option would add approximately 300 miles to those drivers' commutes, considering that the closest un-tolled Hudson River crossing is in Albany. In short, Defendants are making it up as they go along—the definition of arbitrary and capricious decision making.

---

[21] *See* Final EA Chapter 6, *Economic Conditions* at 6-47–49, 6-80–84 (Apr. 2023), https://www.mta.info/document/110831; Final EA Chapter 17, *Environmental Justice* at 17-62, 17-67–72 (Apr. 2023), https://www.mta.info/document/110886 (describing "substantial benefits associated with reduced vehicle congestion in the Manhattan CBD" and measures designed to lessen impacts on low-income drivers).

4.    *Defendants have no right to terminate the VPPP Agreement—regardless of their justification*

Defendants do not have the right to terminate the VPPP Agreement in any event. As noted, the VPPP Agreement itself says nothing about Defendants having a right to terminate. Rather, it refers to *TBTA* alone as having such right. This reflects the parties' understanding that the Program would be long running (unless TBTA decided to end it). The VPPP Agreement expressly refers to: (i) monitoring the Program for at least ten years, (ii) phasing in the tolls over a period of six years, with ongoing tolling thereafter, and (iii) the TMA, which requires TBTA to raise $15 billion through the issuance of long-term bonds. VPPP Agreement cls. 8(b), 11, Attach. A.

Defendants claim a right to terminate under the Uniform Guidance regulations issued by the Office of Management and Budget ("OMB Regulations"), 2 C.F.R. Part 200. But the problem for Defendants is that those regulations actually make clear that if Defendants wanted to have a right to terminate, they were required to say so explicitly in the agreement. *See Singh v. U.S. Dep't of Just.*, 461 F.3d 290, 296 (2d Cir. 2006) ("[A]n administrative agency must adhere to its own regulations."). Indeed, while the OMB Regulations permit unilateral termination by the recipient of an award, *see* 2 C.F.R. § 200.340(a)(3), they do not include a similar provision allowing unilateral termination by an agency.[22] Taken together, these regulations have been interpreted by federal agencies as prohibiting agencies from unilaterally terminating awards, including for policy reasons. *See, e.g.*, *Guidance for Federal Assistance*, 89 Fed. Reg. 30046, 30089 (Apr. 22, 2024).

To be sure, Section 200.340(a)(4) permits termination by the agency when done "pursuant

---

[22] Moreover, under 2 C.F.R. §§ 200.341(a) and 342, even if an agency has a termination right (and Defendants do not), it may terminate a cooperative agreement only after providing the recipient written notice and an opportunity to be heard, which obviously did not occur here. Recognizing their error on that front, Defendants belatedly claimed to provide "notice" and an "opportunity to contest" in the April 21 Letter. But that supposed opportunity came weeks *after* the February 19 termination of the VPPP Agreement. *See Climate United Fund v. Citibank, N.A.*, 2025 WL 842360, *2, 8 (D.D.C. Mar. 18, 2025) (OMB Regulations require agency to "take certain procedural steps *before* it can terminate a federal award" (emphasis added)).

to the terms and conditions of the Federal award," and even then, only to "the extent authorized by law." 2 C.F.R. § 200.340(a)(4); *see also* 89 Fed. Reg. at 30089 (revised language of subsection (a)(4) only permits termination due to changes in "agency priorities" where such condition is "included in the terms and condition of the award"). But that only proves our point. Again, the VPPP Agreement says *nothing at all* in its terms and conditions about Defendants terminating it. In fact, precisely to prevent the sort of "pull out the rug from under them" behavior that Defendants want to engage in here, the very regulations that Defendants invoke actually require that the "Federal agency or pass-through entity must *clearly and unambiguously* specify all termination provisions in the terms and conditions of the Federal award." 2 C.F.R. § 200.340(b) (emphasis added); *see, e.g.*, *Climate United Fund v. Citibank, N.A.*, 2025 WL 1131412, at *16 (D.D.C. Apr. 16, 2025) (agency "can only terminate a federal award on this basis pursuant to the terms and conditions of the federal award"), *stayed pending appeal*, No. 25-5122 (D.C. Cir. Apr. 16, 2025). Finally, because the VPPP Agreement, consistent with the VPPP, contemplates that the Secretary will monitor the Program for "at least ten years," and everyone (including FHWA) understood that the Program would rely on tolling revenues to raise $15 billion in long-term bonds, only TBTA has the right to terminate. *See* Willens Decl. ¶¶ 4-11.

All of this makes the instant case stand in stark contrast to cases where the grant agreement included or expressly incorporated language authorizing termination. *Cf. Sols. in Hometown Connections v. Noem*, 2025 WL 1103253, at *4-5 (D. Md. Apr. 14, 2025) (grant included provision authorizing DHS to terminate award due to changes in "agency priorities").[23] Had the federal

---

[23] Unable to point to any provision in the VPPP Agreement, Defendants rely on a document posted to their website entitled *Contractors and Recipients General Terms and Conditions for Assistance Award* ("General Terms"), which Defendants claim is "incorporate[d]" into the VPPP Agreement. Apr. 21 Ltr. at 3-4. But the VPPP Agreement does not mention the General Terms and only states that the Project Sponsors will "comply with" federal laws and requirements "applicable to this project." VPPP Agmt. cl. 9. That simple agreement to "comply" obviously does not

government wished to have the right to unilaterally terminate congestion pricing, it could have negotiated with the Project Sponsors to include a term authorizing termination in the VPPP Agreement (although the Project Sponsors would never have agreed, given the substantial cost to develop and set up the infrastructure for the Program and the need to interest investors in long-term bonds supported by Program revenues). The federal government did not include any such provision, and cannot attempt to renegotiate now, particularly given that Defendants are not contributing a dime to the Program, which involves areas of exclusively local concern to resolve *New York*'s congestion problems through local means.

In our legal system, the acts of executive branch officers "must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902); *see also* 5 U.S.C. §§ 706(2)(C) (court must set aside agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"). To the extent that Duffy claims some free-ranging authority to revisit agency determinations and thereby terminate the VPPP, the problem he has is that both statute and applicable regulations say otherwise. *See Chao v. Russell P. Le Frois Builder, Inc.*, 291 F.3d 219, 229 n.9 (2d Cir. 2002).

> 5. *Defendants failed to conduct an environmental review under NEPA before purporting to terminate the VPPP Agreement*

To the extent that Defendants now base the "termination" on policy grounds, that is also not in accordance with law because Defendants failed to conduct an environmental review prior

---

incorporate into the VPPP Agreement every Federal law, regulation and guidance document under the sun. 2 C.F.R. § 200.340(b) (agreement must "unambiguously specify" termination conditions); *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996) (in order to be incorporated by reference into an agreement, a paper "must be so referred to and described in the instrument that the paper may be identified beyond all reasonable doubt"). And regardless, the General Terms do not help Defendants because they are entirely circular, only authorizing termination "in accordance with 2 C.F.R. § 200.340," which itself requires the agency to include an agency termination provision in the terms of the federal award.

to taking that action, as mandated by NEPA. NEPA requires federal agencies to prepare an Environmental Impact Statement ("EIS") for any "major federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). In doing so, agencies are required to take a hard look at the proposed action's reasonably foreseeable social, economic and environmental impacts. *See*, *e.g.*, *id.* § 4336; 23 C.F.R. § 771.119(b); *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983). To determine whether a major federal action will significantly affect the quality of the environment, an agency may prepare an Environmental Assessment ("EA"). *See, e.g.*, 42 U.S.C. § 4336(b)(2); 23 C.F.R. § 771.119. If an agency determines that the proposed action will not have significant effects, accounting for mitigation, it may issue a Finding of No Significant Impact ("FONSI"). 42 U.S.C. § 4336(b)(2); 23 C.F.R. § 771.121. If the assessment reveals that there may be significant effects, an environmental impact statement is required. 42 U.S.C. § 4336(b)(2); 23 C.F.R. § 771.119(i).

USDOT under the first Trump Administration recognized that NEPA required an environmental review of the Program because Defendants' approval of tolling authority under the VPPP qualified as a major federal action. As a result, FHWA and the Project Sponsors conducted an exhaustive, multiyear NEPA review that culminated in a final EA and FONSI based on the Project Sponsor's mitigation commitments, clearing the way for the parties' execution of the VPPP Agreement. Defendants' purported termination of the VPPP Agreement would be no less major than their execution of the Agreement in the first place, as it would have no less of an impact on the environment and would significantly alter the status quo. Indeed, considering that the EA and FONSI identified numerous environmental benefits of the Program, including significant reductions in traffic congestion and air pollution regionwide, terminating the VPPP Agreement and halting the Program (even assuming Defendants had the authority to do so, which they do not)

37

would inevitably increase congestion and air pollution, among potentially other adverse environmental consequences. *See, e.g.*, *Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 234-35 (9th Cir. 1990) ("If an ongoing project undergoes changes which themselves amount to major Federal actions, the operating agency must prepare an EIS.") (citing *Andrus v. Sierra Club*, 442 U.S. 347, 363 n.21 (1979) (major federal actions include the "expansion or revision of ongoing programs")).

### 6.     The MTA and TBTA's reliance interests

Duffy's purported "termination" is unlawful for yet another reason: he did not adequately consider the MTA and TBTA's significant reliance interests in the VPPP Agreement, FHWA's 2019 statement that the VPPP is the "best fit" for the Program, or FHWA's longstanding interpretation of the VPPP.  The "longstanding practice of the government—like any other interpretive aid—can inform a court's determination of what the law is." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 386 (2024) (internal quotation marks and alterations omitted).  As the Supreme Court has held, allowing agencies to reverse "consistent" and "longstanding" statutory interpretations "affirmatively destroys," rather than "safeguard[s]," reliance interests by giving "license" to "an agency to change positions as much as it likes."  *Id.* at 386, 410-411.  Duffy's reversal of the agencies' decades-old, consistent interpretation of the VPPP flouts these principles, undermines the MTA and TBTA's reliance interests, and is therefore entitled to no deference. *Garland v. Cargill*, 602 U.S. 406, 412 (2024) (rejecting agency's attempt to "abruptly reverse[] course" in its interpretation of gun laws); *N.L.R.B. v. Noel Canning*, 573 U.S. 513, 525 (2014) (U.S. Supreme Court "has treated practice as an important interpretive factor even when the nature or longevity of that practice is subject to dispute").

Even if Defendants' about-face on USDOT's interpretation of the VPPP statute were a change in *policy* (which it is not), it would still fail APA review.  Where an agency's "prior policy

has engendered serious reliance interests," the agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). A failure to consider reliance interests or to fully explain an agency's reasoning with respect to reliance interests renders an agency's change in position arbitrary and capricious under the APA. *See Regents of the Univ. of California*, 591 U.S. at 33.

And Plaintiffs' reliance on Defendants' interpretation of the VPPP and on the VPPP Agreement in their financial planning to support and sustain the New York metropolitan region's public transit system is quite significant. *See* SAC ¶ 101-02; *see also* C. de Cerreño Decl. ¶¶ 29-37. For example, the MTA relies on Program revenues to fund critical aspects of its Capital Program, in order to deliver critically needed public transit improvements. *See* SAC ¶ 209-11; *see also* Willens Decl. ¶¶ 10-15 And TBTA has already substantially relied on Defendants' interpretation of the VPPP and on the VPPP Agreement in incurring debt that will be repaid, at least in part, by Program revenues. *See* SAC ¶ 214; *see also* Willens Decl. ¶¶ 11-15. Everyone (including FHWA) understood that the bonds, as 30-year bonds, would be paid from toll revenue over the length of their 30-year term. *See* Willens Decl. ¶¶ 4-15. Indeed, FHWA's Re-evaluations were explicit in that respect, noting that the net revenue would be dependent on the bonds' "rates and terms." *E.g.*, Re-Evaluation 2 at 8 n.2.

There can be no doubt that FHWA well understood these reliance interests. Indeed, FHWA confirmed in recent court filings that it understood MTA's financing plan was reliant on long-term Program revenue to repay 30-year bonds. *See* Manhattan Central Business District Tolling Program Supplemental Memorandum at 20-22, *New Jersey v. U.S Dep't of Trans. et al.*, No 23 Civ. 03885 (Jan. 17, 2025), ECF 218-1 (confirming that declaration signed by MTA CFO Kevin Willens on January 2, 2025 explaining how the MTA and TBTA planned to issue long-term bonds

to be repaid by Program revenue "reflects FHWA's contemporaneous understanding of the information conveyed by the Project Sponsors before FHWA's issuance of Re-Evaluation #2"). As the MTA's CFO has explained, the MTA's reliance on the long-term operation of the Program was made crystal clear to FHWA during the development of the Program and negotiation of the VPPP.  *See* Willens Decl. ¶¶ 4-11 (explaining FWHA understood that the MTA could not have signed a VPPP agreement that gave FHWA unilateral authority to terminate Program because financing $15 billion in capital improvements "is dependent on attracting investors to purchase long-term bonds secured with Program revenue").  "The MTA and TBTA have relied on the durability of the VPPP Agreement in incurring" over a billion dollars in debt in the form of short-term notes and loans.  *Id*. ¶¶ 12-15.  Moreover, Plaintiffs incurred substantial costs (some $500 million) in designing the Program, conducting lengthy environmental reviews, and installing the systems necessary to collect tolls, all based on USDOT and FHWA's consistent and longstanding statutory interpretation that the agencies now disavow.  *See*  C. de Cerreño Decl. ¶¶ 29-37.

The February 19 Letter gives superficial attention to these weighty reliance interests, ignoring key facts.  Although the Letter mentions that "TBTA and NYSDOT have relied on the [VPPP] Agreement to begin collecting tolls," Feb. 19 Ltr. at 4, it barely mentions—let alone discusses—Plaintiffs' broader reliance interests.  For example, the Letter notes that "TBTA and NYSDOT have incurred costs related to the program," but dismisses that reliance since the costs "were incurred before FHWA signed the Agreement."  *Id.*  But this leaves out Plaintiffs' substantial reliance on Defendants' "*prior interpretation*," *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 746 (1996) (emphasis added), of the VPPP as permitting cordon-based tolling to raise revenue for mass transit, and Defendants' representation in 2019 that the VPPP would be the "best fit" for the Program.  C. de Cerreño Decl., Ex. C; *see also Fox*, 556 U.S. at 515 (focus is

on whether "*prior policy* has engendered serious reliance interests") (emphasis added). The Letter

also pays no heed to the substantial reliance interest even after the VPPP was signed. *See* Willens

Decl. ¶¶ 12-15. This is not the kind of "detailed justification" that can support a reversal in legal

interpretation—or even a policy change—where the prior policy has engendered serious reliance

interests. *See Fox Television Stations*, 556 U.S. at 515; *see also Encino Motorcars, LLC v.*

*Navarro*, 579 U.S. 211, 222 (2016); *see also Bondi v. VanDerStok*, 145 S. Ct. 857, 873-74 (2025)

("novelty of" statutory interpretation is "strike against it," and the "contemporary and consistent

views of a coordinate branch of government can provide evidence of the law's meaning").

The February 19 Letter also asserts that Plaintiffs' reliance on Program revenues to fund

public transit improvements "was not reasonable given that FHWA approved only a 'pilot

project,'" referring to the text of the VPPP, which authorizes "value pricing pilot projects." Feb.

19 Ltr. at 4. This is nonsensical. The Program is a "pilot" only in the sense that the VPPP statute

authorizes projects to develop knowledge about the efficacy of congestion pricing strategies.

Indeed, to the extent the VPPP itself says anything about the anticipated length of the Program, it

says that the "Secretary *shall* monitor the effect of such programs for a period of *at least 10 years*,"

VPPP § 5 (emphases added). This obviously is inconsistent with the Secretary being able to

terminate the Program mere months in (and consistent with the notion that the Program will run

unless and until TBTA decides to stop it).[24] No sane State government or agency (including

Plaintiffs) would spend years studying the potential environmental effects of a program in advance

---

[24] By contrast, when Congress wanted particular programs or grants to have time limitations under Title 23, it said so, and in many instances required the agreement to say so, too. *See, e.g.*, 23 U.S.C. § 112(b)(4)(C)(v); *id.* § 131(e) (requiring states to remove non-conforming signs or displays within five years of statute's enactment); *id.* § 151(f)(6)(C)(i) (allowing grant recipients to provide funds to private entities operating publicly available electric vehicle charging infrastructure for the first five years of operation).

of implementation and would invest a half-billion dollars in planning, technology, and infrastructure if the project were intended to be short-term or could be summarily struck down.

Contrary to the implication in the February 19 Letter that Plaintiffs' reliance was not reasonable because "FHWA's approval was not authorized by law," Plaintiffs acted reasonably in relying on Defendants' longstanding interpretation of the VPPP, including FHWA's representation to Plaintiffs that it was the "best fit" for the Program.[25] It was not unreasonable—indeed, it was eminently reasonable—for Plaintiffs to rely on FHWA's consistent and well-grounded interpretation of the VPPP dating back to its implementation, when there was no prior indication that the agency might suddenly make a 180-degree change in course. FHWA's prior interpretation of the VPPP is consistent with the statute's plain text, has never been challenged in court, and has never been found by any court to be unauthorized. Moreover, the Supreme Court in *Regents* rejected the argument that a federal agency need not seriously consider reliance interests when the agency determines that its prior policy was not legally authorized. *See* 591 U.S. at 33. As the Court explained there, even where an agency determined that its prior policy was illegal, "nothing about that determination foreclosed or even addressed the option[] of … accommodating particular reliance interests," and the agency's failure to do so was "arbitrary and capricious." *Id.* So too here. The February 19 Letter merely points to its cursory and ill-founded determination of illegality without truly taking into account Plaintiffs' substantial reliance interests.

## C. Defendants' proposed enforcement

Even if the February 19 Letter were not unlawful, and the termination of the VPPP Agreement were valid, Defendants would not have license to effectively shut off funding and

---

[25] While Duffy claims to rest his decision on his legal interpretation of the VPPP, the record here is very clear that Duffy's explanation is pretextual in nature and that President Trump directed him to find a way to end the Program for political reasons. *See, e.g.*, Feb. 19 Ltr. at 1 (President Trump directed "review" of "approval of the [Program]" in light of the President's policy concerns); *see also Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019).

approvals for virtually any and every federal-aid highway project, as they have threatened to do. Rather, under the FAHA and basic constitutional principles, their recourse, if any, is limited.

>    1.    *Defendants lack authority to impose the sanctions threatened in the April 21 Letter*

Defendants do not point to any authority in the VPPP Agreement or the FAHA that would authorize the unprecedented sanctions outlined in the April 21 Letter, which include the withholding of federal funds, advance construction authorizations, approvals to STIP amendments, and NEPA approvals.  They rely instead on a single regulation, 23 C.F.R. § 1.36, that is ostensibly authorized under FHWA's general authority to "prescribe … needful rules and regulations for the carrying out of the provisions of this title."  23 U.S.C. § 315.  According to Defendants, that regulation gives the Executive branch free range to take a sledgehammer to the budgets of MTA and TBTA (and NYSDOT and NYCDOT) unless and until Plaintiffs "cry uncle" and give up the Program.  But Section 1.36 does not, by its terms, give Defendants that power, nor could it here.

As an initial matter, the plain language of Section 1.36 does not authorize the extremely broad sanctions contemplated in the April 21 Letter.  The regulation "applies only if a State fails to comply with or violates federal law," and the Program is authorized under the non-terminable VPPP Agreement.  *Tennessee ex rel. Leech v. Dole*, 567 F. Supp. 704, 718 (M.D. Tenn. 1983), *rev'd on other grounds*, 749 F.2d 331 (6th Cir. 1984).  It is not enough that Defendants no longer like congestion pricing and want it to stop; the Program is authorized under federal law.

But even if the VPPP Agreement were in violation of federal law, Defendants' threatened "compliance measures" go well beyond the terms of Section 1.36 and are not authorized here. Section 1.36 sets out three avenues of potential enforcement: (i) withholding federal funds under Title 23 "on account of" the Program, (ii) withholding "approval of further projects in the State" under Title 23; and (iii) "other action that [the Administrator] deems appropriate under the

circumstances." Section 1.36 does not say that all three avenues of enforcement will be appropriate in any given circumstance, nor does it purport to give Defendants authority to hold up New York's appropriated and authorized federal-aid highway funding (and more).

Start with the first clause of Section 1.36. Here, of course, there are no funds "on account of" the Program because Congress no longer appropriates funds under the VPPP. Every penny of funding for the VPPP comes from sources *other than* the federal government. Perhaps, if Defendants had provided funding under the VPPP Agreement and subsequently determined that the Program is not authorized, and had the right to terminate, they could then withhold that particular stream of funding. But the VPPP Agreement does not give them any such role or right.

Beyond that, the second and third clauses of Section 1.36—withholding "approval of further projects" and "other action … appropriate under the circumstances"—clearly do not authorize Defendants to take the sweeping actions outlined in the April 21 Letter and, if they did, they would exceed the agency's authority under the authorizing statute, 23 U.S.C. § 315. Where a statute delegates authority to an agency, "the role of the reviewing court under the APA" is to "fix the boundaries of the delegated authority" and "police the outer statutory boundaries of those delegations." *Loper Bright Enters.*, 603 U.S. at 395, 404 (cleaned up). The limited authority that Congress granted to FHWA to make "needful rules," 23 U.S.C. § 315, "does not provide the Administrator with carte blanche authority to promulgate any rules, on any matter relating to the [FAHA], in any manner that the Administrator wishes," *Citizens to Save Spencer Cnty. v. EPA*, 600 F.2d 844, 873 (D.C. Cir. 1979) (construing similar language in statute authorizing EPA rulemaking). Indeed, where Congress intends to grant an agency enforcement authority, it has said so clearly. *See, e.g.*, 12 U.S.C. § 1464(n)(9)(D) (authorizing Comptroller of the Currency to "prescribe regulations necessary to enforce compliance"); 7 U.S.C. § 1375(b) (same for Secretary

of Agriculture).  The narrow authority provided in Section 315, by contrast, "is not open-ended, particularly when there is statutory language on point," and it cannot override more specific provisions elsewhere in the statute.  *N.R.D.C. v. EPA*, 749 F.3d 1055, 1063 (D.C. Cir. 2014) (construing EPA statute); *see also Bloate v. United States*, 559 U.S. 196, 207 (2010).

And so, the Secretary has no power to withhold STIP amendments, advance construction authorizations, or NEPA approvals in response to an alleged violation of 23 U.S.C. § 301—as he threatens to do throughout New York State.  None of that is remotely authorized under the FAHA. Defendants' intent to withhold NEPA approvals for projects also conflicts with the agency "action-forcing procedures" enacted by Congress.  *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979). Defendants cannot withhold approvals, because they are mandated to "perform the work necessary to complete the environmental review process."  23 C.F.R. §771.113(a).  At no time in the lengthy NEPA process does a federal agency have the discretion to withhold its participation.  *See* 23 C.F.R. § 771.111(b)(2) ("Administration must respond in writing to a project sponsor's formal project notification within 45 days."); 23 C.F.R. § 771.121(a) ("Administration will review the [Environmental Assessment]"); 23 C.F.R. § 771.123(g) ("Administration … will approve the draft [Environmental Impact Statement] for circulation"); 23 C.F.R. § 771.124(a)(5) ("Administration must indicate approval of the combined final [Environmental Impact Statement]/[Record of Decision]"); 23 C.F.R. § 771.125(c) ("Administration will indicate approval of the [Environmental Impact Statement]for an action by signing and dating the cover page").[26]

Nor can Duffy, in response to a purported violation of Section 301's tolling ban through the continued operation of a single project—congestion pricing—broadly withhold project

---

[26] Nor do Defendants have authority to instruct that all NEPA approvals be categorically denied.  *See Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 714-15 (10th Cir. 2010) (NEPA analysis "must be taken objectively and in good faith, ... and not as a subterfuge designed to rationalize a decision already made") (internal citations omitted).

approvals under Title 23.  Congress has foreclosed that means of enforcement in at least two ways.

*First*, Defendants' intent to withhold "obligations of FHWA funds" conflicts with the detailed

standards enacted by Congress to guide the Secretary in carrying out his duty to promptly authorize

the obligation of Title 23 funding.  *See* 23 U.S.C. § 106(a)(2) (Secretary "shall act" as "soon as

practicable" on submissions for obligations of funds); *id.* § 106(a)(4) (in granting submissions for

obligations, Secretary "shall be guided" by criteria in 23 U.S.C. § 109).  Indeed, it is long settled

that the Executive has no right to broadly impound funds for policy reasons.  *See State Highway*

*Comm'n v. Volpe*, 479 F.2d 1099, 1118 (8th Cir. 1973) (no discretion to withhold obligations due

to status of the economy or need to control inflation); *Louisiana ex rel. Guste v. Brinegar*, 388 F.

Supp. 1319, 1325 (D.D.C. 1975) (FAHA "does not authorize" discretionary withholding of

obligations "for non-program related reasons"); 23 U.S.C. § 101(c) ("no part of any sums

authorized to be appropriated … shall be impounded or withheld from obligation").[27]

    *Second*, the FAHA sets forth in great detail the many specific, limited ways in which

obligated funds could be withheld for specific violations of the FAHA.  Some of these remedies

affect the State's apportionment of funds from the Highway Trust Fund.  *See, e.g.*, 23 U.S.C.

§ 131(b) (for enforcement of the Highway Beautification Act, Secretary may reduce federal

funding allocations by 10%); *id.* § 158(a) (for enforcement of minimum age drinking laws,

Secretary may reduce allocations by 8%).  Others grant the Secretary the power to direct public

authorities "to discontinue collecting tolls" in circumstances not present here.  *E.g.*, *id.*

§ 129(a)(3)(C), (a)(9)(C).  Notably, the VPPP statute and Section 301 do not authorize the

Secretary to direct an end to tolling operations or otherwise seek to impose a penalty.  The fact

---

[27] The MTA, TBTA and NYCDOT incorporate by reference the additional statutory arguments advanced by Plaintiff-Intervenor NYSDOT on pages 12 to 15 of the Memorandum of Law In Support of Intervenor-Plaintiff New York State Department of Transportation's Motion for a Preliminary Injunction.

that Congress granted FHWA enforcement authority in *some* circumstances, but did not do so with respect to Section 301 or the VPPP, is a strong indication that FHWA's authority to enforce compliance in these circumstances is limited. *See, e.g.*, *Avon Nursing & Rehab. v. Becerra*, 995 F.3d 305, 311 (2d Cir. 2021) ("Where Congress includes particular language in one section of a statute but omits it in another, we presume that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (cleaned up). And it is not particularly surprising here, given that—again—the VPPP and VPPP Agreement simply do not contemplate any right of termination by Defendants. *See generally Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."). Moreover, while the scope of the enforcement measures set forth in the April 21 Letter appears to include withholding of STIP amendments that would allow for FTA funding for transit, that cannot be even arguably encompassed within a reading of Section 1.36 as a valid regulation under the FAHA.

2. *Enforcing the February 19 Letter would violate the* Pennhurst *clear statement rule*

Even if Duffy were somehow right that the VPPP did not authorize congestion pricing (which it does), and that he had authority to terminate the Program (which he does not), his attempt to enforce that determination through the wholesale withholding of federal approvals to New York to coerce termination of the Program would run into another insurmountable obstacle: the Constitution. The Spending Clause provides that Congress "shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States…." U.S. Const. art. I, § 8, cl. 1. Even where Congress seeks to condition receipt of funds, such conditions must be "unambiguous[]" and they cannot "surprise[] participating States with post acceptance or 'retroactive' conditions." *Pennhurst State Sch. &*

47

*Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981). Once a State has accepted funds pursuant to a federal spending program, the federal government cannot alter the conditions attached to those funds so significantly as to "accomplish[ ] a shift in kind" of their policy. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583-84 (2012). This "clear statement rule" applies equally to the imposition of affirmative, and as here, negative obligations on the receipt of funds. *See Barnes v. Gorman*, 536 U.S. 181, 186 n.1 (2002) (citation omitted).

There is no question that Defendants' newly announced term—complying with a completely new and unprecedented interpretation of the VPPP—was not expressed "unambiguously" and with a "clear voice" by Congress. *See Texas v. Cardona*, 743 F. Supp. 3d 824, 885 (N.D. Tex. 2024) (granting injunctive relief against Secretary of Education where new Title IX guidance conditioned funding on novel interpretation of statute). Nothing in ISTEA or any of its reauthorizations comes anywhere close to "unambiguously" prohibiting cordon pricing that finances transit programs, and as discussed *supra* at 10-12, the legislative history unambiguously indicates that Congress sought to encourage projects akin to the Program. Thus, withholding approvals for other projects on account of the Program's continued operation is an imposition of new conditions and is unconstitutional under the Spending Clause. *See West Virginia ex rel. Morrisey v. U.S. Dep't of Treasury*, 59 F.4th 1124, 1142 (11th Cir. 2023) (granting State's motion for permanent injunction where provision of American Rescue Plan prohibited states from using federal funds to directly or indirectly offset reduction in net tax revenue, finding statute lacked a clear statement from Congress authorizing the new condition).[28]

---

[28] This lack of a clear statement by Congress is exacerbated by the fact that the VPPP Agreement, again, does not contemplate a right of termination by Defendants, the FAHA's baseline rule is that funds *cannot* be withheld, and the statute sets out in great detail how and when Congress has authorized withholding—none of which apply to the VPPP.

3.     *Defendants' withholding of federal funding is unconstitutionally coercive*

When Congress or a federal agency alter funding conditions so as to coerce the State to change its behavior, they encroach on State sovereignty as guaranteed by the Tenth Amendment by "commandeering … reserved State power." *New York v. U.S. Dep't of Just.*, 951 F.3d 84, 115 (2d Cir. 2020).  As the Supreme Court recognized in *South Dakota v. Dole*, conditions on federal grants may be illegitimate if they are unrelated "to the federal interest in particular national projects or programs" or where "the financial inducement" is "so coercive as to pass the point at which pressure turns into compulsion." 483 U.S. 203, 207, 211 (1987).  Where an agency issues a "threat to a State to 'do this, or else'" it is "coercive at the moment it is uttered" particularly when considering "scale of funding it jeopardizes and the new standards of conduct the [agency] imposes." *New York v. H.H.S.*, 414 F. Supp. 3d 475, 571 (S.D.N.Y. 2019) (HHS threats to withhold all funding for noncompliance with novel "conscience regulations" violated Spending Clause and Tenth Amendment.).

Here, Defendants' threats to withhold all future project approvals and all FHWA funds run afoul of both principles.  First, there is neither a federal nor national interest in prohibiting cordon pricing or the spending of Program revenues on transit services.  In *Dole*, the Supreme Court concluded that the withholding of approximately 5% of previously allocated federal-aid highway funds was not so coercive where Congress sought to promote the national interest of a minimum drinking age.  483 U.S. at 207, 211.  Here, the Program is a project required by State law, and it imposes a toll on vehicles entering a select portion of a single borough within one metropolitan area.  If anything, ISTEA and its reauthorization statutes indicate a national interest in *reducing* congestion in certain localities and *supporting* the completion of transit projects, exactly as congestion pricing does.  *See e.g.*, 23 U.S.C. § 129(d) ("Congestion Mitigation Program"); *id.* § 149 ("Congestion mitigation and air quality improvement program"); ISTEA § 2 (describing

policy of "develop[ing] a National Intermodal Transportation System that is economically efficient and environmentally sound," which "shall include significant improvements in public transportation…."). The only purported interest Duffy invokes is in avoiding additional costs to drivers on a fraction of New York's federal-aid highways paid for with taxpayer dollars, but that is an economic interest of particular motorists accessing the CBD, not a federal or national interest. Moreover, any underlying federal policy of avoiding tolls on federal-aid highways as expressed in Section 301 has been overtaken by ISTEA's countervailing policy of flexibility and promotion of intermodal transportation systems and congestion reduction. Defendants' interpretation of federal law thus *undermines* real federal interests at stake—reducing congestion, improving air quality, and facilitating intermodal transportation—thereby providing an independent basis to reject his interpretation on Tenth Amendment grounds. *See Texas*, 743 F. Supp. 3d at 886 (rejecting updated Title IX funding conditions in part, because they undermined national interest expressed in statute). Second, tying receipt of future project approvals, and potentially all FHWA and even FTA funds (required by formula or otherwise) to topping congestion pricing is unconstitutionally coercive. In *Sebelius*, the Supreme Court rejected conditions on Medicaid funds—where the federal government generally contributed 50 to 83 percent of total funds—because those conditions were an unlawful "means of pressuring the States to accept policy changes." 567 U.S. at 580. The federal funding at issue here is roughly identical to that at issue in *Sebelius.* By way of illustration, the 2020-2024 MTA Capital Plan, financed in part by the Program's revenues, assumes a 50/50 cost split between federal and local sources for critical transit projects such as the Second Avenue Subway.[29] Total federal funding for the 2020-2024 Capital Plan is estimated to be $13.1 billion,

---

[29] MTA, MTA Capital Program 2020–2024 (Sept. 25, 2019), https://files.mta.info/s3fs-public/2019-09/MTA%202020-2024%20Capital%20Program%20-%20Executive%20Summary.pdf.

out of a total expected cost of $54.8 billion.[30]   That $13.1 billion represents 23% of all of the MTA's funding for capital projects, much greater than the amount at issue in *Dole*.   *See* 483 U.S. at 211.   The total $54.8 billion cost of the Capital Plan also includes $15 billion in Program revenues that are dedicated to transit improvements in the New York City metropolitan region, which is of course essential to the State's economy.   As in *Sebelius*, where roughly half of all Medicaid funds were at issue, here a directive that the "the Secretary ... may declare that 'further payments will not be made to the State,'" unless the Program is ceased (in violation of the TMA), constitutes "a gun to the head" and is invalid under the Tenth Amendment.   567 U.S. at 581.   The coercive force of these measures is further multiplied by Defendants' stated plan to also withhold federal approvals and funding from other parts of the State.

## II.   The MTA and TBTA have shown irreparable harm

A party can establish irreparable harm by demonstrating that it will suffer "an actual and imminent" injury that cannot be remedied "if a court waits until the end of trial to resolve the harm."   *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007).   That standard is readily met here, given the remarkably broad scope of the coercive threats to halt reviews needed for all projects and funding within FHWA's purview State wide, including billions of dollars' worth of funding for transit projects currently proposed for addition to New York's STIP, unless the Program is halted.   "Damocles's sword does not have to actually fall ... before the court will issue an injunction."   *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

Defendants threaten to pursue wide range of illegal retaliatory actions, including withholding any further approvals of STIP amendments concerning NYMTC TIP modifications and prohibiting any further obligations of FHWA funds.   *See* April 21 Ltr. at 2.   Such threats seek

---

[30] MTA, 2024–2029 CAPITAL PLAN 34 (Sept. 25, 2024), https://www.mta.info/document/151266.

to force on the Project Sponsors a Hobson's choice: either forgo all funding and projects requiring FHWA actions—which include billions of dollars' worth of funding for MTA projects provided in a recent proposed STIP amendment and projects for which the MTA receives FHWA funding—or abruptly halt the Program, forfeiting a secure and recurring source of revenue supporting the issuance of bonds to fund capital improvements critical to the reliability, accessibility, expansion, and safety of the MTA's regional public transit system, as well as the additional public benefits from reduced congestion and vehicular emissions. Either option would have severe and irreparable harmful consequences.

Numerous courts have found that the loss of expected federal approvals or funding, including where the termination has not yet gone into effect or where the federal funds were eventually distributed, is sufficient to find irreparable harm due to the budgetary and planning uncertainties it may cause, and by virtue of the deprivation of constitutional rights under the Spending Clause. *See City and County of San Francisco v. Trump*, --- F. Supp. 3d ---, 2025 WL 1186310, at *2 (N.D. Cal. Apr. 24, 2025) (where President directed federal agencies to withhold federal funds from so-called "sanctuary jurisdictions," plaintiffs' irreparable injury was "in the form of a budgetary uncertainty" and "undermining trust between [plaintiffs] and the communities they serve" as well as "deprivation of constitutional rights"); *New York v. Trump*, 2025 WL 715621, at *13, 15 (D.R.I. Mar. 6, 2025) (granting preliminary injunction where OMB froze broad categories of federal grant money allocated to various states, including reimbursement of spending for critical transportation infrastructure, due to "chaos and uncertainty" initial freeze caused, and noting that "States may have to suspend, delay or cancel projects"); *Nat'l Council of Nonprofits v. O.M.B.*, 2025 WL 597959, at *18 (D.D.C. Feb. 25, 2025) (recognizing irreparable harm where "a pause on federal funding w[ould] 'threaten[] the very existence of [non-profit organizations']

business") (citations omitted); *Planned Parenthood of Greater Wash. & N. Idaho v. H.H.S.*, 328 F. Supp. 3d 1133, 1139 (E.D. Wash. 2018) (recognizing irreparable harm based on organization's claims that challenged action would cause them to "lay off employees, reduce services, ... cancel established programs, and lose relationships and goodwill with volunteers and community partners") (citations and quotation marks omitted); *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017) (uncertainty prompted by federal executive order threatening to withhold funds from "sanctuary jurisdictions" caused irreparable harm by "interfer[ing] with the Counties' ability to budget, plan for the future, and properly serve their residents" and by requiring them to take "mitigating steps," including placing funds in reserve or making cuts to other services); *United States v. North Carolina*, 192 F. Supp. 3d 620, 630 n.2 (M.D.N.C. 2016) (holding that although it was "not immediately clear … how much funding [plaintiffs] would lose during the pendency of [the] case" or "precise timing of specific grants," court was "satisfied that the loss of funding … [would] likely be severe enough to constitute irreparable harm" given the "nature of the services" at risk, including services to assist victims of sexual assault).

Indeed, Defendants' unconstitutional threats, intended to coerce the State of New York to abandon the Program, have already caused an independent irreparable injury. Limits on the Spending Clause coupled with the Tenth Amendment protect "the status of the States as independent sovereigns in our federal system." *Sebelius*, 567 U.S. at 577. Here, Defendants seek to impose retroactive conditions on the receipt of federal funds to hobble programs meant to further New York's sovereign interests, irreparably harming State sovereignty. *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1367 (S.D. Ga. 2018) ("[l]oss of sovereignty is an irreparable harm"); *see Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 17 (D.D.C. 2014) (recognizing loss of State sovereignty as an irreparable harm). And as discussed *supra* at 49-50, an agency's threat to take compliance

actions is "coercive at the moment it is uttered." *New York*, 414 F. Supp. 3d at 571. It is for that reason courts recognize that forcing compliance with an unlawful agency demand "almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (emphasis in original) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and in the judgment)).

What's more, Defendant's deprivation of Plaintiffs' property interest in the VPPP Agreement in violation of due process is itself the type of constitutional harm that is "ordinarily" irreparable. *A.H. by & through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021) (constitutional deprivation that results in non-compensable damages ordinarily warrants a finding of irreparable harm). Here, Plaintiffs have demonstrated that they were deprived of procedural due process, as their interests in the VPPP agreement were "terminated" without any due process despite the post-decisional and disingenuous offer of an illusory opportunity to challenge a decision that was already announced and which Defendants have clearly stated they are not reconsidering. *See* SAC ¶¶ 22-37 and ¶¶ 202-04. That termination will result in injuries not compensable through monetary damages, and thus "no further showing of irreparable injury is necessary." *See Broecker v. N.Y.C. Dep't of Educ.*, 585 F. Supp. 3d 299, 310 (E.D.N.Y. 2022), *aff'd*, 2023 WL 8888588 (2d Cir. Dec. 26, 2023) (allegation of deprivation of due process rights constituted irreparable injury).

These common-sense principles are illustrated here when one considers the sheer breadth of Defendants' threats. The "compliance measures" threatened by the April 21 letter are extensive and specific, though the full extent of some are indeterminate, which only adds to their intended coercive effect. For the MTA, which receives most federal funding through FTA under Title 49, the primary source of budgetary uncertainty and, indeed, imminent harm (separate from the imminent harm that would arise from halting the Program) comes via Defendants' specific threat

to withhold approvals of STIP amendments concerning NYMTC TIP modifications. The threatened withholding of all STIP approvals threatens billions of dollars in annual congressionally appropriated funding the MTA receives from FTA. Willens Decl. ¶¶ 230-25. This threat already presents imminent harm: NYSDOT recently submitted a proposed STIP amendment concerning a $2.2 billion package of projects for maintenance and railroad track work that is at risk. *Id.* ¶ 25.

In addition to threatening to withhold approvals of STIP amendments, Defendants have threatened to stop obligating all FHWA-administered funds. The MTA regularly receives FHWA funding through the Congestion Mitigation and Air Quality ("CMAQ") section of Title 23, 23 U.S.C. § 149, which is intended to help meet the requirements of the federal Clean Air Act ("CAA") through transportation measures. *Id.* ¶¶ 26-29. The MTA uses the majority of its CMAQ funding for projects under the Americans with Disabilities Act ("ADA"). *Id.* ¶ 27. These projects contribute to reductions in vehicle miles traveled ("VMT") and associated emissions, improving air quality, and reducing regional congestion. *Id.* More specifically, the installation of ADA-compliant elevators and equipment at previously non-accessible stations increases subway ridership and reduces reliance on vehicular modes of transportation such as taxis, for-hire-vehicles, private vehicles, and paratransit services like Access-A-Ride. *Id.* Consequently, increased use of public transit reduces VMT and resultant emissions as well as congestion. *Id.*

The MTA's extensive bus operations will also be harmed, as they operate on roadways throughout the City that are maintained by NYCDOT in part using FHWA funding. *Id.* ¶ 30. The MTA and New York City Transit, an operating agency of the MTA, oversee a fleet of approximately 5,800 buses that service 238 bus routes, 20 Select Bus Service routes, and 75 express bus routes throughout the five boroughs of New York City. *Id.* ¶ 21. Forty-three of these lines operate in Manhattan. *Id.* In 2023 alone, New York City buses served approximately 427

million riders and traveled a collective 152 million miles. *Id.* Without sufficient FHWA funds to maintain the roadways on which MTA buses are driven, the MTA's operations will necessarily suffer. If the condition of these roadways deteriorates due to funding constraints, it will inevitably affect the ability of MTA buses to meet their schedules, and likely contribute to deterioration of the buses themselves, increasing expenses for the MTA to maintain or replace them. *Id.* ¶ 30.

The potential loss of all federal funding from the CMAQ program, but more importantly for all future projects seeking federal funding through STIP amendments, and even the cutting off of funding to maintain the streets on which MTA buses operate, would each undeniably and irreparably harm the MTA's ability to maintain an efficient transportation system that serves millions of people every day and helps to power the economy of the New York metropolitan area. Stymying the MTA's ability to perform its obligations to the public to provide safe, reliable and accessible transportation will undermine its credibility with the public. *City of Los Angeles v. Sessions*, 2018 WL 6071072, at *3 (C.D. Cal. Sept. 13, 2018) (forcing a city to contravene "longstanding policy" priorities and consequently "imped[e] … community relationships" and "diminish[] community trust" constituted irreparable harm).

The alternative—choosing to bend to the coercive intent of the illegal termination of the VPPP Agreement and halt the Program pending resolution of this action—would similarly have dire and irreparable consequences. Irreparable harm exists where, in reliance on the federal government's approval of a program, a State makes "substantial resource investments in planning for the implementation of [that] program," only to have that approval rescinded and the anticipated benefits of those investments lost. *Texas v. Brooks-LaSure*, 2021 WL 5154219, at *12 (E.D. Tex. Aug. 20, 2021) (finding irreparable harm where, in reliance on Centers for Medicare and Medicaid Services' final approval for Texas to implement demonstration program that diverged from default

Social Security Act requirements, Texas "made substantial resource investments in planning for implementation of that program").  Here, TBTA expended approximately $500 million in public funds to prepare for the Program's design, construction, implementation operation, and maintenance, as well as on an information campaign to inform the public of the January 5, 2025 implementation date.  C. de Cerreño Decl. ¶ 30.  "Few if any of these costs would have been incurred had USDOT/FHWA taken the position at the beginning of the long and torturous 5-year process it now takes—that the Program is not lawful under the VPPP because it utilizes cordon pricing to raise money for mass transit."  *Id.* ¶ 31.  These costs will continue to accrue even if TBTA is forced to cease tolling during the pendency of this lawsuit.  According to TBTA's Chief Operating Officer, TBTA will continue to incur substantial costs of $12 million in additional expenditures each month related to the operation and maintenance of the tolling system even if tolls are not collected.  *Id.* ¶ 33.

At the same time, if the Program stops, the MTA and TBTA will not see the expected benefits of their investment, including congestion reduction with its attendant benefits and revenue generation, and will instead lose money maintaining a temporarily defunct tolling system.  The MTA would stand to lose average monthly revenues of $50 million or more, which would delay critical capital improvements to public transit, including adding accessibility to numerous subway stations consistent with the ADA, improving outdated subway signaling, enhancing safety and customer service, and extending public transit to under-served areas—not to mention delay relief from congestion in the CBD, alongside its concomitant economic and environmental costs.  *Id.* ¶¶ 34-35.  The lost revenue could never be recouped, even if the Program is restarted, as those months of tolling would be lost forever.  *Id.* ¶ 34.  These expenses and loss of revenue would amount to a preventable loss of public resources, which the public has an interest in avoiding.  *North Carolina*,

57

192 F. Supp. 3d at 629 (finding irreparable harm where unavailability of funds was "likely to have an immediate impact on [the state's] ability to provide critical resources to the public, causing damage that would persist regardless of whether funding [was] subsequently reinstated").

If federal funding typically received by the MTA becomes unavailable until the Court rules on the legality of FHWA's purported rescission of the VPPP Agreement, the "MTA would be forced to juggle priorities and defer, if not eliminate, many important projects (including accessibility projects) due to the lack of funding." Willens Decl. ¶ 31. "The same would be true if the Project Sponsors capitulated and stopped tolling entries to the CBD, as MTA would have to divert other capital funds to repay the almost $1.4 billion in congestion pricing-related debt that would otherwise be used for important projects and could not issue bonds or finance projects that are already planned." *Id*. "Some projects would undoubtedly not proceed at all or would be materially delayed, contributing to deterioration" of transit service "and delay of improvements to access." *Id*. The consequence of this "budgetary uncertainty" would irreparably harm the public transit system, and thus the traveling public. *See City and County of San Francisco*, 2025 WL 1186310, at *2; *New York*, 2025 WL 715621, at *15. The loss of public resources, and revocation of revenues used to secure bonds issued by Defendant would similarly damage Plaintiffs' reputation and goodwill, an injury "not easily measured or fully compensable in damages." *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) (loss of goodwill and reputation is a "kind of harm is often held to be irreparable").

In addition, NYCDOT faces a host of potential harms that could seriously damage its ability to undertake and complete projects, including projects that are critical for the safety of those who work, live, and travel in the City. Without advance construction authorizations, the local project sponsor must set aside the full amount of the project's costs without hope of

reimbursement, reducing the agency's flexibility and ability to progress transportation programs. *See* Carry Decl. ¶ 8. Similarly, FHWA's refusal to approve STIP amendments would block any new transportation projects from "entering the federal fund eligibility pipeline." *Id.* ¶ 10. And Defendants' threatened actions could also stop current NYCDOT projects in their tracks. Specifically, withholding NEPA approvals "would effectively halt projects in the pipeline where federal funding or approvals are necessary in order to undertake the anticipated work." *Id.* ¶ 9. In Manhattan, there are multiple ongoing or planned projects worth hundreds of millions of dollars that face imminent threat, including projects focused on improving roads, enhancing pedestrian safety (including at least one project focused on safety around schools), and making utility and infrastructure upgrades. *Id.* ¶¶ 13-15. And if FHWA expands its threatened actions beyond Manhattan to the rest of New York City, NYCDOT projects with a combined cost of over $3.1 billion will be at risk. *Id.* ¶¶ 16-18. Many of these projects are critical to ensuring the efficient and safe movement of people and goods throughout the City. The statement in the April 21 Letter that FHWA may exempt "Safety Projects" provides little solace. Because FHWA will determine whether a project qualifies; this uncertainty will seriously harm Plaintiffs' and NYCDOT's ability to plan and budget for the future. Willens Decl. ¶ 24; Carry Decl. ¶ 11.

Finally, and fundamentally, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Our Wicked Lady LLC v. Cuomo*, 2021 WL 915033, at *7 (S.D.N.Y. Mar. 9, 2021) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)); *see also Washington v. Trump*, 2025 WL 509617, at *1 (W.D. Wash. Feb. 16, 2025) ("The rule of law is secured by a strong public interest that the laws 'enacted by their representatives are not imperiled by executive fiat.'") (quoting *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018)). That, of course,

is exactly what is happening here. The federal government is trying to prevent New York from maintaining a congestion pricing program that is mandated by State law, frustrating the intentions of the State's legislative representatives and the public they serve. By forcing the MTA and TBTA "to make an unreasonable choice, [FHWA's order] results in a constitutional injury sufficient to establish … irreparable harm." *County of Santa Clara*, 250 F. Supp. 3d at 538 (where plaintiffs demonstrated that executive order was "unconstitutionally coercive" in violation of Tenth and Fifth Amendment, they adequately demonstrated "a constitutional injury sufficient to establish a likelihood of irreparable harm") (citing *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).

## III.    A preliminary injunction would serve the public interest

"Under the last injunction factor, courts must 'balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,' as well as 'the public consequences in employing the extraordinary remedy of injunction.'" *Chan*, 2024 WL 5199945, at *48 (quoting *Yang v. Kosinski*, 960 F.3d 119, 135-36 (2d Cir. 2020)). As noted, these factors "merge" where the opposing party is the federal government. *New York*, 969 F.3d at 59; *Nken*, 556 U.S. at 435. These two factors weigh heavily in favor of enjoining USDOT's unlawful withholding of FHWA approvals, which will in all likelihood force the MTA to delay or cancel critical projects designed to improve public transit and make subway facilities accessible to people with disabilities, and hinder the provision of acceptable bus service, along with a host of irreparable harm to motorists on State highways as described further in the brief of NYSDOT. Moreover, Defendants' aim of stopping the Program through retaliatory threats would result in the increase of congestion and vehicular emissions and a loss of numerous other Program benefits.

First and foremost, there is "generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal

laws that govern their existence and operations." *Id*. (internal quotation marks omitted); *Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 269 (S.D.N.Y. 2020) ("[T]here is no public interest in allowing Defendants to proceed with unlawful, arbitrary, and capricious executive or agency actions that exceed their statutory authority."); *New York v. D.H.S.*, 408 F. Supp. 3d 334, 351 (S.D.N.Y. 2019), *aff'd as modified*, 969 F.3d 42 (2d Cir. 2020). Defendants acted unlawfully in purporting to rescind the VPPP Agreement and then compounded that unlawful act by threatening to withhold federal approvals to coerce the State, the MTA and TBTA, and NYCDOT into obeying the ultra vires April 21 Duffy Letter. *See supra* at 21-51. Here, the likelihood of success "is a strong indicator that a preliminary injunction would serve the public interest." *League of Women Voters*, 838 F.3d at 12; *see also Saget v. Trump*, 375 F. Supp. 3d 280, 377 (E.D.N.Y. 2019).

Moreover, Defendants' threat to withhold FHWA approvals is plainly not in the public interest. As explained above, the MTA uses funding requiring FHWA approvals for STIP amendments for billions of dollars in federally funded work, as well as FHWA-administered funding to meet the requirements of the CAA and ADA, including by making subway stations more accessible. Unsurprisingly, courts in similar circumstances have held that withholding government funding earmarked for critical public projects does not serve the public interest. *New York*, 2025 WL 715621, at *15 (evidence that withheld federal funds would "endanger the States' ability to provide vital services," including affecting "critical transportation infrastructure" projects, "overwhelmingly show[ed] that the balance of equities weighs heavily in favor of granting" preliminary injunction); *Nat'l Council of Nonprofits*, 2025 WL 597959, at *19 (plaintiffs "more than met their burden" when freeze in federal spending "placed critical programs for children, the elderly, and everyone in between in serious jeopardy"); *County of Santa Clara*, 250

F. Supp. 3d at 539 (threat of withholding federal funds created "significant budget uncertainty" and "coercive effects" that weighed in favor of preliminary injunction).

Halting the Program in response to such threats also "would impair the public interest in lessening both congestion and the extreme financial costs it imposes." *Chan*, 2024 WL 5199945, at *49. Indeed, evidence from the Program's initial months of implementation shows that it is working. "Traffic in the CBD has decreased substantially, with approximately 5.8 million fewer vehicles entering the district in January through March 2025 than would be expected based on data for prior years." C. de Cerreño Decl. ¶ 25(a). This represents an 8% to 13% reduction from a typical January, February, and March. *Id*. New data indicates that traffic in the CBD was down by 12% in April. *Id*. This reduction in congestion has a logical corollary benefit of less vehicular emission and reduced time for emergency vehicle trips and for buses.

Indeed, travel times have also improved. In January, crossing times were 12% faster at the Lincoln Tunnel and 45% faster at the Holland Tunnel; trip times from Brooklyn and Queens fell between 10-30% in January compared to January 2024. *Id*. ¶ 25(c). A recent independent study found a 15% improvement in CBD traffic speeds. *Id*. ¶ 25(h). Trips are also more reliable. Traffic through the Holland Tunnel used to be delayed more than 3 minutes on 54% of weekdays—that has fallen now to 12%. *Id*. ¶ 25(g). "On the Williamsburg Bridge, delays used to be greater than 3 minutes 65% of the time; the Program has reduced that to 2%." *Id*.

Public services have also improved. "[B]us routes have seen significant decreases in the time needed to complete their routes." *Id*. ¶ 25(i). "[T]here are 23% fewer customer trips on express buses that are delayed 10 minutes or more," and "[e]xpress buses are traveling 21% faster on the portion of their routes leading into and within the CBD." *Id*. In addition, "[f]ewer vehicles utilize the nine MTA bridges and tunnels, with levels dropping 2.4% from March of 2024 to March

of 2025." *Id*. ¶ 25(f).  "The largest reductions are at the Hugh L. Carey and Queens-Midtown Tunnels, which lead directly into the [CBD]," and "[t]ruck traffic traveling through these tunnels dropped 14% this year compared to the same period in 2024."  *Id*.

The loss of substantial public benefits—either critical federal funding or the substantial benefits of the Program—weighs heavily in favor of granting preliminary injunctive relief.  *See Chan*, 2024 WL 5199945, at *48 (noting the Program was "predicted to reduce congestion thereby improving regional air quality, providing safety benefits, improving worker productivity, reducing noise pollution, among other benefits"); *see also Brooks-LaSure*, 2021 WL 5154219, at *12 (granting preliminary injunction to block federal agency's rescission of previously granted approval where rescission threatened to "decrease . . . the number of healthcare providers and the quality of care"); *cf. Cascadia Wildlands v. Thrailkill*, 49 F. Supp. 3d 774, 778 (D. Or. 2014), *aff'd*, 806 F.3d 1234 (9th Cir. 2015) ("public's interest in the economic and environmental benefits of the project including providing jobs and retaining infrastructure for them" weighed against granting preliminary injunction to block forest project).

As this Court previously recognized, there is a compelling public interest in avoiding the unnecessary costs that TBTA would incur if it were required to pay continued operating costs during a pause to avoid yet additional costs of stopping and starting the Program.  *Chan*, 2024 WL 5199945, at *49.  Indeed, the public has a clear interest in avoiding the loss of public funds and the substantial benefits those funds would achieve.  *See, e.g.*, *Louisiana v. Biden*, 622 F. Supp. 3d 267, 297 (W.D. La. 2022) (public interest favored permanently enjoining pause on new oil and gas leases on federal lands where "[l]ocal government funding, jobs for Plaintiff States' workers, and funds for the restoration of Louisiana's Coastline are at stake"); *Sierra Forest Legacy v. Sherman*,

951 F. Supp. 2d 1100, 1115 (E.D. Cal. 2013) ("economic health of communities and industries ... is an important element of the public interest that must be considered in balancing the equities.").

Stopping the Program would also mean a return to the crippling congestion that has long plagued Manhattan and resulted in extraordinary costs to the metropolitan region's public. "Numerous studies have established that the congestion addressed by the [Program] itself, if unchecked …, will also continue to impose tremendous costs on individuals and businesses throughout the New York metropolitan region." *Chan*, 2024 WL 5199945, at *49. Congestion "has a $20 billion annual cost, including more than $9 billion in travel-time costs and nearly $6 billion in industry revenue losses." *Id*. (citation omitted). This includes "$1,900 annually for Manhattan Workers and $767 per worker for the New York City metropolitan region." *Id*. Yet Defendants would force the public to return to the days of costly and polluting congestion or accept devastating losses in federal funding. Clearly, such a choice is not in the public interest.

In contrast, Defendants can demonstrate no public interest in a cessation of tolling while this action is litigated. Indeed, they have demonstrated that stopping the tolling is not an urgent matter, by extending the "deadline" to do so twice. The pretextual macro-economic concerns raised by Duffy and President Trump—which FHWA's own NEPA analysis predicted would *not* occur—have indeed failed to materialize. In fact, the opposite has happened. "Pedestrian traffic in Manhattan increased 4.6% between January 5 (the day that toll collection began) and January 31 compared to the same period in 2024." C. de Cerreño Decl. ¶ 26(a). The gross revenue of Broadway shows during January–March 2025 was 25% higher than the same period last year, and attendance was up 20% for January–March of 2025 as compared to the same period last year. *Id*. ¶ 26(c). Hotel occupancy in January was up 3% year over year, and "[r]etail sales were up 1.5% in January and February—on track to be $900 million higher this year than last." *Id*. ¶ 26(b), (d).

"Leasing in the CBD was up 11% this January versus the fourth quarter of 2024, and up 80% since the first quarter of last year." *Id*. ¶ 26(f). There has been less diversion of traffic to outer boroughs (including environmental justice communities) than initially feared. *Id*. ¶ 25(m). Indeed, a recent study published by the National Bureau of Economic Research, with lead authors from Yale and Stanford Universities, confirmed that the Program has benefited areas outside of the CBD as well, with highways and major roadways also seeing sustained speed improvements. *Id*. ¶ 25(m).

The only "public" interest Defendants can cite to support the cessation of tolling is either avoiding the cost of the toll to individual drivers or "[]respect" for the federal government. *See* Trice Decl., Ex. 7. The first is highly ironic given FHWA's previous determination that the Program's forecast (and now demonstrated) congestion reduction effect outweighed individual drivers' interest in a lower cost journey to the CBD, and as noted the Program includes discounted tolls for low-income drivers. This Court has also so found, in denying all of the previous motions to block the Program's implementation. *Chan*, 2024 WL 5199945, at *48-49. As for the second, we are aware of no authority that supports a public interest in permitting the federal Executive to demand compliance from State and local agencies, even as litigation remains pending. Under our system of dual sovereignty, it is the province of the Judiciary, and not the Executive, to police the respective powers and obligations of the federal government.

## CONCLUSION

For the reasons provided herein, the Court should grant Plaintiffs' motion for a preliminary injunction.

Dated: May 5, 2025
New York, New York

Respectfully submitted,

*/s/ Roberta A. Kaplan*
Roberta A. Kaplan
D. Brandon Trice
Maximilian T. Crema
KAPLAN MARTIN LLP
1133 Avenue of the Americas | Suite 1500
New York, NY 10036
Tel.: (212) 316-9500
rkaplan@kaplanmartin.com
btrice@kaplanmartin.com
mcrema@kaplanmartin.com

*/s/ Mark A. Chertok*
Mark A. Chertok
Elizabeth Knauer
Amy Lynn Cassidy
John F. Nelson
Phillip Dane Warren
SIVE, PAGET & RIESEL, P.C.
560 Lexington Avenue, 15th Floor
New York, NY 10022
Tel.: (212) 421-2150
mchertok@sprlaw.com
eknauer@sprlaw.com
acassidy@sprlaw.com
jnelson@sprlaw.com
dwarren@sprlaw.com

*Attorneys for Plaintiffs the Metropolitan Transportation Authority and Triborough Bridge and Tunnel Authority*

MURIEL GOODE-TRUFANT
Corporation Counsel of the City of New York
*/s/ Nathan Taylor*
Nathan Taylor
Christian C. Harned
New York City Law Department
100 Church Street
New York, NY 10007
Tel.: (212) 356-2315
ntaylor@law.nyc.gov
chharned@law.nyc.gov

*Attorneys for Intervenor-Plaintiff New York
City Department of Transportation*

# DECLARATION OF KEVIN WILLENS
Filed 05/05/25
Metro. Transp. Auth. v. Duffy, No. 25 Civ. 1413 (S.D.N.Y.)
(LJL)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

METROPOLITAN TRANSPORTATION AUTHORITY and TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY,

*Plaintiffs,*

and

NEW YORK STATE DEPARTMENT OF TRANSPORTATION, RIDERS ALLIANCE, SIERRA CLUB, and NEW YORK CITY DEPARTMENT OF TRANSPORTATION,

*Intervenor-Plaintiffs,*

v.

SEAN DUFFY, in his official capacity as Secretary of the United States Department of Transportation, GLORIA M. SHEPHERD, in her official capacity as Executive Director of the Federal Highway Administration, UNITED STATES DEPARTMENT OF TRANSPORTATION, and FEDERAL HIGHWAY ADMINISTRATION,

*Defendants.*

Case No. 25 Civ. 1413 (LJL)

## DECLARATION OF KEVIN WILLENS

I, Kevin Willens, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am the Chief Financial Officer ("CFO") of the Metropolitan Transportation Authority (the "MTA"), a position I have held since February 2022.  I have 40 years of experience in public finance. Prior to joining the MTA, I served for 10 years as Co-head of US Public Finance at Goldman Sachs. I have provided investment banking expertise to the MTA for more than 30

1

years, including serving as the MTA's financial advisor for 10 years.

2.     In my capacity as CFO of MTA, I advise the Board of MTA and the Board of its affiliate, Triborough Bridge and Tunnel Authority ("TBTA"), with respect to the use of revenues derived from the Central Business District ("CBD") Tolling Program (the "CBD Tolling Program" or "Program") to finance MTA capital projects.  I also have responsibility for overseeing the securing of billions of dollars per year in federal funding for certain MTA projects.

3.     Every year, consistent with historic practice, the MTA and TBTA issue bonds to raise money to pay for MTA's capital projects.  Interest and a portion of the principal is paid in future years from the revenue pledged to investors until the bonds are fully paid off, which is usually over a 30-to-40-year period, roughly matching the expected useful life of the projects financed by the bonds.  This approach to funding MTA's capital projects is analogous to an individual financing a home purchase with a mortgage and paying the bank over 30 years using the individual's income.

4.     The Traffic Mobility Act ("TMA") enacted by the New York State legislature requires TBTA to implement the CBD Tolling Program in a manner that achieves a minimum $15 billion of funding for the 2020-2024 MTA Capital Program ("Capital Program").  Debt to be paid from CBD Tolling Program revenue has been and will continue to be issued over the next several years to pay for the $15 billion in project expenditures, and then principal and interest of the congestion pricing bonds will be paid from toll revenue over an approximately 30-year period.

5.     Issuing long-term bonds that will be repaid with toll revenues over time has always been a necessary component of the CBD Tolling Program to raise the $15 billion needed for the Capital Program over the nearer term, rather than only funding projects as the revenues actually accrue.  I am aware that on April 24, 2019, shortly after the TMA was enacted, the

Federal Highway Administration ("FHWA"), Federal Transit Authority ("FTA"), and United States Department of Transportation ("USDOT") representatives met with representatives from the New York City Department of Transportation ("NYCDOT"), MTA, TBTA, the New York State Department of Transportation ("NYSDOT"), and the New York Governor's Office. It is my understanding that the purpose of the meeting was to provide FHWA with more information regarding the Program, including that toll revenue would be used in part to secure bonds and repay investors over time with toll revenues. *See* Declaration of Allison L. C. de Cerreño ("C. de Cerreño Decl."), Exhibit A.

6.      In March 2024, the TBTA Board approved a specific toll rate structure for the Program, which was studied in a reevaluation document approved by FHWA in June 2024. During the preparation of the reevaluation document, I consulted with FHWA, during which I explained my professional opinion that based on current economic factors, such as interest rates, the adopted toll structure could generate sufficient funding through the issuance of long-term bonds to meet the TMA requirement. My opinion was grounded in the standard practice for public infrastructure project finance used by the MTA in issuing long-term bonds for capital projects, with which FHWA has familiarity in its role providing funding for federal shares of large infrastructure projects otherwise funded by states.

7.      In November 2024, the TBTA Board was presented with and voted to approve a plan to phase in the March 2024 adopted toll structure. I evaluated that proposal for its ability to accomplish the TMA's funding requirement, and my opinion was reflected in a second reevaluation document. During the preparation of the second reevaluation, I determined that to account for the phased-in approach, which would generate less revenue in the first six years, MTA and TBTA could issue the required amount of long-term bonds over a longer period of

years. Although this approach would take longer, it would nonetheless satisfy the Capital Program funding obligation imposed by the TMA and allow the MTA to complete the projects identified in the Capital Program. FHWA approved the second reevaluation in November 2024.

8. FHWA confirmed that it understood the MTA financing plan was reliant on 30-year bonds in court filings. *See* Manhattan Central Business District Tolling Program Supplemental Memorandum at 20–22, *New Jersey v. U.S Dep't of Trans. et al.*, 23-cv-3885 (Jan. 17, 2025), Dkt. 218-1 (confirming that declaration signed by me on January 2, 2025 explaining how MTA and TBTA planned to issue long-term bonds to be repaid by Program revenue "reflects FHWA's contemporaneous understanding of the information conveyed by the Project Sponsors before FHWA's issuance of Re-Evaluation #2"); *see also* Reply Memorandum in Support of the Federal Defendants' Cross-Motion for Summary Judgment at 4, *Chan et al. v. U.S. Dep't of Trans. et al.*, 23-cv-10365 (Dec. 18, 2024), Dkt. 160.

9. The MTA's plan to leverage CBD Tolling Program revenues through bond issuance was also a subject of discussions between FHWA and the Project Sponsors, TBTA, NYSDOT, and NYCDOT, in which I participated, to negotiate the terms of the binding agreement ultimately executed on November 21, 2024, authorizing the CBD Tolling Program under the Value Pricing Program (the "VPPP Agreement"). During those discussions, I and other TBTA representatives consistently explained to FHWA that it was critical that potential investors would be able to rely on the VPPP Agreement's durability in investing in 30-year bonds secured by Program revenues.

10. Given that the financing of $15 billion in 2020-2024 Capital Program projects is dependent on attracting investors to purchase long-term bonds secured with Program revenue, TBTA could not have agreed to sign the VPPP Agreement if it authorized FHWA to unilaterally

terminate the agreement. Such a provision would make it impossible to find sufficient financing because it would allow FHWA to cut off the means for investors to be paid principal and interest due—through revenues generated by the Program over the long term.

11.     The necessity for lasting tolling authority is clear from simple math. Based on the forecast revenue generation from the Program as reflected in the November 2024 reevaluation, the Program will generate approximately $500 million annually for the first three years, $700 million for the second three years, and $900 million thereafter. Even if the MTA issued interest-free bonds (which of course no investor would buy), it would take over 18 years to repay them. Obviously, with interest included, it will take more time, which is why our plan is to issue several rounds of 30-year bonds. Essentially, it would be impossible to achieve the stated goal of funding $15 billion in capital projects from the Program without the VPPP Agreement remaining in place for a minimum of 18 years, and the financing plan realistically requires the agreement to be in place for 30 years or more.

12.     The MTA and TBTA have relied on the durability of the VPPP Agreement in incurring debt already.  To date, TBTA has issued $1.378 billion in short-term debt that is supported by revenues generated by the Program and will be refinanced with bonds secured by CBD Tolling Program revenues.

13.     More specifically, TBTA issued a $192.8 million note that must be repaid in November 2025 and a $186 million note that must be repaid in December 2025. The total remaining principal and interest payments due on these notes is $397.2 million, which TBTA intends to pay with either CBD Tolling Program revenue or proceeds from long-term CBD Tolling Program bonds secured by and payable from such revenues.

14.     TBTA issued an additional $500 million in short-term notes to fund a portion of

the Capital Program, which must be repaid in February 2028. The total remaining principal and interest payments due on these notes is $574.6 million, which TBTA intends to pay with either CBD Tolling Program revenue or proceeds from long-term CBD Tolling Program bonds secured by and payable from such revenues.

15.     On May 2, 2025, TBTA closed a $500 million loan secured by CBD Tolling Program revenues. This loan is secured by CBD Tolling Program revenue, which loan has to be repaid by May 1, 2026. The total remaining principal and interest payments will be approximately $520 million, which MTA intends to pay with either CBD Tolling Program revenue or proceeds from long-term CBD Tolling Program bonds secured by and payable from such revenues.

16.     If tolling under the CBD Tolling Program does not cease by May 21, 2025, FHWA has threatened several actions, including to withhold approval of any Statewide Transportation Improvement Program ("STIP") amendments concerning New York Metropolitan Transportation Council ("NYMTC") Transportation Improvement Program ("TIP") modifications, which are necessary to obtain federal funding under Title 23 (highways) and Title 49 (transit) of Chapter 53 of the U.S. Code.  Another threatened action is to prohibit further obligations of FHWA funds for projects within New York City.  These threats were articulated in a letter dated April 21, 2025, from the Secretary of Transportation to Governor Hochul and the Project Sponsors.

17.     This presents the Project Sponsors with a terrible choice if the Court does not enjoin FHWA from taking such actions, as NYSDOT, NYCDOT and MTA all depend on FHWA and/or FTA funding to maintain the regional transportation system in a state of good repair.  If TBTA stops tolling during the pendency of this action to protect against the loss of these funds, MTA or TBTA would have to pay for the debt it has already issued reliant on toll revenues (as

described in paragraphs 12-15, *supra*) using other funds, thereby reducing monies that would otherwise be used to undertake other critical public transportation projects.

18.     On the other hand, if, as USDOT has threatened, all FHWA approval actions necessary to release federal funding are withheld, MTA would have to defer, if not forgo, planned improvements to the transit system, including, as explained below, increased accessibility upgrades at numerous subway stations, and, just in the near term, lose out on billions of dollars in funding used to pay for state of good repair and track maintenance in the New York City Subway and Long Island Rail Road ("LIRR"), as well as potentially even greater deprivation over the longer term if this litigation is not finally resolved in 2025.

19.     Before describing these harms, a brief description of the transportation system operated by the MTA is warranted.  The MTA operates the New York City subway and bus systems, as well as the Metro-North and the LIRR commuter rail networks. The subway is one of the world's oldest public transit systems, one of the most used, and has 472 stations in operation.

20.     The subway system operates 24/7 every day of the year.  By annual ridership, the New York City subway is the busiest rapid transit system in the Western Hemisphere and Europe. It transported over one billion passengers in 2024—a number that reflects a still depressed ridership due to COVID-19 pandemic.  The subway system is also one of the world's longest, covering 248 miles in Manhattan, the Bronx, Brooklyn, and Queens.[1]

21.     The MTA also operates a large-scale bus system in each of the five boroughs.  The MTA and New York City Transit ("NYCT"), an affiliate of the MTA, oversee a fleet of approximately 5,800 buses that service 238 bus routes, 20 Select Bus Service routes, and 75

---

[1] MTA operates the Staten Island Rail system in that borough.

express bus routes throughout the five boroughs of New York City.  43 of these lines operate in Manhattan.  In 2023 alone, New York City buses served approximately 427 million riders and traveled a collective 152 million miles.

22.     The MTA operates the two largest commuter railroads in the nation—Metro-North and LIRR.  The Metro-North operates approximately 124 stations and more than 775 miles of track.  In 2024, Metro-North served over 67 million passengers throughout seven counties in New York and two in Connecticut.  The LIRR system services approximately 200,000 customers each weekday.  In 2024, it transported a total of 75.5 million riders.  The LIRR encompasses 126 stations throughout Manhattan, Brooklyn, Queens, and Nassau and Suffolk counties and includes over 700 miles of tracks, sending out 947 trains every weekday.

23.     USDOT's threat to withhold approvals of STIP amendments concerning NYMTC TIP modifications places significant funding at risk.  The STIP is a list of all projects or project phases in New York State proposed to receive federal highway and transit funding.  NYSDOT develops New York State's STIP, which is updated every four years, and is amended frequently to reflect projects newly proposed for federal funding.  New York State is broken into fourteen regions, each of which has a Metropolitan Planning Organization ("MPO") that develops a TIP for its region.  NYMTC is the MPO for New York City, Long Island, and the Lower Hudson Valley, including Westchester, Putnam, and Rockland counties—a region with more than 13 million residents.  MPOs submit TIPs to NYSDOT for inclusion in New York State's STIP.

24.     FHWA and FTA, which oversees federal transit funding, must jointly approve each STIP and STIP amendment, and only projects in a STIP or STIP amendment approved by both FHWA and FTA are eligible for FHWA or FTA funding.  Thus, all future MTA projects seeking federal funding that are not already included in the STIP are at risk if the threat is carried out,

including projects necessary for the long-term safety and reliability of the regional transportation system. As MTA relies on billions of dollars in federal dollars per year to maintain its systems and serve the public, this threat could eviscerate the relatively smaller annual value of CBD Toll Program tolls and stymie planning for critical projects under the newly legislatively approved 2025-2029 MTA Capital Program.

25. One concrete example is already pending. NYSDOT recently submitted a proposed STIP amendment concerning a $2.2 billion package of NYMTC projects for subway and bus maintenance and railroad track work for approval by FHWA and FTA so that FTA funding can be released to MTA. These funds are now at risk if FHWA refuses to approve the STIP amendment pursuant to the threatened actions in the April 21st letter.

26. In addition to the loss of any FTA funding due to USDOT's threatened refusal to allow FHWA to approve STIP amendments, the threatened retaliatory actions, which include cutting off all future obligations of FHWA funding for projects within New York City, could also forestall MTA receipt of FHWA funding aimed at improving air quality, which MTA has used to make subway stations more accessible and thereby reduce vehicle emissions. FHWA's Congestion Mitigation and Air Quality Improvement Program ("CMAQ") provides a flexible funding source to State and local governments for transportation projects and programs to help meet the requirements of the federal Clean Air Act. The funding initially goes to NYSDOT, which in turn disburses funds to different governmental entities. Funding is available to reduce congestion and improve air quality for areas that do not meet the National Ambient Air Quality Standards for ozone, carbon monoxide, or particulate matter (and are thus nonattainment areas for those pollutants) and for former nonattainment areas that are now in compliance (maintenance areas).

MTA expects to receive approximately $55 million from this program for the federal fiscal year (October 1, 2024 to September 30, 2025).

27.     MTA utilizes the majority of CMAQ funding for Americans with Disabilities Act ("ADA") projects.   These undertakings align with the CMAQ program requirements by contributing to reductions in vehicle miles traveled ("VMT") and associated emissions, improving air quality, and reducing regional congestion.   Specifically, the installation of ADA-compliant elevators and equipment at non-accessible stations increases subway ridership and reduces reliance on vehicular modes of transportation such as taxis, for-hire-vehicles, private vehicles, and paratransit services like Access-A-Ride. Consequently, this shift reduces VMT and resultant emissions as well as congestion.

28.     A single illustration reflects the need for and effectiveness of the CMAQ program funding. In September 2024, MTA was awarded $50 million to make ADA improvements at the Middletown Road station on the Pelham Line (No. 6 Train) in the Bronx, including the installation of ADA-compliant elevators and related equipment. These improvements are projected to increase transit ridership by approximately 21 additional trips per day, which would be shifted from private vehicles, taxis, vehicles-for-hire, and paratransit services. This shift in ridership is estimated to reduce daily VMT by 260 miles, as trips that would have been made by car are instead accommodated by the subway system.

29.     A similar ADA-accessible project, using CMAQ funds, is planned for the Morrison Avenue / Soundview Avenue station, also on the No. 6 line in the Bronx, and at the Broadway Junction station in Brooklyn, where five subway lines intersect, in 2025.   The benefits in reduced VMT and emissions, and improved air quality, along with benefits to the ADA community, will be similar to those projected for the Middletown Road station.   Similar projects

10

to these would be at least deferred, if not foregone, if CMAQ funding becomes unavailable.

30. In addition to losing the CMAQ funds, MTA's extensive bus operations will also be harmed, as they operate on roadways throughout the City that are maintained by NYCDOT in part using FHWA funding. If the condition of these roadways deteriorates due to funding constraints, it will inevitably affect the ability of MTA buses to meet their schedules, and likely contribute to deterioration of the buses themselves, thereby increasing expenses for MTA to maintain or replace them.

31. If federal funding typically received by MTA becomes unavailable during the pendency of this lawsuit until the Court rules on the legality of FHWA's purported rescission of the VPPP Agreement, MTA would be forced to juggle priorities and defer, if not eliminate, many important projects (including accessibility projects) due to the lack of funding. The same would be true if the Project Sponsors capitulated and stopped tolling entries to the CBD, as MTA would have to divert other capital funds to repay the almost $1.4 billion in congestion pricing-related debt that would otherwise be used for important projects and could not issue bonds or finance projects that are already planned. Some projects would undoubtedly not proceed at all or would be materially delayed, contributing to deterioration of transit and commuter rail service and delay of improvements to access. The consequence would be irreparable harm to the public transit system, and thus to the traveling public.

32. This would be the case, under USDOT's threats, notwithstanding the fact that federal funding used by the MTA, NYSDOT and NYCDOT is appropriated by Congress specifically to maintain transportation systems in the New York City metropolitan region pursuant to legislative formulas under 49 U.S.C. § 5307, 49 U.S.C. § 5337, and other statutes.

I declare under the penalty of perjury that the foregoing is true and correct.

*Kevin Willens*
Kevin Willens

Dated:  May 5, 2025
        New York, New York

# DECLARATION OF ALLISON L. C. DE CERREÑO, PH.D.

Filed 05/05/25

Metro. Transp. Auth. v. Duffy, No. 25 Civ. 1413 (S.D.N.Y.) (LJL)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| METROPOLITAN TRANSPORTATION AUTHORITY and TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY, <br><br> *Plaintiffs*, <br><br> and <br><br> NEW YORK STATE DEPARTMENT OF TRANSPORTATION, RIDERS ALLIANCE, SIERRA CLUB, and NEW YORK CITY DEPARTMENT OF TRANSPORTATION, <br><br> *Intervenor-Plaintiffs*, <br><br> v. <br><br> SEAN DUFFY, in his official capacity as Secretary of the United States Department of Transportation, GLORIA M. SHEPHERD, in her official capacity as Executive Director of the Federal Highway Administration, UNITED STATES DEPARTMENT OF TRANSPORTATION, and FEDERAL HIGHWAY ADMINISTRATION, <br><br> *Defendants*. | Case No. 25 Civ. 1413 (LJL) |

## DECLARATION OF ALLISON L. C. DE CERREÑO, PH.D.

I, Allison L. C. de Cerreño, Ph.D., hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am the Chief Operating Officer of the Triborough Bridge and Tunnel Authority ("TBTA"), an affiliate of the Metropolitan Transportation Authority (the "MTA"). I have responsibility for overseeing the work of roughly 800 personnel in three TBTA departments: Tolling Management (including roadway and back-office operations), Facilities Management

(including nine bridges and tunnels, the Robert Moses complex, central maintenance, and fleet), and Environmental, Safety and Health (EHS). In addition, in that capacity and in my prior positions with the MTA, I have been and remain the project lead (aka "Project CEO") for the Central Business District Tolling Program (the "CBD Tolling Program" or the "Program"), a New York State legislatively mandated program pursuant to which TBTA, the New York State Department of Transportation ("NYSDOT"), and the New York City Department of Transportation ("NYCDOT") (collectively, the "Project Sponsors") developed and introduced congestion pricing to Manhattan's Central Business District (the "CBD"). The State legislation providing for the Program is the 2019 MTA Reform and Traffic Mobility Act (the "TMA"). The Program, which commenced operations on January 5, 2025, has reduced congestion and, as it continues to operate, will provide a stable source of revenue for the MTA to improve subway, bus and commuter rail systems through projects included in the MTA's 2020-2024 Capital Program and successor capital programs.

2.     In my role as TBTA lead for the Program, I was involved in and have personal knowledge of meetings and communications with the U.S. Department of Transportation ("USDOT") and the Federal Highway Administration ("FHWA"), which date back to 2019. As reflected by those meetings and correspondence, USDOT and FHWA fully understood that the Program entailed what is commonly known as "cordon pricing"—that is, tolling all non-exempt vehicles accessing a specified geographic area, in this case the CBD. USDOT and FHWA also fully understood that the Program was intended to reduce congestion through two complementary means: disincentivizing driving into the CBD by charging tolls, and making the use of transit more attractive by directing net revenues (after costs associated with the Program) to capital

improvements in mass transit. FHWA's ultimate approval of the Program reflected this understanding.

## A. The History of the Program

3.      The USDOT/FHWA determined that the Program required approval from FHWA, which had been conferred the authority to allow state and local agencies to implement tolls on federal-aid highways through the Value Pricing Pilot Program (the "VPPP"). The VPPP was established through the enactment of Section 1012(b) of the Intermodal Surface Transportation Efficiency Act ("ISTEA") of 1991, as amended. The VPPP was initially called the Congestion Pricing Pilot Program; the name of the program was changed to the VPPP in the Transportation Equity Act for the 21st Century ("TEA-21") of 1998, and was continued in the Safe, Accountable, Flexible, Efficient Transportation Equity Act ("SAFETEA-LU") of 2005.[1]  For a detailed description of FHWA's interpretation, guidance and application of the VPPP, *see* Plaintiffs' Amended Complaint at ¶¶ 62–98.

4.      The three Program Sponsors initiated contact with USDOT and FHWA with regard to the Program in the Spring of 2019, shortly after the April 1, 2019 adoption of the TMA. There were several in-person meetings and numerous telephone conferences, including three in-person meetings in Washington D.C. and two in Albany. The initial in-person meeting, in Washington, D.C., was on April 23, 2019, and the second was in Albany the next day; the other in-person meetings were in Washington D.C. in October and December of 2019 and in Albany in November 2019.

---

[1]   *Value Pricing Pilot Program*, U.S. FED. HIGHWAY ADMIN., https://ops.fhwa.dot.gov/congestionpricing/value_pricing/ (last accessed Apr. 18, 2025).

5.      At those meetings, and particularly in the April 2019 meetings with USDOT and FHWA, the Project Sponsors presented the Program and provided detailed explanations of its contemplated operation. Those explanations included that tolling would apply to vehicles that enter the CBD, defined as below and inclusive of 60th Street (with the exception of vehicles using the FDR Drive, West Side Highway, the Battery Park Underpass, and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West Street) in order to reduce the severe congestion in the CBD. This type of congestion pricing is generally called "cordon pricing" (or sometimes "zone-based" or "area-wide pricing"), as the tolling is for a specific geographic area.[2] In addition, it was explained that the Program would incorporate toll rates that would provide a new and recurring source of revenue for the MTA, with net revenues (after paying for Program costs) to be dedicated to capital improvements identified in the MTA's 2020-2024 Capital Plan. The minutes FHWA prepared of the April 24th meeting in Albany reflect the explanation and discussion of these and other elements of the Program. In addition, at that meeting the Project Sponsors provided USDOT and FHWA with a description of the Program. A copy of the April 24, 2019 meeting minutes, along with the Program description that was provided to USDOT/FHWA at the meeting, are annexed hereto as Exhibit "A."

6.      At these meetings, as well as at the later meetings, USDOT and FHWA representatives made clear that, given the nature of the Program, the VPPP is the appropriate vehicle to provide tolling authority on federal-aid highways for a cordon-based congestion pricing program like the Program. That is plain by the "Discussion" subheading in the minutes of the April 24th meeting, which reference the VPPP and its attendant requirements (including compliance with the National Environmental Policy Act, or "NEPA"). The federal agencies explained that

---

[2] *Id.*

NYSDOT already had one of the 15 "slots" allotted in the VPPP, and could have multiple congestion pricing projects under that "slot," including the Program. The federal agencies further explained that there would need to be a VPPP agreement between FHWA and the Project Sponsors. At the close of the April 24th meeting, it was agreed that FHWA would forward to the Project Sponsors a template for a VPPP "Expression of Interest," which was needed to commence the eligibility/approval process, as well as an example of a cooperative agreement that the Project Sponsors would need to enter into with FHWA. *See* Exhibit "A" at 3.

7.      On June 14, 2019, the Project Sponsors held a conference call with FHWA. During that call, as occurred in later meetings, there was discussion of what class of action would be applicable for the anticipated NEPA process (an Environmental Assessment ("EA") or Environmental Impact Statement ("EIS")) and what steps the Project Sponsors could take to advance the Program pending completion of the NEPA process.

8.      The Project Sponsors submitted an Expression of Interest ("EoI") to FHWA seeking approval under the VPPP to implement the Program on June 17, 2019. A copy of the June 17, 2019 cover letter accompanying the EoI and the EoI are annexed hereto as Exhibit "B." As noted in the cover letter, "[t]he purpose of this variable price tolling program is to specifically mitigate the untenable levels of traffic congestion that currently exists in the Central Business District." The cover letter further noted that improving mass transit through revenues from the Program, "provides the greatest return on investment for mitigation traffic congestion." *Id.* at 1.

9.      The full EoI also makes plain the basic elements of the Program and its goals. For example, Section D.2 provides a description of the area to be tolled (*i.e.*, the CBD, with the exceptions noted above).  Section D.4 describes the goals of the Program, including the reduction

of congestion and improvement of air quality, as well as the creation of a sustainable source of funding for the MTA and increase in transit ridership.

10. The FHWA response to the EoI came in the form of an October 24, 2019 letter from the Administrator, which requested further information. A copy of the October 24, 2019 letter is annexed hereto as Exhibit "C" The FHWA stated that "[u]nder the various programs in Federal law that allow tolling of existing infrastructure, the VPPP appears to be the best potential fit, provided that the overall purpose of variable tolling remains to reduce roadway traffic congestion." *Id.* at 1.[3] In addition, noting the Program revenues would be used almost exclusively for mass transit improvement, FHWA asked for details about the use of those revenues. *Id*. at 2. Finally, FHWA acknowledged that the use of cordon pricing was "unprecedented", and that the agency had to consider the precedent it would be setting by approval. *Id.*[4]

11. Following this letter, the Project Sponsors met FHWA in Albany on November 6, 2019 to discuss the October 24th letter. The Project Sponsors then met with USDOT and FHWA in Washington D.C. on December 6, 2019 and obtained guidance on responding to the agencies' further requests for information. At that meeting, there was discussion of the use of the Program revenues and the NEPA class of action.

12. After the December 6 meeting, the Project Sponsors submitted a December 17, 2019 letter to FHWA, together with information requested in the FHWA's October 24th letter. A

---

[3] "Variable tolling" refers to tolling that, like the Program, imposes different toll amounts at different times of the day.

[4] This assertion was not entirely correct, as there had been prior proposals for area-wide tolling approved by FHWA. For example, in 2007, New York City and FHWA entered into an Urban Partnership Agreement in which FHWA agreed to award New York City $5 million in VPPP funding to pursue "a broad area pricing system in Manhattan south of 86th Street." *See* Plaintiffs' Amended Complaint at ¶¶ 84. This approval was conditioned on State legislative action which did not occur at that time.

copy of the December 17, 2019 letter is annexed hereto as Exhibit "D." The Project Sponsors'

December 17th letter emphasized that the premise of the Program was "to implement an area-wide

pricing program under the Value Pricing Pilot Program." The attachment included with the letter

explained, again, that net Program revenues would be dedicated to capital investments in mass

transit. After noting that much of the information requested by the agencies would typically be

contained in the environmental documentation that would be prepared pursuant to NEPA, the

Project Sponsors requested a prompt decision on the class of action for NEPA review that had

been under consideration by USDOT/FHWA for months (since the April 24th meeting). On

January 27, 2020, the Project Sponsors submitted the Traffic and Revenue Study that had been

requested by FHWA; a copy of the cover letter submitting that study is annexed hereto as Exhibit

"E."

13. There was no response to the December 2019 or January 2020 submissions, so the

Project Sponsors wrote the FHWA on July 2, 2020 to request prompt agency action on the EoI (as

required by an Executive Order and guidance issued by the first Trump administration) and a

determination on the NEPA process; *viz*, whether an EA or EIS would be required. A copy of the

July 2, 2020 letter is annexed hereto as Exhibit "F." On September 3, 2020, FHWA responded,

stating that due to the Covid-19 pandemic and potential changed circumstances with regard to

traffic and mass transit ridership, the agency needed more information on these conditions, "as the

impact on congestion is a relevant consideration under the [VPPP]." A copy of the September 3,

2020 letter is annexed hereto as Exhibit "G."

14. The Project Sponsors submitted the requested information on traffic and transit

ridership on October 13, 2020, and reiterated the request that FHWA inform them of the type of

NEPA process to be undertaken. A copy of the October 13, 2020 letter is annexed hereto as Exhibit

"H." It was not until March 30, 2021 that FHWA responded, and informed the Project Sponsors that an EA would be the appropriate NEPA documentation. A copy of the March 30, 2021 letter is annexed hereto as Exhibit "I."

15. A lengthy environmental review process under NEPA ensued. Consistent with discussions with FHWA in 2019 and 2020, as well as at the commencement of the NEPA process, the EA's description of the purpose for the Program was "to reduce traffic congestion in the Manhattan CBD in a manner that will generate revenue for future transportation improvements, pursuant to acceptance into FHWA's VPPP."[5] The EA identified two Program needs: the need to reduce vehicle congestion in the CBD, and the need to create a new local, recurring funding source for MTA's transit capital projects.[6] To further refine the purpose and address the identified needs, the EA identified two specific congestion reduction objectives, which made plain that the primary purpose of the Program was to reduce congestion. These objectives were the reduction of daily vehicle miles traveled ("VMT") in the CBD by at least 5% and the reduction of daily vehicles entering the CBD by at least 10%. The objective related to creating the new, local, recurring source of funding was to generate sufficient net revenue to support the financing of $15 billion for MTA transit capital projects in the agency's 2020-2024 Capital Program.[7]

16. Because the final tolling structure had not yet been defined, for the purpose of evaluating the potential environmental impacts of various tolling options, the Final EA analyzed

---

[5] Final EA Chapter 1, Introduction at 1-10, https://www.mta.info/document/110766 (last accessed Apr. 18, 2025).
[6] *Id*. at 1-10 to 1-18.
[7] *Id*. at 1-18.

seven tolling scenarios, with tolls for passenger cars ranging from $9 to $23 (with different rates for different classes of vehicles), with different toll amounts, credits and exemptions.[8]

17.     The environmental review culminated in the April 2023 Final EA and the June 2023 Finding of No Significant Impact ("FONSI").

18.     On November 30, 2023, the Traffic Mobility Review Board, an entity required by the TMA to recommend a toll structure for consideration by the TBTA Board, issued its recommendation,[9] which was informed by the Final EA. On December 6, 2023, the TBTA Board authorized TBTA to take the requisite steps to promulgate a CBD toll rate schedule.[10]

19.     On March 27, 2024, the TBTA Board adopted a toll rate schedule for the Program, with a planned implementation date in or about June 2024. The Project Sponsors prepared a reevaluation document ("Reevaluation 1") consistent with FHWA's regulations and as contemplated by the FONSI, to assess the effects of the March 2024 adopted toll schedule and determine whether the FONSI was still valid.[11] On June 14, 2024, FHWA confirmed that the reevaluation was consistent with FHWA's regulations and determined that the FONSI remained valid.[12]

---

[8] Final EA Chapter 2, Project Alternatives at 2-29 to 2-38, https://www.mta.info/document/110771 (last accessed Apr. 18, 2025).

[9] Traffic Mobility Review Board, *Congestion Pricing in New York* (Nov. 2023), https://www.mta.info/document/127761.

[10] MTA Board Votes to Begin Public Review Process for Central Business District Tolling Rate Schedule, MTA (Dec. 6, 2023), https://www.mta.info/press-release/mta-board-votes-begin-public-review-process-central-business-district-tolling-rate.

[11] Central Business District (CBD) Tolling Program, Reevaluation (June 24, 2024), https://www.mta.info/document/142711.

[12] Letter from Richard J. Marquis, Division Administrator, Fed. Highway Admin., to Allison L. C. de Cerreño, Ph.D., Chief Operating Officer, MTA Bridges and Tunnels (June 14, 2024), https://www.mta.info/document/142701.

20.    On June 5, 2024, prior to a VPPP agreement being executed, the Governor announced a pause in implementation of the Program, which at that point had been scheduled to begin on June 30, 2024.

21.    On November 14, 2024, the Governor announced a proposal to proceed with the Program, but with the toll rates that had been adopted by the TBTA Board in March 2024 being phased-in gradually over several years. On November 18, 2024, the TBTA Board adopted the phase-in feature of the toll rate schedule that it had approved in March (the "Phase-In Approach").[13]

22.    Under the Phase-In Approach, toll rates for each vehicle class and time of day, as well as tunnel crossing credits, are proportionally reduced from, and then gradually return to, the corresponding values in the March 2024 adopted toll rate schedule. Thus, subject to certain tunnel crossing credits, from 2025 to 2027, the peak-period E-ZPass entry toll rate charged for passenger vehicles will be $9; for motorcycles, $4.50; for larger vehicles including transit and commuter buses and trucks, $14.40 or $21.60, depending on their size; for taxis, $0.75 per trip; and for for-hire vehicles ("FHVs") on trips dispatched by high-volume for-hire services ("HVFHSs"), $1.50 per trip. The toll rates and tunnel crossing credits later increase proportionally for each vehicle category, once in 2028, then again in 2031 to match those in the March 2024 toll rate schedule, as set forth in the November 2024 toll rate schedule.

23.    The Project Sponsors prepared a second reevaluation consistent with FHWA's regulations to assess the effects of the Phase-in Approach of the March 2024 adopted toll structure, entitled Reevaluation 2. This Reevaluation concluded that the effects of the Program were

---

[13] Triborough Bridge and Tunnel Authority Central Business District (CBD) Charges, https://www.mta.info/document/138931 (last accessed Mar. 20, 2025).

consistent with those disclosed in the Final EA, the mitigation set forth in the FONSI (and Reevaluation 1) remained appropriate, and the FONSI remained valid.[14]

24.    On November 21, 2024, FHWA confirmed that Reevaluation 2 was consistent with FHWA's regulations and determined that the FONSI remained valid.[15] FHWA and the Project Sponsors then signed an agreement under the VPPP authorizing the Program's collection of tolls.[16] The agreement, *inter alia*, requires that the Project Sponsors report to FHWA on various performance metrics. Along with direct indicators of congestion reduction, such as daily vehicle entries into the CBD, are indirect indicators, including transit ridership and "capital projects funded or financed through Project revenue."[17]

25.    The Program commenced tolling customers on January 5, 2025. Information available for the first months of operations indicates a noticeable reduction in congestion in the CBD as compared to the same time period in 2024, with the corollary benefits of decreased time for emergency vehicle trips, Access-A-Ride Paratransit Service trips, and commutes.

    a.   Traffic in the CBD decreased substantially, with approximately 5.8 million fewer vehicles entering the district in January through March 2025 than would be expected based on data for prior years. This represents an 8% reduction from a typical January, a 12% reduction from a typical February, and a 13% reduction from a typical March.[18] Although not yet published, preliminary data for April indicate that traffic in the CBD was down by 12%.

---

[14]  Central Business District (CBD) Tolling Program, Reevaluation 2 (Nov. 2024), https://www.mta.info/document/158191.

[15] Letter from Richard J. Marquis, Division Administrator, Fed. Highway Admin., to Allison L. C. de Cerreño, Ph.D., Chief Operating Officer, MTA Bridges and Tunnels (Nov. 21, 2024), https://www.mta.info/document/158196.

[16]  Value Pricing Pilot Program Agreement (Nov. 21, 2024), https://www.mta.info/document/158201.

[17] *Id.* at 9.

[18]  MTA Metrics, Reduction in Vehicle Entries to the CBD, https://metrics.mta.info/?cbdtp/vehiclereductions (last accessed Apr. 18, 2025). Compared to historical monthly averages for each respective month, a total of 1,267,083 fewer vehicles entered the CBD in January 2025; 2,029,860 fewer vehicles in February 2025; and 2,548,820 fewer in

b. Based on MTA's review of relevant data, there was a 10% reduction in VMT by all vehicles in the CBD from January to mid-March of 2025 as compared to the same period in 2024.

c. According to data collected by TRANSCOM,[19] crossing times were 12% faster at the Lincoln Tunnel and 45% faster at the Holland Tunnel from January-March 2025, compared to January-March 2024.[20] Trip times from Brooklyn and Queens to the CBD have dropped between 10% and 30%.[21] Express buses save about 10 minutes on their commutes.[22]

d. According to MTA's assessment of data collected by TRANSCOM, traffic speeds on river crossings were 5% to 30% faster this February than last February. Traffic speeds on major bridges improved significantly: on the Queensboro Bridge, by 31%; on the Brooklyn Bridge, by 26%; and on the Manhattan Bridge, by 7%.[23]

e. Commuter time is reduced; commuters are saving as much as 21 minutes on their trips.[24]

f. Fewer vehicles utilize the nine MTA bridges and tunnels, with levels dropping 2.4% from March of 2024 to March of 2025. The largest reductions are at the Hugh L. Carey and Queens-Midtown Tunnels, which lead directly into the zone.[25]  Truck

---

March 2025. Reductions are measured by subtracting vehicle totals against a historical average of 580.5K daily entries in January, 613.9K daily entries in February, and 642.5K daily entries in March.

[19] TRANSCOM is a coalition of 16 transportation and public safety agencies in the New York – New Jersey – Connecticut metropolitan region. It was created in 1986 to provide a cooperative, coordinated approach to regional transportation management.

[20] January 2025 MTA Board Meeting, Congestion Relief Zone Tolling January 29, 2025 Update , at 4-5, https://www.mta.info/document/163411 (last accessed Apr. 18, 2025); *see also* Andrew Siff, *MTA Calls Congestion Pricing 'Transformative' on Commutes,* NBC NEW YORK, (Jan. 29, 2025), https://www.nbcnewyork.com/new-york-city/mta-congestion-pricing-transformative-commute-impact/6126670/.

[21] January 2025 MTA Board Meeting, Congestion Relief Zone Tolling January 29, 2025 Update, at Slide 5, https://www.mta.info/document/163411 (last accessed Apr. 18, 2025).

[22] *Id.* at 9; February 2025 MTA Board Presentation at 10 (Feb. 26, 2025), https://www.mta.info/document/165401 (last accessed Apr. 18, 2025).

[23] February 2025 MTA Board Presentation at 10 (Feb. 26, 2025), https://www.mta.info/document/165401 (last accessed Apr. 20, 2025); *TRANSCOM*, internally sourced data week of February 24, 2025.

[24] RPA*, Congestion Pricing: What it Means to Save Time* (Mar. 11, 2025), https://rpa.org/news/lab/what-it-means-to-save-time.

[25] MTA Daily Ridership and Traffic, New York State, https://data.ny.gov/Transportation/MTA-Daily-Ridership-and-Traffic-Beginning-2020/sayj-mze2/about_data (last accessed Apr. 18, 2025).

traffic traveling through these tunnels dropped 14% this year compared to the same period in 2024.[26]

g. Trips are also far more reliable. According to TRANSCOM, traffic through the Holland Tunnel used to be delayed more than 3 minutes more than half of all weekdays (54%) – now 12%. On the Williamsburg Bridge, delays used to be greater than 3 minutes 65% of the time; the Program has reduced that to 2%.[27]

h. A recent study published by the National Bureau of Economic Research, with lead authors from Yale and Stanford, found a 15% improvement in CBD traffic speeds.[28] MTA internal data show that local bus speeds have increased by an average of 3% within the CBD, with some routes increasing by as much as 7%.[29]

i. Several bus routes have seen significant decreases in the time needed to complete their routes.[30] Based on internal MTA data from March 2025, there are 23% fewer customer trips on express bus that are delayed 10 minutes or more. Express buses are traveling 21% faster on the portion of their routes leading into and within the CBD.[31]

j. The Program appears to have reversed a long trend of increased emergency response times;[32] as a corollary of lessened congestion in the CBD. Similarly, reduced congestion translates into less delay for school buses in the congestion zone.

---

[26] Roosevelt House Public Policy Institute at Hunters College, *Where have all the Trucks Gone? Truck Diversions through the Bronx and State*, https://www.roosevelthouse.hunter.cuny.edu/?forum-post=trucks-gone-truck-diversions-bronx-staten-island (last accessed Apr. 18, 2025).

[27] February 2025 MTA Board Meeting Presentation at 12 (Feb. 26, 2025), https://www.mta.info/document/165401; *see also TRANSCOM*, internally sourced data week of February 24, 2025.

[28] Cody Cook et al., *The Short-Run Effects of Congestion Pricing in New York City*, NBER (March 17, 2025), https://www.nber.org/system/files/working_papers/w33584/w33584.pdf (last accessed Apr. 18, 2025).

[29] MTA Metrics, Reduction in Vehicle Entries to the CBD, https://metrics.mta.info/?cbdtp/vehiclereductions (last accessed Apr. 18, 2025).

[30] January 2025 MTA Board Meeting, Congestion Relief Zone Tolling January 29, 2025 Update at Slides 9–10, https://www.mta.info/document/163411 (last accessed Apr. 18, 2025).

[31] MTA Metrics, Reduction in Vehicle Entries to the CBD, https://metrics.mta.info/?cbdtp/vehiclereductions (last accessed Apr. 18, 2025).

[32] Ginia Bellafante, *The Life-or-Death Consequences of Killing Congestion Pricing*, N.Y. TIMES (Oct. 10, 2024), https://www.nytimes.com/2024/10/10/nyregion/new-york-fire-department-response-times.html.

k. NYC open data of 311 calls show that complaints about excessive car horn honking within the CBD in January and February are down by more than 70% from the same time period last year, plummeting to 67 this year from 219.[33]

l. According to an internal analysis, between January 5 and March 4, two New York City Department of Environmental Protection noise cameras in the CBD did not issue a single horn-honking ticket. Those two cameras issued 27 during the same time last year.[34]

m. There has been less diversion of traffic to the outer boroughs than expected, thus lessening potential traffic increases in those areas (which include environmental justice communities).[35] The recent National Bureau of Economic Research study confirmed that the Program has benefitted areas outside of the CBD as well, with highways and major roadways also seeing sustained speed improvements.[36]

n. A recent Hunter College study found that truck volumes on MTA bridges and tunnels leading into and out of the Bronx and Staten Island remained essentially the same from January-February of 2024 to those months in 2025.[37] An MTA assessment shows that traffic volumes (cars and trucks) are slightly down on the Cross-Bronx Expressway, with speed increased.[38]

26.    While reducing congestion, the Program has shown no adverse effects on economic activity:

a. Pedestrian traffic in Manhattan increased 4.6% between January 5 (the day that toll collection began) and January 31 compared to the same period in 2024.[39]

---

[33] Jose Martinez and Mia Hollie, *Honking Complaints Plunge 69% Inside Congestion Relief Zone*, (Mar. 11, 2025), (citing analysis of 311 call data); MTA Metrics, Reduction in Vehicle Entries to the CBD, https://metrics.mta.info/?cbdtp/vehiclereductions (last accessed Apr. 18, 2025).

[34] MTA Metrics, Reduction in Vehicle Entries to the CBD, https://metrics.mta.info/?cbdtp/vehiclereductions (last accessed Apr. 18, 2025).

[35] David Colon, *Data: Congestion Pricing Is Not Rerouting Traffic to Outer Boroughs*, STREETSBLOG (Mar. 12, 2025), https://nyc.streetsblog.org/2025/03/12/data-outer-borough-congestion-pricing-spillover-traffic-not-happening.

[36] Cody Cook et al., *The Short-Run Effects of Congestion Pricing in New York City*, NBER (Mar. 17, 2025), https://www.nber.org/system/files/working_papers/w33584/w33584.pdf.

[37] Roosevelt House Public Policy Institute at Hunters College, *Where have all the Trucks Gone? Truck Diversions through the Bronx and State*, https://www.roosevelthouse.hunter.cuny.edu/?forum-post=trucks-gone-truck-diversions-bronx-staten-island (last accessed Apr. 18, 2025).

[38] *See* MTA Metrics, Vehicle Reductions Traffic Patterns in the Bronx Post-Congestion Pricing presentation (Mar. 2025), a copy of which is annexed hereto as Exhibit J.

[39] *See Arun Venugopal*, Vehicle Traffic Is Down in Manhattan, But Pedestrian Traffic Is Up, Data Says, GOTHAMIST (Feb. 13, 2025), https://gothamist.com/news/vehicle-traffic-is-down-in-manhattan-but-pedestrian-traffic-is-up-data-says.

b. Hotel occupancy in the CBD was 73% in January 2025 compared to 70% in January 2024.[40]

c. The gross revenue of Broadway shows January-March 2025 was 25% higher than the same period last year, and attendance at Broadway shows was up 20% for January-March compared to this period of last year.[41]

d. Retail sales were up 1.5% in January and February – on track to be $900M higher this year than last.[42]

e. Leasing in the CBD was up 11% this January versus the fourth quarter of 2024, and up 80% since the first quarter of last year.[43]

f. Real estate availability is down.[44]

27. As aptly stated by Kathryn Wylde, President and CEO of The Partnership for New York, since the initiation of congestion pricing, New Yorkers are "moving faster and there's less traffic."[45]

**B. TBTA and MTA Will Suffer Irreparable Harm if the Project Sponsors are Forced to Suspend the Program in Order to Avoid the Withholding of FHWA funding to the Project Sponsors**

28. TBTA would incur substantial expenses which could not be recouped if the Project Sponsors are compelled to suspend the Program until a final decision in order for the Project Sponsors to avoid the loss of significant State funding.

---

[40] This is based on a March 10, 2025 internal analysis conducted by New York City Economic Development Corporation of CoStar data.

[41] This is based on a March 2025 internal analysis of data made publicly available by the Broadway League. *See* Research and Statistics, Grosses: Broadway in NYC, The Broadway League, https://www.broadwayleague.com/research/grosses-broadway-nyc/ (last accessed Apr. 18, 2025).

[42] This is based on a March 2025 internal analysis of Affinity Solutions Cards & Transactions data.

[43] Colliers, *Downtown NYC Office Market Report: 2025 Q1*, https://www.colliers.com/en/research/new-york/nyc-q1-2025-downtown-office-market-report (last accessed Apr. 18, 2025).

[44] Colliers, *Manhattan Monthly Snapshot: January 2025*, https://www.colliers.com/en/research/new-york/2025_01_manhattan-monthly-snapshot (last accessed Apr. 18, 2025).

[45] Dick Brennan, *President Trump said to have NYC's congestion pricing, bike lanes in his crosshairs*, CBS NEWS (Feb. 10, 2025), https://www.cbsnews.com/newyork/news/president-trump-nyc-congestion-pricing-bike-lanes/.

29.     TBTA has expended substantial taxpayer dollars in reliance on FHWA's repeated representations that the VPPP would encompass the Program, and in the agency's words, is the "best potential fit" for the Program. *See* Exhibit "C" at 1.

30.     TBTA budgeted and has expended over $500 million to establish the Program. These expenditures included developing the methodological approach; conducting the assessment and extensive outreach and developing the final documentation for the environmental review process under NEPA; design, development, implementation and testing of the roadway infrastructure and system; design, development, implementation and testing of the back-office system; additional extensive outreach for the State administrative review process; staff costs, including new staff for the Program; and consulting costs.

31.     Few if any of these costs would have been incurred had USDOT/FHWA taken the position at the beginning of the long and tortuous 5-year process it now takes—that the Program is not lawful under the VPPP because it utilizes cordon pricing to raise money for mass transit. They did not assert such illegality. Instead, as reflected in the Draft EA, the Final EA and the FONSI, the agencies specifically endorsed the goals and objectives of the Program and entered into a VPPP Agreement with the Project Sponsors.

32.     If the Program is temporarily suspended, all the benefits identified above would be lost: traffic would return, travel times would increase, emergency response times would lengthen, buses (including school buses) would face greater delays, and the streets would become less safe. The public would lose the benefits of congestion pricing, and thus the benefits reasonably expected to flow from the $500 million spent by TBTA for the Program, for at least the period of the suspension. These benefits could not be recouped.

33.     Moreover, if the Program is temporarily suspended, TBTA would incur roughly $12 million in additional expenditures per month, most of which would be related to a combination of the operations and maintenance of the roadside tolling system, the operations of the back-office system and customer contact center, and consultant costs. This figure does not include the costs related to additional staff that were brought on specifically for the Program nor other costs, such as those related to outreach and advertising and assessments to be undertaken for the Program. These costs cannot be deferred even if operation of the tolling is suspended. Further, these costs could not be paid by Program revenues, as there would be none during this period. These funds would be lost as a result of a suspension.

34.     Furthermore, a Program suspension would cause TBTA the loss of estimated monthly revenues from the first phase of the Program of over $50 million, based on revenues in January, February, and March 2025, which if annualized would meet the projected net annual revenues forecasted in Reevaluation 2 of roughly $500 million in the first phase.[46] These public dollars could never be recouped, even if the Program is restarted, as those months of tolling revenues would be lost forever.

35.     This loss of funds means that the MTA would, at a minimum, have to delay undertaking much-needed capital improvement to the mass transit system, including such undertakings as adding accessibility to numerous subway stations consistent with the Americans with Disability Act, improving outdated signaling and other improvements to system reliability,

---

[46]  *See* February 2025 Report of the MTA Finance Committee, https://www.mta.info/document/165106 (last accessed Apr. 18, 2025), March Report of the MTA Finance Committee Meeting, https://www.youtube.com/live/VuALrov3tBA?t=1812s (last accessed Apr. 18, 2025).

improving safety and customer service through technology, and extending public transit to under-served areas.[47]

### C. The Public Interest Strongly Favors a Preliminary Injunction

36.     Without an injunction, the Project Sponsors, as noted above, may be compelled to suspend the Program in order to avoid the loss of State funding. In that event, MTA, the recipient of Program revenues, could be prevented from proceeding with vitally important work under the MTA's 2020-2024 Capital Program, which is intended to ensure that improvements put in place will be sustainable for years to come. The total Capital Program is $55.6 billion. Of that amount, $52.2 billion is identified for critical investments in the region's subways, buses, and commuter railroad, nearly one-third of which would be supported by the Program. Key projects of the Capital Program, which would be delayed by a suspension that would halt Program tolling revenues, include those referenced in Paragraph 35, above.

37.     In addition, because MTA would be forced to halt operation of the Program, TBTA could not advance the $155 million package of regional and place-based mitigation for environmental justice communities to which the Project Sponsors committed in the Final EA, FONSI, and reevaluations, and which would address preexisting pollution and chronic health burdens in such communities, including particularly burdened environmental justice communities in New York and New Jersey.[48] Moreover, TBTA has already reached out to the environmental justice communities identified for place-based mitigation, to discuss which types of mitigation are most appropriate for each community. Such measures could include installing roadside vegetation,

---

[47] *See generally* MTA, 2020–2024 Capital Program: Exec. Summary (Oct. 1, 2019), https://files.mta.info/s3fs-public/2019-09/MTA%202020-2024%20Capital%20Program%20-%20Executive%20Summary.pdf (last accessed Apr. 18, 2025).

[48] Final EA Chapter 17, Environmental Justice at App. 17D-25–64, 74–80, https://www.mta.info/document/92741 (last accessed Apr. 18, 2025).

renovating parks and green space, and/or installing air filtration units in schools near highways. Delay of the Program would necessarily stall these efforts.

38.    In contrast, the public would not be harmed by continued operation of the Program; rather, it would continue to receive the benefits of the Program set forth above. In addition, if it became necessary, there are mechanisms that allow TBTA to fully refund toll payers in the unlikely event that USDOT/FHWA prevail in this action. All eligible vehicles entering the CBD are charged and pay the applicable toll rate using one of two mechanisms. Toll payers with an E-ZPass account pay the toll using their E-ZPass account. If the vehicle is not associated with an E-ZPass account, the registered owner of the vehicle receives a toll bill in the mail. No matter what the method of payment by that toll payer, it is recorded. Because the Program uses these cashless methods of collection, no one pays with cash at a toll booth — an outdated method of collection that TBTA replaced at its bridge and tunnel facilities years ago.

39.    Between 92% and 95% of toll payers on current TBTA tolling facilities that enter Manhattan use E-ZPass, and it appears from data available to date that a significant majority of drivers use E-ZPass for the Program. If required for toll payers with a New York E-ZPass account, TBTA is able to refund any tolls paid by crediting such E-ZPass accounts. Toll payers who pay the toll through a non-New York E-ZPass account will be traceable by their respective state tolling agencies, and their payments will also be traceable by those agencies. Consistent with TBTA's prior practice when issuing refunds to toll payers who use a non-New York E-ZPass account, any such refunds can be issued to the respective state tolling agency, which would then reimburse the toll payer. For example, someone driving into the CBD from Delaware with a Delaware E-ZPass account would pay the toll amount to the Delaware state tolling agency. This agency would send the toll amount, on the toll payer's behalf, to TBTA. In turn, if required, TBTA can refund the

Delaware state tolling agency, which in turn could then credit the toll payer's account. Where warranted, TBTA already routinely reconciles New York E-ZPass accounts and non-New York E-ZPass accounts in the ordinary course of business in this manner for bridge and tunnel facilities; Program toll reconciliation would be no different.

40.     The remaining toll payers who do not use E-ZPass are also traceable and can be refunded by the same mechanism that they use to pay their bill. Toll payers without E-ZPass receive a bill in the mail with a unique identifying bill number. These toll payers then have the option of paying that bill through credit card, cash at an authorized payment facility, or by mailing in a check. If a toll payer has paid their bill, and thus paid the toll, TBTA can refund the toll payer by reversing the charges if they used a credit card, or by issuing a refund check if the toll payer paid by cash or check.

41.     In summary, it bears emphasizing that a suspension of the Program would delay the extensive benefits to the public that accompany the Program—and thus the benefits that would otherwise flow from these large-scale expenditures, such as making subway stations accessible to the disabled. Delaying implementation of the Program means the reinstitution of the severe congestion in the CBD, with its concomitant economic and environmental costs to businesses, residents, commuters, workers, and visitors in this area.  Congestion in the CBD has been a $20 billion annual drag on the region's, and thus the country's, economy.[49] And as the most congested urban area in the country, travel times—including for public buses and emergency vehicles, are extraordinarily slow.[50] Delay of the Program would mean the continuation of these conditions, and

---

[49] Final EA Chapter 1, Introduction at 1-12, https://www.mta.info/document/92761 (last accessed Apr. 18, 2025).
[50] *Id*. at 1-1.

harm to the public, while allowing the Program to proceed pending a final decision on the merits would cause no harm to USDOT or FHWA.

Dated:   May 4, 2025
         New York, New York                    Allison L. C. de Cerreño, Ph.D.

# DECLARATION OF WILLIAM CARRY
Filed 05/05/25
Metro. Transp. Auth. v. Duffy, No. 25 Civ. 1413 (S.D.N.Y.)
(LJL)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

METROPOLITAN TRANSPORTATION AUTHORITY
and TRIBOROUGH BRIDGE AND TUNNEL
AUTHORITY,

*Plaintiffs*,

and

NEW YORK STATE DEPARTMENT OF
TRANSPORTATION, RIDERS ALLIANCE, SIERRA
CLUB, and NEW YORK CITY DEPARTMENT OF
TRANSPORTATION,

*Intervenor-Plaintiffs*,

v.

SEAN DUFFY, in his official capacity as Secretary of
the United States Department of Transportation,
GLORIA M. SHEPHERD, in her official capacity as
Executive Director of the Federal Highway
Administration, UNITED STATES DEPARTMENT
OF TRANSPORTATION, and FEDERAL HIGHWAY
ADMINISTRATION,

*Defendants*.

Case No. 25 Civ. 1413 (LJL)

**DECLARATION OF
WILLIAM CARRY IN
SUPPORT OF MOTION
FOR PRELIMINARY
INJUNCTION**

## <u>DECLARATION OF WILLIAM CARRY</u>

I, William Carry, hereby declare under penalty of perjury, pursuant to 28 U.S.C. §
1746, as follows:

1.     I am the Assistant Commissioner for Policy for the New York City ("City")
Department of Transportation ("City DOT"). City DOT is responsible for one of the most complex
urban transportation networks in the world, including 6,300 miles of streets and highways,
approximately 800 bridges and tunnels, and 13,500 signalized intersections. I submit this

Declaration in support of the Plaintiffs' request for a preliminary injunction and/or temporary restraining order.

2.     The facts set forth herein are based on my personal and professional knowledge, conversations with relevant City DOT staff, and a review of records in City DOT's possession.

3.     As part of my work at City DOT, I have knowledge of federal competitive grants, formula funds, and cooperative agreements awarded to the City of New York and administered by City DOT, including those from the United States Department of Transportation ("USDOT") through the Federal Highway Administration ("FHWA"), and those passed to City DOT through the New York State Department of Transportation ("State DOT").

**The April 21, 2025 Letter**

4.     On April 21, 2025, City DOT received a letter from United States Secretary of Transportation Sean Duffy (the "April 21 Letter") which warned that if it "determines that New York is out of compliance with 23 U.S.C. § 301… FHWA will implement appropriate initial compliance measures beginning on or after May 28, 2025," and that those measures would roll out in separate tranches.  In the first tranche, the letter states the measures would include:

- "No further advance construction ("AC") authorizations for projects within the borough of Manhattan, except for projects determined by FHWA to be essential for safety ("Safety Projects").[1]
- No further National Environmental Policy Act ("NEPA") approvals for projects within the borough of Manhattan, except for Safety Projects.
- No further approvals of Statewide Transportation Improvement Program ("STIP") amendments concerning New York Metropolitan Transportation Council ("NYMTC") TIP modifications."

The letter also explains that, continuing "non-compliance" could result in FHWA launching a second tranche of "measures", including if the State's "non-compliance continues …, :

---

[1] According to the April 21 Letter, "Safety Projects include projects under the National Highway Performance Program, Bridge Formula Program, and Highway Safety Improvement Program."

2

- "No further obligations of FHWA funds (both formula and competitive) for projects within New York City, except for Safety Projects.
- No further AC authorizations for projects within New York City, except for Safety Projects.
- No further NEPA approvals for projects within New York City, except for Safety Projects."

Programs cited to in the April 21 Letter are discussed in some greater detail below.

**Federal Transportation Programs In New York City**

5.    Transportation projects are complex and often take years of planning before construction begins. Projects are typically identified, developed, and funded over several years, or even decades, and involve close coordination by partners at the local, state and federal levels. Like other local governments, the City of New York identifies projects for which it prepares preliminary designs and cost estimates, which it presents to its state and federal partners. State DOT and USDOT work with the City as projects advance – or fall out of – review and approval processes that are unique to each federal funding stream.

6.    Federal funds are essential to advance significant capital improvements to bridges, roads, public spaces, and sidewalks throughout the City. Separate federal programs enable the City to keep existing infrastructure in a good state of repair, and expand access to people with mobility challenges consistent with legal requirements such as the Americans with Disabilities Act. Funding decisions are often made after there has been back and forth between the governmental partners and practical impediments are identified and assessed.

7.    The April 21 letter identifies three USDOT activities that will be curtailed if USDOT finds that the CBDTP tolls federal-aid highways without authorization. Each are discussed below.

8.    Advance construction authorizations allow projects to begin without sufficient Federal-aid obligation authority to cover the Federal share of project costs. Without advance

construction authorization, the local sponsor must set aside the full amount of the project's costs (including the share that the federal government is obligated to fund) before starting projects. As a result, a local agency can undertake fewer concurrent projects, and larger projects may crowd out the ability to maintain sufficient obligational authority for smaller ones. Thus, curtailing advance construction authorizations for transportation projects in New York City would immediately reduce City DOT's flexibility in its extensive transportation funding program.

9.     NEPA refers to the National Environmental Policy Act, which requires that the policies, regulations, and laws of the Federal Government be interpreted and administered in accordance with its environmental protection goals. The lead Federal agency is required to work cooperatively with other Federal, state, and local agencies to prepare environmental reviews assessing proposed projects' impacts. These coordinated reviews can include input from the public, as well as from other agencies, and are a prerequisite to federal discretionary action. A pre-determination by a federal agency to preemptively withhold NEPA approvals would effectively halt projects in the pipeline where federal funding or approvals are necessary in order to undertake the anticipated work.

10.    The Statewide Transportation Improvement Program ("STIP") is a comprehensive list of all projects or project phases in New York State proposed to receive Federal funding, pursuant to Title 23 U.S.C. and 49 U.S.C. Chapter 53, during a given four-year period. The most recent STIP for New York State was formally approved on December 23, 2022. The STIP includes highway, transit and non-motorized projects as well as urban and rural projects. The New York Metropolitan Transportation Council is responsible for developing the Transportation Improvement Program ("TIP", or 4-year plan) for New York City, Long Island and the lower Hudson Valley. A blanket refusal to approve STIP projects would essentially block any new

4

projects from entering the federal fund eligibility pipeline. Furthermore, to the extent that major modifications are required for projects, amendments to the TIP/STIP are necessary before those modifications are eligible for federal funds.

11.     I understand that the federal government has stated that "Safety Projects" are exempt from the threatened curtailment, and that the carve-out includes those that fall under the National Highway Performance Program, Bridge Formula Program, and Highway Safety Improvement Program. However, the letter also suggests that FHWA will determine in the first instance which projects qualify as important for public safety.  This risks that a project would not be found to be a "Safety Project" even if it primarily promotes public safety, and is funded through the programs named in the letter, which could stop NEPA review or threaten federal funding.  Any new process that contemplates limiting the availability of federal funding outside the existing statutory framework in the above-mentioned programs, risks subjective curtailment despite their safety focus. Thus, conditioning funding of projects on a new, discretionary determination of their status as "Safety Projects" would also harm City DOT's ability to plan, budget, and ultimately execute its mission.

**Federal Contributions to City DOT's Capital Budget**

12.     While the April 21 Letter addresses funding to State DOT, some of this funding is passed through to City DOT, and forms a crucial part of the agency's Capital Budget. City DOT receives, on average, approximately $250 Million in FHWA funding each year across both capital and expense projects.

13.     In Manhattan alone, multiple major projects could be immediately affected by the threatened curtailment of funding and approvals. The Trans Manhattan Expressway, a roughly $470 Million project, is currently in the preparatory stages of seeking review under NEPA. This

project will rebuild the ramp connecting the Harlem River Drive to the Trans-Manhattan Expressway in Upper Manhattan. The ramp structure was originally constructed in 1939 by the Port Authority, and has thus been in operation for 80 years and is nearing the end of its intended service life.  I understand that the federal government may refuse to process further NEPA approvals or federal funding for the project, which is expected to cover about $98 Million of the project cost. If either or both actions are taken by the federal government, City DOT would be unable to make important improvements to the Expressway. Notably, the project is in far Northern Manhattan, and is not subject to the CBDTP tolls. And while the project should qualify as a Safety Project, not every component is safety related. Any determination by USDOT that some part or all of the project may be curtailed because it is not safety related would threaten City DOT's ability to proceed with this important project.

14. Similarly, two other projects involve reconstructing streets near the New York Public Library ($9.5 Million) and at Delancey Street in the Lower East Side ($41 Million) to improve pedestrian safety. Each of these projects is in the final phase of design, approaching the construction phase. Delancey Street, in particular, is classified as being among the top 10% of high-crash corridors in the borough. By expanding public space, installing proven safety treatments, and providing multimodal transit infrastructure, the Delancey Street Reconstruction project will transform a half mile urban highway into a safer, more accessible, and resilient streetscape for all users. The project will also include critical subsurface utility and infrastructure upgrades to a 100+ year old roadway, which, if left unaddressed, can lead to street failure events such as sinkholes. City DOT expects to solicit bids for construction in Summer 2025; however, the threatened additional discretionary review to determine whether this project is a Safety Project could threaten this timeline, and an adverse determination could yield months of delay. Such a

6

delay could result in cascading delays, coupled with inflation and other cost increases. Any delay to this project—either by curtailing its funding or approvals, or by requiring the City to demonstrate that it is an exempt "Safety Project"—will deprive New Yorkers of long promised critical safety, accessibility and infrastructure upgrades.

15.     Similarly, the "Safe Routes to School" Manhattan capital project is dedicated to pedestrian safety and safe streets near schools in underserved areas. This project will provide critical safety improvements at 19 intersections in the vicinity of seven different schools, all located in upper Manhattan. This project is currently scheduled to start construction in 2026, and delaying the work would deprive New Yorkers – especially children and their families - of critical safety improvements. Even withholding funding for a few months would introduce uncertainty and delay to the project which would ultimately harm the City's ability to complete it.

16.     In further tranches, the April 21 Letter anticipates expanding its curtailment beyond Manhattan to the remainder of New York City. This could threaten federal matching funds for more than 20 projects, with a combined cost of over $3.1 Billion, and a combined federal share of about $570 Million. The projects include efforts intended to improve safer public streets and sidewalks near public schools and other community facilities like public libraries, and important bridge and roadway rehabilitation projects.

17.     Another project potentially subject to federal curtailment of funding and approvals is the reconstruction of the Shore Road Bridge in the borough of the Bronx. This roughly $545 Million project would replace a movable bridge—one of the most frequently opened in the City— that was designed to standards in place over 110 years ago. Delaying the environmental reviews for this project, withholding the roughly $130 Million federal cost-share, or requiring the City to demonstrate to FHWA's discretionary satisfaction that the this is a "Safety Project" would harm

City DOT's ability to execute this necessary replacement because it slows the ability to design and advance the project through the review process while adding construction and other inflationary costs that are regularly incurred over time.

18. Similarly, the Secretary's threatened enforcement could impact the rehabilitation of West Tremont Avenue Bridge over the Metro-North Railroad Hudson Line and the Major Deegan Expressway. This roughly $95 Million project, of which the federal government is to fund approximately $73 Million, or 77%, is currently undergoing final design.

**Impacts of Federal Enforcement**

19. The threatened curtailment of federal funds and approvals to State DOT for projects in Manhattan, and, eventually, New York City as a whole, would irreparably harm City DOT by preventing the commencement and completion of current and future projects necessary to its mission of providing for the safe, equitable, and sustainable movement of people and goods and the creation of public spaces that would otherwise strengthen our communities. Eventually, the curtailment of the threatened funds would lead to projects being delayed or abandoned altogether, and associated cost increases even if funding were later restored. A long-term curtailment of funds could lead to the cancellation of projects necessary for keeping transportation infrastructure in a state of good repair, the loss of staff needed to maintain and improve infrastructure, and the need to forego other projects that would otherwise improve the lives of New Yorkers, commuters, and those traveling to our through the City.  It would also impact City DOT's collaborative work with local vendors, subcontractors, and the Transportation departments of connected jurisdictions.

20. If this enforcement is allowed to occur during the pendency of this litigation, the effects would be immediate, and the resulting delays and cost escalations could not be remedied after a final determination on the merits, and could force the City to choose between substituting

City funds to keep necessary projects on track, and keeping the City's other infrastructure in a state of good repair. To be clear, as described above, the termination of the City's access to federal transportation funding—even for a few months—could have far-reaching consequences for the City of New York. It would reduce City DOT's ability to fulfill its mission, to the detriment of the City of New York's vitally important roads, sidewalks and bridges.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on May 5, 2025, at New York, NY.

William Carry