# EXHIBIT 1C

# DECLARATION OF ALLISON L. C. DE CERREÑO, PH.D.

Filed 05/06/25

Metro. Transp. Auth. v. Duffy, No. 25 Civ. 1413 (S.D.N.Y.) (LJL)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

METROPOLITAN TRANSPORTATION AUTHORITY
and TRIBOROUGH BRIDGE AND TUNNEL
AUTHORITY,

*Plaintiffs*,

and

NEW YORK STATE DEPARTMENT OF
TRANSPORTATION, RIDERS ALLIANCE, SIERRA
CLUB, and NEW YORK CITY DEPARTMENT OF
TRANSPORTATION,

*Intervenor-Plaintiffs*,

v.

SEAN DUFFY, in his official capacity as Secretary of
the United States Department of Transportation,
GLORIA M. SHEPHERD, in her official capacity as
Executive Director of the Federal Highway
Administration, UNITED STATES DEPARTMENT
OF TRANSPORTATION, and FEDERAL HIGHWAY
ADMINISTRATION,

*Defendants*.

Case No. 25 Civ. 1413 (LJL)

## DECLARATION OF ALLISON L. C. DE CERREÑO, PH.D.

I, Allison L. C. de Cerreño, Ph.D., hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.      I am the Chief Operating Officer of the Triborough Bridge and Tunnel Authority ("TBTA"), an affiliate of the Metropolitan Transportation Authority (the "MTA"). I have responsibility for overseeing the work of roughly 800 personnel in three TBTA departments: Tolling Management (including roadway and back-office operations), Facilities Management

(including nine bridges and tunnels, the Robert Moses complex, central maintenance, and fleet), and Environmental, Safety and Health (EHS). In addition, in that capacity and in my prior positions with the MTA, I have been and remain the project lead (aka "Project CEO") for the Central Business District Tolling Program (the "CBD Tolling Program" or the "Program"), a New York State legislatively mandated program pursuant to which TBTA, the New York State Department of Transportation ("NYSDOT"), and the New York City Department of Transportation ("NYCDOT") (collectively, the "Project Sponsors") developed and introduced congestion pricing to Manhattan's Central Business District (the "CBD"). The State legislation providing for the Program is the 2019 MTA Reform and Traffic Mobility Act (the "TMA"). The Program, which commenced operations on January 5, 2025, has reduced congestion and, as it continues to operate, will provide a stable source of revenue for the MTA to improve subway, bus and commuter rail systems through projects included in the MTA's 2020-2024 Capital Program and successor capital programs.

2.      In my role as TBTA lead for the Program, I was involved in and have personal knowledge of meetings and communications with the U.S. Department of Transportation ("USDOT") and the Federal Highway Administration ("FHWA"), which date back to 2019. As reflected by those meetings and correspondence, USDOT and FHWA fully understood that the Program entailed what is commonly known as "cordon pricing"—that is, tolling all non-exempt vehicles accessing a specified geographic area, in this case the CBD. USDOT and FHWA also fully understood that the Program was intended to reduce congestion through two complementary means: disincentivizing driving into the CBD by charging tolls, and making the use of transit more attractive by directing net revenues (after costs associated with the Program) to capital

improvements in mass transit. FHWA's ultimate approval of the Program reflected this understanding.

### A. The History of the Program

3.      The USDOT/FHWA determined that the Program required approval from FHWA, which had been conferred the authority to allow state and local agencies to implement tolls on federal-aid highways through the Value Pricing Pilot Program (the "VPPP"). The VPPP was established through the enactment of Section 1012(b) of the Intermodal Surface Transportation Efficiency Act ("ISTEA") of 1991, as amended. The VPPP was initially called the Congestion Pricing Pilot Program; the name of the program was changed to the VPPP in the Transportation Equity Act for the 21st Century ("TEA-21") of 1998, and was continued in the Safe, Accountable, Flexible, Efficient Transportation Equity Act ("SAFETEA-LU") of 2005. [1]   For a detailed description of FHWA's interpretation, guidance and application of the VPPP, *see* Plaintiffs' Amended Complaint at ¶¶ 62–98.

4.      The three Program Sponsors initiated contact with USDOT and FHWA with regard to the Program in the Spring of 2019, shortly after the April 1, 2019 adoption of the TMA. There were several in-person meetings and numerous telephone conferences, including three in-person meetings in Washington D.C. and two in Albany. The initial in-person meeting, in Washington, D.C., was on April 23, 2019, and the second was in Albany the next day; the other in-person meetings were in Washington D.C. in October and December of 2019 and in Albany in November 2019.

---

[1]   *Value Pricing Pilot Program*, U.S. FED. HIGHWAY ADMIN., https://ops.fhwa.dot.gov/congestionpricing/value_pricing/ (last accessed Apr. 18, 2025).

5.      At those meetings, and particularly in the April 2019 meetings with USDOT and FHWA, the Project Sponsors presented the Program and provided detailed explanations of its contemplated operation. Those explanations included that tolling would apply to vehicles that enter the CBD, defined as below and inclusive of 60th Street (with the exception of vehicles using the FDR Drive, West Side Highway, the Battery Park Underpass, and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West Street) in order to reduce the severe congestion in the CBD. This type of congestion pricing is generally called "cordon pricing" (or sometimes "zone-based" or "area-wide pricing"), as the tolling is for a specific geographic area.[2] In addition, it was explained that the Program would incorporate toll rates that would provide a new and recurring source of revenue for the MTA, with net revenues (after paying for Program costs) to be dedicated to capital improvements identified in the MTA's 2020-2024 Capital Plan. The minutes FHWA prepared of the April 24th meeting in Albany reflect the explanation and discussion of these and other elements of the Program. In addition, at that meeting the Project Sponsors provided USDOT and FHWA with a description of the Program. A copy of the April 24, 2019 meeting minutes, along with the Program description that was provided to USDOT/FHWA at the meeting, are annexed hereto as Exhibit "A."

6.      At these meetings, as well as at the later meetings, USDOT and FHWA representatives made clear that, given the nature of the Program, the VPPP is the appropriate vehicle to provide tolling authority on federal-aid highways for a cordon-based congestion pricing program like the Program. That is plain by the "Discussion" subheading in the minutes of the April 24th meeting, which reference the VPPP and its attendant requirements (including compliance with the National Environmental Policy Act, or "NEPA"). The federal agencies explained that

---

[2] *Id.*

NYSDOT already had one of the 15 "slots" allotted in the VPPP, and could have multiple congestion pricing projects under that "slot," including the Program. The federal agencies further explained that there would need to be a VPPP agreement between FHWA and the Project Sponsors. At the close of the April 24th meeting, it was agreed that FHWA would forward to the Project Sponsors a template for a VPPP "Expression of Interest," which was needed to commence the eligibility/approval process, as well as an example of a cooperative agreement that the Project Sponsors would need to enter into with FHWA. *See* Exhibit "A" at 3.

7.      On June 14, 2019, the Project Sponsors held a conference call with FHWA. During that call, as occurred in later meetings, there was discussion of what class of action would be applicable for the anticipated NEPA process (an Environmental Assessment ("EA") or Environmental Impact Statement ("EIS")) and what steps the Project Sponsors could take to advance the Program pending completion of the NEPA process.

8.      The Project Sponsors submitted an Expression of Interest ("EoI") to FHWA seeking approval under the VPPP to implement the Program on June 17, 2019. A copy of the June 17, 2019 cover letter accompanying the EoI and the EoI are annexed hereto as Exhibit "B." As noted in the cover letter, "[t]he purpose of this variable price tolling program is to specifically mitigate the untenable levels of traffic congestion that currently exists in the Central Business District." The cover letter further noted that improving mass transit through revenues from the Program, "provides the greatest return on investment for mitigation traffic congestion." *Id.* at 1.

9.      The full EoI also makes plain the basic elements of the Program and its goals. For example, Section D.2 provides a description of the area to be tolled (*i.e.*, the CBD, with the exceptions noted above).  Section D.4 describes the goals of the Program, including the reduction

of congestion and improvement of air quality, as well as the creation of a sustainable source of
funding for the MTA and increase in transit ridership.

10.     The FHWA response to the EoI came in the form of an October 24, 2019 letter from
the Administrator, which requested further information. A copy of the October 24, 2019 letter is
annexed hereto as Exhibit "C" The FHWA stated that "[u]nder the various programs in Federal
law that allow tolling of existing infrastructure, the VPPP appears to be the best potential fit,
provided that the overall purpose of variable tolling remains to reduce roadway traffic congestion."
*Id.* at 1.[3] In addition, noting the Program revenues would be used almost exclusively for mass
transit improvement, FHWA asked for details about the use of those revenues. *Id*. at 2. Finally,
FHWA acknowledged that the use of cordon pricing was "unprecedented", and that the agency
had to consider the precedent it would be setting by approval. *Id.*[4]

11.     Following this letter, the Project Sponsors met FHWA in Albany on November 6,
2019 to discuss the October 24th letter. The Project Sponsors then met with USDOT and FHWA
in Washington D.C. on December 6, 2019 and obtained guidance on responding to the agencies'
further requests for information. At that meeting, there was discussion of the use of the Program
revenues and the NEPA class of action.

12.     After the December 6 meeting, the Project Sponsors submitted a December 17,
2019 letter to FHWA, together with information requested in the FHWA's October 24th letter. A

---

[3] "Variable tolling" refers to tolling that, like the Program, imposes different toll amounts at
different times of the day.

[4] This assertion was not entirely correct, as there had been prior proposals for area-wide tolling
approved by FHWA. For example, in 2007, New York City and FHWA entered into an Urban
Partnership Agreement in which FHWA agreed to award New York City $5 million in VPPP
funding to pursue "a broad area pricing system in Manhattan south of 86th Street." *See* Plaintiffs'
Amended Complaint at ¶¶ 84. This approval was conditioned on State legislative action which did
not occur at that time.

copy of the December 17, 2019 letter is annexed hereto as Exhibit "D." The Project Sponsors'

December 17th letter emphasized that the premise of the Program was "to implement an area-wide

pricing program under the Value Pricing Pilot Program." The attachment included with the letter

explained, again, that net Program revenues would be dedicated to capital investments in mass

transit. After noting that much of the information requested by the agencies would typically be

contained in the environmental documentation that would be prepared pursuant to NEPA, the

Project Sponsors requested a prompt decision on the class of action for NEPA review that had

been under consideration by USDOT/FHWA for months (since the April 24th meeting). On

January 27, 2020, the Project Sponsors submitted the Traffic and Revenue Study that had been

requested by FHWA; a copy of the cover letter submitting that study is annexed hereto as Exhibit

"E."

13.     There was no response to the December 2019 or January 2020 submissions, so the

Project Sponsors wrote the FHWA on July 2, 2020 to request prompt agency action on the EoI (as

required by an Executive Order and guidance issued by the first Trump administration) and a

determination on the NEPA process; *viz*, whether an EA or EIS would be required. A copy of the

July 2, 2020 letter is annexed hereto as Exhibit "F." On September 3, 2020, FHWA responded,

stating that due to the Covid-19 pandemic and potential changed circumstances with regard to

traffic and mass transit ridership, the agency needed more information on these conditions, "as the

impact on congestion is a relevant consideration under the [VPPP]." A copy of the September 3,

2020 letter is annexed hereto as Exhibit "G."

14.     The Project Sponsors submitted the requested information on traffic and transit

ridership on October 13, 2020, and reiterated the request that FHWA inform them of the type of

NEPA process to be undertaken. A copy of the October 13, 2020 letter is annexed hereto as Exhibit

"H." It was not until March 30, 2021 that FHWA responded, and informed the Project Sponsors that an EA would be the appropriate NEPA documentation. A copy of the March 30, 2021 letter is annexed hereto as Exhibit "I."

15. A lengthy environmental review process under NEPA ensued. Consistent with discussions with FHWA in 2019 and 2020, as well as at the commencement of the NEPA process, the EA's description of the purpose for the Program was "to reduce traffic congestion in the Manhattan CBD in a manner that will generate revenue for future transportation improvements, pursuant to acceptance into FHWA's VPPP."[5] The EA identified two Program needs: the need to reduce vehicle congestion in the CBD, and the need to create a new local, recurring funding source for MTA's transit capital projects.[6] To further refine the purpose and address the identified needs, the EA identified two specific congestion reduction objectives, which made plain that the primary purpose of the Program was to reduce congestion. These objectives were the reduction of daily vehicle miles traveled ("VMT") in the CBD by at least 5% and the reduction of daily vehicles entering the CBD by at least 10%. The objective related to creating the new, local, recurring source of funding was to generate sufficient net revenue to support the financing of $15 billion for MTA transit capital projects in the agency's 2020-2024 Capital Program.[7]

16. Because the final tolling structure had not yet been defined, for the purpose of evaluating the potential environmental impacts of various tolling options, the Final EA analyzed

---

[5] Final EA Chapter 1, Introduction at 1-10, https://www.mta.info/document/110766 (last accessed Apr. 18, 2025).
[6] *Id.* at 1-10 to 1-18.
[7] *Id.* at 1-18.

seven tolling scenarios, with tolls for passenger cars ranging from $9 to $23 (with different rates for different classes of vehicles), with different toll amounts, credits and exemptions.[8]

17.     The environmental review culminated in the April 2023 Final EA and the June 2023 Finding of No Significant Impact ("FONSI").

18.     On November 30, 2023, the Traffic Mobility Review Board, an entity required by the TMA to recommend a toll structure for consideration by the TBTA Board, issued its recommendation,[9] which was informed by the Final EA. On December 6, 2023, the TBTA Board authorized TBTA to take the requisite steps to promulgate a CBD toll rate schedule.[10]

19.     On March 27, 2024, the TBTA Board adopted a toll rate schedule for the Program, with a planned implementation date in or about June 2024. The Project Sponsors prepared a reevaluation document ("Reevaluation 1") consistent with FHWA's regulations and as contemplated by the FONSI, to assess the effects of the March 2024 adopted toll schedule and determine whether the FONSI was still valid.[11] On June 14, 2024, FHWA confirmed that the reevaluation was consistent with FHWA's regulations and determined that the FONSI remained valid.[12]

---

[8] Final EA Chapter 2, Project Alternatives at 2-29 to 2-38, https://www.mta.info/document/110771 (last accessed Apr. 18, 2025).

[9] Traffic Mobility Review Board, *Congestion Pricing in New York* (Nov. 2023), https://www.mta.info/document/127761.

[10] MTA Board Votes to Begin Public Review Process for Central Business District Tolling Rate Schedule, MTA (Dec. 6, 2023), https://www.mta.info/press-release/mta-board-votes-begin-public-review-process-central-business-district-tolling-rate.

[11] Central Business District (CBD) Tolling Program, Reevaluation (June 24, 2024), https://www.mta.info/document/142711.

[12] Letter from Richard J. Marquis, Division Administrator, Fed. Highway Admin., to Allison L. C. de Cerreño, Ph.D., Chief Operating Officer, MTA Bridges and Tunnels (June 14, 2024), https://www.mta.info/document/142701.

20.     On June 5, 2024, prior to a VPPP agreement being executed, the Governor announced a pause in implementation of the Program, which at that point had been scheduled to begin on June 30, 2024.

21.     On November 14, 2024, the Governor announced a proposal to proceed with the Program, but with the toll rates that had been adopted by the TBTA Board in March 2024 being phased-in gradually over several years. On November 18, 2024, the TBTA Board adopted the phase-in feature of the toll rate schedule that it had approved in March (the "Phase-In Approach").[13]

22.     Under the Phase-In Approach, toll rates for each vehicle class and time of day, as well as tunnel crossing credits, are proportionally reduced from, and then gradually return to, the corresponding values in the March 2024 adopted toll rate schedule. Thus, subject to certain tunnel crossing credits, from 2025 to 2027, the peak-period E-ZPass entry toll rate charged for passenger vehicles will be $9; for motorcycles, $4.50; for larger vehicles including transit and commuter buses and trucks, $14.40 or $21.60, depending on their size; for taxis, $0.75 per trip; and for for-hire vehicles ("FHVs") on trips dispatched by high-volume for-hire services ("HVFHSs"), $1.50 per trip. The toll rates and tunnel crossing credits later increase proportionally for each vehicle category, once in 2028, then again in 2031 to match those in the March 2024 toll rate schedule, as set forth in the November 2024 toll rate schedule.

23.     The Project Sponsors prepared a second reevaluation consistent with FHWA's regulations to assess the effects of the Phase-in Approach of the March 2024 adopted toll structure, entitled Reevaluation 2. This Reevaluation concluded that the effects of the Program were

---

[13] Triborough Bridge and Tunnel Authority Central Business District (CBD) Charges, https://www.mta.info/document/138931 (last accessed Mar. 20, 2025).

consistent with those disclosed in the Final EA, the mitigation set forth in the FONSI (and Reevaluation 1) remained appropriate, and the FONSI remained valid.[14]

24.    On November 21, 2024, FHWA confirmed that Reevaluation 2 was consistent with FHWA's regulations and determined that the FONSI remained valid.[15] FHWA and the Project Sponsors then signed an agreement under the VPPP authorizing the Program's collection of tolls.[16] The agreement, *inter alia*, requires that the Project Sponsors report to FHWA on various performance metrics. Along with direct indicators of congestion reduction, such as daily vehicle entries into the CBD, are indirect indicators, including transit ridership and "capital projects funded or financed through Project revenue."[17]

25.    The Program commenced tolling customers on January 5, 2025. Information available for the first months of operations indicates a noticeable reduction in congestion in the CBD as compared to the same time period in 2024, with the corollary benefits of decreased time for emergency vehicle trips, Access-A-Ride Paratransit Service trips, and commutes.

    a.    Traffic in the CBD decreased substantially, with approximately 5.8 million fewer vehicles entering the district in January through March 2025 than would be expected based on data for prior years. This represents an 8% reduction from a typical January, a 12% reduction from a typical February, and a 13% reduction from a typical March.[18] Although not yet published, preliminary data for April indicate that traffic in the CBD was down by 12%.

---

[14]    Central Business District (CBD) Tolling Program, Reevaluation 2 (Nov. 2024), https://www.mta.info/document/158191.

[15]    Letter from Richard J. Marquis, Division Administrator, Fed. Highway Admin., to Allison L. C. de Cerreño, Ph.D., Chief Operating Officer, MTA Bridges and Tunnels (Nov. 21, 2024), https://www.mta.info/document/158196.

[16]    Value Pricing Pilot Program Agreement (Nov. 21, 2024), https://www.mta.info/document/158201.

[17]    *Id.* at 9.

[18]    MTA Metrics, Reduction in Vehicle Entries to the CBD, https://metrics.mta.info/?cbdtp/vehiclereductions (last accessed Apr. 18, 2025). Compared to historical monthly averages for each respective month, a total of 1,267,083 fewer vehicles entered the CBD in January 2025; 2,029,860 fewer vehicles in February 2025; and 2,548,820 fewer in

     b.  Based on MTA's review of relevant data, there was a 10% reduction in VMT by all vehicles in the CBD from January to mid-March of 2025 as compared to the same period in 2024.

     c.  According to data collected by TRANSCOM,[19] crossing times were 12% faster at the Lincoln Tunnel and 45% faster at the Holland Tunnel from January-March 2025, compared to January-March 2024.[20] Trip times from Brooklyn and Queens to the CBD have dropped between 10% and 30%.[21] Express buses save about 10 minutes on their commutes.[22]

     d.  According to MTA's assessment of data collected by TRANSCOM, traffic speeds on river crossings were 5% to 30% faster this February than last February. Traffic speeds on major bridges improved significantly: on the Queensboro Bridge, by 31%; on the Brooklyn Bridge, by 26%; and on the Manhattan Bridge, by 7%.[23]

     e.  Commuter time is reduced; commuters are saving as much as 21 minutes on their trips.[24]

     f.  Fewer vehicles utilize the nine MTA bridges and tunnels, with levels dropping 2.4% from March of 2024 to March of 2025. The largest reductions are at the Hugh L. Carey and Queens-Midtown Tunnels, which lead directly into the zone.[25] Truck

---

March 2025. Reductions are measured by subtracting vehicle totals against a historical average of 580.5K daily entries in January, 613.9K daily entries in February, and 642.5K daily entries in March.

[19] TRANSCOM is a coalition of 16 transportation and public safety agencies in the New York – New Jersey – Connecticut metropolitan region. It was created in 1986 to provide a cooperative, coordinated approach to regional transportation management.

[20] January 2025 MTA Board Meeting, Congestion Relief Zone Tolling January 29, 2025 Update , at 4-5, https://www.mta.info/document/163411 (last accessed Apr. 18, 2025); *see also* Andrew Siff, *MTA Calls Congestion Pricing 'Transformative' on Commutes,* NBC NEW YORK, (Jan. 29, 2025), https://www.nbcnewyork.com/new-york-city/mta-congestion-pricing-transformative-commute-impact/6126670/.

[21] January 2025 MTA Board Meeting, Congestion Relief Zone Tolling January 29, 2025 Update, at Slide 5, https://www.mta.info/document/163411 (last accessed Apr. 18, 2025).

[22] *Id.* at 9; February 2025 MTA Board Presentation at 10 (Feb. 26, 2025), https://www.mta.info/document/165401 (last accessed Apr. 18, 2025).

[23] February 2025 MTA Board Presentation at 10 (Feb. 26, 2025), https://www.mta.info/document/165401 (last accessed Apr. 20, 2025); *TRANSCOM*, internally sourced data week of February 24, 2025.

[24] RPA*, Congestion Pricing: What it Means to Save Time* (Mar. 11, 2025), https://rpa.org/news/lab/what-it-means-to-save-time.

[25] MTA Daily Ridership and Traffic, New York State, https://data.ny.gov/Transportation/MTA-Daily-Ridership-and-Traffic-Beginning-2020/sayj-mze2/about_data (last accessed Apr. 18, 2025).

traffic traveling through these tunnels dropped 14% this year compared to the same period in 2024.[26]

g.  Trips are also far more reliable. According to TRANSCOM, traffic through the Holland Tunnel used to be delayed more than 3 minutes more than half of all weekdays (54%) – now 12%. On the Williamsburg Bridge, delays used to be greater than 3 minutes 65% of the time; the Program has reduced that to 2%.[27]

h.  A recent study published by the National Bureau of Economic Research, with lead authors from Yale and Stanford, found a 15% improvement in CBD traffic speeds.[28] MTA internal data show that local bus speeds have increased by an average of 3% within the CBD, with some routes increasing by as much as 7%.[29]

i.  Several bus routes have seen significant decreases in the time needed to complete their routes.[30] Based on internal MTA data from March 2025, there are 23% fewer customer trips on express bus that are delayed 10 minutes or more. Express buses are traveling 21% faster on the portion of their routes leading into and within the CBD.[31]

j.  The Program appears to have reversed a long trend of increased emergency response times;[32] as a corollary of lessened congestion in the CBD. Similarly, reduced congestion translates into less delay for school buses in the congestion zone.

---

[26] Roosevelt House Public Policy Institute at Hunters College, *Where have all the Trucks Gone? Truck Diversions through the Bronx and State*, https://www.roosevelthouse.hunter.cuny.edu/?forum-post=trucks-gone-truck-diversions-bronx-staten-island (last accessed Apr. 18, 2025).

[27] February 2025 MTA Board Meeting Presentation at 12 (Feb. 26, 2025), https://www.mta.info/document/165401; *see also TRANSCOM*, internally sourced data week of February 24, 2025.

[28] Cody Cook et al., *The Short-Run Effects of Congestion Pricing in New York City*, NBER (March 17, 2025), https://www.nber.org/system/files/working_papers/w33584/w33584.pdf (last accessed Apr. 18, 2025).

[29] MTA Metrics, Reduction in Vehicle Entries to the CBD, https://metrics.mta.info/?cbdtp/vehiclereductions (last accessed Apr. 18, 2025).

[30] January 2025 MTA Board Meeting, Congestion Relief Zone Tolling January 29, 2025 Update at Slides 9–10, https://www.mta.info/document/163411 (last accessed Apr. 18, 2025).

[31] MTA Metrics, Reduction in Vehicle Entries to the CBD, https://metrics.mta.info/?cbdtp/vehiclereductions (last accessed Apr. 18, 2025).

[32] Ginia Bellafante, *The Life-or-Death Consequences of Killing Congestion Pricing*, N.Y. TIMES (Oct. 10, 2024), https://www.nytimes.com/2024/10/10/nyregion/new-york-fire-department-response-times.html.

k. NYC open data of 311 calls show that complaints about excessive car horn honking within the CBD in January and February are down by more than 70% from the same time period last year, plummeting to 67 this year from 219.[33]

l. According to an internal analysis, between January 5 and March 4, two New York City Department of Environmental Protection noise cameras in the CBD did not issue a single horn-honking ticket. Those two cameras issued 27 during the same time last year.[34]

m. There has been less diversion of traffic to the outer boroughs than expected, thus lessening potential traffic increases in those areas (which include environmental justice communities).[35] The recent National Bureau of Economic Research study confirmed that the Program has benefitted areas outside of the CBD as well, with highways and major roadways also seeing sustained speed improvements.[36]

n. A recent Hunter College study found that truck volumes on MTA bridges and tunnels leading into and out of the Bronx and Staten Island remained essentially the same from January-February of 2024 to those months in 2025.[37] An MTA assessment shows that traffic volumes (cars and trucks) are slightly down on the Cross-Bronx Expressway, with speed increased.[38]

26. While reducing congestion, the Program has shown no adverse effects on economic activity:

a. Pedestrian traffic in Manhattan increased 4.6% between January 5 (the day that toll collection began) and January 31 compared to the same period in 2024.[39]

---

[33] Jose Martinez and Mia Hollie, *Honking Complaints Plunge 69% Inside Congestion Relief Zone*, (Mar. 11, 2025), (citing analysis of 311 call data); MTA Metrics, Reduction in Vehicle Entries to the CBD, https://metrics.mta.info/?cbdtp/vehiclereductions (last accessed Apr. 18, 2025).

[34] MTA Metrics, Reduction in Vehicle Entries to the CBD, https://metrics.mta.info/?cbdtp/vehiclereductions (last accessed Apr. 18, 2025).

[35] David Colon, *Data: Congestion Pricing Is Not Rerouting Traffic to Outer Boroughs*, STREETSBLOG (Mar. 12, 2025), https://nyc.streetsblog.org/2025/03/12/data-outer-borough-congestion-pricing-spillover-traffic-not-happening.

[36] Cody Cook et al., *The Short-Run Effects of Congestion Pricing in New York City*, NBER (Mar. 17, 2025), https://www.nber.org/system/files/working_papers/w33584/w33584.pdf.

[37] Roosevelt House Public Policy Institute at Hunters College, *Where have all the Trucks Gone? Truck Diversions through the Bronx and State*, https://www.roosevelthouse.hunter.cuny.edu/?forum-post=trucks-gone-truck-diversions-bronx-staten-island (last accessed Apr. 18, 2025).

[38] *See* MTA Metrics, Vehicle Reductions Traffic Patterns in the Bronx Post-Congestion Pricing presentation (Mar. 2025), a copy of which is annexed hereto as Exhibit J.

[39] *See Arun Venugopal*, Vehicle Traffic Is Down in Manhattan, But Pedestrian Traffic Is Up, Data Says, GOTHAMIST (Feb. 13, 2025), https://gothamist.com/news/vehicle-traffic-is-down-in-manhattan-but-pedestrian-traffic-is-up-data-says.

b. Hotel occupancy in the CBD was 73% in January 2025 compared to 70% in January 2024.[40]

c. The gross revenue of Broadway shows January-March 2025 was 25% higher than the same period last year, and attendance at Broadway shows was up 20% for January-March compared to this period of last year.[41]

d. Retail sales were up 1.5% in January and February – on track to be $900M higher this year than last.[42]

e. Leasing in the CBD was up 11% this January versus the fourth quarter of 2024, and up 80% since the first quarter of last year.[43]

f. Real estate availability is down.[44]

27.    As aptly stated by Kathryn Wylde, President and CEO of The Partnership for New York, since the initiation of congestion pricing, New Yorkers are "moving faster and there's less traffic."[45]

**B.   TBTA and MTA Will Suffer Irreparable Harm if the Project Sponsors are Forced to Suspend the Program in Order to Avoid the Withholding of FHWA funding to the Project Sponsors**

28.    TBTA would incur substantial expenses which could not be recouped if the Project Sponsors are compelled to suspend the Program until a final decision in order for the Project Sponsors to avoid the loss of significant State funding.

---

[40] This is based on a March 10, 2025 internal analysis conducted by New York City Economic Development Corporation of CoStar data.

[41] This is based on a March 2025 internal analysis of data made publicly available by the Broadway League. *See* Research and Statistics, Grosses: Broadway in NYC, The Broadway League, https://www.broadwayleague.com/research/grosses-broadway-nyc/ (last accessed Apr. 18, 2025).

[42] This is based on a March 2025 internal analysis of Affinity Solutions Cards & Transactions data.

[43] Colliers, *Downtown NYC Office Market Report: 2025 Q1*, https://www.colliers.com/en/research/new-york/nyc-q1-2025-downtown-office-market-report (last accessed Apr. 18, 2025).

[44] Colliers, *Manhattan Monthly Snapshot: January 2025*, https://www.colliers.com/en/research/new-york/2025_01_manhattan-monthly-snapshot (last accessed Apr. 18, 2025).

[45] Dick Brennan, *President Trump said to have NYC's congestion pricing, bike lanes in his crosshairs*, CBS News (Feb. 10, 2025), https://www.cbsnews.com/newyork/news/president-trump-nyc-congestion-pricing-bike-lanes/.

29.     TBTA has expended substantial taxpayer dollars in reliance on FHWA's repeated representations that the VPPP would encompass the Program, and in the agency's words, is the "best potential fit" for the Program. *See* Exhibit "C" at 1.

30.     TBTA budgeted and has expended over $500 million to establish the Program. These expenditures included developing the methodological approach; conducting the assessment and extensive outreach and developing the final documentation for the environmental review process under NEPA; design, development, implementation and testing of the roadway infrastructure and system; design, development, implementation and testing of the back-office system; additional extensive outreach for the State administrative review process; staff costs, including new staff for the Program; and consulting costs.

31.     Few if any of these costs would have been incurred had USDOT/FHWA taken the position at the beginning of the long and tortuous 5-year process it now takes—that the Program is not lawful under the VPPP because it utilizes cordon pricing to raise money for mass transit. They did not assert such illegality. Instead, as reflected in the Draft EA, the Final EA and the FONSI, the agencies specifically endorsed the goals and objectives of the Program and entered into a VPPP Agreement with the Project Sponsors.

32.     If the Program is temporarily suspended, all the benefits identified above would be lost: traffic would return, travel times would increase, emergency response times would lengthen, buses (including school buses) would face greater delays, and the streets would become less safe. The public would lose the benefits of congestion pricing, and thus the benefits reasonably expected to flow from the $500 million spent by TBTA for the Program, for at least the period of the suspension. These benefits could not be recouped.

33.     Moreover, if the Program is temporarily suspended, TBTA would incur roughly $12 million in additional expenditures per month, most of which would be related to a combination of the operations and maintenance of the roadside tolling system, the operations of the back-office system and customer contact center, and consultant costs. This figure does not include the costs related to additional staff that were brought on specifically for the Program nor other costs, such as those related to outreach and advertising and assessments to be undertaken for the Program. These costs cannot be deferred even if operation of the tolling is suspended. Further, these costs could not be paid by Program revenues, as there would be none during this period. These funds would be lost as a result of a suspension.

34.     Furthermore, a Program suspension would cause TBTA the loss of estimated monthly revenues from the first phase of the Program of over $50 million, based on revenues in January, February, and March 2025, which if annualized would meet the projected net annual revenues forecasted in Reevaluation 2 of roughly $500 million in the first phase.[46] These public dollars could never be recouped, even if the Program is restarted, as those months of tolling revenues would be lost forever.

35.     This loss of funds means that the MTA would, at a minimum, have to delay undertaking much-needed capital improvement to the mass transit system, including such undertakings as adding accessibility to numerous subway stations consistent with the Americans with Disability Act, improving outdated signaling and other improvements to system reliability,

---

[46]   *See* February 2025 Report of the MTA Finance Committee, https://www.mta.info/document/165106 (last accessed Apr. 18, 2025), March Report of the MTA Finance Committee Meeting, https://www.youtube.com/live/VuALrov3tBA?t=1812s (last accessed Apr. 18, 2025).

improving safety and customer service through technology, and extending public transit to under-served areas.[47]

### C. The Public Interest Strongly Favors a Preliminary Injunction

36.     Without an injunction, the Project Sponsors, as noted above, may be compelled to suspend the Program in order to avoid the loss of State funding. In that event, MTA, the recipient of Program revenues, could be prevented from proceeding with vitally important work under the MTA's 2020-2024 Capital Program, which is intended to ensure that improvements put in place will be sustainable for years to come. The total Capital Program is $55.6 billion. Of that amount, $52.2 billion is identified for critical investments in the region's subways, buses, and commuter railroad, nearly one-third of which would be supported by the Program. Key projects of the Capital Program, which would be delayed by a suspension that would halt Program tolling revenues, include those referenced in Paragraph 35, above.

37.     In addition, because MTA would be forced to halt operation of the Program, TBTA could not advance the $155 million package of regional and place-based mitigation for environmental justice communities to which the Project Sponsors committed in the Final EA, FONSI, and reevaluations, and which would address preexisting pollution and chronic health burdens in such communities, including particularly burdened environmental justice communities in New York and New Jersey.[48] Moreover, TBTA has already reached out to the environmental justice communities identified for place-based mitigation, to discuss which types of mitigation are most appropriate for each community. Such measures could include installing roadside vegetation,

---

[47] *See generally* MTA, 2020–2024 Capital Program: Exec. Summary (Oct. 1, 2019), https://files.mta.info/s3fs-public/2019-09/MTA%202020-2024%20Capital%20Program%20-%20Executive%20Summary.pdf (last accessed Apr. 18, 2025).

[48] Final EA Chapter 17, Environmental Justice at App. 17D-25–64, 74–80, https://www.mta.info/document/92741 (last accessed Apr. 18, 2025).

renovating parks and green space, and/or installing air filtration units in schools near highways. Delay of the Program would necessarily stall these efforts.

38.     In contrast, the public would not be harmed by continued operation of the Program; rather, it would continue to receive the benefits of the Program set forth above. In addition, if it became necessary, there are mechanisms that allow TBTA to fully refund toll payers in the unlikely event that USDOT/FHWA prevail in this action. All eligible vehicles entering the CBD are charged and pay the applicable toll rate using one of two mechanisms. Toll payers with an E-ZPass account pay the toll using their E-ZPass account. If the vehicle is not associated with an E-ZPass account, the registered owner of the vehicle receives a toll bill in the mail. No matter what the method of payment by that toll payer, it is recorded. Because the Program uses these cashless methods of collection, no one pays with cash at a toll booth — an outdated method of collection that TBTA replaced at its bridge and tunnel facilities years ago.

39.     Between 92% and 95% of toll payers on current TBTA tolling facilities that enter Manhattan use E-ZPass, and it appears from data available to date that a significant majority of drivers use E-ZPass for the Program. If required for toll payers with a New York E-ZPass account, TBTA is able to refund any tolls paid by crediting such E-ZPass accounts. Toll payers who pay the toll through a non-New York E-ZPass account will be traceable by their respective state tolling agencies, and their payments will also be traceable by those agencies. Consistent with TBTA's prior practice when issuing refunds to toll payers who use a non-New York E-ZPass account, any such refunds can be issued to the respective state tolling agency, which would then reimburse the toll payer. For example, someone driving into the CBD from Delaware with a Delaware E-ZPass account would pay the toll amount to the Delaware state tolling agency. This agency would send the toll amount, on the toll payer's behalf, to TBTA. In turn, if required, TBTA can refund the

Delaware state tolling agency, which in turn could then credit the toll payer's account. Where warranted, TBTA already routinely reconciles New York E-ZPass accounts and non-New York E-ZPass accounts in the ordinary course of business in this manner for bridge and tunnel facilities; Program toll reconciliation would be no different.

40.     The remaining toll payers who do not use E-ZPass are also traceable and can be refunded by the same mechanism that they use to pay their bill. Toll payers without E-ZPass receive a bill in the mail with a unique identifying bill number. These toll payers then have the option of paying that bill through credit card, cash at an authorized payment facility, or by mailing in a check. If a toll payer has paid their bill, and thus paid the toll, TBTA can refund the toll payer by reversing the charges if they used a credit card, or by issuing a refund check if the toll payer paid by cash or check.

41.     In summary, it bears emphasizing that a suspension of the Program would delay the extensive benefits to the public that accompany the Program—and thus the benefits that would otherwise flow from these large-scale expenditures, such as making subway stations accessible to the disabled. Delaying implementation of the Program means the reinstitution of the severe congestion in the CBD, with its concomitant economic and environmental costs to businesses, residents, commuters, workers, and visitors in this area.  Congestion in the CBD has been a $20 billion annual drag on the region's, and thus the country's, economy.[49] And as the most congested urban area in the country, travel times—including for public buses and emergency vehicles, are extraordinarily slow.[50] Delay of the Program would mean the continuation of these conditions, and

---

[49] Final EA Chapter 1, Introduction at 1-12, https://www.mta.info/document/92761 (last accessed Apr. 18, 2025).
[50] *Id*. at 1-1.

harm to the public, while allowing the Program to proceed pending a final decision on the merits would cause no harm to USDOT or FHWA.

Dated:   May 4, 2025

      New York, New York
                                    Allison L. C. de Cerreño, Ph.D.

# Exhibit A

**Congestion Pricing 4-24-2019 Meeting Summary**

**Introduction**

On April 1, 2019, the New York State legislature and Governor approved the proposed Congestion Pricing Program that would apply to the geographic area in Manhattan south of 60th St. This area is referred to as the Central Business District (CBD).  Although entry into the CBD would result in vehicles being tolled, certain roads on the perimeter of the geographic area would not be tolled – these include Route 9A and FDR Drive.  The Battery Park underpass and any surface roadway portion of the Hugh L Carey Tunnel connecting to West Street is also not tolled.

 On April 24 at the FHWA NY Division Office, FHWA, FTA and USDOT representatives met with New York City Department of the Transportation (NYC DOT), Metropolitan Transportation Authority (MTA), Tri-borough Bridge & Tunnel Authority (TBTA), New York State Department of Transportation (NYSDOT) and the New York Governor's Office representatives to discuss the proposed Congestive Pricing Initiative.

The requested purpose of the meeting was to have an informal discussion, provide FHWA more information on the proposal, and for FHWA to provide technical guidance to New York.  It was noted that the NYC DOT, MTA, and TBTA had requested a meeting with USDOT leadership and a meeting occurred the day before, and any policy decisions would be made by USDOT leadership.

**Overview of the Initiative (See Enclosed Handout)**

MTA, TBTA and NYCDOT jointly outlined different elements of the initiative.

<u>Operation</u>

- The System is scheduled to go live no earlier than 12/31/2020.
- A six-member Traffic Mobility Review Board will be formed and will recommend toll rates and policy.  The Mobility Review Board will be comprised of 6 persons from the Region.
- An MOU will be developed between NYC DOT and MTA/TBTA within the next 60 days.

<u>Tolling System</u>

- Through legislative exemption, the Congestion Pricing Program is not subject to State environmental review, ULURP (land use requirements) and other NYC local laws.

<u>Tolling Policy</u>

- Variable pricing, with statutory requirements to raise $15 Billion for bonding for the MTA Capital Program.
- Exemptions: emergency vehicles, vehicles transporting persons with disabilities.  Mobility Board allowed to exempt others.
- Tax Credit matching toll value for residents of CBD with AGI under $60,000.
- Other policies will be set by MTA Bridges & Tunnels and informed by recommendation of Traffic Mobility Review Board.
- Passenger cars will be charged a fee once per day.

DOT_0041601

Revenue Allocation

- CBD Tolling Capital Lockbox Fund receives all revenues, plus revenue from internet sales tax and real estate transfer tax (approximately $25 Billion).
- Funds can be expended on; system expenses, bond payments, capital projects, securing and maintaining federal approvals.
- Capital Projects: 80% to New York City Transit, 10% to Long Island Railroad and 10% to Metro North Railroad.

Reporting and Studies

- Biennial reporting required of MTA Bridges and Tunnels, in consultation with NYC DOT, on traffic, VMT, bus speeds, emissions, etc - beginning one year after operation date.
- Annual reporting on expenditures from CBD Tolling Program revenues from MTA/TBTA.
- NYC Parking Impact Study: required 18 months from operation date of system.

**Discussion**

Topics and questions below were discussed; however, no decisions were made.

 VPP (Federal Approval Needed)

- NYSDOT has an existing temporary Value Pricing Pilot (VPP) slot available for this project.
- Multiple parties allowed in VPP agreement.
- Revenues generated will be used for transit and not for roads.
- What transit improvements are being done prior to implementation of the program?
- How much mode shift is anticipated with variable pricing?
- If tolling fails to meet congestion performance criteria, what is the next option?

NEPA (Federal Approval Needed)

- What classification of NEPA document would be required?
- What type of pre-scoping would need to be done?
- Can there be a "testing of the system" before NEPA is complete?
- What would the study area encompass? A regional study area is important but how will the study area be defined? Tri-State region?
- Is a twenty-year analysis horizon necessary?
- Environmental Justice was identified as a key focus area under NEPA

Finance

- With implementation of this initiative, would NY be precluded from discretionary grants such as BUILD or INFRA?

DOT_0041602

Other Potential Federal Approvals

- ITS Operations, 23 CFR 940 compliance.
- Inclusion in New York Metropolitan Transportation Council's Long Range Transportation Plan.
- Inclusion in in the Air Quality Conformity analysis and model.

**Immediate Next Steps**

FHWA

- Provide MTA/TBTA/NYCDOT with templates for a VPP Expression of Interest.
- Provide MTA/TBTA/NYCDOT with an example of a Cooperative Agreement.
- Identify a POC within FHWA.
- Continue to provide New York technical advice as requested.

MTA /TBTA/NYC DOT

- Any follow up questions about the federal process and requirements for US Department of Transportation leadership.
- A schedule for the Congestion Pricing Initiative, NEPA (consider potential impacts in determining class of action), and other potential federal requirements and provided to US Department of Transportation leadership.
- Schedule a follow up meeting with the US Department of Transportation leadership per 4/23/19 meeting.

3

DOT_0041603

# CBD TOLLING PROGRAM  

## Key Components of State Authorizing Legislation



Fifth Avenue Congestion

**Operation:**

- Traffic Mobility Review Board to recommend toll rates and policy between 11/15/20 and 12/31/20
- System goes live no earlier than 12/31/2020
- 30 day testing period
- 60 day period where tolls can be collected but no other "fees or fines"
- Public Information Campaign Required

## Tolling System

- MTA Bridges & Tunnels will establish the Central Business District (CBD) Tolling Program. Program to be planned designed, constructed, installed by MTA Bridges & Tunnels, pursuant to MOU with NYC DOT
- MOU required within sixty days shall also address use of existing City assets and reimbursable costs
- Not subject to State environmental review, ULURP and other NYC local laws

## Tolling Policy

- Variable pricing, with statutory requirement to raise $15 Billion for MTA Capital Program
- Exemptions: emergency vehicles, vehicles transporting persons with disabilities
- Tax Credit matching toll value for residents of CBD with AGI of under $60,000
- Other policies will be set by MTA Bridges & Tunnels, and informed by recommendations of Traffic Mobility Review Board
- 6 persons appointed by MTA Bridges & Tunnels, one at recommendation of Mayor. One member resides in LIRR area, one in Metro North area
- Passenger cars will be charged once per day

April 2019

## Geography

- South of and inclusive of 60th street but shall not include the FDR Drive, and New York state route 9A including the Battery Park underpass and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West St

- Signage required prior to entering CBD to provide notice and toll rates




Tolling Zone

━━━ Exempted Road

## Revenue Allocation

- Central Business District Tolling Capital Lockbox Fund receives all revenues, plus revenue from internet sales tax and real estate transfer tax (approximately $25 Billion)
- Funds can be expended on: system expenses, bond payments, capital projects, securing and maintaining federal approval
- Capital Projects: 80% to NYCT, 10% to LIRR, 10% to Metro North

## Reporting and Studies

- Biennial reporting required of MTA Bridges & Tunnels, in consultation with NYC DOT, on traffic, VMT, bus speeds, emissions, bus speeds etc… (beginning one year after operation date)
- Annual reporting on expenditures from CBD Tolling Program revenues from MTA Bridges & Tunnels
- NYC Parking Impact Study: required 18 months from operation date of system

DOT_0044151

Exhibit B



**Department of
Transportation**

**ANDREW M. CUOMO**
Governor

**MARIE THERESE DOMINGUEZ**
Acting Commissioner

**RONALD L. EPSTEIN**
Executive Deputy Commissioner
Chief Financial Officer

June 17, 2019

Richard J. Marquis
New York Division Administrator
Federal Highway Administration
11A Clinton Avenue, Suite 719
Albany, New York 12207

Dear Mr. Marquis:

I want to personally thank you and your staff for continued discussions detailing the steps
necessary, under federal law, pertaining to implementation of the Central Business District
Tolling Program authorized by New York State in April 2019.

Pursuant to this new legislation, the New York State Department of Transportation (NYSDOT),
in partnership with New York City (NYC) and the Triborough Bridge and Tunnel Authority (TBTA)
desire to implement a variable price tolling program within New York City, south of 60th street,
as quickly as possible. The purpose of this variable price tolling program is to specifically
mitigate the untenable levels of traffic congestion that currently exists in the Central Business
District. As you are aware, New York City traffic congestion now ranks fourth worst among cities
in the United States. This increasing level of congestion is a severe threat to the nation's and
region's economic security, resulting in an innumerable loss of federal and local revenues.

After considerable deliberation over the past decade regarding how to mitigate the alarming
rate of growth in traffic congestion, including two recent Gubernatorial Commission reports,
New York State strongly believes that increased investment in public transportation
alternatives, such as improving the existing subway and bus system, supported through variable
priced tolling provides the greatest return on investment for mitigating traffic congestion.
These strategic investments in public transportation would be complemented by heightened
education and enforcement campaigns.

To facilitate the process of implementing the Central Business District Tolling Program, New York State is pleased to submit this Expression of Interest under the federal Value Pilot Pricing Program (VPPP). It is the State's understanding that this congestion mitigation program would be eligible under a previously approved New York State VPPP slot. In support of this Expression of Interest, attached please find the associated VPPP questionnaire.

In the coming months, the State looks forward to addressing areas of interest raised during our initial discussions, including projected travel pattern impacts/diversions; impacts on overall system travel speeds; and income-based equity impacts.

Thank you for your assistance in advancing this transformational program which will mitigate traffic congestion and serve to preserve and enhance the nation's/region's economic security and competitiveness. Please do not hesitate to contact myself at (518) 457-6700 or Allison C. de Cerreño of TBTA at (646) 252-7750 if we can provide further assistance with respect to this Expression of Interest.

Sincerely,

Ronald L. Epstein
Executive Deputy Commissioner/CFO

Submitted 6/17/19

If you have any questions completing this form, please contact Angela Jacobs at (202) 366-0076. Please complete all applicable information and attach this request via email to angela.jacobs@dot.gov or via U.S. mail to:

**Tolling and Pricing Team,**
**Federal Highway Administration**
**Office of Operations, Attn: Angela Jacobs,**
**1200 New Jersey Avenue, SE, Room E-86 204,**
**Washington, DC, 20590**

Please copy your respective FHWA State Division Office

---

**A) What is the requesting agency, authority, or public company? What is the lead office within the requesting agency, authority, or private company?**

*Name(s):* New York State through the New York State Department of Transportation (NYSDOT), the Triborough Bridge and Tunnel Authority (TBTA), an affiliate of the Metropolitan Transportation Authority (MTA), and the New York City Department of Transportation (NYC DOT).

*Project Website (if applicable) or Your Agency/Company Website:*
https://www.dot.ny.gov
https://new.mta.info/
https://www1.nyc.gov/dot

**B) Contact Information**

| | |
|---|---|
| *Name:* | Ron Epstein |
| *Title:* | Executive Deputy Commissioner, New York State Department of Transportation |
| *Address:* | 50 Wolf Road, 6th Floor, Albany, NY 12232 |
| *Phone:* | (518) 457-8362 |
| *Email:* | ron.epstein@dot.ny.gov |

| | |
|---|---|
| *Name:* | Allison L. C. de Cerreño, Ph.D. |
| *Title:* | Sr. V.P., Business Operations & Transformation Officer, Triborough Bridge and Tunnel Authority |
| *Address:* | 2 Broadway, New York, New York 10004 |
| *Phone:* | (646) 252-7750 |
| *E-mail:* | acdecerreno@mtabt.org |

| | |
|---|---|
| *Name:* | William Carry |
| *Title:* | Senior Director for Special Projects, New York City Department of Transportation |
| *Address:* | 55 Water Street, 9th Floor, New York, NY 10041 |
| *Phone:* | 212-839-6657 |
| *Email:* | wcarry@dot.nyc.gov |

**C) What is the requesting agency seeking? (Please mark appropriate box)**

☑ *Federal Tolling Authority ONLY* for this project or study (no funds requested).

*Please briefly elaborate:* New York State, through NYSDOT, TBTA and NYC DOT, is seeking federal approval under the Value Pricing Pilot Program (VPPP) to initiate a variable tolling program within the Manhattan Central Business District (CBD), generally defined as the area of Manhattan south and inclusive of 60th Street. The purpose of this variable price tolling program is to reduce the high level of traffic congestion in the CBD. The applicants believe that a variable toll to access the CBD, combined with an investment of the

Expression of Interest-FHWA Office of Operations
Version 1.0 12/05

resultant revenues in improving public transit alternatives, will maximize the congestion reduction in the CBD and the surrounding area.

**D) Please provide a brief description of the project/corridor seeking tolling authority. Please identify and describe the subject facility or general area where a toll is to be applied (i.e. name of project/study, location, length, level of service, problem to be addressed, etc.**

**1). Project History:**

The New York City metropolitan region is a vital part of the national economy, accounting for nearly 10% of U.S. gross domestic product. At the center of this region is New York City, home to 8.6 million residents and 4.4 million jobs. Since 2010, the City has undergone tremendous growth and added 440,000 residents, equivalent to the population of Miami, and 700,000 jobs, equivalent to total employment in Philadelphia. New York City is also now the most visited city in the United States, with an estimated 65 million visitors in 2018. Within New York City, the most economically important area is the Manhattan CBD (the area south of and inclusive of 60th Street). This area of just nine square miles boasts over two million jobs, 450 million square feet of office space, and 600,000 residents. See Attachment A for a description of the Manhattan CBD.

However, the continued economic vibrancy of the City and region is threatened by rising traffic congestion. With robust growth have come additional demands on the City's transportation infrastructure, with an increasing number of cars, buses, delivery trucks, taxis and for-hire vehicles competing for scarce roadway capacity. Congestion in New York City ranks fourth worst among cities in the United States (*Global Traffic Scorecard*, INRYX, 2018), with the average auto commuter spending an additional 133 hours on the road each year due to traffic. As shown in Attachment B, traffic speeds in Manhattan south of 60th Street have steadily fallen: from 9.1 miles per hour (mph) in 2010 to 7 mph in 2018, a decline of 23%.

Traffic congestion adversely affects the economy and quality of life in New York City and the metropolitan region. Low travel speeds and unreliable travel times increase auto commute times and erode worker productivity; reduce bus service quality and depress ridership; raise the cost of deliveries and the overall cost of business; increase vehicle emissions; and degrade the quality of life for residents, visitors, and workers. According to a 2018 analysis by the Partnership for New York City, a business group, congestion in the New York City region will cost business, commuters, and residents $100 billion over the next five years (PFNYC, 2018).

In terms of air pollution, growing congestion threatens to undermine recent improvements in air quality in New York City and the region. High levels of fine particulate matter (PM2.5), nitrogen dioxide, and nitric oxide—pollutants that exacerbate heart and respiratory disease—continue to be observed in areas of high traffic. The problem is particularly acute in the Manhattan CBD, which a New York City Department of Health and Mental Hygiene (DOHMH) air quality study found has among the highest concentrations of PM2.5 in the city. DOHMH estimates that PM2.5 contributes to more than 2,000 deaths and almost 6,000 emergency room visits and hospitalizations for cardiovascular and respiratory disease each year in the five boroughs.

One of the strategies to reduce the level of congestion experienced in the CBD is sustained investment in public transportation alternatives. More than 75 percent of trips into the Manhattan CBD are made by bus, subway, commuter rail or ferry. Due to the age and extent of the bus and subway system, service quality has declined markedly since 2010. Improving reliability and performance of the bus and subway system is essential to retaining existing riders, increasing ridership and reversing the growth of private car and for-hire vehicles trips, which are putting further stress on the street network. Due to congested conditions, local bus service speeds in Manhattan are, on average, 24% slower than citywide speeds. Reduction in traffic will result in faster more reliable bus service, which will disproportionally benefit low-income residents.

Reducing congestion in the Manhattan CBD is essential to continued economic growth and to improved regional air quality. In recognition of the scope of these challenges, the State of New York enacted legislation in April

Submitted 6/17/19

2019 creating the Central Business District Tolling Program (CBDTP). Under the program, TBTA, in coordination with the NYS and NYC DOTs, will charge vehicles that enter or remain within in the CBD. Pricing access to the CBD will reduce vehicle demand, relieving congestion and increasing the efficiency of the street network. Revenue raised by the program will provide sustained funding for public transportation, which as it becomes more reliable, will contribute to congestion relief. Please see Attachment C for the CBDTP legislation and Attachment D for a program history.

**2.) Area Description:**
Vehicles would be charged a toll to enter or remain within the Manhattan CBD, defined in the legislation as Manhattan south of and inclusive of sixtieth street, exclusive of the FDR Drive, New York State Route 9A (known as the West Side Highway or West St.), the Battery Park Underpass, and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West Street. Please see Attachment E for a map of the CBD.

**3.) Previous Studies/Current Studies**
**e.g.(Existing HOV, Managed Lanes/Feasibility, Environmental Impact Statement Project Studies)**

In July 2007, the State of New York created the New York City Traffic Congestion Mitigation Commission to consider proposals to reduce congestion in New York City, including a plan put forward by then Mayor Michael Bloomberg to implement congestion pricing in Manhattan. The Commission analyzed and reviewed a number of different strategies for reducing congestion and ultimately recommended a modified version of the Bloomberg congestion pricing plan in January 2008. The proposal was not acted upon by the New York State Legislature.
https://www.dot.ny.gov/programs/repository/TCMC-Final-Report.pdf

In October 2017, New York Governor Andrew M. Cuomo created the Fix NYC Panel, bringing together community representatives, government officials, and business leaders from across the region. The panel was tasked with developing recommendations to address the severe traffic congestion problems in Manhattan's CBD and identify sources of revenue to fix the subway system. The panel examined what congestion pricing could look like for the Manhattan CBD; the panel's January 2018 final report can be found here:
https://www.hntb.com/HNTB/media/HNTBMediaLibrary/Home/Fix-NYC-Panel-Report.pdf

Building on the work of the Fix NYC Panel, the 2018 New York State Enacted Budget created the Metropolitan Transportation Sustainability Advisory Workgroup. The workgroup examined actions that state and local governments could take to deal with the multiple challenges confronting the transportation system in the New York City region. The panel recommended that congestion pricing be adopted to reduce congestion and generate new revenue to modernize the MTA; the workgroup's December 2018 final report can be found here:
https://pfnyc.org/wp-content/uploads/2018/12/2018-12-Metropolitan-Transportation-Sustainability-Advisory-Workgroup-Report.pdf

**4.) Project Goals:**
The goals of the CBD Tolling Program are to:

***(1) Reduce traffic congestion***
  - Key metrics: traffic volumes, speeds, and travel time reliability within the Manhattan CBD and on key routes connecting to the CBD.
***(2) Improve air quality***
  - Key metrics: air quality measurements at locations within and around the Manhattan CBD, with a focus on environmental justice communities.
***(3) Create a sustainable funding source to repair and revitalize the MTA transit system***
  - Key metric: generate revenues, net of VPPP operating costs, to support $15 billion in bonds for MTA capital transit repair and revitalization projects.
***(4) Increase transit ridership***
  - Key metrics: bus, subway, and commuter rail ridership; modal shift from auto, particularly single occupant vehicles, to transit; quality of transit services.

Expression of Interest-FHWA Office of Operations
Version 1.0 12/05

Submitted 6/17/19

*(5) Improve travel options for low-income residents*
- Key metrics: quality of transit services available to low-income residents; bus speeds and travel time reliability.

**5.) Project Concept:**
Vehicles entering the Manhattan CBD would be charged a toll, which would be collected via a cashless tolling system. The legislation leaves open the possibility that trips that occur entirely within the zone could also be charged a toll. It is envisioned that motorists could pay by app, online, by phone, by mail, or through a pre-paid account-based system. The revenues generated by the program would be used to construct, operate and maintain the CBD toll collection program and modernize the MTA transit system, with the goal of attracting new riders and further reducing vehicle demand for scarce road capacity in and connecting to the Manhattan CBD.

*E) Which type of facility is proposed to be tolled or studied?*

*Interstate*

*Non-Interstate*

*Project contains both types of facilities*

☑ *Project is not specific to any type of facility*

As explained above, vehicles would be charged to enter or remain within a specific area. This area does not include an interstate facility.

*F) Does the toll project involve ANY construction?*

*No*        ☑ *Yes (if so, please mark all that apply)*        *Not applicable*

*New construction*        *Expansion*        *Rehabilitation*   *Reconstruction*

*HOV to HOT Conversion*   ☑ *Other not listed.*

*Please briefly elaborate*:
Limited construction to install tolling infrastructure and supporting utilities will be required. The tolling equipment will, to the extent practicable, be mounted on existing infrastructure. Where this is not practicable, new infrastructure or replacement infrastructure will be installed, likely in the form of street light poles, sign gantries or similar structures that are already in use throughout the city. Power and communications will need to be supplied to these locations if not already present. There may be some minor modification of street geometry to enhance or maintain safe pedestrian, bicycle and vehicle movements. The TBTA and NYC DOT have entered into a memorandum of understanding (MOU) for coordinating the planning, design, installation, construction and maintenance of the CBD tolling infrastructure. Please see Attachment F for a copy of the MOU.

*G) Does an HOV lane(s) currently exist on the facility?*

*No*        *Yes*        ☑ *Not applicable*

*H) What is the timetable to enact the tolling or pricing project or study?*

New York State desires to implement the tolling program in early 2021. A preliminary schedule is presented in Attachment G.

Expression of Interest-FHWA Office of Operations
Version 1.0 12/05

Submitted 6/17/19

*I) Are there expressions of support from public officials or the public? Have any public meetings been held? If no public meetings or expressions of support are available, please indicate the agency's plans for ensuring adequate public involvement and seeking public support for the toll project or study.*

Legislation approved by the New York State Senate and Assembly and signed by Governor Andrew M. Cuomo went into effect in April 2019. The CBD Tolling Program was proposed by the Governor Cuomo and supported by the Assembly Speaker Carl Heastie, Senate Majority Leader Andrea Stewart-Cousins, New York City Mayor Bill de Blasio and a majority of the New York State Assembly and Senate. In addition, the FixOurTransit coalition, a group representing over 100 business, labor, environmental, transportation and justice organizations, supported the CBD Tolling Program. Please see Attachment H for a list of coalition members and supportive stakeholder statements.

TBTA with NYC DOT will develop a robust public engagement process as the program moves forward. Working with elected officials, community boards, interest groups in town hall and other settings, the agencies will solicit feedback on all phases of the program. Additionally, the federal environmental review process will provide opportunities for public involvement.

*J) Where known (and if applicable), what is plan for implementing tolls or prices and the strategies to vary toll rates or prices (i.e., the formulae for variable pricing)?*

The authorizing legislation for the program put forth a general framework that will be refined over the next 18 months. The law mandates that passenger vehicles will be charged once daily to enter or remain in the zone, the toll will be variable, and emergency vehicles and vehicles transporting disabled persons will be exempt from the toll. Residents of the CBD with an adjusted gross income of under $60,000 will be eligible for a state tax credit for any tolls paid. A new six-member board, called the Traffic Mobility Review Board (TMRB), will recommend specific toll rates and policies, and will consider variable toll options, additional exemptions, and credits for tolls paid on other facilities for adoption by the TBTA Board.

The authorizing legislation also requires TBTA and NYC DOT to conduct a traffic study that the TMRB will use to inform its recommendations. The traffic study will examine a range of toll rates, variable tolling structures, exemptions, and toll credits. The study will be separate from, but consistent with, the traffic analysis required for the federal environmental review for the program (which will also assess other areas of impact).

Preliminary work is underway for the traffic study and the environmental review. Both efforts will rely upon the most advanced modeling and data analysis tools available, including the Best Practice Model (BPM), the regional transportation model developed by New York Metropolitan Transportation Council (the regional metropolitan planning organization).

In order to develop a range of variable tolling structures, rates and policy scenarios for the TMRB's consideration, the traffic study will examine:

- Effects on general traffic volumes, speeds and travel time reliability within and outside the Manhattan CBD
- Effects on driver behavior, including route, mode and time of travel
- Effects on bus speeds and travel time reliability within and outside the Manhattan CBD
- Effects on transit ridership within and to/from the Manhattan CBD
- Effects on vehicle emissions and air quality within and outside the Manhattan CBD
- Effects on low-income drivers to the Manhattan CBD
- Revenue generation
- Other relevant factors

The TMRB will make its recommendations to the TBTA Board between November 15 and December 31, 2020, per the authorizing statute. Informed by the TMRB recommendations, the TBTA Board will follow the

prescribed statutory process for determining the toll structure, which includes a public hearing and a vote on the rates. The environmental review, which is expected to be complete before the TMRB makes its recommendations, will include traffic analysis based on a range of potential rates and variable tolling structures.

Beginning one year after the CBD tolling program is implemented and every two years thereafter for the life of the program, TBTA, in consultation with the NYC DOT, will undertake a comprehensive evaluation of the effects of the program and produce an evaluation report that looks at congestion, air quality, transit ridership and other factors. In addition, NYC DOT will undertake a study of effects of the program on parking activity and demand in and around of the Manhattan CBD, which is due 18 months after the system begins operation.

### K) What is the reason(s) of the toll project or study? Please mark all that apply.

 *Financing construction*
☑*Reducing congestion*
☑*Improving air quality*
☑*Other not listed.*

ADDRESS ALL AREAS
Please briefly elaborate:

Reducing Congestion
As detailed in Section D, worsening congestion in and around the Manhattan CBD is increasing commute times, degrading bus service, contributing to vehicle emissions, eroding quality of life, and raising the cost of business. By reducing congestion, the CBD tolling program would reverse these trends by improving the efficiency of the transportation network, including improving bus speeds, and supporting the continued economic growth of the city and region.

Improving Air Quality
As detailed in Section D, emissions from the transportation sector are a major contributor to air pollution in New York City and the region, particularly in the congested Manhattan CBD. These emissions exacerbate cardiovascular and respiratory illness and are a public health concern. By reducing traffic volumes and congestion and associated emissions, the CBD tolling program would improve air quality and overall public health.

Create a Sustainable Capital Funding Source for Transit
The MTA subway system is over one hundred years old and needs to be fundamentally modernized to serve the needs of New York City and the region. Improvements are also needed in the MTA's bus and commuter rail systems. By creating a new sustainable revenue source, the CBD tolling program would enable the MTA to invest in improving its transportation network, which in turn, would support the program's goals of increasing transit ridership and improving transit services for low-income residents.

Increasing Transit Ridership
As detailed in Section D, bus and subway service quality in New York City has fallen. As a result, some transit riders have switched to private cars or for-hire vehicle services, putting added strain on the street network. By funding the modernization of the transit network, the CBD tolling program would improve transit services and attract commuters back to the system, helping to further ease demand on surface streets and thus reduce congestion in the CBD.

Improving Transit Services for Low-Income Residents
Ninety-eight percent of low-income workers with jobs in the Manhattan CBD do not commute by private vehicle (Community Service Society, 2017). Dedicating program revenues to transit improvements will

disproportionately benefit low-income New Yorkers, who overwhelmingly rely on transit to access employment, education, and essential services. By enabling investments in transit, the CBD tolling program would improve transit options for low-income New Yorkers.

*L) Please provide a description of the public and/or private agency that will be responsible for operation, maintenance, and/or enforcement for the toll project or study?*

1) **NYSDOT** coordinates and develops comprehensive transportation policy for New York State; coordinates and assists in the development and operation of transportation facilities and services for highways, railroads, mass transit systems, ports, waterways and aviation facilities; and, formulates and keeps current a long-range, comprehensive statewide master plan for the balanced development of public and private commuter and general transportation facilities.

2) **TBTA** is authorized by the program legislation to establish, plan, design, construct, install, operate and maintain the Central Business District Tolling Program in consultation with NYC DOT.

TBTA is among the largest toll agencies in the world.  In 2018 TBTA served more than 322 million customers and collected nearly $2.0 billion in toll revenue on its seven bridges and two tunnels within New York City: the Bronx-Whitestone, Cross Bay Veterans Memorial, Marine Parkway-Gil Hodges Memorial, Throgs Neck, Robert F. Kennedy and Verrazzano-Narrows Bridges and the Hugh L. Carey and Queens-Midtown Tunnels. The Legislature created TBTA's initial predecessor, the Triborough Bridge Authority, in 1933 to build the Triborough Bridge. TBTA is a New York State public benefit corporation, currently governed by Article 3, Title 3 of the New York Public Authorities Law, §550 *et seq.*

TBTA was designed to generate surplus toll revenue, which has been used to support the MTA's integrated transportation network since TBTA became an MTA affiliate in 1968. In 2018, TBTA provided nearly $1.1 billion in total support for transit. TBTA is also dedicated to maintaining its seven bridges and two tunnels in a state of good repair and to providing safe and efficient travel across its facilities. TBTA's 2015-2019 Capital Program, which totals nearly $3 billion, gives high priority to key rehabilitation projects. In 2017 TBTA enhanced the customer experience by converting all of its facilities to open road, Cashless Tolling.

3) **NYC DOT**, which owns and operates the roadway network within and outside of the CBD charging zone, will support and assist TBTA. NYC DOT's mission is to provide for the safe, efficient, and environmentally responsible movement of people and goods in the City of New York and to maintain and enhance the transportation infrastructure crucial to the economic vitality and quality of life of our primary customers, city residents. Over 5,000 employees of NYC DOT oversee one of the most complex urban transportation networks in the world. NYC DOT's staff manage an annual operating budget of $900 million and a five-year $10.1 billion capital program, along with 6,000 miles of streets and highways, 12,000 miles of sidewalk, and 794 bridges and tunnels, including the iconic East River bridges. NYC DOT's staff also installs and maintains over one million street signs, 12,700 signalized intersections, over 315,000 street lights, and over 200 million linear feet of markings.

*M) Please provide a description of how, if at all, any private entities are involved in the up-front costs, or will share in project responsibilities, debt retirement, or revenues?*

No private entities are involved.

Submitted 6/17/19

*N) Please provide any additional information you feel is necessary.*

Below is further information on New York's Best Practice Model (BPM), which will be used for both the environmental review and the traffic study for the TMRB:

The applicants will use the New York Metropolitan Transportation Council's (NYMTC) Best Practice Model (BPM) to assess the potential impact of the tolling program on travel patterns throughout the city and region. The BPM, developed by the New York City metropolitan area's metropolitan planning organization (MPO), is an activity-based transportation model that incorporates transportation behavior and relationships with an extensive set of data that includes a major travel survey of households in the region, land-use inventories, socioeconomic data, traffic and transit counts, and travel times. The applicants will use a base year 2017 BPM calibrated to the toll program, which includes a taxi trip table updated to include for hire vehicles (FHV) trips in New York City in addition to yellow and green taxi trips. The BPM will be used to model several different pricing scenarios and will produce the following metrics: (1) comparison of river crossing volumes by time period (AM, MD, PM, NT, 24 hours), (2) district level vehicle-miles travelled and vehicle hours travelled measures (AM, MD, PM, NT, 24 hours), and district-to-district flow and mode shares (auto, transit, and FHV) for 2021 and 2040 (or another future year). The analysis will include regional routes into Manhattan including trans-Hudson crossings. Districts can be defined at the county and traffic analysis zone level of analysis. New York City districts will include all five boroughs and four to five sub-regions within the Manhattan CBD that will be defined at the start of the program.

Expression of Interest-FHWA Office of Operations
Version 1.0 12/05

# Exhibit C



U.S. Department
of Transportation
**Federal Highway
Administration**

Office of the Administrator

1200 New Jersey Ave., SE
Washington, D.C. 20590

October 24, 2019

Mr. Ron Epstein
Executive Deputy Commissioner/CFO
New York State Department of Transportation
50 Wolf Road
Albany, NY 12232

Dear Mr. Epstein:

Thank you for submitting an Expression of Interest (EoI) to the Federal Highway Administration (FHWA) on behalf of the New York City Department of Transportation, the Triborough Bridge and Tunnel Authority and your department, requesting authority within the Value Pricing Pilot Program (VPPP) to toll motor vehicles within New York City, south of 60th Street, on existing roadways. This letter responds to your EoI and outlines further information that is required. This letter does not constitute an approval or a denial, rather it simply requests additional information that will be necessary as FHWA contemplates future actions.

As you are aware, the VPPP is intended to demonstrate whether and to what extent roadway congestion may be reduced through application of congestion pricing strategies, and the magnitude of the impact of such strategies on driver behavior, traffic volumes, transit ridership, air quality and availability of funds for transportation programs. In fact, of the multiple VPPP projects that have been implemented, FHWA has found that congestion pricing can be very effective for reducing traffic, improving roadway capacity, and providing reliable trips for automobiles as well as commercial vehicles and transit vehicles.

The FHWA has reviewed your EoI to consider the tolling and pricing concepts. Under the various programs in Federal law that allow tolling of existing infrastructure, the VPPP appears to be the best potential fit, provided the overall purpose of variable tolling remains to reduce roadway traffic congestion. While the EoI indicates that a variable pricing structure will be implemented to help mitigate congestion, it does not sufficiently express the degree to which the proposed tolling framework would reduce roadway traffic congestion and on which facilities. Further, many of the implementation and operational details are still in early stages of development, including the various impacts associated with traffic diversion.

For FHWA to conduct a thorough assessment, the Agency requests the findings of a thorough traffic and revenue study to include the following, among other pertinent facts, impacts, and options:

A. Estimated reduction in traffic volumes and congestion levels for various types of system users, including commercial vehicles and transit vehicles;

2

B. How tolling charges will be varied in the variable priced system, and if and how adjustments to the toll pricing schedule will be considered and approved;

C. Anticipated effects on driver behavior, especially as impacted by congestion charge exemptions that may be granted, as well as impacts on low-income drivers and relevant mitigation measures under consideration;

D. Proposed use of revenues generated by the project, especially for operating and maintaining the roadway facilities that will be tolled;

E. Potential impact on transit ridership and plans to sustain the area's transit operations, infrastructure, and rolling stock in a state-of-good-repair;

F. Intended use of Federal-aid highway program funds to implement the project, if applicable and if so, procurement and sourcing plans, including plans to maximize domestic content; and,

G. Considerations of the ITS Regional Architecture, systems engineering, and electronic tolling interoperability.

The FHWA anticipates that much of this information will be further developed and supported by analysis done for the traffic and revenue study and during the environmental review process.

In addition, the proposed project is an area-wide congestion pricing system, which is unprecedented in the VPPP and such type system has not yet been implemented in the U.S. Therefore, FHWA must consider the precedents set by this project. One such consideration is that the VPPP requires maintenance of the infrastructure that is subject to the tolling allowed by the program. However, per our interpretation of the state law that initiates this project, toll revenues must be used almost exclusively for improving transit systems. The FHWA therefore requests further information regarding the planned use of revenues and a certification that the highway and street infrastructure and traffic control devices within the proposed pricing area will be maintained adequately, as is required in other VPPP projects.

If the Central Business District Tolling Project proceeds to the implementation stage, a toll agreement between FHWA, your agency, and the other project partners would need to be developed and signed to secure Federal tolling authority under the VPPP. Upon execution of the toll agreement with FHWA, New York State DOT (NYSDOT) and your partners could then implement the project and collect and use the toll revenues consistent with the legal requirements outlined in Title 23, United States Code.

The FHWA recognizes that NYSDOT and its partners seek an expedited deployment schedule. We will review your information as expeditiously as possible following your submittals, but we cannot guarantee that our determinations will meet your desired start date, especially considering the complexity and new constructs of cordon pricing that the VPPP has not previously authorized elsewhere.

Further information on the VPPP is available on FHWA's Tolling and Pricing Opportunities Website: http://www.ops.fhwa.dot.gov/tolling_pricing/index.htm. As with all VPPP proposals, the Department stands ready to provide technical assistance as requested. If you have any

3

specific questions or require additional information related to the Federal interests or requirements associated with tolling authority under the VPPP or a toll agreement, please feel free to contact the FHWA Division Administrator for the New York Division Office, Mr. Rick Marquis, at 518-431-8897.

Sincerely,

Nicole R. Nason
Administrator

cc:
Marie Therese Dominguez, Commissioner, NYSDOT
Polly Trottenberg, Commissioner, NYCDOT
Patrick Foye, Chairman and CEO, Metropolitan Transportation Authority
Allison L. C. de Cerreno, Senior V.P., Business Operations & Transformation Officer, Triborough Bridge and Tunnel Authority
William Carry, Senior Director for Special Projects, NYCDOT

Exhibit D

 

December 17, 2019

The Honorable Nicole R. Nason
Administrator
Federal Highway Administration
U. S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, D.C. 20590

Dear Administrator Nason:

We want to personally thank you, Under Secretary Szabat, and your colleagues for meeting with us on December 6, 2019. Our discussion was invaluable in helping to guide our response to your October 24, 2019 letter pertaining to the State's June 17, 2019 Expression of Interest to implement an area-wide pricing program under the Value Pricing Pilot Program.

As noted during this meeting, our team has begun the requested Traffic and Revenue Study and we anticipate being able to share an initial draft with you by the end of January 2020. In the interim, we would like to submit Attachment I in response to the specific materials requested in your October 24, 2019 letter so that the Federal Highway Administration may further assess the State's request to proceed with an area-wide pricing program. As discussed, much of the information requested is traditionally compiled through the National Environmental Policy Act process, for which the federal determination on the class of action is pending.

We recognize that this proposal is transformational and unprecedented in reimagining transportation policy in densely populated and congested cities. However, just as the Urban Partnership Agreement promised in 2007, we have the opportunity today to implement a new comprehensive national policy response to urban congestion. We look forward to an immediate decision on the determination of the class of environmental action. With your support, and that of the Federal Highway Administration, we truly have an opportunity to empower communities through innovative self-help market-based strategies to generate new revenues for infrastructure renewal while reducing the regulatory oversight for projects with no or a de minimus federal share. If you have any questions pertaining to the responses in Attachment I, please contact either of us directly at MarieTherese.Dominguez@dot.ny.gov, 518-457-4422 or PFoye@mtahq.org, 212-878-7230.

Sincerely,

Marie Therese Dominguez
Commissioner
New York State Department of Transportation

Patrick J. Foye
Chairman and Chief Executive Officer
Metropolitan Transportation Authority

c.c.:   J. Szabat, Under Secretary Transportation for Policy, USDOT
        P. Trottenberg, Commissioner, NYCDOT
        R. Epstein, Executive Deputy Commissioner, NYSDOT
        A. C. de Cerreño, Senior Vice President, MTA/TBTA
        W. Carry, Senior Director, NYCDOT

**Attachment I**

*A. Estimated reduction in traffic volumes and congestion levels for various types of system users, including commercial vehicles and transit vehicles.*

A more complete response to this question will be provided when New York obtains federal authorization to undertake the environmental review process. In the interim, we anticipate providing preliminary results through the Traffic and Revenue Study, scheduled for completion in late January 2020.[*] With that said, and with respect to your question of where congestion would be reduced, we anticipate that the primary congestion benefits will accrue to the Central Business District (CBD), defined in the Metropolitan Transportation Authority Reform and Traffic Mobility Act of 2019 ("Mobility Act") as:

> *... the geographic area in the borough of Manhattan south of and inclusive of sixtieth street to the extent practicable but shall not include the FDR Drive, and New York state route 9A otherwise known as the "West Side highway," including the Battery Park underpass and any surface roadway portion of the Hugh L. Carey Tunnel connecting to Wst St.*

Additional congestion benefits will likely accrue to areas just outside the zone, including the Upper West and East Sides in Manhattan, Long Island City in Queens, and Williamsburg and Downtown Brooklyn in Brooklyn. While we are refining the calibration for our modeling, preliminary runs indicated that we should achieve the congestion reduction benefits in the range envisioned in the 2007 Urban Partnership Agreement between the City of New York and the United States Department of Transportation. The study will also provide an annualized estimate of revenue generated under each scenario for planning purposes; this will not be an investment-grade revenue estimate.

*B. How tolling charges will be varied in the variable priced system, and if and how adjustments to the toll pricing schedule will be considered and approved.*

The Mobility Act establishes a new six-member Traffic Mobility Review Board (TMRB) to advise on variable toll rates, and potential discounts, exemptions and credits. The TMRB's recommendations on these actions will be presented to the Triborough Bridge and Tunnel Authority Board for review and action no earlier than November 15, 2020. While the TMRB will not provide their recommendations prior to November 15, 2020, we can provide basic parameters as well as a description of the process.

With respect to tolling variability, we anticipate that tolls will vary by time of day, via a fixed schedule, with the highest pricing occurring during peak congestion periods. Figures 1 and 2 provide illustrative views of the typical peak congestion period durations experienced within the CBD. To facilitate collection of tolls, we will be using Pass and

---

[*] The study will also provide an annualized estimate of revenue generated under each scenario for planning purposes; this will not be an investment-grade revenue estimate.

camera (Tolls by Mail) technologies, which are widely accepted throughout the northeast and consistent with the ITS Regional Architecture.

**Figure 1. Hourly Average Traffic Speeds in the Manhattan CBD**



*Source: NYCDOT, Analysis of yellow taxi GPS data.*

**Figure 2. Weekday Hourly Accumulation of Vehicles the Manhattan CBD**



*Source: New York Metropolitan Transportation Council, Hub Bound Travel Data 2017, p. 7.*

**C.  *Anticipated effects on driver behavior, especially as impacted by congestion charge exemptions that may be granted, as well as impacts on low-income drivers and relevant mitigation measures under consideration.***

The Traffic and Revenue Study, as well as the environmental review, will examine impacts on driver behavior, including low-income drivers. The study will assess the degree to which drivers into the CBD switch to other modes, change their route choice, or change the time of day of their journey. The extent of those changes will depend on the toll levels, toll variability by time of day, and whether drivers are given credits for tolls paid on currently-tolled facilities. As the specific toll rates and policies will be determined by the TBTA, informed by the recommendations of the TMRB, the Traffic and Revenue Study will provide a range of options to illustrate possible outcomes.

Of particular interest to the applicants is addressing the so-called "bridge shopping" problem between Brooklyn/Queens and Manhattan. Under current conditions, many drivers choose to travel via the free East River Bridges instead of the tolled TBTA crossings in order to save money. In many cases, these drivers end up traveling out of their way to reach the free crossings, creating additional congestion. Credits for currently-tolled facilities, if recommended by the TMRB and adopted by the TBTA Board, could significantly reduce or eliminate bridge shopping, increasing network efficiency and reducing congestion.

A more complete response related to impacts, if any, on Environmental Justice (EJ) communities will be provided when New York obtains federal authorization to undertake the environmental review process. In terms of known impacts on low-income drivers, the Mobility Act specifically provides a tax credit for tolls paid by residents within the CBD who earn less than $60,000 a year.

**D.  *Proposed use of revenues generated by the project, especially for operating and maintaining the roadway facilities that will be tolled.***

As part of a long and demonstrated commitment by the region to maintain the highway network, New York State Department of Transportation (NYSDOT) and New York City Department of Transportation (NYCDOT) have a history of significantly overmatching available and forecasted federal-aid resources for renewing and modernizing roads and bridges. In September 2019, the New York Metropolitan Transportation Council, the Metropolitan Planning Organization for the ten-county region, inclusive of New York City, adopted a $22 billion fiscally constrained Transportation Improvement Program (TIP) covering the period of 2020 through 2024 of which approximately 50 percent is federally-aided. In addition, during this period, the State and City plan to commit more than $2.0 billion in 100 percent non-federal funds outside of the TIP to operate and maintain the road and bridge infrastructure in the CBD.

With respect to the use of tolling revenues generated through the proposal, the Mobility Act establishes a dedicated locked box. After the use of initial revenues to support and maintain the tolling program, including capital costs, net revenues would be directed for capital projects to support the renewal and modernization of the Metropolitan

Transportation Authority's (MTA) New York City Transit (80 percent); Long Island Rail Road (10 percent); and Metro-North Railroad (10 percent).

It should be noted that the Value Pricing Pilot Program, for which the State has submitted an Expression of Interest, permits the proceeds from an approved tolling project to be used for any eligible activity under Title 23 of the United States Code. The recommended use of the tolling revenues generated through the Central Business District Tolling Program (CBDTP) to renew and modernize the public transportation system, which are an eligible activity under Title 23 of the United States Code.

### E.   Potential impact on transit ridership and plans to sustain the area's transit operations, infrastructure, and rolling stock in a state-of-good-repair.

The Traffic and Revenue Study, as well as the environmental review, will examine the potential impact on transit ridership. With respect to plans, the State of New York, the City of New York, and the MTA have demonstrated a longstanding commitment to sustaining transit operations. For example, the State and City provide approximately $7.2 billion annually in direct and indirect operating support, more than all other states combined. In terms of capital support, the MTA recently adopted a $51.5 billion strategic investment capital plan. The plan assumes a federal share of less than 35 percent and relies heavily on locally generated revenues and direct State and City contributions.

### F.   Intended use of Federal-aid highway program funds to implement the project, if applicable and if so, procurement and sourcing plans, including plans to maximize domestic content.

The Expression of Interest submitted to the Federal Highway Administration on June 17, 2019 does not contemplate the use of Federal-aid highway program funds to implement this project.

### G.   Considerations of the ITS Regional Architecture, systems engineering, and electronic tolling interoperability.

As noted earlier, the CBDTP will use E-ZPass and camera (Tolls by Mail) technologies, widely accepted throughout the northeast, to implement this project. These technologies are consistent with, and incorporated into, the ITS Regional Architecture. Following a Systems Engineering Plan approach, this new application of these technologies will be detailed in the Concept of Operations and integrated into the ITS Regional Architecture. Further, the plan is to share the traffic-related data from the CBDTP with New York City and New York State Departments of Transportation.

# Exhibit E

  

January 27, 2020

The Honorable Nicole R. Nason
Administrator
Federal Highway Administration
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590

Dear Administrator Nason:

We appreciate the guidance provided by you, Under Secretary Szabat and your colleagues at the U.S. Department of Transportation during our December 17, 2019 meeting. To facilitate the Federal Highway Administration's pending review of New York State's request to proceed with an area-wide pricing program under the Value Pricing Pilot Program, we are pleased to transmit the requested Traffic and Revenue Study (attached).

The Study provides a framework for the projected range of effects on vehicle trips, including vehicle miles traveled and transit modal shares for both the Manhattan Central Business District and greater New York City region, using a broad range of potential tolling rates. Based on the comprehensive planning work to date, the Study shows a potential reduction in vehicle miles traveled of approximately eight-percent in the Central Business District – levels which would likely improve travel speeds and reduce congestion. Further, the Study shows an overall congestion benefit for the larger region of nearly 600,000 fewer vehicle miles traveled. The Study also indicates that the estimated revenues are consistent with the reasonably expected locally-derived resources necessary to implement New York State's Traffic Mobility Act.

We greatly appreciate your expedited review of the State's Value Pricing Pilot Program request and look forward to working closely with your team to advance this nation-leading approach toward implementing innovative local strategies to reduce congestion. To aid in your review, we are also attaching a copy of the letter response we sent in December. If you have any questions pertaining to the attached study, please contact any of us directly at MarieTherese.Dominguez@dot.ny.gov, 518-457-4422; PFoye@mtahq.org, 212-878-7230; or PTrottenberg@dot.nyc.gov, 212-839-6400.

Sincerely,

Marie Therese Dominguez
Commissioner
NYSDOT

Patrick J. Foye
Chairman and CEO
MTA

Polly Trottenberg
Commissioner
NYCDOT

CC:   J. Szabat, Under Secretary Transportation for Policy, USDOT
      R. Epstein, Executive Deputy Commissioner, NYSDOT
      A. C. de Cerreño, Senior Vice President, MTA/TBTA
      W. Carry, Senior Director, NYCDOT

# Exhibit F

  

July 2, 2020

The Honorable Nicole R. Nason, Administrator
Federal Highway Administration
U. S. Department of Transportation
200 New Jersey Avenue, SE
Washington, D.C. 20590

Dear Administrator Nason:

We write to follow up with respect to our June 17, 2019 Expression of Interest (EOI) seeking tolling authority for the proposed Central Business District (CBD) Tolling Program (Program) under the Value Pricing Pilot Program (VPPP). We seek immediate action toward consideration of the EOI, and specifically commencement and expeditious undertaking of environmental review under the National Environmental Policy Act (NEPA). The need that our respective agencies has detailed for the CBD Tolling Program has become even more urgent as the result of COVID-19 pandemic. The pandemic has decimated fare revenues for our public transit system and is anticipated to result in increased automobile trips to the Manhattan CBD as businesses return to on-site operations. Without intervention, as proposed under the CBDTP, the region's economic recovery will be hampered while New York City's streets become even more congested.

As the President recently declared in his June 4, 2020 Executive Order (EO)[1], "[u]nnecessary regulatory delays will deny our citizens opportunities for jobs and economic security, keeping millions of Americans out of work and hindering our economic recovery from the national emergency."[2] Consistent with the EO, the Federal Highway Administration (FHWA) should advance the Program (i.e., congestion pricing) by expediting NEPA review.

The Project Sponsors (the New York State Department of Transportation, the Triborough Bridge and Tunnel Authority ["TBTA"] and the New York City Department of Transportation) have had numerous communications with FHWA, both before and after the Sponsors' June 2019 submission of the EOI, including on the subject of the NEPA. The Project Sponsors have provided extensive information to inform FHWA's decision as to the type of NEPA document it will require (an EA or Environmental Impact Statement [EIS]), most recently the submission of the Program Overview and Traffic and Revenue Study, a preliminary assessment of traffic and revenue that could result from the Program, in January 2020. This followed a December 17, 2019 response to FHWA's October 24, 2019 request for further information about the Program.

FHWA has neither responded to the December 17th and January 27th submissions nor determined the level of environmental review it believes is warranted for the Program. This is highly unusual. FHWA typically provides early advice on the type of environmental documentation that will be required (EA versus EIS), in accordance with its obligation under law to "commence its

---

[1] *EO on Accelerating the Nation's Economic Recovery from the COVID-19 Emergency by Expediting Infrastructure Investments and Other Activities  - Infrastructure & Technology* – Issued June 4, 2020.
[2] Id., Sec. 1.

NEPA process at the earliest possible time" (40 CFR 1501.2(d)(3); 40 CFR 1501.4; 23 CFR §§ 771.111(a)(3), (b)(1)). Delaying the commencement of the NEPA process has already substantially delayed implementation of the Program, and will continue to delay it as long as it is deferred.

Apart from deviation from typical FHWA practice, this delay departs from the Trump Administration's stated goals of streamlining federal approval processes. The June 4th Executive Order specifically directs the Secretary of Transportation to "use all relevant emergency and other authorities to expedite work on, and completion of, all authorized and appropriated highway and other infrastructure projects that are within the authority of the Secretary to perform or to advance."[3] In addition, a major goal of proposed changes to the CEQ regulations is "to facilitate more efficient, effective, and timely NEPA reviews by Federal agencies." *See* 85 Fed. Reg. 1684, 1685 (January 10, 2020). As noted by CEQ, its proposal is "consistent with the One Federal Decision policy established by E.O. 13807 for multi-agency review and related permitting and other authorization decisions." 85 Fed. Reg. at 1691. And the May 19th Executive Order on Regulatory Relief to Support Economic Recovery directs federal agencies to take appropriate action to avoid the applicability of regulations and policy that would thwart economic recovery from the COVID-19 pandemic.

The Program will be needed in the near term notwithstanding the current temporary effect of COVID-19 on traffic in the CBD. During the imposition of social distancing restrictions, traffic substantially diminished. There are myriad factors – none of which are predictable at this time – that will determine the timing of the return of normal economic activity and the concomitant restoration of traffic levels, and thus the reemergence of congestion in the CBD. Indeed, although the New York City metropolitan area remains under significant restrictions, traffic has been steadily increasing for more than a month. Since Governor Cuomo declared New York State on Pause on March 22nd, vehicle volumes on MTA Bridges and Tunnels have increased from 65% below pre-pandemic levels to 21% below as of June 26, 2020. Data from the University of Maryland, which is tracking movement nationwide and on a county-by-county scale, supports that observed trend. Based on historical data after other significant events that stalled economic activity, and recent information, traffic levels will rebound – and that return may be rapid. In fact, we can anticipate more people choosing to travel to the CBD by car as businesses reopen in the very near future.[4]

Further delaying the commencement of NEPA review – beyond that which has already occurred – will preclude Program implementation at the time it is needed to address congestion in the CBD and the need to supplement transit revenues. Based on research by the Partnership for New York City, the net economic benefit of the CBDTP of reducing traffic congestion, once traffic recovers from currently depressed levels, could exceed $100 billion over five years.[5] The mass transit system in New York City is critical to the economic recovery of the City and the metropolitan area – which are major drivers of the national economy. The extant difficulty in financing already-planned and needed capital improvements has been exacerbated by the COVID-19 pandemic, as transit revenues have precipitously dropped and new improvements in transit operations are now needed so that people can safely get back to work. The revenues that would be generated by the Program are vital to improve mass transit and allow for a complete economic recovery in our region. Given the CBD's status as a national economic engine, the

---

[3] 6/4/20 EO Sec. 3.a. Expediting the Delivery of Transportation Infrastructure Projects.
[4] *See* http://www.wnyc.org/story/new-york-city-prepares-open-no-plan-managing-more-cars/.
[5] https://pfnyc.org/research/100-billion-cost-of-traffic-congestion-in-metro-new-york/.

ability to generate these revenues will have important economic implications for the nation as a whole.

While New York has advanced this nation-leading self-help approach toward implementing innovative local strategies to reduce congestion, after more than one year since submitting our Expression of Interest, FHWA has not formally accepted this project into the Value Pilot Pricing Program nor authorized the State to proceed with the federally-required environmental review process. As the environmental review represents just the first step in the project approval process, we find it indefensible that in a pandemic recovery era the federal government would continue to withhold such approval. Continued delay only serves to deprive the nation's financial, insurance and real estate capital the means to generate locally-derived revenues in support of critical mobility enhancements to station access and passenger circulation; system throughput and service frequency; and the deployment of innovative safety technologies.  In short, FHWA should promptly commence environmental review as mandated by NEPA.

Sincerely,

Marie Therese Dominguez
Commissioner
NY State Department of Transportation

Patrick J. Foye
Chairman & Chief Executive Officer
Metropolitan Transportation Authority

Polly Trottenberg
Commissioner
NYC Department of Transportation

c.c.:    J. Szabat, Under Secretary for Transportation Policy, USDOT
         R. Epstein, Executive Deputy Commissioner, NYSDOT
         A. C. de Cerreño, Senior Vice President, MTA/TBTA
         W. Carry, Senior Director, NYCDOT

Exhibit G



U.S. Department
of Transportation
**Federal Highway
Administration**

Office of the Administrator

1200 New Jersey Ave., SE
Washington, D.C. 20590

September 3, 2020

Ms. Polly Trottenberg
Commissioner
New York City Department of Transportation
55 Water Street, 9th Floor
New York, NY 10041

Dear Commissioner Trottenberg:

Thank you for your letter of July 2, 2020, requesting that the Federal Highway Administration
(FHWA) take immediate action on the New York City Department of Transportation's
(NYCDOT) Expression of Interest (EOI) for the proposed Central Business District (CBD)
Tolling Program, as well as expediting the environmental review of the CBD Program under the
National Environmental Policy Act (NEPA).

The FHWA appreciates the data provided in the Traffic and Revenue (T&R) Study submitted on
January 27, 2020. Shortly after your submission of the T&R Study, the COVID-19 public health
emergency resulted in an unprecedented situation that has created unforeseen circumstances
across the country, and especially in New York City. In particular, Governors, Mayors and other
public officials have had to take extraordinary steps to respond to this public health emergency
such as order lockdowns, closures of businesses, and impose restrictions on the use of public
transit. These steps, and other actions taken by citizens with respect to travel and social
distancing, have had many unforeseen impacts, including to traffic within the CBD. Considering
these circumstances, please provide updated data on the COVID-19 impacts to current and
anticipated traffic levels in the CBD and impacts to public transit ridership.

As you know, the impact on congestion is a relevant consideration under the Value Pricing Pilot
Program (VPPP). Given the current unprecedented public health emergency, FHWA needs to
assess current traffic levels and public transit ridership as well as an anticipated time line under
which NYCDOT's and other traffic and commercial experts estimate would return to pre-
COVID-19 levels of congestion to inform our decisionmaking under NEPA and the VPPP.

If you have any questions regarding this or other matters, please feel free to contact me. I am
providing identical replies to the co-signers.

Sincerely,

Nicole R. Nason
Administrator

DOT_0040964



U.S. Department
of Transportation
**Federal Highway Administration**

Office of the Administrator

1200 New Jersey Ave., SE
Washington, D.C. 20590

September 3, 2020

Marie Therese Dominguez
Commissioner
New York State Department of Transportation
50 Wolf Road
Albany, NY  12232

Dear Commissioner Dominguez:

Thank you for your letter of July 2, 2020, requesting that the Federal Highway Administration
(FHWA) take immediate action on the New York City Department of Transportation's
(NYCDOT) Expression of Interest (EOI) for the proposed Central Business District (CBD)
Tolling Program, as well as expediting the environmental review of the CBD Program under the
National Environmental Policy Act (NEPA).

The FHWA appreciates the data provided in the Traffic and Revenue (T&R) Study submitted on
January 27, 2020.  Shortly after your submission of the T&R Study, the COVID-19 public health
emergency resulted in an unprecedented situation that has created unforeseen circumstances
across the country, and especially in New York City.  In particular, Governors, Mayors and other
public officials have had to take extraordinary steps to respond to this public health emergency
such as order lockdowns, closures of businesses, and impose restrictions on the use of public
transit.  These steps, and other actions taken by citizens with respect to travel and social
distancing, have had many unforeseen impacts, including to traffic within the CBD.  Considering
these circumstances, please provide updated data on the COVID-19 impacts to current and
anticipated traffic levels in the CBD and impacts to public transit ridership.

As you know, the impact on congestion is a relevant consideration under the Value Pricing Pilot
Program (VPPP).  Given the current unprecedented public health emergency, FHWA needs to
assess current traffic levels and public transit ridership as well as an anticipated time line under
which NYCDOT's and other traffic and commercial experts estimate would return to pre-
COVID-19 levels of congestion to inform our decisionmaking under NEPA and the VPPP.

If you have any questions regarding this or other matters, please feel free to contact me.  I am
providing identical replies to the co-signers.

Sincerely,

Nicole R. Nason
Administrator

DOT_0040965



U.S.Department
of Transportation
**Federal Highway
Administration**

Office of the Administrator

1200 New Jersey Ave., SE
Washington, D.C. 20590

September 3, 2020

Patrick J. Foye
Chairman and Chief Executive Officer
Metropolitan Transportation Authority
2 Broadway
New York, NY 10004

Dear Chairman Foye:

Thank you for your letter of July 2, 2020, requesting that the Federal Highway Administration
(FHWA) take immediate action on the New York City Department of Transportation's
(NYCDOT) Expression of Interest (EOI) for the proposed Central Business District (CBD)
Tolling Program, as well as expediting the environmental review of the CBD Program under the
National Environmental Policy Act (NEPA).

The FHWA appreciates the data provided in the Traffic and Revenue (T&R) Study submitted on
January 27, 2020. Shortly after your submission of the T&R Study, the COVID-19 public health
emergency resulted in an unprecedented situation that has created unforeseen circumstances
across the country, and especially in New York City. In particular, Governors, Mayors and other
public officials have had to take extraordinary steps to respond to this public health emergency
such as order lockdowns, closures of businesses, and impose restrictions on the use of public
transit. These steps, and other actions taken by citizens with respect to travel and social
distancing, have had many unforeseen impacts, including to traffic within the CBD. Considering
these circumstances, please provide updated data on the COVID-19 impacts to current and
anticipated traffic levels in the CBD and impacts to public transit ridership.

As you know, the impact on congestion is a relevant consideration under the Value Pricing Pilot
Program (VPPP). Given the current unprecedented public health emergency, FHWA needs to
assess current traffic levels and public transit ridership as well as an anticipated time line under
which NYCDOT's and other traffic and commercial experts estimate would return to pre-
COVID-19 levels of congestion to inform our decisionmaking under NEPA and the VPPP.

If you have any questions regarding this or other matters, please feel free to contact me. I am
providing identical replies to the co-signers.

Sincerely,

Nicole R. Nason
Administrator

DOT_0040966

# Exhibit H

  

October 13, 2020

The Honorable Nicole R. Nason
Administrator
Federal Highway Administration
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590

Dear Administrator Nason:

We are in receipt of your letter of September 3, 2020, responding to our letter of July 2, 2020 requesting that the Federal Highway Administration act on our June 17, 2019 Expression of Interest for the Central Business District Tolling Program (CBDTP) by providing guidance on the form of environmental review under the National Environmental Policy Act (NEPA) and expedite it consistent with the June 4, 2020 Executive Order.

We believe we provided sufficient data and justification for the need for the CBDTP. To date, we have received no questions from the Federal Highway Administration (FHWA) regarding the Traffic and Revenue Study submitted in January 2020 other than your current question regarding the impact of COVID-19, which we will address here.

Transportation has always been and remains the foundation on which the US economy is built – it is the way we access health and education, the way we grow our businesses, and the way we move around for recreational purposes. We in the New York metropolitan region know this better than anyone as our region is home to the largest transit system in the nation, the two largest commuter rail systems in the nation, and one of the most complex street and highway networks in the nation, not to mention being a recognized gateway for national and international travel and commercial goods.

As you know, USDOT's Bureau of Statistics (BTS) is already showing more movement in our region with the percentage of population staying home decreasing from the peak of the pandemic in many of the counties that feed the CBD (USDOT, BTS, *Trips by Distance*, https://www.bts.gov/browse-statistical-products-and-data/trips-distance/explore-us-mobility-during-covid-19-pandemic). USDOT has additional information via BTS, which is tracking numerous recovery metrics related to transportation and the impact of COVID-19 across multiple modes and geographical areas, including MTA's subway transit ridership. The following paragraphs provide some more detailed data specific to the CBDTP.

While you are aware that MTA's transit ridership remains significantly lower (roughly 68% lower compared to 2019), there has been steady improvement since April 2020 and even at the current ridership, the system moves more customers than any other system in the country. Importantly, with roughly half the riders back, bus ridership is recovering at a faster pace than our rail systems. As bus ridership continues to return, it is especially important to reduce congestion to improve bus speeds and reliability.

With respect to roadway traffic beyond bus transit, as New York continues through its phased reopening, traffic on the roads has returned more rapidly than transit ridership. From a nadir of 70% below 2019 levels in mid-April of this year, traffic on MTA's bridges and tunnels in September 2020 has climbed to 86% compared to the same period last year. New York City Department of Transportation is witnessing similar trends, with weekday daily volumes entering the CBD reaching roughly 95% of pre-COVID levels by mid-September 2020. This data is consistent with reports from WAZE which show New York City nearing pre-COVID traffic levels and rebounding faster than other cities (https://www.waze.com/covid19).

With this traffic comes congestion and reduced traffic speeds. Pre-COVID-19 vehicle speeds averaged 6.6 mph on weekdays and 11.3 mph on weekends; current vehicle speeds are 7.5 mph on weekdays and 10.7 mph on weekends. In other words, congestion has already returned to pre-pandemic levels at certain times and days in Manhattan's CBD.

As traffic volumes entering the CBD recover and speeds in the CBD decline, traffic conditions are on a trajectory to match those when the CBDTP was first raised with the US Department of Transportation in Spring 2019. The CBDTP will be key to helping change these patterns to ensure utilization of *all* travel modes and a reliable and efficient roadway network.

In short, traffic is returning quickly, congestion is growing, and speeds are dropping, making the CBDTP as important now as when we sent you the Notice of Intent in June of last year. We appreciate the many discussions with you, your staff, and the FHWA Division Office since we first approached you in April 2019 about the CBDTP – including the NEPA process, the appropriate NEPA documentation and the types of impacts to be considered – and we have responded to questions during these sessions, as well as in a more formal communication in December 2019 and by providing the Traffic and Revenue Study in January 2020. Current trends foreshadow a return to traffic and congestion to pre-COVID-19 levels this fall or sometime next year. Thus, it is imperative that FHWA inform us of the form of NEPA document (Environmental Assessment [EA] vs. Environmental Impact Statement [EIS]) it believes we should prepare for the CBDTP. We look forward to hearing your response so we can advance the environmental review process in accordance with the Council on Environmental Quality and FHWA regulations as expeditiously as possible.

Sincerely,

Marie Therese Dominguez
Commissioner
NYSDOT

Patrick J. Foye
Chairman and CEO
MTA

Polly Trottenberg
Commissioner
NYCDOT

CC:  J. Szabat, Under Secretary Transportation for Policy, USDOT
     R. Epstein, Executive Deputy Commissioner, NYSDOT
     A. C. de Cerreño, Senior Vice President and Acting CFO, TBTA
     W. Carry, Senior Director, NYCDOT

# Exhibit I



**U.S. Department
of Transportation**

**Federal Highway
Administration**

**New York Division**

March 30, 2021

Leo W. O'Brien Federal Building
11A Clinton Avenue, Suite 719
Albany, NY 12207
(518) 431-4127
(518) 431-4121 (fax)
NewYork.FHWA@dot.gov

In Reply Refer To:
HDA-NY

Ms. Marie Therese Dominguez
Commissioner
New York State Department of Transportation
50 Wolf Road, 6th Floor
Albany, NY 12232

Mr. Henry Gutman
Commissioner
New York City Department of Transportation
80 Maiden Lane, 17th Floor
New York, NY 10038

Mr. Patrick J. Foye
Chairman and Chief Executive Officer
Metropolitan Transportation Authority
2 Broadway
New York, NY 10004

**Subject:  *New York City Central Business District Tolling Program – NEPA Class of Action***

Dear Ms. Dominguez, Mr. Gutman, and Mr. Foye:

New York, acting through New York State Department of Transportation, the Triborough Bridge
and Tunnel Authority and the Metropolitan Transportation Authority (MTA), is working to
implement a legislatively-approved variable tolling program within the Manhattan Central
Business District in order to reduce traffic congestion, improve air quality and make needed
investments in the MTA transit system.  As you know, implementing this variable tolling
program will require acceptance into FHWA's Value Pricing Pilot Program (VPPP), a federal
action triggering review under the National Environmental Policy Act (NEPA).

Because FHWA cannot make a final decision regarding the implementation of tolls under the
VPPP until after the completion of the NEPA process, you reached out to FHWA on October 13,
2020 requesting feedback on the appropriate classification under NEPA needed to ensure the
necessary analysis of, and public engagement in, development of the Central Business District
(CBD) Tolling Program.

This important and potentially precedent-setting project would include variable tolling once a
day for vehicles entering or remaining within Manhattan south of 60th street within the area
known as the Central Business District.  As laid out in your Expression of Interest in the VPPP,

2

the goal of this effort is to reduce congestion, improve air quality, create a sustainable capital funding source for transit, increase transit ridership and improve transit services for low-income residents. Tolls generated from the project would be leveraged to create a total of $15 billion in bonds for the Metropolitan Transportation Authority for needed improvements in the existing transit system.

FHWA stands ready to work with you – through both the NEPA and the VPPP processes – to engage the public in this effort and ensure that necessary traffic, air quality, and other analyses will be conducted to better inform our consideration of the tolling program.

After careful review of the relevant information, FHWA believes that our mutual goals of producing needed traffic and air quality analysis and soliciting robust public input from all stakeholders can best be achieved through the preparation of an Environmental Assessment (EA). The EA will be prepared pursuant to 40 C.F.R. 1500-1508 (CEQ Regulations for Implementing the Procedural Provisions of NEPA, effective September 14, 2020). Also, as part of the preparation of the EA, there will be enhanced coordination and public involvement that engages stakeholders from throughout all three States (New York, New Jersey, and Connecticut) in the commuting area of the CBD in accordance with 23 U.S.C. Section 139 (Efficient environmental reviews for project decision-making).

We look forward to collaborating with and assisting you so that FHWA can arrive at a prompt and informed NEPA determination on this project. FHWA will expedite its efforts wherever possible and we suggest that we begin by scheduling a meeting regarding next steps and a schedule for the NEPA EA process. At the same time, we are happy to discuss Federal requirements that may apply for the development of a VPPP cooperative agreement for the CBD Tolling Program. If you have any questions or comments, please contact me at (518) 431-8897.

Sincerely,

RICHARD JOSEPH MARQUIS
Digitally signed by RICHARD JOSEPH MARQUIS
Date: 2021.03.30 08:58:27 -04'00'

Richard J. Marquis
Division Administrator

cc: Stephen Goodman, Regional Administrator, FTA Region 2

Exhibit J



Photo by Axel Drainville (*Flickr*)

# Traffic Patterns in the Bronx
# Post-Congestion Pricing

**March 2025**

---

  

# Cross Bronx Expressway
*From the George Washington Bridge to the Bruckner Interchange*

## Traffic Volumes

Overall, traffic and truck volumes are slightly down.

## Traffic Speeds

Traffic speeds have increased in both directions

**Average daily traffic volumes on CBE**

|  | Jan-Feb 2024 | Jan-Feb 2025 | % change |
|---|---|---|---|
| All vehicles | 146,711 | 143,043 | -2.5% |
| Trucks | 18,034 | 17,811 | -1.2% |

*Source: NYSDOT traffic counter*

**Median traffic speeds on CBE**

|  | Jan-Feb 2024 | Jan-Feb 2025 | % change |
|---|---|---|---|
| Westbound | 15.5 mph | 17.7 mph | 14.2% |
| Eastbound | 28.4 mph | 30.8 mph | 8.5% |

*Source: TRANSCOM, daytime peak hours (5am-9pm)*

  

# Robert F. Kennedy Bridge

## Traffic Volumes

Small increase in overall vehicles and a reduction in truck traffic

## Traffic Speeds

Northbound speeds have increased, while southbound speeds have slightly decreased

**Average daily traffic volumes on RFK**

|  | Jan-Feb 2024 | Jan-Feb 2025 | % change |
|---|---|---|---|
| All vehicles | 171,400 | 174,700 | 1.9% |
| Trucks | 8,027 | 7,813 | -2.7% |

*Source: TBTA toll plaza data*

**Median traffic speeds on RFK**

|  | Jan-Feb 2024 | Jan-Feb 2025 | % change |
|---|---|---|---|
| Northbound | 38.2 mph | 39.6 mph | 3.7% |
| Southbound | 39.6 mph | 39.3 mph | -0.8% |

*Source: TRANSCOM, daytime peak hours (5am-9pm)*

  

# Major Deegan Expressway
*From Westchester to the RFK Bridge*

## Traffic Volumes

**Average daily traffic volumes on Maj. Deegan N of Mosholu Pkwy**

|  | Jan-Feb 2024 | Jan-Feb 2025 | % change |
|---|---|---|---|
| All vehicles | 126,690 | 125,458 | - 1.0% |

*Source: NYSDOT traffic counter; volumes by class of vehicle not counted at this site*

**Average mid-week daily traffic volumes on Maj. Deegan at Willis Avenue**

|  | Nov 2023 | May 2024 | Oct 2024 | Jan 2025 |
|---|---|---|---|---|
| All vehicles | 138,101 | 154,663 | 136,830 | 121,828 |
| Trucks | 11,746 | 13,021 | 11,199 | 10,152 |

*Source: NYSDOT special short count program*

## Traffic Speeds

Traffic speeds were comparable to last year, with very minor increases in both directions

**Median traffic speeds on Maj. Deegan**

|  | Jan-Feb 2024 | Jan-Feb 2025 | % change |
|---|---|---|---|
| Northbound | 36.3 mph | 36.9 mph | 1.7% |
| Southbound | 37.1 mph | 37.6 mph | 1.3% |

*Source: TRANSCOM, daytime peak hours (5am-9pm)*

  

# Bruckner Expressway
*From the RFK Bridge to the Bruckner Interchange*

## Traffic Volumes

Additional traffic volume data to be collected this fall

## Traffic Speeds

Traffic speeds have risen, though likely due to construction during past years

**Average mid-week daily traffic volumes on Bruckner between RFK and Sheridan Expressway**

|  | Oct-Nov 2019 | Nov 2023 | Oct 2024 | Fall 2025 |
|---|---|---|---|---|
| All vehicles | 116,676 | 124,214 | 115,735 | TBA |
| Trucks | -- | -- | 7,107 | TBA |

*Source: NYCDOT traffic counts and NYSDOT special short count program*

**Median traffic speeds on Bruckner**

|  | Jan-Feb 2023 | Jan-Feb 2024 | Jan-Feb 2025 |
|---|---|---|---|
| Westbound | 31.1 mph | 33.2 mph | 41.9 mph |
| Eastbound | 43.8 mph | 38.9 mph | 45.8 mph |

*Source: TRANSCOM, daytime peak hours (5am-9pm)*

  

# View MTA Traffic Data on our Open Data Portal



Data available online: metrics.mta.info

# CONSOLIDATED SECOND AMENDED COMPLAINT

Filed 05/06/25

Metro. Transp. Auth. v. Duffy, No. 25 Civ. 1413 (S.D.N.Y.) (LJL)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

METROPOLITAN TRANSPORTATION AUTHORITY
and TRIBOROUGH BRIDGE AND TUNNEL
AUTHORITY,

*Plaintiffs*,

and

NEW YORK STATE DEPARTMENT OF
TRANSPORTATION, RIDERS ALLIANCE, SIERRA
CLUB, and NEW YORK CITY DEPARTMENT OF
TRANSPORTATION,

*Intervenor-Plaintiffs*,

v.

SEAN DUFFY, in his official capacity as Secretary of
the United States Department of Transportation,
GLORIA M. SHEPHERD, in her official capacity as
Executive Director of the Federal Highway
Administration, UNITED STATES DEPARTMENT
OF TRANSPORTATION, and FEDERAL HIGHWAY
ADMINISTRATION,

*Defendants*.

Case No. 25 Civ. 1413 (LJL)

**CONSOLIDATED
SECOND AMENDED
COMPLAINT OF
PLAINTIFFS
METROPOLITAN
TRANSPORTATION
AUTHORITY AND
TRIBOROUGH BRIDGE
AND TUNNEL
AUTHORITY AND
INTERVENOR-
PLAINTIFFS NEW YORK
STATE DEPARTMENT OF
TRANSPORTATION AND
NEW YORK CITY
DEPARTMENT OF
TRANSPORTATION**

Plaintiffs, Metropolitan Transportation Authority ("MTA") and Triborough Bridge and Tunnel Authority ("TBTA"), and Intervenor-Plaintiffs New York State Department of Transportation ("NYSDOT") and New York City Department of Transportation ("NYCDOT"), file this consolidated second amended complaint against Defendants Sean Duffy, in his official capacity as Secretary of the United States Department of Transportation, Gloria M. Shepherd, in her official capacity as Executive Director of the Federal Highway Administration, the United States Department of Transportation ("USDOT"), and the Federal Highway Administration ("FHWA"), and allege as follows:

## INTRODUCTION

1.     On January 5, 2025, the State of New York embarked on a bold new program to reduce traffic congestion in the New York City metropolitan area and fund and promote public transit with the Central Business District ("CBD") Tolling Program ("Program").  The Program, also known as Congestion Pricing, is a market-based, user-pay solution that has seen success in major cities around the world and was first conceived of right here in New York City as a possible solution to Manhattan's longstanding congestion woes.

2.     <u>New York Decides to Implement the Program</u>.  For many years, the CBD was one of the most congested urban areas in the country.  Travel times were extraordinarily slow.  Indeed, the term "gridlock" was invented in Manhattan.  Congestion in the CBD has been a $20 billion annual drag on the regional economy, and thus the national economy as well.

3.     In the 1950s, Nobel laureate and Columbia University economist William S. Vickrey proposed a market-based solution to the congestion affecting the City: charging vehicles to drive in highly congested areas.  Over the following decades, New York state and local officials, policy experts, and advocacy groups studied various solutions to identify the most effective way to reduce congestion, which results in lost productivity, poor air quality, slower and less reliable public bus service, delayed emergency response times, and reduced public safety, among other harmful conditions.  That extensive deliberation led to the consensus that congestion pricing is the most effective tool to achieve that goal—a consensus supported by the experience of London, Singapore, Stockholm, and Milan, which have each implemented their own congestion pricing programs and have seen as a result significant decreases in vehicle congestion and corresponding increases in the use of public transit facilities like subways and buses.

4.     In April 2019, following multiple attempts by New York elected officials to implement a form of congestion pricing, the New York Legislature and then-Governor Andrew

Cuomo passed the Traffic Mobility Act ("TMA"), a landmark statute with the goal of reducing traffic congestion in the CBD and creating a dedicated funding source for the MTA's capital needs. N.Y. Veh. & Traf. Law § 1701 *et seq.* The TMA authorized and directed TBTA, the MTA's independent affiliate, to establish and operate a congestion pricing program, including tolling of eligible vehicles entering or remaining in the CBD, and earmarked the revenues from the Program for the MTA's 2020-2024 Capital Program (the "Capital Program") and subsequent capital programs.

5. Shortly after the TMA was enacted, in the spring of 2019, New York State, through NYSDOT, TBTA, and NYCDOT (collectively, the "Project Sponsors"), attended several meetings with representatives from the first Trump Administration's FHWA and USDOT to discuss and present the proposed program. During those meetings, the Project Sponsors explained that the Program would accomplish its aims by tolling eligible vehicles entering the CBD in order to incentivize the use of modes other than driving, and using those tolling revenues to improve the metropolitan region's public transportation infrastructure, thereby further encouraging the use of public transit.

6. <u>The Federal Defendants Authorize the Program Under the Value Pricing Pilot Program</u>. Early on, FHWA and USDOT took the position that the "best fit" for the Program would be for the Project Sponsors to apply for federal tolling authorization through the Value Pricing Pilot Program, a statutory provision under which FHWA may authorize congestion pricing on federal-aid highways to reduce roadway congestion and improve air quality. *See* 23 U.S.C. § 149 note (Value Pricing Pilot Program) ("VPPP").[1] The VPPP, originally called the Congestion

---

[1] A "federal-aid highway" is a "public highway eligible for assistance" under provisions of Chapter 1, Title 23 of the United States Code, "other than a highway functionally classified as a local road or rural minor collector." 23 U.S.C. § 101(a)(6).

Pricing Pilot Program, has been used across the country to authorize tolling to reduce congestion, improve the environment, and raise funding for public transit. It has specifically been used in Fort Myers, Los Angeles, and San Francisco to finance and study congestion pricing in urban areas through the establishment of tolls to enter an area, similar to the programs that exist in London, Singapore, Stockholm, and Milan. Indeed, this type of tolling, known as "cordon pricing" (or sometimes "zone-based pricing" or "area-wide pricing"), has consistently been recognized, in Congress and by USDOT and FHWA, as the model form of "congestion pricing" authorized under the VPPP because it most effectively reduces overall congestion within a geographic area.

7.     In June 2019, the Project Sponsors submitted an Expression of Interest ("EoI"), attached hereto as **Exhibit A**, to FHWA for authority to assess tolls on vehicles entering the CBD. The EoI reiterated that the "purpose of [the Program] is to reduce the high level of traffic congestion in the CBD," and anticipated that "a variable toll to access the CBD, combined with an investment of the resultant revenues in improving public transit alternatives, will maximize the congestion reduction in the CBD and the surrounding area." EoI at 1-2.

8.     Pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, FHWA proceeded to evaluate the potential environmental impacts of the Program. This included, as directed by a former Executive Order that has since been revoked by President Trump, the Program's potential to have a disproportionately high and adverse impact on minority and low-income (*i.e.*, environmental justice ["EJ"]) populations including EJ communities that have pre-existing pollution and health burdens due to historic transportation and land use decisions. After a multi-year environmental review process from 2019 through 2024 that yielded an administrative record of more than 45,000 pages, FHWA and the Project Sponsors prepared a 958-page Final Environmental Assessment ("Final EA") followed by a Finding of No Significant Impact

("FONSI") and two Reevaluations, which determined that the Program would not have a significant adverse impact on the environment or a disproportionately high and adverse impact on EJ communities in light of, among other things, (1) the anticipated reduction of overall vehicle miles traveled ("VMT") and vehicular emissions in the region, and (2) the Project Sponsors' commitment to a robust, $155 million mitigation package to improve air quality and public health in EJ communities that have pre-existing pollution and health burdens and could experience traffic diversions as a result of the Program.

9.       On November 21, 2024, FHWA executed an agreement with the Project Sponsors (the "VPPP Agreement" or "VPPP Agmt."), attached hereto as **Exhibit B**, pursuant to which FHWA approved the Program's collection of tolls under the VPPP and required (among other things) implementation of the Project Sponsors' mitigation commitments.  Consistent with the VPPP, the VPPP Agreement recognizes that toll revenues may be used on any project eligible for federal assistance, which includes public transit.  The VPPP Agreement also requires the Project Sponsors to provide data on project performance (*i.e.*, reduction of congestion and increased use of public transit) for "at least ten years."  VPPP Agmt., cl. 8(b).

10.      The VPPP Agreement does not provide any right to the federal government to terminate the Program; rather, the VPPP Agreement provides only that the parties agree to "return the Project to its original operating condition if *TBTA* decides to discontinue tolls on the Project."  *Id.*, cl. 11 (emphasis added).

11.      The Program Is Succeeding.  The Program went into effect on January 5, 2025, and vehicles entering the CBD are being tolled in accordance with the toll rate schedule regulation adopted by the TBTA Board and authorized in the VPPP Agreement.  Already, the data collected to date (and simply looking at the roads) show that there is less congestion and the Program is

working: vehicle entries to the CBD and commute times have fallen; vehicle speeds—including those of public buses—have increased; more people are visiting Manhattan's commercial districts and supporting the region's businesses; and the MTA's mass transit system is seeing the benefit of increased ridership and increased funding.

12.     A recent study by researchers from the National Bureau of Economic Research ("NBER"), Google Research, Yale University, and Stanford University found that the "introduction of congestion pricing led to an immediate increase in speeds within NYC's CBD, which has persisted since implementation," and estimated "that speeds in NYC's CBD increased by 15%" on average and that the "effects on speeds are even larger during the afternoon—historically the most congested time of day—and persist even after peak-hours pricing ends at 9pm."[2]  Traffic in the CBD has decreased substantially, with approximately 5.8 million fewer vehicles entering the district in January through March 2025 than would be expected based on data for prior years, representing a 12.5% reduction overall across the first three months of the Program.[3]  The data also indicates a 10% reduction in VMT by all vehicles in the CBD from January to mid-March of 2025, as compared to the same period in 2024.

13.     According to data collected by TRANSCOM, a coalition of 16 transportation and public safety agencies in the broader metropolitan region, crossing times were 17% faster at the Lincoln Tunnel and 48% faster at the Holland Tunnel in January 2025, compared to January 2024; trip times from Brooklyn and Queens to the CBD have dropped between 10% and 30%; and express buses save about 10 minutes on their commutes.  Traffic speeds on river crossings have

---

[2] Cody Cook, et al., *The Short-Run Effects of Congestion Pricing in New York City*, NBER (March 17, 2025), https://shoshanavasserman.com/files/2025/03/NYC_Congestion_Pricing_2025.pdf (last accessed April 14, 2025).

[3] MTA, *MTA Metrics: Vehicle Reductions*, https://metrics.mta.info/?cbdtp/vehiclereductions (last accessed April 14, 2025).

been 5% to 30% faster this February than last February.  Traffic speeds on major bridges improved significantly: on the Queensboro Bridge, by 31%; on the Brooklyn Bridge, by 26%; and on the Manhattan Bridge, by 7%.[4]  These trends continued in March: fewer vehicles utilized the nine MTA bridges and tunnels, with levels dropping 2.4% from March of 2024 to March of 2025.[5]  The largest reductions are at the Hugh L. Carey and Queens-Midtown Tunnels, which lead directly into the CBD.  Truck traffic traveling through these tunnels dropped 14% this year compared to the same period in 2024.[6]

14.    Honking is also down, as New Yorkers in the CBD are finally enjoying what might be called some "peace and quiet" since the Program went into effect, corresponding to a 69% decline in noise complaints about honking made to the City's 311 portal.[7]

15.    The dire projections that the Program would harm business are also belied by the data.  Credit card sales data reflect that retail sales in the CBD are on track to be $900 million higher in 2025 compared to the same period last year.[8]  *Crain's New York Business* reports that more people visited the Business Improvement Districts ("BIDs") within the CBD in January 2025 than during the same month last year, noting a 4.6% year-over-year increase in visitation.[9]  Indeed,

---

[4] MTA, January 2025 MTA Board Meeting, *Congestion Relief Zone Tolling January 29, 2025 Update* 9, https://www.mta.info/document/163411 (last accessed Apr. 17, 2025); February 2025 MTA Board Presentation at 10 (Feb. 26, 2025), https://www.mta.info/document/165401 (last accessed Apr. 17, 2025).

[5] *MTA Daily Ridership and Traffic: Beginning 2020*, Data.NY.Gov (Apr. 16, 2025), https://data.ny.gov/Transportation/MTA-Daily-Ridership-and-Traffic-Beginning-2020/sayj-mze2/about_data.

[6] Samuel Schwartz, *Where Have all the Trucks Gone? Truck Diversions Through the Bronx and Staten Island*, Hunter Coll. (Mar. 28, 2025), https://www.roosevelthouse.hunter.cuny.edu/?forum-post=trucks-gone-truck-diversions-bronx-staten-island.

[7] *Id.*

[8] Dave Colon, *Memo to the President: Manhattan Economy Improving, Thanks to Congestion Pricing*, Streetsblog NYC (Feb. 27, 2025), https://nyc.streetsblog.org/2025/02/27/memo-to-the-president-manhattan-economy-improving-thanks-to-congestion-pricing.

[9] Caroline Spivack, *Business Foot Traffic Is Up Within the Congestion Pricing Zone*, Crain's N.Y. Bus. (Feb. 5, 2025), https://www.crainsnewyork.com/transportation/congestion-pricing-zone-business-foot-traffic.

while vehicle traffic may be down in Manhattan, *Gothamist* observes, "pedestrian traffic is up."[10] Data from the Broadway League, meanwhile, shows that there was a 20% year-over-year increase in attendance for Broadway theatre performances in January through March 2025, as well as a 25% increase in gross revenue in January 2025.[11]

16.     Business leaders have voiced their support for the Program, recognizing the benefits of Congestion Pricing for businesses in the CBD and the broader economy.  Greater New York Chamber of Commerce CEO Mark Jaffe has stated that the Program "will improve the quality of life in Manhattan for all who live, work and visit," and that decreased traffic from the Program "should decrease labor time and improve the efficiencies of getting essential commodities onto the shelves."[12]  The Partnership for New York City, a non-profit group of New York business leaders, has likewise voiced its support for the Program, pointing out that it could save "an estimated $20 billion that excess congestion costs annually because of more efficient and timely movement of people and goods, which will increase productivity and reduce expenditures on fuel and overtime."[13]  More recently, the Partnership for New York City's President & CEO Kathryn Wylde stated that, "[i]n every respect, this is a policy that President Trump and the Republicans should be supporting."[14]

---

[10] Arun Venugopal, *Vehicle Traffic is Down in Manhattan, But Pedestrian Traffic Is Up, Data Says*, GOTHAMIST (Feb. 13, 2025), https://gothamist.com/news/vehicle-traffic-is-down-in-manhattan-but-pedestrian-traffic-is-up-data-says.

[11] Research & Statistics, *Grosses-Broadway in NYC*, THE BROADWAY LEAGUE https://www.broadwayleague.com/research/grosses-broadway-nyc/ (last accessed Apr. 17, 2025).Gersh Kuntzman, *Wind in Their Sales: Congestion Pricing Is No 'Toll' on the Broadway Box Office*, STREETSBLOG NYC (Feb. 5, 2025), https://nyc.streetsblog.org/2025/02/05/wind-in-their-sales-congestion-pricing-is-no-toll-on-the-broadway-box-office.

[12] New York's Chamber (@NYChamber), X (Nov. 15, 2024, 3:29 PM), https://x.com/NYChamber/status/1857521387583451602.

[13] Louisa Chafee, et al., *Op-ed: Congestion Pricing Will Be a Boon for New York*, PFNYC.ORG (Nov. 14, 2014), https://pfnyc.org/news/op-ed-congestion-pricing-will-be-a-boon-for-new-york/.

[14] Ry Rivard & Nick Reisman, *New York's Business Boosters Push Trump to Keep Manhattan Tolls*, POLITICO (Feb. 11, 2025), https://www.politico.com/news/2025/02/11/new-york-trump-congestion-pricing-00203540.

17.     The region's subways, buses, and commuter railroads—vital transportation lifelines for so many New Yorkers who live in the metropolitan area and beyond—are already benefiting from substantial investments that have been made as a result of the Program.  In particular, key tenets of the Capital Program include improving outdated signaling and other equipment to increase system reliability; improving safety and customer service through technology; and extending public transit to underserved areas.  And the Program will create many more benefits going forward.  For example, Program revenue will be used to update and renovate numerous subway stations consistent with the Americans with Disabilities Act by building new elevators at 70 stations across the boroughs and replacing up to 65 escalators and 78 elevators, bringing the transportation system to greater than 50% accessibility.

18.     In addition, Program revenue will be used to advance the $155 million package of mitigation for EJ communities, which is designed to address preexisting pollution and chronic health burdens.  These measures will include replacing diesel engines with cleaner technology; installing electric charging infrastructure for trucks; planting roadside vegetation to improve near-road air quality; and installing air filtration units in schools near highways.

19.     TBTA has also issued debt that is supported by revenues generated by the Program and by long-term bonds issued partly in reliance on revenues generated by the Program.  This includes no less than $378.8 million in short-term notes currently outstanding to fund infrastructure costs, and $500 million in short-term notes to fund a portion of the $15 billion of capital projects in the Capital Program.  By the end of the month, TBTA also expects to close a $500 million bank loan to support the Capital Program, relying on Program revenues as security.

9

20.     New Yorkers support the Program because it is working.  According to a poll reported by *CBS News*, the majority of New Yorkers want the Program to continue.[15]  On a 2-to-1 basis, New Yorkers say that the Program is working.[16]  The Program's biggest supporters are the individuals who actually drive into the CBD frequently.[17]  Ultimately, 6 out of every 10 New Yorkers say that President Trump should not take any steps to end the Program.[18]

21.     <u>The New Administration Seeks to "Terminate" the Program</u>.  Notwithstanding the extensive evaluations—and now results—showing that Congestion Pricing is the best way to reduce congestion in the CBD, reduce overall vehicle emissions in the greater region, and improve the accessibility and reliability of public transit, the Program has continued to have its political detractors, including the President of the United States.  As early as May 2024, President Trump posted on "Truth Social" that he would "TERMINATE Congestion Pricing in my FIRST WEEK back in Office," and subsequent media reports—from the President and his allies in Congress— indicated that the Administration wished to immediately and summarily end Congestion Pricing to achieve political objectives.

---

[15]Alecia Reid, *6 in 10 Say They Want NYC Congestion Pricing to Continue, New Poll Finds*, CBS NEWS (Feb. 5, 2025), https://www.cbsnews.com/amp/newyork/news/new-york-city-congestion-pricing-morning-consult-poll/.

[16] *Id.*

[17] *Id.*

[18] *Id.*

22.     On February 19, 2025, the Trump Administration attempted to do just that. Defendant USDOT Secretary Duffy issued a letter to Governor Hochul, attached hereto as **Exhibit C** (the "February 19 Letter" or "Feb. 19 Ltr."), purporting to "rescind" the VPPP Agreement and "terminate" the Program.   The White House "X" account proclaimed that "CONGESTION PRICING IS DEAD.  Manhattan, and all of New York, is SAVED.  LONG LIVE THE KING!", along with a picture of President Trump wearing a crown in front of the Manhattan skyline.



**Figure 1: Feb. 19, 2025 social media post to X.com by @WhiteHouse**

23.     Despite the Administration's "royal" decree, its effort to summarily and unilaterally overturn the solution to the City's congestion enacted by New Yorkers' elected representatives is unlawful and invalid.  Accordingly, Congestion Pricing remains alive and well, and the MTA and TBTA responded by filing this lawsuit seeking a declaration that the Administration's actions are

null and void and for vacatur of the purported "rescission" and "termination." NYSDOT and NYCDOT then successfully moved to intervene as plaintiffs in this lawsuit and, together with the MTA and TBTA, submitted a consolidated first amended consolidated complaint on April 18, 2025. ECF 62. Riders Alliance and Sierra Club also successfully moved to intervene as plaintiffs in this lawsuit and filed their own complaint on March 8, 2025, ECF 41, which they amended on April 18, 2025, ECF 63.

24. Neither the VPPP Agreement nor applicable law or regulations permit Defendants to unilaterally terminate the VPPP Agreement. This makes good sense. If Defendants had some absolute right to unilaterally terminate a VPPP program that had already been approved and implemented, it would create uncertainty around the future of such programs any time leadership at FHWA, USDOT, or the White House changed—uncertainty that would obviously undermine the purposes of the VPPP, make it difficult to issue bonds for other projects, and be inimical to a rules-based, market economy.

25. Beyond that, the two legal rationales for attempting to terminate the VPPP Agreement in Duffy's February 19 letter are so weak as to be transparently pretextual. First, Duffy claimed that the VPPP does not authorize cordon pricing. But the reality is that the VPPP's broad language authorizes a variety of congestion pricing strategies, including cordon pricing, and Duffy's tortured reading is contrary to: (i) the ordinary meaning of "congestion pricing" at the time that the VPPP was enacted (and each time it has subsequently been reauthorized), (ii) the statute's legislative history, and (iii) more recent pronouncements from Congress. It is also contradicted by FHWA's own official guidance documents and reports and FHWA's approval of other cordon-based pilot projects.

26. Duffy's second reason seems to relate to his factually incorrect claim that the toll

rate schedule regulation associated with the Program is "driven primarily by the need to raise revenue for the Metropolitan Transit [sic] Authority (MTA) system."  Even if that were the case, which it is not, it is perfectly clear from the statutory text, the legislative history, and the agency's guidance and actions that States may, and are actually expected to, consider revenue objectives when setting toll rates for projects authorized under the VPPP.  Indeed, Congress expressly stated that States would use toll revenues to fund other "projects eligible under such title," VPPP, cl. 3—which include transit capital projects—and directed the Secretary to report on the effects that VPPP projects have on not only congestion but also "transit ridership … and availability of funds for transportation programs," *id.* at cl. 5.   In a different section of the Intermodal Surface Transportation Efficiency Act of 1991, Pub. L. 102-240 (Dec. 18, 1991) ("ISTEA"), the statute that created the VPPP, Congress even *required* States to consider "the use of innovative mechanisms for financing [transportation] projects, including ... congestion pricing," ISTEA § 1025(a).  For these reasons, Duffy's view that congestion pricing was not authorized by the VPPP borders on being specious.

27.    In the decades since the VPPP was enacted, Congress and FHWA have both repeatedly concluded that the VPPP authorizes cordon-based congestion pricing in New York City and that the revenues from such a program may be used to fund transit infrastructure.  Duffy's abrupt and politically motivated departure from this consensus provides no legitimate basis for FHWA's reversal of its position on the Program, particularly after FHWA reaffirmed the FONSI and approved the Program only a few months prior.  And, in stark contrast to the five-year process that led to FHWA's VPPP approval, Defendants formed this newfound position, and took this agency action, a month following the change in administration, despite having provided no meaningful legal analysis as to their ability to terminate or justifications for terminating the

Program, and despite having conducted no NEPA review of the effects on the environment from ceasing tolling and reintroducing tens of thousands of additional vehicular trips into the CBD daily, preventing improvements to the region's public transit infrastructure, or terminating the EJ mitigation committed to as part of the Program and to be funded through Program revenue.

28.     Further demonstrating the pretextual and arbitrary nature of the termination, Duffy's rationale is in direct conflict with his stated policy to "prioritize" projects "that utilize user-pay models," like Congestion Pricing.  It also runs afoul of Duffy's own recent remarks that saving people time on their commutes would be part of his mission as Secretary.  As Duffy stated during a conference of state highway and transportation officials on February 5, 2025, the Administration should be committed to creating projects that:

> Mak[e] people's lives better.  What you do makes people's lives better.  We're able to get to work and back home to see our loved ones more quickly.  If we don't have our systems that are delayed and we don't sit in traffic we get to spend an extra 15 minutes, maybe an extra 45 minutes a day with the ones that we love as opposed to listening to music or a podcast or, I don't know what you listen to in the car, but whatever you're listening to in the car, or on the train.  We can make people's lives better and spend time with the people we love as opposed to going to the grind of our transportation system.[19]

Of course, the threatened cancellation of Congestion Pricing after it's already been operating successfully for more than three months actually would be the opposite of "making people's lives better" in this important way.

29.     In addition to being inconsistent with the Administration's own broader policy statements, the purported termination of the Program runs contrary to its purported respect for

---

[19] Sean Duffy, *U.S. Secretary of Transportation Sean Duffy Speaks at the American Association of State Highway and Transportation Officials 2025 Washington Briefing*, U.S. Dep't of Transp. (Feb. 5. 2025), https://www.transportation.gov/briefing-room/us-secretary-transportation-sean-duffy-speaks-american-association-state-highway-and.

federalism.  The Program is the first congestion pricing program of its kind to be implemented in the United States, a necessary solution to the unique policy challenges facing the New York metropolitan region and one that reflects the will of the majority of New Yorkers and their elected representatives at every level of government.  Indeed, the clear consensus of the experts and policy makers that have studied the issue is that cordon pricing is the most effective method to reduce congestion in Manhattan—a narrow island with a dense network of roads and numerous points of ingress and egress.  It is also a program that could provide a pathway for other congested urban areas to reduce congestion and fund public transit.  As Justice Brandeis explained nearly a century ago, "[i]t is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country."  *Whalen v. Roe*, 429 U.S. 589, 597 n.20 (1977) (quoting *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J. dissenting)).  President Trump claims to embrace this philosophy and has even pledged, in his own signature way, to "make states the laboratories of democracy once again."[20]  In his first inaugural address, President Trump declared that "we are not merely transferring power from one administration to another, or from one party to another, but we are transferring power from Washington, D.C., and giving it back to you, the American people."[21]  And Duffy, shortly after being confirmed as Secretary of Transportation, committed to not interfere with state transportation initiatives, promising state highway and transportation officials: "I think that you guys know how to do your jobs, and I think we should rethink the way we're doing business together by giving you all a lot more autonomy and a lot more authority, a lot more freedom to do the projects that you know are important in your

---

[20] Michael Stratford, *Trump Endorses States' Rights – But Only When He Agrees with the State*, POLITICO (Apr. 2, 2018), https://www.politico.com/story/2018/04/02/trump-states-rights-education-sanctuary-drilling-492784.
[21] *Id.*

communities."[22]  Yet the Administration's efforts to end the Program, when most New Yorkers believe it should not interfere, are directly contrary to those commitments.

30.     The Administration Seeks to Coerce Compliance and Threatens to Retaliate.  With no viable defense to Plaintiffs' claims on the merits, the Administration has resorted to what has become its *modus operandi*: attempting to improperly leverage federal funding as a way to compel compliance with its unlawful decrees.[23]  On March 18, 2025, Duffy sent a letter to the MTA, attached hereto as **Exhibit D**, demanding information on crime and safety in subways and on buses in New York City and threatening "further consequences, up to and including redirecting or withholding funding."  Although the letter did not directly reference Congestion Pricing, it was widely perceived as an attempt to gain leverage in his efforts to discontinue the Program and "la[y] the groundwork for citing crime as a reason to ultimately withhold federal money," coming just three days before Defendants' then-March 21, 2025 purported deadline for the Program to cease tolling.[24]

31.     On March 20, 2025, Duffy's message was even clearer.  He posted on X an apparent threat that Defendants might withhold unspecified federal funding from the State of New York (and, by implication, from the MTA, TBTA, and NYSDOT), unless the Program is ended.

---

[22] Sean Duffy, *U.S. Secretary of Transportation Sean Duffy Speaks at the American Association of State Highway and Transportation Officials 2025 Washington Briefing* (Feb. 5, 2025), https://www.transportation.gov/briefing-room/us-secretary-transportation-sean-duffy-speaks-american-association-state-highway-and.

[23] Alex Lemonides et al., *Tracking the Lawsuits Against Trump's Agenda*, N.Y. TIMES (Mar. 25, 2025), https://www.nytimes.com/interactive/2025/us/trump-administration-lawsuits.html.

[24] James Barron, *The Subtext of a Trump Official's Letter to the M.T.A.*, N.Y. TIMES (Mar. 20, 2025), https://www.nytimes.com/2025/03/20/nyregion/trump-duffy-nyc-subway.html.



**Figure 2: Mar. 20, 2025 social media post to X by @SecDuffy**

32.     On March 25, 2025, in response to a letter from Governor Hochul, State Senate Majority Leader Andrea Stewart-Cousins, and State Assembly Speaker Carl Heastie proposing an update to the federal transit funding formula, which awards the MTA only 17% of transit funding, despite its carrying 43% of the nation's mass transit riders, Duffy again took to X to suggest that Defendants may improperly withhold federal funds.   Duffy described the proposal as "Outrageous!" and accused the State of "trying to fill the gap with highway funds and taxing the working class"—invoking a term opponents to Congestion Pricing have used to disparage the tolls—rather than "actually fixing their financial mismanagement."  Using the same language from his earlier X post demanding that New York end the Program, Duffy once again warned that "[t]he federal government is not a blank check."



**Figure 3: Mar. 25, 2025 social media post to X by @SecDuffy**

33.     On March 30, 2025 the MTA responded to Duffy's request for information with a thorough, 22-page explanation as to why, in fact, New York's subways are among the safest in the nation and crime is at a historic low.  Even so, the MTA said it would welcome further federal collaboration to ensure that public transit continues as the best and most popular option for the region's commuters.

34.     Meanwhile, on March 20, 2025, Defendant Shepherd sent a letter to NYSDOT, NYCDOT, and MTA Bridges and Tunnels (the "March 20 Shepherd Letter" or "Mar. 20 Ltr."), attached hereto as **Exhibit E**, in which Shepherd noted her prior correspondence "providing you until March 21, 2025, to cease tolling operations that were initiated through the November 21, 2024, Value Pricing Pilot Program (VPPP) Agreement," stated that Duffy "has directed that I extend the period of time to comply by 30 days," and instructed that "toll operations must cease by April 20, 2025."  Mar. 20 Ltr.

35.     In light of this background, on April 2, 2025, the MTA and TBTA asked counsel

for the Federal Defendants during a meet-and-confer for the initial conference in this matter if their clients intend to take unilateral action to enforce the April 20 "deadline." Counsel for the Federal Defendants "did not have information to provide" regarding the timing or likelihood of any such actions by their clients. On April 8, however, DOT posted on its "USDOT Rapid Response" account on X that it "will not hesitate to use every tool at our disposal in response to non-compliance later this month."[25]



**Figure 4: Apr. 8, 2025 social media post to X by @USDOTRapid**

36.    On April 9, the Federal Defendants informed the Court during the initial conference

---

[25] @USDOTRapid, X.com (Apr. 8, 2025).

that Duffy is considering his options and had not yet made a final decision with respect to enforcement of the April 20 deadline.  The Federal Defendants, however, reiterated their position that Plaintiffs should cease tolling by April 20.

37.    On April 21, Duffy sent another letter to Governor Hochul demanding for a third time that the Program end.  ("April 21 Letter").  The April 21 Letter reaffirmed Defendants' position that the VPPP Agreement had been "terminated" by the February 19 Letter and threatened that Defendants "will implement appropriate initial compliance measures" on or after May 28, 2025 if New York continues to operate the Program.

38.    The threatened "compliance measures" include: (1) "no further advance construction ('AC') authorizations,"  (2) "no further [NEPA] approvals," (3) "no further approvals of Statewide Transportation Improvement Program ('STIP') amendments concerning New York Metropolitan Transportation Council TIP modifications," and (4) "no further obligations of FHWA funds (both formula and competitive) for projects within New York City."  These incredibly broad coercive threats would among other things, if implemented, halt reviews needed for all projects and funding within FHWA's purview, including billions of dollars' worth of funding for transit projects currently proposed for addition to New York's STIP, unless the Program is brought to a stop.

39.    The President is not a king, and Defendants have no right to demand compliance with the Administration's unlawful directives.  Plaintiffs will continue to operate the Program as required by New York law unless and until Plaintiffs are directed to stop by a court order.

40.    The MTA, TBTA, NYSDOT, and NYCDOT file this consolidated second amended complaint to seek a declaration that the Administration's purported decision to terminate federal approval for the Program and rescind the VPPP Agreement is null, void, and must be set aside,

and for vacatur of the February 19 Letter.

## PARTIES, JURISDICTION, AND VENUE

41.     Plaintiff the MTA is a public benefit corporation organized under the laws of New York and is responsible for North America's largest public transportation network, serving 15.3 million people across 5,000 square miles in New York City, Long Island, Southeastern New York, Northeastern New Jersey, and Southern Connecticut.  The MTA has offices in New York, New York, and is governed by a 23-member board which is coterminous with the board of TBTA.

42.     Plaintiff TBTA is an affiliate of the MTA.  It is a public benefit corporation organized under the laws of New York, with offices in New York, New York.  TBTA is a signatory to the VPPP Agreement and is responsible under New York law for the implementation and operation of the Program.

43.     Intervenor-Plaintiff NYSDOT is a New York State agency, one of the co-applicants for VPPP approval, and a signatory to the VPPP Agreement.

44.     Intervenor-Plaintiff NYCDOT is an agency of the City of New York, a municipal corporation codified under the laws of the State of New York, one of the co-applicants for VPPP approval, and a signatory to the VPPP Agreement.

45.     Defendant Duffy is the Secretary of USDOT.  He is sued in his official capacity.

46.     Defendant Shepherd is the Executive Director of the FHWA.  She is sued in her official capacity.

47.     Defendant USDOT is a cabinet department of the federal government, with offices in Washington, D.C.

48.     Defendant FHWA is an agency within the USDOT, with offices in Washington, D.C.

49.     This Court has subject matter jurisdiction over this action pursuant to 23 U.S.C. § 1331 because this case presents a federal question under the laws of the United States, including the United States Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*.  This Court has remedial authority including pursuant to the APA, 5 U.S.C. §§ 705, 706; the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.; and Rules 57 and 65 of the Federal Rules of Civil Procedure.

50.     Venue is proper in this district under 28 U.S.C. § 1391(e) because the MTA, TBTA, and NYCDOT are headquartered in this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## BACKGROUND

A.     **New York Passes the Traffic Mobility Act as the Solution to the New York City Area's Longstanding Congestion Problems**

51.     Traffic congestion has long plagued the New York metropolitan area.  For decades, congestion has stymied economic growth and harmed the environment and public health, as well as quality of life in the region.

52.     Congestion on New York City roads, and in the CBD in particular, has a serious negative impact on public health.  As the U.S. Environmental Protection Agency ("EPA") has recognized, higher vehicle traffic leads to higher vehicle emissions, which are associated with negative health impacts like "asthma onset and aggravation, cardiovascular disease, reduced lung function, impaired lung development in children, pre-term and low-birthweight infants, childhood

leukemia, and premature death."[26]  FHWA has consistently acknowledged that "less vehicle traffic can improve air quality and reduce chronic lower respiratory diseases."[27]

53.     Congestion also increases travel times, eroding worker productivity, reducing bus and paratransit service, raising the cost of deliveries, and impeding the movement of emergency vehicles.  A 2018 study estimated that "traffic congestion [would] be a $100 billion drag" on the metropolitan-area economy over the next five years, and identified Manhattan below 60th street—where a quarter of the economic activity is concentrated—as the primary source of traffic congestion in the region.[28]

54.     As noted above, the concept of congestion pricing was first developed in the 1950s by Nobel laureate and Columbia University economist William S. Vickrey, who believed that it offered a market-based solution to overcrowding, whether on subway cars or New York City's streets.  Responding to concerns that some might see congestion pricing "as a tax increase," Professor Vickrey explained that "when motorists' time is considered, it's really a savings."[29]

55.     In 1959, Professor Vickrey testified before the Congressional Joint Committee on Washington Metropolitan Problems to outline "pricing solutions to urban transport problems," including a tolling scheme that would later be described as congestion pricing.[30]  During his testimony, Vickrey stated, "[i]t is a specific feature of the pricing system suggested here that it is

---

[26] OFF. OF TRANSP. & AIR QUALITY, U.S. ENV'T PROT. AGENCY, *Near Roadway Air Pollution and Health: Frequently Asked Questions* (Aug. 2014), https://nepis.epa.gov/Exe/ZyPDF.cgi/P100NFFD.PDF?Dockey=P100NFFD.PDF.

[27] Jhoset Burgos-Rodriguez, et al., *Making Healthy Connections in Transportation*, 87 PUBLIC ROADS 28 (Summer 2023), https://highways.dot.gov/sites/fhwa.dot.gov/files/Public%20Roads%20Summer%202023.pdf.

[28] The Partnership for New York City, *$100 Billion Cost of Traffic Congestion in Metro New York*, PFNYC.ORG (Jan. 2018) https://pfnyc.org/research/100-billion-cost-of-traffic-congestion-in-metro-new-york/.

[29] Jack Basso & Tyler Duvall, *Funding Transportation Infrastructure with User Fees*, BROOKINGS (Feb. 26, 2013), https://www.brookings.edu/articles/funding-transportation-infrastructure-with-user-fees/.

[30] William Vickrey, *Statement to the Joint Committee on Washington, DC, Metropolitan Problems*, 36 J. URB. ECON, 42-65 (1994).

to be applied to the street and highway system as a whole, and not merely to bits and pieces of it."[31] Specifically, he observed that, "[w]here tolls are collected only on selected facilities, such as on the bridges, tunnels, and parkways in the New York area, this often has a very unfortunate effect on the routing of traffic.[32]" Vickrey explicitly "contemplated that the control point [*i.e.*, toll facilities] should more or less completely block off the area into zones, so that it would not be possible to go from one zone to another without passing a checkpoint."[33]

56.  In 1975, Singapore, a small island city-state long plagued by congestion, first put Professor Vickrey's ideas into practice by implementing its famous Area Licensing Scheme, pursuant to which vehicles entering Singapore's Central Business District were required to pay a daily toll.[34]  Singapore's Area Licensing Scheme was a success and is widely credited with dramatically reducing traffic in Singapore's central business district, even as the nation's economy and population have continued to grow.[35]

57.  In 2003, London put Professor Vickrey's idea into practice and moved forward with a congestion pricing program of its own.  The program was an immediate success.  Within the first year of its implementation, London saw a 30% reduction in congestion within the charging zone and an 18% reduction in the number of vehicles entering the zone.[36]  The city also experienced significant increases in the number of commuters choosing to use public transit, including a 38%

---

[31] *Id.* at 47.

[32] *Id.*

[33] *Id.*

[34] Kian-Keong Chin, *Road Pricing – Singapore's 30 Years of Experience*, CESIFO DICE REPORT (2005), https://www.econstor.eu/bitstream/10419/166848/1/ifo-dice-report-v03-y2005-i3-p12-16.pdf.

[35] *Id.*

[36] Transp. For London, *Congestion Charging: Second Annual Report* 2-3 (Apr. 2004), https://content.tfl.gov.uk/impacts-monitoring-report-2.pdf.

rise in bus ridership.[37]  Due to the overwhelming success of its congestion pricing program, London subsequently expanded the congestion charge zone with considerable public support.[38]

58.     In 2006, Stockholm implemented a congestion charge for its central business district on a six-month trial basis, after which citizens would be given a chance to vote on the program's future.  On the eve of launch, fewer than 40% of Stockholm residents supported the plan.[39]  Following implementation of the program, however, Stockholm experienced a 20% decrease in traffic volumes and popular support for the program began to surge.  After the trial expired, a referendum to make the program permanent passed in 2007, and public support for the program rose to over 65%.[40]

59.     In 2011, the people of Milan passed a referendum authorizing Area C, a new congestion pricing toll for vehicles entering the city's central business district.[41]  Under an earlier version of the program, introduced in 2008, higher polluting vehicles were charged for access to the central business district, while less polluting vehicles were able to enter for free.  Area C was enacted to further reduce traffic congestion in the central business district by tolling vehicles that enter the district.  Area C caused a 28% decrease in road congestion, a 24% reduction in road casualties, and significant decreases in pollutants.[42]

60.     The last decade has seen further recognition of the benefits that a congestion pricing program could have for reducing congestion in New York City, improving air quality, and raising

[37] *Id.*

[38] *See* Sam Schwartz et al., *A Comprehensive Transportation Policy for the 21st Century*, 17 N.Y.U. ENV'T L.J. 580, 597 (2008).

[39] Ben Furnas, *Congestion Pricing Lessons from London and Stockholm*, VITAL CITY (June 13, 2024), https://www.vitalcitynyc.org/articles/how-london-and-stockholm-made-congestion-pricing-politics-work.

[40] *Id.*

[41] C40 Cities, *Milan's Area C Reduces Traffic Pollution and Transforms the City Center* (Mar. 2015), https://www.c40.org/case-studies/milan-s-area-c-reduces-traffic-pollution-and-transforms-the-city-center/.

[42] *Id.*

funds to improve mass transit.  As New Yorkers faced serious mass transit issues in 2017, then-Governor Cuomo raised the possibility of implementing a congestion pricing program that would help fund improvements to New York City's public transit infrastructure.  Governor Cuomo instituted an advisory panel which recommended a congestion pricing program.

61.     In 2019, the New York State Legislature enacted the TMA, which authorized and directed TBTA to implement a congestion tolling program in the CBD.  N.Y. Veh. & Traf. Law § 1701 *et seq*.  The TMA's legislative findings declare that traffic in New York—which "ranks second worst among cities in the United States and third worst among cities in the world" and is estimated to cost the metropolitan economy more than "one hundred billion dollars over the next five years"—is "crippling … [for] residents, commuters, taxi and for-hire vehicle traffic, bus transit and emergency services" and "a significant contributor to decreased air quality."  *Id.* § 1701.

62.     The Legislature further found that the underfunding of New York City's aging subway infrastructure has "a deleterious impact on the health, safety, and livelihood of commuters, tourists, resident New Yorkers" as well as "the economy of the state of New York," such that "a long-term and sustainable solution is necessary in order to ensure stable and reliable funding" for this "important mass transit asset."  *Id.*  Consequently, the Legislature declared that to ensure the "public health and safety of New York's residents," the creation of a congestion pricing program in the Manhattan CBD was "a matter of substantial state concern."  *Id.*

63.     The TMA authorizes and directs TBTA to "establish the central business district tolling program," *id.* § 1704 (1), grants TBTA the power "to establish and charge variable tolls and fees for vehicles entering or remaining in the [CBD],"[43] and authorizes TBTA "to make rules and

---

[43] As delineated by the Act, the CBD encompasses the geographic area of Manhattan south and inclusive of 60th Street, but not including the FDR Drive, the West Side Highway, the Battery Park Underpass, and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West Street.  *Id.* § 1704(2).

regulations for the establishment and collection of central business district tolls, fees, and other charges," *id.* § 1704-a (1).

**B.    Congestion Pricing Tolling Authority Under the Federal Value Pricing Pilot Program**

64.    Because Congestion Pricing would impose a toll on several federal-aid highways in Manhattan, the federal government has taken the position that the Program could not begin without federal approval. *Mulgrew v. U.S. Dep't of Transp.*, No. 23 Civ. 10365, 2024 WL 3251732, at *4 (S.D.N.Y. June 20, 2024) (Liman, J.).

65.    The authority of the States to impose tolls on roadways within their borders has been recognized since the early days of the Republic, and the Supreme Court has consistently held as a matter of history and tradition that each State, as a coequal sovereign, is "empowered" to impose "uniform, fair and practical" tolls "for the privilege of using its roads." *Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 715 (1972) (collecting cases); *see also* Cong. Rsch. Serv., R43575, *Tolling U.S. Highways* 1–3 (Aug. 26, 2016).

66.    When Congress established the forerunner of today's federal-aid highway program in 1916, it determined that highways built under that program should be free from tolls. But that general rule, which is today codified at 23 U.S.C. § 301, was almost immediately the subject of numerous carve outs, *see, e.g.*, Oldfield Act of 1927, Pub. L. 69-773 (Mar. 3, 1927) (permitting the use of federal funds to build toll bridges), and today tolls are permitted on federal-aid highways under a wide variety of statutory exceptions, including exceptions that authorize tolling on new infrastructure, tolling on additional lanes added to existing highways, tolling on construction and

conversion of toll-free highways to toll highways, and tolling in connection with high-occupancy vehicle lanes, *see, e.g.*, 23 U.S.C. §§ 129, 166.[44]

67.    One such exception is the VPPP, which was enacted into law as the "Congestion Pricing Pilot Program" as part of ISTEA, a watershed transportation reform bill sponsored and led by U.S. Senator Daniel Moynihan of New York.  As Congress explained in enacting ISTEA, its intention was to foster sweeping change in the nation's transportation networks in order to "develop a National *Intermodal* Transportation System" consisting "of all forms of transportation in a unified, interconnected manner," which "shall include significant improvements in public transportation necessary to achieve national goals for improved air quality, energy conservation, international competitiveness, and mobility."  ISTEA § 2 (emphasis added).  To this end, among other things, Congress included in ISTEA substantial funding for mass transit programs, which Congress found to be an integral part of the "National Intermodal Transportation System," *id.*, and "granted states 'greater flexibility to operate toll facilities and use toll revenues for a variety of transportation projects'" including congestion pricing programs.  *Chan v. U.S. Dep't of Transp.*, No. 23 Civ. 10365, 2024 WL 5199945, at *33 (S.D.N.Y. Dec. 23, 2024) (Liman, J.) (quoting *Am. Trucking Assn's, Inc. v. N.Y. State Thruway Auth.*, 886 F.3d 238, 241 (2d Cir. 2018)).  As President Bush explained when signing ISTEA into law, a "major element" of the legislation was "to provide State and local officials unprecedented flexibility," including the discretion to finance transportation improvements "with toll revenue" and to use transportation funds "on the improvements that [will] best meet local needs, whether highway projects or public transit

---

[44] *See also* OFF. OF HIGHWAY POLICY INFO., FED. HIGHWAY ADMIN., *Toll Facilities in the United States*, https://www.fhwa.dot.gov/policyinformation/tollpage/history.cfm (last accessed Mar. 29, 2025) (noting that federal law "offers States and/or other public entities a variety of opportunities to toll motor vehicles to finance Interstate construction and reconstruction, promote efficiency in the use of highways, reduce traffic congestion and/or improve air quality").

projects." *Statement by President George [H.W.] Bush Upon Signing H.R. 2950*, 1991 U.S.C.C.A.N. 1865 (Dec. 18, 1991).

68.     Consistent with these objectives, ISTEA greatly expanded the circumstances in which States could collect toll revenues on federal-aid highways.  In Section 1012(a) of ISTEA (codified, as amended, at 23 U.S.C. § 129), Congress permitted the collection of tolls on new or reconstructed infrastructure, including highways, bridges, or tunnels.  *See* ISTEA § 1012(a)(1).

69.     In Section 1012(b) of ISTEA (codified, as amended, at 23 U.S.C. § 149 note), Congress authorized the creation of a separate tolling program, the Congestion Pricing Pilot Program, renamed the VPPP in 1998.  Pursuant to Section 1012(b), Congress directed the Secretary of Transportation to "solicit the participation of State and local governments and public authorities for one or more congestion pricing pilot programs," and authorized him to "enter into" agreements to "establish, maintain, and monitor congestion pricing projects."  ISTEA § 1012(b).[45]

70.     Section 1012(b) further authorized the Secretary "to allow the use of tolls" by states, local governments, and public authorities "as part of a pilot program under this section." *Id.* § 1012(b)(4).  In contrast to Section 1012(a), Congress imposed notably fewer restrictions on the use of tolling revenue generated under the Congestion Pricing Pilot Program pursuant to Section 1012(b), requiring only that "[r]evenues generated by any pilot project" be "applied to projects eligible under" Title 23.  *Id.* § 1012(b)(3).  Transit capital projects are eligible for federal assistance under 23 U.S.C. § 142(a)(2).  ISTEA also provided that the Secretary must periodically report on the effects that VPPP projects have on not only congestion but also "transit ridership … and availability of funds for transportation programs."  ISTEA § 1012(b)(5).

---

[45] *See also* 49 C.F.R. § 1.85(c)(22).  FHWA provides tolling authority under the VPPP by entering into tolling agreements with the relevant state actors.  *See Value Pricing Pilot Program Participation, Fiscal Years 2010 and 2011*, 75 F.R. 64397, 64403 (Nov. 19, 2010).

71.     In a different section of ISTEA, Congress made clear that it expected, and indeed required, that States should consider congestion pricing programs as a means of generating revenue for public transit projects.   Section 1025 of ISTEA directed States, in coordination with metropolitan planning organizations, to "undertake a continuous transportation planning process which shall" consider "the use of innovative mechanisms for financing projects, including … congestion pricing."  ISTEA § 1025(c)(16).

72.     Although "congestion pricing" was not defined in ISTEA, the concept was then (and is today) commonly understood worldwide to include cordon pricing.  Indeed, Singapore had already been using such a form of congestion pricing at the time ISTEA was passed for nearly two decades.  And in 1987, just a few years before the enactment of ISTEA, New York City Mayor Ed Koch testified before a Congressional subcommittee about a congestion pricing proposal in New York City that would charge drivers entering Manhattan's central business district $10 per day. *Ozone and Carbon Monoxide Problems: Hearing Before the Subcomm. on Health and Env't of the H. Comm. on Energy & Commerce*, 100 Cong. 55 (1987).

73.     This is confirmed by statements in the legislative record when ISTEA was enacted in 1991, and reinforced by Congress's subsequent re-enactments (and indeed expansion) of congestion pricing in 1995, 1998, and 2005, reflecting a clear common understanding that congestion pricing includes cordon pricing and contemplates as a goal the raising of revenue to promote public transit (and so further reduce congestion).  *See* Pub. L. 104-59, § 325(e) (Nov. 28, 1995); Pub. L. 105-178, § 1216(a) (June 9, 1998); Pub. L. 105-206, § 9006(b) (July 22, 1998); Pub. L. 109-59, § 1604(a) (Aug. 10, 2005).  Not once has Congress questioned FHWA's now-prior interpretation of the VPPP (discussed *infra*) or sought to amend the statute to prohibit cordon pricing or the generation of revenue for mass transit through tolling authorized under the VPPP.

74.     During legislative deliberations regarding ISTEA in 1991, Senator Moynihan explained that the goal was to permit States to launch "innovative congestion pricing experiments" of different varieties.  137 Cong. Rec. S18203-02 (daily ed. Nov. 26, 1991).  On March 21, 1991, at a hearing of the Subcommittee on Water Resources, Transportation, and Infrastructure on "Congestion Pricing and Infrastructure Financing," convened by Senator Moynihan in advance of the introduction of ISTEA, the Subcommittee took testimony from experts on cordon pricing initiatives implemented by Singapore and Hong Kong, which Senator Joe Lieberman noted favorably in his remarks, stating that he was "particularly interested in the congestion-pricing methods suggested by our hearing witnesses today."  *Congestion Pricing and Infrastructure Financing: Hearing Before the Subcomm. on Water Res., Transp., and Infrastructure of the S. Comm. on Env't & Pub. Works*, 102 Cong. 9 (1991).[46]  Senator Moynihan agreed that cordon pricing appeared to be a promising avenue for experimentation: "Singapore is doing it, Hong Kong is doing it, we are talking about it."  *Id.* at 24.  Senator David Durenberger likewise recognized that "congestion pricing may also be an important means which some cities will employ to reduce air quality problems and ease gridlock."  *Id.*  at 3.  Don Pickrell, an economist for USDOT at the time, encouraged Congress to "remove any remaining restrictions on … pricing of highways constructed with Federal financial assistance" and to promote measures including "downtown licensing requirements, ala Singapore," *i.e.*, cordon pricing.  *Id.* at 18.  When the Subcommittee reconvened four days later on March 25, 1991, Peter Mieszkowski, a professor of economics at Rice University, cautioned in his testimony that imposing congestion tolls only on freeways would

---

[46] From July 1983 to March 1985, the British Government of the Territory of Hong Kong implemented a 21-month congestion pricing trial program, which charged vehicles for entering congested portions of the city.  Although the program was generally perceived as successful, it was not continued at the end of the trial period due to a variety of reasons, including protests, an increase in roadway capacity, and the beginning of the political transition from British to Chinese governance.

be ineffective "because people will simply leave the freeway" and "go to the other access roads, which will themselves become very congested. So the congestion policy I think has to be general." *Reauthorization of the Federal-Aid Highway Program: Hearing Before the S. Comm. on Env't & Pub. Works and the Subcomm. on Water Res., Transp., and Infrastructure*, 102 Cong. 40 (1991). Senator Moynihan responded: "Well, you [meaning, local leaders] have got to figure it out yourself. But, yes, *not just limit it to some particular Federal road*, right." *Id.* (emphasis added).

75. Further evidence that Congress understood "congestion pricing" to include cordon pricing can be found in the passage of the Clean Air Act Amendments of 1990, Pub. L. 101-549 (Nov. 15, 1990), which was enacted into law just one year before ISTEA. In that bill, the Clean Air Act was amended to require the EPA Administrator, in consultation with the Secretary of Transportation, to provide transportation agencies information regarding the formulation and emission reduction potential of "transportation control measures," including "programs to limit or restrict vehicle use in downtown areas or other areas of emission concentration particularly during periods of peak use." 42 U.S.C. § 7408(f)(1)(A). During a September 1989 hearing before the Senate Subcommittee on Environmental Protection, several witnesses objected to the inclusion of "transportation control measures" such as tolling vehicles "to enter central business districts." *Clean Air Act Amendments of 1989: Hearing Before the Subcomm. on Env't Protection of the S. Comm. of Env't & Pub. Works*, 101 Cong. 67-68 (1989) (testimony of Regina McLaurin, President of the National Parking Association and Ethan Geto of the Coalition for Improved Transportation and Air Quality). Senators Max Baucus and Lieberman, who were members of the Committee on Environment and Public Works that oversaw the passage of ISTEA, both rejected the witnesses' concerns with the inclusion of transportation control measures, noting that localities needed flexibility when addressing traffic congestion and air pollution. *Id.* at 70 (remarks of Senator

32

Baucus); *id.* at 72-73 (remarks of Senator Lieberman). The language to which the witnesses objected was included in the final text of the bill and remains in force today.

76.     Moreover, as the Senate Committee on Environment and Public Works' report on ISTEA explained, the purpose of the Congestion Pricing Pilot Program was to allow states to "establish, maintain, and monitor congestion pricing programs" and to study, among other things, the effects of such programs on "the availability of funds for transportation programs." S. Rep. No. 102-71, at 26 (1991). That same report noted that the bill was intended to place "[i]ncreased emphasis" on the "use of innovative financing mechanisms including … congestion pricing." *Id.* In other words, everyone, including the relevant members of Congress, understood that congestion pricing included cordon pricing, and that this form of tolling could reduce congestion and fund public transit alternatives—exactly as Congress desired in giving States broad leeway in experimenting with ways to solve the problem, including through tolling under the VPPP.

77.     This ordinary meaning of "congestion pricing" was consistently echoed by FHWA itself from the early 1990s until early 2025. In congressional testimony provided in 1992 shortly after ISTEA was enacted, FHWA was asked by Senator Lautenberg: "How is FHWA defining congestion pricing projects?" *Dep't of Transp. & Related Agencies Appropriations for Fiscal Year 1993: Hearings Before a Subcomm. of the S. Comm. on Appropriations*, 102 Cong. 352 (1992). FHWA responded that it "intend[ed] to define congestion pricing projects to provide useful demonstrations of congestion pricing concepts," and noted that the "potential scope of congestion pricing applications can vary widely, ranging from pricing on a new or existing single road facility to more comprehensive *area-wide road pricing strategies*." *Id.* (emphasis added).

78.     In 1998, Congress enacted the Transportation Equity Act for the 21st Century of 1998, which renamed the Congestion Pricing Pilot Program the "Value Pricing Pilot Program" and

expanded the Secretary's authority to enter into agreements authorizing value pricing pilot programs. Pub. L. 105-178 § 1216 (June 9, 1998). As FHWA has explained, "value pricing" is a synonym for congestion pricing, and the agency often uses the two terms interchangeably.[47] Likewise, the House Conference report confirms that, in renaming the "Congestion Pricing Pilot Program the VPPP, Congress did not intend to alter the scope of the statute." *See* H.R. CONF. REP. 105-550, 407, 1998 U.S.C.C.A.N. 70, 79 (referring to past projects authorized under the Congestion Pricing Pilot Program as "value pricing projects"). If anything, Congress intended to broaden the scope of the program to provide "additional flexibility." *See*, *e.g.*, 144 Cong. Rec. H10497 (Oct. 10, 1998) (extraneous matter submitted by Representative Shuster).

79. Contemporaneous with this new statutory enactment, FHWA issued a VPPP factsheet ("1998 VPPP Fact Sheet") explaining that VPPP projects "have the flexibility to encompass a variety of value pricing applications, including *areawide pricing*…."[48] Another 1998 FHWA publication in the Federal Register (the "1998 FR Notice") identified "[a]pplications of value pricing which are comprehensive, such *as areawide pricing*, [and] pricing of multiple facilities or corridors," as meriting "*highest priority* for Federal support" under the VPPP. 63 Fed. Reg. 53487 (Oct. 5, 1998) (emphasis added). FHWA went on to note that "[m]ore limited applications of value pricing are also acceptable," indicating that FHWA viewed areawide or cordon pricing schemes as the intended primary focus of the VPPP. *Id.* The Notice explained that FHWA would give special priority to "[p]rojects which indicate that revenues will be used to support the goals of the value pricing program," and "projects that lead to substantial congestion

---

[47] *See, e.g.*, FED. HIGHWAY ADMIN., *Welcome to the FHWA Congestion Pricing Web Site*, https://ops.fhwa.dot.gov/congestionpricing/index.htm (last accessed Mar. 26, 2025) ("Congestion pricing - sometimes called value pricing - is a way of harnessing the power of the market to reduce the waste associated with traffic congestion.").

[48] *See* FED. HIGHWAY ADMIN., TEA-21 - Transportation Equity Act for the 21st Century Fact Sheet (Sept. 14, 1998), https://web.archive.org/web/20000818140948/http://www.fhwa.dot.gov/tea21/factsheets/valpr.htm.

reduction and supplant or supplement existing tax-based approaches for generating surface transportation revenues." 63 Fed. Reg. 53487 (Oct. 5, 1998).[49]

80.     In 1999, FHWA published "A Guide to Federal Aid Programs and Projects" ("1999 VPPP Guide"), which listed "area-wide pricing" as the first example of a VPPP concept, as well as a VPPP "Notice of Grant Opportunities" ("1999 VPPP NOGO"), which listed "areawide value pricing" as a "project of interest," and explained that such projects include "[f]ees for entering an area, sometimes called cordon crossing charges, using electronic vehicle identification devices."[50] The 1999 VPPP NOGO also listed "revenue generation" as a potential benefit of VPPP projects and noted that "[p]roposals with the greatest potential to reduce congestion and advance current knowledge of price effects, operations, enforcement, *revenue generation*, equity mitigation and monitoring/evaluation mechanisms will be given the highest priority."[51]     Indeed, that notice recognized that existing projects were already "generating revenues that c[ould] be used to further enhance urban mobility."[52]

81.     A May 2001 notice soliciting applications for participation in the VPPP again classified "applications of value pricing which are comprehensive, such as *area wide pricing*," as among the projects that would "receive highest priority for Federal support." 66 Fed. Reg. 23,077 (May 7, 2001) (emphasis added).

---

[49] A subsequent publication used identical language, reinforcing that "generating surface transportation revenues" is a core purpose of the VPPP.  71 Fed. Reg. 970 (Jan. 6, 2006).

[50] *See* FED. HIGHWAY ADMIN., *A Guide to Federal Aid Programs and Projects* (Apr. 9, 1999), https://web.archive.org/web/20000818124605/http://www.fhwa.dot.gov/infrastructure/progadmin/part1.htm;     FED. HIGHWAY ADMIN., *Value Pricing Pilot Program Notice of Grant Opportunities*, Publication No. FHWA-PL-99-014, https://web.archive.org/web/20000421142620/https://www.fhwa.dot.gov/policy/vppp.htm (last accessed Mar. 11, 2025).

[51] FED. HIGHWAY ADMIN, *Value Pricing Pilot Program Notice of Grant Opportunities*, Publication No. FHWA-PL-99-014, https://web.archive.org/web/20000421142620/https://www.fhwa.dot.gov/policy/vppp.htm (last accessed Mar. 11, 2025).

[52] *Id.*

82.     In 2001 and 2002, the Florida Department of Transportation and Lee County took FHWA up on its solicitation and received $1,545,600 in VPPP funding to study a cordon toll to access Fort Myers Beach (the "Fort Myers Project").[53]   The study examined tolling the only two points of entry to Fort Myers Beach.[54]   No toll-free route to Fort Myers Beach was contemplated.[55]



**Figure 5: Fort Myers Beach Cordon Toll Locations[56]**

---

[53] U.S. GOV'T ACCOUNTABILITY OFF., *Report to the Subcommittee on Transportation, Housing, and Urban Development and Related Agencies*, Committee on Appropriations, House of Representatives 42-43 (Jan. 2012), https://www.gao.gov/assets/gao-12-119.pdf.

[54] Advances in Transportation Studies, *Predicted Driver Response to a Cordon Toll Around Fort Myers Beach, Florida* (2005), https://www.researchgate.net/publication/237385152_Predicted_driver_response_to_a_cordon_toll_around_Fort_Myers_Beach_Florida.

[55] FED. HIGHWAY ADMIN., *Florida: Cordon Pricing in Lee County*, https://www.fhwa.dot.gov/policy/otps/vpqrrt/sec2.cfm (last visited Mar. 11, 2025).

[56] Advances in Transportation Studies, *Predicted Driver Response to a Cordon Toll Around Fort Myers Beach*, Florida (2005), https://www.researchgate.net/publication/237385152_Predicted_driver_response_to_a_cordon_toll_around_Fort_Myers_Beach_Florida.

83.     In 2005, Congress passed the Safe, Accountable, Flexible, Efficient Transportation Equity Act ("SAFETEA-LU") of 2005, which further broadened States' authority to toll the federal-aid highway system.

84.     A Federal Register notice in January 2006 reiterated that "applications of value pricing which are comprehensive and include *pricing of currently free facilities*, such as *area wide pricing*" are "[p]rojects of [i]nterest."  71 Fed. Reg. 970 (Jan. 6, 2006) (emphases added). Similarly, a 2006 FHWA report on the VPPP also underscored the role of tolls in metropolitan areas to support transit infrastructure, emphasizing that "[v]alue priced tolls on existing or new highway lanes in currently congested metropolitan areas can provide a significant source of user-based revenue to pay for the high costs of improving or expanding transportation infrastructure," particularly where local governments are seeking to make up for shortfalls in revenue.[57]

85.     New York City's own history with FHWA further demonstrates that, as FHWA has long recognized, cordon pricing and revenue generation are permitted by the VPPP.

86.     In April 2007, then-mayor Michael Bloomberg proposed an $8 toll on all vehicles entering Manhattan below 86th Street.[58]  New York City and FHWA entered into an Urban Partnership Agreement ("UPA"), attached hereto as **Exhibit F**, in which FHWA agreed to award New York City $5 million in VPPP funding to pursue "a broad area pricing system in Manhattan south of 86th Street."  UPA at 3.  Once implemented, vehicles would be charged a toll for entering, exiting, or driving within the congestion zone.  *Id.*  FHWA highlighted this project repeatedly throughout its 2009 report to Congress on the VPPP, lauding it as a "historic" proposal and the

---

[57] U.S. Dep't of Transp., *Report on the Value Pricing Pilot Program Through April 2006* at 4 (Feb. 11 2022), https://ops.fhwa.dot.gov/congestionpricing/value_pricing/pubs_reports/rpttocongress/index.htm.

[58] Maria Newman, *Mayor Proposes a Fee for Driving in to Manhattan*, N.Y. Times (Apr. 22, 2007), https://www.nytimes.com/2007/04/22/nyregion/23mayorcnd.html.

epitome of what the VPPP intended to permit.[59]  Although FHWA regretted that the 2007 iteration

of congestion pricing in New York City failed to gain approval in the State Legislature (due in part

to the "tight time schedule for securing UPA funding that was imposed by [US]DOT"), FHWA

praised then-Mayor Bloomberg for his commitment to the program.[60]

      87.    Congress was well aware of the New York City's 2007 proposal and discussed it at

length during a June 7, 2007 House Subcommittee on Highways and Transit of the Committee on

Transportation and Infrastructure hearing on "Congestion and Mobility" in order "to receive

testimony on the problem of congestion facing our nation's surface transportation system and some

of the options to deal with the problem."[61]  Notably, the Subcommittee's report emphasized the

problem of congestion in urban areas and observed that one option, "congestion pricing," "can be

implemented in several different forms," including "impos[ing] tolls … around a specified area

such [as] the downtown of a city, or over a wider region."[62]  During the hearing, Federal Transit

Administrator James Simpson, nominated by President Bush, was asked to share the "best idea"

that he had heard recently that would "make the most improvement" in managing congestion, and

he replied "New York is really bold.  What they are proposing now … [is] to have an access fee,

similar to London, south of 86th Street to Lower Manhattan to free up maybe 5 or 10 percent of the

traffic."[63]  Administrator Simpson also observed that "the beauty of this program is whatever we

invest in now … this congestion pricing will throw off about $300 million a year to finance such

---

[59] FED. HIGHWAY ADMIN., *Report on The Value Pricing Pilot Program Through May 2009* at ii (Sept. 17, 2009), https://ops.fhwa.dot.gov/congestionpricing/value_pricing/pubs_reports/rpttocongress/pdf/vppp09rpt.pdf ("FHWA 2009 Report to Congress").

[60] *Id.* at 13-14.

[61] *Congestion and Mobility: Hearing Before the Subcomm. on Highways and Transit of the H. Comm. on Transp. and Infrastructure*, 110 Cong. vi (2007).

[62] *Id.* at x.

[63] *Id*. at 8-10.

things as a $6 billion or $7 billion 2nd Avenue subway, more Express Bus service, and all those things so the commuters and everybody else can get to work in a lot less time."[64]  No witness or legislator suggested an additional federal law would be necessary in order to authorize New York's proposed $8 congestion toll, and Congress did not seek, in subsequent transportation bills, to amend the VPPP to prohibit cordon pricing or use of toll revenue on transit projects.

88.    Also in 2005, the San Francisco County Transportation Authority ("SFCTA") received a $1,040,000 VPPP grant to evaluate the feasibility of area or cordon pricing for San Franscico (the "San Franscisco Project").[65]  The San Franscisco Project included a Northeast Quadrant cordon/area-wide pricing concept with no toll-free routes to enter the congestion zone.[66] A key goal of the San Francisco Project was to develop a comprehensive transportation system management strategy, which "not only contemplates congestion charging, but also focuses on the improvement of competitive alternatives to driving by using the revenues generated through pricing to support investments in transit, bicycling, and walking."[67]  With this goal in mind, the San Francisco Project study concluded that options involving a smaller cordon would not generate enough revenue to "enhance travel options."[68]

---

[64] *Id.*

[65] SAN FRANCISCO COUNTY TRANSP. AUTH., *San Francisco Mobility, Access, and Pricing Study* 5, 17, 60 (Dec. 2010), https://www.sfcta.org/sites/default/files/2019-11/MAPS_study_final_lo_res.pdf; U.S. GOV'T ACCOUNTABILITY OFF., *Report to the Subcommittee on Transportation, Housing, and Urban Development and Related Agencies*, Committee on Appropriations, House of Representatives 44 (Jan. 2012), https://www.gao.gov/assets/gao-12-119.pdf.

[66] *Id.*; SAN FRANCISCO COUNTY TRANSP. AUTH., *San Francisco Parking Supply and Utilization Study Final Report* D-6 (Nov. 2016), https://www.sfcta.org/sites/default/files/2019-03/Parking_Supply_final_report_11.29.16.pdf.

[67] SAN FRANCISCO COUNTY TRANSP. AUTH., *San Francisco Mobility, Access, and Pricing Study* 7, 36–37 (Dec. 2010), https://www.sfcta.org/sites/default/files/2019-11/MAPS_study_final_lo_res.pdf; SAN FRANCISCO COUNTY TRANSP. AUTH., *San Francisco Parking Supply and Utilization Study Final Report* D-6 (Nov. 2016), https://www.sfcta.org/sites/default/files/2019-03/Parking_Supply_final_report_11.29.16.pdf; SAN FRANCISCO COUNTY TRANSP. AUTH., *Value Pricing in San Francisco*, https://ops.fhwa.dot.gov/congestionpricing/value_pricing/pubs_reports/projectreports/pdfs/sfcta_arearoad.pdf (last accessed Mar. 11, 2025).

[68] SAN FRANCISCO COUNTY TRANSP. AUTH., *San Francisco Mobility, Access, and Pricing Study* 51 (Dec. 2010), https://www.sfcta.org/sites/default/files/2019-11/MAPS_study_final_lo_res.pdf.



**Figure 6: Northeast Quadrant Cordon/area-wide Pricing Concept[69]**

89.     At the same time FHWA was approving the San Francisco Project, it was praising cordon pricing schemes in London and Stockholm as models for the kinds of congestion pricing the VPPP was intended to create, lauding the examples as having achieved "significant impacts on traffic volumes, congestion delay, transit ridership, air quality, and *the availability of funds for transportation*, the key impacts sought through the VPPP."[70]

90.     A 2008 FHWA primer on congestion pricing explicitly stated that "[n]et revenues after payment of operating costs can be used to pay for expansion of roadway facilities *or to support alternatives to driving alone, such as public transit*…."[71]   And FHWA's 2009 report to Congress report further opined, in relation to strategies for improving equity and public acceptance

---

[69] San Francisco County Transp. Auth., *San Francisco Parking Supply and Utilization Study Final Report* at D-6 (Nov. 2016), https://www.sfcta.org/sites/default/files/2019-03/Parking_Supply_final_report_11.29.16.pdf.

[70] *Report on The Value Pricing Pilot Program Through May 2009*, *supra* note 59 at 2 (emphasis added).

[71] FED. HIGHWAY ADMIN., *Congestion Pricing: A Primer* 4, https://ops.fhwa.dot.gov/publications/fhwahop08039/fhwahop08039.pdf (last accessed Mar. 31, 2025).

of cordon-based strategies, that "low-income transit riders can benefit significantly from *toll-financed transit improvements*."[72]

91.     By 2009, FHWA continued to lament, in its report to Congress, that "the projects implemented so far have not had significant impacts on congestion or the other objectives of the VPPP because they typically only involve 'partial' pricing of a highway facility," while the VPPP "initially contemplated" "more comprehensive pricing strategies."[73]   "To further the VPPP's objectives," FHWA wrote:

> The VPPP portfolio of implemented projects should include pilot implementations of broad congestion pricing projects involving tolls on all lanes of a highway facility, *all roads in a congested area*, or all roads of an entire roadway network.  *Such approaches tend to take away the choice to drive alone for free in a congested area*.[74]

92.     In 2011, the California Department of Transportation, the Southern California Association of Governments ("SCAG"), and the Los Angeles County Metropolitan Transportation Authority ("LA Metro") were awarded $916,802 in VPPP funding by FHWA to pursue a feasibility study and Concept of Operations for cordon/area-wide pricing in major activity centers within Los Angeles (the "LA Project").[75]   The LA Project included a Downtown Los Angeles cordon/area-wide pricing concept and a Westside cordon pricing concept, in which every inbound route to the congestion zone would be tolled.[76]   Moreover, project alternative screening criteria

---

[72] *Report on The Value Pricing Pilot Program Through May 2009*, *supra* note 59 at iii.

[73] *Id.* at ii.

[74] *Id*. at ii-iii (emphasis added).

[75] FED. HIGHWAY ADMIN., *Report on the Value Pricing Pilot Program Through April 2018* at 13, https://ops.fhwa.dot.gov/congestionpricing/value_pricing/pubs_reports/rpttocongress/pdf/vppp18rpt.pdf (last accessed Mar. 11, 2025); FED. HIGHWAY ADMIN., *California: Cordon/Area Charging in Los Angeles and Build-Out of Express Lanes in Southern California* (Nov. 8, 2014), https://web.archive.org/web/20141108091008/https://ops.fhwa.dot.gov/congestionpricing/value_pricing/projects/involving_tolls/zone_based_pricing/ca_cordon_area_la.htm.

[76] S. CAL. ASS'N OF GOVS., *Congestion Pricing Modeling and Results for Express Travel Choices Study* at 24 (Oct. 2013), https://www.ampo.org/wp-content/uploads/2013/12/Oryani-AMPO-2013-presentation.pdf; SOUTHERN S.

explicitly included "transit potential" and "revenue potential,"[77] and the LA Project proposed using project revenues to fund "local transportation improvements to help reduce congestion and carbon emissions, and offer improved travel options for residents, commuters, and other visitors to the area."[78]



**Figure 7: Downtown and Westside Area Los Angeles Tolling Concepts[79]**

CAL. ASS'N OF GOVS., *Mobility Zone and Pricing Feasibility Study* at 37, 61, 72-73, 75 (Mar. 2019), https://scag.ca.gov/sites/default/files/old/file-attachments/mobilitygozone_report_final.pdf; FED. HIGHWAY ADMIN., *Report on the Value Pricing Pilot Program Through April 2018* at 13, https://ops.fhwa.dot.gov/congestionpricing/value_pricing/pubs_reports/rpttocongress/pdf/vppp18rpt.pdf (last accessed Mar. 11, 2025).

[77] FED. HIGHWAY ADMIN., *California: Cordon/Area Charging in Los Angeles and Build-Out of Express Lanes in Southern California* (Nov. 8, 2014), https://web.archive.org/web/20141108091008/https://ops.fhwa.dot.gov/congestionpricing/value_pricing/projects/involving_tolls/zone_based_pricing/ca_cordon_area_la.htm.

[78] S. CAL. ASS'N OF GOVS., *Mobility Zone and Pricing Feasibility Study* at 9 (Mar. 2019), https://scag.ca.gov/sites/default/files/old/file-attachments/mobilitygozone_report_final.pdf.

[79] S. CAL. ASS'N OF GOVS., *Congestion Pricing Modeling and Results for Express Travel Choices Study* at 24 (Oct. 2013), https://www.ampo.org/wp-content/uploads/2013/12/Oryani-AMPO-2013-presentation.pdf; S. CAL. ASS'N OF GOVS., *Mobility Zone and Pricing Feasibility Study* at 72 (Mar. 2019), https://scag.ca.gov/sites/default/files/old/file-attachments/mobilitygozone_report_final.pdf.

93.     A 2012 FHWA guidance document specifically acknowledged the need for transit investment in New York City,[80] and noted that "[c]ongestion pricing could be applied as one component of a broader regional pricing strategy to support investment needs."[81]

94.     In 2012, San Francisco was awarded another $480,000 of VPPP funding to undertake the Treasure Island Mobility Management Study (the "Treasure Island Project"), which included a congestion fee for private automobiles traveling to or from Treasure Island during peak hours.[82] Revenue generated from the tolls would be used to pay for transportation demand management programs and expanded public bus, shuttle, and ferry transit systems that residents and visitors would be encouraged to use.[83] As with the other projects discussed *supra*, the Treasure Island Project examined concepts with no toll-fee route for entering the congestion zone by driving.[84]

---

[80] FED. HIGHWAY ADMIN., *Effective Approaches for Advancing Congestion Pricing in a Metropolitan Region* 25 (Mar. 2012), https://ops.fhwa.dot.gov/publications/fhwahop12030/fhwahop12030.pdf. Treasure Island is between San Francisco and Oakland and only reachable by a vehicle from the Bay Bridge.

[81] *Id.* at 38.

[82] FED. HIGHWAY ADMIN., *California: Treasure Island Mobility Management Study* (Feb. 11, 2022), https://ops.fhwa.dot.gov/congestionpricing/value_pricing/projects/involving_tolls/systemwide_pricing/ca_treasure_island.htm (last accessed Mar. 31, 2025); Fed. Highway Admin., *Report on the Value Pricing Pilot Program Through April 2018* at 38, https://ops.fhwa.dot.gov/congestionpricing/value_pricing/pubs_reports/rpttocongress/pdf/vppp18rpt.pdf (last accessed Mar. 11, 2025).

[83] CITY OF SAN FRANCISCO, *Advanced Transportation and Congestion Management Technologies Deployment Initiative* at 12, https://www.sfmta.com/sites/default/files/projects/2017/ATCMTD%20Grant%20Application.pdf (last accessed Mar. 11, 2025).

[84] *Id.*; TREASURE ISLAND MOBILITY MANAGEMENT AGENCY, *Treasure Island Mobility Management Study Summary Review* at ES-2 (July 2016), https://www.sfcta.org/sites/default/files/2019-03/TIMM%20Study%20Summary%20Report.pdf.



**Figure 8: Treasure Island Connection to Yerba Buena Island[85]**

95.     Similarly, a 2016 FHWA report to Congress on the status of the VPPP described "efforts and initiatives to effectively support and mainstream congestion pricing" as a "focal point for FHWA programs."[86]   FHWA anticipated that more ambitious "second-generation" projects would rise in prominence under the VPPP in coming years, noting that they "are likely to combine regionwide pricing strategies, such as vehicle miles traveled fees, cordon pricing, and regional pricing, along with a non-toll blueprint."[87]   FHWA even singled out New York City specifically as likely to benefit from "some form of cordon pricing."[88]

---

[85] TREASURE ISLAND MOBILITY MANAGEMENT AGENCY, *Treasure Island Mobility Management Study Summary Review* 1 (July 2016), https://www.sfcta.org/sites/default/files/2019-03/TIMM%20Study%20Summary%20Report.pdf.

[86] FED. HIGHWAY ADMIN., *Report on The Value Pricing Pilot Program Through April 2016* at 31 (2016), https://ops.fhwa.dot.gov/congestionpricing/value_pricing/pubs_reports/rpttocongress/pdf/vppp16rpt.pdf (last accessed Mar. 31, 2025).

[87] FED. HIGHWAY ADMIN., *Report on the Value Pricing Pilot Program Through April 2018* at 35 (2018), https://ops.fhwa.dot.gov/congestionpricing/value_pricing/pubs_reports/rpttocongress/pdf/vppp18rpt.pdf (last accessed Mar. 31, 2025).

[88] FED. HIGHWAY ADMIN., *Report on the Value Pricing Pilot Program Through April 2006* at 10 (2006), https://ops.fhwa.dot.gov/congestionpricing/value_pricing/pubs_reports/rpttocongress/pdf/vppp06rpt.pdf (last accessed Mar. 31, 2025).

96.     This is confirmed by more recent congressional consideration of tolling under the VPPP.  Shortly after the passage of the TMA, on September 11, 2019, the House Subcommittee on Highways and Transit held a hearing on "Pricing and Technology Strategies to Address Congestion," which included a discussion of the Program and the TMA itself.  In the summary prepared by committee staff prior to the hearing, congestion pricing is defined as "a variably-priced lane, such as an Express Lane or HOT Lane; a variable toll on an entire roadway or facility; or a cordon charge that is levied on drivers to enter or move within a specifically-designated area."[89]  The summary noted that "the VPPP allows toll revenues to be used on projects eligible under Title 23," which includes public transit projects.[90]  The Committee's final report on the Infrastructure Investment and Jobs Act of 2021 makes clear the Committee's understanding that ISTEA "clearly states" that revenue generated by a pilot project can and should be used for "projects eligible under title 23" including "transit safety infrastructure improvements and programs" and "for new transit service, system or service expansion":

> It is the sense of the Committee that the Department of Transportation carry out the Value Pricing Pilot Program consistent with the statutory requirements of that program and the Department's longstanding interpretation of title 23.  Section 1012(b)(3) of ISTEA, as amended, clearly states that any project revenues in excess of pilot project operating costs may be used for any projects eligible under title 23.  Under 23 USC 133(b)(4), "transit safety infrastructure improvements and programs" are eligible under the Surface Transportation Block Grant Program, and it has been FHWA's longstanding interpretation that Congestion Mitigation and Air Quality funds may be used for new transit service, system or service expansion, new vehicles, and fare subsidies, if such projects or programs improve air quality.

H. Rep. No. 116-437, at 337 (2020).

___

[89] *Pricing and Technology Strategies to Address Congestion on and Financing of America's Roads: Hearing Before the Subcomm. on Highways and Transit of the H. Comm. on Transp. & Infrastructure*, 116 Cong. 12-13 (2019) (memorandum prepared by staff).

[90] *Id.* at xi.

97.     In 2021, the Utah Department of Transportation submitted an Expression of Interest for a project aimed at reducing congestion at Little Cottonwood Canyon, including a cordon pricing component.[91]  Specifically, under four alternatives studied in the project's Environmental Impact Statement ("EIS"), a toll or a ban on single-occupant vehicles would be implemented on S.R. 210—the only available route connecting the area's ski resorts and Little Cottonwood Canyon.[92]  The EIS for the Little Cottonwood Canyon project notes that tolling revenue may be used for "the operation and maintenance costs of the transit system to reduce fares to make transit an attractive option to paying a toll."[93]  FHWA noted this project in its most recent report to Congress on the VPPP submitted in 2023.[94]

98.     FHWA's current guidance and website reinforces the longstanding commonsense proposition that congestion pricing includes cordon pricing and has as a goal revenue generation to support public transit.  A primer on congestion pricing currently available on the Administration's website—even after the Secretary issued his letter purporting to rescind the VPPP Agreement and terminate the Program—establishes four main types of pricing strategies, including zone-based or cordon charges for which there is no free entry, as well as area-wide or

---

[91] FED. HIGHWAY ADMIN., *Letter Report on the Value Pricing Pilot Program for Fiscal Year 2022* at 1-2 (Sept. 22, 2023), https://ops.fhwa.dot.gov/congestionpricing/ value_pricing/pubs_reports/rpttocongress/vppp22rpt/vppp22rpt.pdf.

[92] UTAH DEP'T OF TRANSP., *Little Cotton Wood Canyon Environmental Impact Statement*, Ch. 7 at 7-16, 7-18, 7-21, 7-22, 7-25 (Sept. 2022), https://littlecottonwoodeis.udot.utah.gov/wp- content/uploads/2022/08/LCC_FEIS_07_Traffic_Transportation.pdf.

[93] UTAH DEP'T OF TRANSP., *Little Cotton Wood Canyon Environmental Impact* Statement, Ch. 2 at 2-50, https://littlecottonwoodeis.udot.utah.gov/wp-content/uploads/2022/08/LCC_FEIS_02_Alternatives.pdf.  The Record of Decision notes that the toll during peak periods will be \$20 to \$30.  UTAH DEP'T OF TRANSP., *Record of Decision* 17 (June 2023), https://littlecottonwoodeis.udot.utah.gov/wp- content/uploads/2023/07/LCC_ROD_Final_June_2023.pdf.

[94] FED. HIGHWAY ADMIN., *Letter Report on the Value Pricing Pilot Program for Fiscal Year 2022* at 1-2 (Sept. 22, 2023), https://ops.fhwa.dot.gov/congestionpricing/ value_pricing/pubs_reports/rpttocongress/vppp22rpt/vppp22rpt.pdf.

system-wide charges.[95]  FHWA has an entire page on its website dedicated to zone-based pricing, including cordon and area pricing, which specifically notes that cordon pricing had been pursued in New York City.[96]  A page on FHWA's website which provides information on tolling facilities includes "Cordon Tolls" among the list of permissible "Project Types/Projects" available to states through the VPPP.[97]

99.     Another FHWA webpage states that "DOT believes that using innovating financing strategies to leverage limited public transportation revenue is integral to the long-term re-thinking of how the United States provides highway *and transit infrastructure*," one such strategy being congestion pricing.[98]

100.    According to FHWA's website, the VPPP is "intended to demonstrate whether and to what extent roadway congestion may be reduced through application of congestion pricing strategies, and the magnitude of the impact of such strategies on driver behavior, traffic volumes, transit ridership, air quality and *availability of funds for transportation programs*."[99]  FHWA also notes on its website that one of the advantages of congestion pricing is that it "benefits State and local governments by improving the quality of transportation services without tax increases or large capital expenditures, by providing additional revenues for funding transportation."[100]

---

[95] FED. HIGHWAY ADMIN., *Congestion Pricing: A Primer* 4, https://ops.fhwa.dot.gov/publications/fhwahop08039/fhwahop08039.pdf (last accessed Mar. 31, 2025).

[96] FED. HIGHWAY ADMIN., *Zone-Based Pricing*, https://ops.fhwa.dot.gov/congestionpricing/strategies/involving_tolls/zone_based.htm (last accessed Mar. 31, 2025).

[97] OFF. OF HIGHWAY POLICY INFO., FED. HIGHWAY ADMIN., *Toll Facilities in the United States*, https://www.fhwa.dot.gov/policyinformation/tollpage/history.cfm (last accessed Mar. 29, 2025).

[98] FED. HIGHWAY ADMIN., *Congestion Pricing: Leveraging*, https://ops.fhwa.dot.gov/congestionpricing/assets/leveraging.pdf (last accessed Mar. 5, 2025).

[99] OFF. OF OPERATIONS, FED. HIGHWAY ADMIN., *Value Pricing Pilot Program*, https://ops.fhwa.dot.gov/congestionpricing/value_pricing/ (last accessed Mar. 31, 2025) (emphasis added).

[100] OFF. OF OPERATIONS, FED. HIGHWAY ADMIN., *Benefits of Congestion Pricing*, https://ops.fhwa.dot.gov/congestionpricing/cp_benefits.htm (last accessed Mar. 9, 2025).

**C.      The Project Sponsors Apply for VPPP Tolling Authority and Conduct a Lengthy Environmental Review Process In Reliance on FHWA's Statements that the VPPP was the "Best Fit" for the Program**

101.    In 2019, FHWA once again confirmed its long-held interpretation that cordon or "area" pricing and revenue generation are permitted under the VPPP, this time in representations made directly to the Project Sponsors in connection with FHWA's consideration of their application for tolling authority for the Program.

102.    Following passage of the TMA, the Project Sponsors engaged in meetings and telephone conferences with FHWA regarding the Program and provided detailed explanations of its contemplated operation.  Those explanations included that tolling would apply to vehicles that enter the CBD, defined as below and inclusive of 60th Street (with the exception of vehicles using the FDR Drive, West Side Highway, the Battery Park Underpass, and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West Street) in order to reduce the severe congestion in the CBD.  In addition, it was explained that the Program would incorporate toll rates that would provide a new and recurring source of revenue for the MTA, with net revenues (after paying for Program operational costs) to be dedicated to capital improvements identified in the MTA's 2020-2024 Capital Plan.  USDOT and FHWA representatives made clear at these meetings that, given the nature of the Program, the VPPP is the appropriate vehicle to provide tolling authority on federal-aid highways for a cordon-based congestion pricing project like the Program.  The federal agencies explained that NYSDOT already had one of the 15 "slots" allotted in the VPPP and could have multiple congestion pricing projects under that "slot," including the Program.  USDOT and FHWA further explained that there would need to be a VPPP agreement between FHWA and the Project Sponsors.  At a meeting on April 24, 2019, it was agreed that FHWA would forward to the Project Sponsors a template for a VPPP Expression of Interest, which was needed to commence

the approval process under the VPPP, as well as an example of an agreement that the Project Sponsors would need to enter into with FHWA once approved.

103. On June 17, 2019, the Project Sponsors submitted the EoI, **Exhibit A**, seeking authorization to implement a variable tolling program aimed at reducing congestion (*i.e.*, a congestion pricing program) in the CBD. The EoI explained that the Project Sponsors sought "approval under the Value Pricing Pilot Program (VPPP) to initiate a variable tolling program within the Manhattan Central Business District (CBD), generally defined as the area of Manhattan south and inclusive of 60th Street." EoI at 1. The EoI was clear that the Project Sponsors contemplated implementing a cordon pricing program, noting that "[v]ehicles would be charged a toll to enter or remain within the Manhattan CBD" and that "vehicles would be charged to enter or remain within a specific area." *Id.* at 3-4. The Project Sponsors were likewise clear that generating revenue for mass transit was another goal of the Program, noting that "revenues generated by the program would be used to construct, operate and maintain the CBD toll collection program and modernize the MTA transit system, with the goal of attracting new riders and further reducing vehicle demand for scarce road capacity in and connecting to the Manhattan CBD." *Id.* at 4; *see also id.* at 3 ("Revenue raised by the program will provide sustained funding for public transportation, which as it becomes more reliable, will contribute to congestion relief."). As the Project Sponsors explained, "[b]y creating a new sustainable revenue source, the CBD tolling program would enable the MTA to invest in improving its transportation network, which in turn, would support the program's goals of increasing transit ridership and improving transit services for low-income residents." *Id.* at 6. The EoI did not contemplate an end date for the Program, but instead stated that the Project Sponsors would prepare reports on "the effects of the program" once "every two years … for the life of the program." *Id.* at 6.

104.     On October 24, 2019, then FHWA Administrator Nicole R. Nason, nominated by President Trump during his first term, responded to the Project Sponsor's EoI in a letter addressed to the Executive Deputy Commissioner of NYSDOT ("FHWA Response"), attached hereto as **Exhibit G**.  According to the Trump Administration at the time, "[u]nder the various programs in Federal law that allow tolling of existing infrastructure, the VPPP appears to be the best potential fit."  FHWA Response at 1.

105.     Following FHWA's response to the EoI, a years-long environmental review process under NEPA ensued.  In assessing the Program, FHWA specifically considered the Program's purpose "to reduce traffic congestion in the [CBD] in a manner that will generate revenue for future transportation improvements," and its specific objectives of: (1) reducing daily VMT within the CBD by at least five percent; (2) reducing the number of vehicles entering the CBD daily by at least ten percent; and (3) creating a funding source for capital improvements and generating sufficient annual net revenues to fund \$15 billion for capital projects.[101]

106.     On August 10, 2022, FHWA and the Project Sponsors issued a Draft Environmental Assessment ("Draft EA"), which was informed by early public outreach and comments as well as complex and comprehensive technical analyses.  The Draft EA identified the Program's dual objectives; the primary objective of congestion reduction and the complementary objective of providing a reliable source of funding for capital public transit projects.  It examined numerous categories of potential environmental effects, such as the visual effects of tolling infrastructure, the indirect air quality and noise effects of changes in traffic patterns, and the effects on transit systems of shifts in travel mode choice.  In accordance with former Executive Order ("EO") 12,898

---

[101] *See* FED. HIGHWAY ADMIN. et al., *Central Business District Tolling Program, Finding of No Significance, Appendix A: Final Environmental Assessment* at ES-6 (June 14, 2024), https://new.mta.info/project/CBDTP/environmental-assessment.

(1994), the Draft EA also studied the potential for disproportionately high and adverse effects on EJ communities, including the potential effects of traffic diversions on local air quality in the locations throughout the region most likely to experience diversions.

107.    Because the tolling structure was not yet established when the Draft EA was issued, and in order to allow FHWA and the Project Sponsors to better assess the range of potential impacts from the Program, the Draft EA analyzed seven tolling scenarios, each with different variables, using EPA-approved traffic and air quality models to predict changes in regional travel demand and patterns for those scenarios, as compared to predicted conditions in 2023 and 2045 without the Program.  It then studied the scenarios that yielded the representative worst-case effects for different resource categories (e.g., traffic, noise, etc.) to consider the full range of potential effects from the Program.   The Draft EA also identified measures to mitigate potential disproportionate and adverse environmental effects and potential effects on EJ populations that were identified in the analyses.

108.    FHWA and the Project Sponsors provided a 44-day public comment period, during which anyone could submit comments on the Draft EA.  In late August 2022, FHWA and the Project Sponsors held six virtual public hearings, totaling over 38 hours, to discuss the Draft EA. This was in addition to early outreach conducted while the Draft EA was in development, and special outreach to communities and organizations, including multiple meetings to discuss environmental justice in relation to the Program.

109.    On March 30, 2021, while working with the Project Sponsors, then-Acting FHWA Administrator Stephanie Pollack commended the Program, saying: "The FHWA looks forward to

assisting New York so we can arrive at a prompt and informed NEPA determination on this important and precedent-setting project."[102]

110.    Between August 2022 and April 2023, FHWA and the Project Sponsors reviewed and prepared responses to each of the thousands of comments and prepared a Final EA incorporating these responses and changes informed by the public input.

111.    The Final EA determined that the Program would not have adverse effects on air quality because it would not cause exceedances of health-based National Ambient Air Quality Standards.  Nevertheless, the Project Sponsors committed to a robust, $155 million mitigation package over five years to improve air quality and public health in EJ communities with preexisting pollution and health burdens throughout the region, with particular investments directed to EJ communities in which the Project could cause any increase in truck traffic.

112.    The Final EA further predicted that the Program would meet each of the objectives described in Paragraph 104 above based on detailed modeling, using the federally approved Best Practices Model maintained by the New York Metropolitan Transportation Council.

113.    The Final EA also predicted many beneficial environmental effects of the Program, including but not limited to:

    a.   reducing emissions of harmful air pollutants including volatile organic compounds, nitrogen oxides, carbon monoxide, particulate matter, carbon dioxide equivalent (*i.e.*, greenhouse gases), and Mobile Source Air Toxics, both within the CBD and region-wide, through an overall reduction in VMT region-wide;

---

[102] FED. HIGHWAY ADMIN., *FHWA Greenlights Environmental Assessment for New York City's Proposed Congestion Pricing Plan* (Mar. 30, 2021), https://highways.dot.gov/newsroom/fhwa-greenlights-environmental-assessment-new-york-citys-proposed-congestion-pricing-plan.

    b.   reducing localized emissions for most EJ communities in the CBD and others outside of the CBD;

    c.   reducing the number of vehicles entering the CBD;

    d.   reducing delays at many intersections and highway segments, thereby improving travel times, reducing vehicle operating costs, and improving safety;

    e.   increasing transit ridership;

    f.   reducing travel times for bus operations and thereby facilitating faster, more reliable bus trips;

    g.   reducing parking demand within the CBD;

    h.   reducing regional energy consumption and greenhouse gas emissions, helping to meet carbon reduction goals;

    i.   improving air quality and health in EJ communities through implementation of a $155 million mitigation program; and

    j.   creating a dedicated revenue source for investments in public transit, which will further reduce congestion and improve air quality over time.

114.    In May 2023, FHWA approved the Final EA.

115.    Starting on May 12, FHWA made the Final EA and Draft FONSI available for public review for a period of 30 days, from May 12 to June 12, 2023.

116.    On June 22, 2023, FHWA issued a FONSI determining that the Program, including mitigation, would not have a significant adverse impact on the environment and would not have a disproportionately high and adverse impact on EJ communities or populations.

117.    On June 23, 2023, FHWA's New York Division Administrator signed the FONSI.

118.    On March 27, 2024, the TBTA Board approved a toll rate schedule through a formal ratemaking process under New York State law.

119.    In June 2024, the Project Sponsors, in consultation with FHWA, completed a reevaluation under NEPA ("Reevaluation 1"), which assessed the effects of the approved toll structure.  On June 14, 2024, FHWA concluded that the approved toll structure and associated impacts were analyzed and mitigated appropriately under NEPA, that no additional environmental analysis was warranted, and that the conclusions in the Final EA and FONSI remained valid.  Reevaluation 1 also concluded that the approved toll structure would meet the congestion-reduction and revenue goals for the Program and achieve similar environmental benefits to those described in the Final EA.

120.    On June 5, 2024, New York Governor Kathy Hochul announced a temporary pause of the Program.  On November 14, 2024, Governor Hochul proposed that the Program move forward with a toll structure approach whereby those toll rates would be phased in gradually over the first several years of the Program (the "Phase-In Approach"), featuring a lower initial toll amount.

121.    In November 2024, the Project Sponsors completed a second reevaluation under NEPA ("Reevaluation 2") to assess the Phase-In Approach.

122.    Reevaluation 2 confirmed that under the Phase-In Approach, the Program would still meet its purpose and need, and all of its objectives.  Reevaluation 2 also confirmed that the Project Sponsors would still implement all mitigation commitments, including for EJ communities, within the same timeframes as contemplated in the Final EA and FONSI.

123.    On November 18, 2024, the TBTA Board formally adopted the Phase-In Approach to the toll rate schedule.

124.    On November 21, 2024, FHWA approved Reevaluation 2, concluding that the effects of the Program were consistent with those disclosed in the EA, that the adopted Phase-In Approach of the approved toll structure and impacts associated with it were analyzed and mitigated accordingly, and that no additional environmental analysis was warranted.

**D.    The VPPP Agreement Is Executed by FHWA and the Project Sponsors**

125.    That same day, on November 21, 2024, FHWA (through Defendant Shepherd) and the Project Sponsors signed an agreement under the VPPP authorizing the Program's collection of tolls and requiring (among other things) implementation of the mitigation commitments made in the FONSI.

126.    The VPPP Agreement reflects FHWA's determination that "this Agreement is necessary to oversee and administer the collection of tolls pursuant to Section 1012(b)(4) of ISTEA," VPPP Agmt. at 1, and states in relevant part that "[e]ffective on the date of this Agreement, the project is approved as a pilot program," *id.*, cl. 8, and that TBTA is authorized to "operate the Program as a toll Project in accordance with the provisions of this Agreement and as a value pricing project," *id.*, cl. 1.  FHWA further agreed that "the imposition of tolls under this Agreement does not render Federal-aid highways within the State of New York generally ineligible for Federal-aid highway funds where such highways are otherwise eligible under the particular funding program." *Id.*, cl. 5.  The VPPP Agreement provides that TBTA may use "toll revenues received from the operation of the Project" for, among other things, "any other projects eligible for assistance under title 23, United States Code."  *Id.*, cl. 2.

127.    In return, the Project Sponsors agreed to a number of obligations in the VPPP Agreement, including: (1) "to adequately maintain" federal-aid highways located in the geographic area of the Program, *id.*, cl. 6; (2) to submit regular reports on the effects of the Program "on driver behavior, traffic volume, congestion, transit ridership" and other topics to FHWA, *id.*, cl. 8(b); and

(3) "to comply with all Federal laws and requirements applicable to this project, including the laws and policies applicable to the Value Pricing Pilot Program," *id.*, cl. 9. The VPPP Agreement further requires that the Project Sponsors "identify benefits the application of tolls has in reducing climate pollution" and "demonstrate the benefits mitigation measures provide to underserved communities." *Id.*, cl. 8(d).

128. In addition, the VPPP Agreement requires that FHWA and the Project Sponsors "will cooperate and work together in the implementation of the Project." *Id.*, cl. 8(a).

129. The VPPP Agreement does not include any provision authorizing FHWA to terminate the agreement. Rather, it contemplates that only TBTA could unilaterally decide to discontinue the Program, requiring the Project Sponsors to "work with FHWA to return the Project to its original operating condition *if TBTA* decides to discontinue tolls on the Project." *Id.*, cl. 11 (emphasis added). The VPPP Agreement further provides that TBTA and NYCDOT shall "monitor and report on the project performance" for "a period of at least ten years or to the end of the life of the Project, whichever is sooner." *Id.*, cl. (8)(b).

130. The VPPP Agreement references FHWA regulations at 23 C.F.R. Part 940 and 950. These regulations do not grant FHWA authority to unilaterally terminate the VPPP Agreement.

**E. Plaintiffs Successfully Implement the Program After Facing Numerous Lawsuits Seeking to Delay or Prevent Congestion Pricing**

131. Prior to implementation of the Program, TBTA budgeted over $500 million towards efforts to establish the Program, and much of that budget has already been expended. These expenditures included developing the methodological approach; conducting the assessment and extensive outreach and developing the final documentation for the environmental review process under NEPA; design, development, implementation, and testing of the roadway infrastructure and system; design, development, implementation, and testing of the Back Office System; additional

extensive outreach for the State administrative review process; staff costs, including new staff for the Program; and consulting costs.

132.    In late 2024, several groups and individuals, as well as the State of New Jersey, sought preliminary injunctive relief on various federal and state constitutional and statutory grounds barring the MTA and TBTA from beginning the Program or collecting tolls. Each of these claims for injunctive relief was rejected by the courts. *See Chan v. U.S. Dep't of Transp.*, No. 23 Civ. 10365, 2024 WL 5199945 (S.D.N.Y. Dec. 23, 2024) (Liman, J.) ("Chan") (111-page opinion denying motions for preliminary injunction in four related cases challenging the program); *see also County of Rockland v. Metro. Transp. Auth.*, No. Civ. 24-3325 (2d Cir. Jan. 28, 2025), ECF 31 (per curiam); *New Jersey v. U.S. Dep't of Transp.*, No. Civ. 25-1033 (3d Cir. Jan. 4, 2025), ECF 9 (Bibas, J.); *County of Rockland v. Triborough Bridge & Tunnel Auth.*, No. 24 Civ. 2285 (S.D.N.Y. Jan. 14, 2025), ECF 56 (Seibel, J.); *New Jersey v. U.S. Dep't of Transp.*, No. 23 Civ. 3885 (D.N.J. Jan. 3, 2025) ("New Jersey"), ECF 212 (Gordon, J.); *County of Rockland v. Triborough Bridge & Tunnel Auth.*, No. 24 Civ. 2285 (S.D.N.Y. Dec. 23, 2024), ECF 52 (Seibel, J.); *Neuhaus v. Triborough Bridge & Tunnel Auth.*, No. 24 Civ. 3983 (S.D.N.Y. Dec. 23, 2024), ECF 44 (Seibel, J.). In rejecting these plaintiffs' requests for a preliminary injunction to halt the Program, courts recognized that the equities and public interest favored the Program moving forward, especially in light of the expenditures necessary to implement the Program and the revenues expected from its operation, *see, e.g.*, *Chan*, 2024 WL 5199945, at *48-49; that the implementation of the Program reflected a policy choice by New York's elected representatives, *see id.* at *48; and that FHWA conducted a thorough analysis in deciding to allow the Program to proceed, *see id.* at *5-10; *New Jersey*, No. 23 Civ. 3885, ECF 212 at 35.

133.    FHWA and USDOT were named as defendants in several of the above-referenced cases.  In the course of defending the Final EA and FONSI, and FHWA's ultimate approval of the Program, FHWA and USDOT submitted briefs to this Court and others that underscored and reiterated FHWA's longstanding view that cordon pricing programs, including those with a revenue objective, are permissible under the VPPP.

134.    In briefs before this Court, FHWA and USDOT described the VPPP as the "means by which the FHWA can provide tolling authority to state, regional, or local governments to implement congestion pricing programs."  *Chan*, ECF 65 at 7 (internal quotation marks omitted). They explained that it was appropriate for FHWA to authorize a cordon pricing program: "Although this may be the first time congestion pricing is applied to a city's central business district (i.e. 'cordon pricing') in the United States, such projects have been successfully implemented in London, Stockholm, Singapore, and Milan, and information from some of those projects was used to inform the analysis conducted here."  *Chan*, ECF 81 at 10; *see also id.* ("[C]ongestion pricing strategies are not novel and the impacts of such strategies on driving behavior, traffic volumes, transit ridership and air quality have been available for review for years.").

135.    FHWA and USDOT recognized that the Program's purpose is to "reduce traffic congestion in the Manhattan CBD in a manner that will generate revenue for future transportation improvements."  *Chan*, ECF 65 at 9.  FHWA and USDOT went on to explain that compliance with the TMA's objective that the Program enable a minimum amount of funding for the MTA Capital Program was not only an "appropriate" consideration in the NEPA process, but also "serves the separation of powers by respecting the democratic legitimacy of legislative judgments," "promotes the balance of 'federalism' by ensuring that federal agencies do not pass judgment on the policy

wisdom of state and local enactments," and "is pragmatically sensible as well, since it ensures federal agencies do not expend resources examining alternatives that the project sponsors are not legally authorized to implement." *Chan*, ECF 160 at 8 (quoting *Mulgrew*, 2024 WL 3251732, at *26).

136.    One of the plaintiffs that sued to prevent implementation of the Program is, as noted, the State of New Jersey, which sued USDOT and FHWA among others.  On December 30, 2024, Judge Leo Gordon granted USDOT, FHWA, the MTA, and TBTA's motions for summary judgment in overwhelming part, rejecting New Jersey's claims that FHWA acted arbitrarily in assessing the potential adverse environmental impacts on New Jersey resulting from air pollution and identifying and assessing the potential for disproportionately high and adverse impacts on New Jersey EJ communities.  *New Jersey*, No. 23 Civ. 3885, ECF 191.  New Jersey also raised concerns about the adequacy of participation afforded to New Jersey entities, officials, and the public throughout the process, and that FHWA had failed to conduct a transportation conformity analysis under the Clean Air Act for the Project with regard to New Jersey's State Implementation Plan, which claims the court also rejected.  The court reserved judgment on two issues that it remanded to FHWA for further explanation: the amount of place-based mitigation funding allocated to New Jersey EJ communities to address the former EO 12,898 and the consideration of alternatives in light of the adopted Phase-In Approach.  *Id.*  The court did not, as sought by New Jersey, vacate the FONSI pending the completion of the remand.  New Jersey subsequently moved for reconsideration and for a temporary restraining order, which the court denied.  FHWA filed its remand results on January 17, 2025, reaffirming the FONSI and Reevaluations, including with respect to the alternatives analysis and the revenue objective.  The remand results are pending *sub judice* before the court.

137.    On January 5, 2025, the Program went into effect.  Vehicles entering the CBD are being tolled at the rates established in the adopted toll rate schedule.

## F.    Data to Date Indicate that the Program Has Been Successful at Reducing Congestion and Is Increasingly Popular with New Yorkers

138.    While the Program has only recently begun and its full benefits have yet to be realized, it is clearly already working.  A recent study by researchers from the National Bureau of Economic Research and Google Research concluded that the "introduction of congestion pricing led to an immediate increase in speeds within NYC's CBD, which has persisted since implementation" and estimate "that speeds in NYC's CBD increased by 15%" on average, and that the "effects on speeds are even larger during the afternoon—historically the most congested time of day—and persist even after peak-hours pricing ends at 9pm."[103]  The researchers also found that the Program "had positive spillovers on speeds throughout the NYC metropolitan area" and had already led to a small, but noticeable decrease in emissions for vehicles driving in the CBD.[104]  Every day there are close to 60,000 fewer cars in the CBD since tolling began.[105]  New Jerseyans driving or commuting by bus are saving as much as 21 minutes on a daily round trip, while commuters from Queens and Long Island are saving as much as 13 minutes.[106]  The *Financial Times* has estimated that "motorists … will save thousands of hours per year they currently waste crawling through smoggy tunnels or over clogged bridges."[107]  This is already being borne out in the first months since the Program took effect.  Crossing times were 17% faster

---

[103] Cody Cook, et al., *supra* note 2 at 2.

[104] *Id.*

[105] Michelle Kaske, *NYC Toll Projected to Boost Economy by as much as $1.3 Billion*, BLOOMBERG (Mar. 11, 2025), https://www.bloomberg.com/news/articles/2025-03-11/nyc-toll-projected-to-boost-economy-by-as-much-as-1-3-billion.

[106] *Id.*

[107] Oliver Roeder & Sam Learner, *First US congestion pricing scheme brings dramatic drop in NY traffic*, FINANCIAL TIMES (Jan. 16, 2025), https://www.ft.com/content/c229b603-3c6e-4a1c-bede-67df2d10d59f.

at the Lincoln Tunnel and 48% faster at the Holland Tunnel in January 2025, compared to January 2024; trip times from Brooklyn and Queens to the CBD have dropped between 10% and 30%, and express buses save about 10 minutes on their commutes.[108]  Traffic speeds on river crossings have been 5% to 30% faster this February than last February.[109]  Traffic speeds on major bridges improved significantly: on the Queensboro Bridge, by 31%; on the Brooklyn Bridge, by 26%; and on the Manhattan Bridge, by 7%.[110]  Fewer vehicles use the nine MTA bridges and tunnels, with the largest reductions at the Hugh L. Carey and Queens-Midtown Tunnels, which lead directly into the CBD.[111]  Truck traffic traveling through these tunnels dropped 14% this year compared to the same period in 2024.[112]  A report by the Regional Plan Association has estimated that the annual value of time savings to commuters could total as much as $1.3 billion.[113]

139.  Data collected by the MTA reveals that since the Program began, vehicle traffic in the CBD decreased substantially, with 5.8 million fewer vehicles entering the CBD in January through March 2025 compared to what would be expected based on data for prior years.[114]  The

---

[108] January 2025 MTA Board Meeting, Congestion Relief Zone Tolling January 29, 2025 Update , at 9, https://www.mta.info/document/163411 (last accessed Apr. 17, 2025); February 2025 MTA Board Presentation at 10 (Feb. 26, 2025), https://www.mta.info/document/165401 (last accessed Apr. 17, 2025).

[109] January 2025 MTA Board Meeting, Congestion Relief Zone Tolling January 29, 2025 Update , at 9, https://www.mta.info/document/163411 (last accessed Apr. 17, 2025); February 2025 MTA Board Presentation at 10 (Feb. 26, 2025), https://www.mta.info/document/165401 (last accessed Apr. 17, 2025).

[110] January 2025 MTA Board Meeting, Congestion Relief Zone Tolling January 29, 2025 Update , at 9, https://www.mta.info/document/163411 (last accessed Apr. 17, 2025); February 2025 MTA Board Presentation at 10 (Feb. 26, 2025), https://www.mta.info/document/165401 (last accessed Apr. 17, 2025).

[111] MTA Daily Ridership and Traffic: Beginning 2020, DATA.NY.GOV (Apr. 16, 2025), https://data.ny.gov/Transportation/MTA-Daily-Ridership-and-Traffic-Beginning-2020/sayj-mze2/about_data.

[112] Samuel Schwartz, *Where Have all the Trucks Gone? Truck Diversions Through the Bronx and Staten Island*, ROOSEVELT HOUSE PUB. POLICY INST. AT HUNTER COLL. (Mar. 28, 2025), https://www.roosevelthouse.hunter.cuny.edu/?forum-post=trucks-gone-truck-diversions-bronx-staten-island

[113] Kate Slevin & Rachel Weinberger, *Congestion Pricing: What it Means to Save Time*, REGIONAL PLAN ASS'N (Mar. 11, 2025), https://rpa.org/news/lab/what-it-means-to-save-time.

[114] MTA, *MTA Metrics: Vehicle Reductions*, https://metrics.mta.info/?cbdtp/vehiclereductions (last accessed Apr. 14, 2025).

NBER's March study found that because of the higher speeds in the CBD resulting from the Program, the decreased travel time for "a hypothetical driver traveling to the CBD every weekday … adds up to 12.5 hours of time saved each year."[115] This means additional time for those driving in the CBD to spend with loved ones rather than sitting in traffic—exactly the kind of impact Secretary Duffy has said he wants to see from local transportation policymakers.[116]

140.    Trips are also far more reliable.  Data shows that traffic through the Holland Tunnel used to be delayed more than 3 minutes on 54% of weekdays—that has fallen to just 12%.[117]  On the Williamsburg Bridge, delays used to be greater than 3 minutes 65% of the time; the Program has reduced that to 2%.[118]

141.    Manhattan buses have also gotten faster; an analysis of peak-hour bus routes revealed that 11 of the 13 local and Select Bus Service routes were faster this January than in the same period in 2024.[119]  The M50, "traditionally among the slowest buses in all of Manhattan," saw a weekday speed increase by 4%.[120]  Meanwhile, express buses are traveling 21% faster on the portion of their routes leading into and within the CBD.  Similarly, reduced congestion

---

[115] Cook et al., *supra* note 2, at 2.

[116] Sean Duffy, *U.S. Secretary of Transportation Sean Duffy speaks at the American Association of State Highway and Transportation Officials 2025 Washington Briefing* (Feb. 5, 2025), https://www.transportation.gov/briefing-room/us-secretary-transportation-sean-duffy-speaks-american-association-state-highway-and ("If we don't have our systems that are delayed and we don't sit in traffic we get to spend an extra 15 minutes, maybe an extra 45 minutes a day with the ones that we love as opposed to listening to music or a podcast …. We can make people's lives better and spend time with the people we love as opposed to going to the grind of our transportation system.").

[117] MTA, *February 2025 MTA Board Meeting Presentation* 12 (Feb. 26, 2025), https://www.mta.info/document/165401 (last accessed Mar. 20, 2025); *see also* TRANSCOM, *Internal Data Set: Sourced Week of Feb. 24, 2025* (data set on file).

[118] *Id.*

[119] Jose Martinez & Mia Hollie, *Manhattan Buses Got a Bit Faster in First Month of Congestion Pricing*, THE CITY (Feb. 21, 2025), https://www.thecity.nyc/2025/02/21/crosstown-bus-speeds-up-congestion-pricing/.

[120] *Id.*

translates into less delay for school buses in the CBD.[121]  One hundred thirty New York City School buses have routes through the CBD and when a bus is stuck in traffic, kids can miss valuable class time and often miss the breakfast offered at school.  Reduced traffic, as a result of the Program, has allowed more of these buses to make it to school on time.

142.    At the same time, the fact that there are now fewer cars on the road in the CBD has not stymied economic activity.  In fact, data provided by the MTA shows that in January 2025, 35.8 million people visited BIDs in the CBD, a 1.5 million increase compared to last January. Credit card sales data reflects that retail sales in the CBD have been $900 million higher in 2025 compared to the same period last year.[122]  Credit card sales data reflects that retail sales in the CBD are on pace to be $900 million higher in 2025 compared to the same period last year.[123]  The gross revenue of Broadway shows in January through March 2025 was 25% higher than in the same period of last year, while attendance at shows was approximately 20% higher in the first three months of 2025 compared to the same period of last year. [124]  As Governor Hochul recently said, "traffic is down and business is up."[125]

143.    This should come as no surprise given business leaders' support for the Program even before it began.  After Governor Hochul announced the Program would move forward with

---

[121] Sophia Lebowitz, *Congestion Pricing Gets Kids to School on Time, Data Shows*, STREETSBLOG NYC (Jan. 17, 2025), https://nyc.streetsblog.org/2025/01/17/congestion-pricing-gets-kids-to-school-on-time-data-shows.

[122] Dave Colon, *Memo to the President: Manhattan Economy Improving, Thanks to Congestion Pricing*, STREETSBLOG NYC (Feb. 27, 2025), https://nyc.streetsblog.org/2025/02/27/memo-to-the-president-manhattan-economy-improving-thanks-to-congestion-pricing.

[123] Dave Colon, *Memo to the President: Manhattan Economy Improving, Thanks to Congestion Pricing*, STREETSBLOG NYC (Feb. 27, 2025), https://nyc.streetsblog.org/2025/02/27/memo-to-the-president-manhattan-economy-improving-thanks-to-congestion-pricing.

[124]    Research   &   Statistics,   *Grosses-Broadway   in   NYC*,   THE   BROADWAY   LEAGUE https://www.broadwayleague.com/research/grosses-broadway-nyc/ (last accessed Apr. 17, 2025).

[125] Gov. Kathy Hochul, *Traffic Down, Business Up: Governor Hochul Highlights Progress Made Under New York's Congestion Pricing Program* (Mar. 21, 2025), https://www.governor.ny.gov/news/traffic-down-business-governor-hochul-highlights-progress-made-under-new-yorks-congestion.

the Phase-In Approach, the Greater New York Chamber of Commerce posted a statement by its CEO on X, noting that the Program "will improve the quality of life in Manhattan for all who live, work and visit."[126]  And the Partnership for New York City's President & CEO Kathryn Wylde has stated that, since the onset of Congestion Pricing, New Yorkers are "moving faster and there's less traffic,"[127] and "[i]n every respect, this is a policy that President Trump and the Republicans should be supporting."[128]

144.    Business leaders have continued to voice their support for the Program since its benefits have truly started to emerge.  For example, Union Square Partnership Executive Director Julie Stein said that since the Program began, "average weekday foot traffic in Union Square has reached its highest levels for this season in recent history, surpassing both pre-pandemic and recent-year benchmarks for January and February."[129]  Stein added that people in the community are saying that "Union Square feels more peaceful and pedestrian-friendly and surface transportation commuting times into and out of the district have improved."[130]  Hudson Square BID President and CEO Samara Karasyk said that, because of the Program, "[w]e have already seen a tangible decrease in traffic around the Holland Tunnel, which … will help grow the local economy and enhance the vitality of our community."[131]

---

[126]    New York's Chamber (@NYChamber), X (Nov. 15, 2024, 3:29 PM), https://x.com/NYChamber/status/1857521387583451602.

[127] Dick Brennan, *President Trump Said to Have NYC's Congestion Pricing, Bike Lanes in his Crosshairs*, CBS News (Feb. 10, 2025), https://www.cbsnews.com/newyork/news/president-trump-nyc-congestion-pricing-bike-lanes/.

[128] Ry Rivard & Nick Reisman, *New York's Business Boosters Push Trump to Keep Manhattan Tolls*, Politico (Feb. 11, 2025), https://www.politico.com/news/2025/02/11/new-york-trump-congestion-pricing-00203540.

[129] *Traffic Down, Business Up*, *supra* note 125.

[130] *Id.*

[131] *Id.*

145.    Emergency vehicle speeds and response times obviously benefit from the reduction of traffic and lessening of congestion.  For many years, increasing traffic in New York City led to longer and longer emergency vehicle response times.  As documented in a report issued by State Senator Brad Hoylman-Sigal, who represents much of the CBD, and traffic engineer Sam Schwartz, over the past decade, "E.M.S. response times to life-threatening situations had increased by 29%; for Fire Department vehicles tending to medical emergencies, the lag was up by 72 percent."[132]  Congestion pricing allows emergency vehicles to respond more quickly to calls.

146.    Reports also indicate that the Program has made the streets safer; data compiled by the New York Police Department reflect decreases in accidents both inside and outside the CBD for the first quarter of 2025 as compared to the comparable period in 2024.[133]

147.    Public transit ridership has seen an increase following the implementation of the Program, with 448,000 more riders on average each day choosing to use MTA public transit options as compared to the same period last year.[134]

148.    Crime in the subway has plummeted, even as ridership has increased.  In January 2025, there were 36% fewer crimes reported on the subway than last January.[135]  Overall, subway crime is down 22% so far in 2025.[136]

---

[132] Ginia Bellfante, *The Life-or-Death Consequences of Killing Congestion Pricing*, N.Y. TIMES (Oct. 10, 2024), https://www.nytimes.com/2024/10/10/nyregion/new-york-fire-department-response-times.html.

[133] N.Y. CITY OPEN DATA, *Motor Vehicle Collisions – Crashes*, https://data.cityofnewyork.us/Public-Safety/Motor-Vehicle-Collisions-Crashes/h9gi-nx95/about_data (last accessed April 17, 2024).

[134] Sam Deutsch, *Congestion Pricing is a Policy Miracle*, SUBSTACK (Mar. 20, 2025), https://bettercities.substack.com/p/congestion-pricing-is-a-policy-miracle.

[135] Barbara Russo-Lennon, *Subway Crime Plummets as Ridership Jumps Significantly in 2025 in Congestion Pricing Era*, AM NY (Feb. 4, 2025), https://www.amny.com/nyc-transit/nyc-subway-crime-plummets-ridership-jumps-2025/.

[136] Lindsay Tuchman, *Trump Administration Threatens to Pull MTA Funding if Agency Does not Provide Crime Stats*, ABC7 NEWS (Mar. 19, 2025), https://abc7ny.com/post/subway-crime-congestion-pricing-nyc-trump-administration-threatens-pull-federal-funding-mta-does-not-report-stats/16049018/.

149. Honking is also down, as New Yorkers in the CBD have actually enjoyed what might be called peace and quiet since the Program went into effect.[137] The two Department of Environmental Protection noise cameras in the CBD have not yet issued a single horn-honking summons since the Program went into effect, whereas 27 were issued during the same time period last year.[138] There has also been a 69% decline in complaints about honking to the city's 311 portal from citizens living inside the CBD for the same time frame in 2024.[139] "Less congestion means less noise," Jaqi Cohen, director of climate and equity policy for Tri-State Transportation Campaign explained, "but I think horn honking is also a symptom of people's frustration behind the wheel, so it probably speaks to the fact that people have easier commutes now."[140]

150. Not only has Congestion Pricing created all of these benefits for New Yorkers and commuters, it has also met revenue raising expectations for the MTA's Capital Program.[141]

151. According to a poll reported by *CBS News*, the majority of New Yorkers want the Program to continue,[142] and polling indicates that support for the Program continues to grow as commuters see its benefits.[143] On a 2-to-1 basis, New Yorkers say that the program is working.[144]

[137] Jose Martinez & Mia Hollie, *Honking Complaints Plunge 69% Inside Congestion Pricing Zone*, THE CITY (Mar. 11, 2025), https://www.thecity.nyc/2025/03/11/traffic-noise-complaints-drop-congestion-pricing/.

[138] *Id.*

[139] *Id.*

[140] *Id.*

[141] Barbara Russo-Lennon, *Congestion Pricing: MTA Announces $51.9 Million in Manhattan Toll Revenue for February*, AMNY (Mar. 24, 2025), https://www.amny.com/news/congestion-pricing-revenue-tolls-february-2025/.

[142] Alecia Reid, *6 in 10 Say They Want NYC Congestion Pricing to Continue, New Poll Finds*, CBS NEWS (Feb. 5, 2025), https://www.cbsnews.com/amp/newyork/news/new-york-city-congestion-pricing-morning-consult-poll/. Another poll, run close in time to the Program's launch, likewise found that a majority of New Yorkers support congestion pricing. *See* Barbara Russo-Lennon, *The Poll Results Are In: Here's How New Yorkers Really Feel About Congestion Pricing*, AMNY (Dec. 3, 2024), https://www.amny.com/news/how-new-yorkers-feel-about-congestion-pricing/.

[143] Philip Marcel, *NYC Congestion Pricing has More Support than Ever as Trump Deadline Looms, New Poll Finds*, NBC NEW YORK (Mar. 10, 2025), https://www.nbcnewyork.com/news/local/nyc-congestion-pricing-support-grows/6165502/.

[144] *Id.*

And many of New York's elected representatives also strongly support the Program. Congressman Jerry Nadler has stated that "congestion pricing is the best — and only — solution to getting our transit system back on track" and will allow the "MTA to advance work on the 2nd Avenue Subway extension, Penn Access, ADA accessibility upgrades, and more. We will end the congested streets that put public safety and emergency response at risk while meeting our climate goals to fight the climate crisis."[145] Manhattan Borough President Mark Levine has also given his strong support to the Program, stating: "Implementing congestion pricing as soon as possible will raise the critical funds we need to build elevators and escalators, modernize signals, and give New Yorkers the transit system we deserve."[146] Assemblymember Tony Simone from Manhattan expressed a similar sentiment: "There is not, has never been and never will be, a substitute for the funding promised through congestion pricing. Mass transit is the backbone of our city and state, which are the economic engine for the nation. This funding is critical to making our system fully accessible, improving service, delivering the infrastructure to increase residential density to combat the housing crisis, create thousands of direct and indirect jobs, and induce billions of dollars of investment."[147] Elected representatives from boroughs outside of the CBD have also expressed their support for the Program and the benefits it is already incurring. State Senator Robert Jackson, who represents parts of Upper Manhattan and the Bronx, stated that "Congestion pricing is already delivering for New York—easing gridlock, cutting pollution, and powering critical funding for our transit system."[148] Similarly, Assemblymember Jessica González-Rojas,

---

[145] Gov. Kathy Hochul, *What They are Saying: Elected and Community Leaders Support Governor Hochul's Plan to Fund Transit and Put Commuters First* (Nov. 14, 2024), https://www.governor.ny.gov/news/what-they-are-saying-elected-and-community-leaders-support-governor-hochuls-plan-fund-transit.

[146] *Id.*

[147] *Id.*

[148] *Traffic Down, Business Up, supra* note 125.

who represents parts of Queens, has said that the Program works, and "we've already seen improvements in commute times and have created a new revenue stream to accelerate the modernization of our public transportation system."[149]  Although some state and local representatives have opposed the Program, they are in the minority, and regardless, the TMA was enacted into law by the Legislature and signed by then-Governor Cuomo.

152.    Following its implementation, many New Yorkers have spoken out about the benefits of the Program.  Walt "Clyde" Frazier, the legendary former point guard for the New York Knicks, declared his support for the Program during a recent Knicks game, commenting: "It's like congestion pricing, Mike, in the paint.  I'm loving the congestion pricing, there's no traffic man, you can get around now."[150]  Nobel laureate and economist Paul Krugman, who lives in New York City, describes the Program as "Economics 101" and has concluded that the Program "has been remarkably successful, exceeding even its supporters' expectations."[151]  Illena Robbins, who grew up in Manhattan and now lives in Queens, said in an interview with the *New York Times* that crossing the street to get lunch "would stress me out," but now that the Program is in effect, she is "able to cross safely, and cars weren't honking.  It was like a whole other world."[152]  Asad Dandia, who owns and operates a walking tour company, agreed "it was much easier to cross the street … definitely quieter [and] definitely calmer."[153]  Ahmed, a truck driver who drives into the CBD regularly, told the Regional Plan Association: "My experience with congestion pricing has been

---

[149] *Id.*

[150] Dave Colon, *Knicks Legend Walt 'Clyde' Frazier: 'I'm Loving The Congestion Pricing*, STREETSBLOG NYC (Mar. 27, 2025), https://nyc.streetsblog.org/2025/03/27/knicks-legend-walt-clyde-frazier-im-loving-the-congestion-pricing.

[151] Paul Krugman, *Trump To New York: Drop Dead*, SUBSTACK (Feb. 9, 2025), https://paulkrugman.substack.com/p/trump-to-new-york-drop-dead.

[152] Dodai Stewart, *New Yorkers Have Little Data but Big Feelings about Congestion Pricing*, N.Y. TIMES (Jan. 11, 2025), https://www.nytimes.com/2025/01/11/nyregion/new-york-congestion-pricing-reaction.html.

[153] *Id.*

good because I'm able to get into the city faster.  I mean, we're talking 45 minutes to an hour faster than I used to."[154]  And Noah, a resident of Hoboken, NJ, who takes the New Jersey Transit 126 bus to Manhattan for work, said that congestion pricing "has made a really noticeable difference" in his life and "shaves [his] commute from 30 minutes to just about 20 minutes."[155]

153.    On social media, New Yorkers have also been praising the Program.  Ramit Sethi posted in all caps on January 9th that his trip to Newark Liberty International Airport was "the fastest trip I've ever taken to the airport from NYC!!! Thank you Congestion Pricing!!!"[156]  Paul Rieckhoff posted on X: "'Its been a month now, and its completely different.  I love it.  I don't mind driving here anymore.  It's great.' – My uber driver today on congestion pricing in Manhattan.  I agree.  The change to traffic in the city is significant.  Especially on the weekends. And especially for those of us that live here."[157]  Sam Biederman wrote: "Congestion pricing is amazing.  Was just in Lower Manhattan.  Not car-choked, foot, bike and car traffic flowing very freely.  Good idea, absolutely worth $9."[158]  Michael Mignano wrote: "Congestion pricing is the greatest thing to happen to NYC in my lifetime."[159]

154.    There is evidence that even former skeptics of the Program are coming to see its benefits.  Ali Lyles, who had initially posted a video on TikTok comparing being charged the toll to "being robbed without a gun," later posted a video acknowledging that he had saved half an

---

[154] Slevin & Weinberger, *supra* note 113.

[155] *Id.*

[156] Stewart, *supra* note 152.

[157] Paul Rieckhoff (@PaulRieckhoff), X (Feb. 2, 2025, 4:18 PM), https://x.com/PaulRieckhoff/status/1886162240250028417.

[158] Sam Biederman (@Biedersam), X (Jan. 5, 2025, 3:32 PM), https://x.com/Biedersam/status/1876001600835354735.

[159] Michael Mignano (@mignano), X (Mar. 21, 2025, 9:02 AM), https://x.com/mignano/status/1903069763951120556.

hour on his commute and said, "there wasn't no traffic, bruh … I might actually like congestion pricing."[160] This is consistent with the experiences of other cities that have implemented congestion pricing programs, such as London and Stockholm, where support for congestion pricing increased significantly following implementation, as the benefits became apparent.[161] As the old adage goes, time is money—in this case, collectively tens of billions of dollars that will be saved as a result of the Program, far more than the collective cost to drivers.

### G. Then-Candidate Trump Repeatedly Threatens to "Kill" Congestion Pricing

155. Donald Trump, as a candidate for national office, repeatedly voiced his political opposition to the Program and stated that he would "terminate" and "kill" the Program once in office.

156. On May 7, 2024, in anticipation of the June 2024 expected implementation, he wrote on Truth Social:



> **Donald J. Trump** ✔
> @realDonaldTrump
>
> I can't believe that New York City is instituting Congestion Pricing, where everyone has to pay a fortune for the "privilege" of coming into the City, which is in desperate trouble without it. It is a big incentive not to come - there are plenty of other places to go. It's been a failure everywhere it has been tried, and would only work if a place were HOT, HOT, HOT, which New York City is not right now. What office tenant or business would want to be here with this tax. Hopefully, it will soon be withdrawn!
>
> 4.99k ReTruths   17.2k Likes                    May 07, 2024, 9:01 AM

**Figure 9: May 7, 2024 social media post to Truth Social by @realDonaldTrump**

---

[160] Stewart, *supra* note 152.

[161] Abdallah Fayyad, *NYC's Congestion Pricing is Unpopular—For now*, Vox (Jan. 10, 2025), https://www.vox.com/policy/394514/congestion-pricing-popular-support-new-york-stockholm-london.

157.    On May 24, 2024, then-candidate Trump posted to social media that he had "stopped" the Program "for years at the Federal level" during his first term in office and promised: "I will TERMINATE Congestion Pricing in my FIRST WEEK back in Office!!!"



Donald J. Trump ✔
@realDonaldTrump

"Congestion Pricing" is a disaster for NYC. I stopped it for years at the Federal level, but Crooked Joe railroaded it through. A massive business killer and tax on New Yorkers, and anyone going into Manhattan. I will TERMINATE Congestion Pricing in my FIRST WEEK back in Office!!! Manhattan is looking for business, not looking to kill business!

3.12k ReTruths   11.7k Likes          May 24, 2024, 2:41 PM

**Figure 10: May 24, 2024 social media post to Truth Social by @realDonaldTrump**

158.    Following the election, President Trump continued to express his personal opposition to the Program, saying in an interview with the *New York Post* on November 14, 2024 that he "strongly disagree[d] with the decision on the congestion tax."[162]

159.    On January 11, then President-elect Trump met with Representatives Nicole Malliotakis and Mike Lawler from New York.[163]  Following the meeting at President Trump's Mar-a-Lago Club, Representative Malliotakis posted the following on X:

---

[162] Steven Nelson, *Trump Slams Hochul Move to Revive NYC Congestion Tax: 'It will Hurt Workers, Families, and Businesses'*, N.Y. POST (Nov. 14, 2024), https://nypost.com/2024/11/14/us-news/trump-slams-hochul-move-to-revive-nyc-congestion-tax/.

[163] Rep. Lawler represents a district in Rockland County, which filed suit to block the program on March 26, 2024, alleging that the Program violates the Equal Protection clauses of the United States and New York constitutions, is an "unauthorized tax," and constitutes an excessive fine in violation of the Eighth Amendment.  As noted, Judge Seibel denied Rockland's request for a preliminary injunction on December 23, 2024, ruling that Rockland had "failed to show a likelihood of success on the merits as to any of [its] claims."  *Rockland v. Metro. Transp. Auth.*, No. 24 Civ. 2285 (S.D.N.Y. Dec. 23, 2024) (Seibel, J.), ECF 52.



**Figure 11: Jan. 11, 2025 social media post to X by @NMalliotakis**

160.    The next day, Representative Malliotakis posted on X that, during the meeting, Trump "told us that he … wants to provide SALT relief and kill congestion pricing."

**H.    The Administration Purports to "Terminate" the VPPP Agreement Based on Spurious and Transparently Pretextual Arguments**

161.    On the day of President Trump's Inauguration, January 20, 2025, New Jersey Governor Phil Murphy made a personal appeal to end the Program.  In a letter to President Trump, Governor Murphy noted the President's previous characterization of congestion pricing as a "disaster" and vow to "TERMINATE" it on his "FIRST WEEK BACK in office!!!"[164]

162.    On January 29, 2025, Secretary Duffy issued an order titled "Ensuring Reliance

---

[164] Carl Campanile, *NJ Gov. Phil Murphy Makes Personal Appeal to Trump to Kill Congestion Pricing*, N.Y. POST (Jan. 20, 2025), https://nypost.com/2025/01/20/us-news/nj-gov-phil-murphy-makes-personal-appeal-to-trump-to-kill-congestion-pricing/.

Upon Sound Economic Analysis in Department of Transportation Policies, Programs, and Activities."[165]  Section 5(f)(i) of the order states that USDOT will "prioritize" projects that "utilize user-pay models."  Congestion pricing is, by definition, a "user-pay" model, as it requires payment for use of the roadways in the CBD.

163.    Similarly, Section 5(f)(iii) of the order requires projects to "mitigate the unique impacts of DOT programs," such as "the accessibility of transportation to families with young children."  The Program meets these goals by generating revenues to install elevators at subway stations, improving pedestrian and cyclist safety, and reducing gridlock to improve travel time reliability, thereby increasing transportation options for families with young children, while also reducing vehicular emissions and financing significant environmental mitigation measures to enhance their health.

164.    On February 19, 2025, USDOT followed through on the President's promise to attempt to "terminate" congestion pricing by undertaking agency action purporting to rescind the VPPP Agreement and revoke federal approval for the Program.   In a letter addressed to Governor Hochul, Duffy explained that he had been directed by President Trump to "review[] the tolling authority granted under VPPP to the Program pilot project for compliance with Federal law" and had "concluded that the scope of this pilot project as approved exceeds the authority authorized by Congress under VPPP."  Feb. 19 Ltr. at 2.  The letter goes on to state, without citation to any statutory or regulatory authority that would purport to authorize such a decision, that Duffy had chosen to "rescind[] FHWA's approval of the [Program] under the [VPPP Agreement] and terminat[e] the Agreement."  *Id.*

---

[165] U.S. DEP'T OF TRANSP., *Signed DOT Order re: Ensuring Reliance Upon Sound Economic Analysis in Department of Transportation Policies Programs and Activities* (Jan. 29, 2025), https://www.transportation.gov/briefing-room/signed-dot-order-re-ensuring-reliance-upon-sound-economic-analysis-department

165.    Although the February 19 Letter claims that he chose to "terminate" the Program on legal grounds arising from his interpretation of the VPPP, the majority of the letter is instead focused on reciting Duffy's policy disagreements with the Program.  For example, Duffy complains that the Program is not "a fair deal" for "working class Americans" because it imposes an additional financial burden on drivers—while failing to acknowledge that TBTA provides a substantial discount plan on Program tolls for low-income drivers and benefits them by reducing driving time. *Id.*[166]  The letter also cites New Jersey Governor Phil Murphy's "significant concerns" about the Program and its effects on New Jersey residents, but overlooks that the U.S. District Court for the District of New Jersey has already largely rejected Governor Murphy's challenges to the Program and that the principal New Jersey challenge was based on EO 12,898, which President Trump has now withdrawn.  *Id.*; *see supra* ¶ 134.

166.    To the extent the February 19 Letter attempts to proffer various legal bases purportedly underpinning Duffy's decision, its conclusory analysis is cursory and unfounded. Duffy first claims that he is "require[d] to narrowly construe" the VPPP because it operates as an "exception" to 23 U.S.C. § 301 which, as noted above, generally restricts tolling on federal-aid highways—a restriction to which there are many broad statutory exceptions, as described *supra*. Feb. 19 Ltr. at 3.  Drawing on this faulty, unprecedented, and overly narrow approach to construing the VPPP, Duffy then seeks to justify his decision to rescind FHWA's approval of the Program on two grounds.

167.    First, he notes the Program "uses a method of tolling known as 'cordon pricing,'" and claims that "FHWA has never before approved a VPPP program that uses cordon pricing."

---

[166] *See* METRO. TRANSP. AUTH., *Congestion Relief Zone Toll: Discounts and Exemptions*, https://www.mta.info/fares-tolls/tolls/congestion-relief-zone/discounts-exemptions (last visited Mar. 27, 2025).

Feb. 19 Ltr. at 3; *but see supra* ¶¶ 80, 86, 90, 92 (collecting cordon pricing projects funded by FHWA under the VPPP). Without any analysis of the text of the VPPP or its accompanying legislative history, and without acknowledging FHWA's long history of endorsing cordon pricing as a value pricing strategy and funding cordon pricing projects under the VPPP, Duffy summarily concludes that "no statute contemplates cordon pricing in a situation where tolls are inescapable." Feb. 19 Ltr. at 3.

168. Second, Duffy objects that "imposition of tolls under the [Program] appears to be driven primarily by the need to raise revenue for the Metropolitan Transit [sic] Authority (MTA) system as opposed to the need to reduce congestion." *Id.* While Duffy concedes, as he must, that "revenue generation is a necessary outcome of any congestion pricing scheme and specifically allowable under the VPPP statute," and that under the VPPP revenue used to "improv[e] the transit system may eventually affect roadway congestion," he nonetheless concludes—again, without any analysis of the statutory text—that the "VPPP does not authorize tolls that are calculated based on considerations separate from reducing congestion or advancing other road-related goals." *Id.*

169. The legal justifications offered by Duffy for his decision to "terminate" federal approval of the Program are wholly without merit. There is no truth to the claim that the VPPP must be narrowly construed because it is an "exception" to 23 U.S.C. § 301. For one thing, the only express exception to Section 301 is Section 129, which broadly sets forth a bevy of ways in which the federal government may participate in tolled highways. *See* 23 U.S.C. § 301 ("Except as provided in Section 129…"); *id.* § 129 (setting forth various programs for government participation). The VPPP, on the other hand, is an additional, stand-alone program that Congress created for project sponsors to consider potential "value pricing pilot programs," in which the Secretary "shall solicit" participation. VPPP, cl. 1. And in all events, the Supreme Court has

repeatedly held that exceptions should be interpreted in the same manner as any other statute, explaining that "[e]xceptions and exemptions are no less part of Congress's work than its rules and standards" and courts "have no right to place our thumbs on one side of the scale or the other." *BP p.l.c. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1538-39 (2021) (rejecting argument that Court must construe exceptions narrowly and explaining that courts have "no license to give statutory exemptions anything but a fair reading"); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 359 (2012) (rejecting the "false notion" that "tax exemptions—or any other exemptions for this matter—should be strictly construed").

170.     Duffy's claim that the VPPP does not permit congestion pricing projects that employ cordon pricing finds no support in the VPPP, which does not purport to limit the type of "congestion pricing pilot programs," later renamed "value pricing pilot programs," that States may implement.  VPPP, cl. 1.  The legislative history establishes that, in enacting ISTEA, Congress anticipated that States could implement cordon-based tolling, *see supra* ¶¶ 70-74, and FHWA informed Congress in testimony, shortly after ISTEA was enacted, that FHWA interpreted the statute to authorize a wide range of congestion pricing strategies, "ranging from pricing on a new or existing single road facility to more comprehensive *area-wide road pricing strategies*," *supra* ¶ 75 (emphasis added).  In the years since 1991 when ISTEA was enacted, FHWA has repeatedly stated that the VPPP permits cordon pricing in official agency publications, notices in the Federal Register, guidance documents, reports to Congress, and other materials.  *See supra* ¶¶ 75, 77-79, 82, 87-89, 91, 96.  To this day, FHWA's website includes "Cordon Tolls" among the list of permissible "Project Types/Projects" available to States through the VPPP.  *Supra* ¶ 96.  Consistent with this understanding, FHWA has many times endorsed cordon pricing and awarded funds to project sponsors under the VPPP to study cordon pricing projects.  *See supra* ¶ 84, 86-98.  And

FHWA has repeatedly concluded that the VPPP authorized cordon pricing in New York City, when FHWA, during President Trump's first term, informed the Project Sponsors that the VPPP was the "best fit" for the Program, and more recently when FHWA executed the VPPP Agreement authorizing tolling under the Program. *Supra* ¶¶ 9. Congress has long been aware of FHWA's interpretation of the VPPP as permitting cordon pricing, based on FHWA's congressional reports and testimony, and has never sought to amend the VPPP to prohibit cordon pricing projects despite amending other portions of the VPPP over the years. *See supra* ¶ 85.

171.    Duffy's position that cordon tolling can only be authorized under a separate statutory provision, 23 U.S.C. § 129(d), authorizing FHWA to approve congestion pricing on Interstate system roads, and only in situations where "drivers can choose a non-Interstate route," Feb. 19 Ltr. at 3, is nonsensical. The entire point of cordon-based tolling, as reflected in the longstanding understanding in the Congressional record and FHWA statements, is to eliminate toll-free routes as the best means of alleviating congestion within a specific geographic area, especially an urban area. *See supra* at ¶¶ 84-85, 89. And indeed, FHWA has funded studies of true cordon toll policies under the VPPP, and another such program is still under review for VPPP tolling authorization. *See supra* at ¶¶ 86, 90, 92, 95.

172.    Duffy's letter is also factually incorrect in claiming that "the imposition of tolls under the CBDTP pilot project appears to be driven primarily by the need to raise revenue for the Metropolitan Transit [sic] Authority (MTA) system as opposed to the need to reduce congestion." Feb. 19 Ltr. at 3. As explained *supra*, revenue generation to support public transit as a non-driving option has always been a complementary objective, and of no greater importance than the primary goal of reducing congestion in the CBD, which transit improvements funded through toll revenues

will also support.  This aspect of Duffy's "reasoning" simply ignores the record before FHWA supporting its execution of the VPPP in 2024.

173.  Equally spurious is Duffy's claim that project sponsors may not consider revenue objectives when setting toll rates under VPPP-authorized tolling programs.  The VPPP contains no such prohibition and, to the contrary, expressly contemplates that project sponsors will use toll "[r]evenues generated by any pilot project" to fund other "projects eligible under such title"— which include capital transit projects eligible for federal assistance.  VPPP, cl. 3.  The statute also provides that the Secretary must periodically report on the effects of VPPP projects, on not only congestion but also on "transit ridership … and availability of funds for transportation programs." *Id.* cl. 5.  As Congress noted at the time, the purpose of the Congestion Pricing Pilot Program was, among other things, to study the effects of such programs on "the availability of funds for transportation programs."  S. Rep. No. 102-71, 26 (1991).  Indeed, far from prohibiting project sponsors from considering revenue, a different section of ISTEA *required* project sponsors to consider "the use of innovative mechanisms for financing [transportation] projects, including … congestion pricing."  ISTEA § 1025(a).  As detailed above, FHWA has repeatedly stated in official reports and guidance documents that revenues from congestion pricing "can be used to pay for expansion of roadway facilities or to support alternatives to driving alone, such as public transit." *Supra* ¶ 88; *see also supra* ¶¶ 89, 91, 93, 96-98.  And FHWA's website reinforces this position, stating that "DOT believes that using innovating financing strategies to leverage limited public transportation revenue is integral to the long-term re-thinking of how the United States provides highway *and transit infrastructure*," one such strategy being congestion pricing. *Supra* ¶ 97.

174.  In the weeks since issuing the February 19 Letter, Duffy has made several statements in the press that misstate easily verifiable aspects of the Program, suggesting that he

may have reached his decision, reversing longstanding FHWA legal interpretation and policy, without considering relevant information.

175.    On February 19, 2025, after issuing the February 19 Letter, Duffy gave an interview with *CBS Evening News* in which he incorrectly stated that Governor Hochul "never did a study to say, 'I really care about congestion and I want to reduce congestion, so I'm going to look at how much money should I charge in a toll and how much will that reduce Congestion?' That analysis was never done."[167]    In fact, the Project Sponsors prepared, and FHWA approved, detailed analyses of the impact of different potential toll rate schedules ranging "from approximately $9 to $23 during peak hours and $5 to $12 during off-peak hours" on VMT and traffic congestion in the CBD in connection with the FHWA's NEPA analysis.  *Mulgrew v. U.S. Dep't of Transp.*, 750 F. Supp. 3d 171, 224 (S.D.N.Y. 2024) (Liman, J.); *see also* Reevaluation 2 at 8, https://www.mta.info/document/158191.    That analysis considered whether various tolling scenarios could achieve objectives to reduce VMT within and the number of vehicles entering the CBD by 5% and 10%, respectively.  The same analysis was conducted in the Reevaluations to ensure that the ultimately approved tolling structure would achieve these congestion-reduction objectives foundational to the purpose of the Program as articulated in the Final EA.

176.    On March 4, 2025, in an interview with *Fox News*, Duffy again falsely claimed that there had been no analysis of the effect of the Program toll schedule on congestion, stating: "if we charge this much money … this much less congestion.  That study was never done.  This is just about raising money for public transportation, and that's why we are fighting it."  As noted above, the Project Sponsors prepared, and FHWA approved, exactly such a study.

---

[167] Matt Troutman, *Trump's Transportation Secretary 100% Open to Some Form of NYC Congestion Pricing After President Declared Tolls 'Dead'*, NY POST (Feb. 21, 2025), https://nypost.com/2025/02/21/us-news/trumps-transportation-secretary-floats-some-form-of-nyc-congestion-pricing/.

177.    On March 31, 2025, Duffy posted on X: "Taxpayers already paid for New York City's Roads, but NY wants to charge them AGAIN to use them.  $9 in, $9 out, with no free alternative."  Again, this statement reflects Duffy's apparent lack of understanding as to basic aspects of the Program.  The Program only charges vehicles upon entry into the CBD and there is no second charge for exiting the CBD.  Under the Program's toll rate schedule, passenger vehicles can only be charged a maximum of once per day for entry into the CBD.  *See* Phase-In Approach Toll Rate Schedule, https://www.mta.info/document/138931.



**Figure 12: Mar. 31, 2025 social media post to X by @SecDuffy**

178.    That same day, February 19, 2025, Duffy released a press statement announcing that FHWA had "terminated approval of the pilot for New York's Central Business District Tolling Program," in which he described the Program as a "slap in the face to working class Americans

and small business owners," and "backwards and unfair."[168]   However, the same analysis that was undertaken by the Project Sponsors and approved by FHWA looked at the projected economic impact of the Program and considered whether residents or businesses would be forced to move or whether there would be changes in economic conditions leading to a loss or substantial diminishment of products and services.  *Chan*, 2024 WL 5199945, at *6.  Their analysis concluded that the Program "would provide an economic *benefit*" to the CBD and "would not be likely to result in the involuntary displacement of residents, business, or employees." *Id.* at *7.  And as noted above, the Program has actually already had a positive impact on business.

I.    **Plaintiffs Bring Suit Seeking a Declaratory Judgment that the February 19 Letter is Null and Void, and Defendants Attempt to Coerce Compliance by Threatening to Illegally Withhold Federal Funding**

179.    When the Administration finally attempted to "terminate" the Program on February 19, 2025, after repeatedly threatening to do so in the press, Plaintiffs immediately commenced the instant lawsuit.  In their original complaint, filed that same day, Plaintiffs alleged that the February 19 Letter was legally invalid and unenforceable and sought a declaratory judgment that the VPPP Agreement remained in effect.  In light of the rights granted to TBTA by the VPPP Agreement, the irreparable harm that ending the Program would cause for the MTA, TBTA, and the people of New York, and the clear deficiencies in the February 19 Letter's rationales, Plaintiffs stated that they would "continue to operate the Program as required by New York law until and unless Plaintiffs are directed to stop by a court order."  ECF 1, ¶¶ 25, 120.

---

[168] Press Release, U.S. DEP'T OF TRANSP., U.S. Department of Transportation Terminates Tolling Approval for New York City's Cordon Pricing Program (Feb. 19, 2025), https://highways.dot.gov/newsroom/us-department-transportation-terminates-tolling-approval-new-york-citys-cordon-pricing.

180.     President Trump nonetheless took to social media to prematurely claim victory, writing on Truth Social that "CONGESTION PRICING IS DEAD.  Manhattan, and all of New York is SAVED.  LONG LIVE THE KING!"



**Figure 13: Feb. 19, 2025 social media post to Truth Social by @realDonaldTrump**

181.     The White House account on X quoted the President and posted an image, presumably prepared by President Trump's staff, of President Trump wearing a crown in front of the Manhattan skyline.



**Figure 1: Feb. 19, 2025 social media post to X by @WhiteHouse**

182. On February 20, 2025, Defendant Shepherd sent a letter to NYSDOT, NYCDOT, and MTA Bridges and Tunnels [TBTA] (the "February 20 Shepherd Letter" or "Feb. 20 Ltr."), attached hereto as **Exhibit H**, stating that "pursuant to Secretary Duffy's February 19, 2025 letter," the "recission of approval and termination of the November 21, 2024 Agreement will be effective on March 21, 2025," and that the Project Sponsors "must cease the collection of tolls" on that date. Feb. 20 Ltr.

183.    Almost immediately upon release of the February 19 Letter, legal scholars and public commentators questioned its validity and noted that it was unlikely to be enforced by the courts.  David A. Super, a professor at Georgetown Law, told the *New York Times* that Duffy did not have authority to rescind federal approval of the Program, explaining: "There is really nothing in the statute that gives the secretary authority to stop these things."[169]  Robert L. Glicksman, a professor at George Washington University Law School, likewise questioned Defendants' authority, noting that simply "[d]eclaring 'I'm the king' is not sufficient grounds for reversing [federal approval of the Program]."[170]  Noah Kazis, an assistant professor at the University of Michigan Law School, called the Administration's move a "political wrecking ball" that disregards the law.[171]  Even supporters of the Administration's efforts to end the Program questioned the reasoning of the February 19 Letter, noting that it appeared to be "based on sloppy analysis and statutory triangulation."[172]

184.    Faced with these obstacles, the Administration resorted to what has become its *modus operandi*: attempting to improperly leverage federal funding as a way to compel compliance with its unlawful decrees.  On March 18, 2025, Duffy sent a letter to the MTA ("March 18 Safety Letter"), **Exhibit D**, demanding detailed information on crime and safety in subways and on buses in New York City, and threatening "further consequences, up to and including redirecting or withholding funding."  Although the letter did not directly reference the Program, it was widely

---

[169] Tracey Tully, *Why Trump's Push to Kill Congestion Pricing Might Fail*, N.Y. TIMES (Feb. 21, 2025), https://www.nytimes.com/2025/02/19/nyregion/trump-congestion-pricing.html.

[170] *Id.*

[171] Chris Dolmetsch, *New York's Congestion Pricing Plan Faces Another Legal Showdown*, BLOOMBERG (Feb. 24, 2025), https://www.bloomberg.com/news/articles/2025-02-24/new-york-s-congestion-pricing-plan-faces-another-legal-showdown.

[172] Paul H. Trice, *The President Picked the Right Fight, Wrong Method in the Battle over New York's Congestion Pricing*, WASH. POST (Mar. 24, 2025), https://www.washingtonpost.com/opinions/2025/03/24/trump-hochul-new-york-congestion-pricing/.

perceived, coming just three days before the then-deadline Defendants had set for the Program to cease tolling and, at a time when subway crime is at a historic low, as an attempt to gain leverage and "la[y] the groundwork for citing crime as a reason to ultimately withhold federal money" from the MTA.[173]

185.     Significantly, Duffy's March 18 demand for information differed materially from a similar letter to the D.C. Metro system, Washington Metropolitan Area Transit Authority ("WMATA"), on March 6, 2025.   While the WMATA letter also requested subway safety information, it did not include the same threat of redirecting or withholding federal funding as in the letter to the MTA.   In his letter to the Chief Executive Officer of WMATA, Duffy similarly requested WMATA's plans to reduce crime and fare evasion and information about WMATA's budget, but stated only that WMATA "should target federal resources expeditiously and appropriately for" eligible federal crime prevention and security activities.

186.     On March 19, 2025, WMATA responded to Duffy with their crime statistics and their planned budget increases for additional safety-related investments.   Five days later, Duffy posted to X that he "appreciate[s] @wmata's response to our request and their commitment to

---

[173] James Barron, *The Subtext of a Trump Official's Letter to the M.T.A.*, N.Y. TIMES (Mar. 20, 2025), https://www.nytimes.com/2025/03/20/nyregion/trump-duffy-nyc-subway.html; *see also* Dick Brennan & Elijah Westbrook, *Transportation Secretary Threatens to Withhold Federal Funding from MTA Unless Agency Reduces Crime, Violence*, CBS NEWS (Mar. 19, 2025), https://www.cbsnews.com/newyork/news/mta-letter-transportation-secretary-sean-duffy/ ("While the letter says nothing about congestion pricing, it comes just days before the Trump administration's Friday deadline to end the tolling program."); Stefanos Chen, *U.S. Threatens to Cut Off M.T.A. Funds Over Subway Safety*, N.Y. TIMES (Mar. 18, 2025), https://www.nytimes.com/2025/03/18/nyregion/trump-mta-funding.html ("Mr. Duffy's letter did not mention congestion pricing, but transit experts and legal observers have said that the federal government might threaten to withdraw funding from other projects to gain leverage in its opposition to the toll.").

reducing transit crime," calling their commitments "good first steps to enhance safety for customers."



**Figure 14: Mar. 24, 2025 social media post to X by @SecDuffy**

187. Duffy's March 18 demand for information also differed materially from a letter he sent to Stephen J. Gardner, the Chief Executive Officer of Amtrak on March 6, 2025. While the Amtrak letter also emphasized the importance of addressing security and preventing crime at Washington Union Station, the letter did not request a response or levy any threats. Instead in his letter, Duffy simply stated that "[i]n the short term, Amtrak must work closely with [Union Station Redevelopment Corporation] to prioritize station projects that benefit all station users, including security, lighting, and other immediate improvements that support maintenance and beautification of the station," and in "[i]n the longer term, Amtrak must continue to coordinate with [Union Station Redevelopment Corporation], the Project sponsor for the Station Expansion Project." Thus, only the letter addressed to the MTA contained the threat that federal funding may be withheld.

188. On March 20, 2025, the day before the deadline Defendants had set for the Program to cease tolling, Duffy posted to X, without prior notice to Plaintiffs, an apparent warning that Defendants will illegally withhold federal funding from the State of New York (and, by implication,

from the MTA, TBTA, and NYSDOT), just as the Trump Administration has done recently in countless other recent cases, unless Plaintiffs agree to end the Program.  Disregarding the fact that the validity of the February 19 Letter is the subject of litigation before this Court, Duffy warned: "the federal government and @POTUS are putting New York on notice" that "refusal to end cordon pricing and your open disrespect towards the federal government is unacceptable."  Expressly drawing the connection between the current litigation and federal funding, he continued: "Know that the billions of dollars the federal government sends to New York are not a blank check. Continued noncompliance will not be taken lightly."  Finally, Duffy purported to grant Plaintiffs a "30-day extension" to cease tolling.



**Figure 2: Mar. 20, 2025 social media post to X by @SecDuffy**

189.    On March 20, 2025, Defendant Shepherd sent a letter to NYSDOT, NYCDOT, and MTA Bridges and Tunnels [TBTA] (the "March 20 Shepherd Letter" or "Mar. 20 Ltr."), **Exhibit E**, in which Shepherd notes her prior correspondence "providing you until March 21,

2025, to cease tolling operations that were initiated through the November 21, 2024, Value Pricing Pilot Program (VPPP) Agreement," states that Duffy "has directed that I extend the period of time to comply by 30 days," and instructs that "toll operations must cease by April 20, 2025." Mar. 20 Ltr.

190.    On March 23, 2025, Duffy gave an interview with Governor Murphy, in which Duffy described the New York subways system using an expletive, stating: "If you want people to take the train, to take transit, then make it safe, make it clean, make it beautiful, make it wonderful, don't make it a s--- h---, which is what she [Governor Hochul] has done."[174]

191.    On March 25, 2025, Duffy again took to X to threaten federal funding to the MTA in response to a letter from Governor Hochul, State Senate Majority Leader Andrea Stewart-Cousins, and State Assembly Speaker Carl Heastie proposing an update to the federal transit funding formula, which awards the MTA only 17% of transit funding, despite its carrying 43% of the nation's mass transit riders. Duffy described the proposal as "Outrageous!" and accused the State of "trying to fill the gap with highway funds and taxing the working class"—an apparent reference to the Program, which opponents often incorrectly refer to as a "tax"—rather than "actually fixing their financial mismanagement."[175] Using the same language from his March 20 X post demanding that New York end the Program, Duffy once again warned that "[t]he federal government is not a blank check."

---

[174] Larry Higgs, *U.S. Transportation Boss Trashes NYC Subway, Proposes a Fix*, NJ.com (Mar. 23, 2025), https://www.nj.com/news/2025/03/us-transportation-boss-trashes-nyc-subway-proposes-a-fix.html.

[175] Indeed, if the toll were a "tax," federal approval for tolling would not be required in the first place.



**Figure 3: Mar. 25, 2025 social media post to X by @SecDuffy**

192. On March 30, 2025 in a detailed, 22-page letter, attached hereto as **Exhibit I** ("MTA Resp."), the MTA provided the requested information on subway crime to Duffy showing that the MTA operates one of the safest transit systems in America, that crime in the NYC subway system is among the lowest it has been in the last 30 years, and that the MTA has committed more than 20 times the minimum requirement in safety grant standards to keeping the system safe. MTA Resp. at 9-11. The MTA's response explained in detail that felonies in the subway system have fallen over the last 30 years, with a 79% decrease in robberies and a 67% decrease in grand larcenies. *Id.* at 10-11. In the first two months of 2025, crime was 47% lower in the subway system than in the first two months of 2020 before COVID-19. *Id.* at 10. The MTA also highlighted that felony assaults were down 7% in the first two months of 2025 compared to the same time frame in 2024, but acknowledged that this was up 11% from the first two months in

2020. *Id.* at 2, 11. The MTA further explained that this increase in felony assaults in recent years is driven by three causes: (1) "increased enforcement of fare compliance and quality-of-life offenses," which is correlated with "increased [felony] assaults on NYPD officers who are patrolling the system in larger numbers," *id.* at 11; (2) the "MTA's ongoing and successful efforts over the last 20 years to amend the NYS Penal Law to classify aggressions committed against transit workers as felonies," *id.* at 6; and (3) enhanced public safety campaigns, which are associated with "higher rates of reporting," *id.* at 11. Over just the last two years, total arrests in the subway system were up 158%, significantly outpacing the increase in assaults, which were up by 4% from 2022 to 2024, even as the overall number of felonies continued to fall.

193. Despite the fact that the MTA is a safer transit system than WMATA, as WMATA riders are 3 times more likely than New York City transit riders to be victims of assaults on a per trip basis, *see id.* at 2, Duffy has not issued a post, as he did in response to WMATA, to commend the MTA for their commitment to safety. Instead, the day after receiving the MTA's response letter, Duffy posted to X that "[f]elony transit assaults on NYC subways are up 56% from 2019." This comment completely misrepresented the safety information provided by the MTA and disregards the MTA's explanation that more felonies are being reported because of additional policing measures and increased legal protections for subway and bus employees. Specifically, as MTA explained in its response to Duffy, the increase in felony assaults is largely a result of the pattern of increased assaults on NYPD officers as those officers have been patrolling the system in greater numbers and enforcing quality-of-life offenses; amendments to the New York State Penal Law to provide greater protections to transit workers from assault; and enhanced public safety awareness campaigns. *Id.* at 6, 11.



**Figure 15: Mar. 31, 2025 social media post to X by @SecDuffy**

194.    On April 4, 2025, Duffy invited members of the press to join him on the New York subway system and attempted to draw a connection between congestion pricing and subway crime, notwithstanding that subway crime is at a historic low and the two issues bear little relation. Specifically, Duffy stated: "If they're going to charge people to drive on roads, they need to offer a better, safer subway system."[176]  He also claimed: "The governor is forcing people into the train system, into the MTA, because she's priced them out of using these roads.  That's fundamentally unfair."

195.    On April 15, 2025, Duffy came across a violent incident while visiting the WMATA subway system involving a police officer who had been stabbed in the face by a man attempting to fare evade.[177]  Notably, while Duffy's statements after the event discussed the general need to "re-secure our transit systems" and address crime, he stopped short of directly criticizing the WMATA for the incident.  This treatment of the WMATA—which is less safe as a system than the MTA—stands in contrast to Duffy's frequent and harsh criticisms of the MTA,

---

[176] Linda Schmidt, *Transportation Secretary Rides NYC Subway, Calls Conditions Unsafe as Federal Funding Hangs in the Balance*, Fox 5 (Apr. 4, 2025), https://www.fox5ny.com/news/transportation-secretary-rides-nyc-subway-calls-conditions-unsafe-federal-funding-hangs-balance.

[177] Andrea Margolis, *DC Transit Police Officer Stabbed at Train Station as Sec. Sean Duffy Arrives to Talk Safety*, FOX NEWS (Apr. 15, 2025), https://www.foxnews.com/us/dc-transit-police-officer-stabbed-train-station-sec-sean-duffy-arrives-talk-safety.

which he described as a "s--- h---" just days earlier, further emphasizing that Duffy's alleged concerns for subways safety are merely a pretext for pressuring Plaintiffs to stop the Program.

**J.   Defendants threaten Plaintiffs with unlawful "compliance measures" to begin on May 28, 2025, if the Program does not cease operation**

196.   On April 18, the MTA, TBTA, NYSDOT, and NYCDOT filed their 111-page consolidated first amended complaint, setting out in detail the many reasons why the February 19 Letter's legal rationales for seeking to terminate the VPPP Agreement are without merit, and alleging that the purported rescission is invalid and based on transparently pretextual reasoning.

197.   Three days later, on April 21, Duffy sent the April 21 Letter, attached hereto as **Exhibit J**, to Governor Hochul demanding for a third time that the Program end.

198.   At the outset, the April 21 Letter affirmed Defendants' position that the VPPP Agreement had been "terminated" by the February 19 Letter. *Id.* at 1.  Seemingly recognizing the weaknesses in the February 19 Letter's legal rationales, however, Duffy attempted to recast that letter's reasoning, claiming without any support that the February 19 Letter also rests on several newfound policy rationales, including that the Program "imposes a disproportionate financial hardship on low and medium-income hardworking American drivers for the benefit of high-income drivers," and that "[h]ighway users whose taxes already paid for the Federal-aid highways in the cordon area are now being forced to pay again while received no new highway benefits in return because there are no toll-free alternative routes available to access the cordoned-off area of Manhattan." *Id.* at 2-3.  The February 19 Letter does not address Defendants' own extensive findings that congestion pricing would benefit low- and medium-income drivers, including by facilitating mass transit opportunities and reducing congestion on the roads.

199.   The April 21 Letter threatens that Defendants "*will* implement appropriate initial compliance measures" on or after May 28, 2025 if New York continues to operate the Program,

citing 23 C.F.R. § 1.36, a regulation enacted pursuant to the FAHA that sets forth FHWA's potential enforcement mechanisms to ensure compliance with the law. *Id.* at 2 (emphasis added). The threatened "compliance measures" include: (1) "no further advance construction ('AC') authorizations," (2) "no further [NEPA] approvals," (3) "no further approvals of Statewide Transportation Improvement Program ('STIP') amendments concerning New York Metropolitan Transportation Council TIP modifications," and (4) "no further obligations of FHWA funds (both formula and competitive) for projects within New York City." The April 21 Letter then states that "if New York's noncompliance continues," FHWA may impose additional measures including "no further obligations of FHWA funds (both formula and competitive)."

200.    The April 21 Letter states that no funding will be withheld for projects "determined by FHWA to be essentially for safety" including projects "under the National Highway Performance Program, Bridge Formula Program, and Highway Safety Improvement Program" but does not clarify what process Defendants will use to determine whether a project is "determined" to "be essential for safety."

201.    The threatened enforcement measures would deprive Plaintiffs of access to federal transportation funds, or to initiate any new projects, shutting down investment in the nation's largest city. And they would similarly deprive NYSDOT and NYCDOT of funding for vital projects. The incredibly broad scope of the coercive threats to halt reviews needed for all projects and funding within FHWA's purview, including billions of dollars' worth of funding for transit projects currently proposed for addition to New York's STIP, unless the Program is brought to a stop.

202.    The April 21 Letter also directs Plaintiffs to "address the policy concerns expressed in my February 19, 2025 letter," even though the February 19 Letter articulated only legal

rationales for terminating the VPPP Agreement.  *Compare* Feb. 19 Ltr. at 3 *with* April 21 Letter at 2-3.

203.   Defendants have left no doubt that they intend to impose "compliance measures" on May 28 if Plaintiffs do not end congestion pricing—regardless of the outcome of this lawsuit. On April 24, a spokesperson for the USDOT stated, "if New York doesn't shut it down, the Department of Transportation is considering halting projects and funding for the [S]tate."[178]

204.   On April 29, Duffy took to TV to criticize the Program, telling the hosts of *Good Day New York* that if Plaintiffs do not "treat those who want to come into Manhattan fairly, maybe we should look at how much money we send the City.  And that's what the Governor [of New York] is going to have to grapple with."[179]  That same day, counsel for Plaintiffs requested that Defendants agree not to take any enforcement action or postpone the April 21 Letter's deadlines. Defendants responded by reiterating the threat of coercion, while trying to deny the Court any ability to review the legality of that threat, claiming that the termination and schedule for "compliance measures" remain in place but that administrative proceedings are ongoing and preclude judicial recourse.  ECF 73.

## K.   The MTA, TBTA, and the Region's Economy and Public Transit System Will be Irreparably Harmed if Plaintiffs are Forced to End the Program

205.   TBTA budgeted over $500 million to establish the Program, and much of the budget was expended in advance of implementation.  These expenditures included developing the methodological approach; conducting the assessment and extensive outreach and developing the final documentation for the environmental review process under NEPA; design, development,

---

[178] Peter Senzamici, *Feds Accidentally upload internal memo admitting plan to kill NYC congestion pricing is 'very unlikely' to succeed – before quickly deleting it,* N.Y. POST, April 24, 2025, https://nypost.com/2025/04/24/us-news/fed-lawyers-cast-doubt-on-duffys-dubious-congestion-kill/.

[179] Good Day New York, WNYW-NY (FOX), Apr. 29, 2025), https://mms.tveyes.com/PlaybackPortal.aspx?SavedEditID=ab76562d-0726-4d6b-bcc4-f28ef11d100b.

implementation and testing of the roadway infrastructure and system; design, development, implementation and testing of the Back Office System; additional extensive outreach for the State administrative review process; staff costs, including new staff for the Program; and consulting costs.

206.    If TBTA is unlawfully prevented from proceeding with the Program, it will incur roughly $12 million in additional expenditures per month, most of which would be related to a combination of the operations and maintenance of the roadside tolling system, the operations of the back-office system and Customer Contact Center, and consultant costs.  This figure does not include the costs related to additional staff that were brought on specifically for the Program nor other costs, such as those related to outreach and advertising and assessments to be undertaken for the Program.  These costs cannot be deferred pending litigation over the legality of the February 19 Letter.

207.    Any pause in the Program would also cause TBTA to lose estimated monthly revenues in the first phase of the Program of over $40 million, based on projected net annual revenues of roughly $500 million during that period.

208.    Furthermore, a pause in the Program would result in increased traffic and congestion, which will lengthen travel times for bus operations and reduce public transit ridership.

209.    Stopping the Program would also prevent the MTA, the end recipient of Program revenues, from proceeding with vitally important work under the Capital Program, which is intended to ensure that improvements put in place will be sustainable for years to come.  The Capital Program identifies $52 billion of critical investments in the region's subways, buses, and commuter railroads, nearly one-third of which would be supported by the Program.

210.   New York's economy, and therefore the nation's economy, depends on keeping New York moving.  In practical terms, that means funding the Capital Program, which is much needed and cannot be further delayed.  As Janno Lieber, the MTA Chair and CEO, explained: "Concrete and steel, you poke holes in it, subject it to water and chemicals and salt for 100 years, it's going to give out."  The reason the State's elected representatives chose Congestion Pricing was, again, because it is simply the best solution to promote speed and convenience in the nation's (and North America's) largest transportation system.

211.   Critical parts of the Capital Program would be delayed if Program tolling revenues are halted.  The Capital Program includes: (1) adding accessibility improvements (including elevators) to numerous subway stations consistent with the Americans with Disabilities Act, by making at least 70 more subway systems accessible through building new elevators at 70 stations in all of the boroughs and replacing up to 65 escalators and 78 elevators, and finally bringing the transportation system to greater than 50% accessibility; (2) improving outdated signaling, by doubling the number of track lines with modernized signals; (3) purchasing over 1,900 new rail cars, which are six times more reliable than older ones, and replacing 2,400 buses; (4) replacing approximately 60 miles of track; and (5) renewing stations and addressing critical repair projects at 175 stations.

212.   The Capital Program will also provide much-needed repairs to Grand Central Terminal, a more than 100-year-old structure that is used by more than 700 trains a day.  And coupled with funding from the 2015-2019 program, the Capital Program further provides funding for three new fully accessible stations on the Second Avenue Subway that would allow connection to the Metro-North lines, strengthening connections for Harlem and East Harlem residents.

213.   New Yorkers, through the Capital Program, will also receive better access to Penn

Station through a new route with four new stations on the Metro-North New Haven Line that will carry up to 50,000 Metro-North customers directly to Penn Station every day.

214.    TBTA has incurred debt that it will rely on Program revenues to repay.  This includes $378.8 million in short-term notes that were previously issued and currently outstanding to fund infrastructure costs and $500 million in short-term notes to fund a portion of the $15 billion of capital projects in the MTA's Capital Program.

215.    Finally, ending the Program means making life worse for millions of New Yorkers through a return to severe congestion in the CBD, with its concomitant economic, environmental, and public health and safety costs to businesses, residents, commuters, workers, and visitors in this area, without any evaluation of these and other environmental impacts, opportunity for public participation, or consideration of alternatives required by NEPA.

216.    Plaintiffs will continue to operate the Program as required by New York law unless and until Plaintiffs are directed to stop by a court order.

217.    Based on the foregoing, there is an actual controversy within the jurisdiction of this Court under 28 U.S.C. §§ 2201 and 2202.

## CAUSES OF ACTION

### COUNT I
### Termination of the VPPP Agreement
### Violation of the Administrative Procedure Act
### (Substantively Arbitrary & Capricious – In Excess of Statutory Authority)
(5 U.S.C. § 701 *et seq.*)

218.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

219.    The acts of all executive branch officers "must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to

grant relief." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902).

220. Further, under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be … contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(B)-(C).

221. Defendants are not authorized by any law—statutory or constitutional—to unilaterally terminate the VPPP Agreement. The VPPP Agreement is a valid agreement, currently in effect, supported by consideration, and subject to considerable reliance interests. Neither ISTEA nor the VPPP Agreement authorizes FHWA to unilaterally rescind the VPPP Agreement, which confers federal tolling authority under Section 1012(b) of ISTEA, as amended.

222. ISTEA does not include any provision authorizing FHWA to terminate the VPPP Agreement. ISTEA authorizes the Secretary to "enter into" agreements "to establish, maintain, and monitor" value pricing pilot programs. ISTEA § 1012(b). ISTEA further directs that the Secretary shall "monitor the effect of such programs for a period of at least 10 years." *Id.* at § 1012(b)(5).

223. The VPPP Agreement does not include any provision authorizing FHWA to terminate the agreement. Rather, the VPPP Agreement contemplates that only TBTA could unilaterally decide to discontinue the Program, requiring the Project Sponsors to "work with FHWA to return the Project to its original operating condition if TBTA decides to discontinue tolls on the Project." VPPP Agmt., cl. 11. The VPPP Agreement further provides that TBTA and NYCDOT shall "monitor and report on the project performance" for "a period of at least ten years or to the end of the life of the Project, whichever is sooner." *Id.*, cl. (8)(b).

224.     The VPPP Agreement references FHWA regulations at 23 C.F.R. Part 940 and 950. These regulations do not grant FHWA authority to unilaterally terminate the VPPP Agreement, and the FHWA has acted *ultra vires*.

225.     An executive officer acts *ultra vires* where it "deprives a contractor of a right expressly or impliedly granted by another statute." *Chamber of Com. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996).

226.     Defendants have deprived Plaintiffs of rights expressly and impliedly granted by ISTEA § 1012(b), which permits tolling of federally funded highways following approval of a VPPP Project.

227.     Defendants have no authority to terminate the VPPP Agreement or rescind TBTA's authority to operate the Program.  Therefore, Defendants have acted in excess of authority and the February 19 Letter is arbitrary and capricious and must be declared unlawful, vacated, and set aside.

**COUNT II**
**Termination of the VPPP Agreement**
**Violation of the Administrative Procedure Act**
**(Substantively Arbitrary & Capricious – Contrary to Law)**
(5 U.S.C. § 701 *et seq.*)

228.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

229.     The acts of all executive branch officers "must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief." *McAnnulty*, 187 U.S. at 108.

230.     Further, under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

231.     Defendants' purported basis to terminate the VPPP Agreement—broadly, that the Program "is not an eligible 'value pricing pilot program'" and thus "FHWA lacked statutory authority to approve" the Program, Feb. 19 Ltr. at 3—finds no support in the statutory text, legislative history, or FHWA's longstanding interpretation of the VPPP, and is "not in accordance with law."

232.     The February 19 Letter states two main rationales for Defendants' conclusion that the Program is not an eligible VPPP project.  First, without any analysis of the statutory text, legislative history, or FHWA's long history of endorsing cordon pricing as a value pricing strategy, Defendant Duffy summarily concludes that "no statute contemplates cordon pricing in a situation where tolls are inescapable."  *Id.*  Second, again without any analysis of the actual statute or its history, Duffy objects that "imposition of tolls under the [Program] appears to be driven primarily by the need to raise revenue for the Metropolitan Transit [sic] Authority (MTA) system as opposed to the need to reduce congestion."  *Id.*  Both rationales are incorrect as a matter of fact and law.

233.     Cordon pricing projects are authorized under the VPPP.  Specifically, the VPPP authorizes the Secretary of Transportation to enter into cooperative agreements with State and local governments to implement "value pricing pilot programs."  VPPP, cl. 1.  The statute does not define "value pricing pilot programs" or otherwise provide guidelines or restrictions on the kinds of projects that are eligible under the statute.  The legislative history reflects Congress's intent to authorize a variety of innovative projects, including those that use cordon-based tolling and "area-wide road pricing strategies."  And cordon-based or area-wide pricing projects have received federal funding pursuant to the VPPP, not to mention the tolling authority actually approved for the Program under the VPPP Agreement itself.

234.     Moreover, it is untrue that the primary driver of the Program is revenue generation. The record is clear that generation of revenue to improve public transit is complementary to the primary purpose of congestion reduction.

235.     In any event, raising revenue to fund the MTA's Capital Program is clearly authorized under the VPPP.  For one, the statutory text explicitly contemplates that State and local governments participating in VPPP projects would use toll revenues to fund other "projects eligible under such title," VPPP, cl. 3, which includes capital transit projects.  The statute also provides that the Secretary must periodically report on the effects that VPPP projects have on not only congestion but also "transit ridership … and availability of funds for transportation programs." *Id.*, cl. 5.  Furthermore, the legislative history of ISTEA and the subsequent laws amending the VPPP confirms that Congress intended for State and local governments to consider revenue generation for mass transit projects in implementing VPPP projects and to be able to use revenues to improve transit services and systems.

236.     Defendants' rationales for purportedly terminating the VPPP Agreement are flatly contradicted by the factual record, the text of the VPPP, the legislative history of ISTEA, and FHWA's subsequent statements about and efforts to implement the VPPP and value pricing projects.  Therefore, Defendants have acted contrary to law and the February 19 Letter is arbitrary and capricious and must be declared unlawful, vacated, and set aside.  Any effort to enforce the February 19 Letter (including by implementing the "compliance measures" outlined in the April 21 Letter) is arbitrary and capricious, and must be enjoined, declared unlawful, vacated, and set aside.

**COUNT III**
**Termination of the VPPP Agreement**
**Violation of the Administrative Procedure Act**
**<u>(Procedurally Arbitrary & Capricious – Contrary to Regulations)</u>**
(5 U.S.C. § 701 *et seq.*)

237.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

238.     The VPPP Agreement is a cooperative agreement because "the principal purpose of the relationship is to transfer a thing of value" (authority to collect toll revenues) and "substantial [federal] involvement is expected."  31 U.S.C. § 6305; 2 C.F.R. § 200.1; *see also* VPPP, cl. 1 (authorizing Secretary to enter into "cooperative agreements" under the VPPP).  FHWA has determined that agreements authorizing projects that require tolling authority under the VPPP are cooperative agreements, even where such agreements do not include a federal funding component.  *See* FED. HIGHWAY ADMIN., *Congestion Pricing, Value Pricing Pilot Program* (May 17, 2024), https://ops.fhwa.dot.gov/congestionpricing/value_pricing ("The Moving Ahead for Progress in the 21st Century (MAP-21) Act did not authorize additional funds after FY2012 for the discretionary grant component of the Value Pricing Pilot Program (VPPP).  However, FHWA's ability to enter into cooperative agreements for projects that require tolling authority under this program for their implementation will continue.") (last accessed Feb. 12, 2025).

239.     FHWA cooperative agreements are governed by the Office of Management and Budget's agency-wide *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* ("Uniform Guidance"), 2 C.F.R. Part 200.  *See id.* § 1201.1. The Uniform Guidance sets out specific conditions under which  a cooperative agreement, *see id.* § 200.1, may be terminated:

        a.  by the agency if the recipient "fails to comply with the terms and conditions" of the award;

        b.  by the agency with the "consent" of the recipient;

        c.  by the recipient; and

        d.  by the agency "pursuant to the terms and conditions" of the award.

*Id.* § 200.340(a).

240.    None of the conditions in which termination is permitted under the Uniform Guidance are present here.  First, Duffy did not and cannot claim that the recipients have failed to comply with the terms of the conditions of the VPPP Agreement, and the recipients have in fact complied with the terms of the VPPP Agreement; second, the recipients did not and do not consent to termination of the VPPP Agreement; third, the recipients have not requested termination of the VPPP Agreement; and, fourth, the VPPP Agreement does not contain any provisions that would permit Defendants to terminate the agreement unilaterally.  Additionally, to the extent the VPPP Agreement contemplates termination by any party, it reflects that TBTA would be the one party which could "discontinue tolls on the Project."  VPPP Agmt., cl. 11.

241.    The Uniform Guidance describes specific steps that an agency must take before it may terminate an award for noncompliance, including providing written notice and an opportunity to be heard.  2 C.F.R. §§ 200.341(a), 342.[180]  FHWA did not provide the recipients with notice of its intent to terminate the VPPP Agreement and also has not provided notice to the recipients of any alleged noncompliance with the VPPP Agreement.  The recipients have not been provided with an opportunity to be heard or to appeal the termination.

242.    The Administration's action in terminating tolling authority under the VPPP Agreement contrary to the terms of the VPPP Agreement and the applicable regulations governing the administration of the VPPP Agreement was arbitrary, capricious, not in accordance with law, and without observance of procedure required by law, within the meaning of the APA, 5 U.S.C.

---

[180] *See also* U.S. DEP'T OF TRANSP., *Guide to Financial Assistance* at 72-77 (Oct. 2019), https://www.transportation.gov/sites/dot.gov/files/2023-10/DOT_Guide_to_Financial_Assistance_effective_January_1_2020.pdf (further describing requirements for pre-termination notice and appeals).

§ 706(2), and should be held unlawful and set aside by the Court.  Any effort to enforce the February

19 Letter (including by implementing the "compliance measures" outlined in the April 21 Letter)

is arbitrary and capricious, and must be enjoined, declared unlawful, vacated, and set aside.

**COUNT IV**
**Termination of the VPPP Agreement**
**Violation of the Administrative Procedure Act**
**(Substantively Arbitrary & Capricious – Insufficient Explanation)**
(5 U.S.C. § 701 *et seq.*)

243.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set

forth fully herein.

244.    At the time of Defendants' purported termination of the VPPP Agreement, FHWA

had issued the Final EA, FONSI, Reevaluation 1, and Reevaluation 2, and had executed the VPPP

Agreement authorizing tolling under the Program.

245.    FHWA's execution of the VPPP Agreement constituted final agency action with

respect to FHWA's decision to authorize tolling under the Program.

246.    Under the APA, an agency "changing its course" is "obligated to supply a reasoned

analysis for the change beyond that which may be required when an agency does not act in the first

instance."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29,

42 (1983).

247.    Defendants did not adequately explain their reasoning for purportedly rescinding

the VPPP Agreement, in violation of the APA.  *See Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92,

106 (2015) ("[T]he APA requires an agency to provide more substantial justification when 'its new

policy rests upon factual findings that contradict those which underlay its prior policy; or when its

prior policy has engendered serious reliance interests that must be taken into account.'") (quoting

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

248.     Defendants did not adequately examine or rely on relevant data in deciding to terminate the VPPP Agreement, in violation of the APA.  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (an agency "must examine the relevant data and articulate a satisfactory explanation for its action.").  The rationales given for rescinding the VPPP Agreement in the February 19 Letter, and for concluding that the VPPP does not authorize the Program, are incorrect, invalid, and directly contrary to the position of the FHWA for the past 34 years.

249.     Defendants failed to consider the impact on the economy, the environment, and congestion in the CBD in acting to terminate the tolling authority for the Program.  The Program will provide substantial benefits to the CBD and the region in terms of reduced traffic and congestion, improved air quality, and concomitant environmental, public health, and economic benefits resulting from shifting traffic patterns that occurred following the implementation of the Program.

250.     Defendants were obligated to consider the costs of ending the VPPP Agreement for Plaintiffs and for transit riders, people residing, working, learning and recreating in and around the CBD.  Defendants failed to do so, having made their decision without seeking input from Plaintiffs and without inquiring about the costs from congestion, pollution, and cessation of the Program in which TBTA has invested hundreds of millions of dollars to bring online.

251.     Defendants also failed to adequately consider whether "there was 'legitimate reliance' on the" FHWA's longstanding interpretation and use of the VPPP as an indispensable tool in efforts to address congestion, reduce pollution, and raise revenues to support public transit.  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (quoting *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996)).  The MTA, TBTA, and now holders of debt issued in reliance on Program revenues, have all relied on the executed VPPP Agreement.  The

February 19 Letter was arbitrary and capricious; where, as here, "an agency changes course … it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Id.* (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)).

252.     Instead, Defendants acted entirely based on political considerations.  Defendants had made no indication that they were reconsidering the Program until President Trump took office last month.  But President Trump has long indicated his desire to "kill" or terminate the Program, both in conversations with Republican lawmakers and in social media posts.  Defendants, bending under this political pressure, did not undertake any analysis or provide any explanation before revoking their prior decision to enter into the VPPP Agreement and approve the Program.

253.     Defendants' action purporting to revoke tolling authority under the VPPP Agreement without providing sufficient explanation of their decision was therefore arbitrary, capricious, and not in accordance with law, and without observance of procedure required by law, within the meaning of the APA, 5 U.S.C. § 706(2), and should be held unlawful and set aside by the Court.   Any effort to enforce the February 19 Letter (including by implementing the "compliance measures" outlined in the April 21 Letter) is arbitrary and capricious, and must be enjoined, declared unlawful, vacated, and set aside.

**COUNT V**
**Termination of the VPPP Agreement**
**Violation of the Administrative Procedure Act**
**(Pretext)**
(5 U.S.C. § 701 *et seq.*; U.S. Const. amend. V, cl. 3)

254.     "[I]n order to permit meaningful judicial review, an agency must 'disclose the basis' of its action." *Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167-69 (1962)).   Here, "[s]everal points,

considered together, reveal a significant mismatch between the decision the Secretary made and the rationale he provided." *Dep't of Com.*, 588 U.S. at 783.

255.    President Trump made his intention to "TERMINATE" the Program clear as a candidate for office, *see supra* ¶ 155, and continued to reiterate his goal in statements after winning election, *see supra* ¶¶ 156-59.  While the reasons for the President's opposition to the Program have changed over time, he never expressed concern that the Program was unauthorized by the VPPP.

256.    The February 19 Letter states that Duffy, upon assuming office, was directed by President Trump to "review FHWA's approval of the [Program]" in light of the President's "concerns" about "the extent of the tolling" and "the significant burdens on the New York City residents, businesses, and area commuters (including those from New Jersey and Connecticut) who regularly use the highway network in the CBD tolling area."  Feb. 19 Ltr. at 1.

257.    Very shortly after receiving this directive from President Trump, Duffy purported to announce a dramatic change in USDOT and FHWA's longstanding interpretation of the VPPP in an informal opinion letter with little or no legal reasoning.  While Duffy claimed to rest his decision on purely legal rationales, the vast majority of his letter is spent reciting policy disagreements with the Program, *see supra* ¶ 163.  Likewise, Duffy's public statements have made abundantly clear that his true motivation for purporting to terminate the VPPP Agreement is political disagreement with the Program itself.

258.    Since then, Defendants have pressed forward with their openly political effort to end the Program by threatening to illegally withhold federal funding from the State of New York (and by implication, from Plaintiffs), and by raising clearly pretextual concerns about subway safety, at a time when subway crime is at historic lows.  *See supra* ¶¶ 182-93.  These actions further

reinforce that Defendants' goal from the start has been to end the Program, rather than interpret the text of the VPPP, and that Defendants worked backwards to attempt to conjure a legal rational with which to "TERMINATE" the Program.

259.    Duffy's reliance on questionable legal interpretations to justify his complete disregard for Plaintiffs' reliance interests—which would otherwise constrain the agency from abruptly terminating the VPPP Agreement and abandoning its long held interpretation of the VPPP—reinforces that Duffy's reasoning is pretextual, and intended to shield his true decisional process from judicial review.

260.    "Altogether, the evidence tells a story that does not match the explanation the Secretary gave for his decision." *Dep't of Com.*, 588 U.S. at 784.  The Administrative Procedure Act bars such pretextual decision-making: "The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public.  Accepting contrived reasons would defeat the purpose of the enterprise." *Id.* at 785.  The February 19 Letter's pretextual rationales violated Plaintiffs' rights under the APA and, in addition, violated the MTA, TBTA, and NYCDOT's rights under the Due Process Clause of the United States Constitution. Any effort to enforce the February 19 Letter (including by implementing the "compliance measures" outlined in the April 21 Letter) is arbitrary and capricious, not to mention unconstitutional, and must be enjoined, declared unlawful, vacated, and set aside.

### COUNT VI
### Termination of the VPPP Agreement
### <u>Violation of the Due Process Clause of the Fifth Amendment</u>
(U.S. Const. amend. V, cl. 3)

261.    Plaintiffs MTA, TBTA, and NYCDOT reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

262.     The Due Process Clause of the Fifth Amendment provides that "No person shall …
be deprived of life, liberty, or property, without due process of law."  U.S. CONST. amend. V, cl. 3.

263.     Upon the execution of the VPPP Agreement, Plaintiffs MTA, TBTA, and
NYCDOT had a property interest in the VPPP Agreement and in the authority granted by the VPPP
Agreement to implement tolls within the CBD for the Program.

264.     An agency's withdrawal of consent for public or private entities to engage in a
contract implicates a property interest protected by the Due Process Clause.  *See, e.g.*, *Toxco Inc.
v. Chu*, 724 F. Supp. 2d 16, 27-28 (D.D.C. 2010).  Defendants' unilateral termination of the VPPP
Agreement deprives Plaintiffs MTA, TBTA, and NYCDOT of a property interest contrary to law.

265.     Further, Plaintiffs MTA, TBTA, and NYCDOT's property interest in the Program
and its infrastructure "attain … constitutional status by virtue of the fact that they have been initially
recognized and protected by state law," here, the TMA, and further recognized in the VPPP
Agreement.  *Ralls Corp. v. Comm. on Foreign Inv.*, 758 F.3d 296, 315 (D.C. Cir. 2014) (quoting
*Paul v. Davis*, 424 U.S. 693, 710 (1976)).

266.     Unilateral termination of the VPPP Agreement does not afford Plaintiffs MTA,
TBTA, and NYCDOT the process they are entitled to under the VPPP Agreement, the relevant
regulations, and the United States Constitution.  Prior to terminating the VPPP Agreement,
Defendants did not provide Plaintiffs MTA, TBTA, and NYCDOT with notice and failed to give
Plaintiffs an opportunity to respond or be heard.

267.     In addition, the VPPP Agreement constitutes an agreement which cannot be
invalidated without due process in accordance with its terms.

268.     Defendants' actions violate the Due Process Clause of the Fifth Amendment by
depriving Plaintiffs MTA, TBTA, and NYCDOT without due process of their property interest in

the VPPP Agreement and the authority granted by the VPPP Agreement to implement tolls within the CBD for the Program.  Any effort to enforce the February 19 Letter (including by implementing the "compliance measures" outlined in the April 21 Letter) is unconstitutional, and must be enjoined, declared unlawful, vacated, and set aside.

### COUNT VII
### *Ultra Vires*
### Termination of the VPPP Agreement

269.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

270.    The acts of all executive branch officers "must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief." *McAnnulty*, 187 U.S. at 108.

271.    ISTEA does not authorize Defendants to unilaterally rescind a cooperative agreement entered into to authorize tolling under the VPPP, nor does the VPPP Agreement itself empower Defendants to terminate the agreement or rescind FHWA's approval of the Program.

272.    The February 19 Letter is *ultra vires* because it purports to unilaterally terminate the VPPP Agreement and rescind TBTA's authority to implement tolls under the VPPP for the Program without statutory authority and contrary to the applicable agency regulations and the terms of the VPPP Agreement.

273.    The February 19 Letter is *ultra vires* because rescission of the VPPP Agreement is not authorized under any provision of law.

274.    The February 19 Letter is *ultra vires* because the VPPP Agreement is a valid and binding agreement and the VPPP Agreement does not permit unilateral rescission by FHWA or any other governmental actor.

275.    In addition, an executive officer also acts *ultra vires* where it "deprives a contractor of a right expressly or impliedly granted by another statute." *Reich*, 74 F.3d at 1328.

276.    Defendants have deprived Plaintiffs of rights expressly and impliedly granted by ISTEA §1012(b), and thus acted *ultra vires*.  Any effort to enforce the February 19 Letter (including by implementing the "compliance measures" outlined in the April 21 Letter) is impermissible, and must be enjoined, declared unlawful, vacated, and set aside.

**COUNT VIII**
**Termination of the VPPP Agreement**
<u>**Violation of the National Environmental Policy Act and the Administrative Procedure Act**</u>
(42 U.S.C. § 4321 *et seq*.; 5 U.S.C. §§ 701–706)

277.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

278.    At the time of Defendants' purported termination of the VPPP Agreement, Defendants had issued the Final EA, FONSI, Reevaluation 1, and Reevaluation 2, and had executed the VPPP Agreement authorizing tolling under the Program.

279.    At the time of Defendants' purported termination of the VPPP Agreement, the NEPA process for the Program was complete, and there was no "major federal action" remaining to occur with respect to the Program.

280.    Defendants' purported termination of the VPPP Agreement constitutes a new final agency action under NEPA and the APA and a major federal action within the meaning of NEPA, 42 U.S.C. §§ 4332(C), 4336e(10).

281.    NEPA requires Defendants to prepare an EIS for any "major Federal action[] significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).

282.     To determine whether a "major federal action" will have a significant effect on "the quality of the human environment," Defendants may prepare an EA.  42 U.S.C. § 4336(b)(2); 23 C.F.R. § 771.119.

283.     If an agency determines that the proposed action will not have significant effects, accounting for mitigation, it can issue a FONSI. 42 U.S.C. § 4336(b)(2); 23 C.F.R. § 771.121.  If the EA reveals that there may be significant effects, an EIS is required.

284.     Either level of review requires public participation opportunities and consideration of alternatives to the proposed action.  *E.g.*, 42 U.S.C. § 4332(C)(iii), (F), (H); 23 C.F.R. § 771.119(b).

285.     Defendants failed to undertake *any* NEPA review of their decision to terminate the VPPP Agreement, much less an adequate environmental review that considered  environmental impacts of the proposed action.

286.     Defendants did not undertake any public participation with respect to their decision to terminate the VPPP Agreement, in contrast to the substantial public participation opportunities afforded prior to the adoption of the Final EA (including a 44-day public comment period) and FONSI (including a 30-day public availability period).

287.     Under NEPA and its implementing regulations, Defendants are required to take a hard look at the reasonably foreseeable social, economic, and environmental impacts of a proposed action and its alternatives.  42 U.S.C. § 4336; 23 C.F.R. § 771.119(b).

288.     Defendants failed to consider the full extent of the reasonably foreseeable impacts of seeking to terminate the Program, which will provide substantial benefits to the CBD and the region in terms of reduced traffic and congestion, improved air quality, and concomitant

environmental, public health, and economic benefits resulting from shifting traffic patterns that occurred following the implementation of the Program.

289.     Defendants failed to consider alternatives to terminating the program. 42 U.S.C. § 4332(C)(iii), (F), (H); 23 C.F.R. § 771.119(b).

290.     Defendants failed to consider or identify measures which might mitigate adverse environmental impacts, and incorporate measures necessary to mitigate adverse impacts into its action terminating the VPPP Agreement.  23 C.F.R. §§ 771.105(e), 771.119(b).

291.     Defendants' action in purportedly revoking tolling authority under the VPPP Agreement without conducting the required NEPA review was therefore arbitrary, capricious, not in accordance with law, and without observance of procedure required by law, within the meaning of the APA, 5 U.S.C. § 706(2), and should be held unlawful and set aside by the Court.  Any effort to enforce the February 19 Letter (including by implementing the "compliance measures" outlined in the April 21 Letter) is arbitrary and capricious, and must be enjoined, declared unlawful, vacated, and set aside.

## COUNT IX
### Withholding of Federal Funds
### Violation of the Spending Clause and Tenth Amendment
### (Const. art I; amend. X)

292.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

293.     The Spending Clause of the U.S. Constitution provides that Congress—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States . . . ."  U.S. Const. art. I, § 8, cl. 1.

294.     The Tenth Amendment of the U.S. Constitution provides that the "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const. amend. X.

295.     Arising from these provisions, there are at least three "general" restrictions on the use of the Spending Power to condition the receipt of federal funds.  *South Dakota v. Dole,* 483 U.S. 203, 207 (1987).

296.     First, "if Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously . . ., enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation.'  *Id.* (citing *Pennhurst State School & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).

297.     Second, conditions on federal grants may be illegitimate if they are unrelated "to the federal interest in particular national projects or programs."  *Id.*

298.     Third, "in some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which pressure turns into compulsion."  *Id.* at 211.

299.     Defendants, through the February 19 Letter and their subsequent efforts to enforce the letter, purport to impose a "retroactive" condition on receipt of federal highway funds.  The MTA, TBTA, NYSDOT, and NYCDOT did not have fair notice that implementing the Program would allow withholding of further highway funds or the imposition of other "compliance measures," including those detailed in the April 21 Letter.

300.     "Congress' power to legislate under the spending power is broad," but conditions on funding must be "unambiguous[]" and they cannot "surprise[] participating States with post acceptance or 'retroactive' conditions."  *Pennhurst*, 451 U.S. at 17, 25. Once a State has accepted funds pursuant to a federal spending program, the Federal government cannot alter the conditions

attached to those funds so significantly as to "accomplish[ ] a shift in kind, not merely degree." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583-84 (2012).

301.    Second, conditions must be "reasonably related to the purpose of the expenditure." *New York v. United States*, 505 U.S. 144, 172 (1992) (citing *Massachusetts v. United States*, 435 U.S. 444 (1978)).

302.    A condition that New York cannot operate the Program addresses a local issue unrelated to the general provision of Federal highway funds.

303.    Finally, "conditions [on receipt of funds]" that "take the form of threats to terminate other significant independent grants" are properly "viewed as a means of pressuring the States to accept policy changes." *Sebelius*, 567 U.S. at 580.

304.    The April 21 Letter threatens to withhold approval or otherwise restrict the MTA, TBTA, NYSDOT, and NYCDOT's ability to obtain federal funding that they would otherwise have access to.

305.    By requiring that MTA, TBTA, NYSDOT, and NYCDOT rescind the Program and nullify the TMA under threat of removing or significantly curtailing their long-held interests in receipt of federal highway funds and to seek approvals for new projects, Defendants are commandeering Plaintiffs and their employees as agents of the federal government's regulatory scheme at the agencies' own cost.  The order interferes in New York State's sovereignty in violation of the Tenth Amendment and the constitutional principles of federalism on which this Nation was founded.

306.    As in *Sebelius*, here a directive that the "the Secretary . . . may declare that 'further payments will not be made to the State'" unless the TMA is invalidated and the Program ceased, constitutes "a gun to the head." *Id.* at 581.

307.     The April 21 Letter purports to alter the terms upon which federal monies were committed and disbursed contrary to law.  These alterations are coercive, retroactive, ambiguous, and unrelated to the purpose of the myriad grants affected.

308.     The remedy these constitutional violations is "to preclude the Federal Government from imposing such a sanction."  *Id.* at 588.  The Court should enjoin and set aside the February 19 Letter as unconstitutional and contrary to law.  Any effort to enforce the February 19 Letter (including by implementing the "compliance measures" outlined in the April 21 Letter) is arbitrary and capricious, and must be enjoined, declared unlawful, vacated, and set aside.

**COUNT X**
**Withholding of Federal Funds**
**Violation of the Separation of Powers – Usurping the Legislative Function**
(42 U.S.C. § 4321 *et seq.*; 5 U.S.C. §§ 701–706)

309.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

310.     The Constitution "grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018); *see* U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause).

311.     Congress also possesses the exclusive power to legislate.  Article I, Section 1 of the Constitution states that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives."  U.S. Const. art. I, § 1; *see also Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

312.     Consistent with these principles, the Executive acts at the lowest ebb of its constitutional authority and power when the President acts contrary to the will of Congress by

116

attempting to unilaterally decline to spend appropriated funds. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-38 (1952) (Jackson, J., concurring).

313. The April 21 Letter violates the separation of powers because the executive branch purports to override the careful judgments of Congress by among other things disregarding relevant statutory provisions and refusing to disburse funding for innumerable federal grant programs.

314. The Court should enjoin and set aside the February 19 Letter as unconstitutional and contrary to law. Any effort to enforce the February 19 Letter (including by implementing the "compliance measures" outlined in the April 21 Letter) is arbitrary and capricious, and must be enjoined, declared unlawful, vacated, and set aside.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

i. Declare that Defendants' purported termination of the VPPP Agreement and rescission of tolling authority under the VPPP was undertaken in violation of the terms of the VPPP Agreement and in excess of statutory authority; arbitrary and capricious in violation of the APA; without observance of procedure required by law and regulation in violation of the APA; based on a pretextual rational in violation of the APA; in violation of Plaintiffs the MTA, TBTA, and NYCDOT's Fifth Amendment right to Due Process; *ultra vires*; and in violation of NEPA;

ii. Declare the February 19 Letter, the February 20 Shepherd Letter, and the March 20 Shepherd Letter null, void, and of no effect, and vacate each letter;

iii. Declare that any effort to enforce the February 19 Letter, including but not limited to the "compliance measures" detailed in the April 21 Letter, are unlawful, and are null, void, and of no effect, and vacate any such effort;

iv. Pursuant to 5 U.S.C. § 705, postpone the effective date of the March 20 Shepherd Letter, the April 21 Letter, and any other agency action purporting to enforce or implement the February 19 Letter, so as to preserve the *status quo* and the rights of Plaintiffs;

v. Grant any further necessary and proper relief pursuant to 28 U.S.C. § 2202;

vi. Enjoin Defendants from enforcing the February 19 Letter, the February 20

Shepherd Letter, the March 20 Shepherd Letter, the April 21 Letter, from taking any further agency actions founded on those documents, or from withdrawing, cancelling, delaying, rescinding, or withholding any appropriated, authorized, obligated, committed, and/or otherwise due federal funding from Plaintiffs in retaliation for commencing this action or for continuing to operate the Program;

vii.   Enjoin Defendants from withdrawing, cancelling, delaying, rescinding, or withholding any appropriated, authorized, obligated, committed, and/or otherwise due federal funding from Plaintiffs in the absence of constitutional and statutory authority and in compliance with applicable law and procedure;

viii.   Award Plaintiffs their costs for the action, including reasonable attorneys' fees; and

ix.   Grant all such other and further relief as it deems just and proper.

Dated: May 6, 2025
        New York, New York

Respectfully submitted,

*/s/ Roberta A. Kaplan*
Roberta A. Kaplan
D. Brandon Trice
Maximilian T. Crema
KAPLAN MARTIN LLP
1133 Avenue of the Americas | Suite 1500
New York, NY 10036
Tel.: (212) 316-9500
rkaplan@kaplanmartin.com
btrice@kaplanmartin.com
mcrema@kaplanmartin.com

*/s/ Mark A. Chertok*
Mark A. Chertok
Elizabeth Knauer
Amy Lynn Cassidy
John F. Nelson
Phillip Dane Warren
SIVE, PAGET & RIESEL, P.C.
560 Lexington Avenue, 15th Floor
New York, NY 10022
Tel.: (212) 421-2150
mchertok@sprlaw.com
eknauer@sprlaw.com

acassidy@sprlaw.com
jnelson@sprlaw.com
dwarren@sprlaw.com

*Attorneys for Plaintiffs the Metropolitan Transportation Authority and Triborough Bridge and Tunnel Authority*

LETITIA JAMES
Attorney General of the State of New York

By: */s/ Andrew G. Frank*
Andrew G. Frank
Assistant Attorney General
N.Y.S. Attorney General's Office
28 Liberty Street
New York, New York 10005
Tel.: (212) 416-8271
Email: andrew.frank@ag.ny.gov

*Attorneys for Intervenor-Plaintiff the New York State Department of Transportation*

MURIEL GOODE-TRUFANT
Corporation Counsel of the City of New York

*/s/ Nathan Taylor*
Nathan Taylor
Christian C. Harned
New York City Law Department
100 Church Street
New York, NY 10007
Tel.: (212) 356-2315
Email: ntaylor@law.nyc.gov
chharned@law.nyc.gov

*Attorneys for Intervenor-Plaintiff New York City Department of Transportation*