THIS AGREEMENT ("Agreement"), made and entered into this 21st day of
_____November_____, 2024, by and among the FEDERAL HIGHWAY
ADMINISTRATION, UNITED STATES DEPARTMENT OF TRANSPORTATION,
(hereinafter referred to as "FHWA") and the NEW YORK STATE DEPARTMENT OF
TRANSPORTATION, an agency of the State of New York, Triborough Bridge and
Tunnel Authority, and New York City Department of Transportation, (hereinafter
referred to as "NYSDOT, TBTA, and NYCDOT ").

WITNESSETH:

WHEREAS, section 1012(b) of the Intermodal Surface Transportation Efficiency Act of
1991 (ISTEA), Public Law 102-240, as amended by section 1216(a) of the Transportation
Equity Act for the 21st Century (TEA-21), and section 1604 (a) of the Safe, Accountable,
Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA- LU), Pub.
L. 109-59 (August 10, 2005) establishes the Value Pricing Pilot Program, hereinafter
referred to as the "pilot program," and permits the FHWA to allow the collection of tolls
as part of the value pricing pilot program established under Section 1012(b); and

WHEREAS, Section 1012(b) of ISTEA, as amended, authorizes the Secretary of
Transportation to enter into cooperative agreements with as many as fifteen (15) State or
local governments or public authorities to establish, maintain, and monitor value pricing
programs, or projects; and

WHEREAS, NYSDOT, through the execution of cooperative agreements for prior value
pricing projects, is one of the fifteen participants in the pilot program; and

WHEREAS, NYSDOT has requested that the FHWA enter into an  agreement with
NYSDOT, TBTA, and NYCDOT related to establishing, maintaining, and monitoring a
value pricing project, known as the Central Business District Tolling Program (CBDTP)
(hereinafter referred to as the "Project"), as part of NYSDOT's participation in the value
pricing pilot program; and

WHEREAS, as part of the CBDTP value pricing pilot program, TBTA intends to toll an
area which includes portions of highway facilities that have been constructed,
reconstructed, rehabilitated, restored, resurfaced or maintained with title 23 funds as
described in Attachment A, and made part of this agreement; and

WHEREAS, the FHWA has determined that this Agreement is necessary to oversee and
administer the collection of tolls pursuant to Section 1012(b)(4) of ISTEA, as amended;
and

WHEREAS, Section 1012(b) of ISTEA, as amended requires that all revenues received
from the operation of a value pricing project be applied only toward the project's
operating costs (including project implementation costs; mitigation measures to deal with
adverse financial effects on low-income drivers; the proper maintenance of the Project;

any reconstruction, rehabilitation, restoration, or resurfacing of the Project; any debt service incurred in implementing the project; a reasonable return on investment of any private person financing the project), and other projects eligible for assistance under title 23, United States Code; and

WHEREAS, this Agreement is neither intended to, nor shall it, result in the independent participation by TBTA and NYCDOT in the value pricing pilot program, it being expressly understood that TBTA's and NYCDOT's participation in the value pricing pilot project approved in this Agreement is (i) derivative of and only exists through NYSDOT's participation in the value pricing pilot program and (ii) limited to the Project; and

NOW THEREFORE, in consideration of the premises and mutual undertakings of the parties, and in conformity with all applicable laws, the NYSDOT, TBTA, NYCDOT, and FHWA hereby agree as follows:

(1)    The FHWA agrees that TBTA may operate the Project as a toll Project in accordance with the provisions of this Agreement and as a value pricing project, as part of NYSDOT's  value pricing pilot program.

(2)    Pursuant to Section 1012(b) of ISTEA, as amended, TBTA will use all toll revenues received from the operation of the Project for the operating costs of the project as described in attachment A (including project implementation costs; mitigation measures to deal with adverse financial effects on low-income drivers; the proper maintenance of the Project; any reconstruction, rehabilitation, restoration, or resurfacing of the Project; any debt service incurred in implementing the project; a reasonable return on investment of any private person financing the project), and any other projects eligible for assistance under title 23, United States Code.

(3)    The toll rates applicable to the Project will vary as described in Attachment A. and in accordance with Section 1012(b) of ISTEA, as amended including Sec. 1012(b)(6) - HOV Passenger Requirements. Notwithstanding section 102(a) of title 23, United States Code, a State may permit vehicles with fewer than 2 occupants to operate in high occupancy vehicle lanes if the vehicles are part of a value pricing pilot program under this section. Sec. 1012(b)(7) - Financial Effects on Low-Income Drivers – Any value pricing pilot program under this subsection shall include, if appropriate, an analysis of the potential effects of the pilot program on low-income drivers and may include mitigation measures to deal with any potential adverse financial effects on low-income drivers.

(4)    TBTA shall conduct or have an independent auditor conduct an annual audit of toll Project records to verify compliance with use of revenues and report the results of the audits to FHWA.

DOT_0047550

(5)     As of the date of the execution of this Agreement, the imposition of tolls under this Agreement does not render Federal-aid highways within the State of New York generally ineligible for Federal-aid highway funds where such highways are otherwise eligible under the particular funding program.

(6)     NYSDOT, TBTA, and NYCDOT, as applicable, will continue to adequately maintain or cause to be adequately maintained, the highway facilities that have been constructed, reconstructed, rehabilitated, restored, or resurfaced or maintained with title 23 funds located in the Project.

(7)     That TBTA agrees, upon reasonable notice, to make all of its records pertaining to the Project subject to audit by the FHWA. TBTA agrees to annually audit the records of the Project for compliance with the provisions of this Agreement and report the results thereof to FHWA. In lieu of the TBTA performing said audit, a report of the New York State Comptroller or an independent auditor furnished to FHWA may satisfy the requirements of this section.

(8)     Effective on the date of this Agreement, the project is approved as a pilot program, and the following requirements shall apply:

   a. In order to carry out Section 1012(b)(5) of ISTEA, as amended, the FHWA and NYSDOT, TBTA and NYCDOT will cooperate and work together in the implementation of the Project.

   b. That TBTA and NYCDOT, as applicable, shall monitor and report on the project performance (Attachment B) from the date of implementation for a period of at least ten years or to the end of the life of the Project, whichever is sooner, to evaluate the effects on driver behavior, traffic volume, congestion, transit ridership, air quality, and availability of funds for transportation programs. Reports begin one year after the operation date and every two years thereafter.

   c. That TBTA and NYCDOT will identify benefits the application of tolls has in reducing climate pollution.

   d. That TBTA and NYCDOT will demonstrate the benefits mitigation measures provide to underserved communities.

(9)     That NYSDOT, TBTA and NYCDOT agree to comply with all Federal laws and requirements applicable to this project, including the laws and policies applicable to the Value Pricing Pilot Program. Such laws and requirements include, but are not limited to Section 1012(b) of ISTEA, as amended, the guidance implementing Section 1012(b) of ISTEA, and 23 CFR Part 940 and 950.

DOT_0047551

(10) TBTA, through NYSDOT, agrees to provide FHWA notice of any proposed changes to the toll structure other than the phases set forth in Attachment A, a minimum of 60 days before such changes go into effect. Any such changes must be eligible pursuant to the VPPP enacted by section 1012(b) of the Intermodal Surface Transportation Efficiency Act of 1991 (ISTEA), Public Law 102-240, as amended by section 1216(a) of the Transportation Equity Act for the 21st Century (TEA-21), and section 1604 (a) of the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA- LU), Pub. L. 109-59 (August 10, 2005).

(11) That NYSDOT, TBTA and NYCDOT agree they will work with FHWA to return the Project to its original operating condition if TBTA decides to discontinue tolls on the Project.

(12) That this Agreement will be prepared in quadruplicate originals so that each signatory will have a signed Agreement. This Agreement may be signed in counterparts, each of which shall be deemed an original and taken together shall constitute one and the same agreement.


IN WITNESS THEREOF, the parties hereto have caused this instrument to be duly executed, the day and year first written above.

STATE OF NEW YORK DEPARTMENT OF
TRANSPORTATION

BY: _Marie Therese Dominguez_

Title: Commissioner

TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY

BY: _____
       Catherine T. Sheridan
Title: President _____


NEW YORK CITY DEPARTMENT OF TRANSPORTATION

BY: _____
       Ydanis Rodriguez
Title: Commissioner _____

DOT_0047552

FEDERAL HIGHWAY ADMINISTRATION
UNITED STATES DEPARTMENT OF TRANSPORTATION

BY: _____

Title: Executive Director


ATTACHMENT A – Project Description
ATTACHMENT B – Performance Metrics

DOT_0047553

**Attachment A**

**Project Description**

The CBD Tolling Program will implement a vehicular tolling program to reduce traffic congestion in the Manhattan Central Business District ("CBD"), consistent with the MTA Reform and Traffic Mobility Act. Traffic congestion is expected to be reduced by disincentivizing use of vehicles within the CBD by imposition of tolls, and concurrently by investments in transit that will incentivize use of transit systems instead of driving. The project purpose is to reduce traffic congestion in the CBD in a manner that will generate revenue for future transportation improvements, pursuant to acceptance into FHWA's Value Pricing Pilot Program.

The CBD consists of the geographic area of Manhattan south and inclusive of 60th Street, but not including Franklin D. Roosevelt Drive ("FDR Drive"), West Side Highway/Route 9A, the Battery Park Underpass, and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West Street (the West Side Highway/Route 9A).

TBTA will toll vehicles entering the CBD via a cashless tolling system. The toll amount will be variable, with higher tolls charges during peak periods when congestion is greater. The toll will apply to all registered vehicles (i.e., those with license plates), with the exception of qualifying vehicles transporting persons with disabilities, qualifying authorized emergency vehicles, transit buses, and specialized government vehicles. Passenger vehicles will be tolled no more than once a day. Taxis and for-hire vehicles ("FHVs") will be tolled on a per-trip basis for rides carrying passengers occurring wholly or partially within the CBD.

The Project will use the same tolling infrastructure and tolling system equipment described and evaluated in the Final Environmental Assessment for the Project (the "Final EA").

The environmental commitments made in the Finding of No Significant Impact will be implemented as described in the Environmental Documents.

To address effects to low-income drivers, the Project will include a tax credit for CBD tolls paid by residents of the CBD whose New York adjusted gross income for the taxable year is less than $60,000. TBTA will coordinate with the New York State Department of Taxation and Finance to ensure availability of documentation needed for drivers eligible for the tax credit. In addition, the Project commits, for five years, to a Low-Income Discount Plan offering low-income frequent drivers a 50 percent discount on the full E-ZPass toll rate after the first 10 trips in each calendar month (excluding the overnight period, which will already be deeply discounted).

The toll amounts will be graduated over a six year period in accordance with the toll rate schedule below. Phase 1 will span 2025 through 2027, Phase 2 will span 2028 through 2030, and Phase 3 will commence in 2031.

6

## Toll Rate Schedule

| | | PHASE 1 2025-2027 | | PHASE 2 2028-2030 | | PHASE 3 starting 2031 | |
|---|---|---|---|---|---|---|---|
| | | CBD ENTRY CHARGE | TUNNEL CROSSING CREDIT | CBD ENTRY CHARGE | TUNNEL CROSSING CREDIT | CBD ENTRY CHARGE | TUNNEL CROSSING CREDIT |
| **a** | **E-ZPass Customers** | | | | | | |
| | **VEHICLE CLASSIFICATION** | | | | | | |
| 1 | Passenger and other vehicles, including sedans, sport utility vehicles, station wagons, hearses, limousines, pickup trucks with factory beds, pickup trucks with caps below the roofline and not extending over the sides, and vans without an extended roof above the windshield | | | | | | |
| | Peak period (5am-9pm weekdays, 9am-9pm weekends) | $9.00 | | $12.00 | | $15.00 | |
| | Peak period for registered Low-Income Discount Plan participants using an eligible vehicle, 11th trip and trips thereafter in a calendar month (5am-9pm weekdays, 9am-9pm weekends) | $4.50 | | $6.00 | | $7.50 | |
| | Peak period per-trip credit (maximum daily credit $5.00) | | | | | | |
| | If entering the CBD via the Lincoln Tunnel or Holland Tunnel | | $3.00 | | $4.00 | | $5.00 |
| | If entering or exiting the CBD via the Queens-Midtown Tunnel or Hugh L. Carey Tunnel | | $1.50 | | $2.00 | | $2.50 |
| | Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $2.25 | | $3.00 | | $3.75 | |
| 2 | Single-unit trucks, including non-articulated trucks, pickup trucks with modified beds, vans with modified body behind the drivers cab, pickup trucks with caps above the roofline or extending over the sides, and vans with an extended roof above the windshield | | | | | | |
| | Peak period (5am-9pm weekdays, 9am-9pm weekends) | $14.40 | | $19.20 | | $24.00 | |
| | Peak period per-trip credit | | | | | | |
| | If entering the CBD via the Lincoln Tunnel or Holland Tunnel | | $7.20 | | $9.60 | | $12.00 |
| | If entering or exiting the CBD via the Queens-Midtown Tunnel or Hugh L. Carey Tunnel | | $3.60 | | $4.80 | | $6.00 |
| | Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $3.60 | | $4.80 | | $6.00 | |
| 3 | Multi-unit trucks, including articulated trucks where a power unit is carrying one or more trailers | | | | | | |
| | Peak period (5am-9pm weekdays, 9am-9pm weekends) | $21.60 | | $28.80 | | $36.00 | |
| | Peak period per-trip credit | | | | | | |
| | If entering the CBD via the Lincoln Tunnel or Holland Tunnel | | $12.00 | | $16.00 | | $20.00 |
| | If entering or exiting the CBD via the Queens-Midtown Tunnel or Hugh L. Carey Tunnel | | $6.00 | | $8.00 | | $10.00 |
| | Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $5.40 | | $7.20 | | $9.00 | |
| 4 | Buses, including vehicles registered with the DMV and plated as a bus, omnibus, or have other designated official plates | | | | | | |
| | Peak period (5am-9pm weekdays, 9am-9pm weekends) | $14.40 | | $19.20 | | $24.00 | |
| | Peak period per-trip credit | | | | | | |
| | If entering the CBD via the Lincoln Tunnel or Holland Tunnel | | $7.20 | | $9.60 | | $12.00 |
| | If entering or exiting the CBD via the Queens-Midtown Tunnel or Hugh L. Carey Tunnel | | $3.60 | | $4.80 | | $6.00 |
| | Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $3.60 | | $4.80 | | $6.00 | |
| | Licensed sightseeing buses | | | | | | |
| | Peak period (5am-9pm weekdays, 9am-9pm weekends) | $21.60 | | $28.80 | | $36.00 | |
| | Peak period per-trip credit | | | | | | |
| | If entering the CBD via the Lincoln Tunnel or Holland Tunnel | | $12.00 | | $16.00 | | $20.00 |
| | If entering or exiting the CBD via the Queens-Midtown Tunnel or Hugh L. Carey Tunnel | | $6.00 | | $8.00 | | $10.00 |
| | Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $5.40 | | $7.20 | | $9.00 | |
| 5 | Motorcycles | | | | | | |
| | Peak period (5am-9pm weekdays, 9am-9pm weekends) | $4.50 | | $6.00 | | $7.50 | |
| | Peak period per-trip credit | | | | | | |
| | If entering the CBD via the Lincoln Tunnel or Holland Tunnel | | $1.50 | | $2.00 | | $2.50 |
| | If entering or exiting the CBD via the Queens-Midtown Tunnel or Hugh L. Carey Tunnel | | $0.75 | | $1.00 | | $1.25 |
| | Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $1.05 | | $1.40 | | $1.75 | |

E-ZPass CBD entry charges are available subject to terms, conditions, and agreements established by the Authority.

The Authority reserves the right to determine whether any vehicle is of unusual or unconventional design, weight, or construction and therefore not within any of the listed categories. The Authority also reserves the right to determine the CBD charge for any such vehicle of unusual or unconventional design, weight, or construction. Any single unit vehicle identified as belonging to Classes 1, 2, or 5 will be up-classed to the next toll class when towing a trailer or another vehicle.

Daily toll cap of once per day for Class 1 and Class 5 vehicles. Caps for other vehicles are subject to change pursuant to the adaptive management approach to mitigating project effects, as committed to in the Final Environmental Assessment.

CBD entry charges and tunnel credits are subject to a variable percentage increase/decrease of up to 10% for up to one year after implementation pursuant to the adaptive management approach to mitigating project effects, as committed to in the Final Environmental Assessment.

The Low-Income Discount Plan shall continue for five years as committed to in the Final Environmental Assessment.

The Authority reserves the right to charge a 25% higher CBD charge during Gridlock Alert Days. Each year, the NYCDOT identifies Gridlock Alert Days during the UN General Assembly and throughout the holiday season when heavy traffic is expected in Manhattan. On Gridlock Alert Days, consider walking, biking, or taking mass transit for any trips in Manhattan.

Qualifying authorized emergency vehicles and qualifying vehicles transporting persons with disabilities are exempt pursuant to Vehicle and Traffic Law § 1704-a (2).

Qualifying authorized commuter buses and specialized government vehicles, as determined by the Authority, are exempt.

DOT_0047555

| TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY CENTRAL BUSINESS DISTRICT (CBD) CHARGES | | | | | | |
|---|---|---|---|---|---|---|
| | | PHASE 1 2025-2027 | | PHASE 2 2028-2030 | | PHASE 3 starting 2031 |
| b Customers Using Fare Media Other Than E-ZPass<br><br>VEHICLE CLASSIFICATION | | CBD ENTRY CHARGE | PER TRIP CHARGE PLAN* (TO/FROM/ WITHIN/ THROUGH CBD) | CBD ENTRY CHARGE | PER TRIP CHARGE PLAN* (TO/FROM/ WITHIN/ THROUGH CBD) | CBD ENTRY CHARGE | PER TRIP CHARGE PLAN* (TO/FROM/ WITHIN/ THROUGH CBD) |
| 1 | Passenger and other vehicles, including sedans, sport utility vehicles, station wagons, hearses, limousines, pickup trucks with factory beds, pickup trucks with caps below the roofline and not extending over the sides, and vans without an extended roof above the windshield | | | | | |
| | Peak period (5am-9pm weekdays, 9am-9pm weekends) | $13.50 | | $18.00 | | $22.50 |
| | Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $3.30 | | $4.40 | | $5.50 |
| 2 | Single-unit trucks, including non-articulated trucks, pickup trucks with modified beds, vans with modified body behind the drivers cab, pickup trucks with caps above the roofline or extending over the sides, and vans with an extended roof above the windshield | | | | | |
| | Peak period (5am-9pm weekdays, 9am-9pm weekends) | $21.60 | | $28.80 | | $36.00 |
| | Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $5.40 | | $7.20 | | $9.00 |
| 3 | Multi-unit trucks, including articulated trucks where a power unit is carrying one or more trailers | | | | | |
| | Peak period (5am-9pm weekdays, 9am-9pm weekends) | $32.40 | | $43.20 | | $54.00 |
| | Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $8.10 | | $10.80 | | $13.50 |
| 4 | Buses, including vehicles registered with the DMV and plated as a bus, omnibus, or have other designated official plates | | | | | |
| | Peak period (5am-9pm weekdays, 9am-9pm weekends) | $21.60 | | $28.80 | | $36.00 |
| | Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $5.40 | | $7.20 | | $9.00 |
| | Licensed sightseeing buses | | | | | |
| | Peak period (5am-9pm weekdays, 9am-9pm weekends) | $32.40 | | $43.20 | | $54.00 |
| | Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $8.10 | | $10.80 | | $13.50 |
| 5 | Motorcycles | | | | | |
| | Peak period (5am-9pm weekdays, 9am-9pm weekends) | $6.75 | | $9.00 | | $11.25 |
| | Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $1.65 | | $2.20 | | $2.75 |
| | NYC TLC taxis, green cabs, for-hire vehicles (FHVs) | | | | | |
| | Taxis, green cabs, and FHVs on trips | | $0.75 | | $1.00 | | $1.25 |
| | FHVs on trips dispatched by high-volume for-hire services (HVFHSs) | | $1.50 | | $2.00 | | $2.50 |

The Authority reserves the right to determine whether any vehicle is of unusual or unconventional design, weight, or construction and therefore not within any of the listed categories. The Authority also reserves the right to determine the CBD charge for any such vehicle of unusual or unconventional design, weight, or construction. Any single unit vehicle identified as belonging to Classes 1, 2, or 5 will be up-classed to the next toll class when towing a trailer or another vehicle.

Daily toll cap of once per day for Class 1 and Class 5 vehicles. Caps for non-passenger vehicles are subject to change pursuant to the adaptive management approach to mitigating project effects, as committed to in the Final Environmental Assessment.

NYC TLC taxi, green cab, and FHV tolls are to be paid by the passenger pursuant to Rules of City of NY Taxi & Limousine Commn (35 RCNY) §§ 58-26 (f), 59A-23 (b), 59D-17 (c).

CBD entry charges and per trip charges are subject to a variable percentage increase/decrease of up to 10% for up to one year after implementation pursuant to the adaptive management approach to mitigating project effects, as committed to in the Final Environmental Assessment.

The Authority reserves the right to charge a 25% higher CBD charge during Gridlock Alert Days. Each year, the NYCDOT identifies Gridlock Alert Days during the UN General Assembly and throughout the holiday season when heavy traffic is expected in Manhattan. On Gridlock Alert Days, consider walking, biking, or taking mass transit for any trips in Manhattan.

Qualifying authorized emergency vehicles and qualifying vehicles transporting persons with disabilities are exempt pursuant to Vehicle and Traffic Law § 1704-a (2).

Qualifying authorized commuter buses and specialized government vehicles, as determined by the Authority, are exempt.

*Subject to full execution of and in compliance with plan agreement by FHV bases and taxi technology system providers.

8

**ATTACHMENT B – Performance Metrics**

As developed in the Final EA and the Reevaluations for the Project dated June 2024 and November 2024, the performance metrics of the system for evaluating the effectiveness of the pilot program and managing congestion are related to reducing vehicles entering the CBD and reducing VMT within the CBD. For reference, the amount of congestion reduction within the CBD for the toll structure is as follows::

- Reduce daily vehicle miles traveled (VMT) within the Manhattan CBD by 6.4 percent (Phase 1) to 8.9 percent (Phase 3)
- Reduce the number of vehicles entering the Manhattan CBD by 13.4 percent (Phase 1) to 17 percent (Phase 3)

Another important factor for measuring congestion reduction in the CBD related to transit investment is transit ridership in the CBD.:

- Increase in transit use entering the CBD.

The program will be collecting a significant amount of data to assess, track, and trend the direct and indirect effects of the project. These data, which are described in the following bullets, will be made public on a regular basis in open data format to the greatest extent practicable.

**Direct Congestion Measures**
- Vehicle entries into the CBD (by type of vehicle, day of week, time of day)
- Historic volumes entering the CBD (average fall weekday/weekend, time of day)
- Taxi and FHV trips to, from, and within the CBD
- Taxi and FHV VMT within the CBD

**Indirect Congestion Measures**
- System-wide transit ridership for transit services providing CBD-related service (monthly total ridership by mode and transit operator)
- Metropolitan Transportation Authority bus speeds within the CBD
- Capital projects funded or financed through Project revenue

**Monitored and Modeled Air Quality Measures**
- PM2.5
- Nitrogen Oxides
- Ozone: via modeling
- Greenhouse Gases

**Reporting on revenue and for audit purposes**
- Project revenue
- Project capital and operating expenses

9

DOT_0047557



# State of New Jersey

DEPARTMENT OF TRANSPORTATION
P.O. Box 600
Trenton, New Jersey 08625-0600

PHILIP D. MURPHY
*Governor*

TAHESHA L. WAY
*Lt. Governor*

FRANCIS K. O'CONNOR
*Commissioner*

January 20, 2025

The Honorable Sean Duffy
Secretary Designee
U.S. Department of Transportation
1200 New Jersey Ave, SE
Washington, DC 20590

Dear Secretary Designee Duffy,

Congratulations on your nomination to serve as the 20th United States Secretary of Transportation. New Jersey is fortunate to have this honor bestowed upon one of its own, and I look forward to working with you on the many transportation initiatives that are important to our home state and the region. I am confident that—with a shared understanding of the issues affecting our state and a willingness to find common ground—we will accomplish great things together.

Unfortunately, today, I must write not only to congratulate you, but also to request your assistance with one critical issue on which the U.S. Department of Transportation ("USDOT") and the Federal Highway Administration ("FHWA") have treated New Jersey very unfairly: congestion pricing in New York City. New Jersey has been voicing concerns about the congestion pricing program for years. But after President Trump joined New Jersey in criticizing New York's plans for congestion pricing last year, the USDOT and FHWA worked with New York officials to short-circuit the review and approval process and launch the program before President Trump took office. As a result, New Jersey commuters and others who want or need to travel to Manhattan south of 60th Street have been forced to pay significant, ill-conceived tolls since the program went live on January 5, 2025, and will be subject to significant environmental impacts in the years to come.

On behalf of the State of New Jersey, I respectfully request that the USDOT and FHWA promptly reconsider and withdraw or rescind the FHWA's June 2023 Finding of No Significant

"IMPROVING LIVES BY IMPROVING TRANSPORTATION"
New Jersey Is An Equal Opportunity Employer • Printed on Recycled and Recyclable Paper

DOT_0047558

OST-S10-250121-014

Impact ("FONSI") for the New York City Central Business District Tolling Program; the FHWA's responses (dated June 14 and November 21, 2024) to the project sponsors' June 2024 Re-Evaluation and November 2024 Re-Evaluation 2; and the FHWA's Supplemental Memorandum dated January 17, 2025, in which the FHWA purports to correct legal deficiencies in its prior actions relating to congestion pricing.

At least four grounds exist for taking this action. In short, modifications to the congestion pricing program made by the project sponsors as they rushed to launch the program resulted in a plan that (1) no longer satisfies the project's objective of generating sufficient annual net revenues to fund $15 billion for capital projects for the Metropolitan Transportation Authority ("MTA") capital program; (2) no longer satisfies the project's objective of establishing a tolling program consistent with New York State's MTA Reform and Traffic Mobility Act ("Traffic Mobility Act"); (3) did not receive the appropriate hard look from the FHWA; and (4) as a federal district court has already found, fails to adequately mitigate significant environmental impacts on New Jersey communities entitled to mitigation that were identified but left unmitigated when the FHWA first green-lit the project. The significant, last-minute changes to the tolling scheme and the rushed approval process to push them through provide ample grounds to rescind or withdraw the FONSI, which was invalid from the day it was issued.

New Jersey's concerns with the FONSI and the accompanying Final Environmental Assessment ("Final EA") from 2023 are the subject of ongoing litigation between the State, the FHWA, and the project sponsors. The Final EA and FONSI committed no place-based mitigation funding to New Jersey at all. After New Jersey filed its lawsuit, the project sponsors issued the Re-Evaluation, which committed a mere $9.8 million in mitigation funding to New Jersey municipalities; the vast majority of the $100 million in place-based mitigation funding was improperly committed to New York communities. On December 30, 2024, a federal district court held that the "FHWA and Project Sponsors acted in an arbitrary and capricious manner in reaching their mitigation determination in the Final EA and FONSI." The court explained that, while there *are* "areas in New Jersey entitled to mitigation" because they will experience significant traffic diversions, the Final EA and FONSI "provide[] *no insight* as to why areas in New Jersey with similarly high pre-existing burdens [as the Bronx] did not receive place-based mitigation commitments," even though the Bronx did receive specific, enforceable place-based mitigation measures. The court remanded the matter to the FHWA to provide a reasoned explanation for its approach to mitigation for New Jersey communities, including the mitigation that was promised for the first time in the Re-Evaluation. But the FHWA's response on remand provides no additional mitigation for New Jersey communities and no reasonable explanation for the arbitrary limits that the FHWA previously allowed the project sponsors to place on the distribution of place-based mitigation.

Because the deficiencies in the 2023 FONSI and Final EA have already been the focus of extensive briefing in district court, and, indeed, are the subject of ongoing proceedings related to, among other things, the arbitrary and capricious allocation of mitigation funding, the rest of this letter generally focuses on the following more recent developments:

1. On March 27, 2024, the Board of the Triborough Bridge and Tunnel Authority ("TBTA") voted to adopt what the project sponsors called "a final schedule of toll rates as well as associated exemptions, crossing credits, and discounts." Re-Evaluation at 1.

2. On May 23, 2024, the project sponsors requested that the FHWA review and approve of the Re-Evaluation, which, among other things, purported to describe and assess the impacts of the new toll structure that was approved in March and differed from any of the toll structures evaluated in the Final EA and FONSI.

3. On June 14, 2024, the FHWA issued its response to the Re-Evaluation. In its decision, the FHWA stated that the Re-Evaluation had been prepared for the limited purpose of determining whether the effects of the adopted tolling structure "are consistent with those disclosed in the April 2023 [Final EA] and whether the mitigation set forth in the June 2023 [FONSI] is still valid." The FHWA concluded that "the analysis conducted in the Re-Evaluation confirms that the adopted toll structure and impacts associated with it was analyzed and mitigated accordingly," such that the "conclusions in the [Final EA] and [FONSI] remains [sic] valid" and "no additional environmental analysis is warranted." The FHWA did not further elaborate on its analysis or conclusions. The public did not have access to the Re-Evaluation before the FHWA issued its response and was not given the opportunity to comment on it.

4. On June 5, 2024, less than a month before the scheduled launch of congestion pricing on June 30, 2024, the Governor of New York announced that she had "directed the MTA to indefinitely pause the program," citing the "burden to working- and middle-class New Yorkers." Press Release, Gov. Kathy Hochul, *Video, Audio & Rush Transcript: Governor Hochul Addresses New Yorkers on Affordability and the Cost of Living* (June 5, 2024), https://www.governor.ny.gov/news/video-audio-rush-transcript-governor-hochul-addresses-new-yorkers-affordability-and-cost.

5. On November 14, 2024 — the week after Election Day — the Governor of New York un-paused the program and "announced a plan to begin implementing congestion pricing in New York City by early January." The Governor's plan involved phasing in the toll structure approved by the TBTA Board in March 2024 over the years 2025 to 2031, with the tolls and credits set at 60 percent of the previously approved amounts for 2025-2027 and 80 percent of the approved amounts in 2028-2030 before reaching 100 percent of the approved amounts in 2031. *See* Press Release, Gov. Kathy Hochul, *Putting Commuters First, Keeping Costs Down: Governor Hochul Unveils Plans for*

DOT_0047560

*Future of Transit and Traffic in New York City, Including a 40 Percent Reduction in Congestion Pricing Tolls* (Nov. 14, 2024), https://www.governor.ny.gov/news/putting-commuters-first-keeping-costs-down-governor-hochul-unveils-plans-future-transit-and.

6. On November 18, 2024, the TBTA Board voted to approve the "phase-in approach" that the Governor had announced days earlier.

7. On November 20, 2024, the project sponsors requested that the FHWA review and approve their Re-Evaluation 2, which described the "phase-in approach."

8. The next day, on November 21, 2024, the FHWA issued its response to Re-Evaluation 2. The FHWA's decision was substantively identical to its June 2024 decision, except that it purported to address whether the effects of the phase-in approach "are consistent with those disclosed in the April 2023 [Final EA] and whether the mitigation set forth in the June 2023 [FONSI] is still valid." The public did not have access to Re-Evaluation 2 before the FHWA issued its response and was not given the opportunity to comment on it.

9. Also on November 21, 2024, the FHWA and the project sponsors executed an "Agreement" to authorize the TBTA to operate the congestion pricing program under the Value Pricing Pilot Program.

10. On December 26, 2024, Governor Hochul announced that she would not permit the TBTA to exercise one of the options available to it under the approved tolling structure—higher tolls on "Gridlock Alert" days. *See* Carl Campanile and Aneeta Bhole, *Hochul Puts Brakes on Congestion Toll's Extra 'Surge-Pricing' Squeeze After Fierce Backlash*, N.Y POST (Dec. 26, 2024), https://nypost.com/2024/12/26/us-news/hochul-puts-brakes-on-congestion-tolls-extra-surge-pricing-squeeze-after-fierce-backlash/.

11. Congestion tolling began on January 5, 2025, after the district court judge who found that the FHWA had acted arbitrarily and capriciously in issuing the FONSI declined to enjoin the congestion pricing program or vacate the FONSI while the FHWA revisited its decision-making on remand.

12. On January 17, 2025, the FHWA issued a "Supplemental Memorandum" that purported to remedy violations of the Administrative Procedure Act and National Environmental Policy Act ("NEPA") identified by a federal court reviewing the Final EA and FONSI and to address questions raised by the court regarding more recent developments.

In short, the project sponsors repeatedly modified their plans for congestion pricing over the course of 2024 in ways that departed from the Final EA that provided the basis for the 2023 FONSI, such that the adopted tolling program no longer meets the project objectives and significantly differs from the seven scenarios assessed in the Final EA and FONSI. *See* Final EA at 2-31 to 2-34. The project sponsors then submitted two "Re-Evaluations" that purported to

DOT_0047561

address these changes and demonstrate why the Final EA and 2023 FONSI remained valid despite the changes.

But the Re-Evaluations (and the FHWA's responses to the Re-Evaluations) failed to adequately address some significant issues and entirely overlooked others. I will highlight four critical problems.

<u>First</u>, the FHWA has inexplicably failed to hold the project sponsors to the revenue-raising requirement that was central to the project from the outset. Following the toll reductions announced in November 2024, it was incumbent upon the project sponsors to explain how they could still meet the project's objective of generating sufficient annual net revenues to fund $15 billion for capital projects for the MTA's 2020-2024 Capital Program, as required by New York's Traffic Mobility Act. *See* N.Y. Veh. & Traf. Law § 1704-a. That $15 billion requirement was one of the project's four objectives set forth in the Final EA and FONSI, and was the principal basis on which the FHWA dismissed all other reasonable alternatives, including ones that would have reduced congestion in the Central Business District. Indeed, the Final EA ruled out consideration of some project alternatives solely because they did not meet this objective.

The project sponsors failed to demonstrate that the revenue-raising objective remains satisfied by the new tolling plan. In a footnote in Re-Evaluation 2, the project sponsors stated, without elaboration or supporting documentation, that "MTA's CFO has determined that the expected revenues to be collected under the Phase-In Approach would in combination still achieve the objective of funding $15 billion in capital projects to allow their completion on the same timeline as projected for the March 2024 Adopted Toll Structure." Re-Evaluation 2 at 8 tbl.2.2 n.2. Yet, according to the project sponsors' own data, annual net revenues were not projected to reach the $0.9 billion that would be sufficient to meet the project's need to fund $15 billion of capital projects for the MTA Capital Program, and the project sponsors admitted that "Phases 1 and 2 [i.e., 2025-2027 and 2028-2030] would not raise as much annual revenue as the tolling scenarios studied in the Final EA or the March 2024 adopted tolling scenario (Phase 3)."[1] Though Re-Evaluation 2 concludes that the "phase-in" approach would allow the program to hit the Traffic Mobility Act's revenue mandate "over time," Re-Evaluation 2 and the FHWA's response do not actually include data or analysis to sustain the bald conclusion that the phase-in approach truly meets the project objective or the requirements of the Traffic Mobility Act.

---

[1] Phase 1 will generate only $0.5 billion per year and Phase 2 will generate only $0.7 billion per year, even if one accepts the project sponsors' representations at face value. *See* Re-Evaluation 2 at 8. Further, the $0.9 billion requirement set forth in the Re-evaluations is itself a reduction of the $1 billion threshold initially anticipated in the Final EA. *See* Final EA at 2-39 ("For the purposes of this EA, the modeling assumes the Project should provide at least $1 billion annually in total net revenue, which would be invested or bonded to generate sufficient funds."). Additionally, recent decisions by New York's Governor to refuse to allow the MTA to exercise its discretion to increase tolls by 25% on "Gridlock Alert Days," when heavier traffic is anticipated, further harms MTA's ability to reach the required $0.9 or $1 billion threshold.

DOT_0047562

Indeed, if there is no limit on the time in which sufficient revenues must be generated, then any program capable of generating revenue—including those dismissed out of hand by the FHWA in the Final EA—would satisfy the revenue requirement.

The Final EA and FONSI were premised on compliance with a very specific revenue objective, and many alternatives were not considered solely because they did not comply with this requirement. The FHWA should rescind or withdraw its prior actions and not allow the project to proceed when one of the most fundamental premises of the Final EA and FONSI is no longer accurate.

Second, the adopted toll structure is not consistent with New York's Traffic Mobility Act — another of the four objectives identified in the Final EA. The congestion pricing program that the project sponsors are now implementing is not consistent with the purposes underlying the statute in at least two ways. First, as noted above, the project sponsors have failed to establish that their phase-in approach satisfies the statute's revenue-raising requirement. Second, as discussed below, the current toll structure flouts the statutory mandate to toll vehicles that enter or remain in the Central Business District.

The Traffic Mobility Act repeatedly states that tolls are to be assessed for "entering or remaining" in the Central Business District — not just for entering. *See* N.Y. Veh. & Traf. Law §§ 1701, 1703, 1704-a. In the Final EA, the project sponsors explained that they were attempting to satisfy this statutory requirement by proposing to toll vehicles twice if they entered and exited the Central Business District on different days and therefore "remained" there for at least a portion of two days. Final EA at 1.[2] Yet the toll structure adopted in March 2024 provided for most vehicles to be tolled only once — upon entry into the Central Business District — regardless of how long they remain or how much they operate on the streets there. Thus, a vehicle that enters the Central Business District for one week and regularly drives within the Central Business District throughout that time would only be tolled *once*; whereas a commuter who drives into the Central Business District for a short period every day would be charged *seven* times.

Neither the project sponsors' Re-Evaluations nor the FHWA's responses acknowledge the change from an "entering or remaining" toll to an "entry-only" toll. Therefore, none of these documents explained how the new approach is consistent with New York's Traffic Mobility Act.

---

[2] Even the approach set forth in the Final EA falls short of adequately tolling vehicles based on how long they remain in the Central Business District. A tolling scheme that accounts for how long a vehicle remains in and operates on the streets of the Central Business District would better implement the statute's plain language and better serve the statute's purpose of reducing congestion than the Final EA's plan to assess an entrance fee and an exit fee (if the exit occurs on a different day) regardless of how long the vehicle remains in the zone and how much it is operated during that time.

DOT_0047563

That omission is important because, from the outset, complying with the Traffic Mobility Act has been one of the project's four objectives.

Third, the FHWA did not adequately assess the changes to the project made by the project sponsors over the course of 2024. Its terse, formulaic responses to the Re-Evaluation and Re-Evaluation 2 do not seriously engage with the changes being advanced.

As noted above, the project sponsors' Re-Evaluation 2 seems to assert that the phase-in approach will allow them to meet their revenue-raising objective without providing data and analyses that support that conclusion. Yet the FHWA somehow accepted the project sponsors' self-serving assertions at face value within one calendar day of their submission of Re-Evaluation 2. Of course the FHWA did not take a hard look at whether the project still meets its revenue objectives. They rubber-stamped the project sponsors' submission with a template response.

Nor does the FHWA's January 2025 Supplemental Memorandum solve this problem. The Supplemental Memorandum attempts a post hoc rationalization for FHWA's uncritical acceptance of the project sponsors' own unsupported statements in their Re-Evaluation 2 by citing a declaration prepared by the MTA's CFO for purposes of litigation on January 2, 2025. That litigation document, which post-dates the FHWA's response to Re-Evaluation 2, obviously was not part of the record before the FHWA months earlier, and — despite the FHWA's new assertion that the CFO's certification "reflects [FHWA's] contemporaneous understanding," Supplemental Memorandum at 21 — the FHWA cites no other basis in the record on which it could have based that understanding.

Moreover, the CFO's declaration reflects that he was forced to adopt an entirely different methodology for evaluating the project's ability to raise sufficient revenue once the project sponsors shifted to the phase-in approach, which assumed that revenues could be raised over a much longer time period. Even if there were reason to think that the FHWA had understood the MTA's methodological shift, there was no excuse for the FHWA not to revisit project alternatives that were excluded from consideration on the basis of the MTA's original approach to its revenue-raising objective but could not have been excluded on the basis of the MTA's new, diluted approach. The project sponsors' gamesmanship in moving their revenue target should have led the FHWA to reevaluate excluded alternatives, yet the FHWA failed to do so.

The FHWA likewise failed to consider adequately the environmental impacts of the phase-in approach. The agency asserts that no further analysis is necessary because the "peak tolling rates" for Phases 1 and 2 in Re-Evaluation 2 "would fall within the ranges studied in the Final EA," and accordingly, "the effects of the phase-in [approach] 'would fall within the ranges studied in the Final EA." However, the mere observation that the tolling *rates* for Phases 1 and 2 may fall within the range of *rates* previously evaluated fails to recognize that the changes since

the Final EA are not limited to the *rates* charged to most vehicles. The project sponsors changed a slew of other variables, from the amounts of crossing credits to the fundamental approach to tolling taxis and for-hire vehicles. For instance, the closest analogue to Phase 1 that was assessed in the Final EA is a $9 tolling scheme that would provide no crossing credits. Conversely, the $9 toll that will be imposed in Phase 1 of the revised tolling scheme would provide crossing credits for the Lincoln, Holland, Queens-Midtown, and Hugh L. Carey Tunnels. Those crossing credits have implications for toll shopping and traffic diversions, but they formed no part of the FHWA's narrow comparison of the pre-credit rates analyzed in the Final EA and those in the adopted toll structure.

As for the March 2024 shift to "entry-only" tolling, that change was not acknowledged — let alone discussed — in the project sponsors' Re-Evaluation or Re-Evaluation 2, and it was not acknowledged — let alone analyzed — in the FHWA's responses. Because none of these documents even addressed the change, they did not consider the distributional impact on which drivers bear the burden of the congestion toll or the impact on the project's environmental goals of tolling vehicles once without any regard to how long they remain and operate in the Central Business District.

The FHWA's failure to take a hard look at the project sponsors' switch to "entry-only" tolling continued in the FHWA's January 2025 Supplemental Memorandum. Again, the FHWA did not so much as mention the switch — even after a court had noted that the toll structure reflected in the June 2024 Re-Evaluation had "changed . . . significantly" from the one originally evaluated and allowed the FHWA to address the issue in the first instance on remand.

<u>Fourth</u>, even after a district court remanded the question of mitigation for New Jersey communities to the FHWA to correct its arbitrary and capricious issuance of a FONSI based on the Final EA, the agency continues to avoid its legal obligation to issue a FONSI only if identified, enforceable measures will mitigate the significant environmental impacts that congestion pricing would otherwise have on many New Jersey communities.

The $100 million allocated to place-based mitigation is an arbitrary cap that was imposed in the Final EA and FONSI — before the FHWA and project sponsors evaluated the adopted tolling scheme, and before the FHWA and project sponsors could conclude with certainty the amount of funding required to mitigate any and all significant impacts. That cap still has not been adequately justified after the FHWA's many bites at the same apple.

Even worse, over 90% of that funding ($90.1 million) will be entirely allocated to New York communities, including $77.4 million to the Bronx alone. Re-Evaluation at 160 tbl. 17.14. Only $9.8 million will be provided to all of New Jersey, and it will be limited to just four communities (Fort Lee, City of Orange, East Orange, and Newark). *Id.* The FHWA and the project sponsors never explained why only *four* New Jersey communities deserve place-based

mitigation when the Final EA identified *fifteen* environmental justice communities in New Jersey with pre-existing air pollutant or chronic disease levels above the 90th percentile that "may need mitigation" because they will suffer increased air pollution due to increases in truck traffic. Final EA at Appendix 17D-71 to 17D-72.[3]

      Nor did the FHWA and the project sponsors explain why Fort Lee — the only community in Bergen County to receive place-based mitigation funding — received just $1.4 million when Bronx County received $71.7 million, notwithstanding that daily traffic increases in Bergen County would be *two to four times greater* than in the Bronx. Instead, the FHWA worked backwards to distribute the $100 million mitigation pool based on each community's population share. But the size of each community's population does not equate to the intensity of the impact that will be felt due to congestion pricing. The FHWA's arbitrary methodology is a direct consequence of its pre-imposed cap on mitigation dollars, which should never have been set before determining which mitigation measures were necessary to alleviate significant impacts in each community.

      Additionally, the four New Jersey communities that will receive place-based mitigation funding are eligible for only three mitigation strategies: "installation of roadside vegetation, renovation of parks and greenspace, and installation of air filtration units in schools near highways, pending the identification of feasible sites." Supplemental Memorandum at 17. The FHWA did not explain how *any* of these measures — which will be implemented at some future time — would reduce the community-wide impacts of air pollution caused by congestion pricing to an insignificant level.[4]

---

[3] The FHWA arbitrarily permitted the project sponsors to limit mitigation to communities with *both* pre-existing air pollutant levels *and* chronic disease levels above the 90th percentile. The FHWA never explained how or why it drew this arbitrary line in the sand. Increased air pollution in communities with some of the nation's highest pre-existing pollutant or chronic disease burdens is a significant impact that merits mitigation.

[4] For instance, the Re-Evaluation states that the installation of roadside vegetation would only "improve *near-road* air quality" and, together with the renovation of parks and greenspaces, would "help to improve community well-being" and *could* have other benefits, such as "reducing air temperatures, reducing stormwater runoff, providing opportunities for exercise, and increasing social interaction"—none of which target the community-wide air pollution that will result from congestion pricing. Re-Evaluation at 161 (emphasis added). Further, the installation of air filtration units in schools near highways with truck traffic increases would only "improve indoor air quality in [those] schools." *Id.* While New Jersey agrees that the health and well-being of its schoolchildren are critical issues, they are by no means the only group that will suffer the consequences of congestion pricing.

Moreover, the cost of implementation for each of these measures means New Jersey's communities—which were allocated *de minimis* mitigation funding—will not receive benefits sufficient to alleviate significant impacts. For example, the City of Orange is set to receive just $0.9 million. Re-Evaluation at 161. FHWA has allocated $10 million to the installation of air filtration units in schools near highways, which will be sufficient to fund 25-40 schools. Supplemental Memorandum at 8. Even assuming 40 schools can be funded, and assuming the City of Orange's entire mitigation budget is allocated to this measure, that means less than 4 schools would receive air filtration units.

DOT_0047566

The district court should have vacated the FONSI and Final EA upon finding that the FHWA had acted arbitrarily and capriciously in issuing the FONSI based on a Final EA that did not make specific commitments to place-based mitigation in New Jersey and in failing to reasonably explain that omission. Indeed, none of the parties to the litigation were able to identify a single case in which a court has ever remanded a NEPA case for mitigation deficiencies in a FONSI without vacating the FONSI or enjoining the project pending remand. Now that the district court has given the FHWA a second chance, and the FHWA has again come up short, it is time to rescind or withdraw the FONSI.

\*       \*       \*

Because the congestion pricing program now in operation does not satisfy all of the project's stated objectives, was never appropriately assessed by the FHWA, and does not provide for adequate mitigation of environmental impacts in New Jersey, the FHWA should rescind or withdraw the FONSI, require further analysis of alternatives that were prematurely ruled out because they too did not meet all of the project's stated objectives, and ensure that any further analysis of the project is accompanied by an adequate opportunity for public participation and dialogue, which was not provided in connection with the Re-Evaluation or Re-Evaluation 2. Finally, the FHWA should address in the first instance any impact that these actions might have on the project sponsors' ongoing implementation of the congestion pricing program.

Congratulations again, and I look forward to working with you.

Sincerely,

Francis K. (Fran) O'Connor
Commissioner
New Jersey Department of Transportation

DOT_0047567



STATE OF NEW JERSEY
OFFICE OF THE GOVERNOR
P.O. BOX 001
TRENTON
08625
(609) 292-6000

PHILIP D. MURPHY
GOVERNOR

January 20, 2025

The Honorable Donald J. Trump
President, The United States of America
The White House
1600 Pennsylvania Avenue NW
Washington, D.C., 20500

Dear Mr. President:

As you begin your second term as President, I welcome any opportunity to work with you and your Administration where we can find common ground.  One area where I believe our priorities align is congestion pricing.

As you know, last spring, New York officials unveiled a congestion tolling scheme with a $15 price tag to enter Manhattan south of 60th Street. Then, weeks later, they announced an "indefinite pause" on their plan due to its burdens on working- and middle-class families. Unfortunately, the "indefinite pause" lasted only through your election. Then, New York and federal officials moved quickly to un-pause the program and start congestion tolling before your inauguration.

I know we share significant concerns about these developments. During your campaign, you called congestion pricing "a disaster for NYC" and a "massive business killer and tax on New Yorkers, and anyone going into Manhattan" that had been "railroaded … through" by federal officials. So you promised to "TERMINATE Congestion Pricing in my FIRST WEEK back in Office!!!" And after your election, you were quoted calling New York's latest tolling plan "the worst plan in the history of womankind."

For my part, I am open to congestion pricing in concept. But New York's scheme has never been well-designed or adequately studied, and the lack of proper analysis was exacerbated over the last year as officials repeatedly made significant changes to the program and secretly rushed them through federal approvals.

DOT_0047568

The resulting congestion pricing plan is a disaster for working- and middle-class New Jersey commuters and residents who need or want to visit lower Manhattan and now need to pay a big fee on top of the bridge or tunnel tolls they already pay. And adding insult to injury, New Jersey communities are not being fully compensated for the additional traffic and attendant pollution that will be re-routed to them because of congestion pricing.

Soon, New Jersey plans to amend its pending lawsuit against the U.S. Department of Transportation and the Federal Highway Administration over congestion pricing to challenge how they handled New York's changes to the program over the last year.

In the meantime, I am attaching a letter on behalf of New Jersey requesting that New York's congestion pricing scheme receive the close look it deserved but did not receive from the federal government last year. I hope that you will ensure that this request receives prompt attention from the relevant officials within your Administration.

Sincerely,

Philip D. Murphy
Governor



# THE SECRETARY OF TRANSPORTATION
## WASHINGTON, DC 20590

February 19, 2025

The Honorable Kathy Hochul
Governor of New York
Albany, NY 12224

Dear Governor Hochul:

I am writing to you concerning the Federal Highway Administration's (FHWA) approval of the Central Business District (CBD) Tolling Program (CBDTP), which is a pilot project under the Value Pricing Pilot Program (VPPP). The FHWA implements VPPP on behalf of the Secretary of Transportation pursuant to a delegation of authority. On November 21, 2024, FHWA and the New York State Department of Transportation (NYSDOT) executed an agreement (November 21 Agreement) approving the CBDTP pilot project under VPPP. The VPPP is an exception to the general rule prohibiting tolling on highways. Congress approved the VPPP exception in 1991 as a pilot to test congestion reduction techniques. New York State is one of 15 States authorized to implement the program.

Pursuant to the November 21 Agreement, FHWA approved NYSDOT's implementation of CBDTP as a pilot project under VPPP. Under the pilot project, NYSDOT and its project sponsors, Triborough Bridge and Tunnel Authority (TBTA) and New York City Department of Transportation (NYCDOT), were authorized to implement a method of congestion pricing known as "cordon pricing," under which certain vehicles are charged tolls upon entry into Manhattan south of and inclusive of 60th Street. The imposition of tolls under the CBDTP pilot project by NYSDOT and its project sponsors became operational on January 5, 2025.

President Trump recently took office on January 20, 2025. I was nominated by the President to be the Secretary of Transportation, confirmed by the Senate on January 28, 2025, and sworn into office on January 29, 2025. Upon assuming my responsibilities, President Trump asked me to review FHWA's approval of CBDTP as a pilot project under VPPP. In particular, the President expressed his concerns about the extent of the tolling that was approved by the Department of Transportation on highways that have been constructed with funds under the Federal-aid Highway Program and the significant burdens on the New York City residents, businesses, and area commuters (including those from New Jersey and Connecticut) who regularly use the highway network in the CBD tolling area.

As Secretary of Transportation, I am aware of many concerns regarding the CBDTP pilot project. For example, in a January 20, 2025, letter to President Trump, which I reviewed, New Jersey Governor Murphy expressed significant concerns about the impacts that the imposition of tolls under the CBDTP pilot project is having on New Jersey commuters and residents. Also, in a January 20, 2025, letter to me, New Jersey Department of Transportation Commissioner O'Connor also expressed many concerns regarding the impacts of the CBDTP pilot project to New Jersey communities. Additionally, I have been made aware that legal challenges are pending regarding the project, which question whether the scope of the project exceeds the authority of VPPP.

I share the President's concerns about the impacts to working class Americans who now have an additional financial burden to account for in their daily lives. Users of the highway network within the CBD tolling area have already financed the construction and improvement of these highways through the payment of gas taxes and other taxes. The recent imposition of this CBDTP pilot project upon residents, businesses, and commuters left highway users without any free highway alternative on which to travel within the relevant area. Moreover, the revenues generated under this pilot program are directed toward the transit system as opposed to the highways. I do not believe that this is a fair deal.

In light of the President's concerns about the CBDTP pilot project, the legal challenges that have been made, as well as the concerns expressed by New Jersey Governor Murphy and New Jersey Commissioner O'Connor, I reviewed the tolling authority granted under VPPP to the CBDTP pilot project for compliance with Federal law. For the reasons explained below, I have concluded that the scope of this pilot project as approved exceeds the authority authorized by Congress under VPPP.

The construction of Federal-aid highways as a toll-free highway system has long been one of the most basic and fundamental tenets of the Federal-aid Highway Program. Ever since the enactment of the Federal-Aid Road Act of 1916, Congress has required that roads constructed with Federal-aid highway funds be free from tolls of all kinds, subject to limited exceptions. *See* Public Law 64-154, § 1, 39 Stat. 355 (1916). This general requirement was codified at 23 U.S.C. § 301 under Pub. L. No. 85-767, 72 Stat. 885 (1958), and remains the law today. Specifically, this statute currently reads as follows:

> Except as provided in section 129 of this title with respect to certain toll bridges and toll tunnels, all highways constructed under the provisions of this title shall be free from tolls of all kinds.

In 1991, Congress created a limited exception to the tolling prohibition for "congestion pricing pilot projects" implemented by States, local governments, or public authorities. Intermodal Surface Transportation Efficiency Act of 1991, § 1012(b), Pub. L. No. 102-240. Congress did not define "congestion pricing pilot project." Congress later amended the statute to replace "congesting pricing pilot projects" with "value pricing pilot programs," but it again did not

DOT_0047571

define this term. Transportation Equity Act of the 21st Century, § 1216(a), Pub. L. No. 105-178 (1998). The long-standing history of the anti-tolling provision requires me to narrowly construe this exception.

I have concluded that CBDTP is not an eligible "value pricing pilot program," for two reasons.

*First*, CBDTP uses a method of tolling known as "cordon pricing," under which drivers who enter Manhattan south of 60th Street are charged tolls no matter what roads they use. Unlike other forms of tolling, the CBDTP's cordon pricing program provides no toll-free option for many drivers who want or need to travel by vehicle in this major urbanized area. Congress in a separate statutory provision has authorized cordon pricing on the *Interstate System* where drivers can choose a non-Interstate route. *See* 23 U.S.C. § 129(d)(4)(B), (6)(A). But no statute contemplates cordon pricing in a situation where tolls are inescapable, and FHWA has never before approved a VPPP program that uses cordon pricing or that does not provide a toll-free option. I have concluded that Congress did not, in using the vague phrase "value pricing pilot program," authorize the unprecedented and consequential step of cordon pricing. Indeed, the Town of Hempstead and its supervisor have sued FHWA, TBTA, and NYSDOT making this argument, and I believe that FHWA faces a significant risk of loss in that litigation. *See Town of Hempstead v. DOT*, No. 24-cv-3263 (E.D.N.Y.).

*Second*, the imposition of tolls under the CBDTP pilot project appears to be driven primarily by the need to raise revenue for the Metropolitan Transit Authority (MTA) system as opposed to the need to reduce congestion. I recognize that preliminary project data published by the MTA reports a congestion reduction benefit, but the toll rate that is set under VPPP should not be driven primarily by revenue targets, particularly revenue targets that have nothing to do with highway infrastructure. While revenue generation is a necessary outcome of any congestion pricing scheme and specifically allowable under the VPPP statute, the primary consideration of the toll rates here is to raise revenue for an MTA capital program. This revenue target for MTA projects artificially drives the establishment of toll rates to the highway users rather than the price needed to reduce congestion. As a result, highway users of the Federal-aid highway network within the priced zone are burdened with a price that is set to raise certain amounts of revenue for MTA capital projects rather than a price that is necessary to have an impact on congestion. Even if improving the transit system may eventually affect roadway congestion, there is no indication that the tolls were set in order to achieve these attenuated effects. I have concluded that VPPP does not authorize tolls that are calculated based on considerations separate from reducing congestion or advancing other road-related goals.

Federal-aid infrastructure projects must be carried out in compliance with Federal law. Due to my conclusion that FHWA lacked statutory authority to approve the cordon pricing tolling under the CBDTP pilot project, I am rescinding FHWA's approval of the CBDTP pilot project under the November 21 Agreement and terminating the Agreement. I recognize that FHWA under the prior Administration concluded, when executing the November 21 Agreement, that the CBDTP was eligible for approval under VPPP, and that my determination represents a change in position.

FHWA, however, did not explain the basis for its conclusion, and nothing in the prior approval undermines the above analysis upon which my determination is based.

I recognize, moreover, that TBTA and NYSDOT have relied on the Agreement to begin collecting tolls under the program, but I have concluded that such reliance should not prevent the termination of the November 21 Agreement. While the TBTA and NYSDOT have incurred costs related to the program, many of those costs were incurred before FHWA signed the Agreement, and FHWA is not aware of any substantial costs associated with the physical stopping of the program. To be sure, the termination of the program may deprive the transit system of funding, but any reliance on that funding stream was not reasonable given that FHWA approved only a "pilot project." Finally, any reliance interests cannot overcome the conclusion that FHWA's approval was not authorized by law.

The FHWA will contact NYSDOT and its project sponsors to discuss the orderly cessation of toll operations under this terminated pilot project.

Sincerely,

Sean P. Duffy