CC:    Marie Therese Dominquez, Esq. NYSDOT Commissioner
       Catherine T. Sheridan, President of TBTA
       Ydanis Rodriguez, NYCDOT Commissioner

DOT_0047574



U.S. Department
of Transportation

**Federal Highway
Administration**

1200 New Jersey Ave., SE
Washington, DC  20590

February 20, 2025

Marie Therese Dominguez, Commissioner
New York State Department of Transportation
50 Wolf Road
Albany, NY  12232

Ydanis Rodriguez, Commissioner
New York City Department of Transportation
55 Water Street, 9th Floor
New York, NY  10041

Catherine T. Sheridan, President
MTA Bridges and Tunnels
2 Broadway, 23rd Floor
New York, NY  10004

Dear Commissioner Dominguez, Commissioner Rodriguez, and President Sheridan:

I am writing pursuant to Secretary Duffy's February 19, 2025, letter terminating the November 21, 2024 Value Pricing Pilot Program (VPPP) Agreement under which the Federal Highway Administration (FHWA) has approved the implementation of tolls as part of the New York's Central Business District Tolling Program (CBDTP).  The Secretary's letter stated that the FHWA will contact the New York State Department of Transportation (NYSDOT) and its project sponsors, Triborough Bridge and Tunnel Authority (TBTA) and New York City Department of Transportation (NYCDOT), to discuss the orderly cessation of toll operations under the CBDTP.

In order to provide NSYDOT and its project sponsors time to terminate operations of this pilot project in an orderly manner, this rescission of approval and termination of the November 21, 2024 Agreement will be effective on March 21, 2025.  Accordingly, NYSDOT and its project sponsors must cease the collection of tolls on Federal-aid highways in the CBDTP area by March 21, 2025.  Please work with Rick Marquis, the FHWA's New York Division Administrator, to provide the necessary details and updates regarding the cessation of toll operations.

Sincerely,

Gloria M. Shepherd
Executive Director



U.S. Department
of Transportation

**Federal Highway
Administration**

1200 New Jersey Ave., SE
Washington, DC  20590

March 20, 2025

Marie Therese Dominguez, Commissioner
New York State Department of Transportation
50 Wolf Road
Albany, NY  12232

Ydanis Rodriguez, Commissioner
New York City Department of Transportation
55 Water Street, 9th Floor
New York, NY  10041

Catherine T. Sheridan, President
MTA Bridges and Tunnels
2 Broadway, 23rd Floor
New York, NY  10004

Dear Commissioner Dominguez, Commissioner Rodriguez, and President Sheridan:

I am writing pursuant to my February 20, 2025 letter, providing you until March 21, 2025, to
cease tolling operations that were initiated through the November 21, 2024, Value Pricing Pilot
Program (VPPP) Agreement.  The Secretary has directed that I extend the period of time to
comply by 30 days.   Accordingly, toll operations must cease by April 20, 2025.

Please work with Rick Marquis, FHWA's New York Division Administrator, to provide the
necessary details and updates regarding the cessation of toll operations.

Sincerely,

Gloria M. Shepherd
Executive Director

DOT_0047576



**THE SECRETARY OF TRANSPORTATION**
WASHINGTON, DC 20590

April 21, 2025

The Honorable Kathy Hochul
Governor of New York
Albany, NY 12224

Dear Governor Hochul:

I write to warn you that the State of New York risks serious consequences if it continues to fail to comply with Federal law, and to direct New York to show cause why the Federal Highway Administration ("FHWA") should not impose appropriate measures to ensure compliance.

Under 23 U.S.C. § 301, all roads constructed using Federal-aid highway funds "shall be free from tolls of any kind," unless an exception applies. In November 2024, the Biden Administration signed a Value Pricing Pilot Program ("VPPP") agreement that authorized an exception for New York's Central Business District Tolling Program ("CBDTP"). On February 19, 2025, I terminated that agreement. New York therefore is not legally permitted to collect tolls on roads within the CBDTP zone that were constructed using Federal-aid highway funds.

To allow for an orderly shutdown, on February 20, 2025, FHWA notified New York that the termination would take effect on March 21, 2025. FHWA made clear that New York "must cease the collection of tolls" by March 21, 2025, and directed New York to "provide the necessary details and updates regarding the cessation of toll operations." In a spirit of goodwill based on ongoing discussions with New York, FHWA later extended the deadline to April 20, 2025, and again requested that New York provide information about the cessation of tolling.

New York has not responded to FHWA's requests for information. You have also publicly declared that New York will continue to collect tolls in open defiance of Federal law, and the April 20, 2025, deadline has now passed without New York taking action to comply.

**Accordingly, I hereby direct the New York State Department of Transportation ("NYSDOT") to show cause, no later than May 21, 2025, why FHWA should not take appropriate steps under 23 CFR § 1.36 to remedy New York's noncompliance with 23 U.S.C. § 301 in connection with the CBDTP. By that date, NYSDOT shall submit a response to FHWA's New York Division Administrator that either: (1) certifies that the collection of tolls under the CBDTP has ceased; or (2) demonstrates that the continued collection of tolls does not violate 23 U.S.C. § 301. The project's other sponsors—the Triborough Bridge and Tunnel Authority ("TBTA") and the New York City Department of Transportation ("NYCDOT")—may also submit responses.**

If, after evaluating NYSDOT's response and any responses received from TBTA and NYCDOT (or if NYSDOT fails to submit a timely response), FHWA determines that New York is out of compliance with 23 U.S.C. § 301, FHWA will implement appropriate initial compliance measures beginning on or after May 28, 2025, until compliance is achieved, to include:

- No further advance construction ("AC") authorizations for projects within the borough of Manhattan, except for projects determined by FHWA to be essential for safety ("Safety Projects").[1]
- No further National Environmental Policy Act ("NEPA") approvals for projects within the borough of Manhattan, except for Safety Projects.
- No further approvals of Statewide Transportation Improvement Program ("STIP") amendments concerning New York Metropolitan Transportation Council ("NYMTC") TIP modifications.

If New York's noncompliance continues, FHWA may consider imposing additional measures such as:

- No further obligations of FHWA funds (both formula and competitive) for projects within New York City, except for Safety Projects.
- No further AC authorizations for projects within New York City, except for Safety Projects.
- No further NEPA approvals for projects within New York City, except for Safety Projects.

The corrective measures noted above may be expanded to other geographic areas within the State of New York, if any noncompliance continues.

The response(s) to the directive to show cause should include any arguments related to my determination, explained in the February 19, 2025, letter, that FHWA lacked the statutory authority to approve the New York City cordon pricing project as a "value pricing pilot project."

The response(s) should also address the policy concerns expressed in my February 19, 2025, letter, which were an independent basis for my decision to terminate the VPPP agreement. New York's cordon pricing program imposes a disproportionate financial hardship on low and medium-income hardworking American drivers for the benefit of high-income drivers. It is not consistent with the Federal-aid Highway Program, which was established and funded as a "user-pay" system through the gas tax. Highway users whose taxes already paid for the Federal-aid highways in the cordon area are now being forced to pay again while receiving no new highway benefits in return because there are no toll-free alternative routes available to access the cordoned-off area of Manhattan. This type of cordon pricing is unprecedented in the United States and is inconsistent with any previous pilot project approved under the VPPP. Anyone needing to drive into the area is either forced to pay a cost-prohibitive toll or required to use the

---

[1] Safety Projects include projects under the National Highway Performance Program, Bridge Formula Program, and Highway Safety Improvement Program.

3

substandard transit system run by the Metropolitan Transit Authority ("MTA"). This is a breach of the promise made to the hardworking American taxpayers whose gas taxes have funded the existing Federal-aid highway system in this area.

I am also concerned that the tolls collected from highway users under this pilot project have been set and will be used primarily for funding transit capital projects.[2] It is a fundamental principle of the Federal-aid Highway Program that toll revenues should be used to pay for the infrastructure on which the toll is imposed, with any excess reinvested back into the broader highway network. Although the VPPP statute permits revenues from pilot programs to be used for transit projects eligible for funding under title 23 of the U.S. Code, it is unconscionable as a matter of policy that highway users are being forced to bail out the MTA transit system. Moreover, setting tolls with the primary goal of raising revenue for the MTA conflicts with the purpose of the VPPP to initiate pilot projects designed to relieve congestion, not fund transit capital projects.

Rather than establishing good transportation policy under this pilot project, the Biden Administration sought to advance its preference for funding transit systems over highway improvements. Under this Administration, FHWA policy will no longer support this type of project or policy. While I am Secretary, FHWA will only prioritize tolling projects under the VPPP that provide for toll-free alternative routes and set tolls with the aims of reducing congestion and/or raising revenue primarily for highway infrastructure, rather than projects such as the CBDTP, which forces hardworking Americans who rely upon the already-paid-for existing Federal-aid highway network to pay cost-prohibitive tolls designed to fund MTA's capital projects.

Finally, I note that MTA, TBTA, NYSDOT, and NYCDOT alleged in the Complaints they filed in the U.S. District Court for the Southern District of New York that the VPPP agreement is a "cooperative agreement" that may only be terminated pursuant to 2 CFR Part 200. To the extent those regulations apply, they support my termination of the VPPP agreement. Under 2 CFR § 200.340(a)(4), a cooperative agreement may be terminated by a federal agency if it "no longer effectuates the program goals or agency priorities." As explained above, and in my February 19, 2025, letter, the CBDTP does not effectuate the goals or priorities of the U.S. Department of Transportation.

Although MTA, TBTA, NYSDOT, and NYCDOT further allege that termination was not permissible under this regulation because the VPPP agreement does not contain any provision that would permit FHWA to terminate the agreement unilaterally, that suggestion is equally unavailing. Indeed, the VPPP agreement expressly incorporates all Federal laws and requirements applicable to the project, and the terms and conditions pertinent to FHWA cooperative agreements unambiguously provide that such agreements may be terminated under

---

[2] New York's implementing legislation for the CBDTP provides that the level of tolls must be set to achieve minimum funding requirements for MTA capital projects. *See* N.Y. Veh. & Traf. Law § 1704-a(1).

2 CFR § 200.340.[3]  Moreover, it simply cannot be that this "pilot program" must be permitted to go on *forever*, for as long as New York wants.  Perpetual operation of a value pricing pilot is not mandated by law, and the right to termination is inherent in the VPPP agreement.  Furthermore, the allegations by MTA, TBTA, NYSDOT, and NYCDOT that they were not given proper "notice" and an "opportunity to be heard" with respect to the termination, pursuant to 2 CFR § 200.341(a), is unavailing in light of this letter, which once again provides notice of the termination and, for now the third time, provides them with a fair opportunity to contest that termination before FHWA begins imposing compliance measures.  To the extent the regulations at 2 CFR Part 200 apply, this letter serves as the written notice of termination under 2 CFR § 200.341(a), and the directive to show cause outlined above serves as NYSDOT's, TBTA's, and NYCDOT's opportunity to object and provide information challenging the termination under 2 CFR § 200.342.

As always, I remain available for further communication with you on these issues, and I look forward to receiving New York's response.

Sincerely,

Sean P. Duffy

CC:    Marie Therese Dominquez, Esq. NYSDOT Commissioner
       Catherine T. Sheridan, President of TBTA
       Ydanis Rodriguez, NYCDOT Commissioner

---

[3] *See* Federal Highway Administration, *Contractors and Recipients General Terms and Conditions for Assistance Awards* § 17, *available at* https://www.fhwa.dot.gov/cfo/contractor_recip/gtandc_after2023aug07.cfm.



**THE CITY OF NEW YORK**
# LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, NY 10007-2601

**MURIEL GOODE-TRUFANT**
*Corporation Counsel*

**CHRISTIAN C. HARNED**
Environmental Law Division
(212) 356-1676
FAX:  (212) 356-2069
chharned@law.nyc.gov

May 21, 2025

BY MAIL AND EMAIL TO:
Richard Marquis
Division Administrator
Federal Highway Administration, New York Division
11A Clinton Avenue
Albany, NY 12207
Rick.Marquis@dot.gov

> Re:    Compliance with 23 U.S.C. § 301 in Connection with the Congestion Pricing Program

To Administrator Marquis:

Our office represents the New York City Department of Transportation ("City DOT"). We write in response to the April 21, 2025 letter ("Letter") from United States Department of Transportation ("USDOT") Secretary Duffy to New York State Governor Hochul about the continued operation of the Central Business District Tolling Program ("Congestion Pricing" or the "Program").  In the Letter, Secretary Duffy reaffirmed his view that he terminated Congestion Pricing's federal approval, the Value Pricing Pilot Program ("VPPP") agreement, on February 19, 2025.   Secretary Duffy then ordered the New York State Department of Transportation ("State DOT") to show cause why the Federal Highway Administration ("FHWA") should not implement various penalties to compel the cessation of tolling, and ordered State DOT to submit a response demonstrating that continued tolling does not violate 23 U.S.C. § 301.  Secretary Duffy also invited City DOT to submit a response, which we do in this letter.

Congestion Pricing does not violate the prohibition on tolling federal highways under 23 U.S.C. § 301 because the Program is operating pursuant to a VPPP agreement authorizing the tolling of federal aid highways within Manhattan's Central Business District.  On November 21, 2024, FHWA entered into a VPPP agreement with State DOT, City DOT, and the Triborough

DOT_0047581

Bridge and Tunnel Authority ("TBTA").[1]  That VPPP agreement is lawful and remains in effect for the Program for the reasons set forth in the Consolidated Second Amended Complaint ("SAC") in *Metropolitan Transportation Authority, et al. v. Sean Duffy, et al.*, 25 Civ. 1413 (LJL) ("*MTA v. Duffy*"), and in the memorandum of law in support of a motion for a preliminary injunction ("Memorandum of Law") filed by the Metropolitan Transportation Authority ("MTA"), TBTA, and City DOT in that proceeding.[2]  *See, e.g.*, Appx. 3 at 24-38.  The legality of Secretary Duffy's purported termination of the VPPP agreement is properly being considered in the United States District Court, Southern District of New York, by Judge Lewis J. Liman.  Because Secretary Duffy took a final position purporting to revoke the VPPP agreement in his February letter, the question of whether that action was proper is now squarely before the court.  *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395-396 (2024).  Any further process before FHWA could only produce reasoning and arguments that post-date the February decision, and thus could not be considered by the court in any event.  *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (a reviewing court "must judge the propriety of [agency] action solely by the grounds invoked by the agency.").

The Letter also outlined a number of measures FHWA will take to compel the cessation of Congestion Pricing, including: (1) "no further advance construction authorizations;" (2) "no further National Environmental Policy Act ("NEPA") approvals," except for "Safety Projects;" and, (3) "no further approvals of Statewide Transportation Council TIP modifications."  The Letter indicates that these measures would initially apply to projects in the borough of Manhattan, but may be imposed to all projects in New York City and elsewhere in the State should tolling continue.  The Letter also states that FHWA may impose additional penalties, including withholding "further obligations of FHWA funds (both formula and competitive) for projects within New York City."  However, as detailed in the SAC and the Memorandum of Law, the threatened enforcement would be improper, even if the absence of the VPPP agreement, for a number of reasons.  First, FHWA lacks authority to impose the sanctions contemplated in the Letter.  *See, e.g.*, Appx. 3 at 43-47.  Second, the proposed enforcement measures violate the Spending Clause of the U.S. Constitution.  *Id*. at 47-48.  Third, the proposed enforcement measures violate the Tenth Amendment of the U.S. Constitution because they would be unduly coercive.  *Id*. at 49-51.  For these reasons, the penalties the April 21 letter threatens would be improper and should not be imposed.

City DOT reserves all its rights, including the right to present additional arguments regarding the subjects raised in the Letter.

---

[1] A copy of the VPPP agreement is annexed hereto as Appendix 1.

[2] A copy of the SAC in *MTA v. Duffy* is annexed hereto as Appendix 2.  A copy of the memorandum of law in support of the motion for a preliminary injunction filed by MTA, TBTA, and City DOT is annexed hereto as Appendix 3.  Exhibits to those filings are incorporated by reference to this letter.

DOT_0047582

Respectfully submitted,

Christian C. Harned
Assistant Corporation Counsel
Nathan Taylor
Assistant Corporation Counsel

DOT_0047583

# Appendix 1

DOT_0047584

THIS AGREEMENT ("Agreement"), made and entered into this 21st day of
_____November_____, 2024, by and among the FEDERAL HIGHWAY
ADMINISTRATION, UNITED STATES DEPARTMENT OF TRANSPORTATION,
(hereinafter referred to as "FHWA") and the NEW YORK STATE DEPARTMENT OF
TRANSPORTATION, an agency of the State of New York, Triborough Bridge and
Tunnel Authority, and New York City Department of Transportation, (hereinafter
referred to as "NYSDOT, TBTA, and NYCDOT ").


WITNESSETH:

WHEREAS, section 1012(b) of the Intermodal Surface Transportation Efficiency Act of
1991 (ISTEA), Public Law 102-240, as amended by section 1216(a) of the Transportation
Equity Act for the 21st Century (TEA-21), and section 1604 (a) of the Safe, Accountable,
Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA- LU), Pub.
L. 109-59 (August 10, 2005) establishes the Value Pricing Pilot Program, hereinafter
referred to as the "pilot program," and permits the FHWA to allow the collection of tolls
as part of the value pricing pilot program established under Section 1012(b); and

WHEREAS, Section 1012(b) of ISTEA, as amended, authorizes the Secretary of
Transportation to enter into cooperative agreements with as many as fifteen (15) State or
local governments or public authorities to establish, maintain, and monitor value pricing
programs, or projects; and

WHEREAS, NYSDOT, through the execution of cooperative agreements for prior value
pricing projects, is one of the fifteen participants in the pilot program; and

WHEREAS, NYSDOT has requested that the FHWA enter into an  agreement with
NYSDOT, TBTA, and NYCDOT related to establishing, maintaining, and monitoring a
value pricing project, known as the Central Business District Tolling Program (CBDTP)
(hereinafter referred to as the "Project"), as part of NYSDOT's participation in the value
pricing pilot program; and

WHEREAS, as part of the CBDTP value pricing pilot program, TBTA intends to toll an
area which includes portions of highway facilities that have been constructed,
reconstructed, rehabilitated, restored, resurfaced or maintained with title 23 funds as
described in Attachment A, and made part of this agreement; and

WHEREAS, the FHWA has determined that this Agreement is necessary to oversee and
administer the collection of tolls pursuant to Section 1012(b)(4) of ISTEA, as amended;
and

WHEREAS, Section 1012(b) of ISTEA, as amended requires that all revenues received
from the operation of a value pricing project be applied only toward the project's
operating costs (including project implementation costs; mitigation measures to deal with
adverse financial effects on low-income drivers; the proper maintenance of the Project;

any reconstruction, rehabilitation, restoration, or resurfacing of the Project; any debt service incurred in implementing the project; a reasonable return on investment of any private person financing the project), and other projects eligible for assistance under title 23, United States Code; and

WHEREAS, this Agreement is neither intended to, nor shall it, result in the independent participation by TBTA and NYCDOT in the value pricing pilot program, it being expressly understood that TBTA's and NYCDOT's participation in the value pricing pilot project approved in this Agreement is (i) derivative of and only exists through NYSDOT's participation in the value pricing pilot program and (ii) limited to the Project; and

NOW THEREFORE, in consideration of the premises and mutual undertakings of the parties, and in conformity with all applicable laws, the NYSDOT, TBTA, NYCDOT, and FHWA hereby agree as follows:

(1)  The FHWA agrees that TBTA may operate the Project as a toll Project in accordance with the provisions of this Agreement and as a value pricing project, as part of NYSDOT's  value pricing pilot program.

(2)  Pursuant to Section 1012(b) of ISTEA, as amended, TBTA will use all toll revenues received from the operation of the Project for the operating costs of the project as described in attachment A (including project implementation costs; mitigation measures to deal with adverse financial effects on low-income drivers; the proper maintenance of the Project; any reconstruction, rehabilitation, restoration, or resurfacing of the Project; any debt service incurred in implementing the project; a reasonable return on investment of any private person financing the project), and any other projects eligible for assistance under title 23, United States Code.

(3)  The toll rates applicable to the Project will vary as described in Attachment A. and in accordance with Section 1012(b) of ISTEA, as amended including Sec. 1012(b)(6) - HOV Passenger Requirements. Notwithstanding section 102(a) of title 23, United States Code, a State may permit vehicles with fewer than 2 occupants to operate in high occupancy vehicle lanes if the vehicles are part of a value pricing pilot program under this section. Sec. 1012(b)(7) - Financial Effects on Low-Income Drivers – Any value pricing pilot program under this subsection shall include, if appropriate, an analysis of the potential effects of the pilot program on low-income drivers and may include mitigation measures to deal with any potential adverse financial effects on low-income drivers.

(4)  TBTA shall conduct or have an independent auditor conduct an annual audit of toll Project records to verify compliance with use of revenues and report the results of the audits to FHWA.

DOT_0047586

(5)   As of the date of the execution of this Agreement, the imposition of tolls under this Agreement does not render Federal-aid highways within the State of New York generally ineligible for Federal-aid highway funds where such highways are otherwise eligible under the particular funding program.

(6)   NYSDOT, TBTA, and NYCDOT, as applicable, will continue to adequately maintain or cause to be adequately maintained, the highway facilities that have been constructed, reconstructed, rehabilitated, restored, or resurfaced or maintained with title 23 funds located in the Project.

(7)   That TBTA agrees, upon reasonable notice, to make all of its records pertaining to the Project subject to audit by the FHWA. TBTA agrees to annually audit the records of the Project for compliance with the provisions of this Agreement and report the results thereof to FHWA. In lieu of the TBTA performing said audit, a report of the New York State Comptroller or an independent auditor furnished to FHWA may satisfy the requirements of this section.

(8)   Effective on the date of this Agreement, the project is approved as a pilot program, and the following requirements shall apply:

   a.  In order to carry out Section 1012(b)(5) of ISTEA, as amended, the FHWA and NYSDOT, TBTA and NYCDOT will cooperate and work together in the implementation of the Project.

   b.  That TBTA and NYCDOT, as applicable, shall monitor and report on the project performance (Attachment B) from the date of implementation for a period of at least ten years or to the end of the life of the Project, whichever is sooner, to evaluate the effects on driver behavior, traffic volume, congestion, transit ridership, air quality, and availability of funds for transportation programs. Reports begin one year after the operation date and every two years thereafter.

   c.  That TBTA and NYCDOT will identify benefits the application of tolls has in reducing climate pollution.

   d.  That TBTA and NYCDOT will demonstrate the benefits mitigation measures provide to underserved communities.

(9)   That NYSDOT, TBTA and NYCDOT agree to comply with all Federal laws and requirements applicable to this project, including the laws and policies applicable to the Value Pricing Pilot Program. Such laws and requirements include, but are not limited to Section 1012(b) of ISTEA, as amended, the guidance implementing Section 1012(b) of ISTEA, and 23 CFR Part 940 and 950.

3

DOT_0047587

(10)  TBTA, through NYSDOT, agrees to provide FHWA notice of any proposed
      changes to the toll structure other than the phases set forth in Attachment A, a
      minimum of 60 days before such changes go into effect. Any such changes must
      be eligible pursuant to the VPPP enacted by section 1012(b) of the Intermodal
      Surface Transportation Efficiency Act of 1991 (ISTEA), Public Law 102-240,
      as amended by section 1216(a) of the Transportation Equity Act for the 21st
      Century (TEA-21), and section 1604 (a) of the Safe, Accountable, Flexible,
      Efficient Transportation Equity Act: A Legacy for Users (SAFETEA- LU), Pub.
      L. 109-59 (August 10, 2005).

(11)  That NYSDOT, TBTA and NYCDOT agree they will work with FHWA to
      return the Project to its original operating condition if TBTA decides to
      discontinue tolls on the Project.

(12)  That this Agreement will be prepared in quadruplicate originals so that each
      signatory will have a signed Agreement. This Agreement may be signed in
      counterparts, each of which shall be deemed an original and taken together shall
      constitute one and the same agreement.


IN WITNESS THEREOF, the parties hereto have caused this instrument to be duly
executed, the day and year first written above.

STATE OF NEW YORK DEPARTMENT OF
TRANSPORTATION

BY:  _____

Title:  Commissioner

TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY

BY:  _____
        Catherine T. Sheridan
Title: President _____


NEW YORK CITY DEPARTMENT OF TRANSPORTATION

BY:  _____
        Ydanis Rodriguez
Title: Commissioner _____

4

DOT_0047588

FEDERAL HIGHWAY ADMINISTRATION
UNITED STATES DEPARTMENT OF TRANSPORTATION

BY: *Gloria M. Shepherd*

Title: Executive Director


ATTACHMENT A – Project Description
ATTACHMENT B – Performance Metrics

5

DOT_0047589

**Attachment A**

**Project Description**

The CBD Tolling Program will implement a vehicular tolling program to reduce traffic congestion in the Manhattan Central Business District ("CBD"), consistent with the MTA Reform and Traffic Mobility Act. Traffic congestion is expected to be reduced by disincentivizing use of vehicles within the CBD by imposition of tolls, and concurrently by investments in transit that will incentivize use of transit systems instead of driving. The project purpose is to reduce traffic congestion in the CBD in a manner that will generate revenue for future transportation improvements, pursuant to acceptance into FHWA's Value Pricing Pilot Program.

The CBD consists of the geographic area of Manhattan south and inclusive of 60th Street, but not including Franklin D. Roosevelt Drive ("FDR Drive"), West Side Highway/Route 9A, the Battery Park Underpass, and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West Street (the West Side Highway/Route 9A).

TBTA will toll vehicles entering the CBD via a cashless tolling system. The toll amount will be variable, with higher tolls charges during peak periods when congestion is greater. The toll will apply to all registered vehicles (i.e., those with license plates), with the exception of qualifying vehicles transporting persons with disabilities, qualifying authorized emergency vehicles, transit buses, and specialized government vehicles. Passenger vehicles will be tolled no more than once a day. Taxis and for-hire vehicles ("FHVs") will be tolled on a per-trip basis for rides carrying passengers occurring wholly or partially within the CBD.

The Project will use the same tolling infrastructure and tolling system equipment described and evaluated in the Final Environmental Assessment for the Project (the "Final EA").

The environmental commitments made in the Finding of No Significant Impact will be implemented as described in the Environmental Documents.

To address effects to low-income drivers, the Project will include a tax credit for CBD tolls paid by residents of the CBD whose New York adjusted gross income for the taxable year is less than $60,000. TBTA will coordinate with the New York State Department of Taxation and Finance to ensure availability of documentation needed for drivers eligible for the tax credit. In addition, the Project commits, for five years, to a Low-Income Discount Plan offering low-income frequent drivers a 50 percent discount on the full E-ZPass toll rate after the first 10 trips in each calendar month (excluding the overnight period, which will already be deeply discounted).

The toll amounts will be graduated over a six year period in accordance with the toll rate schedule below. Phase 1 will span 2025 through 2027, Phase 2 will span 2028 through 2030, and Phase 3 will commence in 2031.

6

DOT_0047590

## Toll Rate Schedule

| TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY CENTRAL BUSINESS DISTRICT (CBD) CHARGES | | | | | | |
|---|---|---|---|---|---|---|
| | PHASE 1 2025-2027 | | PHASE 2 2028-2030 | | PHASE 3 starting 2031 | |
| a E-ZPass Customers | CBD ENTRY CHARGE | TUNNEL CROSSING CREDIT | CBD ENTRY CHARGE | TUNNEL CROSSING CREDIT | CBD ENTRY CHARGE | TUNNEL CROSSING CREDIT |
| VEHICLE CLASSIFICATION | | | | | | |
| 1 Passenger and other vehicles, including sedans, sport utility vehicles, station wagons, hearses, limousines, pickup trucks with factory beds, pickup trucks with caps below the roofline and not extending over the sides, and vans without an extended roof above the windshield | | | | | | |
|   Peak period (5am-9pm weekdays, 9am-9pm weekends) | $9.00 | | $12.00 | | $15.00 | |
|   Peak period for registered Low-Income Discount Plan participants using an eligible vehicle, 11th trip and trips thereafter in a calendar month (5am-9pm weekdays, 9am-9pm weekends) | $4.50 | | $6.00 | | $7.50 | |
|   Peak period per-trip credit (maximum daily credit $5.00) | | | | | | |
|     If entering the CBD via the Lincoln Tunnel or Holland Tunnel | | $3.00 | | $4.00 | | $5.00 |
|     If entering or exiting the CBD via the Queens-Midtown Tunnel or Hugh L. Carey Tunnel | | $1.50 | | $2.00 | | $2.50 |
|   Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $2.25 | | $3.00 | | $3.75 | |
| 2 Single-unit trucks, including non-articulated trucks, pickup trucks with modified beds, vans with modified body behind the drivers cab, pickup trucks with caps above the roofline or extending over the sides, and vans with an extended roof above the windshield | | | | | | |
|   Peak period (5am-9pm weekdays, 9am-9pm weekends) | $14.40 | | $19.20 | | $24.00 | |
|   Peak period per-trip credit | | | | | | |
|     If entering the CBD via the Lincoln Tunnel or Holland Tunnel | | $7.20 | | $9.60 | | $12.00 |
|     If entering or exiting the CBD via the Queens-Midtown Tunnel or Hugh L. Carey Tunnel | | $3.60 | | $4.80 | | $6.00 |
|   Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $3.60 | | $4.80 | | $6.00 | |
| 3 Multi-unit trucks, including articulated trucks where a power unit is carrying one or more trailers | | | | | | |
|   Peak period (5am-9pm weekdays, 9am-9pm weekends) | $21.60 | | $28.80 | | $36.00 | |
|   Peak period per-trip credit | | | | | | |
|     If entering the CBD via the Lincoln Tunnel or Holland Tunnel | | $12.00 | | $16.00 | | $20.00 |
|     If entering or exiting the CBD via the Queens-Midtown Tunnel or Hugh L. Carey Tunnel | | $6.00 | | $8.00 | | $10.00 |
|   Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $5.40 | | $7.20 | | $9.00 | |
| 4 Buses, including vehicles registered with the DMV and plated as a bus, omnibus, or have other designated official plates | | | | | | |
|   Peak period (5am-9pm weekdays, 9am-9pm weekends) | $14.40 | | $19.20 | | $24.00 | |
|   Peak period per-trip credit | | | | | | |
|     If entering the CBD via the Lincoln Tunnel or Holland Tunnel | | $7.20 | | $9.60 | | $12.00 |
|     If entering or exiting the CBD via the Queens-Midtown Tunnel or Hugh L. Carey Tunnel | | $3.60 | | $4.80 | | $6.00 |
|   Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $3.60 | | $4.80 | | $6.00 | |
|   Licensed sightseeing buses | | | | | | |
|   Peak period (5am-9pm weekdays, 9am-9pm weekends) | $21.60 | | $28.80 | | $36.00 | |
|   Peak period per-trip credit | | | | | | |
|     If entering the CBD via the Lincoln Tunnel or Holland Tunnel | | $12.00 | | $16.00 | | $20.00 |
|     If entering or exiting the CBD via the Queens-Midtown Tunnel or Hugh L. Carey Tunnel | | $6.00 | | $8.00 | | $10.00 |
|   Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $5.40 | | $7.20 | | $9.00 | |
| 5 Motorcycles | | | | | | |
|   Peak period (5am-9pm weekdays, 9am-9pm weekends) | $4.50 | | $6.00 | | $7.50 | |
|   Peak period per-trip credit | | | | | | |
|     If entering the CBD via the Lincoln Tunnel or Holland Tunnel | | $1.50 | | $2.00 | | $2.50 |
|     If entering or exiting the CBD via the Queens-Midtown Tunnel or Hugh L. Carey Tunnel | | $0.75 | | $1.00 | | $1.25 |
|   Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $1.05 | | $1.40 | | $1.75 | |

E-ZPass CBD entry charges are available subject to terms, conditions, and agreements established by the Authority.

The Authority reserves the right to determine whether any vehicle is of unusual or unconventional design, weight, or construction and therefore not within any of the listed categories. The Authority also reserves the right to determine the CBD charge for any such vehicle of unusual or unconventional design, weight, or construction. Any single unit identified as belonging to Classes 1, 2, or 5 will be up-classed to the next toll class when towing a trailer or another vehicle.

Daily toll cap of once per day for Class 1 and Class 5 vehicles. Caps for other vehicles are subject to change pursuant to the adaptive management approach to mitigating project effects, as committed to in the Final Environmental Assessment.

CBD entry charges and tunnel credits are subject to a variable percentage increase/decrease of up to 10% for up to one year after implementation pursuant to the adaptive management approach to mitigating project effects, as committed to in the Final Environmental Assessment.

The Low-Income Discount Plan shall continue for five years as committed to in the Final Environmental Assessment.

The Authority reserves the right to charge a 25% higher CBD charge during Gridlock Alert Days. Each year, the NYCDOT identifies Gridlock Alert Days during the UN General Assembly and throughout the holiday season when heavy traffic is expected in Manhattan. On Gridlock Alert Days, consider walking, biking, or taking mass transit for any trips in Manhattan.

Qualifying authorized emergency vehicles and qualifying vehicles transporting persons with disabilities are exempt pursuant to Vehicle and Traffic Law § 1704-a (2).

Qualifying authorized commuter buses and specialized government vehicles, as determined by the Authority, are exempt.

DOT_0047591

**TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY CENTRAL BUSINESS DISTRICT (CBD) CHARGES**

| b Customers Using Fare Media Other Than E-ZPass<br><br>VEHICLE CLASSIFICATION | PHASE 1 2025-2027 CBD ENTRY CHARGE | PHASE 1 PER TRIP CHARGE PLAN* (TO/FROM/WITHIN/THROUGH CBD) | PHASE 2 2028-2030 CBD ENTRY CHARGE | PHASE 2 PER TRIP CHARGE PLAN* (TO/FROM/WITHIN/THROUGH CBD) | PHASE 3 starting 2031 CBD ENTRY CHARGE | PHASE 3 PER TRIP CHARGE PLAN* (TO/FROM/WITHIN/THROUGH CBD) |
|---|---|---|---|---|---|---|
| 1 Passenger and other vehicles, including sedans, sport utility vehicles, station wagons, hearses, limousines, pickup trucks with factory beds, pickup trucks with caps below the roofline and not extending over the sides, and vans without an extended roof above the windshield | | | | | | |
| Peak period (5am-9pm weekdays, 9am-9pm weekends) | $13.50 | | $18.00 | | $22.50 | |
| Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $3.30 | | $4.40 | | $5.50 | |
| 2 Single-unit trucks, including non-articulated trucks, pickup trucks with modified beds, vans with modified body behind the drivers cab, pickup trucks with caps above the roofline or extending over the sides, and vans with an extended roof above the windshield | | | | | | |
| Peak period (5am-9pm weekdays, 9am-9pm weekends) | $21.60 | | $28.80 | | $36.00 | |
| Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $5.40 | | $7.20 | | $9.00 | |
| 3 Multi-unit trucks, including articulated trucks where a power unit is carrying one or more trailers | | | | | | |
| Peak period (5am-9pm weekdays, 9am-9pm weekends) | $32.40 | | $43.20 | | $54.00 | |
| Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $8.10 | | $10.80 | | $13.50 | |
| 4 Buses, including vehicles registered with the DMV and plated as a bus, omnibus, or have other designated official plates | | | | | | |
| Peak period (5am-9pm weekdays, 9am-9pm weekends) | $21.60 | | $28.80 | | $36.00 | |
| Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $5.40 | | $7.20 | | $9.00 | |
| Licensed sightseeing buses | | | | | | |
| Peak period (5am-9pm weekdays, 9am-9pm weekends) | $32.40 | | $43.20 | | $54.00 | |
| Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $8.10 | | $10.80 | | $13.50 | |
| 5 Motorcycles | | | | | | |
| Peak period (5am-9pm weekdays, 9am-9pm weekends) | $6.75 | | $9.00 | | $11.25 | |
| Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $1.65 | | $2.20 | | $2.75 | |
| NYC TLC taxis, green cabs, for-hire vehicles (FHVs) | | | | | | |
| Taxis, green cabs, and FHVs on trips | | $0.75 | | $1.00 | | $1.25 |
| FHVs on trips dispatched by high-volume for-hire services (HVFHSs) | | $1.50 | | $2.00 | | $2.50 |

The Authority reserves the right to determine whether any vehicle is of unusual or unconventional design, weight, or construction and therefore not within any of the listed categories. The Authority also reserves the right to determine the CBD charge for any such vehicle of unusual or unconventional design, weight, or construction. Any single unit vehicle identified as belonging to Classes 1, 2, or 5 will be up-classed to the next toll class when towing a trailer or another vehicle.

Daily toll cap of once per day for Class 1 and Class 5 vehicles. Caps for non-passenger vehicles are subject to change pursuant to the adaptive management approach to mitigating project effects, as committed to in the Final Environmental Assessment.

NYC TLC taxi, green cab, and FHV tolls are to be paid by the passenger pursuant to Rules of City of NY Taxi & Limousine Commn (35 RCNY) §§ 58-26 (f), 59A-23 (b), 59D-17 (c).

CBD entry charges and per trip charges are subject to a variable percentage increase/decrease of up to 10% for up to one year after implementation pursuant to the adaptive management approach to mitigating project effects, as committed to in the Final Environmental Assessment.

The Authority reserves the right to charge a 25% higher CBD charge during Gridlock Alert Days. Each year, the NYCDOT identifies Gridlock Alert Days during the UN General Assembly and throughout the holiday season when heavy traffic is expected in Manhattan. On Gridlock Alert Days, consider walking, biking, or taking mass transit for any trips in Manhattan.

Qualifying authorized emergency vehicles and qualifying vehicles transporting persons with disabilities are exempt pursuant to Vehicle and Traffic Law § 1704-a (2).

Qualifying authorized commuter buses and specialized government vehicles, as determined by the Authority, are exempt.

*Subject to full execution of and in compliance with plan agreement by FHV bases and taxi technology system providers.

DOT_0047592

**ATTACHMENT B – Performance Metrics**

As developed in the Final EA and the Reevaluations for the Project dated June 2024 and November 2024, the performance metrics of the system for evaluating the effectiveness of the pilot program and managing congestion are related to reducing vehicles entering the CBD and reducing VMT within the CBD. For reference, the amount of congestion reduction within the CBD for the toll structure is as follows::

- Reduce daily vehicle miles traveled (VMT) within the Manhattan CBD by 6.4 percent (Phase 1) to 8.9 percent (Phase 3)
- Reduce the number of vehicles entering the Manhattan CBD by 13.4 percent (Phase 1) to 17 percent (Phase 3)

Another important factor for measuring congestion reduction in the CBD related to transit investment is transit ridership in the CBD.:

- Increase in transit use entering the CBD.

The program will be collecting a significant amount of data to assess, track, and trend the direct and indirect effects of the project. These data, which are described in the following bullets, will be made public on a regular basis in open data format to the greatest extent practicable.

**Direct Congestion Measures**
- Vehicle entries into the CBD (by type of vehicle, day of week, time of day)
- Historic volumes entering the CBD (average fall weekday/weekend, time of day)
- Taxi and FHV trips to, from, and within the CBD
- Taxi and FHV VMT within the CBD

**Indirect Congestion Measures**
- System-wide transit ridership for transit services providing CBD-related service (monthly total ridership by mode and transit operator)
- Metropolitan Transportation Authority bus speeds within the CBD
- Capital projects funded or financed through Project revenue

**Monitored and Modeled Air Quality Measures**
- PM2.5
- Nitrogen Oxides
- Ozone: via modeling
- Greenhouse Gases

**Reporting on revenue and for audit purposes**
- Project revenue
- Project capital and operating expenses

DOT_0047593

# Appendix 2

DOT_0047594

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

METROPOLITAN TRANSPORTATION AUTHORITY
and TRIBOROUGH BRIDGE AND TUNNEL
AUTHORITY,

<em>Plaintiffs</em>,

and

NEW YORK STATE DEPARTMENT OF
TRANSPORTATION, RIDERS ALLIANCE, SIERRA
CLUB, and NEW YORK CITY DEPARTMENT OF
TRANSPORTATION,

<em>Intervenor-Plaintiffs</em>,

v.

SEAN DUFFY, in his official capacity as Secretary of
the United States Department of Transportation,
GLORIA M. SHEPHERD, in her official capacity as
Executive Director of the Federal Highway
Administration, UNITED STATES DEPARTMENT
OF TRANSPORTATION, and FEDERAL HIGHWAY
ADMINISTRATION,

<em>Defendants</em>.

Case No. 25 Civ. 1413 (LJL)

**CONSOLIDATED
SECOND AMENDED
COMPLAINT OF
PLAINTIFFS
METROPOLITAN
TRANSPORTATION
AUTHORITY AND
TRIBOROUGH BRIDGE
AND TUNNEL
AUTHORITY AND
INTERVENOR-
PLAINTIFFS NEW YORK
STATE DEPARTMENT OF
TRANSPORTATION AND
NEW YORK CITY
DEPARTMENT OF
TRANSPORTATION**

Plaintiffs, Metropolitan Transportation Authority ("MTA") and Triborough Bridge and Tunnel Authority ("TBTA"), and Intervenor-Plaintiffs New York State Department of Transportation ("NYSDOT") and New York City Department of Transportation ("NYCDOT"), file this consolidated second amended complaint against Defendants Sean Duffy, in his official capacity as Secretary of the United States Department of Transportation, Gloria M. Shepherd, in her official capacity as Executive Director of the Federal Highway Administration, the United States Department of Transportation ("USDOT"), and the Federal Highway Administration ("FHWA"), and allege as follows:

## INTRODUCTION

1.      On January 5, 2025, the State of New York embarked on a bold new program to reduce traffic congestion in the New York City metropolitan area and fund and promote public transit with the Central Business District ("CBD") Tolling Program ("Program"). The Program, also known as Congestion Pricing, is a market-based, user-pay solution that has seen success in major cities around the world and was first conceived of right here in New York City as a possible solution to Manhattan's longstanding congestion woes.

2.      <u>New York Decides to Implement the Program</u>. For many years, the CBD was one of the most congested urban areas in the country. Travel times were extraordinarily slow. Indeed, the term "gridlock" was invented in Manhattan. Congestion in the CBD has been a $20 billion annual drag on the regional economy, and thus the national economy as well.

3.      In the 1950s, Nobel laureate and Columbia University economist William S. Vickrey proposed a market-based solution to the congestion affecting the City: charging vehicles to drive in highly congested areas. Over the following decades, New York state and local officials, policy experts, and advocacy groups studied various solutions to identify the most effective way to reduce congestion, which results in lost productivity, poor air quality, slower and less reliable public bus service, delayed emergency response times, and reduced public safety, among other harmful conditions. That extensive deliberation led to the consensus that congestion pricing is the most effective tool to achieve that goal—a consensus supported by the experience of London, Singapore, Stockholm, and Milan, which have each implemented their own congestion pricing programs and have seen as a result significant decreases in vehicle congestion and corresponding increases in the use of public transit facilities like subways and buses.

4.      In April 2019, following multiple attempts by New York elected officials to implement a form of congestion pricing, the New York Legislature and then-Governor Andrew

DOT_0047596

Cuomo passed the Traffic Mobility Act ("TMA"), a landmark statute with the goal of reducing traffic congestion in the CBD and creating a dedicated funding source for the MTA's capital needs. N.Y. Veh. & Traf. Law § 1701 *et seq.* The TMA authorized and directed TBTA, the MTA's independent affiliate, to establish and operate a congestion pricing program, including tolling of eligible vehicles entering or remaining in the CBD, and earmarked the revenues from the Program for the MTA's 2020-2024 Capital Program (the "Capital Program") and subsequent capital programs.

5.     Shortly after the TMA was enacted, in the spring of 2019, New York State, through NYSDOT, TBTA, and NYCDOT (collectively, the "Project Sponsors"), attended several meetings with representatives from the first Trump Administration's FHWA and USDOT to discuss and present the proposed program. During those meetings, the Project Sponsors explained that the Program would accomplish its aims by tolling eligible vehicles entering the CBD in order to incentivize the use of modes other than driving, and using those tolling revenues to improve the metropolitan region's public transportation infrastructure, thereby further encouraging the use of public transit.

6.     The Federal Defendants Authorize the Program Under the Value Pricing Pilot Program. Early on, FHWA and USDOT took the position that the "best fit" for the Program would be for the Project Sponsors to apply for federal tolling authorization through the Value Pricing Pilot Program, a statutory provision under which FHWA may authorize congestion pricing on federal-aid highways to reduce roadway congestion and improve air quality. *See* 23 U.S.C. § 149 note (Value Pricing Pilot Program) ("VPPP").[1] The VPPP, originally called the Congestion

---

[1] A "federal-aid highway" is a "public highway eligible for assistance" under provisions of Chapter 1, Title 23 of the United States Code, "other than a highway functionally classified as a local road or rural minor collector." 23 U.S.C. § 101(a)(6).

DOT_0047597

Pricing Pilot Program, has been used across the country to authorize tolling to reduce congestion, improve the environment, and raise funding for public transit. It has specifically been used in Fort Myers, Los Angeles, and San Francisco to finance and study congestion pricing in urban areas through the establishment of tolls to enter an area, similar to the programs that exist in London, Singapore, Stockholm, and Milan. Indeed, this type of tolling, known as "cordon pricing" (or sometimes "zone-based pricing" or "area-wide pricing"), has consistently been recognized, in Congress and by USDOT and FHWA, as the model form of "congestion pricing" authorized under the VPPP because it most effectively reduces overall congestion within a geographic area.

7.      In June 2019, the Project Sponsors submitted an Expression of Interest ("EoI"), attached hereto as **Exhibit A**, to FHWA for authority to assess tolls on vehicles entering the CBD. The EoI reiterated that the "purpose of [the Program] is to reduce the high level of traffic congestion in the CBD," and anticipated that "a variable toll to access the CBD, combined with an investment of the resultant revenues in improving public transit alternatives, will maximize the congestion reduction in the CBD and the surrounding area." EoI at 1-2.

8.      Pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, FHWA proceeded to evaluate the potential environmental impacts of the Program. This included, as directed by a former Executive Order that has since been revoked by President Trump, the Program's potential to have a disproportionately high and adverse impact on minority and low-income (*i.e.*, environmental justice ["EJ"]) populations including EJ communities that have pre-existing pollution and health burdens due to historic transportation and land use decisions. After a multi-year environmental review process from 2019 through 2024 that yielded an administrative record of more than 45,000 pages, FHWA and the Project Sponsors prepared a 958-page Final Environmental Assessment ("Final EA") followed by a Finding of No Significant Impact

DOT_0047598

("FONSI") and two Reevaluations, which determined that the Program would not have a significant adverse impact on the environment or a disproportionately high and adverse impact on EJ communities in light of, among other things, (1) the anticipated reduction of overall vehicle miles traveled ("VMT") and vehicular emissions in the region, and (2) the Project Sponsors' commitment to a robust, $155 million mitigation package to improve air quality and public health in EJ communities that have pre-existing pollution and health burdens and could experience traffic diversions as a result of the Program.

9.      On November 21, 2024, FHWA executed an agreement with the Project Sponsors (the "VPPP Agreement" or "VPPP Agmt."), attached hereto as **Exhibit B**, pursuant to which FHWA approved the Program's collection of tolls under the VPPP and required (among other things) implementation of the Project Sponsors' mitigation commitments. Consistent with the VPPP, the VPPP Agreement recognizes that toll revenues may be used on any project eligible for federal assistance, which includes public transit. The VPPP Agreement also requires the Project Sponsors to provide data on project performance (*i.e.*, reduction of congestion and increased use of public transit) for "at least ten years." VPPP Agmt., cl. 8(b).

10.      The VPPP Agreement does not provide any right to the federal government to terminate the Program; rather, the VPPP Agreement provides only that the parties agree to "return the Project to its original operating condition if *TBTA* decides to discontinue tolls on the Project." *Id.*, cl. 11 (emphasis added).

11.      The Program Is Succeeding. The Program went into effect on January 5, 2025, and vehicles entering the CBD are being tolled in accordance with the toll rate schedule regulation adopted by the TBTA Board and authorized in the VPPP Agreement. Already, the data collected to date (and simply looking at the roads) show that there is less congestion and the Program is

5

working: vehicle entries to the CBD and commute times have fallen; vehicle speeds—including those of public buses—have increased; more people are visiting Manhattan's commercial districts and supporting the region's businesses; and the MTA's mass transit system is seeing the benefit of increased ridership and increased funding.

12.     A recent study by researchers from the National Bureau of Economic Research ("NBER"), Google Research, Yale University, and Stanford University found that the "introduction of congestion pricing led to an immediate increase in speeds within NYC's CBD, which has persisted since implementation," and estimated "that speeds in NYC's CBD increased by 15%" on average and that the "effects on speeds are even larger during the afternoon— historically the most congested time of day—and persist even after peak-hours pricing ends at 9pm."[2]   Traffic in the CBD has decreased substantially, with approximately 5.8 million fewer vehicles entering the district in January through March 2025 than would be expected based on data for prior years, representing a 12.5% reduction overall across the first three months of the Program.[3]   The data also indicates a 10% reduction in VMT by all vehicles in the CBD from January to mid-March of 2025, as compared to the same period in 2024.

13.     According to data collected by TRANSCOM, a coalition of 16 transportation and public safety agencies in the broader metropolitan region, crossing times were 17% faster at the Lincoln Tunnel and 48% faster at the Holland Tunnel in January 2025, compared to January 2024; trip times from Brooklyn and Queens to the CBD have dropped between 10% and 30%; and express buses save about 10 minutes on their commutes.  Traffic speeds on river crossings have

---

[2] Cody Cook, et al., *The Short-Run Effects of Congestion Pricing in New York City*, NBER (March 17, 2025), https://shoshanavasserman.com/files/2025/03/NYC_Congestion_Pricing_2025.pdf (last accessed April 14, 2025).

[3] MTA, *MTA Metrics: Vehicle Reductions*, https://metrics.mta.info/?cbdtp/vehiclereductions (last accessed April 14, 2025).

DOT_0047600

been 5% to 30% faster this February than last February.  Traffic speeds on major bridges improved

significantly: on the Queensboro Bridge, by 31%; on the Brooklyn Bridge, by 26%; and on the

Manhattan Bridge, by 7%.[4]  These trends continued in March: fewer vehicles utilized the nine

MTA bridges and tunnels, with levels dropping 2.4% from March of 2024 to March of 2025.[5]  The

largest reductions are at the Hugh L. Carey and Queens-Midtown Tunnels, which lead directly into

the CBD.  Truck traffic traveling through these tunnels dropped 14% this year compared to the

same period in 2024.[6]

   14.    Honking is also down, as New Yorkers in the CBD are finally enjoying what might

be called some "peace and quiet" since the Program went into effect, corresponding to a 69%

decline in noise complaints about honking made to the City's 311 portal.[7]

   15.    The dire projections that the Program would harm business are also belied by the

data.  Credit card sales data reflect that retail sales in the CBD are on track to be $900 million

higher in 2025 compared to the same period last year.[8]  *Crain's New York Business* reports that

more people visited the Business Improvement Districts ("BIDs") within the CBD in January 2025

than during the same month last year, noting a 4.6% year-over-year increase in visitation.[9]  Indeed,

---

[4] MTA, January 2025 MTA Board Meeting, *Congestion Relief Zone Tolling January 29, 2025 Update* 9, https://www.mta.info/document/163411 (last accessed Apr. 17, 2025); February 2025 MTA Board Presentation at 10 (Feb. 26, 2025), https://www.mta.info/document/165401 (last accessed Apr. 17, 2025).

[5] *MTA Daily Ridership and Traffic: Beginning 2020*, Data.NY.Gov (Apr. 16, 2025), https://data.ny.gov/Transportation/MTA-Daily-Ridership-and-Traffic-Beginning-2020/sayj-mze2/about_data.

[6] Samuel Schwartz, *Where Have all the Trucks Gone? Truck Diversions Through the Bronx and Staten Island*, HUNTER COLL. (Mar. 28, 2025), https://www.roosevelthouse.hunter.cuny.edu/?forum-post=trucks-gone-truck-diversions-bronx-staten-island.

[7] *Id.*

[8] Dave Colon, *Memo to the President: Manhattan Economy Improving, Thanks to Congestion Pricing*, STREETSBLOG NYC (Feb. 27, 2025), https://nyc.streetsblog.org/2025/02/27/memo-to-the-president-manhattan-economy-improving-thanks-to-congestion-pricing.

[9] Caroline Spivack, *Business Foot Traffic Is Up Within the Congestion Pricing Zone*, CRAIN'S N.Y. BUS. (Feb. 5, 2025), https://www.crainsnewyork.com/transportation/congestion-pricing-zone-business-foot-traffic.

DOT_0047601

while vehicle traffic may be down in Manhattan, *Gothamist* observes, "pedestrian traffic is up."[10] Data from the Broadway League, meanwhile, shows that there was a 20% year-over-year increase in attendance for Broadway theatre performances in January through March 2025, as well as a 25% increase in gross revenue in January 2025.[11]

16.     Business leaders have voiced their support for the Program, recognizing the benefits of Congestion Pricing for businesses in the CBD and the broader economy.  Greater New York Chamber of Commerce CEO Mark Jaffe has stated that the Program "will improve the quality of life in Manhattan for all who live, work and visit," and that decreased traffic from the Program "should decrease labor time and improve the efficiencies of getting essential commodities onto the shelves."[12]  The Partnership for New York City, a non-profit group of New York business leaders, has likewise voiced its support for the Program, pointing out that it could save "an estimated $20 billion that excess congestion costs annually because of more efficient and timely movement of people and goods, which will increase productivity and reduce expenditures on fuel and overtime."[13]  More recently, the Partnership for New York City's President & CEO Kathryn Wylde stated that, "[i]n every respect, this is a policy that President Trump and the Republicans should be supporting."[14]

---

[10] Arun Venugopal, *Vehicle Traffic is Down in Manhattan, But Pedestrian Traffic Is Up, Data Says*, GOTHAMIST (Feb. 13, 2025), https://gothamist.com/news/vehicle-traffic-is-down-in-manhattan-but-pedestrian-traffic-is-up-data-says.

[11] Research & Statistics, *Grosses-Broadway in NYC*, THE BROADWAY LEAGUE https://www.broadwayleague.com/research/grosses-broadway-nyc/ (last accessed Apr. 17, 2025).Gersh Kuntzman, *Wind in Their Sales: Congestion Pricing Is No 'Toll' on the Broadway Box Office*, STREETSBLOG NYC (Feb. 5, 2025), https://nyc.streetsblog.org/2025/02/05/wind-in-their-sales-congestion-pricing-is-no-toll-on-the-broadway-box-office.

[12] New York's Chamber (@NYChamber), X (Nov. 15, 2024, 3:29 PM), https://x.com/NYChamber/status/1857521387583451602.

[13] Louisa Chafee, et al., *Op-ed: Congestion Pricing Will Be a Boon for New York*, PFNYC.ORG (Nov. 14, 2014), https://pfnyc.org/news/op-ed-congestion-pricing-will-be-a-boon-for-new-york/.

[14] Ry Rivard & Nick Reisman, *New York's Business Boosters Push Trump to Keep Manhattan Tolls*, POLITICO (Feb. 11, 2025), https://www.politico.com/news/2025/02/11/new-york-trump-congestion-pricing-00203540.

DOT_0047602

17.     The region's subways, buses, and commuter railroads—vital transportation lifelines for so many New Yorkers who live in the metropolitan area and beyond—are already benefiting from substantial investments that have been made as a result of the Program.  In particular, key tenets of the Capital Program include improving outdated signaling and other equipment to increase system reliability; improving safety and customer service through technology; and extending public transit to underserved areas.  And the Program will create many more benefits going forward.  For example, Program revenue will be used to update and renovate numerous subway stations consistent with the Americans with Disabilities Act by building new elevators at 70 stations across the boroughs and replacing up to 65 escalators and 78 elevators, bringing the transportation system to greater than 50% accessibility.

18.     In addition, Program revenue will be used to advance the $155 million package of mitigation for EJ communities, which is designed to address preexisting pollution and chronic health burdens.  These measures will include replacing diesel engines with cleaner technology; installing electric charging infrastructure for trucks; planting roadside vegetation to improve near-road air quality; and installing air filtration units in schools near highways.

19.     TBTA has also issued debt that is supported by revenues generated by the Program and by long-term bonds issued partly in reliance on revenues generated by the Program.  This includes no less than $378.8 million in short-term notes currently outstanding to fund infrastructure costs, and $500 million in short-term notes to fund a portion of the $15 billion of capital projects in the Capital Program.  By the end of the month, TBTA also expects to close a $500 million bank loan to support the Capital Program, relying on Program revenues as security.

DOT_0047603

20.     New Yorkers support the Program because it is working.  According to a poll reported by *CBS News*, the majority of New Yorkers want the Program to continue.[15]  On a 2-to-1 basis, New Yorkers say that the Program is working.[16]  The Program's biggest supporters are the individuals who actually drive into the CBD frequently.[17]  Ultimately, 6 out of every 10 New Yorkers say that President Trump should not take any steps to end the Program.[18]

21.     <u>The New Administration Seeks to "Terminate" the Program</u>.  Notwithstanding the extensive evaluations—and now results—showing that Congestion Pricing is the best way to reduce congestion in the CBD, reduce overall vehicle emissions in the greater region, and improve the accessibility and reliability of public transit, the Program has continued to have its political detractors, including the President of the United States.  As early as May 2024, President Trump posted on "Truth Social" that he would "TERMINATE Congestion Pricing in my FIRST WEEK back in Office," and subsequent media reports—from the President and his allies in Congress—indicated that the Administration wished to immediately and summarily end Congestion Pricing to achieve political objectives.

---

[15] Alecia Reid, *6 in 10 Say They Want NYC Congestion Pricing to Continue, New Poll Finds*, CBS NEWS (Feb. 5, 2025), https://www.cbsnews.com/amp/newyork/news/new-york-city-congestion-pricing-morning-consult-poll/.

[16] *Id.*

[17] *Id.*

[18] *Id.*

DOT_0047604

22.    On February 19, 2025, the Trump Administration attempted to do just that. Defendant USDOT Secretary Duffy issued a letter to Governor Hochul, attached hereto as **Exhibit C** (the "February 19 Letter" or "Feb. 19 Ltr."), purporting to "rescind" the VPPP Agreement and "terminate" the Program.   The White House "X" account proclaimed that "CONGESTION PRICING IS DEAD.  Manhattan, and all of New York, is SAVED.  LONG LIVE THE KING!", along with a picture of President Trump wearing a crown in front of the Manhattan skyline.



**Figure 1: Feb. 19, 2025 social media post to X.com by @WhiteHouse**

23.    Despite the Administration's "royal" decree, its effort to summarily and unilaterally overturn the solution to the City's congestion enacted by New Yorkers' elected representatives is unlawful and invalid.  Accordingly, Congestion Pricing remains alive and well, and the MTA and TBTA responded by filing this lawsuit seeking a declaration that the Administration's actions are

11

DOT_0047605

null and void and for vacatur of the purported "rescission" and "termination." NYSDOT and NYCDOT then successfully moved to intervene as plaintiffs in this lawsuit and, together with the MTA and TBTA, submitted a consolidated first amended consolidated complaint on April 18, 2025. ECF 62. Riders Alliance and Sierra Club also successfully moved to intervene as plaintiffs in this lawsuit and filed their own complaint on March 8, 2025, ECF 41, which they amended on April 18, 2025, ECF 63.

24.     Neither the VPPP Agreement nor applicable law or regulations permit Defendants to unilaterally terminate the VPPP Agreement. This makes good sense. If Defendants had some absolute right to unilaterally terminate a VPPP program that had already been approved and implemented, it would create uncertainty around the future of such programs any time leadership at FHWA, USDOT, or the White House changed—uncertainty that would obviously undermine the purposes of the VPPP, make it difficult to issue bonds for other projects, and be inimical to a rules-based, market economy.

25.     Beyond that, the two legal rationales for attempting to terminate the VPPP Agreement in Duffy's February 19 letter are so weak as to be transparently pretextual. First, Duffy claimed that the VPPP does not authorize cordon pricing. But the reality is that the VPPP's broad language authorizes a variety of congestion pricing strategies, including cordon pricing, and Duffy's tortured reading is contrary to: (i) the ordinary meaning of "congestion pricing" at the time that the VPPP was enacted (and each time it has subsequently been reauthorized), (ii) the statute's legislative history, and (iii) more recent pronouncements from Congress. It is also contradicted by FHWA's own official guidance documents and reports and FHWA's approval of other cordon-based pilot projects.

26.     Duffy's second reason seems to relate to his factually incorrect claim that the toll

12

rate schedule regulation associated with the Program is "driven primarily by the need to raise revenue for the Metropolitan Transit [sic] Authority (MTA) system." Even if that were the case, which it is not, it is perfectly clear from the statutory text, the legislative history, and the agency's guidance and actions that States may, and are actually expected to, consider revenue objectives when setting toll rates for projects authorized under the VPPP. Indeed, Congress expressly stated that States would use toll revenues to fund other "projects eligible under such title," VPPP, cl. 3—which include transit capital projects—and directed the Secretary to report on the effects that VPPP projects have on not only congestion but also "transit ridership … and availability of funds for transportation programs," *id.* at cl. 5. In a different section of the Intermodal Surface Transportation Efficiency Act of 1991, Pub. L. 102-240 (Dec. 18, 1991) ("ISTEA"), the statute that created the VPPP, Congress even *required* States to consider "the use of innovative mechanisms for financing [transportation] projects, including ... congestion pricing," ISTEA § 1025(a). For these reasons, Duffy's view that congestion pricing was not authorized by the VPPP borders on being specious.

27. In the decades since the VPPP was enacted, Congress and FHWA have both repeatedly concluded that the VPPP authorizes cordon-based congestion pricing in New York City and that the revenues from such a program may be used to fund transit infrastructure. Duffy's abrupt and politically motivated departure from this consensus provides no legitimate basis for FHWA's reversal of its position on the Program, particularly after FHWA reaffirmed the FONSI and approved the Program only a few months prior. And, in stark contrast to the five-year process that led to FHWA's VPPP approval, Defendants formed this newfound position, and took this agency action, a month following the change in administration, despite having provided no meaningful legal analysis as to their ability to terminate or justifications for terminating the

13

Program, and despite having conducted no NEPA review of the effects on the environment from ceasing tolling and reintroducing tens of thousands of additional vehicular trips into the CBD daily, preventing improvements to the region's public transit infrastructure, or terminating the EJ mitigation committed to as part of the Program and to be funded through Program revenue.

28.     Further demonstrating the pretextual and arbitrary nature of the termination, Duffy's rationale is in direct conflict with his stated policy to "prioritize" projects "that utilize user-pay models," like Congestion Pricing.  It also runs afoul of Duffy's own recent remarks that saving people time on their commutes would be part of his mission as Secretary.  As Duffy stated during a conference of state highway and transportation officials on February 5, 2025, the Administration should be committed to creating projects that:

> Mak[e] people's lives better.  What you do makes people's lives better.  We're able to get to work and back home to see our loved ones more quickly.  If we don't have our systems that are delayed and we don't sit in traffic we get to spend an extra 15 minutes, maybe an extra 45 minutes a day with the ones that we love as opposed to listening to music or a podcast or, I don't know what you listen to in the car, but whatever you're listening to in the car, or on the train.  We can make people's lives better and spend time with the people we love as opposed to going to the grind of our transportation system.[19]

Of course, the threatened cancellation of Congestion Pricing after it's already been operating successfully for more than three months actually would be the opposite of "making people's lives better" in this important way.

29.     In addition to being inconsistent with the Administration's own broader policy statements, the purported termination of the Program runs contrary to its purported respect for

---

[19] Sean Duffy, *U.S. Secretary of Transportation Sean Duffy Speaks at the American Association of State Highway and Transportation Officials 2025 Washington Briefing*, U.S. Dep't of Transp. (Feb. 5. 2025), https://www.transportation.gov/briefing-room/us-secretary-transportation-sean-duffy-speaks-american-association-state-highway-and.

DOT_0047608

federalism.  The Program is the first congestion pricing program of its kind to be implemented in the United States, a necessary solution to the unique policy challenges facing the New York metropolitan region and one that reflects the will of the majority of New Yorkers and their elected representatives at every level of government.  Indeed, the clear consensus of the experts and policy makers that have studied the issue is that cordon pricing is the most effective method to reduce congestion in Manhattan—a narrow island with a dense network of roads and numerous points of ingress and egress.  It is also a program that could provide a pathway for other congested urban areas to reduce congestion and fund public transit.  As Justice Brandeis explained nearly a century ago, "[i]t is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country."  *Whalen v. Roe*, 429 U.S. 589, 597 n.20 (1977) (quoting *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J. dissenting)).  President Trump claims to embrace this philosophy and has even pledged, in his own signature way, to "make states the laboratories of democracy once again."[20]  In his first inaugural address, President Trump declared that "we are not merely transferring power from one administration to another, or from one party to another, but we are transferring power from Washington, D.C., and giving it back to you, the American people."[21]  And Duffy, shortly after being confirmed as Secretary of Transportation, committed to not interfere with state transportation initiatives, promising state highway and transportation officials: "I think that you guys know how to do your jobs, and I think we should rethink the way we're doing business together by giving you all a lot more autonomy and a lot more authority, a lot more freedom to do the projects that you know are important in your

---

[20] Michael Stratford, *Trump Endorses States' Rights – But Only When He Agrees with the State*, POLITICO (Apr. 2, 2018), https://www.politico.com/story/2018/04/02/trump-states-rights-education-sanctuary-drilling-492784.
[21] *Id.*

DOT_0047609

communities."[22]  Yet the Administration's efforts to end the Program, when most New Yorkers believe it should not interfere, are directly contrary to those commitments.

30.      <u>The Administration Seeks to Coerce Compliance and Threatens to Retaliate</u>.  With no viable defense to Plaintiffs' claims on the merits, the Administration has resorted to what has become its *modus operandi*: attempting to improperly leverage federal funding as a way to compel compliance with its unlawful decrees.[23]  On March 18, 2025, Duffy sent a letter to the MTA, attached hereto as **Exhibit D**, demanding information on crime and safety in subways and on buses in New York City and threatening "further consequences, up to and including redirecting or withholding funding."  Although the letter did not directly reference Congestion Pricing, it was widely perceived as an attempt to gain leverage in his efforts to discontinue the Program and "la[y] the groundwork for citing crime as a reason to ultimately withhold federal money," coming just three days before Defendants' then-March 21, 2025 purported deadline for the Program to cease tolling.[24]

31.      On March 20, 2025, Duffy's message was even clearer.  He posted on X an apparent threat that Defendants might withhold unspecified federal funding from the State of New York (and, by implication, from the MTA, TBTA, and NYSDOT), unless the Program is ended.

---

[22] Sean Duffy, *U.S. Secretary of Transportation Sean Duffy Speaks at the American Association of State Highway and Transportation Officials 2025 Washington Briefing* (Feb. 5, 2025), https://www.transportation.gov/briefing-room/us-secretary-transportation-sean-duffy-speaks-american-association-state-highway-and.

[23] Alex Lemonides et al., *Tracking the Lawsuits Against Trump's Agenda*, N.Y. TIMES (Mar. 25, 2025), https://www.nytimes.com/interactive/2025/us/trump-administration-lawsuits.html.

[24] James Barron, *The Subtext of a Trump Official's Letter to the M.T.A.*, N.Y. TIMES (Mar. 20, 2025), https://www.nytimes.com/2025/03/20/nyregion/trump-duffy-nyc-subway.html.

16

DOT_0047610



**Figure 2: Mar. 20, 2025 social media post to X by @SecDuffy**

32.     On March 25, 2025, in response to a letter from Governor Hochul, State Senate Majority Leader Andrea Stewart-Cousins, and State Assembly Speaker Carl Heastie proposing an update to the federal transit funding formula, which awards the MTA only 17% of transit funding, despite its carrying 43% of the nation's mass transit riders, Duffy again took to X to suggest that Defendants may improperly withhold federal funds.  Duffy described the proposal as "Outrageous!" and accused the State of "trying to fill the gap with highway funds and taxing the working class"—invoking a term opponents to Congestion Pricing have used to disparage the tolls—rather than "actually fixing their financial mismanagement."  Using the same language from his earlier X post demanding that New York end the Program, Duffy once again warned that "[t]he federal government is not a blank check."

17



**Figure 3: Mar. 25, 2025 social media post to X by @SecDuffy**

33.     On March 30, 2025 the MTA responded to Duffy's request for information with a thorough, 22-page explanation as to why, in fact, New York's subways are among the safest in the nation and crime is at a historic low.  Even so, the MTA said it would welcome further federal collaboration to ensure that public transit continues as the best and most popular option for the region's commuters.

34.     Meanwhile, on March 20, 2025, Defendant Shepherd sent a letter to NYSDOT, NYCDOT, and MTA Bridges and Tunnels (the "March 20 Shepherd Letter" or "Mar. 20 Ltr."), attached hereto as **Exhibit E**, in which Shepherd noted her prior correspondence "providing you until March 21, 2025, to cease tolling operations that were initiated through the November 21, 2024, Value Pricing Pilot Program (VPPP) Agreement," stated that Duffy "has directed that I extend the period of time to comply by 30 days," and instructed that "toll operations must cease by April 20, 2025."  Mar. 20 Ltr.

35.     In light of this background, on April 2, 2025, the MTA and TBTA asked counsel

DOT_0047612

for the Federal Defendants during a meet-and-confer for the initial conference in this matter if their clients intend to take unilateral action to enforce the April 20 "deadline."  Counsel for the Federal Defendants "did not have information to provide" regarding the timing or likelihood of any such actions by their clients.  On April 8, however, DOT posted on its "USDOT Rapid Response" account on X that it "will not hesitate to use every tool at our disposal in response to non-compliance later this month."[25]



**Figure 4: Apr. 8, 2025 social media post to X by @USDOTRapid**

36.     On April 9, the Federal Defendants informed the Court during the initial conference

---

[25] @USDOTRapid, X.com (Apr. 8, 2025).

DOT_0047613

that Duffy is considering his options and had not yet made a final decision with respect to enforcement of the April 20 deadline.  The Federal Defendants, however, reiterated their position that Plaintiffs should cease tolling by April 20.

37.     On April 21, Duffy sent another letter to Governor Hochul demanding for a third time that the Program end.  ("April 21 Letter").  The April 21 Letter reaffirmed Defendants' position that the VPPP Agreement had been "terminated" by the February 19 Letter and threatened that Defendants "will implement appropriate initial compliance measures" on or after May 28, 2025 if New York continues to operate the Program.

38.     The threatened "compliance measures" include: (1) "no further advance construction ('AC') authorizations,"  (2) "no further [NEPA] approvals," (3) "no further approvals of Statewide Transportation Improvement Program ('STIP') amendments concerning New York Metropolitan Transportation Council TIP modifications," and (4) "no further obligations of FHWA funds (both formula and competitive) for projects within New York City."  These incredibly broad coercive threats would among other things, if implemented, halt reviews needed for all projects and funding within FHWA's purview, including billions of dollars' worth of funding for transit projects currently proposed for addition to New York's STIP, unless the Program is brought to a stop.

39.     The President is not a king, and Defendants have no right to demand compliance with the Administration's unlawful directives.  Plaintiffs will continue to operate the Program as required by New York law unless and until Plaintiffs are directed to stop by a court order.

40.     The MTA, TBTA, NYSDOT, and NYCDOT file this consolidated second amended complaint to seek a declaration that the Administration's purported decision to terminate federal approval for the Program and rescind the VPPP Agreement is null, void, and must be set aside,

DOT_0047614

and for vacatur of the February 19 Letter.

## PARTIES, JURISDICTION, AND VENUE

41.     Plaintiff the MTA is a public benefit corporation organized under the laws of New York and is responsible for North America's largest public transportation network, serving 15.3 million people across 5,000 square miles in New York City, Long Island, Southeastern New York, Northeastern New Jersey, and Southern Connecticut. The MTA has offices in New York, New York, and is governed by a 23-member board which is coterminous with the board of TBTA.

42.     Plaintiff TBTA is an affiliate of the MTA. It is a public benefit corporation organized under the laws of New York, with offices in New York, New York. TBTA is a signatory to the VPPP Agreement and is responsible under New York law for the implementation and operation of the Program.

43.     Intervenor-Plaintiff NYSDOT is a New York State agency, one of the co-applicants for VPPP approval, and a signatory to the VPPP Agreement.

44.     Intervenor-Plaintiff NYCDOT is an agency of the City of New York, a municipal corporation codified under the laws of the State of New York, one of the co-applicants for VPPP approval, and a signatory to the VPPP Agreement.

45.     Defendant Duffy is the Secretary of USDOT. He is sued in his official capacity.

46.     Defendant Shepherd is the Executive Director of the FHWA. She is sued in her official capacity.

47.     Defendant USDOT is a cabinet department of the federal government, with offices in Washington, D.C.

48.     Defendant FHWA is an agency within the USDOT, with offices in Washington, D.C.

DOT_0047615

49.     This Court has subject matter jurisdiction over this action pursuant to 23 U.S.C. § 1331 because this case presents a federal question under the laws of the United States, including the United States Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*.  This Court has remedial authority including pursuant to the APA, 5 U.S.C. §§ 705, 706; the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.; and Rules 57 and 65 of the Federal Rules of Civil Procedure.

50.     Venue is proper in this district under 28 U.S.C. § 1391(e) because the MTA, TBTA, and NYCDOT are headquartered in this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## **BACKGROUND**

### A.     New York Passes the Traffic Mobility Act as the Solution to the New York City Area's Longstanding Congestion Problems

51.     Traffic congestion has long plagued the New York metropolitan area.  For decades, congestion has stymied economic growth and harmed the environment and public health, as well as quality of life in the region.

52.     Congestion on New York City roads, and in the CBD in particular, has a serious negative impact on public health.  As the U.S. Environmental Protection Agency ("EPA") has recognized, higher vehicle traffic leads to higher vehicle emissions, which are associated with negative health impacts like "asthma onset and aggravation, cardiovascular disease, reduced lung function, impaired lung development in children, pre-term and low-birthweight infants, childhood

DOT_0047616

leukemia, and premature death."[26]  FHWA has consistently acknowledged that "less vehicle traffic can improve air quality and reduce chronic lower respiratory diseases."[27]

53.  Congestion also increases travel times, eroding worker productivity, reducing bus and paratransit service, raising the cost of deliveries, and impeding the movement of emergency vehicles.  A 2018 study estimated that "traffic congestion [would] be a $100 billion drag" on the metropolitan-area economy over the next five years, and identified Manhattan below 60th street— where a quarter of the economic activity is concentrated—as the primary source of traffic congestion in the region.[28]

54.  As noted above, the concept of congestion pricing was first developed in the 1950s by Nobel laureate and Columbia University economist William S. Vickrey, who believed that it offered a market-based solution to overcrowding, whether on subway cars or New York City's streets.  Responding to concerns that some might see congestion pricing "as a tax increase," Professor Vickrey explained that "when motorists' time is considered, it's really a savings."[29]

55.  In 1959, Professor Vickrey testified before the Congressional Joint Committee on Washington Metropolitan Problems to outline "pricing solutions to urban transport problems," including a tolling scheme that would later be described as congestion pricing.[30]  During his testimony, Vickrey stated, "[i]t is a specific feature of the pricing system suggested here that it is

---

[26] OFF. OF TRANSP. & AIR QUALITY, U.S. ENV'T PROT. AGENCY, *Near Roadway Air Pollution and Health: Frequently Asked Questions* (Aug. 2014), https://nepis.epa.gov/Exe/ZyPDF.cgi/P100NFFD.PDF?Dockey=P100NFFD.PDF.

[27] Jhoset Burgos-Rodriguez, et al., *Making Healthy Connections in Transportation*, 87 PUBLIC ROADS 28 (Summer 2023), https://highways.dot.gov/sites/fhwa.dot.gov/files/Public%20Roads%20Summer%202023.pdf.

[28] The Partnership for New York City, *$100 Billion Cost of Traffic Congestion in Metro New York*, PFNYC.ORG (Jan. 2018) https://pfnyc.org/research/100-billion-cost-of-traffic-congestion-in-metro-new-york/.

[29] Jack Basso & Tyler Duvall, *Funding Transportation Infrastructure with User Fees*, BROOKINGS (Feb. 26, 2013), https://www.brookings.edu/articles/funding-transportation-infrastructure-with-user-fees/.

[30] William Vickrey, *Statement to the Joint Committee on Washington, DC, Metropolitan Problems*, 36 J. URB. ECON, 42-65 (1994).

DOT_0047617

to be applied to the street and highway system as a whole, and not merely to bits and pieces of it."[31] Specifically, he observed that, "[w]here tolls are collected only on selected facilities, such as on the bridges, tunnels, and parkways in the New York area, this often has a very unfortunate effect on the routing of traffic.[32]" Vickrey explicitly "contemplated that the control point [*i.e.*, toll facilities] should more or less completely block off the area into zones, so that it would not be possible to go from one zone to another without passing a checkpoint."[33]

56.    In 1975, Singapore, a small island city-state long plagued by congestion, first put Professor Vickrey's ideas into practice by implementing its famous Area Licensing Scheme, pursuant to which vehicles entering Singapore's Central Business District were required to pay a daily toll.[34]   Singapore's Area Licensing Scheme was a success and is widely credited with dramatically reducing traffic in Singapore's central business district, even as the nation's economy and population have continued to grow.[35]

57.    In 2003, London put Professor Vickrey's idea into practice and moved forward with a congestion pricing program of its own.  The program was an immediate success.  Within the first year of its implementation, London saw a 30% reduction in congestion within the charging zone and an 18% reduction in the number of vehicles entering the zone. [36]  The city also experienced significant increases in the number of commuters choosing to use public transit, including a 38%

---

[31] *Id.* at 47.

[32] *Id.*

[33] *Id.*

[34] Kian-Keong Chin, *Road Pricing – Singapore's 30 Years of Experience*, CESIFO DICE REPORT (2005), https://www.econstor.eu/bitstream/10419/166848/1/ifo-dice-report-v03-y2005-i3-p12-16.pdf.

[35] *Id.*

[36] Transp. For London, *Congestion Charging: Second Annual Report* 2-3 (Apr. 2004), https://content.tfl.gov.uk/impacts-monitoring-report-2.pdf.

DOT_0047618

rise in bus ridership.[37]  Due to the overwhelming success of its congestion pricing program, London subsequently expanded the congestion charge zone with considerable public support.[38]

58.     In 2006, Stockholm implemented a congestion charge for its central business district on a six-month trial basis, after which citizens would be given a chance to vote on the program's future.  On the eve of launch, fewer than 40% of Stockholm residents supported the plan.[39]  Following implementation of the program, however, Stockholm experienced a 20% decrease in traffic volumes and popular support for the program began to surge.  After the trial expired, a referendum to make the program permanent passed in 2007, and public support for the program rose to over 65%.[40]

59.     In 2011, the people of Milan passed a referendum authorizing Area C, a new congestion pricing toll for vehicles entering the city's central business district. [41]  Under an earlier version of the program, introduced in 2008, higher polluting vehicles were charged for access to the central business district, while less polluting vehicles were able to enter for free.  Area C was enacted to further reduce traffic congestion in the central business district by tolling vehicles that enter the district.  Area C caused a 28% decrease in road congestion, a 24% reduction in road casualties, and significant decreases in pollutants.[42]

60.     The last decade has seen further recognition of the benefits that a congestion pricing program could have for reducing congestion in New York City, improving air quality, and raising

---

[37] *Id.*

[38] *See* Sam Schwartz et al., *A Comprehensive Transportation Policy for the 21st Century*, 17 N.Y.U. ENV'T L.J. 580, 597 (2008).

[39] Ben Furnas, *Congestion Pricing Lessons from London and Stockholm*, VITAL CITY (June 13, 2024), https://www.vitalcitynyc.org/articles/how-london-and-stockholm-made-congestion-pricing-politics-work.

[40] *Id.*

[41] C40 Cities, *Milan's Area C Reduces Traffic Pollution and Transforms the City Center* (Mar. 2015), https://www.c40.org/case-studies/milan-s-area-c-reduces-traffic-pollution-and-transforms-the-city-center/.

[42] *Id.*

DOT_0047619

funds to improve mass transit.  As New Yorkers faced serious mass transit issues in 2017, then-Governor Cuomo raised the possibility of implementing a congestion pricing program that would help fund improvements to New York City's public transit infrastructure.  Governor Cuomo instituted an advisory panel which recommended a congestion pricing program.

61.     In 2019, the New York State Legislature enacted the TMA, which authorized and directed TBTA to implement a congestion tolling program in the CBD.  N.Y. Veh. & Traf. Law § 1701 *et seq*.  The TMA's legislative findings declare that traffic in New York—which "ranks second worst among cities in the United States and third worst among cities in the world" and is estimated to cost the metropolitan economy more than "one hundred billion dollars over the next five years"—is "crippling … [for] residents, commuters, taxi and for-hire vehicle traffic, bus transit and emergency services" and "a significant contributor to decreased air quality."  *Id.* § 1701.

62.     The Legislature further found that the underfunding of New York City's aging subway infrastructure has "a deleterious impact on the health, safety, and livelihood of commuters, tourists, resident New Yorkers" as well as "the economy of the state of New York," such that "a long-term and sustainable solution is necessary in order to ensure stable and reliable funding" for this "important mass transit asset."  *Id.*  Consequently, the Legislature declared that to ensure the "public health and safety of New York's residents," the creation of a congestion pricing program in the Manhattan CBD was "a matter of substantial state concern."  *Id.*

63.     The TMA authorizes and directs TBTA to "establish the central business district tolling program," *id.* § 1704 (1), grants TBTA the power "to establish and charge variable tolls and fees for vehicles entering or remaining in the [CBD],"[43] and authorizes TBTA "to make rules and

---

[43] As delineated by the Act, the CBD encompasses the geographic area of Manhattan south and inclusive of 60th Street, but not including the FDR Drive, the West Side Highway, the Battery Park Underpass, and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West Street.  *Id.* § 1704(2).

26

DOT_0047620

regulations for the establishment and collection of central business district tolls, fees, and other charges," *id.* § 1704-a (1).

**B.     Congestion Pricing Tolling Authority Under the Federal Value Pricing Pilot Program**

64.     Because Congestion Pricing would impose a toll on several federal-aid highways in Manhattan, the federal government has taken the position that the Program could not begin without federal approval. *Mulgrew v. U.S. Dep't of Transp.*, No. 23 Civ. 10365, 2024 WL 3251732, at *4 (S.D.N.Y. June 20, 2024) (Liman, J.).

65.     The authority of the States to impose tolls on roadways within their borders has been recognized since the early days of the Republic, and the Supreme Court has consistently held as a matter of history and tradition that each State, as a coequal sovereign, is "empowered" to impose "uniform, fair and practical" tolls "for the privilege of using its roads." *Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 715 (1972) (collecting cases); *see also* Cong. Rsch. Serv., R43575, *Tolling U.S. Highways* 1–3 (Aug. 26, 2016).

66.     When Congress established the forerunner of today's federal-aid highway program in 1916, it determined that highways built under that program should be free from tolls. But that general rule, which is today codified at 23 U.S.C. § 301, was almost immediately the subject of numerous carve outs, *see, e.g.*, Oldfield Act of 1927, Pub. L. 69-773 (Mar. 3, 1927) (permitting the use of federal funds to build toll bridges), and today tolls are permitted on federal-aid highways under a wide variety of statutory exceptions, including exceptions that authorize tolling on new infrastructure, tolling on additional lanes added to existing highways, tolling on construction and

27

DOT_0047621

conversion of toll-free highways to toll highways, and tolling in connection with high-occupancy vehicle lanes, *see, e.g.*, 23 U.S.C. §§ 129, 166.[44]

67.     One such exception is the VPPP, which was enacted into law as the "Congestion Pricing Pilot Program" as part of ISTEA, a watershed transportation reform bill sponsored and led by U.S. Senator Daniel Moynihan of New York.  As Congress explained in enacting ISTEA, its intention was to foster sweeping change in the nation's transportation networks in order to "develop a National *Intermodal* Transportation System" consisting "of all forms of transportation in a unified, interconnected manner," which "shall include significant improvements in public transportation necessary to achieve national goals for improved air quality, energy conservation, international competitiveness, and mobility."  ISTEA § 2 (emphasis added).  To this end, among other things, Congress included in ISTEA substantial funding for mass transit programs, which Congress found to be an integral part of the "National Intermodal Transportation System," *id.*, and "granted states 'greater flexibility to operate toll facilities and use toll revenues for a variety of transportation projects'" including congestion pricing programs.  *Chan v. U.S. Dep't of Transp.*, No. 23 Civ. 10365, 2024 WL 5199945, at *33 (S.D.N.Y. Dec. 23, 2024) (Liman, J.) (quoting *Am. Trucking Assn's, Inc. v. N.Y. State Thruway Auth.*, 886 F.3d 238, 241 (2d Cir. 2018)).  As President Bush explained when signing ISTEA into law, a "major element" of the legislation was "to provide State and local officials unprecedented flexibility," including the discretion to finance transportation improvements "with toll revenue" and to use transportation funds "on the improvements that [will] best meet local needs, whether highway projects or public transit

---

[44] *See also* OFF. OF HIGHWAY POLICY INFO., FED. HIGHWAY ADMIN., *Toll Facilities in the United States*, https://www.fhwa.dot.gov/policyinformation/tollpage/history.cfm (last accessed Mar. 29, 2025) (noting that federal law "offers States and/or other public entities a variety of opportunities to toll motor vehicles to finance Interstate construction and reconstruction, promote efficiency in the use of highways, reduce traffic congestion and/or improve air quality").

DOT_0047622

projects." *Statement by President George [H.W.] Bush Upon Signing H.R. 2950*, 1991 U.S.C.C.A.N. 1865 (Dec. 18, 1991).

68.     Consistent with these objectives, ISTEA greatly expanded the circumstances in which States could collect toll revenues on federal-aid highways. In Section 1012(a) of ISTEA (codified, as amended, at 23 U.S.C. § 129), Congress permitted the collection of tolls on new or reconstructed infrastructure, including highways, bridges, or tunnels. *See* ISTEA § 1012(a)(1).

69.     In Section 1012(b) of ISTEA (codified, as amended, at 23 U.S.C. § 149 note), Congress authorized the creation of a separate tolling program, the Congestion Pricing Pilot Program, renamed the VPPP in 1998. Pursuant to Section 1012(b), Congress directed the Secretary of Transportation to "solicit the participation of State and local governments and public authorities for one or more congestion pricing pilot programs," and authorized him to "enter into" agreements to "establish, maintain, and monitor congestion pricing projects." ISTEA § 1012(b).[45]

70.     Section 1012(b) further authorized the Secretary "to allow the use of tolls" by states, local governments, and public authorities "as part of a pilot program under this section." *Id.* § 1012(b)(4). In contrast to Section 1012(a), Congress imposed notably fewer restrictions on the use of tolling revenue generated under the Congestion Pricing Pilot Program pursuant to Section 1012(b), requiring only that "[r]evenues generated by any pilot project" be "applied to projects eligible under" Title 23. *Id.* § 1012(b)(3). Transit capital projects are eligible for federal assistance under 23 U.S.C. § 142(a)(2). ISTEA also provided that the Secretary must periodically report on the effects that VPPP projects have on not only congestion but also "transit ridership … and availability of funds for transportation programs." ISTEA § 1012(b)(5).

---

[45] *See also* 49 C.F.R. § 1.85(c)(22). FHWA provides tolling authority under the VPPP by entering into tolling agreements with the relevant state actors. *See Value Pricing Pilot Program Participation, Fiscal Years 2010 and 2011*, 75 F.R. 64397, 64403 (Nov. 19, 2010).

DOT_0047623

71.     In a different section of ISTEA, Congress made clear that it expected, and indeed required, that States should consider congestion pricing programs as a means of generating revenue for public transit projects.   Section 1025 of ISTEA directed States, in coordination with metropolitan planning organizations, to "undertake a continuous transportation planning process which shall" consider "the use of innovative mechanisms for financing projects, including … congestion pricing."  ISTEA § 1025(c)(16).

72.     Although "congestion pricing" was not defined in ISTEA, the concept was then (and is today) commonly understood worldwide to include cordon pricing.  Indeed, Singapore had already been using such a form of congestion pricing at the time ISTEA was passed for nearly two decades.  And in 1987, just a few years before the enactment of ISTEA, New York City Mayor Ed Koch testified before a Congressional subcommittee about a congestion pricing proposal in New York City that would charge drivers entering Manhattan's central business district $10 per day. *Ozone and Carbon Monoxide Problems: Hearing Before the Subcomm. on Health and Env't of the H. Comm. on Energy & Commerce*, 100 Cong. 55 (1987).

73.     This is confirmed by statements in the legislative record when ISTEA was enacted in 1991, and reinforced by Congress's subsequent re-enactments (and indeed expansion) of congestion pricing in 1995, 1998, and 2005, reflecting a clear common understanding that congestion pricing includes cordon pricing and contemplates as a goal the raising of revenue to promote public transit (and so further reduce congestion).  *See* Pub. L. 104-59, § 325(e) (Nov. 28, 1995); Pub. L. 105-178, § 1216(a) (June 9, 1998); Pub. L. 105-206, § 9006(b) (July 22, 1998); Pub. L. 109-59, § 1604(a) (Aug. 10, 2005).  Not once has Congress questioned FHWA's now-prior interpretation of the VPPP (discussed *infra*) or sought to amend the statute to prohibit cordon pricing or the generation of revenue for mass transit through tolling authorized under the VPPP.

30

DOT_0047624

74.    During legislative deliberations regarding ISTEA in 1991, Senator Moynihan explained that the goal was to permit States to launch "innovative congestion pricing experiments" of different varieties.  137 Cong. Rec. S18203-02 (daily ed. Nov. 26, 1991).  On March 21, 1991, at a hearing of the Subcommittee on Water Resources, Transportation, and Infrastructure on "Congestion Pricing and Infrastructure Financing," convened by Senator Moynihan in advance of the introduction of ISTEA, the Subcommittee took testimony from experts on cordon pricing initiatives implemented by Singapore and Hong Kong, which Senator Joe Lieberman noted favorably in his remarks, stating that he was "particularly interested in the congestion-pricing methods suggested by our hearing witnesses today."  *Congestion Pricing and Infrastructure Financing: Hearing Before the Subcomm. on Water Res., Transp., and Infrastructure of the S. Comm. on Env't & Pub. Works*, 102 Cong. 9 (1991).[46]  Senator Moynihan agreed that cordon pricing appeared to be a promising avenue for experimentation: "Singapore is doing it, Hong Kong is doing it, we are talking about it."  *Id.* at 24.  Senator David Durenberger likewise recognized that "congestion pricing may also be an important means which some cities will employ to reduce air quality problems and ease gridlock."  *Id.*  at 3.  Don Pickrell, an economist for USDOT at the time, encouraged Congress to "remove any remaining restrictions on … pricing of highways constructed with Federal financial assistance" and to promote measures including "downtown licensing requirements, ala Singapore," *i.e.*, cordon pricing.  *Id.* at 18.  When the Subcommittee reconvened four days later on March 25, 1991, Peter Mieszkowski, a professor of economics at Rice University, cautioned in his testimony that imposing congestion tolls only on freeways would

---

[46] From July 1983 to March 1985, the British Government of the Territory of Hong Kong implemented a 21-month congestion pricing trial program, which charged vehicles for entering congested portions of the city.  Although the program was generally perceived as successful, it was not continued at the end of the trial period due to a variety of reasons, including protests, an increase in roadway capacity, and the beginning of the political transition from British to Chinese governance.

31

be ineffective "because people will simply leave the freeway" and "go to the other access roads, which will themselves become very congested. So the congestion policy I think has to be general." *Reauthorization of the Federal-Aid Highway Program: Hearing Before the S. Comm. on Env't & Pub. Works and the Subcomm. on Water Res., Transp., and Infrastructure*, 102 Cong. 40 (1991). Senator Moynihan responded: "Well, you [meaning, local leaders] have got to figure it out yourself. But, yes, *not just limit it to some particular Federal road*, right." *Id.* (emphasis added).

75.     Further evidence that Congress understood "congestion pricing" to include cordon pricing can be found in the passage of the Clean Air Act Amendments of 1990, Pub. L. 101-549 (Nov. 15, 1990), which was enacted into law just one year before ISTEA. In that bill, the Clean Air Act was amended to require the EPA Administrator, in consultation with the Secretary of Transportation, to provide transportation agencies information regarding the formulation and emission reduction potential of "transportation control measures," including "programs to limit or restrict vehicle use in downtown areas or other areas of emission concentration particularly during periods of peak use." 42 U.S.C. § 7408(f)(1)(A). During a September 1989 hearing before the Senate Subcommittee on Environmental Protection, several witnesses objected to the inclusion of "transportation control measures" such as tolling vehicles "to enter central business districts." *Clean Air Act Amendments of 1989: Hearing Before the Subcomm. on Env't Protection of the S. Comm. of Env't & Pub. Works*, 101 Cong. 67-68 (1989) (testimony of Regina McLaurin, President of the National Parking Association and Ethan Geto of the Coalition for Improved Transportation and Air Quality). Senators Max Baucus and Lieberman, who were members of the Committee on Environment and Public Works that oversaw the passage of ISTEA, both rejected the witnesses' concerns with the inclusion of transportation control measures, noting that localities needed flexibility when addressing traffic congestion and air pollution. *Id.* at 70 (remarks of Senator

32

Baucus); *id.* at 72-73 (remarks of Senator Lieberman). The language to which the witnesses objected was included in the final text of the bill and remains in force today.

76. Moreover, as the Senate Committee on Environment and Public Works' report on ISTEA explained, the purpose of the Congestion Pricing Pilot Program was to allow states to "establish, maintain, and monitor congestion pricing programs" and to study, among other things, the effects of such programs on "the availability of funds for transportation programs." S. Rep. No. 102-71, at 26 (1991). That same report noted that the bill was intended to place "[i]ncreased emphasis" on the "use of innovative financing mechanisms including … congestion pricing." *Id.* In other words, everyone, including the relevant members of Congress, understood that congestion pricing included cordon pricing, and that this form of tolling could reduce congestion and fund public transit alternatives—exactly as Congress desired in giving States broad leeway in experimenting with ways to solve the problem, including through tolling under the VPPP.

77. This ordinary meaning of "congestion pricing" was consistently echoed by FHWA itself from the early 1990s until early 2025. In congressional testimony provided in 1992 shortly after ISTEA was enacted, FHWA was asked by Senator Lautenberg: "How is FHWA defining congestion pricing projects?" *Dep't of Transp. & Related Agencies Appropriations for Fiscal Year 1993: Hearings Before a Subcomm. of the S. Comm. on Appropriations*, 102 Cong. 352 (1992). FHWA responded that it "intend[ed] to define congestion pricing projects to provide useful demonstrations of congestion pricing concepts," and noted that the "potential scope of congestion pricing applications can vary widely, ranging from pricing on a new or existing single road facility to more comprehensive *area-wide road pricing strategies*." *Id.* (emphasis added).

78. In 1998, Congress enacted the Transportation Equity Act for the 21st Century of 1998, which renamed the Congestion Pricing Pilot Program the "Value Pricing Pilot Program" and

DOT_0047627

expanded the Secretary's authority to enter into agreements authorizing value pricing pilot programs. Pub. L. 105-178 § 1216 (June 9, 1998). As FHWA has explained, "value pricing" is a synonym for congestion pricing, and the agency often uses the two terms interchangeably.[47] Likewise, the House Conference report confirms that, in renaming the "Congestion Pricing Pilot Program the VPPP, Congress did not intend to alter the scope of the statute." *See* H.R. CONF. REP. 105-550, 407, 1998 U.S.C.C.A.N. 70, 79 (referring to past projects authorized under the Congestion Pricing Pilot Program as "value pricing projects"). If anything, Congress intended to broaden the scope of the program to provide "additional flexibility." *See*, *e.g.*, 144 Cong. Rec. H10497 (Oct. 10, 1998) (extraneous matter submitted by Representative Shuster).

79.     Contemporaneous with this new statutory enactment, FHWA issued a VPPP factsheet ("1998 VPPP Fact Sheet") explaining that VPPP projects "have the flexibility to encompass a variety of value pricing applications, including *areawide pricing*…."[48] Another 1998 FHWA publication in the Federal Register (the "1998 FR Notice") identified "[a]pplications of value pricing which are comprehensive, such *as areawide pricing*, [and] pricing of multiple facilities or corridors," as meriting "*highest priority* for Federal support" under the VPPP. 63 Fed. Reg. 53487 (Oct. 5, 1998) (emphasis added). FHWA went on to note that "[m]ore limited applications of value pricing are also acceptable," indicating that FHWA viewed areawide or cordon pricing schemes as the intended primary focus of the VPPP. *Id.* The Notice explained that FHWA would give special priority to "[p]rojects which indicate that revenues will be used to support the goals of the value pricing program," and "projects that lead to substantial congestion

---

[47] *See, e.g.*, FED. HIGHWAY ADMIN., *Welcome to the FHWA Congestion Pricing Web Site*, https://ops.fhwa.dot.gov/congestionpricing/index.htm (last accessed Mar. 26, 2025) ("Congestion pricing - sometimes called value pricing - is a way of harnessing the power of the market to reduce the waste associated with traffic congestion.").

[48] *See* FED. HIGHWAY ADMIN., TEA-21 - Transportation Equity Act for the 21st Century Fact Sheet (Sept. 14, 1998), https://web.archive.org/web/20000818140948/http://www.fhwa.dot.gov/tea21/factsheets/valpr.htm.

DOT_0047628

reduction and supplant or supplement existing tax-based approaches for generating surface transportation revenues." 63 Fed. Reg. 53487 (Oct. 5, 1998).[49]

80.     In 1999, FHWA published "A Guide to Federal Aid Programs and Projects" ("1999 VPPP Guide"), which listed "area-wide pricing" as the first example of a VPPP concept, as well as a VPPP "Notice of Grant Opportunities" ("1999 VPPP NOGO"), which listed "areawide value pricing" as a "project of interest," and explained that such projects include "[f]ees for entering an area, sometimes called cordon crossing charges, using electronic vehicle identification devices."[50] The 1999 VPPP NOGO also listed "revenue generation" as a potential benefit of VPPP projects and noted that "[p]roposals with the greatest potential to reduce congestion and advance current knowledge of price effects, operations, enforcement, *revenue generation*, equity mitigation and monitoring/evaluation mechanisms will be given the highest priority."[51]   Indeed, that notice recognized that existing projects were already "generating revenues that c[ould] be used to further enhance urban mobility."[52]

81.     A May 2001 notice soliciting applications for participation in the VPPP again classified "applications of value pricing which are comprehensive, such as *area wide pricing*," as among the projects that would "receive highest priority for Federal support."  66 Fed. Reg. 23,077 (May 7, 2001) (emphasis added).

---

[49] A subsequent publication used identical language, reinforcing that "generating surface transportation revenues" is a core purpose of the VPPP.  71 Fed. Reg. 970 (Jan. 6, 2006).

[50] *See* FED. HIGHWAY ADMIN., *A Guide to Federal Aid Programs and Projects* (Apr. 9, 1999), https://web.archive.org/web/20000818124605/http://www.fhwa.dot.gov/infrastructure/progadmin/part1.htm;   FED. HIGHWAY ADMIN., *Value Pricing Pilot Program Notice of Grant Opportunities*, Publication No. FHWA-PL-99-014, https://web.archive.org/web/20000421142620/https://www.fhwa.dot.gov/policy/vppp.htm  (last accessed Mar. 11, 2025).

[51] FED. HIGHWAY ADMIN, *Value Pricing Pilot Program Notice of Grant Opportunities*, Publication No. FHWA-PL-99-014, https://web.archive.org/web/20000421142620/https://www.fhwa.dot.gov/policy/vppp.htm (last accessed Mar. 11, 2025).

[52] *Id.*

DOT_0047629

82.    In 2001 and 2002, the Florida Department of Transportation and Lee County took FHWA up on its solicitation and received $1,545,600 in VPPP funding to study a cordon toll to access Fort Myers Beach (the "Fort Myers Project").[53]  The study examined tolling the only two points of entry to Fort Myers Beach.[54]  No toll-free route to Fort Myers Beach was contemplated.[55]



**Figure 5: Fort Myers Beach Cordon Toll Locations[56]**

---

[53] U.S. GOV'T ACCOUNTABILITY OFF., *Report to the Subcommittee on Transportation, Housing, and Urban Development and Related Agencies*, Committee on Appropriations, House of Representatives 42-43 (Jan. 2012), https://www.gao.gov/assets/gao-12-119.pdf.

[54] Advances in Transportation Studies, *Predicted Driver Response to a Cordon Toll Around Fort Myers Beach, Florida* (2005), https://www.researchgate.net/publication/237385152_Predicted_driver_response_to_a_cordon_toll_around_Fort_Myers_Beach_Florida.

[55] FED. HIGHWAY ADMIN., *Florida: Cordon Pricing in Lee County*, https://www.fhwa.dot.gov/policy/otps/vpqrrt/sec2.cfm (last visited Mar. 11, 2025).

[56] Advances in Transportation Studies, *Predicted Driver Response to a Cordon Toll Around Fort Myers Beach*, Florida (2005), https://www.researchgate.net/publication/237385152_Predicted_driver_response_to_a_cordon_toll_around_Fort_Myers_Beach_Florida.

DOT_0047630

83.     In 2005, Congress passed the Safe, Accountable, Flexible, Efficient Transportation Equity Act ("SAFETEA-LU") of 2005, which further broadened States' authority to toll the federal-aid highway system.

84.     A Federal Register notice in January 2006 reiterated that "applications of value pricing which are comprehensive and include *pricing of currently free facilities*, such as *area wide pricing*" are "[p]rojects of [i]nterest."  71 Fed. Reg. 970 (Jan. 6, 2006) (emphases added). Similarly, a 2006 FHWA report on the VPPP also underscored the role of tolls in metropolitan areas to support transit infrastructure, emphasizing that "[v]alue priced tolls on existing or new highway lanes in currently congested metropolitan areas can provide a significant source of user-based revenue to pay for the high costs of improving or expanding transportation infrastructure," particularly where local governments are seeking to make up for shortfalls in revenue.[57]

85.     New York City's own history with FHWA further demonstrates that, as FHWA has long recognized, cordon pricing and revenue generation are permitted by the VPPP.

86.     In April 2007, then-mayor Michael Bloomberg proposed an $8 toll on all vehicles entering Manhattan below 86th Street.[58]  New York City and FHWA entered into an Urban Partnership Agreement ("UPA"), attached hereto as **Exhibit F**, in which FHWA agreed to award New York City $5 million in VPPP funding to pursue "a broad area pricing system in Manhattan south of 86th Street."  UPA at 3.  Once implemented, vehicles would be charged a toll for entering, exiting, or driving within the congestion zone.  *Id.*  FHWA highlighted this project repeatedly throughout its 2009 report to Congress on the VPPP, lauding it as a "historic" proposal and the

---

[57] U.S. DEP'T OF TRANSP., *Report on the Value Pricing Pilot Program Through April 2006* at 4 (Feb. 11 2022), https://ops.fhwa.dot.gov/congestionpricing/value_pricing/pubs_reports/rpttocongress/index.htm.

[58] Maria Newman, *Mayor Proposes a Fee for Driving in to Manhattan*, N.Y. TIMES (Apr. 22, 2007), https://www.nytimes.com/2007/04/22/nyregion/23mayorcnd.html.

DOT_0047631

epitome of what the VPPP intended to permit.[59]  Although FHWA regretted that the 2007 iteration

of congestion pricing in New York City failed to gain approval in the State Legislature (due in part

to the "tight time schedule for securing UPA funding that was imposed by [US]DOT"), FHWA

praised then-Mayor Bloomberg for his commitment to the program.[60]

　　　　87.　　Congress was well aware of the New York City's 2007 proposal and discussed it at

length during a June 7, 2007 House Subcommittee on Highways and Transit of the Committee on

Transportation and Infrastructure hearing on "Congestion and Mobility" in order "to receive

testimony on the problem of congestion facing our nation's surface transportation system and some

of the options to deal with the problem."[61]  Notably, the Subcommittee's report emphasized the

problem of congestion in urban areas and observed that one option, "congestion pricing," "can be

implemented in several different forms," including "impos[ing] tolls … around a specified area

such [as] the downtown of a city, or over a wider region."[62]  During the hearing, Federal Transit

Administrator James Simpson, nominated by President Bush, was asked to share the "best idea"

that he had heard recently that would "make the most improvement" in managing congestion, and

he replied "New York is really bold.  What they are proposing now … [is] to have an access fee,

similar to London, south of 86th Street to Lower Manhattan to free up maybe 5 or 10 percent of the

traffic."[63]  Administrator Simpson also observed that "the beauty of this program is whatever we

invest in now … this congestion pricing will throw off about $300 million a year to finance such

---

[59] FED. HIGHWAY ADMIN., *Report on The Value Pricing Pilot Program Through May 2009* at ii (Sept. 17, 2009), https://ops.fhwa.dot.gov/congestionpricing/value_pricing/pubs_reports/ rpttocongress/pdf/vppp09rpt.pdf ("FHWA 2009 Report to Congress").

[60] *Id.* at 13-14.

[61] *Congestion and Mobility: Hearing Before the Subcomm. on Highways and Transit of the H. Comm. on Transp. and Infrastructure*, 110 Cong. vi (2007).

[62] *Id.* at x.

[63] *Id*. at 8-10.

DOT_0047632

things as a \$6 billion or \$7 billion 2nd Avenue subway, more Express Bus service, and all those things so the commuters and everybody else can get to work in a lot less time."[64]  No witness or legislator suggested an additional federal law would be necessary in order to authorize New York's proposed \$8 congestion toll, and Congress did not seek, in subsequent transportation bills, to amend the VPPP to prohibit cordon pricing or use of toll revenue on transit projects.

88.    Also in 2005, the San Francisco County Transportation Authority ("SFCTA") received a \$1,040,000 VPPP grant to evaluate the feasibility of area or cordon pricing for San Franscico (the "San Franscisco Project").[65]  The San Franscisco Project included a Northeast Quadrant cordon/area-wide pricing concept with no toll-free routes to enter the congestion zone.[66] A key goal of the San Francisco Project was to develop a comprehensive transportation system management strategy, which "not only contemplates congestion charging, but also focuses on the improvement of competitive alternatives to driving by using the revenues generated through pricing to support investments in transit, bicycling, and walking."[67]  With this goal in mind, the San Francisco Project study concluded that options involving a smaller cordon would not generate enough revenue to "enhance travel options."[68]

---

[64] *Id.*

[65] SAN FRANCISCO COUNTY TRANSP. AUTH., *San Francisco Mobility, Access, and Pricing Study* 5, 17, 60 (Dec. 2010), https://www.sfcta.org/sites/default/files/2019-11/MAPS_study_final_lo_res.pdf; U.S. GOV'T ACCOUNTABILITY OFF., *Report to the Subcommittee on Transportation, Housing, and Urban Development and Related Agencies*, Committee on Appropriations, House of Representatives 44 (Jan. 2012), https://www.gao.gov/assets/gao-12-119.pdf.

[66] *Id.*; SAN FRANCISCO COUNTY TRANSP. AUTH., *San Francisco Parking Supply and Utilization Study Final Report* D-6 (Nov. 2016), https://www.sfcta.org/sites/default/files/2019-03/Parking_Supply_final_report_11.29.16.pdf.

[67] SAN FRANCISCO COUNTY TRANSP. AUTH., *San Francisco Mobility, Access, and Pricing Study* 7, 36–37 (Dec. 2010), https://www.sfcta.org/sites/default/files/2019-11/MAPS_study_final_lo_res.pdf; SAN FRANCISCO COUNTY TRANSP. AUTH., *San Francisco Parking Supply and Utilization Study Final Report* D-6 (Nov. 2016), https://www.sfcta.org/sites/default/files/2019-03/Parking_Supply_final_report_11.29.16.pdf; SAN FRANCISCO COUNTY TRANSP. AUTH., *Value Pricing in San Francisco*, https://ops.fhwa.dot.gov/congestionpricing/value_pricing/pubs_reports/projectreports/pdfs/sfcta_arearoad.pdf (last accessed Mar. 11, 2025).

[68] SAN FRANCISCO COUNTY TRANSP. AUTH., *San Francisco Mobility, Access, and Pricing Study* 51 (Dec. 2010), https://www.sfcta.org/sites/default/files/2019-11/MAPS_study_final_lo_res.pdf.

DOT_0047633



**Figure 6: Northeast Quadrant Cordon/area-wide Pricing Concept[69]**

89.     At the same time FHWA was approving the San Francisco Project, it was praising cordon pricing schemes in London and Stockholm as models for the kinds of congestion pricing the VPPP was intended to create, lauding the examples as having achieved "significant impacts on traffic volumes, congestion delay, transit ridership, air quality, and *the availability of funds for transportation*, the key impacts sought through the VPPP."[70]

90.     A 2008 FHWA primer on congestion pricing explicitly stated that "[n]et revenues after payment of operating costs can be used to pay for expansion of roadway facilities *or to support alternatives to driving alone, such as public transit*…."[71]   And FHWA's 2009 report to Congress report further opined, in relation to strategies for improving equity and public acceptance

---

[69] San Francisco County Transp. Auth., *San Francisco Parking Supply and Utilization Study Final Report* at D-6 (Nov. 2016), https://www.sfcta.org/sites/default/files/2019 03/Parking_Supply_final_report_11.29.16.pdf.

[70] *Report on The Value Pricing Pilot Program Through May 2009*, *supra* note 59 at 2 (emphasis added).

[71] FED. HIGHWAY ADMIN., *Congestion Pricing: A Primer* 4, https://ops.fhwa.dot.gov/publications/fhwahop08039/fhwahop08039.pdf (last accessed Mar. 31, 2025).

DOT_0047634

of cordon-based strategies, that "low-income transit riders can benefit significantly from *toll-financed transit improvements*."[72]

91.     By 2009, FHWA continued to lament, in its report to Congress, that "the projects implemented so far have not had significant impacts on congestion or the other objectives of the VPPP because they typically only involve 'partial' pricing of a highway facility," while the VPPP "initially contemplated" "more comprehensive pricing strategies."[73]   "To further the VPPP's objectives," FHWA wrote:

> The VPPP portfolio of implemented projects should include pilot implementations of broad congestion pricing projects involving tolls on all lanes of a highway facility, *all roads in a congested area*, or all roads of an entire roadway network.  *Such approaches tend to take away the choice to drive alone for free in a congested area.*[74]

92.     In 2011, the California Department of Transportation, the Southern California Association of Governments ("SCAG"), and the Los Angeles County Metropolitan Transportation Authority ("LA Metro") were awarded $916,802 in VPPP funding by FHWA to pursue a feasibility study and Concept of Operations for cordon/area-wide pricing in major activity centers within Los Angeles (the "LA Project").[75]   The LA Project included a Downtown Los Angeles cordon/area-wide pricing concept and a Westside cordon pricing concept, in which every inbound route to the congestion zone would be tolled.[76]   Moreover, project alternative screening criteria

---

[72] *Report on The Value Pricing Pilot Program Through May 2009*, *supra* note 59 at iii.

[73] *Id.* at ii.

[74] *Id*. at ii-iii (emphasis added).

[75] FED. HIGHWAY ADMIN., *Report on the Value Pricing Pilot Program Through April 2018* at 13, https://ops.fhwa.dot.gov/congestionpricing/value_pricing/pubs_reports/rpttocongress/pdf/vppp18rpt.pdf (last accessed Mar. 11, 2025); FED. HIGHWAY ADMIN., *California: Cordon/Area Charging in Los Angeles and Build-Out of Express Lanes in Southern California* (Nov. 8, 2014), https://web.archive.org/web/20141108091008/https://ops.fhwa.dot.gov/congestionpricing/value_pricing/projects/involving_tolls/zone_based_pricing/ca_cordon_area_la.htm.

[76] S. CAL. ASS'N OF GOVS., *Congestion Pricing Modeling and Results for Express Travel Choices Study* at 24 (Oct. 2013), https://www.ampo.org/wp-content/uploads/2013/12/Oryani-AMPO-2013-presentation.pdf; SOUTHERN S.

DOT_0047635

explicitly included "transit potential" and "revenue potential,"[77] and the LA Project proposed using project revenues to fund "local transportation improvements to help reduce congestion and carbon emissions, and offer improved travel options for residents, commuters, and other visitors to the area."[78]



**Figure 7: Downtown and Westside Area Los Angeles Tolling Concepts[79]**

CAL. ASS'N OF GOVS., *Mobility Zone and Pricing Feasibility Study* at 37, 61, 72-73, 75 (Mar. 2019), https://scag.ca.gov/sites/default/files/old/file-attachments/mobilitygozone_report_final.pdf; FED. HIGHWAY ADMIN., *Report on the Value Pricing Pilot Program Through April 2018* at 13, https://ops.fhwa.dot.gov/congestionpricing/value_pricing/pubs_reports/rpttocongress/pdf/vppp18rpt.pdf (last accessed Mar. 11, 2025).

[77] FED. HIGHWAY ADMIN., *California: Cordon/Area Charging in Los Angeles and Build-Out of Express Lanes in Southern California* (Nov. 8, 2014), https://web.archive.org/web/20141108091008/https://ops.fhwa.dot.gov/congestionpricing/value_pricing/projects/involving_tolls/zone_based_pricing/ca_cordon_area_la.htm.

[78] S. CAL. ASS'N OF GOVS., *Mobility Zone and Pricing Feasibility Study* at 9 (Mar. 2019), https://scag.ca.gov/sites/default/files/old/file-attachments/mobilitygozone_report_final.pdf.

[79] S. CAL. ASS'N OF GOVS., *Congestion Pricing Modeling and Results for Express Travel Choices Study* at 24 (Oct. 2013), https://www.ampo.org/wp-content/uploads/2013/12/Oryani-AMPO-2013-presentation.pdf; S. CAL. ASS'N OF GOVS., *Mobility Zone and Pricing Feasibility Study* at 72 (Mar. 2019), https://scag.ca.gov/sites/default/files/old/file-attachments/mobilitygozone_report_final.pdf.

DOT_0047636

93.     A 2012 FHWA guidance document specifically acknowledged the need for transit investment in New York City,[80] and noted that "[c]ongestion pricing could be applied as one component of a broader regional pricing strategy to support investment needs."[81]

94.     In 2012, San Francisco was awarded another $480,000 of VPPP funding to undertake the Treasure Island Mobility Management Study (the "Treasure Island Project"), which included a congestion fee for private automobiles traveling to or from Treasure Island during peak hours.[82]   Revenue generated from the tolls would be used to pay for transportation demand management programs and expanded public bus, shuttle, and ferry transit systems that residents and visitors would be encouraged to use.[83]   As with the other projects discussed *supra*, the Treasure Island Project examined concepts with no toll-fee route for entering the congestion zone by driving.[84]

---

[80] FED. HIGHWAY ADMIN., *Effective Approaches for Advancing Congestion Pricing in a Metropolitan Region* 25 (Mar. 2012), https://ops.fhwa.dot.gov/publications/fhwahop12030/ fhwahop12030.pdf.  Treasure Island is between San Francisco and Oakland and only reachable by a vehicle from the Bay Bridge.

[81] *Id.* at 38.

[82] FED. HIGHWAY ADMIN., *California: Treasure Island Mobility Management Study* (Feb. 11, 2022), https://ops.fhwa.dot.gov/congestionpricing/value_pricing/projects/involving_tolls/systemwide_pricing/ca_treasure_i sland.htm (last accessed Mar. 31, 2025); Fed. Highway Admin., *Report on the Value Pricing Pilot Program Through April 2018* at 38, https://ops.fhwa.dot.gov/congestionpricing/value_pricing/pubs_reports/rpttocongress/pdf/ vppp18rpt.pdf (last accessed Mar. 11, 2025).

[83] CITY OF SAN FRANCISCO, *Advanced Transportation and Congestion Management Technologies Deployment Initiative* at 12, https://www.sfmta.com/sites/default/files/projects/2017/ATCMTD%20Grant%20Application.pdf (last accessed Mar. 11, 2025).

[84] *Id.*; TREASURE ISLAND MOBILITY MANAGEMENT AGENCY, *Treasure Island Mobility Management Study Summary Review* at ES-2 (July 2016), https://www.sfcta.org/sites/default/files/2019- 03/TIMM%20Study%20Summary%20Report.pdf.

DOT_0047637



**Figure 8: Treasure Island Connection to Yerba Buena Island[85]**

95.     Similarly, a 2016 FHWA report to Congress on the status of the VPPP described "efforts and initiatives to effectively support and mainstream congestion pricing" as a "focal point for FHWA programs."[86]  FHWA anticipated that more ambitious "second-generation" projects would rise in prominence under the VPPP in coming years, noting that they "are likely to combine regionwide pricing strategies, such as vehicle miles traveled fees, cordon pricing, and regional pricing, along with a non-toll blueprint."[87]  FHWA even singled out New York City specifically as likely to benefit from "some form of cordon pricing."[88]

---

[85] TREASURE ISLAND MOBILITY MANAGEMENT AGENCY, *Treasure Island Mobility Management Study Summary Review* 1 (July 2016), https://www.sfcta.org/sites/default/files/2019-03/TIMM%20Study%20Summary%20Report.pdf.

[86] FED. HIGHWAY ADMIN., *Report on The Value Pricing Pilot Program Through April 2016* at 31 (2016), https://ops.fhwa.dot.gov/congestionpricing/value_pricing/pubs_reports/rpttocongress/pdf/vppp16rpt.pdf (last accessed Mar. 31, 2025).

[87] FED. HIGHWAY ADMIN., *Report on the Value Pricing Pilot Program Through April 2018* at 35 (2018), https://ops.fhwa.dot.gov/congestionpricing/value_pricing/pubs_reports/rpttocongress/pdf/vppp18rpt.pdf (last accessed Mar. 31, 2025).

[88] FED. HIGHWAY ADMIN., *Report on the Value Pricing Pilot Program Through April 2006* at 10 (2006), https://ops.fhwa.dot.gov/congestionpricing/value_pricing/pubs_reports/rpttocongress/pdf/vppp06rpt.pdf (last accessed Mar. 31, 2025).

DOT_0047638

96.     This is confirmed by more recent congressional consideration of tolling under the VPPP.  Shortly after the passage of the TMA, on September 11, 2019, the House Subcommittee on Highways and Transit held a hearing on "Pricing and Technology Strategies to Address Congestion," which included a discussion of the Program and the TMA itself.  In the summary prepared by committee staff prior to the hearing, congestion pricing is defined as "a variably-priced lane, such as an Express Lane or HOT Lane; a variable toll on an entire roadway or facility; or a cordon charge that is levied on drivers to enter or move within a specifically-designated area."[89]  The summary noted that "the VPPP allows toll revenues to be used on projects eligible under Title 23," which includes public transit projects.[90]  The Committee's final report on the Infrastructure Investment and Jobs Act of 2021 makes clear the Committee's understanding that ISTEA "clearly states" that revenue generated by a pilot project can and should be used for "projects eligible under title 23" including "transit safety infrastructure improvements and programs" and "for new transit service, system or service expansion":

> It is the sense of the Committee that the Department of Transportation carry out the Value Pricing Pilot Program consistent with the statutory requirements of that program and the Department's longstanding interpretation of title 23.   Section 1012(b)(3) of ISTEA, as amended, clearly states that any project revenues in excess of pilot project operating costs may be used for any projects eligible under title 23.   Under 23 USC 133(b)(4), "transit safety infrastructure improvements and programs" are eligible under the Surface Transportation Block Grant Program, and it has been FHWA's longstanding interpretation that Congestion Mitigation and Air Quality funds may be used for new transit service, system or service expansion, new vehicles, and fare subsidies, if such projects or programs improve air quality.

H. Rep. No. 116-437, at 337 (2020).

---

[89] *Pricing and Technology Strategies to Address Congestion on and Financing of America's Roads: Hearing Before the Subcomm. on Highways and Transit of the H. Comm. on Transp. & Infrastructure*, 116 Cong. 12-13 (2019) (memorandum prepared by staff).

[90] *Id.* at xi.

DOT_0047639

97.     In 2021, the Utah Department of Transportation submitted an Expression of Interest for a project aimed at reducing congestion at Little Cottonwood Canyon, including a cordon pricing component.[91]  Specifically, under four alternatives studied in the project's Environmental Impact Statement ("EIS"), a toll or a ban on single-occupant vehicles would be implemented on S.R. 210—the only available route connecting the area's ski resorts and Little Cottonwood Canyon.[92]  The EIS for the Little Cottonwood Canyon project notes that tolling revenue may be used for "the operation and maintenance costs of the transit system to reduce fares to make transit an attractive option to paying a toll."[93]  FHWA noted this project in its most recent report to Congress on the VPPP submitted in 2023.[94]

98.     FHWA's current guidance and website reinforces the longstanding commonsense proposition that congestion pricing includes cordon pricing and has as a goal revenue generation to support public transit.  A primer on congestion pricing currently available on the Administration's website—even after the Secretary issued his letter purporting to rescind the VPPP Agreement and terminate the Program—establishes four main types of pricing strategies, including zone-based or cordon charges for which there is no free entry, as well as area-wide or

---

[91] FED. HIGHWAY ADMIN., *Letter Report on the Value Pricing Pilot Program for Fiscal Year 2022* at 1-2 (Sept. 22, 2023), https://ops.fhwa.dot.gov/congestionpricing/value_pricing/pubs_reports/rpttocongress/vppp22rpt/vppp22rpt.pdf.

[92] UTAH DEP'T OF TRANSP., *Little Cotton Wood Canyon Environmental Impact Statement*, Ch. 7 at 7-16, 7-18, 7-21, 7-22, 7-25 (Sept. 2022), https://littlecottonwoodeis.udot.utah.gov/wp-content/uploads/2022/08/LCC_FEIS_07_Traffic_Transportation.pdf.

[93] UTAH DEP'T OF TRANSP., *Little Cotton Wood Canyon Environmental Impact* Statement, Ch. 2 at 2-50, https://littlecottonwoodeis.udot.utah.gov/wp-content/uploads/2022/08/LCC_FEIS_02_Alternatives.pdf.  The Record of Decision notes that the toll during peak periods will be $20 to $30.  UTAH DEP'T OF TRANSP., *Record of Decision* 17 (June 2023), https://littlecottonwoodeis.udot.utah.gov/wp-content/uploads/2023/07/LCC_ROD_Final_June_2023.pdf.

[94] FED. HIGHWAY ADMIN., *Letter Report on the Value Pricing Pilot Program for Fiscal Year 2022* at 1-2 (Sept. 22, 2023), https://ops.fhwa.dot.gov/congestionpricing/value_pricing/pubs_reports/rpttocongress/vppp22rpt/vppp22rpt.pdf.

DOT_0047640

system-wide charges.[95]  FHWA has an entire page on its website dedicated to zone-based pricing, including cordon and area pricing, which specifically notes that cordon pricing had been pursued in New York City.[96]  A page on FHWA's website which provides information on tolling facilities includes "Cordon Tolls" among the list of permissible "Project Types/Projects" available to states through the VPPP.[97]

99.    Another FHWA webpage states that "DOT believes that using innovating financing strategies to leverage limited public transportation revenue is integral to the long-term re-thinking of how the United States provides highway *and transit infrastructure*," one such strategy being congestion pricing.[98]

100.    According to FHWA's website, the VPPP is "intended to demonstrate whether and to what extent roadway congestion may be reduced through application of congestion pricing strategies, and the magnitude of the impact of such strategies on driver behavior, traffic volumes, transit ridership, air quality and *availability of funds for transportation programs*."[99]  FHWA also notes on its website that one of the advantages of congestion pricing is that it "benefits State and local governments by improving the quality of transportation services without tax increases or large capital expenditures, by providing additional revenues for funding transportation."[100]

---

[95] FED. HIGHWAY ADMIN., *Congestion Pricing: A Primer* 4,
https://ops.fhwa.dot.gov/publications/fhwahop08039/fhwahop08039.pdf (last accessed Mar. 31, 2025).

[96] FED. HIGHWAY ADMIN., *Zone-Based Pricing*,
https://ops.fhwa.dot.gov/congestionpricing/strategies/involving_tolls/zone_based.htm (last accessed Mar. 31, 2025).

[97] OFF. OF HIGHWAY POLICY INFO., FED. HIGHWAY ADMIN., *Toll Facilities in the United States*,
https://www.fhwa.dot.gov/policyinformation/tollpage/history.cfm (last accessed Mar. 29, 2025).

[98] FED. HIGHWAY ADMIN., *Congestion Pricing: Leveraging*,
https://ops.fhwa.dot.gov/congestionpricing/assets/leveraging.pdf (last accessed Mar. 5, 2025).

[99] OFF. OF OPERATIONS, FED. HIGHWAY ADMIN., *Value Pricing Pilot Program*,
https://ops.fhwa.dot.gov/congestionpricing/value_pricing/ (last accessed Mar. 31, 2025) (emphasis added).

[100] OFF. OF OPERATIONS, FED. HIGHWAY ADMIN., *Benefits of Congestion Pricing*,
https://ops.fhwa.dot.gov/congestionpricing/cp_benefits.htm (last accessed Mar. 9, 2025).

DOT_0047641

**C.    The Project Sponsors Apply for VPPP Tolling Authority and Conduct a Lengthy Environmental Review Process In Reliance on FHWA's Statements that the VPPP was the "Best Fit" for the Program**

101.    In 2019, FHWA once again confirmed its long-held interpretation that cordon or "area" pricing and revenue generation are permitted under the VPPP, this time in representations made directly to the Project Sponsors in connection with FHWA's consideration of their application for tolling authority for the Program.

102.    Following passage of the TMA, the Project Sponsors engaged in meetings and telephone conferences with FHWA regarding the Program and provided detailed explanations of its contemplated operation.  Those explanations included that tolling would apply to vehicles that enter the CBD, defined as below and inclusive of 60th Street (with the exception of vehicles using the FDR Drive, West Side Highway, the Battery Park Underpass, and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West Street) in order to reduce the severe congestion in the CBD.  In addition, it was explained that the Program would incorporate toll rates that would provide a new and recurring source of revenue for the MTA, with net revenues (after paying for Program operational costs) to be dedicated to capital improvements identified in the MTA's 2020-2024 Capital Plan.  USDOT and FHWA representatives made clear at these meetings that, given the nature of the Program, the VPPP is the appropriate vehicle to provide tolling authority on federal-aid highways for a cordon-based congestion pricing project like the Program.  The federal agencies explained that NYSDOT already had one of the 15 "slots" allotted in the VPPP and could have multiple congestion pricing projects under that "slot," including the Program.  USDOT and FHWA further explained that there would need to be a VPPP agreement between FHWA and the Project Sponsors.  At a meeting on April 24, 2019, it was agreed that FHWA would forward to the Project Sponsors a template for a VPPP Expression of Interest, which was needed to commence

DOT_0047642

the approval process under the VPPP, as well as an example of an agreement that the Project Sponsors would need to enter into with FHWA once approved.

103.    On June 17, 2019, the Project Sponsors submitted the EoI, **Exhibit A**, seeking authorization to implement a variable tolling program aimed at reducing congestion (*i.e.*, a congestion pricing program) in the CBD.  The EoI explained that the Project Sponsors sought "approval under the Value Pricing Pilot Program (VPPP) to initiate a variable tolling program within the Manhattan Central Business District (CBD), generally defined as the area of Manhattan south and inclusive of 60th Street."  EoI at 1.   The EoI was clear that the Project Sponsors contemplated implementing a cordon pricing program, noting that "[v]ehicles would be charged a toll to enter or remain within the Manhattan CBD" and that "vehicles would be charged to enter or remain within a specific area."  *Id.* at 3-4.   The Project Sponsors were likewise clear that generating revenue for mass transit was another goal of the Program, noting that "revenues generated by the program would be used to construct, operate and maintain the CBD toll collection program and modernize the MTA transit system, with the goal of attracting new riders and further reducing vehicle demand for scarce road capacity in and connecting to the Manhattan CBD."  *Id.* at 4; *see also id.* at 3 ("Revenue raised by the program will provide sustained funding for public transportation, which as it becomes more reliable, will contribute to congestion relief.").  As the Project Sponsors explained, "[b]y creating a new sustainable revenue source, the CBD tolling program would enable the MTA to invest in improving its transportation network, which in turn, would support the program's goals of increasing transit ridership and improving transit services for low-income residents."  *Id.* at 6.  The EoI did not contemplate an end date for the Program, but instead stated that the Project Sponsors would prepare reports on "the effects of the program" once "every two years … for the life of the program."  *Id.* at 6.

DOT_0047643

104.    On October 24, 2019, then FHWA Administrator Nicole R. Nason, nominated by President Trump during his first term, responded to the Project Sponsor's EoI in a letter addressed to the Executive Deputy Commissioner of NYSDOT ("FHWA Response"), attached hereto as **Exhibit G**.  According to the Trump Administration at the time, "[u]nder the various programs in Federal law that allow tolling of existing infrastructure, the VPPP appears to be the best potential fit."  FHWA Response at 1.

105.    Following FHWA's response to the EoI, a years-long environmental review process under NEPA ensued.  In assessing the Program, FHWA specifically considered the Program's purpose "to reduce traffic congestion in the [CBD] in a manner that will generate revenue for future transportation improvements," and its specific objectives of: (1) reducing daily VMT within the CBD by at least five percent; (2) reducing the number of vehicles entering the CBD daily by at least ten percent; and (3) creating a funding source for capital improvements and generating sufficient annual net revenues to fund $15 billion for capital projects.[101]

106.    On August 10, 2022, FHWA and the Project Sponsors issued a Draft Environmental Assessment ("Draft EA"), which was informed by early public outreach and comments as well as complex and comprehensive technical analyses.  The Draft EA identified the Program's dual objectives; the primary objective of congestion reduction and the complementary objective of providing a reliable source of funding for capital public transit projects.  It examined numerous categories of potential environmental effects, such as the visual effects of tolling infrastructure, the indirect air quality and noise effects of changes in traffic patterns, and the effects on transit systems of shifts in travel mode choice.  In accordance with former Executive Order ("EO") 12,898

---

[101] *See* FED. HIGHWAY ADMIN. et al., *Central Business District Tolling Program, Finding of No Significance, Appendix A: Final Environmental Assessment* at ES-6 (June 14, 2024), https://new.mta.info/project/CBDTP/environmental-assessment.

DOT_0047644

(1994), the Draft EA also studied the potential for disproportionately high and adverse effects on EJ communities, including the potential effects of traffic diversions on local air quality in the locations throughout the region most likely to experience diversions.

107.   Because the tolling structure was not yet established when the Draft EA was issued, and in order to allow FHWA and the Project Sponsors to better assess the range of potential impacts from the Program, the Draft EA analyzed seven tolling scenarios, each with different variables, using EPA-approved traffic and air quality models to predict changes in regional travel demand and patterns for those scenarios, as compared to predicted conditions in 2023 and 2045 without the Program.  It then studied the scenarios that yielded the representative worst-case effects for different resource categories (e.g., traffic, noise, etc.) to consider the full range of potential effects from the Program.   The Draft EA also identified measures to mitigate potential disproportionate and adverse environmental effects and potential effects on EJ populations that were identified in the analyses.

108.   FHWA and the Project Sponsors provided a 44-day public comment period, during which anyone could submit comments on the Draft EA.  In late August 2022, FHWA and the Project Sponsors held six virtual public hearings, totaling over 38 hours, to discuss the Draft EA. This was in addition to early outreach conducted while the Draft EA was in development, and special outreach to communities and organizations, including multiple meetings to discuss environmental justice in relation to the Program.

109.   On March 30, 2021, while working with the Project Sponsors, then-Acting FHWA Administrator Stephanie Pollack commended the Program, saying: "The FHWA looks forward to

DOT_0047645

assisting New York so we can arrive at a prompt and informed NEPA determination on this important and precedent-setting project."[102]

110.    Between August 2022 and April 2023, FHWA and the Project Sponsors reviewed and prepared responses to each of the thousands of comments and prepared a Final EA incorporating these responses and changes informed by the public input.

111.    The Final EA determined that the Program would not have adverse effects on air quality because it would not cause exceedances of health-based National Ambient Air Quality Standards.   Nevertheless, the Project Sponsors committed to a robust, $155 million mitigation package over five years to improve air quality and public health in EJ communities with preexisting pollution and health burdens throughout the region, with particular investments directed to EJ communities in which the Project could cause any increase in truck traffic.

112.    The Final EA further predicted that the Program would meet each of the objectives described in Paragraph 104 above based on detailed modeling, using the federally approved Best Practices Model maintained by the New York Metropolitan Transportation Council.

113.    The Final EA also predicted many beneficial environmental effects of the Program, including but not limited to:

      a.    reducing emissions of harmful air pollutants including volatile organic compounds, nitrogen oxides, carbon monoxide, particulate matter, carbon dioxide equivalent (*i.e.*, greenhouse gases), and Mobile Source Air Toxics, both within the CBD and region-wide, through an overall reduction in VMT region-wide;

---

[102] FED. HIGHWAY ADMIN., *FHWA Greenlights Environmental Assessment for New York City's Proposed Congestion Pricing Plan* (Mar. 30, 2021), https://highways.dot.gov/newsroom/fhwa-greenlights-environmental-assessment-new-york-citys-proposed-congestion-pricing-plan.

DOT_0047646

b.  reducing localized emissions for most EJ communities in the CBD and others outside of the CBD;

c.  reducing the number of vehicles entering the CBD;

d.  reducing delays at many intersections and highway segments, thereby improving travel times, reducing vehicle operating costs, and improving safety;

e.  increasing transit ridership;

f.  reducing travel times for bus operations and thereby facilitating faster, more reliable bus trips;

g.  reducing parking demand within the CBD;

h.  reducing regional energy consumption and greenhouse gas emissions, helping to meet carbon reduction goals;

i.  improving air quality and health in EJ communities through implementation of a $155 million mitigation program; and

j.  creating a dedicated revenue source for investments in public transit, which will further reduce congestion and improve air quality over time.

114.  In May 2023, FHWA approved the Final EA.

115.  Starting on May 12, FHWA made the Final EA and Draft FONSI available for public review for a period of 30 days, from May 12 to June 12, 2023.

116.  On June 22, 2023, FHWA issued a FONSI determining that the Program, including mitigation, would not have a significant adverse impact on the environment and would not have a disproportionately high and adverse impact on EJ communities or populations.

117.  On June 23, 2023, FHWA's New York Division Administrator signed the FONSI.

53

DOT_0047647

118.    On March 27, 2024, the TBTA Board approved a toll rate schedule through a formal ratemaking process under New York State law.

119.    In June 2024, the Project Sponsors, in consultation with FHWA, completed a reevaluation under NEPA ("Reevaluation 1"), which assessed the effects of the approved toll structure.  On June 14, 2024, FHWA concluded that the approved toll structure and associated impacts were analyzed and mitigated appropriately under NEPA, that no additional environmental analysis was warranted, and that the conclusions in the Final EA and FONSI remained valid. Reevaluation 1 also concluded that the approved toll structure would meet the congestion-reduction and revenue goals for the Program and achieve similar environmental benefits to those described in the Final EA.

120.    On June 5, 2024, New York Governor Kathy Hochul announced a temporary pause of the Program.  On November 14, 2024, Governor Hochul proposed that the Program move forward with a toll structure approach whereby those toll rates would be phased in gradually over the first several years of the Program (the "Phase-In Approach"), featuring a lower initial toll amount.

121.    In November 2024, the Project Sponsors completed a second reevaluation under NEPA ("Reevaluation 2") to assess the Phase-In Approach.

122.    Reevaluation 2 confirmed that under the Phase-In Approach, the Program would still meet its purpose and need, and all of its objectives.  Reevaluation 2 also confirmed that the Project Sponsors would still implement all mitigation commitments, including for EJ communities, within the same timeframes as contemplated in the Final EA and FONSI.

123.    On November 18, 2024, the TBTA Board formally adopted the Phase-In Approach to the toll rate schedule.

DOT_0047648

124.     On November 21, 2024, FHWA approved Reevaluation 2, concluding that the effects of the Program were consistent with those disclosed in the EA, that the adopted Phase-In Approach of the approved toll structure and impacts associated with it were analyzed and mitigated accordingly, and that no additional environmental analysis was warranted.

**D.     The VPPP Agreement Is Executed by FHWA and the Project Sponsors**

125.     That same day, on November 21, 2024, FHWA (through Defendant Shepherd) and the Project Sponsors signed an agreement under the VPPP authorizing the Program's collection of tolls and requiring (among other things) implementation of the mitigation commitments made in the FONSI.

126.     The VPPP Agreement reflects FHWA's determination that "this Agreement is necessary to oversee and administer the collection of tolls pursuant to Section 1012(b)(4) of ISTEA," VPPP Agmt. at 1, and states in relevant part that "[e]ffective on the date of this Agreement, the project is approved as a pilot program," *id.*, cl. 8, and that TBTA is authorized to "operate the Program as a toll Project in accordance with the provisions of this Agreement and as a value pricing project," *id.*, cl. 1.  FHWA further agreed that "the imposition of tolls under this Agreement does not render Federal-aid highways within the State of New York generally ineligible for Federal-aid highway funds where such highways are otherwise eligible under the particular funding program." *Id.*, cl. 5.  The VPPP Agreement provides that TBTA may use "toll revenues received from the operation of the Project" for, among other things, "any other projects eligible for assistance under title 23, United States Code." *Id.*, cl. 2.

127.     In return, the Project Sponsors agreed to a number of obligations in the VPPP Agreement, including: (1) "to adequately maintain" federal-aid highways located in the geographic area of the Program, *id.*, cl. 6; (2) to submit regular reports on the effects of the Program "on driver behavior, traffic volume, congestion, transit ridership" and other topics to FHWA, *id.*, cl. 8(b); and

55

DOT_0047649

(3) "to comply with all Federal laws and requirements applicable to this project, including the laws and policies applicable to the Value Pricing Pilot Program," *id.*, cl. 9.  The VPPP Agreement further requires that the Project Sponsors "identify benefits the application of tolls has in reducing climate pollution" and "demonstrate the benefits mitigation measures provide to underserved communities."  *Id.*, cl. 8(d).

128.    In addition, the VPPP Agreement requires that FHWA and the Project Sponsors "will cooperate and work together in the implementation of the Project."  *Id.*, cl. 8(a).

129.    The VPPP Agreement does not include any provision authorizing FHWA to terminate the agreement.  Rather, it contemplates that only TBTA could unilaterally decide to discontinue the Program, requiring the Project Sponsors to "work with FHWA to return the Project to its original operating condition *if TBTA* decides to discontinue tolls on the Project."  *Id.*, cl. 11 (emphasis added).  The VPPP Agreement further provides that TBTA and NYCDOT shall "monitor and report on the project performance" for "a period of at least ten years or to the end of the life of the Project, whichever is sooner."  *Id.*, cl. (8)(b).

130.    The VPPP Agreement references FHWA regulations at 23 C.F.R. Part 940 and 950. These regulations do not grant FHWA authority to unilaterally terminate the VPPP Agreement.

### E.    Plaintiffs Successfully Implement the Program After Facing Numerous Lawsuits Seeking to Delay or Prevent Congestion Pricing

131.    Prior to implementation of the Program, TBTA budgeted over $500 million towards efforts to establish the Program, and much of that budget has already been expended.  These expenditures included developing the methodological approach; conducting the assessment and extensive outreach and developing the final documentation for the environmental review process under NEPA; design, development, implementation, and testing of the roadway infrastructure and system; design, development, implementation, and testing of the Back Office System; additional

DOT_0047650

extensive outreach for the State administrative review process; staff costs, including new staff for the Program; and consulting costs.

132.     In late 2024, several groups and individuals, as well as the State of New Jersey, sought preliminary injunctive relief on various federal and state constitutional and statutory grounds barring the MTA and TBTA from beginning the Program or collecting tolls.  Each of these claims for injunctive relief was rejected by the courts.  *See Chan v. U.S. Dep't of Transp.*, No. 23 Civ. 10365, 2024 WL 5199945 (S.D.N.Y. Dec. 23, 2024) (Liman, J.) ("Chan") (111-page opinion denying motions for preliminary injunction in four related cases challenging the program); *see also County of Rockland v. Metro. Transp. Auth.*, No. Civ. 24-3325 (2d Cir. Jan. 28, 2025), ECF 31 (per curiam); *New Jersey v. U.S. Dep't of Transp.*, No. Civ. 25-1033 (3d Cir. Jan. 4, 2025), ECF 9 (Bibas, J.); *County of Rockland v. Triborough Bridge & Tunnel Auth.*, No. 24 Civ. 2285 (S.D.N.Y. Jan. 14, 2025), ECF 56 (Seibel, J.); *New Jersey v. U.S. Dep't of Transp.*, No. 23 Civ. 3885 (D.N.J. Jan. 3, 2025) ("New Jersey"), ECF 212 (Gordon, J.); *County of Rockland v. Triborough Bridge & Tunnel Auth.*, No. 24 Civ. 2285 (S.D.N.Y. Dec. 23, 2024), ECF 52 (Seibel, J.); *Neuhaus v. Triborough Bridge & Tunnel Auth.*, No. 24 Civ. 3983 (S.D.N.Y. Dec. 23, 2024), ECF 44 (Seibel, J.).  In rejecting these plaintiffs' requests for a preliminary injunction to halt the Program, courts recognized that the equities and public interest favored the Program moving forward, especially in light of the expenditures necessary to implement the Program and the revenues expected from its operation, *see, e.g.*, *Chan*, 2024 WL 5199945, at *48-49; that the implementation of the Program reflected a policy choice by New York's elected representatives, *see id.* at *48; and that FHWA conducted a thorough analysis in deciding to allow the Program to proceed, *see id.* at *5-10; *New Jersey*, No. 23 Civ. 3885, ECF 212 at 35.

DOT_0047651

133.    FHWA and USDOT were named as defendants in several of the above-referenced cases.  In the course of defending the Final EA and FONSI, and FHWA's ultimate approval of the Program, FHWA and USDOT submitted briefs to this Court and others that underscored and reiterated FHWA's longstanding view that cordon pricing programs, including those with a revenue objective, are permissible under the VPPP.

134.    In briefs before this Court, FHWA and USDOT described the VPPP as the "means by which the FHWA can provide tolling authority to state, regional, or local governments to implement congestion pricing programs."  *Chan*, ECF 65 at 7 (internal quotation marks omitted). They explained that it was appropriate for FHWA to authorize a cordon pricing program: "Although this may be the first time congestion pricing is applied to a city's central business district (i.e. 'cordon pricing') in the United States, such projects have been successfully implemented in London, Stockholm, Singapore, and Milan, and information from some of those projects was used to inform the analysis conducted here."  *Chan*, ECF 81 at 10; *see also id.* ("[C]ongestion pricing strategies are not novel and the impacts of such strategies on driving behavior, traffic volumes, transit ridership and air quality have been available for review for years.").

135.    FHWA and USDOT recognized that the Program's purpose is to "reduce traffic congestion in the Manhattan CBD in a manner that will generate revenue for future transportation improvements."  *Chan*, ECF 65 at 9.  FHWA and USDOT went on to explain that compliance with the TMA's objective that the Program enable a minimum amount of funding for the MTA Capital Program was not only an "appropriate" consideration in the NEPA process, but also "serves the separation of powers by respecting the democratic legitimacy of legislative judgments," "promotes the balance of 'federalism' by ensuring that federal agencies do not pass judgment on the policy

58

wisdom of state and local enactments," and "is pragmatically sensible as well, since it ensures federal agencies do not expend resources examining alternatives that the project sponsors are not legally authorized to implement." *Chan*, ECF 160 at 8 (quoting *Mulgrew*, 2024 WL 3251732, at *26).

136.   One of the plaintiffs that sued to prevent implementation of the Program is, as noted, the State of New Jersey, which sued USDOT and FHWA among others.  On December 30, 2024, Judge Leo Gordon granted USDOT, FHWA, the MTA, and TBTA's motions for summary judgment in overwhelming part, rejecting New Jersey's claims that FHWA acted arbitrarily in assessing the potential adverse environmental impacts on New Jersey resulting from air pollution and identifying and assessing the potential for disproportionately high and adverse impacts on New Jersey EJ communities.  *New Jersey*, No. 23 Civ. 3885, ECF 191.  New Jersey also raised concerns about the adequacy of participation afforded to New Jersey entities, officials, and the public throughout the process, and that FHWA had failed to conduct a transportation conformity analysis under the Clean Air Act for the Project with regard to New Jersey's State Implementation Plan, which claims the court also rejected.  The court reserved judgment on two issues that it remanded to FHWA for further explanation: the amount of place-based mitigation funding allocated to New Jersey EJ communities to address the former EO 12,898 and the consideration of alternatives in light of the adopted Phase-In Approach.  *Id.*  The court did not, as sought by New Jersey, vacate the FONSI pending the completion of the remand.  New Jersey subsequently moved for reconsideration and for a temporary restraining order, which the court denied.  FHWA filed its remand results on January 17, 2025, reaffirming the FONSI and Reevaluations, including with respect to the alternatives analysis and the revenue objective.  The remand results are pending *sub judice* before the court.

DOT_0047653

137.    On January 5, 2025, the Program went into effect.  Vehicles entering the CBD are being tolled at the rates established in the adopted toll rate schedule.

## F.    Data to Date Indicate that the Program Has Been Successful at Reducing Congestion and Is Increasingly Popular with New Yorkers

138.    While the Program has only recently begun and its full benefits have yet to be realized, it is clearly already working.  A recent study by researchers from the National Bureau of Economic Research and Google Research concluded that the "introduction of congestion pricing led to an immediate increase in speeds within NYC's CBD, which has persisted since implementation" and estimate "that speeds in NYC's CBD increased by 15%" on average, and that the "effects on speeds are even larger during the afternoon—historically the most congested time of day—and persist even after peak-hours pricing ends at 9pm."[103]  The researchers also found that the Program "had positive spillovers on speeds throughout the NYC metropolitan area" and had already led to a small, but noticeable decrease in emissions for vehicles driving in the CBD.[104]  Every day there are close to 60,000 fewer cars in the CBD since tolling began.[105]  New Jerseyans driving or commuting by bus are saving as much as 21 minutes on a daily round trip, while commuters from Queens and Long Island are saving as much as 13 minutes.[106]  The *Financial Times* has estimated that "motorists … will save thousands of hours per year they currently waste crawling through smoggy tunnels or over clogged bridges."[107]  This is already being borne out in the first months since the Program took effect.  Crossing times were 17% faster

---

[103] Cody Cook, et al., *supra* note 2 at 2.

[104] *Id.*

[105] Michelle Kaske, *NYC Toll Projected to Boost Economy by as much as $1.3 Billion*, Bloomberg (Mar. 11, 2025), https://www.bloomberg.com/news/articles/2025-03-11/nyc-toll-projected-to-boost-economy-by-as-much-as-1-3-billion.

[106] *Id.*

[107] Oliver Roeder & Sam Learner, *First US congestion pricing scheme brings dramatic drop in NY traffic*, Financial Times (Jan. 16, 2025), https://www.ft.com/content/c229b603-3c6e-4a1c-bede-67df2d10d59f.

DOT_0047654

at the Lincoln Tunnel and 48% faster at the Holland Tunnel in January 2025, compared to January 2024; trip times from Brooklyn and Queens to the CBD have dropped between 10% and 30%, and express buses save about 10 minutes on their commutes.[108]  Traffic speeds on river crossings have been 5% to 30% faster this February than last February.[109]  Traffic speeds on major bridges improved significantly: on the Queensboro Bridge, by 31%; on the Brooklyn Bridge, by 26%; and on the Manhattan Bridge, by 7%.[110]  Fewer vehicles use the nine MTA bridges and tunnels, with the largest reductions at the Hugh L. Carey and Queens-Midtown Tunnels, which lead directly into the CBD.[111]  Truck traffic traveling through these tunnels dropped 14% this year compared to the same period in 2024.[112]  A report by the Regional Plan Association has estimated that the annual value of time savings to commuters could total as much as $1.3 billion.[113]

139.    Data collected by the MTA reveals that since the Program began, vehicle traffic in the CBD decreased substantially, with 5.8 million fewer vehicles entering the CBD in January through March 2025 compared to what would be expected based on data for prior years.[114]  The

---

[108] January 2025 MTA Board Meeting, Congestion Relief Zone Tolling January 29, 2025 Update , at 9, https://www.mta.info/document/163411 (last accessed Apr. 17, 2025); February 2025 MTA Board Presentation at 10 (Feb. 26, 2025), https://www.mta.info/document/165401 (last accessed Apr. 17, 2025).

[109] January 2025 MTA Board Meeting, Congestion Relief Zone Tolling January 29, 2025 Update , at 9, https://www.mta.info/document/163411 (last accessed Apr. 17, 2025); February 2025 MTA Board Presentation at 10 (Feb. 26, 2025), https://www.mta.info/document/165401 (last accessed Apr. 17, 2025).

[110] January 2025 MTA Board Meeting, Congestion Relief Zone Tolling January 29, 2025 Update , at 9, https://www.mta.info/document/163411 (last accessed Apr. 17, 2025); February 2025 MTA Board Presentation at 10 (Feb. 26, 2025), https://www.mta.info/document/165401 (last accessed Apr. 17, 2025).

[111] MTA Daily Ridership and Traffic: Beginning 2020, DATA.NY.GOV (Apr. 16, 2025), https://data.ny.gov/Transportation/MTA-Daily-Ridership-and-Traffic-Beginning-2020/sayj-mze2/about_data.

[112] Samuel Schwartz, *Where Have all the Trucks Gone? Truck Diversions Through the Bronx and Staten Island*, ROOSEVELT HOUSE PUB. POLICY INST. AT HUNTER COLL. (Mar. 28, 2025), https://www.roosevelthouse.hunter.cuny.edu/?forum-post=trucks-gone-truck-diversions-bronx-staten-island

[113] Kate Slevin & Rachel Weinberger, *Congestion Pricing: What it Means to Save Time*, REGIONAL PLAN ASS'N (Mar. 11, 2025), https://rpa.org/news/lab/what-it-means-to-save-time.

[114] MTA, *MTA Metrics: Vehicle Reductions*, https://metrics.mta.info/?cbdtp/vehiclereductions (last accessed Apr. 14, 2025).

DOT_0047655

NBER's March study found that because of the higher speeds in the CBD resulting from the Program, the decreased travel time for "a hypothetical driver traveling to the CBD every weekday … adds up to 12.5 hours of time saved each year."[115]  This means additional time for those driving in the CBD to spend with loved ones rather than sitting in traffic—exactly the kind of impact Secretary Duffy has said he wants to see from local transportation policymakers.[116]

140.   Trips are also far more reliable.  Data shows that traffic through the Holland Tunnel used to be delayed more than 3 minutes on 54% of weekdays—that has fallen to just 12%.[117]  On the Williamsburg Bridge, delays used to be greater than 3 minutes 65% of the time; the Program has reduced that to 2%.[118]

141.   Manhattan buses have also gotten faster; an analysis of peak-hour bus routes revealed that 11 of the 13 local and Select Bus Service routes were faster this January than in the same period in 2024.[119]  The M50, "traditionally among the slowest buses in all of Manhattan," saw a weekday speed increase by 4%.[120]  Meanwhile, express buses are traveling 21% faster on the portion of their routes leading into and within the CBD.  Similarly, reduced congestion

---

[115] Cook et al., *supra* note 2, at 2.

[116] Sean Duffy, *U.S. Secretary of Transportation Sean Duffy speaks at the American Association of State Highway and Transportation Officials 2025 Washington Briefing* (Feb. 5, 2025), https://www.transportation.gov/briefing-room/us-secretary-transportation-sean-duffy-speaks-american-association-state-highway-and ("If we don't have our systems that are delayed and we don't sit in traffic we get to spend an extra 15 minutes, maybe an extra 45 minutes a day with the ones that we love as opposed to listening to music or a podcast …. We can make people's lives better and spend time with the people we love as opposed to going to the grind of our transportation system.").

[117] MTA, *February 2025 MTA Board Meeting Presentation* 12 (Feb. 26, 2025), https://www.mta.info/document/165401 (last accessed Mar. 20, 2025); *see also* TRANSCOM, *Internal Data Set: Sourced Week of Feb. 24, 2025* (data set on file).

[118] *Id.*

[119] Jose Martinez & Mia Hollie, *Manhattan Buses Got a Bit Faster in First Month of Congestion Pricing*, THE CITY (Feb. 21, 2025), https://www.thecity.nyc/2025/02/21/crosstown-bus-speeds-up-congestion-pricing/.

[120] *Id.*

DOT_0047656

translates into less delay for school buses in the CBD.[121]  One hundred thirty New York City School buses have routes through the CBD and when a bus is stuck in traffic, kids can miss valuable class time and often miss the breakfast offered at school.  Reduced traffic, as a result of the Program, has allowed more of these buses to make it to school on time.

142.    At the same time, the fact that there are now fewer cars on the road in the CBD has not stymied economic activity.  In fact, data provided by the MTA shows that in January 2025, 35.8 million people visited BIDs in the CBD, a 1.5 million increase compared to last January.  Credit card sales data reflects that retail sales in the CBD have been $900 million higher in 2025 compared to the same period last year.[122]  Credit card sales data reflects that retail sales in the CBD are on pace to be $900 million higher in 2025 compared to the same period last year.[123]  The gross revenue of Broadway shows in January through March 2025 was 25% higher than in the same period of last year, while attendance at shows was approximately 20% higher in the first three months of 2025 compared to the same period of last year. [124]  As Governor Hochul recently said, "traffic is down and business is up."[125]

143.    This should come as no surprise given business leaders' support for the Program even before it began.  After Governor Hochul announced the Program would move forward with

[121] Sophia Lebowitz, *Congestion Pricing Gets Kids to School on Time, Data Shows*, STREETSBLOG NYC (Jan. 17, 2025), https://nyc.streetsblog.org/2025/01/17/congestion-pricing-gets-kids-to-school-on-time-data-shows.

[122] Dave Colon, *Memo to the President: Manhattan Economy Improving, Thanks to Congestion Pricing*, STREETSBLOG NYC (Feb. 27, 2025), https://nyc.streetsblog.org/2025/02/27/memo-to-the-president-manhattan-economy-improving-thanks-to-congestion-pricing.

[123] Dave Colon, *Memo to the President: Manhattan Economy Improving, Thanks to Congestion Pricing*, STREETSBLOG NYC (Feb. 27, 2025), https://nyc.streetsblog.org/2025/02/27/memo-to-the-president-manhattan-economy-improving-thanks-to-congestion-pricing.

[124] Research & Statistics, *Grosses-Broadway in NYC*, THE BROADWAY LEAGUE https://www.broadwayleague.com/research/grosses-broadway-nyc/ (last accessed Apr. 17, 2025).

[125] Gov. Kathy Hochul, *Traffic Down, Business Up: Governor Hochul Highlights Progress Made Under New York's Congestion Pricing Program* (Mar. 21, 2025), https://www.governor.ny.gov/news/traffic-down-business-governor-hochul-highlights-progress-made-under-new-yorks-congestion.

DOT_0047657

the Phase-In Approach, the Greater New York Chamber of Commerce posted a statement by its CEO on X, noting that the Program "will improve the quality of life in Manhattan for all who live, work and visit."[126]  And the Partnership for New York City's President & CEO Kathryn Wylde has stated that, since the onset of Congestion Pricing, New Yorkers are "moving faster and there's less traffic,"[127] and "[i]n every respect, this is a policy that President Trump and the Republicans should be supporting."[128]

144.    Business leaders have continued to voice their support for the Program since its benefits have truly started to emerge.  For example, Union Square Partnership Executive Director Julie Stein said that since the Program began, "average weekday foot traffic in Union Square has reached its highest levels for this season in recent history, surpassing both pre-pandemic and recent-year benchmarks for January and February."[129]  Stein added that people in the community are saying that "Union Square feels more peaceful and pedestrian-friendly and surface transportation commuting times into and out of the district have improved."[130]  Hudson Square BID President and CEO Samara Karasyk said that, because of the Program, "[w]e have already seen a tangible decrease in traffic around the Holland Tunnel, which … will help grow the local economy and enhance the vitality of our community."[131]

---

[126]    New York's Chamber (@NYChamber), X (Nov. 15, 2024, 3:29 PM), https://x.com/NYChamber/status/1857521387583451602.

[127] Dick Brennan, *President Trump Said to Have NYC's Congestion Pricing, Bike Lanes in his Crosshairs*, CBS NEWS (Feb. 10, 2025), https://www.cbsnews.com/newyork/news/president-trump-nyc-congestion-pricing-bike-lanes/.

[128] Ry Rivard & Nick Reisman, *New York's Business Boosters Push Trump to Keep Manhattan Tolls*, POLITICO (Feb. 11, 2025), https://www.politico.com/news/2025/02/11/new-york-trump-congestion-pricing-00203540.

[129] *Traffic Down, Business Up*, *supra* note 125.

[130] *Id.*

[131] *Id.*

DOT_0047658

145.     Emergency vehicle speeds and response times obviously benefit from the reduction of traffic and lessening of congestion.  For many years, increasing traffic in New York City led to longer and longer emergency vehicle response times.  As documented in a report issued by State Senator Brad Hoylman-Sigal, who represents much of the CBD, and traffic engineer Sam Schwartz, over the past decade, "E.M.S. response times to life-threatening situations had increased by 29%; for Fire Department vehicles tending to medical emergencies, the lag was up by 72 percent."[132]  Congestion pricing allows emergency vehicles to respond more quickly to calls.

146.     Reports also indicate that the Program has made the streets safer; data compiled by the New York Police Department reflect decreases in accidents both inside and outside the CBD for the first quarter of 2025 as compared to the comparable period in 2024.[133]

147.     Public transit ridership has seen an increase following the implementation of the Program, with 448,000 more riders on average each day choosing to use MTA public transit options as compared to the same period last year.[134]

148.     Crime in the subway has plummeted, even as ridership has increased.  In January 2025, there were 36% fewer crimes reported on the subway than last January.[135]  Overall, subway crime is down 22% so far in 2025.[136]

---

[132] Ginia Bellfante, *The Life-or-Death Consequences of Killing Congestion Pricing*, N.Y. TIMES (Oct. 10, 2024), https://www.nytimes.com/2024/10/10/nyregion/new-york-fire-department-response-times.html.

[133] N.Y. CITY OPEN DATA, *Motor Vehicle Collisions – Crashes*, https://data.cityofnewyork.us/Public-Safety/Motor-Vehicle-Collisions-Crashes/h9gi-nx95/about_data (last accessed April 17, 2024).

[134] Sam Deutsch, *Congestion Pricing is a Policy Miracle*, SUBSTACK (Mar. 20, 2025), https://bettercities.substack.com/p/congestion-pricing-is-a-policy-miracle.

[135] Barbara Russo-Lennon, *Subway Crime Plummets as Ridership Jumps Significantly in 2025 in Congestion Pricing Era*, AM NY (Feb. 4, 2025), https://www.amny.com/nyc-transit/nyc-subway-crime-plummets-ridership-jumps-2025/.

[136] Lindsay Tuchman, *Trump Administration Threatens to Pull MTA Funding if Agency Does not Provide Crime Stats*, ABC7 NEWS (Mar. 19, 2025), https://abc7ny.com/post/subway-crime-congestion-pricing-nyc-trump-administration-threatens-pull-federal-funding-mta-does-not-report-stats/16049018/.

65

149.     Honking is also down, as New Yorkers in the CBD have actually enjoyed what might be called peace and quiet since the Program went into effect.[137]   The two Department of Environmental Protection noise cameras in the CBD have not yet issued a single horn-honking summons since the Program went into effect, whereas 27 were issued during the same time period last year.[138]   There has also been a 69% decline in complaints about honking to the city's 311 portal from citizens living inside the CBD for the same time frame in 2024.[139]   "Less congestion means less noise," Jaqi Cohen, director of climate and equity policy for Tri-State Transportation Campaign explained, "but I think horn honking is also a symptom of people's frustration behind the wheel, so it probably speaks to the fact that people have easier commutes now."[140]

150.     Not only has Congestion Pricing created all of these benefits for New Yorkers and commuters, it has also met revenue raising expectations for the MTA's Capital Program.[141]

151.     According to a poll reported by *CBS News*, the majority of New Yorkers want the Program to continue,[142] and polling indicates that support for the Program continues to grow as commuters see its benefits.[143]   On a 2-to-1 basis, New Yorkers say that the program is working.[144]

---

[137] Jose Martinez & Mia Hollie, *Honking Complaints Plunge 69% Inside Congestion Pricing Zone*, THE CITY (Mar. 11, 2025), https://www.thecity.nyc/2025/03/11/traffic-noise-complaints-drop-congestion-pricing/.

[138] *Id.*

[139] *Id.*

[140] *Id.*

[141] Barbara Russo-Lennon, *Congestion Pricing: MTA Announces $51.9 Million in Manhattan Toll Revenue for February*, AMNY (Mar. 24, 2025), https://www.amny.com/news/congestion-pricing-revenue-tolls-february-2025/.

[142] Alecia Reid, *6 in 10 Say They Want NYC Congestion Pricing to Continue, New Poll Finds*, CBS NEWS (Feb. 5, 2025),     https://www.cbsnews.com/amp/newyork/news/new-york-city-congestion-pricing-morning-consult-poll/. Another poll, run close in time to the Program's launch, likewise found that a majority of New Yorkers support congestion pricing.  *See* Barbara Russo-Lennon, *The Poll Results Are In: Here's How New Yorkers Really Feel About Congestion Pricing*, AMNY (Dec. 3, 2024), https://www.amny.com/news/how-new-yorkers-feel-about-congestion-pricing/.

[143] Philip Marcel, *NYC Congestion Pricing has More Support than Ever as Trump Deadline Looms, New Poll Finds*, NBC NEW YORK (Mar. 10, 2025), https://www.nbcnewyork.com/news/local/nyc-congestion-pricing-support-grows/6165502/.

[144] *Id.*

66

DOT_0047660

And many of New York's elected representatives also strongly support the Program.  Congressman Jerry Nadler has stated that "congestion pricing is the best — and only — solution to getting our transit system back on track" and will allow the "MTA to advance work on the 2nd Avenue Subway extension, Penn Access, ADA accessibility upgrades, and more.  We will end the congested streets that put public safety and emergency response at risk while meeting our climate goals to fight the climate crisis."[145]  Manhattan Borough President Mark Levine has also given his strong support to the Program, stating: "Implementing congestion pricing as soon as possible will raise the critical funds we need to build elevators and escalators, modernize signals, and give New Yorkers the transit system we deserve."[146]  Assemblymember Tony Simone from Manhattan expressed a similar sentiment: "There is not, has never been and never will be, a substitute for the funding promised through congestion pricing.  Mass transit is the backbone of our city and state, which are the economic engine for the nation.  This funding is critical to making our system fully accessible, improving service, delivering the infrastructure to increase residential density to combat the housing crisis, create thousands of direct and indirect jobs, and induce billions of dollars of investment."[147]  Elected representatives from boroughs outside of the CBD have also expressed their support for the Program and the benefits it is already incurring.  State Senator Robert Jackson, who represents parts of Upper Manhattan and the Bronx, stated that "Congestion pricing is already delivering for New York—easing gridlock, cutting pollution, and powering critical funding for our transit system."[148]  Similarly, Assemblymember Jessica González-Rojas,

---

[145] Gov. Kathy Hochul, *What They are Saying: Elected and Community Leaders Support Governor Hochul's Plan to Fund Transit and Put Commuters First* (Nov. 14, 2024), https://www.governor.ny.gov/news/what-they-are-saying-elected-and-community-leaders-support-governor-hochuls-plan-fund-transit.

[146] *Id.*

[147] *Id.*

[148] *Traffic Down, Business Up*, *supra* note 125.

DOT_0047661

who represents parts of Queens, has said that the Program works, and "we've already seen improvements in commute times and have created a new revenue stream to accelerate the modernization of our public transportation system."[149]   Although some state and local representatives have opposed the Program, they are in the minority, and regardless, the TMA was enacted into law by the Legislature and signed by then-Governor Cuomo.

152.    Following its implementation, many New Yorkers have spoken out about the benefits of the Program.  Walt "Clyde" Frazier, the legendary former point guard for the New York Knicks, declared his support for the Program during a recent Knicks game, commenting: "It's like congestion pricing, Mike, in the paint.  I'm loving the congestion pricing, there's no traffic man, you can get around now."[150]  Nobel laureate and economist Paul Krugman, who lives in New York City, describes the Program as "Economics 101" and has concluded that the Program "has been remarkably successful, exceeding even its supporters' expectations."[151]  Illena Robbins, who grew up in Manhattan and now lives in Queens, said in an interview with the *New York Times* that crossing the street to get lunch "would stress me out," but now that the Program is in effect, she is "able to cross safely, and cars weren't honking.  It was like a whole other world."[152]  Asad Dandia, who owns and operates a walking tour company, agreed "it was much easier to cross the street … definitely quieter [and] definitely calmer."[153]  Ahmed, a truck driver who drives into the CBD regularly, told the Regional Plan Association: "My experience with congestion pricing has been

---

[149] *Id.*

[150] Dave Colon, *Knicks Legend Walt 'Clyde' Frazier: 'I'm Loving The Congestion Pricing*, STREETSBLOG NYC (Mar. 27, 2025), https://nyc.streetsblog.org/2025/03/27/knicks-legend-walt-clyde-frazier-im-loving-the-congestion-pricing.

[151] Paul Krugman, *Trump To New York: Drop Dead*, SUBSTACK (Feb. 9, 2025), https://paulkrugman.substack.com/p/trump-to-new-york-drop-dead.

[152] Dodai Stewart, *New Yorkers Have Little Data but Big Feelings about Congestion Pricing*, N.Y. TIMES (Jan. 11, 2025), https://www.nytimes.com/2025/01/11/nyregion/new-york-congestion-pricing-reaction.html.

[153] *Id.*

DOT_0047662

good because I'm able to get into the city faster.  I mean, we're talking 45 minutes to an hour faster than I used to."[154]  And Noah, a resident of Hoboken, NJ, who takes the New Jersey Transit 126 bus to Manhattan for work, said that congestion pricing "has made a really noticeable difference" in his life and "shaves [his] commute from 30 minutes to just about 20 minutes."[155]

153.    On social media, New Yorkers have also been praising the Program.  Ramit Sethi posted in all caps on January 9th that his trip to Newark Liberty International Airport was "the fastest trip I've ever taken to the airport from NYC!!! Thank you Congestion Pricing!!!"[156]  Paul Rieckhoff posted on X: "'Its been a month now, and its completely different.  I love it.  I don't mind driving here anymore.  It's great.' – My uber driver today on congestion pricing in Manhattan.  I agree.  The change to traffic in the city is significant.  Especially on the weekends. And especially for those of us that live here."[157]  Sam Biederman wrote: "Congestion pricing is amazing.  Was just in Lower Manhattan.  Not car-choked, foot, bike and car traffic flowing very freely.  Good idea, absolutely worth $9."[158]  Michael Mignano wrote: "Congestion pricing is the greatest thing to happen to NYC in my lifetime."[159]

154.    There is evidence that even former skeptics of the Program are coming to see its benefits.  Ali Lyles, who had initially posted a video on TikTok comparing being charged the toll to "being robbed without a gun," later posted a video acknowledging that he had saved half an

---

[154] Slevin & Weinberger, *supra* note 113.

[155] *Id.*

[156] Stewart, *supra* note 152.

[157] Paul Rieckhoff (@PaulRieckhoff), X (Feb. 2, 2025, 4:18 PM), https://x.com/PaulRieckhoff/status/1886162240250028417.

[158] Sam Biederman (@Biedersam), X (Jan. 5, 2025, 3:32 PM), https://x.com/Biedersam/status/1876001600835354735.

[159] Michael Mignano (@mignano), X (Mar. 21, 2025, 9:02 AM), https://x.com/mignano/status/1903069763951120556.

DOT_0047663

hour on his commute and said, "there wasn't no traffic, bruh … I might actually like congestion pricing."[160] This is consistent with the experiences of other cities that have implemented congestion pricing programs, such as London and Stockholm, where support for congestion pricing increased significantly following implementation, as the benefits became apparent.[161] As the old adage goes, time is money—in this case, collectively tens of billions of dollars that will be saved as a result of the Program, far more than the collective cost to drivers.

## G.   Then-Candidate Trump Repeatedly Threatens to "Kill" Congestion Pricing

155.    Donald Trump, as a candidate for national office, repeatedly voiced his political opposition to the Program and stated that he would "terminate" and "kill" the Program once in office.

156.    On May 7, 2024, in anticipation of the June 2024 expected implementation, he wrote on Truth Social:



> **Donald J. Trump** ✔
> @realDonaldTrump
>
> I can't believe that New York City is instituting Congestion Pricing, where everyone has to pay a fortune for the "privilege" of coming into the City, which is in desperate trouble without it. It is a big incentive not to come - there are plenty of other places to go. It's been a failure everywhere it has been tried, and would only work if a place were HOT, HOT, HOT, which New York City is not right now. What office tenant or business would want to be here with this tax. Hopefully, it will soon be withdrawn!
>
> **4.99k** ReTruths   **17.2k** Likes          May 07, 2024, 9:01 AM

**Figure 9: May 7, 2024 social media post to Truth Social by @realDonaldTrump**

---

[160] Stewart, *supra* note 152.

[161] Abdallah Fayyad, *NYC's Congestion Pricing is Unpopular—For now*, Vox (Jan. 10, 2025), https://www.vox.com/policy/394514/congestion-pricing-popular-support-new-york-stockholm-london.

DOT_0047664

157.    On May 24, 2024, then-candidate Trump posted to social media that he had "stopped" the Program "for years at the Federal level" during his first term in office and promised: "I will TERMINATE Congestion Pricing in my FIRST WEEK back in Office!!!"



> **Donald J. Trump** ✓
> @realDonaldTrump
>
> "Congestion Pricing" is a disaster for NYC. I stopped it for years at the Federal level, but Crooked Joe railroaded it through. A massive business killer and tax on New Yorkers, and anyone going into Manhattan. I will TERMINATE Congestion Pricing in my FIRST WEEK back in Office!!! Manhattan is looking for business, not looking to kill business!
>
> 3.12k ReTruths   11.7k Likes                    May 24, 2024, 2:41 PM

**Figure 10: May 24, 2024 social media post to Truth Social by @realDonaldTrump**

158.    Following the election, President Trump continued to express his personal opposition to the Program, saying in an interview with the *New York Post* on November 14, 2024 that he "strongly disagree[d] with the decision on the congestion tax."[162]

159.    On January 11, then President-elect Trump met with Representatives Nicole Malliotakis and Mike Lawler from New York.[163]  Following the meeting at President Trump's Mar-a-Lago Club, Representative Malliotakis posted the following on X:

---

[162] Steven Nelson, *Trump Slams Hochul Move to Revive NYC Congestion Tax: 'It will Hurt Workers, Families, and Businesses'*, N.Y. Post (Nov. 14, 2024), https://nypost.com/2024/11/14/us-news/trump-slams-hochul-move-to-revive-nyc-congestion-tax/.

[163] Rep. Lawler represents a district in Rockland County, which filed suit to block the program on March 26, 2024, alleging that the Program violates the Equal Protection clauses of the United States and New York constitutions, is an "unauthorized tax," and constitutes an excessive fine in violation of the Eighth Amendment.  As noted, Judge Seibel denied Rockland's request for a preliminary injunction on December 23, 2024, ruling that Rockland had "failed to show a likelihood of success on the merits as to any of [its] claims."  *Rockland v. Metro. Transp. Auth.*, No. 24 Civ. 2285 (S.D.N.Y. Dec. 23, 2024) (Seibel, J.), ECF 52.

DOT_0047665



**Figure 11: Jan. 11, 2025 social media post to X by @NMalliotakis**

160.    The next day, Representative Malliotakis posted on X that, during the meeting,

Trump "told us that he … wants to provide SALT relief and kill congestion pricing."

## H.    The Administration Purports to "Terminate" the VPPP Agreement Based on Spurious and Transparently Pretextual Arguments

161.    On the day of President Trump's Inauguration, January 20, 2025, New Jersey

Governor Phil Murphy made a personal appeal to end the Program.  In a letter to President Trump,

Governor Murphy noted the President's previous characterization of congestion pricing as a

"disaster" and vow to "TERMINATE" it on his "FIRST WEEK BACK in office!!!"[164]

162.    On January 29, 2025, Secretary Duffy issued an order titled "Ensuring Reliance

---

[164] Carl Campanile, *NJ Gov. Phil Murphy Makes Personal Appeal to Trump to Kill Congestion Pricing*, N.Y. POST (Jan. 20, 2025), https://nypost.com/2025/01/20/us-news/nj-gov-phil-murphy-makes-personal-appeal-to-trump-to-kill-congestion-pricing/.

DOT_0047666

Upon Sound Economic Analysis in Department of Transportation Policies, Programs, and Activities."[165]  Section 5(f)(i) of the order states that USDOT will "prioritize" projects that "utilize user-pay models."  Congestion pricing is, by definition, a "user-pay" model, as it requires payment for use of the roadways in the CBD.

163.    Similarly, Section 5(f)(iii) of the order requires projects to "mitigate the unique impacts of DOT programs," such as "the accessibility of transportation to families with young children."  The Program meets these goals by generating revenues to install elevators at subway stations, improving pedestrian and cyclist safety, and reducing gridlock to improve travel time reliability, thereby increasing transportation options for families with young children, while also reducing vehicular emissions and financing significant environmental mitigation measures to enhance their health.

164.    On February 19, 2025, USDOT followed through on the President's promise to attempt to "terminate" congestion pricing by undertaking agency action purporting to rescind the VPPP Agreement and revoke federal approval for the Program.   In a letter addressed to Governor Hochul, Duffy explained that he had been directed by President Trump to "review[] the tolling authority granted under VPPP to the Program pilot project for compliance with Federal law" and had "concluded that the scope of this pilot project as approved exceeds the authority authorized by Congress under VPPP."  Feb. 19 Ltr. at 2.  The letter goes on to state, without citation to any statutory or regulatory authority that would purport to authorize such a decision, that Duffy had chosen to "rescind[] FHWA's approval of the [Program] under the [VPPP Agreement] and terminat[e] the Agreement."  *Id.*

---

[165] U.S. DEP'T OF TRANSP., *Signed DOT Order re: Ensuring Reliance Upon Sound Economic Analysis in Department of Transportation Policies Programs and Activities* (Jan. 29, 2025), https://www.transportation.gov/briefing-room/signed-dot-order-re-ensuring-reliance-upon-sound-economic-analysis-department

DOT_0047667

165.    Although the February 19 Letter claims that he chose to "terminate" the Program on legal grounds arising from his interpretation of the VPPP, the majority of the letter is instead focused on reciting Duffy's policy disagreements with the Program.  For example, Duffy complains that the Program is not "a fair deal" for "working class Americans" because it imposes an additional financial burden on drivers—while failing to acknowledge that TBTA provides a substantial discount plan on Program tolls for low-income drivers and benefits them by reducing driving time. *Id.*[166]  The letter also cites New Jersey Governor Phil Murphy's "significant concerns" about the Program and its effects on New Jersey residents, but overlooks that the U.S. District Court for the District of New Jersey has already largely rejected Governor Murphy's challenges to the Program and that the principal New Jersey challenge was based on EO 12,898, which President Trump has now withdrawn.  *Id.*; *see supra* ¶ 134.

166.    To the extent the February 19 Letter attempts to proffer various legal bases purportedly underpinning Duffy's decision, its conclusory analysis is cursory and unfounded. Duffy first claims that he is "require[d] to narrowly construe" the VPPP because it operates as an "exception" to 23 U.S.C. § 301 which, as noted above, generally restricts tolling on federal-aid highways—a restriction to which there are many broad statutory exceptions, as described *supra*. Feb. 19 Ltr. at 3.  Drawing on this faulty, unprecedented, and overly narrow approach to construing the VPPP, Duffy then seeks to justify his decision to rescind FHWA's approval of the Program on two grounds.

167.    First, he notes the Program "uses a method of tolling known as 'cordon pricing,'" and claims that "FHWA has never before approved a VPPP program that uses cordon pricing."

---

[166] *See* METRO. TRANSP. AUTH., *Congestion Relief Zone Toll: Discounts and Exemptions*, https://www.mta.info/fares-tolls/tolls/congestion-relief-zone/discounts-exemptions (last visited Mar. 27, 2025).

DOT_0047668

Feb. 19 Ltr. at 3; *but see supra* ¶¶ 80, 86, 90, 92 (collecting cordon pricing projects funded by FHWA under the VPPP).  Without any analysis of the text of the VPPP or its accompanying legislative history, and without acknowledging FHWA's long history of endorsing cordon pricing as a value pricing strategy and funding cordon pricing projects under the VPPP, Duffy summarily concludes that "no statute contemplates cordon pricing in a situation where tolls are inescapable." Feb. 19 Ltr. at 3.

168.    Second, Duffy objects that "imposition of tolls under the [Program] appears to be driven primarily by the need to raise revenue for the Metropolitan Transit [sic] Authority (MTA) system as opposed to the need to reduce congestion." *Id.*  While Duffy concedes, as he must, that "revenue generation is a necessary outcome of any congestion pricing scheme and specifically allowable under the VPPP statute," and that under the VPPP revenue used to "improv[e] the transit system may eventually affect roadway congestion," he nonetheless concludes—again, without any analysis of the statutory text—that the "VPPP does not authorize tolls that are calculated based on considerations separate from reducing congestion or advancing other road-related goals." *Id.*

169.    The legal justifications offered by Duffy for his decision to "terminate" federal approval of the Program are wholly without merit.  There is no truth to the claim that the VPPP must be narrowly construed because it is an "exception" to 23 U.S.C. § 301.  For one thing, the only express exception to Section 301 is Section 129, which broadly sets forth a bevy of ways in which the federal government may participate in tolled highways.  *See* 23 U.S.C. § 301 ("Except as provided in Section 129…"); *id.* § 129 (setting forth various programs for government participation).  The VPPP, on the other hand, is an additional, stand-alone program that Congress created for project sponsors to consider potential "value pricing pilot programs," in which the Secretary "shall solicit" participation.  VPPP, cl. 1.  And in all events, the Supreme Court has

75

repeatedly held that exceptions should be interpreted in the same manner as any other statute, explaining that "[e]xceptions and exemptions are no less part of Congress's work than its rules and standards" and courts "have no right to place our thumbs on one side of the scale or the other." *BP p.l.c. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1538-39 (2021) (rejecting argument that Court must construe exceptions narrowly and explaining that courts have "no license to give statutory exemptions anything but a fair reading"); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 359 (2012) (rejecting the "false notion" that "tax exemptions—or any other exemptions for this matter—should be strictly construed").

170.   Duffy's claim that the VPPP does not permit congestion pricing projects that employ cordon pricing finds no support in the VPPP, which does not purport to limit the type of "congestion pricing pilot programs," later renamed "value pricing pilot programs," that States may implement.  VPPP, cl. 1.  The legislative history establishes that, in enacting ISTEA, Congress anticipated that States could implement cordon-based tolling, *see supra* ¶¶ 70-74, and FHWA informed Congress in testimony, shortly after ISTEA was enacted, that FHWA interpreted the statute to authorize a wide range of congestion pricing strategies, "ranging from pricing on a new or existing single road facility to more comprehensive *area-wide road pricing strategies*," *supra* ¶ 75 (emphasis added).  In the years since 1991 when ISTEA was enacted, FHWA has repeatedly stated that the VPPP permits cordon pricing in official agency publications, notices in the Federal Register, guidance documents, reports to Congress, and other materials.  *See supra* ¶¶ 75, 77-79, 82, 87-89, 91, 96.  To this day, FHWA's website includes "Cordon Tolls" among the list of permissible "Project Types/Projects" available to States through the VPPP.  *Supra* ¶ 96.  Consistent with this understanding, FHWA has many times endorsed cordon pricing and awarded funds to project sponsors under the VPPP to study cordon pricing projects.  *See supra* ¶ 84, 86-98.  And

76

DOT_0047670

FHWA has repeatedly concluded that the VPPP authorized cordon pricing in New York City, when FHWA, during President Trump's first term, informed the Project Sponsors that the VPPP was the "best fit" for the Program, and more recently when FHWA executed the VPPP Agreement authorizing tolling under the Program. *Supra* ¶¶ 9. Congress has long been aware of FHWA's interpretation of the VPPP as permitting cordon pricing, based on FHWA's congressional reports and testimony, and has never sought to amend the VPPP to prohibit cordon pricing projects despite amending other portions of the VPPP over the years. *See supra* ¶ 85.

171. Duffy's position that cordon tolling can only be authorized under a separate statutory provision, 23 U.S.C. § 129(d), authorizing FHWA to approve congestion pricing on Interstate system roads, and only in situations where "drivers can choose a non-Interstate route," Feb. 19 Ltr. at 3, is nonsensical. The entire point of cordon-based tolling, as reflected in the longstanding understanding in the Congressional record and FHWA statements, is to eliminate toll-free routes as the best means of alleviating congestion within a specific geographic area, especially an urban area. *See supra* at ¶¶ 84-85, 89. And indeed, FHWA has funded studies of true cordon toll policies under the VPPP, and another such program is still under review for VPPP tolling authorization. *See supra* at ¶¶ 86, 90, 92, 95.

172. Duffy's letter is also factually incorrect in claiming that "the imposition of tolls under the CBDTP pilot project appears to be driven primarily by the need to raise revenue for the Metropolitan Transit [sic] Authority (MTA) system as opposed to the need to reduce congestion." Feb. 19 Ltr. at 3. As explained *supra*, revenue generation to support public transit as a non-driving option has always been a complementary objective, and of no greater importance than the primary goal of reducing congestion in the CBD, which transit improvements funded through toll revenues

DOT_0047671

will also support.  This aspect of Duffy's "reasoning" simply ignores the record before FHWA supporting its execution of the VPPP in 2024.

173.    Equally spurious is Duffy's claim that project sponsors may not consider revenue objectives when setting toll rates under VPPP-authorized tolling programs.  The VPPP contains no such prohibition and, to the contrary, expressly contemplates that project sponsors will use toll "[r]evenues generated by any pilot project" to fund other "projects eligible under such title"— which include capital transit projects eligible for federal assistance.  VPPP, cl. 3.  The statute also provides that the Secretary must periodically report on the effects of VPPP projects, on not only congestion but also on "transit ridership … and availability of funds for transportation programs." *Id.* cl. 5.  As Congress noted at the time, the purpose of the Congestion Pricing Pilot Program was, among other things, to study the effects of such programs on "the availability of funds for transportation programs."  S. Rep. No. 102-71, 26 (1991).  Indeed, far from prohibiting project sponsors from considering revenue, a different section of ISTEA *required* project sponsors to consider "the use of innovative mechanisms for financing [transportation] projects, including … congestion pricing."  ISTEA § 1025(a).  As detailed above, FHWA has repeatedly stated in official reports and guidance documents that revenues from congestion pricing "can be used to pay for expansion of roadway facilities or to support alternatives to driving alone, such as public transit." *Supra* ¶ 88; *see also supra* ¶¶ 89, 91, 93, 96-98.  And FHWA's website reinforces this position, stating that "DOT believes that using innovating financing strategies to leverage limited public transportation revenue is integral to the long-term re-thinking of how the United States provides highway *and transit infrastructure*," one such strategy being congestion pricing.  *Supra* ¶ 97.

174.    In the weeks since issuing the February 19 Letter, Duffy has made several statements in the press that misstate easily verifiable aspects of the Program, suggesting that he

DOT_0047672

may have reached his decision, reversing longstanding FHWA legal interpretation and policy, without considering relevant information.

175.    On February 19, 2025, after issuing the February 19 Letter, Duffy gave an interview with *CBS Evening News* in which he incorrectly stated that Governor Hochul "never did a study to say, 'I really care about congestion and I want to reduce congestion, so I'm going to look at how much money should I charge in a toll and how much will that reduce Congestion?' That analysis was never done."[167]    In fact, the Project Sponsors prepared, and FHWA approved, detailed analyses of the impact of different potential toll rate schedules ranging "from approximately $9 to $23 during peak hours and $5 to $12 during off-peak hours" on VMT and traffic congestion in the CBD in connection with the FHWA's NEPA analysis. *Mulgrew v. U.S. Dep't of Transp.*, 750 F. Supp. 3d 171, 224 (S.D.N.Y. 2024) (Liman, J.); *see also* Reevaluation 2 at 8, https://www.mta.info/document/158191.    That analysis considered whether various tolling scenarios could achieve objectives to reduce VMT within and the number of vehicles entering the CBD by 5% and 10%, respectively.  The same analysis was conducted in the Reevaluations to ensure that the ultimately approved tolling structure would achieve these congestion-reduction objectives foundational to the purpose of the Program as articulated in the Final EA.

176.    On March 4, 2025, in an interview with *Fox News*, Duffy again falsely claimed that there had been no analysis of the effect of the Program toll schedule on congestion, stating: "if we charge this much money … this much less congestion.  That study was never done.  This is just about raising money for public transportation, and that's why we are fighting it."  As noted above, the Project Sponsors prepared, and FHWA approved, exactly such a study.

---

[167] Matt Troutman, *Trump's Transportation Secretary 100% Open to Some Form of NYC Congestion Pricing After President Declared Tolls 'Dead'*, NY POST (Feb. 21, 2025), https://nypost.com/2025/02/21/us-news/trumps-transportation-secretary-floats-some-form-of-nyc-congestion-pricing/.

DOT_0047673

177.     On March 31, 2025, Duffy posted on X: "Taxpayers already paid for New York

City's Roads, but NY wants to charge them AGAIN to use them.  $9 in, $9 out, with no free

alternative."  Again, this statement reflects Duffy's apparent lack of understanding as to basic

aspects of the Program.  The Program only charges vehicles upon entry into the CBD and there is

no second charge for exiting the CBD.  Under the Program's toll rate schedule, passenger vehicles

can only be charged a maximum of once per day for entry into the CBD.  *See* Phase-In Approach

Toll Rate Schedule, https://www.mta.info/document/138931.



**Figure 12: Mar. 31, 2025 social media post to X by @SecDuffy**

178.     That same day, February 19, 2025, Duffy released a press statement announcing

that FHWA had "terminated approval of the pilot for New York's Central Business District Tolling

Program," in which he described the Program as a "slap in the face to working class Americans

80

and small business owners," and "backwards and unfair."[168]  However, the same analysis that was undertaken by the Project Sponsors and approved by FHWA looked at the projected economic impact of the Program and considered whether residents or businesses would be forced to move or whether there would be changes in economic conditions leading to a loss or substantial diminishment of products and services.  *Chan*, 2024 WL 5199945, at *6.  Their analysis concluded that the Program "would provide an economic *benefit*" to the CBD and "would not be likely to result in the involuntary displacement of residents, business, or employees." *Id.* at *7.  And as noted above, the Program has actually already had a positive impact on business.

I.      **Plaintiffs Bring Suit Seeking a Declaratory Judgment that the February 19 Letter is Null and Void, and Defendants Attempt to Coerce Compliance by Threatening to Illegally Withhold Federal Funding**

179.    When the Administration finally attempted to "terminate" the Program on February 19, 2025, after repeatedly threatening to do so in the press, Plaintiffs immediately commenced the instant lawsuit.  In their original complaint, filed that same day, Plaintiffs alleged that the February 19 Letter was legally invalid and unenforceable and sought a declaratory judgment that the VPPP Agreement remained in effect.  In light of the rights granted to TBTA by the VPPP Agreement, the irreparable harm that ending the Program would cause for the MTA, TBTA, and the people of New York, and the clear deficiencies in the February 19 Letter's rationales, Plaintiffs stated that they would "continue to operate the Program as required by New York law until and unless Plaintiffs are directed to stop by a court order."  ECF 1, ¶¶ 25, 120.

---

[168] Press Release, U.S. DEP'T OF TRANSP., U.S. Department of Transportation Terminates Tolling Approval for New York City's Cordon Pricing Program (Feb. 19, 2025), https://highways.dot.gov/newsroom/us-department-transportation-terminates-tolling-approval-new-york-citys-cordon-pricing.

DOT_0047675

180.     President Trump nonetheless took to social media to prematurely claim victory, writing on Truth Social that "CONGESTION PRICING IS DEAD.  Manhattan, and all of New York is SAVED.  LONG LIVE THE KING!"



**Figure 13: Feb. 19, 2025 social media post to Truth Social by @realDonaldTrump**

181.     The White House account on X quoted the President and posted an image, presumably prepared by President Trump's staff, of President Trump wearing a crown in front of the Manhattan skyline.

DOT_0047676



**Figure 1: Feb. 19, 2025 social media post to X by @WhiteHouse**

182. On February 20, 2025, Defendant Shepherd sent a letter to NYSDOT, NYCDOT, and MTA Bridges and Tunnels [TBTA] (the "February 20 Shepherd Letter" or "Feb. 20 Ltr."), attached hereto as **Exhibit H**, stating that "pursuant to Secretary Duffy's February 19, 2025 letter," the "recission of approval and termination of the November 21, 2024 Agreement will be effective on March 21, 2025," and that the Project Sponsors "must cease the collection of tolls" on that date. Feb. 20 Ltr.

DOT_0047677

183.    Almost immediately upon release of the February 19 Letter, legal scholars and public commentators questioned its validity and noted that it was unlikely to be enforced by the courts.  David A. Super, a professor at Georgetown Law, told the *New York Times* that Duffy did not have authority to rescind federal approval of the Program, explaining: "There is really nothing in the statute that gives the secretary authority to stop these things."[169]  Robert L. Glicksman, a professor at George Washington University Law School, likewise questioned Defendants' authority, noting that simply "[d]eclaring 'I'm the king' is not sufficient grounds for reversing [federal approval of the Program]."[170]  Noah Kazis, an assistant professor at the University of Michigan Law School, called the Administration's move a "political wrecking ball" that disregards the law.[171]  Even supporters of the Administration's efforts to end the Program questioned the reasoning of the February 19 Letter, noting that it appeared to be "based on sloppy analysis and statutory triangulation."[172]

184.    Faced with these obstacles, the Administration resorted to what has become its *modus operandi*: attempting to improperly leverage federal funding as a way to compel compliance with its unlawful decrees.  On March 18, 2025, Duffy sent a letter to the MTA ("March 18 Safety Letter"), **Exhibit D**, demanding detailed information on crime and safety in subways and on buses in New York City, and threatening "further consequences, up to and including redirecting or withholding funding."  Although the letter did not directly reference the Program, it was widely

---

[169] Tracey Tully, *Why Trump's Push to Kill Congestion Pricing Might Fail*, N.Y. TIMES (Feb. 21, 2025), https://www.nytimes.com/2025/02/19/nyregion/trump-congestion-pricing.html.

[170] *Id.*

[171] Chris Dolmetsch, *New York's Congestion Pricing Plan Faces Another Legal Showdown*, BLOOMBERG (Feb. 24, 2025), https://www.bloomberg.com/news/articles/2025-02-24/new-york-s-congestion-pricing-plan-faces-another-legal-showdown.

[172] Paul H. Trice, *The President Picked the Right Fight, Wrong Method in the Battle over New York's Congestion Pricing*, WASH. POST (Mar. 24, 2025), https://www.washingtonpost.com/opinions/2025/03/24/trump-hochul-new-york-congestion-pricing/.

DOT_0047678

perceived, coming just three days before the then-deadline Defendants had set for the Program to

cease tolling and, at a time when subway crime is at a historic low, as an attempt to gain leverage

and "la[y] the groundwork for citing crime as a reason to ultimately withhold federal money" from

the MTA.[173]

185.    Significantly, Duffy's March 18 demand for information differed materially from

a similar letter to the D.C. Metro system, Washington Metropolitan Area Transit Authority

("WMATA"), on March 6, 2025.   While the WMATA letter also requested subway safety

information, it did not include the same threat of redirecting or withholding federal funding as in

the letter to the MTA.   In his letter to the Chief Executive Officer of WMATA, Duffy similarly

requested WMATA's plans to reduce crime and fare evasion and information about WMATA's

budget, but stated only that WMATA "should target federal resources expeditiously and

appropriately for" eligible federal crime prevention and security activities.

186.    On March 19, 2025, WMATA responded to Duffy with their crime statistics and

their planned budget increases for additional safety-related investments.   Five days later, Duffy

posted to X that he "appreciate[s] @wmata's response to our request and their commitment to

---

[173] James Barron, *The Subtext of a Trump Official's Letter to the M.T.A.*, N.Y. TIMES (Mar. 20, 2025), https://www.nytimes.com/2025/03/20/nyregion/trump-duffy-nyc-subway.html; *see also* Dick Brennan & Elijah Westbrook, *Transportation Secretary Threatens to Withhold Federal Funding from MTA Unless Agency Reduces Crime, Violence*, CBS NEWS (Mar. 19, 2025), https://www.cbsnews.com/newyork/news/mta-letter-transportation-secretary-sean-duffy/ ("While the letter says nothing about congestion pricing, it comes just days before the Trump administration's Friday deadline to end the tolling program."); Stefanos Chen, *U.S. Threatens to Cut Off M.T.A. Funds Over Subway Safety*, N.Y. TIMES (Mar. 18, 2025), https://www.nytimes.com/2025/03/18/nyregion/trump-mta-funding.html ("Mr. Duffy's letter did not mention congestion pricing, but transit experts and legal observers have said that the federal government might threaten to withdraw funding from other projects to gain leverage in its opposition to the toll.").

DOT_0047679

reducing transit crime," calling their commitments "good first steps to enhance safety for customers."



**Figure 14: Mar. 24, 2025 social media post to X by @SecDuffy**

187.    Duffy's March 18 demand for information also differed materially from a letter he sent to Stephen J. Gardner, the Chief Executive Officer of Amtrak on March 6, 2025.  While the Amtrak letter also emphasized the importance of addressing security and preventing crime at Washington Union Station, the letter did not request a response or levy any threats.  Instead in his letter, Duffy simply stated that "[i]n the short term, Amtrak must work closely with [Union Station Redevelopment Corporation] to prioritize station projects that benefit all station users, including security, lighting, and other immediate improvements that support maintenance and beautification of the station," and in "[i]n the longer term, Amtrak must continue to coordinate with [Union Station Redevelopment Corporation], the Project sponsor for the Station Expansion Project."  Thus, only the letter addressed to the MTA contained the threat that federal funding may be withheld.

188.    On March 20, 2025, the day before the deadline Defendants had set for the Program to cease tolling, Duffy posted to X, without prior notice to Plaintiffs, an apparent warning that Defendants will illegally withhold federal funding from the State of New York (and, by implication,

86

from the MTA, TBTA, and NYSDOT), just as the Trump Administration has done recently in countless other recent cases, unless Plaintiffs agree to end the Program. Disregarding the fact that the validity of the February 19 Letter is the subject of litigation before this Court, Duffy warned: "the federal government and @POTUS are putting New York on notice" that "refusal to end cordon pricing and your open disrespect towards the federal government is unacceptable." Expressly drawing the connection between the current litigation and federal funding, he continued: "Know that the billions of dollars the federal government sends to New York are not a blank check. Continued noncompliance will not be taken lightly." Finally, Duffy purported to grant Plaintiffs a "30-day extension" to cease tolling.



**Figure 2: Mar. 20, 2025 social media post to X by @SecDuffy**

189.   On March 20, 2025, Defendant Shepherd sent a letter to NYSDOT, NYCDOT, and MTA Bridges and Tunnels [TBTA] (the "March 20 Shepherd Letter" or "Mar. 20 Ltr."), **Exhibit E**, in which Shepherd notes her prior correspondence "providing you until March 21,

DOT_0047681

2025, to cease tolling operations that were initiated through the November 21, 2024, Value Pricing Pilot Program (VPPP) Agreement," states that Duffy "has directed that I extend the period of time to comply by 30 days," and instructs that "toll operations must cease by April 20, 2025." Mar. 20 Ltr.

190. On March 23, 2025, Duffy gave an interview with Governor Murphy, in which Duffy described the New York subways system using an expletive, stating: "If you want people to take the train, to take transit, then make it safe, make it clean, make it beautiful, make it wonderful, don't make it a s--- h---, which is what she [Governor Hochul] has done."[174]

191. On March 25, 2025, Duffy again took to X to threaten federal funding to the MTA in response to a letter from Governor Hochul, State Senate Majority Leader Andrea Stewart-Cousins, and State Assembly Speaker Carl Heastie proposing an update to the federal transit funding formula, which awards the MTA only 17% of transit funding, despite its carrying 43% of the nation's mass transit riders. Duffy described the proposal as "Outrageous!" and accused the State of "trying to fill the gap with highway funds and taxing the working class"—an apparent reference to the Program, which opponents often incorrectly refer to as a "tax"—rather than "actually fixing their financial mismanagement."[175] Using the same language from his March 20 X post demanding that New York end the Program, Duffy once again warned that "[t]he federal government is not a blank check."

---

[174] Larry Higgs, *U.S. Transportation Boss Trashes NYC Subway, Proposes a Fix*, NJ.com (Mar. 23, 2025), https://www.nj.com/news/2025/03/us-transportation-boss-trashes-nyc-subway-proposes-a-fix.html.

[175] Indeed, if the toll were a "tax," federal approval for tolling would not be required in the first place.

DOT_0047682



**Figure 3: Mar. 25, 2025 social media post to X by @SecDuffy**

192. On March 30, 2025 in a detailed, 22-page letter, attached hereto as **Exhibit I**

("MTA Resp."), the MTA provided the requested information on subway crime to Duffy showing

that the MTA operates one of the safest transit systems in America, that crime in the NYC subway

system is among the lowest it has been in the last 30 years, and that the MTA has committed more

than 20 times the minimum requirement in safety grant standards to keeping the system safe. MTA

Resp. at 9-11. The MTA's response explained in detail that felonies in the subway system have

fallen over the last 30 years, with a 79% decrease in robberies and a 67% decrease in grand

larcenies. *Id.* at 10-11. In the first two months of 2025, crime was 47% lower in the subway

system than in the first two months of 2020 before COVID-19. *Id.* at 10. The MTA also

highlighted that felony assaults were down 7% in the first two months of 2025 compared to the

same time frame in 2024, but acknowledged that this was up 11% from the first two months in

89

2020.  *Id.* at 2, 11.  The MTA further explained that this increase in felony assaults in recent years is driven by three causes: (1) "increased enforcement of fare compliance and quality-of-life offenses," which is correlated with "increased [felony] assaults on NYPD officers who are patrolling the system in larger numbers," *id.* at 11; (2) the "MTA's ongoing and successful efforts over the last 20 years to amend the NYS Penal Law to classify aggressions committed against transit workers as felonies," *id.* at 6; and (3) enhanced public safety campaigns, which are associated with "higher rates of reporting," *id.* at 11.  Over just the last two years, total arrests in the subway system were up 158%, significantly outpacing the increase in assaults, which were up by 4% from 2022 to 2024, even as the overall number of felonies continued to fall.

193.    Despite the fact that the MTA is a safer transit system than WMATA, as WMATA riders are 3 times more likely than New York City transit riders to be victims of assaults on a per trip basis, *see id.* at 2, Duffy has not issued a post, as he did in response to WMATA, to commend the MTA for their commitment to safety.  Instead, the day after receiving the MTA's response letter, Duffy posted to X that "[f]elony transit assaults on NYC subways are up 56% from 2019." This comment completely misrepresented the safety information provided by the MTA and disregards the MTA's explanation that more felonies are being reported because of additional policing measures and increased legal protections for subway and bus employees.  Specifically, as MTA explained in its response to Duffy, the increase in felony assaults is largely a result of the pattern of increased assaults on NYPD officers as those officers have been patrolling the system in greater numbers and enforcing quality-of-life offenses; amendments to the New York State Penal Law to provide greater protections to transit workers from assault; and enhanced public safety awareness campaigns.  *Id.* at 6, 11.

90



**Figure 15: Mar. 31, 2025 social media post to X by @SecDuffy**

194.     On April 4, 2025, Duffy invited members of the press to join him on the New York subway system and attempted to draw a connection between congestion pricing and subway crime, notwithstanding that subway crime is at a historic low and the two issues bear little relation. Specifically, Duffy stated: "If they're going to charge people to drive on roads, they need to offer a better, safer subway system."[176]  He also claimed: "The governor is forcing people into the train system, into the MTA, because she's priced them out of using these roads.  That's fundamentally unfair."

195.     On April 15, 2025, Duffy came across a violent incident while visiting the WMATA subway system involving a police officer who had been stabbed in the face by a man attempting to fare evade.[177]  Notably, while Duffy's statements after the event discussed the general need to "re-secure our transit systems" and address crime, he stopped short of directly criticizing the WMATA for the incident.  This treatment of the WMATA—which is less safe as a system than the MTA—stands in contrast to Duffy's frequent and harsh criticisms of the MTA,

---

[176] Linda Schmidt, *Transportation Secretary Rides NYC Subway, Calls Conditions Unsafe as Federal Funding Hangs in the Balance*, Fox 5 (Apr. 4, 2025), https://www.fox5ny.com/news/transportation-secretary-rides-nyc-subway-calls-conditions-unsafe-federal-funding-hangs-balance.

[177] Andrea Margolis, *DC Transit Police Officer Stabbed at Train Station as Sec. Sean Duffy Arrives to Talk Safety*, Fox News (Apr. 15, 2025), https://www.foxnews.com/us/dc-transit-police-officer-stabbed-train-station-sec-sean-duffy-arrives-talk-safety.

DOT_0047685

which he described as a "s--- h---" just days earlier, further emphasizing that Duffy's alleged concerns for subways safety are merely a pretext for pressuring Plaintiffs to stop the Program.

**J.      Defendants threaten Plaintiffs with unlawful "compliance measures" to begin on May 28, 2025, if the Program does not cease operation**

196.    On April 18, the MTA, TBTA, NYSDOT, and NYCDOT filed their 111-page consolidated first amended complaint, setting out in detail the many reasons why the February 19 Letter's legal rationales for seeking to terminate the VPPP Agreement are without merit, and alleging that the purported rescission is invalid and based on transparently pretextual reasoning.

197.    Three days later, on April 21, Duffy sent the April 21 Letter, attached hereto as **Exhibit J**, to Governor Hochul demanding for a third time that the Program end.

198.    At the outset, the April 21 Letter affirmed Defendants' position that the VPPP Agreement had been "terminated" by the February 19 Letter. *Id.* at 1.  Seemingly recognizing the weaknesses in the February 19 Letter's legal rationales, however, Duffy attempted to recast that letter's reasoning, claiming without any support that the February 19 Letter also rests on several newfound policy rationales, including that the Program "imposes a disproportionate financial hardship on low and medium-income hardworking American drivers for the benefit of high-income drivers," and that "[h]ighway users whose taxes already paid for the Federal-aid highways in the cordon area are now being forced to pay again while received no new highway benefits in return because there are no toll-free alternative routes available to access the cordoned-off area of Manhattan." *Id.* at 2-3.  The February 19 Letter does not address Defendants' own extensive findings that congestion pricing would benefit low- and medium-income drivers, including by facilitating mass transit opportunities and reducing congestion on the roads.

199.    The April 21 Letter threatens that Defendants "*will* implement appropriate initial compliance measures" on or after May 28, 2025 if New York continues to operate the Program,

DOT_0047686

citing 23 C.F.R. § 1.36, a regulation enacted pursuant to the FAHA that sets forth FHWA's potential enforcement mechanisms to ensure compliance with the law. *Id.* at 2 (emphasis added). The threatened "compliance measures" include: (1) "no further advance construction ('AC') authorizations," (2) "no further [NEPA] approvals," (3) "no further approvals of Statewide Transportation Improvement Program ('STIP') amendments concerning New York Metropolitan Transportation Council TIP modifications," and (4) "no further obligations of FHWA funds (both formula and competitive) for projects within New York City." The April 21 Letter then states that "if New York's noncompliance continues," FHWA may impose additional measures including "no further obligations of FHWA funds (both formula and competitive)."

200.    The April 21 Letter states that no funding will be withheld for projects "determined by FHWA to be essentially for safety" including projects "under the National Highway Performance Program, Bridge Formula Program, and Highway Safety Improvement Program" but does not clarify what process Defendants will use to determine whether a project is "determined" to "be essential for safety."

201.    The threatened enforcement measures would deprive Plaintiffs of access to federal transportation funds, or to initiate any new projects, shutting down investment in the nation's largest city. And they would similarly deprive NYSDOT and NYCDOT of funding for vital projects. The incredibly broad scope of the coercive threats to halt reviews needed for all projects and funding within FHWA's purview, including billions of dollars' worth of funding for transit projects currently proposed for addition to New York's STIP, unless the Program is brought to a stop.

202.    The April 21 Letter also directs Plaintiffs to "address the policy concerns expressed in my February 19, 2025 letter," even though the February 19 Letter articulated only legal

93

rationales for terminating the VPPP Agreement.  *Compare* Feb. 19 Ltr. at 3 *with* April 21 Letter at 2-3.

203.    Defendants have left no doubt that they intend to impose "compliance measures" on May 28 if Plaintiffs do not end congestion pricing—regardless of the outcome of this lawsuit. On April 24, a spokesperson for the USDOT stated, "if New York doesn't shut it down, the Department of Transportation is considering halting projects and funding for the [S]tate."[178]

204.    On April 29, Duffy took to TV to criticize the Program, telling the hosts of *Good Day New York* that if Plaintiffs do not "treat those who want to come into Manhattan fairly, maybe we should look at how much money we send the City.  And that's what the Governor [of New York] is going to have to grapple with."[179]  That same day, counsel for Plaintiffs requested that Defendants agree not to take any enforcement action or postpone the April 21 Letter's deadlines. Defendants responded by reiterating the threat of coercion, while trying to deny the Court any ability to review the legality of that threat, claiming that the termination and schedule for "compliance measures" remain in place but that administrative proceedings are ongoing and preclude judicial recourse.  ECF 73.

## K.    The MTA, TBTA, and the Region's Economy and Public Transit System Will be Irreparably Harmed if Plaintiffs are Forced to End the Program

205.    TBTA budgeted over $500 million to establish the Program, and much of the budget was expended in advance of implementation.  These expenditures included developing the methodological approach; conducting the assessment and extensive outreach and developing the final documentation for the environmental review process under NEPA; design, development,

---

[178] Peter Senzamici, *Feds Accidentally upload internal memo admitting plan to kill NYC congestion pricing is 'very unlikely' to succeed – before quickly deleting it,* N.Y. POST, April 24, 2025, https://nypost.com/2025/04/24/us-news/fed-lawyers-cast-doubt-on-duffys-dubious-congestion-kill/.

[179] Good Day New York, WNYW-NY (FOX), Apr. 29, 2025), https://mms.tveyes.com/PlaybackPortal.aspx?SavedEditID=ab76562d-0726-4d6b-bcc4-f28ef11d100b.

DOT_0047688

implementation and testing of the roadway infrastructure and system; design, development, implementation and testing of the Back Office System; additional extensive outreach for the State administrative review process; staff costs, including new staff for the Program; and consulting costs.

206.    If TBTA is unlawfully prevented from proceeding with the Program, it will incur roughly $12 million in additional expenditures per month, most of which would be related to a combination of the operations and maintenance of the roadside tolling system, the operations of the back-office system and Customer Contact Center, and consultant costs.  This figure does not include the costs related to additional staff that were brought on specifically for the Program nor other costs, such as those related to outreach and advertising and assessments to be undertaken for the Program.  These costs cannot be deferred pending litigation over the legality of the February 19 Letter.

207.    Any pause in the Program would also cause TBTA to lose estimated monthly revenues in the first phase of the Program of over $40 million, based on projected net annual revenues of roughly $500 million during that period.

208.    Furthermore, a pause in the Program would result in increased traffic and congestion, which will lengthen travel times for bus operations and reduce public transit ridership.

209.    Stopping the Program would also prevent the MTA, the end recipient of Program revenues, from proceeding with vitally important work under the Capital Program, which is intended to ensure that improvements put in place will be sustainable for years to come.  The Capital Program identifies $52 billion of critical investments in the region's subways, buses, and commuter railroads, nearly one-third of which would be supported by the Program.

DOT_0047689

210.   New York's economy, and therefore the nation's economy, depends on keeping New York moving.  In practical terms, that means funding the Capital Program, which is much needed and cannot be further delayed.  As Janno Lieber, the MTA Chair and CEO, explained: "Concrete and steel, you poke holes in it, subject it to water and chemicals and salt for 100 years, it's going to give out."  The reason the State's elected representatives chose Congestion Pricing was, again, because it is simply the best solution to promote speed and convenience in the nation's (and North America's) largest transportation system.

211.   Critical parts of the Capital Program would be delayed if Program tolling revenues are halted.  The Capital Program includes: (1) adding accessibility improvements (including elevators) to numerous subway stations consistent with the Americans with Disabilities Act, by making at least 70 more subway systems accessible through building new elevators at 70 stations in all of the boroughs and replacing up to 65 escalators and 78 elevators, and finally bringing the transportation system to greater than 50% accessibility; (2) improving outdated signaling, by doubling the number of track lines with modernized signals; (3) purchasing over 1,900 new rail cars, which are six times more reliable than older ones, and replacing 2,400 buses; (4) replacing approximately 60 miles of track; and (5) renewing stations and addressing critical repair projects at 175 stations.

212.   The Capital Program will also provide much-needed repairs to Grand Central Terminal, a more than 100-year-old structure that is used by more than 700 trains a day.  And coupled with funding from the 2015-2019 program, the Capital Program further provides funding for three new fully accessible stations on the Second Avenue Subway that would allow connection to the Metro-North lines, strengthening connections for Harlem and East Harlem residents.

213.   New Yorkers, through the Capital Program, will also receive better access to Penn

DOT_0047690

Station through a new route with four new stations on the Metro-North New Haven Line that will

carry up to 50,000 Metro-North customers directly to Penn Station every day.

214.    TBTA has incurred debt that it will rely on Program revenues to repay.  This

includes $378.8 million in short-term notes that were previously issued and currently outstanding

to fund infrastructure costs and $500 million in short-term notes to fund a portion of the $15 billion

of capital projects in the MTA's Capital Program.

215.    Finally, ending the Program means making life worse for millions of New Yorkers

through a return to severe congestion in the CBD, with its concomitant economic, environmental,

and public health and safety costs to businesses, residents, commuters, workers, and visitors in this

area, without any evaluation of these and other environmental impacts, opportunity for public

participation, or consideration of alternatives required by NEPA.

216.    Plaintiffs will continue to operate the Program as required by New York law unless

and until Plaintiffs are directed to stop by a court order.

217.    Based on the foregoing, there is an actual controversy within the jurisdiction of this

Court under 28 U.S.C. §§ 2201 and 2202.

## CAUSES OF ACTION

### COUNT I
### Termination of the VPPP Agreement
### Violation of the Administrative Procedure Act
### (Substantively Arbitrary & Capricious – In Excess of Statutory Authority)
(5 U.S.C. § 701 *et seq.*)

218.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set

forth fully herein.

219.    The acts of all executive branch officers "must be justified by some law, and in case

an official violates the law to the injury of an individual the courts generally have jurisdiction to

97

DOT_0047691

grant relief." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902).

220.    Further, under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be … contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(B)-(C).

221.    Defendants are not authorized by any law—statutory or constitutional—to unilaterally terminate the VPPP Agreement.  The VPPP Agreement is a valid agreement, currently in effect, supported by consideration, and subject to considerable reliance interests.  Neither ISTEA nor the VPPP Agreement authorizes FHWA to unilaterally rescind the VPPP Agreement, which confers federal tolling authority under Section 1012(b) of ISTEA, as amended.

222.    ISTEA does not include any provision authorizing FHWA to terminate the VPPP Agreement.  ISTEA authorizes the Secretary to "enter into" agreements "to establish, maintain, and monitor" value pricing pilot programs.  ISTEA § 1012(b).  ISTEA further directs that the Secretary shall "monitor the effect of such programs for a period of at least 10 years."  *Id.* at § 1012(b)(5).

223.    The VPPP Agreement does not include any provision authorizing FHWA to terminate the agreement.  Rather, the VPPP Agreement contemplates that only TBTA could unilaterally decide to discontinue the Program, requiring the Project Sponsors to "work with FHWA to return the Project to its original operating condition if TBTA decides to discontinue tolls on the Project."  VPPP Agmt., cl. 11.  The VPPP Agreement further provides that TBTA and NYCDOT shall "monitor and report on the project performance" for "a period of at least ten years or to the end of the life of the Project, whichever is sooner."  *Id.*, cl. (8)(b).

DOT_0047692

224.     The VPPP Agreement references FHWA regulations at 23 C.F.R. Part 940 and 950. These regulations do not grant FHWA authority to unilaterally terminate the VPPP Agreement, and the FHWA has acted *ultra vires*.

225.     An executive officer acts *ultra vires* where it "deprives a contractor of a right expressly or impliedly granted by another statute." *Chamber of Com. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996).

226.     Defendants have deprived Plaintiffs of rights expressly and impliedly granted by ISTEA § 1012(b), which permits tolling of federally funded highways following approval of a VPPP Project.

227.     Defendants have no authority to terminate the VPPP Agreement or rescind TBTA's authority to operate the Program.  Therefore, Defendants have acted in excess of authority and the February 19 Letter is arbitrary and capricious and must be declared unlawful, vacated, and set aside.

**COUNT II**
**Termination of the VPPP Agreement**
**Violation of the Administrative Procedure Act**
**(Substantively Arbitrary & Capricious – Contrary to Law)**
(5 U.S.C. § 701 *et seq.*)

228.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

229.     The acts of all executive branch officers "must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief." *McAnnulty*, 187 U.S. at 108.

230.     Further, under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

DOT_0047693

231.  Defendants' purported basis to terminate the VPPP Agreement—broadly, that the Program "is not an eligible 'value pricing pilot program'" and thus "FHWA lacked statutory authority to approve" the Program, Feb. 19 Ltr. at 3—finds no support in the statutory text, legislative history, or FHWA's longstanding interpretation of the VPPP, and is "not in accordance with law."

232.  The February 19 Letter states two main rationales for Defendants' conclusion that the Program is not an eligible VPPP project.  First, without any analysis of the statutory text, legislative history, or FHWA's long history of endorsing cordon pricing as a value pricing strategy, Defendant Duffy summarily concludes that "no statute contemplates cordon pricing in a situation where tolls are inescapable."  *Id.*  Second, again without any analysis of the actual statute or its history, Duffy objects that "imposition of tolls under the [Program] appears to be driven primarily by the need to raise revenue for the Metropolitan Transit [sic] Authority (MTA) system as opposed to the need to reduce congestion."  *Id.*  Both rationales are incorrect as a matter of fact and law.

233.  Cordon pricing projects are authorized under the VPPP.  Specifically, the VPPP authorizes the Secretary of Transportation to enter into cooperative agreements with State and local governments to implement "value pricing pilot programs."  VPPP, cl. 1.  The statute does not define "value pricing pilot programs" or otherwise provide guidelines or restrictions on the kinds of projects that are eligible under the statute.  The legislative history reflects Congress's intent to authorize a variety of innovative projects, including those that use cordon-based tolling and "area-wide road pricing strategies."  And cordon-based or area-wide pricing projects have received federal funding pursuant to the VPPP, not to mention the tolling authority actually approved for the Program under the VPPP Agreement itself.

DOT_0047694

234.    Moreover, it is untrue that the primary driver of the Program is revenue generation. The record is clear that generation of revenue to improve public transit is complementary to the primary purpose of congestion reduction.

235.    In any event, raising revenue to fund the MTA's Capital Program is clearly authorized under the VPPP.  For one, the statutory text explicitly contemplates that State and local governments participating in VPPP projects would use toll revenues to fund other "projects eligible under such title," VPPP, cl. 3, which includes capital transit projects.  The statute also provides that the Secretary must periodically report on the effects that VPPP projects have on not only congestion but also "transit ridership … and availability of funds for transportation programs." *Id.*, cl. 5. Furthermore, the legislative history of ISTEA and the subsequent laws amending the VPPP confirms that Congress intended for State and local governments to consider revenue generation for mass transit projects in implementing VPPP projects and to be able to use revenues to improve transit services and systems.

236.    Defendants' rationales for purportedly terminating the VPPP Agreement are flatly contradicted by the factual record, the text of the VPPP, the legislative history of ISTEA, and FHWA's subsequent statements about and efforts to implement the VPPP and value pricing projects.  Therefore, Defendants have acted contrary to law and the February 19 Letter is arbitrary and capricious and must be declared unlawful, vacated, and set aside.  Any effort to enforce the February 19 Letter (including by implementing the "compliance measures" outlined in the April 21 Letter) is arbitrary and capricious, and must be enjoined, declared unlawful, vacated, and set aside.

**COUNT III**
**Termination of the VPPP Agreement**
**Violation of the Administrative Procedure Act**
**(Procedurally Arbitrary & Capricious – Contrary to Regulations)**
(5 U.S.C. § 701 *et seq.*)

DOT_0047695

237.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

238.    The VPPP Agreement is a cooperative agreement because "the principal purpose of the relationship is to transfer a thing of value" (authority to collect toll revenues) and "substantial [federal] involvement is expected."  31 U.S.C. § 6305; 2 C.F.R. § 200.1; *see also* VPPP, cl. 1 (authorizing Secretary to enter into "cooperative agreements" under the VPPP).  FHWA has determined that agreements authorizing projects that require tolling authority under the VPPP are cooperative agreements, even where such agreements do not include a federal funding component. *See* FED. HIGHWAY ADMIN., *Congestion Pricing, Value Pricing Pilot Program* (May 17, 2024), https://ops.fhwa.dot.gov/congestionpricing/value_pricing ("The Moving Ahead for Progress in the 21st Century (MAP-21) Act did not authorize additional funds after FY2012 for the discretionary grant component of the Value Pricing Pilot Program (VPPP).  However, FHWA's ability to enter into cooperative agreements for projects that require tolling authority under this program for their implementation will continue.") (last accessed Feb. 12, 2025).

239.    FHWA cooperative agreements are governed by the Office of Management and Budget's agency-wide *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* ("Uniform Guidance"), 2 C.F.R. Part 200.  *See id.* § 1201.1. The Uniform Guidance sets out specific conditions under which  a cooperative agreement, *see id.* § 200.1, may be terminated:

  a. by the agency if the recipient "fails to comply with the terms and conditions" of the award;

  b. by the agency with the "consent" of the recipient;

  c. by the recipient; and

DOT_0047696

        d.  by the agency "pursuant to the terms and conditions" of the award.

*Id.* § 200.340(a).

240.     None of the conditions in which termination is permitted under the Uniform Guidance are present here.  First, Duffy did not and cannot claim that the recipients have failed to comply with the terms of the conditions of the VPPP Agreement, and the recipients have in fact complied with the terms of the VPPP Agreement; second, the recipients did not and do not consent to termination of the VPPP Agreement; third, the recipients have not requested termination of the VPPP Agreement; and, fourth, the VPPP Agreement does not contain any provisions that would permit Defendants to terminate the agreement unilaterally.  Additionally, to the extent the VPPP Agreement contemplates termination by any party, it reflects that TBTA would be the one party which could "discontinue tolls on the Project."  VPPP Agmt., cl. 11.

241.     The Uniform Guidance describes specific steps that an agency must take before it may terminate an award for noncompliance, including providing written notice and an opportunity to be heard.  2 C.F.R. §§ 200.341(a), 342.[180]  FHWA did not provide the recipients with notice of its intent to terminate the VPPP Agreement and also has not provided notice to the recipients of any alleged noncompliance with the VPPP Agreement.  The recipients have not been provided with an opportunity to be heard or to appeal the termination.

242.     The Administration's action in terminating tolling authority under the VPPP Agreement contrary to the terms of the VPPP Agreement and the applicable regulations governing the administration of the VPPP Agreement was arbitrary, capricious, not in accordance with law, and without observance of procedure required by law, within the meaning of the APA, 5 U.S.C.

---

[180] *See also* U.S. DEP'T OF TRANSP., *Guide to Financial Assistance* at 72-77 (Oct. 2019), https://www.transportation.gov/sites/dot.gov/files/2023-10/DOT_Guide_to_Financial_Assistance_effective_January_1_2020.pdf (further describing requirements for pre-termination notice and appeals).

DOT_0047697

§ 706(2), and should be held unlawful and set aside by the Court.  Any effort to enforce the February

19 Letter (including by implementing the "compliance measures" outlined in the April 21 Letter)

is arbitrary and capricious, and must be enjoined, declared unlawful, vacated, and set aside.

### COUNT IV
### Termination of the VPPP Agreement
### Violation of the Administrative Procedure Act
### (Substantively Arbitrary & Capricious – Insufficient Explanation)
(5 U.S.C. § 701 *et seq.*)

243.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set

forth fully herein.

244.    At the time of Defendants' purported termination of the VPPP Agreement, FHWA

had issued the Final EA, FONSI, Reevaluation 1, and Reevaluation 2, and had executed the VPPP

Agreement authorizing tolling under the Program.

245.    FHWA's execution of the VPPP Agreement constituted final agency action with

respect to FHWA's decision to authorize tolling under the Program.

246.    Under the APA, an agency "changing its course" is "obligated to supply a reasoned

analysis for the change beyond that which may be required when an agency does not act in the first

instance."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29,

42 (1983).

247.    Defendants did not adequately explain their reasoning for purportedly rescinding

the VPPP Agreement, in violation of the APA.  *See Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92,

106 (2015) ("[T]he APA requires an agency to provide more substantial justification when 'its new

policy rests upon factual findings that contradict those which underlay its prior policy; or when its

prior policy has engendered serious reliance interests that must be taken into account.'") (quoting

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

DOT_0047698

248.     Defendants did not adequately examine or rely on relevant data in deciding to terminate the VPPP Agreement, in violation of the APA. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (an agency "must examine the relevant data and articulate a satisfactory explanation for its action."). The rationales given for rescinding the VPPP Agreement in the February 19 Letter, and for concluding that the VPPP does not authorize the Program, are incorrect, invalid, and directly contrary to the position of the FHWA for the past 34 years.

249.     Defendants failed to consider the impact on the economy, the environment, and congestion in the CBD in acting to terminate the tolling authority for the Program. The Program will provide substantial benefits to the CBD and the region in terms of reduced traffic and congestion, improved air quality, and concomitant environmental, public health, and economic benefits resulting from shifting traffic patterns that occurred following the implementation of the Program.

250.     Defendants were obligated to consider the costs of ending the VPPP Agreement for Plaintiffs and for transit riders, people residing, working, learning and recreating in and around the CBD. Defendants failed to do so, having made their decision without seeking input from Plaintiffs and without inquiring about the costs from congestion, pollution, and cessation of the Program in which TBTA has invested hundreds of millions of dollars to bring online.

251.     Defendants also failed to adequately consider whether "there was 'legitimate reliance' on the" FHWA's longstanding interpretation and use of the VPPP as an indispensable tool in efforts to address congestion, reduce pollution, and raise revenues to support public transit. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (quoting *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996)). The MTA, TBTA, and now holders of debt issued in reliance on Program revenues, have all relied on the executed VPPP Agreement. The

DOT_0047699

February 19 Letter was arbitrary and capricious; where, as here, "an agency changes course … it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Id.* (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)).

252.    Instead, Defendants acted entirely based on political considerations.  Defendants had made no indication that they were reconsidering the Program until President Trump took office last month.  But President Trump has long indicated his desire to "kill" or terminate the Program, both in conversations with Republican lawmakers and in social media posts.  Defendants, bending under this political pressure, did not undertake any analysis or provide any explanation before revoking their prior decision to enter into the VPPP Agreement and approve the Program.

253.    Defendants' action purporting to revoke tolling authority under the VPPP Agreement without providing sufficient explanation of their decision was therefore arbitrary, capricious, and not in accordance with law, and without observance of procedure required by law, within the meaning of the APA, 5 U.S.C. § 706(2), and should be held unlawful and set aside by the Court.  Any effort to enforce the February 19 Letter (including by implementing the "compliance measures" outlined in the April 21 Letter) is arbitrary and capricious, and must be enjoined, declared unlawful, vacated, and set aside.

### COUNT V
### Termination of the VPPP Agreement
### Violation of the Administrative Procedure Act
### <u>(Pretext)</u>
(5 U.S.C. § 701 *et seq.*; U.S. Const. amend. V, cl. 3)

254.    "[I]n order to permit meaningful judicial review, an agency must 'disclose the basis' of its action." *Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167-69 (1962)).  Here, "[s]everal points,

DOT_0047700

considered together, reveal a significant mismatch between the decision the Secretary made and the rationale he provided." *Dep't of Com.*, 588 U.S. at 783.

255.    President Trump made his intention to "TERMINATE" the Program clear as a candidate for office, *see supra* ¶ 155, and continued to reiterate his goal in statements after winning election, *see supra* ¶¶ 156-59.  While the reasons for the President's opposition to the Program have changed over time, he never expressed concern that the Program was unauthorized by the VPPP.

256.    The February 19 Letter states that Duffy, upon assuming office, was directed by President Trump to "review FHWA's approval of the [Program]" in light of the President's "concerns" about "the extent of the tolling" and "the significant burdens on the New York City residents, businesses, and area commuters (including those from New Jersey and Connecticut) who regularly use the highway network in the CBD tolling area."  Feb. 19 Ltr. at 1.

257.    Very shortly after receiving this directive from President Trump, Duffy purported to announce a dramatic change in USDOT and FHWA's longstanding interpretation of the VPPP in an informal opinion letter with little or no legal reasoning.  While Duffy claimed to rest his decision on purely legal rationales, the vast majority of his letter is spent reciting policy disagreements with the Program, *see supra* ¶ 163.  Likewise, Duffy's public statements have made abundantly clear that his true motivation for purporting to terminate the VPPP Agreement is political disagreement with the Program itself.

258.    Since then, Defendants have pressed forward with their openly political effort to end the Program by threatening to illegally withhold federal funding from the State of New York (and by implication, from Plaintiffs), and by raising clearly pretextual concerns about subway safety, at a time when subway crime is at historic lows.  *See supra* ¶¶ 182-93.  These actions further

DOT_0047701

reinforce that Defendants' goal from the start has been to end the Program, rather than interpret the text of the VPPP, and that Defendants worked backwards to attempt to conjure a legal rational with which to "TERMINATE" the Program.

259.    Duffy's reliance on questionable legal interpretations to justify his complete disregard for Plaintiffs' reliance interests—which would otherwise constrain the agency from abruptly terminating the VPPP Agreement and abandoning its long held interpretation of the VPPP—reinforces that Duffy's reasoning is pretextual, and intended to shield his true decisional process from judicial review.

260.    "Altogether, the evidence tells a story that does not match the explanation the Secretary gave for his decision." *Dep't of Com.*, 588 U.S. at 784.  The Administrative Procedure Act bars such pretextual decision-making: "The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public.  Accepting contrived reasons would defeat the purpose of the enterprise." *Id.* at 785.  The February 19 Letter's pretextual rationales violated Plaintiffs' rights under the APA and, in addition, violated the MTA, TBTA, and NYCDOT's rights under the Due Process Clause of the United States Constitution. Any effort to enforce the February 19 Letter (including by implementing the "compliance measures" outlined in the April 21 Letter) is arbitrary and capricious, not to mention unconstitutional, and must be enjoined, declared unlawful, vacated, and set aside.

## COUNT VI
## Termination of the VPPP Agreement
## <u>Violation of the Due Process Clause of the Fifth Amendment</u>
(U.S. Const. amend. V, cl. 3)

261.    Plaintiffs MTA, TBTA, and NYCDOT reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

DOT_0047702

262.    The Due Process Clause of the Fifth Amendment provides that "No person shall …
be deprived of life, liberty, or property, without due process of law."  U.S. CONST. amend. V, cl. 3.

263.    Upon the execution of the VPPP Agreement, Plaintiffs MTA, TBTA, and
NYCDOT had a property interest in the VPPP Agreement and in the authority granted by the VPPP
Agreement to implement tolls within the CBD for the Program.

264.    An agency's withdrawal of consent for public or private entities to engage in a
contract implicates a property interest protected by the Due Process Clause.  *See, e.g.*, *Toxco Inc.
v. Chu*, 724 F. Supp. 2d 16, 27-28 (D.D.C. 2010).  Defendants' unilateral termination of the VPPP
Agreement deprives Plaintiffs MTA, TBTA, and NYCDOT of a property interest contrary to law.

265.    Further, Plaintiffs MTA, TBTA, and NYCDOT's property interest in the Program
and its infrastructure "attain … constitutional status by virtue of the fact that they have been initially
recognized and protected by state law," here, the TMA, and further recognized in the VPPP
Agreement.  *Ralls Corp. v. Comm. on Foreign Inv.*, 758 F.3d 296, 315 (D.C. Cir. 2014) (quoting
*Paul v. Davis*, 424 U.S. 693, 710 (1976)).

266.    Unilateral termination of the VPPP Agreement does not afford Plaintiffs MTA,
TBTA, and NYCDOT the process they are entitled to under the VPPP Agreement, the relevant
regulations, and the United States Constitution.  Prior to terminating the VPPP Agreement,
Defendants did not provide Plaintiffs MTA, TBTA, and NYCDOT with notice and failed to give
Plaintiffs an opportunity to respond or be heard.

267.    In addition, the VPPP Agreement constitutes an agreement which cannot be
invalidated without due process in accordance with its terms.

268.    Defendants' actions violate the Due Process Clause of the Fifth Amendment by
depriving Plaintiffs MTA, TBTA, and NYCDOT without due process of their property interest in

DOT_0047703

the VPPP Agreement and the authority granted by the VPPP Agreement to implement tolls within the CBD for the Program. Any effort to enforce the February 19 Letter (including by implementing the "compliance measures" outlined in the April 21 Letter) is unconstitutional, and must be enjoined, declared unlawful, vacated, and set aside.

## COUNT VII
### *Ultra Vires*
### Termination of the VPPP Agreement

269.  Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

270.  The acts of all executive branch officers "must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief." *McAnnulty*, 187 U.S. at 108.

271.  ISTEA does not authorize Defendants to unilaterally rescind a cooperative agreement entered into to authorize tolling under the VPPP, nor does the VPPP Agreement itself empower Defendants to terminate the agreement or rescind FHWA's approval of the Program.

272.  The February 19 Letter is *ultra vires* because it purports to unilaterally terminate the VPPP Agreement and rescind TBTA's authority to implement tolls under the VPPP for the Program without statutory authority and contrary to the applicable agency regulations and the terms of the VPPP Agreement.

273.  The February 19 Letter is *ultra vires* because rescission of the VPPP Agreement is not authorized under any provision of law.

274.  The February 19 Letter is *ultra vires* because the VPPP Agreement is a valid and binding agreement and the VPPP Agreement does not permit unilateral rescission by FHWA or any other governmental actor.

DOT_0047704

275.     In addition, an executive officer also acts *ultra vires* where it "deprives a contractor of a right expressly or impliedly granted by another statute." *Reich*, 74 F.3d at 1328.

276.     Defendants have deprived Plaintiffs of rights expressly and impliedly granted by ISTEA §1012(b), and thus acted *ultra vires*.  Any effort to enforce the February 19 Letter (including by implementing the "compliance measures" outlined in the April 21 Letter) is impermissible, and must be enjoined, declared unlawful, vacated, and set aside.

## COUNT VIII
### Termination of the VPPP Agreement
### <u>Violation of the National Environmental Policy Act and the Administrative Procedure Act</u>
(42 U.S.C. § 4321 *et seq*.; 5 U.S.C. §§ 701–706)

277.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

278.     At the time of Defendants' purported termination of the VPPP Agreement, Defendants had issued the Final EA, FONSI, Reevaluation 1, and Reevaluation 2, and had executed the VPPP Agreement authorizing tolling under the Program.

279.     At the time of Defendants' purported termination of the VPPP Agreement, the NEPA process for the Program was complete, and there was no "major federal action" remaining to occur with respect to the Program.

280.     Defendants' purported termination of the VPPP Agreement constitutes a new final agency action under NEPA and the APA and a major federal action within the meaning of NEPA, 42 U.S.C. §§ 4332(C), 4336e(10).

281.     NEPA requires Defendants to prepare an EIS for any "major Federal action[] significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).

DOT_0047705

282.    To determine whether a "major federal action" will have a significant effect on "the quality of the human environment," Defendants may prepare an EA.  42 U.S.C. § 4336(b)(2); 23 C.F.R. § 771.119.

283.    If an agency determines that the proposed action will not have significant effects, accounting for mitigation, it can issue a FONSI. 42 U.S.C. § 4336(b)(2); 23 C.F.R. § 771.121.  If the EA reveals that there may be significant effects, an EIS is required.

284.    Either level of review requires public participation opportunities and consideration of alternatives to the proposed action.  *E.g.*, 42 U.S.C. § 4332(C)(iii), (F), (H); 23 C.F.R. § 771.119(b).

285.    Defendants failed to undertake *any* NEPA review of their decision to terminate the VPPP Agreement, much less an adequate environmental review that considered  environmental impacts of the proposed action.

286.    Defendants did not undertake any public participation with respect to their decision to terminate the VPPP Agreement, in contrast to the substantial public participation opportunities afforded prior to the adoption of the Final EA (including a 44-day public comment period) and FONSI (including a 30-day public availability period).

287.    Under NEPA and its implementing regulations, Defendants are required to take a hard look at the reasonably foreseeable social, economic, and environmental impacts of a proposed action and its alternatives.  42 U.S.C. § 4336; 23 C.F.R. § 771.119(b).

288.    Defendants failed to consider the full extent of the reasonably foreseeable impacts of seeking to terminate the Program, which will provide substantial benefits to the CBD and the region in terms of reduced traffic and congestion, improved air quality, and concomitant

DOT_0047706

environmental, public health, and economic benefits resulting from shifting traffic patterns that occurred following the implementation of the Program.

289.    Defendants failed to consider alternatives to terminating the program. 42 U.S.C. § 4332(C)(iii), (F), (H); 23 C.F.R. § 771.119(b).

290.    Defendants failed to consider or identify measures which might mitigate adverse environmental impacts, and incorporate measures necessary to mitigate adverse impacts into its action terminating the VPPP Agreement.  23 C.F.R. §§ 771.105(e), 771.119(b).

291.    Defendants' action in purportedly revoking tolling authority under the VPPP Agreement without conducting the required NEPA review was therefore arbitrary, capricious, not in accordance with law, and without observance of procedure required by law, within the meaning of the APA, 5 U.S.C. § 706(2), and should be held unlawful and set aside by the Court.  Any effort to enforce the February 19 Letter (including by implementing the "compliance measures" outlined in the April 21 Letter) is arbitrary and capricious, and must be enjoined, declared unlawful, vacated, and set aside.

## COUNT IX
### Withholding of Federal Funds
### <u>Violation of the Spending Clause and Tenth Amendment</u>
### (Const. art I; amend. X)

292.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

293.    The Spending Clause of the U.S. Constitution provides that Congress—not the Executive—"shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States . . . ."  U.S. Const. art. I, § 8, cl. 1.

DOT_0047707

294.     The Tenth Amendment of the U.S. Constitution provides that the "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const. amend. X.

295.     Arising from these provisions, there are at least three "general" restrictions on the use of the Spending Power to condition the receipt of federal funds.  *South Dakota v. Dole,* 483 U.S. 203, 207 (1987).

296.     First, "if Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously . . ., enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation.'  *Id.* (citing *Pennhurst State School & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).

297.     Second, conditions on federal grants may be illegitimate if they are unrelated "to the federal interest in particular national projects or programs."  *Id.*

298.     Third, "in some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which pressure turns into compulsion."  *Id.* at 211.

299.     Defendants, through the February 19 Letter and their subsequent efforts to enforce the letter, purport to impose a "retroactive" condition on receipt of federal highway funds.  The MTA, TBTA, NYSDOT, and NYCDOT did not have fair notice that implementing the Program would allow withholding of further highway funds or the imposition of other "compliance measures," including those detailed in the April 21 Letter.

300.     "Congress' power to legislate under the spending power is broad," but conditions on funding must be "unambiguous[]" and they cannot "surprise[] participating States with post acceptance or 'retroactive' conditions."  *Pennhurst*, 451 U.S. at 17, 25. Once a State has accepted funds pursuant to a federal spending program, the Federal government cannot alter the conditions

114

DOT_0047708

attached to those funds so significantly as to "accomplish[ ] a shift in kind, not merely degree." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583-84 (2012).

301.    Second, conditions must be "reasonably related to the purpose of the expenditure." *New York v. United States*, 505 U.S. 144, 172 (1992) (citing *Massachusetts v. United States*, 435 U.S. 444 (1978)).

302.    A condition that New York cannot operate the Program addresses a local issue unrelated to the general provision of Federal highway funds.

303.    Finally, "conditions [on receipt of funds]" that "take the form of threats to terminate other significant independent grants" are properly "viewed as a means of pressuring the States to accept policy changes." *Sebelius*, 567 U.S. at 580.

304.    The April 21 Letter threatens to withhold approval or otherwise restrict the MTA, TBTA, NYSDOT, and NYCDOT's ability to obtain federal funding that they would otherwise have access to.

305.    By requiring that MTA, TBTA, NYSDOT, and NYCDOT rescind the Program and nullify the TMA under threat of removing or significantly curtailing their long-held interests in receipt of federal highway funds and to seek approvals for new projects, Defendants are commandeering Plaintiffs and their employees as agents of the federal government's regulatory scheme at the agencies' own cost.  The order interferes in New York State's sovereignty in violation of the Tenth Amendment and the constitutional principles of federalism on which this Nation was founded.

306.    As in *Sebelius*, here a directive that the "the Secretary . . . may declare that 'further payments will not be made to the State'" unless the TMA is invalidated and the Program ceased, constitutes "a gun to the head." *Id.* at 581.

DOT_0047709

307.    The April 21 Letter purports to alter the terms upon which federal monies were committed and disbursed contrary to law.  These alterations are coercive, retroactive, ambiguous, and unrelated to the purpose of the myriad grants affected.

308.    The remedy these constitutional violations is "to preclude the Federal Government from imposing such a sanction."  *Id.* at 588.  The Court should enjoin and set aside the February 19 Letter as unconstitutional and contrary to law.  Any effort to enforce the February 19 Letter (including by implementing the "compliance measures" outlined in the April 21 Letter) is arbitrary and capricious, and must be enjoined, declared unlawful, vacated, and set aside.

### COUNT X
### Withholding of Federal Funds
### Violation of the Separation of Powers – Usurping the Legislative Function
(42 U.S.C. § 4321 *et seq.*; 5 U.S.C. §§ 701–706)

309.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

310.    The Constitution "grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018); *see* U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause).

311.    Congress also possesses the exclusive power to legislate.  Article I, Section 1 of the Constitution states that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives."  U.S. Const. art. I, § 1; *see also Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

312.    Consistent with these principles, the Executive acts at the lowest ebb of its constitutional authority and power when the President acts contrary to the will of Congress by

DOT_0047710

attempting to unilaterally decline to spend appropriated funds. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-38 (1952) (Jackson, J., concurring).

313. The April 21 Letter violates the separation of powers because the executive branch purports to override the careful judgments of Congress by among other things disregarding relevant statutory provisions and refusing to disburse funding for innumerable federal grant programs.

314. The Court should enjoin and set aside the February 19 Letter as unconstitutional and contrary to law. Any effort to enforce the February 19 Letter (including by implementing the "compliance measures" outlined in the April 21 Letter) is arbitrary and capricious, and must be enjoined, declared unlawful, vacated, and set aside.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

i.    Declare that Defendants' purported termination of the VPPP Agreement and rescission of tolling authority under the VPPP was undertaken in violation of the terms of the VPPP Agreement and in excess of statutory authority; arbitrary and capricious in violation of the APA; without observance of procedure required by law and regulation in violation of the APA; based on a pretextual rational in violation of the APA; in violation of Plaintiffs the MTA, TBTA, and NYCDOT's Fifth Amendment right to Due Process; *ultra vires*; and in violation of NEPA;

ii.   Declare the February 19 Letter, the February 20 Shepherd Letter, and the March 20 Shepherd Letter null, void, and of no effect, and vacate each letter;

iii.  Declare that any effort to enforce the February 19 Letter, including but not limited to the "compliance measures" detailed in the April 21 Letter, are unlawful, and are null, void, and of no effect, and vacate any such effort;

iv.   Pursuant to 5 U.S.C. § 705, postpone the effective date of the March 20 Shepherd Letter, the April 21 Letter, and any other agency action purporting to enforce or implement the February 19 Letter, so as to preserve the *status quo* and the rights of Plaintiffs;

v.    Grant any further necessary and proper relief pursuant to 28 U.S.C. § 2202;

vi.   Enjoin Defendants from enforcing the February 19 Letter, the February 20

DOT_0047711

Shepherd Letter, the March 20 Shepherd Letter, the April 21 Letter, from taking any further agency actions founded on those documents, or from withdrawing, cancelling, delaying, rescinding, or withholding any appropriated, authorized, obligated, committed, and/or otherwise due federal funding from Plaintiffs in retaliation for commencing this action or for continuing to operate the Program;

vii.  Enjoin Defendants from withdrawing, cancelling, delaying, rescinding, or withholding any appropriated, authorized, obligated, committed, and/or otherwise due federal funding from Plaintiffs in the absence of constitutional and statutory authority and in compliance with applicable law and procedure;

viii.  Award Plaintiffs their costs for the action, including reasonable attorneys' fees; and

ix.  Grant all such other and further relief as it deems just and proper.


Dated: May 6, 2025
      New York, New York

                                Respectfully submitted,


                                */s/ Roberta A. Kaplan*
                                Roberta A. Kaplan
                                D. Brandon Trice
                                Maximilian T. Crema
                                KAPLAN MARTIN LLP
                                1133 Avenue of the Americas | Suite 1500
                                New York, NY 10036
                                Tel.: (212) 316-9500
                                rkaplan@kaplanmartin.com
                                btrice@kaplanmartin.com
                                mcrema@kaplanmartin.com


                                */s/ Mark A. Chertok*
                                Mark A. Chertok
                                Elizabeth Knauer
                                Amy Lynn Cassidy
                                John F. Nelson
                                Phillip Dane Warren
                                SIVE, PAGET & RIESEL, P.C.
                                560 Lexington Avenue, 15th Floor
                                New York, NY 10022
                                Tel.: (212) 421-2150
                                mchertok@sprlaw.com
                                eknauer@sprlaw.com

DOT_0047712

acassidy@sprlaw.com
jnelson@sprlaw.com
dwarren@sprlaw.com

*Attorneys for Plaintiffs the Metropolitan Transportation Authority and Triborough Bridge and Tunnel Authority*

LETITIA JAMES
Attorney General of the State of New York

By: */s/ Andrew G. Frank*
Andrew G. Frank
Assistant Attorney General
N.Y.S. Attorney General's Office
28 Liberty Street
New York, New York 10005
Tel.: (212) 416-8271
Email: andrew.frank@ag.ny.gov

*Attorneys for Intervenor-Plaintiff the New York State Department of Transportation*

MURIEL GOODE-TRUFANT
Corporation Counsel of the City of New York

*/s/ Nathan Taylor*
Nathan Taylor
Christian C. Harned
New York City Law Department
100 Church Street
New York, NY 10007
Tel.: (212) 356-2315
Email: ntaylor@law.nyc.gov
chharned@law.nyc.gov

*Attorneys for Intervenor-Plaintiff New York City Department of Transportation*

119

# Appendix 3

DOT_0047714

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

METROPOLITAN TRANSPORTATION AUTHORITY
and TRIBOROUGH BRIDGE AND TUNNEL
AUTHORITY,

                              *Plaintiffs*,

        and

NEW YORK STATE DEPARTMENT OF
TRANSPORTATION, RIDERS ALLIANCE, SIERRA
CLUB, and NEW YORK CITY DEPARTMENT OF
TRANSPORTATION,

                              *Intervenor-Plaintiffs*,

              v.

SEAN DUFFY, in his official capacity as Secretary of
the United States Department of Transportation,
GLORIA M. SHEPHERD, in her official capacity as
Executive Director of the Federal Highway
Administration, UNITED STATES DEPARTMENT
OF TRANSPORTATION, and FEDERAL HIGHWAY
ADMINISTRATION,

                              *Defendants*.

Case No. 25 Civ. 1413 (LJL)

**ORAL ARGUMENT
REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS
THE METROPOLITAN TRANSPORTATION AUTHORITY AND
TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY AND INTERVENOR-
PLAINTIFF NEW YORK CITY DEPARTMENT OF TRANSPORTATION'S
MOTION FOR A PRELIMINARY INJUNCTION**

DOT_0047715

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ................................................................................. 6

    A. The Traffic Mobility Act and FHWA's representations ................................. 6

    B. New York's statutory right to federal funds .................................. 7

    C. The broad scope of congestion pricing tolling authority under the VPPP ..................... 9

    D. The parties complete the years' long NEPA process and FHWA
       and the Project Sponsors execute the VPPP Agreement ...................................... 12

    E. The Administration purports to "terminate" the VPPP Agreement
       based on spurious and transparently pretextual arguments................................... 14

    F. Plaintiffs bring suit and Defendants attempt to coerce compliance
       by threatening to illegally withhold federal approvals and funding .................... 15

    G. Defendants threaten unlawful "compliance" measures, dramatically
       altering the status quo ................................................................. 16

ARGUMENT .................................................................................. 20

I.  Plaintiffs are likely to succeed on the merits .................................... 21

    A. The Court has jurisdiction................................................................ 21

    B. The February 19 Letter is arbitrary and capricious....................................... 24

        1.      Cordon Pricing .................................................... 24

        2.      Revenue Objectives ................................................. 29

        3.      Defendants' "policy concerns" ................................... 32

        4.      Defendants have no right to terminate the VPPP
                Agreement—regardless of their justification........................... 34

5.    Defendants failed to conduct an environmental review
under NEPA before purporting to terminate the VPPP Agreement ......... 36

6.    The MTA and TBTA's reliance interests .................................................. 38

C. Defendants' proposed enforcement ............................................................. 42

1.    Defendants lack authority to impose the sanctions
threatened in the April 21 Letter ................................................. 43

2.    Enforcing the February 19 Letter would violate
the *Pennhurst* clear statement rule ............................................. 47

3.    Defendants' withholding of federal funding is
unconstitutionally coercive ...................................................... 49

II.  The MTA and TBTA have shown irreparable harm........................................ 51

III. A preliminary injunction would serve the public interest................................ 60

CONCLUSION............................................................................................. 65

DOT_0047717

# TABLE OF AUTHORITIES

## CASES

*A.H. by & through Hester v. French*,
    985 F.3d 165 (2d Cir. 2021)...................................................................... 54

*Aetna Cas. & Sur. Co. v. United States*,
    71 F.3d 475 (2d Cir. 1995)........................................................................ 21

*Akiachak Native Cmty. v. Jewell*,
    995 F. Supp. 2d 7 (D.D.C. 2014).............................................................. 53

*Am. Sch. of Magnetic Healing v. McAnnulty*,
    187 U.S. 94 (1902)................................................................................... 36

*Am. Trucking Assn's, Inc. v. N.Y. State Thruway Auth.*,
    886 F.3d 238 (2d Cir. 2018)................................................................. 9, 31

*Avon Nursing & Rehab. v. Becerra*,
    995 F.3d 305 (2d Cir. 2021)...................................................................... 47

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
    462 U.S. 87 (1983)................................................................................... 37

*Barnes v. Gorman*,
    536 U.S. 181 (2002)................................................................................. 48

*Bloate v. United States*,
    559 U.S. 196 (2010)................................................................................. 45

*Bond v. United States*,
    572 U.S. 844 (2014)................................................................................. 30

*Bondi v. VanDerStok*,
    145 S. Ct. 857 (2025)............................................................................... 41

*Bostock v. Clayton Cnty.*,
    590 U.S. 644 (2020)................................................................................. 25

*Bowen v. Georgetown Univ. Hosp.*,
    488 U.S. 204 (1988)................................................................................. 47

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988)................................................................................. 21

DOT_0047718

*Broecker v. N.Y.C. Dep't of Educ.*,
   585 F. Supp. 3d 299 (E.D.N.Y. 2022) ....................................................... 54

*Broecker v. N.Y.C. Dep't of Educ.*,
   No. 23-655, 2023 WL 8888588 (2d Cir. Dec. 26, 2023) .......................... 54

*California v. Dep't of Educ.*,
   132 F.4th 92 (1st Cir. 2025) ...................................................................... 22

*Carroll v. Trump*,
   49 F.4th 759 (2d Cir. 2022) ...................................................................... 27

*Cascadia Wildlands v. Thrailkill*,
   49 F. Supp. 3d 774 (D. Or. 2014) ............................................................. 63

*Cascadia Wildlands v. Thrailkill*,
   806 F.3d 1234 (9th Cir. 2015) .................................................................. 63

*Chan v. U.S. Dep't of Transp.*,
   2024 WL 5199945 (S.D.N.Y. Dec. 23, 2024) ................................... *passim*

*Chao v. Russell P. Le Frois Builder, Inc.*,
   291 F.3d 219 (2d Cir. 2002) ...................................................................... 36

*Citizens to Save Spencer Cnty. v. EPA*,
   600 F.2d 844 (D.C. Cir. 1979) .................................................................. 44

*City and County of San Francisco v. Trump*,
   2025 WL 1186310 (N.D. Cal. Apr. 24, 2025) .................................... 52, 58

*City of Los Angeles v. Sessions*,
   No. 17 Civ. 7215, 2018 WL 6071072 (C.D. Cal. Sept. 13, 2018) ........... 56

*Climate United Fund v. Citibank, N.A.*,
   2025 WL 1131412 (D.D.C. Apr. 16, 2025) ........................................ 23, 34

*Climate United Fund v. Citibank, N.A.*,
   2025 WL 842360 (D.D.C. Mar. 18, 2025) ............................................... 35

*Climate United Fund v. Citibank, N.A.*,
   No. 25-5122 (D.C. Cir. Apr. 16, 2025) .................................................... 35

*Cnty. of Rockland v. Metro. Transp. Auth.*,
   No. 24 Civ. 2285 (S.D.N.Y. Jan. 14, 2025) ............................................ 13

DOT_0047719

*Cnty. of Rockland v. Metro. Transp. Auth.*,
    No. 24A945 (S. Ct. Apr. 8, 2025) ........................................................................ 13

*Cnty. of Rockland v. Triborough Bridge & Tunnel Auth.*,
    No. 24 Civ. 2285 (S.D.N.Y. Dec. 23, 2024), ...................................................... 13

*Cohen v. Postal Holdings, LLC*,
    873 F.3d 394 (2d Cir. 2017)................................................................................. 21

*County of Santa Clara v. Trump*,
    250 F. Supp. 3d 497 (N.D. Cal. 2017) ..................................................... 53, 60, 61

*Credit Suisse Sec. (USA) LLC v. Ebling*,
    2006 WL 3457693 (S.D.N.Y. Nov. 27, 2006 ........................................................ 6

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019)............................................................................................. 42

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020).................................................................................... 32, 39, 42

*Department of Education v. California*,
    145 S. Ct. 966 (2025)........................................................................................... 22

*E. Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018) ............................................................................... 59

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016)............................................................................................. 41

*Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*,
    405 U.S. 707 (1972)............................................................................................. 30

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009).................................................................................. 39, 40, 41

*Fiero v. Fin. Indus. Regul. Auth., Inc.*,
    660 F.3d 569 (2d Cir. 2011)........................................................................... 27, 31

*Garland v. Cargill*,
    602 U.S. 406 (2024)............................................................................................. 38

*Georgia v. Pruitt*,
    326 F. Supp. 3d 1356 (S.D. Ga. 2018) ................................................................ 53

v

DOT_0047720

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
    481 F.3d 60 (2d Cir. 2007) ............................................................. 51

*Gutierrez v. Ada*,
    528 U.S. 250 (2000) ..................................................................... 28

*In re Bernard L. Madoff Inv. Sec. LLC*,
    779 F.3d 74 (2d Cir. 2015) ............................................................. 32

*Jama v. I.C.E.*,
    543 U.S. 335 (2005) ..................................................................... 30

*Johnson v. Newport Lorillard*,
    2003 WL 169797 (S.D.N.Y. 2003) .................................................... 20

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ................................................. 51, 60, 61

*Linea Area Nacional de Chile S.A. v. Meissner*,
    65 F.3d 1034 (2d Cir. 1995) ........................................................... 22

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. 369 (2024) ................................................................. 38, 44

*Louisiana ex rel. Guste v. Brinegar*,
    388 F. Supp. 1319 (D.D.C. 1975) ..................................................... 46

*Louisiana v. Biden*,
    622 F. Supp. 3d 267 (W.D. La. 2022) ................................................ 63

*Maine v. U.S. Dep't of Agric.*,
    F. Supp. 3d, 2025 WL 1088946 (D. Me. Apr. 11, 2025) ......................... 22

*Mantena v. Hazuda*,
    2018 WL 3745668 (S.D.N.Y. 2018) .................................................. 24

*Maryland v. King*,
    567 U.S. 1301 (2012) ................................................................... 59

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) .......................................................... 60

*Mendis v. Filip*,
    554 F.3d 335 (2d Cir. 2009) ........................................................... 30

DOT_0047721

*Mulgrew v. U.S. Dep't of Transp.*,
750 F. Supp. 3d 171 (S.D.N.Y. 2024)................................................................ 6, 12

*N.L.R.B. v. Noel Canning*,
573 U.S. 513 (2014)............................................................................................ 39

*N.L.R.B. v. SW General, Inc.*,
580 U.S. 288 (2017)............................................................................................ 26

*N.R.D.C. v. EPA*,
749 F.3d 1055 (D.C. Cir. 2014) ......................................................................... 46

*Nat'l Council of Nonprofits v. O.M.B.*,
No. 25 Civ. 239, 2025 WL 597959 (D.D.C. Feb. 25, 2025)......................... 54, 63

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012)................................................................................ 49, 52, 55

*Neuhaus v. Triborough Bridge & Tunnel Auth.*,
No. 24 Civ. 3983 (S.D.N.Y. Dec. 23, 2024) ..................................................... 14

*New Jersey v. Metro. Transp. Auth.*,
No. 1033 (3d Cir. Jan. 4, 2025).......................................................................... 14

*New Jersey v. U.S. Dep't of Transp.*,
No. 23 Civ. 3885 (D.N.J. Jan. 3, 2025).......................................................... 14, 41

*New York v. D.H.S.*,
969 F.3d 42 (2d Cir. 2020)............................................................................ 62, 63

*New York v. H.H.S.*,
414 F. Supp. 3d 475 (S.D.N.Y. 2019)...................................................... 30, 50, 55

*New York v. Rescue*,
705 F. Supp. 3d 104 (S.D.N.Y. 2023)................................................................ 21

*New York v. Trump*,
2025 WL 1098966 (D.R.I. Apr. 14, 2025).......................................................... 23

*New York v. Trump*,
No. 25 Civ. 39, 2025 WL 715621 (D.R.I. Mar. 6, 2025) ........................ 54, 60, 63

*New York v. U.S. Dep't of Educ.*,
477 F. Supp. 3d 279 (S.D.N.Y. 2020)................................................................ 20

DOT_0047722

*New York v. U.S. Dep't of Just.*,
    951 F.3d 84 (2d Cir. 2020) ................................................................. 50

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................... 20, 62

*Our Wicked Lady LLC v. Cuomo*,
    2021 WL 915033 (S.D.N.Y. Mar. 9, 2021) ............................................ 61

*PaineWebber Inc. v. Bybyk*,
    81 F.3d 1193 (2d Cir. 1996) .............................................................. 37

*Park Irmat Drug Corp. v. Optumrx, Inc.*,
    152 F. Supp. 3d 127 (S.D.N.Y. 2016) ................................................. 21

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981) ............................................................................ 49

*Perkins Coie LLP v. U.S. Dep't of Just.*,
    F. Supp. 3d, 2025 WL 1276857 (D.D.C. May 2, 2025) ......................... 24

*Planned Parenthood of Greater Wash. & N. Idaho v. H.H.S.*,
    328 F. Supp. 3d 1133 (E.D. Wash. 2018) ........................................... 54

*Regeneron Pharmaceuticals, Inc. v. H.H.S.*,
    510 F. Supp. 3d 29 (S.D.N.Y., 2020) ................................................. 21

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
    102 F.3d 12 (1st Cir. 1996) .............................................................. 60

*Sackett v. EPA*,
    566 U.S. 120 (2012) ....................................................................... 24

*Saget v. Trump*,
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) ............................................... 63

*SEC v. SIPC*,
    872 F. Supp. 2d 1 (D.D.C. 2012) ...................................................... 33

*Sierra Forest Legacy v. Sherman*,
    951 F. Supp. 2d 1100 (E.D. Cal. 2013) .............................................. 65

*Singh v. U.S. Dep't of Just.*,
    461 F.3d 290 (2d Cir. 2006) ............................................................. 35

DOT_0047723

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ......................................................................................... 32

*Smiley v. Citibank (South Dakota), N.A.*,
   517 U.S. 735 (1996) ......................................................................................... 41

*Sols. in Hometown Connections v. Noem*,
   2025 WL 1103253 (D. Md. Apr. 14, 2025) ................................................... 36

*South Dakota v. Dole*,
   483 U.S. 203 (1987) ........................................................................... 50, 51, 52

*Spadaro v. U.S. C.B.P.*,
   978 F.3d 34 (2d Cir. 2020) ............................................................................. 28

*State Highway Comm'n of Missouri v. Volpe*,
   479 F.2d 1099 (8th Cir. 1973) ....................................................................... 47

*Tennessee ex rel. Leech v. Dole*,
   567 F. Supp. 704 (M.D. Tenn. 1983) ....................................................... 44, 45

*Texas v. Brooks-LaSure*,
   2021 WL 5154219 (E.D. Tex. Aug. 20, 2021) .......................................... 58, 65

*Texas v. Cardona*,
   743 F. Supp. 3d 824 (N.D. Tex. 2024) ....................................................... 49, 51

*Texas v. EPA*,
   829 F.3d 405 (5th Cir. 2016) ......................................................................... 55

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) ......................................................................................... 55

*United States v. North Carolina*,
   192 F. Supp. 3d 620 (M.D.N.C. 2016) ...................................................... 55, 59

*Upper Snake River Chapter of Trout Unlimited v. Hodel*,
   921 F.2d 232 (9th Cir. 1990) ......................................................................... 39

*Wash. All. of Tech. Workers v. D.H.S.*,
   50 F.4th 164 (D.C. Cir. 2022) ....................................................................... 28

*Washington v. Trump*,
   No. 25 Civ. 244, 2025 WL 509617 (W.D. Wash. Feb. 16, 2025) ............................ 61

DOT_0047724

*West Virginia ex rel. Morrisey v. U.S. Dep't of Treasury*,
  59 F.4th 1124 (11th Cir. 2023) ............................................................ 50

*Yang v. Kosinski*,
  960 F.3d 119 (2d Cir. 2020)................................................................. 62

## STATUTES

5 U.S.C. § 702 .......................................................................................... 22

5 U.S.C. § 706 .......................................................................................... 37

12 U.S.C. § 1464 ...................................................................................... 46

23 U.S.C. § 106 ........................................................................................ 47

23 U.S.C. § 101 .................................................................................. 4, 7, 47

23 U.S.C. § 104 .......................................................................................... 7, 8

23 U.S.C. § 106 ............................................................................... 8, 31, 47

23 U.S.C. § 109 ............................................................................... 8, 31, 47

23 U.S.C. § 112 ........................................................................................ 42

23 U.S.C. § 115 ........................................................................................ 18

23 U.S.C. § 129 ................................................................................. *passim*

23 U.S.C. § 131 .................................................................................. 42, 48

23 U.S.C. § 142 ........................................................................................ 10

23 U.S.C. § 149 .................................................................................... 2, 57

23 U.S.C. § 151 ........................................................................................ 42

23 U.S.C. § 158 ........................................................................................ 48

23 U.S.C. § 301 ....................................................................... 9, 23, 25, 46

23 U.S.C. § 315 ............................................................................. 44, 45, 46

28 U.S.C. § 1331 ...................................................................................... 22

42 U.S.C. § 4321 ........................................................................................ 2

42 U.S.C. § 4332 .................................................................................. 19, 38

42 U.S.C. § 4336 .................................................................................. 19, 38

49 U.S.C. § 5303 ........................................................................................ 9

49 U.S.C. § 5329 ........................................................................................ 9

49 U.S.C. § 5336 ........................................................................................ 9

DOT_0047725

49 U.S.C. § 5337 .................................................................................................... 9

49 U.S.C. § 5338 ................................................................................................. 8, 9

49 U.S.C. § 60301 ................................................................................................ 31

7 U.S.C. § 1375(b) ............................................................................................... 46

N.Y. Veh. & Traf. Law § 1701 ........................................................................ 6, 30

Pub. L. 102-240 (Dec. 18, 1991 .......................................................................... 9

Pub. L. 104-59 (Nov. 28, 1995) ......................................................................... 11

Pub. L. 105-178 (June 9, 1998) ...................................................................... 9, 11

Pub. L. 105-206, § 9006(b) (July 22, 1998) ....................................................... 11

Pub. L. 109-59, § 1604(a) (Aug. 10, 2005) ........................................................ 11

## REGULATIONS AND ADMINISTRATIVE GUIDANCE

2 C.F.R. § 200.340 ...................................................................................... *passim*

23 C.F.R. § 1.36 ................................................................... 17, 19, 23, 44

23 C.F.R. § 450.220 ............................................................................................. 18

23 C.F.R. § 450.222 ............................................................................................. 18

23 C.F.R. § 771.111 ............................................................................................. 46

23 C.F.R. § 771.113 ............................................................................................. 46

23 C.F.R. § 771.119 ............................................................................................. 38

23 C.F.R. § 771.121 ....................................................................................... 38, 46

23 C.F.R. § 771.124 ............................................................................................. 46

23 C.F.R. § 771.125 ............................................................................................. 47

49 C.F.R. § 1.85 .................................................................................................. 33

89 Fed. Reg. at 30089 ......................................................................................... 36

*Guidance for Federal Financial Assistance*, 89 Fed. Reg. 30046, 30089 (Apr. 22, 2024) .......... 36

## OTHER AUTHORITIES

*About Us*, NYMTC, .......................................................................................... 18

Alex Lemonides et al., *Tracking the Lawsuits Against Trump's Agenda*, N.Y. TIMES (May 2, 2025), ....................................................................................................... 4

DOT_0047726

Arun Venugopal, *Vehicle Traffic Is Down in Manhattan*, GOTHAMIST (Feb. 13, 2025), ............. 66

*Congestion Charging*, *Black's Law Dictionary* (10th ed. 2014) .................................................. 27

*Congestion*, *Cassell Encyclopaedia Dictionary*, 312 (1990) ..................................................... 27

Elena Safiorva, Kenneth Gillingham & Abram Lipman, *Choosing Congestion Pricing Policy:*

    *Cordon Tolls Versus Link-Based Tolls*, 1932 J. OF TRANSP. RSCH. BD. (2005) ...................... 29

FHWA, *Advance Construction and Partial Conversion of Advance Construction*, ..................... 18

FHWA, *Welcome to the FHWA Congestion Pricing Web Site*, ....................................................... 9

Final EA Chapter 17, Environmental Justice at 17-62, 17-67–72 (Apr. 2023), ................... 17, 34

Final EA Chapter 6, Economic Conditions at 6-47–49, 6-80–84 (Apr. 2023), ..................... 17, 34

Good Day New York, WNYW-NY (FOX) (Apr. 29, 2025), ................................................. 20, 34

MTA, MTA CAPITAL PROGRAM 2020–2024 (Sept. 25, 2019) ...................................................... 52

NYSDOT, STATE TRANSPORTATION IMPROVEMENT PROGRAM SUMMARY, .............................. 18

Oldfield Act of 1927, Pub. L. 69-773 (Mar. 3, 1927) .................................................................. 9

Paul W. Wilson, *Welfare Effects of Congestion Pricing In Singapore*,

    15 TRANSP. 191, 191 (1988) ................................................................................................ 27

Peter Senzamici, *Feds Accidentally Upload Internal Memo Admitting Plan to Kill NYC*

    *Congestion Pricing Is 'Very Unlikely' to Succeed—Before Quickly Deleting It*, N.Y. POST

    (Apr. 24, 2025) ................................................................................................................ 20

*Statement by President George Bush Upon Signing H.R. 2950*,

    1991 U.S.C.C.A.N. 1865 (Dec. 18, 1991) ........................................................................ 10

DOT_0047727

Plaintiffs the Metropolitan Transportation Authority ("MTA") and Triborough Bridge and Tunnel Authority ("TBTA"), an MTA affiliate, and Intervenor-Plaintiff New York City Department of Transportation ("NYCDOT") respectfully submit this memorandum of law in support of their motion for a preliminary injunction enjoining the illegal, arbitrary, and unfounded withholding of federal transportation project approvals and funding, and other unlawful acts intended to coerce the cessation of the Central Business District ("CBD") Tolling Program ("Program" or "congestion pricing").

## PRELIMINARY STATEMENT

On January 5, 2025, after more than five years of engagement with and reliance on the federal government and its longstanding interpretation of the statute establishing the Value Pricing Pilot Program ("VPPP")—including during the first Trump Administration—New York launched congestion pricing. The Program is a long-sought-after effort to reduce traffic congestion in the New York City metropolitan area by implementing a market-based, user-pay solution that charges drivers a toll to enter the CBD (Manhattan at and below 60th Street), and then uses the revenue from those tolls to improve and expand the region's aging public transportation system, particularly the NYC subway. This method of tolling, also known as "congestion pricing," has been successful in big cities around the world including London, Milan, Singapore, and Stockholm, and was first conceived of here in New York City at Columbia University in the 1950s as a solution to what even then was perceived to be the region's significant congestion woes. As of today, only four months into the Program, the available data, not to mention simply looking at the streets, show that the Program is working: traffic in the CBD has dropped, commute times have fallen, vehicle speeds (including for public buses) have increased, more people are visiting Manhattan's commercial districts and supporting the region's businesses, and the MTA's regional public transit system is seeing increased ridership and benefiting from increased funding.

DOT_0047728

Despite the Program's success, the President continues to oppose it, consistent with his position since he began running for his second term last year, when he promised to "TERMINATE" and "kill" the Program if elected.  The President is entitled to his personal and political view on whether congestion pricing is or is not good policy.  But he has no authority to stop the Program now.  In fact, during the first Trump Administration, Defendants advised TBTA, New York State Department of Transportation ("NYSDOT"), and NYCDOT (collectively, the "Project Sponsors") to seek federal authorization for the Program under the VPPP, 23 U.S.C. § 149 note, and the federal government and the Project Sponsors proceeded to do precisely that, analyzing the Program's environmental impacts under the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA"), for more than four years in a process that yielded thousands of pages of environmental assessment.

Defendant Federal Highway Administration ("FHWA") (through Defendant Gloria Shepherd) and the Project Sponsors then executed a binding agreement on November 21, 2024 authorizing the Program under the VPPP (the "VPPP Agreement").  The VPPP Agreement contemplates that congestion pricing will continue unless and until *TBTA* alone decides to stop it, and says nothing whatsoever to even suggest that the federal government (which has not contributed and is not contributing any funds to the Program) has the power to unilaterally terminate it—let alone do so just months after the VPPP Agreement was executed and the Program began.  The absence of such a right on the part of Defendants is consistent with the VPPP statute, which envisions that the Program will continue for *at least ten years*, with regular updates being provided to the federal government on its impact on congestion, transit ridership, and transit funding.  It is also consistent with the fact that a central component of the Program, as everyone has long known, is to use the tolling revenue (now projected between $500 million and $900

DOT_0047729

million a year) to raise $15 billion for the MTA Capital Program through bonds with terms running at least *30 years* out from the commencement of tolling.  Obviously, none of that would make any sense if Defendants could simply terminate the Program at any time.   Indeed, Defendants themselves have recognized that agreements like the one here "must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award."  2 C.F.R. § 200.340(b).  The VPPP Agreement's silence is dispositive.

Nonetheless, shortly after taking office this year, President Trump decided to make good on his 2024 campaign promises, declaring on social media that "CONGESTION PRICING IS DEAD. … LONG LIVE THE KING!"  Simultaneously, on February 19, 2025, Defendant Sean Duffy issued a four-page letter purporting to "terminate" the VPPP Agreement.  Duffy claimed to have determined—without any statutory basis or analysis, and contrary to decades of FHWA public statements (including to Congress), approvals, and guidance—that the VPPP does not permit FHWA to authorize congestion pricing programs covering all the roads in a geographic area (known as "cordon," "zone-based," or "area-wide" pricing).  Duffy also claimed to have determined that the VPPP does not authorize a program that "appears to be driven primarily by the need to raise revenue for the Metropolitan Transit [sic] Authority."  But these rationales are so weak as to be transparently pretextual.  The VPPP plainly covers tolling programs like the one here, since Congress understood congestion pricing to encompass cordon pricing when it passed the VPPP in 1991 and when it reauthorized the VPPP several times over the last 30 years.  Likewise, the statutory text authorizes the use of tolling revenue to fund transit programs.  Congress (and FHWA) have long understood that the VPPP allows tolling programs that have a revenue objective; tolling, by definition, raises revenue.  Using tolls to promote public transit as an alternative to driving, as the Program does, obviously reduces traffic congestion.  What's more,

3

Duffy did not cite any provision of law entitling him to terminate the VPPP Agreement, because there is none.

Given the patently unlawful nature of the purported rescission, the MTA and TBTA did not agree to stop congestion pricing as directed by Duffy. Instead, they immediately commenced this lawsuit seeking a declaration that Duffy's action is invalid. ECF 1. With no serious defense on the merits, the Administration has now resorted to what seems to be its *modus operandi*: attempting to improperly leverage federal funding in order to coerce compliance with its wishes, rather than defend the legality of its propositions in court.[1] After making several proclamations that congestion pricing must end, Defendant Duffy wrote to Governor Hochul on April 21 reiterating that the VPPP Agreement had been terminated, but "direct[ing] New York to show cause" by May 21 that it was in compliance with the Federal-Aid Highway Act, 23 U.S.C. § 101 *et seq.* ("FAHA"), and warning that if Defendants determine congestion pricing is not permitted under the VPPP (as they already have) and congestion pricing continues (as Plaintiffs have said it will absent a court order to the contrary), FHWA "will implement" "compliance measures beginning on or after May 28." The sweeping sanctions outlined in the letter include withholding FHWA funds authorized by Congress under the FAHA, as well as withholding advance construction authorizations and NEPA approvals (other than undefined "Safety Projects")—which means that myriad future projects depending on federal approvals, and ultimately federal funding, could not proceed. The sanctions also include withholding approval of amendments to the Statewide Transportation Improvement Program, which would preclude funding for highway and transit projects throughout the State. Any or all of these would have immediate and harmful

---

[1] Alex Lemonides et al., *Tracking the Lawsuits Against Trump's Agenda*, N.Y. TIMES (May 2, 2025), https://www.nytimes.com/interactive/2025/us/trump-administration-lawsuits.html.

DOT_0047731

implications for the ability of MTA and TBTA (and NYSDOT and NYCDOT) to deliver vital transportation services for the metropolitan region.

Defendants' efforts to avoid the judicial process have placed Plaintiffs and NYCDOT in an impossible position. The threatened measures will undeniably cause irreparable harm. That is the point: Defendants acknowledge that they seek to coerce compliance with their lawless demands by threatening the funding of other public projects. The loss of federal approvals and funding will undermine the MTA, TBTA, and NYCDOT's ability to maintain an efficient transportation system on behalf of the millions of people who rely on that system each day. On the other hand, capitulating to Defendants' demands would be just as devastating: the MTA would lose $50 million or more in monthly revenues, a dedicated source of public transit funding to support the bonding of much higher amounts, which loss could never be recovered. The MTA would also be deprived of funds to make much-needed improvements to the subway system. And the public would once again suffer the negative environmental and economic impacts that the Program is intended to reduce. As this Court recognized in rejecting efforts to enjoin the Program before it started, stopping congestion pricing "would delay the environmental and economic benefits the Tolling Program was designed to convey and force the TBTA to bear a sizeable financial burden." *Chan v. U.S. Dep't of Transp.*, 2024 WL 5199945, at *48 (S.D.N.Y. Dec. 23, 2024) (Liman, J.).

Under our legal system, the Administration cannot set aside the longstanding and well-reasoned determinations of Congress and the Executive agencies, nor displace the Judiciary from its role in construing the law, by trying to strong-arm compliance. And Plaintiffs and NYCDOT should not be put to the Hobson's choice of acceding to unlawful demands to shut down one vital program in order to avoid losing funding for so many others. *See Credit Suisse Sec. (USA) LLC v. Ebling*, 2006 WL 3457693, at *3 (S.D.N.Y. Nov. 27, 2006) (preliminary injunction warranted

5

DOT_0047732

where harm movant seeks to redress would occur before ultimate resolution and thus movant would "lose its right to meaningfully resolve" its claims).  The Court should enjoin Defendants from engaging in such unlawful retribution and preserve the status quo while this litigation proceeds so that the legality of Defendants' actions can be decided in an orderly manner.

## BACKGROUND

### A.    The Traffic Mobility Act and FHWA's representations

Traffic congestion has long stymied economic growth, harmed the environment and public health, and undermined quality of life in the New York City metropolitan region.  In 2019, after decades of discussion about solutions, New York passed the Traffic Mobility Act (the "TMA"), N.Y. Veh. & Traf. Law § 1701 *et seq.*, which authorizes TBTA to establish and implement a plan for tolling all eligible vehicles entering the Manhattan CBD, and requires that the tolling "ensure[s] annual revenues and fees collected under such program, less costs of operation of the same, provide for sufficient revenues ... to fund fifteen billion dollars for capital projects for the 2020 to 2024 MTA capital program, and any additional revenues above that amount to be available for any successor programs," *Mulgrew v. U.S. Dep't of Transp.*, 750 F. Supp. 3d 171, 187, 191 (S.D.N.Y. 2024) (Liman, J.).

Because the Program would apply to certain federal-aid highways within the area to be tolled, the Project Sponsors (as noted, TBTA, NYSDOT, and NYCDOT) engaged with FHWA and the United States Department of Transportation ("USDOT") to discuss how best to implement such tolling in a manner consistent with the FAHA.  From the outset, the Project Sponsors explained in meetings with FHWA that the Program's tolls would apply to all eligible vehicles entering the CBD, and that the Program would incorporate toll rates that would provide a new and recurring revenue source for the MTA.  Declaration of Dr. Allison L. C. de Cerreño ("C. de

6

Cerreño Decl.") ¶¶ 5-12.  In response, FHWA and USDOT advised the Project Sponsors that the VPPP was the appropriate vehicle for them to use to obtain such tolling authority.  *Id*. ¶¶ 6, 10.

And so, on June 17, 2019, the Project Sponsors submitted an Expression of Interest ("EoI") seeking authorization under the VPPP to charge vehicles a "toll to enter or remain within the Manhattan CBD," with the goals (first) of "reduc[ing] traffic congestion," and, among other things, "[c]reat[ing] a sustainable funding source to repair and revitalize the MTA transit system" and "[i]ncreas[ing] transit ridership."  C. de Cerreño Decl., Ex. B at 3-4.  The EoI did not contemplate an end date for the Program and stated that the Project Sponsors would prepare reports on "the effects of the program" once "every two years … for the life of the program."  *Id.* at 6.  On October 24, 2019, FHWA reiterated that the VPPP "appear[ed] to be the best potential fit" among the various programs available under federal law that allow for tolling on federal-aid highways.  C. de Cerreño Decl., Ex. C at 1.

### B.    New York's statutory right to federal funds

The FAHA was enacted "to accelerate the construction of Federal-aid highway systems," 23 U.S.C. § 101(b)(1), and to that end requires the apportionment of funds from the Highway Trust Fund, which consists of taxes paid by each State's highway users, to be appropriated by the Secretary to the States for federal-aid highways.  Specifically, the Secretary "shall distribute" a "base apportionment" of funding to each State based upon a specified formula for various programs, 23 U.S.C. § 104(b), with each State "[g]uaranteed" an apportionment of at least 95 cents on the dollar with respect to its tax payments into the Highway Trust Fund attributable to the number of highway users in the State, *id.* § 104(c)(1)(B).  Upon apportionment to the State, the State transportation department submits proposed projects to the Secretary for approval, and the Secretary "shall act on the plans, specifications, and estimates as soon as practicable," "guided by Section 109," and "enter into a formal project agreement … formalizing the conditions of the

DOT_0047734

project approval." *Id.* § 106(a)(1)-(2), (4).  Section 109, in turn, sets forth detailed standards to guide the Secretary in carrying out his duty promptly to act on proposals, including in order to "adequately serve the existing and planned future traffic of the highway in a manner that is conducive to safety, durability, and economy of maintenance." *Id.* § 109(a)(1).  In other words, each State—including New York—is entitled to get back nearly all of the money that *its taxpayers paid* to the federal government for these purposes, with relatively limited discretion afforded to the Secretary.

Federal Transit Administration ("FTA") funding is similarly subject to legislative directives.  Congress establishes the legal authority for FTA programs through authorizing legislation, with each reauthorization amending the Federal Transit laws codified in Title 49 U.S.C. Chapter 53.  The most recent authorization, the Infrastructure Investment and Jobs Act ("IIJA"), reauthorizes surface transportation programs for Fiscal Year ("FY") 2022 through FY 2026.  The IIJA authorizes up to $108 billion to support federal public transportation programs, including $91 billion in "guaranteed" funding.  *See* 49 U.S.C. § 5338.  The largest sums of funding fall under the Urbanized Area Formula Grants ("UAFGs") ($33.5 billion) (§ 5338(a)(2)(C)), the Rail Vehicle Replacement Program ($1.5 billion), the Capital Investment Grants (up to $23 billion, with $8 billion guaranteed); and the State of Good Repair Grants ($23.1 billion) (§ 5338(a)(2)(L)).  These amounts cover the *total* apportionment under the life of the IIJA, until the passage of the next surface transportation reauthorization.  The total appropriations are then provided to States and transit agencies under different programs within Chapter 53.[2]  Although each provision provides different bases for calculating the funds to be distributed to each state, urban area, or particular

---

[2] *See e.g.*, § 5303 (Metropolitan transportation planning); § 5307(Urbanized Area Formula Grants); § 5329 (Public Transportation Safety Program); § 5336 (Apportionment of appropriations for formula grants).

DOT_0047735

project, the allocations for Urbanized Area Formula Grants and State of Good Repair Grants are determined by a Congressionally designated formula provided in Sections 5336 and 5337.

## C. The broad scope of congestion pricing tolling authority under the VPPP

When Congress established the forerunner to today's federal-aid highway program in 1916, it determined that highways eligible for federal funds under the program should generally be free from tolls. However, that rule was immediately subject to numerous carveouts. *See, e.g.*, Oldfield Act of 1927, Pub. L. 69-773 (Mar. 3, 1927). Indeed, the current codification of the "Freedom from tolls" provision in Section 301 acknowledges a broad exception in Section 129, which allows for projects as wide-ranging as the construction of new toll highways, construction of new lanes and conversion into a toll highway, and the reconstruction of toll-free highways and conversion into toll facilities. *See* 23 U.S.C. §§ 301 & 129(a)(A), (F).

Originally called the "Congestion Pricing Pilot Program,"[3] the VPPP was enacted as part of the Intermodal Surface Transportation Efficiency Act of 1991, Pub. L. 102-240 (Dec. 18, 1991) ("ISTEA"), to grant "states 'greater flexibility to operate toll facilities and use toll revenues for a variety of transportation projects,'" *Chan*, 2024 WL 5199945, at *33 (quoting *Am. Trucking Assn's, Inc. v. N.Y. State Thruway Auth.*, 886 F.3d 238, 241 (2d Cir. 2018)). In passing ISTEA, Congress explained that it sought to "develop a National *Intermodal* Transportation System" consisting "of all forms of transportation in a unified, interconnected manner." ISTEA § 2 (emphasis added); *see also* Second Amended Complaint ("SAC") ¶ 67.[4] And in signing the bill

---

[3] Congress renamed the Congestion Pricing Pilot Program the Value Pricing Pilot Program in 1998. Pub. L. 105-178 § 1216 (June 9, 1998). FHWA has explained that "value pricing" is a synonym for congestion pricing and that the agency uses the terms interchangeably. *See, e.g.*, FHWA, *Welcome to the FHWA Congestion Pricing Web Site*, https://ops.fhwa.dot.gov/congestionpricing/index.htm (last accessed Mar. 26, 2025) ("Congestion pricing— sometimes called value pricing—is a way of harnessing the power of the market to reduce the waste associated with traffic congestion.").

[4] Simultaneous with today's filing, Plaintiffs and Plaintiff-Intervenors have moved for leave to file a Second Amended Complaint based upon Defendants' post-April 19 actions. ECF 79. Defendants do not oppose the amendment, and

DOT_0047736

into law, President Bush observed that a "major element" of ISTEA was "to provide State and local officials unprecedented flexibility," including discretion to finance transportation improvements "with toll revenue" and use funds "on the improvements that [will] best meet local needs, whether highway projects or public transit projects." *Statement by President George Bush Upon Signing H.R. 2950*, 1991 U.S.C.C.A.N. 1865 (Dec. 18, 1991).

The VPPP directs that the Secretary of Transportation "*shall* solicit" State and local government participation in "value pricing pilot programs," and therefore may "enter into" agreements with project sponsors to "establish, maintain, and monitor congestion pricing projects," and "to allow the use of tolls" as "part of a pilot program under this section." VPPP, cls. 1, 4 (emphasis added).[5]  Again, to be clear, the VPPP permits tolls "[n]otwithstanding sections 129 and 301," and permits project sponsors to use "[r]evenues generated by any pilot project" to fund other "projects eligible under such title," which include transit capital projects eligible for federal assistance. *Id.*, cl. 3; *see also* 23 U.S.C. § 142(a)(2).

Although ISTEA does not define the term "congestion pricing," the concept was then (and is today) understood to include cordon pricing.  In fact, cordon pricing was the *prototype* of congestion pricing, originating with Columbia economist William S. Vickrey, who testified before Congress in 1959 that congestion pricing should be "applied to the street and highway system [in New York City] as a whole, and not merely to bits and pieces of it" because, if tolls were "only on selected facilities, such as on the bridges, tunnels, and parkways in the New York area," it might only have the unintended consequence of rerouting traffic.  SAC ¶ 55.  Indeed, when ISTEA was

---

while the motion is *sub judice*, for the sake of convenience we refer in this memorandum to the allegations in the proposed Second Amended Complaint.

[5] In a separate section, ISTEA directs states to consider "the use of innovative mechanisms for financing projects, including … congestion pricing."  ISTEA § 1025(a).

DOT_0047737

enacted in 1991, Singapore had already successfully operated cordon pricing for over 15 years. *See id.* ¶¶ 72-79 (describing legislative history). And as FHWA explained to Congress shortly after ISTEA was enacted, the agency understood that the "potential scope of congestion pricing applications [under the VPPP] can vary widely, ranging from pricing on a new or existing single road facility to more comprehensive *area-wide road pricing strategies*." *Id.* ¶ 77 (emphasis added).

In the decades since the VPPP was enacted, during which Congress has amended the statute several times (in 1995, 1998, and 2005), *id.* ¶ 73,[6] Congress and FHWA have continued to understand congestion pricing to include cordon pricing. FHWA, for example, has repeatedly concluded that "areawide pricing" should merit the "highest priority for Federal support" under the VPPP because such programs are often the most effective at reducing congestion. *Id.* ¶ 79. FHWA has reiterated this interpretation in notices published to the Federal Register, *id.*, official guidance documents, *id.* ¶ 90, and reports to Congress, *id.* ¶¶ 79-81. FHWA has also authorized federal funds under the VPPP for numerous cordon pricing studies, including in Fort Myers Beach, Florida in 2001 and 2002, *id.* ¶ 82; downtown San Francisco in 2005, *id.* ¶ 88; downtown Los Angeles in 2011, *id.* ¶ 92; and Treasure Island in San Francisco in 2012, *id.* ¶ 94[7]

In fact, in 2007, FHWA agreed to award New York City $5 million in VPPP funding to consider a cordon pricing scheme in which all vehicles entering Manhattan south of 86th Street would be tolled. *Id.* ¶ 86. Speaking before Congress, the FHWA Administrator at the time described cordon pricing in Manhattan as the "best idea" he had heard for managing congestion,

---

[6] Pub. L. 104-59, § 325(e) (Nov. 28, 1995); Pub. L. 105-178, § 1216(a) (June 9, 1998); Pub. L. 105-206, § 9006(b) (July 22, 1998); Pub. L. 109-59, § 1604(a) (Aug. 10, 2005).

[7] In 2021, the Utah Department of Transportation submitted an Expression of Interest for a project aimed at reducing congestion at Little Cottonwood Canyon, including a cordon pricing component. SAC ¶ 97. FHWA noted this project in its most recent report to Congress on the VPPP submitted in 2023. *Id.*

11

and explained that "the beauty of this program is whatever we invest in now … this congestion pricing will throw off about $300 million a year to finance such things as a $6 billion or $7 billion 2nd Avenue subway, more Express Bus service, and all those things so the commuters and everybody else can get to work in a lot less time." *Id.* ¶ 87. Even now, FHWA's website continues to make clear that cordon pricing is a permissible use of VPPP tolling authority. *Id.* ¶ 98.

### D. The parties complete the years' long NEPA process and FHWA and the Project Sponsors execute the VPPP Agreement

In reliance on Defendants' representations in late 2020 to proceed under the VPPP, the Project Sponsors commenced a four-year environmental review process under NEPA that culminated in 2024. *See Mulgrew*, 750 F. Supp. 3d at 189-95. The final environmental authorization, the Second "Re-Evaluation" issued by Defendants at the end of November 2024, recognizes that the Program's tolling schedule would "be implemented through a phase-in over six years," with the last toll schedule implemented beginning in 2031, *Chan*, No. 23 Civ. 10365, ECF 129-5 at 8-9, and that the MTA would issue bonds to generate the $15 billion mandated under the TMA based on $500 million to $900 million per year in toll revenues, *id.* at 15.

On November 21, 2024, FHWA and the Project Sponsors signed the VPPP Agreement authorizing the Program's collection of tolls from eligible vehicles entering the CBD pursuant to the VPPP. Declaration of Brandon Trice ("Trice Decl."), Ex. 1 ("VPPP Agreement" or "VPPP Agmt."). The VPPP Agreement states that "[e]ffective on the date of this Agreement, the project is approved as a pilot program" under the VPPP, and TBTA is authorized to "operate the Program as a toll Project in accordance with the provisions of this Agreement and as a value pricing project." *Id.*, cls. 1, 8. FHWA agreed that "the imposition of tolls under this Agreement does not render Federal-aid highways within the State of New York generally ineligible for Federal-aid highway funds where such highways are otherwise eligible under the particular funding program." *Id.*, cl. 5.

12

Consistent with the statute, the VPPP Agreement states TBTA may use "toll revenues received from the operation of the Project" for, among other things, "any other projects eligible for assistance under title 23, United States Code." *Id.*, cl. 2.; *see* VPPP, cl. 3.  It also includes an attachment describing the Program in detail and states that TBTA "will toll vehicles entering the CBD," includes the approved toll rate schedule, and notes that a goal of the Program is to "generate revenue for future transportation improvements."  VPPP Agmt., Attach. A.

The VPPP Agreement does not include any provision authorizing FHWA to terminate the agreement unilaterally, as the Secretary has purported to do here.  Just the opposite: it specifies that only TBTA could unilaterally decide to discontinue the Program, requiring the Project Sponsors to "work with FHWA to return the Project to its original operating condition *if TBTA* decides to discontinue tolls on the Project." *Id.*, cl. 11 (emphasis added).  The VPPP Agreement further provides, consistent with the VPPP, that TBTA and NYCDOT shall "monitor and report on the project performance" for "a period of at least ten years or to the end of the life of the Project, whichever is sooner." *Id.*, cl. (8)(b); *see* VPPP, cl. 5.  And it reflects the three phases of tolling, with the last increase occurring in 2031—six years from now.  VPPP Agmt., Attach. A.

After the courts rejected numerous attempts to stop the Program, congestion pricing went into effect on January 5, 2025.[8]  Although the full benefits of the Program have yet to be realized, it has already proven to be a dramatic success, creating measurable improvements in travel times,

---

[8] *See Chan*, 2024 WL 5199945 (111-page decision denying motions for preliminary injunctions in four related cases); *see also Cnty. of Rockland v. Metro. Transp. Auth.*, No. 24A945 (S. Ct. Apr. 8, 2025) (Sotomayor, J., in chambers); *Cnty. of Rockland v. Metro. Transp. Auth.*, No. 24-3325 (2d Cir. Jan. 28, 2025), ECF 31 (per curiam); *New Jersey v. Metro. Transp. Auth.*, No. 1033 (3d Cir. Jan. 4, 2025), ECF 9 (Bibas, J.); *Cnty. of Rockland v. Metro. Transp. Auth.*, No. 24 Civ. 2285 (S.D.N.Y. Jan. 14, 2025), ECF 56 (Seibel, J.); *New Jersey v. U.S. Dep't of Transp.*, No. 23 Civ. 3885 (D.N.J. Jan. 3, 2025), ECF 212 (Gordon, J.); *Cnty. of Rockland v. Triborough Bridge & Tunnel Auth.*, No. 24 Civ. 2285 (S.D.N.Y. Dec. 23, 2024), ECF 52 (Seibel, J.); *Neuhaus v. Triborough Bridge & Tunnel Auth.*, No. 24 Civ. 3983 (S.D.N.Y. Dec. 23, 2024), ECF 44 (Seibel, J.).

DOT_0047740

traffic congestion, and the overall quality of life for those who live, visit and work in the CBD. *See* C. de Cerreño Decl. ¶¶ 25-27, 41.

      **E.**      **The Administration purports to "terminate" the VPPP Agreement based on spurious and transparently pretextual arguments**

      Despite the Program's success and its growing support, President Trump has remained a stubborn and vocal opponent.  Even before the Program began, in May 2024, then-candidate Trump posted to social media that he would "TERMINATE Congestion Pricing in my FIRST WEEK back in Office!!!!"  Trice Decl., Ex. 2.  In January 2025, Representative Nicole Malliotakis posted on X that then-candidate Trump informed her during a meeting with New York and New Jersey Republicans that he "wants to … kill congestion pricing."  *Id.*, Ex. 3.

      On February 19, President Trump followed through on trying to "kill" the Program, declaring on X that "CONGESTION PRICING IS DEAD. …  LONG LIVE THE KING."  *Id.*, Ex. 4.  To effectuate this "royal decree," that same day, Defendant Duffy sent a letter to Governor Hochul purporting to withdraw Defendants' approval of the Program and rescind the VPPP Agreement.  *Id.*, Ex. 5 (the "February 19 Letter" or "Feb. 19 Ltr.").  As grounds for the purported recission, Duffy asserted that the VPPP is "a limited exception" to Section 301 that must be "narrowly construe[d]," and that the VPPP, through "the vague phrase 'value pricing pilot program,'" does not "authorize the unprecedented and consequential step of cordon pricing."  *Id.* at 2-3.  Duffy further claimed that the VPPP does not authorize tolls "that are calculated based on considerations separate from reducing congestion or advancing other road-related goals."  *Id.* at 3. The February 19 Letter fails to acknowledge that FHWA has for many decades interpreted the VPPP to permit cordon pricing, and that such projects can and should have a revenue objective, including one that supports public transit projects.  *See supra* at Background Section C; SAC ¶ 26. Duffy did not cite any statutory, regulatory, or other basis to terminate the VPPP Agreement.

DOT_0047741

**F.    Plaintiffs bring suit and Defendants attempt to coerce compliance by
threatening to illegally withhold federal approvals and funding**

Plaintiffs commenced this action the same day the February 19 Letter was issued, seeking
a declaratory judgment that Defendants' purported termination of the VPPP Agreement is unlawful
and without effect, and seeking vacatur of that decision.  The MTA and TBTA further stated that
congestion pricing would "continue … as required by New York law until and unless" a court
orders otherwise.  ECF 1 ¶ 120.

The next day, February 20, Defendant Shepherd sent a letter to the Project Sponsors
demanding that they "cease the collection of tolls" by March 21.  Trice Decl., Ex. 6.  The day
before that deadline, on March 20, Duffy posted on X that the continued operation of the Program
exhibited "disrespect towards the federal government" and was "unacceptable." *Id.*, Ex. 7.  The
Secretary threatened to leverage federal funding to compel compliance, stating: "Know that
billions of dollars the federal government sends to New York are not a blank check.  Continued
noncompliance will not be taken lightly." *Id.*  That same day, Shepherd sent a second letter stating
that Duffy had directed her to "extend the period of time to comply by 30 days" and instructing
that tolling cease by April 20.  *Id.*, Ex. 8.  During an April 2 meet and confer, counsel for the MTA
and TBTA asked if Defendants intended to take any action to enforce the April 20 "deadline" set
forth in Shepherd's March 20 letter, so that the parties and the Court could set an orderly briefing
schedule.  ECF 49 at 4.  Counsel for Defendants responded that they "did not have information to
provide." *Id.*  Notwithstanding this representation, on April 8, USDOT posted another threat on
X, warning that the agency "will not hesitate to use every tool at our disposal in response to non-
compliance later this month."  Trice Decl., Ex. 9.

DOT_0047742

### G.   Defendants threaten unlawful "compliance" measures, dramatically altering the status quo

On April 18, the MTA, TBTA, NYSDOT, and NYCDOT filed their 111-page consolidated first amended complaint, ECF 62, setting out in detail why the February 19 Letter's claimed legal rationales for seeking to terminate the VPPP Agreement are without merit, and alleging that the purported rescission is invalid and based on transparently pretextual reasoning.

Three days later, on April 21, Duffy sent another letter to Governor Hochul demanding for the third time that she end the Program.  Trice Decl., Ex 10 ("April 21 Letter" or "Apr. 21 Ltr.").  At the outset, the April 21 Letter affirmed Defendants' position that the VPPP Agreement had already been "terminated" by the February 19 Letter.  *Id.* at 1.  But in apparent recognition of the weaknesses in that letter, Duffy attempted to recast the federal government's reasoning, claiming that the February 19 Letter also rested on several policy rationales, including that the Program "imposes a disproportionate financial hardship on low and medium-income hardworking American drivers," and that "there are no toll-free alternative routes available to access the cordoned-off area of Manhattan."  *Id.* at 2-3.  While the February 19 Letter did note that Defendants' review of the Program's eligibility was prompted by their disagreement on policy grounds, the February 19 Letter is clear that Defendants' purported termination of the VPPP Agreement rested on their legal interpretation of the VPPP.  Feb. 19 Ltr. at 3.  What's more, Defendants' alleged "policy concerns" are fatally undermined by their own extensive findings that congestion pricing would benefit low- and medium-income people, including by facilitating mass transit opportunities and reducing congestion on the roads, as well as the discount for frequent low-income drivers to the CBD built into the Program.[9]

---

[9]   *See*  Final  EA  Chapter  6,  Economic  Conditions  at  6-47–49,  6-80–84  (Apr.  2023), https://www.mta.info/document/110831; Final EA Chapter 17, Environmental Justice at 17-62, 17-67–72 (Apr. 2023),

DOT_0047743

The April 21 Letter goes on to threaten that Defendants "*will* implement appropriate initial compliance measures" on or after May 28, 2025 if New York continues to operate the Program, citing 23 C.F.R. § 1.36, a regulation enacted pursuant to the FAHA that sets forth FHWA's potential enforcement mechanisms to ensure compliance with the law. *Id.* at 2 (emphasis added). These "compliance measures," according to Duffy, include the broad suspension of federal approvals for transportation projects, which would result in the withholding of federal transportation funding in many instances. Specifically, the April 21 Letter threatens to suspend: (1) "further advance construction ('AC') authorizations," (2) "further [NEPA] approvals," (3) "further approvals of Statewide Transportation Improvement Program ('STIP') amendments concerning New York Metropolitan Transportation Council TIP modifications," and (4) "further obligations of FHWA funds (both formula and competitive) for projects within New York City." *Id.* The April 21 Letter further threatens that those measures may be extended "to other geographic areas within the State of New York." *Id.*

The STIP is "a comprehensive list of all projects or project phases in New York State proposed to receive Federal funding pursuant to Title 23 [(highways)] and 49 [(transit)] U.S.C. Chapter 53," and includes all highway, transit and non-motorized projects" requiring Federal aid from across urban and rural parts of the state.[10]  NYSDOT is responsible for updating New York's STIP, which includes Transportation Improvement Programs ("TIPs") from each of the state's fourteen Metropolitan Planning Organizations ("MPOs").[11]  The STIP is updated every four years,

---

https://www.mta.info/document/110886 (describing "substantial benefits associated with reduced vehicle congestion in the Manhattan CBD" and measures designed to lessen impacts on low-income drivers).

[10] NYSDOT, STATE TRANSPORTATION IMPROVEMENT PROGRAM SUMMARY, https://www.dot.ny.gov/programs/stip/files/2023_STIP_Narrative.pdf.

[11] The New York Metropolitan Transportation Council ("NYMTC") is the MPO for New York City, Long Island, and the Lower Hudson Valley, including Westchester, Putnam, and Rockland counties—a region with more than 13 million residents. *About Us*, NYMTC, https://www.nymtc.org/en-us/ (last accessed May 1, 2025).

DOT_0047744

and is amended frequently to reflect projects newly proposed for federal funding. Declaration of Kevin Willens ("Willens Decl.") ¶ 23. FHWA and FTA, which oversees federal transit funding, must jointly approve each STIP and STIP amendment submitted to them by NYSDOT, and only projects in a STIP or STIP amendment approved by both FHWA and FTA "are eligible for funds administered by the FHWA or the FTA." 23 C.F.R. §§ 450.220(a), 450.222(a). Accordingly, the threat not to provide further approvals of STIP amendments encompasses all federal funding to the Project Sponsors for projects not included in the STIP.

The breadth of harm is enhanced by the threatened withholding of any advance construction authorizations. Advance construction, provided for in 23 U.S.C. § 115, allows states to obtain federal authorization for projects on the STIP while not yet allocating federal funding to the project, and to later convert the project to a Federal-aid project.[12] And the withholding of NEPA "approvals"—which are needed for "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), or to determine that a project will not have significant effects, *id.* § 4336—could include even non-federally funded projects that require federal authorization, as did the Program. Finally, the April 21 Letter threatens to withhold all "further obligations of FHWA funds (both formula and competitive) for projects within New York City." The April 21 Letter does not explain the Secretary's authority to take any of these enforcement measures, beyond citing 23 C.F.R. § 1.36 (which does not authorize the Secretary to deem the Program "illegal," let alone impose the sweeping "compliance measures" on account of its continued operation), and it does not cite any basis for these threatened actions other than the continued operation of the Program.

---

[12] See FHWA, *Advance Construction and Partial Conversion of Advance Construction*, https://www.fhwa.dot.gov/ipd/finance/tools_programs/federal_aid/ac_pcac/, last accessed May 4, 2025.

DOT_0047745

The threatened enforcement measures, if taken, would deprive Plaintiffs and NYCDOT of access to federal transportation funds, or the ability to initiate any new projects, shutting down critical transportation investment in the nation's largest city.  *See* Willens Decl. ¶ 24 (noting loss of STIP approvals would jeopardize funding for subway and bus maintenance, and railroad track work, as well as other future projects requiring FTA funding); *id.*  ¶¶ 25-26 (describing projects currently funded by FHWA dedicated to improving air quality and funding accessibility upgrades to public transportation infrastructure).  And they would similarly deprive NYSDOT and NYCDOT of funding for vital projects, thereby harming MTA's ability to provide safe and reliable bus service on City streets.  *Id.* ¶ 30; *see also* Declaration of William Carry ("Carry Decl.") ¶¶ 8-10 (explaining how withholding of advance construction authorizations and NEPA and STIP approvals would reduce NYCDOT's project funding flexibility and halt many projects).

Defendants have left no doubt that they intend to impose "compliance measures" on May 28 if Plaintiffs and NYCDOT do not end congestion pricing.  On April 24, a spokesperson for the USDOT stated, "if New York doesn't shut it down, the Department of Transportation is considering halting projects and funding for the [S]tate."[13]  On April 29, Duffy took to TV to criticize the Program, telling the hosts of *Good Day New York* that if Plaintiffs and NYCDOT do not "treat those who want to come into Manhattan fairly, maybe we should look at how much money we send the City.  And that's what the Governor [of New York] is going to have to grapple with."[14]  That same day, counsel for Plaintiffs requested that Defendants agree not to take any enforcement action or postpone the April 21 Letter's deadlines.  Defendants responded by

---

[13] Peter Senzamici, *Feds Accidentally Upload Internal Memo Admitting Plan to Kill NYC Congestion Pricing Is 'Very Unlikely' to Succeed—Before Quickly Deleting It*, N.Y. POST (Apr. 24, 2025), https://nypost.com/2025/04/24/us-news/fed-lawyers-cast-doubt-on-duffys-dubious-congestion-kill/.

[14] Good Day New York, WNYW-NY (FOX) (Apr. 29, 2025), https://mms.tveyes.com/PlaybackPortal.aspx?SavedEditID=ab76562d-0726-4d6b-bcc4-f28ef11d100b.

DOT_0047746

reiterating their coercive threats, claiming that the termination and schedule for "compliance measures" remain in place, but taking the position that, because "administrative proceedings" are ongoing, Plaintiffs are precluded from seeking any relief from this Court. ECF 73.

## LEGAL STANDARD

Plaintiffs are entitled to preliminary injunctive relief because they have shown that "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest." *New York v. U.S. Dep't of Educ.*, 477 F. Supp. 3d 279, 293 (S.D.N.Y. 2020). Where, as here, the federal government is the opposing party, the last two factors merge. *Id.* at 294 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence." *Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016) (quoting *Johnson v. Newport Lorillard*, 2003 WL 169797, at *1 (S.D.N.Y. 2003).[15] Courts in this district recognize that preliminary injunctions are essential tools "to preserve the status quo by preventing during the pendency of the suit the occurrence of that irreparable sort of harm which the movant fears will occur." *New York v. Rescue*, 705 F. Supp. 3d 104, 118 (S.D.N.Y. 2023).

## ARGUMENT

The Court should preliminarily enjoin Defendants from taking any of the actions outlined in the April 21 Letter or any other actions in retaliation for Plaintiffs' refusal to comply with their unlawful demand to stop congestion pricing. Defendants have no valid basis to implement "compliance measures" because the Program is authorized by the VPPP Agreement. The February

---

[15] The Court is currently considering whether Defendants have waived privilege over a document that was filed to the public docket and, according to news reports, establishes that Defendants' stated rationales for terminating the VPPP Agreement are pretextual. ECF 72. Should the Court find that Defendants waived privilege, Plaintiffs respectfully request permission to submit a supplemental letter, limited to three pages, addressing this highly relevant evidence.

DOT_0047747

19 Letter "terminating" the VPPP Agreement rests on pretextual and borderline frivolous legal arguments, to which the Court owes no deference. Secretary Duffy's "policy concerns" are unavailing; they are not only irrelevant as a matter of law but illegal, *post hoc* justifications, and Duffy has no authority to terminate the VPPP Agreement on his own. Even if Defendants' actions with respect to the VPPP Agreement were lawful, that would not entitle them to withhold funds or approvals consistent with either the FAHA or the U.S. Constitution, and those threatened actions would not only cause irreparable harm, but would be against the public interest.

I. **Plaintiffs are likely to succeed on the merits**

A. **The Court has jurisdiction**

As an initial matter, this Court has jurisdiction over this case under 28 U.S.C. § 1331 because Plaintiffs assert federal constitutional, equitable, and statutory claims. With respect to Plaintiffs' Administrative Procedure Act ("APA") claims, the Court may grant relief under 5 U.S.C. §§ 702 and 705 based on the "source of the rights upon which the plaintiff bases its claims," and the "type of relief sought." *Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 403 (2d Cir. 2017). Plaintiffs seek to vindicate their statutory and constitutional rights, and—since we seek declaratory and injunctive relief and vacatur, not monetary damages—this case is at core a challenge to Defendants' wrongful rescission of the VPPP Agreement, purported "termination" of the Program, and attempt to coerce compliance through the unlawful withholding of critical federal approvals for transportation projects. Although enjoining Defendants' latest attempts to coerce compliance with the February 19 Letter would result in the issuance of certain federal approvals, and lead to funds being released to Plaintiffs, that is insufficient to divest the Court of jurisdiction to afford relief under the APA or the Constitution. *See Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988); *see also Aetna Cas. & Sur. Co. v. United States*, 71 F.3d 475, 478 (2d Cir. 1995) (recognizing distinction between (1) claims "for damages to compensate for the government's failure to perform

21

DOT_0047748

a duty," and (2) claims seeking "to require the government to perform its duty"); *Linea Area Nacional de Chile S.A. v. Meissner*, 65 F.3d 1034, 1042 (2d Cir. 1995) (APA jurisdiction where plaintiff sought reimbursement of its expenses because the statute required government to reimburse parties such as the plaintiff).

While we expect that Defendants may raise it, *Department of Education v. California* is not inconsistent with these principles.  145 S. Ct. 966 (2025) (per curiam).  There, the "terms and conditions of [109] individual grant awards [were] at issue," *California v. Dep't of Educ.*, 132 F.4th 92, 96-97 (1st Cir. 2025), and the plaintiffs fundamentally sought "to enforce a contractual obligation to pay money" and "represented … that they ha[d] the financial wherewithal to keep their programs running," *California*, 145 S. Ct. at 968-69.  Here, Plaintiffs first and foremost challenge Defendants' improper agency actions of rescinding approval under the VPPP, a challenge that unquestionably does not fall with the Tucker Act's exclusive-jurisdiction provision. Plaintiffs also seek to enjoin Defendants' sweeping (and retaliatory) attempts to enforce the February 19 termination by withholding certain necessary federal approvals.  Plaintiffs are not relying on any federal funding agreements as a source of rights.  As numerous courts have recognized since *California*, challenges like this are properly heard by the federal district courts. *See, e.g.*, *New York v. Trump*, 2025 WL 1098966, at *1-2 (D.R.I. Apr. 14, 2025); *Maine v. U.S. Dep't of Agric.*, --- F. Supp. 3d ---, 2025 WL 1088946, at *19 & n.8 (D. Me. Apr. 11, 2025).  It would neither make sense nor be consistent with basic principles of substantial justice if the federal government could divest a district court of jurisdiction in a pending case simply by threatening to withdraw some aspect of the plaintiff's federal funding.

Despite Defendants' assertions to the contrary, the instant motion is also ripe for resolution. While Defendants in their April 21 Letter have purported to keep the door open by issuing an order

DOT_0047749

to "show cause … why FHWA should not take appropriate steps under 23 CFR § 1.36 to remedy New York's noncompliance with 23 U.S.C. § 301 in connection with the [Program.]," Apr. 21 Ltr. at 1, there is no serious question that: (i) Defendants have already determined that the Program is not compliant with Section 301; and (ii) they "will" therefore take some or all of the compliance measures identified in the April 21 Letter, *id*. at 2. Indeed, in the April 21 Letter, Secretary Duffy reiterates that in the February 19 Letter, he "terminated" the VPPP Agreement (past tense), that "New York therefore is not legally permitted to collect tolls…," *id.* at 1,[16] and that "New York risks serious consequences if it *continues* to fail to comply with Federal law…," *id.* (emphasis added).

As in *Sackett v. EPA*, 566 U.S. 120 (2012), Defendants' February 19 Letter and compliance orders constitute "final agency action" because they have "all of the hallmarks of APA finality," including that "legal consequences will flow from issuance of the order." *Id.* at 127. It does not matter that Defendants may (putatively) invite Plaintiffs and Plaintiff-Intervenors to "engage in informal discussion of the terms and requirements" or "inform" Defendants of any errors in their understanding of the facts and the law. The mere possibility that an agency might reconsider in light of informal discussion and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal." *Id.* Judge Howell reached a similar conclusion in the case involving the Executive Order issued against the law firm Perkins Coie. *See Perkins Coie LLP v. U.S. Dep't of Just.*, --- F. Supp. 3d ---, 2025 WL 1276857, at *24-25 (D.D.C. May 2, 2025) (challenge was ripe because "whatever the exact guidance ultimately issued," "access of employees of Perkins Coie to federal buildings and government employees will be 'limit[ed]' as a

---

[16] Moreover, although Duffy claims to provide "notice" and an "opportunity to contest" under 2 C.F.R. § 200.342 in the April 21 letter, this opportunity came weeks *after* the February 19 termination of the VPPP Agreement. *See Climate United Fund v. Citibank, N.A.*, 2025 WL 842360, at *2 (D.D.C. Mar. 18, 2025) (explaining that the OMB Regulations require an agency to "take certain procedural steps *before* it can terminate a federal award").

23

result"). Indeed, this case is on even firmer footing than *Sackett* because Defendants are not asking for further information from Plaintiffs to determine whether they are "confident enough about [their] conclusion to initiate litigation." *Id.* After all, they already have it—Plaintiffs and Plaintiff-Intervenors have spelled out in the Amended Complaint why the purported termination of the VPPP Agreement is unlawful. First Amended Complaint ¶¶ 49-176; *see also* SAC ¶¶ 51-178.

Moreover, even if Defendants were implying that they would re-open their determination that the Program is invalid—and they have not—it could hardly be clearer under the circumstances that any further consideration would be completely pretextual. The April 21 Letter itself reiterates that the VPPP Agreement *was terminated*, so any suggestion that said termination is being reconsidered would be in "name only." *Mantena v. Hazuda*, 2018 WL 3745668, at *6 (S.D.N.Y. 2018) (declining to find "re-opening" of immigration proceeding rendered agency action non-final where "circumstances of reopening [were] suspect" because government did not "identif[y] issues with the original decision [or] areas that warranted further evidentiary development" and government acted just nine days after plaintiff filed amended complaint).

### B.     The February 19 Letter is arbitrary and capricious

The February 19 Letter, which serves as the purported basis for Defendants' actions, is entirely inconsistent with the statutory scheme it seeks to enforce, and arbitrarily announces an atextual interpretation of the FAHA in violation of the APA. The VPPP, by its plain terms, authorizes both "cordon pricing" and the use of toll revenue to support public transit, and Duffy failed to adequately consider Defendants' own long-held legal positions or Plaintiffs' justifiable reliance on those positions, among other things.

#### 1.     *Cordon Pricing*

In the February 19 Letter, Duffy first and principally argues that 23 U.S.C. § 301 prohibits "tolls" on "roads constructed with Federal-aid highway funds," "subject to limited exceptions,"

24

and because the VPPP's "value pricing pilot program," is such an "exception," it must be "narrowly construe[d]" to exclude "cordon pricing." Feb. 19 Ltr. at 2-3. This is wrong.

To begin with, the VPPP is not an "exception" to Section 301's toll ban. The express "exception" to Section 301 is Section 129, which provides non-discretionary authority for tolling on federal-aid highways under a wide variety of circumstances. *See* 23 U.S.C. § 301 ("Except as provided in Section 129…"); *id.* § 129 (setting forth various circumstances in which federal-aid highways may be tolled). The VPPP, on the other hand, is an additional, stand-alone program that Congress created for project sponsors to consider potential "value pricing pilot projects," in which the Secretary "shall solicit" participation. VPPP, cl. 1. To that end, the VPPP states that "*[n]otwithstanding* section 129 and 301," tolling is permitted for "value pricing pilot programs." *Id.*, cls. 2, 4. As the Supreme Court has recognized, this "notwithstanding" language "shows which of two or more provisions prevails in the event of a conflict." *N.L.R.B. v. SW General, Inc.*, 580 U.S. 288, 302 (2017).[17]

Rather than putting a thumb on the scale, as Duffy does, the proper starting place in interpreting the VPPP is the statutory text, "in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020). Nothing in the plain language of the VPPP suggests that Congress required there to be other toll-free routes that could be used to access the area subject to tolling. To the contrary, the VPPP authorizes tolling as part of "value pricing pilot programs" without limitation. VPPP, cl. 1.

There can be no serious dispute that the VPPP permits a broad set of programs including

---

[17] Even if the VPPP were an "exception" to Section 301, exceptions must be interpreted in the same manner as any other statutory provision. *See, e.g.*, *BP P.L.C. v. Mayor of Balt.*, 141 S. Ct. 1532, 1538-39 (2021) (rejecting argument that court must construe exceptions narrowly and explaining that courts have "no license to give statutory exemptions anything but a fair reading"); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 359 (2012) (rejecting the "false notion" that "tax exemptions—or any other exemptions for this matter—should be strictly construed").

DOT_0047752

cordon pricing. When the VPPP was enacted into law in 1991, the Secretary was directed to solicit participation for "congestion pricing pilot programs," later amended in 1998 to "value pricing pilot programs." *Id.*, cl. 1. While neither term is defined in the statute, at the time of enactment, "congestion pricing" meant a charge (or price) intended to remedy or offset congestion. *See Congestion*, *Cassell Encyclopaedia Dictionary*, 312 (1990) (defined as an "abnormal accumulation (of inhabitants, traffic etc.")); *see also Congestion Charging*, *Black's Law Dictionary* (10th ed. 2014) (defined as "method of reducing traffic in major cities, esp. in city centers, by charging drivers a fee to go beyond a certain point on the roads in the cities"). Nothing in that definition suggests a limitation on the types of congestion pricing programs that may be implemented, much less a ban on "cordon pricing." To the contrary, as noted, the very architect of congestion pricing, Professor Vickrey, proposed cordon pricing as *the way* to cure congestion *in New York* City, given the relatively narrow geography of Manhattan, the solution necessarily involves cordon pricing. *See supra* at 10-11. And by the time the VPPP was enacted, Singapore had successfully operated a cordon pricing system for over 15 years, commonly referred to as a "congestion pricing program." *See, e.g.*, Paul W. Wilson, *Welfare Effects of Congestion Pricing In Singapore*, 15 TRANSP. 191, 191 (1988).

This common and contemporaneous understanding of the term "congestion pricing" persisted over the next three decades, as Congress reauthorized the VPPP in 1995, 1998, and 2005. Shortly after the passage of ISTEA in 1991, Congress asked FHWA how it defined the term "congestion pricing" in the VPPP, and FHWA responded as follows: the "potential scope of congestion pricing applications can vary widely, ranging from pricing on a new or existing single road facility to more comprehensive *area-wide road pricing strategies*." SAC ¶ 69 (emphasis added). From there, FHWA consistently understood congestion pricing to encompass—and in fact

DOT_0047753

quintessentially cover—cordon pricing, and the agency even funded multiple cordon pricing studies under the VPPP.  *See supra* at 11-12; SAC ¶¶ 82, 88, 92, 94.  Far from limiting project sponsors to any particular methodology, Congress continued to allow experimentation, which after all was the whole point of the VPPP in the first place.  *See supra* at 10-11; SAC ¶ 72.  Thus, the "contemporary legal context" in which Congress acted demonstrates that the ordinary meaning of "congestion pricing" included cordon pricing.  *Fiero v. Fin. Indus. Regul. Auth., Inc.*, 660 F.3d 569, 577 (2d Cir. 2011); *see also Wash. All. of Tech. Workers v. D.H.S.*, 50 F.4th 164, 182 (D.C. Cir. 2022) ("If Congress has continually declined to disturb a longstanding interpretation of a statute," it indicates Congress "at least acquiesces in, and apparently affirms, that interpretation").

Not surprisingly, this construction is supported by the broader statutory context as well. ISTEA is rife with limitations and specific definitions where Congress intended them, but there are no such limitations for the VPPP.  For example, in creating the Suspended Light Rail System Technology Pilot Program, Congress described certain characteristics that any such program "shall" have.  ISTEA § 3030(c)(3).  The VPPP contains no such limitation: at most, beyond the broad authorization to enter into "value pricing pilot programs," it requires the Secretary to "monitor" the "effects such programs are having on driver behavior, traffic volume, transit ridership, air quality, and availability of funds for transportation programs," which requirements reflect a general focus on objectives like reducing congestion through reducing traffic and promoting other forms of transportation.  VPPP, cl. 5.  After all, this is not just the common understanding of Congress; it is simply common sense.

To the extent there were any doubt, the fact that everyone always understood that congestion pricing encompassed cordon pricing is supported by the "mischief the statute sought to remedy," *Carroll v. Trump*, 49 F.4th 759, 770-71 (2d Cir. 2022), as well as the legislative history,

DOT_0047754

*Spadaro v. U.S. C.B.P.*, 978 F.3d 34, 46 (2d Cir. 2020).  Indeed, during hearings leading to the passage of ISTEA, the bill's sponsor, Senator Daniel Patrick Moynihan, described Singapore as a "particularly interest[ing]" method of "congestion pricing," and agreed that cordon pricing was a promising method of congestion pricing, explaining, "Singapore is doing it, Hong Kong is doing it, we are talking about it."  SAC ¶ 74.  Likewise, in passing the Clean Air Act Amendments of 1990, Congress was clear that "transportation control measures" under that statute should include tolling vehicles "to enter central business districts."  *Id.* ¶ 75.  Again, Congress has repeatedly said the point of the VPPP was to encourage *experimentation* in order to curb congestion.  *Id.* ¶ 74.

Duffy's reliance on 23 U.S.C. § 129(d)(4)(B) doesn't work either.  Feb. 19 Ltr. at 3.  For one thing, Section 129(d), which establishes the "Congestion relief program," was enacted as part of the 2021 Infrastructure Jobs and Investment Act, and as a later law that is separate from the VPPP, it has no relevance to the meaning of the VPPP.  *Gutierrez v. Ada*, 528 U.S. 250, 257-58 (2000) ("[L]ater laws that do not seek to clarify an earlier enacted general term and do not depend for their effectiveness upon clarification, or a change in the meaning of an earlier statute, are beside the point in reading the first enactment.").  Regardless, the fact that Congress described projects eligible for funding under that program to include "deployment and operation of a system that implements or enforces high occupancy vehicle toll lanes, cordon pricing, parking pricing, or congestion pricing," hardly shows that the "value pricing pilot program" under the VPPP excludes "cordon pricing."  Again, the VPPP broadly refers, without limitation, to "value pricing," which has always been understood to include cordon pricing.[18]  If anything, the list of examples in

---

[18] *See* Elena Safiorva et al., *Choosing Congestion Pricing Policy: Cordon Tolls Versus Link-Based Tolls*, 1932 J. OF TRANSP. RSCH. BD. (2005) ("Distributional effects of cordon and link-based tolls are also examined in the hope of understanding why one scheme might be preferred over another.").

DOT_0047755

Section 129(d) again reflects Congress's understanding of the diverse, non-exclusive methods that are encompassed under the umbrella term "congestion pricing."

### 2.   Revenue Objectives

Duffy also claims that tolls cannot be "calculated based on considerations separate from reducing congestion or advancing other road-related goals." Feb. 19 Ltr. at 3. He then goes on to chastise the Program (which Defendants approved) for being "driven primarily by the need to raise revenue for the Metropolitan Transit [sic] Authority as opposed to the need to reduce congestion." *Id.*[19] But this second rationale in the February 19 letter is just as invalid.

First of all, the VPPP authorizes tolls on federal-aid highways. It therefore follows that "raising revenue" is a permissible function of a VPPP program—that, of course, is what tolls do. And while Duffy appears to take issue with the particular toll rates of the Program, nothing in the VPPP statute imposes limits on those rates. Moreover, the statute explicitly provides that "[r]evenues generated" may be used to fund other transportation "projects eligible under" Title 23, including capital transit projects. VPPP, cl. 4; *cf.* 23 U.S.C. § 129(d)(6)(B) (setting specific limits on toll rates for separate "congestion relief program"). As this Court has explained, and as Duffy is compelled to concede, *see* Feb. 19 Ltr. at 3, the statutory text makes it "unmistakably clear" that "a public authority [is] permitted to collect funds that exceed a toll road's costs and spend those funds on non-toll road projects," *Chan*, 2024 WL 5199945, at * 17.

---

[19] Duffy is mistaken in claiming that raising revenue is the "primary" driver of the Program. Feb. 19 Ltr. 3. The Program has complementary goals of congestion reduction and providing MTA with a stable funding source, with the latter also supporting congestion reduction by helping travelers shift modes from driving to transit. *See* N.Y. Veh. & Traf. Law § 1701. These dual goals were reflected in the EoI, *see* C. de Cerreño Decl., Ex. B, at 3-4, and the purpose and need for the Program was developed in consultation with FHWA, *see* SAC ¶¶ 116-24. Indeed, FHWA previously acknowledged and defended these complementary objectives in filings before this Court. *See Chan*, ECF 65 at 6, 9; *Chan*, ECF 160 at 8. Duffy's clear factual error is another reason to find the February 19 Letter invalid. *See New York v. H.H.S.*, 414 F. Supp. 3d 475, 545, 577 (S.D.N.Y. 2019) (where agency's stated justification for undertaking rulemaking was "factually untrue," that "alone made the agency's decision … arbitrary and capricious").

DOT_0047756

Duffy's position on revenue generation is also undermined by the rest of the VPPP.  Far from prohibiting consideration of revenue, Congress anticipated and even required States to consider using excess revenues from congestion pricing programs as a funding source for public transportation.  VPPP, cl. 4.  The VPPP instructs the Secretary to report to Congress "every 2 years on the effects" that VPPP programs "are having on … transit ridership, air quality, and *availability of funds for transportation programs*."  *Id.*, cl. 5 (emphasis added).  And, in a separate section of ISTEA, Congress directed that States "shall undertake a continuous transportation planning process," which "shall" consider "the use of innovative mechanisms for financing projects, including … tolls [and] congestion pricing."  ISTEA § 1025(a).  This, of course, is in keeping with the broader intent of ISTEA, which was enacted to "develop a National *Intermodal* Transportation System" consisting "of all forms of transportation in a unified, interconnected manner," *id.* § 2 (emphasis added), and to grant "states greater flexibility to operate toll facilities and use toll revenues for a variety of transportation projects" including congestion pricing.  *Chan*, 2024 WL 5199945, at *33; *see also* SAC ¶ 64-78 (collecting legislative history establishing Congress intended to permit the use of tolls to fund public transit programs).

The courts "do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply."  *Mendis v. Filip*, 554 F.3d 335, 340 n.5 (2d Cir. 2009) (quoting *Jama v. I.C.E.*, 543 U.S. 335, 341 (2005)).  This is particularly true where, as here, the federal government's proposed interpretation of a statute would curtail an area "of traditional State responsibility" like public transportation systems such as buses or subways.  *Bond v. United States*, 572 U.S. 844, 858-59 (2014) (Congress must provide a "clear statement" if it seeks to "override the usual constitutional balance of federal and state powers"); *see also Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 715 (1972) (describing

DOT_0047757

States' traditional authority over road tolls). Congress knows how to specify the factors that should or should not be considered in connection with projects authorized under Title 23, and it did not include any prohibition on the consideration of revenue in the VPPP. *See, e.g.*, 23 U.S.C. § 106(a)(4) (cross-referencing 23 U.S.C. § 109); *see also* 49 U.S.C. § 60301(e).

The Second Circuit considered an argument much like Duffy's in *American Trucking Associations, Inc. v. New York State Thruway Authority*, which concerned the use of toll revenue to fund New York's canal system under another tolling provision in ISTEA. 886 F.3d 238, 246 (2d Cir. 2018) (citing ISTEA §1012(e)). There, the Trucking Associations argued that the Thruway Authority's desire to use tolling revenue to fund New York's canal program meant that the challenged tolls were higher than they ought to be, and that Congress, in enacting ISTEA, had "meant to limit the amount" of tolls that could be collected "to fund unrelated projects." *Id.* The Second Circuit rejected this argument, holding that it was "unmistakably clear" that "Congress meant to permit the Thruway Authority to continue collecting tolls of whatever amount" and to use any "surplus revenue" for "other transportation projects." *Id.* Like Section 1012(e), VPPP clause 3 permits toll revenues to be used for "any project eligible for assistance" under Title 23, including capital transit projects, without any limitation on the toll amounts.

Again, the whole point of the VPPP was to encourage experimentation through pilot programs intended to actually *reduce congestion*, and everyone understood that meant an "*intermodal*" approach where other forms of transportation, besides cars, were incentivized and supported. SAC ¶ 67. Given that tolls would generate revenue, it was assumed—and encouraged—that those revenues would go toward other transportation methods to reduce traffic congestion, like buses or subways. And on top of that, Congress acquiesced to FHWA's longstanding interpretation of the VPPP, *see Fiero*, 660 F.3d at 577; *see also S*AC ¶¶ 84-100

31

(collecting examples of FHWA recognizing VPPP permits revenue objective), by amending the VPPP four times without seeking to disturb that interpretation.[20]

### 3.   Defendants' "policy concerns"

After Plaintiffs filed their amended complaint detailing at length the deficiencies in Duffy's statutory analysis on April 18, Defendants realized they needed a new approach, so in their April 21 Letter they sought to recast Duffy's original termination decision as also resting on supposed "policy concerns," including the alleged "disproportionate financial hardship" the Program imposes and the "unconscionable" nature of "highway users" (*i.e.*, drivers on the City's streets) "being forced to bail out the MTA transit system."  April 21 Ltr. at 2-3.  But the February 19 Letter is clear that these policy concerns merely prompted Duffy's legal review, and that his ultimate decision to terminate the VPPP Agreement rests on "two reasons" derived from his interpretation of the VPPP, specifically his conclusions that (1) cordon pricing "is not authorized under Congress' use of the phrase 'value pricing pilot program,'" and (2) the "VPPP does not authorize tolls that are calculated based on considerations separate from reducing congestion."  Feb 19. Ltr. at 3.  Having apparently realized the weaknesses of those justifications, Defendants do not get a second bite at the apple.  Where, as here, an agency issues a memorandum "to elaborate on the reasons" for the initial agency action, offering new and "separate," policy reasons for action already taken, those new reasons "can be viewed only as impermissible *post hoc* rationalizations." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21-22 (2020).  This would

---

[20] The Court does not owe any deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), to the February 19 Letter's abrupt and poorly reasoned reversal of FHWA's longstanding interpretation of the VPPP. *See In re Bernard L. Madoff Inv. Sec. LLC*, 779 F.3d 74, 82 (2d Cir. 2015).  It is perfectly clear that the President set out to "kill" the Program for political reasons and directed Secretary Duffy to manufacture a legal rationale for doing so, so that is what he did. *See supra*.  An agency decision that contradicts an agency's long-held view is entitled "to little, if any, deference." *SEC v. SIPC*, 872 F. Supp. 2d 1, 10 (D.D.C. 2012).  FHWA has for many years had the authority to administer the VPPP, 49 C.F.R. § 1.85(c)(22), and in that capacity, it has consistently and repeatedly concluded that the VPPP permits cordon pricing as well as the consideration of revenue objectives. *See supra* at 10-12; SAC ¶ 27.

32

include elevating policy concerns that were previously cited as commentary in the Feb. 19 letter into supposed legal rationales for the decision to terminate. And, even if these *post hoc* rationalizations could be considered, they are flatly inconsistent (again) with the VPPP itself, which expressly contemplates the use of tolling revenues to promote mass transit as a means of reducing congestion, as well as with the extensive environmental review record in this case, which concluded that the Program will provide substantial benefits to low- and moderate-income commuters.[21] Moreover, even if the Court were willing to entertain Defendants' policy rationales, and even assuming that Secretary Duffy's decision was based on policy and not a legal infirmity in the VPPP Agreement, then the termination of the Agreement without any NEPA review was clearly in violation of law for the reasons explained *infra*, Point I.B.5. In any event, Duffy's concern that "there are no toll-free alternative routes available to access the [CBD]," Apr. 21 Ltr. at 2, and purported belief that this is unprecedented or against preexisting USDOT policy, *see* Good Day New York, *supra* note 14, is unfounded. FHWA has approved tolls on many routes that do not provide for toll-free access, including several here in New York such as on the two I-278 bridges to Staten Island, as well as on two I-190 bridges to Grand Island, leaving no toll-free alternative routes to access either of those destinations. It also defies belief that Duffy (a cabinet member and New Jersey resident) would claim that absent the Program, New Jersey drivers could access the CBD through a toll-free "roundabout way." Though technically true, the only such option would add approximately 300 miles to those drivers' commutes, considering that the closest un-tolled Hudson River crossing is in Albany. In short, Defendants are making it up as they go along—the definition of arbitrary and capricious decision making.

---

[21] *See* Final EA Chapter 6, *Economic Conditions* at 6-47–49, 6-80–84 (Apr. 2023), https://www.mta.info/document/110831; Final EA Chapter 17, *Environmental Justice* at 17-62, 17-67–72 (Apr. 2023), https://www.mta.info/document/110886 (describing "substantial benefits associated with reduced vehicle congestion in the Manhattan CBD" and measures designed to lessen impacts on low-income drivers).

DOT_0047760

4. *Defendants have no right to terminate the VPPP Agreement—regardless of their justification*

Defendants do not have the right to terminate the VPPP Agreement in any event. As noted, the VPPP Agreement itself says nothing about Defendants having a right to terminate. Rather, it refers to *TBTA* alone as having such right. This reflects the parties' understanding that the Program would be long running (unless TBTA decided to end it). The VPPP Agreement expressly refers to: (i) monitoring the Program for at least ten years, (ii) phasing in the tolls over a period of six years, with ongoing tolling thereafter, and (iii) the TMA, which requires TBTA to raise $15 billion through the issuance of long-term bonds. VPPP Agreement cls. 8(b), 11, Attach. A.

Defendants claim a right to terminate under the Uniform Guidance regulations issued by the Office of Management and Budget ("OMB Regulations"), 2 C.F.R. Part 200. But the problem for Defendants is that those regulations actually make clear that if Defendants wanted to have a right to terminate, they were required to say so explicitly in the agreement. *See Singh v. U.S. Dep't of Just.*, 461 F.3d 290, 296 (2d Cir. 2006) ("[A]n administrative agency must adhere to its own regulations."). Indeed, while the OMB Regulations permit unilateral termination by the recipient of an award, *see* 2 C.F.R. § 200.340(a)(3), they do not include a similar provision allowing unilateral termination by an agency.[22] Taken together, these regulations have been interpreted by federal agencies as prohibiting agencies from unilaterally terminating awards, including for policy reasons. *See, e.g.*, *Guidance for Federal Assistance*, 89 Fed. Reg. 30046, 30089 (Apr. 22, 2024).

To be sure, Section 200.340(a)(4) permits termination by the agency when done "pursuant

---

[22] Moreover, under 2 C.F.R. §§ 200.341(a) and 342, even if an agency has a termination right (and Defendants do not), it may terminate a cooperative agreement only after providing the recipient written notice and an opportunity to be heard, which obviously did not occur here. Recognizing their error on that front, Defendants belatedly claimed to provide "notice" and an "opportunity to contest" in the April 21 Letter. But that supposed opportunity came weeks *after* the February 19 termination of the VPPP Agreement. *See Climate United Fund v. Citibank, N.A.*, 2025 WL 842360, *2, 8 (D.D.C. Mar. 18, 2025) (OMB Regulations require agency to "take certain procedural steps *before* it can terminate a federal award" (emphasis added)).

34

to the terms and conditions of the Federal award," and even then, only to "the extent authorized by law."  2 C.F.R. § 200.340(a)(4); *see also* 89 Fed. Reg. at 30089 (revised language of subsection (a)(4) only permits termination due to changes in "agency priorities" where such condition is "included in the terms and condition of the award").  But that only proves our point.  Again, the VPPP Agreement says *nothing at all* in its terms and conditions about Defendants terminating it. In fact, precisely to prevent the sort of "pull out the rug from under them" behavior that Defendants want to engage in here, the very regulations that Defendants invoke actually require that the "Federal agency or pass-through entity must *clearly and unambiguously* specify all termination provisions in the terms and conditions of the Federal award."  2 C.F.R. § 200.340(b) (emphasis added); *see, e.g.*, *Climate United Fund v. Citibank, N.A.*, 2025 WL 1131412, at *16 (D.D.C. Apr. 16, 2025) (agency "can only terminate a federal award on this basis pursuant to the terms and conditions of the federal award"), *stayed pending appeal*, No. 25-5122 (D.C. Cir. Apr. 16, 2025). Finally, because the VPPP Agreement, consistent with the VPPP, contemplates that the Secretary will monitor the Program for "at least ten years," and everyone (including FHWA) understood that the Program would rely on tolling revenues to raise $15 billion in long-term bonds, only TBTA has the right to terminate.  *See* Willens Decl. ¶¶ 4-11.

All of this makes the instant case stand in stark contrast to cases where the grant agreement included or expressly incorporated language authorizing termination.  *Cf. Sols. in Hometown Connections v. Noem*, 2025 WL 1103253, at *4-5 (D. Md. Apr. 14, 2025) (grant included provision authorizing DHS to terminate award due to changes in "agency priorities").[23]  Had the federal

---

[23] Unable to point to any provision in the VPPP Agreement, Defendants rely on a document posted to their website entitled *Contractors and Recipients General Terms and Conditions for Assistance Award* ("General Terms"), which Defendants claim is "incorporate[d]" into the VPPP Agreement.  Apr. 21 Ltr. at 3-4.  But the VPPP Agreement does not mention the General Terms and only states that the Project Sponsors will "comply with" federal laws and requirements "applicable to this project."  VPPP Agmt. cl. 9.  That simple agreement to "comply" obviously does not

35

government wished to have the right to unilaterally terminate congestion pricing, it could have negotiated with the Project Sponsors to include a term authorizing termination in the VPPP Agreement (although the Project Sponsors would never have agreed, given the substantial cost to develop and set up the infrastructure for the Program and the need to interest investors in long-term bonds supported by Program revenues). The federal government did not include any such provision, and cannot attempt to renegotiate now, particularly given that Defendants are not contributing a dime to the Program, which involves areas of exclusively local concern to resolve *New York*'s congestion problems through local means.

In our legal system, the acts of executive branch officers "must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902); *see also* 5 U.S.C. §§ 706(2)(C) (court must set aside agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"). To the extent that Duffy claims some free-ranging authority to revisit agency determinations and thereby terminate the VPPP, the problem he has is that both statute and applicable regulations say otherwise. *See Chao v. Russell P. Le Frois Builder, Inc.*, 291 F.3d 219, 229 n.9 (2d Cir. 2002).

> 5.  *Defendants failed to conduct an environmental review under NEPA before purporting to terminate the VPPP Agreement*

To the extent that Defendants now base the "termination" on policy grounds, that is also not in accordance with law because Defendants failed to conduct an environmental review prior

---

incorporate into the VPPP Agreement every Federal law, regulation and guidance document under the sun. 2 C.F.R. § 200.340(b) (agreement must "unambiguously specify" termination conditions); *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996) (in order to be incorporated by reference into an agreement, a paper "must be so referred to and described in the instrument that the paper may be identified beyond all reasonable doubt"). And regardless, the General Terms do not help Defendants because they are entirely circular, only authorizing termination "in accordance with 2 C.F.R. § 200.340," which itself requires the agency to include an agency termination provision in the terms of the federal award.

36

to taking that action, as mandated by NEPA.  NEPA requires federal agencies to prepare an Environmental Impact Statement ("EIS") for any "major federal action[] significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  In doing so, agencies are required to take a hard look at the proposed action's reasonably foreseeable social, economic and environmental impacts.  *See*, *e.g.*, *id.* § 4336; 23 C.F.R. § 771.119(b); *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).  To determine whether a major federal action will significantly affect the quality of the environment, an agency may prepare an Environmental Assessment ("EA").  *See, e.g.*, 42 U.S.C. § 4336(b)(2); 23 C.F.R. § 771.119.  If an agency determines that the proposed action will not have significant effects, accounting for mitigation, it may issue a Finding of No Significant Impact ("FONSI").  42 U.S.C. § 4336(b)(2); 23 C.F.R. § 771.121.  If the assessment reveals that there may be significant effects, an environmental impact statement is required.  42 U.S.C. § 4336(b)(2); 23 C.F.R. § 771.119(i).

USDOT under the first Trump Administration recognized that NEPA required an environmental review of the Program because Defendants' approval of tolling authority under the VPPP qualified as a major federal action.  As a result, FHWA and the Project Sponsors conducted an exhaustive, multiyear NEPA review that culminated in a final EA and FONSI based on the Project Sponsor's mitigation commitments, clearing the way for the parties' execution of the VPPP Agreement.  Defendants' purported termination of the VPPP Agreement would be no less major than their execution of the Agreement in the first place, as it would have no less of an impact on the environment and would significantly alter the status quo.  Indeed, considering that the EA and FONSI identified numerous environmental benefits of the Program, including significant reductions in traffic congestion and air pollution regionwide, terminating the VPPP Agreement and halting the Program (even assuming Defendants had the authority to do so, which they do not)

37

would inevitably increase congestion and air pollution, among potentially other adverse environmental consequences.  *See, e.g.*, *Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 234-35 (9th Cir. 1990) ("If an ongoing project undergoes changes which themselves amount to major Federal actions, the operating agency must prepare an EIS.") (citing *Andrus v. Sierra Club*, 442 U.S. 347, 363 n.21 (1979) (major federal actions include the "expansion or revision of ongoing programs")).

### 6.      The MTA and TBTA's reliance interests

Duffy's purported "termination" is unlawful for yet another reason: he did not adequately consider the MTA and TBTA's significant reliance interests in the VPPP Agreement, FHWA's 2019 statement that the VPPP is the "best fit" for the Program, or FHWA's longstanding interpretation of the VPPP.  The "longstanding practice of the government—like any other interpretive aid—can inform a court's determination of what the law is." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 386 (2024) (internal quotation marks and alterations omitted).  As the Supreme Court has held, allowing agencies to reverse "consistent" and "longstanding" statutory interpretations "affirmatively destroys," rather than "safeguard[s]," reliance interests by giving "license" to "an agency to change positions as much as it likes."  *Id*. at 386, 410-411.  Duffy's reversal of the agencies' decades-old, consistent interpretation of the VPPP flouts these principles, undermines the MTA and TBTA's reliance interests, and is therefore entitled to no deference. *Garland v. Cargill*, 602 U.S. 406, 412 (2024) (rejecting agency's attempt to "abruptly reverse[] course" in its interpretation of gun laws); *N.L.R.B. v. Noel Canning*, 573 U.S. 513, 525 (2014) (U.S. Supreme Court "has treated practice as an important interpretive factor even when the nature or longevity of that practice is subject to dispute").

Even if Defendants' about-face on USDOT's interpretation of the VPPP statute were a change in *policy* (which it is not), it would still fail APA review.  Where an agency's "prior policy

DOT_0047765

has engendered serious reliance interests," the agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).   A failure to consider reliance interests or to fully explain an agency's reasoning with respect to reliance interests renders an agency's change in position arbitrary and capricious under the APA.  *See Regents of the Univ. of California*, 591 U.S. at 33.

And Plaintiffs' reliance on Defendants' interpretation of the VPPP and on the VPPP Agreement in their financial planning to support and sustain the New York metropolitan region's public transit system is quite significant.  *See* SAC ¶ 101-02; *see also* C. de Cerreño Decl. ¶¶ 29-37.  For example, the MTA relies on Program revenues to fund critical aspects of its Capital Program, in order to deliver critically needed public transit improvements.  *See* SAC ¶ 209-11; *see also* Willens Decl. ¶¶ 10-15   And TBTA has already substantially relied on Defendants' interpretation of the VPPP and on the VPPP Agreement in incurring debt that will be repaid, at least in part, by Program revenues.  *See* SAC ¶ 214; *see also* Willens Decl. ¶¶ 11-15.  Everyone (including FHWA) understood that the bonds, as 30-year bonds, would be paid from toll revenue over the length of their 30-year term.  *See* Willens Decl. ¶¶ 4-15.  Indeed, FHWA's Re-evaluations were explicit in that respect, noting that the net revenue would be dependent on the bonds' "rates and terms."  *E.g.*, Re-Evaluation 2 at 8 n.2.

There can be no doubt that FHWA well understood these reliance interests.  Indeed, FHWA confirmed in recent court filings that it understood MTA's financing plan was reliant on long-term Program revenue to repay 30-year bonds.  *See* Manhattan Central Business District Tolling Program Supplemental Memorandum at 20-22, *New Jersey v. U.S Dep't of Trans. et al.*, No 23 Civ. 03885 (Jan. 17, 2025), ECF 218-1 (confirming that declaration signed by MTA CFO Kevin Willens on January 2, 2025 explaining how the MTA and TBTA planned to issue long-term bonds

DOT_0047766

to be repaid by Program revenue "reflects FHWA's contemporaneous understanding of the information conveyed by the Project Sponsors before FHWA's issuance of Re-Evaluation #2"). As the MTA's CFO has explained, the MTA's reliance on the long-term operation of the Program was made crystal clear to FHWA during the development of the Program and negotiation of the VPPP. *See* Willens Decl. ¶¶ 4-11 (explaining FWHA understood that the MTA could not have signed a VPPP agreement that gave FHWA unilateral authority to terminate Program because financing $15 billion in capital improvements "is dependent on attracting investors to purchase long-term bonds secured with Program revenue"). "The MTA and TBTA have relied on the durability of the VPPP Agreement in incurring" over a billion dollars in debt in the form of short-term notes and loans. *Id*. ¶¶ 12-15. Moreover, Plaintiffs incurred substantial costs (some $500 million) in designing the Program, conducting lengthy environmental reviews, and installing the systems necessary to collect tolls, all based on USDOT and FHWA's consistent and longstanding statutory interpretation that the agencies now disavow. *See* C. de Cerreño Decl. ¶¶ 29-37.

The February 19 Letter gives superficial attention to these weighty reliance interests, ignoring key facts. Although the Letter mentions that "TBTA and NYSDOT have relied on the [VPPP] Agreement to begin collecting tolls," Feb. 19 Ltr. at 4, it barely mentions—let alone discusses—Plaintiffs' broader reliance interests. For example, the Letter notes that "TBTA and NYSDOT have incurred costs related to the program," but dismisses that reliance since the costs "were incurred before FHWA signed the Agreement." *Id.* But this leaves out Plaintiffs' substantial reliance on Defendants' "*prior interpretation*," *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 746 (1996) (emphasis added), of the VPPP as permitting cordon-based tolling to raise revenue for mass transit, and Defendants' representation in 2019 that the VPPP would be the "best fit" for the Program. C. de Cerreño Decl., Ex. C; *see also Fox*, 556 U.S. at 515 (focus is

DOT_0047767

on whether "*prior policy* has engendered serious reliance interests") (emphasis added).  The Letter also pays no heed to the substantial reliance interest even after the VPPP was signed.  *See* Willens Decl. ¶¶ 12-15.  This is not the kind of "detailed justification" that can support a reversal in legal interpretation—or even a policy change—where the prior policy has engendered serious reliance interests.  *See Fox Television Stations*, 556 U.S. at 515; *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016); *see also Bondi v. VanDerStok*, 145 S. Ct. 857, 873-74 (2025) ("novelty of" statutory interpretation is "strike against it," and the "contemporary and consistent views of a coordinate branch of government can provide evidence of the law's meaning").

The February 19 Letter also asserts that Plaintiffs' reliance on Program revenues to fund public transit improvements "was not reasonable given that FHWA approved only a 'pilot project,'" referring to the text of the VPPP, which authorizes "value pricing pilot projects."  Feb. 19 Ltr. at 4.  This is nonsensical.  The Program is a "pilot" only in the sense that the VPPP statute authorizes projects to develop knowledge about the efficacy of congestion pricing strategies. Indeed, to the extent the VPPP itself says anything about the anticipated length of the Program, it says that the "Secretary *shall* monitor the effect of such programs for a period of *at least 10 years*," VPPP § 5 (emphases added).  This obviously is inconsistent with the Secretary being able to terminate the Program mere months in (and consistent with the notion that the Program will run unless and until TBTA decides to stop it).[24]  No sane State government or agency (including Plaintiffs) would spend years studying the potential environmental effects of a program in advance

---

[24] By contrast, when Congress wanted particular programs or grants to have time limitations under Title 23, it said so, and in many instances required the agreement to say so, too.  *See, e.g.*, 23 U.S.C. § 112(b)(4)(C)(v); *id.* § 131(e) (requiring states to remove non-conforming signs or displays within five years of statute's enactment); *id.* § 151(f)(6)(C)(i) (allowing grant recipients to provide funds to private entities operating publicly available electric vehicle charging infrastructure for the first five years of operation).

DOT_0047768

of implementation and would invest a half-billion dollars in planning, technology, and infrastructure if the project were intended to be short-term or could be summarily struck down.

Contrary to the implication in the February 19 Letter that Plaintiffs' reliance was not reasonable because "FHWA's approval was not authorized by law," Plaintiffs acted reasonably in relying on Defendants' longstanding interpretation of the VPPP, including FHWA's representation to Plaintiffs that it was the "best fit" for the Program.[25]  It was not unreasonable—indeed, it was eminently reasonable—for Plaintiffs to rely on FHWA's consistent and well-grounded interpretation of the VPPP dating back to its implementation, when there was no prior indication that the agency might suddenly make a 180-degree change in course.  FHWA's prior interpretation of the VPPP is consistent with the statute's plain text, has never been challenged in court, and has never been found by any court to be unauthorized.  Moreover, the Supreme Court in *Regents* rejected the argument that a federal agency need not seriously consider reliance interests when the agency determines that its prior policy was not legally authorized.  *See* 591 U.S. at 33.  As the Court explained there, even where an agency determined that its prior policy was illegal, "nothing about that determination foreclosed or even addressed the option[] of … accommodating particular reliance interests," and the agency's failure to do so was "arbitrary and capricious."  *Id.*  So too here.  The February 19 Letter merely points to its cursory and ill-founded determination of illegality without truly taking into account Plaintiffs' substantial reliance interests.

## C.    Defendants' proposed enforcement

Even if the February 19 Letter were not unlawful, and the termination of the VPPP Agreement were valid, Defendants would not have license to effectively shut off funding and

---

[25] While Duffy claims to rest his decision on his legal interpretation of the VPPP, the record here is very clear that Duffy's explanation is pretextual in nature and that President Trump directed him to find a way to end the Program for political reasons.  *See, e.g.*, Feb. 19 Ltr. at 1 (President Trump directed "review" of "approval of the [Program]" in light of the President's policy concerns); *see also Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019).

DOT_0047769

approvals for virtually any and every federal-aid highway project, as they have threatened to do. Rather, under the FAHA and basic constitutional principles, their recourse, if any, is limited.

>1.     *Defendants lack authority to impose the sanctions threatened in the April 21 Letter*

Defendants do not point to any authority in the VPPP Agreement or the FAHA that would authorize the unprecedented sanctions outlined in the April 21 Letter, which include the withholding of federal funds, advance construction authorizations, approvals to STIP amendments, and NEPA approvals.  They rely instead on a single regulation, 23 C.F.R. § 1.36, that is ostensibly authorized under FHWA's general authority to "prescribe … needful rules and regulations for the carrying out of the provisions of this title."  23 U.S.C. § 315.  According to Defendants, that regulation gives the Executive branch free range to take a sledgehammer to the budgets of MTA and TBTA (and NYSDOT and NYCDOT) unless and until Plaintiffs "cry uncle" and give up the Program.  But Section 1.36 does not, by its terms, give Defendants that power, nor could it here.

As an initial matter, the plain language of Section 1.36 does not authorize the extremely broad sanctions contemplated in the April 21 Letter.  The regulation "applies only if a State fails to comply with or violates federal law," and the Program is authorized under the non-terminable VPPP Agreement.  *Tennessee ex rel. Leech v. Dole*, 567 F. Supp. 704, 718 (M.D. Tenn. 1983), *rev'd on other grounds*, 749 F.2d 331 (6th Cir. 1984).  It is not enough that Defendants no longer like congestion pricing and want it to stop; the Program is authorized under federal law.

But even if the VPPP Agreement were in violation of federal law, Defendants' threatened "compliance measures" go well beyond the terms of Section 1.36 and are not authorized here. Section 1.36 sets out three avenues of potential enforcement: (i) withholding federal funds under Title 23 "on account of" the Program, (ii) withholding "approval of further projects in the State" under Title 23; and (iii) "other action that [the Administrator] deems appropriate under the

43

DOT_0047770

circumstances." Section 1.36 does not say that all three avenues of enforcement will be appropriate in any given circumstance, nor does it purport to give Defendants authority to hold up New York's appropriated and authorized federal-aid highway funding (and more).

Start with the first clause of Section 1.36. Here, of course, there are no funds "on account of" the Program because Congress no longer appropriates funds under the VPPP. Every penny of funding for the VPPP comes from sources *other than* the federal government. Perhaps, if Defendants had provided funding under the VPPP Agreement and subsequently determined that the Program is not authorized, and had the right to terminate, they could then withhold that particular stream of funding. But the VPPP Agreement does not give them any such role or right.

Beyond that, the second and third clauses of Section 1.36—withholding "approval of further projects" and "other action … appropriate under the circumstances"—clearly do not authorize Defendants to take the sweeping actions outlined in the April 21 Letter and, if they did, they would exceed the agency's authority under the authorizing statute, 23 U.S.C. § 315. Where a statute delegates authority to an agency, "the role of the reviewing court under the APA" is to "fix the boundaries of the delegated authority" and "police the outer statutory boundaries of those delegations." *Loper Bright Enters.*, 603 U.S. at 395, 404 (cleaned up). The limited authority that Congress granted to FHWA to make "needful rules," 23 U.S.C. § 315, "does not provide the Administrator with carte blanche authority to promulgate any rules, on any matter relating to the [FAHA], in any manner that the Administrator wishes," *Citizens to Save Spencer Cnty. v. EPA*, 600 F.2d 844, 873 (D.C. Cir. 1979) (construing similar language in statute authorizing EPA rulemaking). Indeed, where Congress intends to grant an agency enforcement authority, it has said so clearly. *See, e.g.*, 12 U.S.C. § 1464(n)(9)(D) (authorizing Comptroller of the Currency to "prescribe regulations necessary to enforce compliance"); 7 U.S.C. § 1375(b) (same for Secretary

DOT_0047771

of Agriculture).  The narrow authority provided in Section 315, by contrast, "is not open-ended, particularly when there is statutory language on point," and it cannot override more specific provisions elsewhere in the statute.  *N.R.D.C. v. EPA*, 749 F.3d 1055, 1063 (D.C. Cir. 2014) (construing EPA statute); *see also Bloate v. United States*, 559 U.S. 196, 207 (2010).

And so, the Secretary has no power to withhold STIP amendments, advance construction authorizations, or NEPA approvals in response to an alleged violation of 23 U.S.C. § 301—as he threatens to do throughout New York State.  None of that is remotely authorized under the FAHA.  Defendants' intent to withhold NEPA approvals for projects also conflicts with the agency "action-forcing procedures" enacted by Congress.  *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979).  Defendants cannot withhold approvals, because they are mandated to "perform the work necessary to complete the environmental review process."  23 C.F.R. §771.113(a).  At no time in the lengthy NEPA process does a federal agency have the discretion to withhold its participation.  *See* 23 C.F.R. § 771.111(b)(2) ("Administration must respond in writing to a project sponsor's formal project notification within 45 days."); 23 C.F.R. § 771.121(a) ("Administration will review the [Environmental Assessment]"); 23 C.F.R. § 771.123(g) ("Administration … will approve the draft [Environmental Impact Statement] for circulation"); 23 C.F.R. § 771.124(a)(5) ("Administration must indicate approval of the combined final [Environmental Impact Statement]/[Record of Decision]"); 23 C.F.R. § 771.125(c) ("Administration will indicate approval of the [Environmental Impact Statement]for an action by signing and dating the cover page").[26]

Nor can Duffy, in response to a purported violation of Section 301's tolling ban through the continued operation of a single project—congestion pricing—broadly withhold project

---

[26] Nor do Defendants have authority to instruct that all NEPA approvals be categorically denied.  *See Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 714-15 (10th Cir. 2010) (NEPA analysis "must be taken objectively and in good faith, ... and not as a subterfuge designed to rationalize a decision already made") (internal citations omitted).

DOT_0047772

approvals under Title 23.  Congress has foreclosed that means of enforcement in at least two ways.

*First*, Defendants' intent to withhold "obligations of FHWA funds" conflicts with the detailed

standards enacted by Congress to guide the Secretary in carrying out his duty to promptly authorize

the obligation of Title 23 funding.  *See* 23 U.S.C. § 106(a)(2) (Secretary "shall act" as "soon as

practicable" on submissions for obligations of funds); *id.* § 106(a)(4) (in granting submissions for

obligations, Secretary "shall be guided" by criteria in 23 U.S.C. § 109).  Indeed, it is long settled

that the Executive has no right to broadly impound funds for policy reasons.  *See State Highway*

*Comm'n v. Volpe*, 479 F.2d 1099, 1118 (8th Cir. 1973) (no discretion to withhold obligations due

to status of the economy or need to control inflation); *Louisiana ex rel. Guste v. Brinegar*, 388 F.

Supp. 1319, 1325 (D.D.C. 1975) (FAHA "does not authorize" discretionary withholding of

obligations "for non-program related reasons"); 23 U.S.C. § 101(c) ("no part of any sums

authorized to be appropriated … shall be impounded or withheld from obligation").[27]

     *Second*, the FAHA sets forth in great detail the many specific, limited ways in which

obligated funds could be withheld for specific violations of the FAHA.  Some of these remedies

affect the State's apportionment of funds from the Highway Trust Fund.  *See, e.g.*, 23 U.S.C.

§ 131(b) (for enforcement of the Highway Beautification Act, Secretary may reduce federal

funding allocations by 10%); *id.* § 158(a) (for enforcement of minimum age drinking laws,

Secretary may reduce allocations by 8%).  Others grant the Secretary the power to direct public

authorities "to discontinue collecting tolls" in circumstances not present here.  *E.g.*, *id.*

§ 129(a)(3)(C), (a)(9)(C).  Notably, the VPPP statute and Section 301 do not authorize the

Secretary to direct an end to tolling operations or otherwise seek to impose a penalty.  The fact

---

[27] The MTA, TBTA and NYCDOT incorporate by reference the additional statutory arguments advanced by Plaintiff-Intervenor NYSDOT on pages 12 to 15 of the Memorandum of Law In Support of Intervenor-Plaintiff New York State Department of Transportation's Motion for a Preliminary Injunction.

46

that Congress granted FHWA enforcement authority in *some* circumstances, but did not do so with respect to Section 301 or the VPPP, is a strong indication that FHWA's authority to enforce compliance in these circumstances is limited. *See, e.g.*, *Avon Nursing & Rehab. v. Becerra*, 995 F.3d 305, 311 (2d Cir. 2021) ("Where Congress includes particular language in one section of a statute but omits it in another, we presume that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (cleaned up). And it is not particularly surprising here, given that—again—the VPPP and VPPP Agreement simply do not contemplate any right of termination by Defendants. *See generally Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."). Moreover, while the scope of the enforcement measures set forth in the April 21 Letter appears to include withholding of STIP amendments that would allow for FTA funding for transit, that cannot be even arguably encompassed within a reading of Section 1.36 as a valid regulation under the FAHA.

### 2. Enforcing the February 19 Letter would violate the *Pennhurst* clear statement rule

Even if Duffy were somehow right that the VPPP did not authorize congestion pricing (which it does), and that he had authority to terminate the Program (which he does not), his attempt to enforce that determination through the wholesale withholding of federal approvals to New York to coerce termination of the Program would run into another insurmountable obstacle: the Constitution. The Spending Clause provides that Congress "shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States…." U.S. Const. art. I, § 8, cl. 1. Even where Congress seeks to condition receipt of funds, such conditions must be "unambiguous[]" and they cannot "surprise[] participating States with post acceptance or 'retroactive' conditions." *Pennhurst State Sch. &*

47

*Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981).  Once a State has accepted funds pursuant to a federal spending program, the federal government cannot alter the conditions attached to those funds so significantly as to "accomplish[ ] a shift in kind" of their policy.  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583-84 (2012).  This "clear statement rule" applies equally to the imposition of affirmative, and as here, negative obligations on the receipt of funds.  *See Barnes v. Gorman*, 536 U.S. 181, 186 n.1 (2002) (citation omitted).

There is no question that Defendants' newly announced term—complying with a completely new and unprecedented interpretation of the VPPP—was not expressed "unambiguously" and with a "clear voice" by Congress.  *See Texas v. Cardona*, 743 F. Supp. 3d 824, 885 (N.D. Tex. 2024) (granting injunctive relief against Secretary of Education where new Title IX guidance conditioned funding on novel interpretation of statute).  Nothing in ISTEA or any of its reauthorizations comes anywhere close to "unambiguously" prohibiting cordon pricing that finances transit programs, and as discussed *supra* at 10-12, the legislative history unambiguously indicates that Congress sought to encourage projects akin to the Program.  Thus, withholding approvals for other projects on account of the Program's continued operation is an imposition of new conditions and is unconstitutional under the Spending Clause.  *See West Virginia ex rel. Morrisey v. U.S. Dep't of Treasury*, 59 F.4th 1124, 1142 (11th Cir. 2023) (granting State's motion for permanent injunction where provision of American Rescue Plan prohibited states from using federal funds to directly or indirectly offset reduction in net tax revenue, finding statute lacked a clear statement from Congress authorizing the new condition).[28]

---

[28] This lack of a clear statement by Congress is exacerbated by the fact that the VPPP Agreement, again, does not contemplate a right of termination by Defendants, the FAHA's baseline rule is that funds *cannot* be withheld, and the statute sets out in great detail how and when Congress has authorized withholding—none of which apply to the VPPP.

48

3.     *Defendants' withholding of federal funding is unconstitutionally coercive*

When Congress or a federal agency alter funding conditions so as to coerce the State to change its behavior, they encroach on State sovereignty as guaranteed by the Tenth Amendment by "commandeering … reserved State power." *New York v. U.S. Dep't of Just.*, 951 F.3d 84, 115 (2d Cir. 2020). As the Supreme Court recognized in *South Dakota v. Dole*, conditions on federal grants may be illegitimate if they are unrelated "to the federal interest in particular national projects or programs" or where "the financial inducement" is "so coercive as to pass the point at which pressure turns into compulsion." 483 U.S. 203, 207, 211 (1987). Where an agency issues a "threat to a State to 'do this, or else'" it is "coercive at the moment it is uttered" particularly when considering "scale of funding it jeopardizes and the new standards of conduct the [agency] imposes." *New York v. H.H.S.*, 414 F. Supp. 3d 475, 571 (S.D.N.Y. 2019) (HHS threats to withhold all funding for noncompliance with novel "conscience regulations" violated Spending Clause and Tenth Amendment.).

Here, Defendants' threats to withhold all future project approvals and all FHWA funds run afoul of both principles. First, there is neither a federal nor national interest in prohibiting cordon pricing or the spending of Program revenues on transit services. In *Dole*, the Supreme Court concluded that the withholding of approximately 5% of previously allocated federal-aid highway funds was not so coercive where Congress sought to promote the national interest of a minimum drinking age. 483 U.S. at 207, 211. Here, the Program is a project required by State law, and it imposes a toll on vehicles entering a select portion of a single borough within one metropolitan area. If anything, ISTEA and its reauthorization statutes indicate a national interest in *reducing* congestion in certain localities and *supporting* the completion of transit projects, exactly as congestion pricing does. *See e.g.*, 23 U.S.C. § 129(d) ("Congestion Mitigation Program"); *id.* § 149 ("Congestion mitigation and air quality improvement program"); ISTEA § 2 (describing

49

policy of "develop[ing] a National Intermodal Transportation System that is economically efficient and environmentally sound," which "shall include significant improvements in public transportation…."). The only purported interest Duffy invokes is in avoiding additional costs to drivers on a fraction of New York's federal-aid highways paid for with taxpayer dollars, but that is an economic interest of particular motorists accessing the CBD, not a federal or national interest. Moreover, any underlying federal policy of avoiding tolls on federal-aid highways as expressed in Section 301 has been overtaken by ISTEA's countervailing policy of flexibility and promotion of intermodal transportation systems and congestion reduction. Defendants' interpretation of federal law thus *undermines* real federal interests at stake—reducing congestion, improving air quality, and facilitating intermodal transportation—thereby providing an independent basis to reject his interpretation on Tenth Amendment grounds. *See Texas*, 743 F. Supp. 3d at 886 (rejecting updated Title IX funding conditions in part, because they undermined national interest expressed in statute). Second, tying receipt of future project approvals, and potentially all FHWA and even FTA funds (required by formula or otherwise) to topping congestion pricing is unconstitutionally coercive. In *Sebelius*, the Supreme Court rejected conditions on Medicaid funds—where the federal government generally contributed 50 to 83 percent of total funds—because those conditions were an unlawful "means of pressuring the States to accept policy changes." 567 U.S. at 580. The federal funding at issue here is roughly identical to that at issue in *Sebelius.* By way of illustration, the 2020-2024 MTA Capital Plan, financed in part by the Program's revenues, assumes a 50/50 cost split between federal and local sources for critical transit projects such as the Second Avenue Subway.[29] Total federal funding for the 2020-2024 Capital Plan is estimated to be $13.1 billion,

---

[29] MTA, MTA CAPITAL PROGRAM 2020–2024 (Sept. 25, 2019), https://files.mta.info/s3fs-public/2019-09/MTA%202020-2024%20Capital%20Program%20-%20Executive%20Summary.pdf.

DOT_0047777

out of a total expected cost of $54.8 billion.[30]  That $13.1 billion represents 23% of all of the MTA's funding for capital projects, much greater than the amount at issue in *Dole*.  *See* 483 U.S. at 211.  The total $54.8 billion cost of the Capital Plan also includes $15 billion in Program revenues that are dedicated to transit improvements in the New York City metropolitan region, which is of course essential to the State's economy.  As in *Sebelius*, where roughly half of all Medicaid funds were at issue, here a directive that the "the Secretary ... may declare that 'further payments will not be made to the State,'" unless the Program is ceased (in violation of the TMA), constitutes "a gun to the head" and is invalid under the Tenth Amendment.  567 U.S. at 581.  The coercive force of these measures is further multiplied by Defendants' stated plan to also withhold federal approvals and funding from other parts of the State.

## II.    The MTA and TBTA have shown irreparable harm

A party can establish irreparable harm by demonstrating that it will suffer "an actual and imminent" injury that cannot be remedied "if a court waits until the end of trial to resolve the harm."  *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007).  That standard is readily met here, given the remarkably broad scope of the coercive threats to halt reviews needed for all projects and funding within FHWA's purview State wide, including billions of dollars' worth of funding for transit projects currently proposed for addition to New York's STIP, unless the Program is halted.  "Damocles's sword does not have to actually fall ... before the court will issue an injunction."  *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

Defendants threaten to pursue wide range of illegal retaliatory actions, including withholding any further approvals of STIP amendments concerning NYMTC TIP modifications and prohibiting any further obligations of FHWA funds.  *See* April 21 Ltr. at 2.  Such threats seek

---

[30] MTA, 2024–2029 CAPITAL PLAN 34 (Sept. 25, 2024), https://www.mta.info/document/151266.

DOT_0047778

to force on the Project Sponsors a Hobson's choice: either forgo all funding and projects requiring FHWA actions—which include billions of dollars' worth of funding for MTA projects provided in a recent proposed STIP amendment and projects for which the MTA receives FHWA funding—or abruptly halt the Program, forfeiting a secure and recurring source of revenue supporting the issuance of bonds to fund capital improvements critical to the reliability, accessibility, expansion, and safety of the MTA's regional public transit system, as well as the additional public benefits from reduced congestion and vehicular emissions.  Either option would have severe and irreparable harmful consequences.

Numerous courts have found that the loss of expected federal approvals or funding, including where the termination has not yet gone into effect or where the federal funds were eventually distributed, is sufficient to find irreparable harm due to the budgetary and planning uncertainties it may cause, and by virtue of the deprivation of constitutional rights under the Spending Clause.  *See City and County of San Francisco v. Trump*, --- F. Supp. 3d ---, 2025 WL 1186310, at *2 (N.D. Cal. Apr. 24, 2025) (where President directed federal agencies to withhold federal funds from so-called "sanctuary jurisdictions," plaintiffs' irreparable injury was "in the form of a budgetary uncertainty" and "undermining trust between [plaintiffs] and the communities they serve" as well as "deprivation of constitutional rights"); *New York v. Trump*, 2025 WL 715621, at *13, 15 (D.R.I. Mar. 6, 2025) (granting preliminary injunction where OMB froze broad categories of federal grant money allocated to various states, including reimbursement of spending for critical transportation infrastructure, due to "chaos and uncertainty" initial freeze caused, and noting that "States may have to suspend, delay or cancel projects"); *Nat'l Council of Nonprofits v. O.M.B.*, 2025 WL 597959, at *18 (D.D.C. Feb. 25, 2025) (recognizing irreparable harm where "a pause on federal funding w[ould] 'threaten[] the very existence of [non-profit organizations']

DOT_0047779

business") (citations omitted); *Planned Parenthood of Greater Wash. & N. Idaho v. H.H.S.*, 328 F. Supp. 3d 1133, 1139 (E.D. Wash. 2018) (recognizing irreparable harm based on organization's claims that challenged action would cause them to "lay off employees, reduce services, ... cancel established programs, and lose relationships and goodwill with volunteers and community partners") (citations and quotation marks omitted); *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017) (uncertainty prompted by federal executive order threatening to withhold funds from "sanctuary jurisdictions" caused irreparable harm by "interfer[ing] with the Counties' ability to budget, plan for the future, and properly serve their residents" and by requiring them to take "mitigating steps," including placing funds in reserve or making cuts to other services); *United States v. North Carolina*, 192 F. Supp. 3d 620, 630 n.2 (M.D.N.C. 2016) (holding that although it was "not immediately clear … how much funding [plaintiffs] would lose during the pendency of [the] case" or "precise timing of specific grants," court was "satisfied that the loss of funding … [would] likely be severe enough to constitute irreparable harm" given the "nature of the services" at risk, including services to assist victims of sexual assault).

Indeed, Defendants' unconstitutional threats, intended to coerce the State of New York to abandon the Program, have already caused an independent irreparable injury.  Limits on the Spending Clause coupled with the Tenth Amendment protect "the status of the States as independent sovereigns in our federal system." *Sebelius*, 567 U.S. at 577.  Here, Defendants seek to impose retroactive conditions on the receipt of federal funds to hobble programs meant to further New York's sovereign interests, irreparably harming State sovereignty.  *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1367 (S.D. Ga. 2018) ("[l]oss of sovereignty is an irreparable harm"); *see Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 17 (D.D.C. 2014) (recognizing loss of State sovereignty as an irreparable harm).  And as discussed *supra* at 49-50, an agency's threat to take compliance

53

DOT_0047780

actions is "coercive at the moment it is uttered." *New York*, 414 F. Supp. 3d at 571.  It is for that reason courts recognize that forcing compliance with an unlawful agency demand "almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (emphasis in original) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and in the judgment)).

What's more, Defendant's deprivation of Plaintiffs' property interest in the VPPP Agreement in violation of due process is itself the type of constitutional harm that is "ordinarily" irreparable. *A.H. by & through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021) (constitutional deprivation that results in non-compensable damages ordinarily warrants a finding of irreparable harm).  Here, Plaintiffs have demonstrated that they were deprived of procedural due process, as their interests in the VPPP agreement were "terminated" without any due process despite the post-decisional and disingenuous offer of an illusory opportunity to challenge a decision that was already announced and which Defendants have clearly stated they are not reconsidering.  *See* SAC ¶¶ 22-37 and ¶¶ 202-04.  That termination will result in injuries not compensable through monetary damages, and thus "no further showing of irreparable injury is necessary." *See Broecker v. N.Y.C. Dep't of Educ.*, 585 F. Supp. 3d 299, 310 (E.D.N.Y. 2022), *aff'd*, 2023 WL 8888588 (2d Cir. Dec. 26, 2023) (allegation of deprivation of due process rights constituted irreparable injury).

These common-sense principles are illustrated here when one considers the sheer breadth of Defendants' threats.  The "compliance measures" threatened by the April 21 letter are extensive and specific, though the full extent of some are indeterminate, which only adds to their intended coercive effect.  For the MTA, which receives most federal funding through FTA under Title 49, the primary source of budgetary uncertainty and, indeed, imminent harm (separate from the imminent harm that would arise from halting the Program) comes via Defendants' specific threat

DOT_0047781

to withhold approvals of STIP amendments concerning NYMTC TIP modifications.  The threatened withholding of all STIP approvals threatens billions of dollars in annual congressionally appropriated funding the MTA receives from FTA.  Willens Decl. ¶¶ 230-25.  This threat already presents imminent harm: NYSDOT recently submitted a proposed STIP amendment concerning a $2.2 billion package of projects for maintenance and railroad track work that is at risk.  *Id.* ¶ 25.

In addition to threatening to withhold approvals of STIP amendments, Defendants have threatened to stop obligating all FHWA-administered funds.  The MTA regularly receives FHWA funding through the Congestion Mitigation and Air Quality ("CMAQ") section of Title 23, 23 U.S.C. § 149, which is intended to help meet the requirements of the federal Clean Air Act ("CAA") through transportation measures.  *Id.* ¶¶ 26-29.  The MTA uses the majority of its CMAQ funding for projects under the Americans with Disabilities Act ("ADA").  *Id.* ¶ 27.  These projects contribute to reductions in vehicle miles traveled ("VMT") and associated emissions, improving air quality, and reducing regional congestion.  *Id.*  More specifically, the installation of ADA-compliant elevators and equipment at previously non-accessible stations increases subway ridership and reduces reliance on vehicular modes of transportation such as taxis, for-hire-vehicles, private vehicles, and paratransit services like Access-A-Ride.  *Id.*  Consequently, increased use of public transit reduces VMT and resultant emissions as well as congestion.  *Id.*

The MTA's extensive bus operations will also be harmed, as they operate on roadways throughout the City that are maintained by NYCDOT in part using FHWA funding.  *Id.* ¶ 30.  The MTA and New York City Transit, an operating agency of the MTA, oversee a fleet of approximately 5,800 buses that service 238 bus routes, 20 Select Bus Service routes, and 75 express bus routes throughout the five boroughs of New York City.  *Id.* ¶ 21.  Forty-three of these lines operate in Manhattan.  *Id.*  In 2023 alone, New York City buses served approximately 427

DOT_0047782

million riders and traveled a collective 152 million miles.  *Id.*  Without sufficient FHWA funds to maintain the roadways on which MTA buses are driven, the MTA's operations will necessarily suffer.  If the condition of these roadways deteriorates due to funding constraints, it will inevitably affect the ability of MTA buses to meet their schedules, and likely contribute to deterioration of the buses themselves, increasing expenses for the MTA to maintain or replace them.  *Id*. ¶ 30.

The potential loss of all federal funding from the CMAQ program, but more importantly for all future projects seeking federal funding through STIP amendments, and even the cutting off of funding to maintain the streets on which MTA buses operate, would each undeniably and irreparably harm the MTA's ability to maintain an efficient transportation system that serves millions of people every day and helps to power the economy of the New York metropolitan area. Stymying the MTA's ability to perform its obligations to the public to provide safe, reliable and accessible  transportation  will undermine its credibility with the public.  *City of Los Angeles v. Sessions*, 2018 WL 6071072, at *3 (C.D. Cal. Sept. 13, 2018) (forcing a city to contravene "longstanding policy" priorities and consequently "imped[e] … community relationships" and "diminish[] community trust" constituted irreparable harm).

The alternative—choosing to bend to the coercive intent of the illegal termination of the VPPP Agreement and halt the Program pending resolution of this action—would similarly have dire and irreparable consequences.  Irreparable harm exists where, in reliance on the federal government's approval of a program, a State makes "substantial resource investments in planning for the implementation of [that] program," only to have that approval rescinded and the anticipated benefits of those investments lost.  *Texas v. Brooks-LaSure*, 2021 WL 5154219, at *12 (E.D. Tex. Aug. 20, 2021) (finding irreparable harm where, in reliance on Centers for Medicare and Medicaid Services' final approval for Texas to implement demonstration program that diverged from default

56

Social Security Act requirements, Texas "made substantial resource investments in planning for implementation of that program"). Here, TBTA expended approximately $500 million in public funds to prepare for the Program's design, construction, implementation operation, and maintenance, as well as on an information campaign to inform the public of the January 5, 2025 implementation date. C. de Cerreño Decl. ¶ 30. "Few if any of these costs would have been incurred had USDOT/FHWA taken the position at the beginning of the long and torturous 5-year process it now takes—that the Program is not lawful under the VPPP because it utilizes cordon pricing to raise money for mass transit." *Id.* ¶ 31. These costs will continue to accrue even if TBTA is forced to cease tolling during the pendency of this lawsuit. According to TBTA's Chief Operating Officer, TBTA will continue to incur substantial costs of $12 million in additional expenditures each month related to the operation and maintenance of the tolling system even if tolls are not collected. *Id.* ¶ 33.

At the same time, if the Program stops, the MTA and TBTA will not see the expected benefits of their investment, including congestion reduction with its attendant benefits and revenue generation, and will instead lose money maintaining a temporarily defunct tolling system. The MTA would stand to lose average monthly revenues of $50 million or more, which would delay critical capital improvements to public transit, including adding accessibility to numerous subway stations consistent with the ADA, improving outdated subway signaling, enhancing safety and customer service, and extending public transit to under-served areas—not to mention delay relief from congestion in the CBD, alongside its concomitant economic and environmental costs. *Id.* ¶¶ 34-35. The lost revenue could never be recouped, even if the Program is restarted, as those months of tolling would be lost forever. *Id.* ¶ 34. These expenses and loss of revenue would amount to a preventable loss of public resources, which the public has an interest in avoiding. *North Carolina*,

57

192 F. Supp. 3d at 629 (finding irreparable harm where unavailability of funds was "likely to have an immediate impact on [the state's] ability to provide critical resources to the public, causing damage that would persist regardless of whether funding [was] subsequently reinstated").

If federal funding typically received by the MTA becomes unavailable until the Court rules on the legality of FHWA's purported rescission of the VPPP Agreement, the "MTA would be forced to juggle priorities and defer, if not eliminate, many important projects (including accessibility projects) due to the lack of funding."  Willens Decl. ¶ 31.  "The same would be true if the Project Sponsors capitulated and stopped tolling entries to the CBD, as MTA would have to divert other capital funds to repay the almost $1.4 billion in congestion pricing-related debt that would otherwise be used for important projects and could not issue bonds or finance projects that are already planned."  *Id*.  "Some projects would undoubtedly not proceed at all or would be materially delayed, contributing to deterioration" of transit service "and delay of improvements to access."  *Id*.  The consequence of this "budgetary uncertainty" would irreparably harm the public transit system, and thus the traveling public.  *See City and County of San Francisco*, 2025 WL 1186310, at *2; *New York*, 2025 WL 715621, at *15.  The loss of public resources, and revocation of revenues used to secure bonds issued by Defendant would similarly damage Plaintiffs' reputation and goodwill, an injury "not easily measured or fully compensable in damages."  *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) (loss of goodwill and reputation is a "kind of harm is often held to be irreparable").

In addition, NYCDOT faces a host of potential harms that could seriously damage its ability to undertake and complete projects, including projects that are critical for the safety of those who work, live, and travel in the City.  Without advance construction authorizations, the local project sponsor must set aside the full amount of the project's costs without hope of

DOT_0047785

reimbursement, reducing the agency's flexibility and ability to progress transportation programs. *See* Carry Decl. ¶ 8. Similarly, FHWA's refusal to approve STIP amendments would block any new transportation projects from "entering the federal fund eligibility pipeline." *Id.* ¶ 10. And Defendants' threatened actions could also stop current NYCDOT projects in their tracks. Specifically, withholding NEPA approvals "would effectively halt projects in the pipeline where federal funding or approvals are necessary in order to undertake the anticipated work." *Id.* ¶ 9. In Manhattan, there are multiple ongoing or planned projects worth hundreds of millions of dollars that face imminent threat, including projects focused on improving roads, enhancing pedestrian safety (including at least one project focused on safety around schools), and making utility and infrastructure upgrades. *Id.* ¶¶ 13-15. And if FHWA expands its threatened actions beyond Manhattan to the rest of New York City, NYCDOT projects with a combined cost of over $3.1 billion will be at risk. *Id.* ¶¶ 16-18. Many of these projects are critical to ensuring the efficient and safe movement of people and goods throughout the City. The statement in the April 21 Letter that FHWA may exempt "Safety Projects" provides little solace. Because FHWA will determine whether a project qualifies; this uncertainty will seriously harm Plaintiffs' and NYCDOT's ability to plan and budget for the future. Willens Decl. ¶ 24; Carry Decl. ¶ 11.

Finally, and fundamentally, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Our Wicked Lady LLC v. Cuomo*, 2021 WL 915033, at *7 (S.D.N.Y. Mar. 9, 2021) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)); *see also Washington v. Trump*, 2025 WL 509617, at *1 (W.D. Wash. Feb. 16, 2025) ("The rule of law is secured by a strong public interest that the laws 'enacted by their representatives are not imperiled by executive fiat.'") (quoting *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018)). That, of course,

DOT_0047786

is exactly what is happening here. The federal government is trying to prevent New York from maintaining a congestion pricing program that is mandated by State law, frustrating the intentions of the State's legislative representatives and the public they serve. By forcing the MTA and TBTA "to make an unreasonable choice, [FHWA's order] results in a constitutional injury sufficient to establish … irreparable harm." *County of Santa Clara*, 250 F. Supp. 3d at 538 (where plaintiffs demonstrated that executive order was "unconstitutionally coercive" in violation of Tenth and Fifth Amendment, they adequately demonstrated "a constitutional injury sufficient to establish a likelihood of irreparable harm") (citing *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).

## III.     A preliminary injunction would serve the public interest

"Under the last injunction factor, courts must 'balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,' as well as 'the public consequences in employing the extraordinary remedy of injunction.'" *Chan*, 2024 WL 5199945, at *48 (quoting *Yang v. Kosinski*, 960 F.3d 119, 135-36 (2d Cir. 2020)). As noted, these factors "merge" where the opposing party is the federal government. *New York*, 969 F.3d at 59; *Nken*, 556 U.S. at 435. These two factors weigh heavily in favor of enjoining USDOT's unlawful withholding of FHWA approvals, which will in all likelihood force the MTA to delay or cancel critical projects designed to improve public transit and make subway facilities accessible to people with disabilities, and hinder the provision of acceptable bus service, along with a host of irreparable harm to motorists on State highways as described further in the brief of NYSDOT. Moreover, Defendants' aim of stopping the Program through retaliatory threats would result in the increase of congestion and vehicular emissions and a loss of numerous other Program benefits.

First and foremost, there is "generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal

DOT_0047787

laws that govern their existence and operations." *Id*. (internal quotation marks omitted); *Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 269 (S.D.N.Y. 2020) ("[T]here is no public interest in allowing Defendants to proceed with unlawful, arbitrary, and capricious executive or agency actions that exceed their statutory authority."); *New York v. D.H.S.*, 408 F. Supp. 3d 334, 351 (S.D.N.Y. 2019), *aff'd as modified*, 969 F.3d 42 (2d Cir. 2020). Defendants acted unlawfully in purporting to rescind the VPPP Agreement and then compounded that unlawful act by threatening to withhold federal approvals to coerce the State, the MTA and TBTA, and NYCDOT into obeying the ultra vires April 21 Duffy Letter. *See supra* at 21-51. Here, the likelihood of success "is a strong indicator that a preliminary injunction would serve the public interest." *League of Women Voters*, 838 F.3d at 12; *see also Saget v. Trump*, 375 F. Supp. 3d 280, 377 (E.D.N.Y. 2019).

Moreover, Defendants' threat to withhold FHWA approvals is plainly not in the public interest. As explained above, the MTA uses funding requiring FHWA approvals for STIP amendments for billions of dollars in federally funded work, as well as FHWA-administered funding to meet the requirements of the CAA and ADA, including by making subway stations more accessible. Unsurprisingly, courts in similar circumstances have held that withholding government funding earmarked for critical public projects does not serve the public interest. *New York*, 2025 WL 715621, at *15 (evidence that withheld federal funds would "endanger the States' ability to provide vital services," including affecting "critical transportation infrastructure" projects, "overwhelmingly show[ed] that the balance of equities weighs heavily in favor of granting" preliminary injunction); *Nat'l Council of Nonprofits*, 2025 WL 597959, at *19 (plaintiffs "more than met their burden" when freeze in federal spending "placed critical programs for children, the elderly, and everyone in between in serious jeopardy"); *County of Santa Clara*, 250

61

F. Supp. 3d at 539 (threat of withholding federal funds created "significant budget uncertainty" and "coercive effects" that weighed in favor of preliminary injunction).

Halting the Program in response to such threats also "would impair the public interest in lessening both congestion and the extreme financial costs it imposes." *Chan*, 2024 WL 5199945, at *49. Indeed, evidence from the Program's initial months of implementation shows that it is working. "Traffic in the CBD has decreased substantially, with approximately 5.8 million fewer vehicles entering the district in January through March 2025 than would be expected based on data for prior years." C. de Cerreño Decl. ¶ 25(a). This represents an 8% to 13% reduction from a typical January, February, and March. *Id*. New data indicates that traffic in the CBD was down by 12% in April. *Id*. This reduction in congestion has a logical corollary benefit of less vehicular emission and reduced time for emergency vehicle trips and for buses.

Indeed, travel times have also improved. In January, crossing times were 12% faster at the Lincoln Tunnel and 45% faster at the Holland Tunnel; trip times from Brooklyn and Queens fell between 10-30% in January compared to January 2024. *Id*. ¶ 25(c). A recent independent study found a 15% improvement in CBD traffic speeds. *Id*. ¶ 25(h). Trips are also more reliable. Traffic through the Holland Tunnel used to be delayed more than 3 minutes on 54% of weekdays—that has fallen now to 12%. *Id*. ¶ 25(g). "On the Williamsburg Bridge, delays used to be greater than 3 minutes 65% of the time; the Program has reduced that to 2%." *Id*.

Public services have also improved. "[B]us routes have seen significant decreases in the time needed to complete their routes." *Id*. ¶ 25(i). "[T]here are 23% fewer customer trips on express buses that are delayed 10 minutes or more," and "[e]xpress buses are traveling 21% faster on the portion of their routes leading into and within the CBD." *Id*. In addition, "[f]ewer vehicles utilize the nine MTA bridges and tunnels, with levels dropping 2.4% from March of 2024 to March

62

DOT_0047789

of 2025." *Id*. ¶ 25(f). "The largest reductions are at the Hugh L. Carey and Queens-Midtown Tunnels, which lead directly into the [CBD]," and "[t]ruck traffic traveling through these tunnels dropped 14% this year compared to the same period in 2024." *Id*.

The loss of substantial public benefits—either critical federal funding or the substantial benefits of the Program—weighs heavily in favor of granting preliminary injunctive relief. *See Chan*, 2024 WL 5199945, at *48 (noting the Program was "predicted to reduce congestion thereby improving regional air quality, providing safety benefits, improving worker productivity, reducing noise pollution, among other benefits"); *see also Brooks-LaSure*, 2021 WL 5154219, at *12 (granting preliminary injunction to block federal agency's rescission of previously granted approval where rescission threatened to "decrease . . . the number of healthcare providers and the quality of care"); *cf. Cascadia Wildlands v. Thrailkill*, 49 F. Supp. 3d 774, 778 (D. Or. 2014), *aff'd*, 806 F.3d 1234 (9th Cir. 2015) ("public's interest in the economic and environmental benefits of the project including providing jobs and retaining infrastructure for them" weighed against granting preliminary injunction to block forest project).

As this Court previously recognized, there is a compelling public interest in avoiding the unnecessary costs that TBTA would incur if it were required to pay continued operating costs during a pause to avoid yet additional costs of stopping and starting the Program. *Chan*, 2024 WL 5199945, at *49. Indeed, the public has a clear interest in avoiding the loss of public funds and the substantial benefits those funds would achieve. *See, e.g.*, *Louisiana v. Biden*, 622 F. Supp. 3d 267, 297 (W.D. La. 2022) (public interest favored permanently enjoining pause on new oil and gas leases on federal lands where "[l]ocal government funding, jobs for Plaintiff States' workers, and funds for the restoration of Louisiana's Coastline are at stake"); *Sierra Forest Legacy v. Sherman*,

DOT_0047790

951 F. Supp. 2d 1100, 1115 (E.D. Cal. 2013) ("economic health of communities and industries ... is an important element of the public interest that must be considered in balancing the equities.").

Stopping the Program would also mean a return to the crippling congestion that has long plagued Manhattan and resulted in extraordinary costs to the metropolitan region's public. "Numerous studies have established that the congestion addressed by the [Program] itself, if unchecked …, will also continue to impose tremendous costs on individuals and businesses throughout the New York metropolitan region." *Chan*, 2024 WL 5199945, at *49. Congestion "has a $20 billion annual cost, including more than $9 billion in travel-time costs and nearly $6 billion in industry revenue losses." *Id*. (citation omitted). This includes "$1,900 annually for Manhattan Workers and $767 per worker for the New York City metropolitan region." *Id*. Yet Defendants would force the public to return to the days of costly and polluting congestion or accept devastating losses in federal funding. Clearly, such a choice is not in the public interest.

In contrast, Defendants can demonstrate no public interest in a cessation of tolling while this action is litigated. Indeed, they have demonstrated that stopping the tolling is not an urgent matter, by extending the "deadline" to do so twice. The pretextual macro-economic concerns raised by Duffy and President Trump—which FHWA's own NEPA analysis predicted would *not* occur—have indeed failed to materialize. In fact, the opposite has happened. "Pedestrian traffic in Manhattan increased 4.6% between January 5 (the day that toll collection began) and January 31 compared to the same period in 2024." C. de Cerreño Decl. ¶ 26(a). The gross revenue of Broadway shows during January–March 2025 was 25% higher than the same period last year, and attendance was up 20% for January–March of 2025 as compared to the same period last year. *Id*. ¶ 26(c). Hotel occupancy in January was up 3% year over year, and "[r]etail sales were up 1.5% in January and February—on track to be $900 million higher this year than last." *Id*. ¶ 26(b), (d).

DOT_0047791

"Leasing in the CBD was up 11% this January versus the fourth quarter of 2024, and up 80% since the first quarter of last year." *Id*. ¶ 26(f).  There has been less diversion of traffic to outer boroughs (including environmental justice communities) than initially feared.  *Id*. ¶ 25(m).  Indeed, a recent study published by the National Bureau of Economic Research, with lead authors from Yale and Stanford Universities, confirmed that the Program has benefited areas outside of the CBD as well, with highways and major roadways also seeing sustained speed improvements.  *Id*. ¶ 25(m).

The only "public" interest Defendants can cite to support the cessation of tolling is either avoiding the cost of the toll to individual drivers or "[]respect" for the federal government.  *See* Trice Decl., Ex. 7.  The first is highly ironic given FHWA's previous determination that the Program's forecast (and now demonstrated) congestion reduction effect outweighed individual drivers' interest in a lower cost journey to the CBD, and as noted the Program includes discounted tolls for low-income drivers.  This Court has also so found, in denying all of the previous motions to block the Program's implementation.  *Chan*, 2024 WL 5199945, at *48-49.  As for the second, we are aware of no authority that supports a public interest in permitting the federal Executive to demand compliance from State and local agencies, even as litigation remains pending.  Under our system of dual sovereignty, it is the province of the Judiciary, and not the Executive, to police the respective powers and obligations of the federal government.

## CONCLUSION

For the reasons provided herein, the Court should grant Plaintiffs' motion for a preliminary injunction.

DOT_0047792

Dated: May 5, 2025
      New York, New York

Respectfully submitted,

*/s/ Roberta A. Kaplan*
Roberta A. Kaplan
D. Brandon Trice
Maximilian T. Crema
KAPLAN MARTIN LLP
1133 Avenue of the Americas | Suite 1500
New York, NY 10036
Tel.: (212) 316-9500
rkaplan@kaplanmartin.com
btrice@kaplanmartin.com
mcrema@kaplanmartin.com

*/s/ Mark A. Chertok*
Mark A. Chertok
Elizabeth Knauer
Amy Lynn Cassidy
John F. Nelson
Phillip Dane Warren
SIVE, PAGET & RIESEL, P.C.
560 Lexington Avenue, 15th Floor
New York, NY 10022
Tel.: (212) 421-2150
mchertok@sprlaw.com
eknauer@sprlaw.com
acassidy@sprlaw.com
jnelson@sprlaw.com
dwarren@sprlaw.com

*Attorneys for Plaintiffs the Metropolitan Transportation Authority and Triborough Bridge and Tunnel Authority*

MURIEL GOODE-TRUFANT
Corporation Counsel of the City of New York
*/s/ Nathan Taylor*
Nathan Taylor
Christian C. Harned
New York City Law Department
100 Church Street
New York, NY 10007
Tel.: (212) 356-2315
ntaylor@law.nyc.gov
chharned@law.nyc.gov

66

*Attorneys for Intervenor-Plaintiff New York*
*City Department of Transportation*

67

DOT_0047794



1133 Avenue of the Americas
Suite 1500
New York, New York 10036

(212) 316-9500
rkaplan@kaplanmartin.com

May 21, 2025

**BY EMAIL**

Richard Marquis
Division Administrator
Federal Highway Administration, New York Division
11A Clinton Avenue
Albany, NY 12207
rick.marquis@dot.gov

> *Re:*     Response to April 21, 2025 Order to Show Cause

Dear Division Administrator Marquis:

On behalf of the Metropolitan Transportation Authority ("MTA") and Triborough Bridge and Tunnel Authority ("TBTA"), we write in response to United States Department of Transportation ("USDOT") Secretary Sean Duffy's letter dated April 21, 2025 (the "April 21 Letter" or "Apr. 21 Ltr."), in which he "directs" the New York State Department of Transportation ("NYSDOT") to "show cause" by May 21 "why [the Federal Highway Administration ('FHWA')] should not take appropriate steps under 23 CFR § 1.36 to remedy New York's noncompliance with 23 U.S.C. § 301 in connection with" New York's Central Business District Tolling Program (the "Program"). The April 21 Letter also invites TBTA and the New York City Department of Transportation ("NYCDOT," and together with NYSDOT and TBTA, the "Project Sponsors") to submit responses.

At the outset, the MTA and TBTA object to Secretary Duffy's so-called "order to show cause" as procedurally improper. Secretary Duffy already purported to "terminate" the Value Pricing Pilot Program Agreement authorizing the Program (the "VPPP Agreement") in his letter dated February 19, 2025 (the "February 19 Letter" or "Feb. 19 Ltr."), without any prior notice or opportunity to be heard as required by the relevant regulations, 2 C.F.R. §§ 200.341(a) and 342. The April 21 Letter is clear that, in his view, the VPPP Agreement was already "terminated" by virtue of that earlier correspondence. Apr. 21 Ltr. at 1. Indeed, the Secretary has reaffirmed that position repeatedly on television and social media, including as recently as last week.[1] It is thus obvious that USDOT's decision has already been made, and that this is an "opportunity to be heard" in name only. Secretary Duffy did not afford the Project Sponsors any notice or due process

---

[1] @SecDuffy, X (May 15, 2025 6:07 PM) ("I'm fighting back against New York's illegal toll …"), https://x.com/SecDuffy/status/1923138083194626177.

before that alleged termination, and he cannot cure that failure now through a sham exchange of letters.

As to whether the Program is authorized under the VPPP and whether FHWA may seek to coerce compliance with Secretary Duffy's directives that tolling under the Program end, as you know, those questions (among others) are already pending before a federal court in litigation that the MTA and TBTA commenced on February 19th, the same day on which the Secretary purported to terminate the VPPP Agreement. *See Metro. Transp. Auth. v. Duffy*, No. 25 Civ. 1413 (LJL) (S.D.N.Y.) ("*Duffy*").[2] While the MTA and TBTA take this opportunity to summarize many of the points made in our pleadings and briefs in *Duffy* and to provide information about the success of the Program, this response should not be construed as a basis to claim that any determination by Secretary Duffy or USDOT currently the subject of litigation in *Duffy* is non-final or otherwise unripe for judicial review.

**The Program Is Authorized Under the Value Pricing Pilot Program.**

The Program is authorized under the Value Pricing Pilot Program statute, which allows cordon pricing programs and gives states the flexibility to use revenues from their tolling programs to fund transit projects. 23 U.S.C. § 149 note (Value Pricing Pilot Program) (the "VPPP").

First, and contrary to the first justification cited in the February 19 Letter, the VPPP clearly authorizes cordon pricing programs. As explained more fully in the MTA and TBTA's memorandum of law in support of their motion for a preliminary injunction, *Duffy*, ECF 83, when Congress first enacted the VPPP, "congestion pricing" meant a charge intended to reduce congestion, without any limitation on whether the charge could be imposed on a geographic area. In fact, at that time cordon pricing was the quintessential example of "congestion pricing." During the congressional debates concerning the initial passage of the VPPP in 1991, for instance, members of Congress specifically pointed to the example of Singapore, which operated a cordon pricing program, as inspiration. That same meaning persisted over the ensuing decades as Congress reauthorized the VPPP and FHWA sought out programs to fulfill the VPPP's objectives. Indeed, FHWA has long interpreted the VPPP to authorize cordon pricing and has approved and funded multiple programs intended to impose a charge on a geographic area rather than just a particular highway.[3] There is nothing in the text, context, and history of the statute, or in FHWA's decades of administrative practice, that suggests that a cordon pricing program would not be covered; indeed, everything indicates the opposite. *See Duffy*, ECF 83 at 24–29.

Second, and contrary to the second justification in the February 19 Letter, the VPPP allows state and local governments to use the revenues from tolls to fund public transportation projects like those planned in MTA's 2020-2024 Capital Program. The statute explicitly states that governments can use the revenues from tolling programs to fund transportation projects that are otherwise eligible under Title 23 of the U.S. Code, which includes capital transit projects. *See id.*

---

[2] Attached hereto and incorporated by reference are the MTA and TBTA's filings in *Duffy*, including the Second Amended Complaint ("SAC") (ECF 96) and the memoranda, declarations, and exhibits submitted in support of the MTA and TBTA's motion for a preliminary injunction (ECF 83, 84, 85, 86, 87, 91).

[3] FHWA has authorized federal funds under the VPPP for numerous cordon pricing studies, including in Fort Myers Beach, Florida in 2001 and 2002; downtown San Francisco in 2005; downtown Los Angeles in 2011; and Treasure Island in San Francisco in 2012. *See Duffy*, ECF 83 at 11; SAC ¶¶ 82, 88, 92, 94. Additionally, in 2007, FHWA agreed to award New York City $5 million in VPPP funding to consider a cordon pricing scheme in which all vehicles entering Manhattan south of 86th Street would be tolled. *Duffy*, ECF 83 at 11; SAC ¶ 86.

DOT_0047796

at 29.  And other aspects of the statute make clear that Congress anticipated that state governments would use VPPP project revenues to improve public transportation options.  *See id.* at 30.  Furthermore, it simply is not true that the Program's toll rates were "set and will be used primarily for funding transit capital projects."  Apr. 21 Ltr. at 3.  The toll rates were not set "primarily" for funding public transit capital projects, but to achieve congestion reduction and to provide a reliable source of funding for public transit capital projects.  *See Duffy*, ECF 96 ("SAC") ¶¶ 101–104.  Moreover, the provision of funding for public transportation projects obviously has the effect of reinforcing the goal of reducing congestion: improving New York City's public transit system will make public transit more attractive and shift travelers from using private vehicles to using public transit.  *See Duffy*, ECF 83 at 29 n.19.

The April 21 Letter states, without citation, that it is a "fundamental principle of the Federal-aid Highway Program that toll revenues should be used to pay for the infrastructure on which the toll is imposed, with any excess reinvested back into the broader highway network."  Apr. 21 Ltr. at 3.  That claim finds no support in the text of the VPPP or in other toll-related provisions of Title 23.  In fact, as described above and in detail in the MTA and TBTA's litigation filings, the VPPP and Title 23 specifically allow for toll revenues to be used on capital transit projects.  Indeed, the April 21 Letter admits this, stating that "the VPPP statute permits revenues from pilot programs to be used for transit projects eligible for funding under title 23 of the U.S. Code."  *Id.*  Secretary Duffy's sole response to this statutory provision is that "it is unconscionable as a matter of policy that highway users are being forced to bail out the MTA transit system."  *Id.*  As explained below, those supposed policy concerns are simply after-the-fact rationalizations to justify the Secretary's illegal attempt to end the Program, but even taking those concerns at face value, the Secretary is mistaken.  Whatever the Administration's feelings about how revenues from the Program *should* be used, that is not its decision to make; the people's elected representatives in Congress decided to allow states to use toll revenues to fund public transportation projects when they enacted (and subsequently reauthorized) the VPPP, and the people's elected representatives in New York made the decision to create the Program and direct MTA and TBTA to use toll revenues to help fund projects under MTA's 2020-2024 Capital Program.  The Program fully complies with the requirements of the VPPP and FHWA's prior approval.

**The Secretary's "Policy Concerns" Are Unfounded and Are Not a Basis to Terminate the Program.**

The Secretary's putative "policy concerns" likewise do not support the purported termination of the VPPP Agreement.  To begin with, this rationale is entirely *post hoc*: again, the February 19 Letter is clear that the Secretary's decision to "terminate" the VPPP Agreement was made on February 19 and rested solely on "two reasons" derived from his interpretation of the VPPP statute, namely, that (1) cordon pricing "is not authorized under Congress' use of the phrase 'value pricing pilot program,'" and (2) the "VPPP does not authorize tolls that are calculated based on considerations separate from reducing congestion."  Feb. 19 Ltr. at 3.  For the reasons explained in the MTA and TBTA's preliminary injunction motion, the Secretary cannot rectify the fatal flaws in those justifications by inventing new justifications after the fact.  *Duffy*, ECF 83 at 32–33.

Even if the Secretary could rely on his *post hoc* policy rationalizations, they are flatly contradicted by the VPPP itself and the extensive environmental review record.  Contrary to the Secretary's claims that the Program "imposes a disproportionate financial burden on low and medium-income hardworking American drivers for the benefit of high-income drivers," FHWA

May 21, 2025
Page 4 of 6

concluded as part of the exhaustive review under the National Environmental Policy Act ("NEPA") that the Program would provide substantial benefits to low- and medium-income commuters, *id.* at 16, 33.[4]  The VPPP Agreement confirms that FHWA and the Project Sponsors analyzed this issue and that the Project Sponsors adopted several mitigation measures that would avoid any disproportionately high and adverse effect on low-income drivers, which is the demographic group identified in the VPPP statute as subject to protection.  *See* VPPP Agreement cl. 3, 8(d), Attachment A; *see also* VPPP § 7.

The April 21 Letter also claims that the Program is a "breach of the promise" to drivers as part of the Federal-aid Highway Program because they will receive "no new highway benefits" from paying a toll.  Apr. 21 Ltr. at 3.  This position is not only untenable, but it is contradicted by the Secretary's acknowledgement that the Program will benefit drivers.  Numerous courts, including in cases challenging the Program on constitutional grounds, have rejected this very argument.  *See, e.g.*, *Chan v. U.S. Dep't of Transp.*, No. 23 Civ. 10365, 2024 WL 5199945, at *21, 23–24, 26–27 (S.D.N.Y. Dec. 23, 2024) (Liman, J.) (holding "[a]ll drivers … will benefit equally from the reduced congestion, saving time otherwise spent in traffic, improving travel-time reliability, and reducing the potential for auto collisions" and collecting cases); *see also Chan v. U.S. Dep't of Transp.*, No. 23 Civ. 10365, 2025 WL 1144703, at *20 n.17 (S.D.N.Y. Apr. 17, 2025) (Liman, J.) (rejecting as "flawed" the argument that the Program provides no benefits to drivers "if the revenues are not directed toward road maintenance" because "[e]ven if the trucks have no alternative route, they may benefit from the fact that others do have the ability to take advantage of alternative routes in the form of reduced congestion and quicker transit through the CBD").  Thus, even if the Secretary's purported "policy concerns" were relevant, the Program was fully consistent with those policies when it was approved, and it remains so today.  *Duffy*, ECF 83 at 16, 32–33.[5]

The Secretary's April 21 Letter also announces that FHWA "will no longer support this type of project" and states his view that "it is unconscionable as a matter of policy" for Program revenues to be invested in improving public transit.  Apr. 21 Ltr. at 3.  But while FHWA may have discretion to adopt forward-looking policies provided they comply with governing law, FHWA has no authority to terminate the VPPP Agreement based on retroactively imposed changes in administrative policy or priorities.  *See Duffy*, ECF 83 at 34–42.  With respect to the use of Program revenues, even the Secretary acknowledges that the VPPP specifically authorizes the use of tolling revenue for "projects eligible under" Title 23, including capital transit projects.  *Id.* at 29–32.  Moreover, FHWA has already authorized federal funds under the VPPP for cordon pricing studies where the revenue generated from the tolls would be used to pay for local transportation

---

[4]  *See also* Final EA Chapter 6, Economic Conditions at 6-47–49, 6-80–84 (Apr. 2023), https://www.mta.info/document/110831; Final EA Chapter 17, Environmental Justice at 17–62, 17–67–72 (Apr. 2023), https://www.mta.info/document/110886 (describing "substantial benefits associated with reduced vehicle congestion in the Manhattan CBD" and measures designed to lessen impacts on low-income drivers).

[5]  The Program is also consistent with Secretary Duffy's January 29, 2025 order stating that USDOT will "prioritize" projects that "utilize user-pay models."  U.S. DEP'T OF TRANSP., Signed DOT Order re: Ensuring Reliance Upon Sound Economic Analysis in Department of Transportation Policies Programs and Activities at § 5(f)(i) (Jan. 29, 2025), https://www.transportation.gov/briefing-room/signed-dot-order-re-ensuring-reliance-upon-sound-economic-analysis-department.

improvements, including in San Francisco and Los Angeles. *See id.* at 14; SAC ¶¶ 90, 92, 94.[6] Secretary Duffy may now find that policy "unconscionable," Apr. 21 Ltr. at 3, but he cannot displace Congress' statute with his own view of what constitutes "good transportation policy." Moreover, because "MTA's transit systems and the CBD roadways form a single integrated system," investment in public transit furthers the goal of congestion reduction that the Secretary cannot deny underlies the VPPP statute and is consistent with current FHWA policy. *Chan*, 2024 WL 5199945, at *13–14, 21, 26.

Finally, to the extent that the Secretary is now attempting to recast his decision to "terminate the VPPP Agreement" as discretionary and one based on "policy concerns," then his decision also violated the law because there is no record showing that USDOT conducted an environmental review prior to taking that action, as mandated by NEPA. *See Duffy*, ECF 83 at 36–38. Indeed, USDOT under the first Trump Administration recognized that NEPA required an environmental review of the Program because the approval of tolling authority under the VPPP qualified as a major federal action. The Secretary's purported termination is no less major than FHWA USDOT's execution of the VPPP Agreement in the first place, particularly given the adverse environmental consequences that would inevitably flow from halting the Program now that tolling has commenced. *Id.* Indeed, evidence from the Program's initial months shows that traffic in the CBD is down, vehicle speeds are up (including for public buses), commutes are faster and more reliable, and more people are visiting Manhattan's commercial districts and supporting the region's businesses. *Id*. at 13–14, 62–65. The Secretary had no authority to discard these and other benefits, and thus generate negative environmental impacts, without undertaking the environmental review mandated by NEPA.

**The Secretary Has No Authority to "Terminate" the Congestion Pricing Program or to Implement His Threatened Compliance Measures.**

The foregoing demonstrates that the Program is fully consistent with the VPPP and that the Secretary's legal rationales and newfound policy concerns fall far short of permitting him to terminate the VPPP Agreement. What's more, even beyond these threshold challenges, the Secretary has no authority either to terminate the Program or to effectuate any of his threatened compliance measures.

The VPPP Agreement itself says nothing about FHWA or USDOT having a right to terminate. Rather, it grants TBTA alone such right. VPPP Agmt., cl. 11. There is nothing in the VPPP Agreement, the statute, or other sources of law that would grant the Secretary the authority to end the VPPP Program. *Duffy*, ECF 83 at 34–36. While the Secretary claims in the April 21 Letter that 2 C.F.R. § 200.340(a)(4) grants authority to terminate an award that "no longer effectuates the program goals or agency priorities," that is not what the regulation says. Rather, under the cited regulation, USDOT or FHWA may terminate an agreement "*pursuant to the terms and conditions*" of the award. *Id.* (emphasis added). That, of course, has no relevance here where, as noted, the VPPP Agreement by its express terms gives only TBTA, and not the Secretary, the power to terminate. *Duffy*, ECF 83 at 13. If USDOT or FHWA wanted to have the right to unilaterally terminate congestion pricing, they were required under their own regulations to

---

[6] Moreover, tolling is already authorized on many routes that do not provide alternatives for toll-free access, including several in New York State, such as the two I-278 bridges to Staten Island, as well as on two I-90 bridges to Grand Island, leaving no toll-free alternative routes to access either of those destinations. See *Duffy*, ECF 83 at 33.

DOT_0047799

negotiate with the Project Sponsors for such a term that was "clearly and unambiguously" explicit —having failed to do so, they cannot attempt to renegotiate that issue now.  *See* 2 C.F.R. § 200.340(b).

In any event, the Project Sponsors would never have agreed to such a right, because that uncertainty would have rendered impossible the infrastructure investments the Program required in order to operate, as well as the long-term bonding the Program is statutorily required to support. As FHWA's own court filings concede, the goal of raising $15 billion in capital improvements for the MTA Capital Program is dependent on attracting investors to purchase long-term bonds secured by Program revenue.  The MTA and TBTA made crystal clear to FHWA and USDOT when negotiating the VPPP Agreement that long-term operation of the Program is essential for this reason.  Obviously, the MTA and TBTA never would have spent years studying the potential environmental effects of congestion pricing or invested a half-billion dollars in planning, technology, and infrastructure if they had understood that the Secretary could end the Program on a whim.  To the extent that Secretary Duffy relies on the fact that the VPPP uses the term "pilot program" to support his argument for a unilateral termination right, the VPPP explicitly contemplates that the USDOT Secretary "*shall* monitor the effect of such programs for a period of *at least 10 years*," *Duffy*, ECF 83 at 13; VPPP § 5 (emphases added), and the VPPP Agreement requires that "TBTA and NYCDOT … shall monitor and report on the project performance … from the date of implementation for a period of at least ten years or to the end of the life of the Project," VPPP Agmt. cl. 8(b).  These provisions are inconsistent with the idea that the Program was ever intended to be short-term or temporary.

Finally, we are compelled to note that implementing certain threatened measures in an attempt to force the Project Sponsors to terminate the Program is unlawful for multiple other reasons, including that: (1) FHWA does not have authority under 23 C.F.R. § 1.36 to impose such sanctions; (2) FHWA's enforcement of such sanctions would violate the clear statement rule outlined in *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981); and (3) FHWA's withholding of federal funds is unconstitutionally coercive.  *Duffy*, ECF 83 at 42–51.


Needless to say, MTA and TBTA reserve all rights, including the right to assert additional and/or alternative reasons why the Program is compliant with 23 U.S.C. §301.


Very truly yours,

Roberta A. Kaplan


cc:    Mark A. Chertok
       Elizabeth Knauer
       D. Brandon Trice

DOT_0047800

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Filed 05/05/25

Metro. Transp. Auth. v. Duffy, No. 25 Civ. 1413 (S.D.N.Y.) (LJL)

DOT_0047801

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

METROPOLITAN TRANSPORTATION AUTHORITY
and TRIBOROUGH BRIDGE AND TUNNEL
AUTHORITY,

*Plaintiffs*,

and

NEW YORK STATE DEPARTMENT OF
TRANSPORTATION, RIDERS ALLIANCE, SIERRA
CLUB, and NEW YORK CITY DEPARTMENT OF
TRANSPORTATION,

*Intervenor-Plaintiffs*,

v.

SEAN DUFFY, in his official capacity as Secretary of
the United States Department of Transportation,
GLORIA M. SHEPHERD, in her official capacity as
Executive Director of the Federal Highway
Administration, UNITED STATES DEPARTMENT
OF TRANSPORTATION, and FEDERAL HIGHWAY
ADMINISTRATION,

*Defendants*.

Case No. 25 Civ. 1413 (LJL)

**ORAL ARGUMENT
REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS
THE METROPOLITAN TRANSPORTATION AUTHORITY AND
TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY AND INTERVENOR-
PLAINTIFF NEW YORK CITY DEPARTMENT OF TRANSPORTATION'S
MOTION FOR A PRELIMINARY INJUNCTION**

DOT_0047802

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................ 1

BACKGROUND ......................................................................................... 6

    A. The Traffic Mobility Act and FHWA's representations ................................. 6

    B. New York's statutory right to federal funds ............................................. 7

    C. The broad scope of congestion pricing tolling authority under the VPPP ....... 9

    D. The parties complete the years' long NEPA process and FHWA

       and the Project Sponsors execute the VPPP Agreement ......................... 12

    E. The Administration purports to "terminate" the VPPP Agreement

       based on spurious and transparently pretextual arguments ..................... 14

    F. Plaintiffs bring suit and Defendants attempt to coerce compliance

       by threatening to illegally withhold federal approvals and funding .......... 15

    G. Defendants threaten unlawful "compliance" measures, dramatically

       altering the status quo ................................................................ 16

ARGUMENT ......................................................................................... 20

   I.  Plaintiffs are likely to succeed on the merits .................................... 21

    A. The Court has jurisdiction ......................................................... 21

    B. The February 19 Letter is arbitrary and capricious ........................... 24

         1.    Cordon Pricing ............................................................... 24

         2.    Revenue Objectives ......................................................... 29

         3.    Defendants' "policy concerns" ........................................... 32

         4.    Defendants have no right to terminate the VPPP

             Agreement—regardless of their justification ........................ 34

DOT_0047803

5.      Defendants failed to conduct an environmental review
under NEPA before purporting to terminate the VPPP Agreement ......... 36

6.      The MTA and TBTA's reliance interests ................................................... 38

C. Defendants' proposed enforcement ............................................................. 42

1.      Defendants lack authority to impose the sanctions
threatened in the April 21 Letter ................................................................ 43

2.      Enforcing the February 19 Letter would violate
the *Pennhurst* clear statement rule ........................................................... 47

3.      Defendants' withholding of federal funding is
unconstitutionally coercive ........................................................................ 49

II.   The MTA and TBTA have shown irreparable harm ......................................... 51

III.  A preliminary injunction would serve the public interest ................................. 60

CONCLUSION .................................................................................................................. 65

DOT_0047804

# TABLE OF AUTHORITIES

## CASES

*A.H. by & through Hester v. French,*
   985 F.3d 165 (2d Cir. 2021)...................................................................... 54

*Aetna Cas. & Sur. Co. v. United States,*
   71 F.3d 475 (2d Cir. 1995)........................................................................ 21

*Akiachak Native Cmty. v. Jewell,*
   995 F. Supp. 2d 7 (D.D.C. 2014)............................................................... 53

*Am. Sch. of Magnetic Healing v. McAnnulty,*
   187 U.S. 94 (1902).................................................................................... 36

*Am. Trucking Assn's, Inc. v. N.Y. State Thruway Auth.,*
   886 F.3d 238 (2d Cir. 2018)................................................................... 9, 31

*Avon Nursing & Rehab. v. Becerra,*
   995 F.3d 305 (2d Cir. 2021)...................................................................... 47

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
   462 U.S. 87 (1983).................................................................................... 37

*Barnes v. Gorman,*
   536 U.S. 181 (2002).................................................................................. 48

*Bloate v. United States,*
   559 U.S. 196 (2010).................................................................................. 45

*Bond v. United States,*
   572 U.S. 844 (2014).................................................................................. 30

*Bondi v. VanDerStok,*
   145 S. Ct. 857 (2025)................................................................................ 41

*Bostock v. Clayton Cnty.,*
   590 U.S. 644 (2020).................................................................................. 25

*Bowen v. Georgetown Univ. Hosp.,*
   488 U.S. 204 (1988).................................................................................. 47

*Bowen v. Massachusetts,*
   487 U.S. 879 (1988).................................................................................. 21

DOT_0047805

*Broecker v. N.Y.C. Dep't of Educ.*,
  585 F. Supp. 3d 299 (E.D.N.Y. 2022) ................................................ 54

*Broecker v. N.Y.C. Dep't of Educ.*,
  No. 23-655, 2023 WL 8888588 (2d Cir. Dec. 26, 2023) ........................ 54

*California v. Dep't of Educ.*,
  132 F.4th 92 (1st Cir. 2025) ............................................................. 22

*Carroll v. Trump*,
  49 F.4th 759 (2d Cir. 2022) ............................................................. 27

*Cascadia Wildlands v. Thrailkill*,
  49 F. Supp. 3d 774 (D. Or. 2014) ..................................................... 63

*Cascadia Wildlands v. Thrailkill*,
  806 F.3d 1234 (9th Cir. 2015) .......................................................... 63

*Chan v. U.S. Dep't of Transp.*,
  2024 WL 5199945 (S.D.N.Y. Dec. 23, 2024) ................................. *passim*

*Chao v. Russell P. Le Frois Builder, Inc.*,
  291 F.3d 219 (2d Cir. 2002) ............................................................ 36

*Citizens to Save Spencer Cnty. v. EPA*,
  600 F.2d 844 (D.C. Cir. 1979) ......................................................... 44

*City and County of San Francisco v. Trump*,
  2025 WL 1186310 (N.D. Cal. Apr. 24, 2025) ............................... 52, 58

*City of Los Angeles v. Sessions*,
  No. 17 Civ. 7215, 2018 WL 6071072 (C.D. Cal. Sept. 13, 2018) ........... 56

*Climate United Fund v. Citibank, N.A.*,
  2025 WL 1131412 (D.D.C. Apr. 16, 2025) ................................... 23, 34

*Climate United Fund v. Citibank, N.A.*,
  2025 WL 842360 (D.D.C. Mar. 18, 2025) ........................................ 35

*Climate United Fund v. Citibank, N.A.*,
  No. 25-5122 (D.C. Cir. Apr. 16, 2025) ............................................ 35

*Cnty. of Rockland v. Metro. Transp. Auth.*,
  No. 24 Civ. 2285 (S.D.N.Y. Jan. 14, 2025) ...................................... 13

iv

DOT_0047806

*Cnty. of Rockland v. Metro. Transp. Auth.*,
   No. 24A945 (S. Ct. Apr. 8, 2025) ........................................................... 13

*Cnty. of Rockland v. Triborough Bridge & Tunnel Auth.*,
   No. 24 Civ. 2285 (S.D.N.Y. Dec. 23, 2024), ........................................... 13

*Cohen v. Postal Holdings, LLC*,
   873 F.3d 394 (2d Cir. 2017) .................................................................... 21

*County of Santa Clara v. Trump*,
   250 F. Supp. 3d 497 (N.D. Cal. 2017) ....................................... 53, 60, 61

*Credit Suisse Sec. (USA) LLC v. Ebling*,
   2006 WL 3457693 (S.D.N.Y. Nov. 27, 2006 .............................................. 6

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019) ................................................................................ 42

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020) ................................................................... 32, 39, 42

*Department of Education v. California*,
   145 S. Ct. 966 (2025) .............................................................................. 22

*E. Bay Sanctuary Covenant v. Trump*,
   932 F.3d 742 (9th Cir. 2018) .................................................................. 59

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016) ................................................................................ 41

*Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*,
   405 U.S. 707 (1972) ................................................................................ 30

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ................................................................. 39, 40, 41

*Fiero v. Fin. Indus. Regul. Auth., Inc.*,
   660 F.3d 569 (2d Cir. 2011) .......................................................... 27, 31

*Garland v. Cargill*,
   602 U.S. 406 (2024) ................................................................................ 38

*Georgia v. Pruitt*,
   326 F. Supp. 3d 1356 (S.D. Ga. 2018) .................................................... 53

v

DOT_0047807

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
    481 F.3d 60 (2d Cir. 2007) ................................................................. 51

*Gutierrez v. Ada*,
    528 U.S. 250 (2000) ........................................................................ 28

*In re Bernard L. Madoff Inv. Sec. LLC*,
    779 F.3d 74 (2d Cir. 2015) ................................................................. 32

*Jama v. I.C.E.*,
    543 U.S. 335 (2005) ........................................................................ 30

*Johnson v. Newport Lorillard*,
    2003 WL 169797 (S.D.N.Y. 2003) ....................................................... 20

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ........................................................ 51, 60, 61

*Linea Area Nacional de Chile S.A. v. Meissner*,
    65 F.3d 1034 (2d Cir. 1995) ............................................................... 22

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. 369 (2024) .................................................................... 38, 44

*Louisiana ex rel. Guste v. Brinegar*,
    388 F. Supp. 1319 (D.D.C. 1975) ....................................................... 46

*Louisiana v. Biden*,
    622 F. Supp. 3d 267 (W.D. La. 2022) .................................................. 63

*Maine v. U.S. Dep't of Agric.*,
    F. Supp. 3d, 2025 WL 1088946 (D. Me. Apr. 11, 2025) .............................. 22

*Mantena v. Hazuda*,
    2018 WL 3745668 (S.D.N.Y. 2018) ..................................................... 24

*Maryland v. King*,
    567 U.S. 1301 (2012) ...................................................................... 59

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012) ............................................................. 60

*Mendis v. Filip*,
    554 F.3d 335 (2d Cir. 2009) ............................................................. 30

DOT_0047808

*Mulgrew v. U.S. Dep't of Transp.*,
   750 F. Supp. 3d 171 (S.D.N.Y. 2024)............................................................ 6, 12

*N.L.R.B. v. Noel Canning*,
   573 U.S. 513 (2014)............................................................................................ 39

*N.L.R.B. v. SW General, Inc.*,
   580 U.S. 288 (2017)............................................................................................ 26

*N.R.D.C. v. EPA*,
   749 F.3d 1055 (D.C. Cir. 2014) ........................................................................ 46

*Nat'l Council of Nonprofits v. O.M.B.*,
   No. 25 Civ. 239, 2025 WL 597959 (D.D.C. Feb. 25, 2025)............................. 54, 63

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012)................................................................................... 49, 52, 55

*Neuhaus v. Triborough Bridge & Tunnel Auth.*,
   No. 24 Civ. 3983 (S.D.N.Y. Dec. 23, 2024) ...................................................... 14

*New Jersey v. Metro. Transp. Auth.*,
   No. 1033 (3d Cir. Jan. 4, 2025)............................................................................ 14

*New Jersey v. U.S. Dep't of Transp.*,
   No. 23 Civ. 3885 (D.N.J. Jan. 3, 2025).......................................................... 14, 41

*New York v. D.H.S.*,
   969 F.3d 42 (2d Cir. 2020)............................................................................. 62, 63

*New York v. H.H.S.*,
   414 F. Supp. 3d 475 (S.D.N.Y. 2019).......................................................... 30, 50, 55

*New York v. Rescue*,
   705 F. Supp. 3d 104 (S.D.N.Y. 2023).................................................................. 21

*New York v. Trump*,
   2025 WL 1098966 (D.R.I. Apr. 14, 2025).......................................................... 23

*New York v. Trump*,
   No. 25 Civ. 39, 2025 WL 715621 (D.R.I. Mar. 6, 2025) ........................... 54, 60, 63

*New York v. U.S. Dep't of Educ.*,
   477 F. Supp. 3d 279 (S.D.N.Y. 2020)................................................................. 20

DOT_0047809

*New York v. U.S. Dep't of Just.*,
   951 F.3d 84 (2d Cir. 2020) ................................................................. 50

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................ 20, 62

*Our Wicked Lady LLC v. Cuomo*,
   2021 WL 915033 (S.D.N.Y. Mar. 9, 2021) ............................................. 61

*PaineWebber Inc. v. Bybyk*,
   81 F.3d 1193 (2d Cir. 1996) ............................................................... 37

*Park Irmat Drug Corp. v. Optumrx, Inc.*,
   152 F. Supp. 3d 127 (S.D.N.Y. 2016) ................................................... 21

*Pennhurst State Sch. & Hosp. v. Halderman*,
   451 U.S. 1 (1981) ............................................................................ 49

*Perkins Coie LLP v. U.S. Dep't of Just.*,
   F. Supp. 3d, 2025 WL 1276857 (D.D.C. May 2, 2025) ............................. 24

*Planned Parenthood of Greater Wash. & N. Idaho v. H.H.S.*,
   328 F. Supp. 3d 1133 (E.D. Wash. 2018) ............................................. 54

*Regeneron Pharmaceuticals, Inc. v. H.H.S.*,
   510 F. Supp. 3d 29 (S.D.N.Y., 2020) ................................................... 21

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
   102 F.3d 12 (1st Cir. 1996) ............................................................... 60

*Sackett v. EPA*,
   566 U.S. 120 (2012) ........................................................................ 24

*Saget v. Trump*,
   375 F. Supp. 3d 280 (E.D.N.Y. 2019) ................................................. 63

*SEC v. SIPC*,
   872 F. Supp. 2d 1 (D.D.C. 2012) ....................................................... 33

*Sierra Forest Legacy v. Sherman*,
   951 F. Supp. 2d 1100 (E.D. Cal. 2013) ............................................... 65

*Singh v. U.S. Dep't of Just.*,
   461 F.3d 290 (2d Cir. 2006) ............................................................. 35

DOT_0047810

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) ............................................................................... 32

*Smiley v. Citibank (South Dakota), N.A.*,
  517 U.S. 735 (1996) ............................................................................... 41

*Sols. in Hometown Connections v. Noem*,
  2025 WL 1103253 (D. Md. Apr. 14, 2025) ............................................. 36

*South Dakota v. Dole*,
  483 U.S. 203 (1987) ..................................................................... 50, 51, 52

*Spadaro v. U.S. C.B.P.*,
  978 F.3d 34 (2d Cir. 2020) .................................................................... 28

*State Highway Comm'n of Missouri v. Volpe*,
  479 F.2d 1099(8th Cir. 1973) ................................................................. 47

*Tennessee ex rel. Leech v. Dole*,
  567 F. Supp. 704 (M.D. Tenn. 1983) ................................................. 44, 45

*Texas v. Brooks-LaSure*,
  2021 WL 5154219 (E.D. Tex. Aug. 20, 2021) .................................... 58, 65

*Texas v. Cardona*,
  743 F. Supp. 3d 824 (N.D. Tex. 2024) .............................................. 49, 51

*Texas v. EPA*,
  829 F.3d 405 (5th Cir. 2016) ................................................................. 55

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994) ............................................................................... 55

*United States v. North Carolina*,
  192 F. Supp. 3d 620 (M.D.N.C. 2016) .............................................. 55, 59

*Upper Snake River Chapter of Trout Unlimited v. Hodel*,
  921 F.2d 232 (9th Cir. 1990) ................................................................. 39

*Wash. All. of Tech. Workers v. D.H.S.*,
  50 F.4th 164 (D.C. Cir. 2022) ............................................................... 28

*Washington v. Trump*,
  No. 25 Civ. 244, 2025 WL 509617 (W.D. Wash. Feb. 16, 2025) ............. 61

DOT_0047811

*West Virginia ex rel. Morrisey v. U.S. Dep't of Treasury*,
   59 F.4th 1124 (11th Cir. 2023) .................................................................. 50

*Yang v. Kosinski*,
   960 F.3d 119 (2d Cir. 2020) ...................................................................... 62

## STATUTES

5 U.S.C. § 702 ............................................................................................... 22

5 U.S.C. § 706 ............................................................................................... 37

12 U.S.C. § 1464 ........................................................................................... 46

23 U.S.C. § 106 ............................................................................................. 47

23 U.S.C. § 101 ........................................................................................ 4, 7, 47

23 U.S.C. § 104 ............................................................................................. 7, 8

23 U.S.C. § 106 ..................................................................................... 8, 31, 47

23 U.S.C. § 109 ..................................................................................... 8, 31, 47

23 U.S.C. § 112 ............................................................................................. 42

23 U.S.C. § 115 ............................................................................................. 18

23 U.S.C. § 129 ........................................................................................ *passim*

23 U.S.C. § 131 ......................................................................................... 42, 48

23 U.S.C. § 142 ............................................................................................. 10

23 U.S.C. § 149 ......................................................................................... 2, 57

23 U.S.C. § 151 ............................................................................................. 42

23 U.S.C. § 158 ............................................................................................. 48

23 U.S.C. § 301 ............................................................................... 9, 23, 25, 46

23 U.S.C. § 315 .................................................................................. 44, 45, 46

28 U.S.C. § 1331 ........................................................................................... 22

42 U.S.C. § 4321 ........................................................................................... 2

42 U.S.C. § 4332 ...................................................................................... 19, 38

42 U.S.C. § 4336 ...................................................................................... 19, 38

49 U.S.C. § 5303 ........................................................................................... 9

49 U.S.C. § 5329 ........................................................................................... 9

49 U.S.C. § 5336 ........................................................................................... 9

DOT_0047812

49 U.S.C. § 5337 ................................................................................................... 9

49 U.S.C. § 5338 .............................................................................................. 8, 9

49 U.S.C. § 60301 ............................................................................................. 31

7 U.S.C. § 1375(b) ............................................................................................ 46

N.Y. Veh. & Traf. Law § 1701 ..................................................................... 6, 30

Pub. L. 102-240 (Dec. 18, 1991 ........................................................................ 9

Pub. L. 104-59 (Nov. 28, 1995) ...................................................................... 11

Pub. L. 105-178 (June 9, 1998) .................................................................... 9, 11

Pub. L. 105-206, § 9006(b) (July 22, 1998) .................................................... 11

Pub. L. 109-59, § 1604(a) (Aug. 10, 2005) .................................................... 11

## REGULATIONS AND ADMINISTRATIVE GUIDANCE

2 C.F.R. § 200.340 ..................................................................................... *passim*

23 C.F.R. § 1.36 .................................................................... 17, 19, 23, 44

23 C.F.R. § 450.220 .......................................................................................... 18

23 C.F.R. § 450.222 .......................................................................................... 18

23 C.F.R. § 771.111 .......................................................................................... 46

23 C.F.R. § 771.113 .......................................................................................... 46

23 C.F.R. § 771.119 .......................................................................................... 38

23 C.F.R. § 771.121 ..................................................................................... 38, 46

23 C.F.R. § 771.124 .......................................................................................... 46

23 C.F.R. § 771.125 .......................................................................................... 47

49 C.F.R. § 1.85 ................................................................................................ 33

89 Fed. Reg. at 30089 ...................................................................................... 36

*Guidance for Federal Financial Assistance*, 89 Fed. Reg. 30046, 30089 (Apr. 22, 2024) .......... 36

## OTHER AUTHORITIES

*About Us*, NYMTC, ......................................................................................... 18

Alex Lemonides et al., *Tracking the Lawsuits Against Trump's Agenda*, N.Y. TIMES (May 2, 2025), ........................................................................................................ 4

DOT_0047813

Arun Venugopal, *Vehicle Traffic Is Down in Manhattan*, Gothamist (Feb. 13, 2025),............ 66

*Congestion Charging*, *Black's Law Dictionary* (10th ed. 2014) ................................. 27

*Congestion*, *Cassell Encyclopaedia Dictionary*, 312 (1990)....................................... 27

Elena Safiorva, Kenneth Gillingham & Abram Lipman, *Choosing Congestion Pricing Policy: Cordon Tolls Versus Link-Based Tolls*, 1932 J. of Transp. Rsch. Bd. (2005) ..................... 29

FHWA, *Advance Construction and Partial Conversion of Advance Construction*,..................... 18

FHWA, *Welcome to the FHWA Congestion Pricing Web Site*,....................................... 9

Final EA Chapter 17, Environmental Justice at 17-62, 17-67–72 (Apr. 2023), ................... 17, 34

Final EA Chapter 6, Economic Conditions at 6-47–49, 6-80–84 (Apr. 2023), ..................... 17, 34

Good Day New York, WNYW-NY (FOX) (Apr. 29, 2025), ................................................ 20, 34

MTA, MTA Capital Program 2020–2024 (Sept. 25, 2019) ........................................... 52

NYSDOT, State Transportation Improvement Program Summary, ............................... 18

Oldfield Act of 1927, Pub. L. 69-773 (Mar. 3, 1927)............................................... 9

Paul W. Wilson, *Welfare Effects of Congestion Pricing In Singapore*, 15 Transp. 191, 191 (1988)......................................................................... 27

Peter Senzamici, *Feds Accidentally Upload Internal Memo Admitting Plan to Kill NYC Congestion Pricing Is 'Very Unlikely' to Succeed—Before Quickly Deleting It*, N.Y. Post (Apr. 24, 2025)...................................................................................... 20

*Statement by President George Bush Upon Signing H.R. 2950*, 1991 U.S.C.C.A.N. 1865 (Dec. 18, 1991) ............................................................. 10

DOT_0047814

Plaintiffs the Metropolitan Transportation Authority ("MTA") and Triborough Bridge and Tunnel Authority ("TBTA"), an MTA affiliate, and Intervenor-Plaintiff New York City Department of Transportation ("NYCDOT") respectfully submit this memorandum of law in support of their motion for a preliminary injunction enjoining the illegal, arbitrary, and unfounded withholding of federal transportation project approvals and funding, and other unlawful acts intended to coerce the cessation of the Central Business District ("CBD") Tolling Program ("Program" or "congestion pricing").

## PRELIMINARY STATEMENT

On January 5, 2025, after more than five years of engagement with and reliance on the federal government and its longstanding interpretation of the statute establishing the Value Pricing Pilot Program ("VPPP")—including during the first Trump Administration—New York launched congestion pricing.  The Program is a long-sought-after effort to reduce traffic congestion in the New York City metropolitan area by implementing a market-based, user-pay solution that charges drivers a toll to enter the CBD (Manhattan at and below 60th Street), and then uses the revenue from those tolls to improve and expand the region's aging public transportation system, particularly the NYC subway.  This method of tolling, also known as "congestion pricing," has been successful in big cities around the world including London, Milan, Singapore, and Stockholm, and was first conceived of here in New York City at Columbia University in the 1950s as a solution to what even then was perceived to be the region's significant congestion woes.  As of today, only four months into the Program, the available data, not to mention simply looking at the streets, show that the Program is working: traffic in the CBD has dropped, commute times have fallen, vehicle speeds (including for public buses) have increased, more people are visiting Manhattan's commercial districts and supporting the region's businesses, and the MTA's regional public transit system is seeing increased ridership and benefiting from increased funding.

Despite the Program's success, the President continues to oppose it, consistent with his position since he began running for his second term last year, when he promised to "TERMINATE" and "kill" the Program if elected. The President is entitled to his personal and political view on whether congestion pricing is or is not good policy. But he has no authority to stop the Program now. In fact, during the first Trump Administration, Defendants advised TBTA, New York State Department of Transportation ("NYSDOT"), and NYCDOT (collectively, the "Project Sponsors") to seek federal authorization for the Program under the VPPP, 23 U.S.C. § 149 note, and the federal government and the Project Sponsors proceeded to do precisely that, analyzing the Program's environmental impacts under the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA"), for more than four years in a process that yielded thousands of pages of environmental assessment.

Defendant Federal Highway Administration ("FHWA") (through Defendant Gloria Shepherd) and the Project Sponsors then executed a binding agreement on November 21, 2024 authorizing the Program under the VPPP (the "VPPP Agreement"). The VPPP Agreement contemplates that congestion pricing will continue unless and until *TBTA* alone decides to stop it, and says nothing whatsoever to even suggest that the federal government (which has not contributed and is not contributing any funds to the Program) has the power to unilaterally terminate it—let alone do so just months after the VPPP Agreement was executed and the Program began. The absence of such a right on the part of Defendants is consistent with the VPPP statute, which envisions that the Program will continue for *at least ten years*, with regular updates being provided to the federal government on its impact on congestion, transit ridership, and transit funding. It is also consistent with the fact that a central component of the Program, as everyone has long known, is to use the tolling revenue (now projected between $500 million and $900

DOT_0047816

million a year) to raise $15 billion for the MTA Capital Program through bonds with terms running at least *30 years* out from the commencement of tolling.  Obviously, none of that would make any sense if Defendants could simply terminate the Program at any time.   Indeed, Defendants themselves have recognized that agreements like the one here "must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award."  2 C.F.R. § 200.340(b).  The VPPP Agreement's silence is dispositive.

Nonetheless, shortly after taking office this year, President Trump decided to make good on his 2024 campaign promises, declaring on social media that "CONGESTION PRICING IS DEAD. … LONG LIVE THE KING!"  Simultaneously, on February 19, 2025, Defendant Sean Duffy issued a four-page letter purporting to "terminate" the VPPP Agreement.  Duffy claimed to have determined—without any statutory basis or analysis, and contrary to decades of FHWA public statements (including to Congress), approvals, and guidance—that the VPPP does not permit FHWA to authorize congestion pricing programs covering all the roads in a geographic area (known as "cordon," "zone-based," or "area-wide" pricing).  Duffy also claimed to have determined that the VPPP does not authorize a program that "appears to be driven primarily by the need to raise revenue for the Metropolitan Transit [sic] Authority."  But these rationales are so weak as to be transparently pretextual.  The VPPP plainly covers tolling programs like the one here, since Congress understood congestion pricing to encompass cordon pricing when it passed the VPPP in 1991 and when it reauthorized the VPPP several times over the last 30 years.  Likewise, the statutory text authorizes the use of tolling revenue to fund transit programs.  Congress (and FHWA) have long understood that the VPPP allows tolling programs that have a revenue objective; tolling, by definition, raises revenue.  Using tolls to promote public transit as an alternative to driving, as the Program does, obviously reduces traffic congestion.  What's more,

DOT_0047817

Duffy did not cite any provision of law entitling him to terminate the VPPP Agreement, because there is none.

Given the patently unlawful nature of the purported rescission, the MTA and TBTA did not agree to stop congestion pricing as directed by Duffy. Instead, they immediately commenced this lawsuit seeking a declaration that Duffy's action is invalid. ECF 1. With no serious defense on the merits, the Administration has now resorted to what seems to be its *modus operandi*: attempting to improperly leverage federal funding in order to coerce compliance with its wishes, rather than defend the legality of its propositions in court.[1] After making several proclamations that congestion pricing must end, Defendant Duffy wrote to Governor Hochul on April 21 reiterating that the VPPP Agreement had been terminated, but "direct[ing] New York to show cause" by May 21 that it was in compliance with the Federal-Aid Highway Act, 23 U.S.C. § 101 *et seq.* ("FAHA"), and warning that if Defendants determine congestion pricing is not permitted under the VPPP (as they already have) and congestion pricing continues (as Plaintiffs have said it will absent a court order to the contrary), FHWA "will implement" "compliance measures beginning on or after May 28." The sweeping sanctions outlined in the letter include withholding FHWA funds authorized by Congress under the FAHA, as well as withholding advance construction authorizations and NEPA approvals (other than undefined "Safety Projects")—which means that myriad future projects depending on federal approvals, and ultimately federal funding, could not proceed. The sanctions also include withholding approval of amendments to the Statewide Transportation Improvement Program, which would preclude funding for highway and transit projects throughout the State. Any or all of these would have immediate and harmful

---

[1] Alex Lemonides et al., *Tracking the Lawsuits Against Trump's Agenda*, N.Y. TIMES (May 2, 2025), https://www.nytimes.com/interactive/2025/us/trump-administration-lawsuits.html.

DOT_0047818

implications for the ability of MTA and TBTA (and NYSDOT and NYCDOT) to deliver vital transportation services for the metropolitan region.

Defendants' efforts to avoid the judicial process have placed Plaintiffs and NYCDOT in an impossible position.  The threatened measures will undeniably cause irreparable harm.  That is the point: Defendants acknowledge that they seek to coerce compliance with their lawless demands by threatening the funding of other public projects.  The loss of federal approvals and funding will undermine the MTA, TBTA, and NYCDOT's ability to maintain an efficient transportation system on behalf of the millions of people who rely on that system each day.  On the other hand, capitulating to Defendants' demands would be just as devastating: the MTA would lose $50 million or more in monthly revenues, a dedicated source of public transit funding to support the bonding of much higher amounts, which loss could never be recovered.  The MTA would also be deprived of funds to make much-needed improvements to the subway system.  And the public would once again suffer the negative environmental and economic impacts that the Program is intended to reduce.  As this Court recognized in rejecting efforts to enjoin the Program before it started, stopping congestion pricing "would delay the environmental and economic benefits the Tolling Program was designed to convey and force the TBTA to bear a sizeable financial burden." *Chan v. U.S. Dep't of Transp.*, 2024 WL 5199945, at *48 (S.D.N.Y. Dec. 23, 2024) (Liman, J.).

Under our legal system, the Administration cannot set aside the longstanding and well-reasoned determinations of Congress and the Executive agencies, nor displace the Judiciary from its role in construing the law, by trying to strong-arm compliance.  And Plaintiffs and NYCDOT should not be put to the Hobson's choice of acceding to unlawful demands to shut down one vital program in order to avoid losing funding for so many others.  *See Credit Suisse Sec. (USA) LLC v. Ebling*, 2006 WL 3457693, at *3 (S.D.N.Y. Nov. 27, 2006) (preliminary injunction warranted

DOT_0047819

where harm movant seeks to redress would occur before ultimate resolution and thus movant would "lose its right to meaningfully resolve" its claims).  The Court should enjoin Defendants from engaging in such unlawful retribution and preserve the status quo while this litigation proceeds so that the legality of Defendants' actions can be decided in an orderly manner.

## BACKGROUND

### A.    The Traffic Mobility Act and FHWA's representations

Traffic congestion has long stymied economic growth, harmed the environment and public health, and undermined quality of life in the New York City metropolitan region.  In 2019, after decades of discussion about solutions, New York passed the Traffic Mobility Act (the "TMA"), N.Y. Veh. & Traf. Law § 1701 *et seq.*, which authorizes TBTA to establish and implement a plan for tolling all eligible vehicles entering the Manhattan CBD, and requires that the tolling "ensure[s] annual revenues and fees collected under such program, less costs of operation of the same, provide for sufficient revenues ... to fund fifteen billion dollars for capital projects for the 2020 to 2024 MTA capital program, and any additional revenues above that amount to be available for any successor programs," *Mulgrew v. U.S. Dep't of Transp.*, 750 F. Supp. 3d 171, 187, 191 (S.D.N.Y. 2024) (Liman, J.).

Because the Program would apply to certain federal-aid highways within the area to be tolled, the Project Sponsors (as noted, TBTA, NYSDOT, and NYCDOT) engaged with FHWA and the United States Department of Transportation ("USDOT") to discuss how best to implement such tolling in a manner consistent with the FAHA.  From the outset, the Project Sponsors explained in meetings with FHWA that the Program's tolls would apply to all eligible vehicles entering the CBD, and that the Program would incorporate toll rates that would provide a new and recurring revenue source for the MTA.  Declaration of Dr. Allison L. C. de Cerreño ("C. de

6

DOT_0047820

Cerreño Decl.") ¶¶ 5-12.  In response, FHWA and USDOT advised the Project Sponsors that the VPPP was the appropriate vehicle for them to use to obtain such tolling authority.  *Id.* ¶¶ 6, 10.

And so, on June 17, 2019, the Project Sponsors submitted an Expression of Interest ("EoI") seeking authorization under the VPPP to charge vehicles a "toll to enter or remain within the Manhattan CBD," with the goals (first) of "reduc[ing] traffic congestion," and, among other things, "[c]reat[ing] a sustainable funding source to repair and revitalize the MTA transit system" and "[i]ncreas[ing] transit ridership."  C. de Cerreño Decl., Ex. B at 3-4.  The EoI did not contemplate an end date for the Program and stated that the Project Sponsors would prepare reports on "the effects of the program" once "every two years … for the life of the program."  *Id.* at 6.  On October 24, 2019, FHWA reiterated that the VPPP "appear[ed] to be the best potential fit" among the various programs available under federal law that allow for tolling on federal-aid highways.  C. de Cerreño Decl., Ex. C at 1.

### B.    New York's statutory right to federal funds

The FAHA was enacted "to accelerate the construction of Federal-aid highway systems," 23 U.S.C. § 101(b)(1), and to that end requires the apportionment of funds from the Highway Trust Fund, which consists of taxes paid by each State's highway users, to be appropriated by the Secretary to the States for federal-aid highways.  Specifically, the Secretary "shall distribute" a "base apportionment" of funding to each State based upon a specified formula for various programs, 23 U.S.C. § 104(b), with each State "[g]uaranteed" an apportionment of at least 95 cents on the dollar with respect to its tax payments into the Highway Trust Fund attributable to the number of highway users in the State, *id.* § 104(c)(1)(B).  Upon apportionment to the State, the State transportation department submits proposed projects to the Secretary for approval, and the Secretary "shall act on the plans, specifications, and estimates as soon as practicable," "guided by Section 109," and "enter into a formal project agreement … formalizing the conditions of the

DOT_0047821

project approval." *Id.* § 106(a)(1)-(2), (4).  Section 109, in turn, sets forth detailed standards to guide the Secretary in carrying out his duty promptly to act on proposals, including in order to "adequately serve the existing and planned future traffic of the highway in a manner that is conducive to safety, durability, and economy of maintenance." *Id.* § 109(a)(1).  In other words, each State—including New York—is entitled to get back nearly all of the money that *its taxpayers paid* to the federal government for these purposes, with relatively limited discretion afforded to the Secretary.

Federal Transit Administration ("FTA") funding is similarly subject to legislative directives.  Congress establishes the legal authority for FTA programs through authorizing legislation, with each reauthorization amending the Federal Transit laws codified in Title 49 U.S.C. Chapter 53.  The most recent authorization, the Infrastructure Investment and Jobs Act ("IIJA"), reauthorizes surface transportation programs for Fiscal Year ("FY") 2022 through FY 2026.  The IIJA authorizes up to $108 billion to support federal public transportation programs, including $91 billion in "guaranteed" funding.  *See* 49 U.S.C. § 5338.  The largest sums of funding fall under the Urbanized Area Formula Grants ("UAFGs") ($33.5 billion) (§ 5338(a)(2)(C)), the Rail Vehicle Replacement Program ($1.5 billion), the Capital Investment Grants (up to $23 billion, with $8 billion guaranteed); and the State of Good Repair Grants ($23.1 billion) (§ 5338(a)(2)(L)).  These amounts cover the *total* apportionment under the life of the IIJA, until the passage of the next surface transportation reauthorization.  The total appropriations are then provided to States and transit agencies under different programs within Chapter 53.[2]  Although each provision provides different bases for calculating the funds to be distributed to each state, urban area, or particular

---

[2] *See e.g.*, § 5303 (Metropolitan transportation planning); § 5307(Urbanized Area Formula Grants); § 5329 (Public Transportation Safety Program); § 5336 (Apportionment of appropriations for formula grants).

DOT_0047822

project, the allocations for Urbanized Area Formula Grants and State of Good Repair Grants are determined by a Congressionally designated formula provided in Sections 5336 and 5337.

## C.      The broad scope of congestion pricing tolling authority under the VPPP

When Congress established the forerunner to today's federal-aid highway program in 1916, it determined that highways eligible for federal funds under the program should generally be free from tolls.  However, that rule was immediately subject to numerous carveouts.  *See, e.g.*, Oldfield Act of 1927, Pub. L. 69-773 (Mar. 3, 1927).  Indeed, the current codification of the "Freedom from tolls" provision in Section 301 acknowledges a broad exception in Section 129, which allows for projects as wide-ranging as the construction of new toll highways, construction of new lanes and conversion into a toll highway, and the reconstruction of toll-free highways and conversion into toll facilities.  *See* 23 U.S.C. §§ 301 & 129(a)(A), (F).

Originally called the "Congestion Pricing Pilot Program,"[3] the VPPP was enacted as part of the Intermodal Surface Transportation Efficiency Act of 1991, Pub. L. 102-240 (Dec. 18, 1991) ("ISTEA"), to grant "states 'greater flexibility to operate toll facilities and use toll revenues for a variety of transportation projects,'" *Chan*, 2024 WL 5199945, at *33 (quoting *Am. Trucking Assn's, Inc. v. N.Y. State Thruway Auth.*, 886 F.3d 238, 241 (2d Cir. 2018)).  In passing ISTEA, Congress explained that it sought to "develop a National *Intermodal* Transportation System" consisting "of all forms of transportation in a unified, interconnected manner."   ISTEA § 2 (emphasis added); *see also* Second Amended Complaint ("SAC") ¶ 67.[4]  And in signing the bill

---

[3] Congress renamed the Congestion Pricing Pilot Program the Value Pricing Pilot Program in 1998.  Pub. L. 105-178 § 1216 (June 9, 1998).  FHWA has explained that "value pricing" is a synonym for congestion pricing and that the agency uses the terms interchangeably.  *See, e.g.*, FHWA, *Welcome to the FHWA Congestion Pricing Web Site*, https://ops.fhwa.dot.gov/congestionpricing/index.htm (last accessed Mar. 26, 2025) ("Congestion pricing—sometimes called value pricing—is a way of harnessing the power of the market to reduce the waste associated with traffic congestion.").

[4] Simultaneous with today's filing, Plaintiffs and Plaintiff-Intervenors have moved for leave to file a Second Amended Complaint based upon Defendants' post-April 19 actions.  ECF 79.  Defendants do not oppose the amendment, and

DOT_0047823

into law, President Bush observed that a "major element" of ISTEA was "to provide State and local officials unprecedented flexibility," including discretion to finance transportation improvements "with toll revenue" and use funds "on the improvements that [will] best meet local needs, whether highway projects or public transit projects." *Statement by President George Bush Upon Signing H.R. 2950*, 1991 U.S.C.C.A.N. 1865 (Dec. 18, 1991).

The VPPP directs that the Secretary of Transportation "*shall* solicit" State and local government participation in "value pricing pilot programs," and therefore may "enter into" agreements with project sponsors to "establish, maintain, and monitor congestion pricing projects," and "to allow the use of tolls" as "part of a pilot program under this section." VPPP, cls. 1, 4 (emphasis added).[5]  Again, to be clear, the VPPP permits tolls "[n]otwithstanding sections 129 and 301," and permits project sponsors to use "[r]evenues generated by any pilot project" to fund other "projects eligible under such title," which include transit capital projects eligible for federal assistance. *Id.*, cl. 3; *see also* 23 U.S.C. § 142(a)(2).

Although ISTEA does not define the term "congestion pricing," the concept was then (and is today) understood to include cordon pricing.  In fact, cordon pricing was the *prototype* of congestion pricing, originating with Columbia economist William S. Vickrey, who testified before Congress in 1959 that congestion pricing should be "applied to the street and highway system [in New York City] as a whole, and not merely to bits and pieces of it" because, if tolls were "only on selected facilities, such as on the bridges, tunnels, and parkways in the New York area," it might only have the unintended consequence of rerouting traffic.  SAC ¶ 55.  Indeed, when ISTEA was

---

while the motion is *sub judice*, for the sake of convenience we refer in this memorandum to the allegations in the proposed Second Amended Complaint.

[5] In a separate section, ISTEA directs states to consider "the use of innovative mechanisms for financing projects, including … congestion pricing."  ISTEA § 1025(a).

DOT_0047824

enacted in 1991, Singapore had already successfully operated cordon pricing for over 15 years. *See id.* ¶¶ 72-79 (describing legislative history).  And as FHWA explained to Congress shortly after ISTEA was enacted, the agency understood that the "potential scope of congestion pricing applications [under the VPPP] can vary widely, ranging from pricing on a new or existing single road facility to more comprehensive *area-wide road pricing strategies*."  *Id.* ¶ 77 (emphasis added).

In the decades since the VPPP was enacted, during which Congress has amended the statute several times (in 1995, 1998, and 2005), *id.* ¶ 73,[6] Congress and FHWA have continued to understand congestion pricing to include cordon pricing.  FHWA, for example, has repeatedly concluded that "areawide pricing" should merit the "highest priority for Federal support" under the VPPP because such programs are often the most effective at reducing congestion.  *Id.* ¶ 79.  FHWA has reiterated this interpretation in notices published to the Federal Register, *id.*, official guidance documents, *id.* ¶ 90, and reports to Congress, *id.* ¶¶ 79-81.  FHWA has also authorized federal funds under the VPPP for numerous cordon pricing studies, including in Fort Myers Beach, Florida in 2001 and 2002, *id.* ¶ 82; downtown San Francisco in 2005, *id.* ¶ 88; downtown Los Angeles in 2011, *id.* ¶ 92; and Treasure Island in San Francisco in 2012, *id.* ¶ 94[7]

In fact, in 2007, FHWA agreed to award New York City $5 million in VPPP funding to consider a cordon pricing scheme in which all vehicles entering Manhattan south of 86th Street would be tolled.  *Id.* ¶ 86.  Speaking before Congress, the FHWA Administrator at the time described cordon pricing in Manhattan as the "best idea" he had heard for managing congestion,

---

[6] Pub. L. 104-59, § 325(e) (Nov. 28, 1995); Pub. L. 105-178, § 1216(a) (June 9, 1998); Pub. L. 105-206, § 9006(b) (July 22, 1998); Pub. L. 109-59, § 1604(a) (Aug. 10, 2005).

[7] In 2021, the Utah Department of Transportation submitted an Expression of Interest for a project aimed at reducing congestion at Little Cottonwood Canyon, including a cordon pricing component.  SAC ¶ 97.  FHWA noted this project in its most recent report to Congress on the VPPP submitted in 2023.  *Id.*

DOT_0047825

and explained that "the beauty of this program is whatever we invest in now … this congestion pricing will throw off about $300 million a year to finance such things as a $6 billion or $7 billion 2nd Avenue subway, more Express Bus service, and all those things so the commuters and everybody else can get to work in a lot less time."  *Id.* ¶ 87.  Even now, FHWA's website continues to make clear that cordon pricing is a permissible use of VPPP tolling authority.  *Id.* ¶ 98.

**D.**    **The parties complete the years' long NEPA process and FHWA and the Project Sponsors execute the VPPP Agreement**

In reliance on Defendants' representations in late 2020 to proceed under the VPPP, the Project Sponsors commenced a four-year environmental review process under NEPA that culminated in 2024.  *See Mulgrew*, 750 F. Supp. 3d at 189-95.  The final environmental authorization, the Second "Re-Evaluation" issued by Defendants at the end of November 2024, recognizes that the Program's tolling schedule would "be implemented through a phase-in over six years," with the last toll schedule implemented beginning in 2031, *Chan*, No. 23 Civ. 10365, ECF 129-5 at 8-9, and that the MTA would issue bonds to generate the $15 billion mandated under the TMA based on $500 million to $900 million per year in toll revenues, *id.* at 15.

On November 21, 2024, FHWA and the Project Sponsors signed the VPPP Agreement authorizing the Program's collection of tolls from eligible vehicles entering the CBD pursuant to the VPPP.  Declaration of Brandon Trice ("Trice Decl."), Ex. 1 ("VPPP Agreement" or "VPPP Agmt.").  The VPPP Agreement states that "[e]ffective on the date of this Agreement, the project is approved as a pilot program" under the VPPP, and TBTA is authorized to "operate the Program as a toll Project in accordance with the provisions of this Agreement and as a value pricing project." *Id.*, cls. 1, 8.  FHWA agreed that "the imposition of tolls under this Agreement does not render Federal-aid highways within the State of New York generally ineligible for Federal-aid highway funds where such highways are otherwise eligible under the particular funding program." *Id.*, cl. 5.

12

Consistent with the statute, the VPPP Agreement states TBTA may use "toll revenues received from the operation of the Project" for, among other things, "any other projects eligible for assistance under title 23, United States Code." *Id.*, cl. 2.; *see* VPPP, cl. 3.  It also includes an attachment describing the Program in detail and states that TBTA "will toll vehicles entering the CBD," includes the approved toll rate schedule, and notes that a goal of the Program is to "generate revenue for future transportation improvements."  VPPP Agmt., Attach. A.

The VPPP Agreement does not include any provision authorizing FHWA to terminate the agreement unilaterally, as the Secretary has purported to do here.  Just the opposite: it specifies that only TBTA could unilaterally decide to discontinue the Program, requiring the Project Sponsors to "work with FHWA to return the Project to its original operating condition *if TBTA* decides to discontinue tolls on the Project." *Id.*, cl. 11 (emphasis added).  The VPPP Agreement further provides, consistent with the VPPP, that TBTA and NYCDOT shall "monitor and report on the project performance" for "a period of at least ten years or to the end of the life of the Project, whichever is sooner." *Id.*, cl. (8)(b); *see* VPPP, cl. 5.  And it reflects the three phases of tolling, with the last increase occurring in 2031—six years from now.  VPPP Agmt., Attach. A.

After the courts rejected numerous attempts to stop the Program, congestion pricing went into effect on January 5, 2025.[8]  Although the full benefits of the Program have yet to be realized, it has already proven to be a dramatic success, creating measurable improvements in travel times,

---

[8] *See Chan*, 2024 WL 5199945 (111-page decision denying motions for preliminary injunctions in four related cases); *see also Cnty. of Rockland v. Metro. Transp. Auth.*, No. 24A945 (S. Ct. Apr. 8, 2025) (Sotomayor, J., in chambers); *Cnty. of Rockland v. Metro. Transp. Auth.*, No. 24-3325 (2d Cir. Jan. 28, 2025), ECF 31 (per curiam); *New Jersey v. Metro. Transp. Auth.*, No. 1033 (3d Cir. Jan. 4, 2025), ECF 9 (Bibas, J.); *Cnty. of Rockland v. Metro. Transp. Auth.*, No. 24 Civ. 2285 (S.D.N.Y. Jan. 14, 2025), ECF 56 (Seibel, J.); *New Jersey v. U.S. Dep't of Transp.*, No. 23 Civ. 3885 (D.N.J. Jan. 3, 2025), ECF 212 (Gordon, J.); *Cnty. of Rockland v. Triborough Bridge & Tunnel Auth.*, No. 24 Civ. 2285 (S.D.N.Y. Dec. 23, 2024), ECF 52 (Seibel, J.); *Neuhaus v. Triborough Bridge & Tunnel Auth.*, No. 24 Civ. 3983 (S.D.N.Y. Dec. 23, 2024), ECF 44 (Seibel, J.).

DOT_0047827

traffic congestion, and the overall quality of life for those who live, visit and work in the CBD. *See* C. de Cerreño Decl. ¶¶ 25-27, 41.

###### E. The Administration purports to "terminate" the VPPP Agreement based on spurious and transparently pretextual arguments

Despite the Program's success and its growing support, President Trump has remained a stubborn and vocal opponent.  Even before the Program began, in May 2024, then-candidate Trump posted to social media that he would "TERMINATE Congestion Pricing in my FIRST WEEK back in Office!!!!"  Trice Decl., Ex. 2.  In January 2025, Representative Nicole Malliotakis posted on X that then-candidate Trump informed her during a meeting with New York and New Jersey Republicans that he "wants to … kill congestion pricing."  *Id.*, Ex. 3.

On February 19, President Trump followed through on trying to "kill" the Program, declaring on X that "CONGESTION PRICING IS DEAD. …  LONG LIVE THE KING."  *Id.*, Ex. 4.  To effectuate this "royal decree," that same day, Defendant Duffy sent a letter to Governor Hochul purporting to withdraw Defendants' approval of the Program and rescind the VPPP Agreement.  *Id.*, Ex. 5 (the "February 19 Letter" or "Feb. 19 Ltr.").  As grounds for the purported recission, Duffy asserted that the VPPP is "a limited exception" to Section 301 that must be "narrowly construe[d]," and that the VPPP, through "the vague phrase 'value pricing pilot program,'" does not "authorize the unprecedented and consequential step of cordon pricing."  *Id.* at 2-3.  Duffy further claimed that the VPPP does not authorize tolls "that are calculated based on considerations separate from reducing congestion or advancing other road-related goals."  *Id.* at 3. The February 19 Letter fails to acknowledge that FHWA has for many decades interpreted the VPPP to permit cordon pricing, and that such projects can and should have a revenue objective, including one that supports public transit projects.  *See supra* at Background Section C; SAC ¶ 26. Duffy did not cite any statutory, regulatory, or other basis to terminate the VPPP Agreement.

DOT_0047828

**F.     Plaintiffs bring suit and Defendants attempt to coerce compliance by threatening to illegally withhold federal approvals and funding**

Plaintiffs commenced this action the same day the February 19 Letter was issued, seeking a declaratory judgment that Defendants' purported termination of the VPPP Agreement is unlawful and without effect, and seeking vacatur of that decision.  The MTA and TBTA further stated that congestion pricing would "continue … as required by New York law until and unless" a court orders otherwise.  ECF 1 ¶ 120.

The next day, February 20, Defendant Shepherd sent a letter to the Project Sponsors demanding that they "cease the collection of tolls" by March 21.  Trice Decl., Ex. 6.  The day before that deadline, on March 20, Duffy posted on X that the continued operation of the Program exhibited "disrespect towards the federal government" and was "unacceptable."  *Id.*, Ex. 7.  The Secretary threatened to leverage federal funding to compel compliance, stating: "Know that billions of dollars the federal government sends to New York are not a blank check.  Continued noncompliance will not be taken lightly."  *Id.*  That same day, Shepherd sent a second letter stating that Duffy had directed her to "extend the period of time to comply by 30 days" and instructing that tolling cease by April 20.  *Id.*, Ex. 8.  During an April 2 meet and confer, counsel for the MTA and TBTA asked if Defendants intended to take any action to enforce the April 20 "deadline" set forth in Shepherd's March 20 letter, so that the parties and the Court could set an orderly briefing schedule.  ECF 49 at 4.  Counsel for Defendants responded that they "did not have information to provide."  *Id.*  Notwithstanding this representation, on April 8, USDOT posted another threat on X, warning that the agency "will not hesitate to use every tool at our disposal in response to non-compliance later this month."  Trice Decl., Ex. 9.

DOT_0047829

### G.   Defendants threaten unlawful "compliance" measures, dramatically altering the status quo

On April 18, the MTA, TBTA, NYSDOT, and NYCDOT filed their 111-page consolidated first amended complaint, ECF 62, setting out in detail why the February 19 Letter's claimed legal rationales for seeking to terminate the VPPP Agreement are without merit, and alleging that the purported rescission is invalid and based on transparently pretextual reasoning.

Three days later, on April 21, Duffy sent another letter to Governor Hochul demanding for the third time that she end the Program.  Trice Decl., Ex 10 ("April 21 Letter" or "Apr. 21 Ltr.").  At the outset, the April 21 Letter affirmed Defendants' position that the VPPP Agreement had already been "terminated" by the February 19 Letter.  *Id.* at 1.  But in apparent recognition of the weaknesses in that letter, Duffy attempted to recast the federal government's reasoning, claiming that the February 19 Letter also rested on several policy rationales, including that the Program "imposes a disproportionate financial hardship on low and medium-income hardworking American drivers," and that "there are no toll-free alternative routes available to access the cordoned-off area of Manhattan."  *Id.* at 2-3.  While the February 19 Letter did note that Defendants' review of the Program's eligibility was prompted by their disagreement on policy grounds, the February 19 Letter is clear that Defendants' purported termination of the VPPP Agreement rested on their legal interpretation of the VPPP.  Feb. 19 Ltr. at 3.  What's more, Defendants' alleged "policy concerns" are fatally undermined by their own extensive findings that congestion pricing would benefit low- and medium-income people, including by facilitating mass transit opportunities and reducing congestion on the roads, as well as the discount for frequent low-income drivers to the CBD built into the Program.[9]

---

[9]  *See* Final EA Chapter 6, Economic Conditions at 6-47–49, 6-80–84 (Apr. 2023), https://www.mta.info/document/110831; Final EA Chapter 17, Environmental Justice at 17-62, 17-67–72 (Apr. 2023),

16

The April 21 Letter goes on to threaten that Defendants "*will* implement appropriate initial compliance measures" on or after May 28, 2025 if New York continues to operate the Program, citing 23 C.F.R. § 1.36, a regulation enacted pursuant to the FAHA that sets forth FHWA's potential enforcement mechanisms to ensure compliance with the law. *Id.* at 2 (emphasis added). These "compliance measures," according to Duffy, include the broad suspension of federal approvals for transportation projects, which would result in the withholding of federal transportation funding in many instances. Specifically, the April 21 Letter threatens to suspend: (1) "further advance construction ('AC') authorizations," (2) "further [NEPA] approvals," (3) "further approvals of Statewide Transportation Improvement Program ('STIP') amendments concerning New York Metropolitan Transportation Council TIP modifications," and (4) "further obligations of FHWA funds (both formula and competitive) for projects within New York City." *Id.* The April 21 Letter further threatens that those measures may be extended "to other geographic areas within the State of New York." *Id.*

The STIP is "a comprehensive list of all projects or project phases in New York State proposed to receive Federal funding pursuant to Title 23 [(highways)] and 49 [(transit)] U.S.C. Chapter 53," and includes all highway, transit and non-motorized projects" requiring Federal aid from across urban and rural parts of the state. [10] NYSDOT is responsible for updating New York's STIP, which includes Transportation Improvement Programs ("TIPs") from each of the state's fourteen Metropolitan Planning Organizations ("MPOs"). [11] The STIP is updated every four years,

---

https://www.mta.info/document/110886 (describing "substantial benefits associated with reduced vehicle congestion in the Manhattan CBD" and measures designed to lessen impacts on low-income drivers).

[10] NYSDOT, STATE TRANSPORTATION IMPROVEMENT PROGRAM SUMMARY, https://www.dot.ny.gov/programs/stip/files/2023_STIP_Narrative.pdf.

[11] The New York Metropolitan Transportation Council ("NYMTC") is the MPO for New York City, Long Island, and the Lower Hudson Valley, including Westchester, Putnam, and Rockland counties—a region with more than 13 million residents. *About Us*, NYMTC, https://www.nymtc.org/en-us/ (last accessed May 1, 2025).

DOT_0047831

and is amended frequently to reflect projects newly proposed for federal funding. Declaration of Kevin Willens ("Willens Decl.") ¶ 23. FHWA and FTA, which oversees federal transit funding, must jointly approve each STIP and STIP amendment submitted to them by NYSDOT, and only projects in a STIP or STIP amendment approved by both FHWA and FTA "are eligible for funds administered by the FHWA or the FTA." 23 C.F.R. §§ 450.220(a), 450.222(a). Accordingly, the threat not to provide further approvals of STIP amendments encompasses all federal funding to the Project Sponsors for projects not included in the STIP.

The breadth of harm is enhanced by the threatened withholding of any advance construction authorizations. Advance construction, provided for in 23 U.S.C. § 115, allows states to obtain federal authorization for projects on the STIP while not yet allocating federal funding to the project, and to later convert the project to a Federal-aid project.[12] And the withholding of NEPA "approvals"—which are needed for "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. § 4332(2)(C), or to determine that a project will not have significant effects, *id.* § 4336—could include even non-federally funded projects that require federal authorization, as did the Program. Finally, the April 21 Letter threatens to withhold all "further obligations of FHWA funds (both formula and competitive) for projects within New York City." The April 21 Letter does not explain the Secretary's authority to take any of these enforcement measures, beyond citing 23 C.F.R. § 1.36 (which does not authorize the Secretary to deem the Program "illegal," let alone impose the sweeping "compliance measures" on account of its continued operation), and it does not cite any basis for these threatened actions other than the continued operation of the Program.

---

[12] See FHWA, *Advance Construction and Partial Conversion of Advance Construction,* https://www.fhwa.dot.gov/ipd/finance/tools_programs/federal_aid/ac_pcac/, last accessed May 4, 2025.

18

The threatened enforcement measures, if taken, would deprive Plaintiffs and NYCDOT of access to federal transportation funds, or the ability to initiate any new projects, shutting down critical transportation investment in the nation's largest city. *See* Willens Decl. ¶ 24 (noting loss of STIP approvals would jeopardize funding for subway and bus maintenance, and railroad track work, as well as other future projects requiring FTA funding); *id.* ¶¶ 25-26 (describing projects currently funded by FHWA dedicated to improving air quality and funding accessibility upgrades to public transportation infrastructure). And they would similarly deprive NYSDOT and NYCDOT of funding for vital projects, thereby harming MTA's ability to provide safe and reliable bus service on City streets. *Id.* ¶ 30; *see also* Declaration of William Carry ("Carry Decl.") ¶¶ 8-10 (explaining how withholding of advance construction authorizations and NEPA and STIP approvals would reduce NYCDOT's project funding flexibility and halt many projects).

Defendants have left no doubt that they intend to impose "compliance measures" on May 28 if Plaintiffs and NYCDOT do not end congestion pricing. On April 24, a spokesperson for the USDOT stated, "if New York doesn't shut it down, the Department of Transportation is considering halting projects and funding for the [S]tate."[13] On April 29, Duffy took to TV to criticize the Program, telling the hosts of *Good Day New York* that if Plaintiffs and NYCDOT do not "treat those who want to come into Manhattan fairly, maybe we should look at how much money we send the City. And that's what the Governor [of New York] is going to have to grapple with."[14] That same day, counsel for Plaintiffs requested that Defendants agree not to take any enforcement action or postpone the April 21 Letter's deadlines. Defendants responded by

---

[13] Peter Senzamici, *Feds Accidentally Upload Internal Memo Admitting Plan to Kill NYC Congestion Pricing Is 'Very Unlikely' to Succeed—Before Quickly Deleting It*, N.Y. POST (Apr. 24, 2025), https://nypost.com/2025/04/24/us-news/fed-lawyers-cast-doubt-on-duffys-dubious-congestion-kill/.

[14] Good Day New York, WNYW-NY (FOX) (Apr. 29, 2025), https://mms.tveyes.com/PlaybackPortal.aspx?SavedEditID=ab76562d-0726-4d6b-bcc4-f28ef11d100b.

DOT_0047833

reiterating their coercive threats, claiming that the termination and schedule for "compliance measures" remain in place, but taking the position that, because "administrative proceedings" are ongoing, Plaintiffs are precluded from seeking any relief from this Court.  ECF 73.

## LEGAL STANDARD

Plaintiffs are entitled to preliminary injunctive relief because they have shown that "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest."  *New York v. U.S. Dep't of Educ.*, 477 F. Supp. 3d 279, 293 (S.D.N.Y. 2020). Where, as here, the federal government is the opposing party, the last two factors merge.  *Id.* at 294 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  "In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence." *Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016) (quoting *Johnson v. Newport Lorillard*, 2003 WL 169797, at *1 (S.D.N.Y. 2003).[15]  Courts in this district recognize that preliminary injunctions are essential tools "to preserve the status quo by preventing during the pendency of the suit the occurrence of that irreparable sort of harm which the movant fears will occur."  *New York v. Rescue*, 705 F. Supp. 3d 104, 118 (S.D.N.Y. 2023).

## ARGUMENT

The Court should preliminarily enjoin Defendants from taking any of the actions outlined in the April 21 Letter or any other actions in retaliation for Plaintiffs' refusal to comply with their unlawful demand to stop congestion pricing.  Defendants have no valid basis to implement "compliance measures" because the Program is authorized by the VPPP Agreement.  The February

---

[15] The Court is currently considering whether Defendants have waived privilege over a document that was filed to the public docket and, according to news reports, establishes that Defendants' stated rationales for terminating the VPPP Agreement are pretextual.  ECF 72.  Should the Court find that Defendants waived privilege, Plaintiffs respectfully request permission to submit a supplemental letter, limited to three pages, addressing this highly relevant evidence.

DOT_0047834

19 Letter "terminating" the VPPP Agreement rests on pretextual and borderline frivolous legal arguments, to which the Court owes no deference.  Secretary Duffy's "policy concerns" are unavailing; they are not only irrelevant as a matter of law but illegal, *post hoc* justifications, and Duffy has no authority to terminate the VPPP Agreement on his own.  Even if Defendants' actions with respect to the VPPP Agreement were lawful, that would not entitle them to withhold funds or approvals consistent with either the FAHA or the U.S. Constitution, and those threatened actions would not only cause irreparable harm, but would be against the public interest.

I.     **Plaintiffs are likely to succeed on the merits**

   A.     **The Court has jurisdiction**

       As an initial matter, this Court has jurisdiction over this case under 28 U.S.C. § 1331 because Plaintiffs assert federal constitutional, equitable, and statutory claims.  With respect to Plaintiffs' Administrative Procedure Act ("APA") claims, the Court may grant relief under 5 U.S.C. §§ 702 and 705 based on the "source of the rights upon which the plaintiff bases its claims," and the "type of relief sought."  *Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 403 (2d Cir. 2017). Plaintiffs seek to vindicate their statutory and constitutional rights, and—since we seek declaratory and injunctive relief and vacatur, not monetary damages—this case is at core a challenge to Defendants' wrongful rescission of the VPPP Agreement, purported "termination" of the Program, and attempt to coerce compliance through the unlawful withholding of critical federal approvals for transportation projects.  Although enjoining Defendants' latest attempts to coerce compliance with the February 19 Letter would result in the issuance of certain federal approvals, and lead to funds being released to Plaintiffs, that is insufficient to divest the Court of jurisdiction to afford relief under the APA or the Constitution.  *See Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988); *see also Aetna Cas. & Sur. Co. v. United States*, 71 F.3d 475, 478 (2d Cir. 1995) (recognizing distinction between (1) claims "for damages to compensate for the government's failure to perform

DOT_0047835

a duty," and (2) claims seeking "to require the government to perform its duty"); *Linea Area Nacional de Chile S.A. v. Meissner*, 65 F.3d 1034, 1042 (2d Cir. 1995) (APA jurisdiction where plaintiff sought reimbursement of its expenses because the statute required government to reimburse parties such as the plaintiff).

While we expect that Defendants may raise it, *Department of Education v. California* is not inconsistent with these principles. 145 S. Ct. 966 (2025) (per curiam). There, the "terms and conditions of [109] individual grant awards [were] at issue," *California v. Dep't of Educ.*, 132 F.4th 92, 96-97 (1st Cir. 2025), and the plaintiffs fundamentally sought "to enforce a contractual obligation to pay money" and "represented … that they ha[d] the financial wherewithal to keep their programs running," *California*, 145 S. Ct. at 968-69. Here, Plaintiffs first and foremost challenge Defendants' improper agency actions of rescinding approval under the VPPP, a challenge that unquestionably does not fall with the Tucker Act's exclusive-jurisdiction provision. Plaintiffs also seek to enjoin Defendants' sweeping (and retaliatory) attempts to enforce the February 19 termination by withholding certain necessary federal approvals. Plaintiffs are not relying on any federal funding agreements as a source of rights. As numerous courts have recognized since *California*, challenges like this are properly heard by the federal district courts. *See, e.g.*, *New York v. Trump*, 2025 WL 1098966, at *1-2 (D.R.I. Apr. 14, 2025); *Maine v. U.S. Dep't of Agric.*, --- F. Supp. 3d ---, 2025 WL 1088946, at *19 & n.8 (D. Me. Apr. 11, 2025). It would neither make sense nor be consistent with basic principles of substantial justice if the federal government could divest a district court of jurisdiction in a pending case simply by threatening to withdraw some aspect of the plaintiff's federal funding.

Despite Defendants' assertions to the contrary, the instant motion is also ripe for resolution. While Defendants in their April 21 Letter have purported to keep the door open by issuing an order

DOT_0047836

to "show cause … why FHWA should not take appropriate steps under 23 CFR § 1.36 to remedy New York's noncompliance with 23 U.S.C. § 301 in connection with the [Program.]," Apr. 21 Ltr. at 1, there is no serious question that: (i) Defendants have already determined that the Program is not compliant with Section 301; and (ii) they "will" therefore take some or all of the compliance measures identified in the April 21 Letter, *id*. at 2. Indeed, in the April 21 Letter, Secretary Duffy reiterates that in the February 19 Letter, he "terminated" the VPPP Agreement (past tense), that "New York therefore is not legally permitted to collect tolls…," *id*. at 1,[16] and that "New York risks serious consequences if it *continues* to fail to comply with Federal law…," *id*. (emphasis added).

As in *Sackett v. EPA*, 566 U.S. 120 (2012), Defendants' February 19 Letter and compliance orders constitute "final agency action" because they have "all of the hallmarks of APA finality," including that "legal consequences will flow from issuance of the order." *Id*. at 127. It does not matter that Defendants may (putatively) invite Plaintiffs and Plaintiff-Intervenors to "engage in informal discussion of the terms and requirements" or "inform" Defendants of any errors in their understanding of the facts and the law. The mere possibility that an agency might reconsider in light of informal discussion and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal." *Id*. Judge Howell reached a similar conclusion in the case involving the Executive Order issued against the law firm Perkins Coie. *See Perkins Coie LLP v. U.S. Dep't of Just.*, --- F. Supp. 3d ---, 2025 WL 1276857, at *24-25 (D.D.C. May 2, 2025) (challenge was ripe because "whatever the exact guidance ultimately issued," "access of employees of Perkins Coie to federal buildings and government employees will be 'limit[ed]' as a

---

[16] Moreover, although Duffy claims to provide "notice" and an "opportunity to contest" under 2 C.F.R. § 200.342 in the April 21 letter, this opportunity came weeks *after* the February 19 termination of the VPPP Agreement. *See Climate United Fund v. Citibank, N.A.*, 2025 WL 842360, at *2 (D.D.C. Mar. 18, 2025) (explaining that the OMB Regulations require an agency to "take certain procedural steps *before* it can terminate a federal award").

DOT_0047837

result"). Indeed, this case is on even firmer footing than *Sackett* because Defendants are not asking for further information from Plaintiffs to determine whether they are "confident enough about [their] conclusion to initiate litigation." *Id.* After all, they already have it—Plaintiffs and Plaintiff-Intervenors have spelled out in the Amended Complaint why the purported termination of the VPPP Agreement is unlawful. First Amended Complaint ¶¶ 49-176; *see also* SAC ¶¶ 51-178.

Moreover, even if Defendants were implying that they would re-open their determination that the Program is invalid—and they have not—it could hardly be clearer under the circumstances that any further consideration would be completely pretextual. The April 21 Letter itself reiterates that the VPPP Agreement *was terminated*, so any suggestion that said termination is being reconsidered would be in "name only." *Mantena v. Hazuda*, 2018 WL 3745668, at *6 (S.D.N.Y. 2018) (declining to find "re-opening" of immigration proceeding rendered agency action non-final where "circumstances of reopening [were] suspect" because government did not "identif[y] issues with the original decision [or] areas that warranted further evidentiary development" and government acted just nine days after plaintiff filed amended complaint).

## B.      The February 19 Letter is arbitrary and capricious

The February 19 Letter, which serves as the purported basis for Defendants' actions, is entirely inconsistent with the statutory scheme it seeks to enforce, and arbitrarily announces an atextual interpretation of the FAHA in violation of the APA. The VPPP, by its plain terms, authorizes both "cordon pricing" and the use of toll revenue to support public transit, and Duffy failed to adequately consider Defendants' own long-held legal positions or Plaintiffs' justifiable reliance on those positions, among other things.

### 1.      *Cordon Pricing*

In the February 19 Letter, Duffy first and principally argues that 23 U.S.C. § 301 prohibits "tolls" on "roads constructed with Federal-aid highway funds," "subject to limited exceptions,"

DOT_0047838

and because the VPPP's "value pricing pilot program," is such an "exception," it must be "narrowly construe[d]" to exclude "cordon pricing." Feb. 19 Ltr. at 2-3. This is wrong.

To begin with, the VPPP is not an "exception" to Section 301's toll ban. The express "exception" to Section 301 is Section 129, which provides non-discretionary authority for tolling on federal-aid highways under a wide variety of circumstances. *See* 23 U.S.C. § 301 ("Except as provided in Section 129…"); *id.* § 129 (setting forth various circumstances in which federal-aid highways may be tolled). The VPPP, on the other hand, is an additional, stand-alone program that Congress created for project sponsors to consider potential "value pricing pilot projects," in which the Secretary "shall solicit" participation. VPPP, cl. 1. To that end, the VPPP states that "*[n]otwithstanding* section 129 and 301," tolling is permitted for "value pricing pilot programs." *Id.*, cls. 2, 4. As the Supreme Court has recognized, this "notwithstanding" language "shows which of two or more provisions prevails in the event of a conflict." *N.L.R.B. v. SW General, Inc.*, 580 U.S. 288, 302 (2017).[17]

Rather than putting a thumb on the scale, as Duffy does, the proper starting place in interpreting the VPPP is the statutory text, "in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020). Nothing in the plain language of the VPPP suggests that Congress required there to be other toll-free routes that could be used to access the area subject to tolling. To the contrary, the VPPP authorizes tolling as part of "value pricing pilot programs" without limitation. VPPP, cl. 1.

There can be no serious dispute that the VPPP permits a broad set of programs including

---

[17] Even if the VPPP were an "exception" to Section 301, exceptions must be interpreted in the same manner as any other statutory provision. *See, e.g.*, *BP P.L.C. v. Mayor of Balt.*, 141 S. Ct. 1532, 1538-39 (2021) (rejecting argument that court must construe exceptions narrowly and explaining that courts have "no license to give statutory exemptions anything but a fair reading"); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 359 (2012) (rejecting the "false notion" that "tax exemptions—or any other exemptions for this matter—should be strictly construed").

DOT_0047839

cordon pricing.  When the VPPP was enacted into law in 1991, the Secretary was directed to solicit participation for "congestion pricing pilot programs," later amended in 1998 to "value pricing pilot programs."  *Id.*, cl. 1.  While neither term is defined in the statute, at the time of enactment, "congestion pricing" meant a charge (or price) intended to remedy or offset congestion.  *See Congestion*, *Cassell Encyclopaedia Dictionary*, 312 (1990) (defined as an "abnormal accumulation (of inhabitants, traffic etc.")); *see also Congestion Charging*, *Black's Law Dictionary* (10th ed. 2014) (defined as "method of reducing traffic in major cities, esp. in city centers, by charging drivers a fee to go beyond a certain point on the roads in the cities").  Nothing in that definition suggests a limitation on the types of congestion pricing programs that may be implemented, much less a ban on "cordon pricing."  To the contrary, as noted, the very architect of congestion pricing, Professor Vickrey, proposed cordon pricing as *the way* to cure congestion *in New York* City, given the relatively narrow geography of Manhattan, the solution necessarily involves cordon pricing.  *See supra* at 10-11.  And by the time the VPPP was enacted, Singapore had successfully operated a cordon pricing system for over 15 years, commonly referred to as a "congestion pricing program."  *See, e.g.*, Paul W. Wilson, *Welfare Effects of Congestion Pricing In Singapore*, 15 TRANSP. 191, 191 (1988).

This common and contemporaneous understanding of the term "congestion pricing" persisted over the next three decades, as Congress reauthorized the VPPP in 1995, 1998, and 2005. Shortly after the passage of ISTEA in 1991, Congress asked FHWA how it defined the term "congestion pricing" in the VPPP, and FHWA responded as follows: the "potential scope of congestion pricing applications can vary widely, ranging from pricing on a new or existing single road facility to more comprehensive *area-wide road pricing strategies*." SAC ¶ 69 (emphasis added).  From there, FHWA consistently understood congestion pricing to encompass—and in fact

26

DOT_0047840

quintessentially cover—cordon pricing, and the agency even funded multiple cordon pricing studies under the VPPP.  *See supra* at 11-12; SAC ¶¶ 82, 88, 92, 94.  Far from limiting project sponsors to any particular methodology, Congress continued to allow experimentation, which after all was the whole point of the VPPP in the first place.  *See supra* at 10-11; SAC ¶ 72.  Thus, the "contemporary legal context" in which Congress acted demonstrates that the ordinary meaning of "congestion pricing" included cordon pricing.  *Fiero v. Fin. Indus. Regul. Auth., Inc.*, 660 F.3d 569, 577 (2d Cir. 2011); *see also Wash. All. of Tech. Workers v. D.H.S.*, 50 F.4th 164, 182 (D.C. Cir. 2022) ("If Congress has continually declined to disturb a longstanding interpretation of a statute," it indicates Congress "at least acquiesces in, and apparently affirms, that interpretation").

Not surprisingly, this construction is supported by the broader statutory context as well. ISTEA is rife with limitations and specific definitions where Congress intended them, but there are no such limitations for the VPPP.  For example, in creating the Suspended Light Rail System Technology Pilot Program, Congress described certain characteristics that any such program "shall" have.  ISTEA § 3030(c)(3).  The VPPP contains no such limitation: at most, beyond the broad authorization to enter into "value pricing pilot programs," it requires the Secretary to "monitor" the "effects such programs are having on driver behavior, traffic volume, transit ridership, air quality, and availability of funds for transportation programs," which requirements reflect a general focus on objectives like reducing congestion through reducing traffic and promoting other forms of transportation.  VPPP, cl. 5.  After all, this is not just the common understanding of Congress; it is simply common sense.

To the extent there were any doubt, the fact that everyone always understood that congestion pricing encompassed cordon pricing is supported by the "mischief the statute sought to remedy," *Carroll v. Trump*, 49 F.4th 759, 770-71 (2d Cir. 2022), as well as the legislative history,

27

*Spadaro v. U.S. C.B.P.*, 978 F.3d 34, 46 (2d Cir. 2020).  Indeed, during hearings leading to the passage of ISTEA, the bill's sponsor, Senator Daniel Patrick Moynihan, described Singapore as a "particularly interest[ing]" method of "congestion pricing," and agreed that cordon pricing was a promising method of congestion pricing, explaining, "Singapore is doing it, Hong Kong is doing it, we are talking about it."  SAC ¶ 74.  Likewise, in passing the Clean Air Act Amendments of 1990, Congress was clear that "transportation control measures" under that statute should include tolling vehicles "to enter central business districts." *Id.* ¶ 75.  Again, Congress has repeatedly said the point of the VPPP was to encourage *experimentation* in order to curb congestion. *Id.* ¶ 74.

Duffy's reliance on 23 U.S.C. § 129(d)(4)(B) doesn't work either.  Feb. 19 Ltr. at 3.  For one thing, Section 129(d), which establishes the "Congestion relief program," was enacted as part of the 2021 Infrastructure Jobs and Investment Act, and as a later law that is separate from the VPPP, it has no relevance to the meaning of the VPPP.  *Gutierrez v. Ada*, 528 U.S. 250, 257-58 (2000) ("[L]ater laws that do not seek to clarify an earlier enacted general term and do not depend for their effectiveness upon clarification, or a change in the meaning of an earlier statute, are beside the point in reading the first enactment.").  Regardless, the fact that Congress described projects eligible for funding under that program to include "deployment and operation of a system that implements or enforces high occupancy vehicle toll lanes, cordon pricing, parking pricing, or congestion pricing," hardly shows that the "value pricing pilot program" under the VPPP excludes "cordon pricing."  Again, the VPPP broadly refers, without limitation, to "value pricing," which has always been understood to include cordon pricing.[18]   If anything, the list of examples in

---

[18] *See* Elena Safirova et al., *Choosing Congestion Pricing Policy: Cordon Tolls Versus Link-Based Tolls*, 1932 J. OF TRANSP. RSCH. BD. (2005) ("Distributional effects of cordon and link-based tolls are also examined in the hope of understanding why one scheme might be preferred over another.").

DOT_0047842

Section 129(d) again reflects Congress's understanding of the diverse, non-exclusive methods that are encompassed under the umbrella term "congestion pricing."

### 2. Revenue Objectives

Duffy also claims that tolls cannot be "calculated based on considerations separate from reducing congestion or advancing other road-related goals." Feb. 19 Ltr. at 3. He then goes on to chastise the Program (which Defendants approved) for being "driven primarily by the need to raise revenue for the Metropolitan Transit [sic] Authority as opposed to the need to reduce congestion." *Id.*[19] But this second rationale in the February 19 letter is just as invalid.

First of all, the VPPP authorizes tolls on federal-aid highways. It therefore follows that "raising revenue" is a permissible function of a VPPP program—that, of course, is what tolls do. And while Duffy appears to take issue with the particular toll rates of the Program, nothing in the VPPP statute imposes limits on those rates. Moreover, the statute explicitly provides that "[r]evenues generated" may be used to fund other transportation "projects eligible under" Title 23, including capital transit projects. VPPP, cl. 4; *cf.* 23 U.S.C. § 129(d)(6)(B) (setting specific limits on toll rates for separate "congestion relief program"). As this Court has explained, and as Duffy is compelled to concede, *see* Feb. 19 Ltr. at 3, the statutory text makes it "unmistakably clear" that "a public authority [is] permitted to collect funds that exceed a toll road's costs and spend those funds on non-toll road projects," *Chan*, 2024 WL 5199945, at * 17.

---

[19] Duffy is mistaken in claiming that raising revenue is the "primary" driver of the Program. Feb. 19 Ltr. 3. The Program has complementary goals of congestion reduction and providing MTA with a stable funding source, with the latter also supporting congestion reduction by helping travelers shift modes from driving to transit. *See* N.Y. Veh. & Traf. Law § 1701. These dual goals were reflected in the EoI, *see* C. de Cerreño Decl., Ex. B, at 3-4, and the purpose and need for the Program was developed in consultation with FHWA, *see* SAC ¶¶116-24. Indeed, FHWA previously acknowledged and defended these complementary objectives in filings before this Court. *See Chan*, ECF 65 at 6, 9; *Chan*, ECF 160 at 8. Duffy's clear factual error is another reason to find the February 19 Letter invalid. *See New York v. H.H.S.*, 414 F. Supp. 3d 475, 545, 577 (S.D.N.Y. 2019) (where agency's stated justification for undertaking rulemaking was "factually untrue," that "alone made the agency's decision … arbitrary and capricious").

DOT_0047843

Duffy's position on revenue generation is also undermined by the rest of the VPPP. Far from prohibiting consideration of revenue, Congress anticipated and even required States to consider using excess revenues from congestion pricing programs as a funding source for public transportation. VPPP, cl. 4. The VPPP instructs the Secretary to report to Congress "every 2 years on the effects" that VPPP programs "are having on … transit ridership, air quality, and *availability of funds for transportation programs*." *Id.*, cl. 5 (emphasis added). And, in a separate section of ISTEA, Congress directed that States "shall undertake a continuous transportation planning process," which "shall" consider "the use of innovative mechanisms for financing projects, including … tolls [and] congestion pricing." ISTEA § 1025(a). This, of course, is in keeping with the broader intent of ISTEA, which was enacted to "develop a National *Intermodal* Transportation System" consisting "of all forms of transportation in a unified, interconnected manner," *id.* § 2 (emphasis added), and to grant "states greater flexibility to operate toll facilities and use toll revenues for a variety of transportation projects" including congestion pricing. *Chan*, 2024 WL 5199945, at *33; *see also* SAC ¶ 64-78 (collecting legislative history establishing Congress intended to permit the use of tolls to fund public transit programs).

The courts "do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply." *Mendis v. Filip*, 554 F.3d 335, 340 n.5 (2d Cir. 2009) (quoting *Jama v. I.C.E.*, 543 U.S. 335, 341 (2005)). This is particularly true where, as here, the federal government's proposed interpretation of a statute would curtail an area "of traditional State responsibility" like public transportation systems such as buses or subways. *Bond v. United States*, 572 U.S. 844, 858-59 (2014) (Congress must provide a "clear statement" if it seeks to "override the usual constitutional balance of federal and state powers"); *see also Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 715 (1972) (describing

DOT_0047844

States' traditional authority over road tolls).  Congress knows how to specify the factors that should or should not be considered in connection with projects authorized under Title 23, and it did not include any prohibition on the consideration of revenue in the VPPP.  *See, e.g.*, 23 U.S.C. § 106(a)(4) (cross-referencing 23 U.S.C. § 109); *see also* 49 U.S.C. § 60301(e).

The Second Circuit considered an argument much like Duffy's in *American Trucking Associations, Inc. v. New York State Thruway Authority*, which concerned the use of toll revenue to fund New York's canal system under another tolling provision in ISTEA.  886 F.3d 238, 246 (2d Cir. 2018) (citing ISTEA §1012(e)).  There, the Trucking Associations argued that the Thruway Authority's desire to use tolling revenue to fund New York's canal program meant that the challenged tolls were higher than they ought to be, and that Congress, in enacting ISTEA, had "meant to limit the amount" of tolls that could be collected "to fund unrelated projects."  *Id.*  The Second Circuit rejected this argument, holding that it was "unmistakably clear" that "Congress meant to permit the Thruway Authority to continue collecting tolls of whatever amount" and to use any "surplus revenue" for "other transportation projects."  *Id.*  Like Section 1012(e), VPPP clause 3 permits toll revenues to be used for "any project eligible for assistance" under Title 23, including capital transit projects, without any limitation on the toll amounts.

Again, the whole point of the VPPP was to encourage experimentation through pilot programs intended to actually *reduce congestion*, and everyone understood that meant an "*intermodal*" approach where other forms of transportation, besides cars, were incentivized and supported.  SAC ¶ 67.  Given that tolls would generate revenue, it was assumed—and encouraged—that those revenues would go toward other transportation methods to reduce traffic congestion, like buses or subways.  And on top of that, Congress acquiesced to FHWA's longstanding interpretation of the VPPP, *see Fiero*, 660 F.3d at 577; *see also S*AC ¶¶ 84-100

31

(collecting examples of FHWA recognizing VPPP permits revenue objective), by amending the VPPP four times without seeking to disturb that interpretation.[20]

### 3. Defendants' "policy concerns"

After Plaintiffs filed their amended complaint detailing at length the deficiencies in Duffy's statutory analysis on April 18, Defendants realized they needed a new approach, so in their April 21 Letter they sought to recast Duffy's original termination decision as also resting on supposed "policy concerns," including the alleged "disproportionate financial hardship" the Program imposes and the "unconscionable" nature of "highway users" (*i.e.*, drivers on the City's streets) "being forced to bail out the MTA transit system."  April 21 Ltr. at 2-3.  But the February 19 Letter is clear that these policy concerns merely prompted Duffy's legal review, and that his ultimate decision to terminate the VPPP Agreement rests on "two reasons" derived from his interpretation of the VPPP, specifically his conclusions that (1) cordon pricing "is not authorized under Congress' use of the phrase 'value pricing pilot program,'" and (2) the "VPPP does not authorize tolls that are calculated based on considerations separate from reducing congestion."  Feb 19. Ltr. at 3.  Having apparently realized the weaknesses of those justifications, Defendants do not get a second bite at the apple.  Where, as here, an agency issues a memorandum "to elaborate on the reasons" for the initial agency action, offering new and "separate," policy reasons for action already taken, those new reasons "can be viewed only as impermissible *post hoc* rationalizations." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21-22 (2020).  This would

---

[20] The Court does not owe any deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), to the February 19 Letter's abrupt and poorly reasoned reversal of FHWA's longstanding interpretation of the VPPP.  *See In re Bernard L. Madoff Inv. Sec. LLC*, 779 F.3d 74, 82 (2d Cir. 2015).  It is perfectly clear that the President set out to "kill" the Program for political reasons and directed Secretary Duffy to manufacture a legal rationale for doing so, so that is what he did.  *See supra*.  An agency decision that contradicts an agency's long-held view is entitled "to little, if any, deference." *SEC v. SIPC*, 872 F. Supp. 2d 1, 10 (D.D.C. 2012).  FHWA has for many years had the authority to administer the VPPP, 49 C.F.R. § 1.85(c)(22), and in that capacity, it has consistently and repeatedly concluded that the VPPP permits cordon pricing as well as the consideration of revenue objectives.  *See supra* at 10-12; SAC ¶ 27.

DOT_0047846

include elevating policy concerns that were previously cited as commentary in the Feb. 19 letter into supposed legal rationales for the decision to terminate. And, even if these *post hoc* rationalizations could be considered, they are flatly inconsistent (again) with the VPPP itself, which expressly contemplates the use of tolling revenues to promote mass transit as a means of reducing congestion, as well as with the extensive environmental review record in this case, which concluded that the Program will provide substantial benefits to low- and moderate-income commuters.[21] Moreover, even if the Court were willing to entertain Defendants' policy rationales, and even assuming that Secretary Duffy's decision was based on policy and not a legal infirmity in the VPPP Agreement, then the termination of the Agreement without any NEPA review was clearly in violation of law for the reasons explained *infra*, Point I.B.5. In any event, Duffy's concern that "there are no toll-free alternative routes available to access the [CBD]," Apr. 21 Ltr. at 2, and purported belief that this is unprecedented or against preexisting USDOT policy, *see* Good Day New York, *supra* note 14, is unfounded. FHWA has approved tolls on many routes that do not provide for toll-free access, including several here in New York such as on the two I-278 bridges to Staten Island, as well as on two I-190 bridges to Grand Island, leaving no toll-free alternative routes to access either of those destinations. It also defies belief that Duffy (a cabinet member and New Jersey resident) would claim that absent the Program, New Jersey drivers could access the CBD through a toll-free "roundabout way." Though technically true, the only such option would add approximately 300 miles to those drivers' commutes, considering that the closest un-tolled Hudson River crossing is in Albany. In short, Defendants are making it up as they go along—the definition of arbitrary and capricious decision making.

---

[21] *See* Final EA Chapter 6, *Economic Conditions* at 6-47–49, 6-80–84 (Apr. 2023), https://www.mta.info/document/110831; Final EA Chapter 17, *Environmental Justice* at 17-62, 17-67–72 (Apr. 2023), https://www.mta.info/document/110886 (describing "substantial benefits associated with reduced vehicle congestion in the Manhattan CBD" and measures designed to lessen impacts on low-income drivers).

DOT_0047847

4.    *Defendants have no right to terminate the VPPP Agreement—regardless of their justification*

Defendants do not have the right to terminate the VPPP Agreement in any event.  As noted, the VPPP Agreement itself says nothing about Defendants having a right to terminate.  Rather, it refers to *TBTA* alone as having such right.  This reflects the parties' understanding that the Program would be long running (unless TBTA decided to end it).  The VPPP Agreement expressly refers to: (i) monitoring the Program for at least ten years, (ii) phasing in the tolls over a period of six years, with ongoing tolling thereafter, and (iii) the TMA, which requires TBTA to raise $15 billion through the issuance of long-term bonds.  VPPP Agreement cls. 8(b), 11, Attach. A.

Defendants claim a right to terminate under the Uniform Guidance regulations issued by the Office of Management and Budget ("OMB Regulations"), 2 C.F.R. Part 200.  But the problem for Defendants is that those regulations actually make clear that if Defendants wanted to have a right to terminate, they were required to say so explicitly in the agreement.  *See Singh v. U.S. Dep't of Just.*, 461 F.3d 290, 296 (2d Cir. 2006) ("[A]n administrative agency must adhere to its own regulations.").  Indeed, while the OMB Regulations permit unilateral termination by the recipient of an award, *see* 2 C.F.R. § 200.340(a)(3), they do not include a similar provision allowing unilateral termination by an agency.[22]  Taken together, these regulations have been interpreted by federal agencies as prohibiting agencies from unilaterally terminating awards, including for policy reasons.  *See, e.g.*, *Guidance for Federal Assistance*, 89 Fed. Reg. 30046, 30089 (Apr. 22, 2024).

To be sure, Section 200.340(a)(4) permits termination by the agency when done "pursuant

---

[22] Moreover, under 2 C.F.R. §§ 200.341(a) and 342, even if an agency has a termination right (and Defendants do not), it may terminate a cooperative agreement only after providing the recipient written notice and an opportunity to be heard, which obviously did not occur here.  Recognizing their error on that front, Defendants belatedly claimed to provide "notice" and an "opportunity to contest" in the April 21 Letter.  But that supposed opportunity came weeks *after* the February 19 termination of the VPPP Agreement.  *See Climate United Fund v. Citibank, N.A.*, 2025 WL 842360, *2, 8 (D.D.C. Mar. 18, 2025) (OMB Regulations require agency to "take certain procedural steps *before* it can terminate a federal award" (emphasis added)).

DOT_0047848

to the terms and conditions of the Federal award," and even then, only to "the extent authorized by law." 2 C.F.R. § 200.340(a)(4); *see also* 89 Fed. Reg. at 30089 (revised language of subsection (a)(4) only permits termination due to changes in "agency priorities" where such condition is "included in the terms and condition of the award"). But that only proves our point. Again, the VPPP Agreement says *nothing at all* in its terms and conditions about Defendants terminating it. In fact, precisely to prevent the sort of "pull out the rug from under them" behavior that Defendants want to engage in here, the very regulations that Defendants invoke actually require that the "Federal agency or pass-through entity must *clearly and unambiguously* specify all termination provisions in the terms and conditions of the Federal award." 2 C.F.R. § 200.340(b) (emphasis added); *see, e.g.*, *Climate United Fund v. Citibank, N.A.*, 2025 WL 1131412, at *16 (D.D.C. Apr. 16, 2025) (agency "can only terminate a federal award on this basis pursuant to the terms and conditions of the federal award"), *stayed pending appeal*, No. 25-5122 (D.C. Cir. Apr. 16, 2025). Finally, because the VPPP Agreement, consistent with the VPPP, contemplates that the Secretary will monitor the Program for "at least ten years," and everyone (including FHWA) understood that the Program would rely on tolling revenues to raise $15 billion in long-term bonds, only TBTA has the right to terminate. *See* Willens Decl. ¶¶ 4-11.

All of this makes the instant case stand in stark contrast to cases where the grant agreement included or expressly incorporated language authorizing termination. *Cf. Sols. in Hometown Connections v. Noem*, 2025 WL 1103253, at *4-5 (D. Md. Apr. 14, 2025) (grant included provision authorizing DHS to terminate award due to changes in "agency priorities").[23] Had the federal

---

[23] Unable to point to any provision in the VPPP Agreement, Defendants rely on a document posted to their website entitled *Contractors and Recipients General Terms and Conditions for Assistance Award* ("General Terms"), which Defendants claim is "incorporate[d]" into the VPPP Agreement. Apr. 21 Ltr. at 3-4. But the VPPP Agreement does not mention the General Terms and only states that the Project Sponsors will "comply with" federal laws and requirements "applicable to this project." VPPP Agmt. cl. 9. That simple agreement to "comply" obviously does not

DOT_0047849

government wished to have the right to unilaterally terminate congestion pricing, it could have negotiated with the Project Sponsors to include a term authorizing termination in the VPPP Agreement (although the Project Sponsors would never have agreed, given the substantial cost to develop and set up the infrastructure for the Program and the need to interest investors in long-term bonds supported by Program revenues). The federal government did not include any such provision, and cannot attempt to renegotiate now, particularly given that Defendants are not contributing a dime to the Program, which involves areas of exclusively local concern to resolve *New York*'s congestion problems through local means.

In our legal system, the acts of executive branch officers "must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902); *see also* 5 U.S.C. §§ 706(2)(C) (court must set aside agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"). To the extent that Duffy claims some free-ranging authority to revisit agency determinations and thereby terminate the VPPP, the problem he has is that both statute and applicable regulations say otherwise. *See Chao v. Russell P. Le Frois Builder, Inc.*, 291 F.3d 219, 229 n.9 (2d Cir. 2002).

> 5.  *Defendants failed to conduct an environmental review under NEPA before purporting to terminate the VPPP Agreement*

To the extent that Defendants now base the "termination" on policy grounds, that is also not in accordance with law because Defendants failed to conduct an environmental review prior

---

incorporate into the VPPP Agreement every Federal law, regulation and guidance document under the sun. 2 C.F.R. § 200.340(b) (agreement must "unambiguously specify" termination conditions); *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996) (in order to be incorporated by reference into an agreement, a paper "must be so referred to and described in the instrument that the paper may be identified beyond all reasonable doubt"). And regardless, the General Terms do not help Defendants because they are entirely circular, only authorizing termination "in accordance with 2 C.F.R. § 200.340," which itself requires the agency to include an agency termination provision in the terms of the federal award.

DOT_0047850

to taking that action, as mandated by NEPA.  NEPA requires federal agencies to prepare an Environmental Impact Statement ("EIS") for any "major federal action[] significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  In doing so, agencies are required to take a hard look at the proposed action's reasonably foreseeable social, economic and environmental impacts.  *See*, *e.g.*, *id.* § 4336; 23 C.F.R. § 771.119(b); *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).  To determine whether a major federal action will significantly affect the quality of the environment, an agency may prepare an Environmental Assessment ("EA").  *See, e.g.*, 42 U.S.C. § 4336(b)(2); 23 C.F.R. § 771.119.  If an agency determines that the proposed action will not have significant effects, accounting for mitigation, it may issue a Finding of No Significant Impact ("FONSI").  42 U.S.C. § 4336(b)(2); 23 C.F.R. § 771.121.  If the assessment reveals that there may be significant effects, an environmental impact statement is required.  42 U.S.C. § 4336(b)(2); 23 C.F.R. § 771.119(i).

USDOT under the first Trump Administration recognized that NEPA required an environmental review of the Program because Defendants' approval of tolling authority under the VPPP qualified as a major federal action.  As a result, FHWA and the Project Sponsors conducted an exhaustive, multiyear NEPA review that culminated in a final EA and FONSI based on the Project Sponsor's mitigation commitments, clearing the way for the parties' execution of the VPPP Agreement.  Defendants' purported termination of the VPPP Agreement would be no less major than their execution of the Agreement in the first place, as it would have no less of an impact on the environment and would significantly alter the status quo.  Indeed, considering that the EA and FONSI identified numerous environmental benefits of the Program, including significant reductions in traffic congestion and air pollution regionwide, terminating the VPPP Agreement and halting the Program (even assuming Defendants had the authority to do so, which they do not)

37

would inevitably increase congestion and air pollution, among potentially other adverse environmental consequences. *See, e.g.*, *Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 234-35 (9th Cir. 1990) ("If an ongoing project undergoes changes which themselves amount to major Federal actions, the operating agency must prepare an EIS.") (citing *Andrus v. Sierra Club*, 442 U.S. 347, 363 n.21 (1979) (major federal actions include the "expansion or revision of ongoing programs")).

### 6. *The MTA and TBTA's reliance interests*

Duffy's purported "termination" is unlawful for yet another reason: he did not adequately consider the MTA and TBTA's significant reliance interests in the VPPP Agreement, FHWA's 2019 statement that the VPPP is the "best fit" for the Program, or FHWA's longstanding interpretation of the VPPP. The "longstanding practice of the government—like any other interpretive aid—can inform a court's determination of what the law is." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 386 (2024) (internal quotation marks and alterations omitted). As the Supreme Court has held, allowing agencies to reverse "consistent" and "longstanding" statutory interpretations "affirmatively destroys," rather than "safeguard[s]," reliance interests by giving "license" to "an agency to change positions as much as it likes." *Id.* at 386, 410-411. Duffy's reversal of the agencies' decades-old, consistent interpretation of the VPPP flouts these principles, undermines the MTA and TBTA's reliance interests, and is therefore entitled to no deference. *Garland v. Cargill*, 602 U.S. 406, 412 (2024) (rejecting agency's attempt to "abruptly reverse[]" course" in its interpretation of gun laws); *N.L.R.B. v. Noel Canning*, 573 U.S. 513, 525 (2014) (U.S. Supreme Court "has treated practice as an important interpretive factor even when the nature or longevity of that practice is subject to dispute").

Even if Defendants' about-face on USDOT's interpretation of the VPPP statute were a change in *policy* (which it is not), it would still fail APA review. Where an agency's "prior policy

DOT_0047852

has engendered serious reliance interests," the agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  A failure to consider reliance interests or to fully explain an agency's reasoning with respect to reliance interests renders an agency's change in position arbitrary and capricious under the APA.  *See Regents of the Univ. of California*, 591 U.S. at 33.

And Plaintiffs' reliance on Defendants' interpretation of the VPPP and on the VPPP Agreement in their financial planning to support and sustain the New York metropolitan region's public transit system is quite significant.  *See* SAC ¶ 101-02; *see also* C. de Cerreño Decl. ¶¶ 29-37.  For example, the MTA relies on Program revenues to fund critical aspects of its Capital Program, in order to deliver critically needed public transit improvements.  *See* SAC ¶ 209-11; *see also* Willens Decl. ¶¶ 10-15  And TBTA has already substantially relied on Defendants' interpretation of the VPPP and on the VPPP Agreement in incurring debt that will be repaid, at least in part, by Program revenues.  *See* SAC ¶ 214; *see also* Willens Decl. ¶¶ 11-15.  Everyone (including FHWA) understood that the bonds, as 30-year bonds, would be paid from toll revenue over the length of their 30-year term.  *See* Willens Decl. ¶¶ 4-15.  Indeed, FHWA's Re-evaluations were explicit in that respect, noting that the net revenue would be dependent on the bonds' "rates and terms."  *E.g.*, Re-Evaluation 2 at 8 n.2.

There can be no doubt that FHWA well understood these reliance interests.  Indeed, FHWA confirmed in recent court filings that it understood MTA's financing plan was reliant on long-term Program revenue to repay 30-year bonds.  *See* Manhattan Central Business District Tolling Program Supplemental Memorandum at 20-22, *New Jersey v. U.S Dep't of Trans. et al.*, No 23 Civ. 03885 (Jan. 17, 2025), ECF 218-1 (confirming that declaration signed by MTA CFO Kevin Willens on January 2, 2025 explaining how the MTA and TBTA planned to issue long-term bonds

DOT_0047853

to be repaid by Program revenue "reflects FHWA's contemporaneous understanding of the information conveyed by the Project Sponsors before FHWA's issuance of Re-Evaluation #2"). As the MTA's CFO has explained, the MTA's reliance on the long-term operation of the Program was made crystal clear to FHWA during the development of the Program and negotiation of the VPPP.  *See* Willens Decl. ¶¶ 4-11 (explaining FWHA understood that the MTA could not have signed a VPPP agreement that gave FHWA unilateral authority to terminate Program because financing $15 billion in capital improvements "is dependent on attracting investors to purchase long-term bonds secured with Program revenue").  "The MTA and TBTA have relied on the durability of the VPPP Agreement in incurring" over a billion dollars in debt in the form of short-term notes and loans.  *Id*. ¶¶ 12-15.  Moreover, Plaintiffs incurred substantial costs (some $500 million) in designing the Program, conducting lengthy environmental reviews, and installing the systems necessary to collect tolls, all based on USDOT and FHWA's consistent and longstanding statutory interpretation that the agencies now disavow.  *See*  C. de Cerreño Decl. ¶¶ 29-37.

The February 19 Letter gives superficial attention to these weighty reliance interests, ignoring key facts.  Although the Letter mentions that "TBTA and NYSDOT have relied on the [VPPP] Agreement to begin collecting tolls," Feb. 19 Ltr. at 4, it barely mentions—let alone discusses—Plaintiffs' broader reliance interests.  For example, the Letter notes that "TBTA and NYSDOT have incurred costs related to the program," but dismisses that reliance since the costs "were incurred before FHWA signed the Agreement."  *Id.*  But this leaves out Plaintiffs' substantial reliance on Defendants' "*prior interpretation*," *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 746 (1996) (emphasis added), of the VPPP as permitting cordon-based tolling to raise revenue for mass transit, and Defendants' representation in 2019 that the VPPP would be the "best fit" for the Program.  C. de Cerreño Decl., Ex. C; *see also Fox*, 556 U.S. at 515 (focus is

40

on whether "*prior policy* has engendered serious reliance interests") (emphasis added).  The Letter

also pays no heed to the substantial reliance interest even after the VPPP was signed.  *See* Willens

Decl. ¶¶ 12-15.  This is not the kind of "detailed justification" that can support a reversal in legal

interpretation—or even a policy change—where the prior policy has engendered serious reliance

interests.  *See Fox Television Stations*, 556 U.S. at 515; *see also Encino Motorcars, LLC v.

Navarro*, 579 U.S. 211, 222 (2016); *see also Bondi v. VanDerStok*, 145 S. Ct. 857, 873-74 (2025)

("novelty of" statutory interpretation is "strike against it," and the "contemporary and consistent

views of a coordinate branch of government can provide evidence of the law's meaning").

The February 19 Letter also asserts that Plaintiffs' reliance on Program revenues to fund

public transit improvements "was not reasonable given that FHWA approved only a 'pilot

project,'" referring to the text of the VPPP, which authorizes "value pricing pilot projects."  Feb.

19 Ltr. at 4.  This is nonsensical.  The Program is a "pilot" only in the sense that the VPPP statute

authorizes projects to develop knowledge about the efficacy of congestion pricing strategies.

Indeed, to the extent the VPPP itself says anything about the anticipated length of the Program, it

says that the "Secretary *shall* monitor the effect of such programs for a period of *at least 10 years*,"

VPPP § 5 (emphases added).  This obviously is inconsistent with the Secretary being able to

terminate the Program mere months in (and consistent with the notion that the Program will run

unless and until TBTA decides to stop it).[24]  No sane State government or agency (including

Plaintiffs) would spend years studying the potential environmental effects of a program in advance

---

[24] By contrast, when Congress wanted particular programs or grants to have time limitations under Title 23, it said so, and in many instances required the agreement to say so, too.  *See, e.g.*, 23 U.S.C. § 112(b)(4)(C)(v); *id.* § 131(e) (requiring states to remove non-conforming signs or displays within five years of statute's enactment); *id.* § 151(f)(6)(C)(i) (allowing grant recipients to provide funds to private entities operating publicly available electric vehicle charging infrastructure for the first five years of operation).

DOT_0047855

of implementation and would invest a half-billion dollars in planning, technology, and infrastructure if the project were intended to be short-term or could be summarily struck down.

Contrary to the implication in the February 19 Letter that Plaintiffs' reliance was not reasonable because "FHWA's approval was not authorized by law," Plaintiffs acted reasonably in relying on Defendants' longstanding interpretation of the VPPP, including FHWA's representation to Plaintiffs that it was the "best fit" for the Program.[25] It was not unreasonable—indeed, it was eminently reasonable—for Plaintiffs to rely on FHWA's consistent and well-grounded interpretation of the VPPP dating back to its implementation, when there was no prior indication that the agency might suddenly make a 180-degree change in course. FHWA's prior interpretation of the VPPP is consistent with the statute's plain text, has never been challenged in court, and has never been found by any court to be unauthorized. Moreover, the Supreme Court in *Regents* rejected the argument that a federal agency need not seriously consider reliance interests when the agency determines that its prior policy was not legally authorized. *See* 591 U.S. at 33. As the Court explained there, even where an agency determined that its prior policy was illegal, "nothing about that determination foreclosed or even addressed the option[] of … accommodating particular reliance interests," and the agency's failure to do so was "arbitrary and capricious." *Id.* So too here. The February 19 Letter merely points to its cursory and ill-founded determination of illegality without truly taking into account Plaintiffs' substantial reliance interests.

## C.   Defendants' proposed enforcement

Even if the February 19 Letter were not unlawful, and the termination of the VPPP Agreement were valid, Defendants would not have license to effectively shut off funding and

---

[25] While Duffy claims to rest his decision on his legal interpretation of the VPPP, the record here is very clear that Duffy's explanation is pretextual in nature and that President Trump directed him to find a way to end the Program for political reasons. *See, e.g.*, Feb. 19 Ltr. at 1 (President Trump directed "review" of "approval of the [Program]" in light of the President's policy concerns); *see also Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019).

DOT_0047856

approvals for virtually any and every federal-aid highway project, as they have threatened to do. Rather, under the FAHA and basic constitutional principles, their recourse, if any, is limited.

   1. *Defendants lack authority to impose the sanctions threatened in the April 21 Letter*

  Defendants do not point to any authority in the VPPP Agreement or the FAHA that would authorize the unprecedented sanctions outlined in the April 21 Letter, which include the withholding of federal funds, advance construction authorizations, approvals to STIP amendments, and NEPA approvals.  They rely instead on a single regulation, 23 C.F.R. § 1.36, that is ostensibly authorized under FHWA's general authority to "prescribe … needful rules and regulations for the carrying out of the provisions of this title."  23 U.S.C. § 315.  According to Defendants, that regulation gives the Executive branch free range to take a sledgehammer to the budgets of MTA and TBTA (and NYSDOT and NYCDOT) unless and until Plaintiffs "cry uncle" and give up the Program.  But Section 1.36 does not, by its terms, give Defendants that power, nor could it here.

  As an initial matter, the plain language of Section 1.36 does not authorize the extremely broad sanctions contemplated in the April 21 Letter.  The regulation "applies only if a State fails to comply with or violates federal law," and the Program is authorized under the non-terminable VPPP Agreement.  *Tennessee ex rel. Leech v. Dole*, 567 F. Supp. 704, 718 (M.D. Tenn. 1983), *rev'd on other grounds*, 749 F.2d 331 (6th Cir. 1984).  It is not enough that Defendants no longer like congestion pricing and want it to stop; the Program is authorized under federal law.

  But even if the VPPP Agreement were in violation of federal law, Defendants' threatened "compliance measures" go well beyond the terms of Section 1.36 and are not authorized here. Section 1.36 sets out three avenues of potential enforcement: (i) withholding federal funds under Title 23 "on account of" the Program, (ii) withholding "approval of further projects in the State" under Title 23; and (iii) "other action that [the Administrator] deems appropriate under the

43

circumstances." Section 1.36 does not say that all three avenues of enforcement will be appropriate in any given circumstance, nor does it purport to give Defendants authority to hold up New York's appropriated and authorized federal-aid highway funding (and more).

Start with the first clause of Section 1.36. Here, of course, there are no funds "on account of" the Program because Congress no longer appropriates funds under the VPPP. Every penny of funding for the VPPP comes from sources *other than* the federal government. Perhaps, if Defendants had provided funding under the VPPP Agreement and subsequently determined that the Program is not authorized, and had the right to terminate, they could then withhold that particular stream of funding. But the VPPP Agreement does not give them any such role or right.

Beyond that, the second and third clauses of Section 1.36—withholding "approval of further projects" and "other action … appropriate under the circumstances"—clearly do not authorize Defendants to take the sweeping actions outlined in the April 21 Letter and, if they did, they would exceed the agency's authority under the authorizing statute, 23 U.S.C. § 315. Where a statute delegates authority to an agency, "the role of the reviewing court under the APA" is to "fix the boundaries of the delegated authority" and "police the outer statutory boundaries of those delegations." *Loper Bright Enters.*, 603 U.S. at 395, 404 (cleaned up). The limited authority that Congress granted to FHWA to make "needful rules," 23 U.S.C. § 315, "does not provide the Administrator with carte blanche authority to promulgate any rules, on any matter relating to the [FAHA], in any manner that the Administrator wishes," *Citizens to Save Spencer Cnty. v. EPA*, 600 F.2d 844, 873 (D.C. Cir. 1979) (construing similar language in statute authorizing EPA rulemaking). Indeed, where Congress intends to grant an agency enforcement authority, it has said so clearly. *See, e.g.*, 12 U.S.C. § 1464(n)(9)(D) (authorizing Comptroller of the Currency to "prescribe regulations necessary to enforce compliance"); 7 U.S.C. § 1375(b) (same for Secretary

44

DOT_0047858

of Agriculture).  The narrow authority provided in Section 315, by contrast, "is not open-ended, particularly when there is statutory language on point," and it cannot override more specific provisions elsewhere in the statute.  *N.R.D.C. v. EPA*, 749 F.3d 1055, 1063 (D.C. Cir. 2014) (construing EPA statute); *see also Bloate v. United States*, 559 U.S. 196, 207 (2010).

And so, the Secretary has no power to withhold STIP amendments, advance construction authorizations, or NEPA approvals in response to an alleged violation of 23 U.S.C. § 301—as he threatens to do throughout New York State.  None of that is remotely authorized under the FAHA.  Defendants' intent to withhold NEPA approvals for projects also conflicts with the agency "action-forcing procedures" enacted by Congress.  *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979).  Defendants cannot withhold approvals, because they are mandated to "perform the work necessary to complete the environmental review process."  23 C.F.R. §771.113(a).  At no time in the lengthy NEPA process does a federal agency have the discretion to withhold its participation.  *See* 23 C.F.R. § 771.111(b)(2) ("Administration must respond in writing to a project sponsor's formal project notification within 45 days."); 23 C.F.R. § 771.121(a) ("Administration will review the [Environmental Assessment]"); 23 C.F.R. § 771.123(g) ("Administration … will approve the draft [Environmental Impact Statement] for circulation"); 23 C.F.R. § 771.124(a)(5) ("Administration must indicate approval of the combined final [Environmental Impact Statement]/[Record of Decision]"); 23 C.F.R. § 771.125(c) ("Administration will indicate approval of the [Environmental Impact Statement]for an action by signing and dating the cover page").[26]

Nor can Duffy, in response to a purported violation of Section 301's tolling ban through the continued operation of a single project—congestion pricing—broadly withhold project

---

[26] Nor do Defendants have authority to instruct that all NEPA approvals be categorically denied.  *See Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 714-15 (10th Cir. 2010) (NEPA analysis "must be taken objectively and in good faith, ... and not as a subterfuge designed to rationalize a decision already made") (internal citations omitted).

DOT_0047859

approvals under Title 23. Congress has foreclosed that means of enforcement in at least two ways. *First*, Defendants' intent to withhold "obligations of FHWA funds" conflicts with the detailed standards enacted by Congress to guide the Secretary in carrying out his duty to promptly authorize the obligation of Title 23 funding. *See* 23 U.S.C. § 106(a)(2) (Secretary "shall act" as "soon as practicable" on submissions for obligations of funds); *id.* § 106(a)(4) (in granting submissions for obligations, Secretary "shall be guided" by criteria in 23 U.S.C. § 109). Indeed, it is long settled that the Executive has no right to broadly impound funds for policy reasons. *See State Highway Comm'n v. Volpe*, 479 F.2d 1099, 1118 (8th Cir. 1973) (no discretion to withhold obligations due to status of the economy or need to control inflation); *Louisiana ex rel. Guste v. Brinegar*, 388 F. Supp. 1319, 1325 (D.D.C. 1975) (FAHA "does not authorize" discretionary withholding of obligations "for non-program related reasons"); 23 U.S.C. § 101(c) ("no part of any sums authorized to be appropriated … shall be impounded or withheld from obligation").[27]

*Second*, the FAHA sets forth in great detail the many specific, limited ways in which obligated funds could be withheld for specific violations of the FAHA. Some of these remedies affect the State's apportionment of funds from the Highway Trust Fund. *See, e.g.*, 23 U.S.C. § 131(b) (for enforcement of the Highway Beautification Act, Secretary may reduce federal funding allocations by 10%); *id.* § 158(a) (for enforcement of minimum age drinking laws, Secretary may reduce allocations by 8%). Others grant the Secretary the power to direct public authorities "to discontinue collecting tolls" in circumstances not present here. *E.g.*, *id.* § 129(a)(3)(C), (a)(9)(C). Notably, the VPPP statute and Section 301 do not authorize the Secretary to direct an end to tolling operations or otherwise seek to impose a penalty. The fact

---

[27] The MTA, TBTA and NYCDOT incorporate by reference the additional statutory arguments advanced by Plaintiff-Intervenor NYSDOT on pages 12 to 15 of the Memorandum of Law In Support of Intervenor-Plaintiff New York State Department of Transportation's Motion for a Preliminary Injunction.

DOT_0047860

that Congress granted FHWA enforcement authority in *some* circumstances, but did not do so with respect to Section 301 or the VPPP, is a strong indication that FHWA's authority to enforce compliance in these circumstances is limited. *See, e.g.*, *Avon Nursing & Rehab. v. Becerra*, 995 F.3d 305, 311 (2d Cir. 2021) ("Where Congress includes particular language in one section of a statute but omits it in another, we presume that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (cleaned up). And it is not particularly surprising here, given that—again—the VPPP and VPPP Agreement simply do not contemplate any right of termination by Defendants. *See generally Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."). Moreover, while the scope of the enforcement measures set forth in the April 21 Letter appears to include withholding of STIP amendments that would allow for FTA funding for transit, that cannot be even arguably encompassed within a reading of Section 1.36 as a valid regulation under the FAHA.

> ## 2. *Enforcing the February 19 Letter would violate the* Pennhurst *clear statement rule*

Even if Duffy were somehow right that the VPPP did not authorize congestion pricing (which it does), and that he had authority to terminate the Program (which he does not), his attempt to enforce that determination through the wholesale withholding of federal approvals to New York to coerce termination of the Program would run into another insurmountable obstacle: the Constitution. The Spending Clause provides that Congress "shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States…." U.S. Const. art. I, § 8, cl. 1. Even where Congress seeks to condition receipt of funds, such conditions must be "unambiguous[]" and they cannot "surprise[] participating States with post acceptance or 'retroactive' conditions." *Pennhurst State Sch. &*

DOT_0047861

*Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981). Once a State has accepted funds pursuant to a federal spending program, the federal government cannot alter the conditions attached to those funds so significantly as to "accomplish[ ] a shift in kind" of their policy. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583-84 (2012). This "clear statement rule" applies equally to the imposition of affirmative, and as here, negative obligations on the receipt of funds. *See Barnes v. Gorman*, 536 U.S. 181, 186 n.1 (2002) (citation omitted).

There is no question that Defendants' newly announced term—complying with a completely new and unprecedented interpretation of the VPPP—was not expressed "unambiguously" and with a "clear voice" by Congress. *See Texas v. Cardona*, 743 F. Supp. 3d 824, 885 (N.D. Tex. 2024) (granting injunctive relief against Secretary of Education where new Title IX guidance conditioned funding on novel interpretation of statute). Nothing in ISTEA or any of its reauthorizations comes anywhere close to "unambiguously" prohibiting cordon pricing that finances transit programs, and as discussed *supra* at 10-12, the legislative history unambiguously indicates that Congress sought to encourage projects akin to the Program. Thus, withholding approvals for other projects on account of the Program's continued operation is an imposition of new conditions and is unconstitutional under the Spending Clause. *See West Virginia ex rel. Morrisey v. U.S. Dep't of Treasury*, 59 F.4th 1124, 1142 (11th Cir. 2023) (granting State's motion for permanent injunction where provision of American Rescue Plan prohibited states from using federal funds to directly or indirectly offset reduction in net tax revenue, finding statute lacked a clear statement from Congress authorizing the new condition).[28]

---

[28] This lack of a clear statement by Congress is exacerbated by the fact that the VPPP Agreement, again, does not contemplate a right of termination by Defendants, the FAHA's baseline rule is that funds *cannot* be withheld, and the statute sets out in great detail how and when Congress has authorized withholding—none of which apply to the VPPP.

DOT_0047862

3.    *Defendants' withholding of federal funding is unconstitutionally coercive*

When Congress or a federal agency alter funding conditions so as to coerce the State to change its behavior, they encroach on State sovereignty as guaranteed by the Tenth Amendment by "commandeering … reserved State power." *New York v. U.S. Dep't of Just.*, 951 F.3d 84, 115 (2d Cir. 2020). As the Supreme Court recognized in *South Dakota v. Dole*, conditions on federal grants may be illegitimate if they are unrelated "to the federal interest in particular national projects or programs" or where "the financial inducement" is "so coercive as to pass the point at which pressure turns into compulsion." 483 U.S. 203, 207, 211 (1987). Where an agency issues a "threat to a State to 'do this, or else'" it is "coercive at the moment it is uttered" particularly when considering "scale of funding it jeopardizes and the new standards of conduct the [agency] imposes." *New York v. H.H.S.*, 414 F. Supp. 3d 475, 571 (S.D.N.Y. 2019) (HHS threats to withhold all funding for noncompliance with novel "conscience regulations" violated Spending Clause and Tenth Amendment.).

Here, Defendants' threats to withhold all future project approvals and all FHWA funds run afoul of both principles. First, there is neither a federal nor national interest in prohibiting cordon pricing or the spending of Program revenues on transit services. In *Dole*, the Supreme Court concluded that the withholding of approximately 5% of previously allocated federal-aid highway funds was not so coercive where Congress sought to promote the national interest of a minimum drinking age. 483 U.S. at 207, 211. Here, the Program is a project required by State law, and it imposes a toll on vehicles entering a select portion of a single borough within one metropolitan area. If anything, ISTEA and its reauthorization statutes indicate a national interest in *reducing* congestion in certain localities and *supporting* the completion of transit projects, exactly as congestion pricing does. *See e.g.*, 23 U.S.C. § 129(d) ("Congestion Mitigation Program"); *id.* § 149 ("Congestion mitigation and air quality improvement program"); ISTEA § 2 (describing

49

policy of "develop[ing] a National Intermodal Transportation System that is economically efficient and environmentally sound," which "shall include significant improvements in public transportation…."). The only purported interest Duffy invokes is in avoiding additional costs to drivers on a fraction of New York's federal-aid highways paid for with taxpayer dollars, but that is an economic interest of particular motorists accessing the CBD, not a federal or national interest. Moreover, any underlying federal policy of avoiding tolls on federal-aid highways as expressed in Section 301 has been overtaken by ISTEA's countervailing policy of flexibility and promotion of intermodal transportation systems and congestion reduction. Defendants' interpretation of federal law thus *undermines* real federal interests at stake—reducing congestion, improving air quality, and facilitating intermodal transportation—thereby providing an independent basis to reject his interpretation on Tenth Amendment grounds. *See Texas*, 743 F. Supp. 3d at 886 (rejecting updated Title IX funding conditions in part, because they undermined national interest expressed in statute). Second, tying receipt of future project approvals, and potentially all FHWA and even FTA funds (required by formula or otherwise) to topping congestion pricing is unconstitutionally coercive. In *Sebelius*, the Supreme Court rejected conditions on Medicaid funds—where the federal government generally contributed 50 to 83 percent of total funds—because those conditions were an unlawful "means of pressuring the States to accept policy changes." 567 U.S. at 580. The federal funding at issue here is roughly identical to that at issue in *Sebelius.* By way of illustration, the 2020-2024 MTA Capital Plan, financed in part by the Program's revenues, assumes a 50/50 cost split between federal and local sources for critical transit projects such as the Second Avenue Subway.[29] Total federal funding for the 2020-2024 Capital Plan is estimated to be $13.1 billion,

---

[29] MTA, MTA CAPITAL PROGRAM 2020–2024 (Sept. 25, 2019), https://files.mta.info/s3fs-public/2019-09/MTA%202020-2024%20Capital%20Program%20-%20Executive%20Summary.pdf.

DOT_0047864

out of a total expected cost of $54.8 billion.[30]  That $13.1 billion represents 23% of all of the MTA's funding for capital projects, much greater than the amount at issue in *Dole*.  *See* 483 U.S. at 211.  The total $54.8 billion cost of the Capital Plan also includes $15 billion in Program revenues that are dedicated to transit improvements in the New York City metropolitan region, which is of course essential to the State's economy.  As in *Sebelius*, where roughly half of all Medicaid funds were at issue, here a directive that the "the Secretary ... may declare that 'further payments will not be made to the State,'" unless the Program is ceased (in violation of the TMA), constitutes "a gun to the head" and is invalid under the Tenth Amendment.  567 U.S. at 581.  The coercive force of these measures is further multiplied by Defendants' stated plan to also withhold federal approvals and funding from other parts of the State.

## II.    The MTA and TBTA have shown irreparable harm

A party can establish irreparable harm by demonstrating that it will suffer "an actual and imminent" injury that cannot be remedied "if a court waits until the end of trial to resolve the harm."  *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007).  That standard is readily met here, given the remarkably broad scope of the coercive threats to halt reviews needed for all projects and funding within FHWA's purview State wide, including billions of dollars' worth of funding for transit projects currently proposed for addition to New York's STIP, unless the Program is halted.  "Damocles's sword does not have to actually fall ... before the court will issue an injunction."  *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

Defendants threaten to pursue wide range of illegal retaliatory actions, including withholding any further approvals of STIP amendments concerning NYMTC TIP modifications and prohibiting any further obligations of FHWA funds.  *See* April 21 Ltr. at 2.  Such threats seek

---

[30] MTA, 2024–2029 CAPITAL PLAN 34 (Sept. 25, 2024), https://www.mta.info/document/151266.

DOT_0047865

to force on the Project Sponsors a Hobson's choice: either forgo all funding and projects requiring FHWA actions—which include billions of dollars' worth of funding for MTA projects provided in a recent proposed STIP amendment and projects for which the MTA receives FHWA funding— or abruptly halt the Program, forfeiting a secure and recurring source of revenue supporting the issuance of bonds to fund capital improvements critical to the reliability, accessibility, expansion, and safety of the MTA's regional public transit system, as well as the additional public benefits from reduced congestion and vehicular emissions.  Either option would have severe and irreparable harmful consequences.

Numerous courts have found that the loss of expected federal approvals or funding, including where the termination has not yet gone into effect or where the federal funds were eventually distributed, is sufficient to find irreparable harm due to the budgetary and planning uncertainties it may cause, and by virtue of the deprivation of constitutional rights under the Spending Clause.  *See City and County of San Francisco v. Trump*, --- F. Supp. 3d ---, 2025 WL 1186310, at *2 (N.D. Cal. Apr. 24, 2025) (where President directed federal agencies to withhold federal funds from so-called "sanctuary jurisdictions," plaintiffs' irreparable injury was "in the form of a budgetary uncertainty" and "undermining trust between [plaintiffs] and the communities they serve" as well as "deprivation of constitutional rights"); *New York v. Trump*, 2025 WL 715621, at *13, 15 (D.R.I. Mar. 6, 2025) (granting preliminary injunction where OMB froze broad categories of federal grant money allocated to various states, including reimbursement of spending for critical transportation infrastructure, due to "chaos and uncertainty" initial freeze caused, and noting that "States may have to suspend, delay or cancel projects"); *Nat'l Council of Nonprofits v. O.M.B.*, 2025 WL 597959, at *18 (D.D.C. Feb. 25, 2025) (recognizing irreparable harm where "a pause on federal funding w[ould] 'threaten[] the very existence of [non-profit organizations']

52

business") (citations omitted); *Planned Parenthood of Greater Wash. & N. Idaho v. H.H.S.*, 328 F. Supp. 3d 1133, 1139 (E.D. Wash. 2018) (recognizing irreparable harm based on organization's claims that challenged action would cause them to "lay off employees, reduce services, ... cancel established programs, and lose relationships and goodwill with volunteers and community partners") (citations and quotation marks omitted); *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017) (uncertainty prompted by federal executive order threatening to withhold funds from "sanctuary jurisdictions" caused irreparable harm by "interfer[ing] with the Counties' ability to budget, plan for the future, and properly serve their residents" and by requiring them to take "mitigating steps," including placing funds in reserve or making cuts to other services); *United States v. North Carolina*, 192 F. Supp. 3d 620, 630 n.2 (M.D.N.C. 2016) (holding that although it was "not immediately clear … how much funding [plaintiffs] would lose during the pendency of [the] case" or "precise timing of specific grants," court was "satisfied that the loss of funding … [would] likely be severe enough to constitute irreparable harm" given the "nature of the services" at risk, including services to assist victims of sexual assault).

Indeed, Defendants' unconstitutional threats, intended to coerce the State of New York to abandon the Program, have already caused an independent irreparable injury. Limits on the Spending Clause coupled with the Tenth Amendment protect "the status of the States as independent sovereigns in our federal system." *Sebelius*, 567 U.S. at 577. Here, Defendants seek to impose retroactive conditions on the receipt of federal funds to hobble programs meant to further New York's sovereign interests, irreparably harming State sovereignty. *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1367 (S.D. Ga. 2018) ("[l]oss of sovereignty is an irreparable harm"); *see Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 17 (D.D.C. 2014) (recognizing loss of State sovereignty as an irreparable harm). And as discussed *supra* at 49-50, an agency's threat to take compliance

53

DOT_0047867

actions is "coercive at the moment it is uttered." *New York*, 414 F. Supp. 3d at 571.  It is for that reason courts recognize that forcing compliance with an unlawful agency demand "almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (emphasis in original) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring in part and in the judgment)).

What's more, Defendant's deprivation of Plaintiffs' property interest in the VPPP Agreement in violation of due process is itself the type of constitutional harm that is "ordinarily" irreparable.  *A.H. by & through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021) (constitutional deprivation that results in non-compensable damages ordinarily warrants a finding of irreparable harm).  Here, Plaintiffs have demonstrated that they were deprived of procedural due process, as their interests in the VPPP agreement were "terminated" without any due process despite the post-decisional and disingenuous offer of an illusory opportunity to challenge a decision that was already announced and which Defendants have clearly stated they are not reconsidering.  *See* SAC ¶¶ 22-37 and ¶¶ 202-04.  That termination will result in injuries not compensable through monetary damages, and thus "no further showing of irreparable injury is necessary."  *See Broecker v. N.Y.C. Dep't of Educ.*, 585 F. Supp. 3d 299, 310 (E.D.N.Y. 2022), *aff'd*, 2023 WL 8888588 (2d Cir. Dec. 26, 2023) (allegation of deprivation of due process rights constituted irreparable injury).

These common-sense principles are illustrated here when one considers the sheer breadth of Defendants' threats.  The "compliance measures" threatened by the April 21 letter are extensive and specific, though the full extent of some are indeterminate, which only adds to their intended coercive effect.  For the MTA, which receives most federal funding through FTA under Title 49, the primary source of budgetary uncertainty and, indeed, imminent harm (separate from the imminent harm that would arise from halting the Program) comes via Defendants' specific threat

DOT_0047868

to withhold approvals of STIP amendments concerning NYMTC TIP modifications.   The threatened withholding of all STIP approvals threatens billions of dollars in annual congressionally appropriated funding the MTA receives from FTA.  Willens Decl. ¶¶ 230-25.  This threat already presents imminent harm: NYSDOT recently submitted a proposed STIP amendment concerning a $2.2 billion package of projects for maintenance and railroad track work that is at risk.  *Id.* ¶ 25.

In addition to threatening to withhold approvals of STIP amendments, Defendants have threatened to stop obligating all FHWA-administered funds.  The MTA regularly receives FHWA funding through the Congestion Mitigation and Air Quality ("CMAQ") section of Title 23, 23 U.S.C. § 149, which is intended to help meet the requirements of the federal Clean Air Act ("CAA") through transportation measures.  *Id.* ¶¶ 26-29.  The MTA uses the majority of its CMAQ funding for projects under the Americans with Disabilities Act ("ADA").  *Id.* ¶ 27.  These projects contribute to reductions in vehicle miles traveled ("VMT") and associated emissions, improving air quality, and reducing regional congestion.  *Id.*  More specifically, the installation of ADA-compliant elevators and equipment at previously non-accessible stations increases subway ridership and reduces reliance on vehicular modes of transportation such as taxis, for-hire-vehicles, private vehicles, and paratransit services like Access-A-Ride.  *Id.*  Consequently, increased use of public transit reduces VMT and resultant emissions as well as congestion.  *Id.*

The MTA's extensive bus operations will also be harmed, as they operate on roadways throughout the City that are maintained by NYCDOT in part using FHWA funding.  *Id.* ¶ 30.  The MTA and New York City Transit, an operating agency of the MTA, oversee a fleet of approximately 5,800 buses that service 238 bus routes, 20 Select Bus Service routes, and 75 express bus routes throughout the five boroughs of New York City.  *Id.* ¶ 21.  Forty-three of these lines operate in Manhattan.  *Id.*  In 2023 alone, New York City buses served approximately 427

DOT_0047869

million riders and traveled a collective 152 million miles.  *Id.*  Without sufficient FHWA funds to maintain the roadways on which MTA buses are driven, the MTA's operations will necessarily suffer.  If the condition of these roadways deteriorates due to funding constraints, it will inevitably affect the ability of MTA buses to meet their schedules, and likely contribute to deterioration of the buses themselves, increasing expenses for the MTA to maintain or replace them.  *Id.* ¶ 30.

The potential loss of all federal funding from the CMAQ program, but more importantly for all future projects seeking federal funding through STIP amendments, and even the cutting off of funding to maintain the streets on which MTA buses operate, would each undeniably and irreparably harm the MTA's ability to maintain an efficient transportation system that serves millions of people every day and helps to power the economy of the New York metropolitan area. Stymying the MTA's ability to perform its obligations to the public to provide safe, reliable and accessible  transportation  will undermine its credibility with the public.  *City of Los Angeles v. Sessions*, 2018 WL 6071072, at *3 (C.D. Cal. Sept. 13, 2018) (forcing a city to contravene "longstanding policy" priorities and consequently "imped[e] … community relationships" and "diminish[] community trust" constituted irreparable harm).

The alternative—choosing to bend to the coercive intent of the illegal termination of the VPPP Agreement and halt the Program pending resolution of this action—would similarly have dire and irreparable consequences.  Irreparable harm exists where, in reliance on the federal government's approval of a program, a State makes "substantial resource investments in planning for the implementation of [that] program," only to have that approval rescinded and the anticipated benefits of those investments lost. *Texas v. Brooks-LaSure*, 2021 WL 5154219, at *12 (E.D. Tex. Aug. 20, 2021) (finding irreparable harm where, in reliance on Centers for Medicare and Medicaid Services' final approval for Texas to implement demonstration program that diverged from default

56

Social Security Act requirements, Texas "made substantial resource investments in planning for implementation of that program"). Here, TBTA expended approximately $500 million in public funds to prepare for the Program's design, construction, implementation operation, and maintenance, as well as on an information campaign to inform the public of the January 5, 2025 implementation date. C. de Cerreño Decl. ¶ 30. "Few if any of these costs would have been incurred had USDOT/FHWA taken the position at the beginning of the long and torturous 5-year process it now takes—that the Program is not lawful under the VPPP because it utilizes cordon pricing to raise money for mass transit." *Id.* ¶ 31. These costs will continue to accrue even if TBTA is forced to cease tolling during the pendency of this lawsuit. According to TBTA's Chief Operating Officer, TBTA will continue to incur substantial costs of $12 million in additional expenditures each month related to the operation and maintenance of the tolling system even if tolls are not collected. *Id.* ¶ 33.

At the same time, if the Program stops, the MTA and TBTA will not see the expected benefits of their investment, including congestion reduction with its attendant benefits and revenue generation, and will instead lose money maintaining a temporarily defunct tolling system. The MTA would stand to lose average monthly revenues of $50 million or more, which would delay critical capital improvements to public transit, including adding accessibility to numerous subway stations consistent with the ADA, improving outdated subway signaling, enhancing safety and customer service, and extending public transit to under-served areas—not to mention delay relief from congestion in the CBD, alongside its concomitant economic and environmental costs. *Id.* ¶¶ 34-35. The lost revenue could never be recouped, even if the Program is restarted, as those months of tolling would be lost forever. *Id.* ¶ 34. These expenses and loss of revenue would amount to a preventable loss of public resources, which the public has an interest in avoiding. *North Carolina*,

57

DOT_0047871

192 F. Supp. 3d at 629 (finding irreparable harm where unavailability of funds was "likely to have an immediate impact on [the state's] ability to provide critical resources to the public, causing damage that would persist regardless of whether funding [was] subsequently reinstated").

If federal funding typically received by the MTA becomes unavailable until the Court rules on the legality of FHWA's purported rescission of the VPPP Agreement, the "MTA would be forced to juggle priorities and defer, if not eliminate, many important projects (including accessibility projects) due to the lack of funding."  Willens Decl. ¶ 31.  "The same would be true if the Project Sponsors capitulated and stopped tolling entries to the CBD, as MTA would have to divert other capital funds to repay the almost $1.4 billion in congestion pricing-related debt that would otherwise be used for important projects and could not issue bonds or finance projects that are already planned."  *Id*.  "Some projects would undoubtedly not proceed at all or would be materially delayed, contributing to deterioration" of transit service "and delay of improvements to access."  *Id*.  The consequence of this "budgetary uncertainty" would irreparably harm the public transit system, and thus the traveling public.  *See City and County of San Francisco*, 2025 WL 1186310, at *2; *New York*, 2025 WL 715621, at *15.  The loss of public resources, and revocation of revenues used to secure bonds issued by Defendant would similarly damage Plaintiffs' reputation and goodwill, an injury "not easily measured or fully compensable in damages."  *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) (loss of goodwill and reputation is a "kind of harm is often held to be irreparable").

In addition, NYCDOT faces a host of potential harms that could seriously damage its ability to undertake and complete projects, including projects that are critical for the safety of those who work, live, and travel in the City.  Without advance construction authorizations, the local project sponsor must set aside the full amount of the project's costs without hope of

58

reimbursement, reducing the agency's flexibility and ability to progress transportation programs. *See* Carry Decl. ¶ 8. Similarly, FHWA's refusal to approve STIP amendments would block any new transportation projects from "entering the federal fund eligibility pipeline." *Id.* ¶ 10. And Defendants' threatened actions could also stop current NYCDOT projects in their tracks. Specifically, withholding NEPA approvals "would effectively halt projects in the pipeline where federal funding or approvals are necessary in order to undertake the anticipated work." *Id.* ¶ 9. In Manhattan, there are multiple ongoing or planned projects worth hundreds of millions of dollars that face imminent threat, including projects focused on improving roads, enhancing pedestrian safety (including at least one project focused on safety around schools), and making utility and infrastructure upgrades. *Id.* ¶¶ 13-15. And if FHWA expands its threatened actions beyond Manhattan to the rest of New York City, NYCDOT projects with a combined cost of over $3.1 billion will be at risk. *Id.* ¶¶ 16-18. Many of these projects are critical to ensuring the efficient and safe movement of people and goods throughout the City. The statement in the April 21 Letter that FHWA may exempt "Safety Projects" provides little solace. Because FHWA will determine whether a project qualifies; this uncertainty will seriously harm Plaintiffs' and NYCDOT's ability to plan and budget for the future. Willens Decl. ¶ 24; Carry Decl. ¶ 11.

Finally, and fundamentally, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Our Wicked Lady LLC v. Cuomo*, 2021 WL 915033, at *7 (S.D.N.Y. Mar. 9, 2021) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)); *see also Washington v. Trump*, 2025 WL 509617, at *1 (W.D. Wash. Feb. 16, 2025) ("The rule of law is secured by a strong public interest that the laws 'enacted by their representatives are not imperiled by executive fiat.'") (quoting *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018)). That, of course,

59

is exactly what is happening here.  The federal government is trying to prevent New York from maintaining a congestion pricing program that is mandated by State law, frustrating the intentions of the State's legislative representatives and the public they serve.  By forcing the MTA and TBTA "to make an unreasonable choice, [FHWA's order] results in a constitutional injury sufficient to establish … irreparable harm."  *County of Santa Clara*, 250 F. Supp. 3d at 538 (where plaintiffs demonstrated that executive order was "unconstitutionally coercive" in violation of Tenth and Fifth Amendment, they adequately demonstrated "a constitutional injury sufficient to establish a likelihood of irreparable harm") (citing *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).

## III.    A preliminary injunction would serve the public interest

"Under the last injunction factor, courts must 'balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,' as well as 'the public consequences in employing the extraordinary remedy of injunction.'"  *Chan*, 2024 WL 5199945, at \*48 (quoting *Yang v. Kosinski*, 960 F.3d 119, 135-36 (2d Cir. 2020)).  As noted, these factors "merge" where the opposing party is the federal government.  *New York*, 969 F.3d at 59; *Nken*, 556 U.S. at 435.  These two factors weigh heavily in favor of enjoining USDOT's unlawful withholding of FHWA approvals, which will in all likelihood force the MTA to delay or cancel critical projects designed to improve public transit and make subway facilities accessible to people with disabilities, and hinder the provision of acceptable bus service, along with a host of irreparable harm to motorists on State highways as described further in the brief of NYSDOT. Moreover, Defendants' aim of stopping the Program through retaliatory threats would result in the increase of congestion and vehicular emissions and a loss of numerous other Program benefits.

First and foremost, there is "generally no public interest in the perpetuation of unlawful agency action."  *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).  "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal

60

laws that govern their existence and operations." *Id*. (internal quotation marks omitted); *Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 269 (S.D.N.Y. 2020) ("[T]here is no public interest in allowing Defendants to proceed with unlawful, arbitrary, and capricious executive or agency actions that exceed their statutory authority."); *New York v. D.H.S.*, 408 F. Supp. 3d 334, 351 (S.D.N.Y. 2019), *aff'd as modified*, 969 F.3d 42 (2d Cir. 2020).  Defendants acted unlawfully in purporting to rescind the VPPP Agreement and then compounded that unlawful act by threatening to withhold federal approvals to coerce the State, the MTA and TBTA, and NYCDOT into obeying the ultra vires April 21 Duffy Letter.  *See supra* at 21-51.  Here, the likelihood of success "is a strong indicator that a preliminary injunction would serve the public interest."  *League of Women Voters*, 838 F.3d at 12; *see also Saget v. Trump*, 375 F. Supp. 3d 280, 377 (E.D.N.Y. 2019).

Moreover, Defendants' threat to withhold FHWA approvals is plainly not in the public interest.  As explained above, the MTA uses funding requiring FHWA approvals for STIP amendments for billions of dollars in federally funded work, as well as FHWA-administered funding to meet the requirements of the CAA and ADA, including by making subway stations more accessible.  Unsurprisingly, courts in similar circumstances have held that withholding government funding earmarked for critical public projects does not serve the public interest.  *New York*, 2025 WL 715621, at *15  (evidence that withheld federal funds would "endanger the States' ability to provide vital services," including affecting "critical transportation infrastructure" projects, "overwhelmingly show[ed] that the balance of equities weighs heavily in favor of granting" preliminary injunction); *Nat'l Council of Nonprofits*, 2025 WL 597959, at *19 (plaintiffs "more than met their burden" when freeze in federal spending "placed critical programs for children, the elderly, and everyone in between in serious jeopardy"); *County of Santa Clara*, 250

61

F. Supp. 3d at 539 (threat of withholding federal funds created "significant budget uncertainty" and "coercive effects" that weighed in favor of preliminary injunction).

Halting the Program in response to such threats also "would impair the public interest in lessening both congestion and the extreme financial costs it imposes." *Chan*, 2024 WL 5199945, at *49. Indeed, evidence from the Program's initial months of implementation shows that it is working. "Traffic in the CBD has decreased substantially, with approximately 5.8 million fewer vehicles entering the district in January through March 2025 than would be expected based on data for prior years." C. de Cerreño Decl. ¶ 25(a). This represents an 8% to 13% reduction from a typical January, February, and March. *Id.* New data indicates that traffic in the CBD was down by 12% in April. *Id.* This reduction in congestion has a logical corollary benefit of less vehicular emission and reduced time for emergency vehicle trips and for buses.

Indeed, travel times have also improved. In January, crossing times were 12% faster at the Lincoln Tunnel and 45% faster at the Holland Tunnel; trip times from Brooklyn and Queens fell between 10-30% in January compared to January 2024. *Id.* ¶ 25(c). A recent independent study found a 15% improvement in CBD traffic speeds. *Id.* ¶ 25(h). Trips are also more reliable. Traffic through the Holland Tunnel used to be delayed more than 3 minutes on 54% of weekdays—that has fallen now to 12%. *Id.* ¶ 25(g). "On the Williamsburg Bridge, delays used to be greater than 3 minutes 65% of the time; the Program has reduced that to 2%." *Id.*

Public services have also improved. "[B]us routes have seen significant decreases in the time needed to complete their routes." *Id.* ¶ 25(i). "[T]here are 23% fewer customer trips on express buses that are delayed 10 minutes or more," and "[e]xpress buses are traveling 21% faster on the portion of their routes leading into and within the CBD." *Id.* In addition, "[f]ewer vehicles utilize the nine MTA bridges and tunnels, with levels dropping 2.4% from March of 2024 to March

62

of 2025." *Id*. ¶ 25(f).  "The largest reductions are at the Hugh L. Carey and Queens-Midtown

Tunnels, which lead directly into the [CBD]," and "[t]ruck traffic traveling through these tunnels

dropped 14% this year compared to the same period in 2024." *Id*.

The loss of substantial public benefits—either critical federal funding or the substantial

benefits of the Program—weighs heavily in favor of granting preliminary injunctive relief.  *See*

*Chan*, 2024 WL 5199945, at *48 (noting the Program was "predicted to reduce congestion thereby

improving regional air quality, providing safety benefits, improving worker productivity, reducing

noise pollution, among other benefits"); *see also Brooks-LaSure*, 2021 WL 5154219, at *12

(granting preliminary injunction to block federal agency's rescission of previously granted

approval where rescission threatened to "decrease . . . the number of healthcare providers and the

quality of care"); *cf. Cascadia Wildlands v. Thrailkill*, 49 F. Supp. 3d 774, 778 (D. Or. 2014), *aff'd*,

806 F.3d 1234 (9th Cir. 2015) ("public's interest in the economic and environmental benefits of

the project including providing jobs and retaining infrastructure for them" weighed against

granting preliminary injunction to block forest project).

As this Court previously recognized, there is a compelling public interest in avoiding the

unnecessary costs that TBTA would incur if it were required to pay continued operating costs

during a pause to avoid yet additional costs of stopping and starting the Program.  *Chan*, 2024 WL

5199945, at *49.  Indeed, the public has a clear interest in avoiding the loss of public funds and

the substantial benefits those funds would achieve.  *See, e.g.*, *Louisiana v. Biden*, 622 F. Supp. 3d

267, 297 (W.D. La. 2022) (public interest favored permanently enjoining pause on new oil and gas

leases on federal lands where "[l]ocal government funding, jobs for Plaintiff States' workers, and

funds for the restoration of Louisiana's Coastline are at stake"); *Sierra Forest Legacy v. Sherman*,

63

951 F. Supp. 2d 1100, 1115 (E.D. Cal. 2013) ("economic health of communities and industries ... is an important element of the public interest that must be considered in balancing the equities.").

Stopping the Program would also mean a return to the crippling congestion that has long plagued Manhattan and resulted in extraordinary costs to the metropolitan region's public. "Numerous studies have established that the congestion addressed by the [Program] itself, if unchecked …, will also continue to impose tremendous costs on individuals and businesses throughout the New York metropolitan region." *Chan*, 2024 WL 5199945, at *49. Congestion "has a $20 billion annual cost, including more than $9 billion in travel-time costs and nearly $6 billion in industry revenue losses." *Id*. (citation omitted). This includes "$1,900 annually for Manhattan Workers and $767 per worker for the New York City metropolitan region." *Id*. Yet Defendants would force the public to return to the days of costly and polluting congestion or accept devastating losses in federal funding. Clearly, such a choice is not in the public interest.

In contrast, Defendants can demonstrate no public interest in a cessation of tolling while this action is litigated. Indeed, they have demonstrated that stopping the tolling is not an urgent matter, by extending the "deadline" to do so twice. The pretextual macro-economic concerns raised by Duffy and President Trump—which FHWA's own NEPA analysis predicted would *not* occur—have indeed failed to materialize. In fact, the opposite has happened. "Pedestrian traffic in Manhattan increased 4.6% between January 5 (the day that toll collection began) and January 31 compared to the same period in 2024." C. de Cerreño Decl. ¶ 26(a). The gross revenue of Broadway shows during January–March 2025 was 25% higher than the same period last year, and attendance was up 20% for January–March of 2025 as compared to the same period last year. *Id*. ¶ 26(c). Hotel occupancy in January was up 3% year over year, and "[r]etail sales were up 1.5% in January and February—on track to be $900 million higher this year than last." *Id*. ¶ 26(b), (d).

DOT_0047878

"Leasing in the CBD was up 11% this January versus the fourth quarter of 2024, and up 80% since the first quarter of last year." *Id*. ¶ 26(f). There has been less diversion of traffic to outer boroughs (including environmental justice communities) than initially feared. *Id*. ¶ 25(m). Indeed, a recent study published by the National Bureau of Economic Research, with lead authors from Yale and Stanford Universities, confirmed that the Program has benefited areas outside of the CBD as well, with highways and major roadways also seeing sustained speed improvements. *Id*. ¶ 25(m).

The only "public" interest Defendants can cite to support the cessation of tolling is either avoiding the cost of the toll to individual drivers or "[]respect" for the federal government. *See* Trice Decl., Ex. 7. The first is highly ironic given FHWA's previous determination that the Program's forecast (and now demonstrated) congestion reduction effect outweighed individual drivers' interest in a lower cost journey to the CBD, and as noted the Program includes discounted tolls for low-income drivers. This Court has also so found, in denying all of the previous motions to block the Program's implementation. *Chan*, 2024 WL 5199945, at *48-49. As for the second, we are aware of no authority that supports a public interest in permitting the federal Executive to demand compliance from State and local agencies, even as litigation remains pending. Under our system of dual sovereignty, it is the province of the Judiciary, and not the Executive, to police the respective powers and obligations of the federal government.

## CONCLUSION

For the reasons provided herein, the Court should grant Plaintiffs' motion for a preliminary injunction.

DOT_0047879

Dated: May 5, 2025  
      New York, New York

Respectfully submitted,

*/s/ Roberta A. Kaplan*  
Roberta A. Kaplan  
D. Brandon Trice  
Maximilian T. Crema  
KAPLAN MARTIN LLP  
1133 Avenue of the Americas | Suite 1500  
New York, NY 10036  
Tel.: (212) 316-9500  
rkaplan@kaplanmartin.com  
btrice@kaplanmartin.com  
mcrema@kaplanmartin.com

*/s/ Mark A. Chertok*  
Mark A. Chertok  
Elizabeth Knauer  
Amy Lynn Cassidy  
John F. Nelson  
Phillip Dane Warren  
SIVE, PAGET & RIESEL, P.C.  
560 Lexington Avenue, 15th Floor  
New York, NY 10022  
Tel.: (212) 421-2150  
mchertok@sprlaw.com  
eknauer@sprlaw.com  
acassidy@sprlaw.com  
jnelson@sprlaw.com  
dwarren@sprlaw.com

*Attorneys for Plaintiffs the Metropolitan Transportation Authority and Triborough Bridge and Tunnel Authority*

MURIEL GOODE-TRUFANT  
Corporation Counsel of the City of New York  
*/s/ Nathan Taylor*  
Nathan Taylor  
Christian C. Harned  
New York City Law Department  
100 Church Street  
New York, NY 10007  
Tel.: (212) 356-2315  
ntaylor@law.nyc.gov  
chharned@law.nyc.gov

66

*Attorneys for Intervenor-Plaintiff New York
City Department of Transportation*

67

DOT_0047881

# DECLARATION OF KEVIN WILLENS
Filed 05/05/25
Metro. Transp. Auth. v. Duffy, No. 25 Civ. 1413 (S.D.N.Y.)
(LJL)

DOT_0047882

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

METROPOLITAN TRANSPORTATION AUTHORITY
and TRIBOROUGH BRIDGE AND TUNNEL
AUTHORITY,

<em>Plaintiffs</em>,

and

NEW YORK STATE DEPARTMENT OF
TRANSPORTATION, RIDERS ALLIANCE, SIERRA
CLUB, and NEW YORK CITY DEPARTMENT OF
TRANSPORTATION,

<em>Intervenor-Plaintiffs</em>,

v.

SEAN DUFFY, in his official capacity as Secretary of
the United States Department of Transportation,
GLORIA M. SHEPHERD, in her official capacity as
Executive Director of the Federal Highway
Administration, UNITED STATES DEPARTMENT
OF TRANSPORTATION, and FEDERAL HIGHWAY
ADMINISTRATION,

<em>Defendants</em>.

Case No. 25 Civ. 1413 (LJL)

## DECLARATION OF KEVIN WILLENS

I, Kevin Willens, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am the Chief Financial Officer ("CFO") of the Metropolitan Transportation Authority (the "MTA"), a position I have held since February 2022. I have 40 years of experience in public finance. Prior to joining the MTA, I served for 10 years as Co-head of US Public Finance at Goldman Sachs. I have provided investment banking expertise to the MTA for more than 30

1

DOT_0047883

years, including serving as the MTA's financial advisor for 10 years.

2.      In my capacity as CFO of MTA, I advise the Board of MTA and the Board of its affiliate, Triborough Bridge and Tunnel Authority ("TBTA"), with respect to the use of revenues derived from the Central Business District ("CBD") Tolling Program (the "CBD Tolling Program" or "Program") to finance MTA capital projects.   I also have responsibility for overseeing the securing of billions of dollars per year in federal funding for certain MTA projects.

3.      Every year, consistent with historic practice, the MTA and TBTA issue bonds to raise money to pay for MTA's capital projects.  Interest and a portion of the principal is paid in future years from the revenue pledged to investors until the bonds are fully paid off, which is usually over a 30-to-40-year period, roughly matching the expected useful life of the projects financed by the bonds.  This approach to funding MTA's capital projects is analogous to an individual financing a home purchase with a mortgage and paying the bank over 30 years using the individual's income.

4.      The Traffic Mobility Act ("TMA") enacted by the New York State legislature requires TBTA to implement the CBD Tolling Program in a manner that achieves a minimum $15 billion of funding for the 2020-2024 MTA Capital Program ("Capital Program").  Debt to be paid from CBD Tolling Program revenue has been and will continue to be issued over the next several years to pay for the $15 billion in project expenditures, and then principal and interest of the congestion pricing bonds will be paid from toll revenue over an approximately 30-year period.

5.      Issuing long-term bonds that will be repaid with toll revenues over time has always been a necessary component of the CBD Tolling Program to raise the $15 billion needed for the Capital Program over the nearer term, rather than only funding projects as the revenues actually accrue.  I am aware that on April 24, 2019, shortly after the TMA was enacted, the

2

DOT_0047884

Federal Highway Administration ("FHWA"), Federal Transit Authority ("FTA"), and United States Department of Transportation ("USDOT") representatives met with representatives from the New York City Department of Transportation ("NYCDOT"), MTA, TBTA, the New York State Department of Transportation ("NYSDOT"), and the New York Governor's Office. It is my understanding that the purpose of the meeting was to provide FHWA with more information regarding the Program, including that toll revenue would be used in part to secure bonds and repay investors over time with toll revenues. *See* Declaration of Allison L. C. de Cerreño ("C. de Cerreño Decl."), Exhibit A.

6.      In March 2024, the TBTA Board approved a specific toll rate structure for the Program, which was studied in a reevaluation document approved by FHWA in June 2024. During the preparation of the reevaluation document, I consulted with FHWA, during which I explained my professional opinion that based on current economic factors, such as interest rates, the adopted toll structure could generate sufficient funding through the issuance of long-term bonds to meet the TMA requirement. My opinion was grounded in the standard practice for public infrastructure project finance used by the MTA in issuing long-term bonds for capital projects, with which FHWA has familiarity in its role providing funding for federal shares of large infrastructure projects otherwise funded by states.

7.      In November 2024, the TBTA Board was presented with and voted to approve a plan to phase in the March 2024 adopted toll structure. I evaluated that proposal for its ability to accomplish the TMA's funding requirement, and my opinion was reflected in a second reevaluation document. During the preparation of the second reevaluation, I determined that to account for the phased-in approach, which would generate less revenue in the first six years, MTA and TBTA could issue the required amount of long-term bonds over a longer period of

DOT_0047885

years.  Although this approach would take longer, it would nonetheless satisfy the Capital
Program funding obligation imposed by the TMA and allow the MTA to complete the projects
identified in the Capital Program.  FHWA approved the second reevaluation in November 2024.

8.      FHWA confirmed that it understood the MTA financing plan was reliant on 30-
year bonds in court filings.  *See* Manhattan Central Business District Tolling Program
Supplemental Memorandum at 20–22, *New Jersey v. U.S Dep't of Trans. et al.*, 23-cv-3885 (Jan.
17, 2025), Dkt. 218-1 (confirming that declaration signed by me on January 2, 2025 explaining
how MTA and TBTA planned to issue long-term bonds to be repaid by Program revenue "reflects
FHWA's contemporaneous understanding of the information conveyed by the Project Sponsors
before FHWA's issuance of Re-Evaluation #2"); *see also* Reply Memorandum in Support of the
Federal Defendants' Cross-Motion for Summary Judgment at 4, *Chan et al. v. U.S. Dep't of
Trans. et al.*, 23-cv-10365 (Dec. 18, 2024), Dkt. 160.

9.      The MTA's plan to leverage CBD Tolling Program revenues through bond
issuance was also a subject of discussions between FHWA and the Project Sponsors, TBTA,
NYSDOT, and NYCDOT, in which I participated, to negotiate the terms of the binding agreement
ultimately executed on November 21, 2024, authorizing the CBD Tolling Program under the
Value Pricing Program (the "VPPP Agreement").  During those discussions, I and other TBTA
representatives consistently explained to FHWA that it was critical that potential investors would
be able to rely on the VPPP Agreement's durability in investing in 30-year bonds secured by
Program revenues.

10.     Given that the financing of $15 billion in 2020-2024 Capital Program projects is
dependent on attracting investors to purchase long-term bonds secured with Program revenue,
TBTA could not have agreed to sign the VPPP Agreement if it authorized FHWA to unilaterally

DOT_0047886

terminate the agreement. Such a provision would make it impossible to find sufficient financing because it would allow FHWA to cut off the means for investors to be paid principal and interest due—through revenues generated by the Program over the long term.

11. The necessity for lasting tolling authority is clear from simple math. Based on the forecast revenue generation from the Program as reflected in the November 2024 reevaluation, the Program will generate approximately $500 million annually for the first three years, $700 million for the second three years, and $900 million thereafter. Even if the MTA issued interest-free bonds (which of course no investor would buy), it would take over 18 years to repay them. Obviously, with interest included, it will take more time, which is why our plan is to issue several rounds of 30-year bonds. Essentially, it would be impossible to achieve the stated goal of funding $15 billion in capital projects from the Program without the VPPP Agreement remaining in place for a minimum of 18 years, and the financing plan realistically requires the agreement to be in place for 30 years or more.

12. The MTA and TBTA have relied on the durability of the VPPP Agreement in incurring debt already. To date, TBTA has issued $1.378 billion in short-term debt that is supported by revenues generated by the Program and will be refinanced with bonds secured by CBD Tolling Program revenues.

13. More specifically, TBTA issued a $192.8 million note that must be repaid in November 2025 and a $186 million note that must be repaid in December 2025. The total remaining principal and interest payments due on these notes is $397.2 million, which TBTA intends to pay with either CBD Tolling Program revenue or proceeds from long-term CBD Tolling Program bonds secured by and payable from such revenues.

14. TBTA issued an additional $500 million in short-term notes to fund a portion of

5

DOT_0047887

the Capital Program, which must be repaid in February 2028. The total remaining principal and interest payments due on these notes is $574.6 million, which TBTA intends to pay with either CBD Tolling Program revenue or proceeds from long-term CBD Tolling Program bonds secured by and payable from such revenues.

15.     On May 2, 2025, TBTA closed a $500 million loan secured by CBD Tolling Program revenues. This loan is secured by CBD Tolling Program revenue, which loan has to be repaid by May 1, 2026. The total remaining principal and interest payments will be approximately $520 million, which MTA intends to pay with either CBD Tolling Program revenue or proceeds from long-term CBD Tolling Program bonds secured by and payable from such revenues.

16.     If tolling under the CBD Tolling Program does not cease by May 21, 2025, FHWA has threatened several actions, including to withhold approval of any Statewide Transportation Improvement Program ("STIP") amendments concerning New York Metropolitan Transportation Council ("NYMTC") Transportation Improvement Program ("TIP") modifications, which are necessary to obtain federal funding under Title 23 (highways) and Title 49 (transit) of Chapter 53 of the U.S. Code.  Another threatened action is to prohibit further obligations of FHWA funds for projects within New York City.  These threats were articulated in a letter dated April 21, 2025, from the Secretary of Transportation to Governor Hochul and the Project Sponsors.

17.     This presents the Project Sponsors with a terrible choice if the Court does not enjoin FHWA from taking such actions, as NYSDOT, NYCDOT and MTA all depend on FHWA and/or FTA funding to maintain the regional transportation system in a state of good repair.  If TBTA stops tolling during the pendency of this action to protect against the loss of these funds, MTA or TBTA would have to pay for the debt it has already issued reliant on toll revenues (as

6

DOT_0047888

described in paragraphs 12-15, *supra*) using other funds, thereby reducing monies that would otherwise be used to undertake other critical public transportation projects.

18.     On the other hand, if, as USDOT has threatened, all FHWA approval actions necessary to release federal funding are withheld, MTA would have to defer, if not forgo, planned improvements to the transit system, including, as explained below, increased accessibility upgrades at numerous subway stations, and, just in the near term, lose out on billions of dollars in funding used to pay for state of good repair and track maintenance in the New York City Subway and Long Island Rail Road ("LIRR"), as well as potentially even greater deprivation over the longer term if this litigation is not finally resolved in 2025.

19.     Before describing these harms, a brief description of the transportation system operated by the MTA is warranted.  The MTA operates the New York City subway and bus systems, as well as the Metro-North and the LIRR commuter rail networks. The subway is one of the world's oldest public transit systems, one of the most used, and has 472 stations in operation.

20.     The subway system operates 24/7 every day of the year.  By annual ridership, the New York City subway is the busiest rapid transit system in the Western Hemisphere and Europe. It transported over one billion passengers in 2024—a number that reflects a still depressed ridership due to COVID-19 pandemic.  The subway system is also one of the world's longest, covering 248 miles in Manhattan, the Bronx, Brooklyn, and Queens.[1]

21.     The MTA also operates a large-scale bus system in each of the five boroughs.  The MTA and New York City Transit ("NYCT"), an affiliate of the MTA, oversee a fleet of approximately 5,800 buses that service 238 bus routes, 20 Select Bus Service routes, and 75

---

[1] MTA operates the Staten Island Rail system in that borough.

DOT_0047889

express bus routes throughout the five boroughs of New York City. 43 of these lines operate in Manhattan. In 2023 alone, New York City buses served approximately 427 million riders and traveled a collective 152 million miles.

22. The MTA operates the two largest commuter railroads in the nation—Metro-North and LIRR. The Metro-North operates approximately 124 stations and more than 775 miles of track. In 2024, Metro-North served over 67 million passengers throughout seven counties in New York and two in Connecticut. The LIRR system services approximately 200,000 customers each weekday. In 2024, it transported a total of 75.5 million riders. The LIRR encompasses 126 stations throughout Manhattan, Brooklyn, Queens, and Nassau and Suffolk counties and includes over 700 miles of tracks, sending out 947 trains every weekday.

23. USDOT's threat to withhold approvals of STIP amendments concerning NYMTC TIP modifications places significant funding at risk. The STIP is a list of all projects or project phases in New York State proposed to receive federal highway and transit funding. NYSDOT develops New York State's STIP, which is updated every four years, and is amended frequently to reflect projects newly proposed for federal funding. New York State is broken into fourteen regions, each of which has a Metropolitan Planning Organization ("MPO") that develops a TIP for its region. NYMTC is the MPO for New York City, Long Island, and the Lower Hudson Valley, including Westchester, Putnam, and Rockland counties—a region with more than 13 million residents. MPOs submit TIPs to NYSDOT for inclusion in New York State's STIP.

24. FHWA and FTA, which oversees federal transit funding, must jointly approve each STIP and STIP amendment, and only projects in a STIP or STIP amendment approved by both FHWA and FTA are eligible for FHWA or FTA funding. Thus, all future MTA projects seeking federal funding that are not already included in the STIP are at risk if the threat is carried out,

DOT_0047890

including projects necessary for the long-term safety and reliability of the regional transportation system.  As MTA relies on billions of dollars in federal dollars per year to maintain its systems and serve the public, this threat could eviscerate the relatively smaller annual value of CBD Toll Program tolls and stymie planning for critical projects under the newly legislatively approved 2025-2029 MTA Capital Program.

25.     One concrete example is already pending.  NYSDOT recently submitted a proposed STIP amendment concerning a $2.2 billion package of NYMTC projects for subway and bus maintenance and railroad track work for approval by FHWA and FTA so that FTA funding can be released to MTA.  These funds are now at risk if FHWA refuses to approve the STIP amendment pursuant to the threatened actions in the April 21st letter.

26.     In addition to the loss of any FTA funding due to USDOT's threatened refusal to allow FHWA to approve STIP amendments, the threatened retaliatory actions, which include cutting off all future obligations of FHWA funding for projects within New York City, could also forestall MTA receipt of FHWA funding aimed at improving air quality, which MTA has used to make subway stations more accessible and thereby reduce vehicle emissions. FHWA's Congestion Mitigation and Air Quality Improvement Program ("CMAQ") provides a flexible funding source to State and local governments for transportation projects and programs to help meet the requirements of the federal Clean Air Act.  The funding initially goes to NYSDOT, which in turn disburses funds to different governmental entities.  Funding is available to reduce congestion and improve air quality for areas that do not meet the National Ambient Air Quality Standards for ozone, carbon monoxide, or particulate matter (and are thus nonattainment areas for those pollutants) and for former nonattainment areas that are now in compliance (maintenance areas).

9

MTA expects to receive approximately $55 million from this program for the federal fiscal year (October 1, 2024 to September 30, 2025).

27.     MTA utilizes the majority of CMAQ funding for Americans with Disabilities Act ("ADA") projects.  These undertakings align with the CMAQ program requirements by contributing to reductions in vehicle miles traveled ("VMT") and associated emissions, improving air quality, and reducing regional congestion.  Specifically, the installation of ADA-compliant elevators and equipment at non-accessible stations increases subway ridership and reduces reliance on vehicular modes of transportation such as taxis, for-hire-vehicles, private vehicles, and paratransit services like Access-A-Ride. Consequently, this shift reduces VMT and resultant emissions as well as congestion.

28.     A single illustration reflects the need for and effectiveness of the CMAQ program funding. In September 2024, MTA was awarded $50 million to make ADA improvements at the Middletown Road station on the Pelham Line (No. 6 Train) in the Bronx, including the installation of ADA-compliant elevators and related equipment. These improvements are projected to increase transit ridership by approximately 21 additional trips per day, which would be shifted from private vehicles, taxis, vehicles-for-hire, and paratransit services. This shift in ridership is estimated to reduce daily VMT by 260 miles, as trips that would have been made by car are instead accommodated by the subway system.

29.     A similar ADA-accessible project, using CMAQ funds, is planned for the Morrison Avenue / Soundview Avenue station, also on the No. 6 line in the Bronx, and at the Broadway Junction station in Brooklyn, where five subway lines intersect, in 2025.  The benefits in reduced VMT and emissions, and improved air quality, along with benefits to the ADA community, will be similar to those projected for the Middletown Road station.  Similar projects

10

DOT_0047892

to these would be at least deferred, if not foregone, if CMAQ funding becomes unavailable.

30.     In addition to losing the CMAQ funds, MTA's extensive bus operations will also be harmed, as they operate on roadways throughout the City that are maintained by NYCDOT in part using FHWA funding.  If the condition of these roadways deteriorates due to funding constraints, it will inevitably affect the ability of MTA buses to meet their schedules, and likely contribute to deterioration of the buses themselves, thereby increasing expenses for MTA to maintain or replace them.

31.     If federal funding typically received by MTA becomes unavailable during the pendency of this lawsuit until the Court rules on the legality of FHWA's purported rescission of the VPPP Agreement, MTA would be forced to juggle priorities and defer, if not eliminate, many important projects (including accessibility projects) due to the lack of funding.  The same would be true if the Project Sponsors capitulated and stopped tolling entries to the CBD, as MTA would have to divert other capital funds to repay the almost $1.4 billion in congestion pricing-related debt that would otherwise be used for important projects and could not issue bonds or finance projects that are already planned. Some projects would undoubtedly not proceed at all or would be materially delayed, contributing to deterioration of transit and commuter rail service and delay of improvements to access.  The consequence would be irreparable harm to the public transit system, and thus to the traveling public.

32.     This would be the case, under USDOT's threats, notwithstanding the fact that federal funding used by the MTA, NYSDOT and NYCDOT is appropriated by Congress specifically to maintain transportation systems in the New York City metropolitan region pursuant to legislative formulas under 49 U.S.C. § 5307, 49 U.S.C. § 5337, and other statutes.

DOT_0047893

I declare under the penalty of perjury that the foregoing is true and correct.

*Kevin Willens*
Kevin Willens

Dated: May 5, 2025
New York, New York

12

DOT_0047894

# DECLARATION OF ALLISON L. C. DE CERREÑO, PH.D.

Filed 05/05/25

Metro. Transp. Auth. v. Duffy, No. 25 Civ. 1413 (S.D.N.Y.) (LJL)

DOT_0047895

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

METROPOLITAN TRANSPORTATION AUTHORITY
and TRIBOROUGH BRIDGE AND TUNNEL
AUTHORITY,

<em>Plaintiffs</em>,

and

NEW YORK STATE DEPARTMENT OF
TRANSPORTATION, RIDERS ALLIANCE, SIERRA
CLUB, and NEW YORK CITY DEPARTMENT OF
TRANSPORTATION,

<em>Intervenor-Plaintiffs</em>,

v.

SEAN DUFFY, in his official capacity as Secretary of
the United States Department of Transportation,
GLORIA M. SHEPHERD, in her official capacity as
Executive Director of the Federal Highway
Administration, UNITED STATES DEPARTMENT
OF TRANSPORTATION, and FEDERAL HIGHWAY
ADMINISTRATION,

<em>Defendants</em>.

Case No. 25 Civ. 1413 (LJL)

## DECLARATION OF ALLISON L. C. DE CERREÑO, PH.D.

I, Allison L. C. de Cerreño, Ph.D., hereby declare under penalty of perjury, pursuant to 28

U.S.C. § 1746, as follows:

1.  I am the Chief Operating Officer of the Triborough Bridge and Tunnel Authority

("TBTA"), an affiliate of the Metropolitan Transportation Authority (the "MTA"). I have

responsibility for overseeing the work of roughly 800 personnel in three TBTA departments:

Tolling Management (including roadway and back-office operations), Facilities Management

DOT_0047896

(including nine bridges and tunnels, the Robert Moses complex, central maintenance, and fleet), and Environmental, Safety and Health (EHS). In addition, in that capacity and in my prior positions with the MTA, I have been and remain the project lead (aka "Project CEO") for the Central Business District Tolling Program (the "CBD Tolling Program" or the "Program"), a New York State legislatively mandated program pursuant to which TBTA, the New York State Department of Transportation ("NYSDOT"), and the New York City Department of Transportation ("NYCDOT") (collectively, the "Project Sponsors") developed and introduced congestion pricing to Manhattan's Central Business District (the "CBD"). The State legislation providing for the Program is the 2019 MTA Reform and Traffic Mobility Act (the "TMA"). The Program, which commenced operations on January 5, 2025, has reduced congestion and, as it continues to operate, will provide a stable source of revenue for the MTA to improve subway, bus and commuter rail systems through projects included in the MTA's 2020-2024 Capital Program and successor capital programs.

2.      In my role as TBTA lead for the Program, I was involved in and have personal knowledge of meetings and communications with the U.S. Department of Transportation ("USDOT") and the Federal Highway Administration ("FHWA"), which date back to 2019. As reflected by those meetings and correspondence, USDOT and FHWA fully understood that the Program entailed what is commonly known as "cordon pricing"—that is, tolling all non-exempt vehicles accessing a specified geographic area, in this case the CBD. USDOT and FHWA also fully understood that the Program was intended to reduce congestion through two complementary means: disincentivizing driving into the CBD by charging tolls, and making the use of transit more attractive by directing net revenues (after costs associated with the Program) to capital

2

DOT_0047897

improvements in mass transit. FHWA's ultimate approval of the Program reflected this understanding.

**A. The History of the Program**

3.      The USDOT/FHWA determined that the Program required approval from FHWA, which had been conferred the authority to allow state and local agencies to implement tolls on federal-aid highways through the Value Pricing Pilot Program (the "VPPP"). The VPPP was established through the enactment of Section 1012(b) of the Intermodal Surface Transportation Efficiency Act ("ISTEA") of 1991, as amended. The VPPP was initially called the Congestion Pricing Pilot Program; the name of the program was changed to the VPPP in the Transportation Equity Act for the 21st Century ("TEA-21") of 1998, and was continued in the Safe, Accountable, Flexible, Efficient Transportation Equity Act ("SAFETEA-LU") of 2005.[1]   For a detailed description of FHWA's interpretation, guidance and application of the VPPP, *see* Plaintiffs' Amended Complaint at ¶¶ 62–98.

4.      The three Program Sponsors initiated contact with USDOT and FHWA with regard to the Program in the Spring of 2019, shortly after the April 1, 2019 adoption of the TMA. There were several in-person meetings and numerous telephone conferences, including three in-person meetings in Washington D.C. and two in Albany. The initial in-person meeting, in Washington, D.C., was on April 23, 2019, and the second was in Albany the next day; the other in-person meetings were in Washington D.C. in October and December of 2019 and in Albany in November 2019.

---

[1]   *Value Pricing Pilot Program*, U.S. FED. HIGHWAY ADMIN., https://ops.fhwa.dot.gov/congestionpricing/value_pricing/ (last accessed Apr. 18, 2025).

DOT_0047898

5.      At those meetings, and particularly in the April 2019 meetings with USDOT and FHWA, the Project Sponsors presented the Program and provided detailed explanations of its contemplated operation. Those explanations included that tolling would apply to vehicles that enter the CBD, defined as below and inclusive of 60th Street (with the exception of vehicles using the FDR Drive, West Side Highway, the Battery Park Underpass, and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West Street) in order to reduce the severe congestion in the CBD. This type of congestion pricing is generally called "cordon pricing" (or sometimes "zone-based" or "area-wide pricing"), as the tolling is for a specific geographic area.[2] In addition, it was explained that the Program would incorporate toll rates that would provide a new and recurring source of revenue for the MTA, with net revenues (after paying for Program costs) to be dedicated to capital improvements identified in the MTA's 2020-2024 Capital Plan. The minutes FHWA prepared of the April 24th meeting in Albany reflect the explanation and discussion of these and other elements of the Program. In addition, at that meeting the Project Sponsors provided USDOT and FHWA with a description of the Program. A copy of the April 24, 2019 meeting minutes, along with the Program description that was provided to USDOT/FHWA at the meeting, are annexed hereto as Exhibit "A."

6.      At these meetings, as well as at the later meetings, USDOT and FHWA representatives made clear that, given the nature of the Program, the VPPP is the appropriate vehicle to provide tolling authority on federal-aid highways for a cordon-based congestion pricing program like the Program. That is plain by the "Discussion" subheading in the minutes of the April 24th meeting, which reference the VPPP and its attendant requirements (including compliance with the National Environmental Policy Act, or "NEPA"). The federal agencies explained that

---

[2] *Id.*

DOT_0047899

NYSDOT already had one of the 15 "slots" allotted in the VPPP, and could have multiple congestion pricing projects under that "slot," including the Program. The federal agencies further explained that there would need to be a VPPP agreement between FHWA and the Project Sponsors. At the close of the April 24th meeting, it was agreed that FHWA would forward to the Project Sponsors a template for a VPPP "Expression of Interest," which was needed to commence the eligibility/approval process, as well as an example of a cooperative agreement that the Project Sponsors would need to enter into with FHWA. *See* Exhibit "A" at 3.

7.      On June 14, 2019, the Project Sponsors held a conference call with FHWA. During that call, as occurred in later meetings, there was discussion of what class of action would be applicable for the anticipated NEPA process (an Environmental Assessment ("EA") or Environmental Impact Statement ("EIS")) and what steps the Project Sponsors could take to advance the Program pending completion of the NEPA process.

8.      The Project Sponsors submitted an Expression of Interest ("EoI") to FHWA seeking approval under the VPPP to implement the Program on June 17, 2019. A copy of the June 17, 2019 cover letter accompanying the EoI and the EoI are annexed hereto as Exhibit "B." As noted in the cover letter, "[t]he purpose of this variable price tolling program is to specifically mitigate the untenable levels of traffic congestion that currently exists in the Central Business District." The cover letter further noted that improving mass transit through revenues from the Program, "provides the greatest return on investment for mitigation traffic congestion." *Id.* at 1.

9.      The full EoI also makes plain the basic elements of the Program and its goals. For example, Section D.2 provides a description of the area to be tolled (*i.e.*, the CBD, with the exceptions noted above).  Section D.4 describes the goals of the Program, including the reduction

DOT_0047900

of congestion and improvement of air quality, as well as the creation of a sustainable source of

funding for the MTA and increase in transit ridership.

10.    The FHWA response to the EoI came in the form of an October 24, 2019 letter from

the Administrator, which requested further information. A copy of the October 24, 2019 letter is

annexed hereto as Exhibit "C" The FHWA stated that "[u]nder the various programs in Federal

law that allow tolling of existing infrastructure, the VPPP appears to be the best potential fit,

provided that the overall purpose of variable tolling remains to reduce roadway traffic congestion."

*Id.* at 1.[3] In addition, noting the Program revenues would be used almost exclusively for mass

transit improvement, FHWA asked for details about the use of those revenues. *Id*. at 2. Finally,

FHWA acknowledged that the use of cordon pricing was "unprecedented", and that the agency

had to consider the precedent it would be setting by approval. *Id.*[4]

11.    Following this letter, the Project Sponsors met FHWA in Albany on November 6,

2019 to discuss the October 24th letter. The Project Sponsors then met with USDOT and FHWA

in Washington D.C. on December 6, 2019 and obtained guidance on responding to the agencies'

further requests for information. At that meeting, there was discussion of the use of the Program

revenues and the NEPA class of action.

12.    After the December 6 meeting, the Project Sponsors submitted a December 17,

2019 letter to FHWA, together with information requested in the FHWA's October 24th letter. A

---

[3] "Variable tolling" refers to tolling that, like the Program, imposes different toll amounts at
different times of the day.

[4] This assertion was not entirely correct, as there had been prior proposals for area-wide tolling
approved by FHWA. For example, in 2007, New York City and FHWA entered into an Urban
Partnership Agreement in which FHWA agreed to award New York City $5 million in VPPP
funding to pursue "a broad area pricing system in Manhattan south of 86th Street." *See* Plaintiffs'
Amended Complaint at ¶¶ 84. This approval was conditioned on State legislative action which did
not occur at that time.

DOT_0047901

copy of the December 17, 2019 letter is annexed hereto as Exhibit "D." The Project Sponsors'

December 17th letter emphasized that the premise of the Program was "to implement an area-wide

pricing program under the Value Pricing Pilot Program." The attachment included with the letter

explained, again, that net Program revenues would be dedicated to capital investments in mass

transit. After noting that much of the information requested by the agencies would typically be

contained in the environmental documentation that would be prepared pursuant to NEPA, the

Project Sponsors requested a prompt decision on the class of action for NEPA review that had

been under consideration by USDOT/FHWA for months (since the April 24th meeting). On

January 27, 2020, the Project Sponsors submitted the Traffic and Revenue Study that had been

requested by FHWA; a copy of the cover letter submitting that study is annexed hereto as Exhibit

"E."

13.     There was no response to the December 2019 or January 2020 submissions, so the

Project Sponsors wrote the FHWA on July 2, 2020 to request prompt agency action on the EoI (as

required by an Executive Order and guidance issued by the first Trump administration) and a

determination on the NEPA process; *viz*, whether an EA or EIS would be required. A copy of the

July 2, 2020 letter is annexed hereto as Exhibit "F." On September 3, 2020, FHWA responded,

stating that due to the Covid-19 pandemic and potential changed circumstances with regard to

traffic and mass transit ridership, the agency needed more information on these conditions, "as the

impact on congestion is a relevant consideration under the [VPPP]." A copy of the September 3,

2020 letter is annexed hereto as Exhibit "G."

14.     The Project Sponsors submitted the requested information on traffic and transit

ridership on October 13, 2020, and reiterated the request that FHWA inform them of the type of

NEPA process to be undertaken. A copy of the October 13, 2020 letter is annexed hereto as Exhibit

DOT_0047902

"H." It was not until March 30, 2021 that FHWA responded, and informed the Project Sponsors that an EA would be the appropriate NEPA documentation. A copy of the March 30, 2021 letter is annexed hereto as Exhibit "I."

15.     A lengthy environmental review process under NEPA ensued. Consistent with discussions with FHWA in 2019 and 2020, as well as at the commencement of the NEPA process, the EA's description of the purpose for the Program was "to reduce traffic congestion in the Manhattan CBD in a manner that will generate revenue for future transportation improvements, pursuant to acceptance into FHWA's VPPP."[5] The EA identified two Program needs: the need to reduce vehicle congestion in the CBD, and the need to create a new local, recurring funding source for MTA's transit capital projects.[6] To further refine the purpose and address the identified needs, the EA identified two specific congestion reduction objectives, which made plain that the primary purpose of the Program was to reduce congestion. These objectives were the reduction of daily vehicle miles traveled ("VMT") in the CBD by at least 5% and the reduction of daily vehicles entering the CBD by at least 10%. The objective related to creating the new, local, recurring source of funding was to generate sufficient net revenue to support the financing of $15 billion for MTA transit capital projects in the agency's 2020-2024 Capital Program.[7]

16.     Because the final tolling structure had not yet been defined, for the purpose of evaluating the potential environmental impacts of various tolling options, the Final EA analyzed

---

[5] Final EA Chapter 1, Introduction at 1-10, https://www.mta.info/document/110766 (last accessed Apr. 18, 2025).
[6] *Id*. at 1-10 to 1-18.
[7] *Id*. at 1-18.

DOT_0047903

seven tolling scenarios, with tolls for passenger cars ranging from $9 to $23 (with different rates for different classes of vehicles), with different toll amounts, credits and exemptions.[8]

17.     The environmental review culminated in the April 2023 Final EA and the June 2023 Finding of No Significant Impact ("FONSI").

18.     On November 30, 2023, the Traffic Mobility Review Board, an entity required by the TMA to recommend a toll structure for consideration by the TBTA Board, issued its recommendation,[9] which was informed by the Final EA. On December 6, 2023, the TBTA Board authorized TBTA to take the requisite steps to promulgate a CBD toll rate schedule.[10]

19.     On March 27, 2024, the TBTA Board adopted a toll rate schedule for the Program, with a planned implementation date in or about June 2024. The Project Sponsors prepared a reevaluation document ("Reevaluation 1") consistent with FHWA's regulations and as contemplated by the FONSI, to assess the effects of the March 2024 adopted toll schedule and determine whether the FONSI was still valid.[11] On June 14, 2024, FHWA confirmed that the reevaluation was consistent with FHWA's regulations and determined that the FONSI remained valid.[12]

---

[8] Final EA Chapter 2, Project Alternatives at 2-29 to 2-38, https://www.mta.info/document/110771 (last accessed Apr. 18, 2025).
[9] Traffic Mobility Review Board, *Congestion Pricing in New York* (Nov. 2023), https://www.mta.info/document/127761.
[10] MTA Board Votes to Begin Public Review Process for Central Business District Tolling Rate Schedule, MTA (Dec. 6, 2023), https://www.mta.info/press-release/mta-board-votes-begin-public-review-process-central-business-district-tolling-rate.
[11] Central Business District (CBD) Tolling Program, Reevaluation (June 24, 2024), https://www.mta.info/document/142711.
[12] Letter from Richard J. Marquis, Division Administrator, Fed. Highway Admin., to Allison L. C. de Cerreño, Ph.D., Chief Operating Officer, MTA Bridges and Tunnels (June 14, 2024), https://www.mta.info/document/142701.

DOT_0047904

20.     On June 5, 2024, prior to a VPPP agreement being executed, the Governor announced a pause in implementation of the Program, which at that point had been scheduled to begin on June 30, 2024.

21.     On November 14, 2024, the Governor announced a proposal to proceed with the Program, but with the toll rates that had been adopted by the TBTA Board in March 2024 being phased-in gradually over several years. On November 18, 2024, the TBTA Board adopted the phase-in feature of the toll rate schedule that it had approved in March (the "Phase-In Approach").[13]

22.     Under the Phase-In Approach, toll rates for each vehicle class and time of day, as well as tunnel crossing credits, are proportionally reduced from, and then gradually return to, the corresponding values in the March 2024 adopted toll rate schedule. Thus, subject to certain tunnel crossing credits, from 2025 to 2027, the peak-period E-ZPass entry toll rate charged for passenger vehicles will be $9; for motorcycles, $4.50; for larger vehicles including transit and commuter buses and trucks, $14.40 or $21.60, depending on their size; for taxis, $0.75 per trip; and for for-hire vehicles ("FHVs") on trips dispatched by high-volume for-hire services ("HVFHSs"), $1.50 per trip. The toll rates and tunnel crossing credits later increase proportionally for each vehicle category, once in 2028, then again in 2031 to match those in the March 2024 toll rate schedule, as set forth in the November 2024 toll rate schedule.

23.     The Project Sponsors prepared a second reevaluation consistent with FHWA's regulations to assess the effects of the Phase-in Approach of the March 2024 adopted toll structure, entitled Reevaluation 2. This Reevaluation concluded that the effects of the Program were

---

[13] Triborough Bridge and Tunnel Authority Central Business District (CBD) Charges, https://www.mta.info/document/138931 (last accessed Mar. 20, 2025).

DOT_0047905

consistent with those disclosed in the Final EA, the mitigation set forth in the FONSI (and Reevaluation 1) remained appropriate, and the FONSI remained valid.[14]

24.    On November 21, 2024, FHWA confirmed that Reevaluation 2 was consistent with FHWA's regulations and determined that the FONSI remained valid.[15] FHWA and the Project Sponsors then signed an agreement under the VPPP authorizing the Program's collection of tolls.[16] The agreement, *inter alia*, requires that the Project Sponsors report to FHWA on various performance metrics. Along with direct indicators of congestion reduction, such as daily vehicle entries into the CBD, are indirect indicators, including transit ridership and "capital projects funded or financed through Project revenue."[17]

25.    The Program commenced tolling customers on January 5, 2025. Information available for the first months of operations indicates a noticeable reduction in congestion in the CBD as compared to the same time period in 2024, with the corollary benefits of decreased time for emergency vehicle trips, Access-A-Ride Paratransit Service trips, and commutes.

    a.    Traffic in the CBD decreased substantially, with approximately 5.8 million fewer vehicles entering the district in January through March 2025 than would be expected based on data for prior years. This represents an 8% reduction from a typical January, a 12% reduction from a typical February, and a 13% reduction from a typical March.[18] Although not yet published, preliminary data for April indicate that traffic in the CBD was down by 12%.

---

[14] Central Business District (CBD) Tolling Program, Reevaluation 2 (Nov. 2024), https://www.mta.info/document/158191.

[15] Letter from Richard J. Marquis, Division Administrator, Fed. Highway Admin., to Allison L. C. de Cerreño, Ph.D., Chief Operating Officer, MTA Bridges and Tunnels (Nov. 21, 2024), https://www.mta.info/document/158196.

[16] Value Pricing Pilot Program Agreement (Nov. 21, 2024), https://www.mta.info/document/158201.

[17] *Id.* at 9.

[18] MTA Metrics, Reduction in Vehicle Entries to the CBD, https://metrics.mta.info/?cbdtp/vehiclereductions (last accessed Apr. 18, 2025). Compared to historical monthly averages for each respective month, a total of 1,267,083 fewer vehicles entered the CBD in January 2025; 2,029,860 fewer vehicles in February 2025; and 2,548,820 fewer in

DOT_0047906

b. Based on MTA's review of relevant data, there was a 10% reduction in VMT by all vehicles in the CBD from January to mid-March of 2025 as compared to the same period in 2024.

c. According to data collected by TRANSCOM,[19] crossing times were 12% faster at the Lincoln Tunnel and 45% faster at the Holland Tunnel from January-March 2025, compared to January-March 2024.[20] Trip times from Brooklyn and Queens to the CBD have dropped between 10% and 30%.[21] Express buses save about 10 minutes on their commutes.[22]

d. According to MTA's assessment of data collected by TRANSCOM, traffic speeds on river crossings were 5% to 30% faster this February than last February. Traffic speeds on major bridges improved significantly: on the Queensboro Bridge, by 31%; on the Brooklyn Bridge, by 26%; and on the Manhattan Bridge, by 7%.[23]

e. Commuter time is reduced; commuters are saving as much as 21 minutes on their trips.[24]

f. Fewer vehicles utilize the nine MTA bridges and tunnels, with levels dropping 2.4% from March of 2024 to March of 2025. The largest reductions are at the Hugh L. Carey and Queens-Midtown Tunnels, which lead directly into the zone.[25]  Truck

---

March 2025. Reductions are measured by subtracting vehicle totals against a historical average of 580.5K daily entries in January, 613.9K daily entries in February, and 642.5K daily entries in March.

[19] TRANSCOM is a coalition of 16 transportation and public safety agencies in the New York – New Jersey – Connecticut metropolitan region. It was created in 1986 to provide a cooperative, coordinated approach to regional transportation management.

[20] January 2025 MTA Board Meeting, Congestion Relief Zone Tolling January 29, 2025 Update , at 4-5, https://www.mta.info/document/163411 (last accessed Apr. 18, 2025); *see also* Andrew Siff, *MTA Calls Congestion Pricing 'Transformative' on Commutes,* NBC NEW YORK, (Jan. 29, 2025), https://www.nbcnewyork.com/new-york-city/mta-congestion-pricing-transformative-commute-impact/6126670/.

[21] January 2025 MTA Board Meeting, Congestion Relief Zone Tolling January 29, 2025 Update, at Slide 5, https://www.mta.info/document/163411 (last accessed Apr. 18, 2025).

[22] *Id.* at 9; February 2025 MTA Board Presentation at 10 (Feb. 26, 2025), https://www.mta.info/document/165401 (last accessed Apr. 18, 2025).

[23] February 2025 MTA Board Presentation at 10 (Feb. 26, 2025), https://www.mta.info/document/165401 (last accessed Apr. 20, 2025); *TRANSCOM*, internally sourced data week of February 24, 2025.

[24] RPA*, Congestion Pricing: What it Means to Save Time* (Mar. 11, 2025), https://rpa.org/news/lab/what-it-means-to-save-time.

[25] MTA Daily Ridership and Traffic, New York State, https://data.ny.gov/Transportation/MTA-Daily-Ridership-and-Traffic-Beginning-2020/sayj-mze2/about_data (last accessed Apr. 18, 2025).

DOT_0047907

traffic traveling through these tunnels dropped 14% this year compared to the same period in 2024.[26]

g. Trips are also far more reliable. According to TRANSCOM, traffic through the Holland Tunnel used to be delayed more than 3 minutes more than half of all weekdays (54%) – now 12%. On the Williamsburg Bridge, delays used to be greater than 3 minutes 65% of the time; the Program has reduced that to 2%.[27]

h. A recent study published by the National Bureau of Economic Research, with lead authors from Yale and Stanford, found a 15% improvement in CBD traffic speeds.[28] MTA internal data show that local bus speeds have increased by an average of 3% within the CBD, with some routes increasing by as much as 7%.[29]

i. Several bus routes have seen significant decreases in the time needed to complete their routes.[30] Based on internal MTA data from March 2025, there are 23% fewer customer trips on express bus that are delayed 10 minutes or more. Express buses are traveling 21% faster on the portion of their routes leading into and within the CBD.[31]

j. The Program appears to have reversed a long trend of increased emergency response times;[32] as a corollary of lessened congestion in the CBD. Similarly, reduced congestion translates into less delay for school buses in the congestion zone.

---

[26] Roosevelt House Public Policy Institute at Hunters College, *Where have all the Trucks Gone? Truck Diversions through the Bronx and State*, https://www.roosevelthouse.hunter.cuny.edu/?forum-post=trucks-gone-truck-diversions-bronx-staten-island (last accessed Apr. 18, 2025).
[27] February 2025 MTA Board Meeting Presentation at 12 (Feb. 26, 2025), https://www.mta.info/document/165401; *see also TRANSCOM*, internally sourced data week of February 24, 2025.
[28] Cody Cook et al., *The Short-Run Effects of Congestion Pricing in New York City*, NBER (March 17, 2025), https://www.nber.org/system/files/working_papers/w33584/w33584.pdf (last accessed Apr. 18, 2025).
[29] MTA Metrics, Reduction in Vehicle Entries to the CBD, https://metrics.mta.info/?cbdtp/vehiclereductions (last accessed Apr. 18, 2025).
[30] January 2025 MTA Board Meeting, Congestion Relief Zone Tolling January 29, 2025 Update at Slides 9–10, https://www.mta.info/document/163411 (last accessed Apr. 18, 2025).
[31] MTA Metrics, Reduction in Vehicle Entries to the CBD, https://metrics.mta.info/?cbdtp/vehiclereductions (last accessed Apr. 18, 2025).
[32] Ginia Bellafante, *The Life-or-Death Consequences of Killing Congestion Pricing*, N.Y. Times (Oct. 10, 2024), https://www.nytimes.com/2024/10/10/nyregion/new-york-fire-department-response-times.html.

DOT_0047908

k.  NYC open data of 311 calls show that complaints about excessive car horn honking within the CBD in January and February are down by more than 70% from the same time period last year, plummeting to 67 this year from 219.[33]

l.  According to an internal analysis, between January 5 and March 4, two New York City Department of Environmental Protection noise cameras in the CBD did not issue a single horn-honking ticket. Those two cameras issued 27 during the same time last year.[34]

m.  There has been less diversion of traffic to the outer boroughs than expected, thus lessening potential traffic increases in those areas (which include environmental justice communities).[35] The recent National Bureau of Economic Research study confirmed that the Program has benefitted areas outside of the CBD as well, with highways and major roadways also seeing sustained speed improvements.[36]

n.  A recent Hunter College study found that truck volumes on MTA bridges and tunnels leading into and out of the Bronx and Staten Island remained essentially the same from January-February of 2024 to those months in 2025.[37] An MTA assessment shows that traffic volumes (cars and trucks) are slightly down on the Cross-Bronx Expressway, with speed increased.[38]

26.  While reducing congestion, the Program has shown no adverse effects on economic activity:

a.  Pedestrian traffic in Manhattan increased 4.6% between January 5 (the day that toll collection began) and January 31 compared to the same period in 2024.[39]

---

[33] Jose Martinez and Mia Hollie, *Honking Complaints Plunge 69% Inside Congestion Relief Zone*, (Mar. 11, 2025), (citing analysis of 311 call data); MTA Metrics, Reduction in Vehicle Entries to the CBD, https://metrics.mta.info/?cbdtp/vehiclereductions (last accessed Apr. 18, 2025).

[34] MTA Metrics, Reduction in Vehicle Entries to the CBD, https://metrics.mta.info/?cbdtp/vehiclereductions (last accessed Apr. 18, 2025).

[35] David Colon, *Data: Congestion Pricing Is Not Rerouting Traffic to Outer Boroughs*, STREETSBLOG (Mar. 12, 2025), https://nyc.streetsblog.org/2025/03/12/data-outer-borough-congestion-pricing-spillover-traffic-not-happening.

[36] Cody Cook et al., *The Short-Run Effects of Congestion Pricing in New York City*, NBER (Mar. 17, 2025), https://www.nber.org/system/files/working_papers/w33584/w33584.pdf.

[37] Roosevelt House Public Policy Institute at Hunters College, *Where have all the Trucks Gone? Truck Diversions through the Bronx and State*, https://www.roosevelthouse.hunter.cuny.edu/?forum-post=trucks-gone-truck-diversions-bronx-staten-island (last accessed Apr. 18, 2025).

[38] *See* MTA Metrics, Vehicle Reductions Traffic Patterns in the Bronx Post-Congestion Pricing presentation (Mar. 2025), a copy of which is annexed hereto as Exhibit J.

[39] *See Arun Venugopal*, Vehicle Traffic Is Down in Manhattan, But Pedestrian Traffic Is Up, Data Says, GOTHAMIST (Feb. 13, 2025), https://gothamist.com/news/vehicle-traffic-is-down-in-manhattan-but-pedestrian-traffic-is-up-data-says.

14

    b.  Hotel occupancy in the CBD was 73% in January 2025 compared to 70% in January 2024.[40]

    c.  The gross revenue of Broadway shows January-March 2025 was 25% higher than the same period last year, and attendance at Broadway shows was up 20% for January-March compared to this period of last year.[41]

    d.  Retail sales were up 1.5% in January and February – on track to be $900M higher this year than last.[42]

    e.  Leasing in the CBD was up 11% this January versus the fourth quarter of 2024, and up 80% since the first quarter of last year.[43]

    f.  Real estate availability is down.[44]

27.    As aptly stated by Kathryn Wylde, President and CEO of The Partnership for New York, since the initiation of congestion pricing, New Yorkers are "moving faster and there's less traffic."[45]

**B.  TBTA and MTA Will Suffer Irreparable Harm if the Project Sponsors are Forced to Suspend the Program in Order to Avoid the Withholding of FHWA funding to the Project Sponsors**

28.    TBTA would incur substantial expenses which could not be recouped if the Project Sponsors are compelled to suspend the Program until a final decision in order for the Project Sponsors to avoid the loss of significant State funding.

---

[40] This is based on a March 10, 2025 internal analysis conducted by New York City Economic Development Corporation of CoStar data.

[41] This is based on a March 2025 internal analysis of data made publicly available by the Broadway League. *See* Research and Statistics, Grosses: Broadway in NYC, The Broadway League, https://www.broadwayleague.com/research/grosses-broadway-nyc/ (last accessed Apr. 18, 2025).

[42] This is based on a March 2025 internal analysis of Affinity Solutions Cards & Transactions data.

[43] Colliers, *Downtown NYC Office Market Report: 2025 Q1*, https://www.colliers.com/en/research/new-york/nyc-q1-2025-downtown-office-market-report (last accessed Apr. 18, 2025).

[44] Colliers, *Manhattan Monthly Snapshot: January 2025*, https://www.colliers.com/en/research/new-york/2025_01_manhattan-monthly-snapshot (last accessed Apr. 18, 2025).

[45] Dick Brennan, *President Trump said to have NYC's congestion pricing, bike lanes in his crosshairs*, CBS News (Feb. 10, 2025), https://www.cbsnews.com/newyork/news/president-trump-nyc-congestion-pricing-bike-lanes/.

DOT_0047910

29.     TBTA has expended substantial taxpayer dollars in reliance on FHWA's repeated representations that the VPPP would encompass the Program, and in the agency's words, is the "best potential fit" for the Program. *See* Exhibit "C" at 1.

30.     TBTA budgeted and has expended over $500 million to establish the Program. These expenditures included developing the methodological approach; conducting the assessment and extensive outreach and developing the final documentation for the environmental review process under NEPA; design, development, implementation and testing of the roadway infrastructure and system; design, development, implementation and testing of the back-office system; additional extensive outreach for the State administrative review process; staff costs, including new staff for the Program; and consulting costs.

31.     Few if any of these costs would have been incurred had USDOT/FHWA taken the position at the beginning of the long and tortuous 5-year process it now takes—that the Program is not lawful under the VPPP because it utilizes cordon pricing to raise money for mass transit. They did not assert such illegality. Instead, as reflected in the Draft EA, the Final EA and the FONSI, the agencies specifically endorsed the goals and objectives of the Program and entered into a VPPP Agreement with the Project Sponsors.

32.     If the Program is temporarily suspended, all the benefits identified above would be lost: traffic would return, travel times would increase, emergency response times would lengthen, buses (including school buses) would face greater delays, and the streets would become less safe. The public would lose the benefits of congestion pricing, and thus the benefits reasonably expected to flow from the $500 million spent by TBTA for the Program, for at least the period of the suspension. These benefits could not be recouped.

16

33.     Moreover, if the Program is temporarily suspended, TBTA would incur roughly $12 million in additional expenditures per month, most of which would be related to a combination of the operations and maintenance of the roadside tolling system, the operations of the back-office system and customer contact center, and consultant costs. This figure does not include the costs related to additional staff that were brought on specifically for the Program nor other costs, such as those related to outreach and advertising and assessments to be undertaken for the Program. These costs cannot be deferred even if operation of the tolling is suspended. Further, these costs could not be paid by Program revenues, as there would be none during this period. These funds would be lost as a result of a suspension.

34.     Furthermore, a Program suspension would cause TBTA the loss of estimated monthly revenues from the first phase of the Program of over $50 million, based on revenues in January, February, and March 2025, which if annualized would meet the projected net annual revenues forecasted in Reevaluation 2 of roughly $500 million in the first phase.[46] These public dollars could never be recouped, even if the Program is restarted, as those months of tolling revenues would be lost forever.

35.     This loss of funds means that the MTA would, at a minimum, have to delay undertaking much-needed capital improvement to the mass transit system, including such undertakings as adding accessibility to numerous subway stations consistent with the Americans with Disability Act, improving outdated signaling and other improvements to system reliability,

---

[46]     *See* February 2025 Report of the MTA Finance Committee, https://www.mta.info/document/165106 (last accessed Apr. 18, 2025), March Report of the MTA Finance Committee Meeting, https://www.youtube.com/live/VuALrov3tBA?t=1812s (last accessed Apr. 18, 2025).

DOT_0047912

improving safety and customer service through technology, and extending public transit to under-served areas.[47]

### C.  The Public Interest Strongly Favors a Preliminary Injunction

36.     Without an injunction, the Project Sponsors, as noted above, may be compelled to suspend the Program in order to avoid the loss of State funding. In that event, MTA, the recipient of Program revenues, could be prevented from proceeding with vitally important work under the MTA's 2020-2024 Capital Program, which is intended to ensure that improvements put in place will be sustainable for years to come. The total Capital Program is $55.6 billion. Of that amount, $52.2 billion is identified for critical investments in the region's subways, buses, and commuter railroad, nearly one-third of which would be supported by the Program. Key projects of the Capital Program, which would be delayed by a suspension that would halt Program tolling revenues, include those referenced in Paragraph 35, above.

37.     In addition, because MTA would be forced to halt operation of the Program, TBTA could not advance the $155 million package of regional and place-based mitigation for environmental justice communities to which the Project Sponsors committed in the Final EA, FONSI, and reevaluations, and which would address preexisting pollution and chronic health burdens in such communities, including particularly burdened environmental justice communities in New York and New Jersey.[48] Moreover, TBTA has already reached out to the environmental justice communities identified for place-based mitigation, to discuss which types of mitigation are most appropriate for each community. Such measures could include installing roadside vegetation,

---

[47] *See generally* MTA, 2020–2024 Capital Program: Exec. Summary (Oct. 1, 2019), https://files.mta.info/s3fs-public/2019-09/MTA%202020-2024%20Capital%20Program%20-%20Executive%20Summary.pdf (last accessed Apr. 18, 2025).
[48] Final EA Chapter 17, Environmental Justice at App. 17D-25–64, 74–80, https://www.mta.info/document/92741 (last accessed Apr. 18, 2025).

DOT_0047913

renovating parks and green space, and/or installing air filtration units in schools near highways. Delay of the Program would necessarily stall these efforts.

38.     In contrast, the public would not be harmed by continued operation of the Program; rather, it would continue to receive the benefits of the Program set forth above. In addition, if it became necessary, there are mechanisms that allow TBTA to fully refund toll payers in the unlikely event that USDOT/FHWA prevail in this action. All eligible vehicles entering the CBD are charged and pay the applicable toll rate using one of two mechanisms. Toll payers with an E-ZPass account pay the toll using their E-ZPass account. If the vehicle is not associated with an E-ZPass account, the registered owner of the vehicle receives a toll bill in the mail. No matter what the method of payment by that toll payer, it is recorded. Because the Program uses these cashless methods of collection, no one pays with cash at a toll booth — an outdated method of collection that TBTA replaced at its bridge and tunnel facilities years ago.

39.     Between 92% and 95% of toll payers on current TBTA tolling facilities that enter Manhattan use E-ZPass, and it appears from data available to date that a significant majority of drivers use E-ZPass for the Program. If required for toll payers with a New York E-ZPass account, TBTA is able to refund any tolls paid by crediting such E-ZPass accounts. Toll payers who pay the toll through a non-New York E-ZPass account will be traceable by their respective state tolling agencies, and their payments will also be traceable by those agencies. Consistent with TBTA's prior practice when issuing refunds to toll payers who use a non-New York E-ZPass account, any such refunds can be issued to the respective state tolling agency, which would then reimburse the toll payer. For example, someone driving into the CBD from Delaware with a Delaware E-ZPass account would pay the toll amount to the Delaware state tolling agency. This agency would send the toll amount, on the toll payer's behalf, to TBTA. In turn, if required, TBTA can refund the

DOT_0047914

Delaware state tolling agency, which in turn could then credit the toll payer's account. Where warranted, TBTA already routinely reconciles New York E-ZPass accounts and non-New York E-ZPass accounts in the ordinary course of business in this manner for bridge and tunnel facilities; Program toll reconciliation would be no different.

40.     The remaining toll payers who do not use E-ZPass are also traceable and can be refunded by the same mechanism that they use to pay their bill. Toll payers without E-ZPass receive a bill in the mail with a unique identifying bill number. These toll payers then have the option of paying that bill through credit card, cash at an authorized payment facility, or by mailing in a check. If a toll payer has paid their bill, and thus paid the toll, TBTA can refund the toll payer by reversing the charges if they used a credit card, or by issuing a refund check if the toll payer paid by cash or check.

41.     In summary, it bears emphasizing that a suspension of the Program would delay the extensive benefits to the public that accompany the Program—and thus the benefits that would otherwise flow from these large-scale expenditures, such as making subway stations accessible to the disabled. Delaying implementation of the Program means the reinstitution of the severe congestion in the CBD, with its concomitant economic and environmental costs to businesses, residents, commuters, workers, and visitors in this area.  Congestion in the CBD has been a $20 billion annual drag on the region's, and thus the country's, economy.[49] And as the most congested urban area in the country, travel times—including for public buses and emergency vehicles, are extraordinarily slow.[50] Delay of the Program would mean the continuation of these conditions, and

---

[49] Final EA Chapter 1, Introduction at 1-12, https://www.mta.info/document/92761 (last accessed Apr. 18, 2025).
[50] *Id*. at 1-1.

DOT_0047915

harm to the public, while allowing the Program to proceed pending a final decision on the merits would cause no harm to USDOT or FHWA.

Dated:     May 4, 2025
           New York, New York                    Allison L. C. de Cerreño, Ph.D.

DOT_0047916

# DECLARATION OF WILLIAM CARRY

Filed 05/05/25

Metro. Transp. Auth. v. Duffy, No. 25 Civ. 1413 (S.D.N.Y.)

(LJL)

DOT_0047917

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

METROPOLITAN TRANSPORTATION AUTHORITY
and TRIBOROUGH BRIDGE AND TUNNEL
AUTHORITY,

*Plaintiffs*,

and

NEW YORK STATE DEPARTMENT OF
TRANSPORTATION, RIDERS ALLIANCE, SIERRA
CLUB, and NEW YORK CITY DEPARTMENT OF
TRANSPORTATION,

*Intervenor-Plaintiffs*,

v.

SEAN DUFFY, in his official capacity as Secretary of
the United States Department of Transportation,
GLORIA M. SHEPHERD, in her official capacity as
Executive Director of the Federal Highway
Administration, UNITED STATES DEPARTMENT
OF TRANSPORTATION, and FEDERAL HIGHWAY
ADMINISTRATION,

*Defendants*.

Case No. 25 Civ. 1413 (LJL)

**DECLARATION OF
WILLIAM CARRY IN
SUPPORT OF MOTION
FOR PRELIMINARY
INJUNCTION**

---

## <u>DECLARATION OF WILLIAM CARRY</u>

I, William Carry, hereby declare under penalty of perjury, pursuant to 28 U.S.C. §
1746, as follows:

1.  I am the Assistant Commissioner for Policy for the New York City ("City")
Department of Transportation ("City DOT"). City DOT is responsible for one of the most complex
urban transportation networks in the world, including 6,300 miles of streets and highways,
approximately 800 bridges and tunnels, and 13,500 signalized intersections. I submit this

1

DOT_0047918

Declaration in support of the Plaintiffs' request for a preliminary injunction and/or temporary restraining order.

2.     The facts set forth herein are based on my personal and professional knowledge, conversations with relevant City DOT staff, and a review of records in City DOT's possession.

3.     As part of my work at City DOT, I have knowledge of federal competitive grants, formula funds, and cooperative agreements awarded to the City of New York and administered by City DOT, including those from the United States Department of Transportation ("USDOT") through the Federal Highway Administration ("FHWA"), and those passed to City DOT through the New York State Department of Transportation ("State DOT").

**The April 21, 2025 Letter**

4.     On April 21, 2025, City DOT received a letter from United States Secretary of Transportation Sean Duffy (the "April 21 Letter") which warned that if it "determines that New York is out of compliance with 23 U.S.C. § 301… FHWA will implement appropriate initial compliance measures beginning on or after May 28, 2025," and that those measures would roll out in separate tranches.  In the first tranche, the letter states the measures would include:

- "No further advance construction ("AC") authorizations for projects within the borough of Manhattan, except for projects determined by FHWA to be essential for safety ("Safety Projects").[1]
- No further National Environmental Policy Act ("NEPA") approvals for projects within the borough of Manhattan, except for Safety Projects.
- No further approvals of Statewide Transportation Improvement Program ("STIP") amendments concerning New York Metropolitan Transportation Council ("NYMTC") TIP modifications."

The letter also explains that, continuing "non-compliance" could result in FHWA launching a second tranche of "measures", including if the State's "non-compliance continues …, :

---

[1] According to the April 21 Letter, "Safety Projects include projects under the National Highway Performance Program, Bridge Formula Program, and Highway Safety Improvement Program."

2

- "No further obligations of FHWA funds (both formula and competitive) for projects within New York City, except for Safety Projects.
- No further AC authorizations for projects within New York City, except for Safety Projects.
- No further NEPA approvals for projects within New York City, except for Safety Projects."

Programs cited to in the April 21 Letter are discussed in some greater detail below.

**Federal Transportation Programs In New York City**

5.      Transportation projects are complex and often take years of planning before construction begins.  Projects are typically identified, developed, and funded over several years, or even decades, and involve close coordination by partners at the local, state and federal levels. Like other local governments, the City of New York identifies projects for which it prepares preliminary designs and cost estimates, which it presents to its state and federal partners.  State DOT and USDOT work with the City as projects advance – or fall out of – review and approval processes that are unique to each federal funding stream.

6.      Federal funds are essential to advance significant capital improvements to bridges, roads, public spaces, and sidewalks throughout the City.  Separate federal programs enable the City to keep existing infrastructure in a good state of repair, and expand access to people with mobility challenges consistent with legal requirements such as the Americans with Disabilities Act.  Funding decisions are often made after there has been back and forth between the governmental partners and practical impediments are identified and assessed.

7.      The April 21 letter identifies three USDOT activities that will be curtailed if USDOT finds that the CBDTP tolls federal-aid highways without authorization.  Each are discussed below.

8.      Advance construction authorizations allow projects to begin without sufficient Federal-aid obligation authority to cover the Federal share of project costs. Without advance

3

construction authorization, the local sponsor must set aside the full amount of the project's costs (including the share that the federal government is obligated to fund) before starting projects. As a result, a local agency can undertake fewer concurrent projects, and larger projects may crowd out the ability to maintain sufficient obligational authority for smaller ones. Thus, curtailing advance construction authorizations for transportation projects in New York City would immediately reduce City DOT's flexibility in its extensive transportation funding program.

9.      NEPA refers to the National Environmental Policy Act, which requires that the policies, regulations, and laws of the Federal Government be interpreted and administered in accordance with its environmental protection goals. The lead Federal agency is required to work cooperatively with other Federal, state, and local agencies to prepare environmental reviews assessing proposed projects' impacts. These coordinated reviews can include input from the public, as well as from other agencies, and are a prerequisite to federal discretionary action. A pre-determination by a federal agency to preemptively withhold NEPA approvals would effectively halt projects in the pipeline where federal funding or approvals are necessary in order to undertake the anticipated work.

10.     The Statewide Transportation Improvement Program ("STIP") is a comprehensive list of all projects or project phases in New York State proposed to receive Federal funding, pursuant to Title 23 U.S.C. and 49 U.S.C. Chapter 53, during a given four-year period. The most recent STIP for New York State was formally approved on December 23, 2022. The STIP includes highway, transit and non-motorized projects as well as urban and rural projects. The New York Metropolitan Transportation Council is responsible for developing the Transportation Improvement Program ("TIP", or 4-year plan) for New York City, Long Island and the lower Hudson Valley. A blanket refusal to approve STIP projects would essentially block any new

4

DOT_0047921

projects from entering the federal fund eligibility pipeline. Furthermore, to the extent that major modifications are required for projects, amendments to the TIP/STIP are necessary before those modifications are eligible for federal funds.

11.     I understand that the federal government has stated that "Safety Projects" are exempt from the threatened curtailment, and that the carve-out includes those that fall under the National Highway Performance Program, Bridge Formula Program, and Highway Safety Improvement Program. However, the letter also suggests that FHWA will determine in the first instance which projects qualify as important for public safety.  This risks that a project would not be found to be a "Safety Project" even if it primarily promotes public safety, and is funded through the programs named in the letter, which could stop NEPA review or threaten federal funding.  Any new process that contemplates limiting the availability of federal funding outside the existing statutory framework in the above-mentioned programs, risks subjective curtailment despite their safety focus. Thus, conditioning funding of projects on a new, discretionary determination of their status as "Safety Projects" would also harm City DOT's ability to plan, budget, and ultimately execute its mission.

**Federal Contributions to City DOT's Capital Budget**

12.     While the April 21 Letter addresses funding to State DOT, some of this funding is passed through to City DOT, and forms a crucial part of the agency's Capital Budget. City DOT receives, on average, approximately $250 Million in FHWA funding each year across both capital and expense projects.

13.     In Manhattan alone, multiple major projects could be immediately affected by the threatened curtailment of funding and approvals. The Trans Manhattan Expressway, a roughly $470 Million project, is currently in the preparatory stages of seeking review under NEPA. This

5

DOT_0047922

project will rebuild the ramp connecting the Harlem River Drive to the Trans-Manhattan Expressway in Upper Manhattan. The ramp structure was originally constructed in 1939 by the Port Authority, and has thus been in operation for 80 years and is nearing the end of its intended service life.  I understand that the federal government may refuse to process further NEPA approvals or federal funding for the project, which is expected to cover about $98 Million of the project cost. If either or both actions are taken by the federal government, City DOT would be unable to make important improvements to the Expressway. Notably, the project is in far Northern Manhattan, and is not subject to the CBDTP tolls. And while the project should qualify as a Safety Project, not every component is safety related. Any determination by USDOT that some part or all of the project may be curtailed because it is not safety related would threaten City DOT's ability to proceed with this important project.

14.     Similarly, two other projects involve reconstructing streets near the New York Public Library ($9.5 Million) and at Delancey Street in the Lower East Side ($41 Million) to improve pedestrian safety. Each of these projects is in the final phase of design, approaching the construction phase. Delancey Street, in particular, is classified as being among the top 10% of high-crash corridors in the borough. By expanding public space, installing proven safety treatments, and providing multimodal transit infrastructure, the Delancey Street Reconstruction project will transform a half mile urban highway into a safer, more accessible, and resilient streetscape for all users. The project will also include critical subsurface utility and infrastructure upgrades to a 100+ year old roadway, which, if left unaddressed, can lead to street failure events such as sinkholes. City DOT expects to solicit bids for construction in Summer 2025; however, the threatened additional discretionary review to determine whether this project is a Safety Project could threaten this timeline, and an adverse determination could yield months of delay. Such a

6

delay could result in cascading delays, coupled with inflation and other cost increases. Any delay to this project—either by curtailing its funding or approvals, or by requiring the City to demonstrate that it is an exempt "Safety Project"—will deprive New Yorkers of long promised critical safety, accessibility and infrastructure upgrades.

15.     Similarly, the "Safe Routes to School" Manhattan capital project is dedicated to pedestrian safety and safe streets near schools in underserved areas. This project will provide critical safety improvements at 19 intersections in the vicinity of seven different schools, all located in upper Manhattan. This project is currently scheduled to start construction in 2026, and delaying the work would deprive New Yorkers – especially children and their families - of critical safety improvements. Even withholding funding for a few months would introduce uncertainty and delay to the project which would ultimately harm the City's ability to complete it.

16.     In further tranches, the April 21 Letter anticipates expanding its curtailment beyond Manhattan to the remainder of New York City. This could threaten federal matching funds for more than 20 projects, with a combined cost of over $3.1 Billion, and a combined federal share of about $570 Million. The projects include efforts intended to improve safer public streets and sidewalks near public schools and other community facilities like public libraries, and important bridge and roadway rehabilitation projects.

17.     Another project potentially subject to federal curtailment of funding and approvals is the reconstruction of the Shore Road Bridge in the borough of the Bronx. This roughly $545 Million project would replace a movable bridge—one of the most frequently opened in the City— that was designed to standards in place over 110 years ago. Delaying the environmental reviews for this project, withholding the roughly $130 Million federal cost-share, or requiring the City to demonstrate to FHWA's discretionary satisfaction that the this is a "Safety Project" would harm

7

DOT_0047924

City DOT's ability to execute this necessary replacement because it slows the ability to design and advance the project through the review process while adding construction and other inflationary costs that are regularly incurred over time.

18.     Similarly, the Secretary's threatened enforcement could impact the rehabilitation of West Tremont Avenue Bridge over the Metro-North Railroad Hudson Line and the Major Deegan Expressway. This roughly $95 Million project, of which the federal government is to fund approximately $73 Million, or 77%, is currently undergoing final design.

**Impacts of Federal Enforcement**

19.     The threatened curtailment of federal funds and approvals to State DOT for projects in Manhattan, and, eventually, New York City as a whole, would irreparably harm City DOT by preventing the commencement and completion of current and future projects necessary to its mission of providing for the safe, equitable, and sustainable movement of people and goods and the creation of public spaces that would otherwise strengthen our communities. Eventually, the curtailment of the threatened funds would lead to projects being delayed or abandoned altogether, and associated cost increases even if funding were later restored. A long-term curtailment of funds could lead to the cancellation of projects necessary for keeping transportation infrastructure in a state of good repair, the loss of staff needed to maintain and improve infrastructure, and the need to forego other projects that would otherwise improve the lives of New Yorkers, commuters, and those traveling to our through the City.  It would also impact City DOT's collaborative work with local vendors, subcontractors, and the Transportation departments of connected jurisdictions.

20.     If this enforcement is allowed to occur during the pendency of this litigation, the effects would be immediate, and the resulting delays and cost escalations could not be remedied after a final determination on the merits, and could force the City to choose between substituting

DOT_0047925

City funds to keep necessary projects on track, and keeping the City's other infrastructure in a state of good repair. To be clear, as described above, the termination of the City's access to federal transportation funding—even for a few months—could have far-reaching consequences for the City of New York. It would reduce City DOT's ability to fulfill its mission, to the detriment of the City of New York's vitally important roads, sidewalks and bridges.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on May 5, 2025, at New York, NY.

William Carry

9

DOT_0047926

# DECLARATION OF D. BRANDON TRICE

Filed 05/05/25

Metro. Transp. Auth. v. Duffy, No. 25 Civ. 1413 (S.D.N.Y.)

(LJL)

DOT_0047927

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

METROPOLITAN TRANSPORTATION AUTHORITY
and TRIBOROUGH BRIDGE AND TUNNEL
AUTHORITY,

*Plaintiffs*,

and

NEW YORK STATE DEPARTMENT OF
TRANSPORTATION, RIDERS ALLIANCE, SIERRA
CLUB, and NEW YORK CITY DEPARTMENT OF
TRANSPORTATION,

*Intervenor-Plaintiffs*,

v.

SEAN DUFFY, in his official capacity as Secretary of
the United States Department of Transportation,
GLORIA M. SHEPHERD, in her official capacity as
Executive Director of the Federal Highway
Administration, UNITED STATES DEPARTMENT
OF TRANSPORTATION, and FEDERAL HIGHWAY
ADMINISTRATION,

*Defendants*.

Case No. 25 Civ. 1413 (LJL)

## DECLARATION OF D. BRANDON TRICE IN SUPPORT OF
## PLAINTIFFS THE METROPOLITAN TRANSPORTATION AUTHORITY AND
## TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY AND INTERVENOR-
## PLAINTIFF NEW YORK CITY DEPARTMENT OF TRANSPORTATION'S
## MOTION FOR A PRELIMINARY INJUNCTION

I, D. Brandon Trice, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am a member of the bar of the State of New York and am admitted to appear

before this Court.  I am a partner in the law firm Kaplan Martin LLP, counsel for Plaintiffs the

Metropolitan Transportation Authority ("MTA") and Triborough Bridge and Tunnel Authority ("TBTA") in the above-captioned action.

2. I respectfully submit this declaration in support of Plaintiffs and Intervenor-Plaintiff New York City Department of Transportation's ("NYCDOT") motion for a preliminary injunction.

3. Attached hereto as **Exhibit 1** is true and correct copy of the Value Pricing Pilot Program Agreement signed by the Federal Highway Administration ("FHWA"), TBTA, the New York State Department of Transportation ("NYSDOT"), and NYCDOT on November 21, 2024.

4. Attached hereto as **Exhibit 2** is a true and correct copy of then-candidate Donald Trump's May 24, 2024 Truth Social post.

5. Attached hereto as **Exhibit 3** is a true and correct copy of Representative Nicole Malliotakis's January 11, 2025 X post.

6. Attached hereto as **Exhibit 4** is a true and correct copy of President Trump's February 19, 2025 X post.

7. Attached hereto as **Exhibit 5** is true and correct copy of the February 19, 2025 letter from Defendant Sean Duffy ("Duffy") to Governor Kathy Hochul.

8. Attached hereto as **Exhibit 6** is a true and correct copy of the February 20, 2025 letter from Defendant Gloria Shepherd ("Shepherd") addressed to TBTA, NYSDOT, and NYCDOT (collectively, the "Project Sponsors").

9. Attached hereto as **Exhibit 7** is a true and correct copy of Duffy's March 20, 2025 X post.

10. Attached hereto as **Exhibit 8** is a true and correct copy of the March 20, 2025 letter from Shepherd to the Project Sponsors.

DOT_0047929

11.     Attached hereto as **Exhibit 9** is a true and correct copy of the April 8, 2025 X post by the U.S. Department of Transportation.

12.     Attached hereto as **Exhibit 10** is a true and correct copy of the April 21, 2025 letter from Duffy to Governor Kathy Hochul.

Dated:  New York, New York                    /s/ D. Brandon Trice
        May 5, 2025                           D. Brandon Trice

DOT_0047930

# EXHIBIT 1

DOT_0047931

THIS AGREEMENT ("Agreement"), made and entered into this 21st day of
_____November_____, 2024, by and among the FEDERAL HIGHWAY
ADMINISTRATION, UNITED STATES DEPARTMENT OF TRANSPORTATION,
(hereinafter referred to as "FHWA") and the NEW YORK STATE DEPARTMENT OF
TRANSPORTATION, an agency of the State of New York, Triborough Bridge and
Tunnel Authority, and New York City Department of Transportation, (hereinafter
referred to as "NYSDOT, TBTA, and NYCDOT ").


WITNESSETH:

WHEREAS, section 1012(b) of the Intermodal Surface Transportation Efficiency Act of
1991 (ISTEA), Public Law 102-240, as amended by section 1216(a) of the Transportation
Equity Act for the 21st Century (TEA-21), and section 1604 (a) of the Safe, Accountable,
Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA- LU), Pub.
L. 109-59 (August 10, 2005) establishes the Value Pricing Pilot Program, hereinafter
referred to as the "pilot program," and permits the FHWA to allow the collection of tolls
as part of the value pricing pilot program established under Section 1012(b); and

WHEREAS, Section 1012(b) of ISTEA, as amended, authorizes the Secretary of
Transportation to enter into cooperative agreements with as many as fifteen (15) State or
local governments or public authorities to establish, maintain, and monitor value pricing
programs, or projects; and

WHEREAS, NYSDOT, through the execution of cooperative agreements for prior value
pricing projects, is one of the fifteen participants in the pilot program; and

WHEREAS, NYSDOT has requested that the FHWA enter into an  agreement with
NYSDOT, TBTA, and NYCDOT related to establishing, maintaining, and monitoring a
value pricing project, known as the Central Business District Tolling Program (CBDTP)
(hereinafter referred to as the "Project"), as part of NYSDOT's participation in the value
pricing pilot program; and

WHEREAS, as part of the CBDTP value pricing pilot program, TBTA intends to toll an
area which includes portions of highway facilities that have been constructed,
reconstructed, rehabilitated, restored, resurfaced or maintained with title 23 funds as
described in Attachment A, and made part of this agreement; and

WHEREAS, the FHWA has determined that this Agreement is necessary to oversee and
administer the collection of tolls pursuant to Section 1012(b)(4) of ISTEA, as amended;
and

WHEREAS, Section 1012(b) of ISTEA, as amended requires that all revenues received
from the operation of a value pricing project be applied only toward the project's
operating costs (including project implementation costs; mitigation measures to deal with
adverse financial effects on low-income drivers; the proper maintenance of the Project;

any reconstruction, rehabilitation, restoration, or resurfacing of the Project; any debt service incurred in implementing the project; a reasonable return on investment of any private person financing the project), and other projects eligible for assistance under title 23, United States Code; and

WHEREAS, this Agreement is neither intended to, nor shall it, result in the independent participation by TBTA and NYCDOT in the value pricing pilot program, it being expressly understood that TBTA's and NYCDOT's participation in the value pricing pilot project approved in this Agreement is (i) derivative of and only exists through NYSDOT's participation in the value pricing pilot program and (ii) limited to the Project; and

NOW THEREFORE, in consideration of the premises and mutual undertakings of the parties, and in conformity with all applicable laws, the NYSDOT, TBTA, NYCDOT, and FHWA hereby agree as follows:

(1) The FHWA agrees that TBTA may operate the Project as a toll Project in accordance with the provisions of this Agreement and as a value pricing project, as part of NYSDOT's value pricing pilot program.

(2) Pursuant to Section 1012(b) of ISTEA, as amended, TBTA will use all toll revenues received from the operation of the Project for the operating costs of the project as described in attachment A (including project implementation costs; mitigation measures to deal with adverse financial effects on low-income drivers; the proper maintenance of the Project; any reconstruction, rehabilitation, restoration, or resurfacing of the Project; any debt service incurred in implementing the project; a reasonable return on investment of any private person financing the project), and any other projects eligible for assistance under title 23, United States Code.

(3) The toll rates applicable to the Project will vary as described in Attachment A. and in accordance with Section 1012(b) of ISTEA, as amended including Sec. 1012(b)(6) - HOV Passenger Requirements. Notwithstanding section 102(a) of title 23, United States Code, a State may permit vehicles with fewer than 2 occupants to operate in high occupancy vehicle lanes if the vehicles are part of a value pricing pilot program under this section. Sec. 1012(b)(7) - Financial Effects on Low-Income Drivers – Any value pricing pilot program under this subsection shall include, if appropriate, an analysis of the potential effects of the pilot program on low-income drivers and may include mitigation measures to deal with any potential adverse financial effects on low-income drivers.

(4) TBTA shall conduct or have an independent auditor conduct an annual audit of toll Project records to verify compliance with use of revenues and report the results of the audits to FHWA.

2

DOT_0047933

(5) As of the date of the execution of this Agreement, the imposition of tolls under this Agreement does not render Federal-aid highways within the State of New York generally ineligible for Federal-aid highway funds where such highways are otherwise eligible under the particular funding program.

(6) NYSDOT, TBTA, and NYCDOT, as applicable, will continue to adequately maintain or cause to be adequately maintained, the highway facilities that have been constructed, reconstructed, rehabilitated, restored, or resurfaced or maintained with title 23 funds located in the Project.

(7) That TBTA agrees, upon reasonable notice, to make all of its records pertaining to the Project subject to audit by the FHWA. TBTA agrees to annually audit the records of the Project for compliance with the provisions of this Agreement and report the results thereof to FHWA. In lieu of the TBTA performing said audit, a report of the New York State Comptroller or an independent auditor furnished to FHWA may satisfy the requirements of this section.

(8) Effective on the date of this Agreement, the project is approved as a pilot program, and the following requirements shall apply:

   a. In order to carry out Section 1012(b)(5) of ISTEA, as amended, the FHWA and NYSDOT, TBTA and NYCDOT will cooperate and work together in the implementation of the Project.

   b. That TBTA and NYCDOT, as applicable, shall monitor and report on the project performance (Attachment B) from the date of implementation for a period of at least ten years or to the end of the life of the Project, whichever is sooner, to evaluate the effects on driver behavior, traffic volume, congestion, transit ridership, air quality, and availability of funds for transportation programs. Reports begin one year after the operation date and every two years thereafter.

   c. That TBTA and NYCDOT will identify benefits the application of tolls has in reducing climate pollution.

   d. That TBTA and NYCDOT will demonstrate the benefits mitigation measures provide to underserved communities.

(9) That NYSDOT, TBTA and NYCDOT agree to comply with all Federal laws and requirements applicable to this project, including the laws and policies applicable to the Value Pricing Pilot Program. Such laws and requirements include, but are not limited to Section 1012(b) of ISTEA, as amended, the guidance implementing Section 1012(b) of ISTEA, and 23 CFR Part 940 and 950.

3

DOT_0047934

(10)  TBTA, through NYSDOT, agrees to provide FHWA notice of any proposed changes to the toll structure other than the phases set forth in Attachment A, a minimum of 60 days before such changes go into effect. Any such changes must be eligible pursuant to the VPPP enacted by section 1012(b) of the Intermodal Surface Transportation Efficiency Act of 1991 (ISTEA), Public Law 102-240, as amended by section 1216(a) of the Transportation Equity Act for the 21st Century (TEA-21), and section 1604 (a) of the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA- LU), Pub. L. 109-59 (August 10, 2005).

(11)  That NYSDOT, TBTA and NYCDOT agree they will work with FHWA to return the Project to its original operating condition if TBTA decides to discontinue tolls on the Project.

(12)  That this Agreement will be prepared in quadruplicate originals so that each signatory will have a signed Agreement. This Agreement may be signed in counterparts, each of which shall be deemed an original and taken together shall constitute one and the same agreement.


IN WITNESS THEREOF, the parties hereto have caused this instrument to be duly executed, the day and year first written above.

STATE OF NEW YORK DEPARTMENT OF TRANSPORTATION

BY: _Marie Therese Dominguez_

Title:  Commissioner

TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY

BY: _____
        Catherine T. Sheridan
Title: President _____


NEW YORK CITY DEPARTMENT OF TRANSPORTATION

BY: _____
        Ydanis Rodriguez
Title: Commissioner _____

4

FEDERAL HIGHWAY ADMINISTRATION
UNITED STATES DEPARTMENT OF TRANSPORTATION

BY: _Gloria M. Shepherd_

Title: _Executive Director_

ATTACHMENT A – Project Description
ATTACHMENT B – Performance Metrics

5

**Attachment A**

**Project Description**

The CBD Tolling Program will implement a vehicular tolling program to reduce traffic congestion in the Manhattan Central Business District ("CBD"), consistent with the MTA Reform and Traffic Mobility Act. Traffic congestion is expected to be reduced by disincentivizing use of vehicles within the CBD by imposition of tolls, and concurrently by investments in transit that will incentivize use of transit systems instead of driving. The project purpose is to reduce traffic congestion in the CBD in a manner that will generate revenue for future transportation improvements, pursuant to acceptance into FHWA's Value Pricing Pilot Program.

The CBD consists of the geographic area of Manhattan south and inclusive of 60th Street, but not including Franklin D. Roosevelt Drive ("FDR Drive"), West Side Highway/Route 9A, the Battery Park Underpass, and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West Street (the West Side Highway/Route 9A).

TBTA will toll vehicles entering the CBD via a cashless tolling system. The toll amount will be variable, with higher tolls charges during peak periods when congestion is greater. The toll will apply to all registered vehicles (i.e., those with license plates), with the exception of qualifying vehicles transporting persons with disabilities, qualifying authorized emergency vehicles, transit buses, and specialized government vehicles. Passenger vehicles will be tolled no more than once a day. Taxis and for-hire vehicles ("FHVs") will be tolled on a per-trip basis for rides carrying passengers occurring wholly or partially within the CBD.

The Project will use the same tolling infrastructure and tolling system equipment described and evaluated in the Final Environmental Assessment for the Project (the "Final EA").

The environmental commitments made in the Finding of No Significant Impact will be implemented as described in the Environmental Documents.

To address effects to low-income drivers, the Project will include a tax credit for CBD tolls paid by residents of the CBD whose New York adjusted gross income for the taxable year is less than $60,000. TBTA will coordinate with the New York State Department of Taxation and Finance to ensure availability of documentation needed for drivers eligible for the tax credit. In addition, the Project commits, for five years, to a Low-Income Discount Plan offering low-income frequent drivers a 50 percent discount on the full E-ZPass toll rate after the first 10 trips in each calendar month (excluding the overnight period, which will already be deeply discounted).

The toll amounts will be graduated over a six year period in accordance with the toll rate schedule below. Phase 1 will span 2025 through 2027, Phase 2 will span 2028 through 2030, and Phase 3 will commence in 2031.

6

DOT_0047937

## Toll Rate Schedule

| TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY CENTRAL BUSINESS DISTRICT (CBD) CHARGES | | | | | | |
|---|---|---|---|---|---|---|
| | | PHASE 1 2025-2027 | | PHASE 2 2028-2030 | | PHASE 3 starting 2031 | |
| a E-ZPass Customers | CBD ENTRY CHARGE | TUNNEL CROSSING CREDIT | CBD ENTRY CHARGE | TUNNEL CROSSING CREDIT | CBD ENTRY CHARGE | TUNNEL CROSSING CREDIT |
| **VEHICLE CLASSIFICATION** | | | | | | |
| 1 Passenger and other vehicles, including sedans, sport utility vehicles, station wagons, hearses, limousines, pickup trucks with factory beds, pickup trucks with caps below the roofline and not extending over the sides, and vans without an extended roof above the windshield | | | | | | |
|   Peak period (5am-9pm weekdays, 9am-9pm weekends) | $9.00 | | $12.00 | | $15.00 | |
|   Peak period for registered Low-Income Discount Plan participants using an eligible vehicle, 11th trip and trips thereafter in a calendar month (5am-9pm weekdays, 9am-9pm weekends) | $4.50 | | $6.00 | | $7.50 | |
|   Peak period per-trip credit (maximum daily credit $5.00) | | | | | | |
|    If entering the CBD via the Lincoln Tunnel or Holland Tunnel | | $3.00 | | $4.00 | | $5.00 |
|    If entering or exiting the CBD via the Queens-Midtown Tunnel or Hugh L. Carey Tunnel | | $1.50 | | $2.00 | | $2.50 |
|   Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $2.25 | | $3.00 | | $3.75 | |
| 2 Single-unit trucks, including non-articulated trucks, pickup trucks with modified beds, vans with modified body behind the drivers cab, pickup trucks with caps above the roofline or extending over the sides, and vans with an extended roof above the windshield | | | | | | |
|   Peak period (5am-9pm weekdays, 9am-9pm weekends) | $14.40 | | $19.20 | | $24.00 | |
|   Peak period per-trip credit: | | | | | | |
|    If entering the CBD via the Lincoln Tunnel or Holland Tunnel | | $7.20 | | $9.60 | | $12.00 |
|    If entering or exiting the CBD via the Queens-Midtown Tunnel or Hugh L. Carey Tunnel | | $3.60 | | $4.80 | | $6.00 |
|   Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $3.60 | | $4.80 | | $6.00 | |
| 3 Multi-unit trucks, including articulated trucks where a power unit is carrying one or more trailers | | | | | | |
|   Peak period (5am-9pm weekdays, 9am-9pm weekends) | $21.60 | | $28.80 | | $36.00 | |
|   Peak period per-trip credit: | | | | | | |
|    If entering the CBD via the Lincoln Tunnel or Holland Tunnel | | $12.00 | | $16.00 | | $20.00 |
|    If entering or exiting the CBD via the Queens-Midtown Tunnel or Hugh L. Carey Tunnel | | $6.00 | | $8.00 | | $10.00 |
|   Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $5.40 | | $7.20 | | $9.00 | |
| 4 Buses, including vehicles registered with the DMV and plated as a bus, omnibus, or have other designated official plates | | | | | | |
|   Peak period (5am-9pm weekdays, 9am-9pm weekends) | $14.40 | | $19.20 | | $24.00 | |
|   Peak period per-trip credit: | | | | | | |
|    If entering the CBD via the Lincoln Tunnel or Holland Tunnel | | $7.20 | | $9.60 | | $12.00 |
|    If entering or exiting the CBD via the Queens-Midtown Tunnel or Hugh L. Carey Tunnel | | $3.60 | | $4.80 | | $6.00 |
|   Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $3.60 | | $4.80 | | $6.00 | |
|   Licensed sightseeing buses | | | | | | |
|   Peak period (5am-9pm weekdays, 9am-9pm weekends) | $21.60 | | $28.80 | | $36.00 | |
|   Peak period per-trip credit: | | | | | | |
|    If entering the CBD via the Lincoln Tunnel or Holland Tunnel | | $12.00 | | $16.00 | | $20.00 |
|    If entering or exiting the CBD via the Queens-Midtown Tunnel or Hugh L. Carey Tunnel | | $6.00 | | $8.00 | | $10.00 |
|   Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $5.40 | | $7.20 | | $9.00 | |
| 5 Motorcycles | | | | | | |
|   Peak period (5am-9pm weekdays, 9am-9pm weekends) | $4.50 | | $6.00 | | $7.50 | |
|   Peak period per-trip credit: | | | | | | |
|    If entering the CBD via the Lincoln Tunnel or Holland Tunnel | | $1.50 | | $2.00 | | $2.50 |
|    If entering or exiting the CBD via the Queens-Midtown Tunnel or Hugh L. Carey Tunnel | | $0.75 | | $1.00 | | $1.25 |
|   Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $1.05 | | $1.40 | | $1.75 | |

E-ZPass CBD entry charges are available subject to terms, conditions, and agreements established by the Authority.

The Authority reserves the right to determine whether any vehicle is of unusual or unconventional design, weight, or construction and therefore not within any of the listed categories. The Authority also reserves the right to determine the CBD charge for any such vehicle of unusual or unconventional design, weight, or construction. Any single unit vehicle identified as belonging to Classes 1, 2, or 5 will be up-classed to the next toll class when towing a trailer or another vehicle.

Daily toll cap of once per day for Class 1 and Class 5 vehicles. Caps for other vehicles are subject to change pursuant to the adaptive management approach to mitigating project effects, as committed to in the Final Environmental Assessment.

CBD entry charges and tunnel credits are subject to a variable percentage increase/decrease of up to 10% for up to one year after implementation pursuant to the adaptive management approach to mitigating project effects, as committed to in the Final Environmental Assessment.

The Low-Income Discount Plan shall continue for five years as committed to in the Final Environmental Assessment.

The Authority reserves the right to charge a 25% higher CBD charge during Gridlock Alert Days. Each year, the NYCDOT identifies Gridlock Alert Days during the UN General Assembly and throughout the holiday season when heavy traffic is expected in Manhattan. On Gridlock Alert Days, consider walking, biking, or taking mass transit for any trips in Manhattan.

Qualifying authorized emergency vehicles and qualifying vehicles transporting persons with disabilities are exempt pursuant to Vehicle and Traffic Law § 1704-a (2).

Qualifying authorized commuter buses and specialized government vehicles, as determined by the Authority, are exempt.

7

| TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY CENTRAL BUSINESS DISTRICT (CBD) CHARGES | | | | | | |
|---|---|---|---|---|---|---|
| | | PHASE 1 2025-2027 | | PHASE 2 2028-2030 | | PHASE 3 starting 2031 |
| b Customers Using Fare Media Other Than E-ZPass<br><br>VEHICLE CLASSIFICATION | | CBD ENTRY CHARGE | PER TRIP CHARGE PLAN* (TO/FROM/ WITHIN/ THROUGH CBD) | CBD ENTRY CHARGE | PER TRIP CHARGE PLAN* (TO/FROM/ WITHIN/ THROUGH CBD) | CBD ENTRY CHARGE | PER TRIP CHARGE PLAN* (TO/FROM/ WITHIN/ THROUGH CBD) |
| 1 Passenger and other vehicles, including sedans, sport utility vehicles, station wagons, hearses, limousines, pickup trucks with factory beds, pickup trucks with caps below the roofline and not extending over the sides, and vans without an extended roof above the windshield | | | | | | | |
| Peak period (5am-9pm weekdays, 9am-9pm weekends) | $13.50 | | $18.00 | | $22.50 | |
| Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $3.30 | | $4.40 | | $5.50 | |
| 2 Single-unit trucks, including non-articulated trucks, pickup trucks with modified beds, vans with modified body behind the drivers cab, pickup trucks with caps above the roofline or extending over the sides, and vans with an extended roof above the windshield | | | | | | | |
| Peak period (5am-9pm weekdays, 9am-9pm weekends) | $21.60 | | $28.80 | | $36.00 | |
| Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $5.40 | | $7.20 | | $9.00 | |
| 3 Multi-unit trucks, including articulated trucks where a power unit is carrying one or more trailers | | | | | | | |
| Peak period (5am-9pm weekdays, 9am-9pm weekends) | $32.40 | | $43.20 | | $54.00 | |
| Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $8.10 | | $10.80 | | $13.50 | |
| 4 Buses, including vehicles registered with the DMV and plated as a bus, omnibus, or have other designated official plates | | | | | | | |
| Peak period (5am-9pm weekdays, 9am-9pm weekends) | $21.60 | | $28.80 | | $36.00 | |
| Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $5.40 | | $7.20 | | $9.00 | |
| Licensed sightseeing buses | | | | | | | |
| Peak period (5am-9pm weekdays, 9am-9pm weekends) | $32.40 | | $43.20 | | $54.00 | |
| Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $8.10 | | $10.80 | | $13.50 | |
| 5 Motorcycles | | | | | | | |
| Peak period (5am-9pm weekdays, 9am-9pm weekends) | $6.75 | | $9.00 | | $11.25 | |
| Overnight period (9pm-5am weekdays, 9pm-9am weekends) | $1.65 | | $2.20 | | $2.75 | |
| NYC TLC taxis, green cabs, for-hire vehicles (FHVs) | | | | | | | |
| Taxis, green cabs, and FHVs on trips | | $0.75 | | $1.00 | | $1.25 |
| FHVs on trips dispatched by high-volume for-hire services (HVFHSs) | | $1.50 | | $2.00 | | $2.50 |

The Authority reserves the right to determine whether any vehicle is of unusual or unconventional design, weight, or construction and therefore not within any of the listed categories. The Authority also reserves the right to determine the CBD charge for any such vehicle of unusual or unconventional design, weight, or construction. Any single unit vehicle identified as belonging to Classes 1, 2, or 5 will be up-classed to the next toll class when towing a trailer or another vehicle.

Daily toll cap of once per day for Class 1 and Class 5 vehicles. Caps for non-passenger vehicles are subject to change pursuant to the adaptive management approach to mitigating project effects, as committed to in the Final Environmental Assessment.

NYC TLC taxi, green cab, and FHV tolls to be paid by the passenger pursuant to Rules of City of NY Taxi & Limousine Commn (35 RCNY) §§ 58-26 (f), 59A-23 (b), 59D-17 (c).

CBD entry charges and per trip charges are subject to a variable percentage increase/decrease of up to 10% for up to one year after implementation pursuant to the adaptive management approach to mitigating project effects, as committed to in the Final Environmental Assessment.

The Authority reserves the right to charge a 25% higher CBD charge during Gridlock Alert Days. Each year, the NYCDOT identifies Gridlock Alert Days during the UN General Assembly and throughout the holiday season when heavy traffic is expected in Manhattan. On Gridlock Alert Days, consider walking, biking, or taking mass transit for any trips in Manhattan.

Qualifying authorized emergency vehicles and qualifying vehicles transporting persons with disabilities are exempt pursuant to Vehicle and Traffic Law § 1704-a (2).

Qualifying authorized commuter buses and specialized government vehicles, as determined by the Authority, are exempt.

*Subject to full execution of and in compliance with plan agreement by FHV bases and taxi technology system providers.

8

DOT_0047939

**ATTACHMENT B – Performance Metrics**

As developed in the Final EA and the Reevaluations for the Project dated June 2024 and November 2024, the performance metrics of the system for evaluating the effectiveness of the pilot program and managing congestion are related to reducing vehicles entering the CBD and reducing VMT within the CBD. For reference, the amount of congestion reduction within the CBD for the toll structure is as follows::

- Reduce daily vehicle miles traveled (VMT) within the Manhattan CBD by 6.4 percent (Phase 1) to 8.9 percent (Phase 3)
- Reduce the number of vehicles entering the Manhattan CBD by 13.4 percent (Phase 1) to 17 percent (Phase 3)

Another important factor for measuring congestion reduction in the CBD related to transit investment is transit ridership in the CBD.:

- Increase in transit use entering the CBD.

The program will be collecting a significant amount of data to assess, track, and trend the direct and indirect effects of the project. These data, which are described in the following bullets, will be made public on a regular basis in open data format to the greatest extent practicable.

**Direct Congestion Measures**
- Vehicle entries into the CBD (by type of vehicle, day of week, time of day)
- Historic volumes entering the CBD (average fall weekday/weekend, time of day)
- Taxi and FHV trips to, from, and within the CBD
- Taxi and FHV VMT within the CBD

**Indirect Congestion Measures**
- System-wide transit ridership for transit services providing CBD-related service (monthly total ridership by mode and transit operator)
- Metropolitan Transportation Authority bus speeds within the CBD
- Capital projects funded or financed through Project revenue

**Monitored and Modeled Air Quality Measures**
- PM2.5
- Nitrogen Oxides
- Ozone: via modeling
- Greenhouse Gases

**Reporting on revenue and for audit purposes**
- Project revenue
- Project capital and operating expenses

DOT_0047940

# EXHIBIT 2

DOT_0047941



**Donald J. Trump** ✔
@realDonaldTrump

"Congestion Pricing" is a disaster for NYC. I stopped it for years at the Federal level, but Crooked Joe railroaded it through. A massive business killer and tax on New Yorkers, and anyone going into Manhattan. I will TERMINATE Congestion Pricing in my FIRST WEEK back in Office!!! Manhattan is looking for business, not looking to kill business!

**3.12k** ReTruths  **11.7k** Likes                    May 24, 2024, 2:41 PM

DOT_0047942

# EXHIBIT 3

DOT_0047943