UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__5/28/2025__
```

METROPOLITAN TRANSPORTATION
AUTHORITY, et al.,

        Plaintiffs,

     -v-

SEAN DUFFY, et al.

        Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

     25-cv-1413 (LJL)

     <u>OPINION AND ORDER</u>

------------------------------------------------------------------- X

LEWIS J. LIMAN, United States District Judge:

    This case is about the federal government's attempt to put a stop to New York's Central

Business District ("CBD") Tolling Program ("Tolling Program"). Plaintiffs Metropolitan

Transportation Authority ("MTA") and Triborough Bridge and Tunnel Authority ("TBTA"), and

Intervenor-Plaintiffs New York State Department of Transportation ("NYSDOT") and New York

City Department of Transportation ("NYCDOT"), seek declaratory and injunctive relief that

would safeguard the Tolling Program from certain acts by Defendants Sean Duffy, in his official

capacity as Secretary of the United States Department of Transportation (the "Secretary"), Gloria

M. Shepherd, in her official capacity as Executive Director of the Federal Highway Administration

(the "Executive Director"), the United States Department of Transportation ("USDOT"), and the

Federal Highway Administration ("FHWA") (collectively, "Defendants"). Dkt. No. 96 ("Second

Consolidated Amended Complaint" or "SCAC"). At this time, the MTA, TBTA, NYCDOT, and

NYSDOT have filed motions seeking a preliminary injunction pursuant to 5 U.S.C. § 705 and

Federal Rule of Civil Procedure 65(a). Dkt. Nos. 82 (MTA, TBTA, NYCDOT), 88 (NYSDOT).[1]

---

[1] For the purposes of this Opinion and Order, the Court refers to the MTA, TBTA, NYCDOT, and
NYSDOT, collectively as "Plaintiffs."

This Opinion and Order sets forth the Court's findings of fact and conclusions of law for purposes of Federal Rule of Civil Procedure 52(a)(1).  To the extent any statement labeled as a finding of fact is a conclusion of law, it shall be deemed a conclusion of law, and vice versa.

For the reasons that follow, the MTA, TBTA, NYCDOT, and NYSDOT's motions for a preliminary injunction are granted.

## I. PROCEDURAL HISTORY

The MTA and TBTA initiated this suit by filing a complaint on February 19, 2025.  Dkt. No. 1.  The Court subsequently granted the motions by the Riders Alliance and Sierra Club, NYSDOT, and NYCDOT to intervene on behalf of Plaintiffs.  Dkt. Nos. 32, 36, 55.

On April 18, 2025, the MTA, TBTA, NYSDOT, and NYCDOT filed a consolidated first amended complaint.  Dkt. No. 62.  The Riders Alliance and Sierra Club separately filed an amended intervenor complaint on the same day.  Dkt. No. 63.  On May 5, 2025, the MTA, TBTA, NYSDOT, and NYCDOT filed the Second Consolidated Amended Complaint.  Dkt. No. 96.

On May 5, 2025, the MTA, TBTA, and NYCDOT filed a motion for a preliminary injunction along with a memorandum of law and four supporting declarations.  Dkt. Nos. 82–87.  On May 5 and 6, 2025, the NYSDOT filed a motion for a preliminary injunction along with a memorandum of law and two supporting declarations.  Dkt. Nos. 89–91.

On May 14, 2025, NYC School Bus Umbrella Services, Inc. ("NYCSBUS") filed an amicus brief in support of the preliminary injunction motions.  Dkt. Nos. 105, 107, 115.  On May 15, 2025, twenty-three organizations and two individuals "committed to protecting the safety and well-being of residents in and around New York City, particularly by way of environmental, transit, and civic advocacy" filed an amicus brief in support of the preliminary injunction motions.

Dkt. Nos. 108–109, 112, 114.[2]  On May 15, 2025, six legal and nonprofit advocacy organizations in New York City that serve New Yorkers with disabilities filed another amicus brief in support of the preliminary injunction motions.  Dkt. Nos. 110–111, 113, 116.[3]

On May 16, 2025, Defendants filed a memorandum of law in opposition to the motions for a preliminary injunction.  Dkt. No. 118.

On May 22, 2025, the MTA, TBTA, and NYCDOT filed a reply memorandum of law and a declaration in further support of their motion for a preliminary injunction.  Dkt. Nos. 124–125.  On May 22, 2025, the NYSDOT filed a reply memorandum of law in further support of its motion for a preliminary injunction.  Dkt. No. 126.

The Court held a hearing on the motion for a preliminary injunction on May 27, 2025.  At the hearing, the Court orally issued a temporary restraining order which the Court later memorialized in a written order.  Dkt. No. 129.

Defendants produced the administrative record on May 27, 2025.  Dkt. No. 130.

The discovery and summary judgment schedule includes the following deadlines:

- Motions to complete or supplement the record, or for extra record discovery, are due June 24, 2025; oppositions to such motions are due July 15, 2025; replies in support of such motions are due July 29, 2025.

---

[2] Amici are the Environmental Defense Fund, Natural Resources Defense Council, CIVITAS, New York League of Conservation Voters, Bike New York, Reinvent Albany, MoveNY, Partnership For New York City, Tri-State Transportation Campaign, Open Plans, EmpowerNJ, BlueWaveNJ, Clean Water Action, Bike Hoboken, Our Revolution NJ, Bike North Bergen, Turnpike Trap Coalition, Evergreen, Hudson County Complete Streets, WE ACT for Environmental Justice, StreetsPAC, Transportation Alternatives, New York Public Interest Research Group Fund, Michael B. Gerrard, and Sam Schwartz.
[3] Amici are 504 Democratic Club, Center for Independence of the Disabled, New York, Elevator Action Group, Harlem Independent Living Center, Mobilization for Justice, and New York Lawyers for the Public Interest.

- Defendants' motion for summary judgment must be filed within thirty days of resolution of the last of any motions for discovery and completion of the last of any resulting discovery and/or supplementation of the record; Plaintiffs' and Intervenors' cross-motions for summary judgment and opposition to Defendants' motion for summary judgment are due thirty days thereafter; Defendants' reply in support of their motion for summary judgment and in opposition to Plaintiffs' and Intervenors' cross-motions for summary judgment is due fourteen days thereafter; Plaintiffs' and Intervenors' replies in support of their motions for summary judgment are due fourteen days thereafter.

Dkt. No. 57. Accordingly, the Court anticipates that the motions for summary judgment will be fully briefed by early fall of 2025 and that the Court will issue its final judgment on the merits before the end of the year.

## II.    FINDINGS OF FACT

The Court begins by reviewing the federal and state laws that combined to authorize the creation of the Tolling Program, then turns to a brief history of the cooperative endeavors of the federal, state, and local governments to design and implement the Tolling Program, and finally summarizes the more recent breakdown of that cooperative approach.[4]

---

[4] The Court has had several additional occasions to recount the Tolling Program's origination and path to implementation. *See Mulgrew v. U.S. Dep't of Transp.*, 750 F. Supp. 3d 171, 195 (S.D.N.Y. 2024); *Chan v. U.S. Dep't of Transp.* ("*Chan I*"), 2024 WL 5199945, at *4–11 (S.D.N.Y. Dec. 23, 2024); *Chan v. U.S. Dep't of Transp.* ("*Chan II*"), 2025 WL 1144703, at *2 (S.D.N.Y. Apr. 17, 2025).

A.    **Authorizing Statutes**

1.    **The Value Pricing Pilot Program**

Although states are usually free to toll roads within their borders, Section 301 of the Federal-Aid Highways Act ("FAHA") provides that "[e]xcept as provided in section 129 of this title with respect to certain toll bridges and toll tunnels, all highways constructed under the provisions of this title shall be free from tolls of all kinds."  23 U.S.C. § 301.  Section 129 in turn enumerates broad exceptions in which tolling is permitted.  *See id.* § 129.

Congress enacted the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA") to "develop a National Intermodal Transportation System that is economically efficient and environmentally sound, provides the foundation for the Nation to compete in the global economy, and will move people and goods in an energy efficient manner" and to "reduce energy consumption and air pollution while promoting economic development."  Pub. L. No. 102-240, § 2, 105 Stat. 1914 (1991).[5]

ISTEA created the Congestion Pricing Pilot Program, which directed the Secretary of Transportation to "solicit the participation of State and local governments and public authorities for one or more congestion pricing pilot projects" and stated that "[t]he Secretary may enter into cooperative agreements with as many as 5 such State or local governments or public authorities to establish, maintain, and monitor congestion pricing projects."  *Id.* § 1012(b).  ISTEA provided that "[n]otwithstanding sections 129 and 301 of title 23, United States Code, the Secretary shall allow the use of tolls on the Interstate System as part of a pilot program under this section, but not on

---

[5] President Bush signed ISTEA into law on December 18, 1991, noting that a "major element" of the law "was to provide State and local officials unprecedented flexibility" including "the discretion to use a major portion of their Federal surface transportation funds on the improvements that would best meet local needs, whether highway projects or public transit projects."  *Statement by President George Bush Upon Signing H.R. 2950*, 1991 U.S.C.C.A.N. 1865 (Dec. 18, 1991).

more than 3 of such programs." *Id.* § 1012(b)(4).  It directed that "[r]evenues generated by any pilot project under this subsection must be applied to projects eligible under such title." *Id.* § 1012(b)(3).  ISTEA also provided that "[t]he Secretary shall monitor the effect of such projects for a period of at least 10 years, and shall report to the Committee on Environment and Public Works of the Senate and the Committee on Public Works and Transportation of the House of Representatives every 2 years on the effects such programs are having on driver behavior, traffic, volume, transit ridership, air quality, and availability of funds for transportation programs." *Id.* § 1012(b)(5).  ISTEA also directed that as part of each state's transportation planning process, the state should consider, "[w]here appropriate, the use of innovative mechanisms for financing projects, including value capture pricing, tolls, and congestion pricing." *Id.* § 1025(c)(16).

Congress renamed the Congestion Pricing Pilot Program the Value Pricing Pilot Program ("VPPP") in the Transportation Equity Act for the 21st Century of 1998 ("TEA-21C").  Pub. L. No. 105-178, § 1216(a) (1998).  TEA-21C removed the three-program cap on the number of programs that could include the use of tolls on the Interstate System. *Id.* § 1216(a)(4).  It also increased the overall number of cooperative agreements into which the Secretary could enter from five to fifteen. *Id.* § 1216(a)(2).  The VPPP is presently codified as a note to 23 U.S.C. § 149. *See Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535, 559 n.19 (S.D.N.Y. 2023) ("It is of no moment that this provision was . . . codified as a statutory note, as opposed to a statutory subsection.").

### 2.    The Traffic Mobility Act

For many years, the Manhattan CBD was one of the most congested urban areas in the country.  SCAC ¶ 2.  The sheer quantity of vehicles attempting to navigate the CBD resulted in slow travel times, lost productivity, poor air quality, slower and less reliable public bus service, delayed emergency response times, and reduced public safety. *Id.* ¶¶ 2–3.  In more recent years,

6

the harmful effects of congestion imposed a $20 billion cost on businesses, commuters, and residents. *Id.*

Policymakers have long debated how to address this issue. In the 1950s, Nobel laureate and Columbia University economist William S. Vickrey proposed a market-based solution to resolve New York's roadway congestion: charging vehicles a toll to drive in highly congested areas—an approach now called "congestion pricing." *Id.* ¶ 3; *see also* William S. Vickrey, *Pricing in Urban and Suburban Transport*, 53 Am. Econ. Rev. 452 (1963).

Throughout the following decades, New York state and local officials, policy experts, and advocacy groups continued to study potential solutions. SCAC ¶ 3. Professor Vickrey's proposal gained some traction in New York in the 1970s, when New York Governor Nelson Rockefeller and New York City Mayor John Lindsay submitted a proposal to the United States Environmental Protection Agency ("EPA") to toll the bridges along the East and Harlem Rivers. *See Mulgrew*, 750 F. Supp. 3d at 189. That proposal was ultimately withdrawn after the EPA concluded it would be unnecessary in light of other planned traffic control measures. *See id.* In 2007, New York City Mayor Michael Bloomberg again sought to implement congestion pricing in New York City, proposing that the city toll drivers in Manhattan south of 86th Street, with the revenue to be applied to capital investments in the city's transit network. Dkt. No. 96 ¶ 86.[6] The New York legislature responded to Mayor Bloomberg's proposal by establishing the New York City Traffic Congestion Mitigation Commission, a body of seventeen members appointed by the Governor, to study approaches to reducing congestion in the busiest parts of Manhattan, and develop a comprehensive traffic congestion mitigation plan. *See Mulgrew*, 750 F. Supp. 3d at 189. The Commission

---

[6] *See* Maria Newman, *Mayor Proposes a Fee for Driving in to Manhattan*, N.Y. Times (Apr. 22, 2007), https://www.nytimes.com/2007/04/22/nyregion/23mayorcnd.html.

surveyed a wide array of potential congestion-reducing mechanism and ultimately conducted in-depth studies of the five options that the Commission believed could achieve the Legislature's goal of reducing the average vehicle miles traveled ("VMT") in the congestion relief zone by at least 6.3%: congestion pricing, bridge tolling, parking and taxi pricing schemes, and license plate rationing. *Id.* The Commission ultimately recommended that the Legislature implement the congestion pricing option but suggested alterations to the boundaries of the congestion relief zone—boundaries similar to those ultimately adopted in connection with the Tolling Program. *Id.*

The USDOT and FHWA supported the city's efforts to enact this area-wide congestion pricing scheme. In 2007, the USDOT entered into an "Urban Partnership Agreement" with the NYSDOT and awarded the state $5 million to pursue "a broad area pricing system in Manhattan south of 86th Street." Dkt. No. 62-6; Dkt. No. 85 ¶ 10 n.4. The FHWA also highlighted the project throughout a 2009 report to Congress, describing it in glowing terms as a "historic" "cordon pricing" scheme. SCAC ¶ 86.[7] Ultimately, the 2007 proposal stalled in the New York Legislature and was not enacted into law. *Id.*

New York was not the only city focused on the possibility of congestion pricing; since Professor Vickery's early proposals, London, Singapore, Stockholm, and Milan have each implemented their own congestion pricing programs. *Id.* ¶¶ 56–59.

Ultimately, in April 2019, the New York Legislature passed the Traffic Mobility Act ("TMA"), directing the TBTA to establish the Tolling Program. N.Y. Veh. & Traf. Law §§ 1701 *et seq*. The TMA's legislative findings and declaration stated that "[i]n order to ensure a safe and

---

[7] FHWA, *Report on The Value Pricing Pilot Program Through May 2009* at ii, 13–14 (Sept. 17, 2009), https://ops.fhwa.dot.gov/congestionpricing/value_pricing/pubs_reports/rpttocongress/pdf/vppp09rpt.pdf.

efficient mass transit system within the city of New York and to protect the public health and safety of New York's residents, a program to establish tolls for vehicles entering or remaining in the most congested area of the state is found to be necessary and to be a matter of substantial state concern." *Id.* § 1701.[8]

The TMA set a revenue requirement, directing that the TBTA "shall, at minimum, ensure annual revenues and fees collected under such program, less costs of operation of the same, provide for sufficient revenues . . . necessary to fund fifteen billion dollars for capital projects for the 2020 to 2024 MTA capital program." *Id.* § 1404-a(1).  To meet that revenue requirement and reduce congestion, the TMA authorized the TBTA to "establish and charge variable tolls and fees for vehicles entering or remaining in the central business district at any time" but set forth certain guidelines including that "no toll may be established and charged on passenger vehicles . . . more than once per day for purposes of entering the central business district" and exemptions for qualifying emergency vehicles and qualifying vehicles transporting individuals with disabilities. *Id.* § 1704-a.  It also required the TBTA to "implement a plan for credits, discounts and/or exemptions for tolls paid on bridges and crossings informed by the recommendations of the traffic mobility review board" ("TMRB").  *Id.* § 1704-a(3)(a).  And it permitted the TBTA "to provide additional credits, discounts and exemptions informed by the recommendations of the [TMRB] and a traffic study that considers impact."  *Id.* § 1704-a(3)(b).  The Legislature also established a tax credit for low-income individuals living in the CBD.  N.Y. Tax Law § 606(jjj).  Individuals

---

[8] The TMA provided that the CBD "shall include the geographic area in the borough of Manhattan south of and inclusive of sixtieth street to the extent practicable but shall not include the FDR Drive, and New York state route 9A otherwise known as the 'West Side highway' including the Battery Park underpass and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West St."  *Id.* § 1704(2).

who live in the CBD and have an adjusted gross income under $60,000 may claim a tax credit in the amount of the tolls they paid less any tolls claimed as business expenses.  *Id.*

### B.    Cooperation Between the Federal, State, and Local Agencies

Over the following years—and over the course of two presidential administrations—federal, state, and local agencies worked together to design, approve, and implement the Tolling Program.

### 1.    Cross-Agency Communications

In the spring of 2019, following passage of the VMA, the TBTA, NYSDOT, and NYCDOT (collectively, the "Project Sponsors") initiated contact with the USDOT and FHWA to discuss the Tolling Program.  Dkt. No. 91 ¶¶ 2, 4.  Over the course of the following months, representatives of the various agencies participated in several in-person meetings and numerous telephone conferences.  *Id.* ¶ 4.  At those meetings, and particularly at the April 2019 meetings with USDOT and FHWA, the Project Sponsors provided detailed explanations of the contemplated operation of the Tolling Program.  *Id.* ¶ 5.  They explained that the Tolling Program would address congestion by imposing tolls on vehicles entering the CBD and that the Tolling Program would incorporate toll rates that would provide a new and recurring source of revenue for the MTA's capital projects.  *Id.*; Dkt. No. 91-1.  The presentations explained how the imposition of the tolls and the use of the revenues generated from the tolls would work in tandem to reduce traffic and to improve the quality of life for those using the CBD: the tolls would directly reduce the number of vehicles entering the CBD while the use of the revenue generated by the tolls to finance bonds for capital projects for mass transit would indirectly reduce the number of vehicles entering the CBD by diverting more travelers to mass transit.  Dkt. No. 91-1.  The presentations also highlighted the

10

fact that the Tolling Program would not include a toll-free route. *Id.* at 6.[9] The meetings did not discuss a specific end date for the Tolling Program, but contemplated that monitoring efforts would take over a year to begin and would last for years thereafter. *Id.*

The USDOT and FHWA determined that the Tolling Program would require approval from the FHWA to implement tolls on federal-aid highways through the Value Pricing Pilot Program. Dkt. No. 91 ¶¶ 3, 6; Dkt. No. 91-1 at 2. At a meeting between representatives of the FHWA, Federal Transit Administration ("FTA"), USDOT, NYCDOT, MTA, TBTA, NYSDOT, and New York Governor's Office held on April 24, 2019 at the FHWA New York Division Office, the federal agencies explained that the NYSDOT had already been allotted one of the fifteen value pricing pilot project slots for the project. Dkt. No. 91-1 at 2. The agencies agreed that the next steps would be for the FHWA to send the Project Sponsors a template for a VPPP "Expression of Interest," which was needed to commence the eligibility/approval process, as well as an example of a VPPP cooperative agreement. *Id.*; Dkt. No. 91 ¶ 6.

On June 17, 2019, the Project Sponsors submitted an Expression of Interest ("EoI") to the FHWA seeking approval of the Tolling Program under the VPPP. Dkt. No. 91 ¶ 8; Dkt. No. 91-2. The EoI described the program, including the boundaries of the CBD and the fact that "[r]evenue raised by the program will provide sustained funding for public transportation, which as it becomes more reliable, will contribute to congestion relief." Dkt. No. 91-2 at 6.[10] It identified five project goals for the project: (1) "Reduce traffic congestion"; (2) "Improve air quality"; (3) "Create a sustainable funding source to repair and revitalize the MTA transit system," including by "generat[ing] revenues, net of VPPP operating costs, to support $15 billion in bonds for MTA

---

[9] ECF pagination.
[10] ECF pagination.

capital transit repair and revitalization projects"; (4) "Increase transit ridership"; and (5) "Improve travel options for low-income residents."  *Id.* at 6–7.  The EoI also described the imperative to address congestion in the CBD:

> Traffic congestion adversely affects the economy and quality of life in New York City and the metropolitan region.  Low travel speeds and unreliable travel times increase auto commute times and erode worker productivity; reduce bus service quality and depress ridership; raise the cost of deliveries and the overall cost of business; increase vehicle emissions; and degrade the quality of life for residents, visitors, and workers.  According to a 2018 analysis by the Partnership for New York City, . . . congestion in the New York City region will cost business, commuters, and residents $100 billion over the next five years.

*Id.*  The EoI noted that "[n]inety-eight percent of low-income workers with jobs in the Manhattan CBD do not commute by private vehicle."  *Id.* at 9.  Accordingly, it explained, investing in transit and improving public bus speed and reliability will disproportionately benefit low-income New Yorkers "who overwhelmingly rely on transit to access employment, education, and essential services."  *Id.* at 9–10.

On October 24, 2024, the FHWA responded to the EoI with a letter requesting further information.  Dkt. No. 91-3.  The letter stated that "[u]nder the various programs in Federal law that allow tolling of existing infrastructure, the VPPP appears to be the best potential fit."  *Id.* at 1.  It continued:

> As you are aware, the VPPP is intended to demonstrate whether and to what extent roadway congestion may be reduced through application of congestion pricing strategies, and the magnitude of the impact of such strategies on driver behavior, traffic volumes, transit ridership, air quality and availability of funds for transportation programs.  In fact, of the multiple VPPP projects that have been implemented, FHWA has found that congestion pricing can be very effective for reducing traffic, improving roadway capacity, and providing reliable trips for automobiles as well as commercial vehicles and transit vehicles.

*Id.*  The letter also noted that revenues from the Tolling Program would be used for improving transit systems.  *See id.* at 2.  It stated that "[f]or FHWA to conduct a thorough assessment, the Agency requests the findings of a thorough traffic and revenue study" including certain specified

considerations.  *Id.* at 1–2.  In particular, the FHWA's letter noted that "the proposed project is an area-wide congestion pricing system, which is unprecedented in the VPPP and such type system has not yet been implemented in the U.S." and "[t]herefore, FHWA must consider the precedents set by this project."  *Id.* at 2.  The letter further stated:

> If the Central Business District Tolling Project proceeds to the implementation stage, a toll agreement between FHWA, your agency, and the other project partners would need to be developed and signed to secure Federal tolling authority under the VPPP.  Upon execution of the toll agreement with FHWA, [NYSDOT] and your partners could then implement the project and collect and use the toll revenues consistent with the legal requirements outlined in Title 23, United States Code.

*Id.* at 2.

After receiving the FHWA's letter, the Project Sponsors met with the FHWA twice and the USDOT once and obtained more guidance on the request for information.  Dkt. No. 91 ¶ 11.  The agencies also discussed the use of the Tolling Program's revenues for capital improvement to public transit.  *Id.*  On December 17, 2019, the Project Sponsors submitted a letter to the FHWA providing the requested information.  Dkt. No. 91-4.  On January 27, 2020, the Project Sponsors followed up by submitting the Traffic and Revenue Study that the FHWA had requested.  Dkt. No. 91 ¶ 12; Dkt. No. 91-5.

On July 2, 2020, the Project Sponsors sent the FHWA a letter following up on the EoI and seeking commencement of the environmental review process required by the National Environmental Policy Act ("NEPA").  Dkt. No. 91-6.  The FHWA responded on September 3, 2020, noting that "[s]hortly after your submission of the [Traffic and Revenue] Study, the COVID-19 public health emergency resulted in an unprecedented situation that has created unforeseen circumstances across the country, and especially in New York City."  Dkt. No. 91-7 at 2.[11]  The FHWA explained that the actions taken by the Governor, Mayor, and public officials to "order

---

[11] ECF pagination.

lockdowns, closures of businesses, and impose restrictions on the use of public transit . . . have had many unforeseen impacts, including to traffic within the CBD." *Id.* In consideration of those circumstances, the FHWA requested "updated data on the COVID-19 impacts to current and anticipated traffic levels in the CBD and impacts to public transit ridership." *Id.*

The Project Sponsors responded on October 13, 2020. Dkt. No. 91-8. Their response explained that while the MTA's transit ridership remained lower than pre-pandemic rates, there had been steady improvements. *Id.* at 1. It noted that by September 2020, the traffic on MTA's bridges and tunnels in September 2020 had risen to 86% of the previous year's traffic during that period and weekday daily volumes entering the CBD had reached roughly 95% of pre-COVID levels by mid-September 2020. *Id.* The Project Sponsors also noted that "[t]his data is consistent with reports from WAZE which show New York City nearing pre-COVID traffic levels and rebounding faster than other cities" and also that the city was facing the significant congestion associated with high levels of traffic. *Id.* at 1–2. The Project Sponsors once again inquired how NEPA review should proceed. *See id.*

On March 30, 2021, the FHWA responded with a letter stating that "[a]fter careful review of the relevant information, FHWA believes that our mutual goals of producing needed traffic and air quality analysis and soliciting robust public input from all stakeholders can best be achieved through the preparation of an Environmental Assessment." Dkt. No. 91-9. The letter once again confirmed the FHWA's understanding that "[t]his important and potentially precedent-setting project would include variable tolling once a day for vehicles entering or remaining within . . . the Central Business District." *Id.* at 1.

## 2. NEPA Review

A lengthy environmental review process under NEPA followed, culminating in the April 2023 Final Environmental Assessment ("EA") and a Finding of No Significant Impact ("FONSI")

by the FHWA. Dkt. No. 91 ¶¶ 15, 17. The EA identified two primary, and complementary, needs: the need to reduce vehicle congestion in the CBD, and the need to create a new local, recurring funding source to support the financing of $15 billion for MTA transit capital projects in the agency's 2020-2024 Capital Program. *Id.* ¶ 15.[12] The EA additionally identified two specific congestion reduction objectives: the reduction of daily VMT in the CBD by at least 5% and the reduction of daily vehicles entering the CBD by at least 10%. *Id.* Because the TBTA had not yet adopted a defined tolling structure, the EA analyzed seven different tolling scenarios with tolls for passenger cars ranging from $9 to $23 (with different rates for different classes of vehicles) and variable credits and exemptions. *Id.* ¶ 16.[13] In addition to the seven tolling scenarios, the EA analyzed a no action alternative as the benchmark against which to measure the predicted impacts of the tolling scenarios.[14] The EA explained that "[u]nder the No Action Alternative, existing policies and programs would continue, and planned transportation, policy, and development initiatives that are independent of the CBD Tolling Program would be implemented."[15]

The Final EA predicted that the Tolling Program would meet each of the program's objectives and that it would not have adverse effects on air quality. Dkt. No. 96 ¶¶ 111–112. Nevertheless, the Project Sponsors committed to implement mitigation measures totaling $155 million to improve air quality and public health in communities with preexisting pollution and health burdens. *Id.* ¶ 111. The Final EA also predicted many beneficial environmental effects of the Tolling Program, including but not limited to: (1) reducing emissions of harmful air

---

[12] *See* Chapter 1, Central Business District (CBD) Tolling Program Environmental Assessment (April 2023), https://www.mta.info/document/110766.

[13] *See* Chapter 2, Central Business District (CBD) Tolling Program Environmental Assessment (April 2023), https://www.mta.info/document/110771.

[14] *See id.* at 2–4.

[15] *Id.*

pollutants, both within the CBD and throughout the region-wide; (2) reducing delays at many intersections and highway segments, thereby improving travel times, reducing vehicle operating costs, and improving safety; and (3) reducing regional energy consumption and greenhouse gas emissions, thereby helping to meet carbon reduction goals.  *Id.* ¶ 113.

The Final EA also concluded that the Tolling Program "would provide an economic benefit to the Manhattan CBD, and thus to the region and nation."  Dkt. No. at 16.[16]  It noted that "[g]iven the breadth of public transportation options to, from, and within the Manhattan CBD, workers commuting to the Manhattan CBD have a much lower rate of auto commuting relative to the broader regional and New York City workforce."[17]  "[O]nly 9 percent of Manhattan CBD jobs are held by workers who drive to work alone."[18]

In May 2023, FHWA approved the Final EA.  SCAC ¶ 114.  On June 23, 2023, FHWA's New York Division Administrator signed the FONSI.  *Id.* ¶ 117.

On November 30, 2023, the TMRB issued its recommended tolling structure, which was informed by the Final EA.  Dkt. No. 91 ¶ 18.[19]  The TBTA adopted the recommended structure on March 27, 2024, with a planned implementation date in or about June 2024.  *Id.* ¶ 19.[20]  The Project Sponsors completed a reevaluation to assess the effects of the March 2024 adopted toll schedule and determine whether the FONSI was still valid.  *Id.*[21]  On June 14, 2024, the FHWA confirmed

---

[16]   Final EA Chapter 6, Economic Conditions at 6-80 (Apr. 2023), https://www.mta.info/document/110831.

[17] *Id.* at 6-15.

[18] *Id.*

[19]   *See* TMRB, Congestion Pricing in New York (Nov. 2023), https://www.mta.info/document/127761.

[20] *See* MTA Board Votes to Begin Public Review Process for Central Business District Tolling Rate Schedule, MTA (Dec. 6, 2023), https://www.mta.info/press-release/mta-board-votes-begin-public-review-process-central-business-district-tolling-rate.

[21] *See* Central Business District (CBD) Tolling Program, Reevaluation (June 24, 2024), https://www.mta.info/document/142711.

that the reevaluation was consistent with FHWA's regulations and determined that the FONSI remained valid. *Id.*[22]

On June 5, 2024, New York Governor Kathy Hochul announced a pause in implementation of the Tolling Program. *Id.* ¶ 20. On November 14, 2024, the Governor announced a proposal to proceed with the Tolling Program by employing a phase-in approach. *Id.* ¶ 21. That is, the tolls would be implemented in phases such that the tolls for each vehicle class during Phase 1 (2025–2027) would be 60% of the ultimate rate, tolls during Phase 2 (2028–2030) would be 80% of the ultimate rate, and tolls during Phase 3 (2031 onward) would be 100%. *Id.* ¶¶ 21–22.[23] On November 18, 2024, the TBTA Board approved the phase-in approach. *Id.* ¶ 21. The phase-in approach also increased certain discounts designed to alleviate the financial burden of the Tolling Program. The Low-Income Discount Plan is available to vehicle owners with a reported federal adjusted gross income for the previous calendar year of $50,000 or less, or who receive certain government assistance, and allows participants to pay half-rate tolls after completing ten trips in the same calendar month. *See Chan II*, 2025 WL 1144703, at *7.[24] The Individual Disability Exemption Plan allows individuals with disabilities that prevent them from using public transit, or the caretakers of such individuals to be exempted from the toll. *Id.*[25]

---

[22] *See* Letter from Richard J. Marquis, Division Administrator, Fed. Highway Admin., to Allison L. C. de Cerreño, Ph.D., Chief Operating Officer, MTA Bridges and Tunnels (June 14, 2024), https://www.mta.info/document/142701.

[23] *See* Triborough Bridge and Tunnel Authority Central Business District (CBD) Charges, https://www.mta.info/document/138931.

[24] *See* Low-Income Discount Plan, MTA, https://www.mta.info/fares-tolls/tolls/congestion-relief-zone/discounts-exemptions/low-income-discount-plan.

[25] *See* Individual Disability Exemption Plan, MTA, https://www.mta.info/fares-tolls/tolls/congestion-relief-zone/discounts-exemptions/idep.

In or around November 2024, the Project Sponsors prepared a second reevaluation based on the phased-in toll. *Id.* ¶ 23.[26]  The second reevaluation concluded that, notwithstanding the phase-in nature of the Tolling Program, the program's effects were consistent with those disclosed in the EA and that the FONSI remained valid. *Id.*  On November 21, 2024, the FHWA confirmed that the second reevaluation was consistent with FHWA's regulations and determined that the FONSI remained valid.[27]

### 3.    The Value Pricing Pilot Program Agreement

On November 21, 2024, the FHWA, NYSDOT, TBTA, and NYCDOT, entered into an agreement pursuant to the VPPP.  Dkt. No. 87-1 ("VPPP Agreement").

The VPPP Agreement's preamble notes that ISTEA, as amended, "establishes the Value Pricing Pilot Program . . . and permits the FHWA to allow the collection of tolls as part of the value pricing pilot program." *Id.* at 1.  It further notes that as part of the Tolling Program, the "TBTA intends to toll an area which includes portions of highway facilities that have been constructed, reconstructed, rehabilitated, restored, resurfaced or maintained with title 23 funds." *Id.*

The VPPP Agreement memorializes the FHWA's agreement "that TBTA may operate the Project as a toll Project in accordance with the provisions of this Agreement and as a value pricing project, as part of NYSDOT's value pricing pilot program." *Id.* at 2.  It states "[a]s of the date of the execution of this Agreement, the imposition of tolls under this Agreement does not render Federal-aid highways within the State of New York generally ineligible for Federal-aid highway

---

[26] *See* Central Business District (CBD) Tolling Program, Reevaluation 2 (Nov. 2024), https://www.mta.info/document/158191.
[27] *See* Letter from Richard J. Marquis, Division Administrator, Fed. Highway Admin., to Allison L. C. de Cerreño, Ph.D., Chief Operating Officer, MTA Bridges and Tunnels (Nov. 21, 2024), https://www.mta.info/document/158196.

funds where such highways are otherwise eligible under the particular funding program." *Id.* at 3. The VPPP Agreement takes express note of the boundaries of the CBD and the toll rate schedule associated with the phase-in method. *Id.* at 1–2, 6–7.

The VPPP Agreement also highlights FHWA's understanding that the Tolling Program's net revenue would be used to support the MTA's capital improvement projects. A prefatory clause notes that "Section 1012(b) of ISTEA, as amended requires that all revenues received from the operation of a value pricing project be applied only toward the project's operating costs (including project implementation costs; mitigation measures to deal with adverse financial effects on low-income drivers; the proper maintenance of the Project; any reconstruction, rehabilitation, restoration, or resurfacing of the Project; any debt service incurred in implementing the project; a reasonable return on investment of any private person financing the project), and other projects eligible for assistance under title 23, United States Code." *Id.* at 1–2. An ambulatory clause states that the "TBTA will use all toll revenues received from the operation of the Project for the operating costs of the project as described in attachment A (including project implementation costs; mitigation measures to deal with adverse financial effects on low-income drivers; the proper maintenance of the Project; any reconstruction, rehabilitation, restoration, or resurfacing of the Project; any debt service incurred in implementing the project; a reasonable return on investment of any private person financing the project), and any other projects eligible for assistance under title 23, United States Code." *Id.* at 2.

The Project Sponsors also agreed to certain monitoring requirements. The VPPP Agreement obligates the TBTA to "conduct or have an independent auditor conduct an annual audit of toll Project records to verify compliance with use of revenues and report the results of the audits to FHWA." *Id.* at 2. "In lieu of the TBTA performing said audit, a report of the New York

State Comptroller or an independent auditor furnished to FHWA may satisfy the requirement[].” *Id.* at 3. Upon reasonable notice, the TBTA is to “make all of its records pertaining to the Project subject to audit by the FHWA.” *Id.* The TBTA and NYCDOT, as applicable, shall monitor and report on the project performance “from the date of implementation for a period of at least ten years or to the end of the life of the Project, whichever is sooner, to evaluate the effects on driver behavior, traffic volume, congestion, transit ridership, air quality, and availability of funds for transportation programs.” *Id.* The VPPP Agreement states that the reports shall begin one year after the operation date and shall be made every two years thereafter. *Id.* at 3. The TBTA and NYCDOT are also to “identify benefits the application of tolls has in reducing climate pollution” and “demonstrate the benefits mitigation measures provide to underserved communities.” *Id.*

The VPPP Agreement sets forth “performance metrics of the system for evaluating the effectiveness of the pilot program.” *Id.* at 9. The metrics for measuring congestion include: (1) reducing VMT within the CBD by 6.4% (Phase 1) to 8.9% (Phase 3); (2) reducing the number of vehicles entering the CBD by 13.4% (Phase 1) to 17% (Phase 3); and (3) increasing transit use entering the CBD. *Id.*

The VPPP Agreement specifies “[t]hat NYSDOT, TBTA and NYCDOT agree to comply with all Federal laws and requirements applicable to this project, including the laws and policies applicable to the Value Pricing Pilot Program.” *Id.* at 3. “Such laws and requirements include, but are not limited to Section 1012(b) of ISTEA, as amended, the guidance implementing Section 1012(b) of ISTEA, and 23 CFR Part 940 and 950.” *Id.* It also obligates the TBTA, through NYSDOT, to provide the FHWA notice of any proposed changes to the toll structure at least sixty days before such changes go into effect. *Id.* at 4. The VPPP Agreement states that the “NYSDOT,

TBTA, and NYCDOT agree they will work with FHWA to return the Project to its original operating condition if TBTA decides to discontinue tolls on the Project." *Id.*

### 4.    Legal Challenges to the Tolling Program

Beginning even prior to the Tolling Program's implementation, several federal lawsuits sought to halt the program. *See*, *Chan et al. v. U.S. Department of Transportation et al.*, 23-cv-10365 (S.D.N.Y.); *Mulgrew et al. v. U.S. Department of Transportation et al.*, 24-cv-1644 (S.D.N.Y.); *New Yorkers Against Congestion Pricing Tax et al. v. U.S. Department of Transportation et al.*, 24-cv-367 (S.D.N.Y.); *Trucking Association of New York v. Metropolitan Transportation Authority et al.*, 24-cv-4111 (S.D.N.Y.); *County Of Rockland et al v. Triborough Bridge and Tunnel Authority et al.*, 24-cv-2285 (S.D.N.Y.); *Neuhaus et al. v. Triborough Bridge and Tunnel Authority et al.*, 24-cv-3983 (S.D.N.Y.); *Town of Hempstead v. Triborough Bridge and Tunnel Authority*, 24-cv-3263 (E.D.N.Y.)[28]; *New Jersey v. United States Department of Transportation et al.*, 23-cv-3885 (D.N.J.). The lawsuits asserted federal and state constitutional and procedural challenges to the Tolling Program. The Project Sponsors and the FHWA served as codefendants in many of those cases and cooperated to jointly defend the constitutionality of the Tolling Program and the process by which it was implemented.

The first four—*Chan*, *Mulgrew*, *New Yorkers Against Congestion Pricing Tax*, and *Trucking Association of New York*—are currently pending before this Court. In December of 2024, the Court denied the plaintiffs' motions for a preliminary injunction including because the plaintiffs failed to show irreparable harm or a likelihood of success on the merits of their arguments that the Tolling Program violated the United States or New York Constitutions. In April of 2025,

---

[28] Another case captioned *Town of Hempstead et al v. Hochul et al.*, 24-cv-8121 (E.D.N.Y.) was removed from the New York Supreme Court, Nassau County to the Eastern District of New York in November of 2024, but was remanded to state court in December of 2024.

the Court dismissed many of the plaintiffs' constitutional and procedural claims (some with prejudice and some without) and granted partial summary judgment in favor of the government defendants. In March of 2025, the Court denied the Secretary's motion to stay *Chan*, *Mulgrew*, and *New Yorkers Against Congestion Pricing Tax* pending resolution of the instant case. Amended pleadings in *Chan*, *Mulgrew*, and *Trucking Association of New York* are due in mid-June of 2025.

*County Of Rockland* and *Neuhaus* are currently pending in this District before Judge Cathy Seibel. In December of 2024, Judge Seibel denied the plaintiffs' motion for a preliminary injunction including because the plaintiffs failed to show irreparable harm or a likelihood of success on the merits of their arguments that the Tolling Program is unconstitutional. The *County Of Rockland* plaintiffs appealed the denial of the preliminary injunction to the Second Circuit and that appeal is currently pending, but it is not yet fully briefed. The district court case is not stayed pending the appeal and the parties in both *County Of Rockland* and *Neuhaus* have fully briefed motions to dismiss.

*Town of Hempstead* is pending before Judge Joan M. Azrack in the Eastern District of New York.

*New Jersey* is pending in the District of New Jersey before Judge Leo M. Gordon. In December of 2025, Judge Gordon granted in part and denied in part the parties' motions for summary judgment, remanding certain issues to the FHWA for further environmental review or explanation. However, Judge Gordon denied the plaintiffs' requests for emergency injunctive relief, holding that they failed to demonstrate a likelihood of success on the merits or irreparable harm. In January of 2025, the plaintiffs filed an interlocutory appeal to the Third Circuit challenging the denial of injunctive relief. On January 4, 2025, Circuit Judge Stephanos Bibas denied the plaintiffs' emergency motion for an injunction to halt the Tolling Program and the

plaintiffs thereafter stipulated to a dismissal of the appeal.  In February of 2025, the Secretary moved to stay the district court case pending resolution of the instant case, but ultimately withdrew the motion to stay before it was ruled upon.

### 5.    Implementation of the Tolling Program and Immediate Effects

The TBTA expended over $500 million to establish the Tolling Program.  Dkt. No. 91 ¶ 30. These expenditures included developing the methodological approach; conducting the assessment and extensive outreach and developing the final documentation for the environmental review process under NEPA; design, development, implementation and testing of the roadway infrastructure and system; design, development, implementation and testing of the back-office system; additional extensive outreach for the state administrative review process; staff costs, including new staff for the Tolling Program; and consulting costs.  *Id.*

On January 5, 2025, the Tolling Program went into effect.  *Id.* ¶ 25.

The initial data since then indicates a noticeable reduction in congestion within the CBD as compared to the same time period in 2024, along with attendant benefits to public health and safety.  Traffic in the CBD decreased substantially, with approximately 5.8 million fewer vehicles entering the CBD in January through March of 2025 than would be expected based on data for prior years.  *Id.* ¶ 25(a).[29]  Total VMT by all vehicles in the CBD went down by 10% from January to mid-March of 2025 as compared to the same period in 2024.  *Id.* ¶ 25(b).

Commuters are saving as much as 21 minutes on their trips due to the reduced traffic.  *Id.* ¶ 25(e).[30]  Some express buses have shaved over 10 minutes off their commutes.  *Id*. ¶ 25(c).[31]

---

[29]  *See* MTA Metrics, Reduction in Vehicle Entries to the CBD, https://metrics.mta.info/?cbdtp/vehiclereductions.

[30]  *See* Regional Plan Association, Congestion Pricing: What it Means to Save Time (Mar. 11, 2025), https://rpa.org/news/lab/what-it-means-to-save-time.

[31]  *See* January 2025 MTA Board Meeting, Congestion Relief Zone Tolling January 29, 2025 Update, at Slide 9, https://www.mta.info/document/163411.

MTA internal data show that local bus speeds have increased by an average of 3% within the CBD, with some routes increasing by as much as 7%. *Id.* ¶ 25(h).[32]  Crossing times are 12% faster at the Lincoln Tunnel and 45% faster at the Holland Tunnel than they were in 2024. *Id.* ¶ 25(c).[33] Trip times from Brooklyn and Queens to the CBD have dropped between 10% and 30%. *Id.*[34]  A recent study by the National Bureau of Economic Research indicates that drivers on highways and major roadways outside of the CBD have also enjoyed improved speeds. *Id.* ¶ 25(m).[35]

Trips are also more reliable.  Delays of more than three minutes on the Holland Tunnel now occur on 12% of weekdays as opposed to 54% of weekdays. *Id.* ¶ 25(g).[36]  Delays on the Williamsburg Bridge have had an even more dramatic reduction in frequency—down from 65% of the time to 2%. *Id.*[37]  Complaints about excessive car horn honking within the CBD in January and February are down more than 70% from the same time period last year. *Id.* ¶ 25(k).[38]

Emergency response times are improving under the Tolling Program. *Id.* ¶ 25(j).[39]  School buses have benefitted from reduced delays. *Id.*; Dkt. No. 115 at 3–9.  According to the NYCSBUS's amicus brief, school buses have been able to travel faster in the CBD, causing the on-time arrival rate to rise from 58% to 72%.  Dkt. No. 115 at 4–5.  The decrease in congestion

---

[32] *See* Reduction in Vehicle Entries to the CBD.

[33] *See* Congestion Relief Zone Tolling January 29, 2025 Update, at 4-5.

[34] *See* Congestion Relief Zone Tolling January 29, 2025 Update at Slide 5.

[35] *See* Cody Cook et al., The Short-Run Effects of Congestion Pricing in New York City, NBER (Mar. 17, 2025), https://www.nber.org/system/files/working_papers/w33584/w33584.pdf.

[36] *See* February 2025 MTA Board Meeting Presentation at 12 (Feb. 26, 2025), https://www.mta.info/document/165401.

[37] *See* February 2025 MTA Board Meeting Presentation at 12.

[38] *See* Jose Martinez and Mia Hollie, *Honking Complaints Plunge 69% Inside Congestion Relief Zone*, (Mar. 11, 2025) (citing and discussing 311 complaint data), https://www.thecity.nyc/2025/03/11/traffic-noise-complaints-drop-congestion-pricing/.

[39] *See* Ginia Bellafante, *The Life-or-Death Consequences of Killing Congestion Pricing*, N.Y. Times (Oct. 10, 2024), https://www.nytimes.com/2024/10/10/nyregion/new-york-fire-department-response-times.html.

allows students to spend less time in buses idling in traffic and more time in school—up to more than half an hour of educational time per week.  *Id.* at 8–9.

Available data does not indicate that the Tolling Program has harmed economic interests in New York.  Pedestrian traffic in Manhattan increased 4.6% in the first month of the program compared to the same period in 2024.  Dkt. No. 91 ¶ 26(a).[40]  Retail sales were up 1.5% in January and February—on track to be $900M higher this year than last.  *Id.* ¶ 26(d).[41]

Real estate availability is down and leasing in the CBD was up 11% this January compared to the fourth quarter of 2024, and up 80% compared to the first quarter of last year.  *Id.* ¶ 26(e)–(f).[42]  Hotel occupancy in the CBD increased.  *Id.* ¶ 26(b).  Broadway has also benefitted with theater attendance up 20% and gross revenue up 25%.  *Id.* ¶ 26(c).[43]

### C.    Breakdown of Cooperation

President Donald Trump took office on January 20, 2025.  He had previously voiced opposition to the Tolling Program while campaigning for the presidency.  On May 24, 2024, before the implementation of the Program, he posted the following message on the social media site Truth Social:

> "Congestion Pricing" is a disaster for NYC.  I stopped it for years at the Federal level, but Crooked Joe railroaded it through.  A massive business killer and tax on New Yorkers, and anyone going into Manhattan.  I will TERMINATE Congestion

---

[40] *See* Arun Venugopal, *Vehicle Traffic Is Down in Manhattan, But Pedestrian Traffic Is Up*, Data Says, Gothamist (Feb. 13, 2025), https://gothamist.com/news/vehicle-traffic-is-down-in-manhattan-but-pedestrian-traffic-is-up-data-says.

[41] *See* Dick Brennan, *President Trump said to have NYC's congestion pricing, bike lanes in his crosshairs*, CBS News (Feb. 10, 2025), https://www.cbsnews.com/newyork/news/president-trump-nyc-congestion-pricing-bike-lanes/.

[42] *See Colliers, Downtown NYC Office Market Report: 2025 Q1*, https://www.colliers.com/en/research/new-york/nyc-q1-2025-downtown-office-market-report; Colliers, *Manhattan Monthly Snapshot: January 2025*, https://www.colliers.com/en/research/new-york/2025_01_manhattan-monthly-snapshot.

[43] *See* Research and Statistics, Grosses: Broadway in NYC, The Broadway League, https://www.broadwayleague.com/research/grosses-broadway-nyc/.

> Pricing in my FIRST WEEK back in OFFICE!!! Manhattan is looking for business, not looking to kill business!

Dkt. No. 87-2.

On February 19, 2025, approximately one month after President Trump assumed the office, the White House posted on the social media site X an image of President Trump wearing a bejeweled crown underneath the superimposed words "TRUMP" and "LONG LIVE THE KING." Dkt. No. 87-4.[44]  The image was accompanied by the text:

> "CONGESTION PRICING IS DEAD.  Manhattan, and all of New York, is SAVED.  LONG LIVE THE KING!"
>
> --President Donald  J. Trump.

*Id.*

That same day, February 19, 2025, Secretary Duffy sent a letter to Governor Hochul "rescinding FHWA's approval of the CBDTP pilot project under the November 21 Agreement and terminating the Agreement."  Dkt. No. 87-5 ("February 19 Letter").[45]

The February 19 Letter stated that Secretary Duffy had been recently sworn into office and that "[u]pon assuming my responsibilities, President Trump asked me to review FHWA's approval of [the Tolling Program] as a pilot project under VPPP."  *Id.* at 2.[46]  Secretary Duffy noted concerns raised by the Governor of New Jersey and the Commissioner of the New Jersey Department of Transportation on the Tolling Program's impacts on New Jersey commuters and residents.  *Id.* at 3.  The February 19 Letter also stated that the Secretary had "been made aware that legal challenges

---

[44] *But see* Art. I, § 9, cl. 8 ("No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.").

[45] The letter also cc'ed the Commissioner of the NYSDOT, the President of the TBTA, and the Commissioner of the NYCDOT.  *Id.*

[46] ECF pagination.

are pending regarding the project, which question whether the scope of the project exceeds the authority of VPPP." *Id.* The February 19 Letter stated that the Tolling Program "left highway users without any free highway alternative on which to travel within the relevant area." *Id.* "Moreover, the revenues generated under this pilot program are directed toward the transit system as opposed to the highways." *Id.*

Secretary Duffy wrote that "[i]n light of the President's concerns about the [Tolling Program], the legal challenges that have been made, as well as the concerns expressed by New Jersey Governor Murphy and New Jersey Commissioner O'Connor, I reviewed the tolling authority granted under VPPP to the [Tolling Program] for compliance with Federal law." *Id.* Based on that review, the Secretary "concluded that the scope of this pilot project as approved exceeds the authority authorized by Congress under VPPP." *Id.*

Secretary Duffy then stated the reasons that formed the basis for his conclusion that the FHWA did not have the authority to sign the VPPP Agreement. The February 19 Letter noted as a threshold matter that the "long-standing history of the anti-tolling provision" preventing states from imposing tolls on federal-aid highways, Section 301, "requires me to narrowly construe this exception." *Id.* at 3–4. Secretary Duffy then wrote that he concluded the Tolling Program was not an eligible "value pricing pilot program" for two reasons. *Id.* at 4.

First, according to Secretary Duffy, the Tolling Program "uses a method of tolling known as 'cordon pricing,'" which he does not believe to have been authorized by the VPPP. *Id.* The letter explains that "unlike other forms of tolling, the [Tolling Program's] cordon pricing program provides no toll-free option for many drivers who want or need to travel by vehicle in this major urbanized area." *Id.* The February 19 Letter noted that Congress has, in a separate statutory provision, authorized cordon pricing on the interstate system where drivers can choose a non-

27

interstate route. *Id.* (citing 23 U.S.C. § 129(d)(4)(B), (6)(A)). But, it asserted, "no statute contemplates cordon pricing in a situation where tolls are inescapable, and FHWA has never before approved a VPPP program that uses cordon pricing or that does not provide a toll-free option." *Id.* Accordingly, the Secretary "concluded that Congress did not, in using the vague phrase 'value pricing pilot program,' authorize the unprecedented and consequential step of cordon pricing." *Id.*[47]

Second, the Secretary's letter noted that the imposition of tolls under the Tolling Program "appears to be driven primarily by the need to raise revenue for the [MTA]" and asserted that the "VPPP does not authorize tolls that are calculated based on considerations separate from reducing congestion or advancing other road-related goals." *Id.*

The February 19 Letter stated that because the "FHWA lacked statutory authority to approve the cordon pricing tolling under the [Tolling Program], I am rescinding FHWA's approval of the [Tolling Program] under the November 21 Agreement and terminating the Agreement." *Id.* Secretary Duffy noted that his "determination represents a change in position" from the FHWA's previous approach to the Tolling Program's eligibility, but he stated that because the FHWA did not explain the basis for its prior conclusion concerning eligibility, "nothing in the prior approval undermines the above analysis upon which my determination is based." *Id.* at 4–5. Secretary Duffy also noted in the February 19 Letter that the "TBTA and NYSDOT have relied on the Agreement to begin collecting tolls under the program, but I have concluded that such reliance should not prevent the termination of the November 21 Agreement, including because many of the

---

[47] The Secretary noted that "the Town of Hempstead and its supervisor have sued FHWA, TBTA, and NYSDOT making this argument." *Id.* (citing *Town of Hempstead v. Triborough Bridge and Tunnel Authority*, 24-cv-3263 (E.D.N.Y.)). The Secretary wrote that "I believe that FHWA faces a significant risk of loss in that litigation." *Id.*

costs the TBTA and NYSDOT incurred related to the program were incurred before the FHWA signed the VPPP Agreement." *Id.* at 5. The February 19 Letter further stated that the "FHWA is not aware of any substantial costs associated with the physical stopping of the program" and that while termination may deprive the MTA of funding, "any reliance on that funding stream was not reasonable given that FHWA approved only a 'pilot project.'" *Id.* Finally, it stated that "any reliance interests cannot overcome the conclusion that FHWA's approval was not authorized by law." *Id.* The February 19 Letter stated that the FHWA would "contact NYSDOT and its project sponsors to discuss the orderly cessation of toll operations under this terminated pilot project." *Id.*

The MTA and TBTA initiated this litigation by filing a complaint later the same day. Dkt. No. 1. The complaint stated that "Plaintiffs will continue to operate the Program as required by New York law until and unless Plaintiffs are directed to stop by a court order." *Id.* ¶ 120.

The next day, February 20, 2025, the Executive Director sent a letter to the Commissioner of the NYSDOT, the President of the TBTA, and the Commissioner of the NYCDOT "to discuss the orderly cessation of toll operations under the [Tolling Program." Dkt. No. 87-6. The letter stated that "Secretary Duffy's February 19, 2025, letter terminat[ed] the November 21, 2024 Value Pricing Pilot Program [] Agreement under which the Federal Highway Administration [] ha[d] approved the implementation of tolls as part of the New York's Central Business District Tolling Program." *Id.* However, it stated that "[i]n order to provide NYSDOT and its project sponsors time to terminate operations of this pilot project in an orderly manner, this rescission of approval and termination of the November 21, 2024 Agreement will be effective on March 21, 2025." *Id.* "Accordingly, NYSDOT and its project sponsors must cease the collection of tolls on Federal-aid highways in the [CBD] by March 21, 2025." *Id.* The letter requested that the recipients work with

the FHWA's New York Division Administrator "to provide the necessary details and updates regarding the cessation of toll operations." *Id.*

On March 20, 2025, the day before the deadline set by the FHWA expired, Secretary Duffy posted on the social media site X, tagging Governor Hochul:

> .@GovKathyHochul — the federal government and @POTUS are putting New York on Notice.
>
> Your refusal to end cordon pricing and your open disrespect towards the federal government is unacceptable.
> . . .
> Your unlawful pricing scheme charges working-class citizens to use roads their federal tax dollars already paid to build.
>
> We will provide New York with a 30-day extension as discussions continue.
>
> Know that the billions of dollars the federal government sends to New York are not a blank check.  Continued noncompliance will not be taken lightly.

Dkt. No. 87-7.

That same day, March 20, 2025, the Executive Director sent a second letter to the Commissioner of the NYSDOT, the President of the TBTA, and the Commissioner of the NYCDOT.  Dkt. No. 87-8.  Executive Director Shepherd stated that she was "writing pursuant to my February 20, 2025 letter, providing you until March 21, 2025, to cease tolling operations that were initiated through the November 21, 2024 Value Pricing Pilot Program (VPPP) Agreement." *Id.*  She stated that "[t]he Secretary has directed that I extend the period of time to comply by 30 days." *Id.*  "Accordingly, toll operations must cease by April 20, 2025." *Id.*  Executive Director Shepherd again requested that the recipients of the letter work with the FHWA's New York Division Administrator to provide details and updates regarding the cessation. *Id.*

At a meet-and-confer for this litigation held on April 2, 2025, Plaintiffs asked if Defendants contemplated taking any unilateral action on or after April 20, 2025 that might alter the status quo

and require Plaintiffs to seek expedited injunctive relief.  Dkt. No. 49 at 4.  The Defendants informed Plaintiffs that they did not have information to disclose.  *Id.*

On April 8, 2025, the USDOT Rapid Response posted on social media site X:

1. @USDOT's position remains that New York's elitest cordon pricing scheme is illegal, a form of class warfare that targets working Americans, and unfair to the driving public whose tax dollars have already paid for these roads.

2. USDOT's deadline for stopping toll collection has not changed.  Make no mistake – the Trump Administration and USDOT will not hesitate to use every tool at our disposal in response to non-compliance later this month.

3. USDOT will continue to fight tooth and nail against this unlawful tax on hardworking Americans.

Dkt. No 87-9.

On April 21, 2025, the day after the expiration of the FHWA's extended deadline, Secretary Duffy sent another letter to Governor Hochul.  Secretary Duffy acknowledged that in November 2024, before President Trump took office, the federal government had signed a VPPP agreement "that authorized an exception for New York's Central Business District Tolling Program ('CBDTP')," but he stated: "On February 19, 2025, I terminated that agreement." Dkt. No. 87-10 at 1 ("April 21 Letter").[48]  The April 21 Letter recited that the FHWA had "made clear" that New York "must cease the collection of tolls by March 21, 2025" and provide details and updates regarding such cessation and that it had previously extended the deadline to April 20, 2025 "[i]n a spirit of goodwill."  *Id.* (quotation omitted).  The April 21 Letter "warn[ed]" Governor Hochul "that the State of New York risks serious consequences if it continues to fail to comply with Federal law" and directed New York to show cause why the FHWA "should not impose appropriate measures to ensure compliance."  *Id.*  The April 21 Letter stated in bold:

---

[48] The April 21 Letter also cc'ed the Commissioner of the NYSDOT, the President of the TBTA, and the Commissioner of the NYCDOT.  *Id.*

> I hereby direct the [NYSDOT] to show cause, no later than May 21, 2025, why FHWA should not take appropriate steps under 23 CFR § 1.36 to remedy New York's noncompliance with 23 U.S.C. § 301 in connection with the [Tolling Program]. By that date, NYSDOT shall submit a response to FHWA's New York Division Administrator that either: (1) certifies that the collection of tolls under the [Tolling Program] has ceased; or (2) demonstrates that the continued collection of tolls does not violate 23 U.S.C. § 301. The project's other sponsors—the [TBTA] and the [NYCDOT]—may also submit responses.

*Id.* Secretary Duffy wrote that "[t]he response(s) to the directive to show cause should include any arguments related to my determination, explained in the February 19, 2025, letter that FHWA lacked the statutory authority to approve the New York City cordon pricing project as a 'value pricing pilot project'" and should also "address the policy concerns expressed in my February 19, 2025, letter, which were an independent basis for my decision to terminate the VPPP agreement." *Id.* at 2.[49]

The April 21 Letter stated that "[i]f, after evaluating NYSDOT's response and any responses received from TBTA and NYCDOT (or if NYSDOT fails to submit a timely response), FHWA determines that New York is out of compliance with 23 U.S.C. § 301, FHWA will implement appropriate initial compliance measures beginning on or after May 28, 2025, until compliance is achieved, to include": (1) "No further advance construction ('AC') authorizations for projects within the borough of Manhattan, except for projects determined by FHWA to be essential for safety ('Safety Projects')"[50]; (2) "No further [NEPA] approvals for projects within the borough of Manhattan, except for Safety Projects"; and (3) "No further approvals of Statewide Transportation Improvement Program ('STIP') amendments concerning New York Metropolitan

---

[49] The Secretary's letter also addressed certain arguments that the MTA, TBTA, NYSDOT, and NYCDOT had made in their complaints in this litigation including that "the VPPP agreement is a 'cooperative agreement' that may only be terminated pursuant to 2 CFR Part 200." *Id.* at 3–4.

[50] The letter noted that "Safety Projects include projects under the National Highway Performance Program, Bridge Formula Program, and Highway Safety Improvement Program." *Id.* at 2 n.1. It did not provide any other information as to how the FHWA would determine whether a project was "essential for safety."

Transportation Council ('NYMTC') [Transportation Improvement Plans ('TIP')] modifications." *Id.*

Furthermore, the April 21 Letter stated, "[i]f New York's noncompliance continues, FHWA may consider imposing additional measures." *Id.* According to the April 21, Letter, such "additional measures" could include: (1) "No further obligations of FHWA funds (both formula and competitive) for projects within New York City, except for Safety Projects"; (2) "No further AC authorizations for projects within New York City, except for Safety Projects"; and (3) "No further NEPA approvals for projects within New York City, except for Safety Projects." *Id.* The April 21 Letter states that "[t]he corrective measures noted above may be expanded to other geographic areas within the State of New York, if any noncompliance continues." *Id.*

Secretary Duffy's April 21 Letter also stated his belief that "New York's cordon pricing program imposes a disproportionate financial hardship on low and medium-income hardworking American drivers for the benefit of high-income drivers" and reiterated the point that the Tolling Program's cordon pricing model is "unprecedented in the United States and is inconsistent with any previous pilot project approved under the VPPP." *Id.* The April 21 Letter noted that "[a]nyone needing to drive into the area is either forced to pay a cost-prohibitive toll or required to use the substandard transit system run by the [MTA]." *Id.* at 2–3. Secretary Duffy also reemphasized his "concern[] that the tolls collected from highway users under this pilot project have been set and will be used primarily for funding transit capital projects." *Id.* at 3. The April 21 Letter stated that "setting tolls with the primary goal of raising revenue for the MTA conflicts with the purpose of the VPPP to initiate pilot projects designed to relieve congestion, not fund transit capital projects." *Id.* While the Secretary acknowledged in the April 21 Letter that "the VPPP statute permits revenues from pilot programs to be used for transit projects eligible for funding under title 23 of

33

the U.S. Code," he concluded that "it is unconscionable as a matter of policy that highway users are being forced to bail out the MTA transit system." *Id.*

Secretary Duffy stated in the April 21 Letter that "[u]nder this Administration, FHWA policy will no longer support this type of project or policy." *Id.* "While I am Secretary, FHWA will only prioritize tolling projects under the VPPP that provide for toll-free alternative routes and set tolls with the aims of reducing congestion and/or raising revenue primarily for highway infrastructure." *Id.*

On April 24, 2025, a spokesperson for the USDOT stated, regarding the Tolling Program, "if New York doesn't shut it down, the Department of Transportation is considering halting projects and funding for the [S]tate." Dkt. No. 83 at 19 & n.13.[51]

On April 29, 2025, Secretary Duffy appeared on the television program Good Day New York and stated that if Plaintiffs and the NYCDOT do not "treat those who want to come into Manhattan fairly, maybe we should look at how much we send the city." *Id.* at 19 & n.14.[52] He continued, "that's what the Governor is going to have to grapple with." *Id.*

On May 21, 2025, the MTA, TBTA, and NYCDOT responded to the April 21 Letter's "order to show cause." Dkt. No. 125. Their submission did not provide the agency with new facts but rather consisted almost entirely of the pleadings, briefs, and declarations filed in this case. *Id.*

---

[51] *See* Peter Senzamici, *Feds Accidentally Upload Internal Memo Admitting Plan to Kill NYC Congestion Pricing Is 'Very Unlikely' to Succeed—Before Quickly Deleting It*, N.Y. Post (Apr. 24, 2025), https://nypost.com/2025/04/24/us-news/fed-lawyers-cast-doubt-on-duffys-dubious-congestion-kill/.

[52] *See* Good Day New York, WNYW-NY (FOX) (Apr. 29, 2025), https://mms.tveyes.com/PlaybackPortal.aspx?SavedEditID=ab76562d-0726-4d6b-bcc4-f28ef11d100b.

### III.    LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). "Any party seeking a preliminary injunction 'must demonstrate that it will suffer irreparable harm in the absence of the requested relief.'" *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (quoting *Latino Officers Ass'n v. Safir*, 170 F.3d 167, 171 (2d Cir. 1999)). In order to justify a preliminary injunction, a movant must demonstrate: (1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of granting an injunction. *See Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "The purpose of a preliminary injunction is not to award the movant the ultimate relief sought in the suit but is only to preserve the status quo by preventing during the pendency of the suit the occurrence of that irreparable sort of harm which the movant fears will occur." *Kane v. De Blasio*, 19 F.4th 152, 163 (2d Cir. 2021) (per curiam) (quotation omitted).

### IV.    CONCLUSIONS OF LAW

#### A.    Likelihood of Success on the Merits

Plaintiffs assert that they are likely to succeed on the merits of several of their underlying causes of action. They argue that (1) this Court has jurisdiction, (2) Secretary Duffy's February 19 Letter is arbitrary and capricious, and (3) Defendants lack the authority to pursue any of the so-called "compliance measures" outlined in the April 21 Letter. Dkt. No. 83 at 21–51; Dkt. No. 10–15; Dkt. No. 124 at 3–25; Dkt. No. 126 at 7–9. In response, Defendants argue that Plaintiffs are unlikely to succeed on the merits and contest each of Plaintiffs' arguments. Dkt. No. 118 at 13–28, 35–56.

### 1.    Jurisdiction

Plaintiffs argue that the Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs assert federal constitutional, equitable, and statutory claims.  Dkt. No 83 at 21.

Defendants raise three arguments challenging the Court's jurisdiction over this case. Defendants claim that there is no reviewable final agency action, none of Plaintiffs' claims is ripe for judicial review, and, pursuant to the Tucker Act, 28 U.S.C. § 1491, jurisdiction over any justiciable part of this dispute lies solely with the Court of Federal Claims.  Dkt. No. 118 at 13–28.  The Court reviews each of Defendants' arguments in turn.

### a.    Final Agency Action

"The APA explicitly requires that an agency action be final before a claim is ripe for review."  *Air Espana v. Brien*, 165 F.3d 148, 152 (2d Cir. 1999) (citing 5 U.S.C. § 704).[53]  The finality requirement "allows the agency an opportunity to apply its expertise and correct its

---

[53] In *Air Espana*, the Second Circuit described the requirement of finality as "jurisdictional."  *Id.* (citing *DRG Funding Corp. v. Sec'y of Hous. and Urban Dev.*, 76 F.3d 1212, 1214 (D.C.Cir. 1996)).  However, more recent opinions have called that descriptor into question.  In *Sharkey v. Quarantillo*, the Second Circuit noted that many circuit courts had relied upon the Supreme Court's holding in *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514–15 (2006) to determine that the Section 704 requirement of "final agency action" is not jurisdictional.  *See* 541 F.3d 75, 87 n. 10 (2d Cir. 2008) (collecting cases).  The Second Circuit noted that "[i]t is uncertain in light of recent Supreme Court precedent whether these threshold limitations are truly jurisdictional or are rather essential elements of the APA claims for relief."  *Id.* at 87.  Even more recently, the Second Circuit observed that that "whether the APA's 'final agency action' requirement, 5 U.S.C. § 704, is jurisdictional is an open question in our Circuit."  *6801 Realty Co., LLC v. U.S. Citizenship & Immigr. Servs.*, 719 F. App'x 58, 60 n.1 (2d Cir. 2018) (summary order); *see also Dagbazhalsanova v. U.S. Citizenship & Immigr. Servs.*, 2025 WL 964071, at *4 (E.D.N.Y. Mar. 31, 2025) ("The question of whether final agency action is a jurisdictional requirement remains open in the Second Circuit.").  Ultimately, the Court need not weigh in on the jurisdictional nature of the finality requirement as Section 704 is undisputably "a question of 'statutory standing' that permits 'resolving the case on threshold, non-merits grounds.'"  *6801 Realty*, 719 F. App'x at 60 n.1 (quoting *In re Facebook, Inc., Initial Pub. Offering Derivative Litig.*, 797 F.3d 148, 156 n.6 (2d Cir. 2015)).  The Court's inclusion of the parties' final agency action arguments beneath the "jurisdiction" heading is not intended to be a legal pronouncement.

mistakes, it avoids disrupting the agency's processes, and it relieves the courts from having to engage in piecemeal review which is at the least inefficient and upon completion of the agency process might prove to have been unnecessary." *Id.* (quotation omitted). The APA does not impose an exhaustion requirement on the target of a final agency action. *See Darby v. Cisneros*, 509 U.S. 137, 154 (1993) ("[W]here the APA applies, an appeal to 'superior agency authority' is a prerequisite to judicial review *only* when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review.").

Two conditions must be met for an agency action to be final. "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Salazar v. King*, 822 F.3d 61, 82 (2d Cir. 2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). "And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quoting *Bennett*, 520 U.S. at 178). "For the second prong, the core question is whether the result of the agency's decisionmaking process is one that will directly affect the parties." *Id.* (quotation omitted). Defendants argue that "the Secretary and FHWA's actions, taken as a whole, show an ongoing decision-making process that has neither reached a definitive conclusion nor imposed tangible legal consequences." Dkt. No. 118 at 16. Both conditions to establish final agency action have been satisfied here.

It is clear from Defendants' communications that the decision to terminate the VPPP Agreement was consummated by February 19, 2025 at the latest. In the February 19 Letter, Secretary Duffy stated in clear terms: "I am rescinding FHWA's approval of the [Tolling Program] under the November 21 Agreement and terminating the Agreement." Dkt. No. 87-1 at 4. The

February 19 Letter did not indicate that the Secretary's decision to do so was in any way tentative or interlocutory, instead resting upon the "conclusion that FHWA's approval was not authorized by law." *Id.* at 5. The Secretary's decision was not based on any discretionary analysis but on the conclusion that Congress did not give the FHWA the authority to approve the project. There is nothing equivocal about the letter or about the Secretary's decision. President Trump confirmed the unmistakable meaning of the February 19 Letter the same day, tweeting "CONGESTION PRICING IS DEAD." Dkt. No. 87-4. Executive Director Shepherd's letter dated February 20, 2025 likewise stated in the past tense that the February 19 Letter "terminat[ed] the November 21, 2024 Value Pricing Pilot Program (VPPP) Agreement." Dkt. No. 87-6. In the April 21 Letter, Secretary Duffy confirmed that "[o]n February 19, 2025, I terminated [the VPPP] agreement" and "New York therefore is not legally permitted to collect tolls on roads within the [CBD] that were constructed using Federal-aid highway funds." Dkt. No. 87-10 at 1. Secretary Duffy stated that the April 21 Letter "once again provides notice of the termination." *Id.* at 4. A host of statements by Defendants and their spokespeople continued to confirm that New York's operation of the Tolling Program was unlawful and risked sanctions by the federal government if the state's "noncompliance" continued. *See* Dkt. No. 87-7; Dkt. No 87-9; Dkt. No. 83 at 19 & n.13. Even Defendants' memorandum of law repeatedly describes the February 19 Letter as a "notice of termination." Dkt. No. 118 at i–ii, 9, 11. And Defendants' counsel confirmed at the preliminary injunction hearing that it is still the Secretary's position that the previous Administration lacked the lawful authority to sign the VPPP Agreement, that the VPPP Agreement has been terminated and that, accordingly, the Tolling Program is unlawful. Tr. at 26:4–27:2; 32:4–7; 45:22–46:5; 47:11–48:1.

As the text of Defendants' communications makes clear, the FHWA's "deliberation" over whether to terminate the VPPP Agreement and whether New York is in violation of the law is at an end. *See Sackett v. E.P.A.*, 566 U.S. 120, 129 (2012) (holding that an agency action is final when the text of the agency's order "makes clear" that its deliberation as to whether plaintiffs violated the law "is at an end" and noting that "the Agency may still have to deliberate over whether it is confident enough about this conclusion to initiate litigation, but that is a separate subject"); *N. Am.'s Building Trades Unions v. Dep't of Defense*, 2025 WL 1423610, at *9 (D.D.C. May 16, 2025) (rejecting argument that documents setting forth "the agencies' definitive and authoritative positions" were not final agency actions where they were "plainly not tentative or preliminary"). The Supreme Court has taken a pragmatic approach to the finality inquiry, *see FTC v. Standard Oil of Cal.*, 449 U.S. 232, 239–40 (1980), "focusing on whether judicial review at the time will disrupt the administrative process," *Bell v. New Jersey*, 461 U.S. 773, 779 (1983). The conclusiveness of Defendants' repeated declarations makes it apparent that there is no remaining process for the Court to disrupt.

The fact that the federal government has not yet imposed sanctions on Plaintiffs and has signaled that it is still deciding whether and what sanctions to impose does not make the February 19 Letter any less final. The Supreme Court's decision in *Sackett* is squarely on point. In that case, the EPA had issued an administrative compliance order stating that plaintiffs had violated the Clean Water Act and directing plaintiffs to restore their property pursuant to an EPA work plan. 566 U.S. at 122. The order did not impose sanctions on the plaintiffs and instead invited them to "engage in informal discussion of the terms and requirements" of the order with the EPA and to inform the agency of any allegations which they believed to be inaccurate. *Id.* at 126–27. The Supreme Court rejected the agency's argument that the order was not ripe for review

39

merely because no sanctions had been imposed, holding that the text of the compliance order made it clear the agency's deliberation over whether plaintiffs were in violation of the law was at an end and the question of what sanctions to impose was "a separate subject." *Id.* at 129.[54]  And in circumstances closely paralleling the facts of this case, the District of Columbia Circuit held that the USDOT had "flexed its regulatory muscle, [and] cannot now evade judicial review" where the agency had "effectively declared the [plaintiff]'s operations unlawful and warned the [plaintiff] to cease and desist." *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 412 (D.C. Cir. 2011).  The Circuit explained that "[a]t the very least, this cast a cloud of uncertainty" over the plaintiff's continued operations and that "[i]t also put the [plaintiff] to the painful choice between costly compliance and the risk of prosecution at an uncertain point in the future—a conundrum that we described . . . as 'the very dilemma [the Supreme Court has found] sufficient to warrant judicial review.'" *Id.* (quoting *Ciba-Geigy Corp. v. U.S.E.P.A.*, 801 F.2d 430, 439 (D.C. Cir. 1986)).  The Second Circuit has also confirmed that the subject of an agency order need not wait for the agency to pursue punitive compliance measures: in *Salazar*, the Second Circuit held that a decision by the Department of Education not to suspend student loan collection was a final agency action even before the agency took any action to sanction borrowers who failed to make payments. 822 F.3d at 82.

---

[54] At the preliminary injunction hearing, counsel for Defendants argued that the Clean Water Act provides for a statutory penalty for failure to comply with the government's order.  Tr. at 46:20–47:1; *see Sackett*, 566 U.S. at 123 (noting that "[w]hen the EPA prevails in a civil action, the Act provides for 'a civil penalty not to exceed [$37,500] per day for each violation'" but when "the EPA prevails against any person who has been issued a compliance order but has failed to comply, that amount is increased to $75,000." (quoting 33 U.S.C. § 1319)).  That is a distinction without a difference.  In *Sackett*, as here, the penalty was still dependent on the government taking some action at a later date to pursue the sanctions.

Defendants argue that the first prong of the final agency action test is not met because Secretary Duffy's purported termination of the VPPP Agreement "is part of a larger, unfolding administrative process that remains incomplete." Dkt. No. 118 at 14–18 (citing *Berkeley-Dorchester Ctys. Econ. Dev. Corp. v. U.S. Dep't of Health & Hum. Servs., Admin. for Child. & Fams.*, 2006 WL 8443181, at *1 (D.S.C. Feb. 24, 2006); *Purpose Built Families Found., Inc. v. United States*, 634 F. Supp. 3d 1118, 1121 (S.D. Fla. 2022), *aff'd*, 95 F.4th 1346 (11th Cir. 2024)). Defendants point to the language in the April 21 Letter ordering the NYSDOT to show cause "why FHWA should not take appropriate steps under 23 CFR § 1.36 to remedy New York's noncompliance with 23 U.S.C. § 301 in connection with the [Tolling Program]." Dkt. No. 87-10 at 1. Defendants' protestations fall flat. The April 21 Letter cannot and does not magically convert the Secretary's February 19 declaration of termination into a mere tentative or preliminary view.

At the outset, the April 21 Letter does not, by its terms, purport to rescind the February 19 termination or resurrect the VPPP Agreement. It reiterates that the VPPP Agreement has been terminated and states a definitive position that New York has "continue[d] to collect tolls in upon defiance of federal law." *Id.* at 1. It orders the NYSDOT to show cause why Defendants should not "take appropriate steps . . . to remedy New York's noncompliance," with FAHA's anti-tolling provision, treating noncompliance itself as an established fact. Even the portion of the April 21 Letter ordering NYSDOT to show cause does not indicate that the Secretary considers the matter of whether the VPPP Agreement should remain in place to be an open question. It specifies that the NYSDOT's response must either "(1) certif[y] that the collection of tolls under the [Tolling Program] has ceased; or (2) demonstrate[] that the continued collection of tolls does not violate 23 U.S.C. § 301." *Id.* In other words, New York must either cease operation of the Tolling Program altogether, or else must continue the Tolling Program only in such a way that the

Secretary would not find to violate Section 301—i.e., imposing tolls only on roads other than federal-aid highways.[55]  Such an invitation for submission does not signal reconsideration.  The Secretary has never abandoned his view that, as a matter of law, the FHWA lacked and still lacks the authority to enter the VPPP Agreement.

Even if the April 21 Letter was susceptible of the reading that the NYSDOT could submit materials showing that Congress gave the Secretary the power to enter the VPPP Agreement and the Tolling Program was legally authorized pursuant to the VPPP, that would not be sufficient to make his termination of the VPPP Agreement non-final.  *See Sackett*, 566 U.S. at 127 ("The mere possibility that an agency might reconsider in light of 'informal discussion' and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal.").  The possibility that an agency "may revise" its decision based on new information "is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal."  *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016); *accord Nat'l Env't Dev. Assoc.'s Clean Air Project v. E.P.A.*, 752 F.3d 999, 1006 (D.C. Cir. 2014); *see also S.F. Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 579 (9th Cir. 2019) ("[A] central rationale of the final agency action requirement is to prevent premature intrusion into the agency's deliberations; it is not to require . . . parties to keep knocking at the agency's door when the agency has already made its position clear.").  "Most, if not all, agency decisions incorporate some contingencies, but that is

---

[55] The February 19 Letter make clear that only ceasing tolling on federal-aid highways could constitute "compliance" in light of the Secretary's repeated conclusion that the VPPP could not authorize tolling in connection with the Tolling Program.  *See* Dkt. No. 87-5 at 3–5 (stating that the FHWA's prior approval of the VPPP Agreement "was not authorized by law" as he explained that "I have concluded that the scope of this pilot project as approved exceeds the authority authorized by Congress under VPPP," "I have concluded that Congress did not . . . authorize . . . cordon pricing," and "I have concluded that VPPP does not authorize tolls that are calculated based on considerations separate from reducing congestion or advancing other road-related goals.").

not enough to shield them from judicial review." *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of Airforce*, 128 F.4th 1089, 1109 (9th Cir. 2025).  The fact that Defendants *might* reconsider their decision to terminate the VPPP does not mean that the decision has not been made.  And Defendants have not given any indication that the decision *will* be reconsidered.

An agency may not transform final decisions into nonfinal decisions and thereby forestall judicial review simply by creating an opportunity for "informal revision that offer[s] a mere possibility of success."  *6801 Realty Co.*, 719 F. App'x at 60 .  Instead, when determining whether an agency professing to have reopened a decision has actually rendered the original decision nonfinal, courts look to markers of sincerity such as requests for more evidence, further investigation, or an admission that the earlier decision was deficient in some aspect that reopening may allow the agency to remedy.  *See Mantena v. Hazuda*, 2018 WL 3745668, at *6 (S.D.N.Y. Aug. 7, 2018) (collecting cases); *see, e.g.*, *6801 Realty*, 719 F. App'x at 60 (holding that the agency action was not final where the agency "actually reopened the decision and actively sought new evidence" and "identified issues with the original decision and areas that warranted further evidentiary development.").  Where, as here, an agency identifies no issues with the original decision and does not "request more evidence or set forth any way in which it would investigate further," the agency has reopened the decision "in name only."  *Mantena*, 2018 WL 3745668, at *6.  The April 21 Letter bears none of these markers of sincerity.  Defendants have not even purported to reconsider the decision to terminate the VPPP Agreement and have never wavered from the position that the FHWA's prior execution of the VPPP Agreement was not authorized by the law.  The Secretary and the Executive Director have stated, and continued to state, in no uncertain terms that the VPPP Agreement has been terminated.  And the President of the United

States, whose direction the Secretary is following, *see* Dkt. No. 87-5 at 1–2, has declared definitively that congestion pricing is "dead," Dkt. Nos. 87-2, 87-4.

Indeed, the timing and content of the April 21 Letter bespeak insincerity.  The letter was sent only after many months of litigation in which Defendants were exposed to Plaintiffs' legal arguments.  *See Mantena*, 2018 WL 3745668, at *6 (holding that "the circumstance of reopening are suspect" where the government's decision to reopen the decision was made shortly after plaintiff filed her second amended complaint).  Defendants did not invite discussion on Plaintiffs' reading of the VPPP before deciding and announcing in the February 19 Letter and again in the April 21 Letter that the Tolling Program was unlawful.   Instead, they offered dialogue as a tack-on to their threats of imminent punitive action if Plaintiffs did not cease tolling.   Defendants threatened to pursue severe "compliance measures" against New York beginning just one week after Plaintiffs' submission is due.  There is no evidence that the Secretary is seriously considering whether he erred as a matter of law in his conclusion that the VPPP does not give authority to approve the Tolling Program.  There is every reason to believe that any invitation to dialogue was constructed as a *post hoc* effort simply to avoid judicial review before the Secretary could take the punitive actions he has long promised to take if Plaintiffs do not bow to the federal government's will and cease a program that the Secretary continues to characterize as unlawful.

Defendants' cases are all distinguishable.  In *Berkeley-Dorchester*, the plaintiff challenged the summary suspension of financial assistance under the Head Start program due to asbestos concerns.  2006 WL 8443181, at *1.  The District of South Carolina held that no final agency action had occurred because the summary suspension was "a temporary action prompted by an emergency situation and anticipated to be resolved within a limited time frame."  *Id.* at *16.  As further evidence of the interlocutory nature of the agency's decision, the court noted that the

agency "rescinded the summary suspension within days, upon Plaintiff's production of adequate asbestos documentation as intended by the Head Start Regulations." *Id.*[56] Similarly, in *Purpose Built Fams.*, the plaintiff challenged an agency letter which stated that "the government will withhold certain payments pending results of the government's review of [plaintiff's] grant activities, and that the government will carry out an on-site review of [plaintiff's] facility." 634 F. Supp. 3d at 1123–24. The Southern District of Florida held that the suspension was therefore, by its own terms merely "a preliminary measure, pending completion of the government's audit." *Id.* at 1124. Tellingly, Defendants cite no case in which a cabinet secretary and a president of the United States have declared in no uncertain terms that an administrative approval has been rescinded but yet a court determined that such action is not ripe for review.

With regard to the second prong, Defendants argue that no tangible legal consequences have yet flowed from the FHWA's and Secretary's actions. Dkt. No. 118 at 18–20; *see Alaska Dep't of Env't Conservation v. E.P.A.*, 540 U.S. 461, 483 (2004) (a final action "must either determine 'rights or obligations' or occasion 'legal consequences'" (quoting *Bennett*, 520 U.S. at 178)). But that misstates the impact of Defendants' February 19 pronouncement that the FHWA was revoking Plaintiffs' ability to charge tolls. The Secretary does not suggest that Plaintiffs are free to disregard his order. The February 19 Letter stated the agency's conclusions of law, deemed the VPPP Agreement to have been unauthorized, and on its face terminated and rescinded the VPPP Agreement. The order, if valid, imposes a "legal obligation" upon Plaintiff to cease operation of the Tolling Program and, as the Secretary's own letters confirm, puts Plaintiffs at risk of legal sanctions. *See Sackett*, 566 U.S. at 126 & n.2 (agency action was final where, "according to the Government's current litigating position, the order expose[d]" the plaintiffs to penalties in a

---

[56] *Berkeley-Dorchester* was also decided prior to the Supreme Court's decision in *Sacket*.

potential future enforcement proceeding); *Tzumi Innovations LLC v. Regan*, 557 F. Supp. 3d 499, 507 (S.D.N.Y. 2021) ("Legal consequences also flow from the Letter because it put Plaintiff in the position of complying with EPA's costly recall demand or risking enforcement action at some uncertain point in the future."); *CSI Aviation Servs.*, 637 F.3d at 412.  In addition, the Secretary's pronouncement has endangered Plaintiffs' ability to issue bonds as the bonds are secured by the Tolling Program's revenues and thus rely upon the program's longevity.  Dkt. No. 84 ¶¶ 10–11.

Plaintiffs adequately demonstrate that the April 19 Letter is a final agency action.

### b.    Prudential Ripeness

"Even when an agency has taken final action, a court may refrain from reviewing a challenge to the action if the case is unripe for review" under the doctrine of prudential ripeness. *Nat'l Env't Dev.*, 752 F.3d at 1007–08; *accord Lab. Council for Latin Am. Advancement v. EPA*, 12 F.4th 234, 252–53 (2nd Cir. 2021) ("Under the doctrine of prudential ripeness, courts will decline to review administrative action that would otherwise be reviewable under constitutional and statutory standards because, upon a balancing of the pertinent interests, it is preferable for judicial review to await a more advanced state of administrative consideration."); *see, e.g.*, *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 162 (1967) (holding that a legal challenge to a regulation was not ripe despite the fact that the regulation was a final agency action).  "In the administrative context, the ripeness doctrine 'prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also . . . protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Lacewell v. Off. of Comptroller of Currency*, 999 F.3d 130, 148 (2d Cir. 2021) (alterations in original) (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003)).

To determine whether a claim is prudentially ripe, courts ask "(1) whether [an issue] is fit for judicial resolution and (2) whether and to what extent the parties will endure hardship if decision is withheld." *Simmonds v. I.N.S.*, 326 F.3d 351, 359 (2d Cir. 2003); *accord In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 110 (2d Cir. 2013).

The fitness analysis "requires a weighing of the sensitivity of the issues presented and whether there exists a need for further factual development." *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581 (1985)). Accordingly, the fitness analysis requires "consideration of a variety of pragmatic factors: whether the agency's actions or inactions challenged in the law suit are 'final;' whether the issues presented for review are primarily legal as opposed to factual in nature; and whether administrative remedies have been exhausted at least to the extent that an adequate factual record has been established." *Seafarers Int'l Union v. U.S. Coast Guard*, 736 F.2d 19, 26 (2d Cir. 1984); *accord Clear Channel Outdoor, Inc. v. City of New York*, 608 F. Supp. 2d 477, 505 (S.D.N.Y. 2009), *aff'd*, 594 F.3d 94 (2d Cir. 2010). The hardship analysis focuses on "whether the challenged action creates a direct and immediate dilemma for the parties." *N.Y. C.L. Union v. Grandeau*, 528 F.3d 122, 134 (2d Cir. 2008) (Sotomayor, J) (quotation omitted).

Defendants argue that the issues presented here are not fit for judicial resolution because the agency process is still ongoing. Dkt. No. 118 at 21–23. However, for the reasons stated above with regard to Defendants' arguments concerning final agency action, Defendants fail to show that the ongoing administrative process is anything more than lip service meant to avoid judicial intervention. The action is thus final and the administrative remedies have been sufficiently exhausted—an agency cannot perpetually put off litigation by inviting opportunities to submit materials where there is no indication that any submission would change the agency's course of

action. *See Clear Channel*, 608 F. Supp. 2d at 506 (finding challenge to registration requirements for outdoor advertising companies ripe even where the government had not completed its review of the plaintiff's applications because the rule is final and "[t]here is no indication that it will undergo any further revision").

The issues to be decided are legal ones concerning the lawfulness of the VPPP Agreement and the FHWA's authority to sign it or to terminate it. The Secretary has taken the definitive views that federal law did not permit the FHWA to sign the VPPP Agreement and that he has the authority to terminate the VPPP Agreement. Plaintiffs do not dispute that, if the VPPP did not authorize the FHWA to enter into the VPPP Agreement, then New York may not toll federal-aid highways in connection with the Tolling Program. The Court does not need any further administrative review before it reads the statute and decides whether the Secretary's reading is correct or not. *Cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).

Finally, while Defendants assert that Plaintiffs' challenge for arbitrariness and capriciousness is a fact-intensive one, Dkt. No 118 at 24, they have not identified any fact-gathering or development that remains, *see generally* Dkt. No. 118; Tr. The Secretary has taken his position and Plaintiffs have taken theirs. The issues may be decided based on the briefs and submissions before the Court. Dkt. Nos. 83–87, 89–91, 114–116, 118, 124–126. "[I]ssues have been deemed ripe when they would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future than it is now." *Grandeau*, 528 F.3d at 132 (quoting *Simmonds*, 326 F.3d at 359). But the issues here need no further factual development and raise square questions of law. Defendants identify no questions

48

of fact yet to be developed that would bear on the VPPP Agreement's lawfulness or the Secretary's right to end it. [57]

For the same reasons Plaintiffs have established irreparable harm, *see infra*, Plaintiffs have shown that they will face a direct and immediate dilemma without a decision. *See Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 691 (2d Cir. 2013). "A rule that 'requires an immediate and significant change in [a party's] conduct of its affairs with serious penalties attached to noncompliance' presents a prototypical instance of hardship." *New York v. U.S. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 565 (S.D.N.Y. 2019) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 153 (1967)). "Where 'plaintiffs must either incur great expense to comply with [a regulation's] requirements' or risk 'potentially even greater' consequences for non-compliance, they will suffer hardship if the court foregoes review." *Id.* (quoting *Thomas v. City of New York*, 143 F.3d 31, 36 (2d Cir. 1998)).

Plaintiffs adequately show that their claim that Defendants acted arbitrarily and capriciously is ripe for review at this time.

### c.    Tucker Act

The APA "permits a party to bring an equitable claim challenging arbitrary and capricious action of an administrative agency in federal district court and waives the government's sovereign immunity with respect to such claims in that forum." *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 375 (2d Cir. 1999) (per curiam); *accord Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 406 (2d Cir. 2015). However, the APA specifies that "[n]othing herein . . . confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. The Tucker Act "waives sovereign immunity for contract

---

[57] Notably, Defendants did not submit a declaration or any exhibits in opposition to the preliminary injunction motions—underscoring the conclusion that the issues are legal rather than factual.

disputes with the government and gives the Court of Federal Claims exclusive jurisdiction over such actions." *Up State*, 198 F.3d at 374 (citing 28 U.S.C. §§ 1346(a)(2), 1491(a)(1)). It "impliedly forbids relief other than remedies provided by the Court of Federal Claims for actions that arise out of a contract with the United States." *Id.* at 375 (quotation and alterations omitted); *see Presidential Gardens Assocs. v. United States ex rel. Sec'y of Hous. & Urb. Dev.*, 175 F.3d 132, 143 (2d Cir. 1999).

The parties dispute whether the instant suit is a contract action falling under the exclusive jurisdiction of the Court of Federal Claims. Dkt. No. 83 at 22; Dkt. No. 118 at 26–28; Dkt. No. 124 at 8–10; Dkt. No. 126 at 2–2. "[T]he determination of whether an action is at its essence a contract action for purposes of sovereign immunity under the Tucker Act depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought." *Up State*, 198 F.3d at 375 (quotation omitted); *accord Atterbury*, 805 F.3d at 406; *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982).

The Second Circuit has held that even where a plaintiff styles its claim as an APA claim rather than a contractual claim, the Tucker Act gives the Court of Federal Claims exclusive jurisdiction where the rights to be enforced exist only in contract. *See, e.g.*, *Up State*, 198 F.3d at 377 (holding that the Court of Federal Claims had exclusive jurisdiction over plaintiff's claim that the army violated an agreement to assume the title to a building); *Presidential Gardens*, 175 F.3d at 143 (holding that the Court of Federal Claims had exclusive jurisdiction over plaintiff's claim that was "in essence" seeking specific performance of a settlement agreement). Conversely, the mere fact that a contract is involved does not divest the district court of jurisdiction. *See, e.g.*, *Atterbury*, 805 F.3d at 406–07 (holding that the district court retained jurisdiction where the plaintiff argued that he had a constitutionally-protected property interest in continued employment

50

despite a federal contract that gave the United States Marshall Service the right to dismiss him);
*Noble Energy, Inc. v. Salazar*, 770 F. Supp. 2d 322, 328–29 (D.D.C. 2011) (holding that the
plaintiff's "question falls squarely within the scope of APA review" where plaintiff challenges the
scope of an agency's authority to take an action and "does not seek to enforce its rights under the
terms of [a relevant lease agreement], nor does it ask this Court to determine whether the federal
government violated its contractual obligations"), *vacated on other grounds*, 671 F.3d 1241 (D.C.
Cir. 2012).

The core of Plaintiffs' claim is that the Secretary acted unlawfully in purporting to
terminate the VPPP Agreement and announcing that the FHWA would withhold federal funding
or authorizations if Plaintiffs did not comply.  Plaintiffs are not suing to enforce any term of the
VPPP Agreement or accusing Defendants of breach.[58]  Furthermore, the relief Plaintiffs seek is
non-contractual.  Plaintiffs ask the Court to set aside Defendants' decision to rescind Plaintiffs'
authority to toll federal aid-highways as arbitrary and capricious in light of the VPPP's statutory
scheme and to enjoin Defendants from sanctioning New York on the basis of that rescission as
*ultra vires*.  SCAC at 117.  In asking the Court to enjoin Defendants from pursuing the threatened
"compliance measures," Plaintiffs do not cite any contractual rights arising wholly from the VPPP
Agreement but rather statutory entitlements—federal funding and approvals guaranteed by federal
laws such as the FAHA, NEPA, and the Federal Transit Act that do not derive from any contract.
Dkt. No. 83 ¶¶ 7–9, 44–47.

---

[58] The VPPP Agreement imposes obligations on the Project Sponsors.  The only obligation it
imposes on Defendants is that "[i]n order to carry out Section 1012(b)(5) of ISTEA, as amended,
the FHWA and NYSDOT, TBTA and NYCDOT will cooperate and work together in the
implementation of the Project." Dkt. No. 87-1 § 8(a).  Plaintiffs do not sue to enforce that provision
of the VPPP Agreement.

Although Defendants characterize Plaintiffs' claims as seeking reinstatement of the terminated agreement which Defendants construe as a claim for specific performance, Dkt. No. 118 at 28, "the mere fact that an injunction would require the same governmental restraint that specific (non)performance might require in a contract setting is an insufficient basis to deny a district court the jurisdiction otherwise available," *Megapulse*, 672 F.2d at 971. Plaintiffs are better understood as arguing that Defendants' acts are unauthorized by any law or other source of authority including the VPPP Agreement and therefore that the VPPP Agreement remains unchanged by Defendants' arbitrary and capricious conduct. *See Climate United Fund v. Citibank, N.A.* ("*Climate United Fund I*"), 2025 WL 842360, at *6 (D.D.C. Mar. 18, 2025) (holding that the Court of Federal Claims did not have exclusive jurisdiction over action challenging the termination of a federal award because "Plaintiffs do not challenge a contract between the parties—they challenge an action"); *Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985) (holding that the Court of Federal Claims did not have exclusive jurisdiction where the plaintiff's "claims arise under a federal grant program and turn on the interpretation of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties"). The Court need not pass judgment on the interpretation of any term of the VPPP Agreement. The essence of Plaintiffs' claims requires the Court to review the VPPP Agreement only to determine what it *does not* say.

Thus, "[w]hile the Court here may need to pass on certain questions about a contract, . . . it would do so in the context of the Government's defense of the action, not Plaintiff's independent requests for relief." *Hall v. Nielsen*, 2019 WL 250972, at *3 (D.D.C. Jan. 17, 2019), *aff'd sub nom. Hall v. McAleenan*, 2019 WL 5394627 (D.C. Cir. Oct. 3, 2019); *see also Normandy Apts., Ltd. v. U.S. Dep't of Hous. & Urb. Dev.*, 554 F.3d 1290, 1300 (10th Cir. 2009) ("[T]he fact that

resolution of the claim requires some reference to contract does not magically 'transform [the] action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have." (quoting *Megapulse*, 672 F.2d at 968)).  At base, "[P]laintiffs seek to enforce compliance with statutes and regulations, not any government contract."  *Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 2025 WL 1393876, at *2 (9th Cir. May 14, 2025).

This Court under the APA, not the Court of Claims under the Tucker Act, has the authority to review the relevant statutes and regulations and to determine whether the Secretary's actions are lawful or not.  *See id.* ("Seeking to ensure compliance with statutory and regulatory commands is a matter beyond the scope of the Tucker Act's exclusive jurisdiction."); *Lawrence v. Lew*, 156 F. Supp. 3d 149, 168 (D.D.C. 2016) (Brown-Jackson, J.) (holding that the district court retains jurisdiction where the contract at issue incorporates substantive provisions of federal law such that enforcement requires the interpretation and application of federal law).  This is not a case in which the terms and conditions of some individual grant are at issue such that Plaintiffs seek an order "to enforce a contractual obligation to pay money."  *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (holding that the Court of Federal Claims had exclusive jurisdiction over claims seeking an order where the terms and conditions of individual grants were at issue) (citation omitted)); *but see New York v. Trump*, 2025 WL 1098966, at *2 (D.R.I. Apr. 14, 2025) (distinguishing *Dep't of Educ.*); *Maine v. U.S. Dep't of Agric.*, 2025 WL 1088946, at *19 & n.8 (D. Me. Apr. 11, 2025) (distinguishing *Dep't of Educ.*).  "[I]t would be quite extraordinary to consider Plaintiffs' claims to sound in breach of contract when they do not at all depend on whether the terms of particular awards were breached—they instead challenge whether the agency action here was unlawful, irrespective of any breach."  *Aids Vaccine Advoc. Coal. v. United States Dep't of State*, 2025 WL 752378, at *9 (D.D.C. Mar. 10, 2025).

Furthermore, although the VPPP Agreement is styled as an "agreement," among the NYSDOT, TBTA, NYCDOT, and FHWA, it does not resemble bargained-for consideration so much as a "cooperative agreement" between the federal, state, and local governments. *See* VPPP cl. 1 (providing that "[t]he Secretary may enter into *cooperative agreements* . . . to establish, maintain, and monitor value pricing programs" (emphasis added)); 31 U.S.C. § 6305.[59] Cooperative agreements by which the federal government transfers something of value to a state or local government to achieve a joint public purpose "generally do not confer a 'direct' and 'tangible' benefit on the United States—a requirement for Tucker Act jurisdiction." *Pacito v. Trump*, 2025 WL 893530, at *4 (W.D. Wash. Mar. 24, 2025) (collecting cases); *see Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*, 703 F. Supp. 3d 126, 134 (D.D.C. 2023) ("Because the Cooperative Agreement did not confer a direct benefit on [the agency], the consideration leg of the chair is missing, and [the agency]'s argument that the Claims Court has jurisdiction topples over."). So too here, the VPPP Agreement memorializes the federal government's authorization to toll federal-aid highways for the mutual purpose of reducing congestion, increasing transit

---

[59] Congress provided in 31 U.S.C. § 6305 that:

> An executive agency shall use a cooperative agreement as the legal instrument reflecting a relationship between the United States Government and a State, a local government, or other recipient when—
>
> (1) the principal purpose of the relationship is to transfer a thing of value to the State, local government, or other recipient to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government; and
>
> (2) substantial involvement is expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement.

*Id.*

ridership, and addressing air quality. Dkt. No.87-1 at 9 (performance metrics). It identifies no exchanged consideration. In effect, the VPPP Agreement acts "only as a vehicle" to convey congressionally permitted authorization. *RFE/RL, Inc. v. Lake*, 2025 WL 1232863, at *4 (D.D.C. Apr. 29, 2025) (holding that the Tucker Act did not divest the district court of jurisdiction because the grant agreement was "involved only as a vehicle to distribute congressionally appropriated funds because Congress requires [the agency] to transmit funds to RFE/RL that way."). Defendants do not identify any direct benefit the VPPP Agreement bestowed upon the federal government, thus bringing any claims based upon the agreement (which Plaintiffs' claims are not) outside the ambit of the Tucker Act.

The Tucker Act does not divest this Court of jurisdiction.

### 2.    Arbitrariness and Capriciousness

The APA serves as a "check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950). Under the APA, the "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions" that are found to be: (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," (2) "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and/or (3) "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C)–(D); *see Nat. Res. Def. Council v. U.S. E.P.A.*, 658 F.3d 200, 215 (2d Cir. 2011).

According to Plaintiffs, "[t]he February 19 Letter, which serves as the purported basis for Defendants' actions, is entirely inconsistent with the statutory scheme it seeks to enforce, and arbitrarily announces an atextual interpretation of the FAHA in violation of the APA." Dkt. No. 83 at 24. Plaintiffs advance several arguments as to why the Court should find that the February 19 Letter violated the APA. First, Plaintiffs argue that Secretary Duffy and the FHWA had no

authority to terminate the VPPP Agreement without Plaintiffs' consent. *Id.* at 34–36. Next, assuming that the Secretary had the authority to terminate the VPPP Agreement, Plaintiffs take issue with several of the Secretary's expressed legal and policy bases for termination. Plaintiffs argue that the February 19 Letter exemplifies arbitrary and capricious agency action because it was based on the mistaken legal premise that the FHWA did not have the authority to permit cordon pricing programs or toll rates reflective of non-congestion related goals pursuant to the VPPP. *Id.* at 24–32. Plaintiffs further argue that Defendants' attempt in their memorandum of law in opposition to the motion for a preliminary injunction to reframe those legal conclusions as policy concerns is an attempt at "impermissible *post hoc* rationalization[]." *Id.* at 32 (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21–22 (2020)). Plaintiffs additionally argue that the Secretary failed to adequately consider the MTA's and TBTA's significant reliance interests in the VPPP Agreement, the FHWA's longstanding interpretation of the VPPP, or the history of the FHWA's interactions with the Project Sponsors, including the 2019 statement that the VPPP is the "best fit" for the Program. *Id.* at 38–42; *see Regents of the Univ. of Cal.*, 591 U.S. at 16 (a court reviewing an agency action assesses whether the decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment" (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971))). They also claim Defendants arbitrarily and capriciously failed to conduct an environmental review under NEPA. Dkt. No. 83 at 36–38. In response, Defendants argue that the Secretary and FHWA have authority to terminate the VPPP Agreement and properly made the termination decision on the basis of the Tolling Program's cordon pricing model and toll rates after considering Plaintiffs' reliance interests, though in large part Defendants reframe those considerations as policy concerns rather than conclusions of the VPPP Agreement's illegality. Dkt. No. 118 at 36–49. Defendants

also argue that the FHWA was not required to conduct a new NEPA review before terminating the VPPP Agreement. *Id.* at 49–51.

### a.    Authority to Terminate

Plaintiffs argue that Defendants simply "do not have the right to terminate the VPPP Agreement." Dkt. No. 83 at 34–36. An agency can take only such actions as Congress has enabled it to take. Under the APA therefore, a reviewing court must set aside agency actions that exceed the agency's delegated authority. *See* 5 U.S.C. § 706(2)(C); *Batalla Vidal v. Wolf*, 2020 WL 7121849, at *1 (E.D.N.Y. Dec. 4, 2020); *see also Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902) (noting that the acts of administrative officers "must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief"). Plaintiffs note that "the VPPP Agreement itself says nothing about Defendants having a right to terminate." Dkt. No. 83 at 34. According to Plaintiffs, the lack of an express termination right on the part of the federal government reflects the parties' understanding that the federal government did not have an unfettered unilateral right to terminate the VPPP Agreement. *Id.* (citing Dkt. No. 87-1).

Federal agencies are required to "clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." 2 C.F.R. § 200.340(b). Section 200.340(a) states four ways in which a federal award may be terminated in part or in its entirety:

> (1) By the Federal agency or pass-through entity if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award;
>
> (2) By the Federal agency or pass-through entity with the consent of the recipient or subrecipient, in which case the two parties must agree upon the termination conditions . . .;
>
> (3) By the recipient or subrecipient upon sending the Federal agency or pass-through entity a written notification of the reasons for such termination, the

effective date, and, in the case of partial termination, the portion to be terminated. However, if the Federal agency or pass-through entity determines that the remaining portion of the Federal award will not accomplish the purposes for which the Federal award was made, the Federal agency or pass-through entity may terminate the Federal award in its entirety; or

(4) By the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.

*Id.* § 200.340(a).

Thus, under Section 200.340(a), a federal award may be terminated by the federal government only under one of three circumstances: (1) if the recipient fails to comply with the award's terms and conditions; (2) if the recipient consents to termination, or (3) the terms and conditions of the federal award permit the federal government to terminate the award on other grounds including, to the extent authorized by law, if the award ceases to effectuate program goals or agency priorities. *See id.* Only the recipient or subrecipient has the unfettered discretion to terminate an award. In the event of the termination of the award in its entirety, it need only send notice of the termination with the reasons for the termination and its effective date. *Id.* § 200.340(a)(3).

The regulation serves to effectuate the purpose of federal awards. As the Tolling Program itself illustrates, capital projects invariably involve substantial investment of time and resources. To build a highway or building, plans must be made, employees must be hired, supplies must be purchased, and monies must be raised. The federal government can reserve to itself the right to terminate an award and to deprive the award recipient of the value of that investment, but to do so it must set forth the terms and conditions upon which it will terminate the award when the award is granted and before the investment is made. In the absence of any such reservation, the award recipient and those who invest their time and resources on the award grant are entitled to rely upon it and to presume that the award will be rescinded only if the award recipient or subrecipient fails

to comply with the terms and conditions stated in the award.  Few if any persons would buy bonds to support a capital project were the rule otherwise.

Defendants do not argue that Plaintiffs failed to comply with any term or condition of the VPPP Agreement, and Plaintiffs have not terminated the VPPP Agreement and vehemently do not consent to termination.  Therefore, termination is not permitted under subsections (1), (2), or (3) of Section 200.340(a).  This leaves termination in accordance with a term or condition of the VPPP Agreement under subsection 200.340(a)(4).  But the VPPP Agreement contains no language giving the federal government the right to terminate the agreement.  Dkt. No. 87-1.  Rather, the only provision that speaks to termination is one that contemplates the possibility that the Project Sponsors will decide to terminate the Project.  It states that "NYSDOT, TBTA and NYCDOT agree that they will work with FHWA to return the Project to its original operating condition if TBTA decides to discontinue tolls on the Project."  *Id.* at 4.  In the absence of agreement by the Project Sponsors, the VPPP Agreement can be terminated only if the Project Sponsors fail to comply with a term and condition of the VPPP Agreement.

Defendants respond that a different federal regulation, 2 C.F.R. § 200.211(c)(2) provides that an award must "incorporate, by reference, all general terms and conditions of the Federal award, which must be maintained on the Federal agency's website," 2 C.F.R. § 200.211(c)(2), and that the FHWA's Contractors & Recipients General Terms and Conditions for Assistance Awards ("T&C"), were available on the FHWA's website.  Dkt. No. 18 at 36.[60]  But those T&C do not do the work that the Defendants would need them to do.  They do not contain any express termination provision.  They merely refer back to 2 C.F.R. § 200.340 and state that "[t]his Agreement may be

---

[60] *See Contractors & Recipients General Terms and Conditions for Assistance Awards*, FHWA (Aug. 2, 2023), https://www.fhwa.dot.gov/cfo/contractor_recip/gtandc_after2023aug07.cfm.

terminated or suspended in whole or in part, at any time prior to its expiration date in accordance with 2 CFR 200.340." T&C § 17. If Section 200.340 does not give the Secretary the unilateral right to terminate the VPPP Agreement in the absence of a violation by the Project Sponsors of one of the terms of that agreement, Section 200.211(c)(2) and the T&C do not give Defendants that right.

Defendants also argue that the fourth of Section 200.340(a)'s termination mechanisms requires all federal awards to permit termination based on a change of agency priorities. Dkt. No. 118 at 37. But Defendants' reading of Section 200.340(a)(4), which would undermine the security of all federal awards, is at odds with the plain meaning of its text. The regulation is properly read as stating that an award may be terminated on the ground that it no longer effectuates the program goals or agency priorities only if such a ground (1) is authorized by law and (2) is actually included as a term and condition of the federal award. 2 C.F.R. § 200.340(a)(4); *accord Climate United Fund v. Citibank, N.A.* ("*Climate United Fund II*"), 2025 WL 1131412, at *16 (D.D.C. Apr. 16, 2025) (holding that the regulation's plain language states that the agency "can only terminate a federal award on this basis pursuant to the terms and conditions of the federal award"). In other words, Section 200.340 does not create a default ability by the federal government to terminate an award over the award recipient's objection, whenever an agency determines its priorities have changed. It requires a change in agency priorities to be set forth as a term and condition if the agency wishes to reserve to itself the right to rescind the award based on a change in priority.

Courts interpret regulations by looking to the regulation's plain meaning as determined by the specific context in which the language is used and the broader context of the regulation as a whole. *See United States v. Rowland*, 826 F.3d 100, 108 (2d Cir. 2016) (citing *Yates v. United*

*States*, 574 U.S. 528, 528 (2015) (plurality opinion)); *accord Rock of Ages Corp. v. Sec'y of Lab.*, 170 F.3d 148, 155 (2d Cir. 1999).  The language of subsection 200.340(a)(4), both in isolation and in context, requires the agency to state upfront in an award that it may terminate the award based on change in priority or goals, if it wishes to have the ability to exercise that termination in the absence of consent.

In isolation, subsection (a)(4) provides that the federal agency may terminate an award in part or in its entirety "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4).  The reference to the "terms and conditions of the Federal award," as well as the use of the word "including" is telling.  It signifies that the test following the term describes subsets of the preceding text. *See Carroll v. Trump*, 49 F.4th 759, 768 (2d Cir. 2022); *see also Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 162 (2012) (subsequent history omitted) (explaining that the use of the term "includes" indicates that the text following the term describes subsets of the preceding text (citing *Burgess v. United States*, 553 U.S. 124, 131, n.3, (2008)*.  Defendants' reading renders the phrase "pursuant to the terms and conditions of the Federal award," superfluous.  *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("In construing a statute [courts] are obliged to give effect, if possible, to every word Congress used."). They would have the subsection improbably read "to the extent authorized by law, if the award no longer effectuates the program goals or agency priorities, excepted as prohibited by the terms and conditions of the Federal award."

In context, the only interpretation that makes sense and gives meaning to all of the terms and provisions of Section 200.340 is that a change in agency priorities or goals must be stated in the terms and conditions of the award if it is to provide a basis for unilateral termination of the

award.  The regulation by its terms provides the Federal agency only a limited right to terminate an award over the objection of the award recipient—the recipient or subrecipient must have violated the terms and conditions of the award.  2 C.F.R. § 200.340(a).  In the absence of such violation, the federal agency must have reached advance agreement with the award recipient to permit termination by the federal agency and must have "clearly and unambiguously specif[ied] [such] termination provisions in the terms and conditions of the Federal award."  *Id.* § 200.340(a)(4), (b).  Those provisions, and the security of contract they provide, would be rendered virtually illusory if, in the absence of some contractually agreed upon basis for termination, an agency could at any time terminate an award based upon some open-ended and unspecified change in the agency's priorities or its goals.

Finally, the OMB's most recent guidance also clarifies that the term and condition stating termination could be predicated upon ceased effectuation of program goals or agency priorities is an optional term agencies may choose to include in the award rather than a default provision agencies can exclude only through express waiver.  *See Guidance for Federal Financial Assistance*, 89 Fed. Reg. 30046, 30089 (Apr. 22, 2024) (explaining that pursuant to the regulation, an agency "may include a term and condition allowing termination by the Federal agency or pass-through entity, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities").

Ultimately, Section 200.340(a)(4) does not itself clearly and unambiguously specify a mechanism by which Defendants may terminate the VPPP Agreement.  *See* 2 C.F.R. § 200.340(b). It merely stands for the uncontroversial proposition that an agency may terminate an award in accordance with an express term or condition of the award that permits it to do so and "establishes a boundary to ensure that when dealing with federal awards, no agency exceeds the legal authority

granted to them." *Climate United Fund II*, 2025 WL 1131412; *see also Climate United Fund I*, 2025 WL 842360, at *7. It does not give the Secretary the authority to terminate the Agreement over the objection of the Project Sponsors and in the absence of the violation of a term and condition.

Defendants alternatively argue that "[e]ven if this Court were to find that the Agreement did not expressly incorporate the termination clause of FHWA's general terms and conditions, the clause would still be included by operation of law under the *Christian* doctrine." Dkt. No. 118 at 37 (citing *Aerolease Long Beach v. United States*, 31 Fed. Cl. 342, 374 (1994)). "[U]nder the *Christian* doctrine, a court may insert a clause into a government contract by operation of law if that clause is required under applicable federal administrative regulations." *K-Con, Inc. v. Sec'y of Army*, 908 F.3d 719, 724 (Fed. Cir. 2018); *see G. L. Christian & Assocs. v. United States*, 312 F.2d 418, 427 (Ct. Cl. 1963). The doctrine's namesake provides a helpful illustration. In *G. L. Christian*, the relevant section of the Armed Services Procurement Regulations provided that "'the following standard clause shall be inserted in all fixed-price construction contracts amounting to more than $1,000,' and then proceeded to prescribe a detailed termination clause." 312 F.2d at 424. Therefore, although the government entered into a contract that did not contain the required termination clause, the Court of Claims held that "there was a legal requirement that the plaintiff's contract contain the standard termination clause and the contract must be read as if it did." *Id.* "Accordingly, the Christian Doctrine applies to mandatory contract clauses which express a significant or deeply ingrained strand of public procurement policy." *Gen. Eng'g & Mach. Works v. O'Keefe*, 991 F.2d 775, 779–80 (Fed. Cir. 1993) (collecting cases); *accord K-Con*, 908 F.3d at 724 ("For a court to incorporate a clause into a contract under the Christian doctrine, it generally

must find (1) that the clause is mandatory; and (2) that it expresses a significant or deeply ingrained strand of public procurement policy.").

As stated, Section 200.340(a)(4) does not set forth a mandatory contract clause. It is permissive, allowing but not requiring, the federal agency to include in the award a term stating that the award can be terminated if agency priorities or goals have changed. It therefore cannot serve as the basis for application of the *Christian* doctrine. *See Idir, Inc. v. Postal Serv.*, 1984 WL 543, at *4 (S.D.N.Y. June 25, 1984) (Leval, J.) (holding that the *Christian* doctrine did not imply a clause permitting termination for convenience because "the regulation . . . does not require a termination for convenience clause; it merely authorizes a form in the event such a term is to be included"). The doctrine is additionally inapplicable on the ground that the VPPP Agreement is not a procurement contract. *See Earman v. United States*, 114 Fed. Cl. 81, 112 (2013) (holding that "the *Christian* doctrine is not applicable to this case" because the contract "involves financial assistance agreements, not procurement contracts"), *aff'd*, 589 F. App'x 991 (Fed. Cir. 2015); *see also Mktg. & Mgmt. Info., Inc. v. United States*, 57 Fed. Cl. 665, 674 (2003).[61]

Defendants further argue that they necessarily have the unilateral authority to terminate VPPP agreements based on agency priorities because the VPPP caps the number of value pricing pilot projects the Secretary may approve at fifteen. In the absence of such right to terminate an agreement, they argue, one presidential administration can limit the number of pilot projects a future administration can approve. *See* Dkt. No. 118 at 39 ("Without such authority, the federal government could be locked into just 15 ongoing pilot projects indefinitely, preventing other states or local governments from participating in the program."). That argument is nonsensical. It is true

---

[61] Plaintiffs also correctly point out that "[t]he Second Circuit has never recognized the *Christian* doctrine." Dkt. No. 124 at 18 n.16. *Idir* appears to be the doctrine's only mention by any court in this Circuit.

that the VPPP limits the number of value pricing projects to fifteen. It is thus axiomatic that each project that the Secretary authorizes during one presidential administration means that there will be one less project that, absent congressional legislation, can be authorized during a subsequent administration.[62] But that does not mean that each project is term limited so that it expires once a new president is elected.

Through the ISTEA, Congress intended the Secretary to authorize pilot projects. Congress directed the Secretary of Transportation to "solicit the participation of State and local governments and public authorities for one or more congestion pricing pilot projects." *Id.* § 1012(b). It permitted the Secretary to enter into cooperative agreements with as many as five such state or local governments or public authorities to establish, maintain, and monitor congestion pricing projects," and then directed the Secretary to "allow the use of tolls on the Interstate System as part of a pilot program under this section, but not on more than 3 of such programs." *Id.* TEA-21C expanded the total number of projects to 15 and directed the Secretary to allow the use of tolling on "any value pricing pilot program under this subsection." Pub. L. No. 105-178, § 1216(a)(2). Defendants' argument, if accepted, has built within it the seeds of the destruction of the VPPP and the objectives Congress intended to further with it. The current Secretary has stated that it is the priority of the current Administration to "prioritize tolling projects under the VPPP that provide for toll-free alternative routes and set tolls with the aim of reducing congestion and/or raising revenues primarily for highway infrastructure." Dkt. No. 87-10 at 4.[63] But, if his argument is accepted, few, if any, state or local governments will apply for and invest in such projects because

---

[62] Congress had shown itself willing to address the scarcity of VPPP slots by creating more openings rather than withdrawing approval for existing projects. When Congress passed the TEA-21C, it tripled the number of value pricing pilot projects the Secretary could authorize. *See* Pub. L. No. 105-178, § 1216(a)(2).

[63] ECF pagination.

none of them could be secure that the award that they have given will not be revoked and the investment lost based on the next administration's alternative priorities. Properly read, the VPPP permits the Secretary to authorize up to fifteen pilot projects; not fifteen term-limited pilot projects per presidential administration. Congress did not limit the length of the pilot projects but rather left it to the parties to set a termination date or provision.

In a single, unsupported sentence later in Defendants' memorandum of law, Defendants argue that the "[t]he Secretary's decision to terminate the Agreement, is consistent with the statute that permits the Secretary to take mitigation efforts to protect low-income drivers." Dkt. No. 118 at 45 (citing VPPP cl. 7). But that statutory clause merely states that "[a]ny value pricing pilot program . . . shall include, if appropriate, an analysis of the potential effects of the pilot program on low-income drivers and may include mitigation measures to deal with any potential adverse financial effects on low-income drivers." VPPP cl. 7. And indeed, the Tolling Program did include an analysis of the potential effect on low-income drivers (which found such effect to be either minimal or beneficial) as well as mitigation measures to reduce to tolling burden on low-income drivers.[64] And, if the FHWA wished there to be additional provisions and terms and conditions with respect to low-income drivers, it could have asked that they be included in the VPPP Agreement's terms and conditions. It did not. The VPPP does not authorize the Secretary to unilaterally add mitigation measures after the program's implementation, let alone to terminate the program entirely.

---

[64] *See* Final EA Chapter 6, Economic Conditions; N.Y. Tax Law § 606(jjj); *supra* § II.B.2 discussing the Low-Income Discount Plan and the Individual Disability Exemption Plan); *see also* Dkt. No. 91-2 at 9–10 (explaining that the Tolling Program is intended to benefit low-income individuals who are disproportionately non-drivers reliant upon public transit options).

Plaintiffs have shown a likelihood of success on the merits of their argument that the February 19 Letter exceeded the FHWA or Secretary's authority to terminate the VPPP Agreement.

### b.     Cordon Pricing

Even if the FHWA or Secretary had the authority to terminate the VPPP Agreement, Plaintiffs argue that the decision to terminate was arbitrary and capricious because it was based on the erroneous legal conclusion that the VPPP does not give the Secretary authority to permit states to toll federal-aid highways as part of a cordon-pricing program. Dkt. No. 83 at 24–29. In his February 19 Letter, the Secretary expressed the view that the only programs Congress authorized him to approve were projects that permitted a toll-free option for travelers. Dkt. No. 87-5 at 4.

In opposing the preliminary injunction motions, Defendants do not offer a full-throated defense for that argument, instead contending weakly that the "deficiencies" related to the Tolling Program's cordon pricing model "rise to the level of a statutory problem and render the project ineligible under the VPPP statute." Dkt. No. 118 at 45. Defendants otherwise attempting to reframe the termination decision as being based not on a lack of authority to permit cordon pricing but on shifting agency priorities. *Id.* at 42–44.[65] However, the Secretary's February 19 Letter is not based on policy considerations but on his misconstruction of the VPPP statute. The Secretary's explanation of the VPPP's supposed exclusion of cordon pricing programs rests on two erroneous legal conclusions: first that he was required to adopt a narrow construction of the VPPP's tolling

---

[65] Defendants' attempt to reframe this legal conclusion as an expression of the agency's shifted policy priorities is unavailing for the reasons stated *infra*, § IV.A.2.d. The Court may not accept Defendants' "*post hoc* rationalizations for agency action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983); *accord Pub. Citizen, Inc. v. Mineta*, 340 F.3d 39, 61 (2d Cir. 2003).

provisions, and second that the VPPP's application to "congestion pricing programs" does not authorize tolling in connection with cordon pricing programs.

At the outset, Secretary Duffy expressed his understanding in the February 19 Letter that "[t]he long-standing history of the anti-tolling provision" required him to narrowly construe the VPPP's authorization for tolling programs.  Dkt. No. 87-5 at 4.  That "understanding" is not supported by the law.

It is true that, as a general matter, Congress requires that roads built with federal funds be free from tolls.  *See* 23 U.S.C. § 301 ("Except as provided in section 129 of this title with respect to certain toll bridges and toll tunnels, all highways constructed under the provisions of this title shall be free from tolls of all kinds.").  However, it is manifestly incorrect that all roads built with federal funds must be free from all tolls or that the exceptions to the general rule against tolls must be narrowly construed.  Section 129 enumerates many circumstances in which tolling is permitted.  *Id.* § 129.  And the VPPP provides that "[n]otwithstanding sections 129 and 301 . . . the Secretary shall allow the use of tolls on the Interstate System as part of any value pricing pilot program." VPPP, cl. 4.  Congress' use of the word "notwithstanding" reflects its intent that, even in light of Section 301's general ban on tolling federal-aid highways, tolls may be imposed pursuant to approved congestion pricing programs.   As the Supreme Court has noted, the word "notwithstanding" "shows which of two or more provisions prevails in the event of a conflict." *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 302, (2017); *see also Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993) ("[A] clearer statement is difficult to imagine."  (quotation omitted)).  "Such a clause confirms rather than constrains breadth."  *SW Gen.*, 580 U.S. at 302.

The fact that the VPPP operates as a carve-out to the tolling ban does not mean that it should be grudgingly applied or that the Secretary must afford it only a narrow meaning.

Exceptions to a rule are entitled to no less dignity than the rule to which they are an exception. As the Supreme Court put it as recently as 2021:

> Exceptions and exemptions are no less part of Congress's work than its rules and standards—and all are worthy of a court's respect. That a law might temper its pursuit of one goal by accommodating others can come as no surprise. Often legislation becomes possible only because of such compromises. Often lawmakers tread in areas fraught with competing social demands where everyone agrees trade-offs are required. Whatever the reason for a legislative compromise, we have no right to place our thumbs on one side of the scale or the other.

*BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1539 (2021); *see also Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 439 (2019) (recognizing that courts "have no license to give [statutory] exemption[s] anything but a fair reading"). "[J]ust as we cannot properly expand [an exemption] beyond what its terms permit, we cannot arbitrarily constrict it either by adding limitations found nowhere in its terms." *Food Mktg. Inst.*, 588 U.S. at 439 (citation and emphases omitted).

"The long-standing history of the anti-tolling provision" cannot overcome Congress' express amendment to the anti-tolling policy. The Secretary's apparent belief that he was required to narrowly construe the VPPP's authorization for tolling programs thus was legally erroneous.

After determining that he was required to give the exception for congestion pricing models only a narrow construction, the Secretary then concluded that the scope of the Tolling Program "exceed[ed] the authority granted by Congress under the VPPP" because it used "cordon pricing" "in a situation where tolls are inescapable." Dkt. No. 87-5 at 3–4. That conclusion also is legally erroneous.

Statutory interpretation properly proceeds "in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton Cty.*, 590 U.S. 644, 654 (2020); *see id.* ("After all, only the words on the page constitute the law adopted by Congress and approved by the President."). In 1991, Congress passed ISTEA and directed the Secretary of Transportation to

69

"solicit the participation of State and local governments and public authorities for one or more congestion pricing pilot projects." Pub. L. No. 102-240, § 1012(b). In 1998, Congress changed the name to "value pricing pilot programs." Pub. L. No. 105-178, § 1216(a) Neither enactment included a statutory definition of the terms "congestion pricing pilot project" or "value pricing pilot program." Nonetheless, contemporary understandings of congestion pricing indicate that cordon pricing falls within the class of project contemplated for tolling authorization at the time the VPPP was enacted.

The term "congestion pricing" derives from Professor Vickrey's work dating back to the 1950s. SCAC ¶ 55.[66] In 1959, he testified before the Congressional Joint Committee on Washington Metropolitan Problems that "[i]t is a specific feature of the pricing system suggested here that it is to be applied to the street and highway system as a whole, and not merely to bits and pieces of it." *Id.* Professor Vickrey explicitly "contemplated that the control point [i.e., toll facilities] should more or less completely block off the area into zones, so that it would not be possible to go from one zone to another without passing a checkpoint." *Id.*

Over the following years, Congress proceeded to source information and fund studies on potential congestion pricing projects which included cordon pricing initiatives. *Id.* ¶¶ 82, 88, 92, 94. Such studies included the FHWA's provision of funds to study Mayor Bloomberg's proposed cordon pricing plan as well as a congestion pricing project in Fort Myers Beach that provided for only two points of entry to the area and no toll-free route, a congestion pricing project in San Francisco that included a quadrant where there would be no toll-free entry route, a congestion pricing project in Los Angeles that included two cordon pricing areas in which every inbound route

---

[66] *See* William Vickrey, *Statement to the Joint Committee on Washington, DC, Metropolitan Problems*, 36 J. Urb. Econ. 42–65 (1994).

to the congestion zone would be tolled, and another congestion pricing project in a different part of San Francisco that would toll all private vehicles entering the congestion zone and use the tolling revenue to support public transit alternatives.[67]

Statements made by legislators at the time the VPPP was enacted indicate their contemporary understanding that "congestion pricing" including "cordon pricing."  On March 21, 1991, the Subcommittee on Water Resources, Transportation, and Infrastructure on "Congestion

---

[67] *See* Dkt. No. 85 ¶ 10 n.4; SCAC ¶ 86; U.S. Gov't Accountability Off., *Report to the Subcommittee on Transportation, Housing, and Urban Development and Related Agencies, Committee on Appropriations, House of Representatives* 42–43 (Jan. 2012), https://www.gao.gov/assets/gao-12-119.pdf; Advances in Transportation Studies, *Predicted Driver Response to a Cordon Toll Around Fort Myers Beach, Florida* (2005), https://www.researchgate.net/publication/237385152_Predicted_driver_response_to_a_cordon_t oll_around_Fort_Myers_Beach_Florida; FHWA, *Florida: Cordon Pricing in Lee County*, https://www.fhwa.dot.gov/policy/otps/vpqrrt/sec2.cfm; San Francisco County Transp. Auth., *San Francisco Mobility, Access, and Pricing Study* 5, 17, 60 (Dec. 2010), https://www.sfcta.org/sites/default/files/2019-11/MAPS_study_final_lo_res.pdf; San Francisco County Transp. Auth., *San Francisco Parking Supply and Utilization Study Final Report*, D-6 (Nov. 2016), https://www.sfcta.org/sites/default/files/2019-03/Parking_Supply_final_report_11.29.16.pdf; FHWA, *Report on the Value Pricing Pilot Program Through April 2018* at 13, https://ops.fhwa.dot.gov/congestionpricing/value_pricing/pubs_reports/rpttocongress/pdf/vppp18 rpt.pdf; FHWA, *California: Cordon/Area Charging in Los Angeles and Build-Out of Express Lanes in Southern California* (Nov. 8, 2014), https://web.archive.org/web/20141108091008/https:/ops.fhwa.dot.gov/congestionpricing/value_pricing/projects/involving_tolls/zone_based_pricing/ca_cordon_area_la.htm; S. Cal. Ass'n Of Govs., *Congestion Pricing Modeling and Results for Express Travel Choices Study*, at 24 (Oct. 2013), https://www.ampo.org/wp-content/uploads/2013/12/Oryani-AMPO-2013-presentation.pdf; Southern S. Cal. Ass'n of Govs., *Mobility Zone and Pricing Feasibility Study* 37, 61, 72–73, 75 (Mar. 2019), https://scag.ca.gov/sites/default/files/old/file-attachments/mobilitygozone_report_final.pdf; FHWA, *California: Treasure Island Mobility Management Study* (Feb. 11, 2022), https://ops.fhwa.dot.gov/congestionpricing/value_pricing/projects/involving_tolls/systemwide_p ricing/ca_treasure_island.htm; City Of San Francisco, *Advanced Transportation and Congestion Management Technologies Deployment Initiative* 12, https://www.sfmta.com/sites/default/files/projects/2017/ATCMTD%20Grant%20Application.pdf ; Treasure Island Mobility Management Agency, *Treasure Island Mobility Management Study Summary Review*, at ES-2 (July 2016), https://www.sfcta.org/sites/default/files/2019-03/TIMM%20Study%20Summary%20Report.pdf.

Pricing and Infrastructure Financing" convened in advance of the introduction of ISTEA and took testimony from experts on the cordon pricing initiatives that had then been implemented by Singapore and Hong Kong. *Id.* ¶ 74 (citing *Congestion Pricing and Infrastructure Financing: Hearing Before the Subcomm. on Water Res., Transp., and Infrastructure of the S. Comm. on Env't & Pub. Works*, 102nd Cong. 9 (1991)). Following the hearing, numerous senators, including Senators Joe Lieberman and Daniel Patrick Moynihan, described those cordon pricing initiatives as "congestion pricing." *Id.* The FHWA echoed this understanding. In 1992, shortly after ISTEA was enacted, a senator asked the FHWA how it was defining "congestion pricing projects" and received the response that the "potential scope of congestion pricing applications can vary widely, ranging from pricing on a new or existing single road facility to more *comprehensive area-wide road pricing strategies*." *Id.* ¶ 77 (emphasis added) (citing *Dep't of Transp. & Related Agencies Appropriations for Fiscal Year 1993: Hearings Before a Subcomm. of the S. Comm. on Appropriations*, 102nd Cong. 352 (1992)).

ISTEA itself reflects Congress' intent to support experimentation, giving the Secretary wide latitude to approve projects the Secretary viewed as achieving the program's objectives. Pub. L. No. 102-240, § 1012(b). It states broad goals of "reduc[ing] energy consumption and air pollution while promoting economic development and supporting the Nation's preeminent position in international commerce" as well as improving "mobility for elderly persons, persons with disabilities, and economically disadvantaged persons in urban and rural areas of the country," increasing "productivity growth," and "reducing "traffic congestion." *Id.* § 2. And President Bush's remarks at signing confirm that a "major element" of the law "was to provide State and local officials unprecedented flexibility" including "the discretion to use a major portion of their Federal surface transportation funds on the improvements that would best meet local needs,

whether highway projects or public transit projects." *Statement by President George Bush Upon Signing H.R. 2950*, 1991 U.S.C.C.A.N. 1865. There is no reason to believe that Congress intended to create an artificial distinction between cordon pricing programs and other forms of congestion pricing programs by requiring that projects provide a toll-free alternative. To the extent the VPPP expresses a concern with the tolling burden on low-income individuals, it resolves that concern by stating that pilot shall "shall include, if appropriate, an analysis of the potential effects of the pilot program on low-income drivers and may include mitigation measures to deal with any potential adverse financial effects on low-income drivers." VPPP cl. 7.

Defendants are unable to overcome the myriad evidence demonstrating that the VPPP does not distinguish between cordon pricing programs and other forms of congestion pricing. They do not point to a single historical source that supports their view.

Defendants do not revive the argument that Secretary Duffy made in the February 19 Letter that "Congress in a separate statutory provision has authorized cordon pricing on the Interstate System." Dkt. No. 87-5 at 4 (citing 23 U.S.C. § 129(d)(4)(B), (6)(A)). The Court deems the argument to be abandoned. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014) ("[A] court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."); *accord Malik v. City of New York*, 841 Fed. App'x 281, 284 (2d Cir. 2021) (summary order). There are good reasons for Defendants to have abandoned it. Although the cited portion of the 2021 Infrastructure Jobs and Investment Act expressly permits cordon pricing in addition to congestion pricing, the fact that a later Congress decided to separately use the term "cordon pricing" cannot demonstrate that the earlier Congress did not intend the phrase "congestion pricing" to include cordon pricing. The argument in the February 19 Letter suffers from a timing problem. "[L]ater laws that do not seek to clarify an

earlier enacted general term and do not depend for their effectiveness upon clarification, or a change in the meaning of an earlier statute, are beside the point in reading the first enactment." *Gutierrez v. Ada*, 528 U.S. 250, 257–58 (2000) (quotation omitted).

Defendants also do not reassert the unsupported argument made in the February 19 Letter that the fact no cordon pricing program has been approved before New York's means that Congress did not intend to authorize such a program. It too is deemed abandoned. *See Jackson*, 766 F.3d at 198. In any event, such argument is meritless. There is a first for every program. There is no reason to assume that the first program of its kind must be unauthorized purely because it is the first. This is particularly the case for a statute like the VPPP that was founded upon the theory that individual states could "try novel social and economic experiments without risk to the rest of the country." *Chan I*, 2024 WL 5199945, at *24 (quotation omitted); *see also infra* § IV.A.2.e. (discussing the meaning of the term "pilot project"). What is more telling is that there is no evidence that any administration has ever denied approval for a pilot project on the grounds that it did not offer a toll-free alternative.

Indeed, the FHWA actually *has* authorized the imposition of tolls that do not provide for untolled access. Plaintiffs point out that the "FHWA has approved tolls on many routes that do not provide for toll-free access, including several here in New York such as on the two I-278 bridges to Staten Island, as well as on two I-190 bridges to Grand Island, leaving no toll-free alternative routes to access either of those destinations." Dkt. No. 83 at 33. Under Defendants' argument, Staten Island and Grand Island are cordoned—even though there are means of access to both without paying a toll, those means do not include driving. And, though it is technically true that—absent the Tolling Program—New Jersey commuters would be able to access the CBD without paying a toll, "the only such option would add approximately 300 miles to those drivers'

commutes, considering that the closest un-tolled Hudson River crossing is in Albany." *Id.* The Secretary's argument would have dramatic, and unprecedented, consequences.

An agency acts arbitrarily and capriciously when it takes actions that are not justified by its stated bases. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) ("The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public."). Plaintiffs show a likelihood of success on the merits of their argument that the Secretary's decision to terminate the VPPP Agreement because the statute does not authorize cordon pricing programs was arbitrary and capricious.

### c.    Tolling Revenue

One other erroneous legal conclusion prompted the Secretary to determine that the VPPP did not permit authorization of the Tolling Program: the Secretary's conclusion that the VPPP does not authorize tolls that are "calculated based on considerations separate from reducing congestion or advancing other road-related goals." Dkt. No. 87-5 at 4.[68]

The VPPP does not contain any language excluding the consideration of other factors for determining tolling rates, and Defendants do not point to any source that supports the Secretary's interpretation. Rather, the text of the VPPP undermines the Secretary's legal conclusion. The statute provides that "[r]evenues generated by any pilot project . . . must be applied to projects eligible under" under Title 23. VPPP cl. 3. It provides no restrictions on the use of program revenues beyond that. And transit capital projects are eligible for assistance under Title 31. *See*

---

[68] Plaintiffs also take issue with Defendants' characterization of the Tolling Program as being "driven primarily by the need to raise revenue for the Metropolitan Transit [sic] Authority as opposed to the need to reduce congestion." Dkt. No. 83 at 29 & n.19 (quoting 87-5 at 4). Plaintiffs argue that the Tolling Program's twin goals of reducing congestion and raising revenue are instead "complementary." *Id.*

23 U.S.C. § 142(a)(2).  Under the plain language of the VPPP, revenues can be used for purposes other than highway construction and thus projects can be designed to generate revenues for purposes other than highway construction, such as transit capital projects.

Indeed, the statutory text itself explicitly contemplates that the value pricing pilot programs that are approved under the VPPP will include those that address congestion by, in part, improving alternatives to driving.  The statute  provides that the Secretary shall monitor and report the effects of value pricing pilot programs "are having on driver behavior, traffic volume, transit ridership, air quality, and *availability of funds for transportation programs*."  VPPP cl. 2 (emphasis added). It is unmistakable that Congress intended to permit the Secretary to approve pilots that were intended to generate funds for transportation programs.  This Court has previously acknowledged that "[b]ecause ISTEA provides for the use of excess tolling revenues, it is Congress' unmistakably clear intent that a public authority be permitted to collect funds that exceed a toll road's costs and spend those funds on non-toll road projects."  *Chan I*, 2024 WL 5199945, at *17 (citing *Owner Operator Indep. Drivers Ass'n, Inc. v. Penn. Tpk. Comm'n*, 934 F.3d 283, 293 (3d Cir. 2019); *Am. Trucking Assocs., Inc. v. N.Y. State Thruway Auth.*, 886 F.3d 238, 246 (2d Cir. 2018)).  Congress thus has affirmatively stated that the tolling revenues may be used for other purposes; it has not stated that the tolling rates must be calculated exclusively on the basis of congestion-related considerations.  Courts "do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply."  *Mendis v. Filip*, 554 F.3d 335, 340 n.5 (2d Cir. 2009) (Sotomayor, J.) (quoting *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005)).  It was thus arbitrary and capricious for Defendants to act on the basis of that legal conclusion.

### d.    *Post Hoc Policy Rationales*

In their memorandum of law in opposition to the preliminary injunction motions, Defendants retreat from the contention in the February 19 Letter that Congress did not give the

76

FHWA the authority to sign the VPPP Agreement, Dkt No. 87-5 at 3, and instead attempt to recharacterize the Secretary's stated legal conclusions as merely communicating a shift in policy priorities. *Id.* They wholly abandon the argument that New York's use of other considerations to set toll rates makes the Tolling Program ineligible under the VPPP. Dkt. No. 118 at 45–46. And they argue that "even if Plaintiffs are right that FHWA had authority to enter into an Agreement authorizing the kind of cordon pricing scheme operating under the [Tolling Program], that still does not detract from the valid policy concerns with the [Tolling Program]'s lack of toll-free options for working class drivers . . . [which] are independently sufficient to justify FHWA's actions thus far." *Id.* at 45.

At the outset, Defendants' policy concerns cannot support termination because the Secretary lacks the authority to terminate the VPPP Agreement on the basis of policy concerns. *See supra*, § IV.A.2.a. However, even if the Secretary did possess such authority, Defendants' invocation of policy would still fail on the record before the Court.

Defendants cannot escape the Secretary's flawed legal conclusions by, once those legal conclusions have been challenged, disavowing them and reframing the conclusions as mere expressions of policy. "It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Regents of the Univ. of Cal.*, 591 U.S. at 20 (quoting *Michigan v. E.P.A.*, 576 U.S. 743, 758 (2015)). "When an agency's initial explanation 'indicate[s] the determinative reason for the final action taken,' the agency may elaborate later on that reason (or reasons) but may not provide new ones." *Id.* at 21 (quoting *Camp v. Pitts*, 411 U.S. 138, 143 (1973) (per curiam)); *see id.* (holding that courts may not uphold agency action on the basis of "impermissible '*post hoc* rationalization'" (quoting *Volpe*, 401 U.S. at 420)); *Kakar v. U.S. Citizenship & Immigr. Servs.*, 29 F.4th 129, 133

(2d Cir. 2022) (holding that the agency was "required to articulate a contemporaneous explanation for its decision," which could not be salvaged by an explanation the agency "formulated while litigating this lawsuit" (quotation and alterations omitted)).

The February 19 Letter mentioned the policy concerns only to explain why the Secretary conducted a review of "the tolling authority granted under VPPP to the [Tolling Program] for compliance with Federal law." Dkt. No. 87-5 at 3. In the February 19 Letter, the Secretary made clear that the purported termination of the VPPP Agreement was not based on those purported concerns but on his "conclusion that FHWA lacked statutory authority to approve the cordon pricing tolling under the [Tolling Program]." *Id.* at 4.

The bar against considering *post hoc* rationalizations is not "useless formality" but rather "serves important values of administrative law" by promoting agency accountability and permitting "orderly functioning of the process of review." *Regents of the Univ. of Cal.*, 591 U.S. at 22–23 (quotations omitted). When an agency points to policy concerns not actually examined or relied upon at the time of the action, it deprives the public and the court of the administrative record necessary to determine whether such action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 23 U.S.C. § 706(2)(A). And, of course, it deprives the agency of the opportunity to actually consider whether the application of those policy considerations would in fact support the action.

There are reasons to doubt that Defendants' belatedly expressed policy concerns would support the termination decision even if they had served as the contemporaneous basis for Defendants' decision. The April 21 Letter expresses the concern that "[h]ighway users whose taxes already paid for the Federal-aid highways in the cordon area are now being forced to pay again while receiving no new highway benefits." Dkt. No. 87-10 at 2. But it is the nature of any

toll-based value pricing pilot program that it will impose costs on highway users whose taxes already paid for the Federal-aid highways.  It is only because the highways received federal aid that Federal approval would even be required.  Under Defendants' logic, no federal-aid highway would be tolled—a proposition that even the Secretary does not say he is adopting.  And, as to the notion that the users will receive "no new highway benefits," the April 21 Letter does not address the demonstrated benefit received from measurably faster and more reliable travel speeds within the CBD and connected river-crossings.  Dkt. No. 91 ¶ 25.  The Secretary's February 19 Letter also states that the Secretary "share[s] the President's concerns about the impacts to working class Americans who now have an additional financial burden to account for in their daily lives."  *Id.* at 3.  The April 21 Letter asserts that "New York's cordon pricing program imposes a disproportionate financial hardship on low and medium-income hardworking American drivers for the benefit of high-income drivers."  Dkt. No. 87-10 at 3.  The letters do not acknowledge the discount programs and tax credits available to ensure that low-income drivers can access the CBD with reduced or no tolls.  Nor does the Secretary explain any basis for his assertion that the Tolling Program disproportionally harms low and medium-income individuals.  As the Project Sponsors explained to the FHWA, "[n]inety-eight percent of low-income workers with jobs in the Manhattan CBD do not commute by private vehicle" and are instead disproportionately reliant on the public transit options that the Tolling Program seeks to improve.  Dkt. No. 91-2 at 9–10.  The letters also do not acknowledge the prospect that the increased function, quality, and reach of New York's public transit offerings paid for by the tolls imposed on "high-income drivers" will benefit the present class of low-income drivers.  Such benefits include both the demonstrated fact that the Tolling Program has increased the speed and reliability of car commutes into the CBD and the possibility that low-income individuals who presently must drive will have better public transit

options available to permit cheaper commutes by public transit. The point is not that Defendants' policy rationales could never support a decision to oppose a cordon pricing program. It is that the questions they raise highlight the importance of, and the need for, judicial review based on the information actually considered and acted upon. Though Defendants are free to construct their own policy priorities, the public is entitled to an orderly evaluation of actions purportedly taken based on those policies.

Defendants' belated attempts to reframe the motivating considerations as policy determinations rather than conclusions of illegality are unavailing both as *post hoc* rationalizations and because termination is not available on the grounds of shifting agency priorities. *See supra*, § IV.A.2.a.

### e.    Plaintiffs' Reliance Interests

Plaintiffs further argue that Defendants' purported termination was arbitrary and capricious because the Secretary "did not adequately consider the MTA and TBTA's significant reliance interests in the VPPP Agreement, FHWA's 2019 statement that the VPPP is the 'best fit' for the Program, or FHWA's longstanding interpretation of the VPPP." Dkt. No. 83 at 38–42; Dkt. No. 124 at 19–21. Defendants respond that "the Secretary properly considered Plaintiffs' reliance interests when making his decision" in part because "an agency need not consider and weigh 'unreasonable' reliance interests." Dkt. No. 118 at 46–47 (citing *Libby Welding Co. v. United States*, 444 F. Supp. 987, 992 (D.D.C. 1977), *aff'd*, 595 F.2d 887 (D.C. Cir. 1979)).

"When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Regents of the Univ. of Cal.*, 591 U.S. at 30 (quotation omitted). "It would be arbitrary or capricious to ignore such matters." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The Supreme Court has stated that the agency is "required to assess whether there were reliance interests, determine

80

whether they were significant, and weigh any such interests against competing policy concerns." *Regents of the Univ. of Cal.*, 591 U.S. at 33.  Therefore, the agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate" in circumstances where "its prior policy has engendered serious reliance interests." *Fox Television*, 556 U.S. at 15. The agency need not, however, "demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better." *Id.* (emphases omitted).

Plaintiffs claim to have reasonably and significantly relied on "Defendants' interpretation of the VPPP and on the VPPP Agreement in their financial planning to support and sustain the New York metropolitan region's public transit system."  Dkt. No. 83 at 39.  In particular, they point to the facts that the FHWA maintained a longstanding interpretation of the VPPP as covering cordon pricing, the FHWA's statement in its letter of October 24, 2019 that the "VPPP appears to be the best potential fit" for allowing tolls on existing infrastructure, and the statements in the VPPP Agreement authorizing tolling.  *Id.* at 40–41 (quoting Dkt. No. 91-3).  Based upon the FHWA's communicated policy, the Project Sponsors developed and submitted the plan for the Tolling Program and the TBTA expended over $500 million to establish the Tolling Program.  Dkt. No. 85 ¶¶ 29–30.  It also took on the recurring expenditures related to operation and maintenance of the roadside tolling system, the operations of the back-office system and customer contact center, and consultant costs. *Id.* ¶ 33.  The TBTA further acted in reliance by issuing $1.378 billion in short-term debt that is intended to be paid by the Tolling Program's revenues and will be refinanced with bonds secured by the Tolling Program's  revenues.  Dkt. No. 84 ¶ 12; *see also id*

¶¶ 13–15 (detailing specific issuances and loans).  Those lenders, in turn, presumably relied upon the FHWA's longstanding interpretation when deciding to issue the loans.

These acts of reliance were well-known to Defendants.  The features of the Tolling Program to which the Secretary now objects were also well known to his Department.  As early as April 24, 2019, in their first discussions with FHWA, Plaintiffs informed Defendants that they were planning to finance capital projects to improve New York City's mass transit with bonds secured by the toll revenue generated from congestion pricing.  *Id.* ¶ 5; *see* Dkt. No. 91-1 at 1 (minutes for the meeting noting the "statutory requirements to raise $15 Billion for bonding for the MTA Capital").  The FHWA specifically represented that the project was eligible for one of the value pricing pilot slots allocated to New York.  *See* Dkt. No. 91-1 at 3; *see also* Dkt. No. 91-2 at 3 ("It is the State's understanding that this congestion pricing program would be eligible under a previously approved New York State VPPP slot").

The plan to use the revenues generated by the Tolling Program to finance the capital projects that were intended to further reduce the number of vehicles entering the CBD and to be tolled was foundational to the entire congestion pricing project.  As Plaintiffs' expression of interest to FHWA in June 2019 explained: "By funding the modernization of the transit network, the CBD tolling program would improve transit service and attract commuters back to the system, helping to further ease demand on surface streets and thus reduce congestion in the CBD."  Dkt. No. 91-2 at 9; *see also id.* at 2 ("After considerable deliberation over the past decade regarding how to mitigate the alarming rate of growth in traffic congestion, including two recent Gubernatorial Commission reports, New York State strongly believes that increased investment in public transportation alternatives, such as improving the existing subway and bus system, supported through variable priced tolling provides the greatest return on investment for mitigating

traffic congestion"), 6 ("Revenue raised by the program will provide sustained funding for public transportation, which as it becomes more reliable, will contribution to congestion relief.").

The MTA's chief financial officer ("CFO") consulted with the FHWA during the preparation of the June 2024 NEPA reevaluation and explained his "professional opinion that based on current economic factors, such as interest rates, the adopted toll structure could generate sufficient funding through the issuance of long-term bonds to meet the TMA requirement." Dkt. No. 84 ¶ 6. The FHWA's second reevaluation noted that "[t]he net revenue needed to fund $15 billion depends on a number of economic factors, including but not limited to interest rates and term." Reevaluation 2 at 8 n.2. In recent court filings in *New Jersey v. United States Department of Transportation et al.*, 23-cv-3885 (D.N.J.), the FHWA confirmed that the MTA's CFO's declaration explaining how the MTA and TBTA planned to issue long-term bonds to be repaid by Program revenue "reflects FHWA's contemporaneous understanding of the information conveyed by the Project Sponsors before FHWA's issuance of Re-Evaluation #2." *Id.* ¶ 8. The FHWA similarly confirmed that understanding in filings made to this Court in *Chan et al. v. U.S. Department of Transportation et al.*, 23-cv-10365 (S.D.N.Y.), Dkt. No. 160 at 4. And it could not have been a surprise to the FHWA that the Tolling Program has been costly to establish and maintain.

The FHWA was also well aware that the Tolling Program would not offer a toll-free option. The Project Sponsors highlighted and clearly discussed that feature of the program in their pre-authorization conversations with the FHWA. *See* Dkt No. 91 ¶¶ 2, 5–6, 10 Dkt. No. 91-1 at 6 (providing a map of the tolling zone that does not exempt any road into the CBD). The FHWA's letter of October 24, 2019 explicitly notes that the Tolling Program takes the form of a "cordon pricing" program. Dkt. No. 91-3 at 2.

Plaintiffs contend that Defendants' consideration of these reliance interests was too cursory. The February 19 Letter states that the Secretary "recognizes" that the "TBTA and NYSDOT have relied on the Agreement to begin collecting tolls under the program" but discounts the significance of that reliance because many of the program-related costs "were incurred before FHWA signed the Agreement" and the FHWA approved only a "pilot project." Dkt. No. 87-5 at 5. In their opposition to the motions for a preliminary injunction, Defendants offer the following explanations of why that consideration was sufficient to satisfy the APA: (1) Plaintiffs could not have reasonably relied upon the FHWA's and Secretary's interpretation because the applicable regulation "expressly allows FHWA and the Secretary to terminate the agreement based solely on agency priorities"; (2) most of Plaintiffs' expenditures predated the VPPP Agreement; (3) the Tolling Program was approved as a "pilot project," which could not have generated long-term reliance; and (4) Plaintiffs signed the VPPP Agreement after the 2025 election and in the months before President Trump's administration took office. Dkt. No. 118 at 47–48. Defendants' arguments are unavailing.

First, Plaintiffs have shown a likelihood of success on the merits with respect to their argument that 2 C.F.R. § 200.340 does not provides the FHWA with the unilateral ability to terminate the VPPP Agreement based on changed agency priorities in the absence of language in the terms and conditions giving FHWA that ability. The previously unexpressed and legally erroneous view that the FHWA could withdraw approval based solely on a change in priorities therefore could not have disabused Plaintiffs of their reasonable reliance on the FHWA's statements that the project was eligible for a VPPP slot. Furthermore, even where a prior policy is rescinded as unauthorized, the agency must consider "the options of retaining forbearance or accommodating particular reliance interests." *Regents of the Univ. of Cal.*, 591 U.S. at 33.

Second, while Defendants are correct that Plaintiffs' expenditures related to the establishment of the Tolling Program predated the VPPP Agreement and thus could not have been taken in reliance upon the VPPP Agreement *per se*, that response misunderstands Plaintiffs' argument. Plaintiffs claim that in addition to the VPPP Agreement itself, they relied upon other, earlier manifestations of the FHWA's longstanding policy, including the FHWA's statements to Congress, appropriation of funds to study cordon pricing initiatives, and communications between the FHWA and Plaintiffs before the VPPP Agreement was signed in the years spent envisioning, planning and then executing the congestion pricing project. Dkt. No. 83 at 38–39, 42. Over the years since ISTEA was enacted, the federal government has never taken the view that it did not allow cordon pricing. *See Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996) (holding that agencies must "take account of legitimate reliance on prior interpretation"); *Fox Television*, 556 U.S. at 515 (holding that the question is whether the "prior policy has engendered serious reliance interests").

Third, Defendants argue that the designation of the Tolling Program as a "'pilot project,' by definition, implies a limited and experimental effort, not intended to generate long-term reliance." Dkt. No. 118 at 48; *see* Dkt. No. 87-5 at 5. But although Defendants purport to derive this argument from the definition of the term "pilot project," they do not cite a single dictionary supporting their contention that the term necessarily implies a project of short duration. The dictionary definitions the Court has been able to source say nothing of the sort. Black's Law Dictionary defines "pilot project" as "[a] small-scale advance study conducted to gauge the advisability of conducting a full-scale research project by first evaluating its design, time commitment, costs, and feasibility, plus the effects of potential adverse events." Black's Law Dictionary (12th ed. 2024). The Random House Dictionary of the English Language defines "pilot

project" as "an experimental or trial undertaking prior to full-scale operation or use."  Random House Dictionary of the English Language (1st ed. 1966).  These definitions indicate that a project is designated a pilot by virtue of its scope and not by its duration.  Many pilot projects are of long duration because that duration is necessary to determine whether the project can achieve its goal.

The Tolling Program is just such a project.  It is a pilot in the sense that it is a "first of a kind" trial to determine whether the imposition of tolls and the use of that toll revenue to finance capital projects to improve mass transit will divert enough travelers to the mass transit system to alleviate the critical problem of congestion in the country's most important commercial sector. But it is necessarily of a lengthy duration because capital projects by their nature are long-term. As the MTA's CFO explained, in order to generate the revenues necessary to fund the capital projects to improve public transportation to and within the CBD, New York would need to issue bonds payable over a thirty-year time period.  Dkt. No. 84 ¶¶ 4–15.  Indeed, by its own terms, the VPPP Agreement requires the Secretary to monitor the effect of such programs for a period of at least 10 years, indicating that the pilot programs could have at least that lifespan.  VPPP cl. 5.[69] And as Plaintiffs point out, there would be few rational takers if the pilot projects authorized by the VPPP required state and local governments to invest hundreds of millions of dollars on planning, technology, and infrastructure with the understanding that the project was necessarily short-term.  Merely labeling the project a "pilot" thus could not have put Plaintiffs on notice that expiry was imminent or that it could be terminated solely because one Secretary of Transportation has a different policy preference than an earlier Secretary.

---

[69] Although the VPPP Agreement states that the TBTA and NYCDOT shall monitor and report upon project performance "for a period of at least ten years or to the end of the life of the Project, whichever is sooner," Dkt. No. 87-1 at 3, the potential that the Tolling Program might not last ten years does not alone undermine Plaintiffs' reasonable reliance when the termination agreement provided for early termination by the Project Sponsors but not by Defendants.

Fourth, Defendants argue that the fact that Plaintiffs "rushed to finalize an agreement in November knowing that the incoming President was opposed to the [Tolling Program]" makes their reliance unreasonable. Dkt. No. 118 at 48. They argue that as a matter of "common sense," Plaintiffs could not have actually relied on the belief that the FHWA's prior policy would remain unchanged. *Id.* However, the country has only one President at a time. And it is fair to presume that that President will follow the law, including the APA.

Plaintiffs' expenditures to design and implement the Tolling Program began well before the election cycle had even begun. At that point, Plaintiffs were under no obligation to tailor their future planning to the possibility that a candidate opposed to the Tolling Program would become president, much less to predicate their planning on what he or his cabinet appointee would do once he was the president. The statements that a candidate makes on the stump do not necessarily define the actions their administration will take when in power, especially once the agency undertakes the consideration of the evidence that the APA requires. *See Hawaii v. Trump*, 585 U.S. 667, 699–700 (2018) (disregarding statements made by then-candidate Trump when reviewing the basis for acts taken by the Trump Administration after he assumed office). And the Project Sponsors were not required to believe that the statements candidate Trump made while campaigning and before he was elected and took office would necessarily become policy once he was elected and became charged with representing the entirety of the United States. Plaintiffs also had no obligation to act in accordance with what the incoming Secretary believed the law to be. When the Supreme Court held in *Loper Bright* that interpretation of the law lies in the courts' domain rather than agencies', it noted that that arrangement safeguards reliance interests. *See Loper Bright*, 603 U.S. at 392 (stating that deference to shifting agency interpretations "fosters unwarranted instability in the law, leaving those attempting to plan around agency action in an eternal fog of uncertainty"). Plaintiffs

were entitled to rely on an agreement signed by the then-and-still Executive Director of the FHWA as well as the federal government's statements and actions taken over the course of several administrations, including the first Trump Administration.

Ultimately, none of Defendants' arguments show that Plaintiffs' reliance was unreasonable such that the Secretary was relieved of the requirement to assess the reliance interests, determine whether they were significant, and weigh them against competing policy concerns. *See Regents of the Univ. of Cal.*, 591 U.S. at 33. Defendants now argue that the Secretary *did* weigh Plaintiffs' reliance interests "against the broader harms—to working-class commuters, to New Jersey, and to federal taxpayers." Dkt. No. 118 at 48–49. However, Defendants' failure to acknowledge the reasonableness of Plaintiffs' reliance in either the February 19 Letter or the instant briefing contradicts that claim. Furthermore, the February 19 Letter does not state that the Secretary weighed Plaintiffs' reliance against those "broader harms" but rather that "any reliance interests cannot overcome the conclusion that FHWA's approval was not authorized by law." Dkt. No. 87-5 at 5. As previously stated, the conclusion that the FHWA's prior approval of the Tolling Program was not authorized by law is based on an incorrect interpretation of the VPPP. It therefore cannot suffice to override the FHWA's required weighing analysis.

Plaintiffs show a likelihood of success on the merits with respect to their argument that the Secretary and the FHWA acted arbitrarily and capriciously by failing to adequately consider Plaintiffs' reliance interests.

### f.    NEPA Review

NEPA imposes "procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756–57 (2004). It requires that for "major Federal actions significantly affecting the quality of the human environment," the agency must

prepare a detailed statement setting forth the "reasonably foreseeable environmental effects." 42 U.S.C. § 4332(C).  To determine whether a major federal action will significantly affect the environment, the agency may prepare an environmental assessment, just as the FHWA did prior to authorizing the Tolling Program.  *See* 42 U.S.C. § 4336(b)(2) ("An agency shall prepare an environmental assessment with respect to a proposed agency action that does not have a reasonably foreseeable significant effect on the quality of the human environment, or if the significance of such effect is unknown.").  NEPA states that the environmental assessment shall "set forth the basis of such agency's finding of no significant impact or determination that an environmental impact statement is necessary."  *Id.*  "Because NEPA does not independently provide for judicial review, NEPA is enforced through lawsuits filed under the APA."  *Chan II*, 2025 WL 1144703, at *9.

Plaintiffs argue that Defendants' decision to terminate the VPPP Agreement is a major federal action that threatens sufficiently significant environmental effects, such that the FHWA was required to undertake an environmental review.  Dkt. No. 83 at 37–38; Dkt. No. 124 at 21–23; *see Andrus v. Sierra Club*, 442 U.S. 347, 363 n.21 (1979) ("Major Federal actions include the expansion or revision of ongoing programs." (quotation and alterations omitted)); *Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 234 (9th Cir. 1990) ("[I]f an ongoing project undergoes changes which themselves amount to 'major Federal actions,' the operating agency must prepare an [environmental impact statement].").

Defendants argue that the FHWA was not required to perform any new environmental review because the EA and reevaluations prepared in advance of the VPPP Agreement adequately assessed the impact of termination.  Dkt. No. 118 at 50–51.  They point out that the EA included the no action alternative, "which assessed the environmental impact if the VPPP Agreement was

not signed and implemented, and then compared that with the environmental impact if the VPPP Agreement was signed and implemented." *Id.* at 50.

"NEPA does not prevent an agency from satisfying future NEPA obligations by performing a NEPA analysis at the outset of a long-term project." *Mayo v. Reynolds*, 875 F.3d 11, 22 (D.C. Cir. 2017). However, a single NEPA analysis will not suffice if the environmental analysis occurs too early in the planning process to provide "'meaningful information' necessary for informed consideration." *Id.* Therefore, where a project involves separate subprojects or changes yet to be finalized, the agency may be required to undertake a separate or supplemental NEPA review. *See Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 373 (1989) ("If there remains major Federal action to occur, and if the new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared." (quotation omitted)).

Although Plaintiffs point out that the EA and FONSI issued in anticipation of the VPPP Agreement "identified numerous environmental benefits of the [Tolling Program] including significant reductions in traffic congestion and air pollution regionwide," and therefore posit that halting the Tolling Program "would inevitably increase congestion and air pollution, among potentially other adverse environmental consequences," in their preliminary injunction briefing, they do not identify any potential environmental consequences outside of those already predicted for the no action alternative in the FHWA's earlier NEPA review. Dkt. No. 83 at 37–38. They do not, for example, claim that there would be unique environmental consequences incurred because the Tolling Program was implemented for a few months prior to the potential return to the no action alternative. On the present record, Plaintiffs therefore have not established that the FHWA

could not rely upon the already assembled comparative information to determine that ending the Tolling Program would not have significant environmental effects.

Ultimately, because NEPA is an "action-forcing" statute meant to ensure that agencies consider project effects, *Chan II*, 2025 WL 1144703, at *24, courts will not demand that agencies that have already considered the environmental consequences engage in the performative gesture of complying with NEPA's procedural requirements, *see Nevada v. Dep't of Energy*, 457 F.3d 78, 90 (D.C. Cir. 2006) (citing *Ill. Com. Comm'n v. I.C.C.*, 848 F.2d 1246, 1257 (D.C. Cir. 1988)); *Idaho Sporting Cong. Inc. v. Alexander*, 222 F.3d 562, 567 (9th Cir. 2000) (noting that "[c]ompliance with NEPA's procedures is not an end unto itself" and courts look to whether the agency's environmental assessment "can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made" (quotation omitted)). Plaintiffs have not demonstrated that the FHWA's earlier NEPA review failed to take into account information necessary to evaluate the environmental impacts of terminating the VPPP Agreement and that would have required a separate or supplemental environmental assessment.

Plaintiffs do not show a likelihood of success on the merits of their argument that Defendants acted arbitrarily and capriciously by failing to conduct a new NEPA analysis before deciding to terminate the VPPP Agreement.

### 3. Compliance Measures

Plaintiffs argue that even if the Secretary had validly terminated the VPPP Agreement, Defendants could not impose the "compliance measures" threatened in the April 21 Letter. Dkt. No. 83 at 42–51; Dkt. No. 89 at 10–15. Dkt. No. 124 at 23–25; Dkt. No. 126 at 7–10. They argue that (1) Defendants lack authority to impose the threatened sanctions; (2) enforcing the February 19 Letter would violate the *Pennhurst* clear statement rule; and (3) Defendants'

withholding of federal funding is unconstitutionally coercive.[70]  Defendants focus only on the first argument, responding that "the Secretary's proposed compliance actions fall with his regulatory authority" pursuant to 23 C.F.R. § 1.36.  Dkt. No. 118 at 51–56.

Plaintiffs' arguments would have the Court issue an advisory opinion.  They would have the Court indicate whether, if the Secretary had authority to terminate the VPPP Agreement and if his decision to terminate the VPPP Agreement was lawful and not arbitrary and capricious, he could exercise the compliance measures he has stated that he intends to take.  However, the federal courts do not sit to render advisory opinions.  *See Muskrat v. United States*, 219 U.S. 346 (1911).  Because Plaintiffs have established a likelihood of success with respect to the predicate for any compliance measures is unlawful—the Secretary did not have the power to abrogate the VPPP Agreement and his decision to do so was arbitrary and capricious—the Court has no occasion to entertain the purely hypothetical question whether the Secretary could engage in his planned compliance measures  were the situation otherwise.

The April 21 Letter—like Defendants' opposition—cites a single source of purported authority to impose the threatened sanctions.  It is a regulation promulgated by the FHWA which states:

> If the Administrator determines that a State has violated or failed to comply with the Federal laws or the regulations in this part with respect to a project, he may withhold payment to the State of Federal funds on account of such project, withhold approval of further projects in the State, and take such other action that he deems appropriate under the circumstances, until compliance or remedial action has been accomplished by the State to the satisfaction of the Administrator.

23 C.F.R. § 1.36; *see* Dkt. No. 87-10 at 1; Dkt. No. 118 at 51–56.

---

[70] For the purposes of this Opinion and Order, the Court need not address Defendants' purported violation of the Tenth Amendment.

The power of the administrator of FHWA, and therefore that of the Secretary, thus turns on whether the States "has violated or failed to comply with the Federal laws or the regulations in this part with respect to a project." 23 C.F.R. § 1.36. "When Congress passes an Act empowering administrative agencies to carry on governmental activities, the power of those agencies is circumscribed by the authority granted." *Stark v. Wickard*, 321 U.S. 288, 309 (1944); *see Open Soc'y Just. Initiative v. Trump*, 510 F. Supp. 3d 198, 214 (S.D.N.Y. 2021) ("The acts of all executive branch officers must be justified by some law."). However, Plaintiffs have shown a likelihood of success on the merits of their argument that Defendants did not properly determine that New York has violated any law or regulation including 23 U.S.C. § 301, by collecting tolls as part of the Tolling Program. It follows that Plaintiffs show a likelihood of success on the merits of the argument that, by its own terms, 23 C.F.R. § 1.36 provides Defendants no authority to pursue New York's compliance. New York is not required to comply with the Secretary's dictates unless those dictates are founded in law. In the absence of a violation of law, there is no authority in the Secretary to take the threatened compliance measures. *See State of Tenn. ex rel. Leech v. Dole*, 567 F. Supp. 704, 718 (M.D. Tenn. 1983) ("True [though] it is that 23 C.F.R. § 1.36 provides authority to the FHWA Administrator to withhold payments and to take other appropriate action, this regulation applies only if a State fails to comply with or violates federal law or regulations."), *rev'd on other grounds*, 749 F.2d 331 (6th Cir. 1984).

## V.    Irreparable Harm

"[T]he single most important prerequisite for the issuance of a preliminary injunction" is whether the litigant seeking the injunction "would be irreparably injured in the absence of preliminary injunctive relief." *Yang v. Kosinski*, 960 F.3d 119, 128 (2d Cir. 2020). "Irreparable harm is injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *New York ex rel. Schneiderman v. Actavis PLC*,

787 F.3d 638, 660 (2d Cir. 2015) (citation omitted).  Accordingly, Plaintiffs are entitled to an injunction only if they can demonstrate that, in the interval between this date and the date in the near future upon which the Court is expected to render a final decision, they will suffer an injury that cannot be repaired.  The key word is "irreparable" and "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."  *Sampson v. Murray*, 415 U.S. 61, 90 (1974); *accord Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995) ("[W]here monetary damages may provide adequate compensation, a preliminary injunction should not issue.").  Plaintiffs have demonstrated several forms of irreparable harm, each one of which would be sufficient to establish their claim for preliminary injunctive relief.

A prohibition on a state from "effectuating statutes enacted by representatives of its people" itself inflicts "a form of irreparable injury."  *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers); *accord Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (same); *see also Abbott v. Perez*, 585 U.S. 579, 602 & n.17 (2018) ("The inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State."); *State of Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (finding irreparable harm where "[a]bsent an injunction, the States will be forced to comply with the Department's new regulations, contrary to their own policies"); *see also Maine v. Taylor*, 477 U.S. 131, 135 (1986) ("Federal nullification of a state statute is a grave matter.").  The TMA was adopted by duly elected representatives of the people of the State of New York and signed by the duly elected Governor of New York.  It followed years of study and was based on the conclusion that its adoption would serve the interests of those who live and work in New York, including their economic interests.  *See* N.Y. Veh. & Traf. Law § 1701.  The Tolling Program implements that

94

legislation. The Secretary's actions to purportedly revoke the VPPP Agreement and to impose sanctions to force New York to abandon that duly adopted plan itself inflicts harm on the State, its residents, and those who use its roadways and facilities that cannot be repaired with an award of money damages.

Plaintiffs would suffer other forms of irreparable harm if the Secretary were to take the compliance measures he has stated he can implement if the Tolling Program does not cease. Plaintiffs have outlined a great many projects that rely upon the imperiled funds and approvals:

- The NYCDOT is planning to rebuild the ramp connecting the Harlem River Drive to the Trans-Manhattan Expressway in Upper Manhattan. Dkt. No. 86 ¶ 13. The ramp has been in operation for 80 years and is nearing the end of its intended service life. *Id.* The project to rebuild the ramp requires NEPA approval and cannot proceed if the FHWA withholds that approval. *Id.*

- The NYCDOT is seeking to reconstruct Delancey Street in the Lower East Side to reduce collisions, improve pedestrian safety, and prevent street failure events such as sinkholes. *Id.* ¶ 14. The project is depended upon federal funding and approvals. *Id.*

- The NYSDOT is relying primarily (80%) on FAHA formula funds to reconfigure I-81 in the Syracuse area by replacing an aging viaduct that carries a heavily used portion of the highway with a street-level highway and making improvements to other nearby highways. Dkt. No. 90 ¶ 37. The I-81 corridor is heavily used for trucking and is a vital aspect of the United States' manufacturing and shipping. *Id.* ¶ 36. Approximately 600 construction personnel are working directly on the project. *Id.* ¶ 38. A freeze on either funding or approvals could leave the project

in limbo with only some of the replacement infrastructure in place. *Id.* ¶¶ 39–40, 42.

- The NYSDOT is pursuing a project to replace and rehabilitate five bridges on the Cross Bronx Expressway. *Id.* ¶ 45. The project is currently going through NEPA evaluation and is programmed to receive approximately $330 million of federal formula funds and discretionary funds. *Id.*

- Hundreds of other NYSDOT projects intended to address safety and congestion concerns in Hamilton County, the Adirondacks, Jefferson County, Washington County, Long Island, the Hudson Valley, and other parts of New York are waiting for federal approval or officially obligated funds. Dkt. No. 90 ¶¶ 46–53.

Of course, it is possible that approvals might later be granted if the Court ultimately determines that the Secretary's revocation of the VPPP Agreement was unlawful and he did not have the authority to implement the "compliance measures." But Plaintiffs and those on whose behalf they act will have suffered irreparable harm in the interim. While the funds and approvals are withheld, roads will not be repaired, jobs will be lost, projects will become vastly more expensive due to inflation, and the infrastructure will become increasingly degraded. *Id.* ¶¶ 43, 55. As unrepaired transportation infrastructure continues to age and degrade, the state fisc will suffer and taxpayers will be forced to fund increased maintenance costs. *Id.* ¶¶ 59, 61; Dkt. No. 84 ¶ 31. Deteriorating road conditions are also likely to damage vehicles, including the MTA's buses. Dkt. No. 84 ¶ 30. Withholding funds and approvals would also create an administrative backlog that would significantly burden the NYSDOT's ability to orderly pursue other approvals and authorizations and to oversee other projects. Dkt. No. 90 ¶¶ 63–64. Ultimately, "[i]t is so obvious that it almost need not be stated that when money is obligated . . . and is not paid as promised,

harm follows—debt is incurred, debt is unpaid, . . . and budgets are upended." *New York v. Trump*, 2025 WL 715621, at *13 (D.R.I. Mar. 6, 2025).

By the same token, if the Plaintiffs were to accede to Defendants' threat and halt the Tolling Program, even in the face of a court finding that such threat is likely unlawful, they would also suffer irreparable harm. Plaintiffs have invested significant taxpayer dollars in enacting and administering the Tolling Program. Dkt. No. 84 ¶¶ 12–15; Dkt. No. 85 ¶¶ 29–30, 33. Termination would cause the TBTA to incur approximately $12 million in additional expenditures each month until the Court could issue a final determination. Dkt. No. 85 ¶ 33. Perhaps more devastating, if the Plaintiffs were to cease operating the Tolling Program, they would be deprived of the tolling revenues intended to fund transit capital projects and necessary to refinance the TBTA's short-term debt obligations. Dkt. No. 84 ¶¶ 12–15; Dkt. No. 85 ¶ 34. Those funds are earmarked for projects to make numerous subway stations more accessible to riders with disabilities by permitting them to access public transportation without having to climb or descend steep stairways; to improve the MTA's outdated signaling system to reduce train delays and ensure that riders get to work, school, or home on time; to provide better customer service though technology; and to extend public transit to under-served areas ensuring that all those who live in, work in, and travel to New York can get where they want to go. Dkt. No. 85 ¶ 35.[71] Absent an injunction, those projects would be imperiled or at least delayed. Irreparable harm exists where, in reliance on the federal government's approval of a program, a state makes "substantial resource investments in planning for the implementation of that program," only to have that approval rescinded and the expectation interest that the state would be able to capitalize on those investments stymied. *Texas*

---

[71] *See* MTA, 2020–2024 Capital Program: Exec. Summary (Oct. 1, 2019), https://files.mta.info/s3fs-public/2019-09/MTA%202020-2024%20Capital%20Program%20-%20Executive%20Summary.pdf.

*v. Brooks-LaSure*, 2021 WL 5154219, at *12 (E.D. Tex. Aug. 20, 2021). If Plaintiffs halt the Tolling Program, then even if the Court's ultimate merits determination were to permit the Tolling Program to resume without the specter of withheld federal funds and approvals, Plaintiffs would not be made whole as they (and those they serve) cannot be adequately compensated for the delays in implementing those capital improvements.

In effect, Defendants have challenged Plaintiffs to a game of chicken. Plaintiffs can cease operation of the Tolling Program or else may brace for impact and prepare to suffer the effects of Defendants' threatened compliance measures. Either option would irreparably harm Plaintiffs. *See City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 655–57 (E.D. Pa. 2017) (enjoining Attorney General from imposing conditions on grants to state and local law enforcement concerning immigration enforcement because the city was presented with only the irreparably injurious options of accepting the grant and changing its policies, accepting the grant without changing its policies at risk of sanctions, or foregoing the funds). This is the "prototypical" hardship. *U.S. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d at 565.

Defendants fail to offer any persuasive response. They argue that the harms of noncompliance are merely speculative because the FHWA has not yet imposed any compliance measures. Dkt. No. 118 at 30. However, "[a]s a preliminary injunction requires only a likelihood of irreparable injury, Damocles's sword does not have to actually fall . . . before the court will issue an injunction." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). A preliminary injunction is intended to prohibit a defendant from undertaking actions the Court has determined is likely unlawful before those actions are taken.

The threat of illegal action is hardly speculative. The April 21 Letter states in no uncertain terms that if the FHWA determines that New York has not complied with 23 U.S.C. § 301, "FHWA *will* implement appropriate initial compliance measures beginning on or after May 28, 2025, until compliance is achieved, to include" withholding AC authorizations in Manhattan, NEPA approvals in Manhattan, and approval of STIP amendments concerning NYMTC TIP modifications. Dkt. No. 87-10 at 2 (emphasis added). The text of the letter makes clear that the FHWA will implement all three "compliance measures" in addition to potential other measures on or after May 28, 2028. *Id.* Withholding STIP approvals amounts to withholding federal funding because only projects in a STIP that have been approved by the FHWA or FTA are eligible for funds administered by the FHWA or FTA. 23 C.F.R. § 450.222(a); Dkt. No. 90 ¶¶ 30–32. Withholding AC authorizations and NEPA approvals stalls infrastructure projects and causes many of the delay-related harms outlined above. Plaintiffs are not required to wait to seek preliminary injunctive relief until Defendants take the actions they have promised to take imminently.

Courts have repeatedly recognized the irreparable harm inherent to a situation such as the one in which Defendants have presently placed Plaintiffs, in which a plaintiff can either accede to the government's presumptively unlawful threat or else disobey the government's directive and expose itself to potentially devastating injury throughout the pendency of the proceedings. For example, when the Attorney General sought to impose new conditions on an annual federal grant relied on by the City of Chicago for law enforcement initiatives, the Northern District of Illinois held that "forcing the City either to decline the grant funds based on what it believes to be unconstitutional conditions or accept them and face an irreparable harm, is the type of 'Hobson's choice' that supports irreparable harm." *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 950 (N.D. Ill. 2017), *aff'd*, 888 F.3d 272 (7th Cir. 2018) (subsequent history omitted). And when cities

in California were targeted by the President's executive order purporting to prevent so-called sanctuary jurisdictions from receiving federal grants, the Ninth Circuit found irreparable harm in the fact that "[a] total loss of federal funding would be catastrophic, and the Counties' (and their residents') need for certainty renders damages inadequate." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018); *see also City of Los Angeles v. Sessions*, 2018 WL 6071072, at *3 (C.D. Cal. Sept. 13, 2018) ("While Los Angeles makes many arguments as to how it will suffer irreparable injury absent an injunction, this Court finds most persuasive its argument that it is faced with an impossible choice: either it must certify compliance with unconstitutional and unlawful directives that impinge on the City's sovereignty, damage community trust, and harm public safety, or it will lose congressionally authorized . . . funding."), *aff'd sub nom. City of Los Angeles v. Barr*, 941 F.3d 931 (9th Cir. 2019); *City & Cnty. of San Francisco v. Trump*, 2025 WL 1186310, at *3 (N.D. Cal. Apr. 24, 2025) ("The threat to withhold funding causes [plaintiffs] irreparable injury in the form of budgetary uncertainty.").

Defendants argue that those cases are distinguishable because they concern situations in which the government actually identified which funds would be withheld or which approvals would be revoked. Dkt. No. 118 at 30–31. Here the April 21 Letter "identifies a list of broad categories of compliance measures FHWA may take, without determining whether it would impose any such measures at all, let alone actually identifying what specific measure(s) the agency would take within those categories." Dkt. No. 118 at 30–31. But that after-the-fact legal argument misstates both the position the FHWA has taken and the law. The April 21 Letter leaves no uncertainty as to what the FHWA will do if it finds that New York has failed to cease tolling federal-aid highways in connection with the Tolling Program: with exceptions for projects deemed by the FHWA to be essential for safety, the FHWA will withhold AC authorizations in Manhattan,

NEPA approvals in Manhattan, and approval of STIP amendments concerning NYMTC TIP modifications. Dkt. No. 87–10 at 2. There is nothing equivocal about the statement. The only thing it leaves uncertain is whether the "compliance measures" will be taken on May 28, 2025, or at some undefined time thereafter. And the fact that the Secretary has threatened a panoply of injurious compliance measures—some of which the FHWA has stated it "will" take and some of which it may ultimately choose not to pursue—rather than targeting a more limited expenditure of funds, in no way mitigates the irreparable harm Plaintiffs will suffer if, as appears likely, it turns out that the revocation of the VPPP Agreement was unlawful. The federal government may not force states to comply with its dictates by threatening destructive retribution, only to turn around once compliance is secured and claim that it was merely bluffing. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007) (holding that where a plaintiff eliminates "the imminent threat of harm by simply not doing what he claimed the right to do," that will not preclude subject-matter jurisdiction for declaratory relief if "the threat-eliminating behavior was effectively coerced"). For this same reason, the fact that the FHWA may deem certain projects to be "essential for safety" and thus not subject to withheld federal funding or approval is cold comfort. Dkt. No. 87-10 at 2. The FHWA offers no insight into how it will determine which projects, if any, are safety projects. *Id.* Waiting to see what the FHWA will decide with respect to each project will have a destructive impact on Plaintiffs' ability to plan, budget for, and timely pursue infrastructure projects. Dkt. No. 86 ¶¶ 13–14, 17. Injunctive relief may be awarded "[w]hen enforcement actions are imminent," *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992), even if the precise nature of the enforcement remains to be known, *see, e.g.*, *United States v. North Carolina*, 192 F. Supp. 3d 620, 623 n.2 (M.D.N.C. 2016) (enjoining threatened withholding of federal funds because although it was not clear how much funding plaintiffs would lose during the pendency of

this case, "in light of the magnitude of the funds at issue and the nature of the services provided, the court is satisfied that the loss of funding during the pendency of this case will likely be severe enough to constitute irreparable harm").

Defendants next argue that Plaintiffs' "delay" in filing for a preliminary injunction undermines their claims of irreparable harm. Dkt. No. 118 at 29. Defendants argue that because the Secretary announced the purported termination of the VPPP Agreement on February 19, 2025, Plaintiffs' failure to move for injunctive relief until May 5, 2025 is incompatible with their claims of irreparable harm. This argument does not stand up to even cursory review; the timeline reveals that it is Defendants, not Plaintiffs, that have stalled for time.

Plaintiffs have been both prompt and assiduous in pursuing their claims. They filed a 51-page complaint on February 19, 2025, the very day the Secretary announced the purported termination. Dkt. No. 1. As early as April 4, 2025, Plaintiffs alerted the Court to the potential need to seek preliminary injunctive relief, noting their view that the case would be "best resolved through orderly summary judgment and without the exigency that accompanies motions under Rule 65," but also noting that if Defendants acted to withhold funds, Plaintiffs would "act swiftly to assert their rights." Dkt. No. 49 at 4. Plaintiffs noted that the "Federal Defendants ha[d] unilaterally announced shifting deadlines by which, they claim[ed], tolling 'must cease,'" first setting a deadline of March 20, 2025, then setting a deadline of April 20, 2025. *Id.* Plaintiffs stated that they had pressed Defendants as to whether Defendants intended to take "unilateral action on or after April 20 that might require Plaintiffs to seek expedited injunctive relief." *Id.* Defendants were unable to answer. *Id.* And, had Defendants not issued the April 21 Letter, the parties and the Court were on track to have this case resolved in an orderly manner through summary judgment within months without forcing the Court to express a preliminary view.

As it turns out, within weeks of the April 4 Letter, and Defendants' supposed inability to let Plaintiffs know if enforcement measures were imminent, the Secretary issued the April 21 Letter threatening to take action as early as May 28, 2025. Plaintiffs did not wait after receiving that letter to seek the Court's assistance. Plaintiffs responded to the April 21 Letter with alacrity. They informed the Court of the letter on April 23, 2025, noting that the May 28 date was one day after the Defendants were to file their answers and the administrative record in this case and that they would meet and confer with Defendants "on an appropriate schedule to brief a motion for a preliminary injunction preventing the threatened enforcement actions." Dkt. No. 64 at 1–2. Plaintiffs immediately followed up on their commitments. They contacted Defendants on April 24, 2025 and then again on April 29 to arrange a meet-and-confer, but to no avail. Dkt. Nos. 71,70-1. After Defendants ultimately responded on April 30 that they did not see a reason for Plaintiffs to file a preliminary injunction motion, Plaintiffs offered to postpone seeking a briefing schedule for preliminary injunctive relief if the Defendants would agree not to take enforcement action, even temporarily. *Id.* at 2. Defendants declined. It was at that point, on May 2, 2025, that Plaintiffs proposed to the Court a briefing schedule that would require motions for a preliminary injunction to be filed just three days later by May 5, 2025, with a condensed briefing schedule to follow. Dkt. No. 71-1. This speedy course of action is consistent with Plaintiffs' claims of irreparable harm resulting from Defendants' threatened enforcement.

It is true that a delay in bringing suit or moving for injunctive relief may "undercut[] the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggest[] that there is, in fact, no irreparable injury." *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (quoting *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985)). But there is no evidence of delay.

Plaintiffs have demonstrated that they would be irreparably harmed absent a preliminary injunction.

## VI.    Balance of the Equities and the Public Interest

Under the last injunction factor, courts must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,' as well as 'the public consequences in employing the extraordinary remedy of injunction.'" *Yang*, 960 F.3d at 135–36; *see also We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021) ("When the government is a party to the suit, [the] inquiries into the public interest and the balance of the equities merge."); *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020). Enjoining enforcement of the Secretary's purported termination of the VPPP Agreement pending a final decision on the merits is in the public interest.

Plaintiffs' "extremely high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest" because "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12; *accord Make the Rd. New York v. Pompeo*, 475 F. Supp. 3d 232, 269 (S.D.N.Y. 2020) ("[T]here is no public interest in allowing Defendants to proceed with unlawful, arbitrary, and capricious executive or agency actions that exceed their statutory authority."). "An agency is not harmed by an order prohibiting it from violating the law." *New York*, 2025 WL 715621, at *16. "To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Newby*, 838 F.3d at 12 (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)); *accord Planned Parenthood of N.Y.C., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018) ("Forcing federal agencies to comply with the law is undoubtedly in the public interest.").

Denying a preliminary injunction would cause Plaintiffs hardship and harm the public by endangering the vital transportation infrastructure Plaintiffs provide.  The budget uncertainty caused by Plaintiffs' predicament interferes with Plaintiffs' abilities to plan or manage upcoming projects.  *See Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 539 (N.D. Cal. 2017) (holding that balance of the harm supported issuance of an injunction because the plaintiffs "have a strong interest in avoiding unconstitutional federal enforcement and the significant budget uncertainty that has resulted from the Order's broad and threatening language").  If forced to stop tolling or if denied federal funds, the MTA would be forced to cancel or halt projects designed to promote access to transit for individual with disabilities, to decrease subway delays, and to increase transit options throughout the city.  Dkt. No. 85 ¶ 35.  Absent federal funding or approvals, the NYSDOT and NYCDOT would be unable to move forward with numerous projects necessary to ensure smooth and safe operation of the roads in New York.  Dkt. No. 86 ¶¶ 13–14; Dkt. No. 90 ¶¶ 37– 53.  These projects not only serve important public safety goals but are also critical to the region's economy by directly employing workers and facilitating transportation throughout the state. Forcing Plaintiffs to forego or delay these projects causes Plaintiffs hardship and disserves the public interest.  *See New York ex rel. James v. Rescue*, 705 F. Supp. 3d 104, 137 (S.D.N.Y. 2023) (holding that "ensuring public safety" is in the public interest and weighs in favor of granting preliminary injunction); *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) (subsequent history omitted) (public interest supported preliminary injunction where a pause in funding "placed critical programs for children, the elderly, and everyone in between in serious jeopardy"); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 298 (W.D. La. 2022) (recognizing that balance of equities and public interest weighed in favor of granting

preliminary injunction where "[l]ocal government funding, jobs for Plaintiff States' workers, and funds for the restoration of Louisiana's Coastline are at stake").

Ceasing operation of the Tolling Program would also harm the public by depriving it of the benefits the Tolling Program creates. Plaintiffs provide evidence that the Tolling Program has led to positive outcomes for the region. Traffic in the CBD has decreased substantially and commuter time and trip reliability have substantially improved. Nearly six million fewer vehicles entered the CBD in January through March of 2025 than would be expected based on data from previous years. Dkt. No. 85 ¶ 25(a). River crossing times improved with commuters who travel through the Holland Tunnel enjoying 45% faster crossings. *Id.* ¶ 25(c)–(d). Traffic speeds improved by 31% on the Queensboro Bridge and by 26% on the Brooklyn Bridge. Trip times from Brooklyn and Queens to the CBD have dropped between 10% and 30%. *Id.* Traffic speeds within the CBD have increased by 15%. *Id.* ¶ 25(h). Commuters are saving as much as 21 minutes on their trips. *Id.* ¶ 25(e). School children are getting to school on time more frequently and are regaining up to half an hour of instructional time. Dkt. No. 115 at 4–5, 8–9. Retail sales, pedestrian traffic, hotel occupancy, and leasing have all increased. Dkt. No. 85 ¶ 26. In sum, the reduction in congestion caused by the Tolling Program offers not only superior environmental outcomes, but also increased productivity, improvements to health and safety, more instruction time for schoolchildren, and beneficial economic outcomes. Defendants do not seriously contest that the operation of the Tolling Programs confers these benefits or that such benefits support a preliminary injunction. *See U.S. Dep't of Homeland Sec.*, 969 F.3d at 87 (concerns of "[r]educed productivity and educational attainment" absent injunctive relief support preliminary injunction); *New York v. U.S. Dep't of Homeland Sec.*, 408 F. Supp. 3d 334, 351 (S.D.N.Y. 2019) ("[P]reventing the alleged economic and public health harms provides a significant public benefit"), *aff'd as modified*, 969

F.3d 42; *see also Weed v. Jenkins*, 2015 WL 6555413, at *4 (E.D. Mo. Oct. 28, 2015) (recognizing that "promoting safety upon the highways[] and regulating traffic flow" is in the public interest).[72]

Defendants identify little harm to the public that would follow from a preliminary injunction. They note that there is a public interest in pursuing agency priorities, including that taxpayers should not pay to use federal-aid highways. Dkt. No. 118 at 57–58. Although Defendants may have a valid interest in pursuing their preferred transportation policy, the Second Circuit has held that absent the need to correct an unlawful previous policy, an agency's inability to implement its preferred policy does not outweigh the "wide-ranging economic harms that await the States" upon implementation of the new policy. *U.S. Dep't of Homeland Sec.*, 969 F.3d at 87. Furthermore, if it is later determined that Plaintiffs in fact lacked the authority to continue tolling, all motorists who paid the toll can be made whole. The majority of current toll payers (between 92% and 95%) use E-ZPass. Dkt. No. 85 ¶ 39. Plaintiffs may refund any improperly collected tolls directly to such drivers by crediting their E-ZPass accounts. The remaining motorists who do not use E-ZPass can likewise be refunded by the same mechanism they used to pay the bill— either refund to a credit card, cash at an authorized payment facility, or check sent by mail. *Id.*

---

[72] Defendants cite an article stating that traffic has gone up in some parts of the Bronx. Dkt. No. 118 at 8–9, 58 (citing Hilary Howard, *The South Bronx Has a Pollution Issue. Congestion Pricing May Worsen It*, N.Y. Times (Feb. 2, 2025), https://www.nytimes.com/2025/02/02/nyregion/congestion-pricing-air.html). But the article summarizes "preliminary data from the first two weeks of congestion pricing" and states that "[i]t's still too early to draw any conclusions about traffic in the South Bronx and its link to congestion pricing." Howard, *The South Bronx Has a Pollution Issue.* In response, Plaintiffs cite a more recent article which reported that "[t]raffic has not surged in the South Bronx." Dkt. No. 124 at 30 n.26 (citing Emily Bader, *Here Is Everything That Has Changed Since Congestion Pricing Started*, N.Y. Times (May 11, 2025), https://www.nytimes.com/interactive/2025/05/11/upshot/congestion-pricing.html). That more recent article states that "the number of vehicles traveling daily on the Cross Bronx Expressway was down slightly in January through April, compared with last year, according to the New York State Department of Transportation" and travel speeds increased during weekday work hours. *See* Bader, *Here Is Everything That Has Changed Since Congestion Pricing Started*.

¶ 40.  Given these circumstances, the prospect that individuals will be forced to pay a potentially invalid but refundable toll do not weigh strongly against an injunction.

Plaintiffs adequately demonstrate that the balance of the equities and the public interest weigh in favor of a preliminary injunction.

## CONCLUSION

Plaintiffs have established a likelihood of success on the merits for their claims that Defendants acted arbitrarily and capriciously by purporting to terminate the VPPP Agreement in the February 19 Letter except for the portion of Plaintiffs' argument resting upon Defendants' failure to perform a subsequent NEPA review.  Plaintiffs have adequately shown that they would be irreparably injured absent an injunction, and that the balance of the equities and the public interest support an injunction.  Because each factor weighs in favor of a preliminary injunction, Plaintiffs' motions for a preliminary injunction are GRANTED.

Consistent with the above findings of fact and conclusions of law, the Court issues the following injunction:

Defendants Sean Duffy, in his official capacity as Secretary of the United States Department of Transportation, Gloria M. Shepherd, in her official capacity as Executive Director of the Federal Highway Administration, the United States Department of Transportation, and the Federal Highway Administration as well as all persons identified under Federal Rule of Civil Procedure 65(d)(2), including all of Defendants' respective officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with any of the foregoing, are enjoined from taking any agency action founded on the February 19, 2025 letter from Secretary Duffy to Governor Hochul purporting to terminate the VPPP Agreement and rescind federal approval for New York's Central Business District Tolling Program, including any action to enforce compliance with or implement (1) the February 19 Letter, (2) Defendants'

purported termination of the VPPP Agreement, or (3) Defendants' purported termination of the Tolling Program.  For the avoidance of doubt, Defendants are enjoined from taking any of the "compliance measures" set forth in the April 21, 2025 Letter including withholding federal funds, approvals, or authorizations from New York state or local agencies to enforce compliance with or implement (1) the February 19 Letter, (2) Defendants' purported termination of the VPPP Agreement, or (3) Defendants' purported termination of the Tolling Program.

The Clerk of Court is respectfully directed to close Dkt. Nos. 82 and 88.

SO ORDERED.

Dated: May 28, 2025
New York, New York

_____
LEWIS J. LIMAN
United States District Judge