## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| METROPOLITAN TRANSPORTATION AUTHORITY and TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY,<br><br>*Plaintiffs*,<br><br>and<br><br>NEW YORK STATE DEPARTMENT OF TRANSPORTATION, RIDERS ALLIANCE, SIERRA CLUB, and NEW YORK CITY DEPARTMENT OF TRANSPORTATION,<br><br>*Intervenor-Plaintiffs*,<br><br>v.<br><br>SEAN DUFFY, in his official capacity as Secretary of the United States Department of Transportation, GLORIA M. SHEPHERD, in her official capacity as Executive Director of the Federal Highway Administration, UNITED STATES DEPARTMENT OF TRANSPORTATION, and FEDERAL HIGHWAY ADMINISTRATION,<br><br>*Defendants*. | Case No. 25 Civ. 1413 (LJL) |

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT BY
## PLAINTIFFS THE MTA AND TBTA AND INTERVENOR-PLAINTIFF NYCDOT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................ 1

RELEVANT BACKGROUND ............................................................................................. 2

APPLICABLE STANDARD................................................................................................. 6

ARGUMENT ........................................................................................................................ 7

    I.   The Court Has Jurisdiction Over Plaintiffs' Claims ......................................................... 8

        A.    The February 19 and April 21 Letters are final ....................................... 8

        B.    Plaintiffs' claims are ripe ................................................................... 10

        C.    The Tucker Act does not apply ........................................................... 12

    II.  Defendants' Termination of the VPPP Agreement and Rescission of Tolling
        Authorization Were Arbitrary and Capricious and Contrary to Law ........................ 15

        A.    Defendants do not have authority to terminate the VPPP Agreement.................. 15

        B.    The rationales articulated in the February 19 Letter are arbitrary and capricious 17

            i.    *The VPPP authorizes cordon pricing programs* ....................................... 18

            ii.    *The VPPP authorizes tolling programs that are intended to generate
                 revenue, including for public transit projects* ........................................... 21

        C.    Defendants' purported policy concerns do not support the termination.............. 22

            i.    *Defendants' policy concerns are* post hoc *rationales that cannot
                 support their action and should not be considered* .................................. 23

            ii.    *To the extent they are considered, the Secretary's policy concerns
                 do not stand on their own* ........................................................................ 23

        D.    Defendants did not adequately consider or weigh Plaintiffs' reliance interests ... 25

III. Remedy ............................................................................................................. 28

    A.    The Court should vacate Defendants' letters ........................................ 28

    B.    Equitable relief is warranted ................................................................ 29

CONCLUSION ......................................................................................................... 33

## TABLE OF AUTHORITIES

**CASES**

*6801 Realty Co., LLC v. U.S.C.I.S.*,
719 F. App'x 58 (2d Cir. 2018) .................................................................. 9

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967) ................................................................................... 12

*Aleutian Cap. Partners, LLC v. Scalia*,
975 F.3d 220 (2d Cir. 2020) ....................................................................... 6

*Allina Health Servs. v. Sebelius*,
746 F.3d 1102 (D.C. Cir. 2014) ............................................................... 29

*Am. Bioscience, Inc. v. Thompson*,
269 F.3d 1077 (D.C. Cir. 2001) .................................................................. 6

*Am. Hosp. Ass'n v. Becerra*,
738 F. Supp. 3d 780 (N.D. Tex. 2024) ..................................................... 33

*Am. Trucking Assocs., Inc. v. N.Y. State Thruway Auth.*,
886 F.3d 238 (2d Cir. 2018) ..................................................................... 22

*Bennett v. Spear*,
520 U.S. 154 (1997) ..................................................................................... 8

*Bond v. United States*,
572 U.S. 844 (2014) ................................................................................... 22

*BP P.L.C. v. Mayor & City Council of Baltimore*,
141 S. Ct. 1532 (2021) .............................................................................. 19

*Caviezel v. Great Neck Pub. Sch.*,
500 F. App'x 16 (2d Cir. 2012) .................................................................. 7

*Caviezel v. Great Neck Pub. Sch.*,
814 F. Supp. 2d 209 (E.D.N.Y. 2011) ........................................................ 7

*Chan v. U.S. Dep't of Transp.*,
2024 WL 5199945 (S.D.N.Y Dec. 23, 2024) ..................................... 22, 24

*Chemical Mfrs. Ass'n v. E.P.A.*,
28 F.3d 1259 (D.C. Cir. 1994) ................................................................. 29

*City of New York v. Gordon,*
   155 F. Supp. 3d 411 (S.D.N.Y. 2015) ................................................................. 7

*Climate United Fund v. Citibank, N.A.,*
   2025 WL 1131412 (D.D.C. Apr. 16, 2025) ......................................................... 16

*Cmty. Legal Servs. v. H.H.S.,*
   137 F.4th 932 (9th Cir. 2025) ............................................................................. 13

*Corley v. United States,*
   556 U.S. 303 (2009) ............................................................................................ 16

*Crowley Government Services, Inc. v. General Services Administration,*
   38 F.4th 1108 (2022) .......................................................................................... 14

*CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.,*
   637 F.3d 408 (D.C. Cir. 2011) ........................................................................... 10

*D.H.S. v. Regents of the Univ. of Cal.,*
   591 U.S. 1 (2020) .................................................................................... 23, 26, 28

*Dep't of Com. v. New York,*
   588 U.S. 752 (2019) ............................................................................................ 18

*Dep't of Educ. v. California,*
   145 S. Ct. 966 (2025) .......................................................................................... 14

*Earman v. United States,*
   114 Fed. Cl. 81 (2013) ........................................................................................ 17

*Earman v. United States,*
   589 F. App'x 991 (Fed. Cir. 2015) ..................................................................... 17

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.,*
   36 F.4th 850 (9th Cir. 2022) ......................................................................... 31, 32

*Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.,*
   405 U.S. 707 (1972) ............................................................................................ 22

*F.C.C. v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ............................................................................................ 26

*Faiveley Transp. USA, Inc. v. Wabtec Corp.,*
   2011 WL 1899730 (S.D.N.Y. May 13, 2011) ....................................................... 7

*Ford Motor Co. v. N.L.R.B.*,
  305 U.S. 364 (1939) ........................................................................................ 29

*Freeman v. Giuliani*,
  2024 WL 5239410 (S.D.N.Y. Dec. 27, 2024) ...................................................... 33

*Guertin v. United States*,
  743 F.3d 382 (2d Cir. 2014) ............................................................................. 29

*Hall v. McAleenan*,
  2019 WL 5394627 (D.C. Cir. Oct. 3, 2019) ........................................................ 14

*Hall v. Nielsen*,
  2019 WL 250972 (D.D.C. Jan. 17, 2019) ............................................................ 14

*Hous. Auth. v. United States*,
  140 Fed. Cl. 773 (2018) ................................................................................... 14

*Johnson v. Holder*,
  564 F.3d 95 (2d Cir. 2009) ................................................................................. 7

*Kakar v. U.S.C.I.S.*,
  29 F.4th 129 (2d Cir. 2022) ............................................................................. 23

*Lanvin, Inc. v. Colonia, Inc.*,
  776 F. Supp. 125 (S.D.N.Y. 1991) ....................................................................... 7

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ............................................................................. 31

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) .................................................................................. 25, 28

*Malletier v. Dooney & Bourke, Inc.*,
  561 F. Supp. 2d 368 (S.D.N.Y. 2008) .................................................................. 7

*Mantena v. Hazuda*,
  2018 WL 3745668 (S.D.N.Y. Aug. 7, 2018) .......................................................... 9

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C. Cir. 1982) .................................................................... 14, 15

*Mendis v. Filip*,
  554 F.3d 335 (2d Cir. 2009) ............................................................................. 22

*Metro. Transp. Auth. v. Duffy,*
  2025 WL 1513369 (S.D.N.Y. May 28, 2025) ................................................................ *passim*

*Michigan v. E.P.A.,*
  576 U.S. 743 (2015) ........................................................................................................ 23

*Minard Run Oil Co. v. U.S. Forest Serv.,*
  549 F. App'x 93 (3d Cir. 2013) ...................................................................................... 33

*Minard Run Oil Co. v. U.S. Forest Serv.,*
  894 F. Supp. 2d 642 (W.D. Pa. 2012) ............................................................................ 33

*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010) .................................................................................................. 30, 31

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ............................................................................................................ 7

*Murphy v. New Milford Zoning Comm'n,*
  402 F.3d 342 (2d Cir. 2005) ........................................................................................... 11

*N.L.R.B. v. SW General, Inc.,*
  580 U.S. 288 (2017) ........................................................................................................ 19

*Nat'l Job Corps Ass'n v. Dep't of Lab.,*
  2025 WL 1752414 (S.D.N.Y. June 25, 2025) ........................................................... 12, 13

*Nat'l Org. for Marriage, Inc. v. Walsh,*
  714 F.3d 682 (2d Cir. 2013) ........................................................................................... 12

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
  538 U.S. 803 (2003) ........................................................................................................ 10

*Nat'l Ski Areas Ass'n, Inc. v. U.S. Forest Serv.,*
  910 F. Supp. 2d 1269 (D. Colo. 2012) ........................................................................... 32

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.,*
  434 U.S. 1345 (1977) ...................................................................................................... 30

*New York v. D.H.S.,*
  414 F. Supp. 3d 475 (S.D.N.Y. 2019) ............................................................................ 12

*New York v. Trump,*
  2025 WL 573771 (S.D.N.Y. Feb. 21, 2025) ................................................................... 25

*New York v. U.S. Dep't of Com.*,
  351 F. Supp. 3d 502 (S.D.N.Y.) .................................................................... *passim*

*New York v. U.S. Dep't of Com.*,
  588 U.S. 752 (2019) ................................................................................................ 29

*NLRB v. Wyman–Gordon Co.*,
  394 U.S. 759 (1969) ................................................................................................ 29

*Normandy Apartments, Ltd. v. H.U.D.*,
  554 F.3d 1290 (10th Cir. 2009) ............................................................................ 14

*Pacito v. Trump*,
  2025 WL 893530 (W.D. Wash. Mar. 24, 2025) .................................................. 14

*Pharaohs GC, Inc. v. S.B.A.*,
  990 F.3d 217 (2d Cir. 2021) .................................................................................. 16

*Pursuing Am. Greatness v. F.E.C.*,
  831 F.3d 500 (D.C. Cir. 2016) .............................................................................. 30

*Ramirez v. I.C.E.*,
  568 F. Supp. 3d 10 (D.D.C. 2021) ........................................................................ 31

*Reiter v. Sonotone Corp.*,
  442 U.S. 330 (1979) ................................................................................................ 16

*RFE/RL, Inc. v. Lake*,
  2025 WL 1232863 (D.D.C. Apr. 29, 2025) ........................................................ 13

*Sackett v. E.P.A.*,
  566 U.S. 120 (2012) ............................................................................................ 9, 10

*Seafarers Int'l Union v. U.S. Coast Guard*,
  736 F.2d 19 (2d Cir. 1984) .................................................................................... 11

*Sharkey v. Quarantillo*,
  541 F.3d 75 (2d Cir. 2008) .................................................................................... 11

*Simmonds v. I.N.S.*,
  326 F.3d 351 (2d Cir. 2003) .................................................................................. 10

*Spectrum Leasing Corp. v. United States*,
  764 F.2d 891 (D.C. Cir. 1985) .............................................................................. 14

**STATUTES**

5 U.S.C. § 706 ........................................................................................... 6, 28

23 U.S.C. § 129 .............................................................................................. 18

23 U.S.C. § 142 .............................................................................................. 21

23 U.S.C. § 301 ...................................................................................... 3, 12, 18

ISTEA § 1012 ........................................................................................... 19, 22

**REGULATIONS**

2 C.F.R. § 200.211(c)(2) ................................................................................ 17

2 C.F.R. § 200.340 ....................................................................... 15, 16, 17, 27

*Guidance for Federal Financial Assistance*, 89 Fed. Reg. 30046, 30089 (Apr. 22, 2024).......... 16

**RULES**

Fed. R. Civ. P. 56 ........................................................................................... 6

Fed. R. Civ. P. 65 ........................................................................................... 7

**OTHER AUTHORITIES**

Antonin Scalia & Bryan A. Garner,
    *Reading Law: The Interpretation of Legal Texts* 359 (2012) .................................................. 19

*Contractors & Recipients General Terms and Conditions for Assistance Awards*,
    FHWA (Aug. 2, 2023),
    https://www.fhwa.dot.gov/cfo/contractor_recip/gtandc_after2023aug07.cfm ........................ 17

*Statement by President George Bush Upon Signing H.R. 2950*, 1991 U.S.C.C.A.N. 1865 ......... 19

Plaintiffs the Metropolitan Transportation Authority ("MTA") and Triborough Bridge and Tunnel Authority ("TBTA"), an MTA affiliate, and Intervenor-Plaintiff New York City Department of Transportation ("NYCDOT") respectfully submit this memorandum of law in support of their motion for partial summary judgment.[1]

## PRELIMINARY STATEMENT

One month ago, on May 27, this Court held a hearing and issued a temporary restraining order ("TRO") barring Defendants from taking any action based on Secretary Duffy's February 19 Letter purporting to terminate the VPPP Agreement and rescind federal approval for the Central Business District Tolling Program.[2]  ECF 129.  The next day, after Defendants produced the Administrative Record, the Court issued a 109-page Opinion and Order that converted its TRO into a preliminary injunction ("May 28 Opinion and Order").  ECF 132.  Based on the record before it, the Court, after concluding that it had jurisdiction, held that Plaintiffs had established a likelihood of success on the merits with respect to the following: (1) the February 19 Letter is arbitrary and capricious because Defendants do not have authority to terminate the VPPP Agreement absent a breach of its terms; (2) the Secretary's stated justifications for termination were based on an erroneous reading of the VPPP statute; (3) the Secretary could not rely on *post hoc* policy rationales to justify his decision to terminate; and (4) the Secretary failed to adequately

---

[1] As used herein, "Plaintiffs" refers to the MTA, TBTA, and NYCDOT.  "DOT_" refers to Bates-numbered pages in the Administrative Record filed by Defendants on May 27, 2025 (ECF 130); "PI Brief" to Plaintiffs' memorandum in support of their motion for a preliminary injunction (ECF 83); "PI Opp." to Defendants' consolidated memorandum in opposition to Plaintiffs' motions for a preliminary injunction (ECF 118); "PI Reply" to Plaintiffs' reply memorandum in further support of their motion for a preliminary injunction (ECF 124); and "Tr." to the transcript of the May 27, 2025 oral argument on the motion for a preliminary injunction, a copy of which is attached as Exhibit 1 to the Declaration of D. Brandon Trice.  Unless otherwise noted herein, all defined terms have the same meaning as provided in Plaintiffs' briefing on that motion (ECF 83, 124).

[2] The February 19 Letter is available at ECF 87-5 and DOT_0047570-74; the April 21 Letter is available at ECF 87-10 and DOT_0047577-80; and the VPPP Agreement is available at ECF 87-1 and DOT_0047549-57. For convenience, all other record materials are identified with citations to the docket and to the Administrative Record.

consider Plaintiffs' reliance interests. *Metro. Transp. Auth. v. Duffy*, --- F. Supp. 3d ---, 2025 WL 1513369, at *48 (S.D.N.Y. May 28, 2025) ("*Duffy*").

Plaintiffs now move for partial summary judgment on their APA claims (apart from pretext) (Counts I-IV), and on their *ultra vires* claim (Count VII). Since these claims do not require discovery, the record is sufficient to obtain the full relief that we seek by this motion, which we believe should be granted for the reasons stated in the May 28 Opinion and Order. Nothing has changed between then and now that would warrant the Court revisiting its findings of fact and conclusions of law. Indeed, the Administrative Record filed by Defendants is the same record the Court had before it when issuing its May 28 Opinion and Order. Accordingly, based on the rationale set forth in the May 28 Opinion and Order, the Court should grant Plaintiffs' motion for partial summary judgment on their APA and *ultra vires* claims, vacate Defendants' actions, and issue permanent injunctive relief and/or a declaratory judgment holding unlawful the purported VPPP Agreement termination and prohibiting any future termination other than in the event of a material breach by the Project Sponsors.

## RELEVANT BACKGROUND

The relevant factual and procedural background is set forth in Plaintiffs' briefing on their motion for a preliminary injunction, ECF 83, 124; this Court's May 28 Opinion and Order, *Duffy* at *1-17; and the Administrative Record submitted by Defendants on May 27, ECF 130.

The MTA and TBTA commenced this action on February 19, 2025, the same day that Secretary Duffy sent a letter to Governor Hochul purporting to rescind Defendants' approval of the Program and terminate the VPPP Agreement. Feb. 19 Ltr.; ECF 1. They sought vacatur of that decision, a declaratory judgment, and injunctive relief. ECF 1, 62, 96. The Court subsequently granted motions by the Riders Alliance, Sierra Club, New York State Department of Transportation ("NYSDOT"), and NYCDOT to intervene. *Duffy* at *1. Following two 30-day extensions of time

to comply with the purported termination, on April 21, Duffy sent another letter reiterating that the VPPP Agreement had been terminated as of February 19. That letter also asserted new, *post hoc* policy reasons for terminating the VPPP Agreement, ordered NYSDOT to "show cause" why the continuation of the Program did not violate 23 U.S.C. § 301, and threatened to "implement appropriate initial compliance measures" enumerated in the letter on or after May 28 if New York continued to operate the Program. Apr. 21 Ltr.

Accordingly, on May 5, Plaintiffs moved for a preliminary injunction to prevent Defendants from illegally withholding federal transportation project approvals and funding and from taking any other acts intended to coerce the cessation of the Program. PI Brief. On May 21, the Project Sponsors submitted letter responses to the April 21 Letter in which they explained that Secretary Duffy's asserted rationale for terminating the VPPP Agreement was contrary to the ordinary meaning of the VPPP and inconsistent with FHWA's longstanding interpretation of the statute, and that Secretary Duffy has no authority to terminate the Program or implement his threatened compliance measures. *See* DOT_0047581-8699 (ECF 125-1, 125-2, 125-3, 125-4). The Project Sponsors attached to their submissions many of their filings in this action to date. *Id.*

On May 27, after a two-hour hearing, the Court issued a TRO prohibiting Defendants from taking any action "founded on the February 19, 2025 letter" or from taking any of the "'compliance measures' set forth in the April 21, 2025 letter." ECF 129 at 1. As stated on the record at the hearing, the Court held that "the plaintiffs have demonstrated a likelihood of success on their claims that … the Secretary did not have the authority to terminate the VPPP Agreement, and even if he had the authority, the reasons for terminating rested on errors of law and w[ere] arbitrary and capricious." Tr. 61:25-62:5. The Court also found that Plaintiffs faced irreparable harm absent relief and that the balance of the equities and the public interest weighed in favor of an injunction.

3

*Id.* at 62:6-63:11.  Accordingly, the Court enjoined Defendants "from withholding federal funds, approvals, or authorizations from New York State or local agencies to enforce compliance with or implement the February 19 letter, defendants' purported termination of the VPPP agreement, or defendants' purported termination of the [tolling] program."  *Id.* at 64:2-6; *accord* ECF 129.

On that same day, Defendants filed the Administrative Record, which consists of 1,389 pages, almost all of which is made up of Plaintiffs' filings in this case.  ECF 130.[3]  Indeed, this Court already considered all of the relevant documents in the Administrative Record in reaching its decision to grant a TRO on May 27.  For example, the February 19 Letter, filed now as DOT_0047570-74, was before the Court as ECF 87-5; the March 20 Letter, now DOT_0047576, was ECF 87-8; and the April 21 Letter, now DOT_0047577-80, was ECF 87-10.  The Administrative Record also contains Plaintiffs' Second Amended Complaint, DOT_0048039-158, as well as the declarations and exhibits submitted by Plaintiffs in support of their motion for a preliminary injunction, DOT_0047883-94 (Declaration of Kevin Willens); DOT_0047967-87 (Declaration of Allison L. C. de Cerreño, Ph.D.); DOT_0047917-26 (Declaration of William Carry); DOT_0047927-65 (Declaration of D. Brandon Trice).  The only new documents submitted by Defendants as part of the Administrative Record on May 27 are NYSDOT's response to the April 21 Letter and two letters from New Jersey officials that are not relevant to the merits.[4]  In other words, the Administrative Record does not include any new documents supporting Defendants' positions in this action.

---

[3] Defendants have also incorporated by reference the administrative record previously filed in prior litigation challenging FHWA's NEPA review of the Program, all of which pre-dates Secretary Duffy's incumbency.  ECF 130.

[4] The first letter is from New Jersey Department of Transportation Commissioner Francis O'Connor, dated January 20, 2025, to Secretary Duffy (DOT_0047558-67).  The second letter is from New Jersey Governor Phil Murphy, also dated January 20, 2025, to President Trump (DOT_0047568-69).  Both letters reflect the New Jersey officials' request that FHWA reconsider its approval of the Program, but not on the grounds that the Secretary later relied upon.

On May 28, with the full Administrative Record before it, the Court converted its TRO into a preliminary injunction that extended injunctive relief to the end of this case. In its May 28 Opinion and Order, the Court specifically concluded that Plaintiffs were likely to succeed in establishing jurisdiction because they have challenged a final agency action, the challenge is ripe, and the Tucker Act does not deprive the Court of jurisdiction. *Duffy* at *18-26.[5] The Court further held that Plaintiffs are likely to succeed on the merits of the claims on which they seek summary judgment in the instant motion. First, "[i]n the absence of agreement by the Project Sponsors, the VPPP Agreement can be terminated only if the Project Sponsors fail to comply with a term and condition of the VPPP Agreement." *Id.* at *28. Second, "the Secretary's decision to terminate the VPPP Agreement because the statute does not authorize cordon pricing programs," or "does not authorize tolls that are 'calculated based on considerations separate from reducing congestion or advancing other road-related goals,'" "was arbitrary and capricious" because it was based on an erroneous reading of the statute. *Id.* at *35. Third, the Secretary could not rely on *post hoc* "policy" rationales to justify his termination of the VPPP Agreement and rescission of approval in the February 19 Letter. *Id.* at *36-37.[6] Finally, the Secretary failed to adequately consider Plaintiffs' reasonable and significant reliance interests. *Id.* at *41.

Given this conclusion, the Court found that it was unnecessary to address Plaintiffs' claims that Defendants' threatened "compliance measures" violate the Spending Clause, the Tenth Amendment, and the Separation of Powers (Counts IX-X), because any ruling on the claims would amount to "an advisory opinion." *Id.*[7]

---

[5] As the Court observed, it is unclear whether the finality requirement is jurisdictional or not, but it does not make a difference here. *Id.* at 18 n.53.

[6] The Court also observed there were "reasons to doubt" those policy concerns would support termination even if they had been properly relied upon given the record here. *Id.*

[7] Similarly, because summary judgment on their other APA claims would be sufficient to afford Plaintiffs all the relief sought in this action, consistent with allowing for an earlier resolution and with principles of judicial economy,

The Court further held that Plaintiffs would be irreparably harmed absent a preliminary injunction and that the balance of the equities and the public interest weighed in favor of a preliminary injunction. *Id.* at *47-48. Accordingly, the Court enjoined Defendants and the persons identified under Federal Rule of Civil Procedure 65(d)(2) "from taking any action founded on the February 19, 2025 letter, … including any action to enforce compliance with or implement (1) the February 19 Letter, (2) Defendants' purported termination of the VPPP Agreement, or (3) Defendants' purported termination of the Tolling Program." *Id.* at *49.

## APPLICABLE STANDARD

Under Federal Rule of Civil Procedure 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine despite as to any material fact and the movant is entitled to judgment as a matter of law." When parties move for summary judgment in an APA challenge to agency action, "the district judge sits as an appellate tribunal. The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). Accordingly, "a district court's procedural decision to award summary judgment is generally appropriate." *Aleutian Cap. Partners, LLC v. Scalia*, 975 F.3d 220, 229 (2d Cir. 2020).

Under the APA, courts must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). An agency's decision is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the

---

Plaintiffs do not seek judgment with respect to their constitutional, pretext, or NEPA claims at this time, but rather reserve their right to pursue such claims in the event the instant motion is denied.

product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The law of the case doctrine "commands that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages of the same case, unless cogent and compelling reasons militate otherwise." *Johnson v. Holder*, 564 F.3d 95, 99-100 (2d Cir. 2009) (cleaned up).  Although a court's analysis in ruling on a motion for preliminary injunctive relief is ordinarily non-final, the court may "consider [its] findings of fact and conclusions of law in a prior motion for preliminary injunction" when "determining a motion for summary judgment." *Malletier v. Dooney & Bourke, Inc.*, 561 F. Supp. 2d 368, 382 n.100 (S.D.N.Y. 2008) (quoting *Lanvin, Inc. v. Colonia, Inc.*, 776 F. Supp. 125, 127 (S.D.N.Y. 1991)); *see also* Fed. R. Civ. P. 65(a)(2) ("[E]vidence that is received on the [preliminary injunction] motion and that would be admissible at trial becomes a part of the trial record[.]").  The court's prior findings of fact in connection with granting preliminary injunctive relief are "entitled to persuasive weight," *Faiveley Transp. USA, Inc. v. Wabtec Corp.*, 2011 WL 1899730, at *7 n.5 (S.D.N.Y. May 13, 2011), and its conclusions of law are owed "a certain amount of deference" at later stages of the litigation, *City of New York v. Gordon*, 155 F. Supp. 3d 411, 419 (S.D.N.Y. 2015); *cf. Caviezel v. Great Neck Pub. Sch.*, 814 F. Supp. 2d 209, 213 (E.D.N.Y. 2011), *aff'd*, 500 F. App'x 16 (2d Cir. 2012) (where plaintiff presented "no additional evidence to the Court beyond what was adduced at the preliminary injunction hearing," prior "analysis of that evidence" would inform court's decision at summary judgment).

## ARGUMENT

This case presents the relatively unusual situation in which the record before the Court on summary judgment is the same as the record that the Court considered when it granted Plaintiffs' motion for a preliminary injunction.  *Compare* ECF 130 *with* ECF 84-87, 91.  That motion—which

largely presented legal arguments that did not involve any disputed issues of fact—drew entirely on documents in the Administrative Record filed by Defendants on May 27, including the February 19 and April 21 Letters, the declarations submitted by Plaintiffs in this case, ECF 84-87, 91, and the relevant legislative and administrative materials collected and cited in the Second Amended Complaint. Defendants have not submitted any new records to support the February 19 Letter, apart from the two letters from New Jersey that are not material, as noted above. As a result, the present motion for summary judgment raises identical issues to those already decided by the Court.

## I.      The Court Has Jurisdiction Over Plaintiffs' Claims

### A.      The February 19 and April 21 Letters are final

As this Court has already held, "the text of Defendants' communications makes clear [that] FHWA's 'deliberation' over whether to terminate the VPPP Agreement and whether New York is in violation of the law is at an end." *Duffy* at *19; *see also* Feb. 19 Ltr. Indeed, Defendants' counsel confirmed at oral argument that, in their view, "the previous Administration lacked the lawful authority to sign the VPPP Agreement, that the VPPP Agreement has been terminated and that, accordingly, the [] Program is unlawful." *Duffy* at *19. This unmistakably marks the consummation of the agency's decision to terminate the VPPP Agreement. And there is no question that legal consequences flow from the letters sent by Defendants to Plaintiffs. As the Court recognized, the February 19 Letter, "if valid, imposes a 'legal obligation' upon Plaintiff to cease operation of the Tolling Program[,] … puts Plaintiffs at risk of legal sanctions … [and] has endangered Plaintiffs' ability to issue bonds" to fund capital improvements critical to the MTA's regional public transit system. *Id.* at *22. Thus, the requirements of finality under *Bennett v. Spear*, 520 U.S. 154 (1997), have been "satisfied here," *Duffy* at *19.

Defendants' insistence that their termination decision is part of some "larger, unfolding administrative process," and thereby deprives the Court of jurisdiction, also fails. PI Opp. at 14. As the Supreme Court explained in *Sackett v. E.P.A.*, "an agency action is final when the text of the agency's order 'makes clear' that its deliberation as to whether plaintiffs violated the law 'is at an end.'" *Duffy* at *19 (quoting 566 U.S. 120, 129 (2012)). As in *Sackett*, "[t]he conclusiveness of Defendants' repeated declarations makes it apparent that there is no remaining process for the Court to disrupt." *Id.*; *see also* Feb. 19 Ltr; Apr. 21 Ltr. The February 19 and April 21 Letters purport to determine the "rights or obligations" of the parties and (if upheld) will have substantial "legal consequences" for the Program. *Sackett*, 566 U.S. at 126. "The April 21 Letter cannot and does not magically convert the Secretary's February 19 declaration of termination into a mere tentative or preliminary view." *Duffy* at *20. Instead, it "reiterates that the VPPP Agreement has been terminated and states a definitive position." *Id.*

The fact that Defendants gave Plaintiffs an illusory-at-best opportunity to show that the Program is lawful, Apr. 21 Ltr., and the fact that Defendants had not yet imposed sanctions by the time the Court preliminarily enjoined such action, do not warrant a different conclusion. Just as in *Sackett*, where EPA had not imposed sanctions on the plaintiffs and invited them to engage in informal discussions of the terms and requirements of the order and to identify alleged inaccuracies in its findings, 566 U.S. at 126-27, an agency cannot render an otherwise final decision nonfinal "and thereby forestall judicial review simply by creating an opportunity for 'informal revision that offer[s] a mere possibility of success,'" *Duffy* at *21 (quoting *6801 Realty Co., LLC v. U.S.C.I.S.*, 719 F. App'x 58, 60 (2d Cir. 2018)).

Moreover, even if Defendants had reopened the decision-making process (which they did not), any such "reopening" would be "in name only." *Id.* (quoting *Mantena v. Hazuda*, 2018 WL

3745668, at *6 (S.D.N.Y. Aug. 7, 2018)).  Defendants repeatedly made clear, both in formal letters and in this litigation, that their termination of the VPPP Agreement had happened, past tense, and was not rescinded by the April 21 Letter.  Tr. at 26:5-27:2; 32:4-7; 45:22-46:5; 47:11-48:1; PI Opp. at 9, 11; Feb. 19 Ltr.; Apr. 21 Ltr.  As the Court has already held, "[t]here is every reason to believe that any invitation to dialogue was constructed as a *post hoc* effort simply to avoid judicial review before the Secretary could take the punitive actions he has long promised to take if Plaintiffs do not bow to the federal government's will and cease [the] program."  *Duffy* at *21.  "Tellingly, Defendants cite no case in which a cabinet secretary and a president of the United States have declared in no uncertain terms that an administrative approval has been rescinded but yet a court determined that such action is not ripe for review."  *Id.* at *22.

This position is only buttressed by the fact that Defendants still have not issued any further "final decision" on the legality of the Program, despite their insistence over a month ago that such a decision would be forthcoming and was necessary to render their actions final.[8]  In other words, Defendants have "flexed [their] regulatory muscle," and they "cannot now evade judicial review" by purposely waiting to drop the hammer yet again.  *Id.* at *20 (citing *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 412 (D.C. Cir. 2011)); *see also Sackett*, 566 U.S. at 127.

### B.    Plaintiffs' claims are ripe

Plaintiffs' claims are ripe for review.  To determine whether a claim is prudentially ripe, courts ask "(1) whether [an issue] is fit for judicial decision and (2) whether and to what extent the parties will endure hardship if decision is withheld."  *Simmonds v. I.N.S.*, 326 F.3d 351, 359 (2d Cir.

---

[8] Although the Court enjoined Defendants from taking any action "to enforce compliance with or implement the February 19 Letter" or from "taking any of the 'compliance measures' set forth in the April 21, 2025 Letter," *id.* at *49, the Court did not enjoin Defendants from issuing a so-called "final decision" on the legality of the Program. Moreover, the Court invited the parties to request clarification if they had any questions regarding the scope of the injunction.  Tr. at 64:17-19.

2003); *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).  These factors weigh decisively in favor of judicial review here.  *Duffy* at *22-24.

As the Court already held, the fitness prong is easily met because "[t]he issues to be decided are legal ones concerning the lawfulness of the VPPP Agreement and the FHWA's authority to sign it or terminate it."  *Id.* at *23; *see also Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005) (fitness prong "requires a weighing of the sensitivity of the issues presented and whether there exists a need for further factual development"); *Seafarers Int'l Union v. U.S. Coast Guard*, 736 F.2d 19, 26 (2d Cir. 1984).  Although Defendants have posited that this case is too "fact-intensive" to resolve now, PI Opp. at 24, they have not identified any facts that need to be developed by the agency before the Court can determine "the VPPP Agreement's lawfulness or the Secretary's right to end it," *Duffy* at *23.[9]  Defendants' position is refuted by the Secretary's own statements in the February 19 Letter, which were then reiterated in the April 21 Letter.  "The issues to be decided are legal ones concerning the lawfulness of the VPPP Agreement and the FHWA's authority to sign or terminate it," and the "Court does not need any further administrative review before it reads the statute and decides whether the Secretary's reading is correct or not."  *Id.*

Nor would the Court's decision interfere with any unfolding "administrative process." PI Opp. at 15-18, 21-22.  As the Court has already held, the "ongoing administrative process" that Defendants have concocted is nothing "more than lip service meant to avoid judicial intervention." *Duffy* at *23.  Indeed, while Defendants argued last month that the termination process had "not been consummated" because FHWA had "invited Plaintiffs to contest the notice of termination," PI Opp. at 16, 23-24, Defendants have done nothing in over a month since receiving the Project

---

[9] Even if Defendants had identified any open or disputed factual issues (which they have not), where a dispute "presents legal questions and there is a concrete dispute between the parties, the issues are fit for judicial decision" even where "the factual record is not yet fully developed."  *Sharkey v. Quarantillo*, 541 F.3d 75, 89 (2d Cir. 2008).

Sponsors' May 21 responses to the "order to show cause." Apr. 21 Ltr. Defendants' failure to act only reinforces the Court's conclusion that there is no reason to delay judicial review of the purely legal questions posed in this case; the parties and the Court could otherwise wait forever to resolve a purely legal issue of public importance. *Duffy* at *23-24; Tr. at 64:24-65:7.

Plaintiffs have also shown that "the challenged action creates a direct and immediate dilemma for the parties," thus satisfying the second prong of the ripeness inquiry. *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 691 (2d Cir. 2013); *see* DOT_0047883-94 (ECF 84); DOT_0047967-87 (ECF 91); DOT_0047917-26 (ECF 86). The Secretary claims to have terminated the VPPP Agreement and has threatened to impose "compliance measures" if the Project Sponsors "continue[] to fail to comply with Federal law." Apr. 21 Ltr. Defendants doubled down at oral argument on May 27, confirming that, in their view, the Project Sponsors "are not free to disregard" the Secretary's alleged termination of the VPPP Agreement and that without a valid tolling agreement, the Project Sponsors are violating 23 U.S.C. § 301. Tr. at 47:4-48:2. Agency action "that 'requires an immediate and significant change in [a party's] conduct of its affairs with serious penalties attached to noncompliance' presents a prototypical instance of hardship." *New York v. D.H.S.*, 414 F. Supp. 3d 475, 565 (S.D.N.Y. 2019) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 153 (1967)). Moreover, the limbo that Defendants seek to perpetuate compromises the MTA's ability to finance capital projects through issuance of bonds secured by Program revenues. *Duffy* at *22; DOT_0047886-87 (ECF 84 ¶¶ 10-11).

### C.    The Tucker Act does not apply

Whether an action against the federal government is "at its essence a contract claim" and therefore subject to the exclusive jurisdiction of the Court of Federal Claims depends on (1) "the source of the rights upon which the plaintiff bases his claims," and (2) the "type of relief sought." *Nat'l Job Corps Ass'n v. Dep't of Lab.*, --- F. Supp. 3d ---, 2025 WL 1752414, at *4 (S.D.N.Y.

June 25, 2025) (citing *Duffy* at \*24). As this Court also has already held, the "Tucker Act does not divest this Court of jurisdiction." *Duffy* at \*26.

First, Plaintiffs do not rely on the VPPP Agreement as the "source" of any rights, but instead seek to vacate the February 19 Letter, and permanently enjoin the Secretary from enforcing it, because the February 19 Letter is contrary to the VPPP statute, the APA, and Defendants' own regulations, not to mention the Constitution. *See* ECF 96 ("SAC") ¶ 40. That alone is "dispositive" of Defendants' Tucker Act arguments. *Nat'l Job Corps*, 2025 WL 1752414, at \*4-5 & n.4. As this Court explained in its May 28 Opinion and Order, "Plaintiffs are not suing to enforce any term of the VPPP Agreement or accusing Defendants of breach"; the "core" of Plaintiffs' claim "is that the Secretary acted unlawfully in purporting to terminate the VPPP Agreement." *Duffy* at \*25. To that end, Plaintiffs rely on "statutory entitlements—federal funding and approvals guaranteed by federal laws such as the FAHA, NEPA, and the Federal Transit Act that do not derive from any contract." *Id.* These claims fall squarely within this Court's jurisdiction. *Cmty. Legal Servs. v. H.H.S.*, 137 F.4th 932, 938 (9th Cir. 2025) (ensuring "compliance with statutory and regulatory commands" is "beyond the scope" of Tucker Act).

Although Defendants have argued that there is no statutory obligation for the agency to agree to authorize the Program, PI Opp. at 27, that is not what Plaintiffs are seeking. FHWA *already* approved the Program under the VPPP on November 21, 2024. DOT_0047549-57 (ECF 87-1). To the extent that Plaintiffs' claims implicate the terms of the VPPP Agreement, that is merely because that cooperative agreement is the "vehicle" memorializing FHWA's statutory approval of the Program. *Duffy* at \*26 (quoting *RFE/RL, Inc. v. Lake*, 2025 WL 1232863, at \*4 (D.D.C. Apr. 29, 2025)); *see also* VPPP § 4. While Defendants have argued, without merit, that the VPPP Agreement's terms provide a basis for them to unilaterally terminate, *see* PI Opp. at 27,

as the May 28 Opinion and Order shows, the Court would only consider such arguments "in the context of the Government's defense of the action, not Plaintiff's independent requests for relief." *Duffy* at \*25 (quoting *Hall v. Nielsen*, 2019 WL 250972, at \*3 (D.D.C. Jan. 17, 2019)); *see also Normandy Apartments, Ltd. v. H.U.D.*, 554 F.3d 1290, 1300 (10th Cir. 2009) ("[T]he fact that resolution of the claim requires some reference to contract does not magically transform [the] action ... into one on the contract and deprive the court of jurisdiction it might otherwise have.") (cleaned up). Indeed, "[t]he essence of Plaintiffs' claims requires the Court to review the VPPP Agreement only to determine what it *does not* say." *Duffy* at \*25.

Second, the "type of relief sought" also forecloses application of the Tucker Act because Plaintiffs are not seeking "an order compelling the government to pay money owed." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985); *Crowley*, 38 F.4th at 1108 ("crux of … inquiry" is whether plaintiff "effectively seeks to attain monetary damages"); *see* SAC ¶ 227. Unlike the decisions on which Defendants rely, this case does not involve a "disguised claim for monetary relief," *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 971 (D.C. Cir. 1982), given that the VPPP Agreement does not confer any federal funding at all, *see Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (plaintiffs sought "order [requiring] the payment of money"); DOT_0047549-57 (ECF 87-1). As this Court has explained, cooperative agreements like the VPPP Agreement "generally do not confer a 'direct' and 'tangible' benefit on the United States—a requirement for Tucker Act jurisdiction." *Duffy* at \*26 (quoting *Pacito v. Trump*, --- F. Supp. 3d ---, 2025 WL 893530, at \*4 (W.D. Wash. Mar. 24, 2025)); *accord Hous. Auth. v. United States*, 140 Fed. Cl. 773, 786 (2018) (Tucker Act only applies to "money-mandating contracts"). Accordingly, even if Plaintiffs' claims did arise from the VPPP Agreement—which they do not— this lawsuit would still lie "outside the ambit of the Tucker Act." *Duffy* at \*26. And while

14

Defendants claim that Plaintiffs are seeking specific performance and reinstatement of the VPPP Agreement, Plaintiffs in fact seek a declaration and injunction vacating the Secretary's unlawful conduct. SAC ¶ 227. "[T]he mere fact that an injunction would require the same governmental restraint that specific (non)performance might require in a contract setting is an insufficient basis to deny a district court the jurisdiction otherwise available." *Duffy* at *25 (quoting *Megapulse*, 672 F.2d at 971). Indeed, Plaintiffs are not actually seeking specific performance of any contractual obligation by FHWA.

## II. Defendants' Termination of the VPPP Agreement and Rescission of Tolling Authorization Were Arbitrary and Capricious and Contrary to Law

### A. Defendants do not have authority to terminate the VPPP Agreement

As this Court previously recognized, Defendants do not have the right to terminate the VPPP Agreement absent TBTA's consent or a material breach. *Duffy* at *28. Neither of these circumstances is present here, nor have Defendants argued otherwise. As Defendants have tacitly acknowledged, and as this Court observed in its May 28 Opinion and Order, the VPPP Agreement does not contain any provision that allows Defendants to unilaterally terminate the agreement. *Id.* at *27; *see* PI Opp. at 36-40; Tr. at 32:16-24.

Defendants have argued that Section 200.340(a)(4) of the OMB Regulations somehow allows them to terminate the VPPP Agreement. PI Opp. at 10-11; Apr. 21 Ltr. But this Court rejected that argument, holding that the OMB Regulations do not smuggle an unspoken termination right into the VPPP Agreement, nor do they suggest that a termination provision should be implicitly read into every unfunded cooperative agreement. *Duffy* at *27-30. Rather, the OMB Regulations require agencies to "clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." 2 C.F.R. § 200.340(b). The only termination provision in the VPPP Agreement states that *TBTA* and TBTA alone may terminate

15

the agreement.  VPPP Agmt. cl. 11; DOT_0047549-57 (ECF 87-1).  Defendants' revisionist

reading that the regulations "permit termination based on a change of agency priorities," regardless

of whether such a term is in the award, "renders the phrase 'pursuant to the terms and conditions

of the Federal award' superfluous."  *Duffy* at *28-29 (citing *Reiter v. Sonotone Corp.*, 442 U.S.

330, 339 (1979)); *see also Pharaohs GC, Inc. v. S.B.A.*, 990 F.3d 217, 227 (2d Cir. 2021) ("[A]

statute should be construed so that effect is given to all its provisions, so that no part will be

inoperative or superfluous, void or insignificant.") (quoting *Corley v. United States*, 556 U.S. 303,

314 (2009)).[10]

It should come as no surprise that the applicable regulations require that a federal agency

must "clearly and unambiguously specify all termination provisions in the terms and conditions of

the Federal award," 2 C.F.R. § 200.340(b), given the reliance interests that a federal award

generates, *see infra* at 26-27.  This is especially true of federal awards connected to the funding of

major capital projects, which "invariably involve substantial investment of time and resources."

*Duffy* at *27.  Here, Plaintiffs are relying on the continuation of the Program to help fund critically-

needed capital improvements to New York City's transit system.  *See* DOT_0047886-88 (ECF 84

¶¶ 4, 7-15); *see also* DOT_0047967-87 (ECF 91 ¶¶ 28-41).  And investors who purchase the long-

term bonds that are supported by Program revenues will similarly rely on the Program's ability to

---

[10] OMB's recent guidance on the regulations further supports Plaintiffs' and the Court's construction.  *Duffy* at *29.
That guidance makes clear that a federal agency "*may include*" a term in the terms and conditions of a federal award
allowing the agency to terminate the award on the basis that it no longer effectuates the program goals or agency
priorities.  *Guidance for Federal Financial Assistance*, 89 Fed. Reg. 30046, 30089 (Apr. 22, 2024) (emphasis added).
In other words, any such term is *not* mandatory or automatic; it needs to be included to permit termination on that
basis.  Furthermore, that guidance highlights the importance of federal agencies specifying any applicable termination
provisions in the terms and conditions of an award, stating that the final version of the rule "provides greater clarity
on the policy for termination of awards by the Federal agency … by underscoring the need for agencies and pass-
through entities to clearly and unambiguously communicate termination conditions in the terms and conditions of the
award."  *Id.*; *see also Climate United Fund v. Citibank, N.A.*, 2025 WL 1131412, at *3 (D.D.C. Apr. 16, 2025)
("2 C.F.R. § 200.340 … permit[s] termination of federal grants when inconsistent with agency priorities *only* when
that basis is stated in the grant's terms and conditions.").

continue so long as it is effective. *See id.* As this Court recognized, "[f]ew if any persons would buy bonds to support a capital project" if the federal government had a silent right to terminate any Federal award based solely on changing priorities. *Duffy* at *27.

Defendants' circular reliance on 2 C.F.R. § 200.211(c)(2) as implicitly providing a right to terminate in every one of FHWA's cooperative agreements despite the absence of express termination language is misguided. *See* PI Opp. at 36. That regulation "requires all federal awards to … 'incorporate, by reference, all general terms and conditions of the Federal award'" into the federal award, and FHWA's general terms and conditions ("T&C") state that cooperative agreements may be terminated "in accordance with 2 C.F.R. 200.340." *Id.* at 36.[11] But as this Court has held, "those T&C do not do the work that the Defendants would need them to do" because "[t]hey do not contain any express termination provision" and "merely refer back to 2 C.F.R. § 200.340." *Duffy* at *28.

Finally, while Defendants have invoked the *Christian* doctrine, that does not apply here because "the VPPP Agreement is not a procurement contract." *Id.* at *30 (citing *Earman v. United States*, 114 Fed. Cl. 81, 112 (2013), *aff'd*, 589 F. App'x 991 (Fed. Cir. 2015)). It is also inapplicable because, as the Court has held, Section 200.340(a)(4) and the regulations cited by Defendants do not mandate that the agency insert a government termination clause into cooperative agreements, which is a prerequisite for the *Christian* doctrine to apply. *See id.*

### B.    The rationales articulated in the February 19 Letter are arbitrary and capricious

As this Court has already observed, Secretary Duffy's February 19 Letter, which marked the consummation of the agency's decision-making process, provided that the Secretary's decision

---

[11] (Quoting 2 C.F.R. § 200.211(c)(2) and *Contractors & Recipients General Terms and Conditions for Assistance Awards*, FHWA (Aug. 2, 2023), https://www.fhwa.dot.gov/cfo/contractor_recip/gtandc_after2023aug07.cfm).

"was not based on any discretionary analysis but on the conclusion that Congress did not give the FHWA the authority to approve the project." *Duffy* at \*19; Feb. 19 Ltr.  Specifically, it rested on the Secretary's conclusion that the VPPP statute does not authorize "cordon pricing programs" or "tolls that are calculated based on considerations separate from reducing congestion," including raising revenue for public transit.  *Duffy* at \*14; Feb. 19 Ltr. at 3.  Both arguments have now been soundly rejected by this Court as unsupported by the VPPP statute.  *Duffy* at \*31-35. Consequently, the February 19 Letter is arbitrary and capricious, as its purported recission of the VPPP Agreement was not "justified by its stated bases."  *Id.* at \*35 (citing *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019)).

       *i.*   *The VPPP authorizes cordon pricing programs*

The Secretary's determination that the VPPP statute does not authorize cordon pricing was driven by two legal conclusions: (1) that 23 U.S.C. § 301's prohibition on "tolls" on "roads constructed with Federal-aid highway funds" is "subject to limited exceptions," which must be "narrowly construed"; and (2) that "Congress did not, in using the vague phrase 'value pricing pilot program,' authorize the unprecedented and consequential step of cordon pricing." Feb. 19 Ltr. at 2-3. The Secretary then argued that the VPPP statute, as an exception to the general anti-tolling provision, must therefore be "narrowly construed" to exclude "cordon pricing programs." *Id.*  As this Court has concluded, this reading of Section 301 and the VPPP statute is "manifestly incorrect" on several grounds.  *Duffy* at \*31.

For starters, the VPPP is not an "exception" to Section 301's toll ban.  The express "exception" to Section 301 is Section 129, which provides non-discretionary authority for tolling on federal-aid highways under a variety of circumstances.  *See* 23 U.S.C. § 301 ("Except as provided in Section 129…"); *id.* § 129 (setting forth various circumstances in which federal-aid highways may be tolled).  The VPPP, on the other hand, is an additional, stand-alone program that

Congress created for project sponsors to consider potential "value pricing pilot projects," in which the Secretary "shall solicit" participation. VPPP, cl. 1. To that end, the VPPP states that "*[n]otwithstanding* section 129 and 301," tolling is permitted for "value pricing pilot programs." *Id.*, cls. 2, 4 (emphasis added). As the Supreme Court has recognized, this "notwithstanding" language "shows which of two or more provisions prevails in the event of a conflict." *N.L.R.B. v. SW General, Inc.*, 580 U.S. 288, 302 (2017); *see also Duffy* at *31-32.

In addition, the "fact that the VPPP operates as a carve-out to the tolling ban does not mean that it should be grudgingly applied or that the Secretary must afford it only a narrow meaning," as this Court has noted. *Id.* at *32. As the Supreme Court explained four years ago, exceptions must be interpreted in the same manner as any other statutory provision. *See, e.g., BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1538-39 (2021) (rejecting argument that courts must construe exceptions narrowly and explaining that courts have "no license to give statutory exemptions anything but a fair reading"); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 359 (2012) (rejecting "false notion" that "tax exemptions—or any other exemptions for this matter—should be strictly construed").

Properly analyzed according to its plain terms, there can be no serious dispute that the VPPP permits a broad set of tolling programs, including cordon pricing. As this Court observed, when ISTEA was signed by President Bush, he stated that a "major element" of the law "was to provide State and local officials unprecedented flexibility." *Duffy* at *34 (quoting *Statement by President George Bush Upon Signing H.R. 2950*, 1991 U.S.C.C.A.N. 1865); *see also* SAC ¶ 67. Among ISTEA's provisions was the directive that the Secretary of Transportation "solicit the participation of State and local governments and public authorities for one or more congestion pricing pilot projects," ISTEA § 1012(b), later amended in 1998 to describe them as "value pricing

pilot programs," VPPP, cl. 1.[12]  While neither term is defined in the statute, there is ample evidence that at the time of enactment, "contemporary understandings of congestion pricing indicate that cordon pricing falls within the class of project contemplated for tolling authorization at the time the VPPP was enacted." *Duffy* at *32.

In 1959, Professor Vickrey, the architect of congestion pricing, testified before the Congressional Joint Committee on Washington Metropolitan Problems that "[i]t is a specific feature of the pricing system suggested here that it is to be applied to the street and highway system as a whole, and not merely to bits and pieces of it." *Id.* (citations omitted); *see also* SAC ¶ 55. Indeed, Vickrey, a professor at Columbia University, specifically proposed that a cordon pricing program be implemented in Manhattan, since its narrow geography precluded the addition of more roadway capacity.  SAC ¶ 55.  Before ISTEA was enacted, other municipalities, including Singapore, implemented their own congestion pricing programs based on Vickrey's work and utilized a cordon approach.  *Duffy* at *33.  Thus, when ISTEA was being debated, legislators described "congestion pricing" by referencing cordon pricing programs already in effect around the world.  *Id.*  Shortly after ISTEA's enactment in 1992, FHWA confirmed that it understood "congestion pricing" to include "comprehensive area-wide road pricing strategies."  *Id.*  FHWA regularly echoed this understanding of "congestion pricing" as including cordon pricing for decades, even funding multiple cordon pricing studies under the VPPP.  SAC ¶¶ 82, 88, 92, 94. This included FHWA funding a study of Mayor Bloomberg's proposed cordon pricing plan for Manhattan in 2007, which closely resembled the Program as it is currently operating today, *Duffy* at *33, and which FHWA highlighted as "historic" in a 2009 report to Congress, *id.* at *4 (citing SAC ¶ 86).

---

[12] This substitution was not intended to effect any substantive change.  *See* PI Br. at 9 n.3

In sum, Defendants cannot overcome the "myriad evidence" demonstrating that the VPPP statute authorized cordon pricing programs and have failed to point to "a single historical source that supports their view." *Id.* at *34; *see also id.* (noting the "dramatic, unprecedented, consequences" that could follow from the Secretary's arguments). Thus, the Secretary's decision to terminate the VPPP Agreement because the VPPP statute supposedly did not authorize cordon pricing programs was contrary to law, as well as arbitrary and capricious.

### ii. *The VPPP authorizes tolling programs that are intended to generate revenue, including for public transit projects*

The Secretary also erred in construing the VPPP to prohibit tolls from being "calculated based on considerations separate from reducing congestion or advancing other road-related goals," including, in the case of the Program, to raise revenue for the MTA's capital projects. Feb. 19 Ltr. at 3. As the Court observed, the VPPP statute explicitly provides that "[r]evenues generated" by value pricing pilot programs may be used to fund other transportation "projects eligible under" Title 23, VPPP, cl. 4, and there is no dispute that transit capital projects are eligible for assistance under Title 23. *Duffy* at *35; 23 U.S.C. § 142(a)(2). The statute therefore "provides no restrictions on the use of program revenues beyond that." *Duffy* at *35. This is consistent with FHWA's own historic interpretation of the statute, having funded multiple studies under the VPPP explicitly calling for project toll revenue to be used for transit projects. SAC ¶¶ 87, 88, 92, 94, 97.

Moreover, the VPPP statute "explicitly contemplates" that one of the ways VPPP programs will address congestion is by "improving alternatives to driving." *Duffy* at *35. Specifically, it requires that the Secretary monitor and report on the effects of value pricing pilot programs on "availability of funds for transportation programs." VPPP, cl. 2. In a separate section of ISTEA, Congress directed states to "undertake a continuous transportation planning process," which "shall" consider "the use of innovative mechanisms for financing projects, including … tolls [and]

21

congestion pricing." ISTEA § 1025(c)(16). The statutory text therefore makes it "unmistakably clear" that "a public authority [is] permitted to collect funds that exceed a toll road's costs and spend those funds on non-toll road projects." *Chan v. U.S. Dep't of Transp.*, 2024 WL 5199945, at \*17 (S.D.N.Y Dec. 23, 2024) (Liman, J.). Indeed, when discussing a similar provision of ISTEA concerning the New York State Thruway Authority, the Second Circuit recognized that it is "unmistakably clear" that Congress "meant to permit [municipal authorities] to continue collecting tolls of whatever amount" and to use any "surplus revenue" for "other transportation projects." *Am. Trucking Assocs., Inc. v. N.Y. State Thruway Auth.*, 886 F.3d 238, 246 (2d Cir. 2018) (citing ISTEA § 1012(e)). Courts do not "lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply." *Duffy* at \*35 (quoting *Mendis v. Filip*, 554 F.3d 335, 340 n.5 (2d Cir. 2009) (Sotomayor, J.)). That is particularly true where, as here, the federal government's proposed interpretation of a statute would curtail an area "of traditional state responsibility" like public transportation systems such as buses or subways. *Bond v. United States*, 572 U.S. 844, 858-59 (2014) (Congress must provide "clear statement" if it seeks to "override the usual constitutional balance of federal and state powers"); *see also Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707, 715 (1972) (describing states' traditional authority over road tolls).

### C.  Defendants' purported policy concerns do not support the termination

As the Court previously determined, the policy concerns articulated by Secretary Duffy in the April 21 Letter "are unavailing as both *post hoc* rationalizations and because termination is not permitted on the grounds of shifting agency priorities." *Duffy* at \*37. But even without those fundamental problems with Secretary Duffy's new rationales, they would be substantively arbitrary and capricious in any event.

       i.  *Defendants' policy concerns are* post hoc *rationales that cannot support their action and should not be considered*

"It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'"  *D.H.S. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (quoting *Michigan v. E.P.A.*, 576 U.S. 743, 758 (2015)). Accordingly, an agency is "required to articulate a contemporaneous explanation for its decision," and cannot later salvage it with an explanation "formulated while litigating this lawsuit."  *Kakar v. U.S.C.I.S.*, 29 F.4th 129, 133 (2d Cir. 2022).  This bar against considering *post hoc* rationalizations is not a "'useless formality but rather 'serves important values of administrative law' by promoting agency accountability and permitting 'orderly functioning of the process of review.'"  *Duffy* at *36 (quoting *Regents of the Univ. of Cal.*, 591 U.S. at 22-23).

Secretary Duffy "made clear" in his February 19 Letter that the purported termination of the VPPP Agreement was based on his incorrect "conclusion that FHWA lacked statutory authority to approve the cordon pricing tolling."  *Id.*; Feb. 19 Ltr. at 3.  Specifically, Secretary Duffy wrote that he had "concluded that [the Program] is not an eligible 'value pricing pilot program," for "*two* reasons": (1) cordon pricing is not authorized under Congress' use of the phrase value pricing pilot program; and (2) the "VPPP does not authorize tolls that are calculated based on considerations separate from reducing congestion."  Feb. 19 Ltr. at 3 (emphasis added).  Those legal rationales lack merit.  *See supra* at 17-22.  Moreover, "Defendants cannot escape the Secretary's flawed legal conclusions by … disavowing them and reframing the conclusions as mere expressions of policy."  *Duffy* at *36.

       ii.  *To the extent they are considered, the Secretary's policy concerns do not stand on their own*

In the April 21 Letter, Secretary Duffy for the first time attempted to justify the termination by citing two policy concerns:  (1) that "[h]ighway users whose taxes already paid for the Federal-

aid highways in the cordon area are now being forced to pay again while receiving no new highway benefits in return"; and (2) the Program "imposes a disproportionate financial hardship on low and medium-income hardworking American drivers for the benefit of high-income drivers."  April 21 Ltr. at 2-3.  As this Court has already held, however, even assuming that these policy concerns were properly before the Court (they are not) and could possibly provide a sufficient basis for Defendants to effect a termination despite their lack of authority (they cannot), there are "reasons to doubt" that Defendants' "belatedly expressed policy concerns would support the termination decision."  *Duffy* at \*36.

For the first policy concern, the Court has already noted that "it is the nature of any toll-based value pricing pilot program that it will impose costs on highway users whose taxes already paid for the Federal-aid highways," and that the Program provides "demonstrated benefit" to all highway users in the form of faster and more reliable travel speeds within the CBD and connected river-crossings.  *Id.*  Indeed, multiple courts, including this one, have found that New York's "public transit facilities and roads comprise a single integrated transportation system," and therefore when a "state funnels toll revenue from roadways to public transit options … those improvements to the public transit convey a benefit even on nonriders."  *Chan*, 2024 WL 5199945, at \*21, 26.  These benefits include "reductions in fuel costs, stress, auto emissions, and wait times," and "improved access to the diverse economic markets and cultural attractions of New York City." *Id.* at \*26.

Secretary Duffy's second policy rationale fares no better.  The Court has acknowledged that "[n]inety-eight percent of low-income workers with jobs in the Manhattan CBD do not commute by private vehicle," and in fact are "reliant on the public transit options that the Tolling Program seeks to improve."  *Duffy* at \*36.  Accordingly, ninety-eight percent of the low-income

24

workers with jobs in the Manhattan CBD stand to benefit from increased function, quality, and reach of New York's public transit offerings, a prospect which Defendants simply ignore. *See* Apr. 21 Ltr. Secretary Duffy also does not acknowledge in the April 21 Letter or elsewhere that the Program includes "discount programs and tax credits" such that "low-income drivers can access the CBD with reduced or no tolls." *Duffy* at *36; Apr. 21 Ltr.

It is therefore clear that, even if these "policy concerns" were to be considered, they themselves are arbitrary, "counter to the evidence," and "inconsistent." *New York v. Trump*, 2025 WL 573771, at *21 (S.D.N.Y. Feb. 21, 2025). As the Court has already concluded, even if the Secretary had the authority to terminate the VPPP based on policy concerns (which he does not), Defendants' "invocation of policy would still fail on the record before the Court." *Duffy* at *36.

### D.    Defendants did not adequately consider or weigh Plaintiffs' reliance interests

As this Court has concluded, Defendants' termination of the VPPP Agreement was also unlawful because it did not adequately consider Plaintiffs' significant, reasonable, and well-known reliance interests in the VPPP Agreement, FHWA's 2019 statement that the VPPP was the "best fit" for the Program, or FHWA's longstanding interpretation of the statute. *Id.* at *37-41. Allowing agencies to reverse "consistent" and "longstanding" statutory interpretations "affirmatively destroys," rather than "safeguard[s]," reliance interests by giving "license" to "an agency to change positions as much as it likes." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386, 410-11 (2024). Accordingly, even where an agency changes its policies, it is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns," *Regents of the Univ. of Cal.*, 591 U.S. at 33, and it must "provide a more detailed justification than what would suffice for a new policy created on a blank slate" in circumstances where "its prior policy has engendered serious reliance interests," *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

25

Plaintiffs reasonably and significantly relied on the VPPP Agreement, Defendants'
longstanding interpretation of the VPPP, and three decades of consistent FHWA policy endorsing
cordon pricing in their financial planning and commitments to support the region's public transit
system. DOT_0047982-85 (ECF 91 ¶¶ 29-37). For example, TBTA incurred expenses of
over $500 million to establish the Program, and has been and is incurring roughly $12 million in
monthly operational costs. DOT_0047982-85 (ECF 91 ¶¶ 29-30, 33). TBTA and its lenders also
relied on FHWA's interpretation when TBTA issued $1.378 billion in short-term debt to be repaid
in part by—and refinanced with bonds secured by—Program revenues over decades.
DOT_0047887-88 (ECF 84 ¶¶ 12-15).

"These acts of reliance were well-known to Defendants." *Duffy* at *38. FHWA's own
Reevaluations—as well as recent filings before this Court and others—confirmed the agency's
understanding that the Program's net revenue would depend on the 30-year bonds' "rates and
term." *See Chan v. U.S. Dep't of Transp.*, No. 23 Civ. 10365 (S.D.N.Y.), ECF 160 at 4; *New Jersey
v. U.S. Dep't of Transp.*, No. 23 Civ. 03885 (D.N.J.), ECF 218-1; Reevaluation 2 at 8 n.2. "And it
could not have been a surprise to the FHWA that the Tolling Program has been costly to establish
and maintain." *Duffy* at *38. Likewise, the features of the Program to which Secretary Duffy now
objects were also well known to Defendants, including the prior Trump Administration, since the
federal review process began in 2019. *See id.* Indeed, "[t]he plan to use the revenues generated
by the Tolling Program to finance the capital projects that were intended to further reduce the
number of vehicles entering the CBD and to be tolled was foundational to the entire congestion
pricing project," as was the fact that "the Tolling Program would not offer a toll-free option," *id.*,
because it would take the form of a "cordon pricing" program, *id.*; DOT_0048006-08 (ECF 91-3).

Defendants' superficial consideration of Plaintiffs' reliance interests—which was limited

to a short passage in the February 19 Letter—does not pass muster.  Feb. 19 Ltr.  While the February 19 Letter claimed to "recognize[]" that Plaintiffs "have relied on the Agreement to begin collecting tolls under the program," it nonetheless discounted that reliance because many of the Program-related costs "were incurred before FHWA signed the Agreement" and the agency only approved the Program as a "pilot project."  *Id.* at 3.  As the Court has held, Defendants cannot justify their cursory attention to Plaintiffs' reliance interests by claiming that any such reliance was unreasonable.  *Duffy* at *40.

First, Defendants' argument that the bulk of expenditures predated the VPPP Agreement "misunderstands Plaintiffs' argument."  *Id.* at *39.  These expenditures were incurred in reliance on "earlier manifestations of the FHWA's longstanding policy," including the agency's statements to Congress, its public guidance and pronouncements, appropriation of funds to study other cordon pricing initiatives, and communications with Plaintiffs years before the VPPP Agreement was signed (including during the first Trump Administration).  *Id.*  Second, Defendants have offered no support for their suggestion that the term "pilot project" necessarily implies a project of short duration—a position that Defendants, of course, have never raised before this litigation in any case.  *See id.* at *39-40 (citing multiple dictionaries indicating "that a project is designated a pilot by virtue of its scope and not by its duration"); *see also* VPPP Agmt. cl. 8(b) (TBTA and NYCDOT shall monitor and report on the Program "for a period of at least ten years or to the life of the Project, whichever is sooner").  Third, as explained in Point II.A, *supra*, 2 C.F.R. § 200.340 does not authorize Defendants to terminate the VPPP Agreement.  *See* PI Brief; PI Reply.  Therefore, as this Court held, "[t]he previously unexpressed and legally erroneous view that the FHWA could withdraw approval based solely on a change in priorities therefore could not have disabused Plaintiffs of their reasonable reliance on the FHWA's statements that the project was eligible for a

VPPP slot." *Duffy* at *39.  Finally, the Court has rejected Defendants' argument that Plaintiffs unreasonably relied on the durability of the VPPP Agreement because it was signed after the 2024 election, explaining that "the country has only one President at a time," and "it is fair to presume that the President will follow the law, including the APA."  *Id.* at *40; *Loper Bright*, 603 U.S. at 392.

Put simply, and as a matter of common sense, Plaintiffs would never have incurred the expense and time associated with extensive technical evaluations, planning, installation of equipment, and obtaining federal authorization for the Program based on an understanding that it would be short-lived; nor could long-term bonds be used to finance capital projects based on such an understanding.  Nor would anyone else proposing projects under the VPPP undertake large-scale expenditures for a short-term project.  In other words, Defendants' definition of "pilot" would effectively scuttle the legislation.  *See Duffy* at *40-41.  Ultimately, "none of Defendants' arguments show that Plaintiffs' reliance was unreasonable such that the Secretary was relieved of the requirement to assess the reliance interests, determine whether they were significant, and weigh them against competing policy concerns."  *Id.*; *see also Regents*, 591 U.S. at 33.

## III.  Remedy

### A.  The Court should vacate Defendants' letters

The APA instructs courts to "hold unlawful and set aside" agency actions found to be "arbitrary, capricious, … or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Thus, "the 'normal remedy' in a successful APA challenge is to set aside—that is, vacate—the final agency action at issue."  *New York v. U.S. Dep't of Com.*, 351 F. Supp. 3d 502, 671 (S.D.N.Y.), *aff'd in relevant part*, 588 U.S. 752 (2019) (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)).  Because the Secretary had no authority to terminate the VPPP Agreement or to impose his threatened "compliance measures," the Court should vacate both the

February 19 and April 21 Letters, as well as the implementation letters issued by Defendant Shepherd on February 20 and March 20. *Duffy* at \*27-43.

In opposing Plaintiffs' preliminary injunction motions, Defendants argued that "the broadest possible relief available is to vacate the notices of termination of the Agreement and remand to the agency for further consideration." PI Opp. at 58-59. But in this case, remanding to the agency would be futile. Courts have long held that a remand is unnecessary where "[t]here is not the slightest uncertainty as to the outcome of a [new] proceeding." *NLRB v. Wyman–Gordon Co.*, 394 U.S. 759, 766-67 n.6 (1969); *Chemical Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1268 (D.C. Cir. 1994) (declining to remand where there was no "alternative basis in the record" for rule); *accord Guertin v. United States*, 743 F.3d 382, 388 (2d Cir. 2014) (recognizing "there are occasions in which remand to the agency for further review is not appropriate"). Defendants have not identified any possible lawful basis for terminating the VPPP Agreement in light of this Court's rulings, and if such termination were vacated, there would be no lawful basis for Defendants' consideration of any compliance measures. In short, remanding this matter to FHWA would be a futile gesture.

### B.    Equitable relief is warranted

The preliminary injunction should now be converted into a permanent injunction. A court reviewing agency action under the APA is "vested … with equity powers, and while the court must act within the bounds of the statute and without intruding upon the administrative province, it may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action." *Ford Motor Co. v. N.L.R.B.*, 305 U.S. 364, 373 (1939). Thus, "courts often enjoin future action by government officials where the principles of equity support such relief." *New York*, 351 F. Supp. 3d at 673 (collecting cases).

As the Court is aware, Plaintiffs must demonstrate four factors: "(1) that [they have]

suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff[s] and defendant[s], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010) (internal quotation marks omitted). Where the government is a party, the final two factors merge. *Pursuing Am. Greatness v. F.E.C.*, 831 F.3d 500, 511 (D.C. Cir. 2016).

This test is easily satisfied here. The Court has already found that "Plaintiffs have demonstrated several forms of irreparable harm" for which there is no adequate remedy at law. *Duffy* at *43-47; *see also* PI Brief at 51-60; PI Reply at 25-29. These include endangering "Plaintiffs' ability to issue bonds … secured by the" Program revenues, as well as "budget uncertainty" that "interferes with Plaintiffs' abilities to plan or manage upcoming projects." *Duffy* at *22, 45-47; *see also* DOT_0047883-94 (ECF 84). Plaintiffs (and the public) would also suffer irreparable harm "if the Secretary were to take" his threatened "compliance measures," which would stall public infrastructure projects that rely on federal approvals and funding. *Duffy* at *44. Likewise, halting the Program in the face of coercive threats from Defendants would cause irreparable harm from the unrecoverable loss of public funds, delays to critical transit improvements, and the inability of New York to effectuate a state law "enacted by representatives of its people." *Id*. at *44-47 (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)).

As to the public interest, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Id*. at *47-48 (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). And denying an injunction would "endanger[] the vital transportation infrastructure Plaintiffs provide" and deprive the public of the Program's "superior environmental

outcomes," "increased productivity, improvements to health and safety, more instruction time for schoolchildren, and beneficial economic outcomes." *Id*.; *see also* DOT_0047895-916 (ECF 91).

The Supreme Court's caution in *Monsanto* that courts should not grant an injunction if it would have no "meaningful practical effect independent of its vacatur," 561 U.S. at 165, does not preclude an injunction here, as Defendants purport to have left open a sham "administrative process" in which they threaten to reaffirm their unlawful decision. Judge Furman's application of this principle in *New York v. U.S. Department of Commerce* is instructive. There, the court held that in addition to vacating "Secretary Ross's decision" to include a citizenship question on the 2020 census, "an injunction would have two practical effects beyond mere vacatur": (1) it would stop the Secretary from trying to "reinstate his decision by simply re-issuing his memorandum under a new date or by changing [it] in some immaterial way"; and (2) an injunction would "make it easier for Plaintiffs to seek immediate recourse from this Court in the event that Defendants seek to do anything inconsistent with this Opinion." *New York*, 351 F. Supp. 3d at 676; *see also, e.g.*, *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 890 (9th Cir. 2022) (affirming injunction where "irreparable harm … extends beyond the mere procedural violation"); *Ramirez v. I.C.E.*, 568 F. Supp. 3d 10, 24 (D.D.C. 2021) (holding injunction, not remand, was appropriate because there was "only one *lawful* course of action" for the agency to take (emphasis in original)).

The same reasoning applies here. Although vacatur would "undoubtedly go[] a long way toward redressing [Plaintiffs'] injuries," *New York*, 351 F. Supp. 3d at 676, Defendants' actions, including the Secretary's shifting, *post hoc* justifications for terminating the VPPP Agreement, and threat to impose devastating sanctions following review of the responses to the unfounded "order to show cause" in the April 21 Letter, would continue to endanger Plaintiffs' ability to issue bonds

31

and plan vital public infrastructure projects even after vacatur of the February 19 Letter. *Duffy* at *22, 36; *see also* DOT_0047883-94 (ECF 84). To ensure Defendants do not simply reissue the termination on the same illegal basis, the Court should convert its preliminary injunction barring Defendants from attempting to carry out their threats to punish New York for lawfully implementing the Program into a permanent one. *Duffy* at *15-17. Indeed, enjoining enforcement of unlawful agency directives fits comfortably within the Court's equitable authority. *See Nat'l Ski Areas Ass'n, Inc. v. U.S. Forest Serv.*, 910 F. Supp. 2d 1269, 1288 (D. Colo. 2012) (enjoining enforcement of terms of vacated agency directive that had been incorporated into permits); *accord Env't Def. Ctr.*, 36 F.4th at 890 (affirming injunction where agency had "made no clear commitment to withhold issuance of" permits despite violations of Endangered Species Act).

In addition, Defendants should be enjoined from terminating the VPPP Agreement unless the Project Sponsors agree or Defendants somehow demonstrate, pursuant to applicable law, that the Project Sponsors failed to comply with the Agreement's material terms and conditions. *Duffy* at *28. Such relief "is necessary to make the Court's vacatur effective" and to ensure prompt judicial relief "in the event that Defendants seek to do anything inconsistent with" the Court's opinion. *New York*, 351 F. Supp. 3d at 676.

Absent an injunction, at a minimum, a declaration should be issued that Defendants' termination of the VPPP Agreement was unlawful, that any attempt to enforce the February 19 Letter would be unlawful, and that Defendants may not terminate except with the Project Sponsors' approval. Again, given Defendants' shifting legal justifications and repeated threats to punish New York for its lawful operation of the Program, *see* Apr. 21 Ltr.; DOT_0047956 (ECF 87-7); DOT_0047960 (ECF 87-9), a declaration would "finalize the controversy," promote "judicial economy," and "serve a useful purpose in clarifying or settling the legal issues involved," *Freeman*

*v. Giuliani*, 2024 WL 5239410, at *11 (S.D.N.Y. Dec. 27, 2024) (Liman, J.).  Moreover, absent an

injunction, Plaintiffs are without a "better or more effective remedy."  *Id.*; *see also Am. Hosp. Ass'n*

*v. Becerra*, 738 F. Supp. 3d 780, 804 (N.D. Tex. 2024) (granting vacatur and declaratory judgment);

*Minard Run Oil Co. v. U.S. Forest Serv.*, 894 F. Supp. 2d 642, 664 (W.D. Pa. 2012), *aff'd*, 549 F.

App'x 93 (3d Cir. 2013) (same); *but see New York*, 351 F. Supp. 3d at 678-79 (denying declaratory

relief "as unnecessary" after granting vacatur and permanent injunction).[13]

## CONCLUSION

For the reasons provided herein, Plaintiffs respectfully request that the Court grant their

motion for partial summary judgment, vacate Defendants' February 19, February 20, March 20,

and April 21 Letters, and issue a permanent injunction and/or a declaratory judgment.

---

[13] Other factors considered by courts in the Second Circuit, such as "whether the proposed remedy is being used merely for procedural fencing or a race to res judicata," or "whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court," do not weigh against declaratory relief here.  *Freeman*, 2024 WL 5239410, at *11.

Dated:  June 27, 2025
          New York, New York

Respectfully submitted,


 /s/ Roberta A. Kaplan
Roberta A. Kaplan
D. Brandon Trice
Maximilian T. Crema
KAPLAN MARTIN LLP
1133 Avenue of the Americas | Suite 1500
New York, New York 10036
Tel.: (212) 316-9500
rkaplan@kaplanmartin.com
btrice@kaplanmartin.com
mcrema@kaplanmartin.com


 /s/ Mark A. Chertok
Mark A. Chertok
Elizabeth Knauer
Amy Lynn Cassidy
John F. Nelson
Phillip Dane Warren
SIVE, PAGET & RIESEL, P.C.
560 Lexington Avenue, 15th Floor
New York, New York 10022
Tel.: (212) 421-2150
mchertok@sprlaw.com
eknauer@sprlaw.com
acassidy@sprlaw.com
jnelson@sprlaw.com
dwarren@sprlaw.com

*Attorneys for Plaintiffs the Metropolitan Transportation Authority and Triborough Bridge and Tunnel Authority*


MURIEL GOODE-TRUFANT
Corporation Counsel of the City of New York

 /s/ Nathan Taylor
Nathan Taylor
Christian C. Harned
New York City Law Department
100 Church Street

New York, New York 10007
Tel.: (212) 356-2315
ntaylor@law.nyc.gov
chharned@law.nyc.gov

*Attorneys for Intervenor-Plaintiff New York City Department of Transportation*