# EXHIBIT 1

P5R5mtaA

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
3    METROPOLITAN TRANSPORTATION
     AUTHORITY, et al.,
4
                   Plaintiffs,
5
               v.                          25 Civ. 1413 (LJL)
6
     SEAN DUFFY, et al.,
7
                   Defendants.
8
     ------------------------------x
9
                                      New York, N.Y.
10                                    May 27, 2025
                                      10: a.m.
11
     Before:
12
                      HON. LEWIS J. LIMAN,
13
                                      District Judge
14
                           APPEARANCES
15
16   KAPLAN MARTIN LLP
          Attorneys for Plaintiff
17   BY:  ROBERTA ANN KAPLAN
          MAXIMILIAN CREMA
18        BRANDON TRICE
19   SIVE, PAGET & RIESEL
          Attorneys for Plaintiff (25CV1413)
20   BY:  MARK A. CHERTOK
          ELIZABETH READ KNAUER
21
22   EARTHJUSTICE
          Attorneys for Intervenor Plaintiff
             (Riders Alliance & Sierra Club)
23   BY:  DROR LADIN
24   NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
          Attorneys for Intervenor Plaintiff (NYS DOT)
25   BY:  ANDREW G. FRANK
```

P5R5mtaA

1                             APPEARANCES
                             (Continued)
2


3

NEW YORK CITY LAW DEPARTMENT
4        Attorneys for Intervenor Plaintiff (NYC DOT)
    BY:  NATHAN MICHAEL POTTER TAYLOR
5


6   U.S. DEPARTMENT OF JUSTICE
    BY:  CHARLES E.T. ROBERTS
7        MICHAEL BRUNS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P5R5mtaA

1             (Case called)

2             THE DEPUTY CLERK:  Starting with counsel for

3     plaintiffs, please state your appearances for the record.

4             MS. KAPLAN:  Good morning, your Honor.  Robbie Kaplan

5     from Kaplan Martin, here for the plaintiffs, and I am here with

6     my colleagues, my partner Brandon Trice and my colleague Max

7     Crema.

8             THE COURT:  Good morning.

9             MR. CHERTOK:  Mark Chertok from Sive, Paget & Riesel

10    for MTA/TBTA, along with my partner Elizabeth Knauer.

11            MR. FRANK:  Andrew Frank from the State Attorney

12    General's office on behalf of the State Department of

13    Transportation.

14            MR. TAYLOR:  Nathan Taylor with the New York City Law

15    Department on behalf of the City Department of Transportation.

16            MR. LADIN:  Dror Ladin for intervenors Riders'

17    Alliance and Sierra Club.

18            MR. ROBERTS:  Charles Roberts from the U.S. Department

19    of Justice on behalf of defendants.

20            MR. BRUNS:  Good morning, your Honor.  Michael Bruns,

21    United States Department of Justice, on behalf of defendants.

22            THE COURT:  Is there anybody here from the U.S.

23    Attorney's office for the Southern District of New York?  Or

24    no.

25            MR. ROBERTS:  No, your Honor.

P5R5mtaA

1              THE COURT:  Give me one moment.

2              We are here for oral argument on the motion by

3     plaintiffs for preliminary injunction.  I have allocated 45

4     minutes to each side.  The plaintiffs, as the moving party, go

5     first.

6              Ms. Kaplan, have you decided how you are going to

7     allocate your time and whether you are reserving time for

8     rebuttal?

9              MS. KAPLAN:  We have, your Honor.  I'm going to do 30

10    minutes to begin, only me, and then would like to reserve 15

11    minutes for rebuttal, and Mr. Frank reserves some time to speak

12    at rebuttal, if necessary.

13             MR. FRANK:  Yes.

14             THE COURT:  Mr. Frank.

15             MR. FRANK:  If I might address that briefly?

16             We are not arguing initially, we intend to stay on our

17    papers.  There are some issues the defendants have not

18    addressed so we believe that those issues are unrebutted and so

19    we will rest on our papers.  To the extent that there are

20    issues that both MTA and we have raised, we are willing to rest

21    on our papers, as well as the arguments that Ms. Kaplan will

22    make.  Of course I am here to answer any questions, if the

23    Court wishes.

24             THE COURT:  Thank you very much.

25             Ms. Kaplan, we will hear from you.  Do you want a

P5R5mtaA

1    warning sign as you approach the half hour mark?

2                MS. KAPLAN:  I would love that, your Honor.

3                THE COURT:  At what point?

4                MS. KAPLAN:  Good question.  20-25.

5                THE COURT:  After you have exhausted 20 minutes?

6                MS. KAPLAN:  Yes; and 25.

7                THE COURT:  OK.

8                MS. KAPLAN:  Good morning again, your Honor.

9                As your Honor knows, we commenced this action on

10   February 19, immediately after Department of Transportation

11   Secretary Duffy announced that he was rescinding approval for

12   congestion pricing under the Value Pricing Pilot Program -- or

13   VPPP statute -- and terminating the VPPP agreement because of

14   his view that congestion pricing is not authorized under the

15   VPPP statute.  At that time, your Honor, we quite deliberately

16   did not seek emergency injunctive relief.  As we said from day

17   one, we believe that the secretary's conclusion that the VPPP

18   does not authorize congestion pricing is incorrect as a matter

19   of law so that the purported termination is invalid.  As a

20   result, as everyone knows, congestion pricing has remained in

21   place.  And since nothing has changed since February, there is

22   no reason that the judicial process couldn't play out in the

23   ordinary course, as your Honor will recall, the parties were

24   originally talking about when we were talking about the

25   scheduling in the case.

P5R5mtaA

1          We were always sensitive to the question of timing and

2     we kept raising it with defendants.  We didn't want to find

3     ourselves in a situation where the defendants had acted

4     precipitously and took action before the legal issues here

5     could properly be presented to and decided by your Honor.

6     Things have now changed.

7          After months of threatening to take action if

8     congestion pricing does not end, on April 21, Secretary Duffy

9     issued an order to show cause letter stating that he "will

10    implement" various "compliance measures" as early as May 28 --

11    which your Honor knows is tomorrow -- unless congestion pricing

12    is stopped by May 21 -- and as we all know it didn't.

13         After that letter, your Honor, we promptly tried to

14    meet and confer with defendants regarding a briefing schedule

15    and right after that we filed this motion for preliminary

16    injunction.

17         The clear purpose of the April 21 letter and the

18    compliance measures that are threatened there is to present my

19    clients with a Hobson's choice, either to end congestion

20    pricing and lose its environmental and financial benefits, not

21    to mention the half billion dollars we invested in it and the

22    bonds that we have issued already that are needed to improve

23    and repair the outdated subway infrastructure, or face

24    wide-scale withholding of funds and approvals for

25    transportation projects including, but not limited to, projects

P5R5mtaA

1    here in New York City.

2              THE COURT:  So, Ms. Kaplan, I understand your argument

3    that the Court doesn't have to wait for Damocles' sword to fall

4    before entering an injunction.  The nature of an injunction is

5    to prevent the sword from falling.  Most of the harm that you

6    have identified seems to relate to what would happen if the

7    compliance measures are ordered or if New York stops congestion

8    pricing.  Have you identified any harm to me that your clients

9    have suffered or that co-plaintiffs have suffered right now as

10    a result of the threats?

11              MS. KAPLAN:  Yes, we have, your Honor.

12              As I just mentioned, the MTA issued bonds in

13    connection with congestion pricing.  Those bonds are long-term.

14    They rely upon the revenue stream that will be coming in in the

15    future from congestion pricing.  And, as your Honor knows, that

16    kind of uncertainty in the bond market and financial market is

17    already impairing and injuring the MTA.

18              I should note that our CFO, Kevin Willens is here in

19    the courtroom if your Honor has any questions, but that is the

20    key issue that is already hurting us right now.

21              THE COURT:  Are those the 30-year bonds or are they

22    shorter term?

23              MS. KAPLAN:  I believe they're 30 years but my

24    colleagues just nodded yes, they're 30 years -- no.  One

25    colleague said yes, one colleague said no.  I will get you the

P5R5mtaA

1  answer, your Honor.

2          THE COURT:  OK.

3          MS. KAPLAN:  So, given this kind of unique

4  circumstance we are in, we are seeking a preliminary injunction

5  really to preserve the status quo and to allow your Honor to

6  decide whether defendants' efforts to stop congestion pricing

7  are proper.

8          So, what is defendant's response to this?  They have

9  said two things.  Their argument is that we are both somehow

10  too early and too late.  Too early, they argue, because the

11  administration hasn't actually decided exactly which of the

12  various retaliatory actions they will take in order to punish

13  us for defying President Trump's post on social media on

14  February 19, where he presents a picture of himself wearing a

15  crown and says, in all caps:  Congestion pricing is dead.  Long

16  live the king.  And too late, according to defendants, your

17  Honor, because we should have sought our preliminary injunction

18  earlier.  But as I just explained, we asked defendants when and

19  if they were going to do anything.  And as your Honor will

20  recall, at the conference on April 9, your Honor asked

21  defendants to confirm that there was no action that was

22  imminent to be expected from the federal government.  Counsel

23  for defendants confirmed that Secretary Duffy was still

24  evaluating options.  The one thing we do today know for sure,

25  your Honor, is that as of tomorrow they have said they can and

P5R5mtaA

1    will start taking any of the measures listed in their April 21

2    letter, which isn't even limited to things that are listed

3    there.

4              THE COURT:  Are you also asking, in the alternative,

5    for a TRO so I can consider the arguments today?

6              MS. KAPLAN:  Yes, your Honor.  If your Honor needs

7    more time to consider the arguments, absolutely a TRO would be

8    the appropriate remedy.

9              So, as we have been saying all along, we believe that

10   the Court should act, either by TRO or by preliminary

11   injunction, so as to avoid the parties and the Court having to

12   scramble at the last minute to try to stop or undo the damage.

13   Let me start with finality.

14             The doctrine of finality asks your Honor whether an

15   agency's decision-making process has concluded and whether

16   there will be legal consequences as a result.  That standard is

17   satisfied here.  On February 19, Secretary Duffy said, "I am

18   rescinding FHWA's approval of the program under the November 21

19   VPPP agreement, and I am terminating the agreement."

20   Secretary Duffy's April 21 letter is just as final.  It says

21   that the FHWA will implement certain compliance measures and

22   goes on to list the possible measures that they can implement.

23             The fact that the April 21 letter invites my clients

24   to come up with some way of changing the secretary's mind

25   doesn't really mean that the issue is still open.  It is

important in this respect, your Honor, to note that this is a
legal issue, or what defendants now call a policy issue, not
really a factual issue. And the parties, having discussing
these issues --

THE COURT: They now call it a policy issue.

MS. KAPLAN: Exactly, your Honor.

And the parties have been discussing these issues now
for months. As has been wildly reported in the press, there
were meetings between the governor and the president, there
meeting with officials, etc. So, it is completely implausible
at this point to think that there is anything we can do or say
that would change the Trump Administration's mind. Justice
Scalia's opinion from a unanimous Supreme Court in the *Sackett*
case is directly on point. We relied on that case in our
briefs, defendants didn't address it in their opposition.

In *Sackett*, landowners, I believe in Idaho, challenge
an EPA order finding they violated the Clean Water Act and
directing them to restore their property. Justice Scalia
concluded that the EPA order was a final agency action because
the text of the order made it clear that EPA's deliberation was
at an end.

*Sackett* establishes three important things, your
Honor. One, when an agency issues an order that is on its face
final as to determination of the law, that is a final agency
action. Clearly the February 19 letter was that, your Honor.

P5R5mtaA

1    Two, an agency does not need to try to enforce the order before

2    it is final.  And three, once an agency has rendered a

3    decision, the mere possibility -- those are Justice Scalia's

4    words -- that the agency might reconsider, doesn't really

5    matter for purposes of finality.

6        Defendants respond by saying that the February 19

7    termination letter is part of a larger, again these are their

8    words, quote, larger unfolding administrative process but the

9    only process that remains here is for them to choose which

10   means of enforcement they had to take.  And they haven't

11   invited my clients to weigh in on that.  Plus *Sackett* says that

12   alone is not enough.  Moreover, your Honor, to the extent that

13   there is any such larger unfolding process, then we shouldn't

14   have heard about it for the first time in their opposition

15   papers.  And such process, including whatever it entails,

16   should have been disclosed originally in the February 19 letter

17   under black letter principles of the APA.

18       Defendants argue that the April 21 letter gave us a

19   chance to contest the termination but I would implore your

20   Honor to take a look at the April 21 letter.  I don't think you

21   will find the words "re-open" or "reconsider" anywhere in that

22   letter.  And defendants have repeatedly stated since then that

23   the February 19 termination stands.  In fact, they've said so

24   to the Daily News as recently as May 21, reiterating again that

25   they can start taking compliance measures tomorrow.

P5R5mtaA

1          Moreover, your Honor, as we already know from the

2     prior cases that you have been handling, the VPPP operates as

3     an exception to the original statutory prohibition on tolls on

4     federal highways in Section 301.  Defendants have repeatedly

5     said because they terminated the VPPP here, the program is

6     prohibited under Section 301 and have ordered us to cease

7     tolling.  But, as *Sackett* makes clear, the mere possibility

8     that an agency may reconsider in light of informal discussion

9     is not enough.

10          THE COURT:  Is there really any question that if the

11     VPPP agreement was in fact terminated then the operation of

12     congestion pricing would be in violation of Section 301, in

13     other words, that your clients needed the cooperative agreement

14     in order to go forward?

15          MS. KAPLAN:  No.  No, we don't dispute that at all,

16     your Honor.

17          And the other thing I think is quite clear from these

18     circumstances, your Honor, and I think the *Loper* decision

19     decided by the Supreme Court last term is very important, is

20     that the question you just asked me, interpreting the meaning

21     of 301, interpreting how the various federal statutes with

22     respect to tolling operate, determining whether the VPPP

23     agreement, which they signed, is authorized or not, those are

24     decisions for your Honor.  Secretary Duffy, thanks to *Loper*, no

25     longer has the right to change his interpretation of a statute

P5R5mtaA

```
1   and have that be binding upon anyone.  It is a decision for the
2   Court.  If they say it once in Loper, Chief Justice Roberts, he
3   says it 752 times.
4           THE COURT:  You really counted the numbers?
5           MS. KAPLAN:  No, that's an exaggeration, your Honor.
6   I'm sorry.  Sometimes I can't help but embellish a bit.
7           Defendants also fault us for not seeking injunctive
8   relief immediately after February 19 but, as I said before, we
9   filed the lawsuit immediately after February 19, and we didn't
10  seek injunctive relief for the reasons I already explained.
11  Any delay between the April 21 letter and the day we filed this
12  motion on May 5 is attributable solely to our efforts to try to
13  work out a briefing schedule with defendants.
14          THE COURT:  Let me ask you on that subject, has the
15  administrative record been produced yet?
16          MS. KAPLAN:  No.  Today.  They're getting it today.
17          THE COURT:  Today is the deadline.
18          MS. KAPLAN:  Today is the deadline.  There was
19  correspondence about it over the weekend, your Honor, and what
20  we suggested that the government should do for purposes of
21  efficiency, is not have to file with the Court anything that
22  was previously part of the administrative record in Mulgrew and
23  those cases but anything new to file.  I'm not sure, but I
24  think they're agreeable to that.
25          THE COURT:  I would have been prepared, had the
```

P5R5mtaA

1    administrative record been produced earlier and all discovery

2    with respect to it addressed, to move more quickly as the

3    parties suggested, to summary judgment.

4          MS. KAPLAN:  We will absolutely undertake all efforts

5    to do that, your Honor.

6          Let me turn to rightness, another one of the key

7    arguments that defendants made.  As your Honor knows, the

8    concept or doctrine of prudential rightness is a discretionary

9    doctrine that forms a "narrow exception to this Court's

10   jurisdiction."  To determine whether it applies courts ask,

11   one, whether the issues are fit for judicial decision; and two,

12   whether a party is likely to suffer hardship if the Court

13   withholds consideration.

14         For all the reasons we have already said, your Honor,

15   both factors weigh very heavily in our favor here.  Again, this

16   is a legal challenge, precisely the kind of disputes that

17   courts are supposed to handle under *Loper*; and two, the

18   February 19 letter focused on whether the program is authorized

19   under that statute, under the VPPP statute.  And while

20   defendants, as your Honor has noted, are now repackaging many

21   of their statutory arguments as policy arguments, the

22   permissibility of those rationales presents a legal question

23   for the Court.

24         In terms of hardship, your Honor, there is really no

25   question we are already suffering hardship as a result of the

P5R5mtaA

1    bond issues that I discussed and there can't really be any

2    dispute that if it takes some measure tomorrow, we will have

3    immediate irreparable injury.

4              THE COURT:  Let me ask you a question.

5              MS. KAPLAN:  Sure.

6              THE COURT:  Assume that I agree with you that the

7    secretary did not have the authority to revoke the VPPP

8    agreement.  Would there be any need for me to address what to

9    them seemed to be a hypothetical question as to whether the

10   secretary could employ any of the threatened compliance

11   measures if I had determined that the MTA and the other

12   plaintiffs were in violation?

13             MS. KAPLAN:  That is what we asked for, as your Honor

14   knows, in our compliant.  That is precisely the declaration

15   that we seek.  I don't think the secretary could.  I think any

16   such compliance measures, particularly those listed in the

17   April 21 letter would be unlawful if they attempted to do that,

18   but that is why we sought the relief of declaratory judgment.

19   I have also been thinking --

20             THE COURT:  But do I need to address that?  It may be

21   that I do need to address that if I agree with the defendants

22   that the secretary had the authority to revoke the VPPP

23   agreement or that the prior administration didn't have the

24   authority to sign it.  But, assume that I agree with you that

25   the prior administration had the authority and the secretary

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5R5mtaA

1    doesn't have the authority to revoke it, why would I then go on

2    to decide questions about what would happen in the event that

3    the present secretary, the new secretary, the one who is the

4    defendant here, has that authority?

5        MS. KAPLAN:  I don't think your Honor does need to

6    decide and I would assume and expect that Secretary Duffy will

7    comply with your Honor's order declaring that the cancellation

8    of the VPPP agreement was improper and illegal.

9        I have been thinking, your Honor, because I thought

10   you had raised these issues about what kind of compliance

11   measures would be OK, assuming that the VPPP agreement stays in

12   place and I came up with a couple of ideas.

13       One, and you have to really look at the VPPP

14   agreement, this very clearly sets this forth, one, there is a

15   schedule for the tolls, that is attachment A to the VPPP

16   agreement.  So, if, for example, the MTA were to decide

17   tomorrow -- which are they're not, to be clear, I don't want

18   anyone to freak out here -- decide tomorrow that they're going

19   to increase the tolls from $9 to $15, that would be a violation

20   of the VPPP agreement and they could take measures.  And then

21   on a somewhat lighter note, your Honor, if --

22       THE COURT:  I assume if they reduced the tolls that

23   might also be a violation.

24       MS. KAPLAN:  Exactly right.  Or if, for example, as

25   was the issue in the other case, if the MTA were to charge

P5R5mtaA

1  different tolls to the New Jersey crossings than it would for

2  people coming from New York, that would also be a clear,

3  blatant violation of the VPPP agreement and compliance measures

4  could be taken.

5         Turning to the Tucker Act, your Honor, I think it is

6  pretty easy, actually.  The Tucker Act doesn't apply here

7  because the VPPP agreement is an unfunded cooperative

8  agreement.  We cite cases that say that the Tucker Act doesn't

9  apply because these are not money mandating contracts.  That's

10  the language from the *Bernard Parish* case.  And, the Tucker Act

11  also doesn't apply when there is no jurisdiction in the Court

12  of Federal Claims and there is no jurisdiction in the Court of

13  Federal Claims if it is not a contract based on money.

14         THE COURT:  But the mere fact that it is a cooperative

15  agreement does not necessarily divest the court of claims of

16  jurisdiction; right?  The court of claims has made that clear.

17         MS. KAPLAN:  Correct, your Honor.  The court of claims

18  make that clear but here the dispute is not about the contract.

19  Here the dispute is about whether they have the authority to

20  revoke congestion pricing today, and that's an issue that

21  arises under the APA, NEPA, and the Constitution, not under

22  provisions of this contract.

23         And I will note that we site the *Megapulse* case, your

24  Honor, from the D.C. Circuit, 1982, in which the Court says

25  when the source of rights asserted is constitutional,

P5R5mtaA

```
 1    statutory, or regulatory in nature, the fact that resolution of

 2    the claim requires some reference to a contract does not

 3    magically transform the action into one on the contract and

 4    deprive this Court of jurisdiction.

 5           The Christian doctrine is similar, your Honor.  That

 6    doesn't apply either.  The reason it doesn't apply is because

 7    that applies to procurement contracts and this is not a

 8    procurement contract.  As your Honor knows, we don't get a

 9    penny under the VPPP agreement so there is no way the Christian

10    doctrine could apply.

11           THE COURT:  In fact, I think the only obligation of

12    the FHWA, under the agreement, is to cooperate with your

13    clients.  There is no other affirmative obligation they have

14    whatsoever.

15           MS. KAPLAN:  Correct, your Honor.

16           I now want to turn to the merits or likelihood of

17    success and I will note on that that I think it is telling that

18    defendants don't make any effort to even discuss the merits

19    until page 35 of their brief.

20           THE COURT:  Let me ask you, let's assume that I agree

21    with the position that seems to have been taken by the

22    secretary that the prior administration didn't have the

23    authority to sign the VPPP agreement, Congress didn't give the

24    authority.  Then I wouldn't need to go beyond that, right, to

25    consider whether the decision was otherwise arbitrary and
```

P5R5mtaA

```
1    capricious?  You said that is a legal determination for me.

2              MS. KAPLAN:  Correct.

3              So if, for example, going back to the February 19

4    letter, if as the secretary originally argued, the VPPP statute

5    does not authorize what he calls cordoned pricing, congestion

6    pricing where there is no alternative route into the area, then

7    that would be a legal question for your Honor to make and I

8    don't think you have to decide arbitrary and capricious; that

9    would be correct.  That is really why the whole point about

10   this being open because we are going to talk further with the

11   defendants doesn't make sense here.

12             So, the first concern they now make, which was

13   originally a statutory issue and now they call it a policy

14   issue is this toll-free option I just talked about.  But there

15   is nothing unusual about drivers having to pay a toll to access

16   a certain geographic area.  We New Yorkers are very familiar

17   with that.  All the ways to get onto Staten Island are tolled

18   and have been tolled for decades.  Moreover, defendants ignore

19   the real substantial amount of evidence we cited in our

20   complaints that the FHWA and Congress have, for years,

21   encouraged cordoned pricing options without a toll-free option

22   because they are honestly the most effective ways to reduce

23   congestion.  And on top of that, your Honor, as your Honor

24   knows, the very idea of congestion pricing began here in New

25   York at Columbia University, and the concept had to do with
```

P5R5mtaA

1    Manhattan, lower Manhattan in particular, which is a pretty

2    narrow strip of land; the idea that there would be some

3    alternative non-toll-free way wouldn't really work.

4         The second argument that defendants make is that the

5    program imposes a disproportionate financial burden on low and

6    medium income drivers.  This is contradicted by the FHWA own

7    conclusions in the NEPA analysis that the Court has already

8    been looking at.  There they found that the program would

9    actually benefit those populations, including by facilitating

10   mass transit and reducing congestion on the roads and including

11   the discount that is offered for frequent low-income drivers

12   into the CPD.  I will note, they make an argument about the

13   Bronx, your Honor, and this really goes to irreparable injury,

14   and they say they're worried about congestion increasing in the

15   Bronx, they cite an early article suggesting that that might

16   happen.  It turns out that it hasn't happened.

17        THE COURT:  By the way, you have got 8 minutes to go.

18        MS. KAPLAN:  OK, your Honor.

19        They talk about, the next argument they make is that

20   congestion pricing is a tax but that argument was decided by

21   Judge Seibel already.  And they say that you can't use it to

22   support mass transit but, obviously, that was the whole point

23   of the VPPP agreement.

24        MR. CHERTOK:  Let me turn to termination of authority,

25   your Honor.  The VPPP agreement, as your knows, says nothing

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5R5mtaA

1    about termination.  And to the extent it speaks to longevity it

2    says, which is consistent with the statute, that the private

3    sponsor shall monitor the program for at least 10 years.  The

4    defendant's argument now is that they have the authority to

5    terminate the program under the regulation 2 CFR 200.340(a)(4),

6    but that doesn't work because that regulation says the agency

7    may only terminate a federal award "pursuant to the terms and

8    conditions of the federal award."  And the accompanying

9    regulation says that when a federal agency wants to have a

10    right to terminate, they must "clearly and unambiguously

11    specify all termination provisions in the terms and the

12    conditions of the award."

13            This pretty much forecloses the argument they based on

14    the regulation.

15            So, in order to continue making this argument they go

16    on to say that the VPPP agreement somehow silently incorporates

17    regulations that talk about all federal law and that is how it

18    gives them a right to terminate.  But the provisions they cite

19    to, such as that our clients agree to comply with all federal

20    laws, don't say anything about incorporation and they don't say

21    anything about incorporating any right to terminate.

22    Similarly, another regulation they cite, which says that you

23    must inform recipients of the termination provisions including

24    the applicable termination provisions in a clear and

25    unambiguous way, also obviously doesn't give them a right to

P5R5mtaA

1   terminate because if they followed that, there would be a

2   termination provision in the VPPP agreement itself.

3           It is important, your Honor, to note the defendants

4   don't just argue based on these arguments that they have a

5   unilateral right to terminate the VPPP agreement.  The

6   underlying logic of their argument is that every single

7   agreement that a federal agency enters into, by implication,

8   has a unilateral right to terminate that agreement regardless

9   of what the agreement says or what the agreement is for.  That

10  shows how far they have to stretch to make this incorporation

11  by reference argument, your Honor.  And having read *Loper* and

12  gotten the number wrong on how many times Chief Justice Roberts

13  talks about it being decision for the Court having read *Loper*,

14  that would be completely inconsistent with the reasoning in

15  *Loper*.

16          Reliance and trust, your Honor, we have already

17  touched on.  I would only site that the *Regents* case which

18  makes it clear that even if the agency was correct about the

19  law, they still have to consider reliance and they have clearly

20  no consideration of reliance in here.  The February 19 letter

21  kind of brushes it aside.  They talk about that we shouldn't

22  have relied because we knew that Donald Trump could have become

23  president again but this ignores all the years that followed

24  the last presidential campaign and the fact that we relied on

25  it, the fact that the prior Trump administration said that

P5R5mtaA

1    congestion pricing would be the perfect fit for the issues that

2    we have here, and I would argue that under *Loper* and *Regents*,

3    the idea that an agency can't rely on federal statements

4    because there may be a new administration in the future

5    would --

6          THE COURT:  Your argument is that the recipient and

7    the sub-recipient are not required to accept, at face, the

8    statements of a candidate on the stump and then to also assume

9    that that candidate on the stump (A) will become president; and

10    (B) when becomes president, his secretaries will carry out

11    those views.

12          MS. KAPLAN:  You just said it so much better than I

13    did, your Honor.  I completely agree with that.

14          There is language in *Loper* about instability in the

15    law if these kind of things could change from administration to

16    administration, and obviously if we are talking about a kind of

17    public works transportation project, like we are talking about

18    here, that would be even more concerning.

19          Finally, your Honor, because I don't think I have much

20    time left, I'm going to turn to --

21          THE COURT:  I will give you five more minutes.

22          MS. KAPLAN:  I will turn to balance of the equities

23    and the public interest.  When the government is involved,

24    those two inquiries kind of combine and here they, we believe,

25    strongly favor granting our motion.

P5R5mtaA

1          First of all, obviously we cite the *League of Women*

2    *Voters* case for this.  There is no public interest in the

3    perpetuation of an unlawful agency action and we believe that

4    Secretary Duffy's action to terminate the VPPP agreement was

5    unlawful.

6          There is no --

7          THE COURT:  On the bounds of hardship, so I get your

8    point that the state suffers harm when the policies adopted by

9    its elected representatives are not permitted to go forward,

10   but doesn't the federal government also suffer harm when, on a

11   preliminary basis, before the Court has reached a final

12   determination, the policies of the democratically elected

13   president are enjoined?

14         MS. KAPLAN:  I agree with that, your Honor, and I

15   agree with, as your Honor said at the beginning of this

16   argument, the need, the proper way to decide this would be on

17   summary judgment as we originally discussed at the beginning of

18   the case but it is the defendants who are creating the problem

19   here.  We asked them, if your Honor will recall, in letter

20   after letter, to agree to maintain the status quo so your Honor

21   could properly decide the issues and then we would all have

22   decisions, and they've refused.  They've even refused to not

23   give up the deadline of tomorrow for them putting in place

24   compliance measures that would create irreparable harm to New

25   Yorkers throughout the city and throughout the state.

P5R5mtaA

1        So, there is a way to solve that problem.  They just

2   need to -- we are happy to accelerate even the summary judgment

3   briefing but they need to agree to maintain the status quo in

4   the meantime.  And if they won't, and they haven't, that's why

5   we are in this court asking your Honor to do something which, I

6   agree, your Honor shouldn't need to have to do.

7        I don't think, unless my colleagues tell me I missed

8   anything, I have anything else to say, your Honor, but I'm

9   going to reserve 15 for rebuttal.

10       THE COURT:  You actually have 16 minutes for rebuttal

11  because you used your time efficiently.

12       MS. KAPLAN:  Thank you, your Honor.

13       THE COURT:  I will hear from the defendants.  You have

14  got 45 minutes.

15       MR. ROBERTS:  Good morning, your Honor.  Charles

16  Roberts from the U.S. Department of Justice on behalf of

17  defendants.

18       Plaintiffs bring this case and this motion at the

19  wrong time and in the wrong place.  Either the claims are about

20  whether the Federal Highway Administration's ongoing agency

21  process --

22       THE COURT:  Let me ask you, just as a preliminary

23  matter, is what Ms. Kaplan said, what plaintiffs said correct,

24  that you are not willing to commit, on behalf of your client,

25  to hold off on compliance measures until I decide the summary

P5R5mtaA

1    judgment motions?

2              MR. ROBERTS:  My clients are willing to say that any

3    determination of non-compliance under 301 would provide a

4    reasonable amount of time before any compliance measures --

5              THE COURT:  No, no.  My question to you is, is your

6    client willing, right now, to agree to me entering an order

7    that says -- let's start small -- that for the next 14 days,

8    your client will not take any measures to force the plaintiffs

9    to stop congestion pricing whatsoever.  Is your client willing

10   to agree to a court order to that effect and to comply with

11   that order?

12             MR. ROBERTS:  We would, of course, comply with this

13   Court's orders.  I would have to check with my client about

14   those particular terms that your Honor just laid out, but what

15   I am able to say is any determination of non-compliance would

16   provide for a reasonable amount of time before compliance

17   measures would go into effect in order to help facilitate

18   timely judicial review of that determination of non-compliance.

19   So, we are saying there is going to be a gap between such a

20   determination and the imposition or effectiveness of any

21   compliance measures.  I just don't know, in response to your

22   specific question, whether 14 days is sort of the number that

23   we are talking about there.

24             THE COURT:  Is it still your client's position that

25   the prior administration did not have the lawful authority to

P5R5mtaA

1    sign the VPPP agreement?

2                    MR. ROBERTS:  Yes, your Honor.

3                    As laid out in our brief, we believe that the two

4    issues, which plaintiffs recognize as policy concerns, informed

5    the February letter, informed the April letter.  Those are an

6    independent and adequate ground to affirm the agency's decision

7    here under the APA, and so we don't think your Honor needs to

8    reach --

9                    THE COURT:  Adequate and independent is a standard

10   that the Supreme Court uses when it reviews a state court

11   decision to determine whether it rests upon adequate and

12   independent state grounds.  Is there any authority that that

13   doctrine applies to the APA to permit the Court to sustain

14   administrative action that is taken on one ground but then

15   defend it in litigation on another ground?  Do you have a case

16   that would support that?

17                   MR. ROBERTS:  I dispute the characterization --

18                   THE COURT:  You used the language adequate and

19   independent.

20                   MR. ROBERTS:  No, no.  I am not disputing that, your

21   Honor, and that is correct that is the language that the

22   Supreme Court uses.  What I meant to dispute was the end of

23   your Honor's characterization that these concerns only arose in

24   litigation.  They're on the face of the April letter which is

25   part of the administrative record here and they are on the face

P5R5mtaA

1    of the February letter, as well.  Those policy concerns

2    prompted the secretary's consideration and they are part of

3    that decision from the get-go here.  I don't think anyone is

4    uncertain that those policy concerns were part of this decision

5    from the get-go.

6          THE COURT:  How long is your client willing, if I were

7    to enter an order that says for "X" number of days your client

8    will not take any compliance measures, what is the "X" that

9    your client agrees to?

10         MR. ROBERTS:  I don't have an X number that we are

11   willing to affirmatively offer.  Of course we will comply with

12   X number of days in your Honor's order, as you describe it.

13         Going back to independent and adequate, that is the

14   language the courts use in interpreting the prejudicial error

15   rule that is on the face of the Administrative Procedure Act.

16   706 incorporates the rule of prejudicial error, courts must

17   take account of it, that is the harmless error standard, so a

18   decision is not arbitrary and capricious to the extent that it

19   rests on any valid independent grounds.  And there are many

20   cases that I am willing to provide in supplemental briefing, if

21   your Honor needs it, but if you look at cases discussing

22   prejudicial error under 5 U.S.C. 706, that is where you will

23   find that independent and adequate sort of language.

24         So, there are claims by the Federal Highway

25   Administration's ongoing agency process that may continue, in

P5R5mtaA

1    which case there is no jurisdiction to review that non-final

2    and unread agency action, or their claims are about whether the

3    terms of their contract with the government permitted

4    termination, in which case Congress has provided exclusive

5    jurisdiction in the Court of Federal Claims.  I heard

6    plaintiffs to say both that their claims here today all hinge

7    on the agreement.  Whether or not they're in compliance under

8    301 all hinges on the agreement in interpreting the agreement

9    here.

10           THE COURT:  What provision of the VPPP agreement do

11    you say that the plaintiffs are resting their claim on?  I have

12    the agreement in front of me so tell me which paragraph.

13           MR. ROBERTS:  That they're resting their claim on?

14    They're resting their claim on the absence of an explicit

15    termination provision within the four corners of the agreement

16    is my understanding, so to the extent they need your Honor to

17    interpret that agreement and to determine whether or not it

18    authorized termination?  There is no way to get to the question

19    of whether or not that agreement is in effect without going

20    through the agreement and the question of whether it authorized

21    termination.

22           THE COURT:  So they're relying, you say, not on

23    anything that is in the agreement but on something that is not

24    in the agreement.  That's kind of an odd contract claim, isn't

25    it, to sue somebody for violating a provision that doesn't

P5R5mtaA

1    exist?

2            MR. ROBERTS:  No, your Honor.  The question is whether

3    or not this agreement, as entered into by the parties,

4    contemplated termination and they say that it did not, it does

5    not authorize us to terminate it.  They're not saying that the

6    VPPP statute or any regulation prohibits us from terminating

7    the agreement, they're saying this agreement does not allow us

8    to terminate this agreement.  There is no way around that

9    question of what this agreement means in order to reach the

10   question of whether it was validly terminated.  That is the

11   question.  That is the contractual question before the Court.

12   That is the source and nature of plaintiff's asserted rights

13   here.

14           THE COURT:  Is there anything else other than the

15   absence of language in the VPPP agreement that you say the

16   plaintiffs are resting their claim on in terms of the VPPP

17   agreement?

18           MR. ROBERTS:  I also heard them to be resting on the

19   selective quotation of Section 8(b) of the agreement which says

20   that they will monitor the parties, TBTA and NYCDOT shall

21   monitor and report on the project performance from the date of

22   implementation for a period of at least 10 years or to the end

23   of the life of the project, whichever is sooner.  That part,

24   whichever is sooner, or the end of the life of the program or

25   whichever is sooner, that gets left off of plaintiff's

P5R5mtaA

1    discussion of the 10-year term, the minimum 10-year term that

2    they seem to argue is contemplated by this agreement.  That is

3    one specific piece of language in here that I think that

4    they're also relying on.  To the extent they're saying we at

5    least -- that the defendants at least do not have authority to

6    terminate the agreement for 10 years, they're relying on that

7    particular language and selectively quoting it in order to say

8    that it is a minimum of 10 years when that is clearly not what

9    the full phrase says.

10              But yes, I think, your Honor, to the extent that they

11    are arguing that we are not allowed to terminate the agreement,

12    there is no way to reach to conclusion on that question without

13    interpreting the agreement.  Yes, there is reference to

14    regulations, yes, there is reference to statutes, but

15    plaintiffs own case which they brought up today, *Megapulse*, I

16    believe we cited it as well, but *Megapulse* --

17              THE COURT:  Isn't it actually your client who is

18    seeking to revoke the agreement?  They're quite comfortable

19    with the status quo.  The status quo is that they have an

20    agreement signed by the federal government that permits them to

21    do what they have been doing so they're fine with the status

22    quo.  It is your client who wants to change the status quo, as

23    I understand it.

24              MR. ROBERTS:  That is the process that is under way --

25              THE COURT:  No, the process has concluded, right, in

1    terms of your client has taken the position, you have taken the

2    position here today, right now, that the federal government

3    didn't have the authority to sign the VPPP agreement.

4            MR. ROBERTS:  Yes, but to the extent your Honor

5    disagrees with that, we had other reasons to terminate the

6    agreement and those are the reasons that we have discussed and

7    are resting on here today.  But the source and nature of rights

8    that they assert are contractual.  There is no way around it.

9    The VPPP statute, and they point to no provision in the VPPP

10   statute and no provision of the regulations, that specifically

11   entitle them to authority to run the CBTP.  That only comes

12   through this agreement.  And so, interpreting this agreement is

13   absolutely necessary to determine their claims, that is the

14   source of their rights, asserted rights, and as your Honor just

15   suggested --

16           THE COURT:  I confess, I am still confused because I

17   don't understand it to be your argument that the contract has a

18   termination provision.  Their argument is we have an agreement.

19   It is an agreement.  The government has breached it, is

20   threatening to breach it.  Isn't that the state of play?

21           MR. ROBERTS:  There is a contractual dispute, I'm not

22   sure how else to better characterize a contractual dispute, is

23   that plaintiffs believe we have improperly breached by saying

24   it is terminating.

25           THE COURT:  You are just saying this thing was not

P5R5mtaA

1  without authority.  That is something that courts, federal

2  courts determine every day under the APA, whether

3  administrative action was permitted by law and arbitrary and

4  capricious.

5        MR. ROBERTS:  Your Honor could say that about any

6  contractual claim and *Megapulse* makes clear that that sort of

7  broad rule that any government contract, because it stems from

8  statutory or regulatory or constitutional authority, any

9  government contract claim could be reframed in that way and

10  thereby destroy the jurisdiction of the Court of Federal

11  Claims.

12        THE COURT:  What is your response to the fact that

13  this is, both by statute and under the terms of this, a

14  cooperative agreement?

15        MR. ROBERTS:  The question --

16        THE COURT:  That is what Congress calls it, a

17  cooperative agreement.  The federal government hasn't put in

18  any money, they're not seeking any money.  It is not a money

19  demanding agreement, it is a cooperative agreement.

20        MR. ROBERTS:  What they are seeking is a contractual

21  remedy which is specific performance.  They're asking us to

22  continue to perform on the contract here by continuing to

23  authorize the CBTP, so that is the remedy --

24        THE COURT:  Which provision do you say again?  We are

25  going round and round.  Let me hear your next argument.

P5R5mtaA

1          MR. ROBERTS:  Well, that is, the type of relief

2     argument is also a separate reason for considering this as a

3     government contract under the Tucker Act.  The cooperative

4     label is not dispositive.  The fact that they are seeking us to

5     perform on the contract is the fundamental point there and the

6     government has not waived sovereign immunity as to specific

7     performance of contracts.  That's the whole point of the Tucker

8     Act, is if we have an agreement, a contract between the parties

9     that is susceptible, potentially, to money damages, that is the

10    appropriate remedy.  Whether or not they choose to plead it

11    that way in order to avoid the Court of Federal Claims

12    jurisdiction is not the question.  The question is what is the

13    nature of the relief that they're seeking.  The nature of the

14    relief that they're seeking is as your Honor put it, to enforce

15    this contract, to keep it in place.

16          THE COURT:  I didn't say that, or if I said that I

17    misspoke.  I don't think that they are pointing to any

18    provision of the contract and saying you, the federal

19    government, have to do anything.  They're saying that you

20    cannot say that they have violated Section 301 because you have

21    agreed that they're not violating Section 301.  It may be a

22    different person, you know, we substitute secretaries all the

23    time in terms of under the federal rules, but it is still the

24    secretary of transportation has agreed.

25          MR. ROBERTS:  Right.

P5R5mtaA

1          THE COURT:  The secretary of transportation has agreed

2     that this program is permissible.  Now there is a legal

3     question for me as to whether the secretary of transportation

4     had that authority to agree to the VPPP agreement but that's a

5     question that doesn't turn upon the contract, it turns upon the

6     question of whether the secretary had the authority to sign the

7     VPPP agreement.

8          MR. ROBERTS:  That is one of the questions but the

9     other question still remains is whether we validly terminated

10    this agreement.  And by terminating the agreement we would --

11    we would withdraw Section 1 of the agreement which provides the

12    authorization for them to conduct the CBTP.  That's what

13    plaintiffs want here.  They want Section 12 as a value pricing

14    project as part of NYC DOT's value pricing pilot program,

15    that's what they want to be in force, that is what they're

16    asking for an order from your Honor saying, is this agreement

17    that approves, authorizes you to operate the CBTP without

18    violating 301, that's what they're asking your Honor to put in

19    place and that is specific performance on this agreement.  The

20    cooperative label does not determine that but I would point out

21    actually, your Honor, although there is no transfer of funds

22    within the four corners of this agreement, it does authorize

23    the federal transfer of funds.  As federal officials such as

24    myself traveling here to this argument and as government

25    vehicles traveling to CBTP, we have to pay the tolls.  Unless

P5R5mtaA

```
 1   one of the applicable exceptions applies they are authorized to
 2   collect money from the federal government only by virtue of
 3   this agreement.  And so there is money at stake here as well.
 4   Plaintiffs are very happy to point out --
 5          THE COURT:  I could be a little bit lighthearted and
 6   ask whether my experience taking the subway in from an airport
 7   tends to avoid rush hour traffic, I don't know how you got in
 8   this morning.
 9          MR. ROBERTS:  I traveled in last night.  I lived in
10   New York City for seven years, I have taken all modes of
11   transportation getting in and out of the city.
12          THE COURT:  Did you bike or walk or drive?  How did
13   you get here?
14          MR. ROBERTS:  I took Amtrak up, your Honor.
15          THE COURT:  OK.
16          MR. ROBERTS:  So, the point, though, is that there is
17   an explicit authority for them to receive federal funds that
18   they would not receive but for this agreement.  So to the
19   extent there needs to be money at stake, to the extent there
20   needs to be a potential for money damages in order to get us
21   over the Court of Federal Claims under the Tucker Act, I think
22   that that easily satisfies it.
23          So, either way, this is not the appropriate forum and
24   the Court should deny motions for preliminary injunction.  We
25   also object to the entrance of a TRO as the late-breaking
```

P5R5mtaA

 1    motion in court today was brought, just to preserve that

 2    objection on the record for the same reasons that we lay out in

 3    our papers and in argument today.

 4            If the Court determines otherwise, if the Court

 5    determines that it has jurisdiction here, it should reject

 6    plaintiff's argument that the agency could never terminate this

 7    agreement.  That simply cannot be right.  Indeed, they concede

 8    as much in their reply, is what I understand, and the source

 9    for that, the source for that ability to terminate is the OMB

10    regulations that they're now saying they're trying to resist

11    here in argument today.  I don't understand where another

12    authority to terminate would come from and they say -- I think

13    they say there must be some authority to terminate for some

14    reason under this agreement.  To the extent that authority

15    exists, it has to come from those regulations which are

16    mandatory which must be incorporated --

17            THE COURT:  Tell me what gives the secretary the

18    authority to terminate, which regulation?

19            MR. ROBERTS:  Yes, as we laid them out in our brief,

20    any federal award may be --

21            THE COURT:  Give me a citation, 200.340?

22            MR. ROBERTS:  Yes.

23            THE COURT:  OK.  I have got it in front of me.

24            MR. ROBERTS:  Yes.  And so to the extent they're

25    conceding that we can terminate it for violating the terms and

P5R5mtaA

1  conditions, that's (a)(1) of 200.340 but there is no reason to

2  cut off the rest of (a) which leads down to (a)(4) and includes

3  authority to terminate if an award no longer effectuates the

4  program or agency priorities.

5  　　　　THE COURT:  You actually just skipped a bunch of

6  words, right?  You skipped the:  Pursuant to the terms and

7  conditions of the federal award including to the extent

8  authorized by law if an award no longer effectuates the

9  program.  That's how it reads.

10  　　　　MR. ROBERTS:  Yes, that is how it reads.  The effect

11  of that is if the agency determines that it does not effectuate

12  the agency priorities then that authority kicks in.

13  　　　　THE COURT:  Under your interpretation, what work does

14  the pursuant to the terms and conditions of the federal award

15  do under (a)(4)?

16  　　　　MR. ROBERTS:  I think that the terms and conditions,

17  if they explicitly modify this authority to terminate, if they

18  explicitly waive some aspect of this authority to terminate

19  then that might be what terms and conditions could do.  The

20  default, though, is that this authority applies.  The specific

21  terms and conditions that are 200.340, the termination

22  authority, must be incorporated under 200.211.

23  　　　　THE COURT:  So, under your read, (a)(4) would do

24  exactly the same thing if it read by the federal agency or

25  passed through and to the, if an award no longer effectuates

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5R5mtaA

the program goals or agency priorities, so long as termination

is not prohibited by the terms and conditions of the federal

award.

MR. ROBERTS:  Roughly speaking, your Honor, yes.  That

is the situation here.  I think this provision, that the

additional language that your Honor quoted might do work in a

different agreement.  That's not the agreement that we have

before us today.  The agreement before us today does not have

anything carving out or exempting this termination.

THE COURT:  But you would have the, pursuant to the

terms and conditions of the federal award, be something like

except as provided by the terms and conditions of the federal

award so that the default is that the agency can terminate

based upon change in agency priorities.

MR. ROBERTS:  That's one way it could read.  Pursuant

to the --

THE COURT:  I just want to know your reading.

MR. ROBERTS:  My reading is that when we have an

agreement that is silent as to termination, when it does not

explicitly -- does not explicitly say, it does not -- I should

take that back.  When we have an agreement that is, does not

say you cannot terminate this agreement that does not

explicitly foreclose or limit the authority to terminate, then

this basic if an award no longer effectuates the program goals

or agency priorities, termination authority is the backstop.

P5R5mtaA

1    That's the default.

2              THE COURT:  What is the meaning of agency priorities,

3    in your mind?  Are there limits on what the agency priorities

4    may be?

5              MR. ROBERTS:  They need to be authorized by law.  I

6    think under sub 4, as you just quoted, but that anything that

7    is within the agency's ambit it is statutory constitutional

8    authority, regulatory authority, that is how agencies determine

9    their priorities and effectuate.

10             THE COURT:  Let's assume that the agency decides it is

11   no longer a priority to fund highway projects in states that

12   have a low birth rate, we are going to no longer honor

13   agreements, cooperative agreements with states that have low

14   birth rates.  Consistent with agency priorities?  Is that

15   consistent?  Does the agency have the prerogative to choose

16   that priority?

17             MR. ROBERTS:  I'm not aware of an authority tying

18   highway funds to birth rates.  I'm not aware of one so I --

19             THE COURT:  But what if the agency decided it is our

20   priority now to fund projects in or permit projects to go

21   forward in locales that are agrarian and not urban?

22             MR. ROBERTS:  I'm not aware of a specific authority to

23   distinguish between locales in that way.  I know that some

24   federal highway sort of formulas do take into account the

25   density of population or the types of industries that are in

P5R5mtaA

1    particular areas, so --

2         THE COURT:  Let's say your client currently has said

3    it is his priority to approve VPPP agreements that fund highway

4    infrastructure.  That's how I read the April 21 letter.  Let's

5    say an agreement is signed, a new administration comes in and

6    says it is no longer our priority to fund VPPP agreements where

7    the toll revenue goes for highway infrastructure, we are only

8    going to fund them where the funding goes for public

9    transportation and this locale doesn't have public

10    transportation.  We realize that you had an agreement with the

11    prior administration, prior president, but the new president

12    doesn't think that highway infrastructure should be a priority.

13    I assume under your argument the new administration can do

14    that.

15         MR. ROBERTS:  Yes.  Absolutely.  Those are --

16         THE COURT:  So why would any municipality or state

17    ever invest in highway infrastructure if in three years' time a

18    new administration can say, *Whoops.  Sorry.  Our priorities*

19    *have changed.  We realize people have bought bonds but, you*

20    *know what?  It is no longer our priority to fund highway*

21    *infrastructure we want to fund public transportation.*

22         MR. ROBERTS:  There is no waiver of this sovereign

23    authority to set agency priorities within constitutional

24    statutory regulatory limits in this agreement.  The ability to

25    sort of prioritize between different agency priorities is a

P5R5mtaA

1    sovereign power that is inherent in the agency's authority to

2    set those priorities.  There is no basis.

3           THE COURT:  I don't think anybody is quibbling with

4    that.  The quibble is whether the agency has to reserve that

5    authority at the time of contracting so everybody knows the

6    terms at the beginning or whether there is going to be a rule

7    of law in this country where people launch public works

8    projects only to have them pulled out from under their feet

9    whenever a new administration or new secretary comes into

10   office.

11          MR. ROBERTS:  No, I don't think that is the question.

12   The question here is first of all whether the agreement

13   contains this authority, we maintain that it does.  To the

14   extent that your Honor disagrees that the terms and conditions

15   and these regulations do not explicitly provide that

16   termination authority, then the background Christian principle

17   provides that authority, it must be read in that we have the

18   authority to terminate.  To the extent you disagree with that,

19   then the *Winstar* case that we cite stands for the proposition

20   that we cannot waive that sovereign authority to adjust and

21   change agency priorities unless we do so very explicitly and

22   there is nothing coming close to that here.

23          So that's the order that we go through in order to

24   figure out that termination authority and the question is

25   whether we had that authority.  The question whether we should

P5R5mtaA

1    have exercised it, whether as a policy matter we should or

2    should not have exercised it, that is a question for the agency

3    and perhaps for the parties if they want to have further

4    negotiations and back and forth and engagement on the question

5    of the agreement but not one for resolution that is susceptible

6    to resolution in court.

7        Those changed agency priorities have been the agency's

8    point from the outset and as I just said, it is the agency's

9    prerogative, not plaintiffs, to set and implement those

10   priorities.  Those changed priorities also should not have come

11   as a surprise to anyone.  The president campaigned and won on a

12   platform that included choosing not to prioritize programs like

13   this one.  Plaintiffs entered into that agreement not while he

14   was a candidate, not while he was on the stump -- after he was

15   elected, in a rush.  Now the agency has begun taking steps to

16   fulfill that promise.  Plaintiffs have not established

17   entitlement to that injunction against an incomplete process

18   that they also claim is inadequate.

19       I am happy to focus on any other issues that your

20   Honor would like to discuss in particular.

21       THE COURT:  You have got 19 minutes to go.  I realize

22   Ms. Kaplan ended one minute early but that doesn't impose a

23   restriction on you.

24       MR. ROBERTS:  Then one or two points.  Probably more

25   than one or two, in all candor.

P5R5mtaA

1          I want to make clear that the Court can and should

2   consider subsequent administrative events to the February

3   letter.  We are here on a second amended complaint that was

4   filed after and explicitly challenges the April letter.  The

5   agency's administrative record has not been certified yet, the

6   due date for that is today, and we will be reserving the right

7   to supplement that administrative record because we consider it

8   to still be open as the agency's process is ongoing.

9          THE COURT:  Is there anything in the administrative

10  record, any new information in the administrative record about

11  the impact of congestion pricing or the tolling program on

12  low-income drivers?

13         MR. ROBERTS:  I can't say with certainty at this

14  point, your Honor.  It is in the process of being finalized and

15  certified today with the reservation that it can be

16  supplemented because we consider it to still be open.

17         So, plaintiff's own cases also stand for the

18  proposition that the way in which the agency subsequently

19  treats the challenged action can inform whether that action is

20  considered final for APA purposes.  That pragmatic approach to

21  finality is what the Court is supposed to undertake here.  It

22  is not a blinkered view where we sort of focus on one point in

23  time and disregard everything that came since it.  Perhaps if

24  we were here on the first complaint just challenging the

25  February letter that might be more of an argument that

P5R5mtaA

```
1   plaintiffs could make but we are here on the whole range of the
2   agency's conduct here which, undoubtedly, is not consummated.
3   All of the language in the April letter that plaintiffs wish to
4   invoke in order to say that compliance measures are coming is
5   all conditional, it all begins with "if" or "may."
6           THE COURT:  So tell me, what evidence has the agency
7   requested that, in the agency's mind, might change its view
8   about the lawfulness of the VPPP agreement?  Have they
9   specified that there is particular evidence that they would
10  like to show that the prior administration in fact did have the
11  authority?
12          MR. ROBERTS:  No, I don't think that we have laid
13  out -- we have explicitly given them an opportunity to contest
14  termination.  We have given them explicit opportunity to
15  provide --
16          THE COURT:  What open questions does the agency have
17  with respect to whether the February letter that was sent
18  should be revoked?  Does the agency have open questions about
19  whether the letter it sent in February should be rescinded?
20          MR. ROBERTS:  The agency is actively considering that
21  question.
22          THE COURT:  What questions?  Tell me what you are
23  seeking them to -- the agency has indicated it is seeking them
24  to answer to say, gee, we are not sure that we actually -- we
25  may have acted improperly in sending this letter.  Is that
```

P5R5mtaA

1    the view, that the agency's view is that it acted -- may have

2    acted improperly in sending the February letter?

3            MR. ROBERTS:  That's not the agency's view.  We are

4    open to receiving evidence to that effect and to consider that

5    evidence.

6            THE COURT:  So what evidence, what open questions does

7    the agency have that it wants the plaintiffs to answer?

8            MR. ROBERTS:  It is the same sort of arguments that

9    the plaintiffs are making in the court should be the ones --

10   are along the lines of what they should be making to the

11   agencies, whether we have authority to terminate, whether we

12   did validly terminate, whether the bases for termination were

13   valid.  It is those questions.  That's what we mean by giving

14   them an opportunity to contest that termination before FHWA

15   begins imposing compliance measures, again, before we begin

16   imposing compliance measures.  That is the opportunity that

17   they came to court asking for and that is the opportunity that

18   they have in the unconsummated agency process that is still

19   ongoing now.

20           I also want to distinguish *Sackett*.  The compliance

21   order at *Sackett* imposed its own independent and immediate

22   consequences for failure to comply.  There was a $37,500 daily

23   penalty in *Sackett* that was statutory.  There was also an

24   additional $37,500 penalty that was daily for failure to comply

25   with the compliance order that the agency issued in *Sackett*.

P5R5mtaA

1          So, there is nothing like that here.  Again,

2    compliance measures which plaintiffs admit repeatedly are

3    proposed --

4          THE COURT:  Is it your view that the plaintiffs are

5    free to disregard the secretary's February letter and the

6    president's statements?  I thought your client had actually

7    taken the position that they were not free to disregard it.

8          MR. ROBERTS:  The position is that they are not free

9    to disregard it.  Our position is that there are no immediate

10    consequences until the agency issues a determination --

11          THE COURT:  Your client's position is they're in

12    violation.  Is that right?

13          MR. ROBERTS:  That they are in -- without a valid

14    agreement they cannot impose tolls under 301.

15          THE COURT:  And your client's position is that they

16    don't have a valid agreement and that they are currently in

17    violation.  Is that right?

18          MR. ROBERTS:  There are two pieces to that, that they

19    don't have a valid agreement -- so --

20          THE COURT:  Is it your client's position that they

21    don't have a valid agreement?

22          MR. ROBERTS:  That's correct.

23          THE COURT:  And is it your client's position that

24    without a valid agreement, they cannot have the tolling

25    program?

P5R5mtaA

1           MR. ROBERTS:  That's correct.

2           THE COURT:  OK.

3           MR. ROBERTS:  Nonetheless, there are no independent

4    consequences, no consequences flow from that determination

5    unless and until the agency first issues a determination of

6    non-compliance and then imposes any compliance measures.  And

7    like *Sackett* which doubled the daily penalties, the daily

8    statutory penalties by virtue of the order that was at issue

9    there, there is no such doubling, there is no such increased

10   penalty, there is no such -- you are incurring these penalties

11   now sort of circumstance, in the case here.

12           I would also distinguish *Sackett* on informal

13   discussions.  The order, as plaintiff's characterized it, the

14   order of directive to show cause is not like the open-ended you

15   may come to us if you have informal discussions that you wish

16   to have about this order, which is how I would characterize the

17   *Sackett* order.

18           THE COURT:  Why, if the secretary was uncertain about

19   his legal position didn't he, in February, say this is

20   preliminary and I want to have a discussion.  Why is it only in

21   April that he sent the letter?  Why, if he was uncertain in

22   February, didn't he indicate his uncertainty and ask for there

23   to be discussion?

24           MR. ROBERTS:  From the agency's perspective, we

25   immediately extended the effective --

1              THE COURT:  No.  Answer my question.  Why, in

2      February, if he was uncertain, didn't he say, say I'm uncertain

3      about this.  My preliminary view is that this authority doesn't

4      exist in FHWA but have a discussion with me.

5              MR. ROBERTS:  Our view is that the immediate extension

6      of the effectiveness of the termination reflected that

7      uncertainty.  It was an opportunity for them to come and engage

8      with us.  That is how the agency viewed this from the get-go is

9      we extended the deadline, we extended the deadline.  We didn't

10     hear anything other than court filings.  And so then we come in

11     and say now we must show cause or we might impose compliance

12     measures and that is what they have finally done, they made

13     their submissions on the 21st and the agency is actively

14     considering them so the agency process is not consummated at

15     this point.  And again, there are no tangible legal

16     consequences to them like in *Sackett* of doubling daily

17     penalties or anything like that.

18             THE COURT:  Is there anything tentative about the

19     February 20th letter saying:  Accordingly, NYSDOT and its

20     project sponsors must cease the collection of tolls?  That

21     doesn't sound tentative.

22             MR. ROBERTS:  That is direct language, your Honor, but

23     as I said, the agencies, they're here challenging the full arc

24     of th agency's action here.  Your Honor doesn't need to take a

25     blinkered view of just the February letter and determine

P5R5mtaA

 1   whether or not the agency consummated its process there.  If we

 2   are doing that then we can't be talking about compliance

 3   measures because there was no discussion of compliance measures

 4   in the February letter so they need both letters in order to be

 5   in here, especially seeking preliminary relief in order to talk

 6   about compliance measures.  That opens up the full arc of the

 7   agency's process here for your Honor's consideration.

 8           THE COURT:  What do you say about the proposition that

 9   the Court is not required to wait for Damocles' sword to fall?

10   At what point would it be ripe for me to issue a preliminary

11   injunction?  Do I have to wait for the compliance measures to

12   actually be implemented?

13           MR. ROBERTS:  I don't know.  I don't have a -- I think

14   your Honor wants a very tangible number on what now would

15   happen.  I don't think that I can offer that to you because it

16   is a pragmatic and practical sort of consideration.  Obviously

17   if we were -- and we are not saying this, if we had said

18   compliance measures begin tomorrow, that looks to me like

19   Damocles' sword.  We have said if, after we consider, all of

20   the submissions that you made by May 21, we determine that it

21   is appropriate, we may impose some compliance measures from

22   this list and then, again, if you continue to not comply after

23   that, then we may impose other compliance measures.  And even

24   after that if you continue to not comply, we may impose other

25   compliance measures.  That is not Damocles' sword, that is an

P5R5mtaA

1    ongoing agency process that hasn't consummated.

2              I also want to emphasize that ripeness is a separate

3    consideration for final agency action.  Often times if final

4    agency action is not found, ripeness is also not found by

5    virtue of that, but ripeness is its own independent question

6    about the fitness of the issues for judicial review and the

7    hardship to the parties which, for the reasons we have laid out

8    in our brief, we don't think either of those has been

9    established here.  We do not think that the arbitrary and

10   capricious challenge here is just a purely legal question.  As

11   we discussed early on in your Honor's questions this morning,

12   we think there is the question of agency priorities, these

13   policy considerations that plaintiffs again admit informed the

14   February decision but certainly are at the heart of the April

15   decision which also clarify the February decision.  That is not

16   fit for review until the agency has had a full opportunity to

17   come to ground on it and consummate the decision-making process

18   that is ongoing at this point.

19             The hardship to the parties withholding review, again

20   compliance measures are not imposed, they are not imminent.

21   There is nothing that they can point to in the record that says

22   otherwise.  In fact, the quotations, again the selective

23   quotations of the April letter to suggest that we will

24   absolutely unquestionably impose compliance measures is not

25   supported whatsoever.

P5R5mtaA

1          THE COURT:  So you do argue that that is a hardship to

2     your client but why isn't it a fair reading of the record for

3     me to conclude that that argument is undermined by your

4     client's actions, to date, and in fact to some extent by the

5     statements that you are making right now.  I mean, if in fact

6     your client was suffering a hardship, one would have expected

7     your client to proceed more expeditiously, number one, with

8     respect to compliance measures and, number two, with respect to

9     this litigation.  Your client, with respect to this litigation,

10    has not proceeded particularly quickly and now you are telling

11    me, well, what they're doing is unlawful but who knows when we

12    are going to impose compliance measures.  That sounds to me

13    like your client really would not suffer very much of a

14    hardship if I were to enjoin your client in the time that is

15    necessary for me to make a decision on summary judgment.  Why

16    not let me, give me the time to make a decision on summary

17    judgment, move up your production of the administrative record?

18    You asked for a delay with respect to that.  I want to decide

19    this case quickly.  So, what is the hardship?

20         MR. ROBERTS:  The hardship is in plaintiff's request

21    to enjoin any further consideration of this question at the

22    agency.  An agency is entitled to an opportunity to reconsider,

23    to consider, to fix any of its own mistakes.

24         THE COURT:  I wouldn't preclude you from doing that, I

25    just would preclude you from implementing the compliance

P5R5mtaA

1    measures that you have now said to me, in effect, there is not

2    any particular urgency for us to do.

3         MR. ROBERTS:  Well, I don't think that I have conceded

4    that there is no urgency to impose compliance measures.  I

5    think that I have said that we have not said that there is

6    urgency to impose compliance measures.  We are not at a point

7    where the agency has taken that position that compliance

8    measures are necessary at this time.  We have taken the

9    opposite position, in fact, that we still need to determinate.

10   And what they're seeking in their own briefs and their own

11   words is to enjoin any further consideration of that question

12   and that is a hardship to the agency, to be unable to continue

13   to carry forward and then consummate the agency process that is

14   under way.

15        THE COURT:  So they say with respect to hardships,

16   they said, listen, they think they're right.  Of course they

17   would say that.  You say that you are right.  But they also say

18   if they're wrong and there are low income drivers or drivers

19   generally who have been told, who should not have been told

20   there exists a ready mechanism for paying back the money, why

21   doesn't that totally undermine any hardship and therefore give

22   me the time to consider the summary judgment papers?

23        MR. ROBERTS:  The question, your Honor is asking about

24   hardship to drivers?

25        THE COURT:  I'm asking about hardship.  One of the

P5R5mtaA

1  things I am required to consider is the balance of hardship,

2  the hardship to plaintiffs, the hardship to your client.  Your

3  client has said, listen, this imposes a hardship because there

4  is a toll that's being imposed on people that shouldn't be

5  imposed.  They've responded by saying if there is a toll that

6  was imposed improperly, they can repay it.

7        Why isn't that a complete answer?

8        MR. ROBERTS:  It is not a complete answer because not

9  everyone is entitled.  I mean, on its own terms, not everyone

10  is entitled to that relief.  It may provide some relief as your

11  Honor is describing it for certain drivers, it doesn't provide

12  relief for all drivers subject to the tolls.  And so, to the

13  extent that unlawful tolls --

14        THE COURT:  I thought it did but maybe Ms. Kaplan can

15  correct me.  For people with E-ZPass it is quite easy for them

16  do it.  For people without E-ZPass it is a little bit of an

17  administrative challenge but it still is possible.

18        MR. ROBERTS:  I'm not sure, your Honor.

19        THE COURT:  OK.  You have got a little bit more than

20  two minutes so why don't you sum up.

21        MR. ROBERTS:  I want to sort of conclude by

22  emphasizing actually back to the contractual point here and the

23  separation of powers concerns that it gives rise to.

24        To the extent they're seeking to enforce an agreement

25  against the federal government, to seek specific performance of

P5R5mtaA

a contract, we have not waived sovereign immunity for that.
The implications of that argument for binding through a private
agreement between parties without going through Congress,
without going through notice and comment rule making, without
going through any of the sort of procedures that we have
established for establishing binding policy that can last
across administrations, the incentives that would be created by
allowing for specific performance to be sought and given based
solely on a private agreement between parties and the
government would wreak havoc and create terrible incentives for
future administrations to bind across administrations simply by
virtue of a contract.

　　　　So, too, would plaintiff's request to enjoin the
agency's decision-making process.  Agencies are typically, and
by virtue of the final agency action requirement for
jurisdiction under the APA, allowed to continue and fix their
own mistakes, consider their own mistakes to the extent they
determine there are such mistakes, and then also the
implications of their argument that they could violate the
terms of the agreement could violate 301, and there is no
authority for us to enforce.  I sensed your Honor potentially
resisting the need to decide whether we have the authority to
impose compliance measures, period.  I would urge that
restraint, especially since there are no such compliance
measures before the Court at this point in time, only

P5R5mtaA

1    speculative possibility of such compliance measures down the

2    road.

3         If your Honor has no further questions we will rest on

4    our papers.

5         THE COURT:  Thank you.

6         The plaintiffs have 16 minutes.  Does the Department

7    of Transportation have -- Ms. Kaplan, it is between you and New

8    York State Department of Transportation.

9         MR. FRANK:  No, we have nothing to add, your Honor.

10        THE COURT:  Ms. Kaplan, you have got 16 minutes.

11        MS. KAPLAN:  Thank you, your Honor.

12        Let me start with the end of the argument of my friend

13   on the other side, your Honor.  Your Honor is correct, as we

14   argued in the prior cases the Mulgrew and the other cases, the

15   tolls paid can all be refunded.  About 95 percent of the

16   people -- 92 to 95 percent of the people have E-ZPass, that is

17   a very simple transaction but we can refund all of them.  We

18   hereby incorporate our arguments in the other cases but you

19   even have it here, your Honor, it is in the affidavit of the

20   TBTA COO at paragraph 39 that we submitted on this motion.

21        Two.  On bonds, your Honor, it turns out that both

22   sets of lawyers sitting at counsel table were correct.  Here is

23   the answer:  We issued $1.378 billion in bonds already.  Those

24   are short-term bonds but the intention is to refinance them

25   with 30 to 40-year long-term bonds.  So, again, I give credit

P5R5mtaA

1    to both sides of the table.

2            Let me read, in connection with some of the colloquy

3    your Honor just had with the government, let me just read a

4    statement.  Last week, May 21, the Daily News published an

5    article about these cases and in that article there is a

6    purported statement from a spokesperson for the DOT and this is

7    what the statement is:  "As stated in the April 21 letter, New

8    York Government Hochul has until no later than May 21 to

9    respond to the department."  On that, your Honor, we talked

10   about this right to contest issue with the other side, we have

11   put in hundreds of pages for why we think they didn't have the

12   authority to cancel congestion pricing.  "Following that

13   deadline, in consideration of the government's response, FHWA

14   may commence compliance actions as soon as May 28."

15           So I understood that counsel said there would be a gap

16   in time but last week their statement said it is entirely

17   possible there wouldn't be gap in time before compliance

18   measures ensued.

19           And going back to the bonds question, there is a lot

20   of those questions about the short-term and long-term nature of

21   the bonds is in the affidavit of our CFO issue here, starting

22   at paragraph 12.

23           Your Honor asked the other side a bunch of questions

24   about what happens when an agency issues a ruling or makes a

25   decision based on something and then talks about something else

P5R5mtaA

1   later, and I think the *Department of Homeland Security v.*

2   *Regents* case, which is a recent case out of the Supreme Court,

3   is very, very meaningful on that issue.  And what the Supreme

4   Court said there, your Honor, and I am referring to page 21,

5   the Court said, as follows:  It is a foundational principle of

6   administrative law that judicial review of agency action is

7   limited to the grounds that the agency invoked when it took the

8   action.  There has been much discussion, we contend, that was

9   on February 19.  If those grounds are inadequate, a court may

10  remand for the agency to do one of two things.  First, the

11  agency can offer a fuller explanation of the agency's reasoning

12  at the time of the agency action.  Again, on February 19 here.

13  This, of course, has limitations.  When an agency's initial

14  explanation indicates the determinative reason for the final

15  action taken, the agency may elaborate later on that reason but

16  may not provide new ones.  Exactly what is going on here, your

17  Honor.  Secondly, the agency can deal with the problem afresh

18  by taking new agency action but I have not understood the DOT

19  or any of the defendants in this case to be saying that is what

20  the April 21 letter was.

21          There was some statement that, and I am not sure I got

22  it right, that we somehow misquoted the 10-year term in the

23  VPPP agreement.  I don't think we misquoted it, your Honor.  We

24  fully acknowledge that it says until as long as the contract

25  ends.  That was cited in our briefs, as I understand it, for

P5R5mtaA

1    the reliance in trust of the fact that this is what the parties

2    understood, this is why we are issuing bonds, for reliance and

3    trust that both parties brought into the contract.

4            On the Tucker Act point, your Honor, Section 4 of the

5    VPPP statute states the following:  The secretary shall allow

6    the use of tolls as part of any Value Pricing Pilot Program

7    under this subsection.  That's the fundamental dispute in this

8    case, your Honor.  We believe that the congestion pricing

9    program was authorized and is authorized by the VPPP statute.

10   That is why the FHWA signed the VPPP agreement and the

11   fundamental dispute here is about an issue of law of what the

12   statute permits, whether that provides limitations on the

13   general prohibition of tolling and 301, which we think it does,

14   and it is not a question of contract interpretation.

15           I would also refer your Honor to footnote 7 of our

16   reply brief which talks, again cites *Megapulse* for the point

17   that the mere fact that an injunction required the same

18   governmental restraint that specific performance or

19   non-performance might require in a contract setting is an

20   insufficient basis to deny district court jurisdiction.

21           On terms of the discussion of the regulations and the

22   incorporation of a termination right for the government, your

23   Honor, I again want to state how radical a position we are

24   hearing from the government today because the arguments they

25   make wouldn't just be limited to the VPPP or Section 301.  The

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P5R5mtaA

1    arguments they are making about incorporating regulations that

2    talk about all federal laws would give the government the

3    unilateral right to terminate in almost any contract it enters

4    into.  And the problem, one of the many problems they have with

5    that is it writes out of the regulations Section 200.340(b)

6    which states that an agency must "clearly and unambiguously

7    specify all termination provisions in the terms and conditions

8    of the federal award."  I just don't understand how you can

9    square that language with the argument you heard from my friend

10   on the other side.

11          Finally, your Honor, and this is really kind of an

12   element of the same argument, is that to allow the government

13   to do what it wants to do here, to basically change its mind in

14   a way about the VPPP agreement or the VPPP statute is really we

15   would argue, your Honor, kind of recipe for chaos in terms of

16   administrative law and how the federal government functions and

17   how it functions vis-a-vis the states, and how it functions in

18   terms of these long-term projects where parties invest a lot of

19   money and people have expectations and reliance interests.  And

20   again, there is discussion of this in *Loper Bright*.  In *Loper*

21   *Bright*, I will quote it, Chief Justice Roberts says as follows.

22   He is talking about *Chevron* but the same arguments could be

23   made on what they're saying here.  To allow such an argument

24   becomes a license authorizing an agency to change positions as

25   much as it likes, with unexplained inconsistency, being at most

P5R5mtaA

1    a reason for holding an interpretation to be arbitrary and

2    capricious.  Then he talked about *Chevron*.  He said:  That

3    would foster unwarranted instability in the law, leaving those

4    attempting to plan around agency action in an internal fog of

5    uncertainty.

6           We would respectfully submit, your Honor, that their

7    argument here would lead to an internal fog of uncertainty,

8    that we did what we were supposed to do, that this contract is

9    a valid contract, that congestion pricing is valid under the

10   laws of this country, and we would be willing and open, your

11   Honor, to take any, discuss any options that will allow these

12   important policy issues to be cited in the proper manner by the

13   court and for the other side not to take action in the meantime

14   so that your Honor can do that.

15           I don't have anything else, your Honor.

16           THE COURT:  Thank you.

17           I am going to take a 10-minute recess and then I will

18   be back out on the bench.

19           (Recess)

20           THE COURT:  I have been assisted by very good briefing

21   by the parties and very able argument.  I am going to issue a

22   temporary restraining order under terms that I will say in a

23   moment so that I can consider, more fully, the arguments that

24   have been presented to me orally.

25           On a preliminary basis, I find that the plaintiffs

P5R5mtaA

1    have demonstrated a likelihood of success on their claims that

2    the secretary did not, among other things, that the secretary

3    did not have the authority to terminate the VPPP agreement, and

4    even if he had the authority, the reasons for terminating

5    rested on errors of law and was arbitrary and capricious.

6         I also find that the plaintiffs would suffer

7    irreparable harm in the absence of a restraining order in the

8    time from now until when I have the opportunity to more fully

9    consider the arguments and determine whether to issue a

10   preliminary injunction.  The irreparable harm comes in several

11   forms.  It comes in the form of undermining the authority of a

12   sovereign state to implement a policy of its democratically

13   elected representatives.  There is current harm to the bond

14   market.  The harm also can be measured in terms of the delay

15   and possible cancellation of public works projects in the city

16   and potentially in the state, if the measures identified in the

17   April 21 letter are taken.

18        If, on the other hand, the plaintiffs were to accede

19   to the threat that is contained in the February 19 letter and

20   the April 21 letter and the letters from the FHWA, there would

21   be irreparable harm in the form of the delay and possible

22   cancellation of numerous public works projects, among other

23   things, intended to make transit more efficient and more widely

24   available.

25        In terms of the balance of hardships, the balance of

P5R5mtaA

1    hardships weigh decidedly in favor of the plaintiff.  In the

2    absence of a restraining order, the plaintiffs will suffer a

3    budgetary uncertainty.  In the absence of a restraining order,

4    the plaintiffs will not be able to implement the numerous

5    projects or will be delayed in implementing the numerous

6    projects they have for mass transportation.  On the other hand,

7    any harm to the defendants by implementing a restraining order

8    is, for the most part, readily addressed as the plaintiffs have

9    identified and confirmed.  If it turns out that tolls were

10   wrongly imposed, that can be remedied by a refund of the tolls

11   that were wrongfully imposed.

12          So, I am issuing a restraining order which will run

13   from now until June 9 at 5:00 p.m.  The restraining order

14   restrains the defendants and the persons identified under

15   Rule 65(d)(2), meaning the defendant's officers, agents,

16   servants, employees and attorneys, and all other persons in

17   active concert or participation with them, from taking any

18   agency action founded on the February 19, 2025 letter from

19   Secretary Duffy to Governor Hochul purporting to terminate the

20   VPPP agreement and rescind federal approval for New York's

21   Central Business District Tolling Program including any action

22   to enforce compliance with or implement the February 19 letter,

23   defendant's purported termination of the VPPP agreement, or

24   defendant's purported termination of the tolling program.  They

25   are also restrained from taking any of the actions set forth in

1    the April 21, 2025 letter.  For avoidance of doubt, defendants

2    are enjoined from withholding federal funds, approvals, or

3    authorizations from New York State or local agencies to enforce

4    compliance with or implement the February 19 letter,

5    defendants' purported termination of the VPPP agreement, or

6    defendants' purported termination of the total program.

7            That is the order of the Court.

8            I assume that, Mr. Roberts, you will convey that to

9    your client?

10           MR. ROBERTS:  Yes, your Honor.

11           THE COURT:  I also assume that your client will comply

12   with it, as you have indicated; is that correct?

13           MR. ROBERTS:  Yes, your Honor, as I indicated.

14           THE COURT:  I would like to ask the plaintiff's

15   counsel if you wouldn't mind ordering a copy of the transcript.

16           MS. KAPLAN:  Absolutely, your Honor.

17           THE COURT:  If there are any things in the TRO that I

18   have issued require any further clarification, you all have

19   leave to submit letters to me requesting that clarification.  I

20   would just ask that you attempt to meet and confer before you

21   send me the letters.

22           MS. KAPLAN:  Thank you, your Honor.

23           THE COURT:  My understanding is that the

24   administrative record is going to be produced today.  I am

25   asking the parties to meet and confer with respect to the next

P5R5mtaA

1   steps in this litigation as I think I flagged through my

2   questions, there is a public interest in moving the case along

3   and if there are steps that can be taken to do that including

4   having the summary judgment papers go in more quickly, or

5   limiting the amount of discovery that may be necessary with

6   respect to the administrative record, I would ask that you take

7   that.  You should have a sense from the way I have conducted

8   business so far that the Court is available to all of you as

9   well as to all of the parties who come in front of me, I try to

10  turn to matters quickly.

11          Is there anything else, Ms. Kaplan, from your end?

12          MS. KAPLAN:  Nothing from plaintiffs, your Honor.

13          THE COURT:  Mr. Robert, from your end?

14          MR. ROBERTS:  Nothing from defense, your Honor.

15          THE COURT:  Thank you all for very helpful argument.

16  Have a good day, everybody.

17                          oOo

18

19

20

21

22

23

24

25