## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| METROPOLITAN TRANSPORTATION AUTHORITY & TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY, | |
| Plaintiffs, | **Case No. 25-cv-01413-LJL** |
| NEW YORK STATE DEPARTMENT OF TRANSPORTATION, RIDERS ALLIANCE, SIERRA CLUB, & NEW YORK DEPARTMENT OF TRANSPORTATION | |
| Intervenor-Plaintiffs, | |
| v. | |
| SEAN DUFFY, et al. | |
| Defendants. | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................. 1

BACKGROUND................................................................................................... 2

STANDARD OF REVIEW..................................................................................... 5

ARGUMENT ...................................................................................................... 5

I.    The Court lacks jurisdiction over Plaintiffs' claims. ........................................ 5

    A.    Plaintiffs fail to establish reviewable final agency action for their
        APA claims. ...................................................................................... 6

        1.    *Sackett and CSI Aviation Services* do not support finding final agency
                action. ...........................................................................................7

        2.    *Berkley-Dorchester and Purpose Built Families* are the most
                analogous cases and support finding no final agency action. ................. 10

    B.    None of Plaintiffs' claims are ripe for judicial review......................................... 11

    C.    The Tucker Act vests exclusive jurisdiction over all of Plaintiffs' claims in the
        Court of Federal Claims. ...................................................................... 14

    D.    The Court lacks jurisdiction over Government Plaintiffs' constitutional claims....... 18

    E.    The Court lacks jurisdiction over all *ultra vires* claims. .................................... 20

    F.    Organizational Intervenors do not have a private right of action to bring a
        freestanding NEPA claim.................................................................... 21

    G.    Organizational Intervenors do not have standing. ............................................. 22

II.   Plaintiffs' claims fail because the Secretary and FHWA have acted lawfully. ................ 23

    A.    The Secretary and FHWA have authority to terminate the Agreement................ 23

        1.    Termination based on agency priorities or goals is authorized by
                FHWA's terms and conditions.................................................... 23

        2.    Termination based on agency priorities or goals is independently
                authorized by regulation............................................................ 26

        3.    Termination authority is incorporated by operation of law. .................... 27

        4.    Termination is authorized by the VPPP Statute...................................... 30

       5.      Termination is authorized because the Government did not unmistakably waive its sovereign authority to terminate. ...................... 31

   B.     The Secretary and FHWA reasonably noticed termination of the Agreement. ...... 33

       1.      Defendants reasonably determined that termination was appropriate. ...... 34

       2.      Defendants do not need to conduct a NEPA review again before issuing a notice of termination. ............................................................ 41

III.   Government Plaintiffs' constitutional claims fail. ........................................................ 42

IV.   Plaintiffs can establish neither irreparable injury, nor inadequate remedies at law. .............. 46

V.   The public interest and balance of equities weigh against an injunction. ....................... 46

CONCLUSION ........................................................................................................................ 46

## TABLE OF AUTHORITIES

**Cases**

*Aerolease Long Beach v. United States,*
    31 Fed. Cl. 342, *aff'd,* 39 F.3d 1198 (Fed. Cir. 1994) ............................................... 27, 28, 29

*Air Espana v. Brien,*
    165 F.3d 148 (2d Cir. 1999) ........................................................................................... 6

*Albertson v. FCC,*
    182 F.2d 397 (D.C. Cir. 1950) ..................................................................................... 30

*Alpha Cap. Anstalt v. Shiftpixy, Inc.,*
    432 F. Supp. 3d 326 (S.D.N.Y. 2020) ........................................................................... 5

*Am. Ass'n of Colleges for Tchr. Educ. v. McMahon,*
    No. 1:25-CV-00702-JRR, 2025 WL 890560 (D. Md. Mar. 21, 2025) .......................... 27

*Am. Ground Transp., Inc. v. United States,*
    165 Fed. Cl. 659 (2023) ............................................................................................... 17

*Am. Petroleum Inst. v. EPA,*
    683 F.3d 382 (D.C. Cir. 2012) ..................................................................................... 13

*Armstrong v. Exceptional Child Ctr. Inc.,*
    575 U.S. 320 (2015) ............................................................................................... 18, 19

*Atl. States Legal Found. v. Babbitt,*
    140 F. Supp. 2d 185 (N.D.N.Y. 2001) ......................................................................... 21

*Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.,*
    502 U.S. 32 (1991) ....................................................................................................... 20

*Berkeley-Dorchester Ctys. Econ. Dev. Corp. v.*
    *U.S. Dep't of Health & Hum. Servs., Admin. for Child. & Fams.,*
    2:04-22950-23, 2006 WL 8443181 (D.S.C. Feb. 24, 2006) ................................... 6, 10

*Bowen v. Pub. Agencies Opposed to Social Security Entrapment,*
    477 U.S. 41 (1986) ....................................................................................................... 33

*Brodsky v. U.S. Nuclear Regul. Comm'n,*
    704 F.3d 113 (2d Cir. 2013) ......................................................................................... 21

*C.I.R. v. Clark,*
    489 U.S. 726, 109 S.Ct. 1455, 103 L.Ed.2d 753 (1989) .............................................. 36

*Cal. Sea Urchin Comm'n v. Bean*,
883 F.3d 1173 (9th Cir. 2018) ......................................................................... 30

*California v. U.S. Dep't of Educ.*,
132 F.4th 92 (1st Cir. 2025) ............................................................................. 16

*Chan v. U.S. Dep't of Transp.*,
No. 23-CV-10365 (LJL), 2025 WL 1144703 (S.D.N.Y. Apr. 17, 2025) .................... 42

*College Point Boat Corp. v. United States*,
267 U.S. 12 (1925) .......................................................................................... 28

*Commonwealth of Puerto Rico v. United States*,
490 F.3d 50 (1st Cir. 2007) .............................................................................. 19

*Contiguous Towing, Inc. v. State*,
202 F. Supp. 3d 269 (E.D.N.Y. 2016) ................................................................ 43

*Corley v. United States*,
556 U.S. 303 (2009) ................................................................................. 25, 26

*CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*,
637 F.3d 408 (D.C. Cir. 2011) ................................................................. 7, 9, 10

*Dalton v. Specter*,
511 U.S. 462 (1994) ........................................................................................ 44

*Dart v. United States*,
848 F.2d 217 (D.C. Cir. 1988) .......................................................................... 19

*Department of Commerce v. New York*,
588 U.S. 752 (2019) ................................................................................. 39, 40

*Dep't of Army v. Blue Fox, Inc.*,
525 U.S. 255 (1999) ........................................................................................ 16

*Dep't of Educ. v. California*,
145 S. Ct. 966 (2025) ...................................................................................... 16

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
140 S. Ct. 1891 (2020) .................................................................................... 37

*Earman v. United States*,
114 Fed. Cl. 81 (2013) .................................................................................... 29

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) ............................................................................................. 5, 46

*Env't Def. Fund v. Costle*,
    657 F.2d 275 (D.C. Cir. 1981) ................................................................................ 34

*Ethyl Corp. v. EPA*,
    541 F.2d 1, (D.C. Cir. 1976) ............................................................................ 33, 34

*Federal Express Corp. v. U.S. Dep't of Com.*,
    39 F.4th 756 (D.C. Cir. 2022) ................................................................................ 19

*Friends of Animals v. Pendley*,
    523 F. Supp. 3d 39 (D.D.C. 2021) ......................................................................... 12

*FTC v. Standard Oil Co. of Cal.*,
    449 U.S. 232 (1980) .................................................................................................. 8

*German Language Ctr. v. United States*,
    09-3950, 2010 WL 3824636 (S.D. Tex. Sept. 27, 2010) ....................................... 12

*G.L. Christian & Assocs. v. United States*,
    312 F.2d 418 (Ct. Cl. 1963) ...................................................................... 27, 28, 32

*Greenwich Fin. Servs. Distressed Mortg. v. Countrywide Fin. Corp.*,
    654 F. Supp. 2d 192 (S.D.N.Y. 2009*)* ................................................................. 36

*H.R. Moch Co. v. Rensselaer Water Co.*,
    247 N.Y. 160, 159 N.E. 896 (1928) ....................................................................... 22

*Hayes v. N.Y. Att'y Grievance Comm. of the Eight Jud. Dist.*,
    672 F.3d 158 (2d Cir. 2012) ................................................................................... 43

*Health & Hosp. Corp. of Marion Cnty. v. Talevski*,
    599 U.S. 166 (2023) ............................................................................................... 45

*Henkel of Am., Inc. v. ReliaStar Life Ins. Co.*,
    No. 3:18-CV-965 (JAM), 2023 WL 1801923 (D. Conn. Feb. 7, 2023) ............. 15, 1

*Ingersoll-Rand Co. v. United States*,
    780 F.2d 74 (D.C. Cir. 1985) ...................................................................... 15, 16, 21

*Jafarzadeh v. Nielsen*,
    321 F. Supp. 3d 19 (D.D.C. 2018) ......................................................................... 44

*Just Bagels Mfg., Inc. v. Mayorkas,*
    900 F. Supp. 2d 363 (S.D.N.Y. 2012) ...................................................................... 33

*K-Con, Inc. v. Sec'y of Army,*
    908 F.3d 719 (Fed. Cir. 2018) ............................................................................... 28

*Keystone Driller Co. v. Gen. Excavator Co.,*
    290 U.S. 240 (1933) ........................................................................................... 39

*Lab. Council for Latin Am. Advancement v. EPA,*
    12 F.4th 234 (2d Cir. 2021) .................................................................................. 12

*Libby Welding Co. v. United States,*
    444 F. Supp. 987 (D.D.C. 1977), *aff'd,* 595 F.2d 887 (D.C. Cir. 1979). ........................... 38

*Local 342, Long Island Pub. Serv. Emps. v. Town Bd. of Huntington,*
    31 F.3d 1191 (2d Cir. 1994) .................................................................................. 42

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ........................................................................................... 22

*Makarova v. United States,*
    201 F.3d 110 (2d Cir. 2000) .................................................................................... 5

*MediNatura, Inc. v. FDA,*
    998 F.3d 931 (D.C. Cir. 2021) ........................................................................... 6, 11

*Megapulse, Inc. v. Lewis,*
    672 F.2d 959. (D.C. Cir. 1982) ......................................................................... 15, 16

*Merrion v. Jicarilla Apache Tribe,*
    455 U.S. 130 (1982) ........................................................................................... 33

*Mulgrew v. U.S. Dep't of Transp.,*
    750 F. Supp. 3d 171 (S.D.N.Y. 2024) ............................................................. 3, 38, 42

*N. Atl. States Reg'l Council of Carpenters, Loc. Union No. 290 v.*
*T20 World Cup USA, Inc.,*
    No. 24-CV-07172 (HG), 2025 WL 1434272 (E.D.N.Y. May 19, 2025) ............................... 24

*Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA,*
    752 F.3d 999 (D.C. Cir. 2014) .............................................................................. 12

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) ........................................................................................... 45

*Nat'l Park Hospitality Ass'n v. Dep't of the Interior*,
    538 U.S. 803 (2003) ................................................................................................ 14

*Nevada v. Dep't of Energy*,
    457 F.3d 78 (D.C. Cir. 2006) ................................................................................. 42

*New Jersey Carpenters Vacation Fund v. Harborview Mortgage Loan Trust*,
    581 F.Supp.2d 581 (S.D.N.Y.2008) ...................................................................... 36

*New York v. U.S. Dep't of Health & Hum. Servs.*,
    No. 07 CIV.8621 (PAC), 2008 WL 5211000 (S.D.N.Y. Dec. 15, 2008) .............. 14

*Newport Hosp. & Clinic, Inc. v. Sullivan*,
    No. 88-2490-LFO, 1990 WL 179953 (D.D.C. Sept. 24, 1990) ............................ 11

*NRC v. Texas*,
    No. 23-1300, slip op. (U.S. June 18, 2025) ................................................... 20, 21

*NYC C.L.A.S.H., Inc. v. City of New York*,
    315 F. Supp. 2d 461 (S.D.N.Y. 2004) .................................................................. 22

*Nyunt v. Chairman, Broad. Bd. of Governors*,
    589 F.3d 445 (D.C. Cir. 2009) .......................................................................... 19, 20

*Oneida Indian Nation of N.Y. v. Clark*,
    593 F. Supp. 257 (N.D.N.Y. 1984) ........................................................... 33, 34, 37

*Ove Gustavsson Contracting Co. v. Floete*,
    299 F.2d 655 (2d Cir. 1962) .................................................................................. 43

*Pagan v. NYNEX Pension Plan*,
    52 F.3d 438 (2d Cir. 1995) .................................................................................... 33

*Paskar v. U.S. Dep't of Transp.*,
    714 F.3d 90 (2d Cir. 2013) ...................................................................................... 6

*Pennhurst State School & Hosp. v. Halderman*,
    451 U.S. 1 (1981) .................................................................................................. 44

*Pub. Citizen v. Off. of U.S. Trade Representatives*,
    970 F.2d 916 (D.C. Cir. 1992) .............................................................................. 21

*Purpose Built Families Found., Inc. v. United States*,
    634 F. Supp. 3d 1118 (S.D. Fla. 2022), *aff'd*, 95 F.4th 1346 (11th Cir. 2024) ................... 6, 11

*Quiman, S.A. de C.V. v. United States*,
    No. 98-5036, 1999 WL 44182 (Fed. Cir. 1999) .................................................. 16

*R.I. Dep't of Env't Mgmt. v. United States*,
    304 F.3d 31 (1st Cir. 2002) ............................................................................... 19

*Rajamin v. Deutsche Bank Nat. Tr. Co.*,
    757 F.3d 79 (2d Cir. 2014) ................................................................................ 22

*Residents for Sane Trash Sols., Inc. v. U.S. Army Corps of Eng'rs*,
    31 F. Supp. 3d 571 (S.D.N.Y. 2014) ................................................................... 5

*Roberts v. Roth*,
    594 F. Supp. 3d 29 (D.D.C. 2022) ..................................................................... 13

*Rockies Exp. Pipeline LLC v. Salazar*,
    730 F.3d 1330 (Fed. Cir. 2013) ......................................................................... 29

*S & D Maint. Co. v. Goldin*,
    844 F.2d 962 (2d Cir. 1988) .............................................................................. 43

*Sackett v. EPA*,
    566 U.S. 120 (2012) ............................................................................... 7, 8, 9

*Seven County Infrastructure Coalition v. Eagle County*,
    145 S. Ct. 1497 (2025) ...................................................................................... 41

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) .......................................................................................... 22

*Sw. Airlines Co. v. U.S. Dep't of Transp.*,
    832 F.3d 270 (D.C. Cir. 2016) ............................................................................. 6

*Tucker v. Darien Bd. of Educ.*,
    222 F. Supp. 2d 202 (D. Conn. 2002) ................................................................ 43

*Tzumi Innovations LLC v. Regan*,
    557 F. Supp. 3d 499 (S.D.N.Y. 2021) ................................................................ 22

*U.S. Dep't of Transp. v. Pub. Citizen*,
    541 U.S. 752 (2004) .......................................................................................... 41

*U.S. on Behalf of Dep't of Lab. v. Ins. Co. of N. Am.*,
    131 F.3d 1037 (D.C. Cir. 1997) ......................................................................... 24

*United States v. Bills*,
822 F.2d 373 (3d Cir. 1987)........................................................................... 29

*United States v. Cherokee Nation of Okla.*,
480 U.S. 700 (1987)...................................................................................31, 32

*United States v. Corliss Steam Engine Co.*,
91 U.S. 321 (1875)........................................................................................ 28

*United States v. Winstar Corp.*,
518 U.S. 839 (1996)............................................................................. 31, 32, 33

*Up State Fed. Credit Union v. Walker*,
198 F.3d 372 (2d Cir. 1999).......................................................................14, 16

*Vermont v. Brinegar*,
379 F. Supp. 606 (D. Vt. 1974).................................................................... 45

*Vermont Yankee Nuclear Power Corp. v Nat. Res. Def. Council*,
435 U.S. 519 (1978).................................................................................41, 42

*W.R. Grace & Co.—Conn. v. EPA*,
959 F.2d 360 (1st Cir. 1992) ......................................................................... 12

*Westhampton House, Inc. v. Carey*,
506 F. Supp. 215 (E.D.N.Y. 1980)............................................................... 22

*Wetstein v. W. Terrace Const. Co.*,
No. 95 CIV. 5476 (CSH), 1997 WL 777388 (S.D.N.Y. Dec. 17, 1997) ................. 15

*Yale New Haven Hosp. v. Azar*,
409 F. Supp. 3d 3 (D. Conn. 2019),
*rev'd and remanded on other grounds sub nom.*,
56 F.4th 9 (2d Cir. 2022)............................................................................. 20

*Zhao v. U.S. Dep't of Justice*,
265 F.3d 83 (2d Cir.2001)............................................................................ 33

## Statutes

5 U.S.C. § 706...........................................................................20, 34, 40, 41

23 U.S.C. § 129.................................................................................32, 37

23 U.S.C. § 301...........................................................................8, 32. 36, 45

42 U.S.C. § 1983 ..................................................................................... 19

Pub. L. No. 102-240, § 1012, 105 Stat. 1938 (1991).................................................. 2

Pub. L. No. 105-178, 112 Stat. 107 (1998),
    codified as 23 U.S.C. § 149 note................................................... *passim*

**Rules**

Fed. R. Civ. P. 56................................................................................................ 5

**Regulations**

2 C.F.R. § 200.211.............................................................................................. 23

2 C.F.R. § 200.339.............................................................................................. 44

2 C.F.R. § 200.340......................................................................................... *passim*

2 C.F.R. § 200.341.......................................................................................... 3, 8

2 C.F.R. § 200.342.......................................................................................... 3, 8

23 C.F.R. § 1.36................................................................................................ 44

**Other Authorities**

33 Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Judicial Review § 8307
    (2d ed. 2024 update)..................................................................... 19

*Congestion Pricing*, FHWA Dept. of Transportation Website,
    https://ops.fhwa.dot.gov/congestionpricing/ ........................................ 36

FHWA, *Contractors and Recipients General Terms and Conditions for Assistance Awards*,
    https://www.fhwa.dot.gov/cfo/contractor_recip/gtandc_after2023aug07.cfm
    ("FHWA Terms and Conditions") ........................................... 24, 43

*From* Torncello *to* Krygoski: *25 Years of the Government's Termination for Convenience
    Power*, 7 Fed. Cir. BJ. 337 (1997)........................................... 28

*Pilot*, Black's Law Dictionary ..................................................... 30

*Pilot*, The American Heritage Dictionary...................................... 30

Restatement (Second) of Contracts § 79 (1981) ........................... 17

*Statement by President George Bush Upon Signing H.R. 2950*, 1991 U.S.C.C.A.N. 1865
    (Dec. 18, 1991), 1991 U.S.C.C.A.N. 1865................................ 37

Statement from Governor Murphy Opposing New York's Congestion Pricing Plan,
State of New Jersey (Nov. 14, 2024), https://perma.cc/YX9C-BUSM ................................... 3

**PRELIMINARY STATEMENT**

Just as today's Congress cannot bind future Congresses, yesterday's Executive cannot bind today's. While our judicial system is built on precedent, the democratically elected branches must be free to make decisions about proper current policy, less they risk becoming undemocratic. This case is about who decides whether to maintain a discretionary federal pilot program, how that decision may be made, and the appropriate extent and timing of any judicial review. The sovereign prerogative to discontinue such federal programs, whether implemented through contractual agreement or otherwise, ensures that one Executive cannot irrevocably bind its successors—or voters—to maintain a favored policy. It is no surprise then, that the Executive Branch has well-established authority to terminate contractual arrangements, whether by their terms, by statute or regulation, by operation of law, and even in the absence of express contractual authorization.

This Court's preliminary ruling departs from these principles and precedent, holding that the Executive Branch is indefinitely bound by a "Value Pricing *Pilot* Program Agreement" that purportedly omits a termination clause (whether by oversight or design). That holding would hand the keys to federal programs over to non-federal counterparties, leaving the Executive Branch helpless to respond to even the direst public needs. Rather than require (or permit) Executives to shield definitionally tentative *pilot* programs from democratic accountability through contractual agreement (or collusion), the Court should recognize that the Federal Government retains authority to reasonably terminate the Agreement at issue, and for reasons beyond just material breach.

But even that merits ruling would be premature and improper because jurisdiction is lacking for several reasons. Most centrally, there is no final agency action; the dispute is not ripe; and this contract-based case must be brought in the Court of Federal Claims. Additional independent jurisdictional defects plague various counts throughout both operative complaints.

Meanwhile Plaintiffs and Intervenor-Plaintiffs cannot establish the other factors necessary for the permanent injunctive relief they seek (irreparable harm, lack of adequate remedy, and public interest). Rather, to the extent the Court awards any relief, only remand would be appropriate.

The Court should dismiss the complaints or enter judgment for Defendants on all counts.

At the outset, Defendants incorporate by reference their background and argument sections from their Opposition to the Motion for Preliminary Injunction in their entirety. *See* Defs.' Opp'n to Pls.' Mots. For Prelim. Inj., ECF 118 ("PI Opp'n") at 15–70 (ECF pagination used throughout).[1]

## BACKGROUND

This Court is familiar with this case's background, including from Defendant's PI Opp'n, but a few points merit additional emphasis at this stage.

**Statutory Background.** The Secretary of Transportation has complete discretion whether to enter into any Value Pricing Pilot Program ("VPPP") agreement and thereby establish a VPPP. *See* P.L. 105-178, 112 Stat. 107 (1998), codified as 23 U.S.C. § 149 note ("VPPP Statute") cl. 1 ("shall solicit the participation" versus "may enter into"). From its inception, the VPPP (and its predecessor) provided for federal funding to be part of the deal. *Id.* cl. 2 ("The Secretary shall fund all of the development and other start up costs of such projects, including salaries and expenses, for a period of at least 1 year, and thereafter until such time that sufficient revenues are being generated by the program to fund its operating costs without Federal participation . . ."); Pub. L. No. 102-240, § 1012(b), 105 Stat. 1938 (1991). But federal funds for the program ran out after Congress's last appropriations in 2011. *See* Decl. of Richard Marquis, attached as Exhibit A ("Marquis Decl."). The statute also provides that "[r]evenues generated by any pilot program . . . must be applied to projects eligible under [title 23]." VPPP Statute cl. 3. And it directs the Secretary of Transportation to monitor the effects of any value pricing program on "low-income drivers" and to impose mitigation measures to combat adverse effects on such drivers. *Id.* cl. 7.

**Regulatory Background.** Despite public pushback and despite prior congestion pricing proposals failing due to lack of political support, the New York Legislature enacted the Traffic Mobility Act, which directed the Triborough Bridge and Tunnel Authority ("TBTA") to establish

---

[1] This brief at times overlaps with the preliminary injunction briefing, but it also presents additional arguments, provides further elaboration on existing points, and engages with the Court's preliminary injunction decision. But to ensure preservation of all argument already made, Defendants fully incorporate the background and argument sections from their preliminary injunction brief, which the Court permitted the parties to do. *See* ECF 139.

certain "congestion pricing" projects in the Manhattan Central Business District ("CBD").  *See Mulgrew v. U.S. Dep't of Transp.*, 750 F. Supp. 3d 171, 188 (S.D.N.Y. 2024); PI Opp'n at 16–20 ("Agreement" and "Aftermath of the Agreement").  TBTA wanted to implement a cordon pricing project within the CBD called the Central Business District Tolling Program ("CBDTP")—despite New Jersey opposing it, low-income New Yorkers opposing it, and most New Yorkers opposing it.  *See* Statement from Governor Murphy Opposing New York's Congestion Pricing Plan, State of New Jersey (Nov. 14, 2024), https://perma.cc/YX9C-BUSM; DOT_47558–69 (Governor Murphy's Letters to President Trump and Secretary Duffy); PI Opp'n at 7–8.

After President Trump won the Presidential Election on November 5, 2024, the project sponsors rushed to finalize a VPPP agreement, knowing full well that the incoming administration would be very unlikely to approve the pilot program based on President Trump's stated priorities.  *See* DOT_47549–57.  On November 21, the project sponsors and FHWA signed a VPPP agreement ("the Agreement" or "the VPPP Agreement").  *See* DOT_47549–57.

On February 19, 2025, the Secretary sent a letter to Governor Hochul.  DOT_47570–75 ("the February 19 Letter"); *see also* PI Opp'n at 20–22 ("Notice of Termination of the Agreement and Opportunity to Object").  Based on several policy and legal concerns with the CBDTP, the Secretary in the February 19 Letter stated that he was "rescinding FHWA's approval of the CBDTP . . . and terminating the Agreement."  DOT_47572.  The next day on February 20, 2025, the FHWA Executive Director extended the effective date of termination of the Agreement to March 21, 2025.  DOT_47575.  A subsequent letter from FHWA extended the effective date again to April 20, 2025.  DOT_47576.

On April 21, 2025, the Secretary sent another letter to Governor Hochul.  DOT_47577–80 ("the April Letter").  In that letter, the Secretary reiterated his policy and legal concerns with the Agreement and the CBDTP, emphasizing that the CBDTP and the Agreement no longer effectuates the agency's priorities.  *Id.*  The April Letter also provided parties to the Agreement the "opportunity to be heard" on termination and any potential compliance measures before such measures might be imposed.  DOT_47580 (citing to 2 C.F.R. §§ 200.340, 200.341, 200.342).  The

April Letter directed those parties to submit any written responses by May 21, 2025, contesting the termination and proposed compliance action. *Id.* TBTA, MTA, NYSDOT, and NYCDOT submitted responses to FHWA, objecting to the Secretary's actions and totaling hundreds of pages. *See* DOT_47581–48699. In compliance with the Court's preliminary injunction, ECF 132, Defendants have not taken any further action in response to Plaintiffs' submitted objections.

**This Litigation.** TBTA, MTA, NYSDOT, and NYCDOT's (together "Government Plaintiffs") operative complaint was filed in May. *See* Second Am. Compl., ECF 96 ("MTA Am. Compl."). It asserts 10 counts. *Id.* Counts one through five and eight seek relief under the Administrative Procedure Act ("APA"). Government Plaintiffs claim that the Secretary's actions were substantively and procedurally arbitrary and capricious under the APA because (1) the Secretary provided an improper purpose for termination, (2) acted contrary to regulations, (3) did not sufficiently explain the reasons for his decision, and (4) that the Secretary's stated reasons for his decisions were pretextual. *Id.* ¶¶ 218–60. They also claim that the Secretary violated the APA by noticing termination of the Agreement before conducting a NEPA review. *Id.* ¶¶ 277–91. The other counts claim that the Secretary acted *ultra vires* and violated their due process rights, the Spending Clause, the Tenth Amendment, and the Separation of Powers. *Id.* ¶¶ 261–76, 292–314.

Intervenor-Plaintiffs Riders Alliance and Sierra Club's (together "Organizational Intervenors") operative complaint was filed in April. *See* Intervenor Am. Compl., ECF 63 ("Riders Alliance Am. Compl."). It asserts four counts. *Id.* ¶¶ 82–119. Two claim APA violations, namely arbitrary and capricious agency action and impermissible pretext. *Id.* ¶¶ 82–99. One count is a freestanding NEPA claim that does not invoke the APA. *Id.* ¶¶ 100–06. And the final count asserts that the Secretary and FHWA acted *ultra vires*. *Id.* ¶¶ 107–10.

On May 5, 2025, TBTA, MTA, and NYSDOT filed motions for preliminary injunction, which Defendants opposed. ECF 79–91, 118, 124, 126. Following argument on May 27, 2025, the Court entered a temporary restraining order. ECF 129. The next day, the Court granted the motions for preliminary injunction and enjoined Defendants from taking any actions founded on the February 19 Letter or April Letter. *See* Op. and Order, ECF 132 ("PI Order").

Defendants produced the administrative record.  ECF 130.  And in response to the Court's directive at the preliminary injunction hearing, the parties requested an expedited summary judgment briefing schedule, which allowed the parties to incorporate by reference material stated in the preliminary injunction briefing.  ECF 138.  This Court granted that request.  ECF 139.

## STANDARD OF REVIEW

Defendants move for summary judgment against all Government Plaintiffs and Organizational Intervenors' (together "Plaintiffs") claims.  In deciding a motion for summary judgment, courts "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In APA cases, summary judgment is the vehicle for resolving whether an agency action is appropriate based on review of the administrative record.  *See Residents for Sane Trash Sols., Inc. v. U.S. Army Corps of Eng'rs*, 31 F. Supp. 3d 571, 586 (S.D.N.Y. 2014).  In such cases, any remedy is typically limited to setting aside any unlawful action and remanding for the agency to reconsider and correct its errors.  *See Ward v. Brown*, 22 F.3d 516, 522 (2d Cir. 1994).

To the extent Plaintiffs seek a permanent injunction against Defendants, Plaintiffs must not only establish the merits of their claims but also must four additional elements (1) that Plaintiffs have suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.  *Alpha Cap. Anstalt v. Shiftpixy, Inc.*, 432 F. Supp. 3d 326, 338 (S.D.N.Y. 2020) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

## ARGUMENT

## I.    The Court lacks jurisdiction over Plaintiffs' claims.

Plaintiffs bear the burden of establishing subject matter jurisdiction.  *See Makarova v. United State*s, 201 F.3d 110, 113 (2d Cir. 2000).  None of the Plaintiffs has met that burden for any of their claims.  And there are further, independent jurisdictional defects with many claims.  The Court should thus dismiss all claims for lack of jurisdiction.

### A. Plaintiffs fail to establish reviewable final agency action for their APA claims.

"The APA explicitly requires that an agency action be final before a claim is ripe for review." *Air Espana v. Brien*, 165 F.3d 148, 152 (2d Cir. 1999) (citing 5 U.S.C. § 704). "This requirement of finality is jurisdictional[.]" *Id.*[2] Agency action is not final when the challenged agency conduct, viewed holistically, is part of a larger, unfolding administrative process that remains incomplete. *See, e.g.*, *Berkeley-Dorchester Ctys. Econ. Dev. Corp. v. United States Dep't of Health & Hum. Servs., Admin. for Child. & Fams.*, No. CV 2:04-22950-23, 2006 WL 8443181, at *1 (D.S.C. Feb. 24, 2006); *Purpose Built Families Found., Inc. v. United States*, 634 F. Supp. 3d 1118, 1121 (S.D. Fla. 2022), *aff'd*, 95 F.4th 1346 (11th Cir. 2024); *see also MediNatura, Inc. v. FDA*, 998 F.3d 931, 939 (D.C. Cir. 2021). Nor is it final if the action lacks tangible legal consequences. *Paskar v. U.S. Dep't of Transp.*, 714 F.3d 90, 97 (2d Cir. 2013).

Here, the Secretary and FHWA's actions, taken as a whole, show an ongoing decision-making process that has neither reached a definitive conclusion nor imposed tangible legal consequences. *See* PI Opp'n at 24–31; DOT_ 47570–80. Crucially, Courts look to "the way in which the agency subsequently treats the challenged action," so the letters following February 19 inform finality. *Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016). The day after issuing the February 19 Letter, the agency delayed the effect of termination and then delayed the effect of termination again, ultimately extending the effective date of termination to April 20, 2025. DOT_47570–76. In the April Letter, the Secretary issued a written notice of termination but gave Government Plaintiffs until May 21, 2025, to contest the termination and the contemplated enforcement actions. DOT_47577–80. The Secretary has not made any final decision on whether Government Plaintiffs are in compliance with federal law or whether to impose any compliance measures, and he may reconsider his termination decision based on Government Plaintiffs' submissions. Defendants have thus not consummated a decision on termination, nor have tangible legal consequences befallen Plaintiffs. This ongoing administrative

---

[2] Some decisions in this Circuit have questioned whether the Second Circuit has decided if final agency action is a jurisdictional requirement. *See* PI Opp'n at 24.

process has been halted by the Court's preliminary injunction.  The Secretary and FHWA cannot consider Plaintiffs' recent submissions, *see* DOT_47581–48699, and provide a final rationale for whether the Agreement should be terminated and if so, why.  Thus, because the adminstrative process has been short-circuited and replaced with the Court's decision rather than a final agency decision, this whole dispute remains is not ripe.

The decisions in *Sackett v. EPA*, 566 U.S. 120, 124 (2012), and *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 410 (D.C. Cir. 2011), are materially distinguishable and do not support finding final agency action here. By contrast, Defendants' cited cases offer the closest analogues and show that the Secretary's and FHWA's actions are not final.

**1. *Sackett* and *CSI Aviation Services* do not support finding final agency action.**

In finding that the Secretary's February 19 Letter constituted final agency action, the Court relied heavily on *Sackett*, concluding it to be "squarely on point."  Opinion & Order 39, ECF No. 132 ("PI Order").  Respectfully, it is not.  In *Sackett*, the EPA issued a compliance order that included formal "Findings and Conclusions" that directed the plaintiffs to immediately take certain restoration actions.  566 U.S. 120, 124–25.  Tangible legal consequences flowed directly from the order.  *Id.*  The order immediately confirmed and doubled the penalties to which the Sacketts were exposed—*i.e.*, without the order, they were potentially exposed to daily-accruing penalties for the alleged statutory violation; but with the order, they were definitively exposed to those statutory penalties plus an additional, equal daily-accruing penalty for violating the order itself.  *See id.* at 126–27; Transcript of Oral Argument at 3–5, 25–28, *Sackett v. EPA*, No 10-1062 (Jan. 19, 2012). The order also imposed collateral consequences for the Sacketts by "severely limit[ing their] ability to obtain a permit . . . from the Army Corps of Engineers."  566 U.S. at 126.

And the order in *Sackett* marked the consummation of the agency's decision-making process.  Its findings and conclusions "were not subject to further Agency review."  *Id.* at 127. Although the order allowed for "informal discussions" with EPA, it only allowed those discussions to correct "inaccuracies" and to discuss the "terms and conditions" of the order.  *Id.*  When the plaintiffs sought an internal hearing at the EPA, the EPA outright denied that request.  *Id.* at 125.

The Supreme Court found that the agency's actions to be final, noting that the "mere possibility that an agency might reconsider in light of 'informal discussion' and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal." *Id.* at 127.

But those facts fundamentally differ from this case.  First, the February 19 Letter exposed Plaintiffs to zero statutory or other penalties, let alone daily-accruing penalties.  *See FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 242 (1980).  Only *if* the FHWA issued a determination of non-compliance and decided to implement compliance measures would any Plaintiff have faced legal consequences.  *See* DOT_47577–80 (citing to 2 C.F.R. §§ 200.340, 200.341, 200.342).  And Plaintiffs identify no collateral consequences from the February 19 Letter either, such as the *Sackett* compliance order that restricted access to a different agency's permitting process. Instead, the only burden imposed on Government Plaintiffs is to respond to the agency's assertions made against them, which is not a tangible legal consequence. *Standard Oil*, 449 U.S. at 242.

Second, the compliance order paired with EPA's subsequent actions in *Sackett* showed that the agency had ended all internal agency deliberations and process: the EPA issued the compliance order and refused to hold a hearing for the plaintiffs to rebut the order.  449 U.S. at 224–27.  Here, by contrast, deliberations between Defendants and Government Plaintiffs remained very much open and ongoing, until the issuance of injunctive relief.  After the February 19 Letter, Defendants did not end all formal dialogue with Plaintiffs.  Instead, they delayed the effect of termination twice and then in April, directed Government Plaintiffs to submit objections to the notice of termination for the agency to consider.  *See* DOT_47570–80.  The Secretary further assured Plaintiffs that he would make a final determination only "after" considering their objections.  *See* DOT_47578 ("If, *after* evaluating NYSDOT's response and any responses received from TBTA and NYCDOT . . . [and] determines that New York is out of compliance with 23 U.S.C. § 301, FHWA will implement appropriate initial compliance measures[.]" (emphasis added)).  Thus, contrary to this Court's characterization, the April Letter plainly "request[ed] more evidence" and "set forth [how the agency] would investigate further."  PI Order 43.  That Letter indicated that Plaintiffs'

8

"response(s) … should include" arguments regarding statutory authority *and* "address the [February 19 Letter's] policy concerns."  DOT_47578.

Finally, this Court emphasized *Sackett*'s finding that the compliance order "made it clear the agency's deliberation . . . was at an end" and viewed the Secretary's February 19 Letter the same way.  PI Order at 40.  But the record here tells a different story.  The day after issuing the February 19 Letter, FHWA delayed the effective date of termination by 30 days, immediately indicating termination was not final and providing space for a back-and-forth with the agency. DOT_47575.  That deadline was extended again, and in April, the Secretary directed Government Plaintiffs to formally contest the termination, committing to take action only after reviewing those submissions.  *See* DOT_47570–80.  These are not the actions of an agency making it "clear" that its decision is "at an end."  And any analogy to *Sackett*'s "informal discussions" language is not applicable here.  There, the EPA offered only a vague opportunity to "discuss[]" (not contest) the compliance order's "terms and requirements" (not the underlying compliance decision).  566 U.S. at 120, 127.  Here, Defendants implemented a mechanism that allows Plaintiffs to not just rebut "terms and requirements" but the actual underlying notice of termination.  *See* DOT_47577–80. This is meaningfully more than "informal discussions" on "terms and requirements."

The Court also relied on the D.C. Circuit's decision in *CSI Aviation Services*.  That case is not only distinguishable, but in fact supports Defendants' position that there is no final agency action here.  In *CSI Aviation Services*, DOT issued a cease-and-desist letter after determining that the plaintiff was operating unauthorized air transportation in violation of the Federal Aviation Act. 637 F.3d at 410.  The letter gave the plaintiff 180 days to comply.  *Id.*  The plaintiff challenged the letter internally, but DOT "refused to change its legal position" and instead issued an exemption along with a statement of position that reaffirmed its earlier out-of-compliance determination.  *Id.* at 410–12.  The D.C. Circuit found DOT's statement a final agency action, emphasizing that "[n]ot only did the statement of position admit of no ambiguity, but it gave no indication that it was subject to further agency consideration or possible modification."  *Id.* at 411–12 (citation omitted).

That analysis *supports*—not undermines—Defendants' position here.  In *CSI Aviation Services*, finality attached only after the agency considered and responded to the plaintiff's objections.  Defendants ask this Court to allow the same here, that is for the Secretary to make a final decision on termination and compliance with federal law in response to Government Plaintiffs' recent submissions.  But, respectfully, the Court's premature issuance of injunctive relief halted that ongoing, incomplete process.  And unlike in *CSI Aviation Services*, the series of agency actions here—by extending the effective date of termination twice and inviting formal objections on termination—show that Secretary's and FHWA's decision to terminate is still "subject to further agency consideration or possible modification."  *Id.* at 411–12.  Indeed, the closest analogy to any agency action in *CSI Aviation Services* would be to the initial warning letter DOT sent there—not the final order DOT issued following consideration of the plaintiff's objections.  Thus, under *CSI Aviation Services*' own reasoning, Defendants' actions are not final.

### 2. *Berkley-Dorchester* and *Purpose Built Families* are the most analogous cases and support finding no final agency action.

The Court concluded that *Berkley-Dorchester* and *Purpose Built Families* were distinguishable.  Respectfully, Defendants disagree.

This Court distinguished *Berkley-Dorchester* on the grounds that the agency's summary suspension was a "a "temporary action prompted by an emergency situation and anticipated to be resolved within a limited time frame."  PI Order at 44.  This Court also noted that the suspension was later rescinded.  *Id.* at 44–45.  But those facts were not dispositive for the court.  2006 WL 8443181 at *1–2.  Shortly after the initial suspension (and rescission), the agency sent follow-up letters terminating the plaintiff's grants, while still giving 30 days to cure identified deficiencies.  *Id.*  The plaintiff challenged both the initial termination and the subsequent termination letters.  *Id.* at *15.  The court rejected all of plaintiff's claims for lack of finality.  *Id.* at *15–16.  As to the subsequent letters, the court concluded that they were not indicative of a consummated decision and declined to "insert itself into the center of an abstract and unreconciled dispute."  *Id.* at *16.  That reasoning applies here.  Defendants have given Government Plaintiffs the opportunity to

respond and object to the Secretary's notice of termination, just like the plaintiff received in *Berkley-Dorchester*. Government Plaintiffs have done so. Judicial intervention is premature.

As for *Purpose Built Families*, the Court viewed that case as distinguishable because the agency's suspension was "by its own terms" a "preliminary measure" pending an audit. PI Order at 45. But in *Purpose Built Families*, the court's reasoning did not turn solely on the "preliminary" label; it focused on the ongoing administrative process. 634 F. Supp. 3d at 1124 (holding that the ongoing administrative process was "pending completion of the government's audit"). That court emphasized that the plaintiff had the "opportunity to 'engage' with the government through an administrative process before a final disposition on the future of the . . . grants." *Id.* That reasoning also applies here. While the April Letter may not have been styled as a "preliminary termination" subject to an audit, it functions the same way. The April Letter provides notice of termination, invites objections, sets deadlines, and defers final action until after the agency considers Government Plaintiffs' input. DOT_47577–47580. That type of ongoing, incomplete process should preclude finding finality, as additional cases demonstrate. *See MediNatura, Inc.* 998 F.3d at 939 (finding detainment of a drug was not final because "when a product is detained pursuant to an import alert, the importer is given notice and is afforded an opportunity to be heard"); *Newport Hosp. & Clinic, Inc. v. Sullivan*, No. 88-2490-LFO, 1990 WL 179953, at *5 (D.D.C. Sept. 24, 1990) ("If these communications indeed did represent a final determination, when they could be so easily interpreted as part of an  . . . ongoing process, they fail utterly in their message.").

In short, Defendants' actions neither represent a consummation of the decision-making nor impose concrete consequences for any Plaintiffs. Both Government Plaintiffs and Organizational Intervenors have thus failed to establish final agency action, and this Court should enter judgment in favor of Defendants on all APA claims (MTA Counts I–V, VIII; Riders Alliance Counts I–II).

**B.  None of Plaintiffs' claims are ripe for judicial review.**

The Court should dismiss all counts because all of Plaintiffs' claims are not ripe. "Under the doctrine of prudential ripeness, courts will decline to review administrative action that would otherwise be reviewable under constitutional and statutory standards because, upon a balancing of

the pertinent interests, it is preferable for judicial review to await a more advanced state of administrative consideration." *Lab. Council for Latin Am. Advancement v. EPA* ("*LCLAA*"), 12 F.4th 234, 252–53 (2d Cir. 2021); *see also Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999, 1007–08 (D.C. Cir. 2014) ("Even when an agency has taken final action, a court may refrain from reviewing a challenge to the action if the case is unripe for review." (citation omitted)).

The prudential ripeness doctrine involves a two-part balancing inquiry: whether the issues are "fit" for judicial review, and whether withholding a decision would cause substantial hardship on the parties. *See LCLAA*, 12 F.4th at 252–53. Both parts favor delaying judicial review of Plaintiffs' claims. *See id.*; *Friends of Animals v. Pendley*, 523 F. Supp. 3d 39, 59–60 (D.D.C. 2021). Regardless of whether the court finds a reviewable final agency action, Plaintiffs' claims are not ripe for judicial review because the administrative process was ongoing and Plaintiffs retained a meaningful opportunity to affect that ongoing process—before the issuance of the preliminary injunction. *See* PI Opp'n at 31–37; DOT_47570–80; *see, e.g.*, *German Language Ctr. v. United States*, No. CIV. A. H-09-3950, 2010 WL 3824636, at *4 (S.D. Tex. Sept. 27, 2010); *W.R. Grace & Co.—Conn. v. EPA*, 959 F.2d 360, 364–67 (1st Cir. 1992).

In finding at least part of this case ripe, the Court stated that the ongoing agency process was mere "lip-service" and that "Plaintiffs have shown that they will face a direct and immediate dilemma without a decision." PI Order at 47, 49. The Court also found that the issues presented were purely legal, concluding that "the Secretary has taken his position and Plaintiffs have taken theirs." *Id.* at 48. Respectfully, Defendants disagree.

*First*, the administrative record does not show that the ongoing administrative process is disingenuous—in fact, the Court prematurely characterized the process as mere lip service, despite the fact that the preliminary injunction—not the Secretary—short circuited the process, leaving its legitimacy now unknowable. But the facts show a legitimate administrative process that still ongoing. If the Secretary had issued only the February 19 Letter and then remained silent until April, the April Letter might look less sincere. But that is not what happened. Again, the Secretary twice delayed the effect of termination, DOT_47575–76, and then directed Government Plaintiffs

to submit objections about both termination and potential compliance measures, DOT_47577. The April Letter fits naturally in a series of actions that constitute an administrative process that, if allowed to play out, could clarify or narrow the issues currently before the Court.  Indeed, Government Plaintiffs submitted voluminous objections in response to the April Letter, aimed at influencing the Secretary's final decision on termination.  *See* DOT_47581–48699.  The Court should allow that process to proceed before issuing a decision on an unripe set of facts.

*Second*, judicial review of the primary legal challenge—whether the Secretary acted arbitrarily and capriciously—turns on the agency's (as-yet-incomplete) assessment of facts and policy considerations, which is not a purely legal question and which would benefit from affording the agency the full opportunity to consider the relevant materials.  Defendants maintain that the Secretary can terminate if he determines that the Agreement no longer effectuates agency priorities or program goals.  That is one of the independent bases for the agency's actions to date, and resolving it should await a complete, final record.  DOT_47570–80.

*Third*, Plaintiffs have not demonstrated that they face direct and immediate harm absent judicial intervention.  The caselaw requires that any alleged harm be "certainly impending" absent judicial intervention.  *See Roberts v. Roth*, 594 F. Supp. 3d 29, 35 (D.D.C. 2022) (holding Plaintiff's claim not ripe "because his alleged injury is not certainly impending. While plaintiff argues that his discharge is likely, he has not been discharged at this point."); *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386–87 (D.C. Cir. 2012) ("declining jurisdiction over  dispute while there is still time for the challenging party to convince the agency to alter a tentative position provides the agency an opportunity to correct its own mistakes and to apply its expertise, potentially eliminating the need for (and costs of) judicial review").  But, here, the Secretary expressly stated in April that no compliance measures would be taken until after he received Government Plaintiffs' objections and made a final decision in response to those objections.  DOT_47577–80.  And at oral argument on May 27, 2025, the agency further confirmed through counsel that it would delay the effect of any compliance measures to allow time for orderly review.  Thus, no compliance measures have been chosen, let alone implemented against Plaintiffs.

More fundamentally, any compliance measures may be averted by permitting the ongoing administrative process to run its course. Plaintiffs' claims of potential harm, absent any actual enforcement action, are not legally cognizable. *See Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 810–11 (2003) (rejecting hardship claim because announcement of the regulation, without enforcement, resulted in no practical harm to plaintiff and "mere uncertainty as to the validity of a legal rule" is insufficient); *New York v. U.S. Dep't of Health & Hum. Servs.*, No. 07 CIV.8621 (PAC), 2008 WL 5211000, at *14 (S.D.N.Y. Dec. 15, 2008) ("Maryland's claim would become ripe if CMS were to enforce provisions of the SHO Letter and impose sanctions on Maryland following a hearing in accordance with the statutory and regulatory guidelines.").

Even if the Court finds the Secretary's notice of termination ripe, it should still withhold review of Plaintiffs' claims challenging "potential" compliance measures. As this Court already noted, reviewing such indeterminate measures would amount to an "advisory opinion." PI Order at 92–93 ("Plaintiffs' arguments [on compliance] would have the Court issue an advisory opinion."). Thus, at the very least, none of Plaintiffs' claims challenging the legality of the potential compliance measure are ripe for review.

### C. The Tucker Act vests exclusive jurisdiction over all of Plaintiffs' claims in the Court of Federal Claims.

The Court also lacks jurisdiction because Plaintiffs' claims "essentially arise[] from" a contract, which means that the Tucker Act vests exclusive jurisdiction over this dispute in the Court of Federal Claims. *See* PI Opp'n at 37–39; *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 373 (2d Cir. 1999). In summary, Plaintiffs' arguments and claims sound in contract because "the source of the right at issue here is the contract between the parties rather than [a regulation or statute]." *Up State Fed. Credit Union*, 198 F.3d at 377. The crux of this dispute turns on interpreting specific terms and conditions of the Agreement, and that Agreement provides valuable, bargained-for consideration to all parties. DOT_47549–57. In short, there is a document both sides signed that says, 'if you do this, then we will do that.' That is a contract.

14

This Court disagreed with Defendants' argument for a few reasons. *First*, the Court stated that "Plaintiffs are not suing to enforce any term of the VPPP Agreement or accusing Defendants of breach." PI Order 51. Not so. The Agreement is the only source of Plaintiffs' authority to toll federal-aid highways, and it is that right they seek judicial intervention to preserve. That right springs only from Section 1 of the Agreement; without it, Defendants would have no obligation to authorize tolling and Plaintiffs would have no right to impose it.[3] That is why they have sued to undo that termination or rescission of the *Agreement* and to enjoin any actions implementing or enforcing that termination (i.e., specific performance). *See* MTA Am. Compl. at P. 117 (Prayer for Relief). But a plaintiff cannot "circumvent[]" the Tucker Act by artfully restyling claims seeking specific performance. *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985; *see Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 n.34. (D.C. Cir. 1982).

*Second*, the Court reasoned that it "need not pass judgment on the interpretation of any term of the VPPP Agreement" because "[t]he essence of Plaintiffs' claims requires the Court to review the VPPP Agreement only to determine what it does not say." PI Order at 52–53 (also noting that "Plaintiffs are better understood as arguing that Defendants' acts are unauthorized by any law or other source of authority including the VPPP Agreement and therefore that the VPPP Agreement remains unchanged by Defendants' arbitrary and capricious conduct."). But interpreting what an agreement says and does not say is no less a matter of contract interpretation than construing specific language appearing in a contract. *See, e.g.*, *Wetstein v. W. Terrace Const. Co.*, No. 95 CIV. 5476 (CSH), 1997 WL 777388, at *3 (S.D.N.Y. Dec. 17, 1997) (interpreting a contract and finding that "[t]he contract does not say that [the defendant] is obligated to 'defend, indemnify and hold CRSS harmless,' as [a party] asserts."); *Henkel of Am., Inc. v. ReliaStar Life Ins. Co.*, No. 3:18-CV-965 (JAM), 2023 WL 1801923, at *3 (D. Conn. Feb. 7, 2023) (interpreting a contract and finding that "the contract does not say" what a party asserts is there). And more so,

---

[3] Section 1 also constituted an "obligation" for FHWA that the Court incorrectly overlooked in its analysis. PI Order 51 n.58. Without this Agreement, FHWA would not—indeed could not— authorize the Tolling Program. VPPP Statute cl. 1, 4.

a central issue is what "comply[ing] with all federal laws and requirements applicable to this project" means in the VPPP Agreement. *See* DOT_47549–57. Resolving that issue requires interpreting what that term means. Similarly, the parties dispute whether the terms and conditions incorporate certain mandatory contractual clauses and whether the *Christian* doctrine requires such incorporation—both classic features of government-contract disputes. *See, e.g., infra* Part II.A.3.

Aspects of the Court's opinion appear to acknowledge these integral *contractual* issues. *See, e.g.*, PI Order at 59 ("This leaves termination in accordance with a term or condition of the VPPP Agreement[.]"); *id.* ("But the VPPP Agreement contains no language giving the federal government the right to terminate the agreement."); *id.* at 64 ("The doctrine is additionally inapplicable on the ground that the VPPP Agreement is not a procurement contract."). And rightly so. As explained, this case is all about Plaintiffs' rights and Defendants' authority under the Agreement itself. No federal statute or regulation allows them to operate the Tolling Program or directs FHWA to authorize it. At bottom, Plaintiffs ask this Court to resolve "whether the contract[s] forbid[ ] termination under these conditions." *Ingersoll-Rand Co.*, 780 F.2d at 78. That's a contract dispute bound for the Court of Federal Claims. *See Up State Fed. Credit Union*, 198 F.3d at 373; *Megapulse,*, 672 F.2d at 967 (holding that a district court lacks jurisdiction over any claim, however labeled, if it is in "its essence" contractual); *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025). And because this issue concerns the United States' waiver of sovereign immunity, any doubts must be "strictly construed . . . in favor of the sovereign." *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999).

*Third*, the Court held that "although the VPPP Agreement is styled as an 'agreement' . . . it does not resemble bargained-for consideration so much as a 'cooperative agreement' between the federal, state, and local governments." *See* PI Order at 54–55. But the Agreement reflects a negotiated contract in which both parties received and accepted specific obligations and benefits. *See California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96 (1st Cir. 2025) ("[E]ach grant award takes the form of a contract between the recipient and the government."), *stayed*, 145 S. Ct. 966 (Apr. 4, 2025); *Quiman, S.A. de C.V. v. United States, No. 98-5036*, 1999 WL 44182, at *2 (Fed. Cir. 1999)

(finding a cooperative agreement under which the Department of Agriculture would provide inspectors for certain facilities was not too indefinite to constitute an enforceable contract and should not fail for lack of consideration); *Am. Ground Transp., Inc. v. United States*, 165 Fed. Cl. 659, 666 (2023) ("If bargained for, a mere peppercorn satisfies."); *see also* Restatement (Second) of Contracts § 79 (1981) ("If the requirement of consideration is met, there is no additional requirement of . . . equivalence in the values exchanged.").  Simply put, there is a piece of paper that says Sponsors will do this and, in exchange, the agency will do that. That's a contract.

Plaintiffs were granted the right to implement tolling, including of federal vehicles and officials traveling through the CBD, that otherwise would be prohibited.  *See* Marquis Decl.; DOT_47550 ("TBTA may operate the Project as a toll Project in accordance with the provisions of this Agreement and as a value pricing project[.]").  The value of that contractual provision is beyond dispute; indeed, it is the entire reason for Plaintiffs' legal dispute.  And it requires the provision of *federal* funds to Plaintiffs, through those tolls.  *Id.*

In exchange, the agency received several forms of valuable consideration.  Any toll revenues not used to cover operating costs must be used for "other projects eligible for assistance under title 23, United States Code."  DOT_47550.  Funding other projects eligible for federal assistance reduces the need for DOT to spend federal taxpayer dollars on those same or similar projects. Plaintiffs' commitments to provide certain information about the project's performance and impacts throughout the life of the Agreement in accordance with VPPP Statute cl. 5 and to provide certain tax credits to eligible residents in accordance with VPPP Statute cl. 7 also reflect valuable consideration to the federal government.  *See, e.g.*, DOT_47551 ("TBTA and NYCDOT, as applicable, shall monitor and report on the project performance[.]"); *id.* ("TBTA and NYCDOT will identify benefits the application of tolls has in reducing climate pollution[.]"); DOT_47550 ('TBTA shall conduct or have an independent auditor conduct an annual audit of toll Project records to verify compliance with use of revenues and report the results of the audits to FHWA."); DOT_47554 ("To address effects to low-income drivers, the Project will include a tax credit[.]").

17

These "direct benefit[s]," PI Order at 55, far more valuable than the "mere peppercorn" that would "suffice[]," confirm the VPPP Agreement is a contract for Tucker Act purposes.

*Lastly*, it makes sense to treat VPPP agreements like this one as government contracts because of the statutory context from which they arise. *See* Marquis Decl. From its inception, the VPPP (and its predecessor) provided for federal funding to be part of any deal. *See* VPPP Statute cl. 2 ("The Secretary shall fund [certain] costs . . . for a period of at least 1 year, and thereafter until" the project is self-sustaining.). Federal funds for the program ran out after Congress's last appropriations in 2011. *See* Marquis Decl. But that context further confirms that Congress intended these agreements to be government contracts for which the only potential waiver of sovereign immunity would be the Tucker Act.

The Federal Government has not waived sovereign immunity for specific performance of contracts it enters. Yet that is what Plaintiffs seek and what the current preliminary injunction provides: Defendants must continue to implement the VPPP Agreement's terms. The Tucker Act vests exclusive jurisdiction over this entire contractual dispute in the Court of Federal Claims.

### D. The Court lacks jurisdiction over Government Plaintiffs' constitutional claims.

Government Plaintiffs claim that Defendants' termination of the VPPP Agreement must be set aside because it violates their constitutional right to due process or is *ultra vires*. MTA Am. Compl. ¶¶ 261–68. The due process claim is simply a repackaging of their APA claims. *See id.* ¶ 260 ("The February 19 Letter's pretextual rationales violated Plaintiffs' rights under the APA and, in addition, violated the MTA, TBTA, and NYCDOT's rights under the Due Process Clause of the United States Constitution."). Government Plaintiffs also claim that the "proposed compliance measures" violate the Spending Clause, the Tenth Amendment, and constitutional separation of powers. *Id.* ¶¶ 292–314. But the availability of an adequate statutory remedy—whether through the APA after a final agency action or, more appropriately the Tucker Act—forecloses their constitutional claims.

The Constitution does not contain an implied right of action. *See Armstrong v. Exceptional Child Ctr. Inc.*, 575 U.S. 320, 324–27 (2015). Rather, a court's power to enforce the Constitution

in the absence of a statutory cause of action (such as 42 U.S.C. § 1983) arises only in equity. *See id.* at 327 ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity . . . ."). The "basic premise" of such equitable power "is that, even after the passage of the APA, some residuum of power remains with the district court to review agency action that is *ultra vires*." *R.I. Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 42 (1st Cir. 2002) (citing *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)).

Government Plaintiffs, however, cannot bring their constitutional claims in equity, because for non-statutory, equitable causes of action, a plaintiff must satisfy "the traditional requirement for equitable relief that a plaintiff lack an adequate remedy at law." 33 Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Judicial Review § 8307 (2d ed. 2024 update); *see also, e.g.*, *Commonwealth of Puerto Rico v. United States*, 490 F.3d 50, 59 (1st Cir. 2007) ("[S]uch review [of non-statutory causes of action alleging constitutional violations] may occur only if its absence would 'wholly deprive the party of a meaningful and adequate means of vindicating its . . . rights.'") (quoting (quoting *R.I. Dep't of Env't Mgmt.*, 304 F.3d at 42)); *Federal Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (explaining that there must be "no alternative procedure for review" for "a suit in equity seeking injunctive relief" (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009))). "Thus, if the APA . . . can provide adequate relief, an equitable remedy via nonstatutory review ought not be available." 33 Fed. Prac. & Proc. Judicial Review § 8307. In this way, "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to . . . implied statutory limitations," such as the APA's limitations. *Armstrong*, 575 U.S. at 327.

Here, Government Plaintiffs have an adequate remedy through either the APA after a final agency action or, more appropriately, the Tucker Act. For all the reasons that the Tucker Act precludes APA action for claims that are in essence contractual, the Tucker Act also impliedly precludes a non-statutory constitutional action based on such claims. Government Plaintiffs can seek relief from the Court of Federal Claims, which can adequately vindicate their asserted rights by awarding appropriate damages if they prevail. And even if the Court does not agree with

Defendants' Tucker Act argument, the APA explicitly provides for judicial review of final agency action that is contrary to constitutional power.  *See* 5 U.S.C. § 706(2)(B).  These Plaintiffs, therefore, cannot bring freestanding constitutional claims as equitable, non-statutory causes of action.  Rather, they must do so through the APA; and they did not.  Government Plaintiffs have an adequate statutory remedy, and thus their constitutional claims are jurisdictionally barred.  *See* MTA Am. Compl. (Counts VI, IX–X).

### E.  The Court lacks jurisdiction over all *ultra vires* claims.

Plaintiffs' *ultra vires* claims fare no better and fail for two independent reasons.  *First*, an *ultra vires* claim is the judicial equivalent of "a Hail Mary pass," which "rarely succeeds."  *NRC v. Texas*, No. 23-1300, slip op. at 15 (U.S. June 18, 2025) (quoting *Nyunt*, 589 F.3d at 449).  Such a claim is unavailable where an alternative forum exists for review.  *See id.* ("Ultra vires review is also unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons with a meaningful and adequate opportunity for judicial review, or if a statutory review scheme forecloses all other forms of judicial review."); *Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991) (non-statutory review is available only when a party would be "wholly deprive[d] . . . of a meaningful and adequate means of vindicating its statutory rights"); *see also Yale New Haven Hosp. v. Azar*, 409 F. Supp. 3d 3, 17 (D. Conn. 2019)  (holding that because the plaintiff's *ultra vires* and statutory claims were duplicative, the *ultra vires* claim must be dismissed because alternative procedure for review was available), *rev'd and remanded on other grounds sub nom.* 56 F.4th 9 (2d Cir. 2022). .

Here, Plaintiffs' *ultra vires* claims are the same as their APA claims.  *See* MTA Am. Compl. ¶ 273 ("[t]he February 19 Letter is ultra vires because rescission of the VPPP Agreement is not authorized under any provision of law."); Riders Alliance Am. Compl. ¶ 110. ("Secretary Duffy has nonetheless purported to require the unilateral rescission of the VPPP agreement and the end of the Congestion Pricing Program. Secretary Duffy's actions are undertaken in excess of his express or implied powers and threaten to inflict injury on Riders Alliance and Sierra Club members.").

As outlined above, Plaintiffs have an adequate remedial structure through the APA after a final agency action or the Tucker Act, which means their *ultra vires* claims necessarily fail.

*Second*, *ultra vires* review is only available when "the agency order at issue was an attempted exercise of power that had been specifically withheld, and the agency's order violated a 'specific prohibition' in the Act." *NRC v. Texas*, No. 23-1300, slip op. at 14. "Because ultra vires review could become an easy end-run around the limitations of... judicial-review statutes, this Court's subsequent cases have strictly limited non-statutory ultra vires review." *Id*. Rather, it applies only when an agency has taken action entirely "in excess of its delegated powers and contrary to a specific prohibition" in a statute. *Id*. at 15. Plaintiffs do not identify a specific statutory prohibition on rescinding VPPP agreements, and indeed there is none. Even if the Court determines that the VPPP *Agreement* does not allow the Secretary to terminate this Agreement, that is not a *statutory* prohibition but merely a contractual limitation. If that claim were cognizable then every breach-of-government-contract claim could be reframed as an *ultra vires* action, and plaintiffs could circumvent the Tucker Act's (and the APA's) limits in every case involving a government contract. That is not the law. *See Ingersoll-Rand*, 780 F.2d at 77–78.

### F. Organizational Intervenors do not have a private right of action to bring a freestanding NEPA claim.

Organizational Intervenors bring a freestanding NEPA claim that does not invoke the APA's cause of action. *See* Riders Alliance Am. Compl. ¶¶ 100–106. But the Second Circuit, like others, has made plain that NEPA does not provide a private right of action, and a NEPA claim can only be brought through the APA. *See Brodsky v. U.S. Nuclear Regul. Comm'n*, 704 F.3d 113, 119 (2d Cir. 2013) ("Because NEPA does not itself provide for judicial review, the APA controls."); *Atl. States Legal Found. v. Babbitt*, 140 F. Supp. 2d 185, 189 (N.D.N.Y. 2001); *see also Pub. Citizen v. Off. of U.S. Trade Representatives*, 970 F.2d 916, 918 (D.C. Cir. 1992) ("NEPA does not create a private right of action[.]"). Organizational Intervenors made clear when they brought other claims through the APA. *See* Riders Alliance Am. Compl. ¶¶ 82–99 (Counts I and II labeled "Violation of the Administrative Procedure Act"). But, for whatever reason, they chose not to

bring their NEPA claim through the APA.  *Id.* ¶¶ 100–106 (no mention of the APA).  And that is jurisdictionally fatal because there is no private right of action to enforce NEPA.

### G. Organizational Intervenors do not have standing.

"Plaintiff bears the burden of establishing standing."  *Tzumi Innovations LLC v. Regan*, 557 F. Supp. 3d 499, 505 (S.D.N.Y. 2021) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016)). The Organizational Intervenors appear to be asserting associational standing on behalf of their members.  *See* Riders Alliance Am. Compl. ¶¶ 14–25; ECF 24.  To do so, they must establish that at least one of their members has suffered an injury in fact that is traceable to the challenged conduct and that is redressable by a favorable decision.  *See NYC C.L.A.S.H., Inc. v. City of New York*, 315 F. Supp. 2d 461, 468 (S.D.N.Y. 2004).  They fail to meet their burden.  Although they suggest that their members are injured as purported beneficiaries of the Agreement, Riders Alliance Am. Compl. ¶¶ 14–25, members of the public, like the Plaintiffs' members, do not generally have standing to enforce or sue based on government contracts.  *See, e.g.*, *Rajamin v. Deutsche Bank Nat. Tr. Co.*, 757 F.3d 79, 86 (2d Cir. 2014) (indicating that only "intended third-party beneficiaries of the contract" can sue rather than "mere incidental beneficiaries").  As then Judge Cardozo explained: "[In] a broad sense it is true that every [government] contract . . . is for the benefit of the public.  More than this, however, must be shown to give a right of action to a member of the public not formally a party."  *Westhampton House, Inc. v. Carey*, 506 F. Supp. 215, 217 (E.D.N.Y. 1980) (citing *H.R. Moch Co. v. Rensselaer Water Co.*, 247 N.Y. 160, 164, 159 N.E. 896, 897 (1928)).  Here, the members of the Organizational Intervenors are at most incidental beneficiaries of the Agreement, not the primary or direct ones.  Those members do not have anything more than an attenuated injury and thus lack standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  Finally, to the extent Organizational Intervenors claim injury to the organization itself, they fail there as well, because there is no evidence of direct and tangible harm to Sierra Club or Riders Alliance themselves.

## II.    Plaintiffs' claims fail because the Secretary and FHWA have acted lawfully.

Even if the Court finds jurisdiction, Defendants' actions were lawful.  Defendants have the authority to terminate the Agreement, did not act arbitrarily and capriciously, and have authority to impose compliance measures (after a final agency decision).  *See* PI Opp'n at 46–67.

### A.  The Secretary and FHWA have authority to terminate the Agreement

Plaintiffs claim that Defendants do not have the authority to terminate the Agreement.  *See* MTA Am. Compl. (Counts I, III, VII); Riders Alliance Am. Compl. (Count IV).  They claim they retain the sole right to determine whether the Federal Government continues to authorize the federal pilot program.  That extreme and unprecedented position is wrong for at least five independent reasons: (1) FHWA's terms and conditions permit termination based on agency priorities or goals; (2) federal regulations permit termination based on agency priorities or goals; (3) by operation of law, the Agreement provides for termination based on agency priorities or goals; (4) the VPPP Statute authorizes termination; and (5) the Federal Government did not unmistakably waive its sovereign right to terminate this federal program.

#### 1.  Termination based on agency priorities or goals is authorized by FHWA's terms and conditions.

This Court determined that the "only interpretation that makes sense and gives meaning to all terms" of 2 C.F.R. § 200.340 requires that "a change in agency priorities or goals must be stated in the terms and conditions of the award if it is to provide a basis for unilateral termination of the award."  PI Order at 61–62.  Defendants disagree with that reading of the regulation.  But even assuming the Court's reading is correct, FHWA's terms and conditions plainly permit Defendants to terminate the Agreement based on their assessment of agency priorities or program goals.

To start, Clause Nine of the VPPP agreement states that "NYSDOT, TBTA and NYCDOT agree to comply with all Federal laws and requirements applicable to this project, including the laws and policies applicable to the Value Pricing Pilot Program."  DOT_47551.  That clause includes 2 C.F.R. § 200.211(c)(2), which requires every federal agency to include or incorporate by reference "all general terms and conditions of the Federal award, which must be maintained on

the Federal agency's website." The parties thereby incorporated FHWA's terms and conditions into the Agreement, as required. *See* FHWA, *Contractors and Recipients General Terms and Conditions for Assistance Awards*, https://www.fhwa.dot.gov/cfo/contractor_recip/gtandc_after2023aug07.cfm ("FHWA Terms and Conditions").

Next, FHWA's terms and conditions state that "this Agreement may be terminated or suspended in whole or in part, at any time prior to its expiration date in accordance with 2 C.F.R. 200.340." *Id.* § 17. The phrase "in accordance with" incorporates by reference 2 C.F.R. § 200.340. *See N. Atl. States Reg'l Council of Carpenters, Loc. Union No. 290 v. T20 World Cup USA, Inc.*, No. 24-CV-07172 (HG), 2025 WL 1434272, at *5 (E.D.N.Y. May 19, 2025) (finding that "the phrase 'in accordance with' clearly communicates that the purpose" is to incorporate by reference). "When a contract incorporates a regulation by reference, that regulation becomes a part of the contract . . . as if the words of that regulation were set out in full in the contract." *U.S. on Behalf of Dep't of Lab. v. Ins. Co. of N. Am.*, 131 F.3d 1037, 1042 (D.C. Cir. 1997).

And by incorporating 2 C.F.R. § 200.340(a)(4) in the Agreement's terms and conditions, the Agreement must be read as if it included the full text of that regulation:

> The Federal award may be terminated in part or its entirety . . . (4) [b]y the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.

2 C.F.R. § 200.340(a)(4). Thus, termination authority based on agency priorities or goals is included in the VPPP Agreement, since those exact words ("if an award no longer effectuates the program goals or agency priorities") are set out in FHWA's terms and conditions and are incorporated into the Agreement. *See Ins. Co. of N. Am.*, 131 F.3d at 1042.

Underscoring this point is the word "including." The concluding phrase of (a)(4) specifies that one basis for termination that must be "includ[ed]" in "the terms and conditions of [any] Federal award" is "if an award no longer effectuates the program goals or agency priorities." That inclusion is not conditioned on the "terms and conditions of the Federal award," nor is it merely

exemplary or hypothetical. Indeed, as this case demonstrates, such termination authority serves vital public policy goals, democratic accountability, and sovereign prerogatives.

Plaintiffs identify no authority *precluding* FHWA from including such termination authority in the Agreement. Indeed, the Court recognized that FHWA could include it. *See* PI Order 59. So the phrase "to the extent authorized by law" does not restrict or prevent including that authority here. Nor does "pursuant to the terms and conditions of the Federal award." That phrase suggests that an award's terms and conditions could modify the default authority to terminate based on agency priorities or goals—for example, by providing a wind-down period between notice and final termination on such a basis. But "pursuant to the terms and conditions of the Federal award" should not be read to instead mean "*only if* the terms and conditions of the Federal award *also* explicitly provide for termination based on agency priorities or goals." That reading is the one that renders the concluding phrase of the regulation superfluous and should be rejected. *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant."). Additionally, no part of the Agreement or terms and conditions sets a minimum term for the Agreement; it is open-ended and therefore subject to termination.

To reject this incorporation theory would require the Court to hold that the agreement itself violates controlling regulations, and was thus never in accordance with law, rendering it voidable if not void. Subsection 200.340(b) requires every agency to "unambiguously specify all termination provisions in the terms and conditions of the Federal award." And paragraph 200.340(a)(4) requires that one such termination provision that must be "includ[ed]" is authority to terminate "if an award no longer effectuates the program goals or agency priorities." If the award was required to specify all termination provisions, and the Court rejects the argument that termination for agency priorities or goals, a required provision, was incorporated into the award, then the award was entered into not in accordance with law, and is voidable if not void.

### 2. Termination based on agency priorities or goals is independently authorized by regulation.

If 2 C.F.R. § 200.340 is not incorporated into the terms and conditions, it provides independent termination authority based on agency priorities or goals for all federal awards.

This Court determined that Section 200.340(a) "stated four ways in which a federal award may be terminated in part of in its entirety." But the Court held that to permit termination based on agency priorities or goals, FHWA's terms and conditions must say more than termination is permitted "in accordance with 2 C.F.R. § 200.340." PI Order at 59–61. The Court seemed to read the phrase "including . . . if an award no longer effectuates the program goals or agency priorities" as providing a hypothetical of what could be included in "the terms and condition of the Federal award." *Id.* 60–61. That reading is incorrect.

The only interpretation that gives effect to every part of Section 200.340(a)(4) is construing the "including . . ." phrase as being automatically "includ[ed]" in the terms and conditions, unless expressly disclaimed. Otherwise, the clause is a mere surplusage. *See Corley*, 556 U.S. at 314. If the clause provides only an example or hypothetical term, the phrase adds nothing that "pursuant to the terms and condition of the Federal award" does not already say. Meanwhile, the phrase "pursuant to the terms and conditions of the Federal award" gives discretion to include whatever termination terms the agency wants, including to modify termination authority based on agency priorities or goals. But that termination authority is the default to be "include[d]."

Consider the following analogy, if an apartment policy reads: "All tenants agree that the landlord may terminate the lease pursuant to the terms and conditions of the lease agreement, including based on unapproved renovations made to the unit." The best reading of the policy is that termination for "unapproved renovations" is automatically included in the power to terminate, unless the terms and conditions say otherwise. To read "unapproved renovations" as giving a mere hypothetical possibility of what could be included makes little sense. The phrase "pursuant to the terms and conditions" already encompasses virtually anything the drafter wants to include.

Likewise, the clause following "including" must provide default authority to unilaterally terminate, unless expressly disclaimed.  That reading alone gives full meaning to every part of 2 C.F.R. § 200.340(a)(4).  And it means that (because neither the terms and conditions nor any law restricts termination based on agency priorities or goals) the regulation reads: "The Federal award may be terminated in part or its entirety . . . [b]y the Federal agency or pass-through entity . . . if an award no longer effectuates the program goals or agency priorities."  *See Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, No. 1:25-CV-00702-JRR, 2025 WL 890560, at *3 (D. Md. Mar. 21, 2025) ("The Federal award may be terminated in . . . its entirety . . . to the extent authorized by law, if an award no longer effectuates the . . . agency priorities." (ellipses in original)).

### 3.  Termination authority is incorporated by operation of law.

Regardless of whether FHWA's terms and conditions or 2 C.F.R. § 200.340(a)(4) explicitly authorize termination based on agency priorities or goals, that authority would still be included by operation of law under the *Christian* doctrine.  That well-established doctrine requires that all mandatory terms be implicitly incorporated into a government agreement, including termination authority.  *See Aerolease Long Beach v. United States,* 31 Fed. Cl. 342, 374 ("[T]he most basic tenet of federal procurement law states that all Government contracts by implication contain all required contract terms.") (citing *G.L. Christian & Assocs. v. United States*, 312 F.2d 418 ((Ct. Cl. 1963)), *aff'd*, 39 F.3d 1198 (Fed. Cir. 1994).

This Court determined that the *Christian* doctrine likely did not apply to this Agreement for two reasons. First, the Court found that termination based on agency priorities or goals was not a mandatory clause.  PI Order at 64.  Second, the Court stated that "[t]he doctrine is additionally inapplicable on the ground that the VPPP Agreement is not a procurement contract."  *Id.* Respectfully, neither reason is correct.

*First*, termination-for-convenience clauses are a cornerstone of government contracting and are deeply ingrained in American legal tradition.  *See G.L. Christian*, 312 F.2d at 426 (indicating that termination for convenience is "deeply ingrained" in government contract law). That principle was articulated in *G.L. Christian* itself, where the court there held that even if a

government official omits a termination for convenience clause, it will be read into the contract by operation of law. *Id.* at 427. Other courts have held similarly. *See, e.g.*, *Aerolease Long Beach,* 31 Fed. Cl. at 374 ("Even if the contract contained no termination . . . clause, the *Christian* doctrine would incorporate such a clause by operation of law."); *K-Con, Inc. v. Sec'y of Army*, 908 F.3d 719, 727 (Fed. Cir. 2018) ("The *Christian* doctrine has been applied essentially to clauses involving the government's administration of a contract such as terminations." (quotation modified and citation omitted)).

But this tradition did not start with *Christian*. Indeed, the Government's default ability to terminate agreements for convenience can be traced back to at least the Civil War era. *See* Joseph J. Petrillo & William E. Conner, *From* Torncello *to* Krygoski*: 25 Years of the Government's Termination for Convenience Power*, 7 Fed. Cir. BJ. 337, 338, 344–49 (1997) (providing a detailed account of the government's termination for convenience power and finding that "the notion that the federal government needs extraordinary flexibility in its contractual obligations . . . is an old one"). As early as 1875, the Supreme Court recognized this right in Civil War era government contracts. *See United States v. Corliss Steam Engine Co.*, 91 U.S. 321, 323 (1875) ("[I]t would be of serious detriment to the public service if the power of the head of the Navy Department did not extend to providing for all such possible contingencies by modification or suspension of the contracts[.]"). In *College Point Boat Corp. v. United States*, 267 U.S. 12, 15 (1925), the Supreme Court reaffirmed this principle, recognizing that "[t]he United States actually did have an unconditional right of cancellation" of a contract. Although the *Christian* doctrine formalized this tradition into a legal "doctrine," its roots are much deeper and older. *See G.L. Christian*, 312 F.2d at 424 (citing *College Point Boat Corporation*).

Thus, of all the mandatory terms required to be incorporated into a government agreement, the termination clause stands as the quintessential example. And the Court should read into the Agreement termination authority based on agency priorities or goals, as such a clause is mandatory under regulations and under the history and tradition of government contracting.

*Second*, this Court viewed the *Christian* doctrine as applicable only to procurement contracts, relying on an unsupported sentence from *Earman v. United States*, 114 Fed. Cl. 81, 112 (2013).[4]  *See* PI Order at 64.  But that limitation is not supported by the doctrine's increasingly broad application.  Courts have applied the *Christian* doctrine beyond procurement contracts and have applied it to a diverse array of government agreements.  In *Aerolease Long Beach*, the Court of Federal Claims applied the *Christian* doctrine to a government lease agreement.  31 Fed. Cl. at 347–53, 374.  In *United States v. Bills*, 822 F.2d 373, 377 (3d Cir. 1987), the Third Circuit applied the doctrine to a scholarship agreement.  In *Rockies Exp. Pipeline LLC v. Salazar*, 730 F.3d 1330, 1338 (Fed. Cir. 2013), the Federal Circuit considered applying the doctrine to a precedent agreement that obligated certain contractors to enter into follow-on agreements.[5]

That broad application makes sense given that the *Christian* doctrine's purposes apply with equal weight to non-procurement government agreements.  This very case illustrates why, as Plaintiffs' position on termination is cloaked in practical absurdity.  Taken to its logical conclusion, their argument would allow one administration to bind all future administrations to open-ended cooperative agreements, so long as the parties omit termination clauses.  According to Plaintiffs, no matter how outdated the policy, harmful the outcomes, or shifting the national priorities, future Presidents and Secretaries could do nothing.  That interpretation of this Agreement defies reason.  The Court should reject it, apply the *Christian* doctrine, and incorporate by operation of law the termination clause that allows unilateral termination based on changed agency priorities or goals.

---

[4]  The *Earman* court seemed to have already determined that the clause at issue was not a "mandatory clause" requiring incorporation under the *Christian* doctrine. 114 Fed. Cl. 81 at 111–12.  Thus, the sentence this Court relied on appears to be dicta.  But regardless, *Earman* did not provide a single citation or reason supporting its finding that the *Christian* doctrine was inapplicable to non-procurement contracts.  *Id.*  And it failed consider that the *Christian* doctrine has been applied outside the procurement context, even in the Court of Federal Claims and the Federal Circuit, as explained further below.

[5]  The follow-on agreements were procurement contracts.  But the precedent agreement itself was not for the procurement of goods or services.

#### 4. Termination is authorized by the VPPP Statute.

Whether or not the VPPP Agreement or any regulation authorizes termination, the VPPP Statute authorizes Defendants to terminate any value pricing pilot program. That authority stems from both statutory text and context. To start, the Secretary's discretionary authority to "establish" programs, VPPP Statute cl. 1 ("may" versus "shall"), necessarily implicates a power to disestablish any of those programs. *See, e.g.*, *Cal. Sea Urchin Comm'n v. Bean*, 883 F.3d 1173, 1183 (9th Cir. 2018), *as amended* (Apr. 18, 2018) (discretionary authority to implement an experimental program reasonably interpreted to allow termination based on policy concerns); *Albertson v. FCC*, 182 F.2d 397, 400 (D.C. Cir. 1950) ("[T]he Commission has clearly recognized its inherent authority to reconsider previous action taken by it," which is derived from the "implied powers arising out of the Act."). In other words, Congress did not direct the Secretary to establish any program, let alone to maintain those he does establish, in perpetuity. *See* VPPP Statute cl. 1 ("The Secretary may enter into cooperative agreements … to establish, maintain, and monitor value pricing programs."). Nothing in the statute locks the agency into a program for all time, so it must retain authority to terminate a program. Another textual point: Congress authorized merely *pilot* programs, not *permanent* programs. As an adjective, "pilot" means "Serving as a *tentative* model for future experiment or development." *Pilot*, The American Heritage Dictionary (emphasis added); *see Pilot*, Black's Law Dictionary ("A small test project or study to assess the feasibility of an idea, policy, product, etc."). The idea of a permanent pilot program is an oxymoron.

Statutory context confirms that termination authority. The monitoring requirements necessarily contemplate termination, and not just for material breach of a given agreement. *See* VPPP cl. 1, 5 (agreements must "monitor value pricing programs" and "Secretary shall monitor the effect of such programs"). These requirements ensure that programs faithfully implement congressional and agency priorities and goals and protect vulnerable members of the public. It makes little sense if the agency is powerless to act on what it learns from those monitoring obligations. And the statutory cap on the number of program sponsors with which the Secretary may enter into cooperative agreements is flexible: "as many as 15." It does not say "only the first

15." That flexibility to maintain up to 15 sponsor relationships preserves authority to terminate agreements to free up spots for new and different sponsors. Congress intended for these programs to foster innovation, not to fossilize upon initiation.

      **5.** **Termination is authorized because the Government did not unmistakably waive its sovereign authority to terminate.**

Although Defendants do not concede that the Government could ever waive authority to terminate a value pricing pilot program, any such waiver at least would need to be unmistakable. And no such unmistakable waiver exists here.

The Supreme Court has held that "where a contract has the effect of extinguishing" any "aspect of sovereignty" such extinguishment may "be 'surrendered only in unmistakable terms.'" *United States v. Winstar Corp.*, 518 U.S. 839, 877–79 (1996) (quoting *United States v. Cherokee Nation of Okla.*, 480 U.S. 700, 707 (1987)). Thus, a sovereign cannot "forever waive[] the right to exercise one of its sovereign powers" by mere silence. *Id.* at 877–78. In other words, "unmistakability" is "needed for *waiver*, not reservation" of a sovereign prerogative. *Id.* at 878 (emphasis added). Powers such as controlling navigation, modifying the terms of a program, and taxation all have triggered this "unmistakability doctrine" and required that any agreement to restrict those powers do so unmistakably. *Id.* at 877–79 (collecting "cases extending back into the 19th century").

The unmistakability doctrine serves a vital role in promoting democratic accountability. If one administration could enter into an agreement, intentionally omit a termination clause, and thereby ossify a policy that binds all future administrations, such a decision should at least be clearly and unequivocally expressed in writing. Similarly, an agency's *un*intentional omission of a termination clause should not freeze in place a policy no matter how misguided or unworkable it becomes. Allowing only a counterparty the right to terminate a federal agreement risks elevating the power of such agreements beyond regulatory, statutory, and even constitutional provisions— all of which may be amended or withdrawn through appropriate, democratically accountable procedures. And it risks ceding to the counterparty truly federal prerogatives. If this Court were

to adopt Plaintiffs' reading of the Agreement, such a decision would create troubling incentives. The Court would be telling the Executive that it can shield preferred policies from alteration or democratic accountability through contractual agreements with no termination clause. And beyond intentional omission of termination clauses, there is also no authority in the law to support locking in unadvisable policy because of inartful or ambiguous drafting in a contract.

Regardless of whether the Court determines the Agreement is a contract for purposes of the Tucker Act, the power to terminate government agreements is a fundamental and historical power of the federal government not surrendered by silence. *See supra* Part II.A.3; *see also G. L. Christian*, 312 F.2d at 426 ("This history shows, in our view, that the Defense Department and the Congress would be loath to sanction a large contract which did not provide for power to terminate[.]"). Plaintiffs' CBDTP is only authorized by Agreement under the statute. VPPP Statute § 1. It cannot lawfully exist without that federal imprimatur, because only that authorization exempts such programs from the general prohibition on tolling certain highways. VPPP Statute § 4 (citing 23 U.S.C. §§ 129, 301). Congress vested the Secretary of Transportation with discretion to authorize—or not authorize—Value Pricing Pilot Programs. *See id.* ("The Secretary *may* enter into cooperative agreements … to establish, maintain, and monitor value pricing programs." (emphasis added)). The agency cannot *silently* surrender the authority to authorize or not authorize such Agreements, if it can surrender it at all.

Indeed, all three sovereign powers identified in *Winstar*—control over navigation, modification of federal programs, and taxation—are analogous to the authority to terminate a Value Pricing Pilot Program. First, the Secretary's authority to permit tolling on a federal-aid highway through the Agreement mirrors a government's control over navigation on the Arkansas river—a power that, as the Court held in *Cherokee Nation*, cannot be surrendered through contractual silence. *Winstar Corp.*, 518 U.S. at 879 (citing *Cherokee Nation of Okla.*, 480 U.S. 700). Second, the authority to exempt federal aid highways from the general prohibition on tolling mirrors a government's power to exempt individuals from Social Security obligations—a power that, as the Court recognized in *Bowen*, likewise cannot be surrendered through contractual silence. *Id.* at 877

(citing *Bowen v. Pub. Agencies Opposed to Social Security Entrapment*, 477 U.S. 41 (1986)). Third, the decision to allow the collection of toll revenues mirrors a government's power to collect tax revenues—a power that, as the Court held in *Merrion*, cannot be surrendered through contractual silence. *Winstar Corp.*, 518 U.S. at 876–77 (citing *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982)). By contrast, there is no precedent for surrendering federal authority to discontinue a federal program through silence.

At bottom, no statute, regulation, or provision of the VPPP Agreement here unmistakably perpetuates a Value Pricing Pilot Program indefinitely. Quite the contrary. The continuation or termination of such a *federal* program is a "sovereign power" of the federal government, which simply cannot be surrendered through silence, "if indeed it could be waived at all." *Winstar Corp.*, 518 U.S. at 878. Accordingly, the Federal Government must retain authority to terminate.

### B.  The Secretary and FHWA reasonably noticed termination of the Agreement

Plaintiffs claim that Defendants acted arbitrarily and capriciously in noticing termination of the Agreement. *See* MTA Am. Compl. ¶¶ 218–27; Riders Alliance Am. Compl. ¶¶ 83, 95. But arbitrary and capricious review is "highly deferential" and limited. *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 443–44 (2d Cir. 1995). An agency acts arbitrarily and capriciously only if it "provides no rational explanation, inexplicably departs from established policies, is devoid of any reasoning, or contains only summary or conclusory statements." *Just Bagels Mfg., Inc. v. Mayorkas*, 900 F. Supp. 2d 363, 372 (S.D.N.Y. 2012) (quoting *Zhao v. U.S. Dep't of Justice,* 265 F.3d 83, 93 (2d Cir.2001)). A court is "not to engage in an independent evaluation" nor is it to "substitute its judgment for that of the agency," rather it is "to determine whether the agency has considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its action." *Id.* (cleaned up).

The arbitrary and capricious standard is akin to the rational basis standard. *See Oneida Indian Nation of N.Y. v. Clark*, 593 F. Supp. 257, 263 (N.D.N.Y. 1984) (citing *Ethyl Corp. v. EPA,* 541 F.2d 1, 34 n. 74, (D.C. Cir. 1976)). Thus, under arbitrary and capricious review, "[i]f a reasonably discernible rational basis for the agency's decision exists, as expressed by the agency

itself, the agency's decision must be affirmed." *Id.* (citing *Env't Def. Fund v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981)).

To the extent the Court finds that Defendants have made a final, reviewable decision to terminate the Agreement, they acted with a rational basis, and the Court should affirm their actions.

### 1. Defendants reasonably determined that termination was appropriate.

As outlined above, the Secretary and FHWA have the authority to terminate this Agreement if they determine that it "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340. In their preliminary injunction briefing, Plaintiffs conceded that "policy grounds" and "policy concerns" informed both the February 19 Letter and the April Letter. *See* MTA Prelim. Inj. at 16 ("the February 19 Letter did note that Defendants' review of the Program's eligibility was prompted by their disagreement on policy grounds"); *id.* at 42 n.25 (claiming that the February 19 Letter was based on the Administration's "policy concerns" with the program). The Secretary's rationale based on agency priorities or goals is independently sufficient to uphold his actions. *See Oneida Indian Nation*, 593 F. Supp. at 263; 5 U.S.C. § 706 (requiring reviewing courts to apply the "rule of prejudicial error"). And the Secretary also reasonably concluded that the Agreement was inconsistent with the VPPP Statute and therefore unauthorized.

**Agency priorities and goals.** In his February and April letters, the Secretary concluded that the Agreement does not effectuate FHWA's and DOT's priority of ensuring toll-free alternatives remain available to motorists. *See* DOT_47570–80. And he explained his reasons:

- "I share the President's concerns about the impacts to working class Americans who now have an additional financial burden to account for in their daily lives." DOT_47571.

- "Users of the highway network within the CBD tolling area have already financed the construction through the payment of gas taxes and other taxes." DOT_47571.

- "New York's cordon pricing program imposes a disproportionate financial hardship on low and medium-income hardworking American drivers for the benefit of high-income drivers." DOT_47578.

- "Highway users whose taxes already paid for the Federal-aid highways in the cordon area are now being forced to pay again while receiving no new highway benefits in return because there are no toll-free alternative routes available to access the [CBD]." *Id.*

- "Anyone needing to drive into the area is either forced to pay a cost-prohibitive toll or required to use substandard transit system run by the Metropolitan Transit Authority ("MTA"). This is a breach of the promise made to the hardworking American taxpayers[.]" DOT_47578–79.

In the February 19 and April Letters, the Secretary thoroughly explained the agency's priorities and the Tolling Program's inconsistency therewith. That kind of explanation reflects reasoned decision-making, not arbitrary and capricious action.

The Secretary also reasonably concluded that the CBDTP's calculation of toll rates based on purposes unrelated to the tolled infrastructure was inconsistent with FHWA's and the Department of Transportation's priorities. He explained that "setting tolls with the primary goal of raising revenue for the MTA conflicts with the purpose of the VPPP to initiate pilot projects designed to relieve congestion, not fund transit capital projects." DOT_47579. And it was "unconscionable as a matter of policy" to require drivers, especially working-class Americans, to pay both federal taxes and tolls, only to see their money diverted from the roads they actually use "to bail out the MTA transit system." *Id.*

While the Secretary acknowledged in his April Letter that the VPPP Statute permits tolling revenues to be used for eligible transit projects under Title 23, he also made clear his priority to see those highway-generated funds directed to support highway improvements. As the Secretary explained: "It is a fundamental principle of the Federal-aid Highway Program that toll revenues should be used to pay for the infrastructure on which the toll is imposed, with any excess reinvested back into the broader highway network." DOT_47579. Because the CBDTP uses tolling revenues "to improve and expand the region's aging public transportation system, particularly the NYC subway," ECF 83-14, it does not align with the priorities of the Department.

The Secretary decided to notice termination of the Agreement based on these agency priorities or goals. And he explained his reasons. The law allows him to do this. This reason alone is independently sufficient to justify the FHWA's and the Secretary's actions thus far.

**Inconsistency with statute.** The Secretary also reasonably determined that the Agreement was not authorized by the VPPP Statute.

*First*, the Secretary properly determined that the CBDTP's cordon pricing model was inconsistent with Congress's intent under Title 23. The "general rule of statutory construction [is] to read exceptions narrowly when the statute itself should be read broadly." *Greenwich Fin. Servs. Distressed Mortg. v. Countrywide Fin. Corp.*, 654 F. Supp. 2d 192, 195 (S.D.N.Y. 2009*); see also C.I.R. v. Clark*, 489 U.S. 726, 739 (1989) ("In construing provisions . . . in which a general statement of policy is qualified by an exception, we usually read the exception narrowly in order to preserve the primary operation of the provision."); *New Jersey Carpenters Vacation Fund v. Harborview Mortgage Loan Trust*, 581 F.Supp.2d 581, 588 (S.D.N.Y.2008) ("Consistent with Congress's aim to interpret CAFA broadly, as reflected in the legislative history, all of CAFA's exceptions are to be interpreted narrowly."). Applying that principle here, the Secretary appropriately gave the statutory tolling ban a broad reading, which is supported by the phrase "of all kinds" in 23 U.S.C. § 301. Prohibition written in such expansive terms requires that any exception to that prohibition be construed narrowly, which the Secretary did here. Moreover, cordon pricing, which does not account for traffic volume or conditions, is more like a tax than a traditional congestion-management tool, which reinforces the Secretary's statutory reading. *See Tax*, Tax Foundation (last accessed May 13, 2025) (defining tax as "a mandatory payment or charge collected by local, state, and national governments from individuals or businesses to cover the costs of general government services, goods, and activities."), https://taxfoundation.org/taxedu/glossary/tax; *Congestion Pricing*, FHWA Dep't of Transportation Website (explaining that "[c]ongestion pricing - sometimes called value pricing - is a way of harnessing the power of the market to reduce the waste associated with traffic congestion"), https://ops.fhwa.dot.gov/congestionpricing/.

*Second*, the Secretary reasonably concluded that New York's plan to set toll rates based on transit capital targets—rather than to reduce congestion or to fund improvement the highway infrastructure on which the tolls would be imposed—was inconsistent with statutory requirements. Under the VPPP, any revenue generated must be used for projects eligible under Title 23. *See* VPPP Statute cl. 3. But the Agreement contains no explanation of how setting toll rates to fund local transit initiatives satisfies the eligibility criteria under Title 23. *See* DOT_47549–57. And the "toll revenue" under any pilot program was intended to repay costs and fund "highway improvements" first and foremost. *See Statement by President George Bush Upon Signing H.R. 2950*, 1991 U.S.C.C.A.N. 1865 (Dec. 18, 1991). Toll rates "calculated based on considerations separate from reducing congestion or advancing other road-related goals" conflict with the statute.

*             *             *

These deficiencies rise to the level of statutory problems and render the Tolling Program invalid. But even if Plaintiffs are right that FHWA had authority to enter into the Agreement, that still does not detract from the valid policy concerns with the CBDTP's lack of toll-free options and improper toll rates. Importantly, DOT had never before authorized such a program under the VPPP. The agency's priorities and program goals for projects approved under 23 U.S.C. § 129, for example, are materially different than under the VPPP Statute, such that other Title 23 projects do not provide a relevant comparator or precedent for VPPPs. *See* PI Order 74–75 (citing only non-VPPP projects as purported examples). Under arbitrary and capricious review, the Court should affirm the termination since there is at least one valid basis for the Secretary's decision. *See Oneida Indian Nation*, 593 F. Supp. at 263.

**Defendants adequately considered Plaintiffs' reliance interests.** Plaintiffs also argue that the Secretary's decision to terminate was arbitrary and capricious because he failed to adequately consider their reliance interests. *See* MTA Am. Compl. ¶ 251; Riders Alliance Am. Compl. ¶ 88. It is true that an agency should "assess the existence and strength of any reliance interests, and weigh them against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1896 (2020). But an agency need not consider and

weigh "unreasonable" reliance interests. *See Libby Welding Co. v. United States*, 444 F. Supp. 987, 992 (D.D.C. 1977), *aff'd*, 595 F.2d 887 (D.C. Cir. 1979).

The Secretary properly considered Plaintiffs' reliance interests. *See* DOT_47570–80. Plaintiffs' theory rests on two claims of reliance: first, that they relied on FHWA's prior interpretation that the VPPP Statute authorizes cordon pricing, and second, that they relied on the Agreement itself in planning their transit program. *See* MTA Am. Compl. ¶ 251.

Defendants did not need to account for Plaintiffs' alleged reliance on the agency's purported prior view that the statute permits cordon pricing. Plaintiffs identify no formal or final expression of that purported view. And the law allows Defendants to terminate the Agreement based on agency priorities, one of the independent grounds the Secretary invoked. *See* 2 C.F.R. § 200.340; DOT_47570–74, DOT_47576. If Plaintiffs failed to account for FHWA's and the Secretary's lawful authority to terminate based on agency priorities, then their reliance rested on an unreasonable understanding of the Secretary's termination power. The Secretary did not have to account for such unreasonable reliance interests. *See Libby Welding Co.*, 444 F. Supp. at 992 (rejecting a plaintiff's arbitrary and capricious argument because "[t]o accept plaintiff's claim of prejudice would allow plaintiff to benefit from its unreasonable reliance" on a waiver clause).

As for Plaintiffs' reliance on the Agreement itself, the Secretary both acknowledged and addressed it. He first recognized that certain costs had been incurred in connection with the CBDTP, though noted that most of those expenditures predated the November VPPP Agreement. DOT_47570–74, 47577–80. Indeed, New York was prepared to rollout the CBDTP in June of 2024 but paused final implementation of the program after President Trump voiced his criticism of the program. *See* ECF 87-2; *Mulgrew*, 750 F. Supp. 3d at 188 (finding that in June 2024, "just weeks before Congestion Pricing was scheduled to go into effect, New York Governor Kathleen Hochul 'directed the MTA to pause implementation'" of the program "such that the policy's fate remains uncertain"). The Secretary also emphasized that the Agreement approved a "pilot project," a designation that, by definition, implies a limited and experimental effort, not intended to generate long-term reliance. *See* DOT_47570–74, 47577–80.

Moreover, Government Plaintiffs now assert substantial reliance even though they rushed to finalize an agreement in November knowing that the incoming President was opposed to the CBDTP. Plaintiffs were fully aware, before the Agreement was even signed, that the change in administration could alter the CBDTP's future. This purported substantial and settled reliance is also inconsistent with the fact that the Agreement and CBDTP are only a few months old. Plaintiffs put in place the tolling infrastructure long before the FHWA ever agreed to sign the Agreement— and while multiple challenges in federal and state courts were ongoing. Having chosen to assume those risks, they cannot now claim a substantial reliance interest in operating this *pilot* program in perpetuity. Under these circumstances, their claim of substantial and settled reliance is inconsistent with the record and common sense. *See Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 241 (1933) ("He who comes into equity must come with clean hands.").

In short, the Secretary recognized and considered Plaintiffs' reasonable reliance on the Agreement but reasonably weighed that against the broader harms—to working-class commuters, to New Jersey, and to federal taxpayers. DOT_47570–74, 47577–80. He reasonably concluded that, on balance, termination better served agency priorities. *Id.* The question is not whether Plaintiffs, or this Court, would have made the same decision. The only question is whether the Secretary acted reasonably. He did.

**The Secretary's rationales were not provide pretextual.** Plaintiffs also claim that the Secretary gave pretextual reasons for terminating of the VPPP agreement, citing *Department of Commerce v. New York*, 588 U.S. 752, 785 (2019). *See* MTA Am. Compl. (Count V); Riders Alliance Am. Compl. (Count I). Plaintiffs' theory of pretext is that termination was politically motivated. MTA Am. Compl. ¶ 257; Riders Alliance Am. Compl. ¶¶ 82–92. But Plaintiffs' reliance on the *Department of Commerce* is misplaced, and their assertion of pretextual political motivation is neither legally cognizable nor supported by the record.

*First*, *Department of Commerce* found an agency's decision unreasonable due to a mismatch between the decision and its justification. 588 U.S. at 785. But that mismatch does not exist here. The Secretary's April Letter did not introduce a new, post hoc rationale for termination.

The same two key reasons for termination of the Agreement were reflected in both the February 19 Letter and in the April Letter. The Secretary explained in both letters his concern that the CBDTP does not (1) provide a toll-free alternative route for low- and medium-income drivers and (2) set tolls with the aims of reducing congestion or raising revenue primarily for highway infrastructure, as opposed to transit capital projects. *See* DOT_47570–74, 47577–80. Indeed, Plaintiffs concede that such "policy grounds" or "policy concerns" informed the February Letter, as well as the April Letter. MTA Prelim. Inj. Mot. at 16, 32, 42, n.25. This consistency undercuts Plaintiffs' claims that the April Letter was merely a pretextual rationalization. Even if the Court does not accept that the April Letter clarified the February 19 Letter, there is no surprise (let alone invidious or unlawful) motivation for the agency's actions; the statutory authority rationales in the February 19 Letter are simply stronger versions of the same agency priorities or goals rationales (*i.e.*, lack of toll-free alternatives and setting toll rates based on transit capital project needs are *so* inconsistent with agency priorities or goals that they amount to statutory problems). There would be no "prejudicial error" in framing or conceiving of the policy rationale as a statutory one; the substance is the same, so it is at most a difference in degree, not kind. 5 U.S.C. § 706.

*Second*, with respect to alleged political motivation, *Department of Commerce* itself held that "[a] court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." 588 U.S. at 781; *see also id.* at 783 ("[i]t is hardly improper for an agency head to come into office with policy preferences and ideas… and work with staff attorneys to substantiate the legal basis for a preferred policy."). Again, Plaintiffs allege no invidious or inappropriate agency purpose (such as animus based on race or religion), and the administrative record reflects none. As outlined above, the law, and the history of government contracting, expressly permit the Secretary and FHWA to act based on their assessment of agency priorities and program goals. And here, the Secretary was transparent about the policy bases for his actions: he stated in both the February 19 Letter and April Letter that the termination was driven by specific DOT priorities. *See* DOT_47570–74, 47577–80. Thus, Plaintiffs' "pretext" claims fail.

### 2. Defendants did not need to conduct a NEPA review again before issuing a notice of termination.

This Court correctly concluded that Plaintiffs are unlikely to succeed "on the merits of their argument that Defendants acted arbitrarily and capriciously by failing to conduct a new NEPA analysis before deciding to terminate the VPPP Agreement." PI Order at 91; PI Opp'n at 60–62. That conclusion is only reinforced by the Supreme Court's recent decision in *Seven County Infrastructure Coalition v. Eagle County*, 145 S. Ct. 1497 (2025). Accordingly, Defendants are entitled to summary judgment on Plaintiffs' NEPA claims. *See* MTA Am. Compl. (Count VIII); Riders Alliance Am. Compl. (Count III).

"NEPA is a procedural cross-check, not a substantive roadblock. The goal of the law is to inform agency decisionmaking, not paralyze it." *Seven Cnty. Infrastructure Coal.*, 145 S. Ct. at 1507. Accordingly, even if an agency's NEPA analysis "falls short in some respects"—which it does not here—courts may not vacate the agency's final action absent evidence that the agency might have "disapprove[d] the project if it added more" to its NEPA analysis. *Id.* at 1514; *see* 5 U.S.C. § 706 (requiring courts to take "due account…of the rule of prejudicial error" when reviewing final agency action). Put simply, NEPA is "a modest procedural requirement," which courts must apply subject to "'the rule of reason'" and "'[c]ommon sense.'" *Seven Cnty. Infrastructure Coal.*, 145 S. Ct. at 1512–13 (quoting *U.S. Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004) & *Vermont Yankee Nuclear Power Corp. v Nat. Res. Def. Council*, 435 U.S. 519, 551 (1978)).

Common sense here counsels that FHWA need not have "engage[d] in the performative gesture" that Plaintiffs demand. PI Order at 91. Because the agency already considered the environmental effects of not implementing the Tolling Program, FHWA was not required to duplicate its analysis just a few months later when it began to take steps to end the brand-new and same Program. Instead, FHWA could "rely upon the already assembled comparative information," *id.*—which Plaintiffs alike admit the agency developed based on "substantial public participation opportunities," *see* MTA Compl. ¶¶ 8, 286; Riders Alliance Am. Compl. ¶ 275; MTA Prelim. Inj.

Mot. at 37–38 (touting "exhaustive, multiyear NEPA review"), and which this Court upheld, *Chan v. U.S. Dep't of Transp.*, No. 23-CV-10365 (LJL), 2025 WL 1144703, at *43 (S.D.N.Y. Apr. 17, 2025); *Mulgrew*, 750 F. Supp. 3d at 188. FHWA "already considered the environmental consequences," so it was not required to do so again. PI Order at 91 (citing *Nevada v. Dep't of Energy*, 457 F.3d 78, 90 (D.C. Cir. 2006)); *see Mulgrew*, 750 F. Supp. 3d at 207.[6] FHWA has satisfied NEPA's purely procedural requirements.

## III.    Government Plaintiffs' constitutional claims fail.

Government Plaintiffs bring three constitutional claims. MTA Am. Compl. (Counts VI, IX, X). All of them fail. Aside from the due process claim, Plaintiffs' constitutional claims challenge the Secretary's "proposed" compliance measures. As this Court has already noted, deciding such abstract and unripe actions would amount to an advisory opinion. PI Order at 92–93. But even if the Court were to consider the claims, they fail in substance.

**Due Process Claim.** Government Plaintiffs claim that Defendants violated their due process rights terminating the Agreement. MTA Am. Compl. ¶ 266. To state a claim for a due process violation a plaintiff must "first identify a property right, second show that the [government] has deprived him of that right, and third show that the deprivation was effected without due process." *Local 342, Long Island Pub. Serv. Emps. v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994). That claim fails at steps one and three. At step one, their interest in the VPPP Agreement does not rise to a property interest protected by the due process clause. In contract cases, the Second Circuit has noted that any plaintiff could try to style any breach of contract claim

---

[6] To the extent that Plaintiffs now attempt to identify a "unique environmental consequences incurred because the Tolling Program was implemented for a few months prior to the potential return to the no action alternative," PI Order at 90, that belated attempt cannot change the outcome. For starters, none of Plaintiffs' submissions to this Court have identified such consequences. Neither operative complaint (nor Plaintiffs' preliminary injunction briefing) raised anything beyond the original Environmental Analysis and Finding of No Significant Impact. They cannot now amend their pleadings via briefing. Nor did any of Plaintiffs' May 21 submissions to the agency in response to the April 2025 show-cause directive. *See* DOT_47581–48699; PI Opp'n at 49–50 (noting that FHWA will consider Plaintiffs' responses regarding NEPA). Neither litigation nor administrative proceedings under NEPA should become an exercise in hiding the ball. *See Vermont Yankee*, 435 U.S. at 553–54.

as a "denial of his entitlement to performance of the contract." *S & D Maint. Co. v. Goldin*, 844 F.2d 962, 966 (2d Cir. 1988). And if the concept of "entitlement" were this expansive, "federal courts could be asked to examine the procedural fairness of every action by a [government] alleged to be in breach of its contracts." *Id.* Accordingly, "in order to prevail on a due process claim alleging a deprivation of a property right, the plaintiff must demonstrate something more than an ordinary contract right and a reliance thereon." *Tucker v. Darien Bd. of Educ.*, 222 F. Supp. 2d 202, 206 (D. Conn. 2002); *see, e.g.*, *Contiguous Towing, Inc. v. State*, 202 F. Supp. 3d 269, 275–76 (E.D.N.Y. 2016) (holding that "Plaintiffs' interest in their five-year towing contract is not the kind of benefit conferred by the government which is subject to due process protection"); *Ove Gustavsson Contracting Co. v. Floete*, 299 F.2d 655, 660 (2d Cir. 1962) (finding no due process claim when a contract was cancelled without a hearing before an Assistant Commissioner who authorized the termination).

Here, Plaintiffs claim that their reliance on the Agreement gives rise to a property interest protected by the due process clause. *See* MTA Am. Compl. ¶ 264 ("An agency's withdrawal of consent for public or private entities to engage in a contract implicates a property interest protected by the Due Process Clause."). That means that this due process theory is nothing more than claiming a property interest in a contract or agreement, which is insufficient in the Second Circuit. *See Goldin*, 844 F.2d at 966; *Tucker*, 222 F. Supp. 2d at 206; *Contiguous Towing, Inc.*, 202 F. Supp. 3d at 275–76; *Floete*, 299 F.2d at 660.

This due process claim also fails at step three. Defendants have provided them notice and an opportunity to object to the Secretary's notice of termination, which is sufficient due process. *See* DOT_47570–74, 47577–80; *Hayes v. New York Att'y Grievance Comm. of the Eight Jud. Dist.*, 672 F.3d 158, 168 (2d Cir. 2012) ("In addition to a requirement of adequate notice of what is prohibited, a regulation must provide at least as much notice of what is required."). And FHWA's terms and conditions, which were incorporated by reference into the Agreement, provided Plaintiffs with the right to "appeal or object to a termination" within 30 days after written notice of termination. *See* FHWA, *Contractors and Recipients General Terms and Conditions for*

*Assistance Awards* § 17.

**Separation of Powers Claim.**  Government Plaintiffs claim that the April Letter violates the separation of powers by "disregarding relevant statutory provisions" and "refusing to disburse funding for innumerable federal grant programs."  But this separation of powers claim is substantively defunct because they are claiming a violation of a statutory provision.  *See Dalton v. Specter*, 511 U.S. 462, 473 (1994) (holding that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review"); *Jafarzadeh v. Nielsen*, 321 F. Supp. 3d 19, 40 (D.D.C. 2018) ("The Court must take care not to transform every claim that an agency action conflicts with a statute into a freestanding separation of powers claim.").  More so, as outlined in Defendants' opposition to motions for preliminary injunction, the Secretary has the regulatory authority to impose the proposed compliance measures under 23 C.F.R. § 1.36.  PI Opp'n at 62–67; *see also* 2 C.F.R. § 200.339 (authorizing a broad array "actions" to "remed[y]" award recipients' "noncompliance" with "Federal statutes"). And that regulatory authority would be the only way that the Secretary could ensure that state and local government are complying with Congress's ban on tolling, which comports with—rather than violates—the Separation of Powers principle.

**Tenth Amendment and Spending Clause Claim.**  Government Plaintiffs claim that the Secretary's proposed compliance measure violate the Spending Clause and the Tenth Amendment. MTA Am. Compl. (Count IX).  They rely on three flawed legal theories.

*First*, Government Plaintiffs claim "Congress' power to legislate under the spending power is broad, but conditions on funding must be 'unambiguous[]' and they cannot "surprise[] participating States with post acceptance or 'retroactive' conditions."  *Id.* ¶ 300 (citing *Pennhurst State School & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981)).  But the relevant condition is the ban on tolling, which is a longstanding federal statutory requirement unchallenged here. This condition was waived for the life of the VPPP Agreement for the CBDTP zone alone. Government Plaintiffs knew, or should have known, that the condition would return once the VPPP Agreement ended. Thus, they were not blindsided, nor was the condition retroactive.  *If* Defendants impose

compliance measures, it will only be *when* there is a final agency determination that no valid VPPP Agreement is in effect and thus, Plaintiffs are violating 23 U.S.C. § 301. *See Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166 (2023) ("[T]he typical remedy for noncompliance with a federal statute enacted pursuant to the Spending Clause is not a private cause of action for noncompliance but rather termination of funds to the State.").

*Second*, Government Plaintiffs rely on *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 585 (2012) and claim the proposed compliance measures constitute a "gun to the head." MTA Am. Compl. ¶ 306. But there the Supreme Court stated that "[n]othing in our opinion precludes Congress from offering funds under the Affordable Care Act to expand the availability of health care, and requiring that States accepting such funds comply with the conditions on their use." *Id.* Here, the Secretary did just that: he advised Plaintiffs that, if FHWA found Plaintiffs not in compliance with 23 U.S.C. § 301, it "will implement appropriate initial compliance measures . . . until compliance is achieved[.]" DOT_47578. That is lawful under *Sebelius*.

*Third*, Government Plaintiffs claim that the Secretary's proposed compliance measures violate the Tenth Amendment's anti-commandeering principle. MTA Am. Compl. ¶ 305. But, first off, as stated above, the Secretary's proposed compliance measures are premised upon a finding that Plaintiffs are violating federal law by continuing to toll absent a valid VPPP agreement. And if that is so, Government Plaintiffs can hardly claim a constitutional violation for being compelled to follow federal law. More so, the Secretary's proposed compliance measures—such as the potential withholding of approval or funding for certain projects—do not amount to a Tenth Amendment violation. A court in this District has held that even a 10 percent reduction in federal funding was insufficient to establish a Tenth Amendment violation. *See Vermon. v. Brinegar*, 379 F. Supp. 606, 616–17 (D. Vt. 1974) ("Although in absolute terms, this 10 percent reduction may constitute a considerable sum of money under certain circumstances, when considered in relation to a state's entire allocation of Federal highway aid, we cannot say that it irresistibly compels a state under threat of economic catastrophe to embrace the federal plan.").

IV.    **Plaintiffs can establish neither irreparable injury, nor inadequate remedies at law.**

To the extent any of the Plaintiffs seek a permanent injunction, they bear the burden of establishing that they will face irreparable injury absent an injunction and that they have inadequate remedies at law. *See eBay Inc.*, 547 U.S. at 391. To the extent Plaintiffs raise the same or similar arguments for irreparable injury as their preliminary injunction motions, their claims of irreparable injury fail for the same reasons articulated in Defendants opposition to motions for preliminary injunction,. *See* PI Opp'n at 39–46. But in short, the harms that Plaintiffs raise in their complaint and preliminary injunction briefing are almost entirely economic harms. *See, e.g.*, MTA Am. Compl. ¶¶ 205–17. Those harms can be remedied in a breach of contract claim. And in the same vein, as outlined in Part I.C, above, Plaintiffs have an adequate remedy at law through a breach of contract claim in the Court of Federal Claims, the proper venue for this dispute. Thus, Plaintiffs fail to show irreparable injury or inadequate remedies at law.

V.    **The public interest and balance of equities weigh against an injunction.**

To seek a permanent injunction, a plaintiff bears the burden of establishing that the public interest and balance of equities weighs in favor of granting on injunction. *See eBay Inc.*, 547 U.S. at 391. But for all the reasons stated in Plaintiffs' opposition to preliminary injunction, an injunction is not in the public's interest; nor does the balance of equities favor Plaintiffs. *See* PI Opp'n at 68–69. Defendants also note that the public interest weighs against issuing an injunction because allowing New York to continue tolling while leaving the Executive Branch powerless to intervene would cause irreparable harm to the public. While New York may, in theory, be able to refund toll charges for some individual motorists, those who pay the tolls through third parties like taxis, rideshares, or delivery services could not recover those charges. That is unrecoverable financial harm to significant segments of the public—an outcome the Court should avoid by denying any request for a permanent injunction.

## CONCLUSION

For the foregoing reasons, the Court should dismiss or grant Defendants summary judgment on all claims. Failing that, any relief should be limited to remand.

Dated: June 27, 2025.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division

CHARLES E.T. ROBERTS
Counsel to the Assistant Attorney General
Civil Division

STEPHEN M. ELLIOTT
Assistant Branch Director
Federal Programs Branch

*/s/ Michael Bruns*
Michael Bruns
Samuel S. Holt
Trial Attorneys
Federal Programs Branch
Civil Division, Department of Justice
1100 L Street NW
Washington, DC 20005
Telephone: 202-514-4011
Email: michael.bruns@usdoj.gov