# EXHIBIT A

# Proposed *Amicus Curiae* Brief

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| METROPOLITAN TRANSPORTATION AUTHORITY, et al.<br><br>   Plaintiff,<br><br>   v.<br><br>SEAN DUFFY, et al.<br><br>   Defendants. | Case No. 25-cv-1413 (LJL) |

### *AMICUS CURIAE* BRIEF BY REGIONAL PLAN ASSOCIATION, INC.

ARENTFOX SCHIFF LLP
Brian Farkas
James G. Pizzo
1301 Avenue of the Americas, 42nd Floor
New York, New York 10019
(212) 484-3900
brian.farkas@afslaw.com
james.pizzo@afslaw.com

*Attorneys for Amicus Curiae Regional Plan Association, Inc.*

**TABLE OF CONTENTS**

Page

INTEREST OF *AMICUS CURIAE* ................................................................................................ 1

SUMMARY OF ARGUMENT .................................................................................................... 2

ARGUMENT .................................................................................................................................. 3

I. THE OBJECTIVE DATA ESTABLISHES THAT THE TOLLING PROGRAM IS ACHIEVING THE GOALS FOR WHICH IT WAS IMPLEMENTED. ...................... 3

    A.    The Tolling Program is achieving its objective in significantly reducing traffic and vehicle congestion in New York City and surrounding areas. ............. 3

    B.    The Tolling Program is achieving its objective in raising funds to support MTA's public transit projects. ............................................................................. 7

    C.    Congestion Pricing provides benefits beyond mere time savings. ...................... 10

CONCLUSION ............................................................................................................................ 11

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ctr. for Indep. of the Disabled, New York v. Metro. Transportation Auth.*,
   No. 17 Civ. 2990, 2024 WL 4008110 (S.D.N.Y. Aug. 29, 2024) ............................................5

**Statutes**

23 U.S.C. 138................................................................................................................................5

42 U.S.C. 4332(2){c ....................................................................................................................5

49 U.S.C. 303................................................................................................................................5

**Other Authorities**

Regional Plan Association, *Congestion Pricing: Faster All Around* (Jun. 18,
   2025), https://rpa.org/news/lab/congestion-pricing-getting-around-faster-all-
   around ................................................................................................................................ *passim*

*Tolling Program, Environmental Assessment*, METROPOLITAN TRANSPORTATION
   AUTHORITY (July 29, 2022), https://www.mta.info/document/93446 ......................................5

*Pollution Issue. Congestion Pricing May Worsen It*, N.Y. TIMES (Feb. 2, 2025) ...........................6

Emily Badger et al., *Here Is Everything That Has Changed Since Congestion
   Pricing Started in New York*, N.Y. TIMES (May 11, 2025).........................................................7

*MTA Finance Committee, Financial Performance Report*, METROPOLITAN
   TRANSPORTATION AUTHORITY (Apr. 28, 2025),
   https://www.mta.info/document/170771 ...................................................................................7

*Congestion Pricing: CSS Analysis*, COMMUNITY SERVICE SOCIETY, October 2017,
   available at https://www.cssny.org/publications/entry/congestion-pricing-css-
   analysis......................................................................................................................................8

Regional Plan Association, *Congestion Pricing: What it Means to Save Time*
   (Mar. 11, 2025), https://rpa.org/news/lab/what-it-means-to-save-time;...................................9

Regional Plan Association, *Congestion Pricing: What it Means to Save Time*
   (Mar. 11, 2025), https://rpa.org/news/lab/what-it-means-to-save-time ..............................9, 10

The Regional Plan Association, Inc. ("RPA") respectfully submits this brief as *amicus curiae* in support of the Motion for Summary Judgment by Plaintiff Metropolitan Transportation Authority ("MTA") (ECF No. 151) and in opposition to the Motion for Summary Judgment by Defendants Sean Duffy et al. (collectively, "Defendants") (ECF No. 156).

## INTEREST OF *AMICUS CURIAE*

Founded in 1922, RPA is an independent, non-profit, civic organization that develops and promotes plans and strategies to improve the economic health, environmental resiliency, equity, and quality of life of the New York, New Jersey, and Connecticut metropolitan area. Central to RPA's mission is the development of long-range plans and policies to guide the region's growth. Through comprehensive independent research, strategic planning, and robust public engagement, RPA has been at the forefront of urban planning in the tri-state area. The organization advises cities, communities, and agencies on various development-related issues, such as the environment, land use, and good governance. RPA also hosts annual conferences, at which leaders from government, business, and civic groups debate the region's most pressing challenges.

Accordingly, the topics at issue in this case are highly relevant to RPA's mission. In fact, RPA has promoted options to reduce traffic in the in Manhattan's central business district since the 1940s and has consistently documented the importance of the transit system in regional livability and economic competitiveness. Notably, RPA has only participated as *amicus curiae* a small handful of times in its century-long history. That fact highlights the significance of this litigation as well as the genuine interest that RPA holds in its outcome.

## SUMMARY OF ARGUMENT

On January 5, 2025, New York's Central Business District ("CBD") Tolling Program ("Tolling Program") went into effect.[1] The Tolling Program has twin aims: (1) reducing vehicle congestion in the New York City metropolitan area, and (2) creating a new funding source to support the financing of transit capital projects for the Metropolitan Transportation Authority ("MTA"). To these ends, the Tolling Program imposes a toll on certain vehicles entering the CBD during specific parts of the day and week (commonly referred to as "Congestion Pricing").

While this litigation implicates broad legal and factual disputes, RPA's focus is narrow. The purpose of this brief is to assess whether—based on objective data and independent research—the Tolling Program is currently achieving the purposes for which it was implemented.

The answer is simple and unequivocal: yes.

A comprehensive sixteen-week analysis provides incontrovertible evidence that the Tolling Program is effectively reducing vehicle congestion while simultaneously generating substantial revenue to bolster the MTA's vital infrastructure projects.

---

[1] RPA incorporates by reference the factual background on the Tolling Program as recited in the Court's May 28, 2025 Opinion and Order. (ECF No. 132).

**ARGUMENT**

Defendants have advanced three factual assertions to support their contention that the Tolling Program is ineffective. First, Defendants claim that the Tolling Program has caused congestion to worsen in communities outside of Manhattan. (ECF No. 118 at 19-20, 69). Second, Defendants state that the revenue derived from the Tolling Program is overstated, or should fund highway infrastructure instead of transit capital projects.[2] (ECF No. 62-3 at 3). Third, Defendants argue that the Tolling Program has had, or will have, negative economic impact on working class Americans. (ECF No. 62-3 at 3). On all three points, Defendants' claims are inaccurate. RPA submits this *amicus curiae* brief to refute these contentions with the objective data. In reality, the Tolling Program has had an overwhelmingly positive impact on New York and the region—exactly in the ways intended.

**I.     THE OBJECTIVE DATA ESTABLISHES THAT THE TOLLING PROGRAM IS ACHIEVING THE GOALS FOR WHICH IT WAS IMPLEMENTED.**

    **A.     The Tolling Program is achieving its objective in significantly reducing traffic and vehicle congestion in New York City and surrounding areas.**

The Tolling Program took effect on January 5, 2025. Since that time, the New York City metropolitan region has experienced immediate positive impacts on its longstanding traffic and congestion problems.

To determine whether this reduction in traffic and vehicle congestion is attributable to Congestion Pricing, RPA methodically organized several relevant data sets.[3] These include:

    (1) A comparison of traffic jam and delay data for the sixteen weeks beginning on

---

[2] Plaintiffs and other *amici curiae* are expected to address Defendants' contentions about the ways that the revenue from the Tolling Program should be spent. Accordingly, RPA focuses on the factual point that the Tolling Program *is* achieving its objective in generating significant revenue for the MTA.

[3] Traffic data originates from Waze Mobile Ltd. ("Waze"), a subsidiary of Google, which provides advanced navigation services based on satellite imagery and analysis of traffic patterns.

    the first Sunday of 2024 (i.e., before Congestion Pricing's implementation) with the sixteen weeks beginning on the first Sunday of January 2025 (i.e., after Congestion Pricing's implementation).[4]

 (2) A comparison of traffic data from the eight weeks of the holiday season after the implementation of Congestion Pricing in 2025 with data from the comparable periods in 2023 and 2024.[5]

Analyzing these data sets has allowed RPA to determine whether any reductions in congestion could be attributable to Congestion Pricing as opposed to some other factor unrelated to the Tolling Program.[6]

RPA's analysis is telling. With Congestion Pricing in effect, the data shows a remarkable ***28.4% decrease*** in traffic between January 5, 2025 and April 26, 2025.[7] As a result, drivers earned back 17 minutes for every hour spent in traffic when compared to the same period in 2024.

In the few months before Congestion Pricing took effect, Manhattan experienced a 3-4% decrease in traffic (due to factors unrelated to the Tolling Program). A similar decrease would therefore be expected to continue regardless of Congestion Pricing.[8] After factoring in the already-expected 3-4% traffic reduction, Congestion Pricing can be fairly attributed to at least a ***25% reduction*** in delays in Manhattan, saving about 15 minutes for every hour spent in traffic.[9] The following graph, created by RPA, illustrates the significant positive impact of the Tolling Program:

---

[4] Regional Plan Association, *Congestion Pricing: Faster All Around* (Jun. 18, 2025), https://rpa.org/news/lab/congestion-pricing-getting-around-faster-all-around.

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*



The traffic data from the holiday season is even more compelling. Far more people travel to and from Manhattan during the holidays, specifically between November and early January of each year. It is therefore no surprise that New York City experiences anomalously high traffic and vehicle congestion during that period. As the holidays wind down, so too does traffic and congestion. But that decrease is traditionally modest—until now.

For the post-holiday travel season between January 7, 2024 and April 27, 2024, New York City experienced a 21% decrease in weekday traffic *without* Congestion Pricing.[10] During the parallel sixteen-week range in 2025 *after* the implementation of Congestion Pricing, post-holiday

---

[10] *Id.*

weekday traffic decreased by ***nearly double***, achieving a **40%** reduction in traffic delays.[11]

Furthermore, the evidence shows that regions even outside of New York City have also benefited from Congestion Pricing through traffic reduction. This positive outcome was not guaranteed. Initially, the 2022 Environmental Impact Assessment predicted possible trip diversions and related increases in personal vehicle and commercial truck traffic in parts of the Bronx, Staten Island, and Bergen and Hudson Counties in New Jersey.[12] Additionally, an article published on February 2, 2025—just a few weeks after the Tolling Program went into effect—postulated that preliminary data suggested Congestion Pricing would divert traffic onto Bronx highways or into South Bronx neighborhood streets.[13] Notably, Defendants relied on this article in opposing the MTA's motion for a preliminary injunction. (*See* ECF No. 118 at 19-20, 69) ("But while Plaintiffs' claim that congestion has improved may hold true for those living and working in Manhattan, congestion has worsened in other New York communities, including the Bronx.").[14]

With the benefit of time, however, empirical data has now proven these predictions untrue, and Defendants' theory debunked. The Bronx and Staten Island have experienced ***reductions*** in traffic delays. Specifically, the hours lost to traffic jams in the Bronx decreased by 17%, 10% of which can be fairly attributed to Congestion Pricing.[15] The result is that Bronx drivers have saved

---

[11] *Id.*

[12] The assessment was submitted on July 29, 2022, pursuant to 42 U.S.C. 4332(2){c), 23 U.S.C. 138, and 49 U.S.C. 303 by the U.S. Department of Transportation, Federal Highway Administration, Triborough Bridge and Tunnel Authority, New York State Department of Transportation, and New York City Department of Transportation. U.S. Dep't of Transportation, *Central Business District (CBD) Tolling Program, Environmental Assessment* (July 29, 2022), https://www.mta.info/document/93446. For the avoidance of doubt, this Court may also take judicial notice of the data derived from the MTA's website and reports. *See Ctr. for Indep. of the Disabled, New York v. Metro. Transportation Auth.*, No. 17 Civ. 2990, 2024 WL 4008110, at *1 (S.D.N.Y. Aug. 29, 2024) (taking judicial notice of information "taken from the MTA's website").

[13] Hilary Howard. *The South Bronx Has a Pollution Issue. Congestion Pricing May Worsen It*, N.Y. TIMES (Feb. 2, 2025), https://www.nytimes.com/2025/02/02/nyregion/congestion-pricing-air.html.

[14] Notably, this was one of, if not the only, argument raised by Defendants against the ability of the Tolling Program to achieve one of its objectives in reducing traffic and congestion. (*See* ECF No. 118).

[15] Regional Plan Association, *Congestion Pricing: Faster All Around* (Jun. 18, 2025),

10 minutes for every hour spent in traffic when compared to the parallel time period in 2024.[16] The Tolling Program also had a slight positive impact on Staten Island with the borough experiencing a 5% decrease of time lost to jams, equating to a savings of 3 minutes for every hour spent in traffic.[17]

As for New York's friends across the Hudson, adjacent counties in New Jersey have enjoyed even greater decreases in traffic due to the Tolling Program. For example, in Bergen County, nine municipalities experienced a 21% reduction in time lost to traffic jams, of which 14% can be attributed to Congestion Pricing.[18] Similar results were identified in Hudson County, where the hours lost to traffic decreased by 13.2%, of which 12.8% can be fairly attributed to Congestion Pricing.[19] As a result, drivers in Bergen County and Hudson County were able to reclaim 12-15 minutes and 8 minutes, respectively, for every hour spent in traffic.[20]

In sum, RPA's comprehensive and methodical analysis of the vehicle and traffic data collected thus far establishes that the Tolling Program is achieving its objective in reducing congestion. Indeed, it is exceeding expectations by creating dramatic improvements on traffic well beyond Manhattan to the outer boroughs and adjacent counties in New Jersey.

### B. The Tolling Program is achieving its objective in raising funds to support MTA's public transit projects.

The Tolling Program is achieving its secondary objective in creating a new funding source to support the financing of MTA's transit capital projects. According to the MTA's Financial

---

https://rpa.org/news/lab/congestion-pricing-getting-around-faster-all-around.

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

Performance Report, issued on April 28, 2025, the Tolling Program is on track to generate approximately $500 million in its first year of being in effect, raising $45 million in net revenue during March 2025 alone.[21] The results are undeniable.

To be clear, Defendants have not argued that the Tolling Program would fail to achieve its revenue-raising objective. Instead, Defendants take issue with the way in which such revenue would be utilized. Specifically, they argue that the revenue created from the Tolling Program should be used "primarily for highway infrastructure, as opposed to transit capital projects." (ECF No. 118 at 53, citing ECF Nos. 87-5, 87-10; *see also*, ECF No. 62-3: "Moreover, the revenues generated under this pilot program are directed toward the transit system as opposed to the highways. I do not believe that this is a fair deal."). But this Court has already rejected that argument: "Under the plain language of the [Value Pricing Pilot Program], revenues can be used for purposes other than highway construction and thus projects can be designed to generate revenues for purposes other than highway construction, such as transit capital projects." (ECF No. 132 at 75-76). For purposes of this *amicus curiae* brief, all that is relevant is whether the Tolling Program has achieved the objectives for which it was implemented, namely the raising of revenue. The evidence shows that this question must be answered in the affirmative.

Defendants also argued that the Tolling Program would have negative economic impacts on working class Americans.[22] But, as this Court already determined, "the Secretary [does not] explain any basis for his assertion that the Tolling Program disproportionally harms low and

---

[21] Emily Badger et al., *Here Is Everything That Has Changed Since Congestion Pricing Started in New York*, N.Y. TIMES (May 11, 2025), https://www.nytimes.com/interactive/2025/05/11/upshot/congestion-pricing.html; Metropolitan Transportation Authority, *MTA Finance Committee, Financial Performance Report* (Apr. 28, 2025), https://www.mta.info/document/170771.

[22] *See* ECF No. 62-3 at 3 ("I share the President's concerns about the impacts to working class Americans who now have an additional financial burden to account for in their daily lives."); ECF No. 118 at 21 ("[T]he Secretary maintained that the absence of a toll-free alternative places a 'disproportionate financial burden on low and medium-income hardworking American drivers,' who already contribute to federally aided highways through federal taxes.").

medium-income individuals." (ECF No. 132 at 79). Contrary to Defendants' assertions, data show that transit riders in the region are more likely to be working class, and therefore, beneficiaries of the MTA's investments in public transit.[23] RPA has extensively studied the effects of the Tolling Program on different socioeconomic levels.[24] The most recent available data reinforces the Court's May 2025 on the preliminary injunction, and further establishes that the Tolling Program boosts economic interests in New York City and surrounding areas.

Moreover, looking to the broader economic impact on New York, the Court properly found that "[a]vailable data does not indicate that the Tolling Program has harmed economic interests in New York." (ECF No. 132 at 25). To further support that conclusion, RPA estimates that traffic costs our economy $20 billion annually, due primarily to the slow movement of goods, delays and uncertainties in traveling, commuting, and various other factors.[25] With the implementation of the Tolling Program, positive impacts can be seen across a number of these metrics, thereby reducing the amount of money lost to traffic-related delays.[26] As a result, RPA estimates that the value of time savings resulting from the significant reduction in traffic and vehicle congestion is expected to total between $500 million and $1.3 billion annually—an enormous sum.[27]

---

[23] Even before the implementation of congestion pricing, Community Service Society—a 150-year old organization that studies economic policy—released a report showing that "only two percent of the city's outer-borough working poor could potentially pay a congestion fee as part of their daily commute [compared to] 58 percent who rely on public transit and would theoretically benefit from a congestion pricing plan that raises money for both improved transit services and fare discounts." *See* Congestion Pricing: CSS Analysis, October 2017, available at https://www.cssny.org/publications/entry/congestion-pricing-css-analysis.

[24] RPA's data derives from the Public Use Microdata Sample ("PUMS") through the U.S. Census Bureau, specifically the 5-Year Estimate for 2019-2023. *See* Public Use Microdata Sample, U.S. CENSUS BUREAU, available at https://www.census.gov/programs-surveys/acs/microdata.html. The economic variables included are personal income, earnings income, wage and salary income, and business income.

[25] Regional Plan Association, *Congestion Pricing: What it Means to Save Time* (Mar. 11, 2025), https://rpa.org/news/lab/what-it-means-to-save-time.

[26] *Id.*; Regional Plan Association, *Congestion Pricing: Faster All Around* (Jun. 18, 2025), https://rpa.org/news/lab/congestion-pricing-getting-around-faster-all-around.

[27] Regional Plan Association, *Congestion Pricing: What it Means to Save Time* (Mar. 11, 2025), https://rpa.org/news/lab/what-it-means-to-save-time; Regional Plan Association, *Congestion Pricing: Faster All*

Therefore, the Tolling Program is achieving its objective in generating revenue to support MTA's projects and improves the overall economic interests of New York City. The evidence does not support Defendants' contention that the Tolling Program harms lower income Americans or the economy more broadly. In fact, the opposite is true.

### C. Congestion Pricing provides benefits beyond mere time savings.

With significant reductions in vehicle congestion from Congestion Pricing, those in the New York City metropolitan area have also enjoyed a number of associated benefits.

<u>First</u>, reduced congestion creates safer streets. Less traffic allows emergency vehicles to navigate streets more efficiently, improving response times to incidents and potentially saving lives. (ECF No. 132 at 24: "Emergency response times are improving under the Tolling Program." *See also*, ECF No. 91 ¶ 25(j)).[28] Additionally, fewer vehicles on the road not only reduces the chances of crashes between motor vehicles, but decreases the likelihood of crashes with pedestrians, cyclists, or other non-vehicle road users, resulting in fewer injuries and deaths.[29]

<u>Second</u>, less traffic creates faster trip times for commuters and commercial drivers, leading to increased productivity. For example, as a result of Congestion Pricing, the MTA has reported that average trip times were down 17% at the Lincoln Tunnel, through which most of the bus traffic into Manhattan flows, and down a remarkable 48% at the Holland Tunnel.[30] These results benefit

---

*Around* (Jun. 18, 2025), https://rpa.org/news/lab/congestion-pricing-getting-around-faster-all-around.

[28] *See also* Badger, *supra* note 20 ("Average travel times for ambulances had been steadily increasing since the pandemic, according to emergency service dispatch data. Those ambulance times rose again this year, but at a slower rate inside the congestion zone than elsewhere.").

[29] *Id*. ("Crashes in the zone that resulted in injuries are down 14 percent this year through April 22, compared with the same period last year, according to police reports detailing motor vehicle collisions. The total number of people injured in crashes (with multiple people sometimes injured in a single crash) declined 15 percent.").

[30] Regional Plan Association, *Congestion Pricing: Faster All Around* (Jun. 18, 2025), https://rpa.org/news/lab/congestion-pricing-getting-around-faster-all-around; *see also* ECF No. 132 at 24 ("Crossing times are 12% faster at the Lincoln Tunnel and 45% faster at the Holland Tunnel than they were in 2024.") (citing ECF No. 91 ¶ 25(c)).

the 330,000 commuters using road vehicles every day across the entire metropolitan area.[31] Shorter commute times, in turn, improve productivity by creating more opportunity to earn during working hours, reducing fatigue and stress, and improving overall work-life balance. Furthermore, decreased trip times also improve productivity for commercial drivers by enabling them to complete their routes more quickly and establish more accurate and reliable schedules, thereby creating additional benefits for individuals and businesses alike.[32]

Third, the overall savings of time on the road has granted drivers, bus riders, and truckers more quality time to be spent with loved ones, pursuing hobbies, or engaging in leisure activities. This increased free time translates directly to improved overall well-being and life satisfaction.

Therefore, RPA's analysis shows that the benefits of the Tolling Program go beyond that of merely reducing traffic. It has also created safer streets, increased productivity, and granted more time to everyday people with shorter commutes.

## CONCLUSION

The New York Central Business District Tolling Program has demonstrated its effectiveness in achieving its objectives of reducing vehicle congestion and generating substantial revenue for the MTA's transit capital projects. RPA's analysis show that, as a purely factual matter, Defendants' critiques are misplaced. The Tolling Program is working. Accordingly, RPA respectfully requests that the Court grant the MTA's Motion for Summary Judgment.

---

[31] Regional Plan Association, *Congestion Pricing: What it Means to Save Time* (Mar. 11, 2025), https://rpa.org/news/lab/what-it-means-to-save-time.

[32] *Id.*

Dated: New York, NY
       June 30, 2025

                              ARENTFOX SCHIFF LLP

                              */s/ Brian Farkas*
                              Brian Farkas
                              James G. Pizzo
                              1301 Avenue of the Americas, 42nd Floor
                              New York, New York 10019
                              (212) 484-3900
                              brian.farkas@afslaw.com
                              james.pizzo@afslaw.com

                              *Attorneys for Amicus Curiae Regional*
                              *Plan Association, Inc.*

12