UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| METROPOLITAN TRANSPORTATION AUTHORITY and TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY, <br><br> Plaintiffs, <br><br> and <br><br> NEW YORK CITY DEPARTMENT OF TRANSPORTATION, NEW YORK STATE DEPARTMENT OF TRANSPORTATION, RIDERS ALLIANCE, and SIERRA CLUB, <br><br> Intervenor-Plaintiffs, <br><br> v. <br><br> SEAN DUFFY, in his official capacity as Secretary of the United States Department of Transportation, GLORIA M. SHEPHERD, in her official capacity as Executive Director of the Federal Highway Administration, UNITED STATES DEPARTMENT OF TRANSPORTATION, and FEDERAL HIGHWAY ADMINISTRATION, <br><br> Defendants. | CIVIL ACTION NO. 1:25-cv-01413-LJL |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN FURTHER SUPPORT OF INTERVENOR-PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT .................................................................................................................................. 2

I.     DEFENDANTS MISUNDERSTAND ARTICLE III STANDING. .................................. 2

II.    DEFENDANTS MISUNDERSTAND NEPA PLEADING. ............................................. 4

III.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON
      PRETEXT (COUNT I). ...................................................................................................... 6

CONCLUSION ............................................................................................................................. 10

## TABLE OF AUTHORITIES

**Page number(s)**

**CASES**

*Brodsky v. U.S. Nuclear Regul. Comm'n*,
    704 F.3d 113 (2d Cir. 2013)...........................................................................................4, 5

*Brodsky v. U.S. Nuclear Regul. Comm'n*,
    783 F. Supp. 2d 448 (S.D.N.Y. 2011) (No. 1:09-cv-10594-LAP).......................................5

*Conservation L. Found., Inc. v. Acad. Express, LLC*,
    129 F.4th 78 (1st Cir. 2025).................................................................................................3

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019).................................................................................................6, 7, 9, 10

*Dep't of Homeland Sec. v. Regents of Univ. of California*,
    591 U.S. 1 (2020).................................................................................................................6

*Env't Def. Fund v. FERC*,
    2 F.4th 953 (D.C. Cir. 2021)...............................................................................................4

*Institutional S'holder Servs., Inc. v. SEC*,
    No. 24-5105, --- F.4th ----, 2025 WL 1802786 (D.C. Cir. July 1, 2025) ...........................2

*Japan Whaling Ass'n. v. Am. Cetacean Soc'y*,
    478 U.S. 221 (1986)............................................................................................................5

*LaFleur v. Whitman*,
    300 F.3d 256 (2d Cir. 2002)................................................................................................4

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    591 U.S. 657 (2020).........................................................................................................2, 3

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024)............................................................................................................9

*Metro. Transp. Auth. v. Duffy*,
    No. 25-CV-1413 (LJL), 2025 WL 1513369 (S.D.N.Y. May 28, 2025) ................7, 8, 9, 10

*Mulgrew v. United States Dep't of Transp.*,
    750 F. Supp. 3d 171 (S.D.N.Y. 2024)..................................................................................4

*N. States Power Co. v. Fed. Transit Admin.*,
    No. 01-295 JRT/FLN, 2001 WL 1618532 (D. Minn. May 24, 2001) ..............................5–6

*SEC v. U.S. Realty & Improvement Co.*,
    310 U.S. 434 (1940) ............................................................................................................. 3

*Sierra Club v. FERC*,
    867 F.3d 1357 (D.C. Cir. 2017) ........................................................................................... 4

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ............................................................................................................ 4

Intervenor-Plaintiffs Riders Alliance and Sierra Club respectfully submit this memorandum of law in opposition to the arguments made by Defendants in support of their Motion for Summary Judgment (ECF No. 158) and in further support of the arguments made in support of Intervenor-Plaintiffs' Motion for Partial Summary Judgment (ECF No. 146).

## PRELIMINARY STATEMENT

Defendants' Memorandum of Law presses a series of extraordinary and unsupported claims, ranging from the unlimited power to break any promise at any time, Defs.' Mem. Law Supp. Mot. Summ. J. at 1, 32, ECF No. 158 ("Defs.' Br.") to the startling premise that there exists no meaningful difference between statutory interpretation and policymaking, *id.* at 39–40. In between, Defendants also misstate the requirements of Article III standing, *id.* at 22, and invent a pleading requirement for claims asserting a violation of the National Environmental Policy Act ("NEPA") that their own authority refutes, *id.* at 21–22.

To streamline briefing, Intervenor-Plaintiffs once again adopt and join the briefing jointly submitted by Plaintiffs Metropolitan Transportation Authority and Triborough Bridge and Tunnel Authority, and Intervenor-Plaintiff New York City Department of Transportation. Riders Alliance and Sierra Club submit brief additional arguments and authorities on three points: First, Defendants are wrong that intervenors are required to show independent Article III standing, but if such a requirement existed then Intervenor-Plaintiffs would satisfy it. Second, Defendants are wrong that NEPA claims are subject to dismissal unless they explicitly invoke the Administrative Procedure Act ("APA") in the body of the claim. Finally, the record Defendants have submitted only strengthens the earlier indications that Secretary Duffy's claimed reliance on statutory interpretation was pretextual. Defendants are not entitled to judgment on this claim, and discovery would be appropriate if full relief were not already available on other claims.

1

**ARGUMENT**

I. **Defendants Misunderstand Article III Standing.**

Defendants maintain that Intervenor-Plaintiffs must establish Article III standing, and that they cannot do so without showing that Riders Alliance and Sierra Club members are intended beneficiaries of the VPPP agreement. Defs.' Br. at 22. Defendants' arguments are fundamentally misguided. First, as the Supreme Court has instructed, there is no requirement that intervenors seeking the same relief as existing parties establish independent Article III standing. But even if such a requirement existed, Defendants are wrong that Riders Alliance and Sierra Club members lack a cognizable injury unless they establish that they are "primary or direct" beneficiaries of the VPPP agreement. *Id.* Instead, as Defendants elsewhere concede, Article III standing requires only a showing that a challenged action will inflict an injury-in-fact, that the injury be traceable to the challenged action, and that the injury would be redressed by a favorable decision. The record establishes that Intervenor-Plaintiffs' members face numerous such injuries arising from Defendants' attempt to terminate the Congestion Pricing Program.

As an initial matter, Defendants are simply wrong that Riders Alliance and Sierra Club, who participate in this action as intervenors, are required to establish independent Article III standing. The Supreme Court has explained that a court "err[s] by inquiring into" an intervenor's "independent Article III standing" where an intervenor seeks the same relief as an existing party. *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020). While it is true that "[i]ntervenors seeking relief broader than or different from that sought by existing parties must possess constitutional standing . . . intervenors that seek the same relief sought by at least one existing party need not do so." *Institutional S'holder Servs., Inc. v. SEC*, No. 24-5105, --- F.4th ----, 2025 WL 1802786, at *4 n.3 (D.C. Cir. July 1, 2025) (citations omitted). Defendants do not and cannot argue that Riders Alliance and Sierra Club seek relief

broader than that sought by Plaintiffs the MTA and TBTA. And as it is uncontested that the MTA and TBTA have Article III standing to pursue their claims in this Court, Defendants have no basis for demanding a showing of "independent Article III standing" from intervenors seeking the same relief. *Little Sisters of the Poor Saints Peter & Paul Home*, 591 U.S. at 674 n.6.[1]

But even if Riders Alliance and Sierra Club were for some reason required to establish independent Article III standing, they would easily do so on this record. As Defendants concede, all that is required to establish associational standing is a showing that "at least one of their members has suffered an injury in fact that is traceable to the challenged conduct and that is redressable by a favorable decision." Defs.' Br. at 22. Declarations submitted in this case establish that Intervenor-Plaintiffs' members will suffer injuries if Defendants succeed in their efforts to terminate the Congestion Pricing Program. The Program provides Intervenor-Plaintiffs' members with cleaner air, better transit, and quieter streets. *See* Baldwin Decl. ¶¶ 4–11, ECF No. 148 (describing pollution, safety, and noise harms due to traffic, along with ongoing improvements provided by Program); Cryer Decl. ¶¶ 4–8, ECF No. 149 (same). Defendants threaten to reverse these improvements, forcing Intervenor-Plaintiffs' members to breathe dirtier air, endure increased noise, and suffer disruption of their daily activities. These injuries are legally cognizable. *See, e.g.*, *Conservation L. Found., Inc. v. Acad. Express, LLC*, 129 F.4th 78, 88 (1st Cir. 2025) ("[B]reathing polluted air is 'traditionally recognized as providing a basis for a

---

[1] Defendants' attempt to impose an independent standing requirement is especially misguided when it comes to intervenors like Riders Alliance and Sierra Club, who participate as permissive intervenors under Federal Rule of Civil Procedure 24(b). *See* Order, ECF No. 32 (granting Riders Alliance and Sierra Club intervention "pursuant to Federal Rule of Civil Procedure 24(b)). As the Supreme Court long ago observed, permissive intervention under Rule 24(b) "plainly dispenses with any requirement that the intervenor shall have a direct personal or pecuniary interest in the subject of the litigation." *SEC v. U.S. Realty & Improvement Co.*, 310 U.S. 434, 459 (1940). Defendants' invented standing requirement would rewrite Rule 24(b) to include a requirement that Congress chose to omit.

lawsuit in American courts.'" (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021))); *Env't Def. Fund v. FERC*, 2 F.4th 953, 971 (D.C. Cir. 2021) ("[C]redible claims of exposure to increased noise and . . . disruption of daily activities . . . are sufficient to satisfy Article III's injury-in-fact requirement." (quoting *Sierra Club v. FERC*, 867 F.3d 1357, 1366 (D.C. Cir. 2017))); *LaFleur v. Whitman*, 300 F.3d 256, 270 (2d Cir. 2002) (an individual's "likely exposure to additional [air pollutant] in the air where she works is certainly an 'injury-in-fact' sufficient to confer standing"); *Mulgrew v. U.S. Dep't of Transp.*, 750 F. Supp. 3d 171, 212 (S.D.N.Y. 2024) (observing that "even a small increase in pollutants abutting" a challenger's "neighborhood would provide the 'identifiable trifle' standing doctrine requires" (citing *LaFleur*, 300 F.3d at 271)). The threatened injuries are directly traceable to Secretary Duffy's unlawful decision to terminate the Congestion Pricing Program and would be redressed by a favorable decision here.

## II. Defendants Misunderstand NEPA Pleading.

Defendants make the surprising argument that it is "jurisdictionally fatal" for a NEPA claim not to specifically reference the APA, because, in their view, a "NEPA claim that does not invoke the APA's cause of action" is subject to automatic dismissal. Defs.' Br. at 21–22. It is surely uncontroversial that NEPA claims are reviewed pursuant to the right of action provided by the APA. But it does not follow that plaintiffs who have invoked the Court's jurisdiction under the APA must explicitly plead each NEPA count as a "NEPA claim through the APA." *Id*. Defendants' contrary view is not only unfounded but contradicted by the very case they rely on.

Defendants' own authority refutes their theory that it is "jurisdictionally fatal" for a NEPA claim to include "no mention of the APA" within the text of the claim itself. *Id*. at 22. Defendants point to the Second Circuit's decision in *Brodsky v. U.S. Nuclear Regul. Comm'n*, 704 F.3d 113, 119 (2d Cir. 2013), as supporting their theory that courts must dismiss "a freestanding NEPA claim" if a complaint brings "other claims through the APA" but does not

4

explicitly mention the APA in the body of the NEPA claim. Defs.' Br. at 21–22. If Defendants had read the complaint in *Brodsky*, they would have seen that it in fact proceeds in identical fashion to Intervenor-Plaintiffs' complaint here: Counts II, IV, VI, VII, XII, XIV, and XVI through XXI of the *Brodsky* complaint are pled as "violation[s] of the APA," while Counts VIII through XI are pled as "violation[s] of NEPA," without mentioning the APA. *See* Complaint at 15–32, *Brodsky v. U.S. Nuclear Regul. Comm'n*, 783 F. Supp. 2d 448 (S.D.N.Y. 2011) (No. 1:09-cv-10594-LAP). Just as in Intervenor-Plaintiffs' pleading, none of the NEPA claims in *Brodsky* explicitly "invoke the APA's cause of action." Defs.' Br. at 21. The *Brodsky* NEPA claims include "no mention of the APA," *id.* at 22, instead describing NEPA's requirements and explaining the ways in which the government's action is alleged to violate that statute. Far from endorsing Defendants' theory that this pleading style is "jurisdictionally fatal," the Second Circuit in *Brodsky* not only exercised jurisdiction over the complaint's NEPA claims, but also found that there was a possible "violation of NEPA's public participation provisions" and ordered remand. *Brodsky*, 704 F.3d at 125.

In fact, it is commonplace for plaintiffs who raise ordinary APA claims alongside NEPA claims to distinguish between them by pleading the NEPA claims as . . . NEPA claims. Contrary to Defendants' unsupported assertion, there is no magic words requirement that a NEPA claim must be styled as a "NEPA claim through the APA" or otherwise provide a "mention of the APA" in the body of the claim. Defs.' Br. at 22. Nor, in any event, would a failure to meet such a requirement prove "jurisdictionally fatal," because courts have ample authority to construe claims under the APA regardless of the way in which they were pled. *See Japan Whaling Ass'n. v. Am. Cetacean Soc'y*, 478 U.S. 221, 228, 230 n.4 (1986) (treating Mandamus Act petition as APA claim); *see also, e.g.*, *N. States Power Co. v. Fed. Transit Admin.*, No. 01-295 JRT/FLN,

2001 WL 1618532, at *14 (D. Minn. May 24, 2001), *aff'd as modified and remanded*, 270 F.3d 586 (8th Cir. 2001) ("In its Complaint, plaintiff asserted a NEPA violation . . . . It is clear from the parties' submissions, that the appropriate cause of action is one for violation of § 702 of the [APA]. The Court will therefore treat plaintiff's Complaint as pleading a cause of action pursuant to § 702 of the APA.").

### III.     Defendants Are Not Entitled to Summary Judgment on Pretext (Count I).

Defendants have done nothing to refute the strong indication that Secretary Duffy's February 19th decision, which purported to rest solely on his obviously false statutory claims, was pretextual. "Several points, considered together, reveal a significant mismatch between the decision the Secretary made and the rationale he provided." *Dep't of Com. v. New York*, 588 U.S. 752, 783 (2019). First, there is the total lack of support for Secretary Duffy's stated reason for acting—his wholly unconvincing claim to be bound by a statutory theory that even Defendants cannot bring themselves to defend. Second, the record shows that Secretary Duffy explicitly relied on the *nature* of the rationale he purported to rest his decision on—dubious statutory theories—as justifying complete disregard for the reliance interests that otherwise would have constrained him from abruptly reversing an enormously expensive, consequential, years-long policy.[2] And third, as the administrative record has revealed, Defendants lack any corroboration for the policy claims they make in favor of their preexisting goal of eliminating the Congestion Pricing Program. *See* Intervenor-Pls.' Mem. Law Supp. Mot. Partial Summ. J. at 8–10, ECF No.

---

[2] "When an agency changes course, as [FHWA] did here, it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Dep't of Homeland Sec. v. Regents of Univ. of California*, 591 U.S. 1, 30 (2020) (cleaned up). Secretary Duffy maintained that the choice of a statutory rationale freed him of this burden because "any reliance interests cannot overcome the conclusion that FHWA's approval was not authorized by law." DOT_0047573 (February 19 Letter).

146. Presenting the public with a phony statutory ground thus offered Secretary Duffy a convenient shortcut to circumvent his need to consider significant reliance interests and conduct an orderly evaluation of the impact of the Congestion Pricing Program on low-income and working-class Americans. "Altogether, the evidence tells a story that does not match the explanation the Secretary gave for his decision." *Dep't of Com.*, 588 U.S. at 784.

The thoroughly irregular explanation Secretary Duffy provided to the public bears striking similarities to the pretextual reasoning supplied by the Secretary of Commerce in *Department of Commerce v. New York*. There, the "sole stated reason" for the Secretary of Commerce's action "seems to have been contrived" to avoid admitting that the Secretary had decided to collect citizenship data as a matter of policy. 588 U.S. at 784. Rather than own up to the true reason for his decision, the Secretary of Commerce found it more convenient to tell the public that he was merely following a request from the Department of Justice. Here too, the significant reliance and policy interests implicated in the Congestion Pricing Program would appear to bar any immediate termination on policy grounds, so Secretary Duffy found it convenient to claim he was merely following Congress's requirements. As this Court observed, "[t]hough Defendants are free to construct their own policy priorities, the public is entitled to an orderly evaluation of actions purportedly taken based on those policies." *Metro. Transp. Auth. v. Duffy*, No. 25-CV-1413 (LJL), 2025 WL 1513369, at *36 (S.D.N.Y. May 28, 2025) ("*Duffy*"). Rather than conducting any such orderly evaluation, Secretary Duffy endeavored to short-circuit his obligation by telling the public that he was bound by Congress's legislative judgment and was simply following statutory command.

In the more than one hundred pages of briefing Defendants have submitted on this motion and their earlier opposition to Plaintiffs' preliminary injunction briefing, Defendants have never

7

meaningfully contested the most basic indication of pretext: Secretary Duffy's stated reason for terminating the Congestion Pricing Program—his ostensible conclusion that no statutory authority exists for the Program—is clearly specious. As in earlier briefing, "Defendants do not offer a full-throated defense" of Secretary Duffy's purported legal conclusion. *Duffy* at *31. They instead devote a scant two paragraphs to a vain attempt to liberally rephrase Secretary Duffy's preposterous statutory claims before once again "contending weakly that the 'deficiencies' related to the Tolling Program's cordon pricing model 'rise to the level of a statutory problem.'" *Id.* (quoting Defendants' earlier preliminary injunction brief); Defs.' Br. at 36–37 (parroting same contention).

Defendants nonetheless insist that no claim for pretext can lie against the February 19 decision—even though that decision purported to rest on a transparently false legal claim—for two reasons. First Defendants argue that there can be no "mismatch between the decision and its justification" because Secretary Duffy's public "statutory authority rationales"—while obviously indefensible—were "simply stronger versions of the same agency priorities or goals rationales" that actually motivated his decision. Defs.' Br. at 39. Second, Defendants argue that, notwithstanding his claim to rest his decision on a legal conclusion, "the Secretary was transparent about the policy bases for his actions" and therefore there can be no pretext claim, regardless of the Secretary's insistence that he reached his decision for a completely different reason than his "policy bases." Defs.' Br. at 40. These arguments fly in the face of both Supreme Court precedent and common sense, and the Court should reject them.

Defendants' first argument is that "framing or conceiving of the [Secretary's true] policy rationale as a statutory one" is not pretextual because it merely clothes a policy preference in the language of legal interpretation. *Id.* This is an absurd claim. While Congress may reasonably

8

"leave policymaking to political actors," the Supreme Court has made clear that "legal interpretation" is an entirely distinct enterprise "based on the traditional tools of statutory construction, not individual policy preferences." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403 (2024). "Defendants cannot escape the Secretary's flawed legal conclusions by, once those legal conclusions have been challenged, disavowing them and reframing the conclusions as mere expressions of policy." *Duffy* at *36. When a political actor pretends that his policy choices are compelled by Congress's judgments rather than his own, he misleads the public. This is not a mere "difference in degree," Defs.' Br. at 40—it is impermissible pretext.

Defendants' second argument is equally feeble. In their view, so long as a policymaker discloses that a decision accords with his policy preferences, he need not reveal whether those preferences furnish the *actual* reason for the decision. *Id*. Defendants maintain that this conclusion is supported by *Department of Commerce*, but that case stands for the opposite proposition. There too, the Secretary of Commerce disclosed in the memorandum announcing his decision to add a citizenship question to the census a list of policy reasons that could conceivably support his decision: "the long history of the citizenship question on the census, as well as the facts that the United Nations recommends collecting census-based citizenship information, and other major democracies such as Australia, Canada, France, Indonesia, Ireland, Germany, Mexico, Spain, and the United Kingdom inquire about citizenship in their censuses," along with "the need for accurate citizenship data and the limited burden that the reinstatement of the citizenship question would impose." 588 U.S. at 763 (quoting memo announcing Secretary's decision to reinstate citizenship question). The problem, of course, was that the Secretary purported to rest his decision not on these freestanding policy judgments but on a contrived request from the Department of Justice, and, as the Supreme Court found, "the decision to

9

reinstate a citizenship question cannot be adequately explained in terms of DOJ's request." *Id.* at 783. Here, regardless of Secretary Duffy's recitation of various policy concerns, "the Secretary made clear that the purported termination of the VPPP Agreement was not based on those purported concerns" but on his flimsy legal rationale. *Duffy* at *36. Contrary to Defendants' claims, a decision is not rendered "transparent" when it identifies policy concerns while hiding the true reason for decision behind a false legal justification. Defs.' Br. at 40.

Secretary Duffy was obligated to provide "genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com.*, 588 U.S. at 785. Defendants have not shown that Secretary Duffy complied with this basic requirement of administrative honesty. They are not entitled to summary judgment on Intervenor-Plaintiffs' pretext claim.[3]

## CONCLUSION

For the reasons described above, the Court should enter judgment against Defendants on Counts II and IV of Intervenor-Plaintiffs' First Amended Complaint.

DATED: July 18, 2025

*s/Dror Ladin*
Dror Ladin
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
(917) 410-8701
dladin@earthjustice.org

*Counsel for Intervenor-Plaintiffs*
*Riders Alliance and Sierra Club*

---

[3] Intervenor-Plaintiffs are not seeking judgment on the pretext claim at this time because the claim should involve further discovery, and full relief is already available and would be provided by judgment in their favor on Claims II and IV of their Complaint.

10