## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

METROPOLITAN TRANSPORTATION
AUTHORITY and TRIBOROUGH BRIDGE AND
TUNNEL AUTHORITY,

*Plaintiffs*,

and

NEW YORK STATE DEPARTMENT OF
TRANSPORTATION, RIDERS ALLIANCE, SIERRA
CLUB, and NEW YORK CITY DEPARTMENT OF
TRANSPORTATION,

*Intervenor-*
*Plaintiffs*,

v.

SEAN DUFFY, in his official capacity as Secretary of
the United States Department of Transportation,
GLORIA M. SHEPHERD, in her official capacity as
Executive Director of the Federal Highway
Administration, UNITED STATES DEPARTMENT
OF TRANSPORTATION, and FEDERAL HIGHWAY
ADMINISTRATION,

*Defendants*.

Case No. 25 Civ. 1413 (LJL)

### MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN FURTHER SUPPORT OF PLAINTIFFS THE MTA AND TBTA AND INTERVENOR-PLAINTIFF NYCDOT'S <u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT .......................................................................................... 1

ARGUMENT ....................................................................................................................... 3

    I.      The Court Has Jurisdiction Over Plaintiffs' Claims. ................................................. 3

         A.     Defendants have taken final agency action. ........................................................ 3

         B.     Plaintiffs' challenge is prudentially ripe. ........................................................... 8

         C.     The Tucker Act does not apply here. .................................................................. 10

    II.     Defendants' Termination of the VPPP Agreement and Rescission of Tolling
         Authorization Were Arbitrary and Capricious and Contrary to Law. ........................ 13

         A.     Defendants do not have the authority to terminate the VPPP Agreement. ........... 13

             1.     The VPPP Agreement does not grant Defendants the right to terminate.  14

             2.     The regulations do not give Defendants the right to terminate. ................ 17

             3.     The *Christian* doctrine does not apply. .................................................... 18

             4.     The VPPP statute does not give Defendants the right to terminate. ......... 22

             5.     There is no "sovereign power" to unilaterally terminate the Program. .... 25

         B.     Defendants' termination of the VPPP Agreement and rescission of tolling
             authorization was arbitrary and capricious. ......................................................... 27

             1.     The Secretary's "policy concerns" are unavailing. .................................. 27

             2.     The Secretary's reading of the VPPP statute is incorrect. ........................ 28

             3.     The Secretary did not adequately consider Plaintiffs' reliance interests. . 30

    III.    Summary judgment is not appropriate as to Plaintiffs' remaining claims. ................. 33

         A.     Plaintiffs' NEPA claim ...................................................................................... 34

         B.     Plaintiffs' pretext claim ...................................................................................... 37

         C.     Plaintiffs' constitutional claims .......................................................................... 40

1.     Due Process Clause ................................................................................. 40

2.     The Spending Clause and the Tenth Amendment .................................... 41

3.     Separation of Powers ............................................................................... 42

IV.    Remedy ................................................................................................................. 43

CONCLUSION .................................................................................................................. 46

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967).................................................................................................. 9

*Aerolease Long Beach v. United States*,
    31 Fed. Cl. 342 (1994)............................................................................................ 19

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
    770 F. Supp. 3d 121 (D.D.C. 2025)........................................................................ 11

*Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*,
    No. 25 Civ. 702 (D. Md.).......................................................................................... 18

*Am. Cntr. for Int'l Lab. Solidarity v. Chavez-Deremer*,
    2025 WL 1795090 (D.D.C. June 30, 2025)....................................................... 11, 13

*Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*,
    2025 WL 890560 (D. Md. Mar. 21, 2025)............................................................... 18

*Am. Ground Transp., Inc. v. United States*,
    165 Fed. Cl. 659 (2023)........................................................................................... 12

*Am. Near E. Refugee Aid v. U.S.A.I.D.*,
    703 F. Supp. 3d 126 (D.D.C. 2023)........................................................................ 13

*Am. Petroleum Inst. v. E.P.A.*,
    683 F.3d 382 (D.C. Cir. 2012)................................................................................... 9

*Andrus v. Sierra Club*,
    442 U.S. 347 (1979)................................................................................................ 35

*Berkeley-Dorchester Ctnys. Econ. Dev. Cor. v. H.H.S.*,
    2006 WL 8443181 (D.S.C. Feb. 24, 2006).......................................................... 6, 7

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988)................................................................................................ 11

*Bridgeport Hosp. v. Becerra*,
    108 F.4th 882 (D.C. Cir. 2024)................................................................................ 22

*A.T.F. v. Fed. Lab. Rels. Auth.*,
    464 U.S. 89 (1983).................................................................................................. 27

*Cal. Sea Urchin Comm'n v. Bean*,
    883 F.3d 1173 (9th Cir. 2018) ................................................................ 24

*Call Henry, Inc. v. United States*,
    855 F.3d 1348 (Fed. Cir. 2017) .............................................................. 22

*Carroll v. Trump*,
    49 F.4th 759 (2d Cir. 2022) .................................................................... 17

*Climate United Fund v. Citibank, N.A.*,
    2025 WL 1131412 (D.D.C. Apr. 16, 2025) ............................................ 18

*Cmty. Legal Servs. v. H.H.S.*,
    137 F.4th 932 (9th Cir. 2025) ........................................................... 10, 12

*College Point Boat Corp. v. United States*,
    267 U.S. 12 (1925) ................................................................................. 20

*Conner Bros. Const. Co., Inc. v. Geren*,
    550 F.3d 1368 (Fed. Cir. 2008) .............................................................. 26

*Cook Cnty. v. Wolf*,
    461 F. Supp. 3d 779 (N.D. Ill. 2020) ..................................................... 40

*Crowley Gov't Servs., Inc. v. G.S.A.*,
    38 F.4th 1099 (D.C. Cir. 2022) .............................................................. 12

*CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*,
    637 F.3d 408 (D.C. Cir. 2011) ............................................................. 5, 6

*CSL Plasma Inc. v. C.B.P.*,
    628 F. Supp. 3d 243 (D.D.C. 2022) ....................................................... 31

*Del. Div. of Health & Soc. Servs. v. D.H.S.S.*,
    665 F. Supp. 1104 (D. Del. 1987) .......................................................... 11

*Dep't of Educ. v. California*,
    145 S. Ct. 966 (2025) ....................................................................... 12, 45

*D.H.S. v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020) ..................................................................... 28, 31

*Dep't of Comm. v. New York*,
    588 U.S. 752 (2019) .................................................................... 38, 39, 40

*DoorDash, Inc., v. City of New York*,
  2025 WL 1827699 (S.D.N.Y. June 30, 2025) ........................................................ 33

*Earman v. United States*,
  589 F. App'x 991 (Fed. Cir. 2015) ...................................................................... 19

*Earman v. United States*,
  114 Fed. Cl. 81 (2013) ........................................................................................ 19

*Elev8 Baltimore, Inc. v. Corp. for Nat'l & Comm. Serv.*,
  2025 WL 1865971 (D. Md. July 7, 2025)............................................................ 11

*Elliott v. Cartagena*,
  84 F.4th 481 (2d Cir. 2023) ................................................................................ 40

*F.T.C. v. Standard Oil Co. of Cal.*,
  449 U.S. 232 (1980)............................................................................................ 4

*Ferreiro v. United States*,
  501 F.3d 1349 (Fed. Cir. 2007)........................................................................... 42

*Friends of Animals v. Pendley*,
  523 F. Supp. 3d 39 (D.D.C. 2021) ...................................................................... 9

*G. L. Christian & Assocs. v. United States*,
  312 F.2d 418 (Ct. Cl. 1963) ...................................................................... 18, 21, 22

*German Language Ctr. v. United States*,
  2010 WL 3824636 (S.D. Tex. Sept. 27, 2010) .................................................... 10

*Hall v. Nielsen*,
  2019 WL 250972 (D.D.C. Jan. 17, 2019)............................................................ 10

*Harris Cnty. v. Kennedy*,
  2025 WL 1707665 (D.D.C. June 17, 2025).......................................................... 13

*Hous. Auth. v. United States*,
  140 Fed. Cl. 773 (2018) ...................................................................................... 12

*Huff v. Vilsack*,
  195 F. Supp. 3d 343 (D.D.C. 2016)..................................................................... 44

*Idir, Inc. v. Postal Serv.*,
  1984 WL 543 (S.D.N.Y. June 25, 1984) .............................................................. 20

*Ingersoll-Rand Co. v. United States,*
   780 F.2d 74 (D.C. Cir. 1985) ................................................................ 12

*K-Con, Inc. v. Sec'y of Army,*
   908 F.3d 719 (Fed. Cir. 2018) ................................................... 20, 21, 22

*Kentucky v. E.P.A.,*
   123 F.4th 447 (6th Cir. 2024) .............................................................. 31

*Kudsk Constr., Inc. v. United States,*
   144 Fed. Cl. 446 (2019) ....................................................................... 21

*Local 342, Long Island Pub. Serv. Emps. v. Town Bd.,*
   31 F.3d 1191 (2d Cir. 1994) ................................................................. 40

*Loper Bright Enters. v. Raimondo,*
   603 U.S. 369 (2024) ................................................................. 22, 27, 31

*Lynch v. United States,*
   292 U.S. 571 (1934) ............................................................................... 2

*Mantena v. Hazuda,*
   2018 WL 3745668 (S.D.N.Y. Aug. 7, 2018) ......................................... 6

*Marsh v. Or. Nat. Res. Council,*
   490 U.S. 360 (1989) ............................................................................. 35

*Mass. Coal. for Immigr. Reform v. D.H.S.,*
   698 F. Supp. 3d 10 (D.D.C. 2023) ...................................................... 35

*MediNatura, Inc. v. F.D.A.,*
   998 F.3d 931 (D.C. Cir. 2021) ............................................................... 7

*Metcalf v. Daley,*
   214 F.3d 1135 (9th Cir. 2000) ............................................................. 34

*Metro. Transp. Auth. v. Duffy,*
   2025 WL 1513369 (S.D.N.Y. May 28, 2025) ............................... *passim*

*Miller v. Metro. Life Ins. Co.,*
   979 F.3d 118 (2d Cir. 2020) ................................................................ 33

*Mktg. & Mgmt. Info., Inc. v. United States,*
   57 Fed. Cl. 665 (2003) ......................................................................... 19

*Mulgrew v. U.S. Dep't of Transp.*,
  750 F. Supp. 3d 171 (S.D.N.Y. 2024)................................................................. 36

*Murphy v. New Milford Zoning Comm'n*,
  402 F.3d 342 (2d Cir. 2005)............................................................................. 8

*N.Y. C.L. Union v. N.Y.C. Transit Auth.*,
  684 F.3d 286 (2d Cir. 2012)............................................................................. 45

*Nat. Res. Def. Council v. Abraham*,
  355 F.3d 179 (2d Cir. 2004)............................................................................. 22

*Nat'l Job Corps Ass'n v. Dep't of Lab.*,
  2025 WL 1752414 (S.D.N.Y. June 25, 2025) ................................................ 11

*Nat'l Org. for Marriage, Inc. v. Walsh*,
  714 F.3d 682 (2d Cir. 2013)............................................................................. 9

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
  538 U.S. 803 (2003)........................................................................................ 9

*Nat'l Fed. of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012).................................................................................. 42, 43

*New Jersey v. U.S. Dep't of Transp.*,
  No. 23 Civ. 3885 (D.N.J.)............................................................................... 32

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*,
  434 U.S. 1345 (1977)...................................................................................... 44

*New York v. D.H.S.*,
  414 F. Supp. 3d 475 (S.D.N.Y. 2019)........................................................ 9, 42

*New York v. H.H.S.*,
  2008 WL 5211000 (S.D.N.Y. Dec. 15, 2008) ............................................... 10

*Newport Hosp. & Clinic, Inc. v. Sullivan*,
  1990 WL 179953 (D.D.C. Sept. 24, 1990) ..................................................... 8

*N. Atl. States Reg'l Council of Carpenters v. T20 World Cup USA, Inc.*,
  2025 WL 1434272 (E.D.N.Y. May 19, 2025) ................................................ 15

*Pacito v. Trump*,
  772 F. Supp. 3d 1204 (W.D. Wash. 2025)...................................................... 12

*PaineWebber Inc. v. Bybyk,*
   81 F.3d 1193 (2d Cir. 1996) ................................................................. 14, 15

*Pennhurst State School & Hosp. v. Halderman,*
   451 U.S. 1 (1981) ................................................................................... 42

*PFLAG, Inc. v. Trump,*
   766 F. Supp. 3d 535 (D. Md. 2025) ....................................................... 43

*Purpose Built Families Found., Inc. v. United States,*
   634 F. Supp. 3d 1118 (S.D. Fla. 2022) ..................................................... 7

*RFE/RL, Inc. v. Lake,*
   2025 WL 1232863 (D.D.C. Apr. 29, 2025) ............................................ 13

*Rhode Island v. Trump,*
   2025 WL 1303868 (D.R.I. May 6, 2025) ............................................... 43

*Rick's Mushroom Serv., Inc. v. United States,*
   521 F.3d 1338 (Fed. Cir. 2008) ............................................................. 12

*Roberts v. Roth,*
   594 F. Supp. 3d 29 (D.D.C. 2022) ........................................................... 9

*Rockies Express Pipeline LLC v. Salazar,*
   730 F.3d 1330 (Fed. Cir. 2013) ............................................................. 20

*Ryan, Beck & Co. v. Fakih,*
   268 F. Supp. 2d 210 (E.D.N.Y. 2003) .................................................... 15

*S. Educ. Found. v. Dep't of Educ.,*
   2025 WL 1453047 (D.D.C. May 21, 2025) ........................................... 11

*S.J. Amoroso Const. Co. v. United States,*
   12 F.3d 1072 (Fed. Cir. 1993) .......................................................... 19, 22

*S.J. Amoroso Const. Co v. United States,*
   26 Cl. Ct. 759 (1992) ............................................................................ 22

*Sackett v. E.P.A.,*
   566 U.S. 120 (2012) ..................................................................... 4, 5, 6

*Scientists' Inst. for Pub. Info. v. Atomic Energy Comm'n,*
   481 F.2d 1079 (D.C. Cir. 1973) ............................................................. 35

*Seven County Infrastructure Coalition v. Eagle County*,
    145 S. Ct. 1497 (2025) ................................................................ 36, 37

*Singh v. U.S. Dep't of Just.*,
    461 F.3d 290 (2d Cir. 2006) ........................................................ 25

*Soler v. G & U, Inc.*,
    615 F. Supp. 736 (S.D.N.Y. 1985) ............................................. 27

*Sols. in Hometown Connections v. Noem*,
    2025 WL 1103253 (D. Md. Apr. 14, 2025) ................................ 26

*Spectrum Leasing Corp. v. United States*,
    764 F.2d 891 (D.C. Cir. 1985) .................................................... 11

*Stewart Park & Reserve Coal., Inc. v. Slater*,
    352 F.3d 545 (2d Cir. 2003) ........................................................ 35

*The Sinking Funds Cases*,
    99 U.S. 700 (1878) ....................................................................... 2

*Tootle v. Sec'y of Navy*,
    446 F.3d 167 (D.C. Cir. 2006) .................................................... 12

*Toxco Inc. v. Chu*,
    724 F. Supp. 2d 16 (D.D.C. 2010) .............................................. 41

*Trudeau v. Fed. Trade Comm'n*,
    456 F.3d 178 (D.C. Cir. 2006) .................................................... 41

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ..................................................................... 33

*U.S. ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cnty.*,
    712 F.3d 761 (2d Cir. 2013) ........................................................ 26

*United Aeronautical Corp. v. U.S. Air Force*,
    80 F.4th 1017 (9th Cir. 2023) ..................................................... 11

*United States v. Bills*,
    822 F.2d 373 (3d Cir. 1987) ........................................................ 20

*United States v. Winstar Corp.*,
    518 U.S. 839 (1996) ................................................................. 25, 26

*Up State Fed. Credit Union v. Walker*,
    198 F.3d 372 (2d Cir. 1999) .................................................................................. 12

*Upper Snake River Chapter of Trout Unlimited v. Hodel*,
    921 F.2d 232 (9th Cir. 1990) ................................................................................. 35

*Vera Inst. for Just. v. Dep't of Just.*,
    2025 WL 1865160 (D.D.C. July 7, 2025) ............................................................. 18

*W.R. Grace & Co.-Conn. v. EPA*,
    959 F.2d 360 (1st Cir. 1992) .................................................................................... 9

*Ward v. Brown*,
    22 F.3d 516 (2d Cir. 1994) .................................................................................... 44

*Washington v. Trump*,
    768 F. Supp. 3d 1239 (W.D. Wash. 2025) ........................................................... 43

*Widakuswara v. Lake*,
    773 F. Supp. 3d 46 (S.D.N.Y. 2025) .................................................................... 43

## STATUTES

5 U.S.C. § 706 ............................................................................................................ 27, 44

23 U.S.C. § 129 ................................................................................................................. 29

23 U.S.C. § 301 ............................................................................................................... 9, 29

31 U.S.C. § 6303 ............................................................................................................... 19

42 U.S.C. § 4332 ............................................................................................................... 35

42 U.S.C. § 4336 ............................................................................................................... 35

N.Y. Veh. & Traf. Law § 1701 ......................................................................................... 32

N.Y. Veh. & Traf. Law § 1704-a(1) .................................................................................. 29

## REGULATIONS

2 C.F.R. § 200 ........................................................................................................... *passim*

23 C.F.R. § 1.36 ............................................................................................................... 43

23 C.F.R. § 771 ................................................................................................................. 36

49 C.F.R. § 18 .................................................................................................. 24

*Guidance for Federal Financial Assistance*,
    89 Fed. Reg. 30046 (Apr. 22, 2024) ........................................................ 17, 20, 26

*Revision of National Environmental Policy Act Regulations*,
    90 Fed. Reg. 29426 (July 3, 2025) .................................................................. 36

*Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments*,
    53 Fed. Reg. 8034 (Mar. 11, 1988) ................................................................. 24

## RULES

Fed. R. Civ. P. 56 ................................................................................... 34, 37, 40

## OTHER AUTHORITIES

James Barron, *The Subtext of a Trump Official's Letter to the M.T.A.*, N.Y. Times
(Mar. 20, 2025),
    https://www.nytimes.com/2025/03/20/nyregion/trump-duffy-nyc-subway.html .................... 39

*Pilot Project*, Black's Law Dictionary (12th ed. 2024) .................................................. 24

*Pilot*, American Heritage Dictionary (5th ed. 2022) ...................................................... 25

*Pilot*, Black's Law Dictionary (12th ed. 2024) ........................................................... 24

*Statement by President George Bush Upon Signing H.R. 2950*,
    1991 U.S.C.C.A.N. 1865 (Dec. 18, 1991) ................................................................ 24

U.S. DEP'T OF TRANSP., DOT ORDER 5610.1D, DOT'S PROCEDURES FOR CONSIDERING ENVIRONMENTAL IMPACTS (2025),
    https://www.transportation.gov/sites/dot.gov/files/2025-07/DOT_Order_
    5610.1D_OST-P-250627-001_508_Compliant.pdf .................................................... 36

Plaintiffs the Metropolitan Transportation Authority ("MTA") and Triborough Bridge and Tunnel Authority ("TBTA"), an MTA affiliate, and Intervenor-Plaintiff New York City Department of Transportation ("NYCDOT") respectfully submit this memorandum of law in opposition to Defendants' motion for summary judgment (ECF 158) ("Defs. Mot.") and in further support of Plaintiffs' motion for partial summary judgment (ECF 152) ("Pls. Mot.").[1]

## PRELIMINARY STATEMENT

As the executive branch now fully embraces the extreme proposition first articulated by Defendants in court in this case on May 27, 2025—that it can terminate virtually any federal agreement at any time for any reason, including for mere convenience—it is worth remembering how we got here. On February 19, 2025, after one month in office, President Trump proclaimed by way of the White House social media account that "CONGESTION PRICING IS DEAD. … LONG LIVE THE KING!," accompanied by an image of President Trump wearing a crown. The same day, Secretary Duffy issued a four-page letter purporting to terminate the Program. Plaintiffs then filed this lawsuit, making it clear that they would continue to operate the Program unless and until a court ordered otherwise. In response, the Administration shifted tactics, purporting to drag out a contrived agency process, while at the same time threatening to withhold critical transportation-related approvals and funding from New York if Plaintiffs did not comply with the Administration's demand to halt the Program in its tracks. Defendants' goal was plain: to prevent judicial review, while seeking to strong-arm Plaintiffs into complying with their unlawful

---

[1] As used herein, "Plaintiffs" refers to the MTA, TBTA, and NYCDOT.  "DOT_" refers to Bates-numbered pages in the administrative record, the index to which was filed by Defendants on May 27, 2025 (ECF 130); "PI Brief" to Plaintiffs' memorandum in support of their motion for a preliminary injunction (ECF 83); "PI Opp." to Defendants' consolidated memorandum in opposition to Plaintiffs and Intervenor-Plaintiff New York State Department of Transportation's ("NYSDOT") motions for a preliminary injunction (ECF 118); and "PI Reply" to Plaintiffs' reply memorandum in further support of their motion for a preliminary injunction (ECF 124).  Unless otherwise noted, all defined terms have the same meaning as provided in Plaintiffs' briefing on their motion for a preliminary injunction. Plaintiffs incorporate the background and arguments presented in that briefing and in their opening motion for partial summary judgment (ECF 152), as permitted by the Court.  *See* ECF 139.

directives outside of court.  After reviewing the parties' arguments, this Court issued a 109-page Opinion and Order on May 28 (ECF 132) (the "May 28 Order"), holding not only that this case was ripe for resolution, but that Defendants were preliminarily enjoined from terminating congestion pricing since they did not have the legal authority to do so.

On summary judgment, Defendants had an opportunity to engage with the Court's May 28 Order and respond to its reasoning and conclusions.  They didn't take it.  Instead, they chose to double down on the same arguments that failed previously.  To the extent that Defendants raise any new arguments at all, it is only to present an even more radical theory.  Now, according to Defendants, it is not just the VPPP Agreement that incorporates by reference a freestanding right of FHWA to terminate its prior approval of the Program based on changed priorities, but the United States itself has the so-called "sovereign power" to do the same by reneging on any agreement that the federal government enters into with any party for any reason regardless of the express terms and governing regulations.  Defs. Mot. at 32.  Such a theory of "sovereign power" is not grounded in law—after all, the federal courts have recognized for at least a century that "[t]he United States are as much bound by their contracts as are individuals."  *Lynch v. United States*, 292 U.S. 571, 580 (1934) (Brandeis, J.) (quoting *The Sinking Funds Cases*, 99 U.S. 700, 719 (1878)).  While the Trump Administration purports to act in the name of promoting "democratic accountability," Defs. Mot. at 1, our system of government is antithetical to the notion of a sovereign who has the power to terminate agreements on a pretextual whim the way that King Henry VIII of England terminated his wives (both literally and figuratively).

Unless a written agreement with the federal government contains a "clear and unambiguous" right to terminate based on changed priorities (and this one does not), no president has the power to override the solution authorized by both Congress and the New York Legislature

for addressing the critical challenges resulting from traffic congestion in Manhattan, the region's poor air quality, and our aging mass transit infrastructure. As Your Honor observed, "Defendants' argument, if accepted, has built within it the seeds of the destruction of the VPPP and the objective *Congress* intended to further with it." *Metro. Transp. Auth. v. Duffy*, No. 25 Civ. 1413 (LJL), 2025 WL 1513369 ("*Duffy*"), at *19, 30 (S.D.N.Y. May 28, 2025) (emphasis added).

Defendants' cross-motion for summary judgment as to Plaintiffs' NEPA, pretext, and constitutional claims also fails. In their single-minded rush to "kill" the Program, Defendants failed to comply with NEPA, failed to adequately and accurately disclose the true rationales for their actions, and overstepped their authority under the Constitution. But the Court need not resolve these issues on summary judgment. The Court should grant Plaintiffs' cross-motion for summary judgment, deny Defendants' motion for summary judgment, and enter a permanent injunction putting an end to Defendants' unlawful attempts to end congestion pricing.

## ARGUMENT

Plaintiffs' motion for summary judgment should prevail, and Defendants' motion for summary judgment fails, primarily for the reasons stated in the May 28 Order. Nothing in Defendants' latest submission should change that result.

### I.    The Court Has Jurisdiction Over Plaintiffs' Claims.[2]

#### A.    Defendants have taken final agency action.

As the Court previously determined, Secretary Duffy's February 19 Letter "is a final agency action." *Duffy* at *19. The Supreme Court's decision in *Sackett* is "squarely on point."

---

[2] As before, Plaintiffs address under jurisdiction the questions of finality, prudential ripeness, and the Tucker Act. *E.g.*, Pls. Mot. at 9-12. Although Defendants argue that the Court does not have "jurisdiction" over Plaintiffs' constitutional claims and *ultra vires* claims, Defs. Mot. at 18-21, they do not cite any cases holding the issue is jurisdictional, as opposed to whether such a claim is properly stated. Plaintiffs accordingly address Defendants' arguments on the merits *infra* note 29.

*Id.* at *20 (citing *Sackett v. E.P.A.*, 566 U.S. 120, 129 (2012)). Like the compliance order issued by the EPA in that case, which stated that the plaintiffs were in violation of the Clean Water Act and directed them to come into compliance or face penalties in future enforcement proceedings, 566 U.S. at 122, the February 19 Letter is final because it purports to "terminat[e]" the VPPP Agreement and "rescind[]" federal approval for the Program, Feb. 19 Letter at 3, and so "makes clear" that the agency's deliberation "is at an end" and, "if valid, imposes a legal obligation upon Plaintiff to cease operation of the Tolling Program" or face "legal sanctions," *Duffy* at *19, 22 (internal quotation marks omitted).

Defendants argue that *Sackett* is inapposite because the statute in question there called for statutory penalties if the plaintiffs failed to comply with the agency's order, whereas here Plaintiffs would "face legal consequences" only "*if* the FHWA issued a determination of non-compliance and decided to implement compliance measures." Defs. Mot. at 7-8 (emphasis in original). "That is a distinction without a difference," however, because in *Sackett*, "the penalty was still dependent on the government taking some action at a later date to pursue those sanctions." *Duffy* at *20 n.54. Fundamentally, the February 19 Letter "puts Plaintiffs at risk of legal sanctions." *Id.* at *22 ("order expose[d]" plaintiffs to penalties). Moreover, Defendants are wrong that Plaintiffs "identify no collateral consequences," Defs. Mot. at 8, since "the Secretary's pronouncement has endangered Plaintiffs' ability to issue bonds as the bonds are secured by the Tolling Program's revenues and thus rely upon the program's longevity," *Id.* at *22; *see* DOT_0047883 ¶¶ 10-11 (ECF No. 84).[3]

Defendants also fail to distinguish *Sackett* on the ground that there is some ongoing agency process with respect to whether to terminate, as opposed to what "sanctions" in the form of

---

[3] While Defendants rely on *F.T.C. v. Standard Oil Co. of California*, Defs. Mot. at 8, a pre-*Sackett* case, the court there held non-final an administrative complaint where the FTC had stated that it had "reason to believe" a violation existed and commenced an administrative process to determine whether that was the case, 449 U.S. 232, 242 (1980).

withdrawal of funding or approvals to impose. Like the compliance order there, Defendants' actions here do not indicate that termination is "subject to further Agency review." 566 U.S. at 127. Quite the opposite, even the April 21 Letter reiterates that the VPPP Agreement "has been terminated," *Duffy* at *20, reiterates also that Plaintiffs are not in compliance, and orders Plaintiffs to "show cause" why sanctions should not issue, *id.* at *16. While Defendants contend that the agency process is somehow ongoing because FHWA twice "delayed the effect of termination," Defs. Mot. at 6, that is both factually and legally inaccurate. Factually, while Defendant Shepherd's February 20 Letter extended the effective date of termination by 30 days to allow the Project Sponsors to cease tolling "in an orderly manner," her March 20 Letter did not. DOT_0047575-76 (ECF 87-6). And the fact that Defendant Shepherd extended the effective date of termination to allow for an orderly transition does not make the February 19 termination any less final; it simply delayed the implementation of that final decision. Indeed, Defendants again confirmed at the preliminary injunction hearing on May 27 that it was still their position that the Program is unlawful. *Duffy* at *19.

The Court's finality determination is further supported by *CSI Aviation Services, Inc. v. U.S. Department of Transportation*, 637 F.3d 408 (D.C. Cir. 2011), which "closely parallel[s]" this case. *Duffy* at *20. As in *CSI Aviation*, here: (1) Defendants issued a "definitive statement of the agency's legal position"; (2) the case "presents a 'purely legal' question of statutory interpretation"; and (3) Defendants have imposed "an immediate and significant burden" on Plaintiffs, having "declared [their] operations unlawful" and warned them to cease operating the Program, which "[a]t the very least … cast a cloud of uncertainty" over the Program and put Plaintiffs "to the painful choice between costly compliance and the risk of [enforcement] at an uncertain point in the future." 637 F.3d at 412. Although Defendants argue that *CSI Aviation* is

distinguishable because "finality attached only after the agency considered and responded to the plaintiff's objections," Defs. Mot. at 10, that too is incorrect. The court found final agency action because the "*initial warning letter* clearly took" a definitive position, and the agency then "refused to change its legal position," instead "issu[ing] an order granting CSI a temporary exemption … [but] reiterat[ing] DOT's position[.]" 637 F.3d at 412 (emphasis added). As the Court has already explained, "[t]he mere possibility that an agency might reconsider in light of 'informal discussion' and invited contentions of accuracy does not suffice to make an otherwise final action nonfinal." *Duffy* at *21 (quoting *Sackett*, 566 U.S. at 127). Accordingly, "[e]ven if the April 21 Letter was susceptible of the reading that the NYSDOT could submit materials showing that Congress gave the Secretary the power to enter the VPPP Agreement and the Tolling Program was legally authorized pursuant to the VPPP, that would not be sufficient to make his termination of the VPPP Agreement non-final." *Id.*[4]

Defendants' two principal cases are inapposite. *Berkeley-Dorchester Counties Economic Development Corporation v. U.S. Department of Health & Human Services*, a district court case that predated *Sackett* (and *CSI Aviation*), involved the summary suspension of financial assistance under the Head Start program due to concerns about asbestos at a school. 2006 WL 8443181 (D.S.C. Feb. 24, 2006). The court held that there was no final agency action because the summary suspension was "a temporary action prompted by an emergency situation" and had in fact been "rescinded … within days" after the plaintiff provided "adequate asbestos documentation." *Id*. at *16. In their brief, Defendants mischaracterize the facts of the case, asserting that the court found

---

[4] In addition, as the Court noted in its May 28 Order, "the timing and the content of the April 21 Letter bespeak insincerity," coming only after many months of litigation and offering dialogue only as "a tack-on to their threats of imminent punitive action if Plaintiffs [do] not cease tolling." *Id.*; *see also Mantena v. Hazuda*, 2018 WL 3745668, at *6 (S.D.N.Y. Aug. 7, 2018) (decision remained final where government re-opened it "in name only" seemingly to avoid judicial review).

non-final "follow-up letters terminating the plaintiff's grants, while still giving 30 days to cure identified deficiencies." Defs. Mot. at 10.  In fact, the court specifically focused on the non-finality of the "summary suspension," and the most it said about subsequent correspondence was that the plaintiffs made "vague" assertions about other "final" agency actions, *Berkeley-Dorchester*, 2006 WL 8443181, at *15-16, presumably because the letters had been administratively appealed successfully, since the plaintiff had already been reinstated as a grantee, *id.* at *2, 11.

Second, unlike the "preliminary" grant suspension subject to the "completion of the government's audit" in *Purpose Built Families Foundation, Inc. v. United States*, 634 F. Supp. 3d 1118, 1124 (S.D. Fla. 2022), the Secretary here unmistakably purported to "terminat[e]" the VPPP Agreement on February 19, and has adamantly refused to withdraw or reopen that decision. Feb. 19 Ltr.; Apr. 21 Ltr.  While Defendants claim that the April 21 Letter is somehow akin to the letters at issue in *Purpose Built Families* because it "defers final action until after the agency considers Government Plaintiffs' input," Defs. Mot. at 11, the only action it defers is the actual imposition of penalties, *see Purpose Built Families*, 634 F. Supp. 3d at 1124-25 (finding letter terminating grant was final because it "states that the agency has decided to terminate [grants]" and "nothing … suggests that there will be further agency procedures or audits prior to a final decision on the termination of the [grants]").  In fact, *Purpose Built Families* reinforces the finality of Defendants' actions here, since none of Defendants' Letters "state[] that the prior termination notice has been vacated."  *Id.* at 1126.[5]

---

[5] *MediNatura* is not to the contrary, as the court there held that the agency's "interlocutory decision" to detain certain drugs pending further administrative proceedings was non-final given the regulations providing an opportunity to contest the drug designation, and went on to hold that the agency's decision, at the conclusion of those proceedings, to deny admission of the drug shipments was final agency action.  *MediNatura, Inc. v. F.D.A.*, 998 F.3d 931, 940 (D.C. Cir. 2021).  *Newport Hosp. & Clinic, Inc. v. Sullivan* did not involve finality under the APA at all; rather, the case dealt with whether an agency's communication was sufficiently clear to trigger a jurisdictional deadline for agency review.  1990 WL 179953, at *3, 5 (D.D.C. Sept. 24, 1990).

**B.        Plaintiffs' challenge is prudentially ripe.**

Defendants argue that this case is not ripe for essentially the same reasons that it supposedly does not entail final agency action: there is an "ongoing administrative process" that the Court "short circuited" by issuing a preliminary injunction, and there is no hardship because Plaintiffs do not face impending harm.  Defs. Mot. at 11-14.

As to the allegedly ongoing process, Defendants have been clear: the Secretary terminated the VPPP Agreement on February 19, and he has neither withdrawn that decision nor indicated any intention to reconsider it.  *See* Defs. Mot. at 3, PI Opp. at 9-11; Feb. 19 Ltr.; Apr. 21 Ltr. Defendants' invitation to participate in an "administrative process" came "only after many months of litigation in which Defendants were exposed to Plaintiffs' legal arguments."  *Duffy* at *20-21. The Court therefore recognized that Defendants' so-called "administrative process" is really nothing "more than lip service meant to avoid judicial intervention."  *Id.* at *23.  In other words, the Court did not "short circuit" anything other than Defendants' effort to coerce compliance with an unlawful agency decision.  *See* Point I.A, *supra*.  Moreover, the issues presented are legal, not factual.  *Duffy* at *23; Pls. Mot. at 11; *see also Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005) (fitness prong "requires a weighing of the sensitivity of the issues presented and whether there exists a need for further factual development").  Although Defendants argue that this concededly "legal challenge" nonetheless "turns on the agency's (as-yet-incomplete) assessment of facts and policy considerations," Defs. Mot. at 13, they "have not identified any fact-gathering or development that remains," *Duffy* at *23.  Nor could they, as the February 19 Letter purporting to terminate the VPPP Agreement was clearly based on purely legal grounds.[6]

---

[6] There is no merit to Defendants' contention that there needs to be a "complete, final record" before the Court can decide whether the Secretary has the legal authority to terminate here based on agency priorities.  Defs. Mot. at 13. "The Court does not need any further administrative review before it reads the statute and decides whether the Secretary's reading is correct or not." *Duffy* at *23.  The "order to show cause" is itself based on a faulty legal premise

With respect to hardship, it is plain that "the challenged action creates a direct and immediate dilemma for the parties." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 691 (2d Cir. 2013).[7]    Defendants have made it abundantly clear that, in their view (however misguided), the Secretary terminated the VPPP Agreement on February 19, that the Project Sponsors "are not free to disregard" that termination, and that without the VPPP Agreement, the Project Sponsors are violating 23 U.S.C. § 301.  Tr. at 47:4-48:2.  The fact that the Secretary has not yet imposed the "compliance measures" he said FHWA would "implement" is irrelevant. Apr. 21 Ltr. at 2.  Agency action "that 'requires an immediate and significant change in [a party's] conduct of its affairs with serious penalties attached to noncompliance' presents a prototypical instance of hardship."  *New York v. D.H.S.*, 414 F. Supp. 3d 475, 565 (S.D.N.Y. 2019) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 153 (1967)).    Moreover, as the Court previously recognized, "the Secretary's pronouncement has" already "endangered Plaintiffs' ability to issue bonds" "secured by" Program revenues.  *Duffy* at *22.[8]

---

that Defendants could lawfully implement compliance measures at all, having terminated the VPPP Agreement.  *See* Apr. 21 Ltr. at 1.

[7] Defendants' argument that "any alleged harm" must "be 'certainly impending,'" Defs. Mot. at 13 (quoting *Roberts v. Roth*, 594 F. Supp. 3d 29, 35 (D.D.C. 2022)), conflates *constitutional* ripeness with *prudential* ripeness. *See Friends of Animals v. Pendley*, 523 F. Supp. 3d 39, 59 (D.D.C. 2021) (distinguishing doctrines).  Defendants have not argued that Plaintiffs' claims are constitutionally unripe.  Defs. Mot. at 11.  *Roberts* is distinguishable in any event.  *See* 594 F. Supp. 3d at 35 (Air Force Captain sought to preemptively challenge discharge recommendation which remained subject to subsequent agency review and determination).

[8] The cases Defendants cite on this point are far afield from the facts here.  *See Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 810 (2003) (Park Service regulation was "nothing more than a 'general statemen[t] of policy'" and did "not command anyone to do anything or to refrain from doing anything"); *Am. Petroleum Inst. v. E.P.A.*, 683 F.3d 382, 387-388 (D.C. Cir. 2012) (challenge to EPA rule was not ripe after EPA issued notice of proposed rulemaking that would eliminate some or all of issues in the litigation); *W.R. Grace & Co.-Conn. v. E.P.A.*, 959 F.2d 360, 367 (1st Cir. 1992) (unfolding EPA permit process would inform legal analyses); *German Language Ctr. v. United States*, 2010 WL 3824636, at *4 (S.D. Tex. Sept. 27, 2010) (agency reopened visa determination in light of subsequent administrative guidance); *New York v. H.H.S.*, 2008 WL 5211000, at *14 (S.D.N.Y. Dec. 15, 2008) (challenge to agency letter regarding implementation of Children's Health Insurance Program not ripe because agency had approved Maryland's program and invited Maryland to "continue to work with" agency to develop a strategy to avoid potential violation).

C.        **The Tucker Act does not apply here.**

This Court held that "[t]he Tucker Act does not divest [it] of jurisdiction." *Duffy* at \*26. While Defendants continue to argue that the "source" of Plaintiffs' rights is the VPPP Agreement, Defs. Mot. at 14, as the Court explained in its May 28 Order, "Plaintiffs are not suing to enforce any term of the VPPP Agreement"—the "core" of Plaintiffs' claim "is that the Secretary acted unlawfully in purporting to terminate the VPPP Agreement" and federal approval for the Program, in violation of the APA and other statutory and constitutional provisions. *Duffy* at \*25. Such claims fall squarely within this Court's jurisdiction. *Cmty. Legal Servs. v. H.H.S.*, 137 F.4th 932, 938 (9th Cir. 2025) (ensuring "compliance with statutory and regulatory commands" is "beyond the scope" of Tucker Act). Plaintiffs do not assert that the VPPP Agreement "obligat[es]" Defendants to grant them tolling authority. Defs. Mot. at 15. That already happened in November 2024 when FHWA "approved" and "authorized" the Program. Feb. 19 Ltr. at 1; *see also* VPPP Agmt. Now, as a result, the VPPP *statute* mandates that the Secretary "*shall* allow the use of tolls." VPPP, cl. 4 (emphasis added). This is not a breach of contract case, but a challenge to revocation of a government approval, a category routinely adjudicated by district courts.

Nor does this dispute "turn[] on interpreting specific terms and conditions of the Agreement." Defs. Mot. at 14. While Defendants contend that the Court must review the VPPP Agreement to address their argument that it incorporates by reference a termination right, *id.* at 16, the Court need only "do so in the context of the Government's *defense* of the action, not Plaintiff's independent requests for relief," *Hall v. Nielsen*, 2019 WL 250972, at \*3 (D.D.C. Jan. 17, 2019) (emphasis in original); *accord United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1026 (9th Cir. 2023); *Nat'l Job Corps Ass'n v. Dep't of Lab.*, 2025 WL 1752414, at \*4-5 (S.D.N.Y. June 25, 2025). "Under such circumstances, where plaintiffs' claims 'do not at all depend on whether the terms of [an agreement] were breached,' 'it would be quite extraordinary' to find that plaintiffs'

10

claims are contractual." *Am. Cntr. for Int'l Lab. Solidarity v. Chavez-Deremer*, 2025 WL 1795090, at *12 (D.D.C. June 30, 2025) (quoting *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 770 F. Supp. 3d 121, 137 (D.D.C. 2025)); *Elev8 Baltimore, Inc. v. Corp. for Nat'l & Comm. Serv.*, 2025 WL 1865971, at *13 (D. Md. July 7, 2025) (collecting recent cases).[9]

Plaintiffs in no way seek "specific performance." Defs. Mot. at 15; *see* SAC at 117 (requesting injunction, declaratory judgment, and vacatur). As many courts have held when rejecting similar arguments by the Trump Administration, "the mere fact that an injunction would require the same governmental restraint that specific (non)performance might require in a contract setting is an insufficient basis to deny a district court the jurisdiction otherwise available." *Duffy* at *25 (citation omitted) (collecting cases); *accord Chavez-Deremer*, 2025 WL 1795090, at *12; *S. Educ. Found. v. Dep't of Educ.*, 2025 WL 1453047, at *7 (D.D.C. May 21, 2025). Nor does this case involve a "disguised claim for monetary relief." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 971 (D.C. Cir. 1982). The VPPP Agreement does not confer any federal funding at all, so Plaintiffs could not possibly be seeking "an order compelling the government to pay money owed." *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985); *Crowley Gov't Servs., Inc. v. G.S.A.*, 38 F.4th 1099, 1108 (D.C. Cir. 2022) ("crux of … inquiry" is whether plaintiff "effectively seeks to attain monetary damages").[10]

---

[9] Contrary to Defendants' contention that the APA must be "strictly construed" as a waiver of sovereign immunity, Defs. Mot. at 16, "established principles of statutory construction mandate a broad construction of the APA and a narrow interpretation of the Tucker Act," *Bowen v. Massachusetts*, 487 U.S. 879, 908 n.46 (1988) (quoting with approval *Del. Div. of Health & Soc. Servs. v. D.H.S.S.*, 665 F. Supp. 1104, 1117-18 (D. Del. 1987)).

[10] That basic fact alone distinguishes many of the cases Defendants cite. *See Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (plaintiffs sought "order [requiring] the payment of money"); *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 374 (2d Cir. 1999) (government contractor sought "substantial monetary damages"); *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 76, 79-80 (D.C. Cir. 1985) (government contractor sought "equitable remedy for the identical contract rights redressable by money damages"). Although Defendants assert that the Program "requires the provision of *federal* funds to Plaintiffs, through those tolls," Defs. Mot. at 17 (emphasis in original), to the extent Defendants are suggesting that tolls on federal vehicles could indirectly lead to the payment of federal funds through tolls, the VPPP Agreement does not include any payment-obligation term or itself give Plaintiffs "a substantive right

In any event, the Tucker Act does not apply "when no jurisdiction lies in the Court of Federal Claims." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006); *accord Cmty. Legal Servs.*, 137 F.4th at 939.   And here, the Court of Federal Claims lacks jurisdiction because the VPPP Agreement is an *unfunded* cooperative agreement rather than a "money-mandating" contract. *Pacito v. Trump*, 772 F. Supp. 3d 1204, 1215 (W.D. Wash. 2025); *see also Hous. Auth. v. United States*, 140 Fed. Cl. 773, 786 (2018) (Tucker Act only applies to "money-mandating contracts").   In addition, the VPPP Agreement does "not confer a direct and tangible benefit on the United States—a requirement for Tucker Act jurisdiction." *Duffy* at *26 (citation omitted).[11] Contrary to Defendants' suggestion, the revenue generated by the Program will not directly reduce or offset Defendants' funding obligations, Defs. Mot. at 17, as Title 23 funds are allocated among the states using a statutory formula which is unaffected by Program receipts, *see* PI Brief at 7-8 (explaining statutory background); VPPP Agmt, cl. 5 (agreeing New York's eligibility for federal-aid highway funds unaffected by Program).   The tax credits available to certain New York residents obviously benefit those residents, and not the United States.   *See Am. Near E. Refugee Aid v. U.S.A.I.D.*, 703 F. Supp. 3d 126, 133 (D.D.C. 2023).   Likewise, the fact that the Project Sponsors are obligated to report on the "performance" and "benefits" of the Program, VPPP Agmt., cl. 8, is "not the kind of direct benefit that would support the finding of consideration," *Chavez-Deremer*, 2025 WL 1795090, at *17 (internal quotation marks omitted).

At bottom, Defendants insist the Tucker Act applies here because "there is a piece of paper that says [the Project] Sponsors will do this and, in exchange, the agency will do that."   Defs. Mot.

---

to recover money-damages." *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008). This action does not seek to compel any federal vehicle to pay Program tolls.

[11] Defendants misstate the relevant standard, relying on cases that do not concern Tucker Act jurisdiction to claim that all they need to show is a "mere peppercorn" of consideration. Defs. Mot. at 17; *see, e.g.*, *Am. Ground Transp., Inc. v. United States*, 165 Fed. Cl. 659, 666 (2023) (addressing merits argument that contract failed for lack of consideration).

at 17.  But that is not enough.  The mere existence of an agreement "does not, by triggering some mystical metamorphosis, automatically transform [this] action ... into one on the contract and deprive the court of jurisdiction it might otherwise have."  *Duffy* at *12 (quoting *Crowley*, 38 F.4th at 1105); *see also Megapulse*, 672 F.2d at 971; *Harris Cnty. v. Kennedy*, 2025 WL 1707665, at *5 (D.D.C. June 17, 2025).  The VPPP Agreement "acts 'only as a vehicle' to convey congressionally permitted authorization" of the Program; that fact alone cannot serve as a basis for depriving this Court of jurisdiction over Plaintiffs' claims.  *Duffy* at *26 (quoting *RFE/RL, Inc. v. Lake*, 2025 WL 1232863, at *4 (D.D.C. Apr. 29, 2025)).

## II.    Defendants' Termination of the VPPP Agreement and Rescission of Tolling Authorization Were Arbitrary and Capricious and Contrary to Law.

### A.    Defendants do not have the authority to terminate the VPPP Agreement.

As the Court previously determined, under 2 C.F.R. § 200.340, "the VPPP Agreement can be terminated only if the Project Sponsors fail to comply with a term and condition of the VPPP Agreement."  *Duffy* at *28.  Any right to terminate based on changed priorities would need to have been set forth "clearly and unambiguously in the terms and conditions of the Federal award."  2 C.F.R. § 200.340(b).  But here "the VPPP Agreement contains no language giving the federal government the right to terminate the agreement."  *Duffy* at *27-28.

Faced with this reality, Defendants engage in multi-step contortions beyond the bounds of reason in a vain effort to insert a nonexistent termination right.  The fact that Defendants' argument requires three separate steps just to arrive back at Section 200.340 demonstrates that no such termination right was "clearly and unambiguously" specified in the VPPP Agreement.  And Defendants' alternative, radical attempt to incorporate an absolute termination right into virtually any federal award based on "sovereign power" has frightening implications for most (if not all) sectors of the U.S. economy, not to mention our federalist system of government.

13

1.     *The VPPP Agreement does not grant Defendants the right to terminate.*

While Defendants claim the authority to terminate the VPPP Agreement under 2 C.F.R. § 200.340(a)(4), that provision only permits termination "in accordance with a term or condition of the VPPP Agreement." *Duffy* at *28.   As the Court observed, "the only provision" of the VPPP Agreement "that speaks to termination is one that contemplates the possibility that the Project Sponsors will decide to terminate the [Program]." *Duffy* at *28.   Unable to rely on the text of the agreement, Defendants again advance their convoluted incorporation-by-reference theory, premised on the idea that the VPPP Agreement: (1) incorporates 2 C.F.R. § 200.211(c)(2) of the OMB Regulations, which (2) incorporates FHWA's T&C, which (3) takes us right back to where we began, by incorporating Section 200.340.   Defs. Mot. at 23-25.   Put another way, Defendants' argument is that by going through all of these steps, they can turn Section 200.340(a)(4) into a "term or condition of the VPPP Agreement" that would permit them to satisfy Section 200.340(a)(4)'s termination conditions.   Obviously this circular logic fails since Section 200.340(a)(4) does not itself contain any language permitting Defendants to terminate the VPPP Agreement.   *Duffy* at *28.   And even if it did, this winding journey through the Federal Register and FHWA's website cannot satisfy 2 C.F.R. § 200.340(b).   *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996) (incorporation-by-reference requires that incorporated document "must be so referred to and described in the instrument that the paper may be identified beyond all reasonable doubt").[12]   In any event, Defendants' theory fails on its own terms.

---

[12] The sole case Defendants cite for their incorporation-by-reference theory, *North Atlantic States Regional Council of Carpenters v. T20 World Cup USA, Inc.*, which does not involve a cooperative agreement, is distinguishable.   2025 WL 1434272 (E.D.N.Y. May 19, 2025).   There, the agreement included multiple provisions specifically identifying the collective bargaining agreement that the plaintiff argued had been incorporated, and stated that the defendant would take certain actions "in accordance with" the specifically identified agreement.   *Id.* at *4-5.

At the first step, Defendants contend that Clause Nine of the VPPP Agreement incorporates by reference 2 C.F.R. § 200.211(c)(2) because it states that the Project Sponsors will "comply with all Federal laws and requirements applicable to this project." Defs. Mot. at 23 (quoting VPPP Agmt., cl. 9).[13] But as we pointed out previously, a statement that the Project Sponsors would comply with applicable federal laws and requirements hardly conveys an intent to incorporate as an express term of the the VPPP Agreement every federal statute or regulation under the sun, *see* PI Brief at 35-36 n.23; PI Reply at 16-17, particularly, as in the case of Section 200.211, one which only places obligations on federal agencies (not the Project Sponsors). Clause Nine does not mention Section 200.211(c)(2) at all. *See PaineWebber*, 81 F.3d at 1201; *Ryan, Beck & Co. v. Fakih*, 268 F. Supp. 2d 210, 223 (E.D.N.Y. 2003).

Even if the VPPP Agreement did expressly incorporate Section 200.211(c)(2) by reference, that regulation does not "clearly and unambiguously" express a termination right. It at most directs *federal agencies* to take steps to incorporate applicable general terms and conditions into federal awards by reference; it does not purport to itself automatically incorporate an agency's terms and conditions into every federal award by operation of law. *Cf.* 2 C.F.R. § 200.211(c)(1) ("Federal agencies must incorporate the following general terms and conditions either in the Federal award or by reference, as applicable…."). In all events, Defendants obviously did not incorporate the T&C into the VPPP Agreement, as there is no reference to the T&C anywhere, presumably because the parties (including FHWA) did not view the T&C as applying to this type of agreement.[14]

---

[13] Defendants have not renewed their argument that Clause Nine also incorporates 2 C.F.R. § 200.211(c)(1)(v). *See* PI Opp. at 36-38. Presumably, that's because Section 200.211(c)(1)(v) undermines Defendants arguments. *See* PI Reply at 17.

[14] Defendants cast aspersions on the Biden Administration by suggesting that the omission of a unilateral termination right may have been "by design" "collusion," or "intentional[]," Defs. Mot. at 1, 31, and that if the VPPP Agreement does not contain a right to terminate it is "voidable if not void," Defs. Mot. at 25. While it is our understanding that FHWA simply (and understandably) used standard language from past VPPP agreements, such conclusory statements in a brief are not entitled to any weight, and only reveal how irrationally outcome-oriented Defendants truly are.

15

But even assuming that (1) Clause Nine of the VPPP Agreement did incorporate Section 200.211(c)(2) by reference, and that (2) the T&C were somehow then fully incorporated into the VPPP Agreement, Defendants' argument would still fail, because the T&C include no express provision allowing termination based on changed priorities. As the Court has reasoned, the T&C simply "do not do the work that the Defendants would need them to do," since they do not actually set forth any express termination right and "merely refer back to 2 C.F.R. § 200.340," which "does not give the Secretary the unilateral right to terminate the VPPP Agreement." *Duffy* at *28.[15]

Resisting this conclusion, Defendants continue to argue, illogically, that Section 200.340(a)(4)'s use of the language "including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities," establishes a "default authority to terminate based on agency priorities or goals"—without any such "clear and unambiguous" term being included in the agreement. Defs. Mot. at 24-25 (selectively quoting 2 C.F.R. § 200.340(a)(4)). But that argument is clearly wrong since it requires ignoring the actual language. Section 200.340(a)(4) provides:

> The Federal award may be terminated in part or its entirety … [b]y the Federal agency or pass-through entity *pursuant to the terms and conditions of the Federal award*, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.

2 C.F.R. § 200.340(a)(4) (emphasis added). As this Court recognized, the term "including" signifies that the text which follows "describes subsets of the preceding text." *Duffy* at *29 (citing *Carroll v. Trump*, 49 F.4th 759, 768 (2d Cir. 2022)). Here, that means that the phrase "to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities,"

---

[15] Defendants claim a right to terminate since the "exact words" from 2 C.F.R. § 200.340(a)(4) are somehow "set out in FHWA's terms and conditions and are incorporated into the [VPPP] Agreement." Defs. Mot. at 24. This is yet another instance of Defendants molding the facts like a ball of clay to fit their arguments, since those "exact words" do not appear anywhere in the T&C.

describes a subset of the "terms and conditions" that *could* be included in the federal award. But Defendants did not include any such terms and conditions in the VPPP Agreement. Not only that, Defendants' tortured reading would eliminate Section 200.340(b) entirely, because there is no world in which a circuitous, three-step incorporation by reference of 200.340(a) "clearly and unambiguously" specifies that the VPPP Agreement could be terminated for changed priorities. Indeed, Defendants cite Section 200.340(b) only once in their papers, Defs. Mot. at 25, and ignore the OMB's guidance that the kind of termination provision envisioned by Section 200.340(a)(4) is the kind of provision which agencies "may include" in federal awards—not a termination right afforded by the regulations. *Guidance for Federal Financial Assistance*, 89 Fed. Reg. 30046, 30089 (Apr. 22, 2024) (agencies may terminate based on change in agency priorities "*[p]rovided that [such] language is included in the terms and conditions of the award*" (emphasis added)).[16]

2.    *The regulations do not give Defendants the right to terminate.*

Similarly, the Court should reject Defendants' contention that Section 200.340 by its own operation—regardless of whether it is incorporated into the terms of the VPPP Agreement— somehow gives every federal agency freestanding unilateral authority to terminate any federal award at any time based on changing agency priorities or goals. Defs. Mot. at 26. That not only "is at odds with the plain meaning" of Section 200.340's text and renders key phrases "superfluous," but would also "undermine the security of all federal awards." *Duffy* at *28-29; *accord, e.g.*, *Vera Inst. for Just. v. Dep't of Just.*, 2025 WL 1865160, at *2 (D.D.C. July 7, 2025) (agency may terminate "for failure to effectuate agency priorities" "only if that basis for

---

[16] Although Defendants assert that we "identify no authority *precluding* FHWA from including such termination authority in the [VPPP] Agreement," Defs. Mot. at 25 (emphasis in original), that is beside the point. Moreover, the VPPP requires the Secretary to "monitor the effect of such projects for a period of at least 10 years, and [] report to [Congress] every 2 years on the effects such programs are having," *Duffy* at *3 (quoting VPPP, cl. 5). While it is not necessary to reach the question here, the VPPP's reporting and monitoring provisions further undermine the notion that Defendants have a clear and unambiguous right to terminate the VPPP Agreement.

termination is itself in the terms and conditions of the award"); *Climate United Fund v. Citibank, N.A.*, --- F.Supp.3d ---, 2025 WL 1131412, at *16 (D.D.C. Apr. 16, 2025) (same).

Defendants offer a half-baked analogy that compares Section 200.340 to an apartment building's policy that purports to allow the landlord to terminate a lease under certain circumstances. Defs. Mot. at 26. But that comparison only highlights the problem with Defendants' argument. If a lease does not include a term allowing the landlord to terminate based on unapproved renovations, then an "apartment policy" would not, by itself, grant the landlord such a right unless the tenants had actually agreed to be bound by such policy.

Defendants' reliance on *American Association of Colleges for Teacher Education v. McMahon*, 2025 WL 890560 (D. Md. Mar. 21, 2025), is also misplaced. Defs. Mot. at 27. The meaning of Section 200.340 was not litigated and the court's single reference to that regulation obviously was not intended to suggest that it has the meaning Defendants want it to have. *See* Mem. in Supp. of Mot. for TRO at 4-5 (ECF 5-1) and Reply Mem. in Supp. of Mot. for TRO at 11-13 (ECF 25), No. 25 Civ. 702 (D. Md.).

### 3.    The Christian *doctrine does not apply.*

Defendants next (again) invoke the *Christian* doctrine to read into the VPPP Agreement— and apparently every other government agreement—a unilateral termination right. But as this Court has already recognized, the *Christian* doctrine has no applicability here. *Duffy* at *29-30. *See generally G. L. Christian & Assocs. v. United States*, 312 F.2d 418 (Ct. Cl. 1963).

The *Christian* doctrine is a judge-made rule used by the Court of Federal Claims to read certain mandatory statutory and regulatory requirements into government procurement contracts. It has never been recognized by the Second Circuit. Even in the Court of Federal Claims, the doctrine is strictly limited to procurement contracts, which the VPPP Agreement is not. *Duffy* at *30; *Earman v. United States*, 114 Fed. Cl. 81, 112 (2013) ("the *Christian* doctrine is not

18

applicable" because case "involves financial assistance agreements, not procurement contracts"), *aff'd*, 589 F. App'x 991 (Fed. Cir. 2015); *Mktg. & Mgmt. Info., Inc. v. United States*, 57 Fed. Cl. 665, 674 (2003) (doctrine inapplicable where contract did not require "use of appropriated funds" and was not covered by Federal Acquisition Regulations); *see also S.J. Amoroso Const. Co. v. United States*, 12 F.3d 1072, 1075 (Fed. Cir. 1993) ("Application of the Christian doctrine turns … on whether *procurement policies* are being avoided or evaded (deliberately or negligently) by lesser officials.") (emphasis added and quotation marks omitted).  Indeed, because the whole "purpose of the Christian doctrine" is "to bring about some degree of internal consistency in *agency procurement policies*," it "should be limited to the special circumstances that called it forth." *S.J. Amoroso*, 12 F.3d at 1079 (Plager, J., concurring) (emphasis added).

While Defendants invoke a handful of cases to argue that the *Christian* doctrine goes beyond procurement contracts, they do so only by blatantly mischaracterizing the facts in those cases.  Defs. Mot. at 29.  Although *Aerolease Long Beach v. United States* did concern a lease, the court recognized that lease was a "procurement" subject to "procurement regulations," and it described the *Christian* doctrine as a "tenet of federal procurement law."  31 Fed. Cl. 342, 356, 374 (1994); *see also* 31 U.S.C. § 6303 (agencies "use a procurement contract" to "lease" property).  Defendants' reliance on *Rockies Express Pipeline LLC v. Salazar* is equally puzzling, as there the Federal Circuit specifically held—contrary to Defendants' claims here, *see* Defs. Mot. at 29 & n.5—that "the Precedent Agreement is a contract *for the procurement* of transportation services."  730 F.3d 1330, 1337 (Fed. Cir. 2013) (emphasis added).  Moreover, the court went on to reject the government's argument that the *Christian* doctrine required it to imply a termination for convenience clause in the Precedent Agreement, since the government had "not shown that the Precedent Agreement was necessarily covered by the [Federal Acquisition Regulations], or that

the termination for convenience clause was necessarily required." *Id.* at 1338; *see also United States v. Bills*, 822 F.2d 373, 377 (3d Cir. 1987) (considering application of *Christian* doctrine in case involving services contract, but ultimately resolving case by holding regulations were incorporated by reference where contracting party "expressly assented" to them).[17]

Even in the procurement context, the *Christian* doctrine only permits a court to incorporate a clause into a procurement contract if it finds: "(1) that the clause is mandatory; and (2) that it expresses a significant or deeply ingrained strand of public procurement policy." *K-Con, Inc. v. Sec'y of Army*, 908 F.3d 719, 724 (Fed. Cir. 2018).  Neither prong is satisfied here.  First, as this Court has held, Section 200.340(a)(4) "is permissive" and "does not set forth a mandatory contract clause." *Duffy* at *30 (citing *Idir, Inc. v. Postal Serv.*, 1984 WL 543, at *4 (S.D.N.Y. June 25, 1984)); *see also Guidance for Federal Financial Assistance*, 89 Fed. Reg. at 30089.

Second, implying a termination clause in the VPPP Agreement would not "express[] a significant or deeply ingrained strand of *public procurement policy*," *K-Con, Inc.*, 908 F.3d at 724 (emphasis added), since, as this Court has recognized, "the VPPP Agreement is not a procurement contract," *Duffy* at *30.  The kinds of provisions that express "deeply ingrained strand[s] of public procurement policy" are ones that have existed for decades and protect the public fisc.  *See, e.g.*, *G. L. Christian & Assocs.*, 312 F.2d at 426 (implying termination clause in procurement contract because it was a "major government principle" since World War I that government be able to cancel defense contracts "when they are no longer needed"); *K-Con*, 908 F.3d at 725-26 (implying

---

[17] Defendants also misconstrue the much older authorities they cite. Defs. Mot. at 28.  In *College Point Boat Corp. v. United States*, for example, the Supreme Court did not state, without qualification, that "'the United States actually did have an unconditional right of cancellation' of a contract." *Id.* (quoting 267 U.S. 12, 15 (1925)).  It actually stated that even though the "contract did not contain any clause authorizing cancellation other than for default by the plaintiff," the United States had an "unconditional right of cancellation" because "the contract was made pursuant to" a particular statute, and "[b]y virtue of the statutory provision … the right to cancel became, by implication, one of the terms of the contract."  *College Point Boat Corp.*, 267 U.S. at 15.  The VPPP itself (and of course the VPPP Agreement) contain no such termination right.

performance bond requirements dating back to 1930s into construction contracts because they would "protect the government by ensuring that a contract will be completed with no further cost to the government even if the contractor defaults"). In contrast, the VPPP Agreement has no such impact on the public fisc and there is no "deeply ingrained" tradition of terminating federal-state cooperative agreements at will. *Cf. Kudsk Constr., Inc. v. United States*, 144 Fed. Cl. 446, 454 (2019) (declining to apply new reporting requirements in contract, and distinguishing *Christian* and *K-Con* as involving requirements dating back many decades).

Obviously, there is nothing unfair about holding the federal government to its word. *Contra* Defs. Mot. at 29. The federal government "can reserve to itself the right to terminate an award," pursuant to statute or validly enacted regulations, but in the absence of such a reservation, "the award recipient and those who invest their time and resources on the award grant are entitled to rely upon it." *Duffy* at *27. It would be absurd to allow the federal government to invoke an unspoken right to unilaterally terminate a program based on the views of changing executive branch officials—particularly where, as here, the Project Sponsors invested half a billion dollars implementing the Program. PI Brief at 35. This would not only upend the reasonable expectations of VPPP participants; it would, as the Court observed, have "built within it the seeds of the destruction of the VPPP and the objectives Congress intended to further with it." *Duffy* at *30.[18]

---

[18] "The *Christian* doctrine guards the dominant *legislative* policy against *ad hoc* encroachment or dispensation *by the executive* and prevents hobbling the very policies which the appointed rule-makers consider significant enough to call for mandatory regulation." *S.J. Amoroso*, 12 F.3d at 1075 (emphases added) (citations and quotation marks omitted). The *Christian* doctrine is not meant to allow the *Executive* to do whatever it wants in government contracts, but rather to ensure that the *legislative* policy is not evaded by the Executive in its contracts. Presumably for this reason, a number of cases applying the doctrine suggest that a provision is "mandatory" when it is required by *statute*, not by regulation alone. *See, e.g.*, *K-Con*, 908 F.3d at 724 (provisions were mandatory "because they are required by statute"); *Call Henry, Inc. v. United States*, 855 F.3d 1348, 1352 (Fed. Cir. 2017) (mandatory provisions "reflect *congressionally enacted*, deeply ingrained procurement policy") (emphasis added); *G. L. Christian*, 312 F.2d at 424 ("As the Armed Services Procurement Regulations were issued under statutory authority, those regulations, including Section 8.703, had the force and effect of law."); *S.J. Amoroso*, 26 Cl. Ct. 759, 764 (1992) ("Where regulations are issued under statutory authority, those regulations have the full force and effect of law"), *aff'd*, 12 F.3d 1072.

And while Defendants act as though there are absolutely no constraints on the Program absent an absolute right to terminate, that is not the case. *See id.* at *27. Local government actors, just like the executive branch of the federal government, face democratic constraints on their exercise of power, and local decision makers can be voted out of office if the results of their agreements with the federal government are "harmful" or "outdated." Defs. Mot. at 29. Perhaps more to the point, the VPPP Agreement itself governs the operation of the Program as approved by FHWA.

4. *The VPPP statute does not give Defendants the right to terminate.*

As this Court has already held, Defendants are wrong that the VPPP statute independently authorizes the Secretary to unilaterally terminate the Program. *Duffy* at * 30-31. Where a statute delegates authority to an agency, "the role of the reviewing court under the APA" is to "fix the boundaries of the delegated authority" and "police the outer statutory boundaries of those delegations." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395, 404 (2024) (cleaned up). Here, there is nothing in the text of the VPPP statute to suggest that the Secretary may unilaterally terminate a VPPP agreement—and that "silence indicates a lack of authority." *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 888 (D.C. Cir. 2024); *see Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 202 (2d Cir. 2004) (federal agency "only those authorities conferred upon it by Congress"). In fact, far from allowing the Secretary to terminate a VPPP program at any time, Congress directed that the Secretary "*shall* monitor the effect of such programs for a period of *at least* 10 years," and report to Congress "every 2 years on the effects such programs *are having*"— requirements that are starkly at odds with a freestanding right to terminate VPPP programs at any time. VPPP, cl. 5 (emphases added).[19] Congress surely recognized that "few, if any, state or local

---

[19] Defendants have not renewed their prior argument that this statutory language was intended to apply to the VPPP program "as a whole," rather than to individual projects authorized under the statute. *See* PI Opp. at 39. Presumably, that is because the argument is nonsensical. *See* PI Reply at 18.

governments [would] apply for and invest in" VPPP projects if the Secretary could end such projects at will, "because none of them could be secure that the award that they have given will not be revoked and the investment lost based on the next administration's alternative priorities." *Duffy* at *30.

Defendants selectively quote the VPPP statute to claim that it grants the Secretary authority to "establish" VPPP projects, from which they infer a power to "disestablish any of those programs." Defs. Mot. at 30. In reality, Congress granted the Secretary the authority to "*enter into cooperative agreements* with [states or local governments] to establish, maintain, and monitor value pricing programs." VPPP, cl. 1 (emphasis added). The Secretary's authority is on the front end: he may negotiate and approve the terms of the cooperative agreement. But once the agreement is signed, the statute is clear that there are restrictions on the Secretary's authority over the funding, tolling authority, and length of VPPP projects. *See id.*, cl. 8(c) (VPPP funds allocated to a state "shall remain available for obligation … for a period of 3 years"); *id.*, cl. 4 (Secretary "shall allow the use of tolls … as part of any value pricing pilot program"); *id.*, cl. 5 (Secretary "shall monitor … for a period of at least 10 years").[20]

The 1991 Congress that adopted ISTEA surely knew what it was doing when it granted the Secretary the authority to "enter into cooperative agreements," VPPP, cl. 1, and would have expected that the Secretary could not unilaterally terminate such agreements for any reason. The applicable USDOT regulations in effect at the time provided that an "award"—including a cooperative agreement—could be terminated only in three circumstances: (1) by the awarding agency "[i]f a grantee or subgrantee materially fail[ed] to comply with any term of an award," 49

---

[20] Neither the "monitoring requirements" nor the "cap on the number of program sponsors" "necessarily contemplate termination." *See* Defs. Mot. at 30-31; *contra Duffy* at *31.

C.F.R. § 18.43 (1988), (2) by the awarding agency "with the consent of the grantee," or (3) "[b]y the grantee . . . upon written notification to the awarding agency," *id*. § 18.44 (1988). The USDOT regulations in effect when Congress adopted ISTEA did not permit an agency to terminate a cooperative agreement at will.[21]

Defendants' last "textual point" is equally weak. Defs. Mot. at 30. The VPPP authorizes "pilot" projects to study the efficacy of congestion pricing strategies for broader, national implementation. *See Statement by President George Bush Upon Signing H.R. 2950*, 1991 U.S.C.C.A.N. 1865 (Dec. 18, 1991) (recognizing that law's "transit research partnership with State and local governments" would provide "the means to improve" the nation's surface transportation system); *see also Pilot Project*, Black's Law Dictionary (12th ed. 2024) ("A small-scale advance study conducted to gauge the advisability of conducting a full-scale research project by first evaluating its design, time commitment, costs, and feasibility, plus the effects of potential adverse events."). It does not follow that use of the word "pilot" means that the projects authorized by the VPPP are necessarily short-term or temporary. As this Court has already recognized, "a project is designated as a pilot by virtue of its scope and not by its duration." *Duffy* at *39 ("Many pilot projects are of long duration because that duration is necessary to determine whether the project can achieve its goal."). Neither of the dictionary definitions quoted by Defendants suggests otherwise. *See Pilot*, Black's Law Dictionary (12th ed. 2024) ("A small test project or study to assess the feasibility of an idea, policy, product, etc."); *Pilot*, American Heritage Dictionary (5th ed. 2022) ("Serving as a tentative model for future experiment or development.").

---

[21] *California Sea Urchin Commission v. Bean* undermines Defendants' arguments. 883 F.3d 1173 (9th Cir. 2018). There, the statute went much further than the VPPP, in that it provided that the Secretary "*may* develop and implement" the marine translocation program at issue—not just enter into a binding cooperative agreement permitting the project to go forward. Even so, the Ninth Circuit found that the statute was "ambiguous" because it did not "speak to the issue of termination at all" and deferred to the agency's interpretation under *Chevron*.

Finally, even if the text of the statute did authorize the Secretary to terminate the VPPP Agreement, such termination would still be prohibited by the OMB Regulations, which only permit termination due to changing agency priorities "pursuant to the terms and conditions of the Federal award." 2 C.F.R. § 200.340(a)(4); *see Singh v. U.S. Dep't of Just.*, 461 F.3d 290, 296 (2d Cir. 2006) ("[A]n administrative agency must adhere to its own regulations.").

> 5.      There is no "sovereign power" to unilaterally terminate the Program.

Defendants' final and arguably most disturbing argument is that the right to unilaterally terminate the VPPP Agreement (and rescind approval) is an "aspect of sovereignty" that can be "surrendered only in unmistakable terms." Defs. Mot. at 31. The unmistakability doctrine is a rule of construction that provides that, in an agreement with a sovereign government, "an ambiguous term of a grant or contract [will not] be construed as a conveyance or surrender *of sovereign power*." *United States v. Winstar Corp.*, 518 U.S. 839, 878 (1996) (plurality opinion) (emphasis added). Defendants do not cite a single case holding that the unmistakability doctrine applies to an agreement like the one at issue here. But even if they had, the unmistakability doctrine would have no application because it does not protect efforts by the government to "abrogate one of its contracts." *Id.* at 878 n.22.

The rationale for the unmistakability doctrine is that "the United States when sued as a contractor cannot be held liable for an obstruction to the performance of a particular contract resulting from its *public and general acts* as a sovereign." *Id.* at 892 (citation and quotation marks omitted) (emphases added). But "the Federal Government, as sovereign," still "has the power to enter contracts that confer vested rights, and the concomitant duty to *honor those rights*." *Id.* at 884 n.28 (citation and quotation marks omitted) (emphasis added). Accordingly, "[t]he unmistakability doctrine does not allow governments to undertake actions that are specifically aimed at voiding" government agreements. *U.S. ex rel. Anti-Discrimination Ctr. of Metro N.Y.,*

25

*Inc. v. Westchester Cnty.*, 712 F.3d 761, 773 (2d Cir. 2013); *accord Conner Bros. Const. Co., Inc. v. Geren*, 550 F.3d 1368, 1374 (Fed. Cir. 2008) (governmental action will not be deemed "public and general" when it "is specifically directed at nullifying" a government agreement) (citations omitted).    Indeed, while Defendants claim that the power to renege on agreements is a "fundamental and historical power of the federal government" protected by the unmistakability doctrine, Defs. Mot. at 32, they are unable to point to a single decision reaching that conclusion.[22]

Perhaps recognizing the weakness of their argument, Defendants appeal to policy.  They claim that the unmistakability doctrine must apply here because allowing "only a counterparty the right to terminate a federal agreement" would necessarily threaten "democratic accountability" by allowing the Executive to "shield preferred policies from alteration." *Id.* at 31-32.  Defendants' claim, however, is belied by the very regulations they invoke.  The OMB Regulations permit termination by an agency due to changes in policy "priorities" so long as such condition is "*included in the terms and condition of the award*." 89 Fed. Reg. at 30089 (emphasis added); 2 C.F.R. § 200.340(a)(4).  *Cf. Sols. in Hometown Connections v. Noem*, 2025 WL 1103253, at *4-5 (D. Md. Apr. 14, 2025) (grant included provision authorizing DHS to terminate award due to changes in "agency priorities").  As this Court has recognized, the OMB Regulations serve "to effectuate the purpose of federal awards" by preventing a new administration from pulling the rug out from under award recipients. *Duffy* at *27 ("As the Tolling Program itself illustrates, capital projects invariably involve substantial investment of time and resources.").  What democratic accountability truly demands is that the long-term commitments made by one presidential

---

[22] The VPPP Agreement did not "cede" to the Project Sponsors any sovereign power analogous to "control over navigation, modification of federal programs, [or] taxation." Defs. Mot. at 32.  All it does is authorize the collection of tolls (an inherently local activity) on federal-aid highways within the CBD.

administration regarding the investment of hundreds of millions of dollars designed to address longstanding problems are honored by successive administrations, regardless of party politics.

### B.    Defendants' termination of the VPPP Agreement and rescission of tolling authorization was arbitrary and capricious.

Even if the Secretary had the authority to terminate the VPPP Agreement absent a breach of its terms (and he did not), the stated bases for that termination articulated in the February 19 Letter were arbitrary and capricious.  Under the APA, a "reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions" that are found to be: (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," (2) "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and/or (3) "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C)-(D).  An agency action "cannot stand if it is inconsistent with the intent of Congress" or it if it would "frustrate the Congressional policy underlying the pertinent legislation."  *Soler v. G & U, Inc.*, 615 F. Supp. 736, 741 (S.D.N.Y. 1985) (*citing Bureau of Alcohol, Tobacco & Firearms v. Fed. Lab. Rels. Auth.*, 464 U.S. 89, 97 (1983)).  Where an agency purports to engage in statutory interpretation, "abdication in favor of the agency is *least* appropriate."  *Loper Bright*, 603 U.S. at 401 (emphasis in original).

#### 1.    The Secretary's "policy concerns" are unavailing.

Defendants again seek to justify their February 19 termination and rescission, first and foremost, based on the "policy concerns" identified by the Secretary in his April 21 Letter.  Defs. Mot. at 34.  This Court, however, has already concluded that the February 19 Letter "made clear that the purported termination of the VPPP Agreement was not based on those purported concerns," but rather on the Secretary's "conclusion that FHWA lacked statutory authority to approve" the Program in the first place.  *Duffy* at *36.  These "policy concerns" are therefore, at best, impermissible *post hoc* rationalizations that cannot be used to sustain agency action on their

own.  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) ("Judicial review of agency action … is limited to the grounds that the agency invoked when it took the action.") (internal quotation marks omitted).

In any event, the Secretary's "policy concerns" reflect neither any identified agency priority, nor even the most cursory review of the Program's effects.  Indeed, this Court has noted that there "are reasons to doubt that Defendants' belatedly expressed policy concerns would support the termination decision."  *Duffy* at *36.  The Secretary's claim that the Program imposes "a disproportionate financial hardship on low and medium-income" drivers, Defs. Mot. at 34, is untethered to reality.  Ninety-eight percent of low-income workers with jobs in the CBD do not commute by private vehicle.  *Duffy* at *36 (citing DOT_0048002-03 (ECF 91-2 at 9-10)).  That means that Program-funded improvements to public transportation benefit ninety-eight percent of low-income workers who have jobs in the CBD.  And for the two percent who drive into the CBD every day, the Program provides a discount plan and tax credit that are not available to "high-income" drivers.  *Id.*; *see also* DOT_0038312; DOT_0037020-25.  The Secretary's reliance on a professed concern that drivers "already financed the construction" of roads within the CBD would necessarily invalidate any VPPP program, since "it is the nature of any toll-based value pricing pilot program that it will impose costs on highway users whose taxes already paid for the Federal-aid highways."  *Duffy* at *36.  This policy, therefore, runs counter to the congressional intent to allow for tolling to relieve congestion.  Unsurprisingly, neither the February 19 nor April 21 Letters address any of the potential (and now partially realized) benefits of the Program, including "increased [] speed and reliability of car commutes" and better public transit options.  *Id.*

### 2.    *The Secretary's reading of the VPPP statute is incorrect.*

Defendants next repeat the same groundless arguments that exceptions to 23 U.S.C. § 301's prohibition on tolls must be construed narrowly, and that the VPPP statute did not authorize cordon

pricing. Defs. Mot. at 18. As explained in Plaintiffs' motion for partial summary judgement, Pls. Mot. at 18-21, and in this Court's prior opinion, that reading is "manifestly incorrect," *Duffy* at *31.

The VPPP is not an "exception" to Section 301's toll ban. The express exception is in 23 U.S.C. § 129. The VPPP, by contrast, is its own, standalone program that permits tolling for programs authorized under that statute "notwithstanding section 129 and 301." VPPP, cls. 2, 4. Contrary to Defendants' claim that exceptions must be construed narrowly, which claim is wrong, *see Duffy* at *32, the use of "notwithstanding" in the VPPP statute makes it explicit that the VPPP controls over any conflict with 23 U.S.C. § 301, *id.* at *31-32. Moreover, there is "myriad evidence" that the VPPP statute, the legislators who drafted it, and every administration to date that has applied it (including the first Trump Administration) envisioned cordon pricing strategies. *See* Pls. Mot. at 19-21; *Duffy* at *34. Remarkably, to this day—six months into this litigation— the FHWA website, Defs. Mot. at 36, still defines "zone-based pricing, including Cordon and Area Pricing" as an eligible "Congestion Pricing Strategy." *What is Congestion Pricing?*, FHWA, https://ops.fhwa.dot.gov/congestionpricing/cp_what_is.htm (last accessed July 18, 2025).

The Secretary's second statutory argument is that the VPPP requires toll rates to be calculated only by considering both congestion reduction and improvements to *highway* infrastructure. As an initial matter, the Secretary is wrong on the facts: the tolls were calculated with the *dual goals* of mitigating congestion and funding capital projects to improve public transit. N.Y Veh. & Traf. Law § 1704-a(1). More fundamentally, Defendants have not pointed to a single source in the text or legislative history of the VPPP establishing the goal of improving highways as one of the required "eligibility criteria." *See* Defs. Mot. at 37. That is because the statute provides only one restriction on the use of funds from tolls, namely that "[r]evenues generated" by value pricing pilot programs can be used to fund other transportation "projects eligible under"

Title 23, including transit projects.  VPPP, cl. 4.  As this Court has observed, the VPPP statute "provides no restrictions on the use of program revenues beyond that" and the Secretary was not free to invent new restrictions found nowhere in the statute's text.  *Duffy* at *35.  And ISTEA is replete with provisions that make it "unmistakably clear" that Congress meant to afford municipalities with flexibility to set tolls "of whatever amount" to fund transportation projects that go far beyond mere highway improvements.  Pls. Mot. at 21-22.

### 3.    The Secretary did not adequately consider Plaintiffs' reliance interests.

The Court held that Defendants "failed to adequately consider" Plaintiffs' significant, reasonable, and well-known reliance interests in the VPPP Agreement, FHWA's 2019 statement that the VPPP was the "best fit" for the Program, and the agency's longstanding interpretation and application of the statute.  *Duffy* at *37-42; *see also* Pl. Brief at 25-28.  Defendants' only rejoinder is to recycle arguments that the Court has already rejected.

Defendants' contention that many of the costs "related to the establishment of the [Program] predated the VPPP Agreement … misunderstands Plaintiffs' argument."  *Duffy* at *39. Defendants do not (and cannot) dispute that FHWA has for decades interpreted the VPPP to authorize cordon pricing and the use of toll revenue to support public transit, as shown by FWHA's formal statements to Congress, awards of congressionally-appropriated VPPP funding to study similar projects, solicitation notices for VPPP projects in the Federal Register, guidance documents, and communications with "Plaintiffs before the VPPP Agreement was signed in the years spent envisioning, planning and then executing" the Program.  *Id.*; *see also* DOT_0047627-41; DOT_0048006 (2019 statement that "the VPPP appears to be the best potential fit" for the Program); DOT_0047969-74.  Citing no authority, Defendants brush this all aside as insufficiently "formal or final" to engender reliance.  Defs. Mot. at 38.  But even if these agency statements were not "formal"—and it is hard to imagine a standard of formality that funding awards, Federal

Register notices, and statements to Congress would fail to meet—Defendants are wrong on the law. "An agency remains obligated to weigh reliance interests" when the agency deviates "from prior practice and precedent, even if there had been no previous formal policy." *CSL Plasma Inc. v. C.B.P.*, 628 F. Supp. 3d 243, 259 (D.D.C. 2022); *see also Kentucky v. E.P.A.*, 123 F.4th 447, 468 (6th Cir. 2024). As the Supreme Court has held, allowing agencies to reverse longstanding statutory interpretations "affirmatively destroys" "reliance interests," "leaving those attempting to plan agency action in an eternal fog of uncertainty." *Loper Bright*, 603 U.S. at 411.

Defendants next contend that because "the law allows [the Secretary] to terminate … based on agency priorities," they were not required to "account for" Plaintiffs' reliance interests. Defs. Mot. at 38. Both parts of this statement are wrong. As explained in Point II.A, *supra*, Defendants had no authority to terminate the VPPP Agreement based on changes in policy preferences. And even if they did, that would not relieve them "of the requirement to assess the reliance interests, determine whether they were significant, and weigh them against competing policy concerns." *Duffy* at *40 (citing *Regents of the Univ. of Cal.*, 140 S. Ct. at 1913-14). Defendants also repeat their argument that the VPPP Agreement's approval of a "pilot project … by definition … implied a limited and experimental effort," Defs. Mot. at 38, but "they do not cite a single dictionary supporting their contention," *Duffy* at *39-40; *see also supra* at 24-25. Plaintiffs' reliance on the long-term operation of the Program was "well known to Defendants," and merely labeling the Program as a "pilot" in the context of the Program's purpose "could not have put Plaintiffs on notice that expiry was imminent or that it could be terminated solely because one Secretary of Transportation has a different policy preference than an earlier" one. *Duffy* at *39-40; *see also* DOT_0036197 (describing Program's purpose as "to reduce traffic congestion in the Manhattan CBD in a manner that will generate revenue for future transportation improvements");

DOT_0004527 (noting New York Legislature's finding that the Program is designed to provide a "long-term and sustainable solution" (quoting N.Y. Veh. & Traf. Law § 1701)).

Without even acknowledging the Court's previous holding, Defendants now argue that they actually *did* consider Plaintiffs' reliance interests and "weighed" them "against the broader harms ... to working-class commuters, to New Jersey, and to federal taxpayers." Defs. Mot. at 39. But as the Court held, the February 19 Letter in fact stated that any reliance interests "cannot overcome the conclusion that FHWA's approval was not authorized by law." *Duffy* at *40 (quoting DOT_0047573). This "incorrect interpretation of the VPPP ... cannot suffice to overcome the FHWA's required weighing analysis." *Id*. Moreover, the administrative record here is bereft of any facts substantiating the so-called harms to commuters, New Jersey, or federal taxpayers, other than assertions made by the New Jersey governor about a lawsuit that Defendants are still defending. *New Jersey v. U.S. Dep't of Transp.*, No. 23 Civ. 3885 (D.N.J.). These so-called harms are nothing more than fig leaves that cannot possibly outweigh the voluminous record compiled by FHWA leading to its authorization of the Program.

Finally, Defendants reiterate their argument that Plaintiffs' reliance was "unreasonable" because then-candidate Donald Trump made statements opposing the Program while running for office. But as the Court recognized, "the country only has one President at a time," and "it is fair to presume that a President will follow the law, including the APA." *Duffy* at *40. And notably, Trump's statements as a candidate and President-elect, which pre-dated FHWA's execution of the VPPP Agreement, obviously did not include statements that his administration would violate the law to terminate authority already granted, and did not contain any suggestion that the Program was ineligible under the VPPP statute. *See id.* at *40 (citing *Trump v. Hawaii*, 585 U.S. 667, 699-700 (2018) ("The statements that a candidate makes on the stump do not necessarily define the

actions their administration will take when in power, especially once the agency undertakes the consideration of the evidence that the APA requires.")).  "Plaintiffs were entitled to rely on an agreement signed by the then-and-still Executive Director of the FHWA as well as the federal government's statements and actions taken over the course of several administrations, including the first Trump Administration."  *Id.*[23]

## III.    Summary judgment is not appropriate as to Plaintiffs' remaining claims.

Given the strong public interest in swift resolution of this action, Plaintiffs only moved for summary judgment on their APA claims (apart from pretext) (Counts I-IV) and on their *ultra vires* claim (Count VII) since those claims do not require discovery and are sufficient to obtain the full relief that Plaintiffs seek.  ECF 151; Pls. Mot. at 2.  Plaintiffs have not moved affirmatively on their remaining claims in light of the Court's holding at the preliminary injunction stage and in order to comply with the Court's request that the parties consider ways to expedite this proceeding. There is no reason for the Court to reach Defendants' motion for summary judgment on those remaining claims now.  *See DoorDash, Inc., v. City of New York*, 2025 WL 1827699, at *15 (S.D.N.Y. June 30, 2025) (denying motions for summary judgment on constitutional claims as moot where resolution of other claims disposed of action); *see also Miller v. Metro. Life Ins. Co.*, 979 F.3d 118, 124 (2d Cir. 2020) ("[I]f it is not necessary to decide more, it is necessary not to decide more.").[24]  However, to the extent the Court reaches those issues, it should deny Defendants' motion with respect to Plaintiffs' NEPA, Pretext, Due Process, Tenth Amendment and Spending Clause, and Separation of Powers claims (Counts V, VI, VIII-X) because

---

[23] Defendants' repeated accusations that Plaintiffs "rushed to finalize an agreement" are absurd on multiple levels. Defs. Mot. at 39.  Finalization of the VPPP Agreement followed *four years* of statutorily-mandated review of tolling scenarios that this Court, and others, thoroughly considered.

[24] For similar reasons, we have not fully set out again our arguments that the "compliance measures" threatened in the April 21 Letter are unlawful, although we incorporate our prior arguments as though set out herein.  *See supra* note 1.

Defendants are not "entitled to judgment as a matter of law" and, in the alternative, because necessary "facts are unavailable" to Plaintiffs absent discovery.  Fed. R. Civ. P. 56(a), (d).

### A.    Plaintiffs' NEPA claim

While the Court previously held at the preliminary injunction stage that Defendants were likely to prevail on their argument that the 2023 EA considered the effects of termination by evaluating the no-action alternative, *Duffy* at *42, the administrative record that has now been filed by Defendants establishes that they failed to follow *any* NEPA process whatsoever prior to taking the major federal action of terminating the VPPP Agreement, which is a clear and open violation of federal law.  Perhaps realizing this, Defendants assert their entitlement to summary judgment on a position taken for the first time *in litigation* and found nowhere in the record or in any public statement by the agency itself: that the 2023 EA for an entirely different—indeed, contrary—action (FHWA's authorization of the Program) obviated the need for the agency to follow *any* NEPA process prior to terminating a Program that is already showing substantial benefits.  Defs. Mot. at 41-42.  But Defendants' *post hoc* argument cannot satisfy FHWA's clear obligations under NEPA.

"NEPA's effectiveness depends entirely on involving environmental considerations in the initial decisionmaking process."  *Metcalf v. Daley*, 214 F.3d 1135, 1145 (9th Cir. 2000).  To that end, NEPA requires that the agency prepare a "detailed statement" on the "reasonably foreseeable environmental effects of the proposed agency action" *prior to taking action*, which may be determined by first preparing an EA.  42 U.S.C. § 4332(C); *see, e.g.*, *Marsh v. Or. Nat. Resources Council*, 490 U.S. 360, 371 (1989); *Stewart Park & Reserve Coal., Inc. v. Slater*, 352 F.3d 545, 557 (2d Cir. 2003); *Scientists' Inst. for Pub. Info. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973) ("[T]he basic thrust of … NEPA is to predict the environmental effects of proposed action *before* the action is taken[.]") (emphasis added).  Indeed, as the Court noted, NEPA requires the EA to "*set forth the basis* of such agency's finding of no significant impact or

34

determination that an environmental impact statement is necessary." *Duffy* at *42 (emphasis added) (quoting 42 U.S.C. § 4336(b)(2)). The record establishes that Defendants did neither here. Nor have they cited any authority for the proposition that NEPA procedures may be dispensed with by virtue of a *post hoc* rationale asserted by counsel in litigation.

To be clear, the question at this stage is simply whether the February 19 termination amounts to a new, major federal action triggering NEPA's procedural requirements.[25] There can be no doubt that it is and does. *See, e.g.*, *Andrus v. Sierra Club*, 442 U.S. 347, 363 n.21 (1979) ("Major federal actions include the expansion or revision of ongoing programs." (internal citations omitted)); *Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 234-35 (9th Cir. 1990) (NEPA's procedural requirements are triggered "[i]f an ongoing project undergoes changes which themselves amount to major Federal actions"); *see also Mass. Coal. for Immigr. Reform*, 698 F. Supp. 3d at 35 (where agency's policy had been constructing a border wall, "decision to freeze construction was unmistakably a change in the status quo [and] therefore constitutes a major federal action that requires NEPA review").

While agencies may rely on prior NEPA analysis where the agency determines that such analysis remains applicable to a changed action, the statute and USDOT's regulations require the agency to first consider whether that would be the case, and to provide both an opportunity for public involvement and an adequate explanation of its ultimate decision. *See* 23 C.F.R. Pt. 771 (setting forth requirements for public involvement in NEPA decisions [*e.g.*, 23

---

[25] The Court previously noted that Plaintiffs had not identified any unique environmental consequences of termination outside those already considered in the 2023 EA's no-action alternative. *Duffy* at *42. However, it is the *agency's* obligation to consider the environmental effects of its actions, and NEPA is violated when the agency fails to do so. To hold otherwise would frustrate the public disclosure and participation functions of NEPA. *See Mass. Coal. for Immigr. Reform v. D.H.S.*, 698 F. Supp. 3d 10, 35 (D.D.C. 2023) ("It would … make little sense to only require [compliance with NEPA] when the Government already knows that what it is doing will impact the environment.").

C.F.R. § 771.119]).[26]   Defendants did neither, and it is far from presumptive that Defendants could

properly rely on the 2023 EA for the Program to determine the effects of its termination now that

there is actual data reflecting the current status quo with the Program in place—as this would likely

be a failure to consider relevant data.  *See Mulgrew v. U.S. Dep't of Transp.*, 750 F. Supp. 3d 171,

200 (S.D.N.Y. 2024) (Liman, J.) (describing "hard look" standard applicable to NEPA APA

challenges).  The Court, however, does not need to consider the merits of any NEPA determination

by Defendants at this stage, since no such determination has been made, let alone documented for

the public, as required by NEPA.

The Supreme Court's recent decision in *Seven County Infrastructure Coalition v. Eagle

County*, 145 S. Ct. 1497 (2025), cited by Defendants, Defs. Mot. at 41, does not absolve them of

their obligation to comply with NEPA's procedural requirements.  While the *Seven County* Court

emphasized the deferential nature of judicial review of an agency's NEPA decision, 145 S. Ct. at

1511, especially where NEPA is used to thwart or delay an infrastructure project, it reaffirmed that

NEPA imposes procedural requirements on agencies, and that "[t]he ultimate question is …

whether the agency's final decision was reasonable and reasonably explained," *id.* at 1514.

Plaintiffs' NEPA claim merely asserts that Defendants failed to follow even the statute's "modest

procedural requirement[s]." *Id.* at 1513.

---

[26] USDOT recently updated its NEPA procedures in the form of an interim order, along with an interim final rule modifying its NEPA implementing regulations at 23 C.F.R. Part 771, although these apply only to actions taken after July 3, 2025.  U.S. DEP'T OF TRANSP., DOT ORDER 5610.1D, DOT'S PROCEDURES FOR CONSIDERING ENVIRONMENTAL IMPACTS (2025), https://www.transportation.gov/sites/dot.gov/files/2025-07/DOT_Order_5610.1D_OST-P-250627-001_508_Compliant.pdf ("DOT Order 5610.1D"); Revision of National Environmental Policy Act Regulations, 90 Fed. Reg. 29426 (July 3, 2025).  The new regulations and order reaffirm the fundamental requirement that no final agency action can be taken until a final NEPA determination has been made, and that while an agency may rely on a preexisting environmental document to satisfy its NEPA obligations, it must first "determine[] that the proposed action is substantially the same as the action covered in the existing environmental document and that the environmental issues were adequately identified and addressed."  23 C.F.R. § 771.141(a)(2).

### B.    Plaintiffs' pretext claim

Defendants are not entitled to summary judgment on Plaintiffs' pretext claim because the administrative record establishes a material issue of fact and otherwise requires facts that are unavailable to Plaintiffs without discovery pursuant to Rule 56(d).  *See* Declaration of D. Brandon Trice ("Trice Decl.") Decl. ¶¶ 7-9.  Defendants argue there is no pretext because the February 19 Letter sets forth the "real reason" for termination—"the CBDTP does not (1) provide a toll-free alternative route for low- and medium-income drivers and (2) set tolls with the aims of reducing congestion or raising revenue primarily for highway infrastructure, as opposed to transit capital projects."  Defs. Mot. at 40.  But the February 19 Letter itself reflects pretext, because the "policy" reasons advanced, at the clear urging of President Trump, are not the actual, statutory bases that the Secretary relied upon.  *Duffy* at *36.  Indeed, after seeing Plaintiffs' legal arguments and realizing that their own pretextual statutory bases were meritless, Defendants regrouped and now purport to have actually relied on policy grounds, a position the Court rightly rejected.  *See supra* at 27-28.  This mismatch between the decision and its justification is enough to require vacatur.[27]

*Department of Commerce v. New York*, 588 U.S. 752 (2019), is on point.  There, even though the Supreme Court held that the Secretary's decision passed the APA's "arbitrary and capricious" test based on its facial rationale, it found the agency action was voidable because *that* rationale, no matter how well founded in the record, was a pretext for the Secretary's true motivation: extra-record discovery revealed that since his first week in office, the Secretary had

---

[27] The Secretary's opinions are, where expressed as facts, refuted by the administrative record.  The EA determined that the Program would not disproportionately burden low-income drivers; would benefit most low- and medium-income commuters to the CBD; and would benefit highway users by reducing congestion.  It is not a "fundamental principle of the Federal-aid Highway Program that toll revenues should be used to pay for the infrastructure on which the toll is imposed, with any excess reinvested back into the broader highway network." Apr. 21 Ltr. at 3; *see also* DOT_0036730-32; DOT_0036763-67.  The Secretary acknowledged in the very next sentence that "the VPPP statute permits revenues from pilot programs to be used for transit projects."  Apr. 21 Ltr. at 3.

directed department officials and even the DOJ to come up with a rationale for adding the census question.  As the Supreme Court held, "[t]he reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public.  Accepting contrived reasons would defeat the purpose of the enterprise.  If judicial review is to be more than an empty ritual, it must demand something better than the explanation offered for the action taken in this case." *Id.* at 785.  If anything, the instant case presents an even stronger pretext claim than in *Department of Commerce*, because the record here reveals both a "mismatch between the Secretary's decision and the rationale he provided" *and* squarely refutes the bases the Secretary has asserted for the termination.  *Id*. at 783.  But at a minimum, the record to date strongly indicates that further discovery would substantiate the pretext claim asserted in the Second Amended Complaint and provides ample reason to deny Defendants' motion.

This conclusion is reinforced by the paltry administrative record submitted by Defendants, which consists almost entirely of Plaintiffs' filings in this case, see Pls. Mot. at 4 (summarizing administrative record), and which Plaintiffs intend to move to supplement should proceedings continue past these pending summary judgment motions.  That record reflects that, as a candidate, President Trump pledged to "TERMINATE Congestion Pricing in my FIRST WEEK back in Office," and then as president-elect, reiterated that promise to Republican members of Congress. DOT_0047664-66 (ECF 96 at 70-72).  Moreover, on its face, the February 19 Letter concedes that immediately upon taking office, President Trump directed Secretary Duffy to "review" the decision to enter into the VPPP Agreement.  In conjunction with the President's earlier vows to terminate the Program, one can reasonably infer that the actual direction was to find a means of doing so, just like the direction of Secretary of Commerce in *Department of Commerce*.  Secretary

Duffy then announced one rationale, was challenged in court, and pivoted to a different one.[28]  And tellingly, the latest policy rationale completely diverges not only from the voluminous pre-VPPP Agreement administrative record as to the expected effects of the Program on the vast majority of commuters, but also from policy priorities the Secretary himself had announced early in his tenure that promote "user-pay" models and increased accessibility of transportation systems to families with small children.  DOT_0047666-67 (ECF 96 at 72-74).

This chronology strongly suggests that, as in *Department of Commerce*, discovery would yield additional facts establishing that the termination of the VPPP Agreement was not based on a legal interpretation, or even any legitimate policy change, but on a campaign promise.  The shifting rationales Defendants have asserted are not explanations, but "more of a distraction."  *Dep't of Comm.*, 588 U.S. at 785; *Cook Cnty. v. Wolf*, 461 F. Supp. 3d 779 (N.D. Ill. 2020) (granting extra-record discovery where plaintiffs made "a strong showing that the [challenged rule] was developed and promulgated 'at least in part because of' a substantial and impermissible reason not reflected

---

[28] Further evidence of pretext can be found in Defendants' latest threats to withhold federal funds from the MTA over concerns of crime and safety, at a time when subway crime is at a historic low.  *See* SAC ¶¶ 184-95.  More specifically, on May 18, Secretary Duffy sent a letter to the MTA demanding detailed information on crime on subways in New York City, and threatening "further consequences, up to and including redirecting or withholding funding."  ECF 62-3 at 1.  Although the letter did not directly reference the Program, given that it came just three days before the then-deadline Defendants had set for the Program to cease tolling, it was widely and reasonably understood to be an attempt to gain leverage and "la[y] the groundwork for citing crime as a reason to ultimately withhold federal money" from the MTA.  James Barron, *The Subtext of a Trump Official's Letter to the M.T.A.*, N.Y. Times (Mar. 20, 2025), https://www.nytimes.com/2025/03/20/nyregion/trump-duffy-nyc-subway.html.  On March 30, in a detailed 22-page letter, the MTA provided the requested information showing that the MTA operates one of the safest transit systems in America, that crime in the NYC subway system is among the lowest it has been in the last 30 years, and that the MTA has committed more than 20 times the minimum requirement in safety grant standards to keeping the system safe.  ECF 62-9 at 9-11.  For more than three months, Defendants waited to take further action until, following this Court's May 28 Order, the Federal Transit Administration ("FTA") sent a further letter on July 7 requesting a wide array of supplemental information.  Trice Decl., Ex. 1 at 1.  The MTA responded on July 16 in a detailed 16-page submission once again demonstrating that transit crime—which makes up just 2% of city-wide crime—is at a historic low and continues to fall.  *Id.*, Ex. 2 at 1.  While Defendants claimed that MTA has been tardy in reporting safety events to FTA's National Transit Database, that too is incorrect.  *Id.*, Ex. 1 at 2.  As MTA explained in its response, the National Transit Database records the last date that safety event reports are updated or modified, rather than the date the report was originally submitted, indicating Defendants' claims of tardiness are based on incorrect information.  *Id.*, Ex. 2 at 3.  In short, there is no basis in reality for Defendants' exaggerated claims that the MTA is unsafe for riders, and Defendants' threats simply confirm the pretextual nature of their efforts to terminate the Program by whatever means necessary.

in the administrative record'"). As a result, even if the Court does not find a material issue of fact based on the existing record, it should deny Defendants' motion for summary judgment pursuant to Rule 56(d). *Elliott v. Cartagena*, 84 F.4th 481, 493 (2d Cir. 2023) (recognizing, where party requested discovery under Rule 56(d), that "[o]nly in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery").

### C.    Plaintiffs' constitutional claims

#### 1.    *Due Process Clause*

To state a due process violation, Plaintiffs must "first identify a property right, second show that the [government] has deprived him of that right, and third show that the deprivation was effected without due process." *Local 342, Long Island Pub. Serv. Emps. v. Town Bd.*, 31 F.3d 1191, 1194 (2d Cir. 1994). Defendants contend that Plaintiffs' due process claims fail for lack of a property right ("step one"), and because Plaintiffs have not shown that deprivation of that property right occurred without due process ("step three"). Defs. Mot. at 42-43. Defendants' arguments lack merit.

Plaintiffs' claimed property interest is the authority to toll, which derives from state law (the TMA), federal law (the VPPP statute), *and* the VPPP Agreement. Defendants have themselves acknowledged that this authority has "value" to Plaintiffs. Defs. Mot. at 17. Since this interest is created "by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits," it is protected by the Due Process Clause. *Toxco Inc. v. Chu*, 724 F. Supp. 2d 16, 27 (D.D.C. 2010). Plaintiffs' claim is not a contractual interest in federal performance of the VPPP Agreement, which is best understood as "only as a vehicle to convey congressionally permitted authorization" to operate the Program. *Duffy* at *26 (internal quotation marks omitted). Thus, Defendants' reliance on cases involving "ordinary contract rights" is unavailing. Defs. Mot. at 43.

Defendants' argument that the claim fails at "step three" relies on their erroneous assertion that the VPPP Agreement is governed by FHWA's T&C, which provide award recipients a right to appeal termination.  *Id.*  But the cited provision in the T&C applies only to "termination or suspension for non-compliance," not a termination based on a new legal interpretation or change in policy.  Indeed, this provision in the T&C actually supports the point that Defendants only have a right to terminate the VPPP Agreement based on a violation of its terms, which they have never even tried to allege.  Instead, Defendants decided to terminate the Agreement unilaterally, without offering Plaintiffs any notice of opportunity to comment or provide input, began threatening Plaintiffs with "compliance measures" shortly thereafter, and only then purported to afford Plaintiffs notice and an opportunity to be heard, long after the decision to terminate had become final.  *See Duffy* at *21 ("Defendants did not invite discussion on Plaintiffs' reading of the VPPP before deciding and announcing in the February 19 Letter and again in the April 21 Letter that the Tolling Program was unlawful.  Instead, they offered dialogue as a tack-on to their threats of imminent punitive action if Plaintiffs did not cease tolling.").  That is a violation of due process.[29]

### 2.    The Spending Clause and the Tenth Amendment

While the Court held that it would be issuing an "advisory opinion" if it were to reach Plaintiffs' Spending Clause and Tenth Amendment claims, given that it had already decided that

---

[29] Defendants argue that the Court lacks jurisdiction over Plaintiffs' constitutional causes of action because they may seek a remedy under the Tucker Act.  But that is not a jurisdictional issue, and in any case Defendants fail to acknowledge that the Court of Federal Claims is unable to grant the requisite injunctive and declaratory relief sought by Plaintiffs.  *See Ferreiro v. United States*, 501 F.3d 1349, 1353 n.3 (Fed. Cir. 2007) ("An order compelling the government to follow its regulations is equitable in nature and is beyond the jurisdiction of the Court of Federal Claims.").  Defendants fail to cite a single case in which a constitutional claim was dismissed on jurisdictional grounds because the plaintiff could pursue an APA or Tucker Act claim.  Defs. Mot. at 18-19.  To the contrary, "the court's power to enjoin unconstitutional acts by the government is inherent in the Constitution itself" and unaffected by the APA.  *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 190 n.22 (D.C. Cir. 2006) (cleaned up).  Defendants likewise fail to cite any cases dismissing an *ultra vires* claim on jurisdictional grounds.  Nor can they as it is well established that *ultra vires* "judicial review survived the enactment of the APA."  *Fed. Express Corp. v. United States Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022).

Defendants cannot terminate the VPPP Agreement and rescind approval, *Duffy* at \*42, Plaintiffs respond briefly to preserve their arguments.

Defendants' assertion that Section 301's prohibition on tolling put Plaintiff's on notice of a funding condition, Defs. Mot. at 44, assumes that the parties understood the VPPP Agreement could be terminated at will by Defendants. The parties did not have such an understanding. *Pennhurst State School & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981). As explained above, Plaintiffs reasonably relied on Defendants' representations as to the durability of the program, as well as the terms of the VPPP Agreement itself. *See supra* at 30-33.

In any event, the Secretary's threat to withhold federal funds for meritless legal reasons was constitutionally coercive. *New York*, 414 F. Supp. 3d at 545, 577. And Defendants' suggestion that the Secretary's proposed compliance measures do not threaten sufficient funding for New York is plainly wrong. Defs. Mot. at 45. Until this Court issued its preliminary injunction, Defendants were insisting that Plaintiffs suspend a Program supporting a substantial portion of the MTA's 2020-2024 Capital Plan, commensurate with the threat the Supreme Court struck down in *National Federation of Independent Businesses v. Sebelius*, 567 U.S. 519, 580 (2012). And Defendants' threatened compliance measures implicated substantial portions of New York, New York City, and the MTA's funding. Defs. Mot. at 45. Regardless of the amount of funding at issue (a question that is not yet fully developed), the *post hoc* funding conditions here are exactly the sort of "threats" to independent grants that are "properly viewed as a means of pressuring the States to accept policy changes." *Sebelius*, 567 U.S. at 580.

### 3. Separation of Powers

Defendants misunderstand Plaintiffs' separation of powers claim. Plaintiffs are not claiming that FHWA merely "violat[ed] a statutory provision," Defs. Mot. at 44, but instead that the agency's threatened refusal to disburse congressionally-appropriated transportation funds runs

afoul of the separation of powers.  Indeed, numerous courts have sustained separation of powers challenges based on similar fact patterns with respect to actions taken by the Trump Administration.  *See, e.g.*, *Widakuswara v. Lake*, 773 F. Supp. 3d 46, 57 (S.D.N.Y. 2025) (enjoining agency from terminating and threatening to terminate majority of United States Agency for Global Media staff, along with cancellation of congressionally approved grants); *Washington v. Trump*, 768 F. Supp. 3d 1239, 1261 (W.D. Wash. 2025) (enjoining enforcement of Executive Order that conditioned receipt of federal funds on termination of grants related to "gender ideology"); *PFLAG, Inc. v. Trump*, 766 F. Supp. 3d 535, 560 (D. Md. 2025) (same); *Rhode Island v. Trump*, 2025 WL 1303868, at *15 (D.R.I. May 6, 2025) (similar).  In other words, even if the Secretary has the regulatory authority to withhold *some* funding under *some* circumstances, he does not have the authority to withhold the funds at issue here, since he has not shown that Plaintiffs are violating any terms or conditions of the underlying grants.  *Duffy* at *43 ("[B]y its own terms, 23 C.F.R. § 1.36 provides Defendants no authority to pursue New York's compliance").

## IV.        Remedy

Defendants concede that if the Court holds that the Secretary unlawfully terminated the VPPP Agreement, vacatur is appropriate.  Defs. Mot. at 5, 46; *see also* 5 U.S.C. § 706(2)(A); Pls. Mot. at 28-29.  While Defendants urge the Court to also remand for FHWA "to reconsider and correct its errors," Defs. Mot. at 5, they still have not proffered any possible lawful basis for terminating the VPPP Agreement.  Accordingly, remanding to FHWA would be a futile gesture that could lead the Secretary to reinstate his unlawful termination, putting the parties right back

before the Court.  *See* Pls. Mot. at 28-29; *Huff v. Vilsack*, 195 F. Supp. 3d 343, 363 (D.D.C. 2016); *Chemical Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1268 (D.C. Cir. 1994).[30]

Defendants' half-hearted opposition to injunctive relief is no more persuasive.  Aside from incorporating arguments that this Court already rejected, *see Duffy* at *43-48, Defendants' only irreparable harm argument is that Plaintiffs' asserted injuries "are almost entirely economic harms" that "can be remedied in a breach of contract claim" in the Court of Federal Claims.  Defs. Mot. at 46.  This argument fails for many reasons.  As explained above, Plaintiffs' claims arise under the APA, not the Tucker Act, so the Court of Federal Claims has no jurisdiction.  *See* Point I.C, *supra*.  More importantly, however, the Court has already found that Plaintiffs will suffer several irreparable injuries with no adequate remedy at law, including undermining "Plaintiffs' ability to issue bonds … secured by" Program revenues, "budget uncertainty" that "interferes with Plaintiffs' abilities to plan or manage upcoming projects," stalling public infrastructure projects that rely on federal approvals and funding, and the inability of New York to effectuate a state law "enacted by" the people's representatives.  *Duffy* at *22, 44-47 (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)).  Such harms "cannot be repaired with an award of money damages," much less in a breach of contract action in the Court of Federal Claims, because "[t]his is not a case in which Plaintiffs . . . seek an order 'to enforce a contractual obligation to pay money.'"  *Duffy* at *25, 44 (quoting *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025)).

---

[30] Defendants' citation to *Ward v. Brown* for the proposition that "any remedy is typically limited to setting aside any unlawful action and remanding for the agency to reconsider and correct its errors," mischaracterizes that decision.  Defs. Mot. at 5 (citing 22 F.3d 516, 522 (2d Cir. 1994)).  In *Ward*, the court specifically found that remand was proper because the "agency ha[d] not considered all relevant factors in taking action," based on an agency policy that required consideration of punishments for like offenses.  22 F.3d at 522.  Vacatur here turns on Defendants' improper legal positions, not any multi-factor agency test.

As for the public interest, Defendants again principally incorporate arguments that the Court has already rejected. *See Duffy* at *47-48; *see also* Pls. Mot. at 30-31. Defendants' only new argument is to speculate that TBTA may not have a ready mechanism in place to refund tolls paid through taxis, rideshares, or delivery services, Defs. Mot. at 46, but such conjecture is not only baseless but irrelevant. The prospect of refunding tolls was relevant at the preliminary injunction stage because the Court was making a *predictive* judgment on the merits. Once the Court makes a *final* decision that the Program is legal, the public interest cannot turn on a counterfactual about how tolls could be refunded if Defendants had prevailed. *See N.Y. C.L. Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (permanent injunction requires showing of actual success on the merits). Regardless, FHWA has already determined that the applicable tolls did not outweigh the Program's benefits,[31] and Defendants' conjecture about refunds does not call into question the Court's determination that the public interest weighs decisively in favor of maintaining the Program. *Duffy* at *47-48; *see also* Pls. Mot. at 30-31.

---

[31] The per-trip charges to taxis and for-hire vehicles ("FHVs") to which Defendants now apparently object (Defs. Mot. at 46) were set under FHWA's guidance at the low amounts of $0.75 and $1.50, respectively, to avoid potential disproportionately high and adverse effects on taxi and FHV drivers, who are overwhelmingly members of minority groups. DOT_0045571-72. Moreover, FHWA found that the Program would not adversely affect—and in many cases would benefit—businesses within the CBD. DOT_0036730-32; DOT_0036748-53; DOT_0036763-65. And notwithstanding Defendants' speculation, it is not really subject to dispute that tolls paid by taxi or FHV passengers could be refunded upon proof of payment.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion for summary judgment, grant Plaintiffs' motion for partial summary judgment, vacate Defendants' February 19, February 20, March 20, and April 21 Letters, and issue a permanent injunction and/or a declaratory judgment.


Dated: July 18, 2025
      New York, New York

                                   Respectfully submitted,


                                 */s/ Roberta A. Kaplan*
                                 Roberta A. Kaplan
                                 D. Brandon Trice
                                 Maximilian T. Crema
                                 KAPLAN MARTIN LLP
                                 1133 Avenue of the Americas | Suite 1500
                                 New York, NY 10036
                                 Tel.: (212) 316-9500
                                 rkaplan@kaplanmartin.com
                                 btrice@kaplanmartin.com
                                 mcrema@kaplanmartin.com


                                 */s/ Mark A. Chertok*
                                 Mark A. Chertok
                                 Elizabeth Knauer
                                 Amy Lynn Cassidy
                                 John F. Nelson
                                 Phillip Dane Warren
                                 SIVE, PAGET & RIESEL, P.C.
                                 560 Lexington Avenue, 15th Floor
                                 New York, NY 10022
                                 Tel.: (212) 421-2150
                                 mchertok@sprlaw.com
                                 eknauer@sprlaw.com
                                 acassidy@sprlaw.com
                                 jnelson@sprlaw.com
                                 dwarren@sprlaw.com


                                 *Attorneys for Plaintiffs the Metropolitan Transportation Authority and Triborough Bridge and Tunnel Authority*

46

MURIEL GOODE-TRUFANT
Corporation Counsel of the City of New York

 /s/ Nathan Taylor
Nathan Taylor
Christian C. Harned
New York City Law Department
100 Church Street
New York, New York 10007
Tel.: (212) 356-2315
ntaylor@law.nyc.gov
chharned@law.nyc.gov

*Attorneys for Intervenor-Plaintiff New York City Department of Transportation*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the length limits requirements of Loc. Civ. R. 7.1(c) because this brief complies with the page limitations established by the Court's July 16, 2025 Order.  ECF 166.

This brief complies with the typeface and type-style requirements of Loc. R. 7.1(b) because it was prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in size 12 Times New Roman font.


Dated: July 18, 2025                                  */s/ Roberta A. Kaplan*
New York, New York                              Roberta A. Kaplan

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Roberta A. Kaplan, counsel for Plaintiffs the MTA and TBTA, and a member of the Bar of this Court, certify that on July 18, 2025, copies of the foregoing brief were filed with the Clerk through the Court's electronic filing system, which will send notice of such filing to all counsel of record.


Dated: July 18, 2025                      */s/ Roberta A. Kaplan*
      New York, New York                      Roberta A. Kaplan