**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| METROPOLITAN TRANSPORTATION AUTHORITY & TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY, | |
| Plaintiffs, | **Case No. 25-cv-01413-LJL** |
| NEW YORK STATE DEPARTMENT OF TRANSPORTATION, RIDERS ALLIANCE, SIERRA CLUB, & NEW YORK DEPARTMENT OF TRANSPORTATION | |
| Intervenor-Plaintiffs, | |
| v. | |
| SEAN DUFFY, et al. | |
| Defendants. | |

**DEFENDANTS' COMBINED OPPOSITION TO PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

STANDARD OF REVIEW ....................................................................................... 2

ARGUMENT ......................................................................................................... 3

I.    Plaintiffs fail to establish jurisdiction for any of their claims. ......................... 3

    A.  Plaintiffs fail to establish that the challenged agency action is final. ......... 4

    B.  Plaintiffs fail to establish that the challenged agency action is ripe for review. ......... 9

    C.  Plaintiffs' claim is contractual and belongs in the Court of Federal Claims. ........... 12

        1.    The VPPP Agreement, not any statute or regulation, is the source of Plaintiffs' asserted rights ................................................. 14

        2.    Plaintiffs seek contractual relief ............................................. 18

        3.    Organizational Intervenors cannot shift this dispute out of the Court of Federal Claims. ......................................................... 19

    D.  The Court lacks jurisdiction over all *ultra vires* claims ............................ 20

    E.  Organizational Intervenors fail to establish standing. ............................... 22

II.   Plaintiffs' claims fail because the Secretary and FHWA have acted lawfully. .............. 26

    A.  The Secretary and FHWA have authority to terminate the Agreement ................... 27

        1.    Termination based on agency priorities or goals is authorized by FHWA's terms and conditions incorporated into the Agreement ........... 28

        2.    Termination based on agency priorities or goals is independently authorized by regulation ......................................................... 30

        3.    Termination authority is incorporated by operation of law ................... 31

        4.    Termination is authorized by the VPPP Statute. ............................. 32

        5.    Termination is authorized because the Government did not unmistakably waive its sovereign authority to terminate ...................... 344

    B.  The Secretary and FHWA reasonably noticed termination of the Agreement ........... 34

III.  The Court should not grant injunctive relief.................................................................. 45

    A.  Plaintiffs do not establish irreparable injury or inadequate remedies at law. ............ 46

    B.  The public interest and balance of equities weigh against an injunction. ................. 47

IV.  Remand is the appropriate relief for any violation......................................................... 48

CONCLUSION .................................................................................................................... 49

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*6801 Realty Co., LLC v. U.S. Citizenship & Immigration Servs.*,
    719 F. App'x 58 (2d Cir. 2018) ........................................................................ 5, 6

*Adler v. Penn Credit Corp.*,
    No. 19-CV-7084 (KMK), 2022 WL 744031 (S.D.N.Y. Mar. 11, 2022) ................................. 4

*Advanced Team Concepts, Inc. v. United States*,
    77 Fed. Cl. 111 (2007) .......................................................................... 31, 32

*Aerolease Long Beach v. United States,*
    31 Fed. Cl. 342, 374 (1994), *aff'd*, 39 F.3d 1198 (Fed. Cir. 1994) ....................................... 31

*Allah v. Juchnewioz,*
    No. 93CIV8813LMMGWG, 2003 WL 1535623 (S.D.N.Y. Mar. 24, 2003) ........................... 3

*Am. Petroleum Inst. v. EPA*,
    683 F.3d 382 (D.C. Cir. 2012) ............................................................................ 11

*Amica Ctr. for Immigrant Rts., v. DOJ*,
    No. 25-298 (RDM), 2025 WL 1852762 (D.D.C. July 6, 2025) ..................................... 22, 25

*Bennett v. Spear*,
    520 U.S. 154 (1997) ...................................................................................... 4

*Benten v. Kessler*,
    799 F. Supp. 281 (E.D.N.Y. 1992) ...................................................................... 33

*Berkeley-Dorchester Ctys. Econ. Dev. Corp. v. HHS, Admin. for Child. & Fams.*,
    No. CV 2:04-22950-23, 2006 WL 8443181 (D.S.C. Feb. 24, 2006) ..................................... 8

*Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*,
    769 F.2d 919 (2d Cir.1985) .............................................................................. 24

*Calcutt v. FDIC*,
    598 U.S. 623 (2023) ................................................................................... 48-49

*Cal. Sea Urchin Comm'n v. Bean*,
    No. CV 14-8499-JFW (CWX), 2015 WL 5737899 (C.D. Cal. Sept. 18, 2015),
    *aff'd*, 883 F.3d 1173 (9th Cir. 2018) ...................................................................... 33

*Castellini v. Lappin*,
  365 F. Supp. 2d 197 (D. Mass. 2005)................................................................ 33

*Cayuga Indian Nation of N.Y. v. Seneca Cnty.*,
  978 F.3d 829 (2d Cir. 2020) .......................................................................... 2

*Clem Perrin Marine Towing, Inc. v. Panama Canal Co.*,
  730 F.2d 186 (5th Cir. 1984).......................................................................... 31

*Columbus Reg'l Hosp. v. United States*,
  990 F.3d 1330 (Fed. Cir. 2021) ................................................................17-18

*Comm'n v. Texas*,
  145 S. Ct. 1762 (2025)................................................................................ 20

*Comprehensive Cmty. Dev. Corp. v. Sebelius*,
  890 F. Supp. 2d 305 (S.D.N.Y. 2012)........................................................36-37

*Conservation L. Found., Inc. v. Acad. Express, LLC*,
  129 F.4th 78 (1st Cir. 2025) .......................................................................... 25

*Corley v. United States*,
  556 U.S. 303 (2009)..................................................................................... 30

*Cross Sound Cable Co., LLC v. Long Island Lighting Co.*,
  No. 21-cv-2771, 2022 WL 247996 (E.D.N.Y. Jan. 27, 2022)............................. 26

*CSI Aviation Servs., Inc. v. DOT*,
  637 F.3d 408 (D.C. Cir. 2011)........................................................................ 5

*Earman v. United States*,
  114 Fed. Cl. 81 (2013).................................................................................. 31

*Env't Def. Fund v. FERC*,
  2 F.4th 953 (D.C. Cir. 2021).......................................................................... 25

*Erickson v. Pardus*,
  551 U.S. 89 (2007)....................................................................................... 21

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024)...............................................................................22, 25

*Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*,
  313 F.3d 852 (4th Cir. 2002)........................................................................... 9

*Fortunoff v. Triad Land Assocs.*,
906 F. Supp. 107 (E.D.N.Y. 1995) ................................................................ 2

*G.L. Christian & Assocs. v. United States*,
312 F.2d 418 (Ct. Cl. 1963) ........................................................................ 31

*Gonzales v. Thomas*,
547 U.S. 183 (2006) .................................................................................... 48

*Greenwich Fin. Servs. Distressed Mortg. v. Countrywide Fin. Corp.*,
654 F. Supp. 2d 192 (S.D.N.Y. 2009) ........................................................ 38

*Harvin v. Nationwide Title Clearing*,
632 F. App'x 599 (11th Cir. 2016) ............................................................. 23

*Henkel of Am., Inc. v. ReliaStar Life Ins. Co.*,
No. 3:18-CV-965 (JAM), 2023 WL 1801923 (D. Conn. Feb. 7, 2023) ................ 16

*Herrera v. Riley*,
886 F.Supp. 45 (D.D.C. 1995) .................................................................... 33

*Hollingsworth v. Perry*,
570 U.S. 693 (2013) .................................................................................... 23

*H.R. Moch Co. v. Rensselaer Water Co.*,
247 N.Y. 160 (1928) ................................................................................... 23

*Huttenstine v. Mast*,
537 F. Supp. 2d 795 (E.D.N.C. 2008), *aff'd*, 334 F. App'x 536(4th Cir. 2009) ............... 28-29

*In re Mead*,
No. 12-01222-8-JRL, 2013 WL 64758 (Bankr. E.D.N.C. Jan. 4, 2013) ................ 28

*Ingersoll-Rand Co. v. United States*,
780 F.2d 74 (D.C. Cir. 1985) ............................................................ *passim*

*Irish Lesbian & Gay Org. v. Giuliani*,
143 F.3d 638 (2d Cir. 1998) ....................................................................... 22

*J.C. Prods, Inc. v. United States*,
608 F. Supp. 92 (W.D. Mich. 1984) ......................................................... 18-19

*Jackson v. Fed. Exp.*,
766 F.3d 189 (2d Cir. 2014) ..................................................................... 26-27

*Jones v. Prince George's Cnty.*,
  348 F.3d 1014 (D.C. Cir. 2003)..................................................................26

*Krihely v. Mayorkas*,
  No. CV 22-02973 (RC), 2023 WL 6215360 (D.D.C. Sept. 25, 2023)...................33

*Lab. Council for Latin Am. Advancement v. EPA*,
  12 F.4th 234 (2d Cir. 2021).....................................................................10

*Lacewell v. Office of Comptroller of Currency*,
  999 F.3d 130 (2nd Cir. 2021) ...................................................................10

*LaFleur v. Whitman*,
  300 F.3d 256 (2d Cir. 2002).....................................................................25

*Libby Welding Co. v. United States*,
  444 F. Supp. 987 (D.D.C. 1977), *aff'd*, 595 F.2d 887 (D.C. Cir. 1979)...............41

*Libertarian Party of Erie Cnty. v. Cuomo*,
  300 F. Supp. 3d 424 (W.D.N.Y. 2018),
  *aff'd in part, appeal dismissed in part*, 970 F.3d 106 (2d Cir. 2020)...................24

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024)..........................................................................30, 31

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)..........................................................................4, 23

*Mantena v. Hazuda*,
  No. 17CV5142, 2018 WL 3745668 (S.D.N.Y. Aug. 7, 2018) ..........................5, 6

*Marcella v. Cap. Dist. Physicians' Health Plan, Inc.*,
  293 F.3d 42 (2d Cir. 2002).......................................................................3

*MediNatura, Inc. v. FDA*,
  998 F.3d 931 (D.C. Cir. 2021)...................................................................8

*Megapulse, Inc. v. Lewis*,
  672 F.2d 959 (D.C.Cir.1982)....................................................................16

*Meyer v. McMaster*,
  394 F. Supp. 3d 550 (D.S.C. 2019)............................................................24

*Meyers v. Jay St. Connecting R.R.*,
  288 F.2d 356 (2d Cir. 1961).......................................................................3

*Mgmt. Sci. Am., Inc. v. Pierce*,
  598 F. Supp. 223 (N.D. Ga. 1984) ................................................................. 18

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ........................................................................................ 45

*Nat'l Treasury Emps. Union v. United States*,
  101 F.3d 1423 (D.C. Cir. 1996) ...................................................................... 11

*New York v. Wolf*,
  No. 20-CV-1127 (JMF), 2021 WL 185190 (S.D.N.Y. Jan. 19, 2021) ........... 45-46

*Nnebe v. Daus*,
  644 F.3d 147 (2d Cir. 2011) ............................................................................ 22

*NYC C.L.A.S.H., Inc. v. City of New York*,
  315 F. Supp. 2d 461 (S.D.N.Y. 2004) ............................................................ 22

*Pac. Gas & Elec. Co. v. United States*,
  838 F.3d 1341 (Fed. Cir. 2016) ................................................................. 19, 23

*Pagan v. NYNEX Pension Plan*,
  52 F.3d 438 (2d Cir. 1995) .......................................................................... 35-36

*Parsons v. DOJ*,
  878 F.3d 162 (6th Cir. 2017) ............................................................................ 9

*Pennsylvania v. Lynn*,
  501 F.2d 848 (D.C. Cir. 1974) ......................................................................... 33

*Purpose Built Families Found., Inc. v. United States*,
  634 F. Supp. 3d 1118 (S.D. Fla. 2022), *aff'd*, 95 F.4th 1346 (11th Cir. 2024) ........ 8

*Quiman, S.A. de C.V. v. United States*,
  No. 98-5036, 1999 WL 44182 (Fed. Cir. 1999) .............................................. 18

*Rajamin v. Deutsche Bank Nat. Tr. Co.*,
  757 F.3d 79 (2d Cir. 2014) ......................................................................... 19, 23

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. USDA*,
  499 F.3d 1108 (9th Cir. 2007) .......................................................................... 2

*Ravi v. United States*,
  104 F.4th 1359 (Fed. Cir. 2024) ...................................................................... 28

*Richard v. Corcella*,
   No. 3:20-CV-1354 (CSH), 2023 WL 4595695 (D. Conn. July 18, 2023).............................21

*Roberts v. Roth*,
   594 F. Supp. 3d 29 (D.D.C. 2022) ...........................................................................................11

*Rockies Exp. Pipeline LLC v. Salazar*,
   730 F.3d 1330 (Fed. Cir. 2013) ................................................................................................31

*Sackett v. EPA*,
   566 U.S. 120 (2012)..................................................................................................................6, 7

*Salazar v. King*,
   822 F.3d 61 (2d Cir. 2016) ..........................................................................................................4

*San Juan City Coll. v. United States*,
   391 F.3d 1357 (Fed. Cir. 2004) ................................................................................................14

*Shomberg v. United States*,
   348 U.S. 540 (1955)...................................................................................................................37

*Spencer v. Connecticut*,
   560 F. Supp. 2d 153 (D. Conn. 2008) .......................................................................................21

*Sw. Airlines Co. v. DOT*,
   832 F.3d 270 (D.C. Cir. 2016)......................................................................................................4

*Union of Concerned Scientists v. U.S. Nuclear Regul. Comm'n*,
   735 F.2d 1437 (D.C. Cir. 1984) ................................................................................................39

*United Healthcare Workers E. v. PSC Cmty. Servs.*,
   608 F. Supp. 3d 50 (S.D.N.Y. 2022).........................................................................................26

*United State v. McLean*,
   No. CR 03–30066–AA, 2005 WL 2371990 (D. Or. Sept 27, 2005).........................................33

*United States v. Bills*,
   822 F.2d 373 (3d Cir. 1987) ......................................................................................................31

*United States v. Buff*,
   636 F. Supp. 3d 441 (S.D.N.Y. 2022)........................................................................................39

*United States v. Winstar Corp.*,
   518 U.S. 839 (1996)...................................................................................................................34

*Up State Fed. Credit Union v. Walker*,
    198 F.3d 372 (2d Cir. 1999) .................................................................................12-13, 14

*Vera Institute of Justice v. DOJ*,
    No. 25-CV-1643 (APM), 2025 WL 1865160 (D.D.C. July 7, 2025) ............................ *passim*

*Ward v. Brown*,
    22 F.3d 516 (2d Cir. 1994) .....................................................................................45, 48-49

*Weininger v. Castro*,
    462 F. Supp. 2d 457 (S.D.N.Y. 2006) ...................................................................... 37

*Westhampton House, Inc. v. Carey*,
    506 F. Supp. 215 (E.D.N.Y. 1980) .......................................................................... 23

*Wetstein v. W. Terrace Const. Co.*,
    No. 95 CIV. 5476 (CSH), 1997 WL 777388 (S.D.N.Y. Dec. 17, 1997) ............................ 16

*Windsor v. United States*,
    797 F. Supp. 2d 320 (S.D.N.Y. 2011) ...................................................................... 26

*Wright v. Ernst & Young LLP*,
    152 F.3d 169 (2d Cir. 1998) .................................................................................... 21

**STATUTES**

23 U.S.C. § 301 ............................................................................................................ 38

VPPP Statute,
    Pub. L. No. 105-178, 112 Stat. 107 (1998), codified as 23 U.S.C. § 149 note ........... 14, 36, 38

**FEDERAL RULES**

Fed. R. Evid. 701 .......................................................................................................... 24

Fed. R. Evid. 702 .......................................................................................................... 24

**ADMINISTRATIVE AND EXECUTIVE MATERIALS**

2 C.F.R. § 200.211 ....................................................................................................... 28

2 C.F.R. § 200.34 ..................................................................................................... 28, 29

23 C.F.R. § 1.36 .............................................................................................................. 8

**OTHER AUTHORITIES**

FHWA, *Contractors and Recipients General Terms and Conditions
for Assistance Awards*,
https://www.fhwa.dot.gov/cfo/contractor_recip/gtandc_after2023aug07.cfm ....................... 28

Triborough Bridge and Tunnel Authority (MTA Bridges and Tunnels)
Subordinate Revenue Bond Anticipation Notes, Series 2025A,
https://www.mta.info/document/163941 .......................................................................... 43

Triborough Bridge and Tunnel Authority (MTA Bridges and Tunnels)
Second Subordinate Revenue Bond Anticipation Notes, Series 2024A,
https://www.mta.info/document/161136 .......................................................................... 43

Triborough Bridge and Tunnel Authority (MTA Bridges and Tunnels)
Second Subordinate Revenue Bond Anticipation Notes, Series 2021A,
http://www.mta.info/document/41136 .............................................................................. 44

Triborough Bridge and Tunnel Authority and Custodian
on Behalf pf 2025 Loan Holding, ("Loan Agreement"),
https://www.mta.info/document/172091 .......................................................................... 44

## PRELIMINARY STATEMENT

Plaintiffs ask this Court to do something unprecedented: permanently enjoin the Federal Government from terminating a contract that authorizes a discretionary "pilot program," thereby, requiring the Federal Government to specifically perform in perpetuity. But imposing that relief would invert the purpose of a discretionary and experimental tolling program by transforming it into a binding obligation with no off ramp—even if the pilot program is a failure, even if public sentiment is decidedly against it, and even if it conflicts with agency priorities or goals. Plaintiffs' claims fail at every turn: jurisdiction, merits, and remedy.

Jurisdictionally, this dispute is premature and, even if it were appropriately timed, belongs in the Court of Federal Claims. Government Plaintiffs' (NYSDOT, NYCDOT, MTA, and TBTA) entire case depends on the VPPP Agreement,[1] from their asserted harms to the source of their asserted rights to the nature of the remedy they seek. And while all Plaintiffs attempt to recast contractual claims as flowing from federal statutes and regulations, courts have rightly rejected those same maneuvers before. Without the VPPP Agreement, Government Plaintiffs would have no harm, no right to the tolling authority they seek to make permanent, and no remedy in the form of reinstatement or permanent specific performance of the Agreement's terms. More jurisdictional defects abound, including with all *ultra vires* claims and with the standing of Organization Intervenors (Riders Alliance and Sierra Club), especially to the extent they seek broader relief than Government Plaintiffs.

The claims also fail on the merits. Defendants acted within their authority and reasonably in noticing termination of the VPPP Agreement. It is foreign to American law to require that a

---

[1] Defendants continue to use the same acronyms and shortforms as defined in their opening summary judgment brief. ECF 158.

federal "pilot program" must continue indefinitely at the sole discretion of the non-federal beneficiary. And Government Plaintiffs have admitted that the broad relief they now seek is both atypical for these kinds of challenges and unnecessary in this one.

The Court should dismiss this suit or grant summary judgment in favor of Defendants.

## STANDARD OF REVIEW

Government Plaintiffs urge this Court to apply some version of the "law of the case" doctrine and adhere to its prior decision granting a preliminary injunction. *See* MTA, TBTA, & NYCDOT Mem. of Law in Supp. of Mot. for Partial Summ. J. at 16,[2] ECF 152 ("MTA Mem."). But that argument is misplaced for several reasons.

*First*, the Second Circuit and other circuits have held that the law of the case doctrine does not apply to preliminary or interlocutory rulings, such as decisions on motions for preliminary injunctions. *See Cayuga Indian Nation of N.Y. v. Seneca Cnty.*, 978 F.3d 829, 834 (2d Cir. 2020) ("Ordinarily, findings of fact and conclusions of law made in a preliminary injunction proceeding do not preclude reexamination of the merits at a subsequent trial."); *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. USDA*, 499 F.3d 1108, 1114 (9th Cir. 2007); *see also Fortunoff v. Triad Land Assocs.*, 906 F. Supp. 107, 113 (E.D.N.Y. 1995). This is because a preliminary injunction order is "by its very nature, tentative," and "it would be anomalous . . . in most cases . . . to regard the initial preliminary injunction ruling as foreclosing the subsequent, more thorough consideration of the merits that the preliminary injunction expressly envisions." *Cayuga Indian Nation*, 978 F.3d at 834 (citation omitted).

*Second*, although Government Plaintiffs assert that the Court had the complete administrative record before it when issuing the preliminary injunction, MTA Mem. 16–17,

---

[2] Defendants cite ECF numbering throughout this brief rather than any internal page numbering.

Plaintiffs overstate the completeness and availability of the record at that stage. Defendants produced the full administrative record, ECF 130, after the Court entered a temporary restraining order, ECF 129, and less than 24 hours before the preliminary injunction issued, ECF 132. Moreover, Defendants have presented new arguments and expanded or clarified prior ones in their motion for summary judgment. *See generally* Defs.' Mem. of Law in Supp. of Mot. for Summ. J., ECF 158 ("Defs.' Mem.").

*Third*, Defendants have also raised threshold jurisdictional defects with all of Plaintiffs' and Intervenor-Plaintiffs' claims. In the Second Circuit, the law of the case doctrine does not apply to questions of subject-matter jurisdiction, as a court has an ongoing obligation to assess— and reassess—its jurisdiction at all stages of litigation. *See Marcella v. Cap. Dist. Physicians' Health Plan, Inc.*, 293 F.3d 42, 47 (2d Cir. 2002) (finding that "the law of the case doctrine is irrelevant to our review of subject-matter jurisdiction"); *Allah v. Juchnewioz*, No. 93CIV8813LMMGWG, 2003 WL 1535623, at *3 (S.D.N.Y. Mar. 24, 2003) (same).

*Finally*, even when the doctrine does apply, "the law of the case does not rigidly bind a court to its former decisions, but is only addressed to its good sense[.]" *Meyers v. Jay St. Connecting R.R.*, 288 F.2d 356, 361 n.10 (2d Cir. 1961) (quotation modified) (citations omitted). And courts find rulings on preliminary injunctions to have less persuasive weight than a final ruling on the merits. *See id.*

In short, because the law of the case doctrine does not apply here, this Court should give all of Defendants' arguments full and independent consideration.

## **ARGUMENT**

### I.    **Plaintiffs fail to establish jurisdiction for any of their claims.**

Because Plaintiffs bear the burden of establishing subject-matter jurisdiction, a court

should assume it lacks jurisdiction until Plaintiffs prove it "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). At the summary judgment stage, Plaintiffs "can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts'" that establish jurisdiction. *Adler v. Penn Credit Corp.*, No. 19-CV-7084 (KMK), 2022 WL 744031, at *6 (S.D.N.Y. Mar. 11, 2022) (quoting Fed. R. Civ. P. 56(e)). Neither Government Plaintiffs nor Organizational Intervenors presented sufficient evidence to establish jurisdiction for any of their claims. The Court should dismiss all claims for lack of jurisdiction.

### A. Plaintiffs fail to establish that the challenged agency action is final.

Plaintiffs have failed to show that the challenged conduct (1) marks the consummation of FHWA's and the Secretary's decisionmaking process and is not a merely intermediary decision and (2) is one by which rights or obligations have been determined or from which tangible legal consequences will flow. *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997); *accord Salazar v. King*, 822 F.3d 61, 82 (2d Cir. 2016).

Beyond the arguments already addressed in Defendants' opening brief, Plaintiffs raise several more arguments for why the Secretary's February 19 and April 21 Letters constitute final agency action. All of them fail.

*First*, Plaintiffs contend "that the text of Defendants' communications makes clear [that] FHWA's 'deliberation' over whether to terminate the VPPP Agreement and whether New York is in violation of the law is at an end." MTA Mem. 17. That is incorrect. Courts look to "the way in which the agency subsequently treats the challenged action," so the letters following February 19 inform the lack of finality here. *See Sw. Airlines Co. v. DOT*, 832 F.3d 270, 275 (D.C. Cir. 2016). The day after issuing the February 19 Letter, the agency delayed the effect of termination,

delayed the effect of termination again, and then formally invited Government Plaintiffs to contest the termination and the contemplated enforcement actions. *See* DOT_47570–80. Those communications are far from "clear" that the agency's deliberations were at an end.

Plaintiffs further characterize the ongoing administrative process created by the April Letter as a "*post hoc* effort simply to avoid judicial review." MTA Mem. 19. But the April Letter fits naturally in a series of actions that constitute a legitimate administrative process that, if allowed to play out, could clarify or narrow the issues currently before the Court. Government Plaintiffs submitted voluminous objections in response to the April Letter, aimed at influencing the Secretary's final decision on termination. *See* DOT_47581–48699. In fact, one of the cases Plaintiffs cite for support held that the agency action was final because "it gave no indication that it was subject to further agency consideration or possible modification." *CSI Aviation Servs., Inc. v. DOT*, 637 F.3d 408, 410, 412 (D.C. Cir. 2011) (citation omitted). That is hardly the case here. Plaintiffs can only speculate about what *might* finally come of the process that remains incomplete (because of their litigation), as Defendants cannot issue a final decision that may (or may not) terminate the Agreement without risking noncompliance with the preliminary injunction.

*Second*, the precedent Plaintiffs cite does not help them. Plaintiffs cited two cases from within the Second Circuit for support: *Mantena v. Hazuda*, No. 17CV5142, 2018 WL 3745668 (S.D.N.Y. Aug. 7, 2018) and *6801 Realty Co., LLC v. U.S. Citizenship & Immigration Servs.*, 719 F. App'x 58 (2d Cir. 2018). Those cases fall on opposite ends of the final to non-final spectrum. In *Mantena*, the agency denied an immigration adjustment application, which automatically terminated the plaintiff's employment authorization and parole status. 2018 WL 3745668, at *1–2. Although the government later *sua sponte* reopened the application after litigation had started, the court still found final agency action. *Id.* at *1–2, 5–6. The court emphasized that the reopening

was in "name only" because the agency did not request any "more evidence" and admitted that it was "doing no further work on the application." *Id.* at *5–6.

By contrast, in *6801 Realty*, the Second Circuit affirmed the dismissal of a challenge to a visa denial for lack of final agency action. 719 F. App'x at 60–61. There, the government also *sua sponte* reopened its decision after litigation had started—but *did* request additional evidence from the plaintiff. *Id.* The Second Circuit found that this showed the agency was not merely engaged in informal discussions but was "actively" pursuing further development of the record. *Id.*

This case aligns much more closely with *6801 Realty*. In April, the Secretary formally invited Plaintiffs to submit evidence regarding their compliance with federal tolling requirements and to contest the notice of termination of the Agreement. *See* DOT_47577–80. The Secretary set a deadline for those submissions, stated he would consider them, and confirmed that he would issue a final decision in response to those submissions. *Id.* So, just like in *6801 Realty*, Defendants are "actively" pursuing further factual development through Plaintiffs' formal submissions of evidence and objections to the termination notice. That distinguishes *Mantena*—where the agency did not seek additional information or signal any intent to re-engage with the record. Because the facts here mirror *6801 Realty*, this Court should find that the agency took no final agency action.

Plaintiffs then rely on *Sackett v. EPA*, 566 U.S. 120, 124 (2012). MTA Mem. 18. As explained, though, *Sackett* does not match the facts of this case. *See* Defs.' Mem. 19–21. To summarize, while Plaintiffs here could—and in fact did—submit objections to the notice of termination, the EPA's order in *Sackett* was "not subject to further agency review." 566 U.S. at 125–127. The EPA expressly denied the plaintiff's request to be heard on the underlying agency decision, whereas Plaintiffs here were formally invited to submit objections to the underlying

notice of termination. *Id.*    And the plaintiffs in *Sackett* were immediately required to take restorative actions in compliance with EPA's order or else face daily accruing penalties for both (i) the alleged statutory violation, *and* (ii) failure to comply with the agency order. *Id.* at 126–27. The Secretary's February 19 and April Letters did not automatically expose Plaintiffs to statutory or other penalties, let alone daily-accruing penalties.

*Third*, Plaintiffs claim that the language of the Secretary's letters and statements by Defendants' counsel at oral argument establish that termination "had happened, past tense" and thus there was a final decision on termination. MTA Mem. 19. But this argument fails both factually and legally. Factually, the April Letter assured Plaintiffs that the agency would make a final determination only "after" considering their objections. *See* DOT_47578 ("If, *after* evaluating NYSDOT's response and any responses received from TBTA and NYCDOT . . . [and] determines that New York is out of compliance with 23 U.S.C. § 301, FHWA will implement appropriate initial compliance measures[.]" (emphasis added)). And notwithstanding Plaintiffs' cherrypicked quotes from the May 27 Hearing, Defendants' counsel confirmed that "the agency is actively considering" whether "[Defendants] have authority to terminate, whether [Defendants] did validly terminate, whether the bases for termination were valid." Tr. of Prelim. Inj. Hr'g 45:6–46:19 (May 27, 2025) ("May 27 Tr."). So, Plaintiffs are wrong that the Secretary has already issued a final decision on termination.

But even assuming that termination had already occurred as Plaintiffs argue, that is still not legally enough. Numerous courts have held that a notice of termination is not a final agency action where, as here, the agency's subsequent conduct shows that its decisionmaking process is still

ongoing and subject to further administrative review.[3] *See, e.g.*, *Berkeley-Dorchester Ctys. Econ. Dev. Corp. v. HHS, Admin. for Child. & Fams.*, No. CV 2:04-22950-23, 2006 WL 8443181, at *1 (D.S.C. Feb. 24, 2006); *Purpose Built Families Found., Inc. v. United States*, 634 F. Supp. 3d 1118, 1121 (S.D. Fla. 2022), *aff'd*, 95 F.4th 1346 (11th Cir. 2024); *MediNatura, Inc. v. FDA*, 998 F.3d 931, 939 (D.C. Cir. 2021).

*Fourth*, Plaintiffs argue that legal consequences flow from the February 19 and April letters because the letters put Plaintiffs at risk of legal sanctions if they do not stop tolling and endanger their ability to issue bonds. MTA Mem. 17. But these "consequences" are insufficient. Plaintiffs' claim that they risk legal sanctions is belied by the Secretary expressly stating that no compliance measures would be taken until after he received Government Plaintiffs' objections and issued a final decision in response to those objections that found them not in compliance with federal law, which has not occurred. DOT_47577–80 (citing to 2 C.F.R. §§ 200.340, 200.341, 200.342). Moreover, compliance measures cannot be undertaken until the FHWA Administrator makes the determination that they are appropriate under 23 C.F.R. § 1.36, and Defendants confirmed at the May 27 Hearing that the agency would allow a reasonable amount of time between any final decision and the imposition of any compliance measures. *See* May 27 Tr. 26:12–23. Simply put, there are no tangible legal consequences for continuing to toll in spite of the February 19 Letter.

Plaintiffs' claim that their ability to issue bonds is *potentially* endangered is a speculative harm not backed up by any specific evidence in the record and, in any event, dependent on the

---

[3] Plaintiffs and this Court assert that "Defendants cite no case in which a cabinet secretary and a president of the United States have declared in no uncertain terms that an administrative approval has been rescinded but yet a court determined that such action is not ripe for review." MTA Mem. 19. But requiring Defendants to identify a case with facts essentially identical to this one is not the appropriate inquiry. Defendants have cited numerous analogous cases where courts found no final agency action under similar circumstances, and those principles apply with full force here.

independent actions of third parties.  For example, Plaintiffs offer no evidence from a potential bond purchaser to support their claim that investors are unwilling to buy bonds, leaving the Court with only speculative and self-serving statements from Plaintiffs.  *E.g.*, May 27 Tr. 7:11–8:1. Even if the bond market were in fact impacted, the independent actions of third parties—here, potential bond purchasers—are not legal consequences that this Court should consider in the final agency action inquiry.  *See Parsons v. DOJ*, 878 F.3d 162, 168 (6th Cir. 2017) (finding in the final agency action context that "harms caused by agency decisions are not legal consequences if they 'stem from independent actions taken by third parties.'"); *Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852, 860 (4th Cir. 2002) (same).  And even if the Court were to consider the independent actions of third parties, the Court should not consider such consequences without any evidence or declarations from those third parties.

*Finally*, Plaintiffs audaciously argue that Defendant's failure to respond to their objections confirms that the agency's deliberations are at an end. MTA Mem. 19.  But Plaintiffs cannot fault Defendants for complying with the Court's preliminary injunction, which broadly barred Defendants from taking "any agency action . . . to . . . implement (1) the February 19 Letter, (2) Defendants' purported termination of the VPPP Agreement, or (3) Defendants' purported termination of the Tolling Program." Op. and Order, ECF 132.  Because it is possible that, absent the injunction, FHWA would issue a final decision reaffirming the February notice of termination and determining that Government Plaintiffs are not in compliance with Federal law, Defendants have not taken further steps beyond reviewing Plaintiffs' submissions.  Unsurprisingly, Plaintiffs cite no authority suggesting that complying with a court order should weigh against a defendant.

### B. Plaintiffs fail to establish that the challenged agency action is ripe for review.

Plaintiffs also have not met their burden to establish prudential ripeness.  Plaintiffs have failed to produce sufficient evidence showing that the issues here are "fit" for judicial review or

that withholding a decision would cause them "substantial hardship."  *See Lab. Council for Latin Am. Advancement v. EPA* ("*LCLAA*"), 12 F.4th 234, 252–53 (2d Cir. 2021).

Plaintiffs insist that the issues before the Court are fit for judicial review because they raise purely legal questions about the lawfulness of the VPPP Agreement.  MTA Mem. 20.  Plaintiffs' reasoning that the issues are legal simply because they involve legal questions is circular.  In any event, that framing does not accurately reflect the inquiry before the Court.  If the Court rejects Defendants' other arguments and subjects the agency's (non-final) actions to APA review, the relevant question would be whether, upon consideration of a complete administrative record, Defendants acted arbitrarily and capriciously.  That requires the Court to identify the agency's reasoning for its action and then assess its reasonableness.  But that inquiry is unripe from the beginning: the agency has not made a final decision whether to terminate the VPPP Agreement after review of Government Plaintiffs' objections, or whether to determine noncompliance with Federal law.  Thus, the Court would be assessing an incomplete administrative record and reviewing Defendants' tentative and preliminary thoughts.  Moreover, Defendants maintain that the Secretary can terminate any VPPP agreement that no longer effectuates agency priorities or program goals.  *See* DOT_47570–80.  For that inquiry, the Court would also benefit from waiting for "a more advanced state of administrative consideration."  *See LCLAA*, 12 F.4th at 252–53.

Plaintiffs claim that the ongoing administrative process can be disregarded as mere "lip service."  MTA Mem. 20–21.  But, as previously explained, the record shows a legitimate administrative process that was nearing a certain and soon conclusion, until the temporary restraining order issued.  Defs.' Mem. 18–26.  And Plaintiffs' doubts about the process's legitimacy are speculative, because *Plaintiffs* short-circuited the process by seeking and receiving an injunction.  *See Lacewell v. Office of Comptroller of Currency*, 999 F.3d 130, 148 (2nd Cir.

2021) (finding that prudential ripeness principles counsel against disrupting an ongoing agency process that could avoid judicial review entirely); *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996) (holding that the ripeness doctrine "comports with our theoretical role as the governmental branch of last resort").

Here again, Plaintiffs also fault Defendants for not issuing a final decision in response to Plaintiffs' objections. MTA Mem. 20. As discussed above, Plaintiffs' point is misplaced, because they cannot fault Defendants for complying with the Court's broad preliminary injunction.

Plaintiffs also attempt—but fail—to show that they will suffer substantial hardship if the Court defers judicial review. *First*, Plaintiffs assert hardship based on Defendants' supposed "threat" to impose compliance measures. MTA Mem. 21. But Plaintiffs must establish that their harm be "certainly impending" absent judicial intervention. *See Roberts v. Roth*, 594 F. Supp. 3d 29, 35 (D.D.C. 2022); *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386–87 (D.C. Cir. 2012). The Secretary here expressly stated in April that no compliance measures would be taken until after he received Government Plaintiffs' objections and made a final decision in response to those objections that found them not in compliance with federal law. DOT_47577–80. The contingency of any compliance measures precludes any finding of "certainly impending" harm, because Plaintiffs cannot even say whether the Secretary will ultimately decide to impose them in response to Plaintiffs' objections. And at the May 27 Hearing, Defendants' counsel confirmed that even if the Secretary were to find Government Plaintiffs out of compliance with Federal law, there would still be a "gap between such a determination and the imposition or effectiveness of any compliance measures." May 27 Tr. at 26:12–23.

*Second*, Plaintiffs argue that the "limbo" created by the ongoing administrative process hindered MTA's ability to issue bonds secured by program revenues. MTA Mem. 21. This

assertion of harm falls short for several reasons:

- Plaintiffs placed themselves in "limbo" by short-circuiting the ongoing administrative process that was nearing a clear, defined endpoint, before the issuance of the preliminary injunction. *See* DOT_47577 ("I hereby direct [NYSDOT] . . . to show cause, *no later than May 21, 2025*[.]" (emphasis added)).

- Plaintiffs offer no evidence that awaiting a final decision would cause harm to their bond market that is both substantial and certainly impending. Had the preliminary injunction not issued, any delay would have been brief: Plaintiffs were required to, and in fact did, submit their objections by May 21, 2025, and thus, the Secretary's final decision likely would have already issued by now if not for the preliminary injunction. Plaintiffs identify no reason or evidence that such a short delay would result in the kind of hardship required to support immediate review.

- Plaintiffs offer insufficient evidence to establish that any potential bond purchaser has been unwilling to buy. Moreover, the bonds issued through April 2025 were not secured by tolling revenue. *See, e.g.*, https://www.mta.info/document/41136; https://www.mta.info/document/172091. Instead, the bonds thus far have all been secured by general revenues, separate Obligation Anticipation Notes, and the proceeds of future Take-Out Bonds—none of which is required to be backed by CBDTP tolling revenues. *Id.* Thus, Plaintiffs fail to explain how the bond market would face "immediate" disruption when the instruments in questions are not even secured by tolling revenues.

**C. Plaintiffs' claim is contractual and belongs in the Court of Federal Claims.**

When an action "arises out of a contract," the United States has only waived sovereign immunity for such an action under the Tucker Act, which vests exclusive jurisdiction for those

actions in the Court of Federal Claims and which does not authorize specific performance as a remedy. *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 374–75 (2d Cir. 1999). Here, Plaintiffs improperly seek to "avoid the jurisdictional bar of the [Tucker Act] merely by alleging violations of regulatory or statutory provisions rather than breach of contract." *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77 (D.C. Cir. 1985). But Plaintiffs cannot overcome the jurisdictional bar because both the source of rights they invoke and relief they seek stem from the VPPP Agreement—a contract. Their core claim concerns whether the agency lawfully terminated the Agreement according to the terms of the VPPP Agreement itself and whether the agency must continue to specifically perform its obligations under that contract. That is a contract dispute.

At the outset, two cases in particular confirm this conclusion. In *Ingersoll-Rand*, the plaintiff challenged the Government's decision to terminate its contract for convenience pursuant to a federal regulation, which was incorporated into the contract. The plaintiff claimed that the termination was arbitrary and capricious. 780 F.2d at 75. The court applied the *Megapulse* test and held that jurisdiction lay exclusively in the Court of Federal Claims. *Id.* at 76–78 (citing *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C.Cir.1982)). On source of rights, the court found that it was "possible to conceive of this dispute as entirely contained within the terms of the contract" since the issue was whether the text of the contract forbids termination under the challenged conditions. *Id.* at 78. On remedy, since the plaintiff "requested an order reinstating the original award of the contract," that was in essence a request for specific performance—a contract remedy. *Id.* at 79–80.

The same conclusion followed in *Vera Institute of Justice v. DOJ*, No. 25-CV-1643 (APM), 2025 WL 1865160, at *10–12 (D.D.C. July 7, 2025). There, the plaintiffs challenged the termination of cooperative agreements, arguing that the termination was unlawful under the APA.

13

*Id.* Judge Mehta dismissed the APA claim, holding that the cooperative agreements were contracts and that jurisdiction lay in the Court of Federal Claims. *Id.* The plaintiffs had "agreed to comply with an array of requirements," and the court found this was sufficient consideration to establish a contract. *Id.* at *10. The court also rejected the idea that the lack of an express damages clause defeated jurisdiction: the court reasoned that where the government breaches a contract by improperly terminating it, the law supplies a remedy only in the Court of Federal Claims. *Id.*; *see San Juan City Coll. v. United States*, 391 F.3d 1357, 1361 (Fed. Cir. 2004). ("If the government has breached the Agreement, [Plaintiffs are] entitled to seek whatever damages [they are] entitled to receive.").

Closer examination of the two *Megapulse* factors further confirms dismissal is required. *See Up State*, 198 F.3d at 375–76 (applying the *Megapulse* test).

1.  The VPPP Agreement, not any statute or regulation, is the source of Plaintiffs' asserted rights.

At the center of this case is the VPPP Agreement. Plaintiffs cannot toll on federal-aid highways without it. The VPPP Statute does not grant any independent authority to toll; that right stems solely from agreements entered into by the Secretary. *See* Pub. L. No. 105-178, 112 Stat. 107 (1998), codified as 23 U.S.C. § 149 note ("VPPP Statute") cl. 1 ("Secretary may enter into cooperative agreements . . . to establish, maintain, and monitor value pricing programs."). The Agreement—not any statute or regulation—is the key that unlocks the right to toll, which is what Plaintiffs want to continue doing and is the reason for this case. Plaintiffs' own arguments prove the point. They contend that the Agreement does not allow the Secretary to terminate unilaterally. *See* MTA Mem. 24 ("[T]he VPPP Agreement does not contain any provision that allows Defendants to unilaterally terminate the agreement."). That claim turns entirely on the what the Agreement does or does not say. So, just as in *Ingersoll-Rand*, this dispute can be conceived as

"entirely contained within the terms of the contract," since the issue is whether the text of the contract forbids termination under these circumstances. 780 F.2d at 78.

Government Plaintiffs unsuccessfully try to distance themselves from the VPPP Agreement. They skirt around it by claiming that the VPPP statute, the APA, and various regulations are the source of their rights. MTA Mem. 21–22. This is misdirection, because their core argument is that FHWA and the Secretary lack authority under *the Agreement* to terminate it—they repeatedly say so in their operative complaint and in their briefing.[4] *See* Second Am. Compl. ¶ 240, ECF 96 ("[T]he VPPP Agreement does not contain any provisions that would permit Defendants to terminate the agreement unilaterally."); MTA, TBTA, & NYCDOT's Mem. of Law in Supp. of Pls. Mot. Prelim., ECF 83 at 26 (same); MTA Mem. 24 (same). At the May 27 Hearing, Government Plaintiffs even conceded that they "need" the VPPP Agreement to continue tolling. *See* May 27 Tr. at 12:10–16. Thus, their attempt to reframe the dispute as an APA or statutory violation is at war with their own merits arguments. If the issue of termination is contractual, then the Tucker Act applies; if it not, then Defendants must have general authority to terminate under the VPPP Statute. *See infra* Part II.A.4.

Plaintiffs also argue that they are not enforcing any specific provision of the VPPP Agreement, because the Court only has to decide what the Agreement does not say. MTA Mem. 22–23. But interpreting what an agreement says and does not say and what an agreement permits

---

[4] Everything in this case comes back to the Agreement. For example, Plaintiffs do not contend that the statute or regulations forbid termination of VPPP Agreement in all cases. They contend that termination is forbidden here only because *the terms of the Agreement* do not give the Government unilateral termination authority. MTA Mem. 24. This just underscores that the Agreement—and its purported lack of a termination clause—is the source of Plaintiffs' rights. The source is not a statute or regulation. If the program were purely statutory or regulatory, then Defendants undoubtedly would have discretion to terminate it, given their discretion to create it. *See infra* Part II.A.4.

and does not permit are no less a matter of contract interpretation than construing specific language appearing in a contract. *See, e.g.*, *Ingersoll-Rand Co.*, 780 F.2d at 78; *Wetstein v. W. Terrace Const. Co.*, No. 95 CIV. 5476 (CSH), 1997 WL 777388, at *3 (S.D.N.Y. Dec. 17, 1997); *Henkel of Am., Inc. v. ReliaStar Life Ins. Co.*, No. 3:18-CV-965 (JAM), 2023 WL 1801923, at *3 (D. Conn. Feb. 7, 2023). And more so, a central issue is what "comply[ing] with all federal laws and requirements applicable to this project" means in the VPPP Agreement. *See* DOT_47549–57. Resolving that issue requires interpreting the Agreement. Similarly, the parties dispute whether the terms and conditions incorporate certain mandatory contractual clauses and whether the *Christian* doctrine requires such incorporation—both classic features of government-contract disputes that the Court of Federal Claims resolves.

Plaintiffs next argue that the Agreement is only a passive "vehicle" for implementing statutory authorization. MTA Mem. 22. But virtually every government contract could be described this way. For example, grant agreements funded under *congressional appropriations*, cooperative agreements permitted by *statute*, and procurement contracts awarded under the *Federal Acquisition Regulations* all depend on regulatory or statutory authorization. So, the fact that the government's authority to enter into a contract or agreement is statutory does not transform a contract claim into an APA claim. *See Vera Inst. of Just.*, 2025 WL 1865160, at *7 (holding that "court[s] must be careful to guard against a disguised contract action that seeks to avoid the Tucker Act merely by alleging violations of regulatory or statutory provisions rather than breach of contract" (quotation modified)); *Megapulse*, 672 F.2d at 968.

Finally, Plaintiffs argue that the Agreement does not "confer a direct and tangible benefit on the United States" and therefore should not be treated as a contract. MTA Mem. 23 (quotations omitted). That is plainly incorrect. Plaintiffs have conceded that the "cooperative agreement"

label is not dispositive for Tucker Act purposes. *See* May 27 Tr. at 17:14–17. And this Agreement does confer direct and tangible benefits on the federal government.

Plaintiffs were granted the right to implement tolling, including of federal vehicles and officials traveling through the CBD, that otherwise would be prohibited. *See* Marquis Decl., ECF 159; DOT_47550 ("TBTA may operate the Project as a toll Project in accordance with the provisions of this Agreement and as a value pricing project[.]"). In exchange, Defendants required Government Plaintiffs to use any toll revenues not used covering operating costs for "other projects eligible for assistance under title 23, United States Code." *See* DOT_47550. That benefits Defendants by reducing the need for DOT to spend federal taxpayer dollars on those same or similar projects. As part of the Agreement, Plaintiffs also committed to provide certain valuable information about the project's performance and impacts throughout the life of the Agreement and to provide certain tax credits to eligible residents. *See, e.g.*, DOT_47551 ("TBTA and NYCDOT, as applicable, shall monitor and report on the project performance[.]"); *id.* ("TBTA and NYCDOT will identify benefits the application of tolls has in reducing climate pollution."); DOT_47550 ("TBTA shall conduct or have an independent auditor conduct an annual audit of toll Project records to verify compliance with use of revenues and report the results of the audits to FHWA."); DOT_47554 ("To address effects to low-income drivers, the Project will include a tax credit[.]"). Courts have held that similar benefits are valuable consideration to the Federal Government for Tucker Act purposes. *See Vera Inst, of Just.*, 2025 WL 1865160, at *10–11 (finding that plaintiffs being required in cooperative agreements to "comply with an array of requirements," including a promise to collect, maintain, and provide data about program performance and to report any fraud were "direct" and "tangible" benefits on the government); *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1339 (Fed. Cir. 2021) ("[C]onsideraton may consist of performance or a return

promise to perform, and performance 'may be a specified act of forbearance, or any one of several specified acts or forbearances of which the offeree is given the choice, or such conduct as will produce a specified result.'"); *Quiman, S.A. de C.V. v. United States, No. 98-5036*, 1999 WL 44182, at *2 (Fed. Cir. 1999) (finding a cooperative agreement under which the Department of Agriculture would provide inspectors for certain facilities was not too indefinite to constitute an enforceable contract and should not fail for lack of consideration).

2. Plaintiffs seek contractual relief.

Plaintiffs seek relief that is quintessentially contractual. The whole purpose of this case is that Plaintiffs want to ensure that they can continue tolling on federal-aid highways in the CBD. That authority cannot exist unless Defendants are required to perform the Agreement that permits tolling. VPPP Statute cl. 1; DOT_47550. The remedy they seek is thus specific performance.

Government Plaintiffs say they are not asking for specific performance but merely for an injunction against unlawful conduct. MTA Mem. 23–24. Yet their motion for summary judgment tells a different story. They ask the Court to "[p]ermanently enjoin[] Defendants . . . from terminating the VPPP Agreement." *See* MTA Mot. for Summ. J. 3, ECF 151. That is a request for the Court to compel performance of the Agreement—to force the agency to reinstate and honors its obligation to allow Plaintiffs to toll according to the terms of the Agreement. Courts routinely hold that pleas to reinstate or preserve the benefits of a government agreement constitute demands for specific performance in disguise and thus fall within the Court of Federal Claims' jurisdiction. *See, e.g., Ingersoll-Rand Co.*, 780 F.2d at 79–80 ("[A]n order reinstating the original award of the contract . . . [is] a request for specific performance."); *Mgmt. Sci. Am., Inc. v. Pierce*, 598 F. Supp. 223, 226 (N.D. Ga. 1984) (where relief would require reinstating contract, action is one to order government to perform the contract); *J.C. Prods, Inc. v. United States*, 608 F. Supp. 92, 96 (W.D. Mich. 1984) (where practical result of granting plaintiff's request for declaratory and injunctive

relief would be reinstatement of terminated contracts, relief would require government to pay contract price).

3. <u>Organizational Intervenors cannot shift this dispute out of the Court of Federal Claims.</u>

Organizational Intervenors try to argue that because their members were not signatories to the VPPP Agreement, they are entitled to challenge its termination in federal district court. *See Riders Alliance & Sierra Club Mem. of Law in Supp. of Partial Mot. for Summ. J.* 7–10, ECF 146 ("Riders Alliance Mem."). They go on to claim that it would be "radical" to hold that members of the public affected by an agreement's termination cannot bring suit. *Id.* at 9. But it is Organizational Intervenors' argument that reflects a fundamental misunderstandings of both standing doctrine and contract law. Indeed, third parties generally cannot enforce or challenge government agreements unless they are *intended* beneficiaries. *Incidental* beneficiaries—like members of the public—lack standing and are not proper parties to such disputes. *See Rajamin v. Deutsche Bank Nat. Tr. Co.*, 757 F.3d 79, 86 (2d Cir. 2014). And Organizational Intervenors here are attempting to assert harms and seek relief broader than Government Plaintiff, which means they have to establish that they or their members are intended beneficiaries to the Agreement and thus have standing. Yet they fail to do so.

If Organizational Intervenors could show that they are intended third-party beneficiaries and have Article III standing, they could bring a claim in the Court of Federal Claims like a party to a government contract. *See Pac. Gas & Elec. Co. v. United States*, 838 F.3d 1341, 1361 (Fed. Cir. 2016). Thus, the Tucker Act does not bar claims for intended beneficiaries of a contract or agreement; it simply channels them to the Court of Federal Claims.

Accepting Organizational Intervenors' theory here would upend Tucker Act jurisdiction. Taking Organizational Intervenors' argument to its logical conclusion would mean that any member of the public indirectly affected or incidentally benefited by a government agreement—

19

which is often hundreds, thousands, or millions of people—could force a dispute into federal district court.  That would nullify the Tucker Act's exclusive-jurisdiction provision and invite forum-shopping where parties to the Agreement are not even located or affected.  Plaintiffs, unsurprisingly, fail to cite any authority supporting such an outcome or theory. And the Court should reject it.

### D.  The Court lacks jurisdiction over all *ultra vires* claims.

"Because *ultra vires* review could become an easy end-run around the limitations of . . . other judicial-review statutes, it "does not apply simply because an agency has arguably reached 'a conclusion which does not comport with the law.'"  *Nuclear Regul. Comm'n v. Texas*, 145 S. Ct. 1762, 1775–76 (2025) (quotation omitted).  "Rather, it applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a specific prohibition' in a statute."  *Id.* "*Ultra vires* review is also unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review[.]'"  *Id.* (quotation omitted).

In *Vera Institute of Justice*, Judge Mehta recently applied the Supreme Court's latest guidance in *Nuclear Regulation Commission* and dismissed plaintiffs' *ultra vires* claims challenging the termination of cooperative agreements.  2025 WL 1865160, at *17.  The court held, first, that the termination was neither "entirely in excess" of delegated authority nor contrary to any clear statutory prohibition.  *Id.*  Second, the court rejected the *ultra vires* theory because it merely repackaged the plaintiffs' APA and contract claims—both of which had available channels for judicial review either in that court or the Court of Federal Claims.  *Id.*

Government Plaintiffs and Organizational Intervenors seek summary judgment on their *ultra vires* claims, but they fail the threshold requirements for bringing such claims.

Start with Organizational Intervenors. In a footnote, they effectively abandon their non-statutory *ultra vires* claim and ask the Court to construe it as an APA claim instead. *See* Riders Alliance Mem. 12 n.4. That abandonment shows the weakness of their *ultra vires* theory. But besides that, Organizational Intervenors cannot rewrite their complaint through briefing. *See Richard v. Corcella*, No. 3:20-CV-1354 (CSH), 2023 WL 4595695, at *3 (D. Conn. July 18, 2023) (finding that a party cannot "amend his amended complaint through his memorandum"); *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (plaintiff cannot amend complaint through memorandum filed in opposition to dispositive motion). Organizational Intervenors were deliberate in their pleading. When they wanted to assert APA claims, they did so expressly. *See* Riders Alliance Am. Compl. ¶¶ 82–99, ECF 63 (Counts I and II labeled "Violation of the Administrative Procedure Act"). On Count 4, they chose *not* to invoke the APA. They cannot now at the summary judgment stage change the basis for their cause of action. Doing so would undermine basic fairness and violate the notice function of the pleading rules. *See Erickson v. Pardus,* 551 U.S. 89, 93 (2007) (finding that a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests"); *Spencer v. Connecticut*, 560 F. Supp. 2d 153, 160 (D. Conn. 2008) ("[W]hen looking at a complaint, a defendant should not have to guess what the claims against him are, only to have the plaintiff assert (during summary judgment, no less) that the complaint alleges something else entirely."). Since Organizational Intervenors have abandoned their *ultra vires* theory, the Court should dismiss it outright.

Even setting that aside, Plaintiffs offer no meaningful defense of their *ultra vires* counts. *First*, neither Government Plaintiffs nor Organizational Intervenors demonstrate why judicial review under the APA or the Tucker Act is unavailable. Instead, they simply point to the reasoning of the Court's May 28 ruling—implicitly admitting that their *ultra vires* theory is indistinguishable

from their APA claims.  *See* MTA Mem. 11; Riders Alliance Mem. 12.  But that is fatal. As *Vera Institute of Justice* confirms, where an APA or Tucker Act remedy is available, a duplicative *ultra vires* claim necessarily fails.  2025 WL 1865160, at *17.

*Second*, Plaintiffs never identify any specific *statutory* prohibition against terminating the Agreement.  Even assuming *arguendo* that the Agreement itself bars unilateral termination by the Secretary, that is a contract issue—not a statutory one.  Plaintiffs make no claim, and there's no basis to argue, that federal *law* categorically prohibits all termination in all circumstances.  Indeed, Plaintiffs admit that Defendants can terminate in certain circumstances.  *See* MTA Mem. 24 ("Defendants do not have the right to terminate the VPPP Agreement *absent* TBTA's consent or a material breach." (emphasis added)).  That also defeats their *ultra vires* claims.

### E.  Organizational Intervenors fail to establish standing.

Organizational Intervenors can only establish standing through associational standing or organizational standing.  If they are asserting associational standing on behalf of their members, they must establish that at least one of their members has suffered an injury in fact that is traceable to the challenged conduct and that is redressable by a favorable decision.  *See NYC C.L.A.S.H., Inc. v. City of New York*, 315 F. Supp. 2d 461, 468 (S.D.N.Y. 2004); *see also Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011).  If asserting organizational standing, they "must meet the same [three-part] standing test that applies to individuals."  *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998) (quotation modified).  Under either theory, they cannot base their standing on a general desire to have the government "act in accordance with law" or on the "intensity of the[ir] interest" in ensuring that the CBDTP continues.  *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381, 394 (2024); *see also Amica Ctr. for Immigrant Rts., v. DOJ*, No. 25-298 (RDM), 2025 WL 1852762, at *17–19 (D.D.C. July 6, 2025) (finding that because the

organizations were not the "intended beneficiaries" of the agreement, they failed to establish a cognizable legal injury).

"[A] generalized grievance, no matter how sincere, is insufficient to confer standing." *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013). Thus, "[a] litigant 'raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.'" *Id.* (quoting *Lujan*, 504 U.S. at 573–74).

This is especially true in the government contracts context, where only "intended third-party beneficiaries of the contract" can sue rather than "mere incidental beneficiaries." *Rajamin v. Deutsche Bank Nat. Tr. Co.*, 757 F.3d 79, 86 (2d Cir. 2014); *see Westhampton House, Inc. v. Carey*, 506 F. Supp. 215, 217 (E.D.N.Y. 1980); *H.R. Moch Co. v. Rensselaer Water Co.*, 247 N.Y. 160, 164 (1928)); *Harvin v. Nationwide Title Clearing*, 632 F. App'x 599, 601 n.1 (11th Cir. 2016). And "[t]hird party beneficiary status is an exceptional privilege, and the requirements to demonstrate third-party beneficiary status are stringent." *Pac. Gas & Elec. Co.*, 838 F.3d at 1361 (quotation modified).

Here, Organizational Intervenors cannot establish associational or organizational standing. Organizational Intervenors claim in declarations and briefing that their members will be injured if the Agreement is terminated. *See generally* ECF 145–150. But nowhere do they establish that the Agreement was specifically intended to create a "direct" and unique benefit for any of their members or the organizations themselves. *See Pac. Gas & Elec. Co.*, 838 F.3d at 1361. At most, they only show that certain individual members of the public are experiencing purported incidental benefits from the Agreement. That shows they do not have standing to sue under any valid theory.

But the standing problems do not end there.

**Associational Standing.**    Besides not showing that their members are intended beneficiaries of the Agreement, Organizational Intervenors fall short in several more respects in their effort to establish associational standing.    For one, the declarations are riddled with deficiencies.    Only one declarant—Daniel Pearlstein—even states that he is a member of Riders Alliance.    *See* ECF 147–150.    The rest fail to identify any affiliation with Riders Alliance or Sierra Club, so it is unclear who these individuals are or whether their declarations are even relevant.    *Id.* Next, the declarations rely on exaggerated language to describe ordinary urban experiences—like walking between cars, waiting at crosswalks, or sitting in traffic.    *See* ECF 147–150.    These alleged everyday inconveniences do not amount to legally cognizable harm.    *Libertarian Party of Erie Cnty. v. Cuomo*, 300 F. Supp. 3d 424, 434 (W.D.N.Y. 2018) ("[I]nconvenience does not establish standing."), *aff'd in part, appeal dismissed in part*, 970 F.3d 106 (2d Cir. 2020); *Meyer v. McMaster*, 394 F. Supp. 3d 550, 556 (D.S.C. 2019) ("[I]nconvenience does not establish standing.").

And for the harms that might rise above inconvenience—like the potential for increased pollution or increased traffic—the declarants do not assert that they have expertise to establish such claims.    For example, declarant Deborah Baldwin claims that "the more that cars sit idling in heavy traffic, the more pollution is emitted near my home."    *See* ECF 147 ¶ 8.    Similar opinions are asserted in the declarations.    *See* ECF 147–150.    But neither Ms. Baldwin nor any of the other declarants provides any foundation for offering such scientific or technical conclusions.    *Id.*  The declarants appear to be laypeople, not experts, and their unsupported assertions about air quality or traffic mitigation are not admissible evidence under the Federal Rules of Evidence and thus cannot be assessed as part of a motion for summary judgment.    *See* Fed. R. Evid. 701, 702;

*Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir.1985) (finding that on motions for summary judgment a party cannot rely on inadmissible evidence).

Even the caselaw Organizational Intervenors cite does not help them. The cases they cite refer to statutory schemes that include a private right of action—something they entirely lack here. *See, e.g.*, *Conservation L. Found., Inc. v. Acad. Express*, LLC, 129 F.4th 78, 83 (1st Cir. 2025) (a case involving the Clean Air Act, which provides a "citizen-suit provision"); *Env't Def. Fund v. FERC*, 2 F.4th 953, 971 (D.C. Cir. 2021) (challenge under the Natural Gas Act, which includes a private right of action.); *LaFleur v. Whitman*, 300 F.3d 256, 270 (2d Cir. 2002) (suit also brought under Clean Air Act, which includes a private cause of action). Nothing in the VPPP Statute or other relevant law allows private citizens to enforce VPPP agreements. And for good reason—in the counterfactual world that Organizational Intervenors want, every government contract implementing a program could become subject to third-party challenge under the APA, regardless of whether the government *and the counterparty* want the agreement to continue. Under Organizational Intervenors' theory, they could sue and force both Government Plaintiffs and Defendants here to keep up the CBDTP, even if all agreed to terminate it. That is a radical view that does not find support in law. *See Amica Ctr. for Immigrant Rts.*, 2025 WL 1852762, at *17–19 (finding that if the court accepted organizational plaintiffs standing theory to challenge a government agreement, "that would mean 'all the organizations in America would have standing to challenge' the alleged maladministration of a government benefit program" (quoting *All. for Hippocratic Med.*, 602 U.S. at 395)).

**Organizational standing.** Organizational Intervenors also offer no evidence that either Riders Alliance or Sierra Club has suffered an injury in fact. *See All. for Hippocratic Med.*, 602 U.S. at 395 (recognizing that an organization suffers a particularized injury only when the

defendant's conduct impedes its "core business activities"); *id.* at 394 (holding that an organization cannot "manufacture [their] own standing" by "spend[ing] 'considerable resources'" to counteract government action that they merely disagree with). They submit a declaration from Daniel Pearlstein—who is the policy director of Riders Alliance—but he does not describe any injury to Riders Alliance itself. ECF 150. And there is no declaration from Sierra Club at all. This failure is fatal.[5]

## II.    Plaintiffs' claims fail because the Secretary and FHWA have acted lawfully.

Even if the Court finds jurisdiction, Defendants' actions were lawful. Defendants have the authority to terminate the Agreement, did not act arbitrarily and capriciously, and have authority to impose appropriate compliance measures (after a final decision). *See* Prelim. Inj., Opp'n 46–67, ECF 118..

If the Court rules in Plaintiffs' favor on their APA or *ultra vires* counts, Plaintiffs' constitutional, pretext, and NEPA claims should be dismissed as abandoned since Plaintiffs only "reserve[d] their right to pursue such claims in the event the instant motion is denied." MTA Mem.

---

[5] Organizational Intervenors may claim that they are not required to establish Article III standing "as long as there is an ongoing case or controversy." *See Windsor v. United States*, 797 F. Supp. 2d 320, 325 (S.D.N.Y. 2011). Defendants maintain—and preserve—that such an argument is incorrect under both Article III and Rule 24. *See, e.g.*, *Jones v. Prince George's Cnty.*, 348 F.3d 1014, 1017 (D.C. Cir. 2003). And it is especially incorrect here since the Organizational Intervenors are asserting generalized, independent grievances about termination of a contract to which they are *not* a party. Organizational Intervenors are also trying to claim that even if the Government Plaintiffs' claims lie in the Court of Federal Claims, their claims should continue in District Court. Riders Alliance Mem. 7–10. But if that is so, they surely must establish Article III standing, because at the very least, a permissive intervenor who seeks different or broader relief from that sought by existing parties must do so. *See 1199SEIU United Healthcare Workers E. v. PSC Cmty. Servs.*, 608 F. Supp. 3d 50, 60 (S.D.N.Y. 2022); *see also Cross Sound Cable Co., LLC v. Long Island Lighting Co.*, No. 21-cv-2771, 2022 WL 247996, at *9–10 (E.D.N.Y. Jan. 27, 2022) (collecting cases). Thus, if this Court properly decides that this case should go to the Court of Federal Claims—or if the Court grants any relief to Plaintiffs different or broader than what Government Plaintiffs seek—then Organizational Intervenors would need Article III standing, which they do not have.

14 n.7; *see Jackson v. Fed. Exp.*, 766 F.3d 189, 197–98 (2d Cir. 2014) (finding that a court can infer from the papers that a party has abandoned claims and can dismiss them at the summary judgment stage).  In any event, Defendants moved for summary judgment on those claims and maintain that they are entitled to final judgment for the reasons outlined in their opening brief.  *See* Defs.' Mem. 17–58.

### A. The Secretary and FHWA have authority to terminate the Agreement

Plaintiffs argue that Defendants do not have the right to unilaterally terminate the Agreement because the Agreement does not allow it.  Instead, they claim that only the non-federal sponsors may terminate in the absence of "a material breach."  MTA Mem. 11, 24.  Accepting Plaintiffs' argument would handcuff the Federal Government to maintain a federally authorized pilot program—even if it is a failure and even if voters want to end it—so long as the non-federal sponsors want to maintain it and technically abide by its terms.

As explained in Defendant's opening brief, Plaintiffs are wrong because (1) FHWA's terms and conditions permit termination based on agency priorities or goals; (2) federal regulations permit termination based on agency priorities or goals; (3) by operation of law, the Agreement provides for termination based on agency priorities or goals; (4) the VPPP Statute authorizes termination; and (5) the Federal Government did not unmistakably waive its sovereign right to terminate this federal program.  Defs.' Mem. 35–45.

1.  <u>Termination based on agency priorities or goals is authorized by FHWA's terms and conditions incorporated into the Agreement.</u>

Plaintiffs concede that FHWA's terms and conditions are incorporated into the Agreement by reference. They now acknowledge that Defendants may terminate the Agreement in the event of "material breach." *See* MTA Mem. 11, 24. But at the same time, they continue to insist that the only grounds for termination must appear within the four corners of the Agreement. *See* MTA Mem. 24–26. Since the Agreement itself makes no mention of "material breach" as a basis for termination, that conceded authority must be incorporated from outside the Agreement. And that incorporation happens through FHWA's terms and conditions. *See* FHWA, *Contractors and Recipients General Terms and Conditions for Assistance Awards*, https://www. fhwa.dot.gov/cfo/contractor_recip/gtandc_after2023aug07.cfm ("FHWA Terms and Conditions") ("This Agreement may be terminated or suspended in whole or in part, at any time prior to its expiration date in accordance with 2 CFR 200.340."); 2 C.F.R. § 200.340(a)(1) ("The Federal award may be terminated in part or its entirety . . . by the Federal agency or pass-through entity if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award."). Thus, by conceding that Defendants may terminate for material breach, Plaintiffs necessarily concede that FHWA's terms and conditions are part of the Agreement.[6]

Those incorporated terms and conditions state that "this Agreement may be terminated or

---

[6] And even if Plaintiffs still try to argue that FHWA's terms and conditions are *not* incorporated into the Agreement by reference, see ECF 83 at 48 n.23, that would mean that the parties entered into the Agreement in violation of federal law, as federal regulations mandate—rather than merely permit—including or incorporating into all federal awards the "general terms and conditions of the Federal award, which must be maintained on the Federal agency's website." 2 C.F.R. § 200.211(c)(2); *Ravi v. United States*, 104 F.4th 1359, 1368 (Fed. Cir. 2024) (explaining that "illegal contracts are unenforceable"). Accordingly, the best reading of the Agreement is that it incorporates the FHWA's terms and conditions. *See In re Mead*, No. 12-01222-8-JRL, 2013 WL 64758, at *4 (Bankr. E.D.N.C. Jan. 4, 2013) (interpreting a contract to avoid a violation of federal law); *Huttenstine v. Mast*, 537 F. Supp. 2d 795, 801 (E.D.N.C. 2008) ("[A] court is to interpret

suspended in whole or in part, at any time prior to its expiration date in accordance with 2 C.F.R.

[§] 200.340." *See* FHWA Terms and Conditions.  The relevant regulation, in full, reads:

> The Federal award may be terminated in part or its entirety as follows: [b]y the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.

2 C.F.R. § 200.340(a)(4).  The parties have differing interpretations of this regulation.

Plaintiffs argue that the phrase "if an award no longer effectuates the program goals or agency priorities" must be expressly included in the terms and conditions to avoid making the phrase "pursuant to the terms and conditions of the Federal award" superfluous.  MTA Mem 25.  Plaintiffs' reading is wrong, as outlined below.  But even under Plaintiffs' reading of the regulation, FHWA's terms and conditions expressly permit and include termination based on their assessment of agency priorities or program goals.

As Defendants have explained, the phrase "in accordance with" incorporates by reference 2 C.F.R. § 200.340. Defs.' Mem. 36 (citing cases).  Thus, termination authority based on agency priorities or goals is clearly and unambiguously included in the VPPP Agreement, since those exact words ("if an award no longer effectuates the program goals or agency priorities") are set out in FHWA's terms and conditions, as Plaintiffs demand.

So, even if the Court found Plaintiffs' cited nonbinding OMB guidance persuasive, which states that an agency "may include" a termination provision based on agency priorities or goals, that guidance does not help them.  MTA Mem. 25 n.10 (citing 89 Fed. Reg. 30046, 30089 (Apr. 22, 2024)).  FHWA in fact included such a termination provision in its terms and conditions.  And even if the Court adopted Plaintiffs' reading of the regulation, FHWA's terms and conditions do

---

contract terms in way that does not render a contract void or doubtful validity."), *aff'd*, 334 F. App'x 536 (4th Cir. 2009).

expressly include termination authority based on agency priorities or goals.

2. <u>Termination based on agency priorities or goals is independently authorized by regulation.</u>

As noted above, Plaintiffs argue that Defendants' interpretation of Section 200.340(a)(4) creates superfluity. MTA Mem. 25. But the only interpretation that gives effect to every part of the text is construing the "including . . ." clause as being automatically "includ[ed]" in the terms and conditions, unless expressly disclaimed. Otherwise, the "including" clause is superfluous.

Plaintiffs never cogently explain the function of the "including" clause under their interpretation. In context, it makes little sense to treat the clause as a mere example or hypothetical term. Typically, an illustrative clause clarifies or sheds light on the meaning of the preceding language. But here, the phrase "if an award no longer effectuates the program goals or agency priorities" does not define or elaborate on the phrase "terms and conditions." The phrase "pursuant to the terms and conditions" already encompasses virtually anything the drafter might want to include. That necessarily renders the "including" clause—if it is just an example—purposeless because it does not clarify the meaning of "terms and conditions."

The phrase "pursuant to the terms and conditions of the Federal award" is best read instead to give discretion to include whatever additional termination terms the agency wants, including to modify termination authority based on agency priorities or goals. But the "including . . ." clause automatically "includes" termination based on agency priorities or goals in the terms and conditions, unless expressly disclaimed. That is the only interpretation that gives effect to every clause of the regulation. *See Corley v. United States*, 556 U.S. 303, 314 (2009).[7]

---

[7] Plaintiffs selectively rely on *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), when it suits their position, but then pivot to citing OMB guidance to support their interpretation of the regulation. *See* MTA Mem. 25 n.10. This inconsistent approach does not change the fact that courts must interpret statutes and regulations according to their plain and best meaning—not based

3.  <u>Termination authority is incorporated by operation of law.</u>

The *Christian* doctrine requires that all mandatory terms be implicitly incorporated into a government agreement, most especially termination authority for the government. *See Aerolease Long Beach v. United States,* 31 Fed. Cl. 342, 374 (1994), *aff'd,* 39 F.3d 1198 (Fed. Cir. 1994); *G.L. Christian & Assocs. v. United States*, 312 F.2d 418 (Ct. Cl. 1963). Plaintiffs argue that the *Christian* doctrine does not apply because the VPPP is not a procurement contract.  MTA Mem. 26.  But that conclusion is unsupported.  Plaintiffs rely entirely on *Earman v. United States*, 114 Fed. Cl. 81, 112 (2013).  But the *Earman* court had already determined that the clause at issue was not mandatory, so any statement about the applicability of the *Christian* doctrine would be dicta.  114 Fed. Cl. 81 at 111–12.  More problematic is that the *Earman* court did not provide any reasoning or authority in stating that the *Christian* doctrine was inapplicable to non-procurement contracts.

On the contrary, the Court of Federal Claims has held that "[u]nder the *Christian* Doctrine, a termination for convenience clause must be read into *any* government contract." *Advanced Team Concepts, Inc. v. United States*, 77 Fed. Cl. 111, 113 (2007) (emphasis added).  Indeed, courts have applied the *Christian* doctrine beyond procurement contracts to an array of government agreements. *See* Defs.' Mem. 41 (citing *Aerolease Long Beach*, 31 Fed. Cl. at 347–53 (government lease agreement); *United States v. Bills*, 822 F.2d 373, 377 (3d Cir. 1987) (scholarship agreement); *Rockies Exp. Pipeline LLC v. Salazar*, 730 F.3d 1330, 1338 (Fed. Cir. 2013) (precedent agreement)); *Clem Perrin Marine Towing, Inc. v. Panama Canal Co.*, 730 F.2d 186, 187 (5th Cir.

---

on agency guidance. *See Loper Bright*, 603 U.S. at 410–11.  In any event, the OMB guidance states that a federal agency "may include" a term allowing termination based on policy does not preclude automatic inclusion.  MTA Mem. 25 n. 10.  The use of "may" is better understood to affirm that an agency may modify the automatic inclusion by doing so explicitly.  Even if this Court disagrees with this interpretation of the OMB guidance, it should not override the plain and best reading of the regulation.

1984) (lease-purchase agreement); *Advanced Team Concepts, Inc.*, 77 Fed. Cl. at 113 (implied-in-fact contract for teaching classes).

Plaintiffs have also not provided any reason that the *Christian* doctrine should be limited to procurement contracts, let alone any reason that cooperative agreements should be treated differently categorically. And as outlined in Defendants' opening brief, the *Christian* doctrine's purposes and historical backing support continuing to apply it to non-procurement government agreements, including this Agreement. Defs,' Mem. 41.

If the Court adopted Plaintiffs' interpretation of the Agreement—that the only parties with termination authority are the state and local actors—that would create a federalism mismatch. It cannot be right that a *federally authorized* program can only be terminated by a *non-federal* actor. Plaintiffs try to retort that this mismatch is justified, because federal awards generate reliance interests. MTA Mem. 25. But that argument does not hold up when the history and tradition of government contracting show that the Federal Government has long exercised an inherent power to terminate for convenience—even when contracting parties have reliance interests. *See* Defs.' Mem. 39–41 (collecting cases demonstrating the history of the inherent power to terminate for convenience).

### 4. Termination is authorized by the VPPP Statute.

As Organizational Intervenors state, this is "a hugely consequential government program." Riders Alliance Mem. 14. It follows that the Federal Government should have the discretion to terminate or modify a "hugely consequential" discretionary federally authorized program if it no longer advances federal policies or goals. Contrary to Plaintiffs' argument that only the state and local beneficiaries can exercise unilateral control over the CBDTP, the VPPP Statute's text and context confirm that Defendants may terminate any value pricing pilot program, including based on consideration of agency priorities or goals. Defs.' Mem. 42–43.

Fundamentally, the discretionary authority to establish a program includes the power to terminate that program. *See id.* (citing cases); *see also California Sea Urchin Comm'n v. Bean*, No. CV 14-8499-JFW (CWX), 2015 WL 5737899, at *7 (C.D. Cal. Sept. 18, 2015), *aff'd*, 883 F.3d 1173 (9th Cir. 2018); *Pennsylvania v. Lynn,* 501 F.2d 848, 855–56 (D.C. Cir. 1974) (holding that an agency "has the discretion, or indeed the obligation, to suspend the [housing subsidy] programs' operation when [they have] adequate reason to believe that they are not serving Congress's purpose"); *Castellini v. Lappin*, 365 F. Supp. 2d 197, 202 (D. Mass. 2005) ("[T]his Court agrees with the agency's reasonable interpretation of the word 'may' in § 4046, and holds that Congress intended to authorize the BOP to operate a boot camp program but did not intend to require the operation of such a program"); *United State v. McLean,* No. CR 03–30066–AA, 2005 WL 2371990, at *3 (D. Or. Sept 27, 2005) (holding that BOP had not exceeded its authority by terminating a federal boot camp program and rejected the argument that the agency's "termination of the Program effectuated a repeal of the statute or otherwise exceeded its statutory authority"); *Herrera v. Riley*, 886 F.Supp. 45 (D.D.C. 1995) (holding "the court would have to reject the proposition that such an obligation would provide a basis for this court to order the Secretary to continue a program which Congress has clearly committed to the Secretary's own discretion").

And that authority is confirmed here by Congress's designation of any VPPP as a mere "*pilot* program." *See* Defs.' Mem. 42 (citing dictionaries); *Krihely v. Mayorkas*, No. CV 22-02973 (RC), 2023 WL 6215360, at *1 (D.D.C. Sept. 25, 2023); *Benten v. Kessler*, 799 F. Supp. 281, 285 (E.D.N.Y. 1992). If Congress intended "pilot" programs to continue indefinitely (and at the discretion of non-federal beneficiaries), it needed to say so; otherwise, the agency can end what it had the discretion to start. *See* Defs.' Mem. 42–43.

5.  <u>Termination is authorized because the Government did not unmistakably waive its sovereign authority to terminate.</u>

As explained, the power to terminate a Value Pricing Pilot Program is part of the Government's sovereign authority, which may be "surrendered only in unmistakable terms." *United States v. Winstar Corp.*, 518 U.S. 839, 877–79 (1996) (quoting *United States v. Cherokee Nation of Okla.*, 480 U.S. 700, 706 (1987)).  *See* Defs' Mem. 31-33.  Federal powers such as controlling navigation, modifying the terms of a program, and taxation all have triggered this "unmistakability doctrine," which requires that any agreement to restrict those powers at least do so unmistakably.  *Winstar Corp.*, 518 U.S. at 877–79 (collecting "cases extending back into the 19th century").  Each of the leading examples *Winstar* identified is analogous to the situation here. Defs.' Mem. 43–45.  The VPPP Agreement concerns a federally authorized program that governs the use of federal-aid highways—akin to controlling navigation; it is implemented pursuant to statutory and federally approved terms—akin to the modification of government benefit programs; and it involves tolling motorists on federal-aid highways—akin to the exercise of the taxing power. Those are each sovereign prerogatives that cannot be relinquished silently.  And because there was not unmistakable waiver here, Defendants can unilaterally terminate this Agreement.

**B.  The Secretary and FHWA reasonably noticed termination of the Agreement**

The termination of the Agreement was a product of reasoned decision-making.  Defs.' Mem. 45–54.  Plaintiffs argue that the termination was arbitrary and capricious because (i) the Secretary's policy grounds are unsupported by evidence, (ii) the Secretary misinterpreted the statute, and (iii) the Secretary did not consider reliance interests.  All three arguments fail.

**Agency priorities and goals.**  The Secretary has consistently and repeatedly stated in both the February 19 Letter and April Letter that policy rationales informed his decision to terminate the VPPP Agreement.  In both letters, the Secretary explained his concerns with the CBDTP: that

(1) it does not provide a toll-free alternative route for low- and medium-income drivers and (2) it does not set tolls with the aim of reducing congestion or raising revenue primarily for highway infrastructure, but with the aim of funding transit capital projects. *See* DOT_47570–74, 47577–80. Plaintiffs effectively conceded as much in their preliminary injunction motion. *See* MTA Prelim. Inj. 16 ("the February 19 Letter did note that Defendants' review of the Program's eligibility was prompted by their disagreement on policy grounds"); *see also id.* at 42 n.25; May 27 Tr. 19:12–14 ("So, the first concern they now make, which was originally a statutory issue and now they call it a policy issue is this toll-free option I just talked about[.]"). Both the letters themselves and Plaintiffs' concessions contradict any finding that the Secretary's policy rationales were merely *post hoc* rationales. MTA Mem. 32.

Plaintiffs also take issue with both of the Secretary's policy rationales. *First*, they argue that any toll-based VPPP will impose costs on taxpayers, so concern over such costs is not reasonable. MTA Mem. 33. But the CBDTP provides no toll-free option. No prior VPPP program lacked toll-free alternatives. The CBDTP's departure from prior VPPP programs provides ample support for the Secretary's rationale. *See* Defs.' Mem. 46–47.

*Second*, Plaintiffs make several policy arguments for why the VPPP Agreement should not be terminated. They argue that the CBDTP benefits taxpayers because it helps improve public transit and reduces fuel costs, stress, auto emissions, and wait times. MTA Mem. 33. But in making these arguments, Plaintiffs are trying to substitute their own policy judgment for that of the Secretary's, which arbitrary and capricious review does not allow. *See Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 443–44 (2d Cir. 1995) (describing arbitrary and capricious review as "highly deferential" and limited such that a court is "not free to substitute [its] own judgment for that of the [agency]"). In the February 19 and April Letters, the Secretary thoroughly explained

the agency's priorities and explained why the CBDTP's was inconsistent with those priorities. *See* DOT_47570–80.

*Third*, Plaintiffs argue that the Secretary ignored that 98 percent of low-income workers do not commute by private vehicle. MTA Mem. 33–34. They also argue that low-income commuters can participate in discount programs or receive tax credits, which may reduce or zero out their toll bills. *Id.* But the costs of the tolls fall on low-income workers in other day-to-day ways. For example, when they receive food delivery or take a cab or rideshare, the cost of the tolls is passed to them. The costs of everyday goods delivered to CBD merchants are increased. There is no way around the toll for low-income and working-class people. And the VPPP directs the Secretary of Transportation to monitor the effects of any value pricing program on "low-income drivers" and to impose mitigation measures to combat adverse effects on such individuals. VPPP Statute cl. 7. The Secretary acted reasonably in following his statutory duties and taking necessary efforts to protect working-class and low-income individuals. *See* DOT_47570–80.

*Fourth*, Plaintiffs argue that the administrative record is devoid of evidence that the Department investigated the impact of the CBDTP on working-class Americans. Rider Alliance Mem. 9. This is wrong. FHWA considered Governor Murphy's letter, which stated "the resulting congesting pricing plan is a disaster for working- and middle-class New Jersey commuters and residents who need or want to visit lower Manhattan and now need to pay a big fee on top of the bridge or tunnel tolls they already pay." DOT_0047569; *see* DOT_47570–71 (describing consideration of New Jersey's letters to the President and DOT).[8] The environmental assessment

---

[8] Contrary to Plaintiffs argument that the letters from Governor Murphy are not relevant, MTA Mem. 13, the letters were directly relied upon when the Secretary came to his decision to terminate the VPPP. *See Comprehensive Cmty. Dev. Corp. v. Sebelius*, 890 F. Supp. 2d 305, 309 (S.D.N.Y. 2012).

of the CBDTP, which is part of the administrative record, also discusses the potential negative consequences that the CBDTP will have on low-income and working-class New Yorkers, including reductions in taxi and for-hire-vehicle employment and the financial burdens on low-income drivers who do not use or have alternative transportation modes. *See* DOT_37001–37025. And it is self-evident that any driver entering the CBD (regardless of income) will incur an additional cost, and that those costs would be unwanted and burdensome for someone already struggling to pay their bills.

**Inconsistency with the statute.** The Secretary also reasonably determined that the Agreement was contrary to the VPPP Statute. As previously explained, the Secretary properly determined that the CBDTP's cordon pricing model was inconsistent with Congress's intent under Title 23 and reasonably concluded that New York's plan to set toll rates based on transit capital targets was inconsistent with statutory requirements. *See* Defs.' Mem. 48–49.

Starting with Plaintiffs' arguments that cordon pricing is authorized by the VPPP Statute. *First*, they argue that the VPPP is not an exception to 23 U.S.C § 301, but rather prevails in the event of a conflict. MTA Mem. 28–30. But this is exactly what an exception is in this context. Plaintiffs spill much ink about the term "notwithstanding," claiming it imparts a different meaning than an exception. But courts have understood that "notwithstanding" is consanguineous with "exception." *Weininger v. Castro*, 462 F. Supp. 2d 457, 488 (S.D.N.Y. 2006) ("This Court concludes that the '*notwithstanding* any other provision of law' language in TRIA *operates as an exception* to immunity from both jurisdiction and execution." (emphasis added)); *Shomberg v. United States*, 348 U.S. 540, 543 (1955) ("Section 318, advanced as just such an *exception*, says '*Notwithstanding* the provisions of section 405(b)'" (emphasis added)). Thus, the word "notwithstanding" means that any program properly authorized by a VPPP Agreement is an

exception to Section 301. More so, a statutory scheme that begins with a broad prohibition and then sets out narrow, specific alternatives is best understood as creating limited exceptions to the general rule. Here, Section 301 sets out a broad ban on tolls "of all kinds." 23 U.S.C. § 301. And then the VPPP Statute allows tolls only when properly authorized by a VPPP Agreement and definitionally limited in nature. *See generally* VPPP Statute (authorizing "pilot" programs). Thus, the VPPP Agreement is an exception to Section 301's ban on tolls.

*Second*, Plaintiffs argue that even if the VPPP Agreement is an exception to Section 301, it should not be narrowly construed but should be given a broader reading that would permit a broad set of tolling programs, including cordon pricing. MTA Mem. 28–29. But the "general rule of statutory construction [is] to read exceptions narrowly when the statute itself should be read broadly." *Greenwich Fin. Servs. Distressed Mortg. v. Countrywide Fin. Corp.*, 654 F. Supp. 2d 192, 195 (S.D.N.Y. 2009*); see also* Defs.' Mem. 48 (citing cases). Applying that principle here, the Secretary appropriately gave the statutory tolling ban a broad reading, which is supported by the phrase "of all kinds" in 23 U.S.C. § 301, and then gave the VPPP exception a narrower reading. That is consistent with the plain and proper meaning of this kind of statutory scheme.

*Third*, Plaintiffs argue that cordon pricing is within the scope of the VPPP because (i) on its signing, President Bush said a major element of the law "was to provide State and local officials unprecedented flexibility," (ii) Professor Vickrey, the "architect of congestion pricing," proposed that cordon pricing be implemented in Manhattan, and (iii) other municipalities in the world such as Singapore implemented cordon pricing based on Vickrey's work. MTA Mem. 28–30. Plaintiffs place too much weight on these statements and authorities. President Bush's statement was silent on cordon pricing—so it is not clear from that one phrase that Congress or the President envisioned cordon pricing to be included in the VPPP. And Professor Vickrey's statements and

Singapore's implementation of cordon pricing do not help Plaintiffs.  It shows that Congress was aware of cordon pricing when enacting the VPPP.   Yet it decided not to include any specific mention of it in the VPPP.  *See Union of Concerned Scientists v. U.S. Nuclear Regul. Comm'n*, 735 F.2d 1437, 1450 (D.C. Cir. 1984) (finding that congressional inaction is relevant where there is evidence that Congress was "aware of the problem").  And how another country may envision "congestion pricing" is not binding—nor is it even persuasive.  *See United States v. Buff*, 636 F. Supp. 3d 441, 447 (S.D.N.Y. 2022) ("[S]ubmissions demonstrating the practices of Italy, Liechtenstein, and Germany are not persuasive.").  And even if cordon pricing is within the scope of the VPPP Statute, this cordon pricing program goes beyond what Congress intended for all the reasons set forth herein.

*Fourth*, Plaintiffs argue that interpreting the VPPP to include cordon pricing is consistent with FHWA's prior activity, which includes funding multiple cordon pricing studies under the VPPP, including one for Manhattan.  MTA Mem. 29.  Yet, despite these cordon pricing studies, the FHWA never authorized a VPPP with cordon pricing—until the CBDTP.  It is consistent with prior FHWA actions to find that cordon pricing is *not* authorized by the VPPP statute.

Next, Plaintiffs argue that the Secretary misinterpreted the VPPP Statute when he determined that the VPPP Statute does not allow revenues generated by a VPPP to be spent on local transit projects.  MTA Mem. 30–31.  That arguments reflect a fundamental misunderstanding of the agency's rationale in terminating the VPPP Agreement.  Plaintiffs believe that the agency's rationale was that the VPPP statute does not permit the spending of toll revenues on capital projects.  MTA Mem. 30.  But that strawman was never the Secretary's rationale.  Rather, the Secretary's rationale is that setting toll *rates*—not spending toll *revenues*—based on the needs of capital projects is incompatible with the VPPP statute.  DOT_0047572 ("Second, the *imposition*

of tolls under the CBDTP pilot project [not the spending of toll revenue] appears to be driven primarily by the need to raise revenue for the Metropolitan Transit Authority (MTA) system as opposed to the need to reduce congestion . . . I have concluded that VPPP does not authorize tolls that are calculated based on considerations separate from reducing congestion or advancing other road-related goals."). While federal law may permit the use of some excess toll revenue for local transit projects, setting toll rates with the primary goal of funding such projects is not consistent with the principles of congestion pricing and is thus inconsistent with the VPPP Statute permitting only congestion (or value) pricing programs.

The central purpose of a congestion pricing program is to manage and reduce traffic congestion—not to generate revenue. To do that, congestion pricing programs should be grounded in supply-and-demand economics: rates are set based on traffic levels and designed to influence traffic behavior. *See Congestion Pricing*, FHWA DOT Website (explaining that "[c]ongestion pricing—sometimes called value pricing—is a way of harnessing the power of the market to reduce the waste associated with traffic congestion"), https://ops.fhwa.dot.gov/congestionpricing/. But in contrast to the traditional model, Plaintiffs have adopted flat toll rates aimed at raising funds for local MTA projects. *See* DOT_47549–57. That does not look like a congestion pricing management tool—but a revenue-generating tool. The Secretary reasonably concluded that that approach was not authorized under the VPPP Statute.

Plaintiffs ask this Court to adopt an unreasonably expansive reading of the VPPP Statute— one that would allow states and municipalities to indefinitely continue any tolling scheme labeled as "congestion pricing," even if it is inconsistent with typical congestion pricing models and with agency goals and priorities. That reading is not tenable.

Because Plaintiffs do not meaningfully engage with the second rationale for the Secretary's

decision, most of their arguments simply miss their mark.  Their arguments about funding studies and using funds for local transit projects do not go to whether setting toll rates based on transit capital needs is consistent with the VPPP Statute.  *See* MTA Mem. 30–31.

**Defendants adequately considered Plaintiffs' reliance interests.**  An agency need only consider and weigh a party's valid, reasonable reliance interests—not "unreasonable" ones.  *See Libby Welding Co. v. United States*, 444 F. Supp. 987, 992 (D.D.C. 1977), *aff'd*, 595 F.2d 887 (D.C. Cir. 1979).  And the Secretary properly considered those here.  *See* DOT_47570–80. Plaintiffs assert three sources of reliance: the alleged prior interpretation of the VPPP Statute that authorizes cordon pricing, FHWA's 2019 statement that the VPPP Statute was the "best fit" for the CBDTP, and the Agreement itself.  None of these justifies the extraordinary reliance Plaintiffs now assert.

*First*, the purported prior interpretation of the VPPP Statute cannot reasonably have engendered serious reliance interests because (i) there is no formal or final expression of that view, and (ii) the Secretary can terminate VPPP agreements, and not just for material breach. See Defs.' Mem. 49–51.

*Second*, the FHWA statement that the VPPP Statute was the "best fit" for the CBDTP cannot generate reliance.  Plaintiffs omit a key qualification from the full FHWA statement. FHWA said: "[u]nder the various programs in Federal law that allow tolling of existing infrastructure, the VPPP appears to be the best potential fit, provided that the *overall purpose of variable tolling remains to reduce roadway traffic congestion.*" Decl. of TBTA C COO ¶ 10, ECF No. 85 (emphasis added). It is unreasonable for Plaintiffs to place any reliance on this statement. First, the statement is qualified: FHWA said the VPPP "appears" to be a "potential" fit. Second, the statement makes clear that the VPPP Statute would only be a good fit if the purpose of the

tolling was to reduce congestion—but that is not what Government Plaintiffs in fact did. As explained above, they set their tolling rates based on raising revenue—not based on "reducing congestion." And they implemented a flat-rate tolling scheme—rather than a "variable tolling" scheme. To rely on this statement, despite the fact that Government Plaintiffs have not created a tolling structure with the "overall purpose . . . to reduce roadway traffic congestion," is unreasonable. If anything, this statement from 2019 and its incompatibility with the tolling program Government Plaintiffs actually created shows that the CBDTP is both out of line with the statute and with the agency's interpretation of the statute. Finally, it is unreasonable to rely on this statement considering it was made when the CBDTP was a tentative and early-stage plan in 2019.

*Finally*, it is unreasonable for Plaintiffs to rely on the Agreement being permanent. As discussed above, the Agreement was for a *pilot* project that incorporated termination based on consideration of agency priorities or goals. Plaintiffs argue that it is not unreasonable to rely on the durability of the CBDTP because "it is fair to presume that the President will follow the law, including the APA." MTA Mem. 37. But Plaintiffs presume a violation of the law—before this Court has finally decided that is so. Defendants maintain that they have always had the ability to terminate the VPPP Agreement based on agency priorities or goals.

Plaintiffs conclude that no one would "propos[e] projects under the VPPP [to] undertake large-scale expenditures for a short-term project." *Id.* But that is wrong. No other VPPP agreement or program has ever looked like this in terms of scale or scope. The congressional appropriations for the entire program were never sufficient to sustain Government Plaintiffs' one project. They should have appropriately scoped their program to reflect that this was a pilot program and taken into account the history of other VPPPs.

To the extent there are any reliance interests in environmental impacts, the agency

considered these when it reviewed the prior NEPA analysis (*see, e.g.,* DOT_0000001-401) and Governor Murphy's letter describing adverse impacts in New Jersey. DOT_0047566.

Plaintiffs now also attempt to argue that Defendants ignored TBTA's reliance interests because TBTA issued $1.378 billion in short-term debt to be repaid in part by—and refinanced with bonds secured by—Program revenues over decades.  MTA Mem. 35.  Plaintiffs point to FHWA's Reevaluations and filings before this Court and others to show that FHWA knew that TBTA was relying on toll revenues for bonds.  *Id.*  However, Plaintiffs overstate this interest. TBTA claims it has issued $1.378B in debt – a $192.8M note, a $186M note, a $500M note, and a $500M term loan – associated with CBDTP revenues.  *See* Decl. of MTA CFO ¶¶ 13-14, ECF 84.  Plaintiffs repeatedly rely on the bond market, both as a reliance interest and as the primary asserted irreparable harm.  But these interests and harms are exaggerated and self-imposed.

- MTA issued short-term Bond Anticipation Notes (BANs) of $500 million and $186 million before the February 19, 2025 letter.  These BANs are not secured by CBDTP tolling revenues, and TBTA is under no obligation to use CBDTP revenues to back the BANs. Triborough Bridge and Tunnel Authority (MTA Bridges and Tunnels) Subordinate Revenue Bond Anticipation Notes, Series 2025A, https://www.mta.info/document/163941 at 1; Triborough Bridge and Tunnel Authority (MTA Bridges and Tunnels) Second Subordinate Revenue Bond Anticipation Notes, Series 2024A https://www.mta.info/document/161136 at 1.   The BANs make clear that the MTA "intends to pay principal of and interest on the Series 2025A Notes from amounts derived from the CBD Tolling Program," but the BANs are actually backed by all general revenues, separate Obligation Anticipation Notes, and the proceeds of future Take-Out Bonds, none of which is required to be backed by CBDTP tolling revenues.  *Id.*  Thus, there is no direct

reliance on the CBDTP for these bonds because they are not directly secured by CBDTP tolling revenues.

- The $192.8M BAN was issued in *June 2021* to pay for capital costs associated with the tolling infrastructure. Triborough Bridge and Tunnel Authority (MTA Bridges and Tunnels) Second Subordinate Revenue Bond Anticipation Notes, Series 2021A,://www.mta.info/document/41136. It does not reference paying for any of this BAN through revenues generated by the CBDTP. Given that the bond was issued long before the Agreement was even signed, there could be no valid reliance interest on the Agreement that Defendants needed to consider.

- The May 2025 $500M term loan (ECF No. 85 ¶ 15) is in fact backed by CBDTP Net Revenues as security but it was entered into on May 2, 2025, well after litigation commenced. Loan Agreement Dated as of May 2, 2025 between Triborough Bridge and Tunnel Authority and Custodian on Behalf pf 2025 Loan Holding – 1, https://www.mta.info/document/172091 ("Loan Agreement"). Also, before this loan was issued, Plaintiffs received the notice of termination requesting the "orderly cessation of tolls." DOT_0047573. Governor Hochul stated that instead they would engage in "orderly resistance." MTA Live, *MTA Board Meeting – 2/26/2025*, YouTube (Feb. 26, 2025), https://youtu.be/QqWQcOATBa8?t=4770. Plaintiffs understood the situation at hand but still issued the loan. Instead of backing it with general revenues like previous BANs, they themselves heightened their risk by securing the loan with CBDTP revenue—Government Plaintiffs cannot manufacture reliance interests when they created the harm themselves. And in any case, the Secretary did consider the relevant reliance interests—including Government Plaintiffs' reliance. With respect to Government Plaintiffs' expenditures, the

Secretary acknowledged and addressed that costs had been incurred but emphasized that the Agreement approved a pilot project and that many of Plaintiffs' expenditures predated the Agreement. *See* DOT_47570–74, 47577–80. Thus, contrary to Plaintiffs' assertion that Defendants ignored TBTA's reliance interest in incurring expenses of over $500 million to establish the Program, including roughly $12 million in monthly operational costs, MTA Mem. 35, these costs were considered but weighed against other competing interests.

### III.    The Court should not grant injunctive relief.

Any remedy in an APA case is typically limited to setting aside any unlawful action and remanding for the agency to reconsider and correct its errors. *See Ward v. Brown*, 22 F.3d 516, 522 (2d Cir. 1994). Plaintiffs agree that the "[t]he APA instructs courts to hold unlawful and set aside agency actions found to be arbitrary, capricious, … or otherwise not in accordance with law… the normal remedy in a successful APA challenge is to set aside—that is, vacate—the final agency action at issue." MTA Mem. 37 (quotation modified).

Yet, Plaintiffs depart from this principle and now ask the court to permanently enjoin Defendants from terminating the VPPP Agreement unless the Project Sponsors agree or Defendants demonstrate that the Project Sponsors failed to comply with the Agreement's material terms and conditions. *Id.* at 38–41.

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). "If a less drastic remedy (such as partial or complete vacatur of [the agency's] decision) [i]s sufficient to redress [Plaintiffs'] injury, no recourse to the additional and extraordinary relief of an injunction [i]s warranted." *New York v. Wolf*, No. 20-CV-1127 (JMF), 2021 WL 185190, at *1 (S.D.N.Y. Jan. 19, 2021) (citing *Monsanto* 561 U.S. at 165–66).

Plaintiffs urge the Court to impose such a "drastic and extraordinary remedy" for two reasons: that there is supposedly a "sham" administrative process and that the process impairs their ability to issue bonds. Nothing in the record supports finding that the administrative process is a sham. The agency has repeatedly extended the deadlines for Plaintiffs and solicited information from them to consider in making its final decision. The Secretary's rationale for terminating the Agreement has been consistent throughout that unfolding process. Indeed, it would be inappropriate to find that the unfinished administrative process was a sham before it was even completed.

As for Plaintiffs' ability to issue bonds, that ability is not impaired. As outlined above, it recently issued a $500 million term loan after this litigation had commenced and before it had received a preliminary injunction ruling in its favor.

In any event, Plaintiffs admitted to the Court that Defendants would "comply with your Honor's order declaring that the cancellation of the VPPP Agreement was improper and illegal," May 27 Tr. 16:6–8, and "remand for the agency to do one of two things" is appropriate if the original agency action's "grounds are inadequate," *id.* at 58:9–20. Nothing since those admissions should sway the Court from the usual remedy in APA cases. Indeed, if the Court does enter a permanent injunction, it will be faced with superintending this complex—and, by Plaintiffs' lights, permanent—federal program.

### A. Plaintiffs do not establish irreparable injury or inadequate remedies at law.

Plaintiffs cannot establish irreparable harm nor inadequate remedies at law because their harms are economic, self-inflicted, speculative, and should be pursued in the Court of Federal Claims.

Plaintiffs argue that they face irreparable harm if the VPPP Agreement is terminated because it endangers the ability to issue bonds and creates budget uncertainty. MTA Mem. 39.

46

Yet, as outlined above, Plaintiffs have been issuing bonds during this litigation, and can—and have in the past—issued bonds that are not secured by CBDTP revenue. They have not quantified this danger or provided any evidence that the danger will materialize or has ever materialized.

Plaintiffs also argue that they would suffer irreparable harm from the threatened compliance measures. MTA Mem. 39. However, these compliance measures are speculative and have not been determined and may never be imposed. To the extent they exist, they also depend on independent third parties' decisions. Moreover, Plaintiffs failed to move on their claims regarding these compliance measures in summary judgment. If Plaintiffs felt they might face irreparable harm from compliance measures, they should have moved the Court for a ruling.

Plaintiffs further argue that halting the VPPP due to threats from FHWA would cause irreparable harm from the unrecoverable loss of public funds, delays to critical transit improvements, and the inability of New York to effectuate a state law "enacted by representatives of its people." MTA Mem. 39. Again, these are speculative harms with insufficient support in the record. Plaintiffs have not described how any critical transit improvements would be delayed. And if the agency's letters are set aside, Plaintiffs may toll under the terms of the VPPP Agreement, gain public funds, and effectuate its state law. An injunction is not necessary to avoid those harms.

Nor is there any reason to think the agency would reissue "under a new day or by changing [it] in some immaterial way." *Id.* at 40. As stated at the May 27 Hearing, "[a]gencies are typically, and by virtue of the final agency action requirement for jurisdiction under the APA, allowed to continue and fix their own mistakes." May 27 Tr. 55:14–18.

### B. The public interest and balance of equities weigh against an injunction.

The public interest and balance of equities weigh against an injunction because the Federal Government should have authority over the continuation of discretionary federal programs. An

injunction would divest the Federal Government of power over its own program. There is also a public interest in saving individuals from paying illegitimately collected tolls. Plaintiffs argue that these tolls could be refunded. May 27 Tr. 56:14-17. The tolls impose externalities that cannot be refunded. For example, unlawfully collected tolls could not be recovered by taxi riders, rideshare riders, and food delivery recipients who pay the toll indirectly.

Plaintiffs argue that the public interest supports an injunction because there is no public interest in an unlawful agency action, and an injunction would preserve Plaintiffs' transportation infrastructure and the VPPP's "superior environmental outcomes," "increased productivity, improvements to health and safety, more instruction time for schoolchildren, and beneficial economic outcomes." MTA Mem. 39–40.

While Plaintiffs' claim that outcomes have improved may hold true for some living and working in Manhattan, outcomes have worsened for others both in and out of the CBD. Weighing those competing policy interests in the context of this federal program is the province of democratically accountable Executive officials, not Plaintiffs. Additionally, Plaintiffs' highly speculative assertions do not outweigh the Government's overarching interest in advancing policy goals that protect the American people from unnecessary fees, especially those most vulnerable to fluctuations in day-to-day monetary demands.

## IV.    Remand is the appropriate relief for any violation.

As stated *supra*, any remedy in an APA case is typically limited to setting aside any unlawful action and remanding the matter to the agency for it to reconsider and correct its errors. *See Calcutt v. FDIC*, 598 U.S. 623, 629 (2023) (per curiam); *Gonzales v. Thomas*, 547 U.S. 183, 187 (2006) (per curiam) (remanding based on court's failure to "appl[y] the ordinary remand rule" (quotation modified)); *Ward*, 22 F.3d at 522. Plaintiffs also ask for a declaration that "Defendants'

termination of the VPPP Agreement was unlawful, that any attempt to enforce the February 19 Letter would be unlawful, and that Defendants may not terminate except with the Project Sponsors' approval." MTA Mem. 41–42. This declaration is even broader than their request for a permanent injunction. It would also be legally incorrect. Plaintiffs admit elsewhere that FHWA could terminate for breaching a material term. This overbroad declaration would strip the Government of that conceded right, and underscores that Plaintiffs are seeking relief that neither Congress nor the agency has authorized.

Plaintiffs argue that remand is not appropriate because it would be futile as there is no legal basis for the Department to terminate the contract. *Id.* at 38. But a declaration that there is no legal basis for termination goes beyond the issues in this case. What is challenged is the decision to terminate the VPPP on specific rationales—not all possible rationales. Their request lays bare their desire for unilateral control over a federal pilot program.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court should dismiss all claims or grant Defendants summary judgment on all claims.

Dated: July 18, 2025.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division

CHARLES E.T. ROBERTS
Counsel to the Assistant Attorney General
Civil Division

STEPHEN M. ELLIOTT
Assistant Branch Director
Federal Programs Branch

*/s/ Michael Bruns*
Michael Bruns
Samuel S. Holt
Trial Attorneys
Federal Programs Branch
Civil Division, Department of Justice
1100 L Street NW
Washington, DC 20005
Telephone: 202-514-4011
Email: michael.bruns@usdoj.gov