# EXHIBIT A

# United States Court of Appeals
## For the First Circuit

No. 25-1343

COMMONWEALTH OF MASSACHUSETTS; DANA NESSEL, on behalf of the
people of the State of Michigan; STATE OF ILLINOIS; STATE OF
ARIZONA; STATE OF CALIFORNIA; STATE OF CONNECTICUT; STATE OF
COLORADO; STATE OF HAWAII; STATE OF MAINE; STATE OF MARYLAND;
STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE
OF DELAWARE; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF
NORTH CAROLINA; STATE OF OREGON; STATE OF RHODE ISLAND; STATE OF
VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN,

Plaintiffs, Appellees,

v.

NATIONAL INSTITUTES OF HEALTH; JAY BHATTACHARYA, M.D., Ph.D. in
the official capacity as Director of the National Institutes of
Health; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (HHS);
ROBERT F. KENNEDY, JR., in the official capacity as Secretary of
the U.S. Department of Health and Human Services,

Defendants, Appellants.

———————————

No. 25-1344

ASSOCIATION OF AMERICAN MEDICAL COLLEGES; THE AMERICAN
ASSOCIATION OF COLLEGES OF PHARMACY; THE ASSOCIATION OF SCHOOLS
AND PROGRAMS OF PUBLIC HEALTH; THE CONFERENCE OF BOSTON TEACHING
HOSPITALS, INC.; GREATER NEW YORK HOSPITAL ASSOCIATION,

Plaintiffs, Appellees,

v.

NATIONAL INSTITUTES OF HEALTH; JAY BHATTACHARYA, M.D., Ph.D. in
the official capacity as Director of the National Institutes of
Health; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (HHS);
ROBERT F. KENNEDY, JR., in the official capacity as Secretary of
the U.S. Department of Health and Human Services,

Defendants, Appellants.

———————————

No. 25-1345

ASSOCIATION OF AMERICAN UNIVERSITIES; AMERICAN COUNCIL ON
EDUCATION; ASSOCIATION OF PUBLIC AND LAND-GRANT UNIVERSITIES;
BRANDEIS UNIVERSITY; BROWN UNIVERSITY; CARNEGIE MELLON
UNIVERSITY; THE REGENTS OF THE UNIVERSITY OF CALIFORNIA; THE
UNIVERSITY OF CHICAGO; CORNELL UNIVERSITY; THE GEORGE WASHINGTON
UNIVERSITY; JOHNS HOPKINS UNIVERSITY; MASSACHUSETTS INSTITUTE OF
TECHNOLOGY; TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA;
UNIVERSITY OF ROCHESTER; TRUSTEES OF TUFTS COLLEGE; THE
CALIFORNIA INSTITUTE OF TECHNOLOGY,

Plaintiffs, Appellees,

v.

DEPARTMENT OF HEALTH AND HUMAN SERVICES; NATIONAL INSTITUTES OF
HEALTH; ROBERT F. KENNEDY, JR., in the official capacity as
Secretary of the U.S. Department of Health and Human Services;
JAY BHATTACHARYA, M.D., Ph.D. in the official capacity as
Director of the National Institutes of Health,

Defendants, Appellants.

_____

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Angel Kelley, U.S. District Judge]

_____

Before

Rikelman, Lipez, and Howard, Circuit Judges.

_____

Jennifer Utrecht, with whom Yaakov M. Roth, Acting Assistant
Attorney General, Brian C. Lea, Deputy Associate Attorney General,
Eric D. McArthur, Deputy Assistant Attorney General, Courtney L.
Dixon, and Jeffrey E. Sandberg, Attorneys, U.S. Department of
Justice, were on brief, for appellants.

Paul D. Clement, with whom James Y. Xi, Kyle R. Eiswald,
Clement & Murphy, PLLC, John P. Bueker, Douglas H. Hallward-
Driemeier, Stephanie A. Webster, Ropes & Gray LLP, Ishan K. Bhabha,
Lindsay C. Harrison, Lauren J. Hartz, Elizabeth Henthorne, Zachary
C. Schauf, Adam G. Unikowsky, Shoba Pillay, and Jenner & Block LLP
were on brief, for appellees.

David C. Kravitz, State Solicitor, with whom Andrea Joy Campbell, Attorney General of Massachusetts, Katherine Dirks, Chief State Trial Counsel, Allyson Slater, Chief, Reproductive Justice Unit, Chris Pappavaselio, Assistant Attorney General, Kwame Raoul, Attorney General of Illinois, Alex Hemmer, Deputy Solicitor General, R. Sam Horan, Assistant Attorney General, Dana Nessel, Attorney General of Michigan, Linus Banghart-Linn, Chief Legal Counsel, Neil Giovanatti, Joshua S. Smith, Kris Mayes, Attorney General of Arizona, Joshua D. Bendor, Solicitor General, Rob Bonta, Attorney General of California, Neli Palma, Senior Assistant Attorney General, Emilio Varanini, Supervising Deputy Attorney General, Sophia Tonnu, Daniel Ambar, Deputy Attorneys General, Philip J. Weiser, Attorney General of Colorado, Shannon Stevenson, Solicitor General, William Tong, Attorney General of Connecticut, Michael K. Skold, Solicitor General, Kathleen Jennings, Attorney General of Delaware, Ian R. Liston, Director of Impact Litigation, Vanessa L. Kassab, Deputy Attorney General, Anne E. Lopez, Attorney General of Hawai'i, David D. Day, Special Assistant to the Attorney General, Kaliko'onālani D. Fernandes, Solicitor General, Aaron M. Frey, Attorney General for Maine, Sean D. Magenis, Thomas A. Knowlton, Anthony G. Brown, Attorney General of Maryland, Julia Doyle, Solicitor General, Adam D. Kirschner, Senior Assistant Attorney General, Keith Ellison, Attorney General of Minnesota, Elizabeth C. Kramer, Solicitor General, Aaron D. Ford, Attorney General of Nevada, Heidi Parry Stern, Solicitor General, Matthew J. Platkin, Attorney General of New Jersey, Angela Cai, Executive Assistant Attorney General, Raúl Torrez, Attorney General of New Mexico, Anjana Samant, Deputy Counsel for Impact Litigation, Letitia James, Attorney General of New York, Ester Murdukhayeva, Deputy Solicitor General, Rabia Muqaddam, Special Counsel for Federal Initiatives, Molly Thomas-Jensen, Special Counsel, Jeff Jackson, Attorney General of North Carolina, Laura Howard, Chief Deputy Attorney General, Daniel P. Mosteller, Associate Deputy Attorney General, Dan Rayfield, Attorney General of Oregon, Benjamin Gutman, Solicitor General, Robert A. Koch, Senior Assistant Attorney General, Peter F. Neronha, Attorney General of Rhode Island, Jordan Broadbent, Special Assistant Attorney General, Charity R. Clark, Attorney General of Vermont, Jonathan T. Rose, Solicitor General, Nicholas W. Brown, Attorney General of Washington, Spencer W. Coates, Ellen Range, Assistant Attorneys General, Joshua L. Kaul, Attorney General of Wisconsin, and Aaron J. Bibb, Assistant Attorney General, were on brief, for appellees.

Alexandra H. Deal, Paik Deal, LLP, Kelsey L. McLean, Alexandra Zegger, and PETA Foundation, on brief for People for the Ethical Treatment of Animals, Inc. as amicus curiae in support of neither

party.

David J. Zimmer and Zimmer, Citron & Clarke LLP, on brief for the American Association of University Professors as amicus curiae in support of appellees.

Jessica L. Ellsworth, Stephanie J. Gold, Aleks Sverdlov, Michael J. West, Jackson B. Skeen, and Hogan Lovells US LLP, on brief for the National Association of College and University Business Officers and Seventeen Other Higher Education Associations as amici curiae in support of appellees.

Joshua B. Shiffrin, Jacob Karabell, and Bredhoff & Kaiser, P.L.L.C., on brief for United Auto Workers as amicus curiae in support of appellees.

Adam Cederbaum, Jonathan B. Miller, Elaine Poon, and Public Rights Project, on brief for Local Governments and Local Government Leaders as amici curiae in support of appellees.

Phillip R. Malone, Nina K. Srejovic, and Juelsgaard Intellectual Property and Innovation Clinic, on brief for Scholars of Economics and Innovation as amici curiae in support of appellees.

Molly A. Meegan, Francisco M. Negrón, Jr., Nicole A. Saharsky, Minh Nguyen-Dang, Wajdi C. Mallat, Sydney N. Royer, and Mayer Brown LLP, on brief for American College of Obstetricians and Gynecologists, American College of Physicians, American Psychiatric Association, American College of Chest Physicians, American College of Emergency Physicians, American College of Radiology, American Geriatrics Society, American Society for Clinical Pathology, American Urological Association, Council of Medical Specialty Societies, and Society for Maternal-Fetal Medicine as amici curiae in support of appellees.

Steve W. Berman, John M. DeStefano, Lauriane Williams, Sophia Weaver, and Hagens Berman Sobol Shapiro LLP, on brief for Members of the U.S. Congress as amici curiae in support of appellees.

---

January 5, 2026

---

**LIPEZ**, **Circuit Judge**.  On the night of Friday, February 7, 2025, the National Institutes of Health ("NIH"), an agency within the Department of Health and Human Services ("HHS"), issued a "Supplemental Guidance" to the 2024 NIH Grants Policy Statement, Notice Number NOT-OD-25-068.  In fewer than three pages, NIH announced that it would be capping the reimbursement of the "indirect costs" associated with NIH-funded research at 15%, effective the following business day, Monday, February 10.  On that Monday, three plaintiff groups filed suit in the District of Massachusetts, arguing, among other things, that NIH's action violated a congressional appropriations rider and contravened HHS's own regulations.

The district court granted the plaintiffs' ex parte requests for a temporary restraining order.  Subsequently, after carefully considering the parties' briefing and arguments, as well as the more than eighty declarations submitted by the plaintiffs, the court issued a nationwide preliminary injunction barring NIH from taking any steps to implement, apply, or enforce the Supplemental Guidance.  At the parties' request, the court converted its preliminary injunction into a permanent injunction and vacated the Supplemental Guidance in its entirety.

We affirm the decision of the district court.

- 5 -

I.

A.  **Background**[1]

NIH is responsible by statute for encouraging, supporting, and promoting research projects that relate "to the causes, diagnosis, treatment, control, and prevention of physical and mental diseases and impairments." 42 U.S.C. § 241(a). NIH is the largest source of funding for medical research in the United States. In 2023 alone, it provided more than $35 billion in grants to outside entities, such as universities and hospitals, which supported the work of more than 300,000 researchers. NIH-funded research has led to lifesaving scientific breakthroughs, including the creation of new treatments for diseases like cancer and diabetes, the advancement of gene and RNA therapies, and the development of drugs to treat illnesses such as HIV and acute lymphoblastic leukemia. NIH-funded research has also brought about a decline in death rates from acute conditions like heart attacks and strokes, a better understanding of various infectious diseases, a decrease in maternal death and morbidity, and an increase in the ability to detect ovarian tumors and diagnose Alzheimer's disease. In short, the public-health benefits of NIH-funded research are enormous.

---

[1] The background facts are undisputed unless otherwise noted.

Pursuant to regulations promulgated by HHS,[2] NIH funds research conducted by outside entities on a reimbursement basis rather than via lump-sum awards, meaning that grant recipients recover their actual, documented research costs. See generally 45 C.F.R. pt. 75 app. III.[3] Recipients are eligible to recover two types of research costs: direct costs and indirect costs. See id. §§ 75.412-.414. Direct costs are research costs attributable to a single research project: for example, the salary of a researcher who works on only one project or expenditures on materials used for only one project. See id. § 75.413(a)-(b). Indirect costs, also known as facilities and administration ("F&A") costs, are research costs that cannot be "readily and specifically" attributed to a single research project. Id. pt. 75 app. III.A; see also id. § 75.414(a). Facilities costs include "equipment and

---

[2] Other federal agencies have similarly issued regulations governing the grant awards process. See, e.g., 2 C.F.R. §§ 200.0-.521 (uniform guidelines issued by the Office of Management and Budget governing administrative requirements, cost principles, and audit requirements for federal awards); id. §§ 300-6099 (various agencies adopting guidelines in full or in part). Because this case involves a challenge to an action by NIH, our focus is on the regulations promulgated by HHS.

[3] As of October 1, 2025, Part 75 of Title 45 of the Code of Federal Regulations has been recodified in Part 200 of Title 2. See Health and Human Services Adoption of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 89 Fed. Reg. 80055, 80070 (Oct. 2, 2024). Because the events relevant to this appeal took place before that change was effectuated, we cite to the regulations as they existed in Part 75 of Title 45.

capital improvement" and "operations and maintenance expenses," id. § 75.414(a): for example, expenditures to build and maintain state-of-the-art laboratories and clinical spaces, purchase sophisticated technology for experiments, dispose of hazardous waste, pay for utilities, and obtain secure data storage. Administration costs include the salaries of administrative, accounting, and information technology personnel and expenditures on compliance infrastructure.[4] See, e.g., id. The labels "direct" and "indirect" thus refer to different categories of research costs but do not indicate that one type of expenditure is more or less critical to research than the other. Indeed, they are both essential to research.

Under HHS's regulations, each grant recipient is instructed to identify and aggregate its indirect costs. See id. pt. 75 app. III.C.1.a, III.C.12. That aggregate amount is divided by the recipient's modified total direct costs[5] "to arrive at" an indirect cost rate, expressed as a percentage. Id. pt. 75 app. III.C.1-2. The calculated rate forms the basis for negotiations between HHS (or another agency, as appropriate)[6] and the grant

_____

[4] NIH's reimbursement of "administrative costs" has been capped at 26% since 1991. See 45 C.F.R. pt. 75 app. III.C.8.a.

[5] Modified total direct costs are a defined subset of a recipient's direct costs. See 45 C.F.R. § 75.2.

[6] The agency responsible for negotiating with the grant recipient is known as the "cognizant" agency. For institutions of higher education, the cognizant agency is either HHS or the

recipient, during which a negotiated indirect cost reimbursement rate is agreed upon.[7]  See _id._ pt. 75 app. III.C.10-12.  The negotiated rate is then memorialized in a negotiated indirect cost rate agreement (a "NICRA"), which "must be accepted by all" federal agencies (not just HHS) for the term of the NICRA, typically two to four years.  _Id._ § 75.414(c)(1); _see also_ _id._ pt. 75 app. III.C.4, III.C.7.  Whenever the recipient is awarded a grant by any federal awarding agency, the awarding agency generally "must use" the NICRA "in effect at the time of the initial award throughout the life of the" award.[8]  _Id._ pt. 75 app. III.C.7.a. So, for example, if the NICRA in effect at the time a recipient is awarded a four-year, $100,000 grant memorializes a 30% negotiated indirect cost reimbursement rate, that 30% rate will apply for all four years of the award.  Over four years, the recipient will be reimbursed for $100,000 in direct costs and $30,000 in indirect costs.

---

Department of Defense, "normally depending on which of the two agencies . . . provides more funds to the educational institution for the most recent three years."  45 C.F.R. pt. 75 app. III.C.11.a(1).  For nonprofit organizations, the cognizant agency is the "agency with the largest dollar value of [f]ederal awards with [that] organization."  _Id._ pt. 75 app. IV.C.2.a.

[7] This negotiation process is separate from the process to apply for specific federal grant awards.

[8] Predetermining negotiated indirect cost reimbursement rates in this way offers several "advantages," including "facilitat[ing] the preparation of [the grant recipients'] budgets."  45 C.F.R. pt. 75 app. III.C.4.

There is a carefully circumscribed procedure that controls any deviation from the negotiated rate. "An HHS awarding agency may use a rate" other than the negotiated indirect cost reimbursement rate "for a class of [f]ederal awards or a single [f]ederal award," as relevant here, "only . . . when approved by a [f]ederal awarding agency head or delegate based on documented justification as described in paragraph (c)(3)" of 45 C.F.R. § 75.414.[9] Id. § 75.414(c)(1). Paragraph (c)(3), in turn, provides that "[t]he HHS awarding agency must implement, and make publicly available, the policies, procedures and general decision making criteria that their programs will follow to seek and justify deviations from negotiated rates." Id. § 75.414(c)(3). The awarding agency is also required to "include in the notice of funding opportunity" -- i.e., the announcement that funding is available for a particular area of research, see id. pt. 75 app. I -- "the policies relating to indirect cost rate reimbursement." Id. § 75.414(c)(4). By doing so, the agency provides a prospective grant recipient with "sufficient information to . . . make an informed decision about whether to submit an application." Id. § 75.203(c)(2).

---

[9] Section 75.414(c)(1) also provides that "[a]n HHS awarding agency may use a rate" other than the negotiated rate "when required by [f]ederal statute or regulation." 45 C.F.R. § 75.414(c)(1). That provision is not at issue in this case.

Although the described "methodology for negotiating indirect costs has been in place since 1965," S. Rep. No. 115-150, at 109 (2017), it has not existed without debate.  Indeed, at several points, presidential administrations and members of Congress have proposed various limitations on the reimbursement of indirect costs.  See Marcy E. Gallo & Laurie Harris, Cong. Rsch. Serv., R48540.2, Universities and Indirect Costs for Federally Funded Research 8-11 (2025).  With few exceptions, those efforts to change the methodology have failed.  See id.

One such failed effort is particularly relevant here. In 2017, the first Trump administration issued a budget proposal for 2018 advocating a 10% cap on NIH's reimbursement of indirect costs.  The proposal explained that reducing expenditures on indirect costs would allow "available funding [to] be better targeted toward supporting the highest priority research on diseases that affect human health" and would "bring NIH's reimbursement rate for indirect costs more in line with the reimbursement rate used by private foundations."  Congress rejected that proposal, with the House Appropriations Committee explaining that it "would have a devastating impact on biomedical research across the country," H.R. Rep. No. 115-244, at 50 (2017), and the Senate Appropriations Committee noting that it "would radically change the nature of the [f]ederal [g]overnment's relationship with the research community" and "jeopardiz[e]

biomedical research nationwide," S. Rep. No. 115-150, at 109.  In addition to refusing to adopt the Trump administration's proposal, Congress enacted an appropriations rider "directing NIH to continue reimbursing institutions for F&A costs" and prohibiting NIH from using appropriated funds "to implement any further caps on F&A cost reimbursements."  H.R. Rep. No. 115-244, at 50; see Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 226, 132 Stat. 348, 740.

In its budget proposal issued in 2019, the Trump administration acknowledged that the appropriations rider "prohibit[s] [NIH] by law from reducing grantee administrative costs and shifting these resources to support direct research" and urged Congress to "eliminate the current prohibition."  Congress declined to do so and instead reenacted the appropriations rider. It has continued to do so in every subsequent year.  See, e.g., Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 224, 138 Stat. 460, 677.

As noted, on February 7, 2025, NIH -- invoking its deviation authority under 45 C.F.R. § 75.414(c) -- announced that it would impose "a standard indirect rate of 15% across all NIH grants for indirect costs in lieu of a separately negotiated rate for indirect costs in every grant."

**B.  Procedural History**

Following the NIH announcement, three plaintiff groups filed the suits underlying this appeal in the District of Massachusetts.  The first group consists of twenty-two attorneys general suing on behalf of their states, the second group consists of five medical associations, and the third group consists of sixteen higher education associations and universities.  Each plaintiff group alleged that the Supplemental Guidance is unlawful on multiple grounds and sought injunctive and declaratory relief.  That same day, the district court granted two of the plaintiff groups' ex parte motions for a temporary restraining order (denying the third as moot the next day), and the court subsequently extended those orders while it considered the parties' arguments for and against a preliminary injunction.

Then, on March 5, 2025, the district court granted the plaintiffs' requests for a preliminary injunction based on three determinations.  First, the court concluded that it had subject-matter jurisdiction over the plaintiffs' claims, rejecting NIH's argument that those claims were for breaches of contract and thus belonged in the Court of Federal Claims (the "CFC") pursuant to the Tucker Act, 28 U.S.C. § 1491.  Second, on the merits, the court held that the Supplemental Guidance likely transgresses the appropriations rider, contravenes HHS's regulations, represents an arbitrary and capricious agency action, is procedurally infirm

because it was issued without notice and comment, and impermissibly applies retroactively.  Third, the court determined that the remaining preliminary-injunction factors favored granting relief. The district court thus enjoined NIH "from taking any steps to implement, apply, or enforce the Supplemental Guidance."  At the parties' request, the court subsequently converted the preliminary injunction into a permanent injunction and vacated the Supplemental Guidance.  NIH timely appealed.

## II.

NIH argues that the district court's decision to permanently enjoin the enforcement of and vacate the Supplemental Guidance was flawed in several respects.  To begin, NIH contends that the district court erred in exercising jurisdiction pursuant to the Administrative Procedure Act's (the "APA's") waiver of sovereign immunity.  As to the merits, NIH takes issue with the district court's holdings on each of the plaintiffs' claims.  For the reasons we shall explain, we agree with the district court that it had jurisdiction over the plaintiffs' claims and that NIH's action is unlawful because it violates a statute and regulations. We therefore find it unnecessary to reach NIH's challenges to the district court's conclusions that the Supplemental Guidance is arbitrary and capricious, required notice-and-comment rulemaking, and is impermissibly retroactive.

## A.  Jurisdiction

The threshold question before us is whether the district court properly exercised subject-matter jurisdiction over the plaintiffs' claims.  The United States and its agencies are generally immune from suit in federal court absent an unequivocal waiver of sovereign immunity.  The APA provides a clear but limited sovereign-immunity waiver for claims against the United States "seeking relief other than money damages" brought by persons "adversely affected or aggrieved by agency action."  5 U.S.C. § 702.  Section 702's waiver does not apply, however, "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."  Id.  Via the Tucker Act, Congress granted the CFC exclusive jurisdiction over, as relevant here, claims "founded . . . upon any express or implied contract with the United States."  28 U.S.C. § 1491(a)(1); see Am. Sci. & Eng'g, Inc. v. Califano, 571 F.2d 58, 62 (1st Cir. 1978) ("[T]he jurisdiction of the [CFC] over suits grounded in contract is exclusive.").  By granting the CFC sole jurisdiction to hear "contract actions . . . against the government," the Tucker Act "impliedly forbids" bringing such actions "in a federal district court" pursuant to the APA's sovereign-immunity waiver.  Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys., 357 F.3d 62, 68 (D.C. Cir. 2004).  A lawsuit that "is essentially

a contract dispute" thus belongs in the CFC rather than in a district court. <u>Am. Sci. & Eng'g</u>, 571 F.2d at 61.

Courts have long contemplated the interplay between the APA and the Tucker Act, developing a robust body of caselaw to determine whether an ostensibly APA-based claim is a breach-of-contract claim in disguise. <u>See</u>, <u>e.g.</u>, <u>Megapulse, Inc. v. Lewis</u>, 672 F.2d 959, 964-71 (D.C. Cir. 1982). To resolve the jurisdictional challenge in this appeal, however, we need look no further than the Supreme Court's recent emergency decisions in <u>Department of Education</u> v. <u>California</u>, 604 U.S. 650 (2025) (per curiam), and <u>NIH</u> v. <u>American Public Health Association</u> ("<u>APHA</u>"), 145 S. Ct. 2658 (2025) (mem.).[10]

<u>Department of Education</u> concerned the sudden terminations of more than 100 grants previously awarded to entities that provide for teacher and school leader recruitment and training. <u>See</u> <u>California</u> v. <u>Dep't of Educ.</u>, 132 F.4th 92, 95 (1st Cir. 2025). Several states brought suit challenging the terminations as contrary to the APA, and the district court quickly issued a temporary restraining order that required the Department

---

[10] Both decisions were issued after the district court rendered its decision in this case, and <u>APHA</u> was issued after the parties completed briefing on appeal. <u>See</u> <u>Dep't of Educ.</u>, 604 U.S. at 650 (issued on April 4, 2025); <u>APHA</u>, 145 S. Ct. at 2658 (issued on August 21, 2025).

of Education to "restore the status quo as it stood prior to the purported terminations." Id. at 95-96.

After we declined to stay the district court's order pending appeal, see id. at 101, the Supreme Court granted the Department of Education's application for a stay, see Dep't of Educ., 604 U.S. at 652. In its short opinion, the Court explained that while "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds," the Court has recognized that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the [d]istrict [c]ourt ordered here." Id. at 651 (first quoting Bowen v. Massachusetts, 487 U.S. 879, 910 (1988); and then quoting Great-W. Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 212 (2002)). The Supreme Court thus concluded that the Department of Education was "likely to succeed in showing the [d]istrict [c]ourt lacked jurisdiction." Id.

APHA involved a newly announced NIH policy, carried out through a series of guidance documents, "prohibit[ing] NIH from funding scientific research grants in certain categories," such as those "studies based on diversity, equity, and inclusion (DEI) and gender identity." Am. Pub. Health Ass'n v. NIH, 145 F.4th 39, 43, 45 (1st Cir. 2025) (citation modified). As a direct result of its new policy, NIH terminated hundreds of existing research grants.

See id. at 45-47. Following a bench trial, the district court entered two orders, separately setting aside both the new policy and the resulting grant terminations as unlawful under the APA. See id. at 43-44. Again, we declined to stay the district court's orders pending appeal. See id. at 44.

NIH then applied to the Supreme Court for a stay. See APHA, 145 S. Ct. at 2659. The application was granted in part and denied in part, with Justice Barrett casting the deciding vote. See id. In her controlling concurrence,[11] Justice Barrett explained that, for the reasons stated in Department of Education, "the [d]istrict [c]ourt likely lacked jurisdiction to hear challenges to the grant terminations, which belong in the [CFC]." APHA, 145 S. Ct. at 2661 (Barrett, J., concurring). As for the challenge to the guidance itself, however, Justice Barrett explained that "the [d]istrict [c]ourt was likely correct to conclude that it had jurisdiction." Id. She observed that "[p]laintiffs frequently seek vacatur of internal agency guidance on arbitrary-and-capricious grounds in district court," and she reasoned that the fact "[t]hat the agency guidance discusses

---

[11] See Marks v. United States, 430 U.S. 188, 193 (1977) ("When a fragmented [Supreme] Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'" (omission in original) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n. 15 (1976))).

internal policies related to grants does not transform a challenge to that guidance into a claim 'founded . . . upon' contract that only the CFC can hear." Id. (omission in original) (quoting 28 U.S.C. § 1491(a)(1)). Justice Barrett also pointed out that "[v]acating the guidance does not reinstate terminated grants," making it appropriate to "channel[] challenges to the grant terminations and guidance to different forums." Id.

These two decisions -- which arose in "like cases" -- inform our jurisdictional analysis here, despite their lack of conclusiveness as to the merits. Trump v. Boyle, 145 S. Ct. 2653, 2654 (2025). Indeed, a straightforward application of APHA resolves the jurisdictional inquiry. Justice Barrett's concurrence in that case plainly distinguishes between challenges to agency-wide policies, which belong in district court, and challenges to the withholding of contractually awarded funds that result from those policies, which belong in the CFC. See APHA, 145 S. Ct. at 2661 (Barrett, J., concurring). Department of Education involved only the latter -- that is, it addressed only challenges to the actual terminations of the recipients' grants. See Dep't of Educ., 604 U.S. at 650. The district court's order temporarily restraining the enforcement of those terminations was, in effect, an order requiring the terminations to be undone, thus forcing the Department of Education "to pay money" that it had been withholding. Id. at 651 (quoting Great-

W., 534 U.S. at 212).  The same is true with respect to the district court's order setting aside the grant terminations in APHA.  See APHA, 145 S. Ct. at 2659.  That vacatur effectively told NIH that it had to reinstate the terminated grant agreements, thus requiring NIH "to pay money" based on them.  Dep't of Educ., 604 U.S. at 651 (quoting Great-W., 534 U.S. at 212); see APHA, 145 S. Ct. at 2659.

Unlike in Department of Education and APHA, the plaintiffs in this case do not challenge any withholding of funds promised under grant agreements.  So, contrary to NIH's assertion at oral argument that the district court's order "require[s] payment under the contract," the district court's ruling is not an order "to pay money."  Dep't of Educ., 604 U.S. at 651 (quoting Great-W., 534 U.S. at 212).  Instead, the plaintiffs challenge only the agency-wide guidance announcing that NIH will reimburse indirect costs at a 15% rate going forward -- a policy that affects future grants as much as it does current ones.  That guidance is a precise analogue to the agency-wide guidance in APHA, in which NIH announced that it would "not fund research related to" certain topics "[g]oing forward."  APHA, 145 S. Ct. at 2661 (Barrett, J., concurring).  And, as we have noted, a majority of the Supreme Court agreed that the plaintiffs' challenge to that guidance belonged in the district court.  See id.; see also id. at 2662-63 (Roberts, C.J., concurring in part and dissenting in part).

Indeed, NIH effectively concedes in its briefing that the challenge brought by the plaintiffs does not belong in the CFC. Specifically, NIH asserts that if "NIH [had] withh[eld] any higher indirect-cost payments, jurisdiction would lie under the Tucker Act to determine whether that withholding was a breach of contract and, if so, to award money damages." That unrealized possibility of jurisdiction in the CFC reveals why this case fits squarely within the two-track framework of APHA. While the withholding of funds for indirect-cost reimbursements may have followed from the Supplemental Guidance, the issuance of the Supplemental Guidance is a separate agency action from the withholding of funds promised under the grant agreements. The latter would have occurred only if an individual grant recipient had sought to obtain funds at the negotiated rate, and NIH refused to provide the money sought. And, of course, NIH could have refused to provide the money sought under that particular grant pursuant to a different policy or for some other reason entirely. Thus, any judicial decision setting aside the withholding of funds would not have vacated the Supplemental Guidance itself, and vacating the Supplemental Guidance would not on its own have "void[ed] [withholding] decisions made under it." APHA, 145 S. Ct. at 2661 (Barrett, J., concurring). In line with APHA, then, jurisdiction is proper in the district court for the plaintiffs' current challenge to the Supplemental Guidance.

We thus turn to NIH's arguments on the merits.

**B. The Appropriations Rider**

We begin with NIH's challenge to the district court's conclusion that the agency action announced in the Supplemental Guidance violates the appropriations rider enacted by Congress in 2018 and reenacted in every subsequent appropriations cycle. The appropriations rider provides:

> In making [f]ederal financial assistance, the provisions relating to indirect costs in part 75 of title 45, Code of Federal Regulations, including with respect to the approval of deviations from negotiated rates, shall continue to apply to the National Institutes of Health to the same extent and in the same manner as such provisions were applied in the third quarter of fiscal year 2017. None of the funds appropriated in this or prior Acts or otherwise made available to the Department of Health and Human Services or to any department or agency may be used to develop or implement a modified approach to such provisions, or to intentionally or substantially expand the fiscal effect of the approval of such deviations from negotiated rates beyond the proportional effect of such approvals in such quarter.

Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 224, 138 Stat. 460, 677. Like the district court, we read the rider as containing three provisions that separately address NIH's authority over the reimbursement of indirect costs.

**1. The First Sentence**

The rider's first sentence provides that the provisions of 45 C.F.R. § 75 "relating to indirect costs . . . , including

with respect to the approval of deviations from negotiated rates, shall continue to apply to [NIH] to the same extent and in the same manner as such provisions were applied in the third quarter of fiscal year 2017." Id.  NIH and the plaintiffs agree that this sentence at a minimum requires NIH to follow the regulations governing the approval of deviations as they existed in the third quarter of 2017.  In other words, the parties agree that the content of those regulations may not be changed, nor their requirements disregarded.  We agree with the plaintiffs that the Supplemental Guidance violates HHS's regulations, as we explain in Section II.C.  Accordingly, we necessarily conclude that the Supplemental Guidance violates the language requiring NIH, as a matter of federal statute, to abide by the specified regulatory provisions.

### 2.  The First Clause of the Second Sentence

Turning to the rider's second sentence, the first clause provides that no appropriated funds "made available to [HHS] or to any department or agency may be used to develop or implement a modified approach to" the provisions of 45 C.F.R. § 75 that deal with indirect costs.  138 Stat. at 677.  Thus, even if an agency could properly comply with the deviation requirements of the regulations in a way different from the approach used in the third quarter of 2017, this clause categorically precludes any such "modified approach." Id.  NIH does not contend that it invoked

any provision of § 75 in the third quarter of 2017 to impose an across-the-board indirect cost reimbursement rate. Indeed, it is undisputed that NIH has never invoked § 75 to displace institution-specific negotiated indirect cost reimbursement rates in the way it does in the Supplemental Guidance. We therefore do not see how NIH's invocation of § 75.414(c) to impose a 15% reimbursement rate is anything but "implement[ation] [of] a modified approach to" that provision, as strictly prohibited by the rider. 138 Stat. at 677.

NIH counters that "[n]othing in the Supplemental Guidance purports to 'develop or implement a modified approach' to" § 75 because the Supplemental Guidance "invokes the 'approach' for deviation already set forth in the regulations." In other words, NIH contends that the rider's prohibition on NIH "taking a 'modified approach' to [HHS's] regulations . . . simply means that NIH must operate within the regulations rather than seeking to change them." That prohibition, NIH argues, does not prevent the agency from relying on the existing regulatory language governing deviations to announce a uniform indirect cost reimbursement rate.

We disagree for two reasons. First, NIH asks us to interpret the first clause of the rider's second sentence to mean only that NIH may not "modify," i.e., change, the provisions of § 75 relating to indirect-cost reimbursement and deviations from negotiated rates. But that is not what the rider says. Congress

- 24 -

made clear that NIH is prohibited from taking "a <u>modified approach
to</u> such provisions."  138 Stat. at 677 (emphasis added).  As we
noted above, NIH's invocation of § 75.414(c) to do something it
has never before done is plainly taking "a modified approach to"
that provision.  <u>Id.</u>

 Second, and again as noted above, NIH acknowledges that
the rider's first sentence requires NIH to abide by the provisions
of § 75 relating to indirect costs as they existed in the third
quarter of 2017 -- i.e., without changing or disregarding them.
Interpreting the first clause of the second sentence only to impose
the same requirement, thereby ignoring the prohibitory "modified
approach" language, would render that clause superfluous.  <u>See
Corley</u> v. <u>United States</u>, 556 U.S. 303, 314 (2009) ("A statute
should be construed so that effect is given to all its provisions,
so that no part will be inoperative or superfluous, void or
insignificant." (citation modified)).

### 3.  **The Final Clause**

 Turning to the last clause of the appropriations rider,
Congress provided that "[HHS] or . . . any department or agency"
may not use appropriated funds "to intentionally or substantially
expand the fiscal effect of the approval of . . . deviations from
negotiated rates beyond the proportional effect of such approvals
in" the third quarter of 2017.  138 Stat. at 677.  NIH insists
that "fiscal effect" refers only to the impact on the government's

finances, while the plaintiffs urge that "fiscal effect" could refer to the impact either on the government's finances or on the finances of grant recipients. We will assume favorably to NIH that "fiscal effect" refers only to the government's finances. Even adopting that assumption, we agree with the plaintiffs that the Supplemental Guidance is contrary to the rider's ultimate clause.

NIH asserts that the final clause of the appropriations rider precludes NIH from "spend[ing] less on medical research activities altogether" -- that is, the clause "mandate[s]" against "spend[ing] less on research costs than Congress ha[s] appropriated" -- but does not prohibit NIH from reallocating appropriated money between direct and indirect-cost reimbursement. That reading is untenable. Nowhere in the final clause do we see the "mandate" that NIH reads into it -- that the agency cannot "reduce its spending on medical research." Indeed, the phrase "medical research" is conspicuously absent from the rider's text. Moreover, NIH's proffered interpretation ignores the mandate that is clear from the rider's text -- namely, that there be "proportional[ity]" between the "fiscal effect" of approved deviations in a given year and the "fiscal effect" of such deviations in 2017's third quarter. 138 Stat. at 677.

Congress's instruction in the rider's final clause can reasonably be read in only one way. The "fiscal effect of the

approval of . . . deviations from negotiated rates" refers to the financial impact of NIH's use of something other than the negotiated rates -- in other words, the amount that NIH withholds based on its approval of deviations in the aggregate, as compared to what it would pay out if it approved no deviations.  Id.  With the "proportional" language, Congress provided that the fiscal impact of all deviations approved by NIH in a given fiscal year must bear the same relationship to NIH's total appropriated budget for that year as it did in the third quarter of 2017.  Id.

So, for example, say that in the third quarter of 2017, NIH approved deviations from negotiated rates that resulted in its paying out $10 million less than it would have paid absent those deviations, and it had a total appropriated budget of $40 billion. The dollar value of the approved deviations would equal .025% of NIH's budget.  In subsequent fiscal years, NIH could only approve deviations that result in no more than roughly the same $10-million-to-$40-billion ratio, or, in other words, that represent around .025% of its appropriated budget.  If that sameness is absent, the rider's proportionality requirement has been violated.

Per NIH's own public statement on Twitter,[12] the Supplemental Guidance's displacement of negotiated rates would lead to $4 billion in annual savings.  That is, NIH's imposition of a 15% indirect cost reimbursement rate would lead it to withhold $4 billion that it would have paid out pursuant to the negotiated rates.  We have every reason to presume that if, in fact, $4 billion represented the same proportion of NIH's appropriated budget as did its approved deviations in the third quarter of 2017, NIH would have provided us with financial information to demonstrate that equivalence.  But NIH has put forth nothing in the record that would allow us to conclude that the Supplemental Guidance's "fiscal effect" is "proportional" to the "fiscal effect" of the deviations allowed in the third quarter of 2017.[13]

Id.

_____

[12] The full statement, which was posted on Twitter (known both now and at the time of the post as X) shortly after the Supplemental Guidance was issued on February 7, reads:

> Last year, $9B of the $35B that the National Institutes of Health (NIH) granted for research was used for administrative overhead, what is known as "indirect costs."  Today, NIH lowered the maximum indirect cost rate research institutions can charge the government to 15%, above what many major foundations allow and much lower than the 60%+ that some institutions charge the government today.  This change will save more than $4B a year effective immediately.

[13] In any event, even if NIH had put forth evidence that the "fiscal effect" of its imposition of a 15% indirect cost reimbursement rate is "proportional" to the "fiscal effect" of

Instead, NIH argues only that the "fiscal effect" of the 15% indirect cost reimbursement rate on the agency's overall medical-research spending would be negligible because the $4 billion in savings would be reallocated to reimburse direct costs. That representation is inconsistent with NIH's public statement, which touted $4 billion in savings, not in increased spending on direct costs. But even if we ignored that inconsistency, our conclusion would be the same for the reason we have already explained -- namely, there is no basis for determining that $4 billion represents the same proportion of NIH's appropriated budget as did its approved deviations in the third quarter of 2017.

\* \* \*

In summary, Congress went to great lengths to ensure that NIH could not displace negotiated indirect cost reimbursement rates with a uniform rate. As a result, the appropriations rider provides three independent grounds for invalidating NIH's Supplemental Guidance. First, the rider's requirement that NIH follow the regulations governing deviations from negotiated rates as they existed in the third quarter of 2017 prevents NIH from disregarding those regulations. Second, the rider's prohibition

---

deviation approvals in the third quarter of 2017, the Supplemental Guidance would still be unlawful pursuant to the appropriations rider's first two provisions, as we have explained.

on NIH taking "a modified approach to" those deviation regulations categorically prevents NIH from changing the way indirect costs are reimbursed. And third, the rider's requirement of proportionality between the "fiscal effect" of approved deviations in the third quarter of 2017 and in subsequent fiscal years prevents NIH from approving deviations that result in a greater financial impact than its approved deviations in that quarter.

Although the plain text of the appropriations rider prohibits NIH from imposing an across-the-board indirect cost reimbursement rate, statutory context provides further "confirmatory evidence of Congress's intent." McKenna v. First Horizon Home Loan Corp., 475 F.3d 418, 424 (1st Cir. 2007). As noted above, the appropriations rider was a direct response to the first Trump administration's proposal to impose a uniform 10% indirect cost reimbursement rate. Not only did Congress decline to adopt the Trump administration's proposed cap on indirect cost reimbursements, but Congress also went further and enacted the rider. Even the first Trump administration recognized that this rider "prohibit[s] [NIH] by law from reducing grantee administrative costs and shifting these resources to support direct research." We see no reason to ignore this backdrop against which the appropriations rider was enacted. After all, "we are not required to exhibit a naiveté from which ordinary citizens are

free."  Dep't of Com. v. New York, 588 U.S. 752, 785 (2019)
(citation modified).

　　　　We thus hold that the Supplemental Guidance violates the
congressionally enacted appropriations rider.

**C.  The Regulatory Provisions**

　　　　We turn now to NIH's contention that the district court
erred in holding that the Supplemental Guidance contravenes HHS's
regulations.  As noted above, if the Supplemental Guidance violates
HHS's regulations pertaining to deviations from the negotiated
rates, it necessarily also violates the first sentence of the
appropriations rider requiring NIH to comply with those
regulations.  See supra Section II.B.1.

　　　　To briefly recap, HHS's regulations require it to
negotiate with each grant recipient to agree upon an indirect cost
reimbursement rate.  See generally 45 C.F.R. pt. 75 app. III.  Once
a negotiated rate is settled upon and memorialized in a NICRA, it
generally "must be accepted by all [f]ederal awarding agencies."
Id. § 75.414(c)(1).[14]  "An HHS awarding agency" such as NIH "may

---

　　　　[14] For convenience, we reproduce here the full text of the
relevant provisions of 45 C.F.R. § 75.414(c):

　　　　　　(c) Federal Agency Acceptance of Negotiated
　　　　　　Indirect Cost Rates.

　　　　　　　　(1) The negotiated rates must be accepted
　　　　　　　　by all [f]ederal awarding agencies.  An
　　　　　　　　HHS awarding agency may use a rate
　　　　　　　　different from the negotiated rate for a
　　　　　　　　class of [f]ederal awards or a single

use a rate different from the negotiated rate for a class of [f]ederal awards or a single [f]ederal award only . . . when approved by a [f]ederal awarding agency head or delegate based on documented justification as described in paragraph (c)(3) of [§ 75.414]." <u>Id.</u>  Paragraph (c)(3) provides that "[t]he HHS awarding agency must implement, and make publicly available, the policies, procedures and general decision making criteria that their programs will follow to seek and justify deviations from negotiated rates."  <u>Id.</u> § 75.414(c)(3).  The district court concluded that the Supplemental Guidance contravenes this regulatory scheme in several ways.

---

[f]ederal award only . . . when approved by a [f]ederal awarding agency head or delegate based on documented justification as described in paragraph (c)(3) of this section.

. . .

(3)  The HHS awarding agency must implement, and make publicly available, the policies, procedures and general decision making criteria that their programs will follow to seek and justify deviations from negotiated rates.

(4) As required under § 75.203(c), the HHS awarding agency must include in the notice of funding opportunity the policies relating to indirect cost rate reimbursement, matching, or cost share as approved. . . .

45 C.F.R. § 75.414(c).

### 1. The "Class" Requirement

The district court held that the Supplemental Guidance does not apply to "a class of [f]ederal awards," as § 75.414(c) requires.  The term "[c]lass of [f]ederal awards" is defined in the regulations as "a group of [f]ederal awards either awarded under a specific program or group of programs or to a specific type of non-[f]ederal entity or group of non-[f]ederal entities to which specific provisions or exceptions may apply."  45 C.F.R. § 75.2.  NIH acknowledges that it may deviate from the negotiated rate only with respect to a "group" of awards, but it argues that "[n]othing in the regulations limits the size of the group of awards that may be adjusted."  NIH's argument, however, cannot be reconciled with the definition of a "[c]lass of [f]ederal awards" as a group of grants "awarded under a specific program" or "to a specific type of . . . entity."  Id.  In context, this repeated use of the word "specific" can only reasonably be understood to restrict the relevant "group" of awards to a finite subset of all federal awards.  Id.  Moreover, as the district court explained, "[i]f a 'class of [f]ederal awards' actually means all [f]ederal awards, the definition provided . . . in § 75.2, and the inclusion of 'a class of [f]ederal awards' in § 75.414(c)(1), would be . . . superfluous and meaningless."  Massachusetts v. NIH, 770 F. Supp. 3d 277, 298 (D. Mass. 2025); see Corley, 556 U.S. at 314.

NIH argues in the alternative that the Supplemental Guidance does, in fact, apply to a "group" of awards -- those made to institutions of higher education ("IHEs"). As the plaintiffs correctly point out, NIH did not make this argument in its briefing before the district court. NIH therefore cannot so argue before us now. See U.S. ex rel. Ge v. Takeda Pharm. Co., 737 F.3d 116, 125 (1st Cir. 2013) (holding that plaintiff's argument "is waived, having been raised only in 'cursory fashion' before the district court").[15] But even if we entertain NIH's argument, it fails on its merit.

The Supplemental Guidance provides: "Pursuant to this Supplemental Guidance, there will be a standard indirect rate of 15% across all NIH grants for indirect costs in lieu of a separately negotiated rate for indirect costs in every grant." (Emphasis added.) Later, the Supplemental Guidance states: "For any new grant issued, and for all existing grants to IHEs retroactive to the date of issuance of this Supplemental Guidance, award recipients are subject to a 15 percent indirect cost rate." (Emphasis added.) While the latter sentence refers to "all

---

[15] To the extent that NIH means to argue via passing reference in its briefs to "NIH grants" that the relevant "group" of awards is those made by NIH, this argument is waived twice over: first, because it was not made in the briefing to the district court, see U.S. ex rel. Ge, 737 F.3d at 125; and second, because by any measure it was not sufficiently developed on appeal, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

existing grants to IHEs," the portion of the sentence mentioning IHEs is offset by commas. The limitation "to IHEs" can therefore be read only as modifying the term "existing grants."[16] Thus, by its plain language -- the broad references to "all NIH grants" and "any new grant issued" -- the Supplemental Guidance applies to more than grants awarded to IHEs. NIH makes little effort to explain otherwise, instead contending that the Supplemental Guidance contains "inartful language," and NIH meant to convey that the 15% rate would apply only to IHEs. We cannot, of course, disregard what the Supplemental Guidance actually says in favor of what NIH now wishes it said.

### 2. The Procedural Requirements

The district court also held that NIH's issuance of the Supplemental Guidance did not comply with the procedural requirements of 45 C.F.R. § 75.414(c)(3). The district court concluded that, by announcing an across-the-board 15% indirect cost reimbursement rate, NIH failed to articulate the "policies, procedures and general decision making criteria" that it "will follow to seek and justify deviations from negotiated rates." 45 C.F.R. § 75.414(c)(3). NIH asserts that it has satisfied the requirement that it publicize its "policies, procedures and

---

[16] Notably (and misleadingly), when quoting this sentence from the Supplemental Guidance in its briefs, NIH omits the critical commas.

general decision making criteria" because that requirement "actively contemplates that NIH may announce generally applicable 'polic[y]'" like the one-size-fits-all cap announced in the Supplemental Guidance. And NIH contends that the Supplemental Guidance does not set forth any "further 'procedures and decision making criteria' . . . because the policy does not contemplate any individualized redetermination of indirect-cost rates."

That contention reveals a fatal regulatory flaw in the Supplemental Guidance. The regulations contemplate precisely the "individualized" or group-specific "redetermination of indirect-cost rates" that NIH disavows. Most obviously, § 75.414(c)(3) cannot permit NIH to announce a "generally applicable 'polic[y]'" that governs -- in the language of the Supplemental Guidance -- "all NIH grants" because, as we have explained, § 75.414(c)(1)'s "class" requirement prohibits exactly that. See supra Section II.C.1. Paragraph (c)(3) cannot be interpreted to allow what paragraph (c)(1) expressly forbids. Moreover, reading § 75.414(c)(3) as permitting NIH to announce an across-the-board 15% indirect cost reimbursement rate would allow paragraph (c)(3) to effectively override the many regulatory provisions outlining the process to negotiate reimbursement rates on an institution-by-institution basis.

Relatedly, the district court concluded that § 75.414(c)(3) itself provides for a two-step sequential process,

which NIH violated by purporting to impose a 15% rate "in one fell swoop." Massachusetts, 770 F. Supp. 3d at 298.  Like the district court, we read the plain language of paragraph (c)(3) to mandate a sequential process: first, NIH announces "the policies, procedures and general decision making criteria" upon which it "will" -- in the future -- base its deviation decisions; and second, NIH applies those policies, procedures, and criteria to determine whether a departure from the negotiated rate for a given award or an appropriately defined class of awards is "justif[ied]." 45 C.F.R. § 75.414(c)(3).  That two-step reading is underscored by paragraph (c)(4), which, as noted above, provides that NIH "must include in the notice of funding opportunity the policies relating to indirect cost rate reimbursement," id. § 75.414(c)(4), so that a prospective grant recipient can "make an informed decision about whether to submit an application," id. § 75.203(c)(2).

NIH concedes that it did not abide by a two-step sequential process in issuing the Supplemental Guidance.  Instead, it asserts that "[n]othing in the text of [§] 75.414(c)(1) and (3) expressly calls for a multi-stage adjudicative process."  As explained above, however, paragraph (c)(3), particularly when read in conjunction with paragraph (c)(4), can only be interpreted as providing for a two-step process.

NIH also claims that § 75.414(c)(4)'s requirement to include in any notice of funding opportunity its policies relating

to indirect cost rate reimbursement as they exist when the notice goes out does not prevent NIH from changing those policies whenever it wants.  If that were so, § 75.414(c)(4)'s notice requirement would be meaningless.  And it certainly would do nothing to "help . . . applicant[s] make . . . informed decision[s]."  <u>Id.</u> § 75.203(c)(2).

We therefore agree with the district court that the Supplemental Guidance is contrary to HHS's regulations.

III.

In sum, we conclude that the district court properly exercised subject-matter jurisdiction over the plaintiffs' claims. We also hold that NIH's attempt, through its Supplemental Guidance, to impose a 15% indirect cost reimbursement rate violates the congressionally enacted appropriations rider and HHS's duly adopted regulations.  The district court's decision is therefore <u>affirmed</u>.

**<u>So ordered.</u>**