**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 25-1575**

───────────

THE SUSTAINABILITY INSTITUTE; AGRARIAN TRUST; ALLIANCE FOR AGRICULTURE; ALLIANCE FOR THE SHENANDOAH VALLEY; BRONX RIVER ALLIANCE; CLEANAIRE NC; LEADERSHIP COUNSEL FOR JUSTICE AND ACCOUNTABILITY; MARBLESEED; PENNSYLVANIA ASSOCIATION FOR SUSTAINABLE AGRICULTURE; RURAL ADVANCEMENT FOUNDATION INTERNATIONAL-USA; ORGANIC ASSOCIATION OF KENTUCKY; EARTH ISLAND INSTITUTE,

and

BALTIMORE, MARYLAND; COLUMBUS, OHIO; MADISON, WISCONSIN; NASHVILLE, TENNESSEE; NEW HAVEN, CONNECTICUT; SAN DIEGO, CALIFORNIA,

Plaintiffs – Appellees,

and

CONSERVATION INNOVATION FUND,

Plaintiff,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; KEVIN HASSETT, in his official capacity as Assistant to the President for Economic Policy and Director of the National Economic Council; UNITED STATES OFFICE OF MANAGEMENT AND BUDGET; RUSSELL VOUGHT, in his official capacity as Director of the United States Office of Management and Budget; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, in his official capacity as Administrator of the United States Environmental Protection Agency; UNITED STATES DEPARTMENT OF AGRICULTURE; BROOKE ROLLINS, in her official capacity as Secretary of Agriculture; UNITED STATES DEPARTMENT OF TRANSPORTATION; SEAN

DUFFY, in his official capacity as the Secretary of the United States Department of Transportation; UNITED STATES DEPARTMENT OF GOVERNMENTAL EFFICIENCY SERVICE; AMY GLEASON, in her official capacity as Acting Administrator of the United States DOGE Service; ELON MUSK, in his official capacity as Senior Advisor of the United States DOGE Service; UNITED STATES DEPARTMENT OF ENERGY; CHRIS WRIGHT, in his official capacity as the Secretary of the United States Department of Energy,

Defendants – Appellants.

------------------------------

CONSTITUTIONAL ACCOUNTABILITY CENTER; PROFESSOR TOBIAS BARRINGTON WOLFF,

Amici Supporting Appellee,

and

U.S. SENATOR SHELDON WHITEHOUSE,

Amicus Supporting Rehearing Petition.

---

Appeal from the United States District Court for the District of South Carolina, at Charleston.  Richard Mark Gergel, District Judge.  (2:25-cv-02152-RMG)

---

Argued:  October 23, 2025                              Decided:  January 21, 2026

---

Before NIEMEYER, RUSHING, and HEYTENS, Circuit Judges.

---

Vacated and remanded by published opinion.  Judge Rushing wrote the opinion, in which Judge Niemeyer and Judge Heytens joined.

---

**ARGUED:**    Sean R. Janda, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants.  Kimberley Hunter, SOUTHERN ENVIRONMENTAL LAW CENTER, Chapel Hill, North Carolina, for Appellees.  **ON BRIEF:**  Brett A. Shumate, Assistant Attorney General, Daniel Tenny, Civil Division, UNITED STATES

DEPARTMENT OF JUSTICE, Washington, D.C.; Bryan P. Stirling, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, South Carolina, for Appellants.    Irena Como, Nicholas S. Torrey, Carl T. Brzorad, Spencer Gall, SOUTHERN ENVIRONMENTAL LAW CENTER, Chapel Hill, North Carolina; Graham Provost, Elaine Poon, Jonathan Miller, PUBLIC RIGHTS PROJECT, Oakland, California; Mark Ankcorn, Senior Chief Deputy City Attorney, CITY OF SAN DIEGO, San Diego, California, for Appellees.    Gerson Smoger, SMOGER & ASSOCIATES, P.C., Dallas, Texas; Robert S. Peck, CENTER FOR CONSTITUTIONAL LITIGATION, P.C., Washington, D.C., for Amicus Supporting Petition for Initial Hearing En Banc United States Senator Sheldon Whitehouse.    Elizabeth B. Wydra, Brianne J. Gorod, Brian R. Frazelle, Miriam Becker-Cohen, Nina Henry, CONSTITUTIONAL ACCOUNTABILITY CENTER, Washington, D.C., for Amicus Constitutional Accountability Center.    Adriana S. Kosovych, New York, New York, Paul DeCamp, Kathleen Barrett, EPSTEIN, BECKER & GREEN, P.C., Washington, D.C., for Amicus Professor Tobias Barrington Wolff.

----

RUSHING, Circuit Judge:

In early 2025, the federal government suspended or terminated environmental and agricultural grants it had previously awarded to several nonprofit organizations and local governments.  The grantees sued, alleging that the President of the United States and various federal agencies and officials (collectively, the Government) violated the Administrative Procedure Act (APA), certain appropriations statutes, and the Constitution by terminating or suspending their grants.

The district court issued a permanent injunction on Plaintiffs' APA claims, "[s]et[ting] aside the freeze and/or termination" of Plaintiffs' grants and directing the Government to "restore Plaintiffs['] access to grant funds immediately."  *Sustainability Inst. v. Trump*, 784 F. Supp. 3d 861, 871 (D.S.C. 2025).  The court also issued a preliminary injunction on Plaintiffs' ultra vires and nonstatutory review claims, enjoining the Government "from freezing and/or terminating" Plaintiffs' grants and again "direct[ing] that Plaintiffs['] access to funding for these grants be immediately restored."  *Id.* at 878.

The Government appealed, and we stayed the district court's injunctions pending appeal.  *See Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025).  Now, after briefing and oral argument, we conclude that the district court abused its discretion in issuing both injunctions.  We therefore vacate the district court's order and remand for further proceedings consistent with this opinion.

I.

A.

Plaintiffs are nonprofit organizations and local governments that were awarded or were subrecipients on 38 federal grants across various funding programs administered by the Department of Energy, the Environmental Protection Agency, the Department of Agriculture, and the Department of Transportation.  In the grant agreements, the administering agencies "agreed to provide funding up to a specified dollar amount, over a specified time period, for specified work advancing Congress's objectives." J.A. 115.  In exchange, the grantees "agreed to use grant funds to complete their agency-approved project on an agency-approved timeline." J.A. 115–116.

The funds for Plaintiffs' grants were appropriated primarily through the Inflation Reduction Act (IRA), Pub. L. No. 117-169, 136 Stat. 1818 (2022), the Infrastructure Investment and Jobs Act (IIJA), Pub. L. No. 117-58, 135 Stat. 429 (2021), and the American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4.  Each statutory scheme follows a similar pattern: Congress appropriated large sums of money to establish certain programs or achieve certain goals, while leaving it to the administering agencies to determine how, and to whom, to allocate funds.

For example, several Plaintiffs received Environmental and Climate Justice block grants.  The IRA appropriated $2.8 billion toward that end, stating that the EPA Administrator "shall use" the funding to award grants to eligible entities to "carry out" listed activities that "benefit disadvantaged communities, as defined by the Administrator." 42 U.S.C. § 7438(a)(1), (b)(1).  Another part of the IRA appropriated over $8 billion for

5

the Department of Agriculture "to carry out . . . the environmental quality incentives program" by funding "agricultural conservation practices or enhancements."  IRA § 21001(a)(1)(A), (B)(iii), 136 Stat. at 2015–2016.  One Plaintiff received a grant funded by these provisions.  The rest of Plaintiffs' grants were funded by similar statutes.  *See*, *e.g.*, IIJA § 601(1)(B), 135 Stat. at 1396 (appropriating approximately $1.96 billion for "'Environmental Programs and Management'" and directing that $238 million "shall be for Chesapeake Bay"); American Rescue Plan Act of 2021 § 1006(b)(1), 135 Stat. at 13 (appropriating funds that the Secretary of Agriculture "shall use" to benefit "socially disadvantaged farmers, ranchers, or forest landowners, or other members of socially disadvantaged groups").[1]

### B.

In January and February 2025, President Donald Trump issued three executive orders touching on federal grant funding.  The first required, as relevant here, that "[a]ll agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022 . . . or the Infrastructure Investment and Jobs Act."  *Unleashing American Energy*, Exec. Order No. 14,154, 90 Fed. Reg. 8353, 8357 (Jan. 20, 2025).  The President further ordered agencies to "review their processes, policies, and programs for issuing grants, loans, contracts, or any other financial disbursements of such appropriated funds for consistency with the law and the policy outlined" elsewhere in the Executive Order.  *Id.*  The second order directed federal agencies to "terminate, to the

---

[1] The joint appendix filed by the parties in this appeal contains a complete list of Plaintiffs' grants and the corresponding appropriations provisions.  *See* J.A. 2125–2139.

maximum extent allowed by law, all . . . 'environmental justice' offices and positions" and "all . . . 'equity-related' grants or contracts." *Ending Radical and Wasteful Government DEI Programs and Preferencing*, Exec. Order No. 14,151, 90 Fed. Reg. 8339, 8339 (Jan. 20, 2025). And the third instructed agencies to "review all existing covered contracts and grants and . . . terminate or modify . . . such covered contracts and grants to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of [the President's] Administration." *Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative*, Exec. Order No. 14,222, 90 Fed. Reg. 11095, 11095–11096 (Feb. 26, 2025).

Following the Executive Orders, agencies began suspending and then terminating covered grants. The Office of Management and Budget (OMB) issued guidance memoranda directing agencies to review their funding programs for compliance with presidential priorities and to pause relevant funding pending review. The agencies funding Plaintiffs' grants also issued directives pausing grant payments. After the initial suspension, some of Plaintiffs' grants were terminated, some were restored, and, at the time of the district court's order, some remained paused pending termination.

C.

Plaintiffs sued in the U.S. District Court for the District of South Carolina. Their amended complaint asserted six counts. Count I alleged that the three Executive Orders issued by President Trump and "Program Freezing Actions" taken by other Defendants

violated the constitutional "separation of powers."[2]   J.A. 137 (capitalization omitted). According to Plaintiffs, the Government's actions "contravene[d] Congress's directives in the IRA, IIJA, and other statutes to carry out and fund the statutory programs at issue in this case" and thereby violated not only the statutes but also the Constitution.  J.A. 139. Count II similarly alleged that the Executive Orders and Program Freezing Actions violated the Constitution's Presentment Clauses because those actions sought "to terminate or modify parts of the IRA or IIJA and other relevant statutes after they were passed by Congress and signed by the President."  J.A. 140 (internal quotation marks and brackets omitted).  Plaintiffs pled Counts I and II as "nonstatutory review and ultra vires" claims. J.A. 137, 140 (capitalization omitted).

Counts III and IV focused on the Program Freezing Actions and alleged violations of the APA.  Count III alleged that the Program Freezing Actions were arbitrary and capricious.  And Count IV alleged, generally, that the Program Freezing Actions were not in accordance with law and without statutory authority because no statute authorized the Government to freeze Plaintiffs' grants and the actions were "contrary to the IRA, the IIJA and other statutes creating and appropriat[ing] money to the programs for which Plaintiffs receive grants."  J.A. 144.

---

[2] Plaintiffs loosely defined "Program Freezing Actions" as the OMB memoranda, the grant-freezing directives (as well as other directives) issued by the agencies funding Plaintiffs' grants, and "various actions that prevent Plaintiffs from accessing grant funds to proceed with the congressionally mandated programs entrusted to them."  J.A. 63–64.  The "various actions" taken by the agencies include, *inter alia*, the agencies' decisions to "block[] Plaintiffs' access to the websites and portals needed to access funds," the labeling of Plaintiffs' accounts as "'suspended,'" and oral communications between the agencies and Plaintiffs.  J.A. 64.

Lastly, Count V alleged that the Executive Orders and the Program Freezing Actions violated the First Amendment, and Count VI alleged that the Executive Orders and Program Freezing Actions "violate[d] the IRA and the IIJA and other relevant statutes." J.A. 147 (capitalization omitted).  Plaintiffs pled Count VI as a "nonstatutory review and ultra vires" claim.  J.A. 147 (capitalization omitted).

The complaint requested various forms of relief.  Plaintiffs asked the district court to declare that certain sections of the Executive Orders were unlawful.  They also asked the court to declare that "executive actions taken to freeze or terminate [Plaintiffs'] awarded federal grants . . . violate the United States Constitution, the statutory provisions enacting and appropriating funds to these programs, and the APA."  J.A. 149–150.  Most relevant here, Plaintiffs requested that the district court "hold unlawful and set aside any actions taken . . . to freeze or terminate [their] federal grants"; "[p]reliminarily and permanently enjoin Defendants from continuing to freeze or terminating [their] grants or effectuating any termination"; and "[p]rohibit Defendants from otherwise impeding, blocking, cancelling, or terminating Plaintiffs' access to their funds."  J.A. 150–151.

Plaintiffs moved for a preliminary injunction, which the Government opposed. Regarding Plaintiffs' APA claims, the Government primarily contended that the Tucker Act stripped the district court of jurisdiction, which belonged exclusively to the Court of Federal Claims.  Rejecting that argument, the district court concluded that it had jurisdiction to resolve Plaintiffs' APA claims because they did "not turn on the terms of a contract between the parties" and sought "equitable, not monetary, relief."  *Sustainability Inst. v. Trump*, No. 2:25-cv-2152, 2025 WL 1486978, at *3–4 (D.S.C. Apr. 29, 2025).

After the court's jurisdictional ruling, the Government consented to the entry of judgment on Plaintiffs' APA claims as to 32 of the grants at issue. The district court then declared "the freeze and/or termination" of the 32 grants unlawful, permanently "[s]et[] aside the freeze and/or termination" of those grants, and directed the Government to "restore Plaintiffs['] access to grant funds immediately." *Sustainability Inst.*, 784 F. Supp. 3d at 871; *see also id.* at 880 ("Plaintiffs are provided declaratory and permanent injunctive relief.").[3]

As for Plaintiffs' non-APA claims, the district court determined that "Plaintiffs' Separation of Powers and ultra vires claims (Counts I and II) plainly state a claim for nonstatutory review" over which the court possessed jurisdiction. *Id.* at 873. Moving to Plaintiffs' likelihood of success on the merits, the court found that the Government "failed to produce a single document showing any individualized review of Plaintiffs' grants or discussion of any basis for freezing or terminating the grants other than disapproval of the purposes of the funding." *Id.* at 875. The court considered this "strong support for Plaintiffs' claim that the freezing and/or termination of the 32 grants constituted a violation of [the agencies'] duty to 'faithfully execute[]' the laws of the United States." *Id.* (quoting U.S. Const. art. II, § 3). In addition, the district court "note[d] that Plaintiffs' nonstatutory review claims and Plaintiffs' APA claims which Defendants have elected not to contest are, for all practical purposes, mirror images of each other." *Id.* Finding the remaining

---

[3] The district court denied injunctive relief as to six grants. *Sustainability Inst.*, 784 F. Supp. 3d at 879–880 (denying preliminary injunction as to "Grants 27–32"). Those six grants are not before us on appeal.

preliminary injunction elements satisfied, *id.* at 875–878, the district court preliminarily "enjoin[ed]" the Government "from freezing and/or terminating" the 32 contested grants and again "direct[ed] that Plaintiffs['] access to funding for these grants be immediately restored," *id.* at 878.

The Government timely appealed, and 28 U.S.C. § 1292(a)(1) authorizes our review.

## II.

"We review an order granting an injunction for abuse of discretion." *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 125 (4th Cir. 2011); *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001). We "review[] factual findings for clear error and legal conclusions *de novo*." *PBM Prods.*, 639 F.3d at 125.

## III.

To obtain a preliminary injunction, plaintiffs must "show (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary [injunctive] relief, (3) that the balance of equities tips in their favor, and (4) that the injunction is in the public interest." *Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 168–169 (4th Cir. 2025) (footnote omitted). The standard for a permanent injunction is "essentially the same" as the standard for a preliminary injunction, except that plaintiffs must show "actual success" on the merits rather than just a "likelihood." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987). As used in these standards, the term "merits" includes jurisdictional issues. *See Bessent*, 152 F.4th at 168 n.3.

11

The Government advances two primary reasons why the district court erred in issuing the injunctions here.  First, the Government argues that the district court lacked jurisdiction over Plaintiffs' APA claims because those claims are essentially contractual and therefore belong in the Court of Federal Claims.  Second, the Government argues that Plaintiffs' nonstatutory review claims exceed the strictly limited boundaries of such review.  We address each issue in turn.[4]

A.

The Government contends that Plaintiffs' APA claims are essentially contractual and therefore belong in the Court of Federal Claims.  Plaintiffs, in turn, insist that their APA claims arise "not from contracts," but from "the Constitution and federal statute." Resp. Br. 35.  Limiting our review to the injunction the district court entered on Plaintiffs' APA claims, we conclude the district court lacked jurisdiction to order that relief, which was designed to enforce obligations to pay money pursuant to Plaintiffs' grants.

"It is axiomatic that the United States may not be sued without its consent and the existence of consent is a prerequisite for jurisdiction." *Randall v. United States*, 95 F.3d 339, 345 (4th Cir. 1996) (internal quotation marks omitted).  The APA waives the federal government's sovereign immunity from suits "seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority."  5 U.S.C. § 702.  However, "[t]he

---

[4] Because we vacate the injunctions on these two bases, we do not address the Government's additional arguments that the challenged actions are committed to agency discretion by law under the APA or that the equities do not support the district court's injunctions.

waiver does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702).

The Tucker Act gives the Court of Federal Claims jurisdiction over "any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). When it applies, the Tucker Act "vest[s] subject matter jurisdiction exclusively in" the Court of Federal Claims.[5] *Portsmouth Redevelopment & Hous. Auth. v. Pierce*, 706 F.2d 471, 473 (4th Cir. 1983); *see also Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam). "[A] plaintiff whose claims against the United States are essentially contractual [is] not . . . allowed to avoid the jurisdictional (and hence remedial) restrictions of the Tucker Act by casting its pleadings in terms that would enable a district court to exercise jurisdiction under a separate statute and enlarged waivers of sovereign immunity, as under the APA." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982); *see also Match-E-Be-Nash-She-Wish*, 567 U.S. at 215 (explaining that Section 702 of the APA "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes").

The question here is whether Plaintiffs' APA claims for injunctive relief are "founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). If so, the district court lacked jurisdiction over the claims. To determine

---

[5] There is one exception not relevant here: District courts and the Court of Federal Claims have concurrent jurisdiction over certain damages claims not exceeding $10,000. *See* 28 U.S.C. § 1346(a)(2); *Randall*, 95 F.3d at 347.

whether a claim is "at its essence a contract claim," courts examine "the source of the rights upon which the plaintiff[s] base[] [their] claims" and "the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968; *see United States v. J & E Salvage Co.*, 55 F.3d 985, 988–989 (4th Cir. 1995) (applying *Megapulse*).

The Supreme Court's recent decisions in *Department of Education v. California* and *National Institutes of Health v. American Public Health Association* are instructive. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2664 (2025) (Gorsuch, J., concurring part and dissenting in part) (emphasizing that the "reasoning" of Supreme Court decisions regarding interim relief "binds lower courts as a matter of vertical *stare decisis*"); *see also Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) (explaining that the Supreme Court's "interim orders . . . inform how a court should exercise its equitable discretion in like cases"). In *California*, the district court entered an order on the plaintiffs' APA claims "enjoining the Government from terminating various education-related grants" and "requir[ing] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue[d]." 145 S. Ct. at 968. The Supreme Court stayed the district court's order pending appeal, finding that "the Government [was] likely to succeed in showing that the District Court lacked jurisdiction" to issue the order. *Id.* The Court explained that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered" in that case. *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over

suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)).

In *National Institutes of Health*, the district court "vacat[ed] the Government's termination of various research-related grants." 145 S. Ct. at 2659. The Supreme Court again stayed the district court's order. *See id.* The Court explained that "[t]he Administrative Procedure Act's limited waiver of sovereign immunity does not provide the District Court with jurisdiction to adjudicate claims based on the research-related grants or to order relief designed to enforce any obligation to pay money pursuant to those grants." *Id.* (internal quotation marks and brackets omitted). The Government was therefore likely to succeed in showing that the district court lacked jurisdiction to enter the order vacating the grant terminations. *See id.*

There is no meaningful difference between the district court's order here and the district court's order in *California*. Like in *California*, the Government here froze or terminated grants *en masse*, allegedly without individualized analysis. *See Sustainability Inst.*, 784 F. Supp. 3d at 870; *California v. Dep't of Educ.*, 769 F. Supp. 3d 72, 77 (D. Mass. 2025) ("The record reflects that there was no individualized analysis of any of the programs . . . ."). Like in *California*, Plaintiffs here sought restoration of their specific grants under the APA. *See*, *e.g.*, J.A. 150–151 (asking the district court to "[p]reliminarily and permanently enjoin Defendants from continuing to freeze or terminating grants or effectuating any termination" and "[p]rohibit Defendants from otherwise impeding, blocking, cancelling, or terminating Plaintiffs' access to their funds"); *see California*, 769 F. Supp. 3d at 80. And like in *California*, that relief is exactly what the district court

15

awarded. *See Sustainability Inst.*, 784 F. Supp. 3d at 871 ("set[ting] aside the freeze and/or termination of Grants 1–26 and 33–38" and "direct[ing] [the Government] to restore Plaintiffs['] access to grant funds immediately"); *California*, 145 S. Ct. at 968 (explaining that the *California* district court "enjoin[ed] the Government from terminating various education-related grants" and "require[d] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue[d]"). If the *California* district court lacked jurisdiction to issue its order, it follows that the district court here did as well. And our conclusion is further confirmed by the Supreme Court's subsequent decision in *National Institutes of Health*. *See* 145 S. Ct. at 2659 (explaining that the APA "does not provide the District Court with jurisdiction to adjudicate claims based on the research-related grants or to order relief designed to enforce any obligation to pay money pursuant to those grants" (internal quotation marks omitted)).

Plaintiffs offer several arguments to try to circumvent *California* and *National Institutes of Health*. We find none of them persuasive. To begin, Plaintiffs insist that their APA claims "arise from the Constitution and federal statute, not from contracts." Resp. Br. 35; *see Megapulse, Inc.*, 672 F.2d at 968 (examining the "the source of the rights upon which the plaintiff[s] base[] [their] claims" to determine whether a claim is essentially contractual). Thus, they argue, their claims are not essentially contractual.

The Supreme Court, however, considered and rejected the same argument in *California* and *National Institutes of Health*. In *California*, the plaintiffs argued that the district court had jurisdiction over their APA claims because they alleged that the grant terminations were "contrary to the Department's regulations and arbitrary and capricious

16

when viewed in light of the statutes authorizing those grants." *See* Opposition to Stay Application at 22, *Dep't of Educ. v. California*, 145 S. Ct. 966 (2025) (No. 24A910), 2025 WL 963588; *see also id.* ("The controversy thus centers around federal statutes and regulations."). Yet the Supreme Court still found that the Government was likely to succeed in showing that the claims belonged in the Court of Federal Claims under the Tucker Act. *California*, 145 S. Ct. at 968. Likewise, in *National Institutes of Health*, the plaintiffs argued that certain "agency-wide policies" were unlawful "because they violate[d] various federal statutes and the Constitution . . . and that the [grant] terminations flowed directly from those unlawful policies." *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 145 F.4th 39, 51 (1st Cir. 2025). But again, the Supreme Court stayed "the District Court's judgments vacating the Government's termination of various research-related grants" because the APA did "not provide the District Court with jurisdiction" to order such relief. *Nat'l Insts. of Health*, 145 S. Ct. at 2659.

The upshot is that the alleged statutory and constitutional violations do not alter the essentially contractual nature of Plaintiffs' APA claims before us on appeal. "The core of [P]laintiffs' suit alleges that the Government unlawfully terminated their grants." *Id.* at 2665 (Kavanaugh, J., concurring in part and dissenting in part). And Plaintiffs identify no source of law, besides their grant agreements, guaranteeing them the relief they seek: continued payments on those grants. At bottom, Plaintiffs' "injury and alleged right to payment stem from the government's refusal to pay promised grants according to the terms and conditions that accompany them." *Id.* at 2664 (Gorsuch, J., concurring in part and

dissenting in part).[6]  Under the Supreme Court's recent decisions, "the source of the rights upon which the plaintiff[s] base[] [their] claims" is thus contractual.  *Megapulse*, 672 F.2d at 968.

Next, Plaintiffs argue that their APA claims are not essentially contractual because they seek "forward-looking injunctive and declaratory relief."  Resp. Br. 41 (capitalization omitted); *see Megapulse*, 672 F.2d at 968 (evaluating relief requested to determine whether a plaintiff's claim is essentially contractual).  Once again, we disagree.  To start, as discussed above, the relief ordered by the district court here and the relief ordered by the district courts in *California* and *National Institutes of Health* are substantially the same. Here, the district court declared "the freeze and/or termination" of Plaintiffs' grants unlawful, "[s]et[] aside the freeze and/or termination" of Plaintiffs' grants, "direct[ed]" the Government to "restore Plaintiffs['] access to [their] grant funds immediately," and prohibited the Government "from freezing, terminating or otherwise interfering with the funding . . . without written authorization."  *Sustainability Inst.*, 784 F. Supp. 3d at 871.  In *California*, the district court "enjoin[ed] the Government from terminating" the grants and "requir[ed] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue[d]."  145 S. Ct. at 968.  And in *National Institutes of Health*, the district court "vacate[d] the Government's termination of various research-related grants." 145 S. Ct. at 2659.

_____

[6] Plaintiffs do not dispute that their grants are contracts under the Tucker Act.

We see no meaningful distinction between the relief ordered here and the relief ordered in those cases, which the Supreme Court determined was sufficiently contractual to trigger the Tucker Act.  The relief Plaintiffs sought and the relief the district court gave them was the reinstatement of their grants.  That is "the classic *contractual* remedy of specific performance."  *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (emphasis added); *cf. Nat'l Insts. of Health*, 145 S. Ct. at 2664 (Gorsuch, J., concurring in part and dissenting in part) ("An order vacating the government's decision to terminate grants under the APA is in every meaningful sense an order requiring the government to pay those grants.").  So contrary to Plaintiffs' assertions, the relief they sought and the district court ordered is contractual in nature.  *See Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 80 (D.C. Cir. 1985) (holding that "a request for specific performance must be resolved by" the Court of Federal Claims).[7]

---

[7] Plaintiffs retort that "the Court of Federal Claims cannot provide the forward-looking relief Plaintiffs seek."  Resp. Br. 43.  But the fact that the Tucker Act does not allow the specific relief Plaintiffs seek does not mean that their claims must proceed under the APA; rather, it shows that Congress made the dispositive choice for contract claims against the United States to be limited to certain money damages.  *See* 5 U.S.C. § 702 ("Nothing herein . . . confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."); *Match-E-Be-Nash-She-Wish*, 567 U.S. at 216 ("[W]hen Congress has dealt in particularity with a claim and [has] intended a specified remedy—including its exceptions—to be exclusive, that is the end of the matter; the APA does not undo that judgment." (internal quotation marks omitted)); *Spectrum Leasing*, 764 F.2d at 894–895 (holding that "Congress intended the jurisdiction *and remedies* of the Tucker Act to be exclusive in cases based on government contracts" and holding that an essentially contractual claim belonged in the Court of Federal Claims even though the claim sought specific performance (emphasis added)); *Megapulse*, 672 F.2d at 967 (explaining that "a plaintiff whose claims against the United States are essentially contractual should not be allowed to avoid the jurisdictional (and hence remedial) restrictions of the Tucker Act" by requesting injunctive relief in district court).

Contrary to Plaintiffs' suggestions, the Supreme Court's decision in *Bowen v. Massachusetts*, 487 U.S. 879 (1988), cannot help them. In *California*, the Court acknowledged *Bowen*'s general rule that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." 145 S. Ct. at 968 (quoting *Bowen*, 487 U.S. at 910). But the Court went on to distinguish *Bowen*, explaining that the APA does not authorize a district court to issue an "order[] 'to enforce a contractual obligation to pay money' along the lines of what the District Court" ordered in *California* because "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (first quoting *Great-West Life & Annuity Ins.*, 534 U.S. at 212; then quoting 28 U.S.C. § 1491(a)(1)). The same reasoning applies here. As discussed above, there is no meaningful difference between the district court's order restoring Plaintiffs' grants and the order issued in *California*. Therefore *California*, not *Bowen*, controls here.

For these reasons, we conclude that the district court lacked jurisdiction to adjudicate Plaintiffs' APA claims challenging the freezing or termination of their grants and to order enforcement of those grants. *See Sustainability Inst.*, 784 F. Supp. 3d at 871. The permanent injunction is therefore vacated.[8]

---

[8] We recognize that Plaintiffs challenged not only their individual grant terminations but also the Executive Orders and various directives issued by the agencies funding their grants. The district court, however, did not purport to vacate any of these actions; instead, the court homed in on the individual grant terminations. *See Sustainability Inst.*, 784 F. Supp. 3d at 871. We therefore express no opinion on whether the district court had jurisdiction to review these high-level actions under the APA, nor what the appropriate remedy would be in the event of an APA violation. *See Nat'l Insts. of Health*, 145 S. Ct. at 2660–2662 (Barrett, J., concurring).

B.

Turning to the preliminary injunction the district court entered on "Plaintiffs' Separation of Powers and ultra vires claims," *Sustainability Inst.*, 784 F. Supp. 3d at 873, the Government argues that Plaintiffs' claims exceed the limited bounds of nonstatutory review. We agree. Plaintiffs' attempt to cast their claims as constitutional, and not statutory, fails under Supreme Court precedent. And when viewed in the proper light, Plaintiffs' claims for restoration of their grants likely cannot satisfy the strict limitations on ultra vires review.

1.

As previously explained, "[t]he general rule is that the sovereign, i.e., the United States, may not be sued without its consent." *Strickland v. United States*, 32 F.4th 311, 363 (4th Cir. 2022). But "[t]he Supreme Court has recognized, in what is sometimes referred to as the *Larson-Dugan* exception to sovereign immunity, that a plaintiff can obtain injunctive relief against an individual officer or agent of the United States in his official capacity for acts beyond his statutory or constitutional authority because such actions 'are considered individual and not sovereign actions.'" *Id.* (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949)). "These types of claims are generally referred to as nonstatutory review claims." *Id.*

The availability of nonstatutory review depends largely on whether the claimed violation is statutory or constitutional. The implied nonstatutory exception for claims alleging that a federal actor has violated a federal statute—often called ultra vires claims— is "necessarily narrow." *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*,

21

698 F.3d 171, 179 (4th Cir. 2012); *see also Long Term Care Partners, LLC v. United States*, 516 F.3d 225, 234 (4th Cir. 2008). As the Supreme Court recently explained, "[b]ecause ultra vires review could become an easy end-run around" limitations imposed by statutes, the Court's "cases have strictly limited nonstatutory ultra vires review." *Nuclear Regul. Comm'n v. Texas*, 145 S. Ct. 1762, 1775 (2025). It is not available "simply because an agency has arguably reached 'a conclusion which does not comport with the law.'" *Id.* at 1776 (quoting *Boire v. Greyhound Corp.*, 376 U.S. 473, 481 (1964)). Rather, ultra vires review "applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*' in a statute." *Id.* (quoting *Ry. Clerks v. Ass'n for Benefit of Non-contract Emps.*, 380 U.S. 650, 660 (1965)); *see Long Term Care Partners*, 516 F.3d at 234 (explaining that ultra vires review is "appropriate only where there is a 'strong and clear demonstration that a clear, specific and mandatory statutory provision has been violated'" (brackets omitted) (quoting *Newport News Shipbuilding & Dry Dock Co. v. NLRB*, 633 F.2d 1079, 1081 (4th Cir. 1980))). A plaintiff invoking ultra vires review also must demonstrate that no other "statutory scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review,'" and that no statute "forecloses all other forms of judicial review." *Nuclear Regul. Comm'n*, 145 S. Ct. at 1776 (quoting *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)). An ultra vires claim is "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Id.* (internal quotation marks omitted).

Nonstatutory review claims alleging a constitutional violation, however, are not subject to the same restrictions. The Supreme Court has held that "where Congress intends

to preclude judicial review of constitutional claims its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988). The Court has "require[d] this heightened showing in part to avoid the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Id.* (internal quotation marks omitted).

Here, Plaintiffs contend that the Government's freeze and termination of their grants violated the Constitution's "separation of powers" and the Presentment Clauses.[9] That is, they attempt to assert constitutional, not statutory, claims. And because their claims are allegedly constitutional, they argue that the "heightened standard of review for ultra vires claims based on *statutory* violations" does not apply. Resp. Br. 32.

We disagree. Though Plaintiffs style their claims as constitutional, the Supreme Court has foreclosed efforts to recast statutory claims as constitutional ones, and that precedent applies here. In *Dalton v. Specter*, the Supreme Court considered and rejected the argument that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine" and therefore "judicial review must be available to determine whether the President has statutory authority for whatever

---

[9] The district court granted Plaintiffs' "motion for preliminary injunction on Claims I and II," which alleged a violation of the separation of powers and a violation of the Presentment Clauses, respectively. *Sustainability Inst.*, 784 F. Supp. 3d at 878; *see also id.* at 873 (concluding that "Plaintiffs' Separation of Powers and ultra vires claims (Counts I and II) plainly state a claim for nonstatutory review"). The court, however, never discussed or even mentioned the Presentment Clauses in its opinion, including when assessing Plaintiffs' likelihood of success on the merits. We note that Plaintiffs did not advance their Presentment Clauses claim in their motion for a preliminary injunction, and they do not mention it on appeal. But because it appears that the district court granted relief on that claim, we address it.

action he takes." 511 U.S. 462, 471 (1994) (internal quotation marks omitted). As the Supreme Court explained, its "cases do not support the proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472. "On the contrary, [the Court] ha[s] often distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority," and its precedent repeatedly "specif[ies] unconstitutional and ultra vires conduct as separate categories." *Id.* "[I]f every claim alleging that the President exceeded his statutory authority were considered a constitutional claim," that "distinction" would be "eviscerat[ed]." *Id.* at 474. Relevant here, the Court ultimately held that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims" freely reviewable at equity but "statutory one[s]" subject to ultra vires review. *Id.* at 473–474; *cf. Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–329 (2015) (refusing to treat a claim that a State violated a federal statute as a constitutional one arising under the Supremacy Clause and instead treating the claim as statutory and finding that Congress foreclosed an implied equitable cause of action).

Here, both of Plaintiffs' constitutional claims assert that because executive officials and agencies violated statutes, they also violated the Constitution. Plaintiffs' separation of powers claim turns on the allegation that the Government's actions "directly contravene[d] Congress's directives *in the IRA, IIJA, and other statutes* to carry out and fund the statutory programs at issue in this case." J.A. 139 (emphasis added); *see also Sustainability Inst.*, 784 F. Supp. 3d at 875 ("Plaintiffs' nonstatutory review claims are based on the argument

that Defendants[] have failed to faithfully execute[] the laws . . . ." (internal quotation marks omitted)).  Similarly, Plaintiffs' Presentment Clauses claim is premised on the idea that the Government's actions would "terminate or modify parts of the *IRA or IIJA and other relevant statutes* after they were passed by Congress and signed by the President." J.A. 140 (emphasis added) (internal quotation marks and brackets omitted); *see also Sustainability Inst.*, 784 F. Supp. 3d at 875.

At their core, both claims "simply alleg[e] that the [Government] has exceeded [its] statutory authority." *Dalton*, 511 U.S. at 473.  The claims are therefore "statutory one[s]." *Id.* at 474; *accord Glob. Health Council v. Trump*, 153 F.4th 1, 13 (D.C. Cir. 2025) ("Here, the grantees assert a non-statutory right to vindicate separation-of-powers principles but they are foreclosed from doing so by *Dalton v. Specter*." (citation omitted)).

Plaintiffs' attempts to avoid *Dalton* are unavailing.  First, Plaintiffs assert that they raise "the type of constitutional claim specifically sanctioned by *Dalton*," Resp. Br. 31, i.e., where the Executive acts in the "*absence* of *any* statutory authority" whatsoever, *Dalton*, 511 U.S. at 473 (discussing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)). That is demonstrably incorrect.  Congress gave the Executive authority to issue grants under the various statutes at issue here, and in their constitutional claims Plaintiffs complain that the Executive "directly contravene[d] Congress's directives in [those] statutes" by freezing funds and cancelling grants.  J.A. 139.  Those alleged statutory

violations are the predicate for Plaintiffs' constitutional claims because without the appropriations statutes there could be no improper withholding of funds.[10]

Second, Plaintiffs contend that *Dalton* rested on the conclusion that the statute at issue there committed the relevant decision to the President's discretion. But *Dalton* contained multiple distinct rulings, and Plaintiffs' argument conflates them. *See Dalton*, 511 U.S. at 476–477 (summarizing the Court's four holdings); *Glob. Health Council*, 153 F.4th at 16–17 (distinguishing between *Dalton*'s holdings). As explained above, the Supreme Court first held that nonstatutory constitutional review was unavailable for the plaintiffs' claim that the President exceeded his statutory authority because the claim was statutory, not constitutional. *See Dalton*, 511 U.S. at 472–474. The Court then separately considered whether ultra vires review was available and concluded it was not because the statute at issue did not limit the President's discretion. *See id.* at 474–476; *see Nuclear Regul. Comm'n*, 145 S. Ct. at 1776 (explaining the requirements of ultra vires review). Plaintiffs focus on this second holding, but it is the first that is relevant here. And nothing about the second holding narrowed the Court's prior conclusion that plaintiffs cannot avoid the limits of ultra vires review by arguing that executive officials' statutory violations implicate the separation of powers. We therefore reject Plaintiffs' attempts to do so here.

---

[10] This case is also unlike *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), and *Collins v. Yellen*, 141 S. Ct. 1761 (2021), where the plaintiffs challenged the constitutionality of federal statutes on separation-of-powers grounds. Plaintiffs here do not contest the constitutionality of the relevant statutes; rather, they seek to enforce them.

2.

Because Plaintiffs' claims are statutory, they must stay within "the painstakingly delineated procedural boundaries" of "nonstatutory ultra vires review." *Nuclear Regul. Comm'n*, 145 S. Ct. at 1775–1776 (internal quotation marks omitted).  As mentioned above, one of these boundaries is that Plaintiffs must show that the Government "has taken action entirely in excess of its delegated powers and contrary to a *specific prohibition* in a statute." *Id.* at 1776 (internal quotation marks omitted).  Thus far, they have failed to do so.

The district court construed Plaintiffs' claims as "alleging that the freezing and/or terminating of their grants violated their rights." *Sustainability Inst.*, 784 F. Supp. 3d at 868; *see also id.* at 875 (discussing "Plaintiffs' claim that the freezing and/or termination of the 32 grants constituted a violation of the . . . Defendants['] duty to 'faithfully execute[]' the laws of the United States" (quoting U.S. Const. art. II, § 3)).  Accordingly, the district court preliminarily enjoined the Government "from freezing and/or terminating Grants 1–26 and 33–38 and direct[ed] that Plaintiffs['] access to funding for these grants be immediately restored." *Id.* at 878.  In ordering that Plaintiffs' specific grants be restored, the district court must have implicitly found that the IRA, IIJA, and other relevant statutes mandated that Plaintiffs' grants be funded.

The problem, however, is that Plaintiffs have identified no statute "specific[ally] prohibit[ing]" the Government from freezing or terminating their grants.  *Nuclear Regul. Comm'n*, 145 S. Ct. at 1776 (internal quotation marks and emphasis omitted).  The appropriations statutes cited by Plaintiffs appropriate funds for particular programs and

goals.[11]  But none of them purport to tell the Government that it must contract specifically with Plaintiffs.  *Cf. Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (explaining that "the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way").  Absent a statute specifically prohibiting the Government from freezing or terminating Plaintiffs' grants, the district court erred in finding that the Government likely acted ultra vires in freezing or terminating those grants.  *See Nuclear Regul. Comm'n*, 145 S. Ct. at 1776.  It follows that the court's awarded remedy—"direct[ing] that Plaintiffs['] access to funding for [their] grants be immediately restored"—was also error. *Sustainability Inst.*, 784 F. Supp. 3d at 878.

Plaintiffs offer a couple of arguments in response, neither of which changes our analysis.  First, Plaintiffs stress that the Government terminated their grants precisely because the Government disagreed with the goals set by the appropriations statutes funding the grants.  *See id.* at 875 (finding that Plaintiffs' grants were frozen or terminated "because they were funded by mandatory congressional legislation that [the Government] do[es] not

---

[11] *See, e.g.*, 42 U.S.C. § 7438(a)(1), (b)(1) (appropriating $2.8 billion that the EPA Administrator "shall use" to "carry out" listed activities that "benefit disadvantaged communities"); IRA § 21001(a)(1)(A), (B)(iii), 136 Stat. at 2015–2016 (appropriating over $8 billion for the Department of Agriculture "to carry out . . . the environmental quality incentives program," which sought to fund "agricultural conservation practices or enhancements" that the Secretary of Agriculture concluded would achieve certain results); IIJA § 601(1)(B), 135 Stat. at 1396 (appropriating $1.96 billion for "'Environmental Programs and Management'" and directing that $238 million "shall be for Chesapeake Bay"); American Rescue Plan Act of 2021 § 1006(b)(1), 135 Stat. at 13 (appropriating funds that the Secretary of Agriculture "shall use" to benefit "socially disadvantaged farmers, ranchers, or forest landowners, or other members of socially disadvantaged groups"); *see also* J.A. 2125–2139.

favor"). But even accepting that as true, Plaintiffs still fail to identify a statute that specifically prohibits the Government from freezing or terminating *their* grants. At best, the appropriations statutes may require that certain funding be available for obligation. The statutes do not require, however, that Plaintiffs themselves receive any funds.

Second, and relatedly, Plaintiffs claim that the Government "cancel[led] entire grant programs wholesale," Resp. Br. 48, and confirmed that it "will not spend the money Congress appropriated at all," *id.* at 23. The theory seems to be that by appropriating funds for certain programs, Congress specifically mandated—in a manner sufficient to trigger ultra vires review—that those programs remain funded. *Cf.*, *e.g.*, *In re Aiken Cnty.*, 725 F.3d 255, 260 (D.C. Cir. 2013) ("[W]here previously appropriated money is available for an agency to perform a statutorily mandated activity, we see no basis for a court to excuse the agency from that statutory mandate."). And by declining to fund the specified programs, Plaintiffs allege, the Government has violated a specific statutory prohibition. *See Nuclear Regul. Comm'n*, 145 S. Ct. at 1776.

On this record, we express no view on Plaintiffs' "program cancellation" theory. Even assuming that the appropriation of funds for a certain program equates, for purposes of ultra vires review, to a specific prohibition on terminating that program—a question the district court should consider in the first instance on remand—the district court did not find that the Government "cancel[led] entire grant programs wholesale," Resp. Br. 48, with the

intent never to re-obligate the funding, *see Sustainability Inst.*, 784 F. Supp. 3d 861.[12]  And we decline to make that finding in the first instance.  *See Core Commc'ns, Inc. v. Verizon Md. LLC*, 744 F.3d 310, 324 (4th Cir. 2014) ("[I]t is axiomatic that appellate courts do not make factual findings." (internal quotation marks and ellipsis omitted)).  Further, evaluating whether the cancellation of a specific program is subject to ultra vires review requires first determining whether a statute mandates that specific program.  *See Nuclear Regul. Comm'n*, 145 S. Ct. at 1776; *cf. Lincoln*, 508 U.S. at 193–194.  But the district court did not undertake that program-by-program analysis here.  *See Sustainability Inst.*, 784 F. Supp. 3d 861.  At bottom, the district court focused on the freeze and termination of Plaintiffs' particular grants—not the termination of entire programs.  We therefore decline to pass on the merits of Plaintiffs' "program cancellation" theory or what the appropriate relief would be in the event that the Government did indeed cancel statutorily mandated programs.

---

[12] The district court noted that certain agencies "issued directives that all spending of funds related to the IRA and IIJA be immediately paused."  *Sustainability Inst.*, 784 F. Supp. 3d at 869; *see also id.* (noting "mass freezing"); *id.* at 876 (mentioning, in passing, "[i]ndefinitely pausing funding").  But pausing funding pending review is not the same as the complete, permanent termination of grant programs that Plaintiffs claim violates a specific statutory prohibition.  Further, that Plaintiffs' grants were frozen or terminated cannot, without more, show that the Government cancelled entire programs.  Nor can the fact that "not one [document] show[ed] any individualized review of decisions to freeze or terminate grants *of the Plaintiffs* in this action."  *Id.* at 870 (emphasis added).  Lastly, we note that the district court acknowledged the Government's representation that it "had resumed the funding for 14 of the 38 grants at issue in this litigation, terminated four grants, and [was] processing the termination of six other grants."  *Id.*  Given the varying statuses of Plaintiffs' grants, we are wary to conclude in the first instance that the Government terminated entire grant programs.

In sum, we find that Plaintiffs' nonstatutory review claims—as the district court understood them—likely do not overcome the "strict[] limit[ations]" imposed on such claims. *Nuclear Regul. Comm'n*, 145 S. Ct. at 1775. The preliminary injunction based on those claims is therefore vacated.

## IV.

For these reasons, we vacate the district court's permanent and preliminary injunctions and remand for further proceedings consistent with this opinion.[13]

*VACATED AND REMANDED*

---

[13] In its principal order, the district court noted that it had previously "entered an order directing Defendants 'not to subsequently freeze or terminate [certain] grants without notice to the Court and authorization from the Court that the freezing and/or termination may proceed.'" *Sustainability Inst.*, 784 F. Supp. 3d at 868 n.2 (quoting *Sustainability Inst.*, 2025 WL 1486978, at *9). The district court then stated that the earlier order (from April 29, 2025) would "remain[] in effect until modified or rescinded by this Court or an appellate court." *Id.* For the reasons given above, we also vacate the April 29 order to the extent it enjoins the Government from freezing or terminating Plaintiffs' grants.