UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                                        :
METROPOLITAN TRANSPORTATION AUTHORITY, :
et al.,                                                                 :
                                                                        :
                                Plaintiffs,          :          25-cv-1413 (LJL)
                                                                        :
                -v-                                  :          OPINION AND ORDER
                                                                        :
SEAN DUFFY, et al.,                                  :
                                                                        :
                                Defendants.          :
                                                                        :
------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _03/03/2026_

LEWIS J. LIMAN, United States District Judge:

On February 19, 2025, the Metropolitan Transportation Authority and the Triborough

Bridge and Tunnell Authority (together, "Plaintiffs") initiated the present lawsuit.  On May 28,

2025, this Court issued a preliminary injunction enjoining the Secretary of the Department of

Transportation Sean Duffy, Executive Director of the Federal Highway Administration Gloria

Shepard, the United States Department of Transportation, and the Federal Highway

Administration (collectively, "Defendants") from terminating New York's congestion pricing

program.  Dkt. No. 132.  Following that opinion, the parties have moved for summary judgment.

Dkt. Nos. 145, 151, 154, 156.  For the following reasons, Plaintiffs' motion for partial summary

judgment is granted, and Defendants' motion for summary judgment is granted in part and

denied in part.

## BACKGROUND

### I.    Factual Background of the Congestion Pricing Program

The background of this case is detailed extensively in the Court's prior opinion granting a preliminary injunction. *See Metro. Transp. Auth. v. Duffy*, 784 F. Supp. 3d 624 (S.D.N.Y. 2025). This opinion is meant to be read as a companion to that earlier opinion.

As relevant here, in April 2019, the New York Legislature enacted the Traffic Mobility Act ("TMA"), which directed the Triborough Bridge and Tunnel Authority ("TBTA") to establish a congestion pricing program for the Manhattan Central Business District ("CBD"). *See Mulgrew v. U.S. Dep't of Transp.*, 750 F. Supp. 3d 171, 188 (S.D.N.Y. 2024). The act defined the CBD as "Manhattan south of 60th street except for the FDR Drive, and New York state route 9A otherwise known as the 'West Side highway' including the Battery Park underpass and any surface roadway portion of the Hugh L. Carey Tunnel connection to West St." *Id.* at 190. The Central Business District Tolling Program ("CBDTP") created was intended to "ensure a safe and efficient mass transit system within the city of New York and to protect the public health and safety of New York's residents." N.Y. Veh. & Traf. Law § 1701. The TMA also set a revenue requirement as well, directing that the TBTA "shall, at minimum, ensure annual revenues and fees collected under such program, less costs of operation of the same, provide for sufficient revenues . . . necessary to fund fifteen billion dollars for capital projects for the 2020 to 2024 [Metropolitan Transit Authority, ("MTA")] capital program." *Id.* § 1404-a(1).

Because the congestion pricing tolls would be placed on a highway "constructed under the provisions" of the Federal-Aid Highways Act, 23 U.S.C. § 301, the permission of the federal Government was required for the project. Section 301 of Title 23 provides that "[e]xcept as provided in section 129 of this title with respect to certain toll bridges and toll tunnels, all highways constructed under the provisions of this title shall be free from tolls of all kinds." *Id.*

Absent falling into a congressional authorized carve-out to that general provision, a state cannot toll a federal highway like those entering the CBD.  One such exception is for congestion pricing programs.  Congress enacted the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA") to "develop a National Intermodal Transportation System that is economically efficient and environmentally sound, provides the foundation for the Nation to compete in the global economy, and will move people and goods in an energy efficient manner" and to "reduce energy consumption and air pollution while promoting economic development."  Pub. L. No. 102-240, § 2 (1991).  Among other things, that statute created a Congestion Pricing Pilot Program, which directed the Secretary of Transportation to "solicit the participation of State and local governments and public authorities for one or more congestion pricing pilot projects" and stated that "[t]he Secretary may enter into cooperative agreements with as many as 5 such State or local governments or public authorities to establish, maintain, and monitor congestion pricing projects."  *Id.* § 1012(b).

ISTEA provided that "[n]otwithstanding sections 129 and 301 of title 23, United States Code, the Secretary shall allow the use of tolls on the Interstate System as part of a pilot program under this section, but not on more than 3 such programs."  *Id.* § 1012(b)(4).  It directed that "[r]evenues generated by any pilot project under this subsection must be applied to projects eligible under such title."  *Id.* § 1012(b)(3).  ISTEA also provided that "[t]he Secretary shall monitor the effect of such projects for a period of at least 10 years, and shall report to the Committee on Environment and Public Works of the Senate and the Committee on Public Works and Transportation of the House of Representatives every 2 years on the effects such programs are having on driver behavior, traffic, volume, transit ridership, air quality, and availability of funds for transportation programs."  *Id.* § 1012(b)(5).  ISTEA directed that as part of each state's

transportation planning process, the state should consider, "[w]here appropriate, the use of innovative mechanisms for financing projects, including value capture pricing, tolls, and congestion pricing." *Id.* § 1025(c)(16).

The Congestion Pricing Pilot Program as passed by Congress envisioned also that funds may be appropriated "to carry out the requirements of this subsection." *Id.* § 1012(b)(6). That sum must "not exceed $25,000,000" in "each fiscal year," and "[n]ot more than $15,000,000 of such amounts shall be made available to carry out each pilot project under this section." *Id.*

Congress renamed the Congestion Pricing Pilot Program the Value Pricing Pilot Program ("VPPP") in the Transportation Equity Act for the 21st Century of 1998 ("TEA-21C"). Pub. L. No. 105-178, § 1216(a) (1998). It replaced the word "congestion" as used in that statute with the word "value." *Id.* TEA-21C removed the three-program cap on the number of programs that could include the use of tolls on the Interstate System. *Id.* § 1216(a)(4). It also increased the overall number of cooperative agreements into which the Secretary could enter from five to fifteen. *Id.* § 1216(a)(2). The statute is presently codified at 23 U.S.C. § 149 note.[1]

Following passage of the TMA, the relevant New York State entities began discussions with the U.S. Department of Transportation ("DOT") and the Federal Highway Administration ("FHWA"), through which it was determined that "the Tolling Program would require approval from the FHWA to implement tolls on federal-aid highways through the Value Pricing Pilot Program." *Duffy*, 784 F. Supp. 3d at 641. On June 17, 2019, the state entities submitted an official Expression of Interest to the FHWA seeking approval of the CBDTP under the VPPP.

---

[1] The statute is codified in the federal register as a note but may also be cited at Pub. L. No. 102-240 § 1012(b). "It is of no moment that this provision was . . . codified as a note, as opposed to a statutory subsection." *Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535, 558 n.19 (S.D.N.Y. 2023). For convenience, in this opinion, the Court refers to the relevant provisions as the "VPPP."

*Duffy*, 784 F. Supp. 3d at 641.  The Expression of Interest explained that the project would operate by charging vehicles a toll to enter the Manhattan CBD, defined as above.  Dkt. No. 91-2 at 6.  It also identified five project goals for the project: (1) "Reduce traffic congestion"; (2) "Improve air quality"; (3) "Create a sustainable funding source to repair and revitalize the MTA transit system," including by "generat[ing] revenues, net of VPPP operating costs, to support $15 billion in bonds for MTA capital transit repair and revitalization projects"; (4) "Increase transit ridership"; and (5) "Improve travel options for low-income residents."  Dkt. No. 91-2 at 6.  In its October 2020 response, the FHWA stated that "[u]nder the various programs in Federal law that allow tolling of existing infrastructure, the VPPP appears to be the best potential fit."  Dkt. No. 91-3 at 1.  That letter continued that the project was "unprecedented" because it would operate as an "area-wide congestion pricing system," but that if it proceeded, "a toll agreement between FHWA, your agency, and the other project partners would need to be developed and signed to secure Federal tolling authority under the VPPP.  Upon execution of the toll agreement with FHWA, New York State [Department of Transportation] and your partners could then implement the project and collect and use the toll revenues consistent with the legal requirements outlined in Title 23, United States Code."  *Id.* at 2.  The letter noted also that approval might not be quickly provided "considering the complexity and new constructs of cordon pricing that the VPPP has not previously authorized elsewhere."  *Id.* at 3.  The FHWA also requested more information about the program, which was provided.  *See generally Duffy*, 784 F. Supp. 3d at 641–42.

On July 2, 2020, the New York State entities reached out to the FHWA seeking commencement of the environmental review process required by the National Environmental Policy Act ("NEPA").  Dkt. No. 91-6.  After a delay and a request for further information in light of the COVID-19 pandemic, on March 30, 2021, the FHWA responded to the Project Sponsors

noting that "[a]fter careful review of the relevant information, FHWA believes that our mutual goals of producing needed traffic and air quality analysis and soliciting robust public input from all stakeholders can best be achieved through the preparation of an Environmental Assessment." Dkt. No. 91-9. The letter confirmed the FHWA's understanding that "[t]his important and potentially precedent-setting project would include variable tolling once a day for vehicles entering or remaining within . . . the Central Business District." *Id.* at 1.

A lengthy environmental review process under NEPA followed, culminating in an April 2023 Final Environmental Assessment ("EA") and a Finding of No Significant Impact ("FONSI") by the FHWA. *Duffy*, 784 F. Supp. 3d at 643 (citing Dkt. No. 91 ¶¶ 15, 17). As the Court previously summarized, the resulting EA "identified two primary, and complementary, needs: the need to reduce vehicle congestion in the CBD, and the need to create a new local, recurring funding source to support the financing of $15 billion for MTA transit capital projects in the agency's 2020–2024 Capital Program." *Id.* (citing Dkt. No. 96). It ultimately "predicted that the Tolling Program would meet each of the program's objectives and that it would not have adverse effects on air quality." *Id.* It also "predicted many beneficial environmental effects of the Tolling Program, including but not limited to: (1) reducing emissions of harmful air pollutants, both within the CBD and throughout the region (2) reducing delays at many intersections and highway segments, thereby improving travel times, reducing vehicle operating costs, and improving safety; and (3) reducing regional energy consumption and greenhouse gas emissions, thereby helping to meet carbon reduction goals." *Id.* Finally, the EA concluded that the program would provide economic benefits to the Manhattan CBD, the region, and the nation. *Id.* The FHWA approved the Final EA in May 2023, and the FONSI was signed on June 23, 2023. *Id.*

On November 21, 2024, the New York State Department of Transportation ("NYSDOT"), TBTA, and New York City Department of Transportation ("NYCDOT") (collectively, the "Project Sponsors") entered into an agreement with the FHWA pursuant to the VPPP.  Dkt. No. 87-1 (the "VPPP Agreement").  The VPPP Agreement memorialized "that the TBTA may operate the Project as a toll Project in accordance with the provisions of this Agreement and as a value pricing project, as a part of NYSDOT's value pricing pilot program." *Id.* at 2.  "As of the date of the execution of this Agreement, the imposition of tolls under this Agreement does not render Federal-aid highways within the State of New York generally ineligible for Federal-aid highway funds where such highways are otherwise eligible under the particular funding program." *Id.* at 3.  A prefatory clause notes that "Section 1012(b) of ISTEA, as amended requires that all revenues received from the operation of a value pricing project be applied only toward the project's operating costs (including project implementation costs; mitigation measures to deal with adverse financial effects on low-income drivers; the proper maintenance of the Project; any reconstruction, rehabilitation, restoration, or resurfacing of the Project; any debt service incurred in implementing the project; a reasonable return on investment of any private person financing the project), and other projects eligible for assistance under title 23, United States Code." *Id.* at 1–2.

Additionally, in the VPPP Agreement the Project Sponsors agreed to certain monitoring requirements.  That is, they are required to "conduct or have an independent auditor conduct an annual audit of toll Project records to verify compliance with use of revenues and report the results of the audits to FHWA." *Id.* at 2.  Upon reasonable notice, the TBTA is to "make all of its records pertaining to the Project subject to audit by the FHWA." *Id.*  The TBTA and NYCDOT, as applicable, shall monitor and report on the project performance "from the date of

implementation for a period of at least ten years or to the end of the life of the Project, whichever is sooner, to evaluate the effects on driver behavior, traffic volume, congestion, transit ridership, air quality, and availability of funds for transportation programs." *Id.* The VPPP Agreement states that the reports shall begin one year after the operation date and shall be made every two years thereafter. *Id.* at 3. The TBTA and NYCDOT are also to "identify benefits the application of tolls has in reducing climate pollution" and "demonstrate the benefits mitigation measures provide to underserved communities." *Id.*

The VPPP Agreement also sets forth "performance metrics of the system for evaluating the effectiveness of the pilot program." *Id.* at 9. The metrics for measuring congestion include: (1) reducing [Vehicle Miles Traveled] within the CBD by 6.4% (Phase 1) to 8.9% (Phase 3); (2) reducing the number of vehicles entering the CBD by 13.4% (Phase 1) to 17% (Phase 3); and (3) increasing transit use entering the CBD. *Id.* In addition, it specifies that "NYSDOT, TBTA and NYCDOT agree to comply with all Federal laws and requirements applicable to this project, including the laws and policies applicable to the Value Pricing Pilot Program." *Id.* at 3. "Such laws and requirements include, but are not limited to Section 1012(b) of ISTEA, as amended, the guidance implementing Section 1012(b) of ISTEA, and 23 CFR Part 940 and 950." *Id.* It also obligates the TBTA, through NYSDOT, to provide the FHWA notice of any proposed changes to the toll structure at least sixty days before such changes go into effect. *Id.* at 4. The VPPP Agreement states that the "NYSDOT, TBTA, and NYCDOT agree they will work with FHWA to return the Project to its original operating condition if TBTA decides to discontinue tolls on the Project." *Id.*

The VPPP Agreement did not award any funds to the Project Sponsors to carry out the approved project. The program went into effect on January 5, 2025. Dkt. No. 91 ¶ 25.

II.    **The Purported Termination of the VPPP Agreement**

President Trump took office on January 20, 2025.  On January 28, Sean Duffy was confirmed by the United States Senate as Secretary of the Department of Transportation (the "Secretary" or "Secretary Duffy").

On February 19, 2025, Secretary Duffy sent a letter to New York Governor Kathy Hochul purporting to rescind the Federal Government's approval of the CBD Tolling Program run pursuant to the VPPP Agreement.  Dkt. No. 87-5 (the "February 19 Letter").  In his letter, he explained that the New Jersey Governor, the New Jersey Commissioner of Transportation, and President Trump had expressed concerns about the CBDTP.  The Secretary "share[d] the President's concerns about the impacts to working class Americans."  Dkt. No. 87-5 at 3.  He continued that "[i]n light of the President's concerns . . . I reviewed the tolling authority granted under VPPP to the CBDTP pilot project for compliance with Federal law."  *Id.*  That legal review led him to two conclusions.  First, he determined that the VPPP Agreement's use of a "cordon pricing" program, which he defined as a congestion pricing program that "provides no toll-free option for many drivers," and charges a toll to enter the cordoned area "no matter what roads they use," was not included in the ambit of a "value pricing pilot program."  *Id.* at 4. Second, the Secretary determined that the CBDTP "appears to be driven primarily by the need to raise revenue for the [MTA] system as opposed to the need to reduce congestion," and that the VPPP does not authorize tolls calculated based on goals "separate from reducing congestion or advancing other road-related goals."  *Id.* at 4.  On the basis of those two conclusions, he stated that the "FHWA lacked statutory authority to approve the cordon pricing tolling under the CBDTP pilot project," and so he was "rescinding FHWA's approval of the CBDTP pilot project under the November 21 Agreement and terminating the Agreement."  *Id.*

9

Also on February 19, the White House posted to the social media site X an image of President Trump wearing a bejeweled crown underneath the superimposed words "TRUMP" and "LONG LIVE THE KING," accompanied by the text "CONGESTION PRICING IS DEAD. Manhattan, and all of New York, is SAVED.  LONG LIVE THE KING."  Dkt. No. 87-4.

This action was commenced by the MTA and the TBTA that same day.  Dkt. No. 1.  In a 51-page complaint, Plaintiffs alleged that the Secretary's termination of the VPPP Agreement was unlawful under the Administrative Procedure Act ("APA") because it was both arbitrary and capricious and contrary to law as the Defendants were not authorized by any law to unilaterally terminate that agreement contrary to its terms, and because they had not adequately explained their reasoning for terminating the Agreement.  They alleged also that the termination violated the Due Process Clause of the 5th Amendment, and that under NEPA the Federal Government was required to undertake a new environmental review upon cancellation thereof.  Dkt. No. 1.  They requested declaratory relief and vacatur of the challenged action.  *Id.*

The day after the MTA and MBTA initiated the litigation, the Executive Director of the FHWA, Gloria M. Shepherd, sent a follow-up letter to the Commissioner of the NYSDOT, the President of the TBTA, and the Commissioner of the NYCDOT "to discuss the orderly cessation of toll operations under the CBDTP."  Dkt. No. 87-6.  She noted that to provide the Project Sponsors "time to terminate operations of this pilot project in an orderly manner, this rescission of approval and termination of the November 21, 2024 agreement will be effective on March 21, 2025."  *Id.*  On March 20, the day before that deadline, the Executive Director sent another letter to the same persons, stating that she was "writing pursuant to my February 20, 2025 letter, providing you until March 21, 2025 to cease tolling operations that were initiated through the November 21, 2024" agreement.  Dkt. No. 87-8.  She continued that "[t]he Secretary has directed

that I extend the period of time to comply by 30 days," such that "toll operations must cease by April 20, 2025." *Id.*

On April 21, 2025, the Secretary himself sent another letter to Governor Hochul reiterating that the agreement had been terminated on February 19. Dkt. No. 87-10 (the "April 21 Letter"). That letter "made clear" that pursuant to the February 19 Letter the Project Sponsors were required to "cease the collection of tolls by March 21, 2025" and provide details and updates regarding the cessation. *Id.* at 1. Because "New York has not responded to FHWA's request for information," the April 21 Letter directed the Project Sponsors to "show cause, no later than May 21, 2025, why FHWA should not take appropriate steps under 23 C.F.R. § 1.36 to remedy New York's noncompliance with 23 U.S.C. § 301 in connection with the [Tolling Program]." *Id.* To do so, NYSDOT was to either (1) certify that "the collection of tolls under the [Tolling Program] has ceased," or (2) demonstrate that the "continued collection of tolls does not violate 23 U.S.C. § 301." *Id.* That response, the letter noted, "should also address the policy concerns expressed in my February 19, 2025, letter, which were an independent basis for my decision to terminate the VPPP agreement." *Id.* at 2. The April 21 Letter also that threatened to "implement appropriate initial compliance measures" if New York continued to operate the program. *Id.* Those included: (1) "No further advance construction authorizations for projects within the borough of Manhattan," (2) "No further [NEPA] approvals for projects within the borough of Manhattan," (3) "No further approvals of Statewide Transportation Improvement Program amendments," and (4) "No further obligations of FHWA funds . . . for projects within New York City." *Id.* at 3. In that letter, the Secretary acknowledged also the present lawsuit that had been initiated several months before. *Id.* at 4.

III.    **This Court's Prior Opinion**

Following the April 21 Letter, Plaintiffs filed the operative complaint, the Consolidated Second Amended Complaint, on May 6, 2025.  Dkt. No. 96.[2]  It asserts 10 counts for relief under the APA and the Constitution.  *Id.* ¶¶ 218–314.  Intervenor-Plaintiffs the Riders Alliance and Sierra Club (the "Organizational Intervenors") filed their operative complaint on April 18, 2025.  Dkt. No. 63.  It asserts four claims under the APA, NEPA, and that the Secretary's actions were *ultra vires*.  *Id.* ¶¶ 82–110.

As early as April 4, 2025, the Plaintiffs had alerted the Court to the potential need to seek preliminary injunctive relief if the Defendants acted to withhold funds, but maintained that the case would be "best resolved through orderly summary judgment and without the exigency that accompanies motions under Rule 65."  Dkt. No. 49 at 4.  Plaintiffs had specifically sought information from the Defendants as to whether they intended to take "unilateral action on or after April 20 that might require Plaintiffs to seek expedited injunctive relief," *id.*, but Defendants could not answer.  Ultimately, the Secretary issued the April 21 Letter threatening enforcement action as early as May 28, 2025.  Plaintiffs attempted unsuccessfully to schedule a meet and confer with Defendants, and when they eventually did get in contact the Defendants declined to agree not take enforcement action, even temporarily.  Dks. Nos. 70, 70-1.  At that point, Plaintiffs proposed a briefing schedule for a preliminary injunction on a quick timeframe.  Dkt. No. 71-1.  The Court ordered that the Plaintiff could file a motion for a preliminary injunction by May 5, that Defendants would respond by the 16th, and that the Court would hold a hearing if necessary on May 27.  Dkt. No. 77.  On May 5, 2025, the TBTA, MTA, and NYSDOT filed

---

[2] This complaint was consolidated with the complaint of Intervenor-Plaintiff New York State Department of Transportation.  Dkt. No. 96.

motions for a preliminary injunction, which Defendants opposed.  Dkt. Nos. 79–91, 118, 124, 126.

At the hearing on May 27, the Court issued a temporary restraining order prohibiting the Secretary from taking any action "founded on the February 19, 2025 letter" or taking any of the "compliance measures set forth in the April 21, 2025 letter."  Dkt. No. 129 at 1.  The Court found that "[o]n a preliminary basis," "the plaintiffs have demonstrated a likelihood of success on their claims that the Secretary did not, among other things . . . have the authority to terminate the VPPP Agreement, and even if he had the authority, the reasons for terminating rested on errors of law and was arbitrary and capricious."  Dkt. No. 135 at 61:25–62:5.  It continued also that the Plaintiffs would suffer irreparable harm "in the time from now until when I have the opportunity to more fully consider the arguments and determine whether to issue a preliminary injunction."  *Id.* at 62:6–10.  Specifically, that harm was in the form of "undermining the authority of a sovereign state to implement a policy of its democratically elected representatives," to "the bond market," and "in terms of the delay and possible cancellation of public works projects in the city and potentially the state."  *Id.* at 62:10–17.

The next day, on May 28, the Court converted the TRO into a preliminary injunction. Dkt. No. 132.  The Court found that it possessed subject matter jurisdiction to address Plaintiffs' claims, that Plaintiffs had established a likelihood of success on the merits, that Plaintiffs would suffer irreparable harm in the absence of an injunction, and that the balance of hardships weighed in favor of injunctive relief.

Specifically, the Court rejected each of the Secretary's three jurisdictional arguments: (1) that there was no reviewable final agency action; (2) that none of the Plaintiffs' claims were ripe

13

for review; and (3) that the Court of Federal Claims had exclusive jurisdiction of any justiciable part of this dispute pursuant to the Tucker Act, 28 U.S.C. § 1491.

As to the existence of final agency action, the Court recited that only two conditions must be met for an agency action to be final: (1) "the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature" and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will follow." *Duffy*, 784 F. Supp. 3d at 657 (quoting *Salazar v. King*, 822 F.3d 61, 82 (2d Cir. 2016)). The Court found that the first condition was satisfied. "[T]he decision to terminate the VPPP Agreement was consummated by February 19, 2025 at the latest." *Id.* at 657. The Secretary's February 19 Letter stated in no uncertain terms that the program was terminated because Congress did not give the Secretary the authority to permit it. There was nothing in the announcement that "was in any way tentative or interlocutory," or otherwise "equivocal." *Id.* The meaning was confirmed by the President's statement the same day: 'CONGESTION PRICING IS DEAD." *Id.* (quoting Dkt. No. 87-4). It was also confirmed by the language of subsequent communications from the Executive Director and the Secretary and even by counsel's representations at the May 27, 2025 hearing. The February 20 letter from the Executive Director acknowledged that the February 19 Letter "terminat[ed] the November 21, 2024 Value Pricing Pilot Program Agreement." Dkt. Nos. 87-6. Her letter one month later on March 20, which was "pursuant to my February 20, 2025 letter," provided only an extension to "cease" operations. Dkt. No. 87-8. And at the hearing before this Court, Counsel for the Secretary "confirmed" that "it is still the Secretary's position that the previous Administration lacked the lawful authority to sign the VPPP Agreement, that the VPPP Agreement has been terminated, and that, accordingly, the Tolling Program is unlawful." *Duffy*, 784 F. Supp. 3d at

657 (quoting Dkt. No. 135 at 26:4–27:2; 32:4–7; 45:22–46:5, 47:11–48:1).  The Court concluded

that the second condition for final agency action was satisfied because the February letter, "if

valid, impose[d] a 'legal obligation' upon Plaintiffs to cease operation of the Tolling Program

and, as the Secretary's own letters confirm[ed], put Plaintiffs at risk of legal sanctions."  *Id.* at

661–62.  "The Secretary does not suggest that Plaintiffs are free to disregard his order" which

"deemed the VPPP Agreement to have been unauthorized, and on its face terminated and

rescinded the VPPP Agreement."  *Id.* at 661.  The Court also noted that "the Secretary's

pronouncement ha[d] endangered Plaintiffs' ability to issue bonds as the bonds are secured by

the Tolling Program's revenues and thus rely upon the program's longevity."  *Id.* at 662.

With respect to prudential ripeness, the Court recited that "(1) whether a claim is

prudentially ripe [depends upon] 'whether [an issue] is fit for judicial resolution and (2) whether

and to what extent the parties will endure hardship if decision is withheld.'"  *Id.* at 662 (quoting

*Simmons v. I.N.S.*, 326 F.3d 351, 359 (2d Cir. 2003)).  Plaintiffs' claim was "fit" for judicial

resolution because the agency action was final, the issues to be decided were legal ones

concerning "the FHWA's authority to sign [the VPPP Agreement] and to terminate it," and no

party had identified any fact-gathering or development that remained for the Court to decide the

relevant legal issues.  *Id.*  The Court also held that the "hardship" condition was satisfied.  "A

rule that 'requires an immediate and significant change in [a party's] conduct of its affairs with

serious penalties attached to noncompliance' presents a prototypical instance of hardship."  *Id.* at

663–64 (quoting *New York v. U.S. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 565

(S.D.N.Y. 2019) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 153 (1967)).

The Court also rejected the Secretary's argument that jurisdiction over the case was

proper only in the Court of Federal Claims under the Tucker Act, 28 U.S.C. §§ 1346(a)(2),

1491(a)(1). *Id.* at 664–67. It did so for two reasons. First, the Tucker Act "waives sovereign immunity for contract disputes with the government," but the VPPP Agreement is not a contract but a "cooperative agreement," which did not "confer a direct and tangible benefit on the United States—a requirement for Tucker Act jurisdiction." *Id.* at 666–67 (internal citations and quotations omitted). Second, the Court held that the action was not in essence contractual: "Plaintiffs are not suing to enforce any term of the VPPP Agreement or accusing Defendants of breach," and the relief Plaintiffs sought was non-contractual. *Id.* at 665. In asking the Court to enjoin Defendants from pursuing the threatened "compliance measures," "Plaintiffs do not cite any contractual rights arising wholly from the VPPP Agreement but rather statutory entitlements—federal funding and approvals guaranteed by federal laws such as the [Federal Aid Highway Act], NEPA, and the Federal Transit Act that do not derive from any contract." *Id.* at 666.

The Court also rejected the Secretary's arguments against Plaintiffs' APA claims. The Court first looked to 2 C.F.R. § 200.340(a), which "states four ways in which a federal award may be terminated in part or in its entirety." *Id.* at 668. Those are:

(1) By the Federal agency or pass-through entity if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award;

(2) By the Federal agency or pass-through entity with the consent of the recipient or subrecipient, in which case the two parties must agree upon the termination conditions . . . ;

(3) By the recipient or subrecipient upon sending the Federal agency or pass-through entity a written notification of the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Federal agency or pass-through entity determines that the remaining portion of the Federal award will not accomplish the purposes for which the Federal award was made, the Federal agency or pass-through entity may terminate the Federal award in its entirety; or

(4) By the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.

2 C.F.R. § 200.340(a).

First, the Court explained that "Defendants do not argue that Plaintiffs failed to comply with any term or condition of the VPPP Agreement, and Plaintiffs have not terminated the VPPP Agreement and vehemently do not consent to termination." *Id.* at 669. Therefore, termination would be appropriately only if permissible under subsection (4). The Court concluded in turn that 2 C.F.R. § 200.340(a)(4) did not by itself permit termination. "The regulation is properly read as stating that an award may be terminated on the grounds that it no longer effectuates the program goals or agency priorities if such ground (1) is authorized by law and (2) is actually included as a term and condition of the federal award." *Id.* at 670. Because termination for failure to effectuate agency priorities was not included within the VPPP Agreement, the Court held it was not a basis upon which that agreement could be terminated.

The Secretary argued that 2 C.F.R. § 200.340 was incorporated into the VPPP Agreement through 2 C.F.R. § 200.211(c)(2), which states that "[f]ederal agencies must inform recipients of the termination provisions in § 200.340, including the applicable termination provisions in the Federal agency's regulations or terms and conditions of the federal award," and that, as a result, the Secretary had the authority to terminate the VPPP Agreement based on a conclusion that, in the Secretary's view, the CBDTP no longer effectuated the DOT's priorities. The Court rejected that argument as well. All that the incorporation of Section 200.340 through Section 200.211(c)(2) would do would be to permit the Secretary to terminate the VPPP Agreement based on a change in DOT priorities if such authority was contained in the VPPP Agreement itself. Section 200.211(c)(2) did not independently give the Secretary the authority to terminate the VPPP Agreement if such authority was not contained in the terms and conditions of the

17

VPPP Agreement.  The Court noted the radical implications of the Secretary's argument: if the incumbent Secretary was able to terminate an award granted by a predecessor Secretary without having included such a term, "[f]ew if any persons would buy bonds to support a capital project." *Id.*  In other words, "Defendants' argument, if accepted, has built within it the seeds of the destruction of the VPPP and the objectives Congress intended to further with it."  *Id.* at 673.

The Court next preliminarily rejected also as contrary to law the Secretary's conclusion in the February 19 Letter that the Secretary did not have the authority to enter into an agreement permitting a cordon pricing program in the first place.  The statute does not define the term "congestion pricing" or "value pricing."  As the Court explained, that the VPPP "operates as a carve-out to the tolling ban [in 21 U.S.C. § 301] does not mean that it should be grudgingly applied or that the Secretary must afford it only a narrow meaning."  *Id.* at 675.  The Secretary was "unable to overcome the myriad evidence demonstrating that the VPPP does not distinguish between cordon pricing programs and other forms of congestion pricing."  *Id.* at 678.  Because an agency action is arbitrary and capricious when "it takes actions that are not justified by its stated bases," the Court held that "Plaintiffs show a likelihood of success on the merits that the Secretary's decision to terminate the VPPP Agreement because the statute does not authorize cordon pricing programs was arbitrary and capricious."  *Id.* at 679.

The Court also held that the Plaintiffs had shown a likelihood of success in their argument that the Secretary's conclusion in his February 19 Letter that the VPPP Agreement was entered into without statutory authority because the statute does not "authorize tolls that are 'calculated based on considerations separate from reducing congestion or advancing other road related goals'" was contrary to law.  *Id.* at 679 (quoting Dkt. No. 87-5 at 4).  The statute "does not contain any language excluding from consideration [] other factors for determining toll

rates," and provides instead that "revenues can be used for purposes other than highway construction and thus can be designed to generate revenues for purposes other than highway construction, such as transit capital projects." *Id.*

The Court further found that Plaintiffs had shown a likelihood of success on their claim that the policy rationales advanced by the Secretary in his letter on April 21 were *post hoc* rationalizations that were arbitrary and capricious. In that letter, the Secretary stated that he had made the decision to terminate the Agreement on the basis that highway users would be forced to "pay again" for a highway funded by federal taxes, and that it would impose a disproportionate financial hardship on low and medium-income American drivers. *Id.* at 681 (citing Dkt. No. 87-10 at 3). But the Secretary had articulated those rationales only after rescinding the Department's approval of the CBDTP in February on the grounds that the approval had been made without legal authority. The February 19 Letter referenced the policy grounds only as the basis of the Secretary's decision to examine whether the Department had the authority to approve the CBDTP in the first instance. It did not identify them as a basis for the Secretary's conclusion to withdraw approval of the program. In the February 19 Letter, the Secretary had definitively concluded that the Department lacked statutory authority to enter the VPPP Agreement, a conclusion that Plaintiffs challenged in this lawsuit that very day. The Defendants could not "escape the Secretary's flawed legal conclusions by, once those legal conclusions have been challenged, disavowing them and reframing the conclusions as mere expressions of policy." *Id.* at 680. "The bar against considering *post hoc* rationalizations is not 'useless formality' but rather 'serves important values of administrative law' by promoting agency accountability and permitting 'orderly functioning of the process of review.'" *Id.* at 681 (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22–23 (2020)).

Moreover, the Court concluded that "[t]here are reasons to doubt that Defendants' belatedly expressed policy concerns would support the termination decision even if they had served as the contemporaneous basis for Defendants' decision," because in making that argument Defendants did not acknowledge contrary arguments or provide evidence in support. *Id.* at 681–82.

Finally, the Court found likelihood of success on the merits as well regarding Plaintiffs' claim that the decision to terminate the VPPP Agreement was arbitrary and capricious because the Secretary did not adequately consider important reliance interests, such as the fundraising and expenditures undertaken by the Project Sponsors in reliance on the functioning of the tolling program. *Id.* at 682–83. That the program is a "pilot project" did not make that reliance unreasonable by indicating it was by necessity temporary. Rather, the project was designated as "a pilot in the sense that it is a 'first of a kind' trial to determine whether the imposition of tolls and the use of that toll revenue to finance capital projects to improve mass transit will divert enough travelers to the mass transit system to alleviate the critical problem of congestion in the country's most important commercial sector." *Id.* at 685. In sum, the Plaintiffs' reliance was reasonable, and Plaintiffs demonstrated sufficiently at the preliminary injunction stage that "the Secretary and the FHWA acted arbitrary and capriciously by failing to adequately consider Plaintiffs' reliance interests." *Id.* at 686.

The Court reached the opposite conclusion as to Plaintiffs' NEPA APA claim, finding that because "Plaintiffs have not demonstrated that the FHWA's earlier NEPA review failed to take into account information necessary to evaluate the environmental impacts of terminating the VPPP Agreement and that would have required a separate or supplemental environmental

20

assessment," they had not shown a likelihood of success on their claim that renewed NEPA review was necessary before the Agreement could be terminated. *Id.* at 688.

On the remaining preliminary injunction factors, the Court determined that Plaintiffs would be irreparably harmed absent a preliminary injunction because (1) "[a] prohibition on a state from 'effectuating statutes enacted by representatives of its people' inflicts 'a form of irreparable injury,'" *id.* at 690 (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977)), and (2) if the threatened compliance measures were taken, "Plaintiffs have outlined a great many projects that rely on the imperiled funds and approvals," *id.* For example, a planned ramp connecting the Harlem River Drive to the Trans-Manhattan expressway, a planned reconstruction of Delancey Street, reconfiguration of I-81 in Syracuse, a project to replace bridges on the Cross Bronx Expressway, and "hundreds of other NYSDOT projects intended to address safety and congestion concerns" would be at risk without the funds derived the program. *Id.* Similarly, "if the Plaintiffs were to accede to Defendants' threat and halt the Tolling Program, even in the face of a court finding that such threat is likely unlawful, they would also suffer irreparable harm." *Id.* at 691. That is, "Plaintiffs have invested significant taxpayer dollars in enacting and administering the Tolling Program," and would "be deprived of the tolling revenues intended to fund transit capital projects and necessary to refinance TBTA's short-term debt obligations." *Id.* The Court rejected the Defendants' argument in response that the harms of noncompliance were speculative, because "[c]ourts have repeatedly recognized the irreparable harm inherent to a situation such as the one in which Defendants have presently placed Plaintiffs, in which a Plaintiff can either accede to the government's presumptively unlawful threat or else disobey the government's directive and

expose itself to potentially devastating injury throughout the pendency of the proceedings." *Id.*
at 692.

The Court concluded also that the equities and public interest weighed in favor of the
issuance of a preliminary injunction. First, there "is a substantial public interest in having
governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.*
at 696 (quoting *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir.
2016)). And second, the Court determined that denying a preliminary injunction would endanger
transportation infrastructure and deny the public the benefits of the duly enacted program. *Id.* at
696–97. For example, "[i]f forced to stop tolling or if denied federal funds, the MTA would be
forced to cancel or halt projects designed to promote access to transit for individual[s] with
disabilities, to decrease subway delays, and to increase transit options throughout the city." *Id.* at
696. Similarly, without funding, "NYSDOT and NYCDOT would be unable to move forward
with numerous projects necessary to ensure smooth and safe operation of the roads in New
York." *Id.* Ceasing of the CBDTP would also undo benefits in the form of lessened congestion,
including commute times and safety. *Id.* at 697. On the other hand, the Defendants "may have a
valid interest in pursuing their preferred transportation policy," but that preference "does not
outweigh the 'wide-ranging economic harms that await the States' upon implementation of a
new policy." *Id.* (quoting *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 87
(2d Cir. 2020)).

Accordingly, the Court preliminarily enjoined the Defendants and the persons identified
under Federal Rule of Civil Procedure 65(d)(2) "from taking any action founded on the February
19 Letter . . . including any action to enforce compliance with or implement (1) the February 19

Letter, (2) Defendant's purported termination of the VPPP Agreement, or (3) Defendants' purported termination of the Tolling Program." *Id.* at 698.[3]

## PROCEDURAL HISTORY

Following the Court's issuance of the preliminary injunction, the parties jointly requested an expedited briefing schedule for summary judgment, Dkt. No. 138, which the Court granted, Dkt. No. 139.  On June 24, the parties wrote a joint letter and agreed that "Local Civil Rule 56.1 does not apply to the forthcoming motions for summary judgment," and so no Rule 56.1 statements were submitted.  Dkt. No. 143.  Accordingly, MTA, NYCDOT, and TBTA submitted their motion for partial summary judgment and accompanying memorandum of law and declaration of Brandon Trice on June 27, 2025.  Dkt. Nos. 150–52.  The NYSDOT submitted its motion and memorandum of law, incorporating the arguments of MTA, NYCDOT, and TBTA, the same day.  Dkt. Nos. 154–55.  Defendants submitted their motion for summary judgment, memorandum of law, and a declaration of Richard Marquis on June 27 as well.  Dkt. Nos. 156, 158–59.  Organizational Intervenors Riders Alliance and Sierra club submitted their motion for partial summary judgment, along with a memorandum of law and four declarations, also on June 27.  Dkt. Nos. 145–50.  All parties submitted their memorandums of law in opposition to the other side's motions for summary judgment on July 18.  Dkt. Nos. 167–71.

The Regional Plan Association, Inc. submitted a motion to file an amicus brief in support of the MTA, Dkt. No. 161, which the Court granted, Dkt. No. 166.

At the preliminary injunction stage, the Court relied upon the record evidence presented by the parties in the form of declarations and exhibits to their various motions.  The day before

---

[3] The Court declined to grant a preliminary injunction based on Plaintiffs' arguments regarding the Secretary's threatened compliance measures that had not yet been implemented, which would "have the Court issue an advisory opinion." *Id.*

the Court issued its preliminary injunction opinion, the Secretary filed the Supplemental

Administrative Record.  Dkt. No. 130.  That record contains only three documents that the Court

had not already considered in its preliminary injunction opinion: NYSDOT's response to the

April 21 Letter and the two letters from New Jersey officials referenced by the Secretary in his

February 19 Letter.  The January 20, 2025 letter from Governor Murphy to President Trump

notes his "significant concerns" about the congestion pricing scheme on the basis that it would

harm New Jersey commuters and residents.  Dkt. No. 130-3 at 20–21.  The letter from New

Jersey Commissioner of the Department of Transportation to Secretary Duffy explains legal

grounds upon which he believed the congestion pricing program to be illegal, none of which

have been adopted by the Secretary in this action.  *Id.* at 10–19.[4]  The NYSDOT's response to

the April 21 Letter, dated May 21, 2025, merely states the Project Sponsor's position that the

VPPP Agreement is lawful and remains in effect for the reasons set forth in the Second Amended

Complaint filed in this action.  Dkt. No. 130-4 at 8–9.

   The Court held oral argument on the motions for summary judgment on January 28,

2026.  At argument, the Court ordered the parties to submit supplemental briefing on several

issues to be submitted by February 6, 2026.  On that date, both parties submitted their

supplemental memoranda of law.  Dkt. Nos. 187, 190.  Plaintiffs also submitted a three-page

---

[4] The four grounds listed by the Commissioner were that the plan "(1) no longer satisfies the
project's objective of generating sufficient annual net revenues to fund $15 billion for capital
projects for the [MTA] capital program; (2) no longer satisfies the project's objective of
establishing a tolling program consistent with New York State's MTA Reform and [TMA]; (3)
did not receive the appropriate hard look from the FHWA under NEPA; and (4) as a federal
district court has already found, fails to adequately mitigate significant environmental impacts on
New Jersey communities entitled to mitigation that were identified but left unmitigated when the
FHWA first green-lit the project."  Dkt. No. 130-3 at 11.  In *Chan v. United States Department
of Transportation*, this Court dismissed NEPA and APA challenges to the CBDTP that mirror
those highlighted by the Commissioner's letter.  782 F. Supp. 3d 39 (S.D.N.Y. 2025).  Those
challenges are not echoed by the Secretary.

letter addressing additional points raised at oral argument, to which Defendants objected.  Dkt.

No. 189.  The Court permitted Defendants to respond with a letter of commensurate length

addressing the same topics, Dkt. No. 190, which was submitted on February 12, 2026, Dkt. No.

193.

## STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  The moving party bears the burden to "demonstrate the absence of a genuine issue of

material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and to oppose summary

judgment, the nonmoving party "may not rely on conclusory allegations or unsubstantiated

speculation," *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010).  "Where, as here, an

APA-based challenge to an agency's action presents a pure question of law, a district court's

procedural decision to award summary judgment is generally appropriate."  *Aleutian Cap.*

*Partners, LLC v. Scalia*, 975 F.3d 220, 229 (2d Cir. 2020).  "Judicial review is generally limited

to the administrative record that the agency relied upon."  *Residents for Sane Trash Sols., Inc. v.*

*U.S. Army Corps of Eng'rs*, 31 F. Supp. 3d 571, 588 (S.D.N.Y. 2014) (citing *Citizens to Preserve*

*Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

Under the APA, courts must "hold unlawful and set aside agency action, findings, and

conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with the law," 5 U.S.C. § 706(2), in excess of statutory authority, *id.* § 706(2)(C), or

"without observance of procedure required by law," *id.* § 706(2)(D).  An agency action is

arbitrary and capricious where "the agency has relied on factors which Congress has not intended

it to consider, entirely failed to consider an important aspect of the problem, offered an

explanation for its decision that runs counter to the evidence before the agency, or is so

implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  An agency action is contrary to law where the agency does not "act in accordance with the law governing" that particular action.  *Sissel v. Wormuth*, 77 F.4th 941, 947 (D.C. Cir. 2023); *see Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 86 (2d Cir. 2006).  If an agency's "action is based on a determination of law," that decision "may not stand if the agency has misconceived the law."  *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943).

The Court's rulings at the preliminary injunction stage are not binding on the Court or the parties at the summary judgment stage.  *See Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 644–45 (2d Cir. 1998).  However, where, as here, the Court has already reached conclusions on all of the legal issues presented by the parties on the same factual record as before it on the motion for a preliminary injunction, "good sense dictates that a court interpret [the law] in the same way throughout a litigation, unless there is an intervening change in the law, or unless an earlier interpretation was clearly an error."  *City of New York v. Gordon*, 155 F. Supp. 3d 411, 419 (S.D.N.Y. 2015) (internal citations omitted); *see also Caviezel v. Great Neck Pub. Schs.*, 814 F. Supp. 2d 209, 213 (E.D.N.Y. 2011), *aff'd* 500 F. App'x 16 (2d Cir. 2012) (summary order) ("[B]ecause the plaintiffs present no additional evidence to the Court beyond what was adduced at the preliminary injunction hearing, the Court's analysis of that evidence, as set forth in its extensive [preliminary injunction] opinion, stands."); *Mallatier v. Dooney & Bourke, Inc.*, 561 F. Supp. 2d 368, 382 n.100 (S.D.N.Y. 2008) ("'[i]n determining a motion for summary judgment, we may consider the Court's findings of fact and conclusions of law in a prior motion for preliminary injunction.'" (quoting *Lanvin, Inc. v. Colonia, Inc.*, 776 F. Supp. 125, 127 (S.D.N.Y.1991))).

**DISCUSSION**

The Court previously addressed most of the legal issues presented in the summary judgment briefing in its 109-page opinion and order granting a preliminary injunction. It did so based on the record evidence produced in advance of that opinion. At summary judgment, the parties rely on essentially that same record. The Court nonetheless has independently reviewed its prior analysis with an open mind. After doing so, the Court reaches the same ultimate conclusions it reached at the preliminary injunction stage. Rather than repeating that analysis verbatim here, the Court thus incorporates by reference its prior decision which should be read in tandem with this opinion. The Court addresses the arguments of the parties, including the Secretary, that were not fully developed at the preliminary injunction stage. To the extent that a particular argument of the parties is not fully addressed, that is because it is addressed in the preliminary injunction opinion.[5]

**I.    Jurisdiction**

Plaintiffs bear the burden of establishing that the Court has jurisdiction over their claims. *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). As the Court previously determined in its preliminary injunction opinion, they have done so here.

**A.    Standing of the Organizational Intervenors**

Defendants argue that the Organizational Intervenors do not have standing to move for partial summary judgment. It is the burden of the party invoking the court's jurisdiction to establish standing. *Spokeo Inc. v. Robbins*, 578 U.S. 330, 338 (2016). However, an intervenor is

---

[5] Organizational Intervenors have adopted and joined the briefing submitted by Plaintiffs. Dkt. No. 146 at 2–3. Accordingly, the Court considers the claims together and addresses arguments specific to Organizational Intervenors only where necessary. Similarly, the New York State Department of Transportation "incorporates by reference" the briefing of the MTA, TBTA, and the NYSDOT. Dkt. No. 155 at 2–3.

required to establish standing itself only where "it seeks additional relief beyond which the plaintiff requests." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017). "Intervenors seeking relief broader than or different from that sought by existing parties must possess constitutional standing, but intervenors that seek the same relief sought by at least one existing party do not need to do so." *Institutional S'holder Servs., Inc. v. SEC*, 142 F.4th 757, 764 n.3 (D.C. Cir. 2025); *see also Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020) (finding that the court below "erred" by "inquiring into" the independent standing of an intervenor seeking the same relief as plaintiff). The Defendants do not contest that Organizational Intervenors seek the same relief as Plaintiffs here. That is dispositive of Defendants' arguments against standing.

The cases cited by Defendants do not support their argument: none involves an intervenor seeking the same relief as the Plaintiff. *See* Dkt. No. 158 at 22; Dkt. No. 171 at 22–26. For example, it is true that an organizational plaintiff suing "on their own behalf for injuries they have sustained . . . must meet the same standing test that applies to individuals by showing actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *Irish Lesbian & Gay Org.*, 143 F.3d at 649 (internal citations and quotations omitted). That proposition has no force where, as here, the intervenor is seeking the same relief as the plaintiff. And again, it is of course true that were Riders Alliance and Sierra Club suing alone, "a generalized grievance, no matter how sincere, is insufficient to confer standing." *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013). But that is not the case before the Court.

### B.    Final Agency Action[6]

Defendants argue that the Court cannot hear this dispute because the actions taken by the FHWA were not final actions subject to judicial review.[7]  "The APA explicitly requires that an agency action be final before a claim is ripe for review."  *Air Espana v. Brien*, 165 F.3d 148, 152 (2d Cir. 1999) (citing 5 U.S.C. § 704).  Two conditions must be met for an agency action to be final.  "First, the action must mark the consummation of the agency's decisionmaking process— it must not be of a merely tentative or interlocutory nature."  *Salazar*, 822 F.3d at 82 (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).  "And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Id.* (quoting *Bennett*, 520 U.S. at 178).

The Court previously addressed Defendants' arguments that the February 19 Letter was not a final agency action in its preliminary injunction opinion, finding that "[a]s the text of Defendants' communications makes clear, the FHWA's 'deliberation' over whether to terminate the VPPP Agreement and whether New York is in violation of the law is at an end."  *Duffy*, 784 F. Supp. 3d at 657.  The Secretary stated on February 19 in no uncertain terms that "I am rescinding FHWA's approval of the [Tolling Program] under the November 21 Agreement and

---

[6] As noted in the preliminary injunction opinion, it is not material for the purposes of resolving the motion for summary judgment whether the finality of an agency action is jurisdictional or is a matter of statutory standing.  *See Duffy*, 784 F. Supp. 3d at 756 n.53 ("Ultimately, the Court need not weigh in on the jurisdictional requirement as Section 704 is undisputably a 'question of statutory standing' that permits 'resolving the case on threshold, non-merits grounds.'") (quoting *6801 Realty Co., LLC v. U.S. Citizenship & Immigr. Servs.*, 719 F. App'x 58, 60 n.1 (2d Cir. 2008) (summary order)).  As such, the inclusion of this section under the "jurisdiction" heading "is not intended to be a legal pronouncement."  *Id.*

[7] The Secretary does not argue that Plaintiffs failed to exhaust administrative remedies before initiating suit.  That is because where the APA applies, "an appeal to 'superior agency authority' is a prerequisite to judicial review *only* when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review."  *Darby v. Cisneros*, 509 U.S. 137, 151 (1993).  Here, exhaustion is neither expressly required by statute or agency rule.

terminating the Agreement." Dkt. No. 87-1 at 4. Importantly, the Court held that "[t]he fact that the federal government has not imposed sanctions on Plaintiffs and has signaled that it is still deciding whether and what sanctions to impose does not make the February 19 Letter any less final." *Id.* at 658. Defendants do not point to anything in the administrative record that the Court did not consider at the preliminary injunction stage that would alter the Court's prior conclusion.

First, and tellingly, the Secretary makes no attempt to distinguish *Salazar v. King*, the Second Circuit case upon which the Court relied in its preliminary injunction opinion. *Duffy*, 784 F. Supp. 3d at 657. There, the Second Circuit held that the Department of Education's refusal to suspend loan collection of student loans that were allegedly fraudulently procured was a final agency action because the decision represented "the consummation of the agency's decisionmaking process," and "[t]he fact that the suspension was temporary does not undermine the fact that the decision to suspend or not to suspend is a final agency action because the action had an immediate and substantial effect upon the complaining party." *Salazar*, 822 F.3d at 82–83 (internal quotations and citations omitted). The court recognized that the plaintiff students could apply for a loan and that further proceedings would be necessary before a final decision was made as to whether the department would discharge the loans. *Id.* at 83. But that did not make the decision not to temporarily suspend any less final. The court focused on the "practical impact" of that decision and clarified that "[t]he APA does not require that the challenged agency action be the agency's final word on the matter for it to be final for the purposes of judicial review." *Id.* at 83–84. "The agency's action is final notwithstanding the possibility of further proceedings in the agency on related issues, so long as judicial review at the time would

30

not disrupt the administrative process."  *Id.* at 84 (quoting *Sharkey v. Quarantillo*, 541 F.3d 75, 89 (2d Cir. 2008)).

Applying that holding to the facts here, the Secretary's definitive legal conclusion that the program must be terminated is a final agency action, regardless of any extensions given to the Project Sponsors to effectuate that termination or any opportunity the sponsors would later have to argue for mitigation as to the enforcement penalties.  Without the VPPP Agreement, which the Secretary purportedly rescinded, the Project Sponsors had no authority to operate the CBDTP without running afoul of the general prohibition on tolling federal aid highways contained in 23 U.S.C. § 301.  Furthermore, there was no "administrative process" to disrupt here; the Secretary sent the February 19 Letter just weeks after his confirmation and has to date provided no evidence of any agency process that led to the dissemination of that letter.  It represented his final, legal conclusion as to the ability of the Department to enter a cordon pricing program agreement.  It would be difficult to imagine a more definitive repudiation of contractual obligations by any party to any form of agreement than the repudiation and rescission set forth in the February 19 Letter.[8]

The Secretary confines his argument at summary judgment to the claim that the Court misunderstood the Supreme Court's decision in *Sackett v. EPA*, 566 U.S. 120, 124 (2012), that it

---

[8] The point is highlighted by the Secretary's argument that the Court should view the VPPP Agreement as a contract and Plaintiffs' action as one upon a contract.  Dkt. No. 158 at 14–18. The Court rejects that argument for the reasons stated *infra* Section I.D.  But, assuming *arguendo* that Plaintiffs here were a private entity that had sued the Government upon its announcement that it would no longer honor its contractual obligations with that company, there would be no question that the agency action was final.  *See Silver Air v. Aeronautic Dev. Corp. Ltd.*, 656 F. Supp. 170, 178 (S.D.N.Y. 1987) ("When a promisor repudiates a contract, the injured party . . . can treat the repudiation as an anticipatory breach and immediately seek damages for breach of contract." (internal citation and quotation marks omitted)).  The result should be no different as to the state entities here that cannot seek damages but seek instead declaratory judgment that the Secretary's action was illegal.

miscited *CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 410 (D.C. Cir. 2011), and that it did not duly consider Defendants' own citations to *Purpose Built Families Foundation, Inc. v. United States*, 634 F. Supp. 3d 1118, 1121 (S.D. Fla. 2022) and *Berkeley-Dorchester Ctys. Econ. Dev. Corp. v. U.S. Dep't of Health & Human Servs.*, 2006 WL 8443181 (D.S.C. Feb. 24, 2006).[9]  Those arguments are not availing.

The Court previously determined that *Sackett* was "squarely on point."  *Duffy*, 784 F. Supp. 3d at 658.  It remains squarely on point.  In that case, the Federal Government argued, as the Secretary argues here, that an administrative order did not reflect final agency action because the agency had invited the subjects of the order to "engage in informal discussion" of its terms and requirements and permitted the subjects to inform the agency of any allegations which were inaccurate, and because the agency had taken no action to enforce the order.  *Sackett*, 566 U.S. at 127.  The Supreme Court rejected those arguments.  It held that the EPA's compliance order determined the "rights" and "obligations" of the Sacketts because, by virtue of the order, the Sacketts had "the legal obligation to 'restore' their property according to an Agency-approved Restoration Work Plan" and that "legal consequences" flowed from issuance of the Order.  *Id.* at 126.  Among other things, the order exposed the Sacketts to double penalties in any future enforcement proceeding.  *Id*.  The Court specifically rejected the EPA's argument that the order was less than final because it invited the Sacketts to inform the agency of any errors in the allegations.  In the Court's view, the invitation to further dialogue was insufficient to insulate the order from review because it "confer[red] no entitlement to further Agency review." *Id.*  It also

_____

[9] In their motion for a preliminary injunction, Plaintiffs relied extensively on the Supreme Court's decision in *Sackett*.  Dkt. No. 82 at 23–24.  Defendants did not cite to the decision in their responsive briefing, despite the opportunity to do so.  Dkt. No. 118.  Neither party pointed the Court toward *CSI Aviation*.

rejected the argument that the Sacketts were not entitled to judicial review because they could obtain such review "by way of a civil action brought by the EPA under 33 U.S.C. § 1319" in light of the fact that the Sacketts could not initiate that process. *Id.*

The Secretary would distinguish *Sackett* on the grounds that the order there immediately subjected the Sacketts to the risk of penalties under the Clean Water Act accruing from the date of the order. But that is "a distinction without a difference." *Duffy*, 784 F. Supp. 3d at 658 n.54. The key point in *Sackett* was that the plaintiffs would be subject to a sanction; it was not the time from which the penalties would accrue—the EPA's "deliberation over whether the Sacketts are in violation of the Act" was "at an end" when it made its legal determination, and that "the Agency may still have to deliberate over whether it is confident enough about this conclusion to initiate litigation" was a "separate subject." 566 U.S. at 129. That same conclusion applies here. The Secretary stated definitively that the VPPP Agreement was terminated as of February 19, 2025, and that FHWA's approval of the CBDTP pilot project was therefore rescinded. Dkt. Nos. 87-5, 65-1. That rescission put the Project Sponsors in active breach of 23 U.S.C. § 301, which made it unlawful for Plaintiffs to impose tolls on highways constructed with federal aid highway funds absent the approval of the Secretary. 23 U.S.C. § 301. "[T]he APA provides for judicial review of all final agency actions, not just those that impose a self-executing sanction." *Sackett*, 566 U.S. at 129. The Secretary directed Plaintiffs to put themselves into compliance with what he stated was the law—an exercise that would have imposed significant burdens on Plaintiffs.

The Secretary further posits that *Sackett* is distinguishable because there the agency offered "only a vague opportunity to 'discuss[]' (not contest) the compliance order's 'terms and requirements' (not the underlying compliance decision)," whereas here the Secretary offered "a mechanism that allows Plaintiffs" to rebut "the actual underlying notice of termination." Dkt.

No. 158 at 9.  But that is revisionist history unsupported by the record.  The Secretary did not

offer even a vague opportunity to Plaintiffs to discuss the lawfulness of the VPPP Agreement

before announcing in the February 19 Letter that the agreement was at an end because the

Department did not have the authority to approve the project in the first place.  The Secretary

stated strongly and clearly that he was "rescinding FHWA's approval" of the project and

"terminating the Agreement" because "FHWA lacked statutory authority to approve the cordon

pricing tolling under the CBDTP pilot project."  Dkt. No. 87-5 at 4.  The Secretary's conclusion

that Congress did not give the Department the right to sign the VPPP Agreement left no room for

discussion.  Indeed, rather than invite discussion, the Secretary noted only that "[t]he FHWA will

contact NYSDOT and its project sponsors to discuss the orderly cessation of toll operations

under this terminated pilot project."  *Id.* at 5.

      The finality of the Secretary's conclusion is supported by the surrounding evidence which

the Secretary concedes that the Court can consider in determining whether Plaintiffs' claim is

ripe.  Dkt. No. 158 at 6 ("Courts look to 'the way in which the agency subsequently treats the

challenged action.'" (quoting *Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C.

Cir. 2016))).  No less an authority than the President of the United States announced on February

19 that "CONGESTION PRICING IS DEAD."  Dkt. No. 87-4.

      More pertinently, the very day after the Secretary sent the February 19 Letter, the

Executive Director of the FHWA extended the effective date only to allow "time to terminate

operations of this pilot program in an orderly manner."  Dkt. No. 87-6.  The Executive Director

did not purport to alter the legal conclusions made by the Secretary the prior day.  Nor is there

any reason to think that she could alter her superior's reading of the authority granted him under

a statute.  The only reasonable understanding of her letter is as a procedural follow up instructing

the Project Sponsors to begin wrapping up a program that had already been terminated so that by March 21, tolling would have stopped.  And that letter followed directly from the Secretary's statement, just one day earlier, that "[t]he FHWA will contact NYSDOT and its project sponsors to discuss the orderly cessation of toll operations under this terminated pilot project."  Dkt. No. 87-5 at 5.  Secretary Duffy admitted no ambiguity that the pilot project was terminated, and that any subsequent communications were restricted to the "orderly cessation" of the project.  Even standing alone, the February 20 letter from the Executive Director indicated no opportunity for review of the Secretary's decision.  The message was loud and clear—Plaintiffs were to begin terminating the program so that the project would come to a complete end by March 21, 2025.

On March 20, in the second extension letter, again the Executive Director informed Plaintiffs just that they were provided "until March 21, 2025, to cease tolling operations."  Dkt. No. 87-8.  The letter too left no ambiguity; deliberation had concluded and the agency demanded action.  The Executive Director was discharging the Secretary's instruction that the project had to end.  In the Executive Director's words, the Project Sponsor's had "to comply" and "toll operations must cease by April 20, 2025."  *Id.*  On that same day the Secretary posted on X that "Your unlawful pricing scheme charges working-class citizens to use roads their federal tax dollars already paid to build.  We will provide New York with a 30-day extension as discussions continue . . . Continued noncompliance will not be taken lightly."  Dkt. No. 87-7.  The extensions were not an effort to engage in a constructive back-and-forth about the merits of the Secretary's legal decision, but rather a practical acknowledgement that it would take time for the Project Sponsors to disassemble a congestion pricing program architecture that had taken time to put in place.

The Secretary relies on his April 21 Letter in support of his argument that there was no final agency action, but that letter was sent months after the February letter, after the Plaintiffs had sued, and in the face of a letter from Plaintiff two weeks earlier clarifying that they would seek injunctive relief in the event of termination. Dkt. No. 87-10. The April 21 Letter confirms that the action taken by the Secretary on February 19 was final agency action. It stated in the past tense: "On February 19, 2025, I terminated that [VPPP] agreement." The Secretary stated: "New York therefore is not legally permitted to collect tolls on roads within the CBDTP zone that were constructed using Federal-aid highway funds." It reiterated that "FHWA made clear" that pursuant to the February 19 Letter, New York was required to cease collection of tolls by March 21, 2025. Dkt. No. 87-10. The compliance deadline was extended only "in a spirit of goodwill." It directed Plaintiffs to "show cause . . . why FHWA should not take appropriate steps under 23 CFR § 1.36 to remedy New York's noncompliance with 23 U.S.C. § 301 in connection with the CBDTP." The "show cause" letter was not as to whether the VPPP Agreement should be revoked or the tolling program permitted. It was as to why the FHWA should not take any of the number of steps the letter outlined "to remedy New York's noncompliance with 23 U.S.C. §301." *Id.*

The April 21 Letter also invited NYSDOT to "demonstrate[] that continued collection of tolls does not violate 23 U.S.C. § 301." *Id.* But that was an empty invitation, considering the Secretary had already reached his final determination that the VPPP Agreement was terminated and FHWA approval rescinded, and that there was not another avenue available to the parties under which they could operate the CBDTP. The Secretary did not rescind his February 19 Letter terminating the congestion pricing program or suggest a willingness to do so. Indeed, both at the preliminary injunction stage and at the summary judgment stage, the Secretary had

36

confirmed that the termination of the VPPP Agreement was final as of February 19 and remained in place. *See* Dkt. No. 135 at 47:11–48:1 (counsel for the Secretary confirming both his position that "they don't have a valid agreement," and that "without a valid agreement, they cannot have the tolling program."); Dkt. No. 193 at 53:22–54:10 (in response to the Court's question at argument on summary judgment of whether the Secretary ever withdrew the February 19 Letter, counsel responds "no," and that "the notice of termination remains in place"). The Secretary's April letter reiterated that the Agreement was terminated and permitted an additional period until May 21 to show cause, after which it would implement compliance measures beginning on May 28. Dkt. No. 87-10. "The April 21 Letter cannot and does not magically convert the Secretary's February 19 declaration of termination into a mere tentative or preliminary view." *Duffy*, 784 F. Supp. 3d at 659.

Indeed, accepting the Secretary's view as to the finality of agency action here would permit any government agency to forever frustrate judicial review, by the mere expedient of offering, on the eve of review of what otherwise was a final agency action, that the agency was prepared to reconsider. An agency could therefore indefinitely delay judicial review of a legal conclusion they had no intention of revisiting, to the great detriment of any counterparty seeking judicial clarification of their rights. "[I]f an agency's indication of an intent to reconsider an interim (or other) action sufficed to render the action non-final, agencies could evade judicial review of their actions even they impose substantial obligations on regulated parties over a considerable period of time." *NDRC v. Wheeler*, 955 F.3d 68, 79 (D.C. Cir. 2020). The mere fact that a determination is "subject to displacement" does not make the action nonfinal. *Id.*; *see Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001) (an agency cannot "effectively prevent judicial review of their policy determinations by simply refusing to take final action.")

Permitting an agency to evade review of its actions in that manner would be contrary to the "central purpose" of the APA to permit a "broad spectrum of judicial review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). It would also permit the agency to rewrite the administrative record out of litigation convenience, offering process and explanation that were not available upon the relevant final action. *See Matena v. Hazuda*, 2018 WL 3745668, at *6 (S.D.N.Y. Aug. 7, 2018) ("an agency may not divest a federal court of jurisdiction by unilaterally reopening its administrative proceeding." (quoting *Otero v. Johnson*, 2016 WL 6476292, at *8 (D. Ariz. Nov. 2, 2016))).

Defendants' invocation of *F.T.C. v. Standard Oil Co. of Calif.*, 449 U.S. 232 (1980) is similarly unavailing. The Court cited *Standard Oil* in its preliminary injunction opinion for the proposition that the Supreme Court has taken "a pragmatic approach to the finality inquiry." *Duffy*, 784 F. Supp.3d at 658. The Secretary relies on *Standard Oil* here for the proposition that there is no final agency action because the only burden imposed on Plaintiffs by the February 19 Letter was "to respond to the agency's assertions made against them, which is not a tangible legal consequence." Dkt. No. 158 at 8. But *Standard Oil* does not support the Secretary's position.

In *Standard Oil*, the Supreme Court determined that an agency's "averment of 'reason to believe' that [the defendant] was violating the act is not a definitive statement of position," and represented only "a threshold determination that further inquiry is warranted and that a complaint should initiate proceedings." 449 U.S. at 241. That conclusion was based on the fact also that the pertinent regulations required the defendant to be provided a hearing before an administrative law judge at which it could "refute the Commission's charges." *Id.* The Secretary's February 19 Letter by its terms did not reflect a "threshold" determination by an agency that was continuing

to deliberate.  It stated in no uncertain terms that the VPPP Agreement was terminated and the Secretary's prior approval to impose tolls on the federal highway for the purposes of congestion pricing was rescinded.  The Executive Director's letters in February and March directed Project Sponsors to "terminate operations of this pilot program in an orderly manner," Dkt. No. 87-6, which would have "a direct and immediate . . . effect on the day-to-day business" of Plaintiffs. *Standard Oil*, 449 U.S. at 239 (quoting *Abbot Lab'ys*, 387 U.S. at 152).

The rescission of approval and the termination of the VPPP Agreement also subjected Plaintiffs, and New York State, to drastic penalties at the discretion of the FHWA administrator. Those penalties include the withholding of approval of further projects in New York State and "such other action that [the administrator] deem[ed]  appropriate under the circumstances."  23 C.F.R. § 1.36.  In the April 21 Letter, the Secretary himself made clear that FHWA would not hesitate to impose such penalties including no further advance construction authorizations for projects within Manhattan, no further NEPA approvals for projects within Manhattan, and no further approvals of Statewide Transportation Improvement Program ["TIP"] amendments concerning New York Metropolitan Transportation Council TIP modifications "until compliance is achieved," with the possibility that the measures might "be expanded to other geographics areas with the State of New York."  Dkt. No. 65-1 at 2.  Plaintiffs were not required to wait until the guillotine fell before seeking judicial review of the Secretary's termination of the VPPP Agreement and rescission of approval for the program.

The Secretary also takes issue with the Court's citation to *CSI Aviation*.  The Court cited the D.C. Circuit's decision in *CSI Aviation* for the proposition that an agency cannot put a party to the "painful choice between costly compliance and the risk of prosecution at an uncertain point in the future," without at the same time subjecting itself to judicial review under the APA.

*Duffy*, 784 F. Supp. 3d at 658 (quoting *CSI Aviation*, 637 F.3d at 412).  The court emphasized that "an agency may not avoid judicial review merely by choosing the form of a letter to express its definitive position on a general question of statutory interpretation."  *CSI Aviation*, 637 F.3d at 412 (citing *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 438 n.9 (D.C. Cir. 1986)).  The Secretary argues that *CSI Aviation* is inapposite because in that case, the agency action the court determined to be final—a cease-and-desist letter—was issued "only after the agency considered and responded to the plaintiff's objections."  Dkt. No. 158 at 10.  In this case, the Secretary acted without considering any objections from Plaintiffs.  But the fact that the Secretary here acted without considering or inviting any objections does not mean his determination was preliminary.

The D.C. Circuit held that the cease-and-desist letter in *CSI Aviation* constituted a final agency action for three reasons: (1) the agency issued a "definitive statement of the agency's legal position" that "admit[ted] no ambiguity [and] gave no indication that it was subject to further agency consideration or possible modification,"; (2) the case "present[ed] a 'purely legal' question of statutory interpretation," and (3) the letter "imposed an immediate and significant burden on" respondent.  637 F.3d at 412.  All three factors are present here.  The Court has extensively detailed the final nature of the Secretary's legal position on the CBDTP, including the definitive conclusion reached in the February 19 Letter, and the reaffirmation of that conclusion in subsequent communications.  Second, the issue on which the Secretary issued his final judgment here is one that presents a "purely legal question of statutory interpretation," just as in *CSI Aviation*.  *Id.* at 412.  Whether or not the Department has the authority to permit tolling on federal aid highways does not turn upon the facts of this case.  Third, the D.C. Circuit found that the agency "has imposed an immediate and significant burden on CSI" by "[a]t the very least," "cast[ing] a cloud of uncertainty over the viability" of the program at issue.  *Id.*  This

Court detailed the burden imposed on Plaintiffs upon receipt of the February 19 Letter in its preliminary injunction opinion, including the risk of legal sanctions for noncompliance and the inability to issue bonds secured by the program's revenues. *See Duffy*, 784 F. Supp. 3d at 661–62. Termination of the CBDTP cast more than a "cloud of uncertainty" over the viability of the program.

The Court previously considered and distinguished too the Secretary's citation to *Purpose Built Families* and *Berkeley-Dorchester*. *See Duffy*, 784 F. Supp. 3d at 661. Defendants argue that the distinction was erroneous. These out-of-circuit district court opinions are not, of course, binding on this Court, and are useful only to the extent they contain persuasive reasoning. Addressing *Berkeley-Dorchester* first, in that case the court found no final agency action where an agency temporarily suspended financial assistance to a school due to concerns about asbestos because the agency action at issue there was temporary and rescinded within a few days. *See Duffy*, 784 F. Supp. 3d at 661 (citing *Berkeley-Dorchester*, 2006 WL 8443181, at *16). The court relied on the "temporary" nature of the summary suspension in finding that that the agency action was not final, which was "prompted by an emergency situation and anticipated to be resolved within a limited time frame." *Berkeley-Dorchester*, 2006 WL 8443181, at *16. To that end, when the school quickly provided the adequate documentation, the summary suspension was rescinded within days. *Id.* That reasoning supports the Plaintiffs' position here: the only quick fix to assuage the Secretary would be to permanently terminate the congestion pricing program.

The Court distinguished *Purpose Built Families* on the basis that there too the court's finding of non-finality was premised on the "preliminary" nature of the suspension at issue. *Duffy*, 784 F. Supp. 3d at 661 (quoting *Purpose Built Fams.*, 634 F. Supp. 3d at 1124). The court

41

in that case expressly premised its determination on the fact that the letter and regulations at issue "make clear that this is a preliminary measure, pending completion of the government's audit." 634 F. Supp. 3d at 1124. The same cannot be said of the February 19 (or subsequent) letters here. *Purpose Built Families* supports the Plaintiffs' position: in a separate section addressing a letter that was not on its face preliminary and stated only that the agency had made a decision to terminate a grant and would be doing so within 7 days, the court found a final agency action over which it had jurisdiction. *Id.* at 1124–25.

The Defendants' pages of briefing on whether there was a final agency action add very little to the arguments this Court considered at the preliminary injunction stage. And despite the additional briefing, Defendants still "cite no case in which a cabinet secretary and a president of the United States have declared in no uncertain terms that an administrative approval has been rescinded and yet a court determined that such action is not ripe for review." *Duffy*, 734 F. Supp. 3d at 661. The February 19 Letter is a final agency action.

## C.    Ripeness

"Even when an agency has taken a final action, a court may refrain from reviewing a challenge to the action if the case is unripe for review" under the doctrine of prudential ripeness. *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1007–08 (D.C. Cir. 2014). That inquiry is distinct from constitutional ripeness. Under Article III, a court "cannot entertain a claim that is based upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Thomas v. City of New York*, 143 F.3d 31, 34 (2d Cir. 1998) (quoting *Oriental Health Spa v. City of Fort Wayne*, 864 F.2d 486, 489 (7th Cir. 1988)). Defendants do not argue that this action is constitutionally unripe. Rather, they argue that the Court should withhold from deciding the case under the prudential exception "to the usual rule that where jurisdiction exists a federal court must exercise it." *Simmonds v. INS*, 326 F.3d 351, 357 (2d Cir.

2003).  When a court declares that a case is not prudentially ripe, that is not "a limitation on the power of the judiciary," but rather a determination "that the case will be *better* decided later and that the parties will not have constitutional rights undermined by the delay." *Id.*  To determine if a question is prudentially ripe, courts ask "(1) whether an issue is fit for judicial resolution and (2) whether and to what extent the parties will endure hardship if decision is withheld." *Id.* at 359 (citing *Abbott Lab'ys*, 387 U.S. at 148–49).  The doctrine "must be reconciled with the 'virtually unflagging' obligation of a court 'to hear and decide cases within its jurisdiction.'" *Revitalization Auto Comms. Env't. Response Trust v. Nat'l Grid USA*, 10 F.4th 87, 102 (2d Cir. 2021) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125–26 (2014)).[10]

In the Court's opinion granting a preliminary injunction, the Court extensively addressed Defendants' argument that the case was not prudentially ripe.  It concluded that the question was both fit for resolution, and that the Project Sponsors would suffer hardship if a decision were withheld.  "Defendants fail to show that the ongoing administrative process is anything more than lip service meant to avoid judicial intervention." *Duffy*, 784 F. Supp. 3d at 663.  In their summary judgment briefing, Defendants contend that they "disagree" with that analysis, but do

---

[10] In *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014), the Supreme Court noted that the doctrine of prudential ripeness was "'in some tension with [the Court's] recent reaffirmation of the principal that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging,'" but declined to "resolve the continuing vitality of the prudential ripeness doctrine." *Id.* at 167 (quoting *Lexmark Int'l*, 572 U.S. at 126).  In *Revitalizing Auto*, the Second Circuit declined to address whether the doctrine of prudential ripeness survived *Susan B. Anthony List*, but "assume[ed]" that it did for the purpose of the decision. 10 F.4th at 102. *See also New York*, 414 F. Supp. 3d at 564 n.68 ("Because the prudential ripeness factors are easily satisfied here, the Court has no occasion to address the doctrine's continued vitality.")  This Court makes the same assumption because the case is ripe under the doctrine of prudential ripeness.  To the extent the doctrine does not survive the Supreme Court's more recent jurisprudence, Defendants' argument that Plaintiffs' claims are not ripe would fail for that reason alone.

not offer any legal or factual arguments distinct from those offered at the preliminary injunction stage. Dkt. No. 158 at 12–14.

First, they argue that the Court "short circuited the process" by entering a preliminary injunction, and that the Court should reverse that injunction and "allow that process to proceed before issuing" a final decision. *Id.* at 13. The Secretary identifies no "process" that he wishes to have continued that could have led to him reversing himself as to his conclusion that the VPPP Agreement was issued in the absence of congressional authority. And he has never abandoned his view that, as a matter of law, the FHWA lacked and still lacks the authority to enter the VPPP Agreement. The Secretary admitted at oral argument that he engaged in no process before issuing the February 19 Letter, no process in between the February 19 Letter and the April 21 Letter, and no process following the April 21 Letter. Dkt. No. 193 at 50:2–52:14. Had there been a process, there would have been nothing in the Court's preliminary injunction that would have prevented the Secretary from continuing it and evaluating the policy benefits and costs of the CBDTP program. There was nothing in the Court's preliminary injunction that prohibited the FHWA from commencing such a process either. The Secretary terminated the VPPP Agreement and rescinded FHWA approval of the CBDTP because he believed that he and his predecessors did not have the authority from Congress to approve the program. On that basis, no weighing of the costs and benefits of the program itself could confer the Secretary with authority to approve a project that Congress itself denied him.

Next, Defendants argue that there remains further factual development to be completed, such that the Court should wait to resolve the matter until there is a "complete, final record." Dkt. No. 158 at 13. That is not how the APA works. Under that statute, the agency action is evaluated on the record that was before it at the time it took the action (which this Court has

already determined to be final).  Moreover, Defendants identify no facts that would permit them

to reverse their position and conclude that the Department had the authority to sign the VPPP

Agreement, nor do they illuminate what possible factual development remains.  Instead, they

vaguely assert that further factual development is necessary because "the Secretary can terminate

[the Agreement] if he determines that the Agreement no longer effectuates agency priorities or

program goals." Dkt. No. 158 at 13.  First, he already purported to do that.  Second, the

Secretary's decision rested upon his interpretation of the VPPP and not upon the facts of the

program or the identification of the agency priorities or program goals.  And the Court's further

determination in its preliminary injunction opinion that the Secretary would not have had the

authority to "terminate" the VPPP Agreement based on a policy difference with the prior

incumbent of his office rested upon the VPPP statute itself.  "Defendants identify no questions of

fact yet to be developed that would bear on the VPPP Agreement's lawfulness or the Secretary's

right to end it." *Duffy*, 784 F. Supp. 3d at 663.  As follows from the discussion above, the case is

fit for decision.  The Secretary has stated a definitive legal position resulting in direct

consequences that he has expressly disavowed he would revisit.  The Secretary "has concluded

its consideration" of the legal question at the base of the dispute.  *Whitman v. Am. Trucking
Ass'n*, 531 U.S. 457, 479 (2001).

The Secretary also argues again that the case is not ripe because his April 21 Letter stated

that no compliance measures would be taken until after Plaintiffs' objections were received.

Dkt. No. 158 at 13.  The Court previously addressed that argument.  The Secretary declared that

the program as operated was illegal as of February 19, and regardless of when he would impose

sanctions on that basis the Project Sponsors would have to modify their conduct or risk such

exposure.  "A rule that requires an immediate and significant change in [a party's] conduct of its

affairs with serious penalties attached to noncompliance presents a prototypical instance of hardship." *Duffy*, 784 F. Supp. 3d at 663–64 (quoting *New York*, 414 F. Supp. 3d at 565); *see also Energy Future Coal. v. EPA*, 793 F.3d 141, 146 (D.C. Cir. 2015) (rejecting the EPA's argument that the case was not ripe because it was "entirely speculative how EPA's action would impact regulated entities" because the suit "present[ed] a purely legal question" such that it was "unnecessary to wait."); *Valentine Props. Assocs. LP v. U.S. Dep't of Hous. & Urban Dev.*, 2007 WL 3146698, at *11 (S.D.N.Y. Oct. 12, 2007) (case was ripe where "Plaintiffs face some hardship in complying with the [agency action], and risk losing a great deal of money").

The Secretary has been clear throughout his communications with the Project Sponsors that they "are not free to disregard" the termination of the VPPP Agreement, and that without it they are in violation of 23 U.S.C. § 301 and subject to penalties.  Dkt. No. 135 at 47:4–48:2.  The compliance measures threatened by the Secretary in the April 21 letter would put "a great many projects that rely upon the imperiled federal funds and approvals" at risk.  *Duffy*, 784 F. Supp. 3d at 690.  They included the end of authorization for projects in Manhattan and the end of NEPA approvals for projects in Manhattan, with the possibility of additional measures spreading first to New York City, and then "to other geographic areas within the State of New York."  Dkt. No. 65-1 at 2.  Plaintiffs had invested "over $500 million to establish the Tolling Program," not including "recurring expenditures related to operation and maintenance of the roadside tolling system, the operation of the back-office system and customer contact center, and consultant costs."  *Id.* at 682.  Suspension of the program would "cause the TBTA to incur approximately $12 million in additional expenditures each month" in the form of those recurring costs.  *Id.* at 690 (citing Dkt. No. 85 ¶ 33).  The Court already recognized that "the Secretary's pronouncement has endangered Plaintiffs' ability to issue bonds as the bonds are secured by the

46

Tolling Program's revenues and thus rely upon the program's longevity." *Duffy*, 784 F. Supp. 3d at 662 (citing Dkt. No. 84 ¶¶ 10–11).

That these costs would flow directly from the Secretary's action reinforce the ripeness of the controversy.  On pain of the listed compliance measures, the Project Sponsors would have to "promptly undertake the lengthy and expensive task" of unwinding the vast congestion pricing project. *Whitman*, 531 U.S. at 479.  The termination of the agreement, had the Court not preliminarily enjoined its effect, would also have entailed the loss of funding resulting from congestion pricing critical to several other infrastructure projects.  That is a "direct and immediate dilemma." *Simmonds*, 326 F.3d at 360; *see also Thomas*, 143 F.3d at 36 (controversy was prudentially ripe where "plaintiffs must either incur great expense to comply with the requirements, or (if they choose to challenge the regulation through noncompliance) run the risk of incurring potentially even greater burdens"); *Variscite NY Four, LLC v. N.Y.S. Cannabis Ctrl. Bd.*, 152 F.4th 47, 59 (2d Cir. 2025) (controversy was prudentially ripe where if forced to wait and bring suit later, "at that point, it may be considerably harder for a district court" to adjudicate the claim).  The Court's observation in connection with the Secretary's final agency action argument also demonstrates that there exists a ripe controversy.  Concerns of prudential ripeness do not put the Plaintiffs, no different from any other party, to the Hobson's choice of (1) incurring the costs of terminating the program, putting themselves in what the Secretary deemed compliance, and thereby potentially giving up the opportunity for judicial review or relief, or (2) disregarding the Secretary's view of the law and subjecting themselves to the drastic penalties that federal statute and regulations permit.  They were entitled to ask the Court for its view of the law before taking the law into their own hands.

The Secretary offers several cases that he argues support his position that the present case is not ripe for resolution, but none are contrary to this Court's prior decision. In *National Park Hospitality Association v. Department of Interior*, the Supreme Court held that a "general statement of policy" that did "not command anyone to do anything or refrain from doing anything" and "create[d] no legal rights or obligations" did not create a ripe controversy. 538 U.S. 803, 809 (2003); *see also id.* at 810 (explaining that the policy at issue "leaves [the affected party] free to conduct its business as it sees fit"). That is clearly inapposite; the Secretary did not issue some general policy statement. He specifically terminated the VPPP Agreement on legal grounds and threatened consequences to follow. It is not clear what, in the Secretary's view, the February 19 Letter did accomplish if not termination of the program, or indeed how the Secretary could terminate the VPPP Agreement by doing anything other than what he did. The D.C. Circuit's decision in *American Petroleum Corporation v. EPA* supports a finding of ripeness, as it clarifies that the requirement is meant to "protect 'the agency's interest in crystallizing its policy before that policy is subjected to judicial review.'" 683 F.3d 382, 387 (D.C. Cir. 2012) (quoting *Wyo. Outdoor Council v. U.S. Forestry Serv.*, 165 F.3d 43, 49 (D.C. Cir. 1999)). As described many times over, the Secretary's February 19 Letter represented a crystalized policy, and there is no indication that even the late-coming chance for Plaintiffs to contest that letter could result in any change to the Secretary's legal position.[11] The dispute is prudentially ripe.

---

[11] The other cases cited by Defendants are also distinguishable on their facts. *See W.R. Grace & Co.-Conn. v. EPA*, 959 F.2d 360, 365 (1st Cir. 1992) (claims were unripe where the EPA "has not revised or rejected a single . . . submission"); *German Language Ctr. v. United States*, 2010 WL 3824636, at *4 (S.D. Tex. Sept. 27, 2010) (claims not ripe where there was "no longer a final decision to review"); *New York v. HHS*, 2008 WL 5211000, at *14 (S.D.N.Y. Sept. 15, 2008) (claims not ripe where program at issue was approved and HHS invited state to "continue to work with" the agency).

48

D.     **Tucker Act**

Defendants' final jurisdictional argument is that because Plaintiffs' claims "essentially arise from a contract," "the Tucker Act vests exclusive jurisdiction over this dispute in the Court of Federal Claims." Dkt. No. 158 at 14. This argument presumes necessarily that there has been final agency action and that the matter is prudentially ripe but asserts that the Plaintiffs must bring their lawsuit elsewhere.

Through the APA the Federal Government has waived sovereign immunity for "equitable claim[s] challenging arbitrary and capricious agency action in an administrative agency in federal district court," but not "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 406 (2d Cir. 2015) (quoting 5 U.S.C. § 702). The Tucker Act, 28 U.S.C. § 1491, waives sovereign immunity with respect to "any claim against the United States founded . . . upon any express or implied contract with the United States," and grants the Court of Federal Claims exclusive jurisdiction over those claims. The Tucker Act permits suits for "liquidated or unliquidated damages in cases not sounding in tort." *Id.* § 1491(a)(1). It also authorizes courts to "provide an entire remedy and to complete the relief afforded by the judgment" by, for example, issuing orders to federal officials that are incident and collateral to any such judgment." *Id.*; *see Smalls v. United States*, 471 F.3d 186, 189 (D.C. Cir. 2006).[12] It therefore "impliedly forbids relief other than remedies provided by the Court of Federal Claims for actions that arise out of a contract with the United States." *Up State Fed. Credit Union v. Walker*, 198 F.3d 372,

---

[12] Money damages from the Federal Government are also available under the Federal Tort Claims Act, 28 U.S.C. § 1346, but that relief is only available where the "claimant has first exhausted administrative remedies" and is not relevant here. *McNeil v. United States*, 508 U.S. 106, 107 (1993); *see Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 612 (D.C. Cir. 1992) ("The Federal Tort Claims Act" is an "anomaly," as it "permits some damage suits in federal district court.").

375 (2d Cir. 1999); *see Presidential Garden Assocs. v. United States ex rel. Sec'y of Hous. & Urb. Dev.*, 175 F.3d 132, 143 (2d Cir. 1999).

The Secretary argues that Plaintiffs' claims are founded upon a contract with the United States and that accordingly the Court has no jurisdiction under the APA. In the Secretary's view, jurisdiction lies exclusively in the Court of Federal Claims, where the only relief available would be money damages. The Court previously concluded that this case does not fall within the Tucker Act. It adheres to that decision.

Under the framework developed by the D.C. Circuit in *Megapulse, Inc. v. Lewis*, "the determination of whether an action is at its essence a contract action for purposes of sovereign immunity under the Tucker Act depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought." *Up State*, 198 F.3d at 375 (quoting *Megapulse*, 672 F.2d 959, 968 (D.C. Cir. 1982)); *accord Atterbury*, 805 F.3d at 406. In its preliminary injunction opinion, the Court held that this action was not within the ambit of the Tucker Act's sovereign immunity waiver because: (1) "[t]he core of Plaintiffs' claim is that the Secretary acted unlawfully in purporting to terminate the VPPP Agreement and announcing that the FHWA would withhold federal funding or authorizations if Plaintiff did not comply," (2) Plaintiffs were not "suing to enforce any term of the VPPP Agreement or accusing Defendants of breach," and (3) "the relief Plaintiffs seek is non-contractual" in that they "ask the Court to set aside Defendants' decision to rescind Plaintiffs' authority to toll federal-aid highways as arbitrary and capricious." *Duffy*, 784 F. Supp. 3d at 665. The Court noted that "while the Court here may need to pass on certain questions about a contract, . . . it would do so in the context of the Government's defense of the action, not Plaintiff's independent requests for relief." *Id.*

(quoting *Hall v. Nielsen*, 2019 WL 250972, at * 3 (D.D.C. Jan. 17, 2019), *aff'd sub nom. Hall v. McAleenan*, 2019 WL 5394627 (D.C. Cir. Oct. 3, 2019)).

Since the Court's decision, a number of federal courts have addressed the question of whether the Tucker Act vests jurisdiction in the Court of Federal Claims for APA challenges to the Federal Government's termination of federal awards.  Most importantly, the Supreme Court has addressed this issue twice in an emergency posture.  In *Department of Education v. California*, it ruled on a temporary restraining order issued by a district court "enjoining the Government from terminating various education-related grants."  604 U.S. 650, 650 (2025).  It explained that "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA."  *Id.* at 651.  The opinion is brief and concluded that "as we have recognized, the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here."  *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)).  The Court clarified, however, that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds."  *Id.* (quoting *Bowen*, 487 U.S. at 910).

Following the Supreme Court's decision in *California*, the Ninth Circuit addressed whether the action by HHS to withdraw government-provided funding for counsel to represent unaccompanied children in immigration proceedings was properly addressed in district court or the Court of Federal Claims.  *Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Human Servs.*, 137 F.4th 932, 938 (9th Cir. 2025).  It held that because the "plaintiffs seek to enforce compliance with statutes and regulations, not government contracts," the legal issue was "beyond the scope of the Tucker Act's jurisdiction."  *Id.*  Addressing *California*, it held that that

51

case "has no application where, as here, the claims sound in statute, rather than contract." *Id.* at 939.

The Supreme Court cited its decision in *California* several months later in *National Institute of Health v. American Public Health Association* ("*APHA*"), reiterating that "as to the District Court's judgments vacating the Government's termination of various research grants," the APA "does not provide the District Court with jurisdiction to adjudicate claims 'based on' the research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." 145 S. Ct. 2658, 2659 (2025) (quoting *California*, 604 U.S. at 651). Justice Barrett wrote the controlling concurrence[13] in which she clarified that the district court "likely lacked jurisdiction to hear challenges to the grant terminations," but that "the District Court was likely correct to conclude that it had jurisdiction to entertain an APA challenge to the [agency] guidance." *Id.* at 2661 (Barrett, J. concurring). "The claims [were] legally distinct." *Id.* at 2661. The Court of Federal Claims had the authority to "award relief to the grantee" if it concluded that "the Government breached a grant agreement." *Id.* at 2662 n.1. Likewise, "[i]f a district court decide[d] that agency guidance violates the APA, it may vacate the guidance, preventing the agency from using it going forward." *Id.*

Several other courts of appeals have addressed the issue following the two Supreme Court decisions. In *Massachusetts v. National Institutes of Health*, the First Circuit reviewed an injunction entered by a district court that vacated guidance from the NIH that capped

---

[13] *See Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented [Supreme] Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)); *see also Mass. v. Nat'l Inst. of Health*, 164 F.4th 1, 11 (1st Cir. 2026) (finding Justice Barrett's concurrence controlling); *Am. Academy of Pediatrics v. U.S. Dep't of Health and Human Servs.*, 2026 WL 80796, at *13 (D.D.C. Jan. 11, 2026) (same).

reimbursement of indirect costs associated with NIH-funded research at 15%.  164 F.4th 1, 9 (1st Cir. 2026).  Applying Justice Barrett's concurrence, the court concluded that the district court had jurisdiction to entertain a challenge to the guidance.  Whereas the district court orders stayed in *California* and *APHA* in effect forced the department "'to pay money' that it had been withholding," *id.* at 12, the plaintiffs in the First Circuit "d[id] not challenge any withholding of funds promised under grant agreements," and so "the district court's ruling is not an order 'to pay money.'"  *Id.* (quoting *California*, 604 U.S. at 651).  Accordingly, the court held that jurisdiction was proper in federal court.

    In *Sustainability Institute v. Trump*, the Fourth Circuit also looked to the recent Supreme Court decisions in addressing a district court's injunction that restored various agricultural grants awarded by different federal agencies.  165 F.4th 817 (4th Cir. 2026).  There, the plaintiffs did not dispute "that their grants are contracts under the Tucker Act."  *Id.* at 827 n.6.  The relief sought by plaintiffs was an order setting aside the freezing of their grants and prohibiting "Defendants from impeding, blocking, cancelling or terminating Plaintiffs' access to their funds" under those grants.  *Id.* at 826.  Therefore, the Fourth Circuit held that "there is no meaningful difference between the district court's order restoring Plaintiff's grants and the order issued in *California*."  *Id.*  It concluded, "[T]he district court lacked jurisdiction to adjudicate Plaintiffs' APA claims challenging the freezing or termination of their grants and to order enforcement of those grants."  *Id.* at 829.  Plaintiff identified "no source of law, besides their grant agreements, guaranteeing the relief they s[ought]."  *Id.* at 828.  Moreover, the relief that they sought was "reinstatement of their grants" and "continued payments on those grants," which was essentially contractual in nature.  *Id.*; *see also Sols. in Hometown Connections v. Noem*, 2026 WL 179590,

at *5 (4th Cir. Jan. 23, 2026) (similar); *Thakur v. Trump*, 2025 WL 3760650, at *3 (9th Cir. Dec. 23, 2025) (similar).

Although these decisions post-date the parties' summary judgment briefing, the Court has taken them into consideration for the purposes of this opinion. *See APHA*, 145 S. Ct. at 2663 (Gorsuch, J., concurring in part and dissenting in part) ("Unless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be." (quoting *Hutto v. Davis*, 454 U.S. 370, 375 (1982))); *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) ("Although our interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases."). Ultimately, as to the Plaintiffs' claims, jurisdiction is appropriate in this Court for two distinct but related reasons: (1) the VPPP Agreement is not a money-mandating agreement; (2) the claim is not, at its essence, contractual.

### 1.    The VPPP Agreement Is Not Money Mandating

This case does not pose the same question the Supreme Court grappled with in *California* or *APHA*. Courts engage in the *Megapulse* analysis only where a claim might be heard in the Court of Federal Claims. Each of the decisions discussed above involved the termination of grants of money. All of the decisions turned on whether the requested relief would have directed the Federal Government in effect to expend its funds as a result of a contractual action or an action under the APA. This case, by contrast, involves an agreement that is not money-mandating, and Plaintiffs' lawsuit neither rests on contractual rights nor seeks relief that the Federal Court of Claims could grant—no equitable relief entered by this Court pursuant to Plaintiffs' complaint would result in the Federal Government making a payment to the Plaintiffs, or to any other entity.

The VPPP Agreement is an unfunded cooperative agreement.  According to 31 U.S.C. § 6305, "[a]n executive agency shall use a cooperative agreement as the legal instrument reflecting a relationship between the United States Government and a State, a local government, or other recipient when (1) the principal purpose of the relationship is to transfer a thing of value to [that entity] to carry out a public purpose . . . instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government; and (2) substantial involvement is expected between the executive agency and the [counterparty] when carrying out the activity contemplated in the agreement."[14]  The Secretary's approval presumably took that form because the VPPP only authorizes the Secretary to enter into cooperative agreements to permit congestion pricing.  Generally, under the VPPP, the "thing of value" necessary to constitute a cooperative agreement might refer to the regulatory grant of approval to build toll infrastructure on a federal aid highway, or to funds that the statute envisions being provided by the Federal Government to aid in carrying out that project.  *See* Pub. L. No 102-240 § 1012(b)(2), (b)(6).  In this case, no funds were awarded as part of the VPPP Agreement.  In a declaration accompanying the Secretary's motion for summary judgment, the New York Division Administrator for the FHWA, Richard Marquis, declares that no such funds have been allocated by Congress in the past decade, and that FHWA "does not anticipate receiving any funding for the Value Pricing Pilot Program."  Dkt. No. 159 ¶¶ 4–5.  Therefore, Plaintiffs have no entitlement to funds under the Agreement.

---

[14] By contrast, the statute instructs that a grant agreement is to be used when the principal purpose of the relationship is to transfer a thing of value to carry out a public purpose but "substantial involvement is not expected" between the Federal Government and the counterparty. 31 U.S.C. § 6304.  Both are distinct from a procurement contract, which is a "legal instrument" whose "principal purpose . . . is to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government."  *Id.* § 6303(1).

The Tucker Act is "merely a jurisdictional statute and does not create a substantive cause of action." *Rick's Mushroom Serv. Inc. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008) (citing *United States v. Testan*, 424 U.S. 392, 398 (1976)). A "plaintiff must look beyond the Tucker Act to identify a substantive source of law that creates the right to recovery of money damages against the United States," *id.*, which is the only relief available in that forum. "In the parlance of Tucker Act cases, that source must be 'money-mandating.'" *Lummi Tribe of the Lummi Rsrv. v. United States*, 870 F.3d 1313, 1317 (Fed. Cir. 2017). In other words, 28 U.S.C. § 1491(a) "has been interpreted to require that a plaintiff seeking to invoke the court's jurisdiction must present a claim for 'actual, presently due money damages from the United States.'" *Nat'l Air Traffic Controllers Ass'n v. United* States, 160 F.3d 714, 716 (Fed. Cir. 1998) (quoting *United States v. King*, 395 U.S. 1, 3 (1969)); *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1354 (Fed. Cir. 2021) ("In order for the Claims Court to have jurisdiction over a breach of contract claim, the action must be solely for money and not for 'injunctive relief or specific performance, except in narrowly defined, statutorily provided circumstances.'" (quoting *Kanemoto v. Reno*, 41 F.3d 641, 645 (Fed. Cir. 1994))).

The Federal Circuit has identified three types of claims from which monetary relief might follow and for which jurisdiction is lodged in the Court of Federal Claims. *See Sanchez v. United States*, 2026 WL 248141, at *19 (Fed. Cir. Jan. 29, 2026). First, "claims alleging the existence of a contract between the plaintiff and the government fall within the Tucker Act's waiver." *Ont. Power Generation, Inc. v. United States*, 369 F.3d 1298, 1301 (Fed. Cir. 2004). Generally, such a contract fulfills the "money mandating requirement for Tucker Act jurisdiction" because there is a "presumption that money damages are available for breach of contract, with no further inquiry being necessary." *Holmes v. United States*, 657 F.3d 1303,

1314 (Fed. Cir. 2011).  That presumption can be rebutted.  "Contracts that expressly disavow money damages, plea agreements in criminal cases, and cooperative agreements [that] are not money-mandating" have been held to rebut the "presumption that money damages are available." *Hous. Auth. of City of New Haven v. United States*, 140 Fed. Cl. 773, 786 (2018) (internal citations and quotations omitted).  Second, "the Tucker Act's waiver encompasses claims where 'the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum.'"  *Ont. Power Generation*, 369 F.3d at 1301 (quoting *Eastport S.S. Corp. v. United States*, 178 Ct. Cl. 599, 605–06, (1967)).  And third, "the Court of Federal Claims has jurisdiction over those claims where 'money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury.'"  *Id.* (quoting *Eastport*, 178 Ct. Cl. at 372).  Whatever the ultimate source of law under which a Plaintiff seeks to recover in the Court of Federal Claims, "it triggers liability only if it 'can be fairly interpreted as mandating compensation.'"  *United States v. Navajo Nation*, 556 U.S. 287, 290 (2009) (quoting *Testan*, 424 U.S. at 400).

That makes sense, as the Court of Federal Claims can generally award only monetary relief; it "cannot grant equitable relief except under very narrow circumstances."  *Wigdor v. United States*, 2015 WL 5439728, at *2 (Fed. Cl. Sept. 15, 2015) (citing *Massie v. United States*, 226 F.3d 1318, 1321 (Fed Cir. 2000)).[15]  Where "the [Court of Federal Claims] cannot grant the equitable relief [Plaintiff] seeks . . . the 'adequate remedy' limitation on the APA's waiver of sovereign immunity does not interfere with the district court jurisdiction over [Plaintiff's]

---

[15] Equitable relief is available in the Court of Federal Claims only as "an incident of and collateral to" a money judgment, in some tax cases, in "nonmonetary disputes" arising out of the Contract Disputes Act, and in bid protests. *James v. Caldera*, 159 F.3d 537, 580 (Fed. Cir. 1998) (internal citations and quotation marks omitted).

claims." *Transohio Sav. Bank v. Dir., OTS*, 967 F.2d 598, 608 (D.C. Cir. 1992). Because the APA only disclaims its waiver of sovereign immunity where there is a different remedy available at law, "a federal district court can[not] be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006). "Put plainly, the Court of Federal Claims can have exclusive jurisdiction *only* with respect to matters that Congress has proclaimed are within its jurisdictional compass." *Id.* at 177; *see also Crowley Gov. Servs., Inc. v. GSA*, 38 F.4th 1099, 1110 (D.C. Cir. 2022) ("Because a plaintiff could not bring this type of tort action in the Claims Court in the first place, that Court would not have exclusive jurisdiction of them.").

The claim at issue is not any one of the three types for which jurisdiction might be appropriate in the Court of Federal Claims. First, assuming the VPPP Agreement is a contract, it is an unfunded one such that it rebuts the general contractual "presumption that money damages are available." *Hous. Auth. of City of New Haven*, 140 Fed. Cl. at 786. Second, Plaintiffs do not seek "in effect" the return of money that the Plaintiff has paid to the Government. *Eastport*, 178 Ct. Cl. at 605. Again, no such money exchanged hands. And third, the Plaintiffs have not asserted that they are nevertheless entitled to a payment from the treasury." *Id.* Ther is no "provision of law relied upon" that "grants the claimant, expressly or by implication, a right to be paid a certain sum." *Id.*

Plaintiffs here have not sued under *any* cause of action that would lead to the payment of money from the United States Treasury. And a suit involving a contract that could not give rise to such payment would not circumvent the Court of Claims. *See Holmes*, 657 F.3d at 1314; *Rick's Mushroom*, 521 F.3d at 1343 (the "cost-share agreement does not provide a substantive right to recover money-damages" and so does not result in jurisdiction under 28 U.S.C.

§ 1491(a)(1)); *St. Bernard Par. Gov. v. United States*, 134 Fed. Cl. 730, 735 (2017) (the cooperative agreement at issue was not "money-mandating" such that jurisdiction would be appropriate unless there was a "specific provision mandating monetary recovery").[16]  Here, Plaintiffs seek only equitable relief.  And that equitable relief, if granted, would not result in the payment of funds from the Treasury or the return of any funds from the Federal Government to Plaintiffs because none were taken by the agency action at issue.

### 2.    Jurisdiction Lies in Federal District Court Under *Megapulse*

Setting aside the dispositive fact that neither the VPPP Agreement nor the VPPP is money-mandating such that the Court of Federal Claims would have jurisdiction over the instant proceeding, analyzing this case under the framework of *Megapulse* only confirms the conclusion that jurisdiction is proper in this Court.[17]  That is, exploring both (1) the source of the rights

---

[16] Nor is the statute at issue here "money mandating" such that jurisdiction in the Court of Federal Claims would be appropriate under the statute alone.  Although the VPPP does contemplate that the Secretary can make available funds of "[n]o more than $15,000,000" to "carry out each pilot project under this section," Pub. L. 102-240 § 1012(b)(6), the VPPP Agreement makes clear that the Federal Government is not obligated to provide any funds to support the CBDTP.

[17] The Court assumes, without deciding, for the purposes of the *Megapulse* analysis that there is sufficient consideration such that the VPPP Agreement is a valid contract.  "Any agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government." *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997).  "[I]n the context of government contracts . . . consideration must render a benefit to the government, not merely a detriment to the contractor; government officials do not have authority to make contracts in which no benefit flows to the government." *Metzger, Shadyac & Schwarz v. United States*, 12 Cl. Ct. 602, 605 (1987).  The "benefit to the federal government 'must be tangible and direct, rather than generalized or incidental.'" *Am. Ctr. for Int'l Labor Solidarity v. Chavez-DeRemer*, 789 F. Supp. 3d 66, 86 (D.D.C. 2025).  The caselaw does not specify that such benefit must be in the form of physical property.  The VPPP is designed, in part, to generate information through the use of pilot projects for the Federal Government regarding the types of programs that can reduce traffic congestion.  Accordingly, the Court assumes that the provision of such information is a sufficiently direct and tangible benefit to support the existence of consideration. *See St. Bernard Parish*, 134 Fed. Cl. at 735–36; *Thermalon Indus. Ltd. v. United States*, 34 Fed. Cl. 411, 415 (1995); *Quiman, S.A. de C.V. v. United States*, 178 F.3d 1313, at *2 (Fed. Cir. 1999)

invoked by Plaintiffs and (2) the relief sought confirm that the action is not "at its essence a contract claim," and so jurisdiction is proper in this Court. *Crowley*, 38 F.4th at 1106. This "well-established *Megapulse* test ferrets out contract claims cloaked in APA garb." *Open Tech. Fund v. Lake*, 2025 WL 3289166, at *5 (D.D.C. 2025).

On the first consideration under *Megapulse*, "the source of the rights upon which plaintiff bases its claims," the Secretary argues that this dispute is at essence contractual because the VPPP Agreement is the "only source of Plaintiffs' authority to toll federal-aid highways." Dkt. No. 158 at 15. But that argument misunderstands the nature of Plaintiffs' claim. Plaintiffs do not sue to enforce the VPPP Agreement. In this lawsuit, they are indifferent to the terms and conditions of that agreement. Nor did the Secretary invoke any of the Agreement's terms in his purported revocation thereof. Plaintiffs sue to vacate the Secretary's allegedly arbitrary action in rescinding approval for the CBDTP. The VPPP Agreement is not the "source of law" that "guarantee[s] them the relief they seek." *Sustainability Institute*, 165 F.4th at 827. Rather, the APA and the VPPP alone are the sources of law upon which the requested relief turns. Plaintiffs' "claim of entitlement rests on . . . applicable statutory . . . constraints—not the terms of any particular contract." *Widakuswara v. Lake*, 2025 WL 1288817, at *12 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting).[18] Because Plaintiffs' claim "depends on interpretations of statutes and regulations rather than the terms of an agreement negotiated by the parties, the claim is not in essence contractual." *Id.* at *13. "Seeking to ensure compliance with statutory and regulatory commands is a matter beyond the scope of the Tucker Act's exclusive jurisdiction." *Cmty. Legal*

_____

(table decision).

[18] The D.C. Circuit granted *en banc* review of the panel opinion in *Widakuswara* from which Judge Pillard dissented, vacating the panel's prior opinion "for the reasons explained by Judge Pillard" in her dissent. *Widakuswara v. Lake*, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025).

*Servs.*, 137 F.4th at 938.  Even the Secretary's arguments that termination of the Agreement was permitted turn on the meaning of the VPPP and federal regulations.

Because Plaintiffs do not "'seek to enforce any duty imposed upon [the government] by the [relevant contract,]' nor did it 'contend [the government] breached the terms' of the contract or 'invoke' the contract in any other meaningful way," the source of the claimed rights is not contractual.  *Climate United Fund v. Citibank N.A.*, 154 F.4th 809, 862 (D.C. Cir. 2025) (Pillard, J., dissenting) (quoting *Perry Cap. v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017)).[19]  As Justice Barrett concluded in *APHA*, "Plaintiffs frequently seek vacatur of [agency action] on arbitrary-and-capricious grounds in district court," and "[t]hat the agency guidance discusses" a "grant[] . . . does not transform a challenge to that guidance into a claim 'founded . . . upon' contract that only the CFC can hear."  *APHA*, 145 S. Ct. at 2661; *see also Am. Acad. of Pediatrics v. HHS*, 2026 WL 80796, at *11 (D.D.C. Jan. 11, 2026) ("The fact that this case rests on First Amendment retaliation and viewpoint discrimination claims constitutes 'truly independent legal grounds' supporting the exercise of jurisdiction by this Court." (quoting *Crowley*, 38 F.4th at 1107)); *Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985) (holding that the Court of Federal Claims did not have exclusive jurisdiction where the plaintiff's "claims arise under a federal grant program and turn on the interpretation of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties").

Even if Plaintiffs had asserted a right based upon contract, that they do not seek monetary relief or specific performance confirms that jurisdiction is appropriate in federal district court.

---

[19] Judge Pillard dissented from the original panel hearing of *Climate United Fund*.  The majority opinion was vacated by the *en banc* court on December 17, 2025.  Dkt. No. 176-1.

Thus, as the Court previously concluded, the case does not satisfy the second *Megapulse* factor (both of which would be necessary to find that jurisdiction was appropriate in the Court of Claims). The question under the second *Megapulse* factor is whether Plaintiffs seek "non-monetary relief that has 'considerable value' independent of any future potential for monetary relief." *Kidwell v. Dep't of Army, Bd. for Correction of Mil. Recs.*, 56 F.3d 279, 285 (D.C. Cir. 1995); *see also Crowley*, 38 F.4th at 1107–08; *Rudometkin v. Wormuth*, 2024 WL 5165697, at *2 (D.C. Cir. Dec. 19, 2024). If so, no Tucker Act jurisdiction lies. That Plaintiffs do not seek monetary relief in their complaint does not alone "settle the question of Tucker Act jurisdiction." *Kidwell*, 56 F.3d at 284. "[P]laintiffs can[not] bypass Tucker Act jurisdiction by converting complaints which 'at their essence' seek money damages from the government into complaints requesting injunctive relief or declaratory actions," that has no value other than the monetary relief that might flow from such equitable remedies. *Id.* But where the relief sought by plaintiff does not "disguise[e] a money claim as a claim requesting a form of equitable relief," *id.*, there is no Tucker Act jurisdiction. That is true even where the "judicial remedy may require one party to pay money to another." *Bowen*, 487 U.S. at 893.

"Courts have not hesitated to look beyond the pleadings of a case brought in district court to determine if it involves a claim over which the Court of Claims has exclusive jurisdiction." *Megapulse*, 672 F.2d at 967. A plaintiff cannot camouflage their claims and "bypass Tucker Act jurisdiction by converting complaints which 'at their essence' seek money damages from the government into complaints requesting injunctive relief or declaratory actions." *Kidwell*, 56 F.3d at 284 (quoting *Megapulse*, 672 F.2d at 968). Such "forum shopping [would] circumvent[t] a primary purpose of the Act—to ensure that a central judicial body adjudicates most claims against the United States Treasury." *Id.* Thus, for example, where a

plaintiff seeks "specific performance of a contractual obligation to pay past due sums," that plaintiff is barred from "seeking specific relief to obtain money to which it claims entitlement" against the Federal Government in district court. *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002); *see Hous. Auth. of Slidell v. United States*, 149 Fed. Cl. 614, 628 (2020) ("[A] complaint for money due and owing under a contract could always be recharacterized as a claim for specific performance (i.e. injunctive relief to compel payment)."). Congress specifically "intended to foreclose specific performance of government contracts" in cases for monetary relief falling within Tucker Act jurisdiction. *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 80 (D.C. Cir. 1985). And courts have been clear that a pleading invoking specific performance to "avoid[] this remedy restriction," *id.*, must nevertheless stay in the Claims Court, *see Presidential Gardens*, 175 F.3d at 143 ("Actions seeking specific performance of a contract, brought in order to avoid the Tucker Act's limitation on money judgments, are not allowed to be brought against the United States."); *Nat'l Ctr. for Mfg. Sci. v. United States*, 114 F.3d 196, 198 (Fed. Cir. 1997) ("While a request for specific performance of a contract might in some cases be construed as an action for the payment of money, that is not the case here.").

Plaintiffs seek nothing affirmative from the Secretary. They seek relief from administrative action and that relief would confer substantial value independent of any future claim for monetary relief (of which, as discussed, there could be none). That is, Plaintiffs seek vacatur and related relief from an order rescinding the cooperative agreement pursuant to which they operate the CBDTP. That relief has immense value apart from any obligations it would impose on the Federal Government (of which there are none). It would forestall the Federal Government from taking the "compliance measures" that would flow from the absence of federal approval and the absence of a VPPP Agreement. Plaintiffs do not seek specific performance of

an obligation that could otherwise be remedied by money damages, *i.e.*, specific performance whose only value would be in the monetary relief it provides. Plaintiffs request the February 19 and April Letters be vacated and equitable relief be granted. That relief would not require the Secretary to take any action. Plaintiffs' relief would be complete without the Secretary taking any further action and simply with the restoration of a prior status quo where no action by the Secretary was required. In other words, Plaintiffs ask only for relief that would prevent the Secretary from taking action found to be unlawful. That relief is outside the scope of the jurisdiction of the Court of Federal Claims and does not circumvent any equivalent relief that the Court of Federal Claims could grant.

The cases cited by the Secretary do not support its argument for Tucker Act jurisdiction. *California* concerned past-due obligations and continuing obligations from grants. 604 U.S. at 651. The Supreme Court concluded that because the district court's order to pay those funds was in effect an order "to enforce a contractual obligation to pay money," jurisdiction was appropriate only in the Court of Federal Claims. *Id.* (quoting *Great-West Life & Annuity*, 534 U.S. at 212). In *Up State*, the disappointed government contractor sought an injunction and a declaratory judgment or, in the alternative monetary damages, requiring the United States Army to take title to a building the plaintiff had constructed and operated and agree to lease it back to the plaintiff. 198 F.3d at 374, 376–77. The first *Megapulse* factor was satisfied because, unlike here, the rights that plaintiff sought to vindicate were not based on "anything other than the lease with the Army." *Id.* at 377. "Had the parties not entered into the agreement at issue in th[e] case, the [plaintiff] could have had no possible right to transfer title in the Building to the Army, or to demand that the Army grant it a facility lease for that building." *Id.* And on the second prong, the relief sought was "analogous to a contract remedy for specific performance." *Id.* As

the very demand for relief confirmed, it had no value other than in the form of the monetary relief it conferred.

The Secretary also relies primarily on the D.C. Circuit's decision in *Ingersoll Rand*. In that case, the plaintiff claimed that the Air Force unlawfully terminated its contract to purchase air compressors. 780 F.2d at 75. Plaintiff challenged the Air Force's decision to solicit new bids and sought specific performance reinstating its original contract. *Id.* The D.C. Circuit held that the case belonged in the Court of Claims under the Tucker Act. Several findings were critical to the court's conclusion. First, the court noted that, in terminating the contract, the Air Force invoked the terms of the contract (and specifically the "termination-for-convenience" clause) and held therefore that it was "possible to conceive of this dispute as entirely contained within the terms of the contract." *Id.* at 78. Plaintiff's claim that the termination violated a federal regulation that permitted it to cancel a contract "only upon a showing of a cogent and compelling reason" was tantamount to a claim that the contract forbade termination. *Id.* "The question presented by the complaint could be phrased as whether the contract forbids termination under these conditions." *Id.* Second, the court concluded that, in those circumstances, the issues raised by plaintiff's claim that the "Air Force had no good reason to terminate the contract and begin resolicitation" came within the "unique expertise of the Court of Claims." *Id.* To permit plaintiff to use a federal regulation to raise what was in essence a contractual question would undermine "the congressional intent to provide a single, uniquely qualified forum for the resolution of contractual disputes." *Id.* Third, the court held that an award of money damages could remedy the wrong committed to plaintiff by the Air Force's unlawful termination of the contract. Although plaintiff might have preferred that a court reinstate the contract and order the Air Force to specifically perform, plaintiff had no right to receive "all its requested remedies" when the

65

Court of Claims Act reflected Congress's intent that a disgruntled contractor receive only money damages and not specific performance. *Id.* at 79.

This case could not be more different. Plaintiffs' claims are not "entirely contained within the terms of the contract." 780 F.2d at 78. Plaintiffs raise the question not of what the contract requires or forbids but whether the Secretary was correct in concluding that Congress did not give the agency authority to enter into the VPPP Agreement. It is a core function of the federal courts to "independently identify and respect [congressional] delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA." *Loper Bright Enterp. v. Raimondo*, 603 U.S. 369, 403 (2024). When the issue presented is whether Congress did or did not grant the agency power to take administrative action, it falls to the federal courts generally under the APA and not to the Federal Court of Claims specifically to resolve that issue. *See id.* (challenge to administrative rule resolved by D.C. Circuit). This case is also "far outside the specialized expertise of the Court of Claims," as a claim that an agency "violated the APA's ban on arbitrary and capricious agency action—a claim for which [the plaintiff] seeks injunctive relief, not payment from the Treasury—is well within the district court's remit." *Climate United Fund*, 154 F.4th at 859 (Pillard, J., dissenting); *see also Tennessee ex rel. Leech v. Dole*, 749 F.2d 331, 335 (6th Cir. 1984) ("In determining whether the Court of Claims has exclusive jurisdiction in this case, we must therefore 'be careful not to subvert congressional objectives underlying the enactment of the judicial review statute by allowing the government to give an overly expansive scope to the notion of claim founded upon a contract.'" (quoting C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4101 (1978)); *Bowen*, 487 U.S. at 908 n.46 ("The policies of the APA take precedence over the purposes of the Tucker Act." (quoting *Del. Div. of Health & Social*

*Servs. v. Dep't of Health & Human Servs.*, 665 F. Supp. 1104, 1117 (Del. 1987))); *Transohio Sav. Bank*, 967 F.2d at 611 (similar).

The district courts, not the Court of Claims, are the only forum capable of evaluating and granting the kind of relief sought by Plaintiffs here. *See Ware v. United States*, 57 Fed. Cl. 782, 785 n.3 (2003) ("Although this court has 'greater freedom than is enjoyed by other federal courts to inquire into the legality of government action,' that freedom arises only in the context of 'jurisdiction to award damages, not specific relief.'" (quoting *Glidden Co. v. Zdanok*, 370 U.S. 530, 557 (1962))); *Martinez v. United States*, 333 F.3d 1295, 1303 (Fed. Cir. 2003) ("the Court of Federal Claims does not have general equity jurisdiction"). And, while money damages under the contract might have compensated the plaintiff in *Ingersoll-Rand* for the loss it suffered by not being able to supply air compressors to the Air Force, Plaintiffs here cannot be compensated by money damages for the injury they suffer if the Secretary's determination to rescind approval of the CBDTP was arbitrary and capricious under the APA. That is, the purpose of the program—to reduce congestion in the CBD and thereby create knock-on beneficial economic and environmental effects—cannot, unlike an unlawfully terminated procurement contract, be adequately compensated with damages.

Finally, *Vera Institute of Justice v. U.S. Department of Justice*, 805 F. Supp. 3d 12 (D.D.C. 2025), does not support the Secretary's position here. The plaintiffs there were organizations that had received grants from the Department of Justice that were terminated without notice and sought a preliminary injunction reversing the terminations and restoring their awards. The Justice Department terminated the awards on the basis that the awards no longer effectuated the program goals or agency priorities. *Id.* at 18–19. The D.C. District Court determined that while "Defendants' rescinding of these awards is shameful," *id.* at 19, the

dispute belonged in the Court of Claims under the Tucker Act. The source of the plaintiffs' rights were entirely contained within the contract. Since the "regulation that Defendants allegedly violated" was a regulation that required the basis for termination to be spelled out in the terms and conditions of the Federal award, the resolution of plaintiffs' rights to grant money would turn upon an examination of "the awards themselves." *Id.* at 32. And "[t]he remedy sought also mark[ed] the claim as essentially contractual." *Id.* Plaintiff sought the "continued payment of the grants." *Id.* Tucker Act jurisdiction thus was proper because "[t]he non-monetary relief that [p]laintiffs s[ought] d[id] not have 'considerable value' apart from the 'future potential for monetary gain.'" *Id.* (quoting *Kidwell*, 56 F.3d at 284).

In sum, this Court "retains the power to make rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds." *Megapulse*, 672 F.2d at 969–70. This is not a "disguised, run of the mill contract action 'within the unique expertise of the Court of Claims." *Widakuswara*, 2025 WL 1288817, at *10 (Pillard, J., dissenting) (quoting *Ingersoll-Rand*, 780 F.2d at 78). "At bottom, Plaintiffs do not bring simple breach of contract claims—they challenge adverse agency action." *Climate United Fund v. Citibank, N.A.*, 775 F. Supp. 3d 335, 345 (D.D.C. 2025).

In the end, under Defendants' argument, Plaintiffs can seek no relief anywhere for agency action they contend is unlawful. That proposition is, "to say the least, troublesome." *Tootle*, 446 F.3d at 176. They cannot seek relief in the district court which has the authority to vacate the February 19 Letter and to issue declaratory relief because, according to the Secretary, the case involves a contract. They also cannot seek relief in the Court of Federal Claims because that court cannot vacate the February 19 Letter or issue declaratory relief. No statute requires that outcome. Jurisdiction is proper in this Court.

### 3. Organizational Intervenors Could Not Seek Relief in the Court of Federal Claims

The fallacy of the Secretary's argument is further demonstrated by the role and the argument of the Organizational Intervenors in this case.

Intervenors assert that they have standing to bring APA claims because their members "will suffer injuries if Defendants succeed in their efforts to terminate the program," including "forcing Intervenor-Plaintiffs' members to breathe dirtier air, endure increased noise, and suffer disruption of their daily activities." Dkt. No. 167 at 3. They seek the same relief as Plaintiffs— an order vacating the Secretary's actions and related equitable relief. They need not, in this case, establish their own independent standing; Plaintiffs have standing. But, assuming hypothetically that the Plaintiffs chose not to challenge the Secretary's decision, and assuming further that Intervenors did have standing, neither they nor anyone else in their position would be able to challenge agency action as contrary to law or arbitrary and capricious under the Secretary's argument.

"To maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government." *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998) (quoting *Ransom v. United States*, 900 F.2d 242, 244 (Fed. Cir. 1990)); *DDS Holdings, Inc. v. United States*, 158 Fed. Cl. 431, 436 (2022) ("To establish jurisdiction in this court on the basis of a contract with the government, plaintiff must demonstrate privity of contract with the government."). Generally, the "government consents to be sued only by those with whom it has privity of contract." *Erickson Air Crane Co. of Wash. v. United States*, 712 F.2d 810, 813 (Fed. Cir. 1984). There is an exception that "permits a suit to be brought against the government 'by an intended third-party beneficiary' to a government contract." *Constructora Guzman, S.A. v. United States*, 161 Fed. Cl. 686, 692 (2022) (quoting

69

*First Hanford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1289 (Fed. Cir.

1999)).  However, particularly in the government contract context, the third-party beneficiary

doctrine is an "exceptional privilege," and the requirements to demonstrate it are "stringent."

*Pac. Gas & Elec. Co. v. United States*, 838 F.3d 1341, 1361 (Fed. Cir. 2016) (internal citations

and quotation marks omitted).  "In order to prove third-party beneficiary status, a party must

demonstrate that the contract not only reflects the express or implied intention to benefit the

party, but that it reflects an intention to benefit the party directly."  *Glass v. United States*, 258

F.3d 1349, 1354 (Fed. Cir. 2001); *see also Schuerman v. United States*, 30 Fed. Cl. 420, 428

(1994) ("In cases of contracts intended to benefit the general public, a stranger to such contract

must show that the contract 'was intended for his direct benefit.'" (quoting *German All. Ins. Co.*

*v. Home Water Supply Co.*, 226 U.S. 220, 230 (1912))).

Organizational Intervenors do not sue as third-party beneficiaries to enforce a contract.

They seek to vacate arbitrary agency action under the APA.  And the parties do not identify any

provision that could be read to confer a benefit upon them directly.  The intent of the VPPP

Agreement is to confer permission on the Project Sponsors so that they can implement a program

that will benefit the public, including the Organizational Intervenors.

Thus, the Secretary's argument is tantamount to the claim that his conduct is immune

from any legal scrutiny.  Under the APA, any person who has constitutional standing can sue to

challenge agency action as arbitrary and capricious and, if successful, can obtain relief.  *See Noel*

*Canning v. NLRB*, 705 F.3d 490, 514 (D.C. Cir. 2013).  But, under the Secretary's argument, his

conduct could not be challenged because he has taken it with respect to a government contract.

The Secretary's argument thus does not seek to "channe[l] challenges" to a court that is equipped

and authorized to hear that challenge. *APHA*, 145 S. Ct. at 2661 (Barrett, J., concurring). If accepted, it would protect his action from challenge by anyone in any court.

## II.    Plaintiffs' APA Claims

As set out above, the action of the Secretary was final; the action is ripe for review; and this Court has jurisdiction to entertain the lawsuit. Accordingly, the Court next turns to the merits of the Plaintiffs' APA claims.

The Court has previously explained that "[u]nder the APA, the 'reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions' that are found to be: (1) 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' (2) 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right,' and/or (3) 'without observance of procedure required by law.'" *Duffy*, 784 F. Supp. 3d at 667 (quoting 5 U.S.C. § 706(2)(A), (C)–(D)). The Court determined at the preliminary injunction stage that the Plaintiffs had established a likelihood of success on the merits of their APA claim. It did so on the basis that: (1) the February 19 Letter exceeded the FHWA or Secretary's authority to terminate the VPPP Agreement, (2) the Secretary's conclusion that the statute does not authorize cordon pricing programs was incorrect as a matter of law, (3) it was arbitrary and capricious for the Secretary to terminate the program on the basis that the VPPP did not permit the Tolling Program, (4) Defendants' policy arguments were *post hoc* rationalizations, and (5) the Secretary and the FHWA acted arbitrarily and capriciously be failing to adequately consider Plaintiffs' reliance interests. *See generally Duffy*, 784 F. Supp. 3d at 667–86.

In the February 19 Letter, Secretary Duffy terminated the VPPP Agreement "[d]ue to my conclusion that FHWA lacked statutory authority to approve the cordon pricing tolling under the CBDTP pilot project." Dkt. No. 87-5. On February 20, the Executive Director of the FHWA, Gloria Shepard, gave Plaintiffs a deadline of March 21, 2025 for compliance. Dkt. No. 87-6. A

month later, on March 20, Shepard gave the Program Sponsors a further 30-day extension, and demanded that "toll operations must cease by April 20, 2025."  Dkt. No. 67-8.  Finally, on April 21, 2025—two months after the rescission, and two months after the initiation of the present lawsuit—Secretary Duffy sent a letter warning of "appropriate measures to ensure compliance" if New York "continues to fail to comply with Federal law."  Dkt. No. 87-10 at 2.  He explained that the letter "once again provides notice of termination."  *Id.* at 5.  He stated that the February 19 Letter had "made clear" that New York was required to "cease the collection of tolls by March 21, 2025."  *Id.* at 1.  He reaffirmed that based on his review of the statutory scheme, New York "is not legally permitted to collect tolls on roads within the CBDTP zone that were constructed using Federal-aid highway funds."  *Id.*  He noted also that the response "should address the policy concerns expressed in my February 19, 2025, letter, which were an independent basis for my decision to terminate the VPPP agreement."  *Id.* at 3.

Defendants argue in their motion for summary judgment that the Court's conclusions at the preliminary injunction stage were incorrect.  The Court first addresses Plaintiffs' arguments that the basis for the termination of the VPPP Agreement as laid out in the February 19 Letter and reiterated throughout later communications is unlawful under the APA.  The Court then turns to Plaintiffs' argument that, even if considering the policy rationale stated in the April 21 Letter, Defendants were not permitted to unilaterally terminate the agreement.

## A.    The Secretary's Legal Grounds for Termination were Arbitrary and Capricious

Count II of Plaintiffs' complaint is that "Defendants' purported basis to terminate the VPPP Agreement—broadly, that the Program 'is not an eligible value pricing pilot program' and thus 'FHWA lacked statutory authority to approve' the Program, Feb. 19 Ltr. at 3—finds no support in the statutory text, legislative history, or FHWA's longstanding interpretation of the

VPPP, and is 'not in accordance with law.'" Dkt. No. 96 ¶ 231. The Court previously addressed this argument, finding that "[t]he Secretary's explanation of the VPPP's supposed exclusion of cordon pricing programs rests on two erroneous legal conclusions: first that he was required to adopt a narrow construction of the VPPP's tolling provisions, and second that the VPPP's application to 'congestion pricing programs' does not authorize tolling in connection with cordon pricing programs." *Duffy*, 784 F. Supp. 3d at 674. It further concluded that the Secretary's conclusion in the February 19 Letter that the VPPP did not permit the Tolling Program was incorrect because "[t]he VPPP does not contain any language excluding the consideration of other factors for determining tolling rates, and Defendants do not point to any source that supports the Secretary's interpretation." *Id.* at 679.

### 1.    The VPPP Allows the Secretary to Permit Cordon Pricing

As discussed supra, the ISTEA originally permitted the Secretary to enter into cooperative agreements for "congestion pricing" projects. Pub. L. 102-240 § 1012(b). The statute did not define either term, but their plain meaning is apparent. The Oxford English Dictionary defined "congestion" in 1989 as "[a] crowding together or accumulation which disorganizes regular and healthy activity: congested or overcrowded condition, as of population, traffic, etc." "Congestion," The Oxford English Dictionary (2d ed. 1989). And "congested" in turn is defined as "[f]illed up by an obstructive accumulation; overcrowded." "Congested," The Oxford English Dictionary (2d ed. 1989). "Pricing" is "[t]he setting of a price for goods, services, etc.; the overall level of prices so set." "Pricing," The Oxford English Dictionary (6th ed. 2007); *see* "Price," The Oxford English Dictionary (2d ed. 1989) ("The money (or other equivalent) for which anything is bought or sold.") Putting the words together, then, the term "congestion pricing" is naturally understood to denote a scheme under which a price is set to

address overcrowding.[20]  And because the exception is to the provision that otherwise would prevent tolls on federal aid-highways, a congestion pricing project must be one where a price is imposed in the form of a toll for the use of such a highway.  It follows necessarily that the projects that the statute permits are those that would, through the use of a toll, charge a price for access to the tolled area and thus limit congestion in that area.

The statute clearly includes an area wide, or cordon, program within its ambit.  A textual distinction between such cordon program and a congestion program is untenable.  Every tolling program, by definition, creates a cordon and limits access—a driver cannot access the cordoned area without paying a toll.  As the Court previously explained, "the FHWA actually has authorized the imposition of tolls that do not provide for untolled access," including "two I-278 bridges to State Island, as well as on two I-190 bridges to Grand Island."  *Duffy*, 784 F. Supp. 3d at 678.[21]  Even absent the CBDTP, the Manhattan CBD is cordoned from New Jersey by tolls. For a New Jersey commuter to access the CBD without paying a toll, she would have to cross the Hudson River in Albany, adding "approximately 300 miles to the commute.  *See id.* at 678–79 (quoting Dkt. No. 83 at 33).  The statute is indifferent, and leaves to the Secretary's discretion in an executed cooperative agreement, the area that is to be cordoned to address traffic congestion and the tolling scheme to be used to further that purpose—whether it is a four-lane highway over a busy interstate that otherwise would experience congestion at the front or back end, or a

---

[20] The Oxford English Dictionary also contains a more recent entry for "congestion pricing," which it defines as "[t]he practice or policy of charging a fee to drive on particular roads at busy times (such as at rush hour), in an attempt to reduce the volume of traffic."  "Congestion Pricing," The Oxford English Dictionary (3d ed. 2024)*.*

[21] Defendants themselves still understand congestion pricing to include cordon pricing.  Their website reads (to date) that a valid congestion pricing strategy includes "zone-based pricing, including Cordon and Area Pricing."
https://ops.fhwa.dot.gov/congestionpricing/cp_what_is.htm (last accessed March 3, 2025).

smaller highway that leads into an inner city.  The statute also is indifferent, and leaves to the Secretary's discretion, the tolling scheme, i.e., the vehicles that are tolled (whether it is some or all), the hours in which a toll is imposed, the availability of alternate routes, and the like.

That the Secretary's discretion was not constrained with respect to the particular types of congestion pricing projects (including cordon pricing) is also consistent with the VPPP's program objectives.  Courts "must read the words Congress enacted 'in their context and with a view to their place in the overall statutory scheme.'"  *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 275 (2023) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)). "We 'consider not only the bare meaning of the critical word or phrase but also its placement and purpose in the statutory scheme.'"  *Lopez v. Garland*, 38 F.4th 315, 320 (2d Cir. 2022) (quoting *Holloway v. United States*, 526 U.S. 1, 6 (1999)).  In passing the ISTEA, Congress addressed "intermodal" transportation, that is, a system that "shall consist of all forms of transportation in a unified, interconnected manner, including the transportation systems of the future, to reduce energy consumption and air pollution while promoting economic development and supporting the United States preeminent position in international commerce."  49 U.S.C. § 5501(b)(1). Such an intermodal system expressly "shall include significant improvements in public transportation necessary to achieve" those national goals, which include too "mobility for elder persons, persons with disabilities, and economically disadvantaged persons in urban and rural areas of the country."  *Id.* § 5501(b)(3).  Importantly, the intermodal transit system Congress conceived of "shall give special emphasis to the contributions of the transportation sectors to increased productivity growth," including by considering the "external benefits of reduced air pollution, reduced traffic congestion, and other aspects of qualify of life in the United States."

*Id.* § 5501(b)(5).  It is to be the "centerpiece of a national investment commitment to create the new wealth of the United States for the 21st century."  *Id.* § 5501(b)(9).[22]

To that end, in addition to the congestion pricing program, Congress (among other things) (i) authorized billions of dollars of funding for a congestion mitigation and air quality improvement program to be paid from the Highway Trust Fund, *id.* §§ 1003(a)(4), 1008; (ii) created a surface transportation program that would permit states to obligate funds apportioned to them for capital costs for transit projects eligible for assistance under the Federal Transit Act and for publicly owned intracity and intercity bus terminals and facilities (as well as for bicycle transportation and pedestrian walkways), *id.* § 1007(a)(2);[23] and (iii) directed the states to develop transportation plans and programs providing "for consideration of all modes of transportation," including at a minimum "[m]ethods to reduce traffic congestion and to prevent traffic congestion from developing in areas where it does not yet occur, including methods which reduce motor vehicle travel, particularly single-occupant motor vehicle traffic" and "[m]ethods to expand and enhance transit services and to increase the use of such services,"  *id.* § 1025.

The Congestion Pricing Pilot Program was not an anomaly.  A central feature of the ISTEA was a form of cooperative federalism in which the Federal Government and the states would work cooperatively to experiment with ways to reduce traffic and enhance air quality in

---

[22] A 1996 report from the FHWA explained that the "key" to understanding flexible funding under the ISTEA was "understanding multimodal transportation."  FHWA, "Intermodal Surface Transportation Efficiency Act, Flexible Funding Opportunities for Transportation Investments," (Jan. 1, 1996), available at https://rosap.ntl.bts.gov/view/dot/4240 (last accessed March 3, 2026). The report continues that "[m]ultimodalism is integration of all modes of transportation— highways, public transportation, bicycle and pedestrian facilities—into an interconnected, 'seamless' system."  *Id.* at 1.

[23] The FHWA's fact sheet for the Surface Transportation Program indicates that funds can be used for "[c]ongestion pricing projects and strategies, including electric toll collection and travel demand management strategies and programs."  MAP-21- Moving Ahead for Progress in the 21st Century, https://www.fhwa.dot.gov/map21/factsheets/stp.cfm (last accessed March 3, 2026)

the national interest.  The legislative history of the ISTEA further solidifies this understanding.
*See Nwozuzu v. Holder*, 726 F.3d 323, 327 (2013) ("If the statutory terms are unambiguous, we
construe the statute according to the plain meaning of its words.  If, however, the terms are
ambiguous or unclear, we may consider legislative history and other tools of statutory
interpretation.").  Congress intended that the states and localities would have flexibility to
achieve Congress's goals including "to deal with congestion" and "to better manage
transportation demands."  137 Cong. Rec. S7453-01, S7454, 1991 WL 99693, at *2 (Statement
of Sen. Lieberman); 137 Cong. Rec. S7412-01, S7416, 1991 WL 99676 at *9 ("This bill gives
the States a tremendous amount of flexibility. . . . those States and cities that choose to construct
new, innovative transportation or management systems can serve as models for other States and
cities.") (Statement of Sen. Chafee); S. Conf. Rep. at 23, 137 Cong. Rec. S18581-01, S18591,
1991 WL 252477 ("Other innovative programs including a congestion pricing pilot program
. . .").  In his signing statement President Bush confirmed that a "major element" of the law "was
to provide State and local officials unprecedented flexibility" including "the discretion to use a
major portion of their Federal surface transportation funds on the improvements that would best
meet local needs, whether highway projects or public transit projects."  Statement by President
George Bush Upon Signing H.R. 2950, 1991 U.S.C.C.A.N. 1865; *see United States v. Prado*,
933 F.3d 121, 139–40 (2d Cir. 2019) (relying in part on Presidential Signing Statement for
meaning).  The flexibility built into the statute is a feature, not a bug, of the scheme envisioned
by Congress.  *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) ("[T]he fact that a
statute can be applied in situations not expressly anticipated by Congress does not demonstrate
ambiguity.  It demonstrates breadth.")

As discussed, in 1998 Congress amended the ISTEA through TEA-21, replacing the term "congestion pricing" with "value pricing," but there is no evidence that by that word change it intended to constrict the inventiveness of states and localities in suggesting solutions for traffic congestion or the discretion of the Secretary to approve such solutions. *See* Pub. L. No. 105-178 § 1216(a) (1998). The Executive Branch indicated that "[t]he change in program name from congestion to value pricing is a recognition of the practice of many [FHWA] State and local partners in the ISTEA program in using terminology that does a better job of focusing on the intended benefits, or value, of pricing programs in reducing congestion." U.S. Dep't of Transp., Fed. Hwy. Admin., Information: Section 1216(a) of the TEA-21, the Value Pricing Pilot Program (July 13, 1998), available at https://www.fhwa.dot.gov/tea21/valuepri.htm (last accessed March 3, 2026). By its terms, the phrase is more capacious than "congestion pricing." "Value" refers to the "material or monetary worth of something; the amount at which something may be estimated in terms of a medium of exchange, as money or goods, or some other similar standard." "Value," The Oxford English Dictionary (2d ed. 1989). A value pricing pilot program is thus naturally read to include any program that sets a price on the basis of the perceived worth of the program goal, in this case, a price to access a federal aid highway with the goal of reducing congestion.

In the Court's "*de novo* quest to say what the law is," it looks also to the implementing agency's "contemporaneous understanding of the statute as evidence of original meaning." *Safdieh v. Comm'r of Internal Rev.*, 2026 WL 546959, at *4 n.31 (2d Cir. 2026). This is not deference, but rather an application of the "well-worn interpretive tool in the face of textual ambiguity" that asks "what the law meant to its intended audience." *Id.* A fact sheet published by the FHWA confirms that "[l]ocal pilot programs have the flexibility to encompass a variety of

value pricing applications, including . . . areawide pricing." U.S. Dep't of Transp., Fed. Hwy.

Admin., TEA-21 Fact Sheet—Value Pricing Pilot Program (Sept. 14, 1998),

https://www.fhwa.dot.gov/tea21/factsheets/valpr.htm (last visited February 22, 2026). Similarly,

in a Report to the Committee on Transportation and Infrasturcture regarding the Value Pricing

Pilot Program through April 2012, sent on September 10, 2012, the then-Secretary of

Transportation Ray LaHood explained that "[a] more commonly used term for 'value pricing' is

'congestion pricing.' Congestion pricing can reduce peak period congestion by charging

motorists new or higher fees for use of roads during peak times in order to encourage drivers to

shift to other travel modes, routes or destinations; to travel at other times of the day; or to forgo

making the trip altogether." U.S. Dep't of Transp., Fed. Hwy. Admin., Value Pricing Pilot

Program: Report to Congress—Executive Summary (May 2000),

https://ops.fhwa.dot.gov/congestionpricing/value_pricing/pubs_reports/rpttocongress/executive_

summary.htm#sec2_2 (last visited February 22, 2026).

The Court has already laid out the extensive history of congestion pricing dating from the

work of Columbia University economist William S. Vickrey in 1963 and going through

proposals of Mayors Lindsay and Bloomberg of New York as well as the evidence that the

Congress that passed ISTEA heard evidence regarding cordon pricing programs implemented in

Singapore and Hong Kong and described them as "congestion pricing" programs. *Duffy*, 784 F.

Supp. 3d at 638–39. The Court refers the reader to that history and does not repeat it here.

Defendants do not challenge it here. Defendants also do not offer any other fair interpretation of

the language of the ISTEA or the VPPP. Defendants have offered no evidence of any

countervailing understanding that the word was more limited in scope, or exempted from its

boundaries those projects that would in effect create an area that was cordoned off by tolls. In

sum, "[t]here is no reason to believe that Congress intended to create an artificial distinction between cordon pricing programs and other forms of congestion pricing programs by requiring that projects provide a toll-free alternative." *Duffy*, 784 F. Supp. 3d at 677.

Rather, the only argument the Secretary makes is that the exception to tolling set forth in ISTEA and VPPP, because it is an exception, should not be given a "fair reading" but a "narrow" reading. He does not explain why that "narrow" reading would exclude "cordon pricing" of the type employed by the CBDTP. Nor does he offer any metrics a court could use to determine what types of congestion pricing or value pricing programs would fit within his "narrowed" interpretation of the term and which would not. And it is the role of this Court, not the Secretary, to determine the bounds of the authority delegated to him by Congress. "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Brights Enters.*, 603 U.S. at 412. "Careful attention to the judgment of the Executive Branch may help inform that inquiry," but "courts need not and under the APA may not defer to an agency interpretation of the law [even if] a statute is ambiguous." *Id.* at 413.

In any event, the Secretary's argument that congestion pricing must be given a narrow interpretation is without merit. "Exceptions and exemptions are no less part of Congress's work than its rules and standards—and all are worthy of a court's respect." *Duffy*, 784 F. Supp. 3d at 675 (quoting *BP P.L.C. v. Mayor & City Council of Baltimore*, 593 U.S. 230 (2021)). Moreover, although the VPPP in effect operates as a carve-out from Congress' general command that roads built with federal funds be free from tolls, it is not framed as an exception in the statute itself. Rather, the statute explains that "notwithstanding sections 129 and 301 . . . the Secretary shall allow the use of tolls on the Interstate System as a part of any value pricing pilot program." Pub.

L. 102-240 § 1212(b).  That is, the VPPP was passed by Congress as a standalone program "notwithstanding" what could otherwise have been understood as contrary authority.  The term "notwithstanding" "shows which of two or more provisions prevails in the event of a conflict." *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017).  The latter "notwithstanding" provision wins.  Such a "notwithstanding" provision may be included to "single out one potential conflict" that Congress determined was "particularly difficult to resolve, or was quite likely to arise."  *Id.* "[I]n construing statutes, the use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provision of the 'notwithstanding' section override conflicting provisions of any other section." *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993).  "A clearer statement is difficult to imagine."  *Id.* (quoting *Liberty Mar. Corp. v. United States*, 928 F.2d 413, 416 (D.C. Cir. 1991)); *see also Shapiro v. U.S. Social Sec. Admin.*, 160 F.4th 347, 355–56 (2d Cir. 2025) (collecting cases).  There is no reason, then, for the court to artificially narrow the terms congestion pricing or value pricing.  They give discretion to the Secretary, leaving it to him or her and not to the courts to determine what types of pilot projects should be allowed on federal aid highways and what types should not be.

The Secretary relies primarily on a single 2009 district court case, *Greenwich Financial Services Distressed Mortgage v. Countrywide Financial Corporation*, 654 F. Supp. 2d 192 (S.D.N.Y. 2009), interpreting the Class Action Fairness Act ("CAFA") which held that exceptions should be given a narrow interpretation.  That decision is inapposite.  It construed a different statute and it preceded the Supreme Court's 2021 decision in *BP P.L.C.* as well as the Court's 2019 decision in *Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427, 439 (2021), and its 2018 decision in *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 88–89 (2018). The trilogy of cases decisively reject the proposition that the language of an exception should be

treated with any less dignity than the language of a statute to which it is an exception.  In the earliest, *Encino*, the Supreme Court expressly rejected an argument presented that "exemptions . . . should be construed narrowly" based on "the flawed premise that the [statute] pursues its remedial purpose at all costs."  *Encino*, 584 U.S. at 88–89.  In each of the three cases, the Supreme Court instructed that exemptions must not be given "anything other than a fair (rather than a narrow) interpretation."  *Id.* (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 363 (2012)) (in reference to the Federal Labor Standards Act); *Food Mktg. Inst.*, 588 U.S. at 439 (in reference to FOIA); *BP P.L.C.*, 593 U.S. at 230 (in reference to 28 U.S.C. § 1447(d)).  "Th[e] Court has 'no license to give statutory exemptions anything but a fair reading.'"  *B.P. PLC* at 230 (quoting *Food Mktg. Inst.*, 588 U.S. at 439).  *Greenwich* thus is not persuasive authority.

Moreover, *Greenwich* is distinguishable on other grounds.  That court's interpretation of the exception to a jurisdictional statute, 28 U.S.C. 1332(d)(9)(C), ultimately turned on its reading of the statute as a whole and not on the position that "exceptions" should be read narrowly in each and every instance.  *Greenwich* concerned an exception to CAFA, which exempted from its scope (and therefore from federal district court jurisdiction) class actions that "solely involve a claim . . . that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security."  28 U.S.C. § 1332(d)(9)(C).  The Court held "[r]ead too literally, this exception would encompass all securities claims, a result that would truly swallow the rule," 654 F. Supp. 2d at 195, and would defeat Congress's purpose which was "to assure that the federal courts are available for all securities cases that have national impact." *Greenwich*, 654 F. Supp. 2d at 195 (quoting *Est. of Barbara Pew v. Cardarelli*, 527 F.3d 25, 32

(2d Cir. 2008)).[24]  Plaintiffs' reading of the of the VPPP to permit cordon pricing programs, by

contrast, does not swallow a general rule.  As discussed *supra*, Congress's focus in the ITSEA

was on transportation generally and not on highways exclusively.  Congress maintained the prior

general rule prohibiting the states from imposing tolls on highways that had been financed with

federal aid, but it also encouraged them to explore other modes of transportation and gave the

Secretary the power to allow the States to experiment with congestion pricing to serve the

national goals of reducing energy consumption and air pollution, promoting economic

development, and making the "significant improvements in public transportation necessary to

achieve national goals for improved air quality, energy conservation, international

competitiveness, and mobility for elderly persons, persons with disabilities, and economically

disadvantaged persons in urban and rural areas of the country."  Pub. L. No. 102-240 § 2.

Construing the ISTEA and VPPP to give the Secretary that authority does not defeat the

purposes of those statutes.  It recognizes those purposes and is faithful to them.

> **2.      Funds Generated by a Value Pricing Program are Not Limited to Use on Highway Infrastructure**

In the February 19 Letter, the Secretary also rested his decision to terminate the VPPP

Agreement and rescind approval for the Program on his conclusion that Congress did not

authorize the DOT to enter into a program that permits "tolls that are calculated based on

considerations separate from reducing congestion or advancing other road-related goals."  Dkt.

No. 87-5 at 4.  The Secretary concluded that Congress deprived the agency of the right to

approve the program because "the primary consideration of the toll rates here is to raise revenue

for an MTA capital program."  *Id.*  The Secretary dedicates a single paragraph to this argument

---

[24] The court followed and relied on the Second Circuit's decision in *Estate of Barbara Pew v. Cardarelli*, 527 F.3d 25, 30, 32 (2d Cir. 2008), which concluded that plaintiffs' argument rendered other language in the statute surplusage.  654 F. Supp. 2d at 196.

in his summary judgment brief.  Dkt. No. 158 at 37.  The problem with the Secretary's argument is not its brevity.  It is that it has no basis in the statute.

To the extent that the Secretary's conclusion was based on the notion that the Plaintiffs in designing the CBDTP could not consider the revenues that would be necessary to provide attractive transit alternatives for travel into the central business district, the statute contains no such restriction.  It authorizes the Secretary to permit tolling projects that will reduce congestion generally including projects that promote alternatives for travel that will reduce congestion. Congress's goal in the ISTEA was to promote "all forms of transportation . . . including the transportation systems of the future, to reduce energy consumption and air pollution while promoting economic developing and supporting the Nation's preeminent position in international commence."  49 U.S.C. § 5501(b)(1).  It specifically directed that the National Intermodal Transportation System should "include significant improvements in public transportation necessary to achieve national goals for improved energy quality, energy conservation, international competitiveness," etc.  *Id.* § 5501(b)(5).  The statute's scope is truly intermodal, devoting sections not only to federal aid highways, but also to public transportation, 23 U.S.C. § 142, and to bicycles, 23 U.S.C. § 217, ferry boat and ferry terminal facilities, 23 U.S.C. § 147, and congestion mitigation and air quality improvements programs, 23 U.S.C. § 149, among many others.

To the extent that the Secretary meant that the congestion pricing projects permitted by the VPPP were limited to those that generated funds to be spent on highways and roads, the statute also contains no such limitation.

The statute specifically envisions that the funds generated through a tolling program may be spent on means of transportation that offer alternatives to a congested roadway.  It states that

'[r]evenues generated by any pilot project . . . must be applied to projects eligible under" under Section 129 of Title 23.  Pub. L. 102-240 § 1012(b)(3).  And it envisions that such projects will include transit that can be used in lieu of driving.  Congress required the Secretary to report on the effects a pilot project would have on, among other things, "transit ridership, air quality, and availability of funds for transportation programs."  23 U.S.C. § 1012(b)(5).  It contemplated that monies generated by permitted tolls from a pilot project would be used to fund transportation programs for those desiring to avoid the tolls.  Section 129(a)(3)(A)(v) of Title 23 clarifies that toll revenues generated under Title 23, including those generated through a congestion pricing program, may be used for "any . . . purpose for which Federal funds may be obligated by a State under this title."  And 23 U.S.C. § 142(a)(2) states that "the Secretary may approve payment from sums apportioned . . . for . . . capital improvement to provide access and coordination between intercity and rural bus service, and construction of facilities to provide connections between highway transportation and other modes of transportation."  Title 23 specifically envisions that funds generated from tolls on highways could be used to improve the alternative modes of transportation to which persons who would otherwise be drivers would be diverted. Those include, importantly, funds that may be allocated for "carrying out any capital transit project eligible for assistance under chapter 52 of title 49," 23 U.S.C. § 142(a)(2), which includes in turn "capital projects," defined to mean a project for "acquiring, constructing, supervising, or inspecting equipment or a facility for use in public transportation," 49 U.S.C. § 5302(4)(A). Title 23 also clarifies that funds may be obligated by states under that title through the congestion mitigation and air quality improvement program to any program "included in a State implementation plan" that "will have air quality benefits."  23 U.S.C. §§ 149.[25]  *See also* 23

---

[25] The FHWA's fact sheet on Congestion Mitigation & Air Quality Improvement Program

U.S.C. § 134 (detailing projects eligible for federal funds as determined by metropolitan

planning organizations, including those detailed under chapter 53 of title 49).

The use of funds generated by the Tolling Program to enhance the mass transit that is

intended to provide an alternative to paying a toll that does not generate congestion is perfectly

consonant with the ISTEA as a whole.  As contemporaneous commentators observed, the ISTEA

was "the first highway bill in the nation's history to have expunged the word 'highway' from its

title."  Paul Stephen Dempsey, "The Law of Intermodal Transportation: What it Was, What it Is,

and What it Should be," 27 Transp. L. J. 367, 391 (2000) (available at

https://digitalcommons.du.edu/cgi/viewcontent.cgi?article=1289&context=tlj) (last accessed

March 3, 2026).  "It shifted Federal transportation policy from traditional highway funding for

automobiles to a system which creates intermodal systems that include highways, rail and mass

transit in a comprehensive system, with seamless connectivity between modes."  *Id.* at 392.  It

provided "funding for new, experimental projects offering alternatives to highway construction,"

and "[v]irtually any project increasing capacity without constructing new vehicular lanes is

eligible for ISTEA funds."  Anderson S. E., R. B. Easley, W. L. Gabler, S. Gobind, A. Johnson,

Y. Minas, J. M. Ruiz, D. D. Shefferly, D. D. Vasavada, D. L. Venable, C. M. Walton, C. J.

Oswald & T. M. Fowler, Towards the Future: The Promise of Intermodal and Multimodal

Transportation Systems, SWUTC/95/60017/71249-3, at 77 (Tex. Transp. Inst. & Southwest

Region Univ. Transp. Ctr. Feb. 1 1995) (available at

https://rosap.ntl.bts.gov/view/dot/13311/dot_13311_DS1.pdf).  *See also* Michael A. Lipsman &

---

(CMAQ) clarifies that funds allocated thereunder "may be used for a transportation project or
program that is likely to contribute to the attainment or maintenance of a national ambient air
quality standard."  FHWA, Congestion Mitigation & Air Quality Improvement Program Fact
Sheet (March 2016) (available at https://www.fhwa.dot.gov/fastact/factsheets/cmaqfs.pdf) (last
accessed March 3, 2026).

Clyde Kenneth Walter, Response of State Transportation Planning Programs to the Intermodal Surface Transportation Efficiency Act of 1991, in Crossroads 2000 Proceedings 167 (Ctr. for Transp. Research & Educ., Iowa State Univ., Ames, IA, Aug. 19–20, 1998)

The Secretary does not point at any provision, nor has the Court identified any provision, limiting the funds generated by a tolling program implemented under the VPPP to use related only to federal highways. The statute is directly to the contrary, indicating that the funds can be spent on any of the many modes of intermodal transportation contemplated in its wide scope. A central purpose of the ISTEA was "create[ing] fudnding flexibility enabling more highway dollars to be allocated to non-highway projects." Dempsey, "The Law of Intermodal Transportation," 27 Transp. L. J. at 408. At base, Congress "has not stated that the tolling rates must be calculated exclusively on the basis of congestion-pricing considerations," and "Courts 'do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply.'" *Duffy*, 784 F. Supp. 3d at 680 (quoting *Mendis v. Filip*, 554 F.3d 335, 340 n.5 (2d Cir. 2009)).

The Secretary's real argument remains at its core that Plaintiffs' (and this Court's) reading of the statute "would allow states and municipalities to indefinitely continue any tolling scheme labeled as 'congestion pricing,' even if it is inconsistent with *typical* congestion pricing models and with agency goals and priorities." Dkt. No. 171 at 40 (emphasis added). The Secretary does not define what he means by "typical," other than that it presumably excludes the congestion pricing program adopted by New York. But the Court's reading does not allow states and municipalities to do anything. It recognizes that Congress allowed the Secretary to approve projects designed to reduce congestion. The Court's reading vindicates the Secretary's power, as granted by Congress. Whether the particular tolling scheme is consistent with any particular

congestion pricing model is not up to the Court. It is up to DOT, and the DOT has discretion to approve those projects that are consistent with its goals and priorities. In other words, Congress did not enshrine any particular congestion pricing model into law, permitting the Secretary to approve projects based on some models but not others based on different models. "ISTEA itself reflects Congress' intent to support experimentation, giving the Secretary wide latitude to approve projects the Secretary viewed as achieving the program's objectives." *Duffy*, 784 F. Supp. 3d at 677. The CBDTP apparently accorded with the views of the prior two Presidential administrations. The fact that it does not accord with the current Secretary's priorities and goals does not mean that his immediate predecessor lacked authority to permit it any more than the fact that a future Secretary might not like the current Secretary's goals and priorities would mean that the current Secretary lacks congressional authority to pursue those goals and priorities.

Taking an action based on a misunderstanding of the governing law is at the core of agency conduct prohibited under the APA. "An agency action, however permissible as an exercise of discretion, cannot be sustained 'where it is based not on the agency's own judgment but on an erroneous view of the law.'" *Sea–Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 646 (D.C. Cir. 1998) (quoting *Prill v. NLRB*, 755 F.2d 941, 947 (D.C. Cir. 1985)). *See Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 86 (2d Cir. 2006) ("[I]f the [agency's] action is based upon a determination of law as to which the reviewing authority of the courts does come into play, an order may not stand if the agency has misconceived the law . . . [T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained." (quoting *Chenery*, 318 U.S. at 94)); *Indep. U.S. Tanker Owners Comm. v. Lewis*, 690 F.2d 908, 921 (D.C. Cir. 1982); *Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 597–98 (D.C. Cir. 2023). "The reasoned

explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

Because the Secretary's termination of the VPPP Agreement and rescission of his approval of the CBDTP was based on a misunderstanding of the Secretary's authority under the operative statute, it violated the APA and Plaintiffs are entitled to summary judgment on their corresponding APA claims.

### B.    The Secretary's Termination Cannot Be Supported by *Post Hoc* Policy Rationales

In the midst of this litigation, in his April 21 Letter, the Secretary offered "policy rationales" as an alternative independent basis for the rescission of his approval of the CBDTP and the termination of the VPPP Agreement, claiming that even if his predecessor had the authority to enter the agreement he now has the authority to rescind it based on those rationales. The Secretary argues now that even if he was wrong on the law in the February 19 Letter, his termination of the VPPP Agreement was nevertheless valid based on the policy rationales in the April 21 Letter.

The Court previously held that the Secretary could not rely on such *post hoc* policy rationalizations to support his February termination of the VPPP Agreement and rescission of approval the CBDTP. *Duffy*, 784 F. Supp. 3d at 680. "It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took action.'" *Dep't of Homeland Sec.*, 591 U.S. at 20 (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)); *see also Chenery*, 318 U.S. at 94. "When an agency's initial explanation 'indicate[s] the determinative reason for the final action taken,' the agency may elaborate later on that reason (or reasons)." *Dep't of Homeland Sec.*, 591 U.S. at 21

(quoting *Camp v. Pitts*, 411 U.S. 138, 143 (1973) (per curiam)).  But the agency can elaborate only on the reasons it actually had for the decision.  It cannot make up new reasons in the course of litigation and assert that those—and not the stated reasons—were the basis of its action.  *See id.* at 21 (holding that courts may not uphold agency action on the basis of "impermissible '*post hoc* rationalization'" (quoting *Volpe*, 401 U.S. at 420)); *Kakar v. U.S. Citizenship & Immigr. Servs.*, 29 F.4th 129, 133 (2d Cir. 2022) (holding that the agency was "required to articulate a contemporaneous explanation for its decision," which could not be salvaged by an explanation the agency "formulated while litigating this lawsuit" (quotation and alterations omitted)).

The policy rationales in the April 21 Letter were exactly such *post hoc* rationalizations. The Secretary did not base his February termination and rescission on those reasons.  He asserted the reasons as the basis for his action later on, only after he was staring down what promised to be a motion for a preliminary injunction in that litigation.  The Court thus concluded "Defendants [could not] escape the Secretary's flawed legal conclusions by, once those legal conclusions ha[d] been challenged, disavowing them and reframing the conclusions as mere expressions of policy."  *Duffy*, 784 F. Supp. 3d at 680.

At summary judgment, the Secretary does not offer any new arguments as to why the policy rationales he now seeks to rely upon are anything but *post hoc* rationales to justify an action unlawfully taken.  As explained, the Secretary's February 19 Letter constituted the final agency action.  It mentioned policy concerns, but only to explain why the Secretary undertook a legal review of the agency's authority to have approved the CBDTP, not as a reason for his decision to terminate the VPPP Agreement and to rescind the approval for the CBDTP.  Dkt. No. 87-5.  *See Duffy*, 784 F. Supp. 3d at 680 (the Secretary cited the policy concerns "only to explain why the Secretary conducted a review" of the program in the first instance).

Even if the Court were to consider the policy considerations the Secretary mentioned in the February 19 Letter and asserted as a basis for his decision stated in the April 21 Letter, the Secretary's reliance on those considerations would be arbitrary and capricious. An unelected administrative agency may not make decisions affecting large segments of the public based on what comes to mind at the moment. It must engage in reasoned decisionmaking. *See Seven Cnty. Infrastructure Coal. v. Eagle Cty.*, 605 U.S. 168, 180 (2025) (under the APA, the Court asks "whether the agency action was reasonable and reasonably explained"). Thus, when its action is challenged under the APA, the agency must show "why it has exercised its discretion in a given manner," and that explanation "must be 'sufficient to enable [a court] to conclude that the [agency's action] was the product of reasoned decisionmaking.'" *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 203 (D.C. Cir. 2007) (quoting *State Farm*, 463 U.S. at 48). To be sure, the Court's scope of review under the deferential "arbitrary and capricious standard" is "narrow." *Dep't of Commerce*, 588 U.S. at 773 (quoting *State Farm*, 463 U.S. at 43). But it is not illusory or meaningless. The Court is charged with inquiring into whether the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. If "the agency [has] examine[d] the relevant data and has set out a satisfactory explanation including a rational connection between the facts found and the choice made, a reviewing court will uphold the agency action, even a decision that is not perfectly clear, provided the agency's path to its conclusion may reasonably be discerned." *Karpova v. Snow*,

497 F.3d 262, 268 (2d Cir. 2007); *see also Seven Cnty. Infrastructure*, 605 U.S. at 179–80; *Ctr.*
*for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 690 F. Supp. 3d 322, 335 (S.D.N.Y. 2023).

The requirement of reasoned decisionmaking is heightened where the agency's decision
is a departure from prior practice—here, the FHWA's prior approval of the CBDTP under the
VPPP.  "A central principle of administrative law is that, when an agency decides to depart from
decades-long past practices and official policies, the agency must at a minimum acknowledge the
change and offer a reasoned explanation for it."  *Am. Wild Horse Pres. Campaign v. Perdue*, 873
F.3d 914, 923 (D.C. Cir. 2017) (citing *Encino*, 579 U.S. at 212); *see Lone Mountain Processing,*
*Inc. v. Sec'y of Labor*, 709 F.3d 1161, 1164 (D.C. Cir. 2013) ("[A]n agency changing its course
must supply a reasoned analysis indicating that prior policies and standards are being
deliberately changed, not casually ignored.  Failing to supply such analysis renders the agency's
action arbitrary and capricious." (internal quotation marks and citation omitted)).

The February 19 Letter referenced concerns expressed by New Jersey's Governor and the
Commissioner of its Department of Transportation that the CBDTP would have an impact on
New Jersey commuters and residents.  Dkt. No. 87-5.  It also referenced the President's concerns
that tolls would have an impact on New York City residents, businesses, and area commuters,
persons who "already financed the construction and improvement of [the federal aid to
highways] through the payment of gas taxes and other taxes."  *Id.*  The April 21 Letter no longer
relied upon the concerns of the New Jersey Governor or Commissioner of the Department of
Transportation.  Dkt. No. 87-10.  It asserted as "an independent basis" for the Secretary decision
to terminate the VPPP Agreement that "New York's cordon pricing program imposes a
disproportionate financial hardship on low and medium-income hardworking American drivers
for the benefit of high-income drivers."  *Id.*  It reiterated that "Highway users whose taxes

92

already paid for the Federal-aid highways in the cordon area are now being forced to pay again while receiving no new highway benefits in return because there are no toll-free alternative routes available to access the cordoned-off area of Manhattan." *Id.*

As an initial matter, the concerns referenced in the February 19 Letter do not have a basis in any part of the administrative record compiled as of that date. The Secretary was not able to identify in briefing or at oral argument any administrative process or reasoning that went into the recitation of those policy concerns. Nor can he point to any data or other analysis that he relied on in making his pronouncement. The February 19 Letter simply recites, without providing any reason for adopting, policy concerns mentioned by the President, the New Jersey Governor, and the Commissioner of the New Jersey Department of Transportation. *Id.* The Secretary does not state either that his policy concerns mirrored the concerns of the New Jersey officials or arose from them, only that he was "aware of" them and "reviewed" the letters. *Id.*

The same is true with respect to the April 21 Letter. The Secretary points to no evidence in the administrative record or to the "facts found" that would point to the conclusion that the cordon pricing program "imposes a disproportionate impact on low and medium-income hardworking American drivers for the benefit of high-income drivers." Dkt. No. 87-10 at 3.[26] *See Urb. Sustainability Dirs. Network v. U.S. Dep't of Ag.*, 2025 WL 2374528, at *35 (D.D.C. Aug. 14, 2025) ("There is, fatally, no 'satisfactory explanation' establishing 'a rational connection' between 'facts found and the choice made.'" (quoting *State Farm*, 463 U.S. at 43)). The Secretary has been unable to point to facts demonstrating that the impact on low- and medium-income Americans is disproportionate to the benefit to low-income Americans from the tolling program or is to the "benefit of high-income drivers." One of the stated objectives of the

---

[26] The Court adopts the locution used by the Secretary in the April 21 Letter. Dkt. No. 87-10.

CBDTP was to "[i]mprove travel options for low-income residents." Dkt. No. 91-2 at 5. The record does not contain facts that would point to the conclusion that it fails in that objective. Rather, the record reflects that low-income workers make up an extraordinarily small portion of those that drive into the CBD and thus bear little burden from the Tolling Program itself: "[n]inety-eight percent of low-income workers with jobs in the Manhattan CBD do not commute by private vehicle." Dkt. No. 91-2 at 9–10. Low-income workers are anticipated to be beneficiaries of the Tolling Program, as they are disproportionately reliant on the public transit options that the Tolling Program seeks to improve. *Id.* And as to the small proportion of low-income workers who drive and who might still prefer to drive rather than to take the enhanced mass transit, the entire premises of the Tolling Program (and the evidence upon which it is based) is that for those who choose to pay the tolls, they will receive offsetting benefits in the form of reduced travel time from reduced congestion.

For those few low-income drivers that do drive into the CBD, the record further reflects that the CBDTP includes discount programs and tax credits to ensure that low-income drivers can access the CBD with reduced or no tolls. The Low-Income Discount Plan "is available to vehicle owners with a reported federal adjusted gross income for the previous calendar year of $50,000 or less, or who receive certain government assistance, and allows participants to pay half-rate tolls after completing ten trips in the same calendar month." *Duffy*, 784 F. Supp. 3d at 645. The Individual Disability Exemption Plan "allows individuals with disabilities that prevent them from using public transit, or the caretakers of such individuals to be exempted from the toll." *Id.* And the tax credit means that "[i]ndividuals who live in the CBD and have an adjusted gross income under $60,000 may claim a tax credit in the amount of the tolls they paid less any

tolls claimed as business expenses." *Id.* at 640 (citing N.Y. Tax Law § 606(jjj)).  The Secretary's letter does not mention these programs at all.

Not only does the record not reflect evidence or facts from which the Secretary could draw the conclusion that the net effect of the Tolling Program is to burden low- and middle-income Americans, it also does not contain facts from which the Secretary could conclude that the impact of the Tolling Program on low- and middle-income drivers would inure to the benefit of "high-income" drivers or, as the April 21 Letter puts it, that the Tolling Program burdens low-income workers to the benefit of "high-income" drivers.  That asserted benefit is unclear.  If it is meant to indicate that persons of high income are more likely than persons of low income to use the enhanced public transit that the tolls will help fund, there is no evidence in the record to support that conclusion.  To the contrary, it is a fair implication from the fact that very few persons of low income drive into the CBD that the persons who do drive into the CBD (or use taxicabs to do so) are persons of relatively higher income.  And to the extent that the Secretary means to say that high-income drivers are benefitted from the reduced congestion created by the Tolling Program, the Secretary does not identify facts to suggest that such reduced congestion is as a result of the decision of low-income persons who would otherwise drive (and thus contribute to congestion) to take public transit instead.  As already noted, the proportion of low-income individuals who drive is extremely small.  Assuming, contrary to the record, that a decision by a low-income worker who otherwise would have driven to take the improved mass transit instead can be considered to be a burden at all, the Secretary offers no reason to believe that the number of low-income drivers who switch to mass transit is so large that they alone would make an appreciable difference in the traffic experienced by higher-income persons who decide not to take mass transit.

Defendants concoct a new argument in their reply brief at summary judgment as to the impact on low-income Americans. Counsel argues that the costs of tolls are passed on to low- and middle-income workers when they take a cab or get food delivery. Dkt. No. 171 at 36. A court does not consider new arguments made for the first time in a reply brief. *See Miller Family Indus., Inc. v. Ives*, 2025 WL 1906059, at *2 (S.D.N.Y. July 10, 2025). Even if the Court considered the argument, it is evident that it is contrived. Even in their briefing, Defendants do not provide a single citation to support the argument in the reply brief. What the record does reveal is that taxis are subject to a differentiated toll scheme, whereby "[i]nstead of paying the daily toll," they are "eligible for a small per-trip charge paid by the passenger for each trip to, from, within, or through the Congestion Relief Zone" of $.75 to $1.50. *See* Congestion Relief Zone Toll Information, https://congestionreliefzone.mta.info/tolling (last accessed March 3, 2026); *see also* Dkt. No. 87-1 at 8 (detailing charges applicable to "for-hire" vehicles).

The second policy concern outlined in the Secretary's April 21 Letter is that "[h]ighway users whose taxes already paid for the Federal-aid highways in the cordon area are now being forced to pay again while receiving no new highway benefits." Dkt. No. 87-10 at 2. But, as the Court previously explained, "it is the nature of any toll-based value pricing pilot program that it will impose costs on highway users whose taxes already paid for the Federal-aid highways. It is only because the highways received federal aid that Federal approval would even be required. Under Defendants' logic, no federal-aid highway would be tolled—a proposition that even the Secretary does not say he is adopting." *Duffy*, 784 F. Supp. 3d at 681. That position would not be defensible; it would directly contradict the entire purpose of Congress's express decision to exempt specific tolling programs in the VPPP. No project could be approved for tolling on a

96

federal aid highway if the condition for its approval was that tolling could be applied only on highways that were not supported by federal aid.

The Secretary responds that Plaintiffs (and the Court) cannot "substitute their own policy judgment for that of the Secretary." Dkt. No. 171 at 35. But Plaintiffs do not ask the Court to accept their policy judgments (nor does the Court do so). The APA requires only there be a path that can be discerned from the administrative record to the conclusion that the Secretary reached. *See Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) ("Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational."); *Fred Meyer Stores, Inc. v. NLRB*, 875 F.3d 630, 638 (D.C. Cir. 2017) (an agency must "reasonably reflect upon the information contained in the record and grapple with contrary evidence.")

It is difficult to imagine more arbitrary and capricious decisionmaking than that at issue here. *See Am. Pub. Gas Assoc. v. U.S. Dep't of Energy*, 22 F.4th 1018, 1025 (D.C. Cir. 2022) ("Agency action is arbitrary and capricious if a reviewing court cannot discern from the record that the agency action was the product of reasoned decision making."). The administrative record consists of discussions of the Tolling Program that began in the spring of 2019, and included numerous meetings, presentations, and compromises. *See generally Duffy*, 784 F. Supp. 3d at 640–43. That process included review under NEPA, which predicted beneficial environmental effects including a reduction in air pollution, traffic delays, and regional energy consumption. *Id.* at 644. The Secretary's February 19 Letter did not grapple with any of that record; nor did the April 21 Letter engage even tangentially with the years-long process and evidence based decisionmaking upon which the VPPP Agreement was based. It contained mere "conclusory statements" which "will not do; an agency's statement must be one of *reasoning*.'"

97

*Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (quoting *Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010)).

Accordingly, Plaintiffs are entitled to summary judgment that the Secretary's decision was arbitrary and capricious on the basis that the policy rationales were *post hoc* rationalizations which were themselves arbitrary and capricious.

### C.    Reliance Interests

Count IV of Plaintiffs' complaint alleges also that the Secretary's decision to terminate the VPPP Agreement was arbitrary and capricious because it did not adequately take reliance interests into consideration.

The Court previously addressed this argument in its preliminary injunction opinion. The Court held that (1) Plaintiffs' reliance on FHWA's longstanding policy that cordon pricing was permitted was reasonable; (2) that their reliance was reasonable despite the "pilot project" label because that referred to the scope, not duration, of the project; and (3) that their reliance was reasonable even considering Defendants' argument that the process was rushed in the final days of the Biden administration because the expenditures to design and implement the program took place long before the election cycle began, and because it was not unreasonable to rely on the position of the government in power at that time. *Duffy*, 784 F. Supp. 3d at 684–86. FHWA had a "longstanding policy" to permit cordon pricing, which spanned many Presidential administrations before the current one and which was reflected in "FHWA's statements to Congress, appropriations of funds to study cordon pricing initiatives, and communications between the FHWA and Plaintiffs before the VPPP Agreement was signed in the years spent envisioning, planning and then executing the congestion pricing project." *Id.* at 684.

As the Court previously explained, "[w]hen an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be

taken into account." *Dep't of Homeland Sec.*, 591 U.S. at 30 (quotation omitted).  "It would be arbitrary or capricious to ignore such matters." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  The Supreme Court has stated that the agency is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents of the Univ. of Cal.*, 591 U.S. at 33.  At summary judgment, as at the preliminary injunction stage, the Secretary concedes the premise but argues that he was not required to consider "unreasonable" reliance interests, like those here.  Dkt. No. 158 at 38 (quoting *Libby Welding Co. v. United States*, 444 F. Supp. 987, 992 (D.D.C. 1977)).  The Secretary does not present any new legal arguments to support the assertion that Plaintiffs' reliance interests were unreasonable.  The Court's decision on the preliminary injunction motion contained a fulsome discussion explaining why the Secretary's action was arbitrary and capricious which applies here.  *Duffy*, 784 F. Supp. 3d at 682-87.

The Secretary does, however, present new arguments regarding a limited basis for the Court's decision—the Court's observation in the preliminary injunction opinion that "[t]he TBTA further acted in reliance by issuing $1.378 billion in short-term debt that is intended to be paid by the tolling Program's revenues and will be refinanced with bonds secured by the Tolling Program's revenues." *Id.* at 683–84 (citing Dkt. No. 84 ¶¶ 12–15).  The Secretary now argues that the reliance interests arising from these bonds are "exaggerated and self imposed."  Dkt. No. 171 at 43.  He did not mention these arguments until his summary judgment reply brief and thus they are not properly raised.  *See Tavarez v. Moo Organic Chocolates, LLC*, 623 F. Supp. 3d 365, 370 (S.D.N.Y. 2022) (quoting *Sacchi v. Verizon Online LLC*, 2015 WL 1729796, at *1 n.1 (S.D.N.Y. Apr. 14, 2015)).[27]

---

[27] The concern raised by arguments not presented until a reply brief is particularly pertinent here:

For purposes of completeness, the Court briefly addresses them now.  The Secretary's argument is essentially that because that debt is not *secured* by CBDTP revenues, there can be no reasonable reliance on that debt.  The Secretary addresses the four different notes that make up the $1.378 billion in debt—a $186 million note that had to be repaid in December 2025, a $500 million note payable by February 2028, a $192.8 million note, and a $500 million loan entered on May 2, 2025.  The Chief Financial Officer of the MTA, Kevin Willens, has explained that the TBTA intends to pay the notes "with either CBD Tolling Program revenue or proceeds from long-term CBD Tolling Program bonds secured by and payable from such revenues."  Dkt. No. 84 ¶¶ 13–14.  The Secretary argues that although the MTA intends to repay those bonds with CBD Tolling Program funds, they are actually "backed by all general revenues," and thus are "not directly secured by CBDTP tolling revenues."  Dkt. No. 171 at 43–44.

The distinction is one without a difference.  The collateral made available to a purchaser of a bond is designed to protect the purchaser, *i.e.* the creditor, in the event of a default.  The point of the TBTA's argument, and of the Court, was not that creditors had relied on collateral that would be rendered illusory because of the termination of the program.  The point was that the Plaintiffs had incurred over a billion dollars in debt in reliance upon what they reasonable understood to be a continuing revenue stream generated by the Tolling Program.  That is debt that will have to be repaid, regardless of the source.  The fact that the TBTA has yet to be able to securitize the debt and back it by Tolling Program revenues thus is immaterial to the question

---

in his new argument on the notes and loans, the Secretary cites external websites and introduce new technical terms to which Plaintiffs had no chance to respond.  In addition, these arguments were fully available to the Secretary both at the time of the preliminary injunction briefing and at the time of their opening summary judgment brief.

whether Plaintiffs' reliance interests are significant. Indeed, if anything, that fact tends to underscore Plaintiffs' need for relief and their need for the Court to make a decision.[28]

In any event, the financing of the bonds is immaterial to the Plaintiffs' motion for summary judgment. As the Court elaborated on at the preliminary injunction stage, "the TBTA expended over $500 million to establish the Tolling Program" and "also took on the recurring expenditures related to operation and maintenance of the roadside tolling system, the operations of the back office system and customer contact center, and consultant costs." *Duffy*, 684 F. Supp. 3d at 682 (internal citations omitted); Dkt. No. 85 ¶¶ 29–33. "These acts of reliance were well-known to Defendants," as they were "well known to [the Secretary's] department." *Duffy*, 684 F. Supp. 3d at 683. The Court has previously pointed out that, as early as April 2019, "in their first discussions with FHWA, Plaintiffs informed Defendants that they were planning to finance capital projects to improve New York City's mass transit with bonds secured by the toll revenue generated from congestion pricing." *Duffy*, 684 F. Supp. 3d at 683. Over the course of two Presidential administrations, the FHWA indicated that the VPPP permitted congestion pricing of the type planned by Plaintiffs. *See* Dkt. No. 83 at 40–41. To strip Plaintiffs of their right to engage in congestion pricing and of the benefit of the investment made in the project of many years, the Secretary was required to do more than to issue a 4-page letter just weeks after his confirmation. He was required at least to assess the reliance interests, determine whether

---

[28] As to the $500 million loan, the MTA CFO declared that the loan is "secured by CBD Tolling Program revenue," and has to be repaid "by May 1, 2026." Dkt. No. 84 ¶ 15. Defendants argue that there can be no reliance interest based on this loan because TBTA did not enter the Loan Agreement until May 2, 2025, after this litigation was already proceeding. It is true that at the point where the $500 million loan was entered, the City was aware of the FHWA's change in position as to the legality of the Tolling Program. But Defendants point to no legal authority or otherwise convincing reason that the City would need to adjust its behavior or self-terminate fundraising based on the Secretary's untested (and, per this Court, incorrect) understanding of the operative law.

they were significant, and weigh them against competing policy concerns.  *See Regents of the Univ. of Cal.*, 591 U.S. at 33.  Plaintiffs are entitled to summary judgment on their reliance-based APA claim.

> **D.    The Secretary Does Not Have the Authority to Terminate the VPPP Agreement for Policy Reasons**

Plaintiffs also move for summary judgment on their claim that the VPPP Agreement could not be canceled even for non-arbitrary policy reasons because such termination is not supported by the statute, regulation, or any other freestanding legal principles.  *See* Dkt. No. 96, Count I.  Plaintiffs are entitled to summary judgment.

As the Court explained in its preliminary injunction opinion, "[a]n agency can only take such actions that Congress has enabled it to take.  Under the APA therefore, a reviewing court must set aside an agency action that exceeded the agency's delegated authority." *Duffy*, 784 F. Supp. 3d at 668 (citing 5 U.S.C. § 706(2)(C)).  Even if the policy rationales proffered by the Secretary for termination of the agreement were not arbitrary post-hoc rationalizations, the Court determined in its preliminary injunction opinion that the Secretary nevertheless acted outside the bounds of his delegated authority in purporting to terminate the agreement on that basis.  The Court explained that the VPPP statute itself does not contain any provision delegating to the Secretary the ability to terminate an agreement for independent policy grounds where no such provision is contained in the agreement.  The Court further explained that under federal regulation 2 C.F.R. § 200.340(a)(4), a federal award may be terminated for changing agency priorities only if "a change in agency priorities or goals [is] stated in the terms and conditions of the award." *Id.* at 671.  Because there was no such term included in the VPPP Agreement, the Court held that unilateral termination due to changing agency priorities was not available.  The

Court held also that the same regulation was not incorporated under the *Christian* doctrine. *Id.* at 672.

The Secretary further develops the arguments he made at summary judgment and makes several new ones. The Court addresses them in turn.

### 1.    Federal Regulations

The Secretary argues that he has authority to terminate the VPPP Agreement under 2 C.F.R. § 200.340(a)(4). That regulation, adopted as "Guidance" by the Office of Management and Budget ("OMB") provides that a "Federal award may be terminated in part or its entirety . . . [b]y the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). The Court rejected that argument at the preliminary injunction stage. It concluded that assuming (contrary to fact) that the Secretary terminated the VPPP Agreement based on policy rationales and a conclusion that the CBDTP was no longer consistent with agency priorities, subsection 200.340(a)(4) was best understood to empower agencies to include a provision, up front, that an award is terminable based on a unilateral determination that it does not effectuate agency goals and priorities. *Duffy*, 784 F. Supp. 3d. at 670. "The regulation is properly read as stating that an award may be terminated on the ground that it no longer effectuates the program goals or agency priorities only if such a ground (1) is authorized by law and (2) is actually included as a term and condition of the federal award." *Id.* In the absence of such a provision, subsection 200.340(a)(4) did not permit the agency to terminate an agreement it had signed (and upon which its counterparty had relied) based on an after-the-fact conclusion that it would have preferred such a provision to have been included.

The Secretary fights that conclusion.  He does not dispute that subsection 200.340(a)(4) is not directly included in the VPPP Agreement.    Rather, through an attenuated chain of reasoning, he asserts that it is incorporated by a reference in the Agreement to generally applicable regulations, which include a separate provision which he asserts in turn incorporates Section 200.340 by reference.  His logic goes as follows: Clause 9 of the VPPP Agreement states that "[t]he NYSDOT, TBTA, and NYCDOT agree to comply with all Federal laws and requirements applicable to this project."  Dkt. No. 87-1 at 3.  There exists a separate regulation, 2 C.F.R. § 200.211(c)(2), that is applicable to Federal awards and that, in pertinent part, requires that "the [f]ederal award must incorporate, by reference, all general terms and conditions of the Federal award, which must be maintained on the Federal agency's website."  2 C.F.R. § 200.211(c)(2).[29]  FHWA's website sets forth its terms and conditions for contractors and recipients, including as a general term and condition: "this Agreement may be terminated or suspended in whole or in part, at any time prior to its expiration and in accordance with 2 C.F.R. § 200.340."  *See* FHWA, *Contractors and Recipients General Terms and Conditions for Assistance Awards*, https://www.fhwa.dot.gov/cfo/contractor_recip/gtandc_after2023aug07.cfm ("FHWA Terms and Conditions"), § 17.  Put simply, the Secretary argues that written into the VPPP Agreement—and every other award made by the FHWA—is an implied incorporated term that FHWA (and all pass-through entities) have the right to terminate an award at any time even if that term is not expressly included in the award itself.  Dkt. No. 171 at 29.  The Secretary also argues that, under subsection 200.340(a)(4) itself, and of its own force, the regulation applies to

---

[29] The Secretary does not reference 2 C.F.R. § 200.211(c)(1)(v), which states that "[f]ederal agencies must inform recipients of the termination provisions in § 200.340, including the applicable termination provisions in the Federal agency's regulations or terms and conditions of the Federal award."  There is no evidence in this record that the Project Sponsors here were specifically informed of those provisions.

all Federal awards "unless expressly disclaimed." *Id.* at 30.  The Secretary misreads Section

200.340.[30]

---

[30] There is limited caselaw addressing subsection 200.340.  The cases date from 2025 and none examines subsection 200.340(a)(4) in depth.  In *City of Chicago v. United States Department of Homeland Security*, 2025 WL 3043528 (N.D. Ill. Oct. 31, 2025), Judge Kennelly agreed with this Court that "Section 200.340 'requires a change in agency priorities to be set forth as a term and condition if the agency wishes to reserve to itself the right to rescind an award based on a change in priority.'" *Id.* at *18 (quoting *Duffy*, 784 F. Supp. 3d at 679).  Likewise, in *Vera Institute*, Judge Mehta concluded that "if [the federal government] wishes to end an award under § 200.340(a)(4) based on its failure to effectuate agency priorities, it can do so only if that basis for termination is itself in the terms and conditions of the award." 2025 WL 1865160, at *2.  Further, in *Washington v. U.S. Department of Commerce*, a district court, addressing the same argument, stated that "Defendants cannot even invoke the regulations on which they rely because the termination provision was not expressly included in the Awards.  This argument flows from the fact that the current regulations require the award itself to 'clearly and unambiguously' include all bases for potential termination in the awards.  2 C.F.R. 200.211(c)(v); 2 C.F.R. § 200.340(b).  Here, nothing in the Award documentation states that either may be terminated because the award no longer effectuates program goals or agency priorities." 2025 WL 2978822, at *7 (W.D. Wash. Oct. 22, 2025).  In *Louisiana Delta Service Corps v. Corporation for National and Community Service*, the court, considering whether plaintiff had an interest in their grant protected by the due process clause, stated that the agency could terminate a grant on the ground that it no longer effectuated the program goals or agency priorities "so long as such termination is 'pursuant to the terms and conditions of the Federal award,'" and concluded that the plaintiff had "an entitlement to the award that had already been granted and therefore has a property interest in the award." 2025 WL 1787429, at *26 (MD. La. June 27, 2025).  In *Urban Sustainability*, the court interpreted a contract that contained explicit textual references to "2 C.F.R. Part 200 or 2 C.F.R. 200.340" to permit termination based on a change in agency priority, 2025 WL 2374528, at *29.  In *American Association of Colleges for Teacher Education v. McMahon*, 770 F. Supp. 3d 822, 855 (D. Md. 2025), the parties disputed whether the Department of Education complied with § 200.340(a)(4).  The court found that the termination provisions of § 200.340(a) were incorporated into the terms and conditions of the plaintiffs' grant award notifications ("GANS") which referred explicitly to "2 CFR Part 200 as adopted at 2 CFR 3474." *Id.* at 855 n.13.  It held, however, that the Department's termination of the awards based on subsection 200.340(a)(4) was arbitrary and capricious because nothing in the record supported or tended to support that the grants were inconsistent with Department priorities "as had been previously established through the statutorily mandated public notice and comment rule making process." *Id.* at 855.  And in *American Public Health Association v. National Institutes of Health*, the court stated that it "need not decide" whether 2 C.F.R. § 200.340 "applied as a contractual term" that was "incorporated into the terms and conditions of the grantees' awards." 786 F. Supp. 3d 237, 256–57 (D. Mass. 2025).

Section 200.340 is contained within Chapter II of Title 2 of the Code of Federal Regulations, titled "Office of Management and Budget Guidance."  Part 200 of Title 2, of which section 200.340 is a part, was promulgated by OMB pursuant to 31 U.S.C. § 6307, which permits OMB to "issue supplementary interpretive guidelines to promote consistent and efficient use of procurement contracts, grant agreements, and cooperative agreements."  *See* 89 Fed. Reg. 30046 (Apr. 22, 2024).  Title 2 of the Code of Federal Regulations sets forth "government-wide policies for the award and administration of Federal financial assistance; and Federal agency regulations implementing that OMB guidance."  2 C.F.R. § 1.100.  "All portions of the guidance apply to grants and cooperative agreements" and the guidance "directly applies only to Federal agencies."  *Id.* § 1.210.  But it is not self-executing.  Each federal agency is "responsible for . . . implementing the guidance." *Id.* § 1.305.[31]

In 2015, the DOT "adopt[ed] the Office of Management and Budget Uniform Administrative Requirements . . . for Federal Awards (2 CFR part 200)."  2 C.F.R.  § 1201.1; 80 Fed. Reg. 78649 (Dec. 17, 2015).  At the time, the subsection upon which the Secretary now relies was not yet in effect.  The DOT has not formally adopted the version of Section 200.340 upon which the Secretary now relies.[32]  Even assuming (without deciding) that the DOT can be

---

[31] An "interpretive rule" or "general statement of policy" such as the Guidance is not required to go through notice and comment rulemaking under the APA.  *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).  "[T]he critical feature of interpretive rules is that they are 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'"  *Id.* (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)).  And while the "absence of a notice-and-comment obligation makes the process of issuing interpretive rules comparatively easier for agencies than issuing legislative rules," "that convenience comes at a price: Interpretive rules 'do not have the force and effect of law and are not accorded that weight in the adjudicatory process.'"  *Id.* (quoting *Shalala*, 514 U.S. at 99); *see PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 588 U.S. 1, 7 (2019).

[32] The OMB Guidance has been revised several times since 2015.  *See* 89 Fed. Reg. 30046 (Apr. 22, 2024).

deemed by it silence to have adopted each successive version of the Guidance without taking formal action, subsection 200.340(a) does not do the work that the Secretary would have it do.

To determine the meaning of agency regulations, a court "must carefully consider the text, structure, history, and purpose of a regulation." *Kisor v. Wilkie*, 588 U.S. 558, 575 (2019) (internal citation and quotation marks omitted). To that end, regulations are not read in isolation but as a whole. *Garcia v. Garland*, 64 F.4th 62, 72 (2d Cir. 2023) ("We 'must read the words in their context and with a view to their place in the overall statutory [or regulatory] scheme' because we construe statutes and regulations, 'not isolated provisions.'" (quoting *Cuthill v. Blinken*, 990 F.3d 272, 279 (2d Cir. 2021))).

Section 200.340(a)(4) by its text permits but does not require the agency to include in an award a provision that the award may be terminated if it "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). That is apparent from the plain language of the provision itself. The provision permits either the Federal agency or a pass-through entity to terminate an award in part or in its entity on three conditions: (1) the award "no longer effectuates the program goals or agency priorities"; (2) such termination is "pursuant to the terms and conditions of the Federal award"; and (3) it is "authorized by law." *Id.* The Secretary argues that the language "pursuant to the terms and conditions of the Federal award" gives the granting agency the "discretion to include whatever additional termination terms the agency wants, including to modify termination authority based on agency priorities or goals," Dkt. No. 171 at 30, such as "a wind-down period between notice and final termination," Dkt. No. 158 at 25. But that argument gives up the ghost. Ifa termination based on subsection (a)(4) may be accomplished only pursuant to the terms and conditions of the Federal award, the terms and conditions must be read to permit a termination based on subsection (a)(4). Subsection (a)(4)

would not be read into every award or cooperative agreement of its own force.  Rather, the Court must read the agreement itself to determine whether the agreement gives the agency the authority to terminate based on a conclusion that the award no longer effectuates program goals or agency priorities.

That the award must explicitly include a provision for termination based on a change in agency priorities or goals is made clear when examining subsection 200.340(a)(4) not in isolation but in the context of the Section of which it is a part.  Section 200.340 contains two subsections.  Subsection 200.340(a) itself contains four subparts.  It reads, in its entirety:

> (a) The Federal award may be terminated in part or its entirety as follows:
>
> (1) By the Federal agency or pass-through entity if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award;
>
> (2) By the Federal agency or pass-through entity with the consent of the recipient or subrecipient, in which case the two parties must agree upon the termination conditions.  These conditions include the effective date and, in the case of partial termination, the portion to be terminated;
>
> (3) By the recipient or subrecipient upon sending the Federal agency or pass-through entity a written notification of the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated.  However, if the Federal agency or pass-through entity determines that the remaining portion of the Federal award will not accomplish the purposes for which the Federal award was made, the Federal agency or pass-through entity may terminate the Federal award in its entirety; or
>
> (4) By the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.

Subsection (a)(3) is particularly illuminating.  The subsection sets forth the means by which a recipient or subrecipient may terminate an award, including a partial award.  It also

provides that if the recipient or subrecipient terminates an award only in part, "the Federal agency or pass-through entity may terminate the Federal award in its entirety" if it "determines that the remaining portion of the Federal award will not accomplish the purposes for which the Federal award was made." 2 C.F.R. § 200.340(a)(3). But, under the Secretary's view, the agency would always have the right—regardless whether there was a termination by the recipient in part—to terminate the award on a theory that it "no longer effectuates the program goals or agency priorities." The Secretary's reading of subsection (a)(4) renders the second sentence of subsection (a)(3) surplusage.[33]

The point is made even more apparent when Section 200.340(a) is read together with following subsection of the same regulation, 2 C.F.R. § 200.340(b). That provision states: "The Federal agency . . . must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." 2 C.F.R. § 200.340(b). The language of Section 200.340(b) is straightforward. "The ordinary meaning of the word 'all' is 'the whole of,' Black's Law Dictionary, (6th ed. 1990); 'every,' Merriam Webster's Collegiate Dictionary (10th ed. 1993); and 'any whatsoever.' The American Heritage College Dictionary (3d ed. 1993)." *Zurich Am. Ins. Co. v. NAES Corp.*, 2025 WL 969552, at *1 (D. Conn. Mar. 31, 2025). "It is 'one of the least ambiguous words in the English language,' and one that leaves 'no room for uncertainty.'" *Am. Home Products Corp. v. CAMBR Co., Inc.*, 2001 WL 79903, at *3 (S.D.N.Y. Jan. 30, 2001) (quoting *GEICO v. Fetisoff*, 958 F.2d 1137, 1142 (D.C. Cir. 1992)). It follows that if the agency wishes to reserve to itself the right to terminate an award based on a view that it no longer

_____

[33] The only difference between the two is that subsection (a)(4) permits termination if the award no longer effectuates the program goals or agency priorities, but an award that will no longer accomplish the purposes for which it was made by definition would appear not to further the program goals.

effectuates the current program goals or agency priorities, the agreement itself must indicate that the agency can terminate for that reason. The agency cannot sit silent, permit the award recipient to rely upon the grant, and only after the fact rely on the provision.

The Secretary has a response. But it is not an effective one. He says that Section 200.340(b) cannot be read to suggest that "the only grounds for termination must appear within the four corners of the Agreement." Dkt. No. 171 at 28. Otherwise, he says, that the agreement would not permit termination for a material breach: "Since the Agreement itself makes no mention of 'material breach' as a basis for termination, that conceded authority must be incorporated from outside the Agreement." *Id.* From that, he apparently reasons that he has the unilateral right to terminate the agreement because such agreement to terminate has not been "expressly disclaimed." Dkt. No. 158 at 27. But Section 200.340(b) does not say that the Award or cooperative agreement must refer to "Termination Provisions" *in haec verba* or contain a section with a heading "Termination." It indicates only that the provision permitting termination be "clear" and "unambiguous," not that it be explicit. *See Urban Sustainability*, 2025 WL 2374528, at *29. The TBTA has such a right to terminate the VPPP Agreement. The agreement itself contemplates such possibilities when it refers to the TBTA "decid[ing] to discontinue tolls on the Project," and refers to the consequences: "NYSDOT, TBTA, and NYCDOT agree they will work with FHWA to return the Project to its original operating condition under that circumstance." Dkt. No. 87-1 § 10. And it refers, again within the four corners of the agreement, to the circumstances under which the TBTA will no longer have the authority to operate the Project. The FHWA agreed that the TBTA may operate the Project conditional upon compliance with the provisions of the VPPP Agreement. *Id.* § 1 ("The FHWA agrees that TBTA may operate the Project as a toll Project in accordance with the provisions of this Agreement and

as a value pricing project, as part of NYSDOT's value pricing program").  By contrast, the

Secretary does not point to a provision of the VPPP Agreement that even hints at the notion that,

regardless the investment the Plaintiffs have made in the Project, their compliance with the terms

of the agreement, and the success they have achieved, the Secretary retains the right to terminate

at any time and without any notice simply because his Department has different goals and

different priorities than it had when it approved the agreement.

The Secretary has yet another argument—that the Plaintiffs' argument would give rise to

its own problem of surplusage.  He asserts that because it is uncontested that the agency could,

theoretically, include a provision in an agreement permitting termination for changing agency

priorities, subsection 200.340(a)(4) cannot be read to give "only an example or hypothetical

term."  Dkt. No. 158 at 26; *see also* Dkt. No. 171 at 30.  But just because the regulation lists that

term as something that may be included does not mean that it therefore is surplusage, and that

therefore the only way to read the regulation is as including a mandatory provision.  Regulators,

just like legislators, sometimes include language in a provision "to remove doubt."  *Marx v. Gen.*

*Revenue Corp.*, 568 U.S. 371, 385 (2013) (a phrase "would not be superfluous if Congress

included it to remove doubt" that a certain outcome is permissible thereunder); A. Scalia & B.

Garner, Reading Law: The Interpretation of Legal Texts 176–77 (2012) (superfluity canon "can

be appropriately discounted" where the drafter engaged "in the ill-conceived but lamentably

common belt-and-suspenders approach"); *Ali v. Fed. Bureau of Prisons*, 522 U.S. 214, 226

(2008) ("Congress may simply have intended to remove any doubt" that one group was

"included in" a broader category that would naturally encompass them); *Bufkin v. Collins*, 604

U.S. 369, 387 (2025) ("[S]ometimes the better overall reading of the statute contains some

redundancy." (quoting *Rimini Street, Inc. v. Oracle USA, Inc.*, 586 U.S. 334, 346 (2019))); *cf.*

*U.S. Postal Serv. v. Konan*, 607 U.S. __, 2026 WL 501765, at *8 (2026) (slip op. at 13) ("canon against surplusage is subordinate" to plain meaning of statute). That is all the more the case when one is talking about guidance provided by OMB to the executive agencies of the Government. OMB is permitted to guide the agencies to what they might want to include in an agreement by pointing out provisions that might be particularly helpful without binding the agencies to include those provisions in every award or cooperative agreement.

In any event, the regulatory history and the understanding of the provision by the Office of Budget and Management provide a ready answer to the Secretary's question. When the agency promulgating a regulation has interpreted it in a way that "implicate[s] its substantive expertise," courts "often defer[] to agencies' reasonable readings of genuinely ambiguous regulations." *Kisor*, 588 U.S. at 577, 563; *see also Auer v. Robbins*, 519 U.S. 452 (1997).[34]

Section 200.340 was last revised in 2024 before the VPPP Agreement was signed. *See* Guidance for Federal Financial Assistance, 89 Fed. Reg. 30046, 30089 (Apr. 22, 2024). Prior to the revision, the regulation had two relevant subsections. Subsection (a)(1) allowed an agency to terminate a Federal award "if a non-Federal entity fails to comply with the terms and conditions of a Federal award." Subsection 340 (a)(2) separately stated that an agency or pass-through entity could terminate an award "if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340 (eff. Aug. 13, 2020–Sept. 30, 2024). In revising the statute,

---

[34] DOT's litigation position in this case is not an interpretation of that regulation, as adopted by DOT, that is entitled to such deference. As the Supreme Court explained in *Kisor*, "the regulatory interpretation must be one actually made by the agency. In other words, it must be the agency's authoritative or official position, rather than any more ad hoc statement not reflecting the agency's views." 588 U.S. 558, 577 (2019). Additionally, the interpretation must "in some way implicate" the "substantive expertise" of the agency. *Id.* This means "that a court should decline to defer to a merely 'convenient litigation position' or '*post hoc* rationalization advanced' to 'defend past agency action and attack.'" *Id.* (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012)).

OMB initially decided to remove subsection 200.340(a)(2) on the basis that subsection (a)(1) already permitted an agency to "specify the conditions upon which an award could be terminated in the terms and conditions of the award, including, for example, when an award no longer effectuates the program goals or agency priorities." 89 Fed. Reg. at 30089. That is, it proposed eliminating the provision because it was redundant; any termination provision would need to be included in the award per section (b)(1), and there was no reason to have an entirely distinct subsection clarifying what one such provision could be. The proposal elicited several comments. One commentator expressed the view that "it was important for pass-through entities to maintain the ability for unilateral termination based on shifting agency priorities." *Id.* Another commentator expressed concern that the standard was "vague." *Id.* One commentator expressed concern that (a)(2) could be read to permit agencies to "terminat[e] high-performing projects based on shifting agency priorities." *Id.*

The OMB ultimately balanced the concern that the pass-through entities continue to maintain the ability to terminate based on shifting priorities with the concern that such authority not be used to terminate awards based solely on shifting agency priorities by continuing the language in the prior subsection (a)(2) but also by making clear that an agency or pass-through entity could terminate an award based on changing priorities only if such termination right was included in the initial award. OMB explained in its guidance that:

> OMB revised paragraph (a)(4) in section 200.340 in the final guidance. The new paragraph (a)(4) continues to provide that a Federal award may be terminated by the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award. The revised version of paragraph (a)(4) also explains that this may include a term and condition allowing termination by the Federal agency or pass-through entity, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities. Provided that the language is included in the terms and condition of the award, the revised termination provision at section 200.340 continues to allow Federal agencies and pass-through entities with authority to terminate an award in the circumstances described in

paragraph (a)(2) in the prior version of the guidance.  The prior version of section 200.340(b) and the proposed version both directed Federal agencies and pass-through entities to clearly and unambiguously specify all termination provisions in the terms and conditions of the award.  As such, OMB finds the final version of the guidance provides greater clarity on the policy for termination of awards by the Federal agency or pass-through entity by underscoring the need for agencies and pass-through entities to clearly and unambiguously communicate termination conditions in the terms and conditions of the award.

89 Fed. Reg. 30046, 30089.

In other words, OMB did not view the textual change as effectuating any substantive difference in the regulation, because subsection (b)(1), which remained unchanged, always required that the agency must "clearly and unambiguously specify all termination provisions in the terms and conditions."  2 C.F.R. 200.340(b)(1).  Even under the prior iteration of (a)(2) which stated that an award could be terminated where "an award no longer effectuates the program goals or agency priorities," "section 200.340(b) . . . directed Federal agencies and pass-through entities to clearly and unambiguously specify all termination provisions in the terms and conditions of the award."  89 Fed. Reg. 30046, 30089.  The addition of (a)(4) and removal of the prior (a)(2) simply provided greater "clarity."  *Id.*

OMB's reading is also consistent with the Executive Branch's apparent understanding of the regulation.  In an Executive Order dated August 7, 2025 titled "Improving Oversight of Federal Grantmaking," the President ordered that "[w]ithin 30 days of the date of this order, each agency head shall . . . submit a report" that details, among other things, "whether the agency's standard terms and conditions for discretionary awards permit termination for convenience and include the termination provisions described in 2 C.F.R. 200.340(a), including the provision that an award may be terminated by the agency 'if an award no long effectuates the program goals or agency priorities.'"  Exec. Order No. 14,332, 90 Fed. Reg. 38,929 (Aug. 7, 2025).  The President ordered that each agency "shall, to the maximum extent permitted by law . . . take steps to revise

the terms and conditions of existing discretionary grants to permit immediate termination for convenience, or clarify that such termination is permitted, including if the award no longer advances agency priorities or the national interest." *Id.* Thus, it requires the agency to determine whether its standard terms and conditions "include" the provision for termination for consistency with program goals or agency priorities, not whether it excludes it.[35] If the Secretary's interpretation of the regulation was right, there would have been no reason for the President to have gone to the length of issuing an Executive Order and no reason for the agencies to review their standard terms and conditions to determine whether they include 2 C.F.R, § 200.340(a)(4) and to revise them if not. Under the Secretary's reading, that provision would already be included by operation of law regardless of what was contained in the standard terms and conditions.

Finally, it is worth pausing to note the dramatic consequences of the Secretary's interpretation of 2 C.F.R. § 200.340(a)(4). *See United States v. Messina*, 806 F.3d 55, 70 (2d Cir. 2015) (cautioning that "interpretation of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available"); A. Scalia & B. Garner, Reading Law 235 (2012) ("What the rule of absurdity seeks to do is what all rules of interpretation seek to do: make sense of the text."). Section 200.340 is of breathtaking scope in federal agreements. Title 2 of the Code of Federal Regulations, in which Section 200.340 is located, sets forth "*government-wide* policies for the award and administration of Federal financial assistance; and Federal agency regulations implementing that OMB guidance."

---

[35] For example, the general terms and conditions for grants from the Department of Health and Human Services, as of October 2025, now state that "Federal awards may also be terminated if an award no longer effectuates the program goals or agency priorities, in line with 2 C.F.R. § 200.340(a)(4)." *See* HHS Grants Policy Statement, at 65 (Effective Date October 1, 2025), available at https://www.hhs.gov/sites/default/files/hhs-grants-policy-statement-oct-2025.pdf.

2 C.F.R. § 1.100 (emphasis added).  Section 1.205 clarifies that "[a]ll portions of the guidance apply to grants and cooperative agreements."  Each federal agency, in turn, is required to "implement[] the guidance," and "ensure that the Federal agency complies with their implementation of the guidance."  *Id.* § 1.305.  A federal award is defined by the regulations to include any (1) "Federal financial assistance that a recipience receives directly from a Federal agency or indirectly from a pass-through entity," (2) any "cost-reimbursement contract under a Federal Acquisition Regulation," and (3) any "instrument setting forth the terms and conditions," including grant agreements, cooperative agreements, or other agreements for assistance.  2 C.F.R. § 200.1.  The Secretary himself asserts that ultimately it is irrelevant whether his website refers to Section 200.340.  Any contract entered into by a federal agency must be read by default to permit termination for change in agency priorities for it to be enforceable.  Dkt. No. 158 at 26–27.

"A range of federal agencies administer grants to nonfederal entities (such as state, local, and tribal governments) to advance federal policy goals."  Congressional Research Service, *Uniform Guidance for Federal Grants: An Overview* (Dec. 17, 2025), available at https://www.congress.gov/crs-product/IF13138 (last accessed March 3, 2026).  The OMB uniform guidance covers "a range of issues pertaining to federal financial assistance (such as grants, but also including other forms of assistance, such as cooperative agreements, direct appropriations, and loans)."  *Id.*  The executive branch has used awards and cooperative agreements to further a number of national interests from health care, to disaster management, to national security, transportation, nutrition and education.  It has used awards to prevent and control emerging infectious diseases, *see* Cooperative Agreement, FAIN NU50CK000517, available at https://www.usaspending.gov/award/ASST_NON_NU50CK000517_075, to plan

urban forestry programs, *see Urb. Sustainability Dirs. Network*, 2025 WL 2374528, at *2 (quoting 16 U.S.C. § 2105(c)), and for cutting-edge medical research, *see Thakur v. Trump*, 787 F. Supp. 3d 955, 966 (N.D. Cal. 2025).

 The Department of Transportation alone has used grants to "fun[d] airport infrastructure projects such as runways, taxiways, airport signage, airport lighting, and airport markings," *see* https://www.faa.gov/airports/aip/2022_aip_grants, to improve natural gas pipeline safety, *see* https://www.phmsa.dot.gov/grants/pipeline/ops-grants-overview, to help modernize ports, https://www.maritime.dot.gov/ports/port-infrastructure-development-program, and to study and test "the safe integration of [automated driving systems] into our Nation's on-road transportation system," *see* https://www.transportation.gov/policy-initiatives/automated-vehicles/ads-grant-overview.  One cooperative agreement from the DOT to the National Railroad Passenger Corporation, which included an outlay amount of $1.9 billion (of $12.5 billion obligated), which began on September 1, 2022 and will continue until December 31, 2035, will provide "an opportunity to restore, rebuild, and modernize AMTRAK's intercity passenger rail rolling stock, facilities, and infrastructure," with the goal of improving safety and reliability of the network. *See* Cooperative Agreement, Federal Award Identification Number 69A36522503700AMTC, available at https://www.usaspending.gov/award/ASST_NON_69A36522503700AMTDC_069.

 The Secretary's reading of Section 200.340(a)(4) thus cannot be confined to the VPPP Agreement.  Under his reading, the recipients of all of these grants and cooperative agreements would be at risk of unilateral termination by the Federal Government—regardless how long the agreement has been in place and regardless how long the project it funded was expected to last— simply because of guidance issued by the Office of Management and Budget which was revised (without notice and comment) in 2024.  "Absent a clear indication" that OMB "intended such a

sweeping effect, we will not infer such a purpose nor will we interpret a [regulation] to effect

that result." *Stafford v. Briggs*, 444 U.S. 527, 545 (1980).

### 2.    The *Christian* Doctrine

Defendants make an alternative argument, that even if Section 200.340(a)(4) cannot be

read into the VPPP Agreement by its own force, it must be read into the Agreement by the

Federal Circuit's *Christian* doctrine (so-called following the case *G.L. Christian & Assocs. v.*

*United States*, 312 F.2d 418, 427 (Ct. Cl.), *cert. denied*, 375 U.S. 954 (1963)).

The *Christian* doctrine instructs that a court should read into every federal procurement

contact an unexpressed clause when it finds "(1) that the clause is mandatory; and (2) that it

expresses a significant or deeply ingrained strand of public procurement policy."  *K-Con v. Sec'y*

*of Army*, 908 F.3d 719, 724 (Fed. Cir. 2018).  The Court of Claims has held that the doctrine is

applicable only to procurement contracts.  *Earman v. United States*, 114 Fed. Cl. 81, 112 (2013);

*see also Mktg. & Mgmt. Info, Inc. v. United States*, 57 Fed. Cl. 665, 674 (2003); *S.J. Amoroso*

*Const. Co. v. United States*, 12 F.3d 1072, 1075 (Fed. Cir. 1993).  The Federal Circuit has

explained the rationale of the doctrine as follows:

> 'To accept plaintiff's plea that a regulation is powerless to incorporate a provision
> into a new contract would be to hobble the very policies which the appointed rule
> makers consider significant enough to call for *mandatory* regulation.  Obligatory
> Congressional enactments are held to govern federal contracts because there is a
> need to guard the dominant legislative policy against ad hoc encroachment or
> dispensation by the executive.  There is a comparable need to protect *the*
> *significant policies* of superior administrators from sapping by subordinates.'

*Gen. Eng'g & Mach. Works v. O'Keefe*, 991 F.2d 775, 779 (Fed. Cir. 1993) (quoting *Christian*,

320 F.2d at 350–51 (emphasis in original)).  "Application of the *Christian* doctrine turns . . . on

whether procurement policies are being 'avoided or evaded (deliberately or negligently) by lesser

officials.'"  *S.J. Amoroso Const.*, 12 F.3d at 1075 (quoting *Christian*, 320 F.2d at 351).

The Secretary argues that the termination for policy provision in Section 200.340(a)(4) of the Code of Federal Regulations is one of these mandatory provisions that must be read into a contract under the *Christian* doctrine.  The Court previously explained why Section 300.240(a)(4) could not be read into the VPPP Agreement under the *Christian* doctrine. *Christian* does not apply on its own terms because Section 200.340(a)(4) "is permissible, allowing, but not requiring, the federal agency to include in the award a term stating that the award can be terminated if the agency priorities or goals have changed." *Duffy*, 784 F. Supp. 3d at 672.  It is not mandatory, such that *Christian* could require it be read-in even where it is absent.  Additionally, "[t]he doctrine is additionally inapplicable on the ground that the VPPP Agreement is not a procurement contract." *Id.* The Court could have added, and now does add, that the Secretary's argument fails the second prong of the *Christian* test: the Secretary fails to identify any significantly or deeply ingrained strand of public procurement policy that requires reading into every procurement contract a mandatory term that the contract is terminable at will whenever the project at issue no longer is consistent with agency priorities. *See Gen. Eng'g & Mach. Works*, 991 F.2d at 779–80.

The Secretary takes issue at summary judgment only with the Court's prior characterization of the doctrine as applying to procurement contracts.  He argues that in fact the *Christian* doctrine has been applied broadly "beyond procurement contracts" to "a diverse array of government agreements," and so it should be applied here.  Dkt. No. 158 at 29.  The cases to which he points, however, all involve procurement.  The Court previously cited to the Court of Federal Claims' decision in *Aerolease Long Beach v. United States*, 31 Fed Cl. 342 (1994). *See Duffy*, 784 F. Supp. 3d at 672.  That case involved an agreement pursuant to which Aerolease agreed to lease office space to the Federal Aviation Administration. *Id.* at 346.  In other words,

as the *Aerolease Long Beach* court understood it, the agreement involved "procurement": the Federal Government was procuring property from Aerolease. The court applied the *Christian* doctrine only after describing it as "the most basic tenant of federal procurement law." *Id.* at 374. In *Rockies Express Pipeline LLC v. Salazar*, cited by the Secretary here, the court understood the precedent agreement at issue to be "a contract for the procurement of transportation services." 730 F.3d 1330, 1337 (Fed. Cir. 2013).[36] And in *United States v. Bills*, the Third Circuit addressed a physician who "breached his contract with the government in which he agreed to provide professional services in exchange for a scholarship to complete his medical studies." 822 F.2d 373, 374 (3d Cir. 1987). In other words, the Government was procuring professional services.

In their reply brief, Defendants also cite for the first time to *Advanced Team Concepts, Inc. v. United States*, in which the Court of Federal Claims stated that "[u]nder the *Christian* Doctrine, a termination for convenience clause must be read into any government contract." 77 Fed. Cl. 111, 113 (2007). The quoted language must be understood in its context: a court of claims case involving a contract for services between Advanced Team Concepts ("ATC") and the Leadership Development Center for the Immigration and Naturalization Service. ATC was initially assigned classes to teach for the 2001 academic year at the Center but was terminated from a number of those classes after a change in leadership. *Id.* at 112–13. Although it does not

---

[36] Defendants state that while follow-on agreements from the precedent agreement were procurement contracts, that the precedent agreement itself was not for the procurement of goods or services. Dkt. No. 152 at 29 n.5. The only purpose of the precedent agreement was that it served as the "primary agreement that obligated the parties to enter into follow-on agreements." *Rockies Express Pipeline*, 730 F.3d at 1333. As that opinion explains, a "'procurement includes all stages of the process of acquiring property or services, beginning with the process of determining a need for property or services ending with process completion or closeout.'" *Id.* at 1336 (quoting 41 U.S.C. § 403(2)). On that basis, it held that the precedent agreement was a procurement contract. *Id.* at 1337.

use the word procurement in the opinion, the contract is clearly one for the procurement of services for the government.  *See* 41 U.S.C. § 403(2).  Defendants also cite for the first time to *Clem Perrin Marine Towing, Inc. v. Panama Canal Co.*, in which the Fifth Circuit applied the *Christian* doctrine to a contract dispute between a government corporation and a private contractor.  730 F.2d 186, 187 (5th Cir. 1984).  That is, again, a procurement contract.  *See id.* at 188 (reading in U.S. Government Standard Form 32 into the contract as required under 41 C.F.R. 1-16.202-1, which "requires that forms used in advertised supply contracts also be used in negotiated supply contracts 'unless it is determined in accordance with agency procedures that the forms are not appropriate for such use.'")

The *Christian* doctrine does not permit the Secretary to terminate the VPPP Agreement based on a view that it is no longer consistent with agency priorities.

### 3.     The VPPP Does Not Limit the Secretary to Awards Terminable At Will

The Secretary next argues that any incumbent of his Office has the inherent authority to terminate at will projects authorized under the VPPP statute by terms of the statute itself.  The Secretary's argument is essentially that because the statute permits him to enter into pilot projects for the use of federal aid highways to reduce congestion, he must also have the authority—regardless of the terms of those agreements and regardless of the reason—to terminate the projects.

As the Court previously wrote, the Secretary's argument under the statute, "if accepted, has built within it the seeds of the destruction of the VPPP and the objectives Congress intended to further with it."  *Duffy*, 784 F. Supp. 3d at 672.  While the Secretary's Section 200.340(a)(4) argument would require him to, at a minimum, determine that a project no longer met agency priorities before he terminated it, the Secretary's VPPP argument is much broader: because it is

based on the notion that no incumbent Secretary could bind a future Secretary to continue a pilot program, it would permit him to terminate a project at any time for any reason or no reason at all. That position misreads the statute and would lead to intolerable results. In the April 21 Letter, the Secretary expressed his view that the FHWA should "prioritize tolling projects under the VPPP that provide for toll-free alternative routes and set tolls with the aims of reducing congestion and/or raising revenue primarily for highway infrastructure." Dkt. No.  His argument, however, would hobble his authority and the authority of every succeeding Secretary of Transportation to achieve that goal or any similar goal by preventing them from committing the Department to any agreement other than one that is effectively one terminable at will. The argument is without merit.

The VPPP, on its face, reflects that the congestion pricing projects the Secretary may approve will be of some duration. It provides that "[t]he Secretary shall fund all of the development and other start up costs of such projects, including salaries and expenses, for a period of at least one year, and thereafter until such time that sufficient revenues are being generated by the program to fund the operating costs without Federal participation." 23 U.S.C. § 1012(b)(2).[37]  It also provides that "[t]he Secretary shall monitor the effect of such projects for a period of at least 10 years, and shall report to the Committee on Environment and Public Works of the Senate and the Committee on Public Works and Transportation of the House of Representatives every 2 years on the effects such programs are having on driver behavior, traffic, volume, transit ridership, air quality, and availability of funds for transportation programs." *Id.*

---

[37] It adds that the Secretary may fund projects for more than one year, but not "for more than 3 years." *Id.*

§ 1012(b)(5).  Plainly, Congress anticipated that the pilot programs to which the Secretary would commit the Federal Government would be long term.

The Secretary bases his argument to the contrary on three textual hooks: (1) the description of the projects that may be authorized under the VPPP as "pilots"; (2) the limitation of the projects that may be authorized under the statute to fifteen; and (3) a negative implication from the authority under the statute to "establish" a program.  None of the hooks, together or alone, do the necessary work for the Secretary.  Congress knew how to limit the Secretary's authority when it wanted to.  *See* 23 U.S.C. § 1012(b)(2) (the Secretary cannot fund any project for more than three years); § 1012(b)(4) (limit on the number of permitted pilot projects); § 1012(b)(6) (limit on amount of federal funding).  It did not limit the Secretary to permitting only those projects that it could also terminate at will.

First, the Court previously addressed the Secretary's argument that the description of the projects permitted to be authorized under the VPPP as "pilots" meant that they could be terminated at will or whenever the Secretary determined that they no longer were consistent with agency priorities.  The dictionary defines a "pilot" as a "small-scale advance study conducted to gauge the advisability of conducing a full-scale research project by first evaluating its design, time commitment, costs, and feasibility, plus the effects of potential adverse effects."  *Duffy*, 784 F. Supp. 3d at 685 (quoting Black's Law Dictionary (12th ed. 2024)); *see also id.* ("The Random House Dictionary of the English Language defines 'pilot project' as 'an experimental or trial undertaking prior to full-scale operation or use.'" (quoting Random House Dictionary of the English Language (1st ed. 1966))).  "These definitions indicate that a project is designated a pilot by virtue of its scope and not by its duration.  Many pilot projects are of long duration because that duration is necessary to determine whether the project can achieve its goal."  *Id.*  The

CBDTP—like virtually all congestion pricing projects—is just such a project. It is defined not by its duration but by its goals. The Tolling Program, if successful, could be adopted in other jurisdictions.

In response, the Secretary cites two cases that happen to use the word "pilot" and are entirely unhelpful. In *Krihely v. Mayorkas*, a district court for the District of Columbia noted that a program was designated by Congress as a "pilot" program, but without further comment on the import or meaning of that word. 2023 WL 6215360, at *1 (D.D.C. Sept. 25, 2023). And in *Benten v. Kessler*, the court again referenced the existence of a "pilot" program without further elaboration of that term or its relevance to the ability of an agency to terminate such a program at any time. 799 F. Supp. 281, 285 (E.D.N.Y. 1992). Neither citation supports that a pilot program must be inherently terminable at will.

Second, the fact that the FHWA can only enter a limited number of congestion pricing pilots does not mean that the only projects that can be authorized are ones that the Secretary can also unilaterally terminate. That argument admits of no limiting principle. Carried to its logical but necessary extreme, it would prevent any Secretary from ever authorizing any pilot. Congress not infrequently makes appropriations that are exhausted by one exercise of executive power without leaving room for subsequent exercises of executive power. Appropriations of funds come to mind. A grant to one organization from a limited pool of funds appropriated by Congress will necessarily limit the executive's authority to make grants to other organizations. But it does not follow from that fact that the executive can only make awards that he (or a successor) can retract at his will. It is essential to the exercise of executive power that the executive must be able to make binding commitments. *See United States v. Bekins*, 304 U.S. 27, 51–52 (1938) ("It is of the essence of sovereignty to be able to make contracts and give consents

bearing upon the exertion of governmental power."). The power to make such commitments necessarily carries with it the consequence that they will be honored. Any other result would "produce the untoward result of compromising the Government's practical capacity to make contracts." *United States v. Winstar Corp.*, 518 U.S. 839, 884 (1996). "[I]t would make an inroad on [executive] power, by expanding the Government's opportunities for contractual abrogation, with the certain result of undermining the Government's credibility at the bargaining table and increasing the cost of its engagements." *Id.*

The VPPP is no different. Each Secretary must have the power to make a commitment if Congress's objectives are to be satisfied. If, as a result, the number of projects permitted to be authorized are exhausted and if the Secretary (whether of this Administration or the next) wishes to authorize an additional project, the answer is that the Secretary should go to Congress for authority. It is not to disable the Secretary from entering into any long-term commitment on the theory that each such commitment by necessity limits his ability to enter into additional agreements. A statute that gave the executive the power to permit tolling projects on federal aid highways but did not also give him or her the power to commit the Federal Government to those projects would not give him or her any power at all.

Finally, the Secretary argues that because the statute gives him the power to "establish" a program, by implication it awards to him also the power to disestablish one. There is an implication that can be drawn from the statutory language, but it is not the one that the Secretary would draw. If the Secretary has the power to establish a program, he or she must have the power to commit to a program. The statute authorizes the Secretary to "enter into cooperative agreements" with State or local governments "to establish, maintain, and monitor congestion pricing projects." Pub. L. 102-240 § 1012(b)(1). Thus, the Secretary has discretion to enter into

a cooperative agreement with a state government in the first instance. It does not follow, however, that the only projects that the Secretary may enter into are projects that he also can unilaterally terminate at any time and for any reason. The opposite implication follows: the statute does not limit the Secretary's power to enter into cooperative agreements. Highway projects are capital projects that require significant investment. Such pilots by their nature require time to determine if the experiment that is being piloted achieves the benefits that are expected. Congress intended that the Secretary have wide latitude to approve projects the Secretary viewed as achieving the program's objections.

It must necessarily follow then that the Secretary has the authority to enter into agreements that are long-term. Indeed, so much is reflected by the fact that the Secretary has the power not only to "establish" but also to "maintain" and to "monitor" congestion pricing projects. If the Secretary has the power to enter into a contract that binds the Government to its counterparty for a stated term, it must also follow that the reference to "establish" in the VPPP does not carry with it the inherent unilateral ability of whoever holds the office of Secretary of the Transportation at any particular moment to terminate a project whether established by himself or a predecessor.

The Secretary cites a single case in support of his argument. It does not involve the VPPP. In *California Sea Urchin Commission v. Bean*, the Ninth Circuit addressed a statute that stated that the Secretary for Fish and Wildlife and Parks for the Department of the Interior "may develop and implement . . . a plan for the relocation and management of a population of California sea otters." 883 F.3d 1173, 1178 (9th Cir. 2018) (quoting Pub. L. 99-625(1)(b)). Under the authority of the law, the Fish and Wildlife Service ("FWS") adopted a rule that established a colony of endangered sea otters in San Nicolas Island, California for the recovery

of that otter population, but at the same time established five failure conditions, any one of which would be the basis for ending the program. *Id.* at 1179.  When the FWS determined that one of the failure conditions had been met and ended the program, the plaintiffs brought suit alleging that the statute did not authorize the FWS to establish the failure conditions and to terminate the program. *Id.* at 1182.  The Ninth Circuit rejected that argument, finding that the agency had reasonably interpreted the statute under *Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984), to permit it to establish conditions for the program and to end it when the agency determined that the program was "counterproductive and harmed, rather than protected, threatened or endangered species." *Id.* at 1183.

Properly understood, *California Sea Urchin Commission* supports Plaintiffs' argument and not the Secretary's.  The Ninth Circuit did not hold that the statute authorized the FWS unilaterally to alter a program that had previously been established regardless of the terms under which that program had been established.  The FWS set failure conditions in the rule that established the program and then exercised the authority that the rule gave it when those failure conditions had been satisfied.  The court's decision thus vindicated agency authority.  It found that the power to establish the program necessarily carried with it the right to set the conditions that gave it the "authority to terminate the program when it determines that the purposes of the statute would no longer be served." *Id.* at 1183.  *California Sea Urchins* would be relevant if the VPPP Agreement had set failure conditions at the outset and the Secretary sought to terminate the program where one of those conditions was met.  But here, the Secretary that entered into the VPPP Agreement did not.  It gave the Plaintiffs the right to operate the CBDTP "in accordance with the provisions of this Agreement" including using the toll revenues for covered projects, and gave only Plaintiffs and not the Secretary or the FHWA the right to terminate the agreement

at will.  Dkt. No. 87-1.  Rather than supporting the Secretary's argument, *California Sea Urchins* suggests that Congress gave the agency broad power to establish a program not, as the Secretary suggests, that it constrained the agency to establish only one type of project—a project that the Secretary could unilaterally terminate at his own discretion.

### 4.    The Sovereign Authority Doctrine Does Not Give the Secretary the Power to Terminate

Finally, Defendants invoke the "unmistakability" doctrine and argue that the executive branch has the "sovereign authority" to terminate the VPPP Agreement and that, as a result, any waiver of that sovereign authority would have to be "unmistakable."  Dkt. No. 158 at 31.  The Secretary's argument is breathtaking.  If accepted, it would make all the other arguments irrelevant.  It is wrong.

The "unmistakability doctrine" refers to the rule that "sovereign power governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms."  *Winstar Corp.*, 518 U.S. at 872 (quoting *Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 52 (1986)).  Under that doctrine, "a contract with a sovereign government will not be read to include an unstated term exempting the other contracting party from the application of a subsequent sovereign act (including an Act of Congress), nor will an ambiguous term of a grant or contract be construed as a conveyance or surrender of sovereign power."  *Id.* at 878.  In plain English, that means that a party that has contracted with a sovereign government is not protected from a subsequent act of that sovereign that has the effect of preventing performance under that contract.  The doctrine speaks not to whether the sovereign can pass laws of general applicability that affect contracting parties, but about the conditions under which a counterparty who is deprived of performance by the

government through a law of general applicability can get relief through a breach of contract action.

To understand the doctrine, it is important to understand *Winstar*. There, three financial institutions initiated suit against the United States asserting breach of contract and constitutional claims arising from Congress' enactment of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"). That act caused federal regulatory agencies to limit financial institutions' application of special accounting treatment to their acquisition of failing thrifts. *Id.* at 856. Although the history and regulatory scheme that led to that outcome is complicated, in short, under a previous statutory scheme the Federal Government, through agencies, made agreements with financial institutions that permitted them to use special accounting methods to acquire failing thrifts with significant liabilities without becoming undercapitalized themselves. When that scheme proved to exacerbate rather than solve underlying instability among thrifts, Congress passed FIRREA to limit application of that special accounting treatment. *See generally id.* at 849–71. As a result, "many financial institutions immediately fell out of compliance with regulatory capital requirements, making them subject to seizure by thrift regulators." *Id.* at 858. The financial institutions sought relief in the courts as a result of what they saw as a breach of the promise that their acquisitions of the failing thrifts would be governed by the beneficial accounting practices. The Federal Government argued in response that because it did not "unmistakably" "waive Congress's authority to enact a subsequent bar to using supervisory goodwill and capital credits to meet regulatory capital requirements," the institutions could not maintain a breach of contract action. *Id.* at 871. In *Winstar*, the Court determined that there was "no reason to apply" the doctrine because "the contracts have not been construed as binding the Government's exercise of authority to modify

banking regulation or of any other sovereign power, and there has been no demonstration that awarding damages for breach would be tantamount to any such limitation." *Id.* at 881.

The Supreme Court began its decision by looking back to the origins of the unmistakability doctrine to determine whether it applied. In describing the early cases from which it originated, the Supreme Court explained that:

> In each, a state or local government entity had made a contract granting a private party some concession (such as a tax exemption or a monopoly), and a subsequent governmental action had abrogated the contractual commitment. In each case, the private party was suing to invalidate the abrogating legislation under the Contract Clause. A requirement that the government's obligation unmistakably appear thus served the dual purpose of limiting contractual incursions on a State's sovereign powers and of avoiding difficult constitutional questions about the extent of state authority to limit the subsequent exercise of legislative power.

*Id.* at 875. The Court continued that the doctrine has expanded from that context to "those of other governmental sovereigns, including the United States." *Id.* No one Congress is superior to any other and so absent an unmistakable indication in a contract with the Federal Government that the contract is subject to breach in event of legislative change, no such breach would occur even where subsequent legislation has the effect of making performance of that agreement impossible. Where a contract is found to contain an unmistakable commitment that subsequent legislative change is tantamount to breach, the result is not, of course, that the subsequent legislature is stopped from enacting a broad change. It is simply that the Federal Government is liable in the form of damages to the contractual counterparty. *See id.* at 871.

Thus, the unmistakability doctrine speaks to the circumstances in which a party through private contract frustrates the power of the sovereign, acting through its legislature, to pass laws in the interest of the general public. The default is that the legislature, by passing a law of general applicability, does not incur contractual liability because the sovereign is not understood to insure counterparties against future legislative change. Such contractual liability can only

exist where the contract states, in unmistakable terms, that subsequent legislative change would result in breach. The doctrine strikes a careful balance. It recognizes that the sovereign can enter into agreements that insure the counterparty against future breach, but only where it does so intentionally. After all, as noted, the Supreme Court has held that the ability of the sovereign to contract is "'the essence of sovereignty' itself." *Id.* at 884 (quoting *Bekins*, 304 U.S. at 51–52). If the sovereign could not commit the government to a contract, the sovereign could not govern at all.

The unmistakability doctrine does not confer on an administrative agency, including the Secretary here, the unilateral ability to terminate any contract or agreement the government has entered into. Put otherwise, it does not prevent an administrative agency, including the Secretary, from committing the government to contractual obligations or limit him to entering into only contracts that are terminable at will. The application of the doctrine in that manner would frustrate the exercise of executive power. It would limit the power of the executive and, as stated, "produce the untoward result of compromising the Government's practical capacity to make contracts." *Winstar*, 518 U.S. at 884. It would wreak havoc across the whole range of federal contracting, from defense contracts to the provision of Medicaid funding to states.

Rather, the unmistakability doctrine performs a function potentially relevant to this case but not the one that the Secretary articulates and not one that helps the Secretary in this case. The Secretary makes the argument that the VPPP and the VPPP Agreement cannot be construed to give the Project Sponsors the right to continue the CBDTP "even if it is a failure and even if voters want to end it—so long as the non-federal sponsors want to maintain it and technically abide by its terms." Dkt. No. 171 at 27. The Secretary argues that such a result would be

inconsistent with democratic values by undermining the ability of the People to decide how federal aid highways should be used and how they should not be used.

In this case, the CBDTP was the product of a democratic process. The VPPP was passed by Congress. The TMA was passed by democratically elected legislators and signed by a Governor elected by the people of New York. The VPPP Agreement was authorized by a Secretary nominated by a duly elected President and confirmed by the Senate. The democratic process worked.

The Secretary's argument nonetheless reflects an understandable concern. It is not necessarily the case that a Secretary of Transportation can commit federal aid highways to particular uses and prevent the Government from deciding at some later point in time that the uses to which they are put no longer further the national interest. The Government retains power to pass laws of general applicability including, presumably, laws regarding the uses to which highways financed by federal aid are put. But the answer to that concern is not to handcuff the executive through the application of the unmistakability doctrine (or the *Christian* doctrine, Section 200.340(a)(4), or the Government's interpretation of the VPPP for that matter). Those applications would limit the ability of the executive to further the objectives set out by the People through their elected representatives. The answer is given by the application of the unmistakability doctrine properly understood. The People through Congress can pass a law in the future deciding that federal aid highways should not be used for pilot projects to reduce congestion and that law of general applicability, unless the Project Sponsors have protection from it, would be applied to the CBDTP. But Congress has not passed such a law and the question of whether and how it would apply to the CBDTP thus is not presented in this case.

Plaintiffs are accordingly entitled to summary judgment on Count I of their complaint.

### III.    The Ultra Vires Claims

Both Plaintiffs and Organizational Intervenors have moved for summary judgment on their claims that the Secretary's actions here were *ultra vires*; that is, that the action was "unauthorized" or "beyond the scope of power allowed or granted by law." *Adamski v. McHugh*, 304 F. Supp. 3d 227, 236 (D.D.C. 2015) (quoting Black's Law Dictionary 1755 (10th ed. 2014)). The Secretary moves for summary judgment on the same claims.

*Ultra vires* review is available where "an agency has taken an action entirely 'in excess of its delegated powers and contrary to a specific prohibition' in a statute." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (quoting *Ry. Clerks v. Ass'n for Benefit of Non-contract Emps.*, 380 U.S. 650, 660 (1965)).  It "derives from the inherent equitable powers of courts." *Am. Fed. of Gov. Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*, 786 F. Supp. 3d 647, 692 (S.D.N.Y. 2025).  *Ultra vires* is "unavailable if, as is usually the case, a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review,' or if a statutory review scheme forecloses all other forms of judicial review." *Nuclear Regul. Comm'n*, 605 U.S. at 681 (quoting *Bd. of Governors, FRS v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)).  "Courts must be exceedingly cautious of exercising *ultra vires* review because it 'seeks the intervention of an equity court where Congress has not authorized statutory judicial review.'" *Masroor v. Noem*, 2025 WL 2439176, at *3 (D.D.C. Aug. 25, 2025) (quoting *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022)).[38]

---

[38] The Secretary frames this inquiry as a jurisdictional one but does not cite any authority for that proposition.  Rather, the cases on which he relies treat the question as a merits inquiry.  In *Nuclear Regulatory Commission*, the Supreme Court determined that Texas could not maintain such a claim after addressing the merits of its argument.  605 U.S. at 871–82.  *See also Fed. Express*, 39 F.4th at 770–71 (treating *ultra vires* claim on the merits after establishing jurisdiction); *accord Am. Fed. of Gov't Emps.*, 786 F. Supp. 3d at 692.

Organizational Intervenors expressly disclaim any stand-alone *ultra vires* claim, noting that because this Court has held that "a reviewing court must set aside agency actions that exceed the agency's delegated authority" under the APA, *Duffy*, 784 F. Supp. 3d at 668, the Court should construe Count VI of their amended complaint as an APA claim. Dkt. No. 146 at 8 n.4. The Court thus treats their stand-alone ultra vires claim as abandoned.[39] *See Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014). Plaintiffs address their standalone *ultra vires* claim only in a footnote. Dkt. No. 168 at 41 n.29.

The Secretary is entitled to summary judgment on Plaintiffs' *ultra vires* claim. The relief Plaintiffs seek in Count VII in their complaint (the *ultra vires* count) is indistinguishable from the relief sought, and that this Court has now granted, in Count I (APA "in excess of statutory authority" count). *Compare* Dkt. No. 96 ¶ 221 ("Defendants are not authorized by any law— statutory or constitutional—to unilaterally terminate the VPPP Agreement") *with id.* ¶ 273 ("The February 19 Letter is *ultra vires* because rescission of the VPPP Agreement is not authorized under any provision of law."). The relief requested in the standalone *ultra vires* count is "simply a variant of their other claims, for which there are adequate forms of judicial review . . . in this court." *Vera Inst. of Justice*, 2025 WL 1865160, at *17 (D.D.C. July 7, 2025). The Court's decision that such relief is available under the APA necessarily means that Plaintiffs have a "meaningful and adequate opportunity for judicial review," *Nuclear Reg. Comm'n*, 605 U.S. at 681, of their argument about Defendants' actions taken in excess of statutory authority. Accordingly, the Court cannot undertake *ultra vires* review.

---

[39] The Secretary argues that the Court should ignore Organizational Intervenors' request to construe the claim as one under the APA as it is tantamount to "rewrite[ing] their complaint through briefing." Dkt. No. 171 at 21. Because Plaintiffs have moved for the same relief under the APA, it is immaterial whether the Court considers the Organizational Intervenors' *ultra vires* APA claim or not.

IV.     **Remaining Claims**

Defendants move for summary judgment on Counts V–VI and VIII–X of the operative

complaint.  In those counts, Plaintiffs allege: (i) the Secretary's action was arbitrary and

capricious because the purported explanation for termination of the agreement was pretextual,

Dkt. No. 96 ¶¶ 254–60 (Count V); (ii) Defendants have violated Plaintiffs' rights under the Due

Process Clause of the Fifth Amendment (Count VI), *id.* ¶¶ 261–68; the termination of the VPPP

Agreement was arbitrary and capricious because the Secretary violated NEPA, *id.* ¶¶ 277–91

(Count VIII); the Defendants violated the Spending Clause and the Tenth Amendment, *id.*

¶¶ 292–308 (Count IX); and Defendants violated principles of separation of powers by usurping

the legislative function, *id.* ¶¶ 309–14 (Count X).  In their briefing, Plaintiffs resist the

Defendants' motion stating that they "reserve their right to pursue such claims in the event the

instant motion is denied," Dkt. No. 152 at 5 n.7, and have submitted a declaration pursuant to

Federal Rule of Civil Procedure 56(d) urging that the Court not dismiss these counts before

conducting discovery.  Dkt. No. 169.[40]  Plaintiffs do not separately move for summary judgment

on those counts.[41]

---

[40] Defendants argue that the constitutional, pretext, and NEPA claims should be dismissed as
abandoned because Plaintiffs "only reserved their rights to pursue such claims in the event the
instant motion is denied."  Dkt. No. 171 at 26–27.  The Court cannot dismiss the claims on that
basis.  *See In re Bridge Const. Servs. Of Fla., Inc.*, 140 F. Supp. 3d 324, 333 (S.D.N.Y. 2015)
("A party does not relinquish a claim simply because it does not seek summary judgment on it").
Defendants also argue that Organizational Intervenors' standalone NEPA claim must be
dismissed because NEPA claims can only be brought through the APA.  However, the absence
of the word "APA" in Organizational Intervenors third cause of action is not fatal.  *See Brodsky
v. U.S. Nuclear Regul. Com'n*, 704 F.3d 113, 119 (2d Cir. 2013) (enforcing NEPA claim through
APA).

[41] Similarly, Organizational Intervenors have moved for summary judgment on their APA claims
premised on the Defendants misinterpretation of the statute (Count II) and that the actions were
ultra vires (Count IV).  They have not moved for summary judgment on their APA pretext claim
(Count I) or their NEPA claim (Count III).  Dkt. No. 167 at 10 n.3.  Because the claims for
which they have moved and not moved for summary judgment mirror those of Plaintiffs, the
Court does not address them independently.

At oral argument on this motion, Plaintiffs took the position that if the Court granted them relief on Counts I–IV of the Consolidated Second Amended Complaint, the Court could consider their APA pretext claim and the constitutional claims to be moot and dismiss them, so that the Court could enter final judgment.  Dkt. No. 193 at 3:23–4:3 ("We think the claims that we did not move for partial summary judgment you can treat as moot" (citing *DoorDash, Inc. v. City of New York*, 789 F. Supp. 3d 337, 359 (S.D.N.Y. 2025))).  The Court went on to specifically note that if it were to do so, "and a different court were to disagree, that may be the end of those other claims.  You've thought about that?"  *Id.* at 4:6–8.  Counsel for Plaintiffs responded that "We thought about it."  *Id.* at 4:9.  Intervenors agreed as to the corresponding claims in their complaint.  *Id.* at 33:22–34:11.  Defendants agreed as well.  *Id.* at 65:16–23 (counsel for the Secretary answering "we do" to the Court asking if he agreed that the claims "on which you're moving for summary judgment and they're not" could be "dismiss[ed] as moot" such that the Court could "enter a final judgment").

Considering that the Court's holding on Plaintiffs' APA claim offers them the relief that they seek, and that the parties agree that the remaining claims may be dismissed as moot, the Court dismisses the Plaintiffs' pretext and constitutional claims as moot.  *See Ruesch v. Comm'r of Internal Revenue*, 25 F.4th 67, 70 (2d Cir. 2022) ("Typically, no live controversy remains where a party has obtained all the relief 'she could receive on the claim through further litigation.'" (quoting *Radha Geismann, M.D., P.C. v. ZocDoc, Inc.*, 909 F.3d 534, 541 (2d Cir. 2018))); *Allstate Ins. Co. v. Serio*, 261 F.3d 143, 149–50 (2d Cir. 2001) ("It is axiomatic that federal courts should, where possible, avoid reaching constitutional questions."); *Expressions Hair Design v. Schneiderman*, 2013 WL 7203883, at *2 (S.D.N.Y. Nov. 4, 2013) (dismissing a claim as moot "[i]n light of the relief described above"); *Burke v. Coggins*, 521 F. Supp. 3d 31,

45 (D.D.C. 2021) (declining to address "constitutional issues that need not be resolved" where "plaintiff receives full relief elsewhere through other avenues.").

Accordingly, of the remaining claims in Plaintiffs and Organizational Intervenors complaints on which the Defendants moved for summary judgment, the Court addresses only the claim that the Secretary's February 19 Letter was arbitrary and capricious because, in issuing it, the Secretary violated NEPA. Dkt. No. 96 ¶¶ 277–91 (Count VIII), Dkt. No. 41 ¶¶ 111–17 (Count III).

### A. NEPA

Defendants move for summary judgment on the Plaintiffs' NEPA claims. Plaintiffs argue that when the Secretary terminated the VPPP Agreement and rescinded approval of the CBDTP he was required to analyze the environmental impact of the reinstitution of toll-free roads into the CBDTP and that the failure to do so rendered the project termination arbitrary and capricious.

NEPA requires that before any federal agency engage in a "major Federal action[n] significantly affecting the quality of the human environment," it prepare "a detailed statement" setting forth the "reasonably foreseeable environmental effects of the proposed agency action." 42 U.S.C. § 4332(2)(C)(i). The environmental impact statement ("EIS") must also address "any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented," "a reasonable range of alternatives to the proposed agency action," "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity," and "any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be

implemented." *Id.* § 4332(2)(C)(ii)-(v).[42]  The requirement that an agency prepare an EIS

"serves NEPA's 'action-forcing' purpose in two important respects." *Robertson v. Methow*

*Valley Citizens Council*, 490 U.S. 332, 349 (1989).  "It ensures that the agency, in reaching its

decision, will have available, and will carefully consider, detailed information concerning

significant environmental impacts; it also guarantees that the relevant information will be made

available to the larger audience that may also play a role in both the decisionmaking process and

the implementation of that decision." *Id.*

     "NEPA does not require the agency to weigh environmental consequences in any

particular way.  Rather, an agency may weigh environmental consequences as the agency

reasonably sees fit under its governing statute and any relevant substantive environmental laws."

*Seven Cty. Infrastructure Coal.*, 605 U.S. at 173.  The law "is a procedural cross-check, not a

substantive roadblock.  The goal of the law is to inform agency decisionmaking, not to paralyze

it." *Id.*  "[I]nherent in NEPA and its implementing regulations is a 'rule of reason,' which

ensures that agencies determine whether and to what extent to prepare an EIS based on the

usefulness of any new potential information to the decisionmaking process." *Dep't of Transp. v.*

*Pub. Citizen*, 541 U.S. 752, 767 (2004) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S 360,

373-74 (1976)).  "[T]he textually mandated focus of NEPA is the 'proposed act'—that is the, the

---

[42] The term "major federal action" is not defined in the statute.  Previously, courts looked to the definition contained in the regulations promulgated by the Council on Environmental Quality ("CEQ").  *See Mineral Poli'y Ctr. v. Norton*, 292 F. Supp. 2d 30, 54 (D.D.C. 2003); 40 C.F.R. § 1508.18.  However, in *Marin Audubon Society v. Federal Aviation Administration*, the D.C. Circuit held that the CEQ has no authority to promulgate binding regulations, and that the Department of Transportation's own rules are "not a substitute" for those regulations, and "do not repeat or paraphrase the language of those regulations."  121 F.4th 902, 915 (D.C. Cir. 2024).  President Trump subsequently ordered that the CEQ rescind its NEPA regulations.  *See* Exec. Order No. 14,154, 90 Fed. Reg. 8353 (Jan. 29, 2025).  The Court need not reach or interpret the term "major federal action" here.

project at hand—not other future or geographically separate projects that may be built (or expanded) as a result of or in the wake of the immediate project under consideration." *Seven Cty. Infrastructure Coal.*, 605 U.S. at 186–87. It follows from the statutory language as well as the congressional intent that where there is no decision to make and no alternatives to consider, an agency is not required to prepare an EIS. "[A]gencies are not required to analyze the effects of projects over which they do not exercise regulatory authority." *Id.* at 188.

The Secretary was not required to prepare or consider an EIS before the February 19 Letter terminating the VPPP Agreement and rescinding approval of the CBDTP because that action did not involve a "decision" by the Secretary. By the language of the letter, there was no decision the Secretary could make. Per his understanding, Congress did not give his Department the "regulatory authority" to enter into the VPPP Agreement and to permit congestion pricing. Put otherwise, and applying a "rule of reason," the Secretary was not required to prepare any form of environmental statement or even to consider whether an EIS need be prepared because it would have no use to the decisionmaking process. The Department either had the authority to sign the VPPP Agreement or it did not. The Court has decided that the agency acted contrary to law and violated the APA when it concluded that Congress deprived it of the authority to sign the VPPP Agreement. But that is because the February 19 Letter violated the APA, not because of the failure to consider the environmental impact of its action.[43]

---

[43] The Court need not and does not consider the hypothetical whether the agency would have been required to prepare an EIS or an environmental assessment ("EA") had it exercised discretion and made a decision on policy grounds. An EA was prepared before the VPPP Agreement was signed in May 2023, and the Court has determined in a separate action that the decision not to prepare an EIS in connection with the decision to sign that agreement was not arbitrary and capricious. *See Chan v. U.S. Dep't of Transp.*, 782 F. Supp. 3d 39, 83–108 (S.D.N.Y. 2025); *Mulgrew v. U.S. Dep't of Transp.*, 750 F. Supp. 3d 171, 211–49 (S.D.N.Y. 2024). The EA considered a "no action" alternative in which the CBDTP was not adopted and the Secretary's February 19 Letter followed shortly after the EA was prepared. In all likelihood

V.      **Remedy**

In their request for relief, Plaintiffs request that the Court (1) declare that the termination was undertaken in violation of the terms of the VPPP Agreement and in excess of statutory authority, (2) declare that the February 19, 20, and March 20 letters are null, void, and of no effect, and vacate each letter, (3) declare that any effort to enforce that February 19 Letter, including the "compliance measures" detailed in the April 21 Letter, are unlawful, (4) postpone the effective date of the March 20 and April 21 letters so as to preserve the status quo, (5) grant any further relief pursuant to 28 U.S.C. § 2202, (6) enjoin the Defendants from enforcing the various letters and from taking further action on the basis of those documents, (7) enjoin Defendants from withdrawing, cancelling, delaying, rescinding, or withholding federal funding from Plaintiffs without constitutional and statutory authority, (8) award Plaintiffs their costs, including reasonable attorneys' fees, and (9) all other further relief as the Court deems proper. Dkt. No. 96 at 117–18.

The Court must vacate the February 19 and the April 21 letters and the actions taken through them. Under the APA, courts are instructed to "hold unlawful and set aside" agency actions found to be "arbitrary, capricious, . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Secretary's actions were arbitrary and capricious, an abuse of discretion, and not in accordance with law. Accordingly, his actions purporting to terminate that agreement, including the February 19 Letter and the April 21 Letter, are vacated. The VPPP

_____

then, and on the current record, the appropriate remedy might be remand for clarification, permitting the agency to indicate whether it had considered the environmental consequences of its new plan to make the federal aid highways toll-free. *Cf. New York v. U.S. Dep't of Com.*, 351 F. Supp.3d 502, 673–74 (S.D.N.Y. S.D.N.Y. 2019). There is no need for the Court to consider that question, however, or the question whether an environmental review might be necessary of future action by the Secretary because (i) it is purely hypothetical on the facts of this case and (ii) Plaintiffs are entitled to their requested remedy of vacatur on other grounds.

Agreement is restored and the FHWA approval of the CBDTP pilot project is reinstated. Plaintiffs are thereby relieved of the obligation to cease tolling operations. Plaintiffs are restored to their position prior to the issuance of the February 19 Letter.

The Court further has concluded that remand is not appropriate in this case. "In the usual case, when an agency violates its obligations under the APA, we will vacate a judgment and remand to the agency to conduct further proceedings." *Guertin v. United States*, 743 F.3d 382, 388 (2d Cir. 2014); *N.Y. Legal Assistance Grp. v. Cardona*, 2025 WL 871371, at *4 (S.D.N.Y. Mar. 20, 2025). That practice is not inviolable, as "there are occasions in which remand to the agency for further review is not appropriate." *Guertin*, 743 F.3d at 388 (citing *Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1226 (10th Cir. 2002)). This is just one of those "unusual circumstances where remand to the agency for further proceedings is not necessary" because the outcome is clear from the "compelling evidence in the record" that there is no further action to be taken following this Court's decision. *Id. See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (in "rare circumstances" the reviewing court is not required to remand to the agency for "additional investigation or explanation"); *Sierra Club v. Petereson*, 185 F.3d 349, 371 (5th Cir. 1999) ("we find this occasion to be a 'rare circumstance' . . . because no record whatsoever existed."); *Dakota, Minn. & E. R.R. Corp. v. U.S. Dep't of Labor Admin. Rev. Bd.*, 984 F.3d 940, 947–48 (8th Cir. 2020).

At oral argument, the Secretary conceded that this "might not be a situation where remand is needed." Dkt. No. 193 at 65:13–14. That concession was well-advised. As discussed at length in this opinion, the February letter was based on the conclusion that Congress did not give the Secretary the authority to approve the CBDTP. That conclusion was an error of law. No amount of further agency deliberation is necessary to decide Congress's authority. That

question belongs to the courts.  *See Nat'l Ass'n of Postal Su'rs v. U.S. Postal Serv.*, 602 F.2d

420, 432 (D.C. Cir. 1979) ("The judicial role is to determine the extent of the agency's delegated

authority and then determine whether the agency has acted within that authority."); *Steele v.

United States*, 144 F.4th 316, 323 (D.C. Cir. 2025).

    As to the policy reasons identified after the fact in the April letter, the Secretary also

admitted that those reasons were not developed as a result of any agency deliberation.  The

administrative record post-VPPP Agreement consists of letters from the New Jersey Governor

and the New Jersey Commissioner of the state's Department of Transportation.  There is no

evidence of an agency deliberation that was in process that a remand can build upon.  Dkt. No.

193 at 51:21–25 (counsel for the Secretary states that "Prior to the April letter, I'm not aware of

anything, again, beyond the correspondence from the State of New Jersey.").  Moreover, the

Court has concluded that the DOT lacks authority to terminate the VPPP agreement based on a

conclusion that it is no longer consistent with agency policies and priorities.  It is not clear, and

the Secretary has not made clear, what the DOT would do in light of that conclusion if the Court

was to remand the case.

    The Court has authority under the APA to enter a declaratory judgment where it has

vacated the underlying agency action.  *See Refugee & Immigrant Ctr. For Educ. & Legal Servs.

v. Noem*, 793 F. Supp.3d 19, 105 (D.D.C. 2025).  Such a declaratory judgment is appropriate

here.  The Declaratory Judgment Act vests federal courts with discretion, in a proper case, to

"declare the rights and other legal relations of any interested party seeking such declaration,

whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  The Court may issue a

declaratory judgment when it would "serve a useful purpose in clarifying and settling the legal

relations in issue" or "afford relief from the uncertainty, insecurity, and controversy giving rise

to the proceeding." *Cont'l Case. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 737 (2d Cir. 1992).

The courts are instructed to consider the following factors to the extent they are relevant:

> (1) "whether the declaratory judgment sought will serve a useful purpose in clarifying or settling the legal issues involved (2) whether such a judgment would finalize the controversy and offer relief from uncertainty; (3) whether the proposed remedy is being used merely for procedural fencing or a race to res judicata; (4) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; (5) whether there is a better or more effective remedy; and (6) whether concerns for judicial efficiency and judicial economy favor declining to exercise jurisdiction.

*Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 99–100 (2d Cir. 2023) (cleaned

up).

A declaratory judgment is appropriate here. It would serve a useful purpose in clarifying

and settling the legal relations in issue and afford relief from uncertainty and insecurity.

Plaintiffs have referenced that investors in bonds have expressed uncertainty regarding the

circumstances under which the CBDTP and the revenues that it generates may be terminated by

the Secretary and that such insecurity has depressed the value of the bonds (and thereby

presumably raised Plaintiffs' cost of capital). They and the Secretary can benefit from a

declaration that determines the legal relations of the parties. There is, moreover, every reason to

believe that there remains an interest by the Plaintiffs in continuing the CBDTP and by the

Secretary in halting it. Plaintiffs maintain that the program has been a success. *See* Dkt. No. 193

at 8:19–9:9 (explaining that a report following the first year of the CBDTP "describes the

program's undeniable positive impact," including a decrease in traffic, decreased greenhouse

emissions, and money raised for capital projects). The Secretary has vowed publicly to continue

to fight it. Dkt. Nos. 188-3, 188-6. The first two factors thus are readily satisfied. The judgment

will also serve a useful purpose in clarifying the circumstances under which the Secretary can

terminate the program and can offer some relief from uncertainty. There is also no evidence here that Plaintiffs seek declaratory judgment for procedural fencing, nor that it would create friction with other courts. This action was initiated in this Court by Plaintiffs when the Secretary terminated the Department's prior approval of their program. The only "race to the courthouse" was a race to obtain relief while such relief could still be effective. The Court's judgment will not encroach on the domain of a state or foreign court.

Moreover, there is no better or more effective remedy. Although the Court's decision granting vacatur removes the basis upon which the Secretary was threatening compliance measures in the April 21 Letter and restores the CBDTP to its current lawful status, an order of vacatur would not necessarily have preclusive effect, in and of itself, in preventing the Secretary from taking action in the future on grounds of 200.340(a)(4), *Christian*, inherent powers under the VPPP, or the "unmistakability doctrine." A declaratory judgment will avoid ambiguity regarding the respective rights of the parties. At oral argument, the Secretary refused to commit that this Court's rulings would definitively settle the issues with respect to those doctrines, even if no appeal is taken or, if an appeal is taken, the Court's rulings are affirmed on appeal by the Second Circuit. Dkt. No. 193 at 64:3–65:2. In the absence of declaratory relief, then, there is a real risk that the Court will set the dispute up for a "redo" in which event the issues that have been thoroughly vetted by the parties will have to be reviewed again by this Court or another court. That reason alone also speaks to the judicial efficiency and judicial economy that favors the issuance of declaratory relief. Plaintiffs are therefore entitled to declaratory judgment that the Secretary is permitted to terminate the VPPP Agreement only pursuant to the terms expressly stated therein, that the Defendants' termination of the VPPP Agreement was unlawful, and that any attempt to enforce the February 19 Letter or April 21 Letter would be unlawful. Defendants

may not terminate the VPPP Agreement under subsection 200.340(a)(4), the incorporation of that provision through the *Christian* doctrine, inherent powers under the VPPP, or the exercise of the Secretary's powers under the unmistakability doctrine.

Plaintiffs request also a declaration that the Defendants "may not terminate [the VPPP] except with the Project Sponsors' approval." Dkt. No. 152 at 32. As Defendants argue, that declaration sweeps too far. Dkt. No. 171 at 49.[44] The VPPP Agreement imposes obligations on Plaintiffs, and the Court has not considered the question whether those obligations are material and whether violation of any of those obligations could provide the basis for termination of the VPPP Agreement. There has been no evidence that Plaintiffs have breached any of the terms of the VPPP Agreement. Accordingly, as Defendants assert, Plaintiffs are not entitled to a declaratory judgment that Defendants may only terminate the agreement with the Project Sponsors' approval.

Finally, Plaintiffs seek a permanent injunction. "An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). "The Supreme Court has cautioned that a district court vacating an agency action under the APA should not issue an injunction unless doing so would 'have [a] meaningful practical effect independent of its vacatur.'" *O.A. v. Trump*, 404 F. Supp. 3d 109, 153–54 (D.D.C. 2019) (quoting *Monsanto*, 569 U.S. at 165–66). The litigation of this case provides some basis for Plaintiffs' worry that injunctive relief is necessary to prevent future disruption to the CBDTP. Defendants have taken precipitous action with little or no notice to Plaintiffs. The February 19 Letter was issued with no notice or

---

[44] Defendants do not object generally to the issuance of a declaratory judgment. Dkt. No. 158 at 48–49.

opportunity to comment.  Then when Plaintiffs attempted to litigate this case through "orderly summary judgment and without the exigency that accompanies motions under Rule 65," Dkt. No. 49 at 4, the Secretary sprung the April 21 Letter on them.  Indeed, they specifically sought information from the Defendants as to whether they intended to take "unilateral action on or after April 20 that might require Plaintiffs to seek expedited injunctive relief," *id.*, but Defendants did not answer except to send the April 21 Letter without warning, threatening calamitous enforcement action as early as May 28, 2025.  Plaintiffs again attempted unsuccessfully to schedule a meet and confer with Defendants, and when they eventually did get in contact the Defendants declined to agree not take enforcement action, even temporarily.  Dkt. Nos. 70, 70-1.

However, Plaintiffs have not made out a sufficient showing to support permanent injunctive relief.  They cite statements of the President of the United States referencing his opposition to the CBDTP, including a post from November 3, 2025 that he is "going to ask our Transportation Secretary, Sean Duffy, to take a good, long look at terminating New York city Congestion Pricing," Dkt. No. 188-1, and another from January 12, 2026 that the CBDTP has "got to be ended, IMMEDIATELY!," Dkt. No. 188-2, and posts by the Secretary of Transportation, stating that "We'll keep fighting the illegal tolls," Dkt. No. 188-3, and that USDOT is "fighting to end" the CBDTP, Dkt. No. 188-6.  But the Court cannot enjoin the President who, after all, is also not a party to this lawsuit.  *Refugee & Immigrant Ctr.*, 793 F. Supp. 3d at 109–10.  He is obviously free to continue to make public statements as well as to ask the Secretary of Transportation to look into whether there are lawful means to end the CBDTP. And, as to the Secretary's statements, he has a right to continue to fight his case and to take an appeal of this Court's orders.  The Secretary has not objected to the declaratory relief the Court is issuing (although he has objected to the Court's substantive rulings supporting that relief).  To

date, he has provided no evidence that he will not abide by the Court's orders including the declaratory judgment.[45]

The lack of a permanent injunction does not leave the Plaintiffs without remedy if they believe the Defendants take action that violates the Court's declaratory judgment. If the parties need further assistance, the Court is open to provide "[f]urther necessary or proper relief." 28 U.S.C. § 2202; *see Starter Corp. v. Convers, Inc.*, 170 F.3d 286, 198 (2d Cir. 1999); *Vt. Structural Slate co. v. Tatko Bros. Slate Co.*, 253 F.2d 29, 29–30 (2d Cir. 1958).

Finally, Plaintiffs are not entitled to an injunction prohibiting "Defendants from withdrawing, cancelling, delaying, rescinding, or withholding federal funding from Plaintiffs without constitutional and statutory authority" because it would be overbroad. This case has involved whether the Secretary can terminate the VPPP Agreement on the bases that he has articulated, or on the basis of Section 200.340(a)(4), under the VPPP itself, or by his sovereign authority. Since the Court has vacated the February 19 Letter and the April 21 Letter, Defendants would have no lawful right to take action on the basis of them. *See Ass'n of Am.*

---

[45] Plaintiffs point the Court toward the decision in *New York v. U.S. Dep't of Com.*, 351 F. Supp. 3d 502 (S.D.N.Y. 2019), in which the court entered an injunction alongside vacatur even though "vacatur of [the agency] decision undoubtedly goes a long way toward redressing Plaintiffs' injuries." *Id.* at 676. It did so because (1) "in the absence of an injunction," the agency could "theoretically reinstate his decision" by taking the exact same action, and (2) "an injunction will make it easier for Plaintiffs to seek immediate recourse from this Court in the event that Defendants seek to do anything inconsistent with this Opinion." *Id.* There is no similar need to enter a permanent injunction here. Unlike in *Department of Commerce*, there is no "looming . . . deadline" in this case that necessitates "immediate recourse." 351 F. Supp. 3d at 676; *see New York v. Wolf*, 2021 WL 185190, at *2 (S.D.N.Y. Jan. 19, 2021) (distinguishing *Department of Commerce* on the basis that there is no "looming deadline that necessitates giving Plaintiffs the ability to seek immediate recourse."); *Batalla Vidal v. Wolf*, 2020 WL 7121849, at *2 (S.D.N.Y. Dec. 4, 2020) ("Under normal circumstances, vacatur alone is the proper remedy for unlawful agency action and the 'Supreme Court has cautioned that a district court vacating an agency action under the APA should not issue an injunction unless doing so would have a meaningful practical effect independent of its vacatur.'" (quoting *O.A. v. Trump*, 404 F. Supp. 3d 109, 153–54 (D.D.C. 2019))).

*Univ. v. Nat'l Sci. Found.*, 788 F. Supp. 3d 106, 143 (D. Mass. 2025) (where "vacatur voids and rescinds the policy itself . . . [e]njoining Defendants from implementing or enforcing that policy that has been vacated would be duplicative.").  This case has raised issues regarding the February and April letters and the reasons asserted in those letters or now used to defend them.  Plaintiffs are not entitled to an injunction that would go beyond those issues.  *See Spin Master Ltd. v. 158*, 463 F. Supp. 3d 348, 382 (S.D.N.Y. 2020) (it is a "fundamental principle" that "injunctive relief should be narrowly tailored to fit specific legal violations." (quoting *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994))).

## CONCLUSION

Plaintiffs' motion for partial summary judgment is GRANTED.  Defendants' motion for summary judgment is GRANTED in part and DENIED in part.  The Clerk of Court is directed to enter judgment in favor of Plaintiffs on Counts I, II, III, and IV of the Consolidated Second Amended Complaint, Dkt. No. 96, and to Intervenor Plaintiffs on Counts II, Dkt. No. 41.  Counts V, VI, IX, and X of Plaintiffs' Consolidated Second Amended Complaint and Count I of Intervenor Plaintiffs' complaint are dismissed.  The Clerk of Court is respectfully requested to enter judgment in favor of Defendants on Counts VII and VIII of Plaintiffs' Consolidated Second Amended Complaint and Counts III and IV of Intervenor Plaintiffs' Complaint.

The Clerk of Court is further respectfully requested to enter a declaratory judgment for Plaintiffs that the Secretary is permitted to terminate the VPPP Agreement only pursuant to the terms expressly stated therein, that the Defendants' termination of the VPPP Agreement was unlawful, and that any attempt to enforce the February 19 Letter or April 21 Letter would be unlawful.  Defendants may not terminate the VPPP Agreement under 2 C.F.R. § 200.340(a)(4), the incorporation of that provision through the *Christian* doctrine, under the Secretary's powers

contained within the VPPP itself, or the exercise of the Secretary's powers under the

unmistakability doctrine.

      The Clerk of Court is respectfully directed to close Dkt. Nos. 145, 151, 154, and 156.


      SO ORDERED.


Dated: March 3, 2026
     New York, New York

                                       LEWIS J. LIMAN
                             United States District Judge