**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DENISE DUNNE, TAMARA LASHCHYK, and RICHARD MANJARRES<br><br>Plaintiffs,<br><br>v.<br><br>METROPOLITAN TRANSPORTATION AUTHORITY and TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY<br><br>Defendants. | **Case No. 2:25-cv-18105-LMG** |

**STATEMENT OF INTEREST OF THE UNITED STATES UNDER 28 U.S.C. § 517**

# TABLE OF CONTENTS


PRELIMINARY STATEMENT .......... 1

BACKGROUND .......... 3

I. Statutory Background .......... 3

A. Toll Ban .......... 3

B. The Value Pricing Pilot Program .......... 3

C. The Interstate System and other Federal-aid highways .......... 4

II. The VPPP Agreement with Defendants .......... 5

III. Relevant Litigation .......... 6

DISCUSSION .......... 7

I. As the VPPP's plain text and neighboring Title 23 provisions make clear, the VPPP only permits tolling on the "Interstate System," rendering the Tolling Program unlawful because it tolls on highways not part of the Interstate System. .......... 8

A. The plain meaning of the VPPP only permits tolling on the "Interstate System," not on all Federal-aid highways. .......... 9

1. "Notwithstanding" Phrase .......... 9

2. "As part of" phrase. .......... 9

3. Absence of the word "only" .......... 9

B. Title 23 repeatedly differentiates between the broader "National Highway System" and the narrower "Interstate System," but the VPPP Statute Tolling Authority is limited to the "Interstate System." .......... 16

II. The Tolling Program is unlawfully operating outside the context of a federally-funded value pricing pilot program. .......... 18

CONCLUSION .......... 22

# TABLE OF AUTHORITIES

**Cases**

*Bethancourt Soto v. Soto*,
807 F. Supp. 3d 397 (D.N.J. 2025) .......... 17

*Biskupski v. Att'y Gen. of U.S.*,
503 F.3d 274 (3d Cir. 2007) .......... 8

*Cent. R Co of N.J. v. U S Pipe Line Co,*
1 F.2d 866 (3d Cir. 1924) .......... 20

*Chase v. United States*,
155 U.S. 489 (1894) .......... 20

*Cisneros v. Alpine Ridge Grp.*,
508 U.S. 10 (1993) .......... 10

*Dobrek v. Phelan*,
419 F.3d 259 (3d Cir. 2005) .......... 19

*Dunn v. Commodity Futures Trading Comm'n,*
519 U.S. 465 (1997) .......... 12

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) .......... 15

*FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd*,
146 S. Ct. 1546 (2026) .......... 8, 12

*Hallstrom v. Tillamook County*,
493 U.S. 20 (1989) ..........11, 12

*In re Crumbs Bake Shop, Inc.*,
522 B.R. 766 (Bankr. D.N.J. 2014) .......... 15

*Ins. Fed. Crop Ins. Corp. v. Merrill*,
332 U.S. 380 (1947) .......... 20

*Lamie v. U.S. Trustee*,
540 U.S. 526 (2004) .......... 8

*Leiter v. United States*,
271 U.S. 204 (1926) .......... 19, 20

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
523 U.S. 26 (1998) .......... 21

*Liberty Glob., Inc. v. Comm'r*,
153 F.4th 966 (10th Cir. 2025) ....................11

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .................... 16

*M.A. ex rel. E.S. v. State–Operated Sch. Dist.*,
344 F.3d 335 (3d Cir. 2003) .................... 16

*Mach Mining, LLC v. Equal Emp. Opportunity Comm'n*,
575 U.S. 480 (2015) .................... 21

*Maine Cmty. Health Options v. United States*,
590 U.S. 296 (2020) .................... 22

*Matter of Carpe Diem 1969 LLC,*
No. 2017-56, 2019 WL 3413841 (D.V.I. July 29, 2019)....................

*Matter of Nobelman*,
968 F.2d 483 (5th Cir. 1992) .................... 16

*Matter of Nobelman*,
508 U.S. 324 (1993) .................... 16

*Mejia De Goico v. U.S. Citizenship & Immigr. Serv.*,
No. 2:23-cv-00812, 2024 WL 3064692 (D.N.J. June 20, 2024) .................... 14

*Memory Integrity, LLC v. Intel Corp.*,
No. 3:15-cv-00262, 2016 WL 1122718 (D. Or. Mar. 22, 2016).................... 15

*Metro. Transp. Auth. v. Duffy*,
--- F. Supp. 3d ---, 2026 WL 588117 (S.D.N.Y. 2026).................... 7

*Mulgrew v. U.S. Dep't of Transp.*,
750 F. Supp. 3d 171 (S.D.N.Y. 2024).................... 5, 6

*New Jersey v. United States Dep't of Transp.*,
761 F. Supp. 3d 729 (D.N.J. 2024).................... 6

*Popa v. Harriet Carter Gifts, Inc.*,
52 F.4th 121 (3d Cir. 2022) .................... 14

*Ross v. Blake*,
578 U.S. 632 (2016) .................... 8

*Salazar v. Ramah Navajo Chapter*,
567 U.S. 182 (2012).................... 22

*Sec'y of Def. v. Pratt & Whitney*,
160 F.4th 1224 (Fed. Cir. 2025) .......... 19, 20

*Stenberg v. Carhart,*
530 U.S. 914 (2000) .......... 8

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001) .......... 11

*U.S. Sec. & Exch. Comm'n v. Vuuzle Media Corp.*,
No. 2:21-cv-01226, 2022 WL 577968 (D.N.J. Feb. 14, 2022) .......... 15

*United States v. Nasir*,
17 F.4th 459 (3d Cir. 2021) .......... 13, 14

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) .......... 17

**Statutes**

23 U.S.C. § 103(b)(2) .......... 5, 9

23 U.S.C. § 103(c) .......... 9

23 U.S.C. § 109(c) .......... 17, 18

23 U.S.C. § 113 .......... 18

23 U.S.C. § 120(e) .......... 18

23 U.S.C. § 129 .......... 21

23 U.S.C. § 129(a)(5) .......... 21

23 U.S.C. § 129(d)(6) .......... 17, 18

23 U.S.C. § 149 .......... 3, 4

23 U.S.C. § 301 .......... *passim*

23 U.S.C § 101(a) .......... *passim*

28 U.S.C. § 517 .......... 1

An Act to Revise Title 23, Pub. L. No. 85–767, 72 Stat. 885 (1958) .......... 3

Federal-aid Highway Act, Pub. L. 90-495, 82 Stat. 815 (1968) .......... 18

Federal Highway Act, Pub. L. No. 67-87, 42 Stat. 212 (1921) .......... 3

Intermodal Surface Transportation Efficiency Act of 1991, Pub. L. No. 102-240, § 1012(b), 105 Stat. 1914 (codified as amended at 23 U.S.C. § 149 note) ........................................ *passim*

Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users, § 1604(a), Pub. L. No. 109-59, 119 Stat 1144 (2005) ............................................................ 22

Transportation Equity Act for the 21st Century, Pub. L. No. 105-178, § 1216(a), 112 Stat. 107 (1998) ............................................................................................... 3, 4, 5

Temporary Surface Transportation Extension Act of 2012, § 101, Pub. L. No. 112-140, 126 Stat 391 ............................................................................................................ 22

**Other Authorities**

HA Lloyd, *Law's "Way of Words": Pragmatics and Textualist Error*, 49 Creighton L. Rev. 221 (2016) ............................................................................... 15

Library of Congress, *United States Code: Federal-aid Highways, 23 U.S.C. §§ 101-131 (1958)*, https://www.loc.gov/resource/uscode.uscode1958-005023001/?pdfPage=9

*Notwithstanding*, Merriam-Webster, https://www.merriam-webster.com/dictionary/notwithstanding .............................................. 10

U.S. Dep't of Transp., Fed. Highway Admin., *Report on the Value Pricing Pilot Program through May 2009* (2009), https://rosap.ntl.bts.gov/view/dot/53671 ........................ 16

**PRELIMINARY STATEMENT**

In its final weeks, the Biden Administration purported to authorize New York to impose tolls on drivers who wish to travel below 61st Street in Manhattan. The Trump Administration, however, has concluded that this "cordon pricing" program imposes a disproportionate financial hardship on low- and medium-income hardworking American drivers for the benefit of high-income drivers, and that it has inflicted serious harm on New York residents and those from other States who drive into Manhattan. Under this Administration, the Department of Transportation ("DOT") has sought to terminate the Value Pricing Pilot Program ("VPPP") Agreement to address these policy concerns and certain legal deficiencies, and it is engaged in ongoing litigation with respect to this effort. *See Metro. Transp. Auth. v. Duffy*, No. 26-1213 (2d Cir.). In addition, DOT has now concluded that its prior grant of authority to New York violated the governing statute for reasons that are relevant to this case. The United States submits this Statement of Interest to explain those reasons and to address Defendants' effort to continue a tolling program that violates federal law.[1]

For more than a century, federal law has broadly prohibited tolls on federally funded highways absent a specific statutory exception. Congress created a narrow exception in the VPPP Statute, which permits DOT to enter into cooperative agreements with State and local governments to establish, maintain, and monitor federally funded value pricing pilot programs, and which allows the Secretary to authorize tolling on the "Interstate System" as part of such a program. In November 2024, New York entered into a VPPP Agreement with the prior administration that

[1] 28 U.S.C. § 517 authorizes the Attorney General to attend to the interests of the United States as a non-party in any suit pending in a court of the United States.

purported to authorize the Manhattan cordon pricing program.[2] But both the VPPP Agreement and the resulting Tolling Program violate the plain terms of the VPPP Statute in, as relevant here, two independent respects.

First, the VPPP Statute permits tolling only on the "Interstate System," not on all Federal-aid highways. Yet New York's Tolling Program imposes tolls entirely on Federal-aid highways outside the Interstate System. The VPPP Agreement and the resulting Tolling Program are thus in violation of the plain terms of the VPPP Statute. Defendants attempt to avoid that straightforward conclusion by asking this Court to depart from the statutory text and infer a sweeping and unstated exception to the broad ban on tolls. Their arguments violate multiple statutory interpretation principles by extracting incomplete phrases from their statutory context, disregarding ordinary rules of grammar and linguistics, attributing significance to provisions that have nothing to do with authorizing tolling, and inferring unstated legislative intent.

Second, the VPPP Statute permits the Secretary to authorize tolling only "as part of" a value pricing project that receives federal funding. But here, DOT under the prior administration gave New York standalone tolling authority that was untethered to any federally funded project, even though DOT has no legal authority to grant a general waiver of the tolling prohibition beyond those means expressly granted by Congress.

The United States recognizes that these legal positions are contrary to positions previously taken by DOT, including with respect to the New York project and other VPPP projects. Upon reexamination, however, DOT has concluded that its prior positions were incorrect, and that the

[2] The parties to the VPPP Agreement include the New York State Department of Transportation, the Triborough Bridge and Tunnel Authority, and the New York City Department of Transportation. For purposes of convenience, these entities are referred to collectively herein as "New York."

interpretations set forth in this filing are the only ones that faithfully follow the text of the statute and ensure that the VPPP Statute is not applied in an overly broad way that circumvents the purposes of the general ban on tolling.

## BACKGROUND

### I. Statutory Background

#### A. Toll Ban

For over a century, states and localities have been prohibited from charging tolls on federally funded highways, subject to limited exceptions. *See* Federal Highway Act, Pub. L. No. 67-87, 42 Stat. 212 (1921) (enacting the first ban on tolls). Last amended in 1958, *see* Pub. L. No. 85–767, 72 Stat. 885 (1958), the current statute banning tolls on all Federal-aid highways provides: "Except as provided in section 129 of this title with respect to certain toll bridges and toll tunnels, all highways constructed under the provisions of this title shall be free from tolls of all kinds." 23 U.S.C. § 301. The term "highway" is defined broadly to include any "road," "street," or "parkway." *Id.* § 101(a)(11)(A).

#### B. The Value Pricing Pilot Program

In 1991, Congress enacted the "Congestion Pricing Pilot Program," which was later renamed the "Value Pricing Pilot Program (VPPP)."[3] Under the VPPP Statute, the Secretary of Transportation may, at his discretion, enter into cooperative agreements to "establish, maintain,

[3] Intermodal Surface Transportation Efficiency Act of 1991, Pub. L. No. 102-240, § 1012(b), 105 Stat. 1914, 1938 (ISTEA) (amended by Transportation Equity Act for the 21st Century, Pub. L. No. 105-178, § 1216(a), 112 Stat. 107, 211 (1998)) (codified as amended at 23 U.S.C. § 149 note (referred to as VPPP Statute)).

and monitor value pricing programs." VPPP Statute cl. 1. The statute provides that the "the Federal share payable for such programs shall be 80 percent" and requires the Secretary to

> fund all preimplementation costs and project design, and all of the development and other start up costs of such projects, including salaries and expenses, for a period of at least 1 year, and thereafter until such time that sufficient revenues are being generated by the program to fund its operating costs without Federal participation, except that the Secretary may not fund the preimplementation or implementation costs of any project for more than 3 years.

*Id.* cl. 2. The Secretary also must "monitor the effect of such programs," including on low-income drivers, and report to Congress the programs' effects. *Id.* cl. 5, 7.

The VPPP Statute provides a narrow exception to the general ban on tolls, providing that "the Secretary shall allow the use of tolls on the Interstate System as part of any value pricing pilot program under this section." *Id.* cl. 4; *see also* Pub. L. No. 105-178, §1216(a), 112 Stat. at 211 . As explained below, the plain language of this provision imposes two important limits: tolling may only be authorized "on the Interstate System," and only "as part of" the type of "value pricing pilot program" the statute describes.

C. The Interstate System and other Federal-aid highways

Congress has long distinguished between (1) the broader network of Federal-aid highways and (2) the Interstate System, which is only one component of that larger network. For example, in 1958, Congress used the term "Federal-aid System" as the umbrella term describing all Federal-aid highways. *See* Library of Congress, *United States Code: Federal-aid Highways, 23 U.S.C. §§ 101-131 (1958)*, https://www.loc.gov/resource/uscode.uscode1958-005023001/?pdfPage=9 (emphasis added) (Cong. Library Art.). At the time, the "Federal-aid System" consisted of three separate components: the primary system, the secondary system, and the interstate system. *Id.* So even then, Congress treated the Interstate System as just a piece of the larger Federal-aid System.

The same legislation that originally enacted the VPPP Statute further defined that distinction. As part of ISTEA, Congress in 1991 redefined the "Interstate System" as the "Dwight D. Eisenhower National System of Interstate and Defense Highways." *See* Pub. L. 102–240, §§ 1005I, 1006(a).

The "Interstate System" means the same as it did in 1991. *See* 23 U.S.C § 101(a)(12). The "National Highway System" means "the Federal-aid highway system," *id.* § 101(a)(16), which consists of urban and rural arterial routes, connector highways, strategic highway connectors, and strategic highways networks that may be "on or off the Interstate System," 23 U.S.C. § 103(b)(2). Most broadly, a "Federal-aid highway" can be any "public highway eligible for assistance under [chapter 1 of title 23] other than a highway functionally classified as a local road or rural minor collector." *Id.* § 101(a)(6). Using those definitions, under 23 U.S.C. § 301, any "public highway" other than "a highway functionally classified as a local road or rural minor collector", *id.* § 101(a)(6), "constructed under the provisions of [Title 23] shall be free from tolls of all kinds." 23 U.S.C. § 301. And within that ban for all "public highways" "constructed under the provisions of [Title 23]" is a narrow exception for a subset of public highways: the Interstate System. VPPP cl. 4; *see also* Pub. L. No. 105–178, §1216(a), 112 Stat. at 211

## II. The VPPP Agreement with Defendants

In April 2019, the New York State Legislature enacted the MTA Reform and Traffic Mobility Act, which directed the Triborough Bridge and Tunnel Authority ("TBTA") and Metropolitan Transportation Authority ("MTA") to establish certain "congestion pricing" projects in lower Manhattan. *Mulgrew v. U.S. Dep't of Transp.*, 750 F. Supp. 3d 171, 188 (S.D.N.Y. 2024). Despite prior congestion pricing proposals failing due to lack of political support, TBTA and MTA set out to implement a cordon pricing project in Manhattan called the Central Business District Tolling Program ("Tolling Program"). In general, cordon pricing charges drivers a fee to enter or

drive within a defined, cordoned area, typically a city center. In this case, TBTA and MTA aimed to charge drivers a fee to enter the Central Business District, which is primarily defined as the southern part of Manhattan, inclusive of 60th Street.

Because the Tolling Program involved tolling highways constructed with federal aid, New York sought federal authorization. *Id.* at 188, 191. The proposal garnered considerable controversy (including vocal opposition by then-candidate Trump).

In November 2024—after the presidential election but before the change in Administration—New York and the government entered into the VPPP Agreement at issue to allow New York to collect tolls on vehicles entering the Central Business District. *See* VPPP Agreement §§ (1), (5), (8), attached as Defs.' Ex. F, ECF 50-12. In addition to granting that federal permission, the VPPP Agreement provides that DOT and its subcomponent the Federal Highway Administration ("FHWA") will monitor and report on the Tolling Program and cooperate with New York. VPPP Agreement §§ (8), (11). In exchange, New York agreed to use revenues for other projects eligible under title 23, set particular toll rates, provide FHWA with annual audit results, adequately maintain the federally funded roads, make their records available for federal audits, and comply "with all Federal laws and requirements applicable to this project"—among other commitments. *See id.* §§ (2), (4), (6), (9)); *see id.* §§ (3), (7), (8). The Tolling Program went into effect on January 5, 2025.

As agreed to and as implemented, the Tolling Program imposes tolls on Federal-aid highways that are *not* part of the Interstate System, *see* Compl. ¶ 22 & Figs. 1, 2, and Defendants' motion to dismiss does not assert otherwise.

**III. Relevant Litigation**

The Tolling Program has provoked considerable litigation. *See, e.g.*, *New Jersey v. United States Dep't of Transp.*, 761 F. Supp. 3d 729, 736 (D.N.J. 2024); *Mulgrew*, 750 F. Supp. 3d at 195–

98; *Metro. Transp. Auth. v. Duffy,* --- F. Supp. 3d ---, 2026 WL 588117, at *1 (S.D.N.Y. 2026). In February 2025, DOT and FHWA sent the New York Governor a letter rescinding approval of the Tolling Program and providing notice of termination of the VPPP Agreement. *Duffy,* 2026 WL 588117, at *4–5, 29. New York sued in the Southern District of New York over that purported termination, and a court entered final judgment in favor of New York and intervenors. *Id.* at *68. DOT and FHWA have appealed that judgment to the Second Circuit. *See Metro. Transp. Auth. v. Duffy*, No. 26-1213 (2d Cir. May 4, 2026).

In December 2025, Plaintiffs here sued MTA and TBTA, asking this Court to "declar[e] that Defendants' 'congestion pricing' is illegal" and "enjoin[] Defendants from continued illegal collection of tolls under their 'congestion pricing' tolling program." *See* Compl., Prayer for Relief ¶¶ iii, iv, ECF 1. Plaintiffs first argue that Defendants' Tolling Program is illegal because Defendants are tolling on Federal-aid highways that are not part of the Interstate System. *Id.* ¶ 72. Plaintiffs separately argue that Defendants' Tolling Program is illegal because Defendants have not met "the VPPP's express federal funding requirement to which any VPPP program is expressly subject." *Id.* ¶ 73. Defendants have now moved to dismiss Plaintiffs' complaint. *See* Defs.' Mot. to Dismiss, ECF 50; Mem. of Law ISO Mot. to Dismiss, ECF 50-1 ("Defs.' Br.").

**<u>DISCUSSION</u>**

Federal statutes should be followed. And federal and state officials cannot validly agree to disregard the plain terms of a statute to achieve a desired policy outcome. The United States submits this Statement of Interest to support two arguments advanced by Plaintiffs here: (1) that New York is operating unlawful tolling on Federal-aid highways that are not part of the Interstate

System; and (2) that the Tolling Program is unlawful because it is not part of a federally-funded value pricing project.[4]

**I. As the VPPP's plain text and neighboring Title 23 provisions make clear, the VPPP only permits tolling on the "Interstate System," rendering the Tolling Program unlawful because it tolls on highways not part of the Interstate System.**

This case presents pure statutory interpretation questions. In interpreting statutes, courts begin with the text, *see Ross v. Blake*, 578 U.S. 632, 638 (2016), because "[i]nterpretation must be driven by 'analysis of the statute' rather than 'psychoanalysis of Congress,'" *FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd*, 146 S. Ct. 1546, 1558-59 (2026) (citation omitted). Where "a statute includes an explicit definition, [courts] must follow that definition[.]" *Biskupski v. Att'y Gen. of U.S.*, 503 F.3d 274, 280 (3d Cir. 2007) (quoting *Stenberg v. Carhart,* 530 U.S. 914, 942 (2000)). And when the text of the governing statute is plain, that is where the inquiry begins and ends; the only thing left for courts to do at that point is "enforce [the statute] . . . according to its terms." *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004).

The relevant statutory text here is plain and unambiguous. Starting with the broad ban on tolls: "all highways constructed" under Title 23 "shall be free from tolls of all kinds," unless an exception applies. 23 U.S.C. § 301. Defendants here do not—and indeed cannot—dispute the broad reach of the toll ban, which reaches "all" Federal-aid highways. *See Matter of Carpe Diem 1969 LLC,* 2019 WL 3413841, at *6 (D.V.I. July 29, 2019) ("[T]here is no broader classification than the word 'all.'"). Title 23's broad ban on tolls thus governs unless a statutory exception applies.

No exception applies. The VPPP Statute authorizes tolling only on the "Interstate System." Congress has previously referred to all Federal-aid highways when it wished to do so, but it chose

[4] The United States does not take a position on any other issue or argument raised by the parties.

a narrower term here. Defendants are thus operating a purported value pricing pilot program that unlawfully imposes tolls on Federal-aid highways that are not part of the Interstate System.

A. <u>The plain meaning of the VPPP only permits tolling on the "Interstate System," not on all Federal-aid highways.</u>

The VPPP Statute states in relevant part that "Notwithstanding sections 129 and 301 of title 23 . . . the Secretary shall allow the use of tolls *on the Interstate System* as part of any value pricing pilot program under this subsection." VPPP Statute cl. 4 (emphasis added). The "Interstate System" is statutorily defined as the "the Dwight D. Eisenhower National System of Interstate and Defense Highways described in section 103(c)." 23 U.S.C § 101(a)(12). The Interstate System is distinct from and only a portion of the broader "National Highway System." The "National Highway System" is statutorily defined as the "the Federal-aid highway system," *id.* § 101(a)(16), which consists of urban and rural arterial routes, connector highways, strategic highway connectors, and strategic highways networks that may be "on or off the Interstate System," 23 U.S.C. § 103(b)(2). In sum, the "National Highway System" is a network of roadways (principal arterials, Interstate highways, strategic highway network, and intermodal connectors) and the "Interstate System" forms just a piece of the larger National Highway System.

In their motion to dismiss, Defendants acknowledge the statutory distinction between the National Highway System and the Interstate System. *See* Defs.' Br. at 20–21.[5] Defendants also acknowledge that, as part of their tolling program, they toll on Federal-aid highways not on the Interstate System. *See id.* This is dispositive: the VPPP Statute only allows highways in the "Interstate System" to be exempted from the ban on tolls. *See* VPPP Statute cl. 4. The VPPP Statute does not exempt all "Federal-aid highways" or the "National Highway System," even though Congress could have easily said as much if it wanted.

[5] Throughout this statement, the United States cites to ECF pagination at the top right corner.

With nothing else, Defendants ask this Court to conjure from silence an exception to the broad, statutorily mandated ban on tolls. In support of their theory, Defendants advance five arguments—none is consistent with the VPPP Statute's plain meaning.

***1. "Notwithstanding" Phrase***. Defendants seize on the phrase "notwithstanding section 301 of title 23," VPPP Statute cl. 4 (citation modified), arguing that the phrase by itself suspends Section 301's tolling ban for all Federal-aid highways. Defs.' Br. at 44–45. That reading is grammatically and legally wrong.

Grammatically, the phrase "notwithstanding section 301 of title 23" is a prepositional phrase, not a complete sentence. *See* Bryan Garner, *The Chicago Guide to Grammar, Usage, and Punctuation* 141–43 (2016). As a prepositional phrase, its meaning depends on the independent clause it modifies, which here is "the Secretary shall allow the use of tolls on the Interstate System[.]" VPPP cl. 4 (emphasis added). It does not negate all of section 301, but merely carves out from section 301 what follows. *See Notwithstanding*, Merriam-Webster, https://www.merriam-webster.com/dictionary/notwithstanding (defining the preposition as "despite").

Legally, as Defendants themselves acknowledge (*see* Defs.' Br. at 45), a "notwithstanding" clause "merely shows which provision prevails in the event of a clash—but does not necessarily denote a clash of provisions." Scalia & Garner, *Reading Law* § 13, at 126–28 (2012); *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993) (holding that a notwithstanding clause "signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions"). Here, the conflict between the VPPP Statute and § 301 is narrow. Section 301 prohibits tolls on all Federal-aid highways, while the VPPP Statute authorizes tolling on the "Interstate System." To that extent, § 301 yields to the VPPP Statute to permit tolling on the Interstate System when authorized by DOT. But the VPPP Statute says *nothing* about tolling on

Federal-aid highways *not* on the Interstate System. With no conflict, § 301 prohibits DOT and FHWA from authorizing any proposed value pricing pilot program that tolls on Federal-aid highways not on the Interstate System. *See Liberty Glob., Inc. v. Comm'r*, 153 F.4th 966, 972 (10th Cir. 2025) ("[T]he notwithstanding clause displaces the background rules—but only if two provisions conflict.").

*Liberty Global* confirms this point. There, the Tenth Circuit interpreted a tax provision stating that "notwithstanding any other provision of this chapter," certain gains from the sale of property would not be treated as U.S. sourced when the relevant amount was "equal to the lesser of the gain or the overall foreign loss account." *Id.* (quotation marks omitted). The taxpayer argued that the notwithstanding provision displaced the general sourcing rule for the entire value of a property sale. *Id.* The Tenth Circuit disagreed, explaining that the provision "limit[ed] its own applicability" to amounts only "equal to the lesser of the gain or the overall foreign loss account." *Id.* To read it otherwise, would have made "much of the provision superfluous." *Id.*; *see also TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."); *Hallstrom v. Tillamook County*, 493 U.S. 20, 27 (1989) ("[W]e are not at liberty to create an exception where Congress has declined to do so.").

The same is true here. The language following the prepositional phrase limits the tolling authority (*i.e.*, the exception to the broader prohibition on tolling) to highways on the "Interstate System." Otherwise, much of the provision would be meaningless if the prepositional phrase were a blanket suspension of § 301. *See Andrews*, 534 U.S. at 31 ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (citation modified)).

***2. "As part of" phrase.*** Defendants next contend that Congress intended to permit tolling on all Federal-aid highways so long as the tolling was "part of a[] value pricing pilot program." *See* Defs.' Br. at 45–46 (quoting VPPP Statute cl. 4). At bottom, Defendants ask this Court to look past what the VPPP actually permits—tolling "on the Interstate System"—and instead infer a host of unstated exceptions from the inherent concept of a "value pricing pilot program." *Id.* at 44–46. But neither the text nor the facts support that theory.

The VPPP Statute directs the Secretary to permit tolling on the Interstate System and says nothing about any other category of Federal-aid highways. *See* VPPP Statute cl. 4. While Defendants appeal to a supposed legislative intent to allow broader tolling (Defs.' Br. at 44–45), "Congress expresses itself as a body through the text it enacts," *FS Credit*, 146 S. Ct. at 1558 , and the language used by Congress is the clearest guide of legislative intent, *Dunn v. Commodity Futures Trading Comm'n,* 519 U.S. 465, 474 (1997). Defendants' argument has no merit.

Nor does the phrase "as part of" alter that conclusion. That phrase identifies the program—a federally approved and federally funded value pricing pilot program—as part of which the tolling exception on the "Interstate System" operates. Take the following illustration. Suppose a mother tells her son: "You may not drive my car on highways. But today I'll allow you to drive my car on 'Highway A' as part of your trip to the grocery store." The son would be undoubtedly breaking the rules if, in addition to driving on Highway A, he drove on Highway B and Highway C merely because those roads were "part of" his trip to the grocery store. And driving even on Highway A would not be allowed for travel outside the permitted trip to the grocery store. The phrase "part of" identifies the broader undertaking of which the exception is a component; it does not expand the exception beyond its stated terms.

And even if one set aside the text and focused on the looser concept of a value pricing pilot program, Defendants' argument would still fail. The concept does not require tolling on non-interstate Federal-aid highways. The Secretary has approved numerous value pricing pilot projects that involve tolling only on the Interstate System. United States Ex. A, *Report on the Value Pricing Pilot Program Through April 2018*; United States Ex. B, *Fiscal Year (FY) 2022 Report to Congress on the Value Pricing Pilot Program (VPPP).* So Defendants' premise—that a value pricing pilot program is "impossible" unless tolling extends beyond the Interstate System—is simply wrong. *See* Defs.' Br. at 46.

***3. Absence of the word "only."*** Defendants then argue that tolling is permitted on all Federal-aid highways because "[c]lause 4 [of the VPPP Statute] does not say the Secretary shall allow the use of tolls 'only' on the Interstate System." Defs.' Br. at 44. But Congress had no need to use the word "only" to specify that tolling was only permitted on the Interstate System. The background rule already prohibits tolling on all Federal-aid highways unless an exception applies. *See* 23 U.S.C § 301. Clause 4 creates an exception for tolling "on the Interstate System." Once a general prohibition is in place, specifying a particular exception naturally leaves the prohibition intact everywhere else.

Although ordinary English usage and common sense are sufficient to dispose of Defendants' "only" argument, the *expressio unius* canon confirms the flaw in the argument. That canon holds that once Congress expressly identifies an exception, courts cannot infer additional exceptions. *See United States v. Nasir*, 17 F.4th 459, 471–72 (3d Cir. 2021) ("As a familiar canon of construction states, *expressio unius est exclusio alterius*: the expression of one thing is the exclusion of the other."). Applying that canon here, Congress in the VPPP Statute expressly created an exception to § 301 for tolling on the "Interstate System," which "implies the deliberate

exclusion" of any other exception. *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 128 (3d Cir. 2022). And when courts in this circuit have applied this canon and limited an exception to its stated terms, they have not required Congress to use the word "only" in the statute. *See, e.g.*, *id.* at 128 (applying the *expressio unius* canon to a list of statutory exceptions not preceded by the word "only" and rejecting "the broader exception the Defendants ask us to read into the statute"); *Nasir*, 17 F.4th at 472 (applying the *expressio unius* canon to a description of controlled-substance offenses not preceded by the word "only" and holding that the list excludes an offense not expressly included); *Mejia De Goico v. U.S. Citizenship & Immigr. Serv.*, 2024 WL 3064692, at *4 (D.N.J. June 20, 2024) (applying the *expressio unius* canon to a list of statutory exceptions not preceded by the word "only" and holding that "the enumerated exceptions constitute the entirety of the exceptions Congress intended to include"). By contrast, Defendants cite no authority for their position that the *expressio unius* canon only applies when Congress uses the word "only" before listing statutory exceptions.

***4. Other unrelated provision.*** Defendants then reach to Clause 8(B) of the VPPP Statute in search of a conflict that the statutory text does not contain. *See* Defs.' Br. at 46–47. Clause 8(B) directs the Secretary to "set aside" funds for "congestion pricing pilot projects that do not involve highway tolls." VPPP Statute cl. 8. Defendants claim that the Clause's reference to "highway tolls" conflicts with Clause 4's authorization of tolling on the "Interstate System" and somehow reveals an unstated congressional intent to permit tolling on all Federal-aid highways. *See* Defs.' Br. at 46–47. That argument fails.

First, there is no conflict. Defendant's reading of the statute is premised on the mistaken belief that congestion pricing pilot projects always involve tolls. But the VPPP statute includes projects with tolls and projects without tolls: DOT and FHWA have authorized many projects that

do not involve tolling. *See* Ex. A, 14-18, 22-26 (describing projects that did not involve tolling). Clause 8(B) directs the Secretary to "set aside" funds for these non-tolling projects. VPPP Statute cl. 8. Because Clause 8(B) speaks to an entirely different subset of projects than the Interstate tolling projects in Clause 4, the clauses do not conflict. *Compare* VPPP Statute cl. 8 *with* cl. 4.

Clause 8(B) has nothing to do with Clause 4. But even if it did, courts interpret statutes in context, not in isolation. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 121 (2000). And "[t]he 'harmonious-reading canon' teaches that '[t]he provisions of a text should be interpreted in a way that renders them compatible, not contradictory.'" *See U.S. Sec. & Exch. Comm'n v. Vuuzle Media Corp.*, 2022 WL 577968, at *7 n.8 (D.N.J. Feb. 14, 2022) (citing Scalia & Garner, *Reading Law* § 27, at 180)). With these interpretation principles in mind, Clauses 4 and 8 are not contradictory. Clause 4 specifically authorizes tolling on the Interstate System, and the Interstate System is, of course, a system of highways. *See* 23 U.S.C § 101(a)(12). Clause 8(B)'s reference to "highway tolls" is an anaphoric[6] reference to the interstate-highway tolls permitted in Clause 4. Thus, Defendants attempt to manufacture conflict when the text read in context is perfectly harmonious.

Second, even if the Court thought there was a conflict, "[a]n accepted principle of statutory construction is that the specific prevails over the general." *In re Crumbs Bake Shop, Inc.*, 522 B.R.

---

[6] Linguistically, an "[a]naphora refers to the relation between an anaphor and an antecedent, where the interpretation of the anaphor is determined via that of the antecedent." *Memory Integrity, LLC v. Intel Corp.*, 2016 WL 1122718, at *13 n.7 (D. Or. Mar. 22, 2016) (quotation marks omitted) (quoting Rodney Huddleston & Geoffrey Pullum, *The Cambridge Grammar of the English Language* 1453 (2002)). A law review article provides the following example: "He's been to Italy many times but he still doesn't speak the language." Context—namely, the antecedent reference to Italy—lets the reader understand that the anaphoric phrase "the language" refers to the "Italian language." *See* HA Lloyd, *Law's "Way of Words": Pragmatics and Textualist Error*, 49 Creighton L. Rev. 221, 272–73 (2016). So too here. Context—the antecedent reference to the "Interstate System"—lets the reader understand "highway tolls" as referring to tolls on Interstate System highways.

766, 777 (Bankr. D.N.J. 2014); *see also Matter of Nobelman*, 968 F.2d 483, 488 (5th Cir. 1992) ("General language of a statute does not prevail over matters specifically dealt with in another part of the same enactment"), *aff'd,* 508 U.S. 324 (1993); Scalia & Garner, *Reading Law* § 28, at 183 (same). So the VPPP Statute's specific authorization of tolling on the "Interstate System" prevails over the general, tangentially related reference to funding set-asides.

***5. Prior unreasoned agency interpretation.*** With little left to support their theories, Defendants turn to the prior position of FHWA and DOT. It is true that FHWA and DOT previously took the position that the VPPP authorized tolling on all Federal-aid highways, even though the statute nowhere says that. *See, e.g.*, U.S. Dep't of Transp., Fed. Highway Admin., *Report on the Value Pricing Pilot Program through May 2009* (2009).[7] But where, as here, an agency's interpretation conflicts with a statute's unambiguous text, courts owe no deference to that interpretation. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400–01 (2024). Nor does the agencies' prior interpretation carry any persuasive force. Defendants identify no instance—and the United States is not aware of any—where DOT or FHWA offered any reasoned explanation for its position. Since the weight due a federal-agency interpretation depends on its "thoroughness," "the validity of its reasoning," and "all those factors which give it power to persuade," *Loper Bright*, 603 U.S. at 388, the agencies' previous unreasoned position deserves little, if any, weight.[8]

---

[7] Available at https://rosap.ntl.bts.gov/view/dot/53671.

[8] Defendants also assert that because "Congress . . . elected to include the words 'Interstate System' in the titles of [certain other] pilot programs," the Court is somehow supposed to create a statutory exception from the mere absence of "Interstate System" in the VPPP Statute's title. *See* Defs.' Br. at 48. But it is a "well-settled rule of statutory interpretation that titles and section headings cannot limit the plain meaning of statutory text where that text is clear." *M.A. ex rel. E.S. v. State–Operated Sch. Dist.*, 344 F.3d 335, 348 (3d Cir. 2003).

B. Title 23 repeatedly differentiates between the broader "National Highway System" and the narrower "Interstate System," but the VPPP Statute Tolling Authority is limited to the "Interstate System."

Courts also interpret the words of statutes "in their context and with a view to their place in the overall statutory scheme." *Bethancourt Soto v. Soto*, 807 F. Supp. 3d 397, 404 (D.N.J. 2025) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014)). The broader structure of Title 23 reinforces that the VPPP Statute only permits tolling on the "Interstate System."

Start with 23 U.S.C. § 129(d)(6), which likewise creates an exception to the general tolling prohibition by permitting tolling on the "Interstate System" as part of a congestion relief program. Defendants contend that the VPPP Statute should be interpreted consistently with § 129(d)(6). *See* Defs.' Br. at 47. The United States agrees. But FHWA has interpreted the congestion relief program under § 129(d)(6) to permit tolling only on the Interstate System—not on all Federal-aid highways. *See* FHWA, Frequently Asked Questions Congestion Relief, attached as United States' Ex. C (Q35: answering "No" to the question "Does the Congestion Relief Program provide Federal tolling authorizations for tolling off the Interstate system?"). That interpretation flows naturally from the plain text that, like the VPPP Statute, only mentions the "Interstate System." The VPPP Statute should thus be read the same way.

The rest of Title 23 reinforces this reading. Throughout the statutory scheme, Congress carefully differentiates between (1) the narrower "Interstate System" and (2) the broader umbrella terms "National Highway System" or all "Federal-aid highways." The following are some examples:

- "A design for new construction, reconstruction, resurfacing (except for maintenance resurfacing), restoration, or rehabilitation of a highway on the National Highway System (other than a highway also on the Interstate System) shall consider" certain listed criteria. 23 U.S.C. § 109(c).

- "Federal participation shall be permitted . . . in the . . . initial construction of 1 or more lanes or other improvements that increase capacity of a highway, bridge, or tunnel (other than a highway on the Interstate System)[.]" *Id.* § 129(a)(1)(B).
- "[T]he Secretary shall establish measures for States to use to assess the performance of the National Highway System (excluding the Interstate System)." *Id.* § 150(c)(3)(A)(ii)(V).

Congress knows the difference between the two terms. Indeed, Congress has even amended Title 23 when it wanted a provision to sweep broader than just the "Interstate System." For example, in 1958, 23 U.S.C. § 113 provided that the Secretary must pay "wages at rates not less than those prevailing" for "work performed on highway projects *on the Interstate System*." *See* Cong. Library Art.(emphasis added). But in 1968, Congress amended that provision to instead cover "work performed on the Federal-aid systems."[9] *See* Federal-aid Highway Act, Pub. L. 90-495, 82 Stat. 815, 815-36 (1968), available at https://www.congress.gov/90/statute/STATUTE-82/STATUTE-82-Pg815.pdf.

And when Congress wants to include all Federal-aid highways and at the same time emphasize that the "Interstate System" is included, it references both. The following are examples:

- "The Federal share payable for any repair or reconstruction provided for by funds made available under section 125 for any project on a Federal-aid highway, including the Interstate System, shall not exceed the Federal share payable[.]" 23 U.S.C. § 120(e).
- "It is declared to be in the national interest to encourage and develop the actual and potential capacity of small business and to utilize this important segment of our economy to the fullest

[9] As explained in Part I.C. of the Background, Congress in 1958 used the phrase "Federal-aid System" to describe all Federal-aid highways. In 1991, as part of ISTEA, Congress began using the phrase "National Highway System" to describe all Federal-aid highways.

practicable extent in construction of Federal-aid highways, including the Interstate System."

*Id.* § 304.

So Defendants' suggestion that Congress used the term "Interstate System" only to emphasize its inclusion while somehow silently encompassing all Federal-aid highways is inconsistent with how Congress has drafted throughout Title 23. *See* Defs.' Br. 50–51.

Defendants' reading of the VPPP Statute is thus incompatible with the larger Title 23 scheme, in addition to the VPPP Statute's plain meaning. By contrast, the United States' and Plaintiffs' reading reflects the VPPP Statute's plain, unambiguous meaning. And "[t]he inquiry ends if the statutory language is unambiguous and the statutory scheme is coherent and consistent." *Dobrek v. Phelan*, 419 F.3d 259, 263 (3d Cir. 2005).

## II. The Tolling Program is unlawfully operating outside the context of a federally-funded value pricing pilot program.

An independent issue here is that New York, along with DOT under the prior Administration, improperly relied on a single provision of the VPPP Statute rather than complying with the statute as a whole. The VPPP Statute principally authorizes DOT to enter into cooperative agreements to "establish, maintain, and monitor" federally-funded value pricing pilot programs. Clause 4 of the Statute—which permits DOT to allow tolling "as part of" such a program—is ancillary to the broader statutory scheme. The clause does not provide an exception to the tolling ban for just *any* project, but only for a federally-funded value pricing pilot program, as described by other clauses of the statute. Here, however, DOT and New York entered into an agreement that allowed tolling for a non-federally-funded project that was not consistent with the statute.

When an agreement and resulting program does not satisfy the statutory criteria governing its formation, the agreement and program are unauthorized. *Cf. Sec'y of Def. v. Pratt & Whitney*, 160 F.4th 1224, 1233 (Fed. Cir. 2025); *Leiter v. United States*, 271 U.S. 204, 206–07 (1926); *Ins.*

*Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 385 (1947). The VPPP Agreement and resulting Tolling Program fall into that category.

In *Pratt & Whitney*, the government entered into an agreement "under authority" of federal acquisition regulations. 160 F.4th at 1233. But the agreement violated those regulations. *Id.* at 1233–34. The Federal Circuit held that the agreement was invalid because the government official lacked authority to enter into such an agreement in violation of governing regulations. *Id.*

In *Leiter*, the Supreme Court held that a lease with the United States for a term of years was unenforceable because it was made without any specific authority of law and entered into when there was no appropriation available for the payment of rent after the first year. 271 U.S. at 206–07. The Court determined that the lease violated a federal statute that provided, "No contract or purchase on behalf of the United States shall be made, unless the same is authorized by law or is under an appropriation adequate to its fulfillment." *Id.* (citing Section 3732 of the Revised Statutes). The Supreme Court thus held that the lease "created no binding obligation against the United States after the first year." *Id.*; *see also Chase v. United States*, 155 U.S. 489, 503 (1894) (holding that a lease issued without congressional funding "was not authorized by law, and consequently no action can be maintained thereon").

And in *Merrill*, the Supreme Court held that a government representation that certain crops were government insurable was not enforceable, because such a representation violated the requirements in an agency regulation. 332 U.S. at 385. The Court reasoned that "'[parties] must turn square corners when they deal with the Government,'" because courts have a duty to "observe the conditions defined by Congress[.]" *Id.*; *see also Cent. R Co of N.J. v. U S Pipe Line Co,* 1 F.2d 866, 870 (3d Cir. 1924) (holding that courts should not "sanction" contracts that violate federal law).

The VPPP Agreement and resulting Tolling Program here violated the requirements of the VPPP Statute. The VPPP Statute grants authority to the Secretary of Transportation to enter into cooperative agreements with state and local government for value pricing pilot programs, and it only permits the Secretary to allow tolling "as part of" such a program. *See* VPPP Statute cl. 1, 4. And the parties to the VPPP Agreement here invoked the VPPP Statute as the VPPP Agreement's sole source of authority. *See* VPPP Agreement §§ (1), (5), (8). Accordingly, only if the VPPP Agreement pertained to a statutorily-compliant value pricing pilot program was tolling authority validly given.

New York's cordon pricing program is *not* a statutorily-compliant value pricing pilot program because it does not receive any Federal funding. The VPPP Statute requires that "[n]otwithstanding sections 129 and 301 of title 23, the Federal share payable for such programs shall be 80 percent" and that DOT "shall fund all preimplementation costs and project design, and all of the development and other start up costs of such projects[.]" VPPP Statute cl. 2. The word "shall" in a statute indicates a command; what follows the word "shall" is "mandatory, not precatory." *Mach Mining, LLC v. Equal Emp. Opportunity Comm'n*, 575 U.S. 480, 486 (2015); *see also Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) (observing that "shall" typically "creates an obligation impervious to . . . discretion").

Nor can the statute be read as merely setting a *cap* on federal funding. The *general* provision at 23 U.S.C. § 129 sets a cap, stating that "the Federal share payable for [tolling projects] shall be a percentage determined by the State, but not to exceed 80 percent." 23 U.S.C. § 129(a)(5). But Clause 2 of the VPPP Statute provides an *exception* to that provision, stating that "[n]otwithstanding section[] 129 . . . of title 23, the Federal share payable shall be 80 percent." Thus, the VPPP Statute requires that the Federal share be *exactly* 80 percent.

It is undisputed that New York's cordon pricing project does not receive any Federal funding. Indeed, Congressional authorization of appropriations for value pricing pilot programs stopped more than a decade before New York and DOT signed the VPPP Agreement.[10] Thus, the project is not the kind of value pricing pilot program for which DOT can validly authorize tolling under the VPPP Statute. The VPPP Agreement and resulting Tolling Program are thus unlawful.

The Supreme Court's decisions in *Maine Cmty. Health Options v. United States*, 590 U.S. 296 (2020) and *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182 (2012), do not require a different result. In *Maine Community*, the Supreme Court addressed whether the government remained obligated to pay amounts that a statute required it to pay, even though Congress failed to appropriate sufficient funds. 590 U.S. at 300–01. The Court held that the government was still obligated. *Id.* Similarly, in *Salazar*, the Supreme Court considered whether the government was required to honor its contractual obligations despite Congress's failure to appropriate sufficient funds to satisfy the contract. 567 U.S. at 189–96. The Court again held yes, that the government was still obligated under the contract. *Id.*

But those holdings do not apply here, because this case asks not whether DOT must pay the amount required by statute or by contract, despite a lack of federal funding. Rather, the issue here is whether—given the undisputed fact that DOT has *not* agreed to provide any funding for New York's cordon pricing program—the program was eligible for a tolling authorization under the VPPP Statute. It was not. Neither *Maine Community* nor *Salazar* answers that question.

---

[10] *See* Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"), § 1604(a), Pub. L. No. 109-59, 119 Stat 1144 (2005) (authorizing appropriations); Temporary Surface Transportation Extension Act of 2012, § 101, Pub. L. No. 112-140, 126 Stat 391 (extending appropriations).

In the end, because the VPPP Agreement and resulting Tolling Program here did not satisfy the statutory criteria governing its formation, the Tolling Program is operating unlawfully. As with the "Interstate System" argument discussed above, the United States recognizes that this argument conflicts with DOT's prior practice. But again, that prior practice conflicted with the plain language of the statute.

## **CONCLUSION**

For the foregoing reasons: (1) the plain meaning of the VPPP Statute only permits tolling on the "Interstate System," not on all Federal-aid highways; and (2) the Tolling Program is unlawful because it is not the type of federally-funded value pricing pilot program for which the statute allows tolling.

Dated: August 14, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

CHARLES E.T. ROBERTS
Counsel to the Assistant Attorney General
Civil Division

STEPHEN M. ELLIOTT
Assistant Branch Director
Federal Programs Branch

*/s/ Michael Bruns*
Michael Bruns
Trial Attorney
Federal Programs Branch
Civil Division, Department of Justice
1100 L Street NW
Washington, DC 20005
Telephone: 202-514-4011
Email: Michael.bruns@usdoj.gov

# Exhibit A

# Report on the Value Pricing Pilot Program Through April 2018

U.S. Department of Transportation
Federal Highway Administration

## EXECUTIVE SUMMARY

Congestion pricing works by shifting some rush hour highway travel to other transportation modes or off-peak periods and by encouraging solo drivers to carpool or forgo making a trip altogether. By removing a fraction (even as small as 5 percent) of the vehicles from a congested roadway, pricing enables the traffic to flow much more efficiently, allowing more vehicles to move through the same physical space.[1]

***Congestion pricing encompasses tolling and non-tolling strategies that can reduce peak period congestion by charging motorists new or higher fees for use of roads and parking during peak times to encourage drivers to shift to other travel modes, routes, or destinations; to travel at other times of the day; or to forgo making the trip altogether.***

Although drivers unfamiliar with the concept initially have questions and concerns, drivers who are more experienced with congestion pricing usually support it because it offers them a reliable trip time. Transit and ridesharing advocates also appreciate the ability of congestion pricing projects to generate revenue and the financial incentives that make alternatives to driving more attractive.

The U.S. Congress established the Congestion Pricing Pilot Program in 1991. It was subsequently renamed the Value Pricing Pilot Program (VPPP) under Section 1216(a) of the Transportation Equity Act for the 21st Century (TEA-21) in 1998 and continued through the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU). The VPPP purpose is to demonstrate whether, and to what extent, roadway congestion may decrease through the application of demand-based pricing strategies. Seeking to measure the impact of such policies on driver behavior, traffic volumes, transit ridership, air quality, and availability of funds for transportation programs, the original program included discretionary grants funding for demonstration projects. The program awarded approximately $65 million in discretionary grant funds between 2008 and 2012, after which no additional discretionary grant funds were authorized. However, since 2012, the United States Department of Transportation (DOT) has retained the ability to grant States authority to enter into cooperative agreements for projects that require tolling authority under this program.

Although the Federal Highway Administration (FHWA) no longer actively solicits VPPP projects, States and local governments continue to explore value pricing and the potential of deploying tolling strategies with FHWA. The FHWA staff continues to provide significant technical assistance to all project partners for project development, implementation, and pre-implementation activities. The FHWA staff also oversees the development and distribution of quarterly reports detailing VPPP accomplishments.

---

[1] *Congestion Pricing – A Primer: Overview,* U.S. Department of Transportation, Federal Highway Administration, October 2008, http://ops.fhwa.dot.gov/publications/fhwahop08039/cp_prim1_00.htm.

**Key Findings**

Through a comprehensive Congestion Pricing Program that includes the VPPP, as well as follow-on initiatives, such as the Congestion Reduction Demonstrations (CRD), Urban Partnership Agreements (UPA), and Express Lanes Demonstration programs, FHWA has now funded more than 135 congestion pricing projects and studies across 21 States and the District of Columbia. The VPPP-supported projects demonstrate the technical feasibility of congestion pricing and, where implemented, have influenced user decisions to change their travel behavior. The VPPP projects and studies have provided many valuable lessons, with several findings demonstrating the significant progress made in the past few years toward successful deployment of comprehensive congestion pricing strategies and programs, especially in congested urban areas:

- The VPPP helped to spark a rapid increase in priced managed lane deployments and the continued acceptance and deployment of this strategy in major metropolitan areas across the United States. During the late 1990s, only four priced managed lane facilities operated in the United States. Very few transportation professionals had experience with implementing and operating congestion pricing on managed lanes. However, as of April 2018, 47 corridors nationwide operate with priced managed lanes, with an additional 23 managed lane projects under construction. All VPPP projects with High-Occupancy Toll lanes have experienced a marked increase in new accounts/transponders, tolled trips, and gross revenues, all of which are indicative of the public's growing acceptance of pricing.

- Pricing can have a positive effect on transit ridership. Express buses using tolled lanes had faster speeds and shorter travel times. For example, the 95 Express in Miami, Florida, added express bus service for both Miami-Dade and Broward Counties, including 22 new articulated buses and 10 new express routes from Broward County to Downtown Miami. Average express bus ridership before the 95 Express Project was 1,746 passengers per day and, as of July 2017, average ridership increased 323 percent to 5,645 riders per day.

- The VPPP created interest and enabled deployment opportunities within congested urban areas for other demand-based pricing strategies, broadening the incorporation of non-driving transportation alternatives. The deployment of non-toll congestion pricing strategies—such as parking pricing, pay-as-you-drive insurance, car sharing, bike sharing, and dynamic ridesharing—has grown and experienced further successes. As an illustration, the goBerkeley Travel Demand Management (TDM) Program survey results showed an overall 3.1 percent reduction in automobile use, with 94 percent of participants reporting that they were walking more, 90 percent indicating that they had increased transit use, and 19 percent stating they were biking more. Among almost 500 Easy Pass program participants, 82 percent said they upped Alameda Contra-Costa Transit use because they had the pass, and nearly half said they deployed their pass at least twice a week. The carshare program included 15 businesses and over 60 participants. Results indicated that more than 10 percent of participants used carsharing as a new travel alternative.

- Efforts to integrate value pricing with parking have led to increased usage of previously underutilized parking spaces. Efficiently pricing parking spaces, as part of the SFpark pilot project in San Francisco, California, led to a gradual reduction of fully occupied blocks and the increasing occupancies for underutilized areas. Staff who led the LA Express Park project in Los Angeles, California, also observed a similar relationship in occupancy after the implementation of value pricing.

- Equity impacts have proven to be minimal, yet remain a concern to the public. In early 2018, the National Highway Cooperative Research Program (NCHRP) released research report 860: Assessing the Environmental Justice Effects of Toll Implementation or Rate Changes: Guidebook and Toolbox. The document shows the practitioner when and how to apply the tools in the toolbox that provide a framework to measure the impacts of tolling, as well as the means to engage low-income and minority population in the decision-making process.

- The VPPP has been a tremendous asset to partners in the transportation industry during the past two decades. Project partners often express their perspectives that priced managed lanes would not be as widespread without the program's influence. The program has enhanced the visibility of these projects, partly through its consistent involvement with industry forums, such as the Transportation Research Board (TRB), the American Association of State Highway and Transportation Officials (AASHTO), the International Bridge, Tunnel and Turnpike Association (IBTTA), and FHWA-sponsored workshops.

**Moving Forward**

The FHWA continues to regard congestion pricing as a critical congestion management tool. The FHWA anticipates that, in the future, connections between multiple demand-based pricing approaches will enhance the effectiveness of comprehensive and coordinated regional programs. Second-generation pricing approaches are likely to combine regionwide pricing strategies, such as vehicle miles traveled fees, cordon pricing, and regional pricing, along with a non-toll blueprint. The goals of these strategies are 1) mainstreaming demand-based pricing into the mindset of transportation professionals as a viable option, and 2) expanding public acceptance of demand-based pricing as one part of a suite of transportation choices. The FHWA will continue to use proven outreach strategies to educate and inform State and local agencies about demand-based pricing strategies, including tolling and non-tolling efforts.

# TABLE OF CONTENTS

**Chapter 1. Introduction .................................................................................................... 8**
Background .................................................................................................................... 8
Report Organization ...................................................................................................... 10
**Chapter 2. The Value Pricing Pilot Program: Project Updates .......................................... 11**
Projects and Studies in Progress .................................................................................. 13
*Projects Involving Tolls ............................................................................................. 13*
*Cordon/Area Charging and Build-Out of Express Lanes in Southern California ........................ 13*
*Projects Not Involving Tolls ........................................................................................ 14*
*BART Travel Incentives Pilot Project in San Francisco, California .......................................... 14*
*One-Way Electric Vehicle Carsharing in San Diego, California ................................................ 14*
*Multimodal Dynamic Parking Pricing in the District of Columbia .............................................. 16*
*Employer Benefit Design to Reduce Single-Occupant Vehicles in Kendall Square, Massachusetts ............ 16*
*Lake Tahoe Market Based Pricing, Lake Tahoe, Nevada ............................................................ 17*
*Park and Ride Pricing in Multifamily Developments in King County, Washington ..................... 18*
Projects Completed Since 2016 ..................................................................................... 19
*Projects Involving Tolls ............................................................................................. 19*
*Treasure Island Mobility Management Study in San Francisco, California ............................... 19*
*Feasibility of Pricing on I-84 in Hartford, Connecticut ............................................................ 19*
*Variable Pricing in I-95 Corridor from New York to New Haven, Connecticut .......................... 20*
*Influencing Travel Behavior, Sensitivity to Environmental Justice in Texas ............................... 21*
*SR 167 Express Toll Lanes Continuous Access Demonstration in Seattle, Washington .............. 22*
*Projects Not Involving Tolls ........................................................................................ 22*
*Residential Parking Management Project in San Francisco, California ..................................... 22*
*Parking Pricing and TDM in the City of Berkeley and UC Berkeley, California ........................ 23*
*Drive Smart Mobile Technology Pilot Program in New York, New York ................................... 24*
*PARK Smart in New York, New York ........................................................................................ 25*
*Getaround Peer-to-Peer Car Sharing Incentives, Portland, Oregon .......................................... 26*
Operational Projects ...................................................................................................... 26
*Projects Involving Tolls ............................................................................................. 26*
*I-680 SMART Carpool Lanes in Alameda County, California .................................................... 26*
*SR 237 Express Lanes Continuous Access Extension in Santa Clara County, California ............ 27*
*Priced Managed Lanes in Miami-Fort Lauderdale Region ........................................................ 28*
*HOT Lanes on I-394 in Minneapolis, Minnesota ...................................................................... 30*
*Interstate 35E MnPASS Managed Lanes Extension in Minneapolis, Minnesota ......................... 31*

*Priced Dynamic Shoulder Lanes in Minnesota* .......... *31*
*HOT Lanes on SR 167 in the Puget Sound Region* .......... *32*
*Variably Priced Tolls on SR 520 in Seattle, Washington* .......... *32*
**Chapter 3. Congestion Pricing Outreach and Technical Assistance Provided by the Federal Highway Administration .......... 33**
**Chapter 4. Conclusion .......... 35**
**Appendix A. VPPP Projects Funded Since 2008 .......... 37**
**Appendix B. Annotated List of Technical Resources .......... 40**

**LIST OF ACRONYMS AND ABBREVIATIONS.**

AASHTO – American Association of State Highway and Transportation Officials
AC Transit – Alameda-Contra Costa Transit District
AET – All Electronic Tolling
BART – Bay Area Rapid Transit
Caltrans – California Department of Transportation
CCTV – Closed-Circuit Television
CTRMA – Central Texas Regional Mobility Authority
ConOps – Concept of Operations
CRD – Congestion Reduction Demonstrations
CTDOT – Connecticut Department of Transportation
DDOT – District of Columbia Department of Transportation
EA – Environmental Assessment
FAST – Fixing America's Surface Transportation Act
FY – Fiscal Year
FDOT – Florida Department of Transportation
FHWA – Federal Highway Administration
GHG – Greenhouse Gas
HOT – High-Occupancy Toll
HOV – High-Occupancy Vehicle
IBTTA – International Bridge, Tunnel, and Turnpike Association
ICPP – Integrated Congestion Pricing Plan
MIT – Massachusetts Institute of Technology
Metro – Los Angeles County Metropolitan Transit Authority
MAP-21 – Moving Ahead for Progress in the 21st Century Act
MnDOT – Minnesota Department of Transportation
MTC – Metropolitan Transportation Commission of the San Francisco Bay Area
NCHRP – National Cooperative Highway Research Program
NYCDOT – New York City Department of Transportation
NCTCOG – North Central Texas Council of Governments
OBD – On-Board Diagnostics
ODOT – Oregon Department of Transportation
OTREC – Oregon Transportation Research and Education Consortium
PAYD – Pay-As-You-Drive
P2P – Peer-to-Peer
PBOT – Portland Bureau of Transportation
RPP – Referral Partnership Program
RTR – Real-Time Ridesharing
SAFETEA-LU – Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users
SBCAG – Santa Barbara County Association of Governments
SCAG – Southern California Association of Governments
SFCTA – San Francisco County Transportation Authority
SFMTA – San Francisco Municipal Transportation Agency
SOV – Single-Occupancy Vehicle
TDM – Travel Demand Management

TEA-21 – Transportation Equity Act for the 21st Century
TRAC – University of Washington State Transportation Research Center
TRB – Transportation Research Board
TxDOT – Texas Department of Transportation
UBI – Usage-Based Insurance
UC – University of California
UPA – Urban Partnership Agreements
DOT – United States Department of Transportation
VHT – Vehicle Hours of Travel
VMT – Vehicle Miles Traveled
VTA – Valley Transportation Authority
VPPP – Value Pricing Pilot Program
WSDOT – Washington State Department of Transportation

# Chapter 1. Introduction

## Background

Congestion pricing works by shifting some rush hour highway travel to other transportation modes or off-peak periods and by encouraging solo drivers to carpool. By removing a fraction (even as small as 5 percent) of the vehicles from a congested roadway, pricing enables the system to flow much more efficiently, allowing more vehicles to move through the same physical space.[2]

> *"Expanding the use of tolling and congestion pricing could help to reduce congestion, while generating revenues that could be used to finance the construction of new roadways and bridges or maintain existing facilities."*
> ***-Beyond Traffic 2045***

Although drivers unfamiliar with the concept initially have questions and concerns, drivers who are more experienced with congestion pricing usually support it because it offers them a reliable trip time. Transit and ridesharing advocates also appreciate the ability of congestion pricing projects to generate revenue and the financial incentives that make alternatives to driving more attractive. The U.S. Department of Transportation (DOT) report, *Beyond Traffic 2045*, cites congestion pricing as a potential policy option to "manage demand."[3] The report also states that "Expanding the use of tolling and congestion pricing could help to reduce congestion while generating revenues that could be used to finance the construction of new roadways and bridges or maintain existing facilities."[4]

Through a comprehensive Congestion Pricing Program that includes the VPPP, as well as follow-on initiatives, FHWA has now funded more than 135 congestion pricing projects and studies across 21 States and the District of Columbia. This report represents findings from VPPP-funded projects, as well as extensive research on a variety of critical topics in congestion pricing. In the early development and application stages of the congestion pricing concept, multiple high-occupancy toll (HOT) lane projects encountered challenges and issues including equity, privacy, technology, and enforcement. Entities that are currently seeking to deploy congestion pricing strategies have benefitted not only from the research that DOT has conducted on these topics but also from sharing results across agencies and among industry partners. The FHWA provides critical support to States to help them implement strategies to manage congestion problems. More importantly, findings from deployed projects continue to

---

[2] Federal Highway Administration, *Congestion Pricing – A Primer: Overview,* FHWA-HOP-08-039 (Washington, DC: FHWA, October 2008). Available at: http://ops.fhwa.dot.gov/publications/fhwahop08039/cp_prim1_00.htm. Accessed 2/24/16.

[3] U.S. Department of Transportation, *Beyond Traffic 2045, Trends and Choices*, 2015. Available at: https://www.transportation.gov/sites/dot.gov/files/docs/Draft_Beyond_Traffic_Framework.pdf

[4] Ibid.

demonstrate that the application of innovative congestion pricing strategies can efficiently manage demand on congested urban facilities.

Because of successful deployments, there is growing consensus that congestion pricing is becoming a viable approach to reducing traffic congestion. Figure 1 depicts the evolution of managed lanes to priced managed lanes from the 1960s through today. In the early years of congestion pricing (1990s-early 2000s) in the United States, transportation agency staff that wished to explore such strategies faced skepticism or indifference within their agencies. Many innovative concepts incubated in the planning arena and took several years to develop into projects. Pilot program funding and support from the VPPP has helped significantly in the evolution from the bus and high-occupancy vehicle (HOV) lanes to priced managed lanes, as shown in Figure 1. The VPPP has also contributed considerably to the accelerating concept development into the implementation of actual congestion pricing projects, often the first of their type in the region. These innovative strategies catch the attention of decision-makers and create desire to deploy similar endeavors.




**Figure 1. Timeline depicting the evolution of Managed Lanes from the 1960s through today. Pilot program funding and support from the VPPP has helped significantly in the evolution from bus HOV lanes to priced managed lanes** [5]

Figure 2 depicts the exponential growth of HOT lanes in the United States between the opening of the first projects in 1995 through 2017. The figure summarizes the deployment of HOT lanes only; however, all priced managed lane types, including express toll lanes, full facility tolling, and HOT lanes, have experienced a similarly rapid growth pattern.

[5] Adapted from D. Ungemah, "HOT Lanes 2.0- An Entrepreneurial Approach to Highway Capacity," Presentation Slides for National Road Pricing Conference in Houston, TX, June 2010.




**Figure 2: Growth in the cumulative length of HOT lanes in the United States.**[6]

## Report Organization

This report provides an update on the various VPPP-funded or toll authorized projects and studies and discusses FHWA's recent outreach and technical assistance to advance congestion pricing beyond the current VPPP project locations. Finally, Appendix A provides a summary of the level of assistance each project received under the VPPP.

6 Texas A&M Transportation Institute, 2018. Data for 2018 only considers opened projects from January through April.

# Chapter 2. The Value Pricing Pilot Program: Project Updates

The U.S. Congress established the Congestion Pricing Pilot Program in 1991. It was subsequently renamed the VPPP under Section 1216(a) of the Transportation Equity Act for the 21st Century (TEA-21) in 1998, and continued in Section 1604(a) Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU), P.L. 109-59. The Moving Ahead for Progress in the 21st Century Act (MAP-21) and the Fixing America's Surface Transportation (FAST) Act did not make any additional funding available. However, FHWA retains the ability to enter into cooperative agreements for projects that require tolling authority under this program for their implementation.

Congress established the VPPP to demonstrate whether congestion pricing strategies could reduce roadway congestion. In addition, the VPPP has a goal to evaluate the magnitude of the impact of such strategies on driver behavior, traffic volumes, transit ridership, air quality, and availability of funds for transportation programs.[7] The program has provided tolling authority and discretionary grants to State or local governments to facilitate the demonstration of congestion pricing applications and report on their effects. According to the statutory requirements of VPPP, FHWA may enter into cooperative agreements with up to 15 State or local governments or other public authorities to establish, maintain, and monitor value pricing pilot programs. Currently, there are 12 State-led programs and 2 city-led programs participating in the VPPP: California, Connecticut, Florida, Illinois, Maryland, Massachusetts, Minnesota, Nevada, Oregon, Texas, Virginia, Washington State, New York City, and the District of Columbia. Many of these programs have multiple projects.

***For information on other VPPP projects, refer to the VPPP Quarterly Report at http://www.ops.fhwa.dot.gov/congestionpricing/value_pricing/projects/index.htm***

The VPPP encourages the implementation and evaluation of value pricing pilot projects to manage congestion on highways through tolling and other pricing mechanisms. Although there is no longer a discretionary grant component, many States have gained experience with pricing strategies with the help of the VPPP, and States now can implement more extensive value pricing projects. The FHWA continues to support States and regions in their pricing initiatives by offering guidance and expertise in choosing the most promising and appropriate of the emerging strategies. Congestion mitigation, environmental concerns, and limited funding for highway construction have led to increased interest by State, regional, and local transportation agencies in exploring the use of demand-based pricing as a strategy to manage congestion on oversubscribed roads.

The following section provides updates on projects currently under study. The projects are either now in progress or completed since 2016. The VPPP projects include tolling and non-tolling projects, with the majority of the non-tolling projects falling into one of four categories: parking pricing, priced vehicle sharing, dynamic ridesharing, and pay-as-you-drive (PAYD) pricing initiatives.

---

[7] Section 1012(b)(5) was amended by the National Highway System Designation Act of 1995 (section 325(e) of Pub. L. 104-59) and section 1216(a) of the Transportation Equity Act for the 21st Century (TEA-21).

**Table 1: Funded VPPP Projects by Status**

| State | Recipient | Project Name | Type | Funding Amount |
|---|---|---|---|---|
| ***Projects and Studies in Progress*** | | | | |
| CA | Southern California Association of Governments | Cordon/Area Charging and Build-Out of Express Lanes in Southern California | Tolled | $916,802 |
| CA | San Francisco County Transportation Authority | BART Travel Incentives Pilot Project | Non-tolled | $508,000 |
| CA | City of San Diego | One-Way Electric Vehicle Carsharing | Non-tolled | $440,653 |
| DC | District Department of Transportation | Multimodal Dynamic Parking Pricing | Non-tolled | $1,090,000 |
| MA | Massachusetts Department of Transportation | Employer Benefit Design to Reduce Single-Occupant Vehicles | Non-tolled | $743,872 |
| NV | Nevada Department of Transportation | Lake Tahoe Market Based Parking Pricing | Non-tolled | $290,455 |
| WA | King County Metro Transit | Park and Ride Pricing in Multifamily Developments | Non-tolled | $543,900 |
| ***Projects Completed Since the Previous Biennial Report in 2016*** | | | | |
| CA | San Francisco County Transportation Authority | Treasure Island Mobility Management Study | Tolled | $480,000 |
| CT | Connecticut Department of Transportation | Feasibility of Pricing on I-84 | Tolled | $644,000 |
| CT | Connecticut Department of Transportation | Variable Pricing on the I-95 Corridor | Tolled | $1,120,000 |
| TX | North Central Texas Council of Governments | Influencing Travel Behavior, Sensitivity to Environmental Justice | Tolled | $588,301 |
| WA | Washington State Department of Transportation | SR 167 Express Toll Lanes Continuous Access Demonstration | Tolled | $520,000 |
| CA | San Francisco Municipal Transportation Agency | Residential Parking Management Project | Non-tolled | $420,000 |
| CA | City of Berkeley | Parking Pricing and TDM | Non-tolled | $169,185 |
| NY | New York City Department of Transportation | Drive Smart Mobile Technology Pilot Program | Non-tolled | $1,000,000 |
| NY | New York City Department of Transportation | PARK Smart | Non-tolled | $950,000 |
| OR | Oregon Department of Transportation | Getaround Peer-to-Peer Car Sharing Incentives | Non-tolled | $1,725,000 |
| ***Operational Projects*** | | | | |
| CA | Santa Clara Valley Transportation Authority | SR 237 Express Lanes Continuous Access Extension | Tolled | $1,600,000 |
| CA | Alameda County Transportation Commission | I-680 SMART Carpool Lanes | Tolled | $714,000 |
| FL | Florida Department of Transportation | Priced Managed Lanes in Miami-Fort Lauderdale Region | Tolled | $900,000 |
| MN | Minnesota Department of Transportation | Interstate 35E MnPASS Managed Lanes Extension | Tolled | $605,000 |
| MN | Minnesota Department of Transportation | Priced Dynamic Shoulder Lanes | Tolled | $5,000,000 |
| MN | Minnesota Department of Transportation | HOT Lanes on I-394 in Minneapolis | Tolled | $925,000 |
| WA | Washington State Department of Transportation | SR 167 Express Toll Lanes | Tolled | 1,680,000 |
| WA | Washington State Department of Transportation | Variably Priced Tolls on SR 520 in Seattle | Tolled | $10,000,000 |

## Projects and Studies in Progress

### Projects Involving Tolls

*Cordon/Area Charging and Build-Out of Express Lanes in Southern California*

The Express Travel Choices (Phase II) study examined the potential of implementing a cordon/areawide pricing pilot in major activity centers within the Los Angeles, California, region. Occurring in conjunction with build-out of the planned managed network of express/HOT lanes across southern California, the study aimed to integrate pricing into a comprehensive approach to congestion management through the development of a concept of operations (ConOps) for the southern California region. Project partners included the Southern California Association of Governments (SCAG), the California Department of Transportation (Caltrans), and the Los Angeles County Metropolitan Transportation Authority (Metro).

The study team for the express lane network completed the first iteration of the ConOps, which provides a blueprint for a regional express lane network that integrates individual express lane facilities into a regional system with consistent or compatible operating, design, and policy rules. The study also helped refine the recommendations for a regional express lane network for inclusion into the adopted SCAG 2016-2040 Regional Transportation Plan/Sustainable Communities Strategy (2016 RTP/SCS), approved April 7, 2016. Like all ConOps documents, the ConOps report is intended to be a "living document" that will be updated with the completion of new express lane projects, the emergence of new technologies, and other changing conditions that emerge. As such, the 2020 RTP/SCS will likely incorporate further ConOps updates. The study team also continues to analyze financial, economic, and environmental justice/equity components of the cordon project. Continued stakeholder engagement is underway with civic organizations, elected leadership, and partner agencies.

Following the successful Phase II project, the Phase III pre-implementation project developed a feasibility study and ConOps for a potential cordon pricing pilot program. Critical analysis areas included economic and environmental justice/equity components and opportunities for integrating new shared mobility/technology initiatives. The study team also conducted broad stakeholder outreach through community meetings/events, social media, billboards, and media engagement. Primary project goals include promoting a balanced transportation system by encouraging travelers to consider mobility options, increasing the use of transit and active transportation modes, improving quality of life by reducing congestion levels, and reducing vehicle miles traveled/vehicle hours traveled (VMT/VHT) and greenhouse gas (GHG) emissions.

The SCAG leads the pre-implementation study efforts in coordination with the City of Los Angeles and the City of Santa Monica, California. The VPPP funded the Phase III implementation study through the end of 2016 with the State of California and local sources contributing financial support for further efforts. Publication of results will occur in late 2018.

**Projects Not Involving Tolls**

*BART Travel Incentives Pilot Project in San Francisco, California*

Ridership on the San Francisco Bay Area Rapid Transit (BART) system increased rapidly in recent years due to population and employment growth. The growth resulted in transit system crowding during peak periods, especially in the corridor connecting San Francisco's Financial District with the East Bay cities via the underwater Transbay Tube.

The San Francisco Travel Smart Rewards Pilot Program, also known as BART Perks, was a 6-month test program that provided low-value cash incentives (via PayPal) to riders for voluntarily shifting their travel to the shoulder hours of the morning peak period. The primary project goal was for BART to provide an improved customer experience by reducing crowding on the system in the Transbay Tube. Participants enrolled in the program through a mobile-friendly Website. At sign-up, participants accepted a user agreement and were prompted to enter their Clipper (smart transit card) ID number.

About 17,800 participants enrolled, and approximately 2,600 of them were frequent weekday peak hour travelers. During the trial that ran from late August 2016 through February 2017, an average of 250 participants, or about 10 percent of those who previously traveled during the peak hour, shifted their ride to one of the shoulder hours. While this shift is modest relative to peak hour trips systemwide, BART Perks demonstrated that incentives could successfully change the departure times of peak period travelers. With a Federal Transit Administration grant, BART will conduct a more targeted, smaller-scale incentive program trial that builds on the lessons learned from BART Perks. The project will be completed in 2018.

*One-Way Electric Vehicle Carsharing in San Diego, California*

"Pricing Your Way to Operational Efficiency: One-Way Electric Vehicle Carsharing in San Diego" is a partnership of University of California (UC) Berkeley, car2go carsharing company, Caltrans, and FHWA. This project explored the travel behavior impact of a one-way, electric vehicle carsharing system and the effects of using pricing experiments to help incentivize consumers to redistribute vehicles in ways that would limit the need for staff to rebalance vehicles, thus enhancing efficiency and reducing congestion impacts. Having conducted three rounds of surveys to assess the impact of using pricing experiments on travel patterns, the project evaluated activity data to ascertain whether the tests resulted in notable vehicle distribution changes.

The research team tested two congestion pricing strategies as part of the study:

1. Provide incentives (e.g., future driving credits) to members if they drive vehicles with nearly-depleted batteries close to the central charging station. If members drove cars for at least 15 minutes and parked within a three-block radius of the central charging station, they would receive a credit for 10 minutes of driving, which travelers could redeem for their next trip. The rationale for establishing this incentive is that it would reduce the burden on the system's staff in retrieving and charging depleted vehicles.

2. Provide incentives (future driving credits) to members, if they drive vehicles out of two predetermined, overstocked areas regarding vehicle supply. Similarly, structured to the first incentive, if users drove vehicles out of the two set regions for at least 10 minutes, they would receive a 10-minute credit.

Responses from the member surveys indicated that:
- 72 percent of respondents had known about the first pricing strategy tested by the research team, and 16 percent had received driving credits from it.
- 82 percent of respondents indicated they would have taken advantage of the first incentive for 30 minutes of driver credits.
- 85 percent of those who received driving credits were satisfied or very satisfied.
- Only 7 percent of respondents were "definitely" willing to take advantage of the second incentive (i.e., moving vehicles from overstocked areas) at the rate of 10 minutes of driving credits for 10 minutes of driving. However, if 10 minutes of driving resulted in 30 minutes of driver credits, 65 percent indicated they would do so.
- In the final survey, 14 percent of respondents had received credit for the second incentive.
- Respondents favored driver credits over cash equivalents.

In addition, an activity data analysis led the research team to a series of findings about the impact of incentives on driver behavior. After the launch of the first incentive, a marked rise occurred in the number of trips to the central charging station, as compared to the pre-incentive baseline. However, the research team observed the increase for only a minority of car2go members. Comparatively, no detectable upturn occurred for the number of vehicles pursuing the second incentive.

Aside from the incentives, this pilot also demonstrated other benefits of one-way carsharing regarding driving behavior and vehicle ownership:

- 27 percent of respondents indicated a decrease in driving because of joining car2go, while only 12 percent stated they drove more.
- 34 percent of respondents reported walking more, versus only 9 percent who walked less.
- 59 percent used taxis less, with only 2 percent noting they used taxis more.

In 2016, four other cities with car2go (Calgary, Seattle, Vancouver, and Washington, District of Columbia) had surveyed members, providing a more comprehensive perspective on the San Diego observations pilot that included these findings:
- 2-5 percent of respondents sold a vehicle, and members per car2go vehicle sold overall 1-3 percent of their vehicles.
- 7-10 percent postponed a vehicle purchase, and a total of 4-9 vehicle acquisitions were suppressed per car2go vehicles.
- On average, each car2go household reduced its vehicle miles traveled (VMT) by 6-16 percent, and its greenhouse gas emissions by 4-18 percent.

The research results show that one-way, electric vehicle carsharing can bring significant benefits to cities regarding vehicle ownership, driving behavior, VMT and GHG reductions, and increased use of alternative transport modes. Carsharing systems can use pricing incentives to

reduce their staffing requirements and ensure adequate vehicle coverage. However, those rewards must have a sufficient structure to match member preferences. The study will be completed in 2018.

*Multimodal Dynamic Parking Pricing in the District of Columbia*

This project is evaluating the state-of-the-art and cost-effective parking management strategies deploying a mix of technologies and data analytics. The implementation of the pilot program occurred in the Chinatown/Penn Quarter area. Lessons learned from the pilot will help to shape eventual deployment throughout the District of Columbia (District). The goal of this pilot project is to increase on-street parking availability by deploying various pricing strategies and reducing the time drivers spend searching for a parking space by providing parking availability information in real-time. The parking management strategies will also apply to delivery vehicles and inter-city buses in the Chinatown/Penn Quarter.

This project has launched the pay-by-space initiative from "pay-and-display" for multi-space meter blocks. To facilitate that transition, the District of Columbia Department of Transportation (DDOT) demarcated all study area parking spaces using space number posts, developed outreach materials, and updated the system infrastructure. A robust public outreach and education program also occurred. The stakeholder outreach included a coordinated effort among the District of Columbia agencies to engage the public and discuss the changes with study area businesses and community groups. In November 2015, DDOT also collected data on existing conditions, such as average time to find an open parking spot, placard usage, double parking/illegal parking activity, and a customer survey. In addition, DDOT continued with the development of a blended "asset-lite" approach to predicting real-time parking space occupancy by incorporating sampled parking occupancy data from the portable closed-circuit television cameras deployed in the field along with limited sensor data, payment data, and citation data. The DDOT also started engaging app developers who could take the real-time parking availability information from a published application program interface and provide it to customers.

As of December 2016, DDOT validated and calibrated 500 installed, in-ground parking occupancy sensors to allow them to function within an urban environment. The installation process included working with sensor vendors to update the technology and adjust installed communication equipment to ensure data could be transmitted to the back office. With the installation of the sensors and initial data available, the project team developed price recommendations and identified locations for potential time-limit adjustments. The project team also coordinated with mobile application developers to ensure that a traveler information system was available before the price changes. The DDOT is currently evaluating the pilot and will provide a final report prior to the end of 2018.

*Employer Benefit Design to Reduce Single-Occupant Vehicles in Kendall Square, Massachusetts*

A research project examined and recommended design changes to employer-sponsored commuter benefit programs in Kendall Square in Cambridge, Massachusetts, to reduce single-occupancy vehicle commuting. The research provided an analysis of both current commuting behaviors for large employers in Cambridge as well as current incentives used in both local and national organizations to promote behavior change. The report presented a tool design to track

the impacts of individual and employer level commuter benefit changes, as well as a series of potential commuter incentives and their expected effects on mode share.

The report also made recommendations for the next phase of experimental trials, including strategies, such as offering incentives to Kendall Square employers. The study provides a focused discussion of potential strategies that the Massachusetts Institute of Technology (MIT) could employ as a large employer in the study area to promote single-occupant vehicle commuting alternatives.

The research findings suggest that by changing the commuting costs and providing both monetary and social incentives to employees, single-occupant vehicle commuting mode share can be reduced, even in high-transit, urban areas like Kendall Square. Introducing a combination of universal transit passes, parking cash-out schemes, daily parking rates, and commuter dashboards can improve transit, walking, and bicycling mode share for employers in Cambridge, Massachusetts.

As of December 2017, work continued with the analysis of the first year-over-year Access MIT results and the initial second year results (as the demand for parking permits and lot utilization has continued to decline by an estimated additional 5-10 percent, based on initial data). The research team also assisted the MIT administration in evaluating new program messaging, casual carpool matching, and parking administration tools that could enhance the MIT program.

The research team also continued to work with a major Boston-based healthcare provider to develop an evaluation plan for their latest commuting benefits changes and their impacts on the commuting behavior to a new 4,000 employee-sized facility. The healthcare provider has agreed to provide "before and after" data to include within the Massachusetts Department of Transportation (MassDOT) benefits pricing project evaluation, and an employee survey was developed and distributed for the site that will reveal specific relocated employees' behavior changes. The research team will fuse survey responses with additional "on the ground" parking and transit usage transaction data. Data collected from this facility will allow the research team to recommend future refinements to the provider's transportation benefit offerings. The study will conclude in 2018.

*Lake Tahoe Market Based Pricing, Lake Tahoe, Nevada*

The Tahoe Transportation District deployed peak-season pricing for a rural tourist destination parking facility. The pricing program also included enforcement of road-shoulder parking prohibitions and improvements to existing traveler information systems. Outside of the VPPP project, an improved shuttle service linked tourist destinations with remote parking and improved bicycle access (including an off-road trail and bicycle rental). The Tahoe Transportation District facilitated a kick-off meeting and site visit in October 2017 with the Technical Advisory Committee and their consultant team. The meeting focused on the development of an outline for the parking management plan. The Nevada Department of Transportation experienced some delays completing agreements between the agencies involved. In addition, the upgrades to the parking lots will not be completed until sometime in the fall. Implementation of the first phase of parking lot pay stations will occur in spring 2019.

*Park and Ride Pricing in Multifamily Developments in King County, Washington*

This project explored opportunities for priced park-and-ride spaces in multifamily developments located near high capacity transit services. King County Metro Transit developed a business model for this innovative source of park-and-ride parking and launched a pilot program in King County, Washington, to test the concept. Early project analyses led to a business model proposal with a private parking management company that assumes operations. King County Metro assists with regulatory compliance, site selection, and marketing of the program to both property owners and park-and-ride users.

Once the pilot project launched, Metro Transit provides marketing and incentives for new park-and-ride users and assistance to the parking management company with property recruitment. The marketing effort includes online ads and direct mailers to homes within a one-mile radius of participating parking lots. Metro Transit covers the permit costs for the first month of attending transit users, as a method to incentivize new users to try the program. Metro supervises new property recruitment to ensure the attractiveness of transit lots and to provide assistance with local regulations.

The pilot program launched in May 2017 for 12 original locations. The pilot steadily grew from 15 to 54 permit holders and increased to 15 sites. During the summer of 2017, roughly 10 percent of permit holders did not renew permits for the following month. However, the market stabilized between the fall and winter months of 2017 and 2018, with only one or two cancellations occurring per month. The most successful locations were southern and eastern King County for areas with high transit frequency and near-capacity park-and-ride lots.

As of March 2018, the program includes:

- 15 participating privately-owned parking lots
- 250 available parking stalls
- 54 active permits with prices that range from $30.00 to $175.00 per month

Metro Transit found the most significant challenge, so far, was the recruitment of additional property owners and transit users. Within the competitive King County real estate market, Metro found that property owners often prioritize the use of existing parking capacity to attract additional tenants, rather than leasing the spaces to individual customers. In addition, local regulatory and zoning restrictions acted as a deterrent and challenge to an effective shared, paid permit parking.

Moving forward, Metro will complete the 1-year pilot operations with a goal to increase the number of available properties and grow permit sales. During the evaluation of the pilot, Metro will assess overall program viability, potential as a self-sustaining operation, and capability of serving a large number of diverse sites located throughout the county. The initial results will help to support future property recruitment for neighborhoods with the highest demand for priced parking. Furthermore, marketing strategies will continue to adapt as Metro Transit learns more about new participant motivations. The study will be completed in 2018.

## Projects Completed Since 2016

This section describes the projects completed since the previous biennial report in 2016.

**Projects Involving Tolls**

*Treasure Island Mobility Management Study in San Francisco, California*

The San Francisco County Transportation Authority (SFCTA) received VPPP funds for the Treasure Island Mobility Management Study, with a goal to advance the implementation of congestion pricing and other demand management programs. The Treasure Island Transportation Implementation Plan detailed a comprehensive set of transportation services that included: frequent ferry and bus service to San Francisco and Oakland, a free island circulator shuttle, a bicycle "library," and other cycling and pedestrian amenities. The plan also outlines demand management strategies that consist of a congestion fee for residents traveling between the island by private automobile during peak hours, required purchase of a pre-paid transit voucher for all residents in market-rate developments, and parking pricing for employee and visitor parking on the island. These transportation services and policies are to be implemented by a Treasure Island Mobility Management Agency (TIMMA); in April of 2014, the San Francisco Board of Supervisors (Board) approved the designation of the SFCTA as the TIMMA.

The TIMMA staff developed toll policy recommendations and had prepared a toll system ConOps. The toll policy recommendations developed as the Treasure Island Mobility Management Study (Study) pay particular attention to transportation affordability for current and future residents in below-market-rate housing on the island, in response to the Board and community input heard through three significant rounds of outreach.

The VPPP funds, along with other local and Federal funds, funded the successful completion of the initial planning and policy work as well as the Systems Engineering for the Congestion Pricing System. The scope of planning work supported by the study is complete. The Study includes the adopted Treasure Island toll policy and documents the supporting planning work, including travel demand modeling and financial analysis of alternative program scenarios, outreach, and development of preliminary cost estimates.

From October 2016 through December 2016, the Study team drafted a Memoranda of Understanding between SFCTA and the Treasure Island Development Authority and Treasure Island Community Development. The remainder of the scope of work funded by the VPPP funds is complete.

*Feasibility of Pricing on I-84 in Hartford, Connecticut*

The Interstate 84 (I-84) Viaduct is a 0.75-mile long section of elevated highway between the Sisson Avenue interchange and the Asylum and Capitol Avenue interchanges in Hartford, Connecticut. The project team evaluated value pricing with the purpose of relieving congestion on one of the most heavily traveled and congested corridors in Connecticut. Given the significant cost of replacing the I-84 Viaduct, toll revenue was a key factor considered when evaluating alternatives. The project team summarized performance measures related to traffic delay, toll diversion, and revenue generation to gauge and compare project benefits and impacts.

In addition, the project team used an I-84 study area simulation model to quantify and visualize the estimated congestion relief benefits of the various alternatives and the potential local network impacts.

The study also examined converting the existing HOV lanes along I-91 and I-84 to high occupancy toll HOT lanes where single-occupant vehicles would be allowed access to the current HOV lanes in exchange for paying a toll. The location of the study area extends from I-84 to Route 9 in West Hartford to the end of the I-84 HOV lanes in Vernon, and from the I-91 HOV lanes in Windsor to I-691 in Meriden. Parallel to this congestion pricing study, Connecticut Department of Transportation (CTDOT) initiated a major investment study of I-84 in Hartford to develop a set of preliminary alternatives for replacing the existing I-84 viaduct. During this congestion relief study, the I-84 Hartford project team developed two preliminary alternatives for use in the tolling technical evaluation.

Analysis of a potential conversion of the existing I-84 and I-91 HOT lanes showed the prospect of significant congestion benefits to both corridors, as single-occupant vehicles would now have the choice of fee-based use of the existing HOV lanes. By reducing volumes in the general-purpose lanes, travel speeds during the congested peak hours increased significantly. The western and southern termini of the I-84 and I-91 HOV lanes, respectively, if converted to HOT lanes, would need further study to evaluate physical changes required to mitigate operational concerns. (Any operational issues could cause more traffic that exits the HOT lane for the general-purpose lanes. Not addressing this potential issue could all but wipe out the benefits provided by the HOT lanes.)

The estimated annual net revenue is modest for each corridor since the analysis and toll rate selection focused on "filling up" the HOT lanes to the maximum extent possible while preserving the free flow speeds of the HOT lane. The estimated annual gross toll revenue would cover tolling operations and maintenance costs. Including the capital cost of tolling results in a net loss for the lanes (although slightly higher toll rates could offset the cost if needed, with the objective of making it revenue neutral or a somewhat positive stand-alone project).

*Variable Pricing in I-95 Corridor from New York to New Haven, Connecticut*

Connecticut studied congestion pricing strategies on two of its most clogged highways to evaluate options to reduce congestion. The CTDOT corridor congestion relief study evaluated I-95 and the Merritt Parkway (Route 15) from New Haven to the New York State line to determine whether a combination of pricing and traditional transportation system improvements could achieve a noticeable level of congestion relief. As part of the study, the project team collected the following data: traffic and travel time, a stated preference survey to estimate the value of time in the study corridors, and a detailed traffic modeling and toll revenue evaluation for a variety of configuration and pricing alternatives.

The project team conducted a preliminary analysis of several tolling alternatives, including tolled managed lanes on I-95 between New Haven and New York. The analysis assumed that the existing lanes on I-95 would remain toll-free and a managed lane alternative consisted of adding additional lanes to I-95 and tolling only this new capacity. The alternative generated a relatively small amount of revenue compared to the significant capital cost of implementing the unique

geometric requirements associated with managed lanes in the corridor. While managed lanes could provide congestion relief to the thoroughfare, the relatively small amount of revenue generation as compared to the cost of construction and toll revenue generated resulted in the dropping of the alternative from the final options.

The final set of alternatives considered in this study assumed all electronic tolling across all lanes of I-95 or both I-95 and Route 15 between New Haven and the New York border and included a scenario where I-95 would expand with an additional general purpose lane in each direction between Bridgeport and Stamford, which is the most congested stretch of I-95. Time of day congestion pricing would be required. For this study, the project team assumed off-peak toll rates as 30 percent lower than peak period toll rates.

Overall, the study found that the addition of an extra travel lane in each direction between the most congested portions of I-95 between Stamford and Bridgeport showed additional benefits when combined with localized selective interchange improvements. An extra lane addition with tolling on I-95 showed potential for dramatic improvements for the future year I-95 operations when compared to the No-Build scenario. The largest number of hours saved are estimated to occur under a widening of I-95 and a tolling of both I-95 and Route 15. The alternative estimates an annual savings of more than 12 million hours of travel time.

The findings demonstrated the potential for a significant reduction for the severe congestion experienced along I-95 between New Haven and New York using congestion pricing. The substantial revenue that could generate through tolling could also be used to support most (if not all) of the cost of widening I-95, depending on the actual magnitude and extent of the widening. Adding capacity and tolling all lanes not only provided congestion relief but also provided for substantially higher revenue at a lower cost to construct and implement.

*Influencing Travel Behavior, Sensitivity to Environmental Justice in Texas*

The Texas Department of Transportation (TxDOT) and North Central Texas Council of Governments (NCTCOG) completed a study to assess the effectiveness of various congestion pricing incentives for the IH-30/Tom Landry Highway. The incentives attempted to encourage alternatives to driving alone or driving during peak periods based on how travelers chose to use the managed lanes. (The research team used smartphones to track subscribers' managed lane use.) The study also included an equity assessment that explored the potential impacts that managed lanes could have on low-income travelers.

The Texas A&M Transportation Institute (TTI) finalized the "Traffic Thermostat" tool for use by transportation agencies in the Dallas/Fort Worth region. The purpose of the traffic thermostat was to help guide planners through a logical, step-wise process of examining potential changes to a managed lane or toll facility. The tool was generic, allowing for the application to any managed lane facility. The traffic thermostat can help planners evaluate the potential to implement various managed lane policies and incentives, according to defined goals and performance measures.

The NCTCOG recruited drivers to participate in the study. The research team monitored actual driver travel patterns to assess how priced facilities influence behaviors for all users, including

low-income populations. Examples of targeted travel behaviors include peak-period pricing, transit, park-and-ride lots, ridesharing, telecommuting, bicycling, and varied work schedules.

The NCTCOG and TTI finalized a baseline analysis that included the goals, objectives, and performance measures identification for traffic thermostat implementation. The region identified value pricing program incentives for travelers and completed a survey of interest in the possible incentives. Based on the survey results, the project team updated the traffic thermostat tool for the IH-30 Managed Lanes to incorporate the survey results.

The TTI and NCTCOG developed an example scenario for the traffic thermostat using baseline data and information from the former HOV lane on IH-30. The research team established acceptable performance thresholds of 50 mph and 5,700 persons per hour across the entire facility. The tool estimated speed and throughput values for selected operational fixes, using the calibrated speed-flow relationship from the regional travel demand model. After running the thermostat, the research team discovered a significant amount of calculation process uncertainty that became apparent after examining the dynamic nature of demand, diversity of user groups, ambiguity with exogenous factors (e.g., regional unemployment, fuel prices). However, using the traffic thermostat can show policymakers and others the inherent challenge of performance management for managed lane facilities.

*SR 167 Express Toll Lanes Continuous Access Demonstration in Seattle, Washington*

The Washington State Department of Transportation (WSDOT) developed a 230 lane-mile system of freeway HOV lanes in the Puget Sound region. The public sees the HOV lanes as a favorite and well-used enhancement to the freeway system. During the past decade, most HOV lanes in the area have seen too much demand, leading to lower speeds, travel unreliability, and failure to meet State and Federal performance goals. To remedy this, WSDOT tested HOT lanes on a pilot basis for the State Route (SR) 167 corridor and developed a dual-lane express toll lane facility on I-405. This project entailed a before-and-after evaluation for re-striping the SR 167 HOT lane system to allow near-continuous access, providing information and outreach to customers and the public, and performing a before-and-after assessment of the system.

The physical roadway changes to accommodate continuous access occurred in the late summer of 2014, and the system has been operating smoothly since. The WSDOT collaborated with the Washington State University Transportation Research Center program to undergo a before-and-after project evaluation. The final report and assessment are available from the WSDOT Website.

### Projects Not Involving Tolls

*Residential Parking Management Project in San Francisco, California*

The San Francisco Municipal Transportation Agency (SFMTA) explored how it could evolve or change existing parking practices in San Francisco. The study assessed how pricing could manage parking in residential and mixed-use areas. As part of this study, occupancy and license plate surveys collected data for 42 two-mile routes within the study area. In addition, online household surveys gleaned information concerning residential travel patterns, commute modes, parking access, and use from November 21 through December 13, 2015.

The project team implemented a public outreach strategy that consisted of community open houses to share project findings and solicit community input. As a part of this project, San Francisco County Transportation Authority (SFCTA) contacted neighborhood and business leaders within select San Francisco neighborhoods to discuss the possibility of conducting a pilot parking management program. The project team evaluated several alternative scenarios for pricing 1-day flex permits and motorcycle permits.

The project team conducted 11 community workshops in May and June 2016 to test the acceptability of potential policy changes. The project team continued to work with the Dogpatch Neighborhood Association through spring 2016. Discussions at these meetings consisted of topics related to on-street parking management tools and changes to the Transportation Code changes to allow greater Referral Partnership Program flexibility. The project team facilitated community consensus building regarding parking management options.

*Parking Pricing and TDM in the City of Berkeley and UC Berkeley, California*

The VPPP provided funding to the city of Berkeley for the go-Berkeley pilot program. This project is now complete. University of California (UC) Berkeley had additional funding to help reduce drive-alone trips to campus through a parking scheme for monthly patrons and a program to incentivize employees to reduce parking without changing parking prices. The UC Berkeley efforts are ongoing.

The goBerkeley Pilot Program launched in Downtown Berkeley, the Elmwood, and Southside/Telegraph on July 2013 with three overarching goals: to support economic vitality, to reduce congestion and emissions, and to assess the feasibility of expanding the program beyond the 2-year pilot period. Coordinating between transportation demand management and parking management, the goBerkeley Pilot Program conducted visitor, resident, and employee surveys and collected transit usage and parking data before and during the pilot period. The program also tested automated parking data collection methods to ascertain the most accurate and cost-effective program design going forward.

The goBerkeley TDM Program aimed to decrease single-occupancy vehicle (SOV) use and increase the use of travel alternatives. The TDM program offered financial incentives for the pilot areas that consisted of:

- 1,000 free 6-month AC Transit "TravelChoice Berkeley" passes for residents.
- 1,000 free 1-year AC Transit Easy Passes for employees.
- Deeply discounted City CarShare fees (up to 90 percent off) for businesses and their employees.

The goBerkeley TDM Program survey results showed an overall 3.1 percent reduction in automobile use, with 94 percent of participants reporting that they were walking more, 90 percent reporting using transit more, and 19 percent reporting biking more. Among almost 500 Easy Pass program participants, 82 percent said they used Alameda-Contra Costa Transit District (AC Transit) more because they had the pass, and nearly half said they used their pass at least twice a week. The carshare program included 15 businesses and over 60 participants. Results indicated that more than 10 percent of participants used carsharing as a new travel alternative.

The goBerkeley Parking pilot assessed the long-term feasibility of demand-responsive parking management through adjusted parking rates and time limits at parking meters, parking lots, and parking garages. Analysis of the observed parking availability, meter transaction data, and community surveys indicated an overall improvement in parking availability and customer satisfaction. Results also showed a change in driver behavior and a shift in parking demand to metered areas with available parking. The analysis also indicated that vehicle-mounted cameras could reduce parking data collection costs and improve parking enforcement.

Considering environmental sustainability, the goBerkeley Pilot Program achieved its goal of reducing emissions resulting from SOV use and by managing parking. The preliminary analysis found that the goBerkeley program has reduced VMT by 1,649 miles per day.

As mentioned above, the VPPP program has provided additional funding to an existing city of Berkeley/UC Berkeley project designed in part to use priced daily parking to reduce drive-alone trips to campus. The project will enable a randomized controlled trial of a second-price-reverse auction for monthly parking patrons to give up their parking privileges on specific days when parking is in highest demand.

Another study conducted as part of the UC Berkeley effort to reduce parking demand explores a new kind of employee parking permit, the FlexPass, which incentivizes employees to reduce parking without significantly changing parking prices. Most employees of the UC Berkeley purchase a monthly parking permit with pre-tax dollars. The FlexPass is also a monthly pass that refunds money to the employee in proportion to the number of working days not parked each month. The study finds that unbundling a monthly employee-parking permit reduces parking by making employees mindful of daily parking usage.

The goBerkeley pilot project officially concluded in early 2017. The project successfully demonstrated that demand-responsive parking management could be used to improve parking availability and reduce vehicle miles traveled (VMT) in a mid-sized city. Based on the results of the pilot, the Berkeley City Council elected to continue goBerkeley as a permanent city program in mid-2015. Since then, staff has twice adjusted parking prices and time limits under program guidelines, in May 2016 and January 2017. The next program adjustment has a tentative schedule date of March 2018.

Building on the foundations of the original program, staff are preparing a new pilot project to test demand-responsive pricing in residential areas adjacent to commercial districts. This project, the Residential Shared Parking Pilot (RSPP), is funded by a Metropolitan Transportation Commission of the San Francisco Bay Area (MTC) Climate Initiatives Program grant and is designed to improve parking availability for the diversity of residential parking users, including residents, nearby employees, and visitors. The RSPP will begin its initial data collection phase next year.

*Drive Smart Mobile Technology Pilot Program in New York, New York*

Drive Smart was a New York City Department of Transportation (NYCDOT) consumer technology project that used data drawn from a car's onboard diagnostics port (OBD-II) to help

New York City drivers save money, save time, and drive more safely. Drive Smart provided a suite of services and mobile applications for drivers—provided by private sector partners—that incentivized safe driving and environmentally efficient travel choices. Participants were also encouraged to enroll in a usage-based insurance (UBI) program offered by a leading national insurer to receive incentives for avoiding driving and for driving during less congested times or on less congested routes. Enrollees also received feedback on their driving and their actual cost of car ownership and use. The NYCDOT used Drive Smart data to learn more about accidents to support the implementation of Vision Zero, New York City's street safety initiative.

In July 2015, NYCDOT launched a 1-year Drive Smart pilot program with 400 volunteer drivers. The NYCDOT procured 450 Drive Smart OBD-II devices for installation in vehicles from pilot participants, launched the program Web site, and conducted a full beta test with 25 test devices and drivers. The OBD-II devices transmitted second-by-second driving data to the Drive Smart server to power the range of driver feedback applications and the UBI product offered by the Drive Smart Technology Partners. The project team used the data to evaluate the effectiveness of Drive Smart toward helping drivers make different travel choices.

*PARK Smart in New York, New York*

The NYCDOT PARK Smart 2.0 program enabled community stakeholders to work with NYCDOT to address local curb management issues such as parking availability, cruising, double-parking, and truck deliveries on busy retail corridors. Working with local merchants and residents to develop a PARK Smart plan that included parking pricing strategies, curb regulation changes and parking technology, the program was successful in increasing curbside access for shoppers, residents, and commercial vehicles.

The NYCDOT began by conducting an analysis of PARK Smart in the Boerum Hill/Cobble Hill section of Brooklyn. Data showed that the program reduced parking occupancy while increasing turnover. The agency then began working with the Myrtle Avenue Brooklyn Partnership and Brooklyn Community Board 2 on a PARK Smart on the Myrtle Avenue corridor in Brooklyn's Fort Greene and Clinton Hill neighborhoods. The agency also reached out to an array of local community and business groups in Brooklyn, Manhattan, and Queens to discuss PARK Smart and identify additional future PARK Smart areas.

The NYCDOT began the development and implementation of a comprehensive data collection effort in over 40 neighborhood retail corridors to collect parking metrics and performance data to influence the "reprogramming of the curb" and to develop both pricing and regulatory structures that will improve the overall operability of the curb. The agency developed a larger framework for the development of a citywide parking management toolbox or "blueprint" for use toward influencing larger parking management policies and approaches. This program built upon the previous experiences in each of the past PARK Smart pilot areas, as well similar programs in peer cities.

PARK Smart was an innovative pilot program that developed a pricing and regulatory mechanism to allocate curb space for mixed vehicle classes by the time of day and block location. These "multi-function meters" and the associated curb regulations use a combination of pricing and regulations to influence driver behavior and meet parking demand. The meter

rates adjust based on observed travel demand patterns. In addition, NYCDOT experimented with new time and rate structures for the pilot blockfaces to determine their applicability at other locations throughout the city. The NYCDOT also developed new geospatial datasets and refined data collection techniques to improve its ability to measure blockface performance and activity.

The NYCDOT continues to talk to an array of local community and business groups in Brooklyn, Manhattan, Staten Island, and Queens to discuss innovative curb management strategies as well as approaches to improving curb operations.

*Getaround Peer-to-Peer Car Sharing Incentives, Portland, Oregon*

Portland-area partners evaluated the effects of peer-to-peer (P2P) car sharing and other incentives on people's travel behavior. Project partners consisted of Getaround Inc., the Oregon Department of Transportation (ODOT), the Portland Bureau of Transportation (PBOT), and the Oregon Transportation Research and Education Consortium (OTREC). The project team also evaluated factors related to usage-based insurance and peak usage pricing. To attain these goals, the project team recruited about 300 car owners and installed a Getaround Carkit™ device within vehicles to track the number of vehicle miles traveled.

The project partners assessed whether P2P car sharing reduced overall VMT by making the driving costs for both car owners and renters variable while creating a revenue stream for car owners and increasing access to jobs and activities for those without cars. The OTREC monitored the rental activity of owner and renter participants in the study, and Getaround monitored rental income activity for owners. The OTREC also surveyed renters about their rental experiences with Getaround, analyzed survey data, and reviewed rental activity of owner and renter participants.

## Operational Projects

### Projects Involving Tolls

The projects below were granted tolling authority under the VPPP, and they continue to report on the performance of their operating projects. Projects that have already been in operation for more than 10 years are no longer required to provide performance data. Some projects received funding to study congestion pricing under the VPPP but subsequently elected to pursue tolling under one of FHWA's other toll programs.

*I-680 SMART Carpool Lanes in Alameda County, California*

The Interstate 680 (I-680) corridor connects employees in Southern Alameda County and the Silicon Valley with homes in the Tri-Valley, East Contra Costa County, Solano County and the San Joaquin Valley. The I-680 Express Lane is the first in a planned 550-mile San Francisco Bay Area regional network of HOT lane projects, which allows carpools to travel free of charge and charges a toll for single occupancy vehicles to use the HOV lane excess capacity.

Assembly Bill 680 authorized the State to enter into agreements with private entities in 1989 that allowed tolling on the lanes. The I-680 SMART carpool lanes were deployed January 1, 2005. Federal value pricing funds provided backing for preliminary engineering and environmental

clearance to convert the southbound HOV lane that opened in 2002 to an Express Lane facility along a 12-mile segment of I-680 in Alameda County, California and a two-mile segment in Santa Clara County, California. In 2008, selected toll system integrator Electronic Transaction Consultants Corporation (ETCC) developed the design parameters and criteria for the dynamic pricing algorithm, as well as the system interface with participating and enforcement agencies and the communication network design.

The southbound I-680 Express Lane opened to traffic on September 20, 2010. The facility counted 234,000 total toll trips for the first quarter of 2018, representing an average of 3,700 daily toll trips for the quarter, which is the same number of trips compared to the same quarter last year. The Total Gross Revenue for the quarter was $719,000. In terms of Express Lane benefits, the observed speeds in the Express Lane are faster than general purpose lane speeds throughout the day.

*SR 237 Express Lanes Continuous Access Extension in Santa Clara County, California*

The SR 237 Express Lanes (Phase 2) project was an extension of the existing first phase of the SR 237 Express Lanes project called SR 237/I-880 Express Connectors. The SR 237 Express Lanes (Phase 2) project involved the conversion of the remaining four miles of HOV lanes on SR 237 to Express Lane operations by providing solo drivers the option of paying a toll to use the Express Lanes during commute hours. Carpools with two or more occupants, motorcycles, transit buses and eligible hybrids continue to use the Express Connectors free of charge. The electronic tolls collection used the FasTrak transponder technology already in use throughout California. Tolls for single-occupant vehicles vary based on demand and adjust to maintain a free-flowing ride on the Express Lanes.

The SR 237 Express Lanes project has successfully operated since March 2012. The existing segment used VPPP funds for implementation, in addition to other sources. Since the beginning of operations, this express lane resulted in over 250,000 hours of total travel time savings for both the express lanes and adjacent general purpose lanes. Over 17 million customers used the express lanes, with about 18 percent consisting of toll-paying travelers. These travelers benefited from a more reliable and faster commute with travel time savings of up to 14 minutes per trip. The savings occurred despite a recent increase in traffic resulting from a stronger economy. Figure 3 shows a visual of the SR 237 Express Lanes.




**Figure 3: SR 237 Express Lanes.**[8]

The Santa Clara Valley Transportation Authority (VTA) received VPPP funds in 2012 to evaluate the potential of using different access approaches, such as continuous access with no painted buffer between the Express Lanes and general-purpose lanes. As part of this project, the project team removed one mile of existing striped buffer as a temporary pilot test. After 6 months of observation, VTA made the buffer removal a permanent change. This conversion extended the SR 237 express lanes about four miles to the west into the city of Sunnyvale. As part of this deployment, VTA studied more options for open and restricted buffer striping access arrangements. The analysis resulted in the selection of additional open access for separating express lanes from the general-purpose lanes. The SR 237 Express Lanes extension is currently under construction and has a scheduled opening date of 2019.

*Priced Managed Lanes in Miami-Fort Lauderdale Region*

The "Miami-Area Urban Partner" applied and received an Urban Partnership Agreement (UPA) grant in 2007 to implement a priced managed lanes project on Interstate 95. The Miami-Area Urban Partnership was comprised of the Florida Department of Transportation (FDOT), Miami-Dade/Broward County Metropolitan Planning Organizations (MPOs), Broward/Miami-Dade County Transit, Miami-Dade County Expressway Authority, and Florida's Turnpike Enterprise. The project focus was primarily to address congestion in the Interstate 95 corridor and involved components commonly referred to as the four "T's":

- Tolling - Implemented congestion pricing or variable tolling demonstrations.
- Transit - Create or expand express bus services or bus rapid transit (BRT), which will benefit from the free flow traffic conditions generated by congestion pricing or variable tolling.
- Telecommuting - Secure agreements with major area employers to establish or expand telecommuting and flex scheduling programs.
- Technology - Utilize cutting-edge technological and operational approaches to improve system performance.

[8] Santa Clara Valley Transportation Authority, 2015.

The 95 Express Project has two phases that span 21 miles across two counties and two FDOT Districts. The northbound section of Phase 1 began operations in December 2008 from State Road 836/Interstate 395 to the Golden Glades Interchange (I-95/SR 826/Florida's Turnpike Interchange). In conjunction with Phase 1 Northbound (NB) implementation, on-ramp traffic meters along northbound Interstate 95 started operation in February 2009. The southbound direction of Phase 1 consisted of the corresponding managed lane improvements that began operations in January 2010; its ramp metering was implemented later that year in April.

Phase 1 of 95 Express used the existing roadway cross-section and created an additional travel lane in each direction. The inside median width narrowed some travel lanes to a reduced diameter from 12 feet to 11 feet. The cross-section allows for two managed lanes (or express lanes), a one-foot buffer, and four general use lanes in both the northbound and southbound directions. The FDOT installed flexible delineators (otherwise called express lane markers) within the one-foot buffer for lane separation using five-foot spacing between each marker.

Phase 2 opened in October 2016, adding four more tolling points throughout the corridor. The lane distribution mirrors Phase 1, but widths remained at 12-feet. The buffer width is 2 feet with express lane markers at 10-foot spacing. The widening of bridges and the addition of auxiliary lanes occurred given the higher availability of public right-of-way. Figure 4 shows a visual of Phase 2 for the 95 Express.




**Figure 4: 95 Express Phase 2 Extension.[9]**

[9] Texas A&M Transportation Institute, 2016.

The toll price changed dynamically based on demand and a goal to maintain a 45 mile per hour speed in the express lanes. Electronic toll collection occurred via SunPass® toll transponders. Changeable message signs (Toll Amount Dynamic Message Signs) notified motorists of the current toll for up to three destinations per direction, with an update approximately every 15 minutes. Registered vanpools, carpools with three or more occupants, hybrid vehicles, and transit, school, and over-the-road buses can use the lanes without paying a toll. Motorcycles can travel in the managed lanes without paying a toll; no registration required. SunPass® registrations increased from 7,100 to 9,100 since its inception, resulting in over 1.7 million toll-exempt trips in 2017.

Corridor speeds and volumes have increased since the opening of the 95 Express. Before implementation, average peak period speed in the HOV lane was 18-20 miles per hour. After implementation, average peak period speeds in the express lanes increased to 45-56 miles per hour, and the adjacent general purpose lanes (non-tolled lanes) speed increased from 15 to 41 miles per hour. Overall corridor throughput has also increased since the project's opening. For example, the average total corridor (express lanes plus general purpose lanes) volume for the northbound lanes after the first full month of operations was over 123,000 vehicles per day. Currently, vehicle throughput is almost 136,000 vehicles—a 10 percent increase. The FDOT provides information to drivers about the expected or typical toll charges based on the time of day. Toll rate information is provided monthly (based on the previous month of activity), allowing motorists to estimate their travel time departures and trip choices.

Transit improvements also occurred with the implementation of the 95 Express. The project added express bus service for both Miami-Dade Broward Counties, including 22 new articulated buses and 10 new express routes from Broward County to Downtown Miami. Average express bus ridership before the 95 Express Project was 1,746 per day. As of July 2017, average ridership increased 323 percent to 5,645 per day.

*HOT Lanes on I-394 in Minneapolis, Minnesota*

Minnesota implemented I-394 MnPASS, which converted the existing HOV lane into the State's first high occupancy toll HOT lane. The lanes, which are dynamically priced, remain free to HOVs and motorcyclists during peak hours and are free to all users in off-peak periods. The first phase of the project opened in May 2005.

The I-394 MnPASS project was the culmination of years of research and planning aimed toward the implementation of a value pricing demonstration project in Minnesota. Guiding this process was the I-394 Community Task Force, made up of local elected officials, citizens and community leaders. A comprehensive evaluation plan was implemented to thoroughly understand conditions and public attitudes before and during project operations. The project remains open to traffic.

Operational and performance data on I-394 MnPASS for the first quarter of calendar year 2018 revealed there were 361,993 total tolled trips for the quarter. On average, there are roughly 30,166 toll trips per week. Total Gross Revenue for the quarter was $490,368 or about $40,864 per week. The average cost for a toll trip on the facility is $1.35.

*Interstate 35E MnPASS Managed Lanes Extension in Minneapolis, Minnesota*

The I-35E MnPASS Extension Study was a pre-implementation planning study aimed at developing and evaluating conceptual alternatives for extending MnPASS Express Lanes between Little Canada Road and CR 96 on I-35E. The Minnesota Department of Transportation (MnDOT) completed the study during the third quarter of 2015. The study resulted in the I-35E MnPASS Extension project moving forward into the pre-design and environmental assessment (EA) process. The MnDOT approved the EA in December 2015 and completed the project at the end of 2016. Funding from the VPPP provided MnDOT with the capability to evaluate the HOT lane extension. The MnPASS lanes through the I-35E/I-694 common area feature two of the innovative recommendations to come out of the study:

- Southbound – the existing inside general purpose lane will convert to a MnPASS lane during the morning peak period
- Northbound – there will be no MnPASS lane designation through this area, creating a gap in the northbound MnPASS lane in the corridor

An in-depth evaluation of this innovative approach will occur by the end of 2018. The land use and transit enhancement component of the study also developed recommendations for increasing transit and carpool use in the I-35E corridor, such as informal park-and-ride sites called "Gather and Go's." Many ideas and recommendations will have further evaluation for potential implementation by local governments, transit providers, and others as community and transit planning and development move forward in the corridor.

*Priced Dynamic Shoulder Lanes in Minnesota*

The Twin Cities Metropolitan Area, encompassing Minneapolis and St. Paul, converted narrow bus-only shoulder lanes along the northbound portion of Interstate 35W between 46th Street and downtown Minneapolis to wider priced dynamic shoulder lanes (PDSLs), and moved the lanes from the right-most to the left-most portion of the roadway to minimize conflict with entering vehicles. Buses and high-occupancy vehicles operate at no charge in the PDSLs with access allowed during peak times to single-occupant vehicles whose drivers are willing to pay the toll, with prices set to ensure free-flow travel. The PDSLs enable bus speeds to increase to 50 mph from the current bus-only shoulder lane speeds of 35 mph or less.

The PDSL links to the dynamically-priced high-occupancy toll lanes on Interstate I-35W, which was created by converting the existing high-occupancy vehicle lanes. The original HOV lanes extended from approximately I-494 to the Burnsville Parkway south of the Minnesota River. Through the Urban Partnership Agreement, these lanes were extended through the Crosstown Commons between I-494 and 46th Street. The result was a new 15-mile, dynamically-priced managed-lane corridor, enhancing the efficiency of bus and HOV trips and providing motorists a new option to experience a fast and reliable trip.

The facility now has 9 years of performance data. The northbound I-35W MnPASS Express Lanes operate from 6am to 10am during the morning rush hour and from 3p.m. to 7p.m. in the afternoon. Tolled trips northbound in the morning and afternoon peak periods on the PDSL totaled 65,163 for the first quarter in 2018, an 8 percent increase from the previous quarter.

Revenue amounted to $126,343 on average tolls of $1.95 per trip. The southbound I-35W MnPASS Express Lanes operate 6 a.m. to 10 a.m. from 42nd Street to Highway 62 in the morning and the full stretch of road from 42nd Street to Cliff Road from 3 p.m. to 7 p.m. in the afternoon.

*HOT Lanes on SR 167 in the Puget Sound Region*

The Puget Sound Regional Council of Washington State estimates that, by 2030, 45 percent of the core freeway system in the Seattle metropolitan area will be congested. The SR 167 High-Occupancy Toll HOT Lanes Pilot Project converted the existing HOV lanes on SR 167 within King County/Seattle, Washington to HOT lanes, from southwest 15th Street in Auburn to I-405 in Renton without expansion of the existing freeway. This 4-year pilot project will evaluate the ability of the HOT lane concept to manage congestion and generate revenue. During the 4-year pilot, the facility's performance, socioeconomic impacts, and public interest/acceptance of the facility will be assessed on an annual basis. The project website is located at: http://www.wsdot.wa.gov/Tolling/SR167HotLanes/default.htm.

The SR 167 HOT lanes continue to operate smoothly and successfully, although performance on the lanes has recently deteriorated. The biggest change during the last few years was an extension of the system for five miles in the SB direction, which opened in December 2016. This change benefited the northern part of the corridor, but created challenges for the southern terminus. Bottlenecks outside the system back vehicles into the HOT lanes and reduce overall performance. The northbound terminus experienced similar challenges. The Washington State Department of Transportation (WSDOT) adjusted the algorithm and is evaluating additional refinements to improve operation.

*Variably Priced Tolls on SR 520 in Seattle, Washington*

The SR 520, a major access freeway into downtown Seattle from the east and from Seattle to eastside employment locations, experiences serious congestion between I-5 and I-405. The floating bridge carried twice as much traffic than it was originally designed to carry. While originally there was a toll to cross the bridge, it was eliminated many years ago. To address congestion, and the 40 percent of throughput capacity that the region estimated was lost on SR 520, King County, Puget Sound Regional Council, and WSDOT decided to re-introduce tolling on SR 520. The toll rates were set on the facility based upon demand to avoid the buildup of congestion and reduce demand on the bridge. Toll rates were on a fixed schedule, and tolling revenues were used to help finance the new bridge. The project deployed an all-electronic toll collection system, allowing tolls to be collected at freeway speeds by transponders, with supplemental automatic cameras reading license plates for vehicles without transponders.

The replacement bridge has been open to traffic for nearly 2 years, allowing for the completion of permanent toll location testing and for the Toll Division to accept the project. The WSDOT continues to monitor the facility and evaluate the impact of variable tolling. The original bridge is no longer in operation.

# Chapter 3. Congestion Pricing Outreach and Technical Assistance Provided by the Federal Highway Administration

The following list summarizes outreach and technical assistance activities performed by the program.

**Project Support and Technical Assistance.** To enable effective and successful implementation of each VPPP project awarded, FHWA Congestion Pricing Program staff provides significant levels of support and technical assistance to VPPP awardees on an ongoing basis. Expertise includes coordinating with project partners, reviewing project materials, and collecting and posting quarterly reports. This effort ensures that VPPP successes and lessons learned are captured and documented, understood, and are available for sharing with other agencies.

**Program Involvement with Professional Forums.** The FHWA involvement in professional transportation organizations, such as the TRB Annual Meeting, has been an important link between public and private transportation professionals and DOT programs. With such a broad cross-section of transportation experts in attendance, TRB and the IBTTA are efficient means of getting the word out on current program results and sharing recent industry developments. The TRB and the IBTTA committees are effective in sharing common experiences, identifying research needs, and helping to plot the course for the congestion pricing industry into the future. Throughout the past two decades, FHWA has provided information at both TRB and IBTTA meetings to raise awareness of pricing success stories and pricing-related outreach materials.

**Written Materials (Primers, White Papers, Guidance, and Flyers).** The VPPP and other related FHWA programs have produced numerous informative documents for industry use. Since 2016, the following white papers have been prepared:

- *Congestion Pricing: Engaging Public Awareness on the True Cost of Driving* that highlights lessons learned from outreach efforts of LA Metro's I-10/I-110 Express Lanes and WSDOT's SR 520 tolling. A presentation of the white paper and a poster summarized the analysis for the 15th International Conference on Managed Lanes in Miami, Florida.
- *Impacts of Congestion Pricing on Low-Income Populations,* which studied tools and approaches used by agencies to examine income equity impacts of congestion pricing projects. The white paper documented the examples of LA Metro's environmental justice analysis for the I-10/I-110 ExpressLanes project and time of day tolling on the 183 North Mobility project in Texas. A virtual workshop will disseminate and discuss the findings.

***Primers and other resources are available on the FHWA Congestion Pricing Web site: http://ops.fhwa.dot.gov/congestionpricing/resources.htm and http://ops.fhwa.dot.gov/congestionpricing/value_pricing/***

**Facilitated Peer Exchange.** Many agencies benefit from FHWA-sponsored peer exchanges that include participation by congestion pricing experts. There is a great benefit in bringing together a broad array of technical specialists and key decision makers from the host agency for the opportunity to interact directly with the out-of-State expert. The local congestion pricing expert

may already have specific knowledge; however, it lends additional credibility to have the project manager from another State deliver the message. It also creates a focus and urgency to bringing many decision makers together to meet with the out-of-State expert. The FHWA sponsored a Managed Lanes and Automated Technologies Peer Exchange in 2017. The Peer Exchange consisted of expert practitioners at the State level that came together to gain a better understanding of the opportunities and challenges associated with implementing Automated Technologies on Managed Lane facilities. The workshop participants included WSDOT, Santa Clara Valley Transportation Authority (VTA), Contra Costa Transportation Authority, and Minnesota DOT as well as private sector participants.

**Workshops.** The VPPP continued to sponsor a workshop series. A series of three *Regional Congestion Pricing Workshops (RCPWs)* helped States and partner agencies develop, advance, promote, and enhance tolling and pricing programs and initiatives within metropolitan areas.[10] The workshops featured experts from operating projects who shared lessons learned from their experiences establishing congestion pricing programs. The information shared was designed to help workshop participants plan, implement, and advance a congestion pricing project in their region. The workshops incorporated an interactive and knowledge sharing approach to encourage stakeholder engagement. A lessons learned report is available that focuses on the findings from three workshops held between March 2016 and May 2017 in Schaumburg, Illinois; Pittsburgh, Pennsylvania; and Portland, Oregon. It details cross-cutting issues impacting participating stakeholders identified during the workshops, summarizes critical developments achieved in the candidate regions since the Webinars, and concludes with a summary of key takeaways and next steps based on stakeholder inputs and workshop experiences.

**Webinars.** The FHWA sponsors a continuing series of Webinars that explore challenges in implementing congestion pricing. Webinars have proven to be one of the most effective and efficient means of delivering project results, research findings, and lessons learned to industry, with the Congestion Pricing Webinar series consistently attracting 200 to 300 participants per event. The FHWA often collaborates with TRB committees in identifying congestion pricing topics that are timely and of interest to practitioners. Webinars sponsored since 2016 included Managed Lanes System Study Best Practices; Best Practices in Enforcement of Managed Lane Facilities; Virtual Workshop on Environmental Justice Tools and Approaches; and NCHRP Research Report 860: Assessing the Environmental Justice Effects of Toll Implementation or Rate Changes: Guidebook and Toolbox. Interested parties can access recordings and presentations from these Webinars using the link in the callout box (seen to the right).

***Recordings and presentations from past Congestion Pricing Webinars are available at http://www.ops.fhwa.dot.gov/congestionpricing/webinars/index.htm.***

[10] More information provided on the website: https://ops.fhwa.dot.gov/publications/fhwahop18015/index.htm

# Chapter 4. Conclusion

Congestion Pricing strategies provide travelers in the corridor with more choices. Program results demonstrate that the application of congestion pricing strategies across the country has had a positive impact on localized congestion problems in major metropolitan areas, and it remains an important FHWA-recommended congestion management strategy for a growing number of States and regions.

The FHWA is now focusing on sharing and widely disseminating lessons learned. This comprehensive approach ensures that outreach efforts account for the wide variety of stakeholders, strategies, and approaches that have been used or are being used across all FHWA congestion pricing programs.

In the past few years, the rapid increase in priced managed lane deployments indicates that acceptance of this strategy continues to spread in major U.S. metropolitan areas. It is anticipated that eventually managed lanes will also be considered a "mainstream" strategy for regions in which they have been deployed, much like 2005-2010-era HOT lane conversions.

There is a significant opportunity for regions that have installed priced managed lanes to expand into other demand-based pricing strategies to further increase transportation alternatives uses, such as transit, carpools, and vanpools on a broader scale. The FHWA is also supporting research and information sharing on the use of other demand-based pricing strategies. Non-toll congestion pricing strategies such as parking pricing, pay-as-you-drive (PAYD) insurance, car sharing, bike sharing, dynamic ridesharing, and other strategies that turn the fixed costs of driving into variable costs, have experienced strong successes as well.

To better encompass this range of strategies, it may be helpful to UPDATE the terminology about priced facilities and begin using the more comprehensive term "demand-based pricing." This change in terminology may also work to broaden the public appeal and acceptance of priced facility strategies, as history has shown that the public's first reaction to "tolled lanes" is typically unfavorable and may even result in rejection.

The FHWA anticipates that, in the future, synergies among demand-based pricing approaches will enhance significantly the effectiveness of comprehensive and coordinated regional programs. Second-generation pricing approaches will likely combine regionwide pricing strategies, such as VMT fees, cordon pricing, and regional pricing, with non-toll strategies.

The VPPP has advanced congestion pricing over the past two decades. In the view of many project partners over that period, priced managed lanes would not be nearly as widespread without the Program's influence. Program results demonstrate that the application of congestion pricing strategies across the country has successfully provided relief to localized congestion problems in major metropolitan areas.

The FHWA will continue its efforts to ensure widespread awareness of pricing as a strategy to manage roadway congestion. Through these efforts, FHWA will continue to equip State and local agencies with resources and guidance to help them understand and implement congestion pricing strategies. These real-world examples enable target audiences to understand that congestion pricing strategies can be successfully implemented in all different types of regions.

# Appendix A. VPPP Projects Funded Since 2008

**VPPP Projects Funded Since 2008**

| FISCAL YEAR | FUNDING RECIPIENTS | STATE | PROJECT | AMOUNT |
|---|---|---|---|---|
| **2008** | Caltrans/San Francisco Municipal Transportation Agency | CA | SFpark Urban Partnership | $10,000,000 |
| **2008** | MnDOT | MN | MN Innovative Choices for Congestion Relief UPA | $5,000,000 |
| **2008** | WSDOT/King county/Puget Sound | WA | Seattle/Lake Washington corridor Tolling and Transit UPA | $10,000,000 |
| **2009** | Caltrans/Valley Transportation Authority | CA | Implement roadway pricing on SR 237 Express Connectors | $3,200,000 |
| **2009** | Twin Cities Area | MN | Feasibility study on pricing innovative lane additions on Trunk Highway 77 | $540,000 |
| **2009** | Twin Cities Area | MN | Pre-implementation study of priced managed lane on I-94 | $400,000 |
| **2009** | Greater Buffalo Niagara Regional Authority | NY | Pre-implementation of study of GPS-based truck pricing system | $717,000 |
| **2009** | Puget Sound/Seattle Area | WA | Express Lanes system concept study | $1,280,000 |
| **2010** | Caltrans / Santa Clara County | CA | Strategies to manage traffic and parking. | $2,358,000 |
| **2010** | Caltrans / City of Berkeley | CA | Strategies to manage on-street parking and reduce congestion from circling vehicles. | $1,800,000 |
| **2010** | Caltrans / Santa Barbara County | CA | Testing of carpooling system that uses participation incentives. | $158,400 |
| **2010** | Florida DOT | FL | Initiative for a regional priced managed lane network that can serve as a model for other regions. | $900,000 |
| **2010** | Tampa-Hillsboro Expressway Authority | FL | Advancement of first regional network of bus toll lanes in the Tampa area. | $800,000 |
| **2010** | NCDOT and Charlotte MPO | NC | Advancement of first regional network of priced lanes in the Charlotte area. | $400,000 |
| **2010** | MnDOT | MN | Expansion of project to test incentive alternatives to monthly parking passes and discourage daily driving. | $24,800 |
| **2010** | Texas DOT | TX | Usage-based insurance pricing and additional incentives for efficient travel choices. | $1,948,000 |
| **2010** | Virginia DOT and Washington Council of Governments | VA | Public Acceptability of Road Use Pricing | $320,000 |
| **2010** | Washington DOT and King County | WA | Implementation of incentives as alternatives to parking. | $1,024,000 |
| **2011** | Caltrans/SCAG | CA | Express Travel Choices | $1,080,000 |
| **2011** | Caltrans/MTC | CA | Priced Electric-assist Bicycle Sharing in San Francisco | $1,054,221 |
| **2011** | Caltrans/SFCTA | CA | Parking Pricing and Regulations Study in San Francisco | $480,000 |

| FISCAL YEAR | FUNDING RECIPIENTS | STATE | PROJECT | AMOUNT |
|---|---|---|---|---|
| **2011** | Connecticut DOT | CT | I-84 Viaduct, Hartford, CT | $644,000 |
| **2011** | Connecticut DOT | CT | I-95 Corridor Full Facility Pricing: New York to New Haven CT | $1,120,000 |
| **2011** | Florida DOT/Florida Transportation Enterprise | FL | Integrated Congestion Pricing Plan (ICPP) | $600,000 |
| **2011** | Illinois State Toll Highway Authority | IL | Integrate and Finance Transit w/ Priced Managed Lanes | $528,840 |
| **2011** | Massachusetts | MA | Pay-As-You-Drive Insurance in Massachusetts | $2,144,000 |
| **2011** | Oregon | OR | Peer-to-Peer Ridesharing in Portland, Oregon | $1,725,000 |
| **2011** | Texas | TX | Integrating Transit Related Pricing Incentives in Support of Managed Lanes | $160,000 |
| **2011** | Texas/NCTCOG | TX | Influencing Travel Behavior and Considering Environmental Justice | $588,301 |
| **2011** | Texas/CTRMA | TX | 183A Turnpike Pilot Downstream Impacts | $1,220,424 |
| **2011** | Virginia | VA | Dynamic Ridesharing with Financial Incentives in Northern VA | $447,200 |
| **2011** | Washington | WA | Parking Pricing for Delivery trucks in Seattle | $446,000 |
| **2012** | Caltrans/SFCTA | CA | Treasure Island Mobility Management study | $480,000 |
| **2012** | Caltrans/Contra Costa Transportation Authority | CA | Contra Costa I-80 tolled-corridor real-time ridesharing (RTR) | $322,400 |
| **2012** | Caltrans/San Diego Association of Governments | CA | San Diego pricing incentives for one-way electric car sharing | $440,653 |
| **2012** | Caltrans/SFMTC | CA | San Francisco Metropolitan Transportation Commission Regional Parking Pricing Analysis Tool | $560,000 |
| **2012** | Caltrans/SFMTA | CA | Parking Pricing Enhancement Study in San Francisco | $420,000 |
| **2012** | Caltrans/VTA | CA | SR 237 Express Lanes Extension in San Jose | $1,600,000 |
| **2012** | Caltrans/LADOT | CA | Performance parking system implementation in Los Angeles | $600,272 |
| **2012** | DDOT | DC | Multimodal, dynamic parking pricing in downtown Washington, DC | $1,090,000 |
| **2012** | FDOT/FTE | FL | Integrated Congestion Pricing Planning--Phase Three | $400,000 |
| **2012** | FDOT/MetroPlan Orlando | FL | Regional Congestion Pricing Study in Orlando | $350,000 |
| **2012** | IDOT | IL | Peer-to-Peer Car Sharing Pilot Project | $715,118 |
| **2012** | MassDOT | MA | Kendall Square Employer Transportation Benefit Pricing Trail | $743,872 |
| **2012** | MnDOT | MN | I-35E MnPass Managed Lane Extension Study | $605,000 |
| **2012** | NYCDOT | NY | DriveSmart New York City | $1,000,000 |
| **2012** | NYCDOT | NY | ParkSmart New York City | $950,000 |
| **2012** | TXDOT/CTRMA | TX | Austin-area real-time carpooling automated toll discounts | $764,008 |

| FISCAL YEAR | FUNDING RECIPIENTS | STATE | PROJECT | AMOUNT |
|---|---|---|---|---|
| **2012** | WSDOT/King County | WA | King County Park-and-Ride Pricing in Multi-Family Developments | $543,900 |
| **2012** | WSDOT | WA | Express Toll Lanes Continuous Access Demonstration | $520,000 |
| **2015*** | Southern California Association of Governments | CA | Analysis, public outreach and environmental assessment of cordon pricing in Westside Los Angeles | $916,802 |
| **2015*** | SFCTA for the San Francisco Bart Area Rapid Transit (BART) System | CA | Development of app for the Travel Smart Rewards Program to encourage travel/route shifts and reduce overcrowding at downtown BART stations during peak periods | $508,000 |
| **2015*** | City of Berkeley/Univ. of Calif. At Berkeley | CA | Parking pricing project to reduce drive-alone trips to campus | $169,185 |
| **2015*** | Lake Tahoe Transportation District | NV | Parking pricing to minimize car travel through the most congested areas around Lake Tahoe | $290,455 |
| **2015*** | Texas Transportation Institute | TX | Pay-as-you-drive (PAYD) insurance study | $1,491,000 |
| **Total** | | | | $68,588,851 |

*These projects were awarded in 2015 but were funded with FY2012 funds and excess funds recovered from completed projects. The FHWA repurposed approximately $3 million of these excess funds. That is why the body of the report indicates that approximately $65 million in funds have been awarded since 2008.

# Appendix B. Annotated List of Technical Resources

Federal Highway Administration, *Congestion Pricing – A Primer Overview*, FHWA-HOP-08-039 (Washington, DC: FHWA, 2008). Available at: http://ops.fhwa.dot.gov/publications/fhwahop08039/cp_prim1_00.htm.

Federal Highway Administration Congestion Pricing Web Site - http://www.ops.fhwa.dot.gov/congestionpricing/.

Federal Highway Administration, *Priced Managed Lane Guide,* FHWA-HOP-13-007 (Washington, DC: FHWA, 2012). Available at: https://ops.fhwa.dot.gov/publications/fhwahop13007/index.htm.

Federal Highway Administration Value Pricing Pilot Program Quarterly Reports - http://www.ops.fhwa.dot.gov/congestionpricing/value_pricing/projects/index.htm.

Levinson, D. and K. Krizek, *The End of Traffic and the Future of Transportation,* 2015. Available at: https://transportist.org/books/the-end-of-traffic-and-the-future-of-transport/.

Martin E., S. Shaheen (2016) Impacts of car2go on Vehicle Ownership, Modal Shift, Vehicle Miles Traveled, and Greenhouse Gas Emission: An Analysis of Five North American Cities. Working Paper. Transportation Sustainability Research Center, UC Berkeley. July 2016. http://innovativemobility.org/wp-content/uploads/2016/07/Impactsofcar2go_FiveCities_2016.pdf.

Section 1012(b)(5) of the Intermodal Surface Transportation Efficiency Act of 1991, PL 102-240, as amended by the National Highway System Designation Act of 1995 (section 325(e) of Pub. L. 104-59) and section 1216(a) of the Transportation Equity Act for the 21st Century (TEA-21).

Shaheen, S., E. Martin, A. Bansal. (2018) "One-Way Electric Vehicle Carsharing in San Diego: An Exploration of Behavioral Impacts and the Impact of Pricing Incentives on Improving Operational Efficiency," *California Department of Transportation.* http://www.dot.ca.gov/newtech/researchreports/reports/2018/CA18-2499_FinalReport.pdf.

Ungemah, D., "HOT Lanes 2.0- An Entrepreneurial Approach to Highway Capacity," Presentation Slides for National Road Pricing Conference in Houston, TX, June 2010.

U.S. Department of Transportation, *Beyond Traffic 2045, Trends and Choices*, 2015. Available at: https://www.transportation.gov/sites/dot.gov/files/docs/Draft_Beyond_Traffic_Framework.pdf.

U.S. Department of Transportation, *Contemporary Approaches in Congestion Pricing: Lessons Learned from the National Evaluation of Congestion Pricing Strategies at Six Sites*, FHWA-JPO-2015-217 (Washington, DC: ITS JPO, 2015). Available at: https://rosap.ntl.bts.gov/view/dot/3555/dot_3555_DS1.pdf.

# Exhibit B

U.S. Department of Transportation
Federal Highway Administration

Office of the Administrator

1200 New Jersey Ave., SE
Washington, DC 20590

September 22, 2023

The Honorable Tom Carper
Chairman
Committee on Environment and Public Works
United States Senate
Washington, DC 20510

Dear Chairman Carper:

This letter constitutes the Fiscal Year (FY) 2022 Report to Congress on the Value Pricing Pilot Program (VPPP) in accordance with the requirements of Section 1012(b) of the Intermodal Surface Transportation Efficiency Act of 1991.

Value pricing includes a variety of strategies to manage congestion on highways and surface streets, including strategies not involving tolls. The following five broad types of pricing strategies have been studied or implemented in the United States:

- Priced Lanes – partial facility pricing involving one or more lanes on a freeway facility
- Priced Highways – full facility pricing of all lanes on a roadway or bridge facility
- Priced Road Networks – network pricing of some or all lanes of a roadway network in an area or region
- Priced Zones – area or cordon pricing
- Road Usage Pricing Without Tolls – usage-based vehicle charges and market-based pricing of employer-provided parking spaces (unlike the above strategies, pricing of employer-provided parking spaces generally does not require FHWA approval under a Federal toll program)

While the program has continued, and its tolling authority is still being used in multiple jurisdictions, neither the Fixing America's Surface Transportation Act nor the Infrastructure Investment and Jobs Act authorized additional discretionary grants funding for the VPPP. All projects funded under the VPPP were completed as of the submission of the 2020 Report to Congress. However, formula Federal-aid highway funds, such as those through the Surface Transportation Block Grant Program, may and sometimes are being used to deploy pricing strategies subject to the eligibility requirements for these funds.

Since the submission of the 2020 VPPP Report to Congress, no new toll agreements have been executed under the VPPP. However, in 2021, the Utah Department of Transportation (UDOT) submitted an Expression of Interest (EoI) for the Little Cottonwood Canyon (State Route 210). UDOT is seeking toll authority under the program and an Environmental Impact Statement is currently under development. In two States that previously acquired authority to toll under

VPPP, California and Oregon, transportation agencies continue to explore pricing alternatives on additional projects. In addition, the New York EoI application, seeking authority to implement a zone-based pricing scheme in central Manhattan, continues to progress through the project development process.

The U.S. Department of Transportation has focused extensively on addressing traffic congestion problems throughout the Nation through various strategies. Relatedly, the Department continues to provide information and coordinates comprehensive technical assistance to the States and other stakeholders.

A similar letter has been sent to the Ranking Member of the Senate Committee on Environment and Public Works and to the Chairman and Ranking Member of the House Committee on Transportation and Infrastructure.

Sincerely,



Shailen P. Bhatt
Administrator

U.S. Department of Transportation
**Federal Highway Administration**

Office of the Administrator

1200 New Jersey Ave., SE
Washington, DC 20590

September 22, 2023

The Honorable Shelley Moore Capito
Ranking Member
Committee on Environment and Public Works
United States Senate
Washington, DC 20510

Dear Ranking Member Capito:

This letter constitutes the Fiscal Year (FY) 2022 Report to Congress on the Value Pricing Pilot Program (VPPP) in accordance with the requirements of Section 1012(b) of the Intermodal Surface Transportation Efficiency Act of 1991.

Value pricing includes a variety of strategies to manage congestion on highways and surface streets, including strategies not involving tolls. The following five broad types of pricing strategies have been studied or implemented in the United States:

- Priced Lanes – partial facility pricing involving one or more lanes on a freeway facility
- Priced Highways – full facility pricing of all lanes on a roadway or bridge facility
- Priced Road Networks – network pricing of some or all lanes of a roadway network in an area or region
- Priced Zones – area or cordon pricing
- Road Usage Pricing Without Tolls – usage-based vehicle charges and market-based pricing of employer-provided parking spaces (unlike the above strategies, pricing of employer-provided parking spaces generally does not require FHWA approval under a Federal toll program)

While the program has continued, and its tolling authority is still being used in multiple jurisdictions, neither the Fixing America's Surface Transportation Act nor the Infrastructure Investment and Jobs Act authorized additional discretionary grants funding for the VPPP. All projects funded under the VPPP were completed as of the submission of the 2020 Report to Congress. However, formula Federal-aid highway funds, such as those through the Surface Transportation Block Grant Program, may and sometimes are being used to deploy pricing strategies subject to the eligibility requirements for these funds.

Since the submission of the 2020 VPPP Report to Congress, no new toll agreements have been executed under the VPPP. However, in 2021, the Utah Department of Transportation (UDOT) submitted an Expression of Interest (EoI) for the Little Cottonwood Canyon (State Route 210). UDOT is seeking toll authority under the program and an Environmental Impact Statement is currently under development. In two States that previously acquired authority to toll under

VPPP, California and Oregon, transportation agencies continue to explore pricing alternatives on additional projects. In addition, the New York EoI application, seeking authority to implement a zone-based pricing scheme in central Manhattan, continues to progress through the project development process.

The U.S. Department of Transportation has focused extensively on addressing traffic congestion problems throughout the Nation through various strategies. Relatedly, the Department continues to provide information and coordinates comprehensive technical assistance to the States and other stakeholders.

A similar letter has been sent to the Chairman of the Senate Committee on Environment and Public Works and to the Chairman and Ranking Member of the House Committee on Transportation and Infrastructure.

Sincerely,

Shailen P. Bhatt
Administrator

U.S. Department of Transportation
Federal Highway Administration

Office of the Administrator

1200 New Jersey Ave., SE
Washington, DC 20590

September 22, 2023

The Honorable Sam Graves
Chairman
Committee on Transportation and Infrastructure
U.S. House of Representatives
Washington, DC 20515

Dear Chairman Graves:

This letter constitutes the Fiscal Year (FY) 2022 Report to Congress on the Value Pricing Pilot Program (VPPP) in accordance with the requirements of Section 1012(b) of the Intermodal Surface Transportation Efficiency Act of 1991.

Value pricing includes a variety of strategies to manage congestion on highways and surface streets, including strategies not involving tolls. The following five broad types of pricing strategies have been studied or implemented in the United States:

- Priced Lanes – partial facility pricing involving one or more lanes on a freeway facility
- Priced Highways – full facility pricing of all lanes on a roadway or bridge facility
- Priced Road Networks – network pricing of some or all lanes of a roadway network in an area or region
- Priced Zones – area or cordon pricing
- Road Usage Pricing Without Tolls – usage-based vehicle charges and market-based pricing of employer-provided parking spaces (unlike the above strategies, pricing of employer-provided parking spaces generally does not require FHWA approval under a Federal toll program)

While the program has continued, and its tolling authority is still being used in multiple jurisdictions, neither the Fixing America's Surface Transportation Act nor the Infrastructure Investment and Jobs Act authorized additional discretionary grants funding for the VPPP. All projects funded under the VPPP were completed as of the submission of the 2020 Report to Congress. However, formula Federal-aid highway funds, such as those through the Surface Transportation Block Grant Program, may and sometimes are being used to deploy pricing strategies subject to the eligibility requirements for these funds.

Since the submission of the 2020 VPPP Report to Congress, no new toll agreements have been executed under the VPPP. However, in 2021, the Utah Department of Transportation UDOT) submitted an Expression of Interest (EoI) for the Little Cottonwood Canyon (State Route 210). UDOT is seeking toll authority under the program and an Environmental Impact Statement is currently under development. In the States that previously acquired authority to toll under

VPPP, California and Oregon, transportation agencies continue to explore pricing alternatives on additional projects. In addition, the New York EoI application, seeking authority to implement a zone-based pricing scheme in central Manhattan, continues to progress through the project development process.

The U.S. Department of Transportation has focused extensively on addressing traffic congestion problems throughout the Nation through various strategies. Relatedly, the Department continues to provide information and coordinates comprehensive technical assistance to the States and other stakeholders.

A similar letter has been sent to the Ranking Member of the House Committee on Transportation and Infrastructure and to the Chairman and Ranking Member of the Senate Committee on Environment and Public Works.

Sincerely,



Shailen P. Bhatt
Administrator

U.S. Department of Transportation
**Federal Highway Administration**

Office of the Administrator

1200 New Jersey Ave., SE
Washington, DC 20590

September 22, 2023

The Honorable Rick Larsen
Ranking Member
Committee on Transportation and Infrastructure
U.S. House of Representatives
Washington, DC 20515

Dear Ranking Member Larsen:

This letter constitutes the Fiscal Year (FY) 2022 Report to Congress on the Value Pricing Pilot Program (VPPP) in accordance with the requirements of Section 1012(b) of the Intermodal Surface Transportation Efficiency Act of 1991.

Value pricing includes a variety of strategies to manage congestion on highways and surface streets, including strategies not involving tolls. The following five broad types of pricing strategies have been studied or implemented in the United States:

- Priced Lanes – partial facility pricing involving one or more lanes on a freeway facility
- Priced Highways – full facility pricing of all lanes on a roadway or bridge facility
- Priced Road Networks – network pricing of some or all lanes of a roadway network in an area or region
- Priced Zones – area or cordon pricing
- Road Usage Pricing Without Tolls – usage-based vehicle charges and market-based pricing of employer-provided parking spaces (unlike the above strategies, pricing of employer-provided parking spaces generally does not require FHWA approval under a Federal toll program)

While the program has continued, and its tolling authority is still being used in multiple jurisdictions, neither the Fixing America's Surface Transportation Act nor the Infrastructure Investment and Jobs Act authorized additional discretionary grants funding for the VPPP. All projects funded under the VPPP were completed as of the submission of the 2020 Report to Congress. However, formula Federal-aid highway funds, such as those through the Surface Transportation Block Grant Program, may and sometimes are being used to deploy pricing strategies subject to the eligibility requirements for these funds.

Since the submission of the 2020 VPPP Report to Congress, no new toll agreements have been executed under the VPPP. However, in 2021, the Utah Department of Transportation (UDOT) submitted an Expression of Interest (EoI) for the Little Cottonwood Canyon (State Route 210). UDOT is seeking toll authority under the program and an Environmental Impact Statement is currently under development. In two of the States that previously acquired authority to toll under

VPPP, California and Oregon, transportation agencies continue to explore pricing alternatives on additional projects. In addition, the New York EoI application, seeking authority to implement a zone-based pricing scheme in central Manhattan, continues to progress through the project development process.

The U.S. Department of Transportation has focused extensively on addressing traffic congestion problems throughout the Nation through various strategies. Relatedly, the Department continues to provide information and coordinates comprehensive technical assistance to the States and other stakeholders.

A similar letter has been sent to the Chairman of the House Committee on Transportation and Infrastructure and to the Chairman and Ranking Member of the Senate Committee on Environment and Public Works.

Sincerely,



Shailen P. Bhatt
Administrator

## Value Pricing Pilot Program Toll Agreements as of May 2022

| STATE/AGENCY | PROJECT | TOLL AGREEMENT SIGNED |
|---|---|---|
| California/San Diego Association of Governments | I-15 Express Lanes (San Diego County) | March 1995 |
| California/Riverside County Transportation Commission | I-15 Express Lanes (Riverside County) | July 2009 |
| California/Riverside County Transportation Commission | State Route 91 (Riverside County) | August 2009 |
| California/Alameda County Transportation Commission | I-680 SMART Carpool Lanes | October 2010 |
| California/Santa Clara Valley Transportation Authority | SR 237 Express Connector | March 2011 |
| Florida/Florida Department of Transportation | I-95 Managed Lanes | April 2009 |
| Florida/Florida Department of Transportation | State Route 826 Palmetto Expressway | September 2014 |
| Maryland/Maryland State Highway Administration | I-95 Express Toll Lanes | July 2005 |
| Minnesota/Minnesota Department of Transportation | I-394 MnPass Express Lane | April 2005 |
| Minnesota/Minnesota Department of Transportation | I-35W Managed Lanes | July 2009 |
| Texas/Texas Department of Transportation/Harris County Toll Road Authority | I-10 (Katy Freeway) | November 2002 |
| Virginia/Virginia Department of Transportation | Elizabeth River Tunnels | September 2009 |
| Washington/Washington State Department of Transportation | State Route 520 Bridge | January 2011 |

# Exhibit C

**Frequently Asked Questions Congestion Relief Grant Program NOFO Version Amendment 3 – 3/13/2024**

**Note: Numbers 11, 13, & 14 of the FAQs have been updated from the version posted on 2/21/2024 with the original NOFO.**

Except for the statutes and regulations cited, the contents of this document do not have the force and effect of law and are not meant to bind the public in any way. This document is intended only to provide information to the public regarding existing requirements under the law or agency policies. For any conflicting information between this Q&A and the notice of funding opportunity (NOFO), the NOFO will take precedence.

## General Questions

### Q1. What is the Congestion Relief Grant Program?

**Answer:** The Congestion Relief Program is a new discretionary program to provide grants to States, metropolitan planning organizations (MPO), cities, and municipalities to advance innovative, integrated, and multimodal solutions for congestion relief in the most congested metropolitan areas of the United States. Congestion Relief Grant Funds were authorized under the Infrastructure Investment and Jobs Act, known as the Bipartisan Infrastructure Law (BIL), and codified under 23 U.S.C. 129(d). Under the Program, projects must be located in urbanized areas with a population greater than 1,000,000. (23 U.S.C. 129(d)(1)).

### Q2. Will selected Applicants have to enter into grant agreements?

**Answer:** Yes. An award of Congestion Relief grant funds occurs when a selected applicant enters a grant agreement or a project agreement which is a type of grant agreement, as described in Section B.4 Type of Award under the NOFO.

### Q3. Can an eligible applicant apply simultaneously both for a Congestion Relief Program grant and another Federal grant?

**Answer:** Yes, an eligible applicant may submit applications to multiple Federal funding opportunities, assuming all applicable program requirements are addressed. The budget should identify other Federal funds the applicant is applying for or has been awarded, if any, that the applicant intends to use.

### Q4. When is the application deadline?

**Answer:** The deadline for all application materials is April 22, 2024.

### Q5. Where can I submit the application?

**Answer:** Final applications must be submitted through Grants.gov.

**Q6. What if I am having technical issues with grants.gov?**

**Answer:** Please refer to the following links for technical issues with grants.gov:

- Grants.gov Applicant Training: https://www.grants.gov/applicants/applicant-training
- Grants.gov Online User Guide: https://www.grants.gov/help/html/help/index.htm#t=GetStarted%2FGetStarted.htm

You can also contact Grants.gov Customer Support Hotline at 1-800-518-4726.

**Q7. Is there other outreach or information on the Congestion Relief Program beyond these Q&As?**

**Answer:** An informational webinar (and presentation) about the Congestion Relief Program will be scheduled during the solicitation period and a recording will be made available.

**Terminology**

**Q8. How is the term "highway users" defined under the Congestion Relief Program?**

**Answer:** FHWA has defined "highway users" for the Congestion Relief Program as a traveler using a single-occupant vehicle on an eligible highway under the Program, or a traveler in a vehicle that does not meet an occupancy requirement to be considered a High Occupancy Vehicle (HOV) on an eligible HOV facility.

**Q9. What is the difference between a Construction Project and a Non-Construction Project?**

**Answer:** Under the Congestion Relief Program "construction" means the supervising, inspecting, actual building, and incurrence of all costs incidental to the construction or reconstruction of a highway and any project activity directly related thereto such as: preliminary engineering, engineering, and design. See 23 USC 101(a)(4) for the full definition. A Congestion Relief Program eligible project, such as the implementation of systems, services, and programs that does not entail a construction activity under 23 USC 101(a)(4) noted above would be considered a Non-Construction Project.

**Q10. Are Intelligent Transportation System (ITS) Projects considered construction or non-construction projects?**

**Answer:** It depends on the scope of the ITS project. An ITS Project is a type of an Operational Improvement Project defined under 23 U.S.C. 101(a)(19) that may involve work ranging from little or no field installation activity to significant installation activity. Refer to the following FHWA information on how to properly designate an ITS project: https://ops.fhwa.dot.gov/plan4ops/resources/memorandum/itsprocurementmemo092519.htm

**Eligibility: Applicants**

**Q11. [Updated – 3/13/2024] Who can receive Congestion Relief Program grants?**

**Answer:** Eligible Applicants for Congestion Relief Program grants are:

- a State for the purpose of carrying out a project in an urbanized area with a population of more than 1,000,000. (23 U.S.C. 129(d)(A)). "State" means any of the 50 States, the District of Columbia, or Puerto Rico. (23 U.S.C. 101(a)(28)); and
- a metropolitan planning organization, city, or municipality for the purpose of carrying out a project in an urbanized area with a population of more than 1,000,000. (23 U.S.C. 129(d)(A)).

Under title 23, a State refers to any of the 50 States plus the District of Columbia and Puerto Rico. Per 23 U.S.C. 302, each State must act through its State department of transportation.

Under 23 CFR 450.104, a MPO means the policy board of an organization created and designated to carry out the metropolitan transportation planning process.

For city or municipality, the FHWA will look to the designation of any such entity under State law.

**Q12. Are there conditions under which an eligible entity can apply to subaward the project and its management?**

**Answer:** An eligible entity selected to receive a Congestion Relief program grant will be the direct recipient of the grant funds. Whether the Congestion Relief Program grant funded project is carried out by the direct recipient, a subrecipient, or a contractor, the direct recipient remains responsible for ensuring all Federal requirements are satisfied. See 2 CFR 200.330 – 200.334 for information on subrecipient monitoring and management. Applicants should describe their proposed approach for implementing the project in their application.

**Q13. [Updated – 3/13/2024] Are transit agencies eligible for a Congestion Relief Program grant?**

**Answer:** Transit agencies are not identified as eligible entities. Should a transit agency be an organization within a State DOT or MPO, then such agency will be eligible as a State DOT or MPO. Also, a transit agency that is an organization of a city or municipality and has the authority to act on behalf of such city or municipality may also be considered as an eligible entity. Other transit agencies may partner with an eligible entity (State DOT, MPO, city or municipality) but cannot pursue a direct grant award under the Congestion Relief Program.

**Q14. [Updated 3/13/2024] Are county transportation agencies eligible for a Congestion Relief Program grant?**

**Answer:** No. Under the Congestion Relief Program entities eligible to apply for a grant are statutorily defined as a State, MPO, city, or municipality. (23 USC 129(d)(1)(A)(i) and (ii)). Counties are not among the entities listed and thus are not eligible to apply for a

Congestion Relief Program grant. For a county to be eligible under the Congestion Relief Program, an entity would need to demonstrate to the FHWA in their grant application that it meets the criteria for a municipality or a city under State law in which the county is located. While a county is not eligible to be a recipient of a grant, it could participate in a project as a subrecipient of, or in partnership with, an eligible entity.

**Eligibility: Projects**

**Q15. Must a proposed project address ALL of the stated Program goals?**

**Answer:** No. An eligible project is one that meets the eligibility requirements (23 U.S.C. 129(d)(4) and addresses at least of one the Program goals (23 U.S.C. 129(d)(3)).

**Q16. What types of projects are eligible for Congestion Relief Program grants?**

**Answer:** Eligible projects for Congestion Relief Program grants are: projects, or an integrated collection of projects, for planning, design, implementation, and construction activities (eligible activities to carry out an eligible project) and achieve the Congestion Relief Program goals as described in Section A and 23 U.S.C.129(d)(3). The eligible projects include the following:

- Deployment and operation of an integrated congestion management system (defined within the NOFO);
- Deployment and operation of a system that implements or enforces high occupancy vehicle toll lanes, cordon pricing, parking pricing, or congestion pricing;
- Deployment and operation of mobility services, including establishing account-based financial systems, commuter buses, commuter vans, express operations, paratransit, and on-demand micro-transit; and
- Incentive programs that encourage travelers to carpool, use nonhighway travel modes during peak period, or travel during nonpeak periods. (23 U.S.C. 129(d)(4)).

**Q17. Can other types of projects besides those listed as eligible projects be considered eligible?**

**Answer:** As stated in Section C.3 of the NOFO, other types of projects than those listed under 23 USC 129(d)(4) that achieve one of more of the Congestion Relief Program goals may be considered for a grant. For example, projects that implement transportation systems management and/or travel demand management strategies to relieve congestion may be considered for this program. FHWA will review project specific information provided in an application to make an eligibility determination.

**Q18. Is a bus-on-shoulder program eligible for a Congestion Relief Program grant?**

**Answer:** Yes. Bus-on-Shoulder may be included in the managed lane portion of the Program defined Integrated Congestion Management System, part of the deployment of express operations, or eligible under "other project types."

**Q19. Is a network of projects eligible for a Congestion Relief Program grant?**

**Answer:** Yes. An integrated collection of projects consisting of multiple projects

addressing the same transportation problem that collectively meet the eligibility criteria provided in Section C.3 of the NOFO may be considered for a Congestion Relief Program award. FHWA will review project specific information provided in an application to make an eligibility determination.

**<u>Eligibility: Cost Items</u>**

**Q20. May Congestion Relief Program grant funds be used to purchase equipment?**

**Answer:** Under certain conditions Congestion Relief Program funds may be used to purchase equipment. There must be a prior written determination that Congestion Relief Program grant funds may be used to purchase the equipment and that participation in those costs complies with Federal requirements and are necessary, reasonable, and allocable to the project.

FHWA's policy for participation in costs associated with equipment acquisition is based on the Uniform Administrative Requirements, Cost Principles and Audit Requirement for Federal Awards in 2 CFR Part 200. (https://www.fhwa.dot.gov/construction/contracts/181214.cfm). Under 2 CFR 200.1 "equipment" means: tangible personal property (including information technology systems) having a useful life of more than one year and a per-unit acquisition cost which equals or exceeds the lesser of the capitalization level established by the non-Federal entity for financial statement purposes, or $5,000.

Recipient costs for equipment may be reimbursed through (a) an approved indirect cost rate plan, or (b) on a project basis through an approved depreciation rate (amortized cost) analysis based on costs that are necessary, reasonable, and allocable to the project. Congestion Relief Program grant funds will participate only in the portion of the amortized cost directly attributable to the time the equipment is used on the project.

Capital expenditures for equipment used in a federal grant are generally unallowable as a direct charge to the Federal grant program except with the prior written approval of the Federal awarding agency. (2 CFR 200.439). FHWA may approve the direct charge to the Congestion Relief Program for the up-front acquisition cost of equipment if a State's request for prior written approval [2 CFR 200.439(b)(1)] provides sufficient documentation supporting a Congestion Relief Program interest.

**Q21. What forms of traveler incentives are eligible under the Congestion Relief Program?**

**Answer:** Congestion Relief Program grant funds may only be used for incentive programs that encourage travelers to carpool, use nonhighway travel modes during peak period, or travel during nonpeak periods, (23 USC 129(d)(4)(D)). Costs associated with these incentive programs must be necessary and reasonable, allocable to the project proposed, and allowable per the cost principles specified in 2 CFR part 200, subpart E.

A cost is "reasonable" if, at the time the decision is made, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost. The cost principles in 2 CFR part 200 identify a number of considerations for determining cost reasonableness including whether the cost is of a type generally recognized as ordinary and necessary for the operation of the non-Federal entity or the proper and efficient performance of the Federal award. incur the cost

(2 CFR 200.404).

Applicants should document their reasoning for the type of proposed incentive and how it is necessary for the proposed project. (2 CFR 200.403(g)). FHWA will review project specific information provided in an application to make an eligibility determination.

In addition, Grantees must ensure appropriate monitoring and oversight to avoid waste or abuse in handling project funds. Grantees' internal controls and financial management systems must be adequate to ensure that award funds are used only for award purposes (2 CFR 200.302–200.303). In particular, grantees considering use of cash or cash-equivalent incentive payments must adopt controls adequate to address risks of misuse.

**Q22. Can project development or planning activities be included with an application for a Congestion Relief Program grant? Or does project planning have to be completed and submitted with the application for a Congestion Relief Program grant?**

**Answer:** Congestion Relief Program grant funds may be used for pre-construction activities (i.e., planning, environmental review, final design) and construction of the same project if it is included in the scope of work. Applicants requesting a grant for pre-construction and construction activities for the same project should submit one application for the entire project.

**Eligibility: Cost Share**

**Q23. How do I calculate Federal share for the Congestion Relief Program?**

**Answer:** The Federal cost share may not exceed 80% of the total project cost.

Applicants should use the following equation when determining the cost share for their project:

Program Grant + Non-Federal Funds = Total Program Project Cost
Program Grant must be <= 0.80 X Total Program Project Cost

For the Congestion Relief Program, Total Program Project Cost means the sum of future eligible Federal and Non-Federal costs that have not yet been incurred. Previously incurred costs will not be considered in determining the Total Program Project Cost. Applicant should review information on non-Federal matching requirements available at https://www.fhwa.dot.gov/legsregs/directives/policy/memonfmr_tapered20190515.htm

FHWA does not use an applicant's cost share when evaluating applications on merit. The FHWA considers an applicant's cost share during the evaluation and selection process only to confirm that the statutorily required cost shares are met.

**Q24. Are toll credits allowable as part of the required non-Federal cost share?**

**Answer:** Yes. When the State is the lead in administering Congestion Relief Program grant funds (i.e., the eligible entity), toll credits may be used for the non-Federal share for Congestion Relief Program projects as allowed for Federal-aid projects under 23 U.S.C. 120(i) and the authorities described in the Federal Highway Administration's "Updated Toll Credit Guidance" (dated September 14, 2021) (available at https://www.fhwa.dot.gov/ipd/finance/tools_programs/federal_aid/matching_strategies/toll_credits.aspx).

If a State intends to use toll credits toward the non-Federal share, the amount of such credits should be specified in the State's Congestion Relief Program application and should be based on balances that have been approved by the State's FHWA Division Office at the time of application. Also, the budget should identify the source of the cash the applicant proposes to use to fund the toll credits that are being applied, such as other eligible Federal-aid funds. Additional funds will not be awarded from the Congestion Relief Program to fund the toll credits. States should refer to 23 U.S.C. 120(i) for detailed information on the terms governing the use of toll credits.

**Application Content: General**

**Q25. Would information beyond the 30-page limit for the Project Narrative be considered for the application evaluation?**

**Answer:** As stated in Section D of the NOFO, the project narrative should not exceed 30 pages in length. Appendices may include documents supporting assertions or conclusions made in the 30-page project narrative and do not count towards the 30-page limit. If an applicant submits a project narrative in excess of 30 pages, applicants are advised not to assume the information contained in those excess pages will be evaluated for eligibility under Section C or project selection under Section E. FHWA highly recommends that any information an applicant would like the FHWA to consider in evaluating their application be included under the 30-page limit.

**Q26. How should proprietary or business sensitive information be noted in any response to the NOFO?**

**Answer:** All information submitted as part of or in support of any application shall use publicly available data or data that can be made public and methodologies that are accepted by industry practice and standards, to the extent possible. If the applicant submits information that the applicant considers to be a trade secret or confidential commercial or financial information, the applicant must provide that information in a separate document, which the applicant may cross-reference from the application narrative or other portions of the application. For the separate document containing confidential information, the applicant must do the following: (1) State on the cover of that document that it ''Contains Confidential Business Information (CBI)''; (2) mark each page that contains confidential information with ''CBI''; (3) highlight or otherwise denote the confidential content on each page; and (4) at the end of the document, explain how disclosure of the confidential information would cause substantial competitive harm. DOT will protect confidential information complying with these requirements to the extent required under applicable law. If FHWA receives a Freedom of Information Act (FOIA) request for the information that the applicant has marked in accordance with this section, FHWA will follow the procedures described in its FOIA regulations at 49 CFR
7.29. Only information that is in the separate document, marked in accordance with this section, and ultimately determined to be confidential under § 7.29 will be exempt from disclosure under FOIA.

**Q27. Where do we send letters of support?**

**Answer:** Letters of support may be submitted with the application, sent electronically to congestion.relief@dot.gov or mailed via hard copy to FHWA Administrator Shailen

Bhatt at the Federal Highway Administration, 1200 New Jersey Avenue SE, Washington DC, 20590. To the extent possible, the FHWA will consider letters of support submitted after the application deadline.

**Q28. Are letters of support or letters of commitment needed from entities or stakeholders?**

**Answer:** No. There is no requirement for letters of support, letters of commitment, or endorsements from any entity, including entities identified in an application with a substantive role in the delivery of the project, under the Congestion Relief Program.

However, as described in the NOFO, letters of support submitted with an application will be considered under Merit Criterion #4 Public Engagement, Collaboration, and Partnerships. Letters of commitment will be considered under FHWA's assessment of Project Readiness during the Financial Completeness Assessment.

**<u>Application Content: Financial Effects on Low-Income Drivers</u>**

**Q29. Which projects are required to have the analysis of the potential effects on low-income drivers?**

**Answer:** It depends. If an eligible Congestion Relief Program project will directly affect the cost of driving (including tolls, mileage, or travel time) for low-income drivers that use the facility, then an analysis of the potential effects of the project on low-income drivers is required under 23 U.S.C. 129(d)(7).

**Q30. Must an analysis of the potential effects on low-income drivers, if applicable, be completed for the project prior to submitting a Congestion Relief Program grant application?**

**Answer:** Yes. The result of an analysis that demonstrates the project will not result in adverse financial effects on low-income drivers must be included in the application. The following are examples of analyses that would suffice:

- An environmental justice analysis that demonstrates the project will not result in disproportionately adverse effects on low-income drivers; or
- A community impact assessment that may address the equitable distribution of the impacts and benefits of the proposed project,

**Q31. Can an Environmental Justice analysis performed for the NEPA process be used to meet the requirements for 23 USC 129(d)(7)?**

**Answer:** Yes. If the Environmental Justice (EJ) analysis includes analysis of the financial effects of the congestion relief project on low-income drivers, then the analysis can be used for 23 USC 129(d)(7) with respect to low-income drivers within the EJ community. However, please note that the requirement in 23 USC 129(d)(7) applies to all low-income drivers who use the facility. Therefore, applicants will also need to provide an analysis concerning low-income drivers that do not reside in the identified EJ communities subject to the EJ analysis.

**Q32. Must mitigation measures to deal with potential adverse financial effects on low-income drivers be included as part of the proposed project?**

**Answer:** No. Although an analysis of the potential effects of a project on low-income drivers may be required (see Q&A #29), there is no statutory requirement under 23 U.S.C. 129(d) that mitigation measures to deal with any potential adverse effects must be included as part of a Congestion Relief Program project. However, in carrying out the FHWA's responsibilities with respect to environmental justice under DOT Order 5610.2C and FHWA Order 6640.23A, the FHWA's review of the proposed action will ensure that disproportionately high and adverse human health and environmental effects on minority populations and low- income populations are avoided, minimized, or mitigated.

**Application Content: Tolling and Pricing**

**Q33. Are all forms of pricing on an eligible project considered tolling?**

**Answer:** Yes. All forms of road-use pricing are considered tolling. Other forms of pricing, such as pricing for parking, is not considered tolling. More information on Federal Tolling Programs, including Tolling and Pricing FAQs, is available here: https://www.fhwa.dot.gov/ipd/tolling_and_pricing/tolling_pricing/federal_tolling_programs.aspx. Information from FHWA on congestion pricing is available here: https://ops.fhwa.dot.gov/congestionpricing/

**Q34. Do all eligible projects that entail tolling or pricing require a federal tolling authorization under the Congestion Relief Program?**

**Answer:** Yes. Projects with an eligible construction activity require a suitable Federal tolling authorization to implement tolling or pricing [23 U.S.C. 301]. Also, any program-funded construction activity on existing toll roads would require a federal tolling authorization. More information on Federal Tolling Programs, including Tolling and Pricing FAQs, is available here: https://www.fhwa.dot.gov/ipd/tolling_and_pricing/tolling_pricing/federal_tolling_programs.aspx

**Q35. Does the Congestion Relief Program provide Federal tolling authorizations for tolling off the Interstate system?**

**Answer**: No. While the Program may fund eligible projects that entail tolling off the Interstate system, the Program, itself, does not provide this tolling authority. The entity would either already have or attain a federal tolling authority suitable to the project description from one of the available Federal Tolling Programs and be subject to the requirements of that program. More information on Federal tolling programs is available at https://www.fhwa.dot.gov/ipd/tolling_and_pricing/tolling_pricing/federal_tolling_programs.aspx

**Q36. Does the Congestion Relief Program provide Federal tolling authorization for tolling on the Interstate system?**

**Answer:** Yes. There is specific statutory authority under 23 USC 129(d)(6) that allows tolling on the Interstate system as part of an eligible Congestion Relief Program project. All statutory eligibility requirements described in Section C of the NOFO must be satisfied. This toll authority is only for projects selected to receive a Congestion Relief

Program grant and is limited to no more than 10 urbanized areas. (23 U.S.C. 129(d)(6)(C)).

**Q37. Does the limitation under 23 USC 129(d)(6)(C) that the Secretary may not approve the use of tolls on the Interstate System under the Congestion Relief Program in more than 10 urbanized areas mean only one project located on one Interstate System route within an urbanized area will be selected for a grant?**

**Answer:** No. Multiple projects located on multiple routes of the Interstate System may receive tolling authorization under 23 USC 129(d)(6). However, the routes of the Interstate System must be within the same urbanized area. For example, Interstate System routes I-111, I-222 and I-333 are all located within the same urbanized area of a State. The State, or other eligible entity in partnership with the State, may propose different Congestion Relief Program projects on each of the three routes.

**Q38. How many of the 10 maximum urbanized areas have Interstate tolling projects approved?**

**Answer:** Since this is the initial NOFO for the Congestion Relief Program, no Interstate tolling project has been approved.

**Q39. What level of mobility and safety analysis is sufficient for a determination under 23 U.S.C. 129(d)(6)(B)(iv) that a proposed tolling project on the Interstate System would not cause a significant impact on safety or mobility in the urbanized area?**

**Answer:** An operational and safety analysis should conclude with verifiable quantifiable data that the proposed Interstate tolling project would not have a significant adverse impact on safety and mobility within the urbanized area where the project is located. The analysis limits should include all affected portions of the transportation system within the urbanized area, as necessary, to fully evaluate the extent of safety and operational impacts associated with the proposed tolling of the Interstate for congestion management purposes. The analysis should include a description and assessment of the impacts and ability of the proposed project to safely and efficiently collect, distribute, and accommodate traffic on the affected routes within the urbanized area.

For projects that ***have completed the NEPA*** process and/or have applicable environmental commitments in an approved NEPA document, the information on the project that is used for NEPA should suffice, provided that the operational and safety analysis of the project matches the level of analysis described in this Q&A.

For projects that ***have not completed NEPA*** the applicant should submit with the application information to assess whether the proposed project will likely have a significant impact on safety or mobility in the urbanized area. Such information may include one or more of the following:

(1) a multimodal assessment of existing and proposed safety and operational performance (qualitative and/or quantitative) using analytical tools, methods, and/or techniques (including but not limited to crash diagnoses, predictive safety analyses, road safety audits, traffic impact studies, or other related documentation);
(2) a safety, operational, and engineering acceptability for an Interstate Access Request approval; or

(3) other relevant local land use planning, transportation planning, project initiation / project development documents.

Note that the FHWA's review of such information for significant safety or mobility for proposed projects where NEPA is not complete is not intended as a statement, limitation or approval of the information being considered as part of the NEPA process for the relevant project. All information being considered as part of the NEPA process will continue to be independently evaluated by the relevant official charged with making the NEPA determination.

**Q40. Would a project that implements Interstate tolling for congestion management purposes require an FHWA Interstate Access approval?**

**Answer:** Generally, no unless access to the Interstate System is added or modified (physical changes) as part of the project. However, under the Congestion Relief Program an operational and safety analysis must still be provided for the Secretary to determine that the proposed Interstate tolling project does not have a significant adverse impact on safety and mobility within the urbanized area where the project is located. Early coordination between the State DOT and the FHWA Division Office is recommended to examine the scope of the project and to make a determination regarding the level of documentation that is required and the process to be followed.

**Other Requirements**

**Q41. If a consulting firm is hired to help develop a Congestion Relief Program grants application and that project is selected for a Congestion Relief Program grants award, can that same firm be hired to perform the construction project design and engineering after award?**

**Answer:** Under 2 CFR 200.317 and 1201.317, if the recipient of the Congestion Relief Program discretionary grant is a State, then the recipient must follow the same policies and procedures it uses for procurements from its non-Federal funds, and the answer to this question is dependent on those policies and procedures. Note that if the consultant is providing design and engineering related services, then 23 CFR part 172 applies.
If the recipient is not a State, the answer is yes, the same firm may be hired if necessary competition requirements are satisfied. Per CFR 200.319, all procurement transactions must be conducted in a manner that provides full and open competition, eliminates unfair competitive advantage, and ensures objective contractor performance. Project sponsors must avoid creating situations that would unfairly favor the firm that helped develop the Congestion Relief Program discretionary grant application or preclude other firms from competing. Additionally, the contractor that the project sponsor hires to draft its solicitation for proposals for the construction project design and engineering work must be excluded from competing for that procurement.

**Q42. Does the environmental review process for compliance with the National Environmental Policy Act (NEPA) need to be completed prior to a grant award?**

**Answer:** It depends whether the proposed project includes developmental phase activities such as preliminary design and NEPA. Congestion Relief Program funds may be used for developmental phase activities however no grant funds will be obligated for the start of final design, utility relocation, right-of-way acquisition or construction or

project implementation until NEPA is complete. The application should provide a schedule that clearly demonstrates the timeframe for completion of environmental review activities and any risks for meeting the projected timeframe. Incomplete environmental review may affect the FHWA's evaluation of project readiness for projects that entail construction.

**Q43. Which tools may be used to quantify the impacts of congestion in response to the Merit Criteria?**

**Answer:** The applicant may use any chosen tool that provides verifiable quantifiable data. FHWA offers the following tools for applicant's consideration:

- FHWA Environmental Review Toolkit, https://www.environment.fhwa.dot.gov/
- CMAQ Emissions Calculator Toolkit, https://www.fhwa.dot.gov/environment/air_quality/cmaq/toolkit/
- FHWA Primer: Economics: Pricing, Demand and Economic Efficiency, https://ops.fhwa.dot.gov/publications/fhwahop08041/cp_prim4_04.htm#:~:text=When%20resources%20are%20allocated%20to,help%20achieve%20an%20efficient%20outcome
- USDOT Transportation and Health Tool, https://www.transportation.gov/transportation-health-tool
- Regional Integrated Transportation Information System (RITIS) Data Analytics Tools, https://ritis.org/tools

## Awards

**Q44. What is the minimum grant award size?**

**Answer:** As stated in Section C of the NOFO, the statutory minimum grant award is $10,000,000. (23 U.S.C. 129(d)(5)(D)). Therefore, the minimum total project cost for a Program project is $12,500,000 in order to meet the minimum grant award amount and the 20% non-Federal match requirement.

**Q45. What is the maximum grant award size?**

**Answer:** There is no statutory maximum award amount under the Congestion Relief Program. The number of grants offered and amount of those grants will be determined by the amount of funding available for FY 2022, FY 2023, and FY 2024 and the applications that advance for consideration for selection as described in Section E of the NOFO.

**Q46. Does an applicant have to indicate they are requesting FY 2022, FY 2023, or FY 2024 Congestion Relief Program grant funds?**

**Answer:** No. To determine whether a project selected to receive a Program grant will be funded with FY 2022, FY 2023, or FY 2024 funds, FHWA will consider the estimated project start date provided in the application. Funds will be assigned after announcement of projects selected to receive an award during the grant agreement development process.

**Q47. How soon after projects selected to receive Congestion Relief Program grants will funds be available and is there a deadline by which the funds must be expended?**

**Answer:** FHWA will not make an award of Congestion Relief Program grant funds until a successful applicant is ready to start an eligible activity. If the successful applicant is a State DOT or if a State DOT will serve as a pass-through entity to a non-State DOT entity, funds will be awarded upon the execution of a project agreement, which is a type of grant agreement for administration of funds to a State DOT in the Fiscal Management Information System. If the successful applicant is a non-State DOT, funds will be awarded upon the execution of a grant agreement with FHWA. A determination will be made if the successful applicant will administer the project or, at the request of the successful applicant, an applicable State DOT will administer the project.

Once obligated, Congestion Relief Program grant funds are available until expended (subject to requirements and policies regarding inactive obligations).